**GRASSO LAW FIRM**

2250 East Germann Road, Suite 10
Chandler, Arizona 85286
(480) 739-1200

Robert Grasso, Jr., Bar No. 015087
Pari K. Scroggin, Bar No. 015288
Pamela L. Judd, Bar No. 022109
rgrasso@grassolawfirm.com
pscroggin@grassolawfirm.com
pjudd@grassolawfirm.com
  Attorneys for Defendants Southwest
  Human Development and Gwynetth Kelly

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Kahraman, an individual; D.K., a minor, through his parent and guardian Jessica Kahraman; and K.K., a minor, through his parent and guardian Jessica Kahraman,<br><br>  Plaintiffs,<br><br>vs.<br><br>The State of Arizona, a governmental entity; Arizona Department of Child Safety ("DCS"), a governmental entity; Sarah Kramer, individually and as an employee with DCS, and John Doe Kramer, her spouse; Sarah Mendez, individually and as an employee with DCS, and John Doe Mendez, her spouse; Madison Bell, individually and as an employee with DCS, and John Doe Bell, her spouse; Mecca Temple, individually and as an employee with DCS, and John Doe Temple, her spouse; Gregory McKay, individually and as an employee with the State of Arizona as the former Director of DCS, and Jane Doe McKay, his spouse; Michael Faust, individually and as an employee with the State of Arizona as the current Director of DCS, and Jane Doe Faust, his spouse; Banner Children's at Desert, formerly Cardon Children Medical Center ("Banner"), an Arizona nonprofit organization; Ryan M. Stewart, M.D., individually and as an employee with Banner, and Jane Doe Stewart, his spouse; Maria | Case No. 2:22-cv-00375-SRB<br><br>**DEFENDANT GWYNETTH KELLY'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** |

Chico, individually and as an employee with Banner, and John Doe Chico, her spouse; Southwest Human Development ("SWHD"), an Arizona nonprofit organization, individually and as a service provider for the State of Arizona; Drue Kaplan-Siekman, individually and as an employee with SWHD, and John Doe Siekman, her spouse; Gwyneth Kelly, individually and as an employee with SWHD, and John Kelly, her spouse; Michael Kelly, M.D. an individual, and Jane Doe Kelly, his spouse; John and Jane Does 1-5; and Black Entities 1-5,

                                                            Defendants.

Defendant Gwynetth Kelly ("Kelly") hereby submits her reply in support of her motion for judgment on the pleadings ("Motion") (Doc. 153).

**I.     Mother's § 1983 Claims Two and Four against Kelly are time barred.**

Plaintiff Jessica Kahraman ("Mother") argues Kelly failed to demonstrate her familial associations claims (Claim Two: unlawful detention and Claim Four: conspiracy to seize and detain) are time barred. However, this Court previously established law of the case that "[Mother's] familial association claims accrued on or around December 28, 2018, or the date [DCS] removed the Boys from [Mother's] custody." (Doc. 145 at 6:19-7:10).

The SAC alleges Kelly did not have any role in this matter until late 2019/early 2020, well after the December 28, 2018, purported detention and any conspiracy to commit the same occurred. (Doc. 74 at ¶¶ 23, 134.) It is unclear how Mother contends her unlawful detention claims against those that actually removed her children from her care can be time barred but her unlawful detention and related conspiracy claims against an employee of a service provider that rendered services after the purported detention are not, since the statute of limitations on a § 1983 claim for unlawful detention begins to run at the time of the initial detention. *See Mills v. City of Covina*, 921 F.3d 1161, 1166 (9th Cir. 2019) (finding the plaintiff's "§ 1983 claims for unlawful stop and detention, false arrest, false imprisonment, … are time-barred" based on the date the plaintiff was searched and arrested). Thus, Mother's unlawful detention claim and conspiracy to commit unlawful

detention claim are clearly time barred. The allegations in the SAC, and this Court's prior ruling clearly establish Mother's Count Two and Count Four are time barred.

**II.     Plaintiffs misconstrue the Court's April 26, 2023, Order (Doc. 145).**

**a. The April 26, 2023, Order dismissed claims against <u>all</u> "State Defendants" based on the running of the statute of limitations.**

Plaintiffs contend the Court did not dismiss on statute of limitations grounds claims against DCS Defendants Madison Bell and Mecca Temple who had ongoing involvement with Plaintiffs after the children's removal from Mother. Plaintiffs are simply incorrect.

The April 26, 2023, Order clearly states: "The Court dismisses Counts 1 and 2 of the SAC as to Ms. Kahraman's [sic] claims against Dr. Stewart, Ms. Chico, and **State Defendants**." (Doc. 145 at 7:8-10 (emphasis added).) The "State Defendants" were defined on the first page of this Order to include "collectively to the Arizona Department of Child Safety ("DCS"), **Madison Bell**, Sarah Kramer, Sarah Mendez, and **Mecca Temple**." (Doc. 145 at 1, fn. 1 (emphasis added.) In concluding, the Court confirmed dismissal of Mother's claims against Bell and Temple as time barred: "The Court dismisses Ms. Kahraman's … Counts 1 and 2 of her familial association claims against Defendants Stewart, Chico, Mendez, Kramer, Bell, and Temple because Ms. Kahraman did not bring these claims before the expiration of the statute of limitations on these claims." (Doc. 145 at 3-7.)

The portion of the Court's Order cited by Plaintiffs for the suggestion that the statute of limitations preclusion did not apply to these DCS employees relates the adequacy of the allegations with respect to the children's Claim Two, not Mother's since Mother's Claim Two against these defendants was dismissed *supra* in the Order. In her present Motion, Kelly only moved for judgment on Mother's claims on statute of limitations grounds. Thus, the children's claims have no bearing on this issue.

**b. The State Defendants did not move for dismissal of Claim Four based on the running of statute of limitations.**

While Claim Four - conspiracy to commit unlawful detention, was not included in the April 26, 2023 Order that dismissed Mother's untimely claims against the State Defendants, the State Defendants did not move for dismissal of this claim based on the

3

running of the statute of limitations, only Claims One and Two. Thus, the Court did not bar Claim Four against the State Defendants on statute of limitations issue because it was not asked to do so. However, because any agreement to commit a conspiracy (Claim Four) and actions to carry out in furtherance of the conspiracy necessarily had to occur before the action that was the alleged basis of the conspiracy (i.e., the removal of the children) and the claim related to the removal of the children is barred by the running of the statute of limitations, the conspiracy claim is also time barred. (*See* fn.1.)

### c. Plaintiffs are misguided by references to Dr. Kelly.

The footnote cited by Plaintiffs for the proposition that Claim Two against former Defendant Dr. Michael Kelly were timely based on his conduct after the removal of the children from Mother's care appears to refer to claims other than Claim Two. Plaintiffs also asserted § 1983 claims for judicial deception and the right of a parent to make medical decisions for her children against Dr. Michael Kelly. These claims are related to actions after the removal of the children. These claims appear to be what the Court was referencing by referring to the report authored by Dr. Michael Kelly on December 2, 2019 (a year after the children had been removed) in footnote 11 of its prior Order. (Doc. 145.) And the Court did not need to analyze the statute of limitations for the claims against Dr. Michael Kelly because Plaintiffs' allegations against him were so deficient that all claims against him were dismissed. (Doc. 145 at 12:20-13:18, 16:9-10; 17:1-3.)

### III.   The Court's prior order is law of the case for claim accrual purposes.

Mother suggests the Court's April 26, 2023, Order is not law of the case for statute of limitations accrual purposes by suggesting the ruling did not relate to all Mother's § 1983 claims. The prior ruling specifically related to Claim One– unlawful seizure and Claim Two– unlawful detention and serves as law of the case on these claims. Mother's attempt to get around the preclusive effect of this prior ruling by arguing Defendants Bell and Temple were not dismissed from Claim Two is simply wrong. (*See* Section II.a. *supra*.) And Kelly only moved for judgment on the basis of the running of the statute of limitations

on Mother's Claim Two to which the Court's April 26, 2023, Order applies and Claim Four to which the Order should be applied. (*See* fn. 1.)

Mother argues *McDonough v. Smith*, 139 S. Ct. 2149 (2019) supports an accrual date on her § 1983 unlawful detention and related conspiracy claims other than that previously determined by this Court. Because this is not new authority but rather authority previously available at the time Plaintiffs responded to the other Defendants' motions to dismiss, *McDonough* cannot be used to create inconsistent results in this case. In effect, Plaintiffs are seeking a horizontal appeal in violation of the law of the case doctrine.

Under the law of the case "a court is generally precluded from reconsidering an issue that has already been decided by the same court…." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). This doctrine is "grounded upon the sound public policy that litigation must come to an end." *Kimball v. Callahan*, 590 F.2d 768, 771 (9th Cir. 1979) (internal quotation omitted). And is intended to maintain consistency. *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997), *overruled by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012). The only exception to the law of the case doctrine impliedly argued by Plaintiffs (since Plaintiffs do not acknowledge the prior ruling as law of the case) is that the prior decision was clearly erroneous. *See Thomas*, 983 F.2d at 155 (stating law of the case may not be applied if the prior decision was "clearly erroneous".) As Plaintiffs argued before (*see* Doc. 119-1 at 10:4-11:2), they suggest the date Mother received custody of her children or the date dependency terminated should be used for accrual purposes based on *McDonough*. *McDonough* used the date a criminal action resolved as the accrual date for a civil action against the same party that prosecuted the prior criminal action upon which the plaintiff's civil § 1983 fabrication of evidence claim was based, 139 S. Ct. at 2153, 2161.

A juvenile dependency case differs significantly from a criminal case. The objective of a criminal matter is conviction. A dependency action is much more amorphous. Even when a child is initially found to be a dependent by the court, the party bringing the action – DCS, generally provides reunification services to reach a result that is in the best interests of the child. *See generally* A.R.S. § 8-846 (stating "the court shall order the department to

make reasonable efforts to provide services to the child and the child's parent" except in enumerated circumstances). Thus, a dependency action differs significantly from a criminal matter and is not inherently adversarial in nature, as is a criminal case.

Furthermore, the *McDonough* concerns of "avoiding parallel **criminal** and civil litigation over the same subject matter and the related possibility of conflicting civil and **criminal** judgments" (*McDonough*, 139 S. Ct. at 2157 (emphasis added)), and having a "significant number of **criminal defendants** … face an untenable choice between (1) letting their claims expire and (2) filing a civil suit against **the very person** who is in the midst of **prosecuting them** (*Id.*, 139 S. Ct. at 2158 (emphasis added)), simply don't apply with regard to Kelly. Kelly was a Southwest Human Development ("SWHD") employee who oversaw visitations between Plaintiffs at SWHD. (Doc. 74 at ¶¶ 20, 79, 80.) Kelly was not a government officer and did not initiate nor was she a party to the dependency action. Likewise, Kelly's employer, SWHD, is not a governmental entity and was not a party to the dependency action. Therefore, *McDonough* has no application with respect to Kelly and does not support Mother's effort to save her claims by advancing the same statute of limitations argument previously rejected by the Court.

The Court also previously rejected Mother's "continuing tort" accrual argument. (Doc. 145 at 5, fn.6.) Since federal law determines when a § 1983 claim accrues, Mother's reliance on state law for her continuing tort theory of accrual is misplaced. *See Norco. Const., Inc. v. King Cnty.*, 801 F.2d 1143, 1145 (9th Cir. 1986) ("Federal law, … determines when the state limitations period begins for a claim under 42 U.S.C. § 1983.") Federal law provides an unlawful detention claim accrues at the time of the initial detention. *Mills v. City of Covina*, 921 F.3d 1161, 1166 (9th Cir. 2019) ("§ 1983 claims for unlawful stop and detention, false arrest, false imprisonment, … are time-barred" based on the date the plaintiff was searched and arrested). Thus, Mother's unlawful detention and related conspiracy to commit unlawful detention[1] against Kelly are time barred.

---

[1] A civil conspiracy claim requires "that the alleged conspirators (1) had an agreement to commit an underlying tort, and (2) accomplished that tort." *Eder v. N. Arizona Consol. Fire*

Based on the law of the case and the inapplicability of *McDonough* to claims asserted against Kelly, the Court's prior finding that the statute of limitations accrued on Mother's familial association claims (including Claim Two) on or around December 28, 2018, is not clearly erroneous, but correct and bars Claims Two and Four against Kelly.

**IV.     Plaintiffs fail to demonstrate the sufficiency of their claims against Kelly.**

The SAC and Plaintiffs' Response fails to articulate any allegations specifically against Kelly in support of their claims. Instead, Plaintiffs lump together the various current and former defendants, conflate Kelly with the State (DCS), and assert in summary fashion using legal labels and conclusions that the "defendants" committed liability creating actions. "[The court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).[2] And "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Labels and conclusion are all that is offered by Plaintiffs. The SAC is deficient of any allegations specifically against Kelly to provide Kelly with notice of the claims against her under the most liberal reading of notice pleading requirements. *Castillo v. Norton*, 219 F.R.D. 155, 159 (D. Ariz. 2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99 (1957) (Rule 8(a) requires the complaint provide a defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests."). Thus, Kelly is entitled to judgment on all claims.

The following are additional deficiencies of each claim against Kelly.

    **a.  Plaintiffs' fail to state allegations or authority to support Claim Five–failure to use reasonable efforts to preserve the family relationship.**

---

*Dist. #1*, No. CV-19-08101-PCT-JJT, 2019 WL 5549170, at *2 (D. Ariz. Oct. 28, 2019). Here, the alleged underlying tort was the removal of the children from Mother. Thus, any agreement or actions to carry out the conspiracy would have necessarily occurred before the children were removed on December 28, 2018. *See Fiswick v. US.*, 329 U.S. 211, 216 (1946) ("The statute of limitations [on a conspiracy claim], unless suspended runs from the last overt act during the existence of the conspiracy.") Thus, the statute of limitations on the conspiracy to commit unlawful detention claim necessarily would have accrued by the date the underlying unlawful detention occurred – December 23, 2018.

[2] The Rule 12(b)(6) standards apply to deciding a Rule 12(c) motion. *United States ex rel. Caffaso v. Gen'l Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n. 4 (9th Cir. 2011.)

This Court previously ruled the juvenile court's failure to terminate Mother's parental rights bars Claim Five. (Doc. 145 at 10, fn16.) Plaintiffs fail to explain why, much less cite any authority to support their position that this claim against Kelly is not barred on the basis. Quite simply, Plaintiffs' failure to allege a termination of Mother's parental rights (which were never terminated), bars Claim Five against Kelly. And Plaintiffs' allegation in the SAC that "[n]o service provider ever agreed with DCS or Ahmet's [the children's father] request to sever," demonstrates the futility of Plaintiffs' Claim Five against Kelly, an employee of a service provider. (*See* Doc. 74 at ¶ 27.)

Additionally, the legal authority cited in the SAC and Plaintiffs' Response relate to duties owned by the State, not a contracted service provider. A.R.S. § 8-846, cited in Plaintiffs' Response but not the SAC relates to the "department", which is defined as DCS in A.R.S. § 8-501(A)(3). Similarly, 42 U.S.C.A. § 671(a)(15) requires "the State" to have a plan that provides for certain services to receive foster care assistance from the federal government. No authority cited by Plaintiffs in the SAC, or their Response provides for a duty owed by service providers or employees thereof to preserve the family relationship.

Finally, although in Claim Five, Plaintiffs allege defendants "fail[ed] to complete a thorough investigation, as required by A.R.S. § 8-456(C)(1) and [relied] on false information provided by Defendants Stewart, Chico, and/or Dr. Kelly" and "unreasonably and unlawfully limiting [Mother's] supervised visits with her boys to two hours twice per week" (Doc. 74 at ¶¶ 200, 203), Plaintiffs did not and cannot allege these actions were within Kelly's scope or control as a SWHD employee. Thus, Plaintiffs' failure to cite any authority that imposes a duty owed by Kelly to preserve the family relationship, much less sufficient facts supporting this duty or a breach thereof, is fatal to Claim Five.

### b. Plaintiffs fail to state allegations that support Claim Six– the right of a parent to make medical decisions for her child, against Kelly.

Plaintiffs fail to allege in the SAC or explain in their Response how Kelly prevented Mother from making any medical decision for her children. K.K.'s hospitalization cannot be a basis of claim against Kelly because she was not involved with Plaintiffs until after this hospitalization. (Doc. 74 at ¶¶ 52-67, 79-80.) Plaintiffs fail to allege any medical

treatment or medical decisions Kelly prevented Mother from making. Rather, Plaintiffs allege in conclusory fashion, "Dr. Stewart, Ms. Chico, Ms. Kramer, Ms. Mendez, Ms. Bell, Ms. Temple, Ms. Kaplan-Siekman, Ms. Gwyneth Kelly, and Dr. Kelly violated Plaintiffs' right to have a parent make medical decisions for their child, and the right of a child to have medical decisions made by their parent." (Doc. 74 at ¶ 212.) This is insufficient. Kelly is without notice of any medical decisions she is alleged to have prevented Mother from making. Quite simply, there were none.

In addressing Claim Six, Plaintiffs' Response discusses protocol followed at supervised visitations. This protocol is not mentioned in Claim Six but in other sections of the SAC in which Plaintiffs allege: "When Parents began visitation at SWHD, acting at the behest of DCS, SWHD agents implemented an MBPS [sic] protocol which prevented Parents from touching the food or liquid to be consumed by the boys." (Doc. 74 at ¶ 80.) Thus, DCS, not SWHD and surely not Kelly who was not involved with Plaintiffs until almost a year after visitations at SWHD began, made the decision to utilize the protocol.

Claim Six only mentions the failure to have the children tested related to mold exposure. (*See* Doc. 74 at ¶ 212.) And Plaintiffs do not allege Kelly had any authority regarding whether the children underwent any mold testing, which she did not. Quite simply, Plaintiff did not (and cannot) allege Kelly prevented Mother from making any medical decisions for her children. Kelly is entitled to judgment on Claim Six.

### c. Kelly was not a State actor, barring Claims Two, Four, Five and Six.

While the SAC alleges Kelly was "acting under the color of law" (Doc. 74 at ¶ 20), Plaintiffs fail to state any allegations that support this conclusion. Plaintiffs' suggestion that the Court allowing a conspiracy claim against two DCS (State) employees to proceed supports a conspiracy with Kelly to render her "acting under color of law" is incorrect. The lines Plaintiffs quote from the Court's April 26, 2023, Order do not relate to the conspiracy claim (Claim Four), but rather Claim Two for unlawful detention. (Doc. 168 at 15:3-5 (citing Doc. 145 at 9:22-10:11 (discussing Claim Two).) But with regard to the conspiracy claim asserted against the Banner Defendants, the Court concluded it "cannot reasonably

infer from these facts that Dr. Stewart and Ms. Chico shared the 'goal' with State Defendants to violate Plaintiffs' rights and acted under the color of law." (Doc. 145 at 8:12-14.) The facts alleged were:

> Dr. Stewart informed the Banner Suspected Child Abuse and Neglect team and DCS that he believed K.K.'s poor health was attributable to Ms. Kahraman having MSP. … Ms. Chico then "orchestrated DCS's involvement by putting forth a malicious and false narrative that Parents were Munchausen parents." … Dr. Stewart and Ms. Chico conspired with State Defendants to violate Plaintiffs' constitutional rights by "providing [State Defendants] false, misleading, and/or unfounded information"; failing to thoroughly review medical records; and "refusing" to return the Boys to their parents' custody.

(Doc. 145 at 8:4-12 (internal citations omitted).)

Plaintiffs' further argument on this issue belies its own position. Plaintiffs acknowledge "[t]he State, through DCS, took the boys into temporary custody based on the false accusations that the parents have MSBP. After the unlawful seizure, DCS prohibited [Mother] from seeing her children through the necessary cooperation of Defendants. When the parents began visitation at SWHD, acting at the behest of DCS, Defendants implemented the DCS-desired MSBP protocol …." (Doc. 168 at 15:13-18 (internal citations omitted).) The foregoing does not demonstrate a conspiracy between Kelly and the State to render that Kelly was acting under color of law. Rather, it demonstrates SWHD carried out its therapeutic supervised visitations pursuant to the directions received from DCS. And Kelly was not involved with Plaintiffs until the end of 2019 (Doc. 74 at ¶ 20), almost a year after visitations at SWHD began and the purported conspiracy was allegedly devised. Thus, Kelly could not be liable for any purported conspiracy, much less the removal of the children, beginning of visitations at SWHD, and implementation of MSBP protocol that occurred before her involvement. *See S. Union Co. v. Sw. Gas Corp.*, 165 F.Supp.2d 1010, 1026 (D. Ariz. 2001) (finding a defendant could not be liable "for torts which occurred before he joined the conspiracy").

Plaintiffs also suggest "Defendants ignored positive reports about [Mother], [and] maintained restrictions on her visits…." (Doc. 168 at 15:18-19), but fail to allege Kelly ever received, much less had a duty to examine or authority to cause any changes premised

on, any favorable reports regarding Mother. Again, Plaintiffs simply conflate Kelly with all defendants and DCS. Similar to the Banner Defendants, it cannot be reasonably inferred from the allegations specifically against Kelly that she shared a common agreed upon goal with the State Defendants (which was allegedly concocted well before her involvement) to violate Plaintiffs' rights to render her actions under the color of law.

### d. Plaintiffs fail to establish a duty owed to them by Kelly to support Claims Eight, Nine and Ten against her.

Plaintiffs again confuse Kelly with the State Defendants to try to establish a duty owed by Kelly in support of their Claims Eight, Nine and Ten by citing authority related to the State's duties and DCS procedures. They then make the leap that this authority creates a duty for a service provider like SWHD, which employed Kelly. Kelly is not the State nor a State employee. Plaintiffs cite no authority that imposes the duties upon which Claims Eight, Nine and Ten are based on Kelly.

Claim Eight relates to "duties of a child safety worker or investigator." (Doc. 74 at 223.) A child safety worker is defined as "a person who has been selected by and trained under the requirements prescribed by the department and who assists in carrying out the provisions of this article [DCS Article 8. Dependent Children]." A.R.S. § 8-801(2). Article 8 relates to interviewing children and welfare investigations. Similarly, investigator is defined as "an employee of the department [i.e. - DCS] who investigates allegations of abuse or neglect pursuant to a DCS report." A.R.S. § 8-456(K)(2). Kelly was not a child safety worker or an investigator, she was an employee of a service provider. (Doc. 72 at ¶ 20.) Just as Claim Eight was dismissed against Dr. Stewart, Ms. Chico and Dr. Kelly[3]

---

[3] "Dr. Stewart diagnosed K.K. with 'malnutrition and failure to thrive' and attributed his condition to Ms. Kahraman, whom he suspected had Munchausen Syndrome by Proxy ("MSP"). Dr. Stewart reported his concerns to Banner's Suspected Child Abuse and Neglect team and contacted DCS. Ms. Chico, … evaluated Mr. and Ms. Kahraman and agreed that Ms. Kahraman suffered from MSP." (Doc. 145 at 2:4-9 (internal citations omitted).) "On December 26, 2018, Dr. Stewart again reported to DCS that he believed Ms. Kahraman suffered from MSP, after which Ms. Kramer and Ms. Mendez pursued a court order to remove the Boys from their parents' custody." (*Id.* at 2:13-15.) Thereafter, Dr. Kelly was hired by DCS and "reported that Ms. Kahraman likely suffered from an 'undiagnosed mental illness.'" (*Id.* at 2:25-3:1.)

because they were not "child safety workers" or "investigators" who owed a duty to Plaintiffs (Doc. 145 at 13:2-9, 13:17-26), Kelly is entitled to judgment on Claim Eight.

Claim Nine asserts a claim of negligence in carrying out the duty to make reasonable and/or diligent efforts to preserve the family relationship. This claim is premised on the State/DCS's alleged duties to preserve the family relationship. (Doc. 74 at ¶¶ 234-237.) Once, again because Kelly was not a DCS employee, Plaintiffs fail to state sufficient allegations to support this claim and Kelly is entitled to judgment on Claim Nine.

Claim Ten is similarly deficient. Claim Ten is for negligence per se and, therefore, necessarily requires a duty imposed by statute. *See Brand v. J. H. Rose Trucking Co.*, 102 Ariz. 201, 205, 427 P.2d 519, 523 (1967) (stating that negligence per se requires "that a party committed the specific act prohibited, or omitted to do the specific act required by the statute or ordinance."). Plaintiffs rely on A.R.S. § 8-456 and § 8-802 that again, relate to "child safety workers" and "investigators", which Kelly was not as discussed *supra*. Therefore, Kelly is entitled to judgment on Claim Ten.

### e. Plaintiffs fail to prove the sufficiency of their IEID claim against Kelly.

Plaintiffs argue they adequately pled an IIED claim against Kelly because a jury could reasonably find <u>defendants</u> "creating and implementing a false narrative of MSBP" to restrict Mother's rights to her children satisfies the stringent IIED standard. (*See* Doc. 168 at 20:14-17.) The flaw with this argument is that Kelly was not even involved until a year after the purported conspiracy and "false narrative" was formed and almost one year after visitations with MSBP protocol began. (Doc. 74 at ¶¶ 20, 79.)

Plaintiffs' further argument regarding Kelly being engaged to "reunite the Kahraman family" is not consistent with the allegations. Kelly oversaw therapeutic supervised visitations. (Doc. 74 at ¶ 80.) She was not the State or a DCS employee that may have reunification duties. Regardless, Plaintiffs take issue with the reunification process based on the continuation of the MSBP protocol, which is simply insufficient to support Plaintiffs' IIED claim against Kelly.

Plaintiffs completely fail to appreciate the allegations in the SAC undercut their IIED against Kelly. Plaintiffs allege:

- "… after August 1, 2018, when the boys began kindergarten, they began complaining of pain in their joints and leg weakness, which progressed until ultimately, they became unable to walk." (Doc. 74 at ¶ 42.)
- "In October 2018, Parents withdrew the boys from public school and decided to homeschool because the boys' health was declining. At this time, K.K. was not able to stand or walk." (Doc. 74 at ¶ 46.)
- "On the morning of December 18, 2018, thirteen days after K.K. was seen by Dr. Jensen, Parents took K.K. to the emergency room of Banner because he had swelling in his hands and face, he was lethargic, and was not eating as he had lost his appetite. He was admitted to Banner with a diagnosis of pulmonary hypertension and severe hypothyroidism." (Doc. 74 at ¶ 52.)
- "Dr. Stewart diagnosed K.K. with malnutrition and failure to thrive, attributing this diagnosis to the Parents having MSBP." (Doc. 74 at ¶ 54.)
- "At Dr. Stewart's direction, the Banner Suspected Child Abuse and Neglect ("SCAN") team was assembled and DCS was called." (Doc. 74 at ¶ 55.)
- "Parents were interviewed by Banner Nurse Practitioner Maria Chico. Ms. Chico orchestrated DCS's involvement by putting forth a malicious and false narrative that Parents were Munchausen parents." (Doc. 74 at ¶ 56.)
- "On or about 26 December 2018, .., Defendant Stewart, …, suggested to DCS that the Parents were MBSP parents." (Doc. 74 at ¶ 69.)
- "On or about 26 December 2018, DCS agents Kramer and Mendez sought a court order to take K.K. and D.K. into temporary custody pursuant to A.R.S. § 8-821 based on Defendant Stewart's and Chico's false and unreasonable accusation that Parents had MSBP." (Doc. 74 at ¶ 70.)
- "Defendant Mendez [DCS] immediately prohibited Jessica from seeing her children, and subsequently restricted her interaction with them to two hours per week at Southwest Human Development ("SWHD"). This restriction would continue in force regarding Jessica for nearly two years[4], until dismissal of the case in November 2020." (Doc. 74 at ¶ 76.)
- "When Parents began visitation at SWHD, acting at the behest of DCS, SWHD agents implemented an MBPS protocol which prevented Parents from touching the food or liquid to be consumed by the boys." (Doc. 74 at ¶ 80.)
- "Dr. Kelly opined 'with reasonable medical certainty that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley' and that 'Ms. Kahraman may benefit from consultation with a psychiatrist to determine if she has an underlying mental disorder (e.g., psychosis, anxiety, depression) that is negatively

---

[4] Plaintiff Response referenced a three year separation between Mother and the children. However, the last year relates to the family court's restrictions on Mother, as the juvenile dependency case was dismissed in November 2020. (Doc. 74 at ¶ 143.)

- impacting her ability to parent her boys in a safe manner.'" (Doc. 74 at ¶ 99.)
- "No service provider ever agreed with DCS or Ahmet's [the children's father] request to sever." (Doc. 74 at ¶ 127.)
- "As soon as Ahmet filed for divorce on January 3, 2020, he changed his stance virtually overnight, reversing his well-documented position that the boys' health decline and food sensitivities were due to high levels of toxic mold. He then started to accuse [Mother] of being an unfit parent with MSBP, and the cause of K.K.'s and D.K.'s health issues." (Doc. 74 at ¶ 130.)

Considering the foregoing and focusing on Kelly's conduct, not that of other current and former defendants, Kelly's conduct simply cannot reasonably be construed as "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," as is necessary to support an IIED claim. *See Ford v. Revlon, Inc.,* 734 P.2d 580, 585 (1987) (quoting Restatement (Second) of Torts § 46 cmt. d). It is unreasonable and untenable to suggest IIED liability could attach to Kelly continuing protocol that had been in place for almost one year before her involvement and while the juvenile dependency action was still pending. Quite simply, it is inconceivable, and at the very least unreasonable, to believe a jury could find Kelly's conduct rose to the stringent standard of outrageousness necessary to support Plaintiffs' IIED claim and, therefore, Kelly is entitled to judgment on Claim Ten.

V.      **Conclusion**

Plaintiffs simply cannot conflate Kelly with other defendants to salvage their claims against her. Judgment must be entered in favor of Kelly, and she should be dismissed as a defendant in this matter based on her present Motion and the entire record in this case.

Plaintiffs suggest they should be granted leave to amend their complaint for a third time. There have been no developments with respect to the allegations in this matter against Kelly since SWHD visitations concluded in November 2020. Plaintiffs initially filed their complaint in this matter on November 16, 2021. It has been almost two years and Plaintiffs fail to suggest any reason why they have not yet been able to state sufficient grounds for a claim against Kelly, much less offer sufficient allegations that could be asserted against Kelly specifically to make their claims viable. They are unable to do so based on Kelly's

limited role. Plaintiffs already had ample opportunity to explore and amend their claims against Kelly. Leave to amend must be denied.

RESPECTFULLY SUBMITTED this 25th day of September, 2023.

**GRASSO LAW FIRM, P.C.**

By /s/Pamela L. Judd
Robert Grasso, Jr.
Pari K. Scroggin
Pamela L. Judd
2250 East Germann Road, Suite 10
Chandler, Arizona 85286
Attorneys for Defendants Southwest Human Development and Gwynetth Kelly