# EXHIBIT 2



**GRIFFIN GROUP**
**INTERNATIONAL**

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Kahraman, an individual; D.K., a minor, through his parent and guardian Jessica Kahraman; and K.K., a minor, through his parent and guardian Jessica Kahraman,<br><br>            Plaintiffs,<br><br>                vs.<br><br>The State of Arizona, a governmental entity, et al.,<br><br>            Defendants. | )Case No. 2:22-cv-00375-SRB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

VIDEO RECORDED DEPOSITION OF RYAN STEWART, M.D.

Phoenix, Arizona
February 26, 2024
10:13 a.m.

REPORTED BY:
JENNIFER HANSSEN, RPR
Certified Reporter
Certificate No. 50165

PREPARED FOR:
ASCII/CONDENSED

(Certified Copy)



2

1                          I N D E X

2  WITNESS                                        PAGE

3  RYAN STEWART, M.D.

4              Examination by Mr. Crown              5
               Examination by Ms. Judd             87
5              Examination by Mr. Connelly         91
               Further Examination by Mr. Crown    138
6              Further Examination by Mr. Connelly 147

7                    E X H I B I T S

8  Deposition
   Exhibits:          Description                 Page
9
   1    Portion of Banner Desert Medical Center    10
10        records (165 pages)

11  2    Letter from Scott Jensen, M.D., 6-3-19    133
         (1 page)
12
13  3    Ryan Stewart LinkedIn profile (3 pages)   136

14

15

16

17

18

19

20

21

22

23

24

25

3

1              VIDEO RECORDED DEPOSITION OF RYAN STEWART,

2    M.D., was taken on February 26, 2024, commencing at

3    10:13 a.m. at Griffin Group International 3200 East

4    Camelback Road, Suite 177, Phoenix, Arizona,

5    before JENNIFER HANSSEN, RPR, a Certified Reporter in

6    the State of Arizona.

7

8    COUNSEL APPEARING:

9                  For the Plaintiffs:
                   MILLS + WOODS LAW, P.L.L.C.
10                 By:  Thomas A. Connelly
                   5055 North 12th Street, Suite 101
11                 Phoenix, Arizona  85014

12                 For the Defendants The State of Arizona,
                   Arizona Department of Child Safety,
13                 Madison Bell, Mecca Temple:
                   TITUS BRUECKNER SPITLER & SHELTS, P.L.C.
14                 By:  Larry J. Crown
                   8355 East Hartford Drive, Suite 200
15                 Scottsdale, Arizona  85255

16                 For the Defendant Southwest Human
                   Development (via videoconference):
17                 GRASSO LAW FIRM, P.C.
                   By:  Pamela L. Judd
18                 2250 East Germann Road, Suite 10 & 11
                   Chandler, Arizona  85286
19
                   For Dr. Stewart:
20                 CAMPBELL YOST CLARE & NORELL, P.C.
                   By:  Margaret F. Dean
21                 3101 North Central Avenue, Suite 1200
                   Phoenix, Arizona  85012
22
     ALSO PRESENT:
23
                   Tony Gonzales, Videographer
24

25

4

```
1                    (Exhibit No. 1 was marked.)
2                    THE VIDEOGRAPHER:  We are on the record.
3    Today's date is February 26th, 2024.  The time on the
4    video monitor is 10:13 a.m.  This is the video recorded
5    deposition of Dr. Ryan Stewart in the matter of Kahraman
6    versus State of Arizona in the United States District
7    Court for the District of Arizona, Case Number
8    2:22-cv-00375-SRB.
9                    Our location is the offices of Griffin
10   Group International, 3200 East Camelback Road,
11   Suite 177, Phoenix, Arizona.  Your certified court
12   reporter is Jennifer Hanssen of Griffin Group
13   International.  My name is Tony Gonzales.  I'm the
14   Certified Legal Video Specialist for the firm of
15   VideoDep located in Phoenix, Arizona.
16                   Counsel, please identify yourselves and
17   state whom you represent for the record at this time
18   starting with plaintiffs' counsel, please.
19                   MR. CONNELLY:  Thomas Connelly on behalf
20   of the plaintiffs.
21                   MR. CROWN:  Larry Crown on behalf of the
22   remaining State defendants, Madison Bell and Mecca
23   Temple.
24                   MS. JUDD:  Pamela Judd on behalf of
25   Southwest Human Development.
```

5

1          MS. DEAN:  This is Margaret Dean on behalf

2  of the witness, Dr. Ryan Stewart.

3          THE VIDEOGRAPHER:  Thank you, Counsel.

4          The court reporter may swear in the

5  witness at this time.

6

7          RYAN STEWART, M.D.,

8

9  called as a witness herein, having been first duly

10  sworn, was examined and testified as follows:

11

12          EXAMINATION

13  BY MR. CROWN:

14     Q.    Good morning, Dr. Stewart.

15     **A.    Morning.**

16     Q.    Can you please state your name for the record

17  and spell your last name, please.

18     **A.    Ryan Stewart, S-T-E-W-A-R-T.**

19     Q.    You are a doctor licensed to practice medicine

20  in the state of Arizona?

21     **A.    Yes, I am.**

22     Q.    Okay.  And your specialty is that of a

23  hospitalist?

24     **A.    Pediatrics is my board certification.**

25          MR. CONNELLY:  Could you speak up a little

6

1  bit, Doctor?

**2     A.     Pediatrics.**

3     Q.     BY MR. CROWN:  Where did you attend medical

4  school?

**5     A.     Wake Forest School of Medicine.**

6     Q.     And you said you are board certified in

7  pediatrics.

**8     A.     Uh-huh.**

9     Q.     When did you become board certified?

**10    A.     2018, October, November.**

11    Q.     What states are you licensed in?

**12    A.     Just Arizona.**

13    Q.     And when did you become licensed in Arizona?

**14    A.     Also, 2018.**

15    Q.     Can you take me briefly through your employment

16  history as a --

**17    A.     Yes.**

18    Q.     -- doctor in Arizona.

**19    A.     So I did my residency training at Phoenix**

**20  Children's Hospital, which is a combined program also**

**21  with Maricopa, now -- now it's called Valleywise, the**

**22  county hospital.  And then -- so 2015 to 2018 was my**

**23  training, residency.  And then in August of 2018, I**

**24  began working for Banner Children's, at that time called**

**25  Cardon Children's, and have been there ever since.**

7

1    Q.    That's the location on South Dobson Road in

2  Mesa?

3    **A.    Uh-huh.**

4    Q.    And it's no longer called Cardon's; right?

5    **A.    Yeah.**

6    Q.    I think it's Banner --

7    **A.    It's called -- yeah, yeah, Banner --**

8              MS. DEAN:  I'm just going to remind you,

9  let him get all the way to the end of the question

10  before you start.

11    **A.    Yes.**

12    Q.    BY MR. CROWN:  And you have been there

13  since 2000 -- your residency was there, and then you

14  stayed on there?

15    **A.    No, my residency was at Phoenix Children's.**

16    Q.    Okay.

17    **A.    And then I got a job at Cardon Children's**

18  **in 2018.**

19    Q.    Okay.  Now, I had asked you at the start if

20  you're a hospitalist.

21    **A.    Uh-huh.**

22    Q.    Is that a designation that you've had at the

23  Banner Children's Hospital?

24    **A.    Yes, so I am employed as a pediatric**

25  **hospitalist.  There is a separate -- it's a new**

8

1   subspecialty certification that you can get to become a

2   pediatric hospitalist, but you have to work for five

3   years in that position in order to apply -- to sit for

4   the board exam.

5      Q.    What is a pediatric hospitalist?

6      A.    A pediatric hospitalist is someone who takes

7   care of children who are admitted to the hospital.  It's

8   basically children who aren't well enough to go home

9   from, say, the emergency department or -- but they're

10  not so sick that they need to be in the ICU.

11     Q.    Are you familiar with what it is to be a

12  mandatory reporter for child abuse or child neglect?

13     A.    Yes.

14     Q.    Are you familiar with the statute in Arizona

15  ARS 13-3620?

16     A.    Roughly familiar, yeah.

17     Q.    Okay.  What is the standard for a pediatric

18  hospitalist at the Banner Children's Hospital to report

19  a suspicion based on a reasonable belief of child abuse

20  or child neglect?

21             MR. CONNELLY:  Form and foundation.

22     A.    The expectation is that if there's reasonable

23  suspicion for neglect or abuse that might otherwise

24  endanger, be life or limb-threatening for a child, that

25  it has to be reported to the authorities of the State.



9

1    Q.    BY MR. CROWN:  I'm going to direct your

2  attention to one of the two twin boys that is the

3  subject of this litigation.  Kenan Kahraman --

**4    A.    Uh-huh.**

5    Q.    -- that is a former patient of yours; correct?

**6    A.    Uh-huh, uh-huh.**

7    Q.    Is that a "yes"?

**8    A.    Yes, yes.**

9    Q.    Okay.  I did not give a long list of

10  instructions on depositions, but it's important that

11  when I ask you a question, that you answer with words

12  instead of, like, "uh-huhs" or head shakes.

**13    A.    Okay.**

14    Q.    Obviously, the court reporter's taking down all

15  the words that we say, and we're also being video

16  recorded for future use and hopefully convenience.

**17    A.    Okay.**

18    Q.    So I will -- I will remind you from time to

19  time.

20          But again, my question was, Kenan Kahraman

21  is a former patient of yours; correct?

**22    A.    Yes.**

23    Q.    Can you tell me when you treated Kenan?

**24    A.    It was 2018.  It was, like, the three days**

**25  around Christmas.  Can't remember the exact dates.**

10

1    Q.    I'm going to go through your progress notes,

2    but it appears that you would have treated him and seen

3    him in the Banner Children's Hospital in Mesa on

4    December 24th, 2018, December 25th of 2018 and

5    December 26th of 2018.  Does that sound familiar to you?

6    **A.    Yes, that sounds like it.**

7    Q.    Okay.  I have placed in front of you what I've

8    marked as Exhibit Number 1.  I've given a copy to your

9    attorney here today, as well as plaintiffs' counsel, and

10   I'm assuming the attorney that is appearing remotely has

11   it as well.

12                There was a set of medical records from

13   Kenan's admission that began on December 18th, 2018.  He

14   was discharged from Banner Children's on January 7th of

15   2019.  The entire medical file for that particular

16   hospital admission was 1,592 pages.

17                I've created Exhibit Number 1 with select

18   records.  I'm going to go through them with you.

19   There's Bates stamp numbers that your attorney put on

20   them when you were an active party in this case, and I

21   will reference them.

22                If at any time my records aren't fully

23   complete and you want to reference other records, we can

24   pull up electronically the entire 1,592 pages, but my

25   questions are going to come from the records within

11

1    Exhibit Number 1.  Okay?

2    **A.    Okay.**

3    Q.    Great.

4           If I can ask you to turn to the document

5    that the last three numbers are 996.  And again,

6    Exhibit 1 is in sequence, and the Bates stamps are at

7    the lower right corner.

8    **A.    Yes.**

9    Q.    Okay.  Now, this, based on my review of the

10   records, is the first physician progress note that you

11   authored in your care of Kenan Kahraman; am I correct?

12              MR. CONNELLY:  It's Kenan, by the way.

13              MR. CROWN:  Is it Kenan?

14              MR. CONNELLY:  Yeah.

15              MR. CROWN:  Okay.  Thank you for that.

16   Have I pronounced the last name correctly, Kahraman?

17              MR. CONNELLY:  Kahraman, yeah.

18              MR. CROWN:  Okay.  Thank you.

19   **A.    Yeah, I believe that's correct.**

20   Q.    BY MR. CROWN:  Okay.  And I want to go through

21   this record with you.  Under Chief Complaint it's stated

22   that Kenan was -- presented with increased lethargy,

23   swelling to face and hands.  Patient not wanting to

24   walk.  And Mom had reported by stating decreased urine

25   output and decreased BM per his normal.  Is this

1   something that you created or was this already in the

2   record as you're starting to add your parts?

3   **A.    This is auto generated.  When parents first**

4   **come into the hospital, whatever they give to the**

5   **admitting personnel, that's whatever Mom -- the**

6   **complaint gets generated.**

7   Q.    And I notice that the auto generation means

8   that as you're making your entries in the hospital

9   computer, there is already the prior doctors' entries,

10  nurses' entries, counsels that have taken place before

11  your involvement on the 24th; correct?

12  **A.    Correct.**

13  Q.    But as you're meeting Kenan for the first time,

14  you're certainly reviewing the prior hospital chart to

15  make sure that you're informed as to the history?

16          MR. CONNELLY:  Form and foundation.

17  Q.    BY MR. CROWN:  Is that fair?

18  **A.    Yes.**

19  Q.    Okay.  And as you do so and you review it, you

20  rely on what's been reported and then you begin or

21  continue the care that's being provided at the Banner

22  Children's Hospital?

23  **A.    Yes.**

24  Q.    Under the Subjective section -- and what is the

25  Subjective section?

13

1    A.    So it's mainly the things that are reported by

2  Mom or nurses, like, things that have happened

3  overnight.   In the first note, it's commonly carried --

4  information also has, like, a transfer summary of what

5  went on from the ICU.

6    Q.    Okay.  Now, Kenan originally presented to the

7  emergency room department; correct?

8    A.    If I remember correctly, he was -- he presented

9  to the emergency department and then was admitted to the

10  ICU first.

11    Q.    Sure.

12         And it's the pediatric ICU unit, correct,

13  also known as the PICU?

14    A.    Correct.

15    Q.    Okay.  And how long was he in the PICU before

16  he was transferred to a floor?

17    A.    I don't remember how many days.

18    Q.    Okay.  If I were to suggest to you that it

19  appeared from the record that he had been transferred

20  from the PICU to a floor the day before you first saw

21  him on December 23rd, would that be consistent?  I think

22  we're going to -- as I cover these records with you.

23    A.    Yeah, I don't remember exactly if I took the

24  initial call from the intensivist in PICU or if I took

25  him the day after.



14

1      Q.    Okay.

**2      A.    I can't quite remember.**

3      Q.    Now, you did review this Subjective section;

4  correct?

**5      A.    Correct.**

6      Q.    And what we see in the Subjective section is

7  that Kenan had a severely restricted diet, as reported?

**8      A.    Yes.**

9      Q.    A few lines down, it says an echo showed right

10 heart failure and pulmonary hypertension; correct?

**11     A.    Correct.**

12     Q.    What is right heart failure?

**13     A.    So right heart failure is -- it's the right**

**14 chamber of the heart, usually describing the ventricle**

**15 is not able to function appropriately as far as to**

**16 circulate blood to the pulmonary blood vessels.**

17     Q.    What is pulmonary hypertension?

**18     A.    There's increased pressure in the pulmonary**

**19 vasculature, so the blood vessels of the lungs, in**

**20 order -- that the heart now has to try to fight against.**

21     Q.    Kenan at the time he's in Banner during this

22 admission is six years old; correct?

**23     A.    Yes.**

24     Q.    I think he was born on September 27th of 2012;

25 correct?

15

1    A.    Correct.

2    Q.    Okay.  So a six-year-old presenting with right

3   heart failure and pulmonary hypertension, those are

4   serious conditions; correct?

5              MR. CONNELLY:  Form and foundation.

6    A.    Correct.

7    Q.    BY MR. CROWN:  I'll address his objection.  Are

8   those serious conditions in a six-year-old boy?

9    A.    **Yeah, they're serious conditions in any aged**

10   **patient.**

11   Q.    Okay.  And then it looks -- or it shows that on

12  December 21st, 2018, Kenan underwent cardiac cath by

13  Dr. Miga.  Dr. Miga was the cardiologist that was

14  following Kenan during his hospitalization; correct?

15   A.    Correct.

16   Q.    Okay.  And Dr. Miga confirmed pulmonary

17  hypertension, and he was responsive to oxygen; is that

18  correct?

19   A.    Yes.

20   Q.    Now, it says that the SCAN, S-C-A-N, all

21  capital letters, was consulted for concerns for neglect

22  and been following him.  What is the SCAN team at Banner

23  Children's Hospital?

24   A.    **So it stood for Suspected Child Abuse and**

25  **Neglect, so they were involved -- they were the**

16

1    specialists to get involved any time there's suspected

2    neglect or abuse or concerns for that.

3        Q.    Now, it says "team."  What does it mean that

4    there was a SCAN team?

5        A.    Well, there's an attending physician,

6    Dr. Singleton, and then there's nurse practitioners or

7    PAs that also work with him.

8        Q.    Okay.  So now, this was already in place as you

9    are seeing Kenan for the first time on December 24th;

10   correct?

11       A.    Correct.

12       Q.    Is that significant to you as you start caring

13   for Kenan?

14       A.    Yeah, I mean, it shows the ICU, that doctors

15   were concerned enough to get them involved.  They had

16   some suspicions or concerns.

17       Q.    Okay.

18       A.    Yeah.

19       Q.    The next sentence in the Subjective section

20   says, "Also Nutrition consulted and he was started on

21   TPN."

22           Can you describe a little bit more about

23   the nutrition component for Kenan's health?

24       A.    Yes.  When he was in the ICU, they started

25   what's called total parenteral nutrition, so they had an



Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

17

1 **IV line access, and they were giving him nutrition**

2 **through the IV while they were working on starting oral**

3 **nutrition.**

4 Q. Okay. In the next paragraph of the Subjective

5 section, the first sentence states, "Patient did better

6 with PO intake overnight, but Mom still limiting his

7 intake significantly."

8 Can you explain what that meant in terms

9 of Mom still limiting his intake significantly?

10 **A. Yes. So the patient -- so Kenan had an**

11 **interest in eating and showed an appetite. Mom's**

12 **concerns from the beginning were that Kenan had**

13 **significant food allergies and sensitivities, and thus,**

14 **was limiting what he could have, both the volume and the**

15 **variety of substances or foods that he could eat, and**

16 **so -- yeah, he wanted to eat more, but Mom was -- was**

17 **limiting what he could have.**

18 Q. So if I can ask you to turn to page 997, and

19 again, I'm referencing the Bates stamp, the last three

20 digits on the Bates stamp. Okay.

21 MR. CONNELLY: I'm sorry. Where? What

22 page?

23 MR. CROWN: I'm at 997.

24 MR. CONNELLY: Thank you.

25 Q. BY MR. CROWN: Now, on this page of



**Video Recorded Deposition of Ryan Stewart, M.D.**

18

1  your 12-24-18 progress note, there is a section titled

2  Assessment/Plan.

3  **A.    Uh-huh.   Yes.**

4  Q.    Is part of this section the auto transfer to

5  the file?

6  **A.    No.**

7  Q.    So this is all your entries, if you will?

8  **A.    Yes.**

9  Q.    Okay.  Do you mind reading those -- your

10  Assessment/Plan that you personally authored?

11  **A.    Yes.   So, "Six-year-old twin male with**

12  **'autism,' multiple reported food 'sensitivities' with**

13  **severely restricted diet, who presented on 12-18 with**

14  **two months of inability to walk, three weeks of chest**

15  **pain, facial swelling and periodic abdominal pain, and**

16  **two weeks of increasing lethargy.  Patient was taken to**

17  **the ED at CCMC where echo showed right heart failure and**

18  **pulmonary hypertension.  He was admitted to the PICU and**

19  **started on therapy with milrinone and diuretics.**

20  **On 12-21, he underwent cardiac cath by**

21  **Dr. Miga which confirmed pulmonary hypertension.**

22  **Responsive to oxygen and nitrous oxide.  SCAN team**

23  **consulted for concerns for neglect and been following**

24  **him.  Also Nutrition consulted and he was started on**

25  **TPN.  He continues to refuse nasal cannula and has been**



19

1   getting ventimask for his O2.  He was also found to have

2   hypothyroidism and started on Synthroid.

3           The parents according to the bedside nurse

4   have been giving him only meatballs.  Have a strong

5   suspicion for medical neglect or medical child abuse."

6   Q.   I'm going to focus in on that last sentence --

7   A.   Uh-huh.

8   Q.   -- that you stated, "Have a strong suspicion

9   for medical neglect or medical child abuse."  Can you

10  state the basis behind your entry that is the subject of

11  that last sentence?

12  A.   Well, the report that I got from the ICU was

13  that Dr. Miga felt that the patient's heart failure was

14  primarily due to malnutrition, and then through the

15  reports that I got from the ICU doctors and from the

16  nutritionist were that Mom was the one limiting his

17  intake, so therefore, the concern is that his

18  malnutrition that led to his medical condition was

19  created by Mom limiting what he would take.

20  Q.   And that became the diagnostic workup, if you

21  will, and also the cause of this constellation of

22  symptoms and conditions of Kenan is that it was the

23  result of malnutrition?

24  A.   Well, that was the most likely possibility.

25  When he came out of the ICU, that was the -- you know,

20

1   in medicine, we operate on probabilities, and so that

2   seemed the most likely and most probable thing.  There

3   were other things that were still being investigated,

4   but the first issue to address when he came out of the

5   ICU was getting him proper nutrition and investigating

6   these potential allergies or intolerances.

7       Q.    Sure.

8             The way you phrased it in this sentence,

9   "strong suspicion --

10      A.    Uh-huh.

11      Q.    -- for medical neglect or medical child abuse,"

12  and then as you explained it, you used the word

13  "possibility" at one time and then you used "most

14  probability."

15      A.    Uh-huh.

16      Q.    So let me ask you, are you using those words

17  interchangeably or is it that as you personally cared

18  for Kenan, your diagnostic opinions were that it was

19  most probably that his problems were due to

20  malnutrition?

21      A.    Sorry.  There's multiple questions in there.

22      Q.    Let me rephrase it.

23      A.    Yeah.

24      Q.    I want to focus in on the word "probably."

25  Ultimately, it was your conclusion that Kenan's



Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

1  condition, right heart failure, pulmonary hypertension,

2  being swollen --

3      **A.    Uh-huh.**

4      Q.    -- not thriving --

5      **A.    Uh-huh.**

6      Q.    -- all of that was most probably due to the

7  malnutrition?

8           MR. CONNELLY:  Form and foundation.

9      **A.    Yeah, so in medicine, you know, rarely is**

10  **anything absolutely certain, so you start with the most**

11  **probable causes of things and then move on to other**

12  **things.  Given the context for his hospitalization and**

13  **the history and his physical exam findings and all of**

14  **his labs, the most likely and most probable or**

15  **suspicious thing, all those interchangeably, would be**

16  **the malnutrition was the cause and that Mom was the**

17  **cause of that malnutrition.**

18      Q.    BY MR. CROWN:  In all these symptoms that we've

19  been talking about, and I'm going to review the clinical

20  diagnoses with you in a little bit, but malnutrition is

21  a known cause for this constellation of symptoms and the

22  conditions and the lab results that Kenan presented

23  with?

24      **A.    Correct.**

25           MR. CONNELLY:  Form and foundation.

22

1    Q.    BY MR. CROWN:  So we have malnutrition as the

2  most likely, most probable cause for all these symptoms

3  and the conditions of Kenan, and Mom is the cause of the

4  malnutrition?

5    **A.    Yes, that was the most probable explanation,**

6  **yep.**

7    Q.    In the section moving down, it says R-E-S-P.

8  That's respiration; correct?

9    **A.    Respiratory -- like, respiratory system.**

10    Q.    The first line is, "Close respiratory -- close

11  respiratory monitoring."

12          MR. CONNELLY:  I'm sorry, Larry.  What

13  page are you on now?

14          MR. CROWN:  I'm still on 998.

15          MR. CONNELLY:  998.  Okay.  Thank you.

16    Q.    BY MR. CROWN:  Is that your note that you

17  entered personally?

18    **A.    Yes.**

19    Q.    And then in the CV section -- and what does CV

20  stand for?

21    **A.    Cardiovascular.**

22    Q.    Okay.  The third line was, "Continue sildenafil

23  three times daily for pulmonary hypertension."

24          Can you explain that?

25    **A.    So these are medications that were started at**

1  Dr. Miga's recommendations, the cardiologist.  So

2  sildenafil is a medication that will help treat

3  pulmonary hypertension.

4      Q.    And then the next entry says, "Echo on 12-24

5  shows improvement from prior BNP and uric acid per

6  cardiology re," records.

7      A.    Yes.

8      Q.    Explain that entry and explain the significance

9  of that entry.

10     A.    So the echo on 12-24 shows improvement from

11 prior, so comparing to previous echocardiograms, the

12 echo was getting better.  And then the BNP and uric acid

13 were two labs that cardiology recommended that we get

14 just to follow.

15          The BNP or brain natriuretic peptide

16 measures the amount of stretch that the heart is going

17 through, so it's a measurement of heart failure.  I

18 can't remember what the uric acid, why cardiology

19 recommended we get that.

20     Q.    And I said records for ACS, but it sounded like

21 I misspoke.  That's recommendations?

22     A.    Yes, recommendations.

23     Q.    As far as that the echo was showing

24 improvement -- now, by this -- by the time you're seeing

25 Kenan, he's been in the hospital for six days.  He's

24

1  been in the PICU, and he's been getting intravenous

2  nutrition; correct?

3      A.    Correct.

4      Q.    So improvement, does that help validate that

5  malnutrition was the cause of these conditions of right

6  heart failure, pulmonary hypertension and the other

7  constellation of conditions?

8              MR. CONNELLY:  Form and foundation.

9      A.    Yes -- yes and no.  So there's different causes

10 of pulmonary hypertension.  Dr. Miga would be the best

11 one to ask this question of.  But we were doing multiple

12 things at once, so it's always hard to know what the --

13 what the one cause is.

14             There is a type of pulmonary hypertension

15 called idiopathic, which doesn't get better over time.

16 It tends to stay the same or get worse.  The fact that

17 his was getting better would have suggested that it was

18 due to malnutrition, and we were resolving the

19 underlying problem, but doesn't answer it for sure at

20 this point.

21     Q.    And probably not by the first time you're

22 seeing him --

23     A.    Uh-huh.

24     Q.    -- but when a six-year-old boy is improving --

25     A.    Uh-huh.

25

1    Q.    -- you stay with the regimen, more nutrition,

2   more calories, the medicine, the oxygen, all of that's

3   taking him away from the intensive care state and

4   allowing him to be on a floor under your care?

5    **A.    Yes, it would suggest that you're addressing**

6   **whatever the underlying issue is.**

7    Q.    Now, moving into the next section, F-E-N/G-I,

8   can you explain for the record what that stands for?

9    **A.    So it stands for fluid, electrolytes, nutrition**

10  **and then /GI, like diet, anything gastrointestinal**

11  **related.**

12   Q.    The first line of that section says, "Diet as

13  tolerated."  And then the next line, "Appreciate

14  Nutrition consult."

15            Can you explain a little bit more what you

16  are ordering here or charting?

17   **A.    So from the medical standpoint, the patient was**

18  **allowed to eat whatever he wanted to and whatever Mom**

19  **would allow him to eat, so whatever he tolerated.  He**

20  **wasn't having any issue with tolerance from what we were**

21  **seeing.  And then we consulted Nutrition to help guide**

22  **us as far as what his nutritional requirements were to**

23  **regain weight and resolve his malnutrition.**

24   Q.    The next line says, "Continue calorie count to

25  determine current intake.  Goal is 1500 calories per day

1   with adequate weight gain."

2                Can you explain that a little bit more?

3      A.    Yeah, so these are the recommendations we were

4   given through GI.  So calorie count follows how much the

5   patient is getting per day, and then his goal as put

6   forth by Nutrition for catch-up weight gain was 1500

7   kilocals per day, and just monitoring daily weights,

8   making sure he was gaining weight every day.

9      Q.    Two entries down, it says, "Patient will be at

10  risk for refeeding syndrome and will require electrolyte

11  monitoring."

12               Can you explain that?

13     A.    Yeah, so a patient that hasn't been getting,

14  like, a balanced diet for an extended period of time,

15  you can deplete certain micronutrients, such as

16  potassium, magnesium, phosphorus, and some vitamins,

17  thiamine, for example.

18               So when you start reintroducing nutrition,

19  if -- as the body starts to ramp back up, you will get a

20  significant depletion of those nutrients in the

21  bloodstream as they start to move into the new cells

22  that the body's making, and so you can get -- like, if

23  you have very severe -- like, dropping your potassium,

24  it can cause arrythmias and you can go into, like,

25  ventricular tachycardia, and you can die from that if

1  not replaced.

2     Q.    And the last entry in this section, "Appreciate

3  GI consult to evaluate Mom's concerns over food

4  intolerance/sensitivities."

5           Can you elaborate a little bit more on

6  that entry?

7     A.    Yeah, so Mom -- Mom's reasonings for limiting

8  his nutrition were based on things that she was seeing

9  and when he would eat certain foods that she perceived

10  as sensitivities or intolerances to certain foods, and

11  so I was getting GI involved to help determine if there

12  was a pattern or what diets to work on or, you know, the

13  basis essentially for some of these sensitivities and

14  intolerances, maybe also potentially resolve some of

15  Mom's concerns about some of these foods.  So they're

16  kind of our specialists as far as, like, GI, gut and

17  sensitivities would go.

18     Q.    If you could turn to the next page that is

19  Bates Stamp Number 999, there is a section called

20  Social, and what is the purpose of that section?

21     A.    So talk about social issues impacting the

22  patient's care.

23     Q.    And it's charted, "Appreciate social work

24  consult, appreciate SCAN team consult for concerns for

25  neglect.  DCS case open."

28

1          Can you explain that a little bit more?

2     A.    Yeah.  So it's not uncommon for patients to

3  have a social work consult any time -- I mean, there's a

4  dozen reasons.  So social work was consulted and SCAN

5  team were also consulted while the patient was in the

6  ICU, and then SCAN team and social work, any time

7  there's any sort of suspicion for neglect or abuse, DCS

8  gets consulted, and then DCS determines if they want to

9  open an active case or not.

10     Q.    Sure.

11          And so what this section tells us is that

12  the SCAN team is concerned for neglect, we know from

13  your entry that you're concerned for medical neglect and

14  medical abuse and that DCS has been notified, so the

15  hospital being staffed with mandatory reporters, all

16  these things are currently taking place with Kenan;

17  correct?

18     A.    Correct.

19     Q.    Now, we get down to -- by the way, you did not

20  see Kenan's twin brother Dylan; am I correct?

21     A.    No, I did not.  I saw him in the room, but I

22  never examined him or took care of him.

23     Q.    Under Coded Diagnoses, what does this section

24  indicate in the hospital record?

25     A.    So these are auto generated from anything that

29

1    is coded by any of the doctors, so Dr. Miga or the ICU

2    doctors or any of the other physicians who see the

3    patient click on a box in the system that they're adding

4    a diagnosis, myself included.  Then it gets added to

5    this.

6        Q.    Sure.

7              And I will actually -- there's a point

8    where I could see where your entries were on the dates

9    that you were seeing Kenan, so we'll go over that.  But

10   this is the ongoing set of diagnoses that have been made

11   by the collective medical team; correct?

12       A.    Correct.

13       Q.    And we have acute right heart failure as a

14   diagnosis; correct?

15       A.    Correct.

16       Q.    Failure to thrive?

17       A.    Correct.

18       Q.    What does it take for that diagnosis to be in

19   place, failure to thrive?

20       A.    So failure to thrive is any patient who is less

21   than a percentile range, so they get a Z score based on

22   their weight on where they should be based on their

23   height and their age.  So I can't remember what his Z

24   score was, but he was, I think, less than the first

25   percentile, so that would definitely get you a failure



30

1  to thrive.

2          THE REPORTER:  It would get what?

3     A.    Failure to thrive diagnosis.

4     Q.    BY MR. CROWN:  Malnutrition can cause failure

5  to thrive?

6     A.    Correct.

7     Q.    And malnutrition can cause acute right heart

8  failure?

9     A.    Correct.

10    Q.    Anasarca, explain what that is.

11    A.    Anasarca is just generalized edema, so swelling

12  of hands, feet and the face.  It's called anasarca.

13    Q.    And when you say "generalized," meaning it's

14  bodywide, there's a swelling that is, you know,

15  throughout the body; correct?

16    A.    It's in multiple places, yes.

17    Q.    What does that indicate?

18    A.    So there are different reasons why patients can

19  have generalized edema.  The two most common would be

20  heart failure or kidney failure, but you could also get

21  it from diffuse inflammation or infections.

22    Q.    And malnutrition can contribute to and cause

23  heart failure; correct?

24    A.    Correct.

25    Q.    So therefore, malnutrition can cause anasarca?

31

1    A.    Correct.

2    Q.    Right ventricular dysfunction.

3    A.    Yes.

4    Q.    This is tied to the acute right heart failure?

5    A.    Yes.

6    Q.    Ketotic hypoglycemia, can you explain what that

7    is for the record?

8    **A.    Yes.  So when a patient goes into a starvation**

9    **state, they start to make ketones, kind of like a**

10   **diabetic, like, in DKA.  So if you're not getting enough**

11   **nutrition, your body starts making ketones and breaking**

12   **down fats and muscles to find an alternate food source,**

13   **so you make ketones.  And then the hypoglycemia meant**

14   **that his glucose at the time at presentation was below**

15   **normal.**

16   Q.    If Kenan did not have this medical

17   intervention, was he starving to death?

18            MR. CONNELLY:  Form and foundation.

19   **A.    Yes, that -- that was a concern, yeah.  More**

20   **general would be without medical intervention, he would**

21   **have had potential threat to life and limb.**

22   Q.    BY MR. CROWN:  And is that a fair description

23   based on what we've been discussing, that without

24   medical intervention, the malnutrition is such that he

25   was starving to death?

32

1            MR. CONNELLY:  Form and foundation.

2       A.    Well, by the evidence of the fact that the

3   patient needed to be admitted to the ICU and receive all

4   these interventions in order to stabilize them would

5   suggest that this was life -- potentially

6   life-threatening if not intervened.

7       Q.    BY MR. CROWN:  Lower extremity weakness, can

8   you explain that a little bit more?

9       A.    Yeah, Mom reported patient was having trouble

10  walking, balance issues, weakness, yeah.

11      Q.    In fact, wasn't it reported that he stopped

12  walking two months before this hospital admission?

13      A.    Yes, that's what Mom reported.

14      Q.    And there was certainly no neurologic or

15  orthopedic explanation for that; correct?

16      A.    Not at the time when he came out of the ICU.

17  It was being investigated still.

18      Q.    Pleural effusion, can you explain what that is?

19      A.    That also would -- it's a similar thought

20  process around the anasarca or generalized edema where

21  you get fluid distributed outside of the blood vessels,

22  you can get fluid that distributes into the bases of the

23  lungs, so it's fluid that's outside of the lungs, but

24  still in the chest cavity.

25      Q.    Sure.



33

1          In that -- in that pleural space area;

2    correct?

3       A.    Yes, yes.

4       Q.    That compromises breathing?

5       A.    It can, yes.

6       Q.    Pulmonary hypertension, what is that?

7       A.    That's when you have increased pressure in the

8    blood vessels in the lungs that the heart now has to try

9    to fight against.

10      Q.    Retarded development following protein-calorie.

11   Can you explain that?

12      A.    Yeah.  So the last word is "malnutrition," so,

13   "Retarded development following protein-calorie

14   malnutrition."  So his height and his weight were less

15   than what would be expected for his age and was being

16   attributed to protein-calorie malnutrition or just

17   malnutrition.

18      Q.    Then the last says, "Unspecified severe

19   protein-calorie malnutrition."

20          Can you explain that?

21      A.    So it's offering a diagnosis for the

22   malnutrition, so he has malnutrition, but it's not --

23   the unspecified says it's not giving a specific reason

24   why, so unspecified reason.

25      Q.    The reason eventually developed into the

**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.

34

1   restricted diet that was caused by Mother Jessica

2   Kahraman; correct?

3   **A.    That was the suspicion that I arrived at, yes.**

4   Q.    So now, staying with page number 999, we have

5   your next physician progress note that you entered on

6   December 25th, 2018; am I correct?

7   **A.    Yes.**

8   Q.    And it appears if we look at page 1000 that the

9   Subjective remained the same and the start of the

10  Assessment/Plan remained the same.  But then if you go

11  to page 1001, there's a point where you add your

12  assessment and plan section.  It's about 10 lines down.

13  It's the sentence, "Patient's appetite has increased."

14  And I believe that's new.  From 12-24, your last

15  sentence was in the Assessment/Plan section, "Have a

16  strong suspicion for medical neglect or medical child

17  abuse."

18          And then it looks like this is what you

19  now added on 12-25; am I correct?

20  **A.    Correct.**

21  Q.    So can you read what you added on 12-25-2018?

22  **A.    "Patient's appetite has increased, and Mom is**

23  **wanting to stop the levothyroxine to avoid having to**

24  **feed him so much.  Mom also still convinced the**

25  **pulmonary hypertension is due to patient's exposure to**



35

1   whiteboard markers.  The patient would likely take

2   adequate PO intake for his nutritional needs if Mom

3   would stop limiting his intake.  Also suspect feeding

4   'intolerance' symptoms are fictitious as they are based

5   solely on Mom's reports and not supported by nurse

6   observations."

7       Q.    Thank you.  Dr. Stewart, I want to now go back

8   and kind of take these in smaller components.

9               The first new sentence, "Patient's

10  appetite has increased," is that what was observed by

11  you and the medical team in the hospital?

12      A.    Yes.

13      Q.    Is that significant to you?

14      A.    Yes.  It shows the patient, you know, was --

15  had adequate nutrition -- or a desire for nutrition, and

16  so that would potentially rule out issues with his gut,

17  so, like, you know, GI issues that decreased patient's

18  appetite or desire to eat, it would lead and confirm the

19  suspicion that he would eat or wants to eat and is

20  capable of eating if allowed to eat.

21      Q.    Supporting the working diagnosis that this is

22  malnutrition caused by Mom?

23      A.    Yes.

24      Q.    And by Mom, Jessica Kahraman?

25      A.    Yes.

Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

36

1    Q.    Okay.  Now, it says here, "Mom is wanting to

2    stop the," and I'm not going to pronounce it correctly,

3    "levothyroxine to avoid having to feed him so much."

4                  Can you explain that --

5    A.    Yes.

6    Q.    -- and the significance?

7    A.    Yes.  Levothyroxine is a synthetic derivative

8    of thyroid hormone.  Thyroid hormone -- so when the

9    patient came in, his thyroid hormone was low, and

10   there's different reasons why it can be low.  And so

11   endocrinology was consulted, and based on their

12   recommendations, he was started on a very small dose of

13   levothyroxine, and levothyroxine when taken in excess

14   can cause increased appetite and increased metabolism.

15                 So Mom's concern was that he was on an

16   excessive dose of levothyroxine, and that was the

17   explanation for why he was so hungry all of a sudden.

18   But then I spoke with endocrinology, and they said that

19   he was on such a small dose, there's no way that this

20   would make him hyperthyroid.

21   Q.    Then it says, "Mom also still convinced the

22   pulmonary hypertension is due to patient's exposure to

23   whiteboard markers."

24                 Can you explain that?

25   A.    Well, that was Mom's concern.  So at this



**Griffin Group International**
888.529.9990 | 602.264.2230

37

1    point, Mom had -- Dr. Miga had been involved, diagnosed

2    the right heart failure, and Dr. Miga expressed to the

3    team that he felt it was due to malnutrition.  Mom felt

4    like it was due more to exposures, so Mom was, you know,

5    concerned about all types of exposures through food and

6    through contact with things, and Mom had a suspicion

7    that the whiteboard markers had caused this right heart

8    failure.

9            So I did a little bit of research and also

10   spoke to Dr. Miga about if this was a possibility.  The

11   only research or data that I found on it was exposure

12   via people who worked in factories making, and so

13   massive amounts of these chemicals.  And then Dr. Miga

14   reaffirmed that malnutrition was the most likely cause

15   of explanation.  He didn't really think that whiteboard

16   markers would explain all this.

17   Q.    So the whiteboard markers, this is something

18   that Kenan would be playing with, I'm assuming, either

19   at home or -- I know he wasn't in school for the last

20   two months because Mom started the home schooling.  But

21   is that what we're talking about, just occasional use of

22   a whiteboard marker on a whiteboard?

23   A.    Yes, that's what Mom expressed, is that he

24   was -- when he was in school and using whiteboard

25   markers at class, that that exposure caused his

38

1  **pulmonary hypertension.**

2    Q.    Your research showed that it would take

3  substantial exposure from -- the type that an

4  occupational exposure of workers that are working with

5  heavy, heavy doses of this to cause anything that would

6  be some abnormality; correct?

7    **A.    Correct.**

8            MR. CONNELLY:  Form and foundation.

9    Q.    BY MR. CROWN:  So between you, Dr. Miga and

10  others that are part of the medical team, whiteboard

11  marker exposure was ruled out as a cause for these

12  symptoms?

13   **A.    Yes.**

14   Q.    And malnutrition remained the leading most

15  probable cause for the right heart failure, pulmonary

16  hypertension and the other diagnoses of Kenan?

17   **A.    Yes.**

18   Q.    Did you discuss that with Jessica Kahraman?

19   **A.    I don't specifically remember.**

20   Q.    Next sentence, "Patient would likely take

21  adequate PO intake for his nutritional needs if Mom

22  would stop limiting his intake."

23          That seems like, again, you're making the

24  conclusion that Mom is the cause for his malnutrition?

25   **A.    Yes, through my interactions with Mom and then**

39

1    the reports I was getting from the nurse, Mom was the

2    gatekeeper for his nutrition, and -- and although Mom as

3    primary guardian had the right to be gatekeeper to his

4    food, the question is whether or not it was appropriate

5    or inappropriate, the amount that she was limiting.

6            And so it was clear that Mom -- the reason

7    why he wasn't getting enough nutrition was because Mom

8    was acting as gatekeeper and limiting what the patient

9    would eat or could eat, and so -- yeah.

10    Q.    Stated another way, with Mom as Kenan's

11    gatekeeper, he was suffering from malnutrition?

12            MR. CONNELLY:   Form and foundation.

13    A.    Yes.

14    Q.    BY MR. CROWN:   Correct?

15            You mentioned what the nurses were

16    reporting.  Do you have a recollection of what the

17    nurses were reporting to you?

18    A.    Yes.  Mainly, that the patient would express

19    hunger and want -- ask for more food, and the patient's

20    mother and father would both tell Kenan he would have to

21    wait to eat for X amount of time.

22    Q.    Was this in the hospital?

23    A.    Yes.

24    Q.    Can you explain that a little bit more.  You've

25    got -- the hospital wants to provide nutrition to him.



Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

40

1    A.    Uh-huh.

2    Q.    He's malnourished, he has severe symptoms, and

3  the parents were intervening in nutritional intake?

4    A.    Yes.  So Mom's concerns were that the patient

5  had allergies or intolerances to most foods and that the

6  foods that the hospital had to offer as far as cafeteria

7  foods weren't the healthiest, and that is a legitimate

8  concern for parents, and so we were working with Mom to

9  allow Mom to bring in foods that she felt were

10  appropriate for Kenan to eat and that he hadn't

11  experienced sensitivities with.

12            His food -- the options available to him

13  were so restricted that I think it was hard for Mom and

14  Dad to make sufficient quantities in order to meet his

15  appetite needs and the calorie requirements, but then

16  Mom was being very restrictive on other food options,

17  and Nutrition had asked Mom to allow Kenan to try at

18  least one new food per day and then try to increase each

19  food as he -- if he showed that he didn't have an

20  intolerance to it, start increasing so he could get a

21  more varied diet and that we could meet his calorie and

22  nutritional needs.

23            The issue we were having is Mom was very

24  slow to expand the things.  She would add things, if

25  memory serves, but usually very small quantities.  The

41

1   other -- when she came out of the ICU, there was

2   discussion about starting a nutritional supplement such

3   as PediaSure or some other, you know, aid that we give

4   children to help them achieve their calorie and

5   nutritional needs.

6          Mom had concerns with pretty much all the

7   ones on the market.  I -- I asked Mom I'll be happy if

8   she picked one and wanted to bring one in, but she

9   struggled or failed to find one that met her

10  requirements, so there basically was at least one

11  ingredient in every available supplement that she took

12  issue with and felt that Kenan was restricted.

13  Q.    So it appears that there was a disagreement

14  between what Kenan needed between Mom and the medical

15  team?

16  A.    Correct.

17  Q.    Now, this next sentence, "Also suspect feeding

18  'intolerance,'" and you put quotes around the word

19  "intolerance" --

20  A.    Uh-huh.

21  Q.    -- "symptoms are fictitious as they're based

22  solely on Mom's reports and not supported by nurse

23  observations."

24          Can you explain that a little bit more?

25  A.    Well, when Mom provided history as to what the

**Kahraman vs
The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.

42

1   feeding intolerances looked like, they were very

2   subjective and not based on things that are well

3   established in the medical literature to support an

4   intolerance or an allergy sensitivity.

5           They were based on things like Kenan being

6   hyperactive after he ate some fruit or him being, like,

7   more irritable or more moody where things that would

8   have me more concerned for a true allergy or intolerance

9   would be, like, rashes or diarrhea, bloody diarrhea.

10  That's part of why I got GI involved, is to see if they

11  wanted to do more of a workup to go looking for GI

12  things.  Potentially sometimes they'll scope patients.

13          There also was a discussion I had with Mom

14  about him now being in a hospital environment where if

15  he were to, say, have anaphylaxis or some other

16  life-threatening reaction to a food, that then -- that

17  he's in a safe place in order for us to do that and then

18  also would corroborate what she was reporting.  And that

19  articulated with Mom that we kind of needed to see to

20  determine that these -- which foods were true allergies,

21  which ones were maybe not a true allergy, was maybe just

22  a kid being a kid.

23      Q.    You used the word "fictitious."

24      A.    Uh-huh.

25      Q.    So seems like in your discussions with Mom as



1    she was providing explanations, "I don't like the

2    whiteboard markers" --

3        **A.    Uh-huh.**

4        Q.    -- you came to the conclusion that she was

5    describing things that were fiction?

6        **A.    So, yeah, my suspicion -- as I talked to Mom**

7    **more, my suspicion was that she at least was perceiving**

8    **things as allergies and intolerances that were not**

9    **actually attributable to an allergy or intolerance, and**

10   **it didn't ascribe any, like, intent or motive behind Mom**

11   **doing so, it's just that what she was describing and**

12   **seeing weren't actually medical in nature, perhaps,**

13   **like, a misperception or bias on her part.**

14       Q.    But that fictitious bias on her part had

15   resulted in Kenan's severe malnutrition, which put him

16   in intensive care in the hospital?

17               MR. CONNELLY:    Form and foundation.

18       **A.    Yes, that was my suspicion.**

19       Q.    BY MR. CROWN:    Then if we move to page 1002,

20   1-0-0-2, under Coded Diagnoses, this appears to be the

21   same that we saw on page 999 with your 12-24 progress

22   note, so it doesn't appear that anything was added by

23   you at this point.

24       **A.    Correct.**

25       Q.    Okay.    If I can ask you to turn to page 1006.



44

1  Now, this is your progress note, Dr. Stewart, that you

2  entered in the medical chart on December 26, 2018; am I

3  correct?

4  **A.    Yes.**

5  Q.    And in the Subjective section, I want to take

6  you towards the bottom.  There's a sentence that begins,

7  "When asked what happens if the patient has corn or corn

8  syrup."  Do you see that?  It's about seven, eight lines

9  from the bottom.

10            MR. CONNELLY:  You're on 1006?

11            MR. CROWN:  I'm on 1006.

12  **A.    Yes.**

13  Q.    BY MR. CROWN:  It states, "When asked what

14  happens if the patient has corn or corn syrup, Mom was

15  unable to provide examples of what his symptoms are.

16  She stated she couldn't remember 'because he hasn't

17  received any corn products in years.'"

18            Your next sentence, "In the past when he

19  has received apple or blueberries, he screams

20  uncontrollable and may have had some facial swelling."

21            Okay.  I want to talk about those two

22  sentences with you and ask you to actually describe, why

23  is that significant?

24  **A.    Well, so part of this doesn't really fit an**

25  **allergy, another part could potentially.  So when Mom --**



1  the screaming uncontrollable, Mom also at a previous

2  time described him as being hyperactive after eating

3  some apples.

4           That -- I mean, medicine doesn't know

5  everything, but that's not really a diagnosed issue, the

6  eating fruit and being hyperactive.  We wouldn't

7  consider that an allergy or an intolerance or not reason

8  to give it.  Facial swelling could potentially fit,

9  like, an anaphylactic-type reaction.

10          So this is one of those times where it's,

11  like, well, this may be a misattribution to an allergy

12  that's not real or misperception or maybe there is

13  something here with this facial swelling.

14     Q.    Now, this is what she's describing to you from

15  prior episodes.  You certainly didn't observe anything

16  like this when Kenan was in the hospital; correct?

17     A.    Correct.

18     Q.    Okay.  And then the next sentence, "Mom showed

19  me a rash the patient had on his upper back last night,

20  but this was not consistent with the urticaria or

21  allergic reaction based on the images on her phone."

22          So I take it when she showed you a rash,

23  she had taken a picture --

24     A.    Yes.

25     Q.    -- of Kenan in the hospital?

46

1                    Okay.  And explain this.  Why is it not

2    consistent with urticaria or allergic reaction?

3        A.    Based on the photo that she showed me on her

4    phone and then based on how quickly it resolved, it

5    seemed more consistent with a heat rash at the time.  It

6    didn't look like hives.

7        Q.    And I take it you would have examined and

8    observed Kenan's back; correct?

9        A.    Correct.

10       Q.    So whatever she showed you on the phone was not

11   present when you saw his back?

12       A.    Yeah, if memory serves.

13       Q.    Now, if you could turn to page 1007, that's --

14   we see at the bottom of that page on the left column

15   Assessment and Plan, and then -- I did that for context.

16   So if you move over now to page 1008, I'm going to pick

17   up your latest entry from this 12-26-18 progress note.

18                   The last three lines states, "Mom refuses

19   to relinquish any control of the patient's food options

20   and refuses supplemental formulas due to corn syrup,

21   maltose and GMOs being present in them."

22                   That's a new entry.  Explain this entry

23   for us.

24       A.    Well, my initial hope when I received the

25   patient from the ICU was that Mom -- I could



1  demonstrate -- well, one way or the other, I could

2  either determine the unlikely probability that, yes,

3  he's truly allergic to dozens of things, which is --

4  which would be super rare, but, you know, strange things

5  happen in medicine.

6              So one, we could allow him to try some of

7  these foods, see and document these things, and thus,

8  confirm Mom's suspicions and then go about dealing with

9  it or treating him.

10             The other option would be hopefully Mom, I

11 could build a relationship with trust with Mom and she

12 would let us start to feed, introduce some of these

13 foods one at a time while in the hospital, while on

14 monitors and Kenan would be able to tolerate them and

15 Mom would see that he was tolerating them and that

16 perhaps she had misinterpreted some of the things that

17 he was experiencing, and then thus, remedy his issue

18 with the malnutrition and get him home and get him off

19 TPN.

20             After the third day -- and really, a lot

21 of things that -- my interactions, a lot of the -- what

22 the nutritionists' interactions, what they were telling

23 me, and the nurses' interactions was that Mom really

24 wasn't open to relinquishing much control other than,

25 like, very small concessions, and that at the rate, my

48

1   **suspicion on this third day was that if discharged home,**

2   **Mom would return to severely restricting his diet.**

3       Q.    Which put Kenan at significant risk of medical

4   compromise and, as we said, death?

5               MR. CONNELLY:  Form --

6       **A.    Yes, potentially.**

7               MR. CONNELLY:  Form and foundation.

8       Q.    BY MR. CROWN:  I'm going to ask you to turn now

9   to page 1009.  The Coded Diagnoses remain the same.  I

10  don't think you added any in this 12-26-18 progress

11  note.  Am I correct?

12      **A.    Correct.**

13      Q.    Okay.  There is a progress note that starts by

14  Maria Chico, NP.  She was one of the medical team

15  members that was also caring for Kenan.  Am I correct?

16      **A.    Correct.**

17      Q.    Do you recall talking with NP Chico?

18      **A.    The only conversation that sticks out in my**

19  **mind was -- with her was at the time when we met with**

20  **the DCS case worker.  I can't distinctly remember**

21  **previous conversations that I had with her, but general**

22  **practice would be that she would be touching base with**

23  **us daily.**

24      Q.    And I want to see if I can jog your memory, and

25  then we've been going probably about an hour; we'll take

49

1  a little break and then continue.  So if I ask you to

2  turn to page 1010, we see at the top the acronym SCAN.

3  So NP Chico is part of the SCAN team; correct?

4      A.    Correct.

5      Q.    And she states in the first paragraph, "Overall

6  update of the child's status discussed yesterday with

7  Dr. Stewart, hospitalist attending.  Kenan has had

8  improvement of his cardiac function and continues to be

9  closely monitored by the cardiology team."

10            Anything about that that -- I mean, you

11  just stated that you recall in general talking with

12  NP Chico, and I'm assuming that since this is a medical

13  team, you're all talking to each other as necessary?

14      A.    Correct.

15      Q.    It says, "Per the EMR, Mom continues with

16  ongoing refusals to allow the child to eat anything

17  other than what parents bring to the hospital which is

18  the same severely regimented, restricted diet he was

19  taking prior to admission and a likely source of the

20  child's severe congestive heart failure on admission."

21            Is that note consistent with what you

22  recall about the issues with Mom and being very

23  restrictive of Kenan's food intake even at the hospital?

24      A.    Yes.

25      Q.    Next paragraph -- well, and then NP Chico



50

1  states, "The likely source of the child's severe CHF on

2  admission."

3          So again, that's consistent with what

4  you've told us, that malnutrition is most probably

5  what's causing the congestive heart failure, right heart

6  function failure, pulmonary hypertension and the other

7  conditions?

8  **A.    Yes.**

9  Q.    Next paragraph, "In addition, Mom has continued

10 to insist on sole documentation of the child's intake

11 which appears to be largely exaggerated.  See RD" -- RD

12 stands for registered dietician?

13 **A.    Yes.**

14 Q.    -- "notes for presumed caloric intake."

15         Does that help jog your memory of what was

16 going on with Mom and, you know, being at odds with the

17 medical team on documenting child's intake?

18         MR. CONNELLY:  Form and foundation.

19 **A.    Yeah, that appears consistent with what I**

20 **remember from the time and from what is being reported**

21 **to me from the nurses and the dietitians.**

22 Q.    BY MR. CROWN:  The next paragraph, "The medical

23 team remains concerned with the child's overall

24 nutritional status as he has been losing weight.  After

25 (sic) the EMR, Mom has been counseled on many occasions

51

 1   throughout this admission thus far."

 2              Again, is that consistent with your

 3   personal interactions with Jessica Kahraman and as

 4   others on the team that you're talking to are describing

 5   their interactions with Jessica Kahraman?

 6       **A.    Yes.**

 7       Q.    And then in the next paragraph, "We discussed

 8   our concerns with DCS yesterday and spoke at length

 9   regarding the child's status on admission, as well as

10   his current status."

11              Did you personally talk with any of the

12   DCS workers?

13       **A.    Not until the third day, yeah.**

14       Q.    Do you recall who you spoke to from DCS?

15       **A.    I do not.**

16       Q.    If I said the name Sarah Kramer or Sarah

17   Mendez, would that jog your memory?

18       **A.    It was a long time ago.**

19       Q.    Can you share with me, without recalling the

20   name, your conversation with a DCS investigator or the

21   DCS investigator's supervisor or both.

22       **A.    So my recollection is in the evening on the**

23   **third day that I was taking care of Kenan, I was asked**

24   **to meet with one of the DCS workers, I can't remember if**

25   **it was one or two, and Maria Chico.  So we met in a**



**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.

52

1  conference room, and then I was asked to offer my

2  medical opinion on whether or not I felt like there was

3  potential life or limb-threatening issues if he were to

4  go home.

5          My opinion at the time was that Mom had

6  not demonstrated a willingness to allow us to determine

7  if he really had any of these allergies or

8  insensitivities.  My suspicion was that they were

9  misperceived and that he would tolerate most, if not

10  all, of the foods.  You know, he may have actually -- he

11  may have actually had one or two.  It's not uncommon for

12  patients to have one or two allergy to food or

13  insensitivities, but to all of them seemed very

14  unlikely.

15          And that if nothing changed, yes, he would

16  be in danger of having this happen again and potentially

17  life-threatening and that the State would need to allow

18  us to feed the child.  And I expressed that my hope at

19  the time was that still Mom would then see him improve

20  with the more free diet and then would resolve her

21  concerns if she was able to see this.

22  Q.    So this meeting that you're attending, you

23  recall it with a DCS investigator, maybe two DCS

24  investigators, and Nurse Practitioner Chico of the SCAN

25  team; correct?



53

1    A.    Correct.

2    Q.    Okay.  And you're in a room, in a --

3    A.    **Yeah, a conference room on one of the floors of**

4    **the hospital.**

5    Q.    So it's just the three or four of you; correct?

6    A.    **Correct.**

7    Q.    And you as the attending hospitalist, pediatric

8    hospitalist, are being asked your medical opinion, and

9    you state if there's no change, then Kenan will be in

10   danger and in a life-threatening situation?

11   A.    **Correct.**

12   Q.    Okay.  The phrase "if no change" stated another

13   way, tell me if you agree, is without the State's

14   intervention to save Kenan from his mother, he would be

15   in a life-threatening situation?

16         MR. CONNELLY:  Form and foundation.

17   A.    **Yes -- yes and no.  A little context to it was**

18   **my objective of the hospitalization was to try to get**

19   **Mom -- like, some buy-in from Mom, some sort of**

20   **self-awareness as -- as to some of these insensitivities**

21   **not actually being real.**

22         **And so my hope, again, was that if the**

23   **State intervened, started letting us feed the patient a**

24   **more liberal diet, let him have what he wanted, and then**

25   **Mom could see him basically cured through this and not**

1  having any issues with said foods, that then she would

2  have some self-awareness and be like, "Okay, yes, I

3  will -- I can feed him these things and he's fine, and

4  things will change."  That was my hope.

5      Q.    BY MR. CROWN:  And understanding that, it

6  was -- since Mom was pushing back or not showing that

7  self-awareness that the medical team would like to see,

8  it required this intervention by the medical team and by

9  the State to protect Kenan?

10             MR. CONNELLY:  Form and foundation.

11      A.    Yes.  My impression from my interactions with

12  Mom and what nurses were telling me and what the

13  nutritionists were telling me did not seem like it was

14  going to happen without intervention from the State.

15             MR. CROWN:  Why don't we take a short

16  break.

17             THE VIDEOGRAPHER:  We are off the record.

18  The time is 11:20 a.m.

19             (Recessed from 11:20 a.m. until

20  11:32 a.m.)

21             THE VIDEOGRAPHER:  We are back on the

22  record.  The time is 11:32 a.m.

23             MR. CROWN:  And, Jennifer, so I have

24  context, are you able to just read the last two

25  questions and answers?



55

1    Q.    BY MR. CROWN:  Doctor, can I ask you to go to

2  page 179.  I'm just going to see if there's anything

3  additional.  Those are your orders, and so if you go

4  into Exhibit 1 and you go to page 179, so am I correct,

5  does this begin the orders that you issued for Kenan?

6    A.    Yes.

7    Q.    So on page 179, it looks like on

8  December 24th, 2018, you issued a series of orders, and

9  can you summarize these orders and explain why you

10 issued these orders.

11   A.    So the proBNP is that first one.  That's the

12 one that looks -- so these first two, proBNP and the

13 uric acid are the ones that Dr. Miga, cardiology, asked

14 that I get, so I was putting those in at his request.  I

15 can't remember why he wanted the uric acid.  The proBNP

16 in general looks just at the amount of stretch for the

17 heart.

18   Q.    Okay.  Now, if you can continue on to page 180,

19 you have a line that says Order Details, 12-24-18 at

20 12:23 p.m., and there's a series of diagnoses.  Can you

21 read those?

22   A.    Yes.  Anasarca, acute right heart failure,

23 right ventricular dysfunction, failure to thrive

24 (child), ketotic hypoglycemia, pleural effusion,

25 retarded development following protein-calorie



56

1    malnutrition, unspecified severe protein-calorie

2    malnutrition, lower extremity weakness, lethargy,

3    pulmonary hypertension.

4    Q.    Now, those are the list of diagnoses that we

5    discussed that are contained in your progress notes;

6    correct?

7    A.    Correct.

8    Q.    And the medical orders that you were issuing

9    were to treat these numerous conditions in Kenan;

10   correct?

11   A.    Correct.

12   Q.    And as we've established, all the result of

13   malnutrition?

14          MR. CONNELLY:  Form and foundation.

15   A.    Correct.

16   Q.    BY MR. CROWN:  And then as we continue on

17   page 181, we can go through 182, 183, 184, 185, those

18   are all a series of orders that you issued on

19   12-24-2018.  And again, those are the orders that you're

20   issuing to treat those many conditions that were present

21   in Kenan?

22          MR. CONNELLY:  Form and foundation.

23   A.    Yeah, treat and to investigate any other

24   related issues.

25   Q.    BY MR. CROWN:  And investigating meaning that

**Kahraman vs**
**The State of Arizona**                      Video Recorded Deposition of Ryan Stewart, M.D.

57

1  you're looking for something other than malnutrition to

2  explain -- malnutrition is the most probable cause, and

3  you're trying to see if there's anything else to explain

4  Kenan's compromise and if there's anything else to rule

5  in or to continue to rule out things?

6          MR. CONNELLY:  Form and foundation.

7  A.    Correct, that's -- I mean, that's standard for

8  medicine, is you continue to look for other related

9  things or other potential causes.  You have what's

10 called a differential diagnosis, and so on there, you

11 have -- just standard medical which would apply in this

12 case is you have your most likely cause based on common

13 things being common and then given presentation,

14 history, results so far, exam.

15          And then you have things that you wouldn't

16 want to miss potentially, and then you also would

17 potentially maybe have, like, some strange, rare things

18 that you would -- to investigate.

19          Just at this time, we were investigating

20 things to basically give Mom the benefit of the doubt,

21 you know, so some of the consults and some of the

22 investigations were potentially to try to -- in

23 pediatrics in particular, we're taught to trust parents

24 initially and believe what they say and give them the

25 benefit of the doubt, so that's what some of these

58

1  things were kind of gearing towards.

2     Q.    BY MR. CROWN:  As we move on to page 186, we

3  now have the orders that you're issuing or did issue on

4  December 25th, 2018.  We have the same list of diagnoses

5  and conditions in Kenan, and your -- I see there's

6  Dr. Bandla who's also issued some orders, but we have a

7  series of orders for you, and that's continuing the

8  workup, the investigation and addressing Kenan's

9  condition?

10     A.    Correct.

11     Q.    Okay.  And then as we move forward on page 191,

12  these are orders that you issued on December 26th of

13  2018.

14     A.    I'm sorry.  Which page?

15     Q.    On page 191.

16     A.    Yes.

17     Q.    Okay.  And by this day, having been

18  investigating and, you know, looking at a differential

19  diagnosis, as you say, to give Mom the benefit of the

20  doubt, it's by this day that you've ruled out what Mom's

21  explanations were and you're at the diagnoses that

22  Kenan's symptoms and condition is most likely the result

23  of malnutrition caused by Mom?

24          MR. CONNELLY:  Form and foundation.

25     A.    Well, I mean, that was still the most likely.

59

1  That was the operating diagnosis that we were operating

2  with.  But this point, Mom hadn't really let us test any

3  of these foods to determine if the allergies or

4  insensitivities actually existed, so, I mean, that was

5  still a possibility, although very unlikely.

6            So, I mean, the context on this day was I

7  felt like the most likely explanation was everything --

8  so everything -- everything was due to malnutrition, it

9  seemed like, and that's what my consultants were telling

10  me and my nutritionists were telling me, and then my

11  experience with Mom, seemed like she was never going to

12  let us -- seemed very unlikely that she was going to let

13  us start to try any of these foods to advance his diet.

14            But I hadn't made, like, a final

15  determination that some of these things were a

16  possibility, some of these -- like, an insensitivity to,

17  like, fructose, per se, does exist.  Allergies to corn

18  does exist.  But at this point, I couldn't determine

19  that those allergies or insensitivities exist other than

20  Mom's reports.  So we were kind of at an impasse at this

21  point where Mom wouldn't let us advance, so -- yeah.

22    Q.    But as you had charted in your progress note,

23  what Mom was explaining did not have any medical

24  support, it did not have any corroboration; correct?

25    A.    Yeah, very little.  Very little.  Seemed very



60

1   unlikely.

2       Q.    And for example, whiteboard erasers and other

3   things that she was trying to explain you had charted

4   were fictitious?

5               MR. CONNELLY:  Form and foundation.

6       A.    **The whiteboard had been more or less ruled out.**

7       Q.    BY MR. CROWN:  Can you turn to page 1076.  You

8   had stated just a little while ago that you were relying

9   on what your consults were telling you, what the

10  nutritionist was telling you; am I correct?

11      A.    **Correct.**

12      Q.    And this is a consultation report from

13  Dr. Miga, the cardiologist, and it's from December 18th

14  of 2018.  It was in the chart.  I'm assuming that you

15  would have reviewed the things in the chart that

16  preceded your involvement with Kenan to give yourself a

17  background, and then you'd reference these things as

18  you're talking to the medical team that included nurses,

19  consults, nutritionists, members of the SCAN team, all

20  of those people, you were part of that team?

21              MR. CONNELLY:  Form.

22      A.    **Correct.**

23      Q.    BY MR. CROWN:  Okay.  So if I can take you to

24  page 1077, in this note by Dr. Miga, if I ask you to --

25  in that first large paragraph, I'm going to count down

**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.

61

1   where I want you to read.  The 14th line, there's a

2   sentence that begins, "He has chronic GI issues."  Do

3   you see that?

4       **A.    Yes.**

5       Q.    Okay.  And I'm going to read it for

6   convenience.  "He has chronic GI issues and has many

7   dietary restrictions and is on a special diet.  His

8   appetite has been diminished.  His mother reports

9   continued decline in his condition, including

10  progressive weakness, fatigue and exercise intolerance."

11              Now, if you read that, and I'm assuming

12  you did, and I've now called your attention to it, this

13  is what Dr. Miga is reporting on December 18th, is that

14  significant to you in your care of Kenan?

15      **A.    Yeah -- well, I'm not sure what you mean by is**

16  **it significant.  He's describing, yeah, this patient is**

17  **having a limited diet and his condition is worsening and**

18  **he's getting weaker, more tired, yeah.  This all fits**

19  **with his presentation, yes.**

20      Q.    And that's really what I -- what I meant, is as

21  what Dr. Miga charts here, it's a consistent history and

22  background from what you personally encountered in your

23  care of Kenan; correct?

24      **A.    Correct.  The -- I don't know, I can add some**

25  **context.  When we get -- so I'm the go-between, so it**



62

1  would be, like, the primary person involved with all the

2  specialists, and at this time, it's kind of a chicken or

3  the egg situation to explain what is causing what.  So

4  Dr. Miga is just describing what Mom's report of his

5  condition, which doesn't offer a direct explanation for

6  why he's declining or why he's so weak or why he has the

7  GI issues.  It's just -- this is more just a descriptive

8  piece.  So that's how I would read and interpret that.

9      Q.    Sure.

10          On page 1078 in this consultation report

11  of Dr. Miga, at the bottom, it says, "Impression:  Kenan

12  is the six-year-old male with a previous history of a

13  metabolic condition, chronic GI issues and chemical

14  sensitivity presenting with progressive weakness,

15  lethargy and edema.  On examination, he had mild

16  generalized edema, hepatomegaly, tachycardia, a loud S2

17  and a soft systolic murmur."

18          I skipped a few lines.  It says, "Kenan

19  has severe pulmonary hypertension with acute diastolic

20  and systolic right heart failure.  His BNP is severely

21  elevated and consistent with his diagnosis.  His CPK is

22  also elevated and consistent with his degree of CHF."

23          And continuing towards the bottom of that,

24  "He has very significant pulmonary hypertension and is

25  at risk for acute decompensation.  His condition is

1   guarded."

2              So that's Kenan's presentation to the

3   hospital when he's admitted into the pediatric ICU unit;

4   correct?

5       A.    Correct.

6       Q.    Okay.  And again, it's that condition that

7   precedes your involvement that is consistent with what

8   you're treating and determining, all the result of

9   malnutrition?

10      A.    Correct, by the time I was involved, there was

11  more context, more time with the patient, they've done

12  more testing, but, yeah, this is his initial eval -- his

13  initial impression or assessment of the patient.

14      Q.    And because Kenan was in such compromise when

15  he was brought to the hospital, one of the factors that

16  you're weighing is he's -- knowing how severe his

17  condition had gotten, you want to make sure he's not put

18  back into that harmful environment and put into an

19  unsafe home or condition; correct?

20              MR. CONNELLY:  Form and foundation.

21      A.    One of -- yeah, one of the requirements of a

22  pediatrician, pediatric hospitalist is you have to have

23  a safe discharge plan, so as best of your ability, you

24  have to make sure that the patient, when you're sending

25  them home, that it's a safe situation.

1              No matter what the condition is, you know,

2   at a minimum, that parents understand when to come back,

3   you know, or that the treatment regimen you have is

4   working and that they'll continue to improve when you

5   send them home.

6       Q.     BY MR. CROWN:   What does "condition is guarded"

7   mean in how you interpret that?

8       A.     It's hard to know exactly what Dr. Miga meant

9   by that.   Generally, it's similar term of potentially

10  critical, you know.   It's not a term I use often.

11  It's -- I usually -- in ICU, it's critical,

12  deteriorating, improving, so I would read that as, like,

13  unclear at this time which way he's headed.

14      Q.     I'll ask you to turn to page 1084.   So this is

15  a consult note that is titled SCAN Initial Consult Note.

16  And again, we see that the author of it is Nurse

17  Practitioner Maria Chico, and she's describing the SCAN

18  team was consulted by Dr. Georgia -- I'm probably not

19  going to get that word right, the last name.   Are you

20  able to pronounce that?

21      A.     We just call her Dr. A.

22      Q.     Dr. A.  All right.  Dr. Georgia A.  But for the

23  record, it's A-N-D-R-O-U-T-S-O-P-O-U-L-O-U.   For

24  comprehensive evaluation.   And I take it since you were

25  talking to the consultants and relying on the consult

65

1   reports, this would, again, be another report that

2   preceded you, so you would have reviewed it as you're

3   reviewing the chart to get informed about Kenan's

4   condition and his history at the hospital; correct?

5       **A.    Correct.**

6       Q.    History of Present Illness's section states,

7   "Dad reports that parents brought the child to the ED

8   for concern of swelling to face and hands."  And then if

9   you turn to page 1085, there is a report that states,

10  "Regarding nutrition, Dad reports the child eats a very

11  specific diet:  New Zealand lamb (purchased at Whole

12  Foods) that is made into a stew along with beets and

13  occasionally carrots.  Dad reports that the child eats

14  the same meal daily for all three meals (breakfast,

15  lunch and dinner), and a mid-morning snack.  When asked,

16  Dad reports that this highly regimented diet is

17  necessary due to the child's reported 'chemical'

18  allergies."

19          Is that something that you discussed with

20  Mom and is there anything about this that you took into

21  account?

22      **A.    Well, it's very restrictive.  Yeah, I mean,**

23  **I -- each day that I talked with Mom, we discussed, you**

24  **know, most extensively on the first day, like, which**

25  **foods that she felt like he was intolerant to or had**



1    reactions to and what the reactions were.

2            I can't remember every single thing, but,

3    like, the blueberries and fructose were a common theme,

4    GMOs, corn, corn syrup, you know, she didn't want any of

5    those things in the foods, which, you know,

6    unfortunately, in Western diets, it does make it hard to

7    find a lot of foods.  This is one of the most

8    restrictive diets I've ever seen in a patient, so that

9    was concerning.

10   Q.    Did you have much interaction or any

11   interaction with Kenan's dad, Ahmet Kahraman?

12   A.    A little bit.  Most of the discussion was from

13   Mom, but he would be in the room.  Yeah, hard to

14   remember exactly, but, yeah, I definitely -- he was in

15   the room, but generally, Mom provided most of the

16   history.

17   Q.    Okay.  Can I ask you to turn to page 1091.

18   Actually, 1090, SCAN was issuing -- in the

19   Assessment/Plan, "SCAN consultation" -- towards the

20   bottom, I'm reading, "SCAN consultation was requested

21   due to concerns for medical neglect issues," and then it

22   lists eight different specific areas of concern.

23            Again, I assume you reviewed this and

24   agreed with those concerns?

25            MR. CONNELLY:  Form and foundation.



Kahraman vs                                    Video Recorded Deposition of Ryan Stewart, M.D.
The State of Arizona

67

1    A.    Yeah.  So if I could add a little context --

2    Q.    BY MR. CROWN:  Yes.

3    A.    -- on the -- on the term "medical neglect."

4    The medical literature kind of has difficulty in really

5    describing this specific case.  Neglect is maybe the

6    wrong term.  There's been serial changes, you know,

7    medical child abuse and lots of different things.  The

8    medical community can't quite agree.

9           Mom, I don't feel like was neglectful.

10   You know, she took the patient to Phoenix Children's for

11   evaluation.  She took him to our ER, you know.  The

12   issue wasn't that she was neglectful.  The issue was

13   that she was, like, obsessed about his diet and was

14   misperceiving allergies and intolerances that perhaps

15   were just portions of normal human processing of foods.

16          You know, some days you're bloated or

17   crampy after eating something.  Sometimes maybe he was

18   getting sick with a viral infection when he was eating a

19   certain food.  So my feeling was Mom was misattributing

20   things he was eating to whatever symptoms, so the

21   symptoms were normal and benign or were related to

22   something different.

23          And so it's not that she was neglectful.

24   It was that she was misconstruing these things, and that

25   was leading her to unnecessarily restrict his diet to a



68

1  dangerous degree.

2    Q.    And I appreciate that clarification.

3           So a little while ago you said this was

4  one of the most restrictive diets you had ever seen;

5  correct?

6    A.    Uh-huh.  Yes.

7    Q.    And what you've just explained is, so that

8  there's a little more context and specificity to the

9  term "medical neglect" -- which is something you

10  actually charted in your progress note?

11   A.    Correct.

12   Q.    But explaining it, whether the word "neglect"

13  for Mom is, by itself, just not descriptive enough,

14  whatever Mom was feeling, whatever Mom was perceiving

15  and misperceiving, it was resulting in her son Kenan to

16  be in a severely compromised medical state; correct?

17           MR. CONNELLY:  Form and foundation.

18   A.    I would say that's an accurate description,

19  yes.

20   Q.    BY MR. CROWN:  And because of that -- I mean,

21  Kenan's six, he's in Mom's care.  In Mom's care, he had

22  moved to a situation that if it wasn't -- if Kenan

23  wasn't saved from Mom, if he wasn't -- if there wasn't

24  this intervention, his course was going to be going on

25  to being critical and could die?

69

1          MR. CONNELLY:  Form and foundation.

2     **A.    Yes, so the concern was, yes, if the sole**

3  **reason why -- which at this time is what we were trying**

4  **to establish, was that if the sole reason why Kenan was**

5  **having all these heart problems was due to malnutrition,**

6  **which the sole reason for that was Mom's restrictive**

7  **behavior and not based on actual medical problems, that**

8  **if Mom didn't understand or accept that that's what was**

9  **going on, that she would continue this behavior and that**

10 **Kenan would, yes, have deterioration and death**

11 **potentially.**

12    Q.    BY MR. CROWN:  So if Kenan was allowed to just

13 stay with Mom without any other intervention, he was at

14 risk of serious harm?

15          MR. CONNELLY:  Form and foundation.

16    **A.    Yes, there was significant concern for that.**

17    Q.    BY MR. CROWN:  On page 190 -- 1091, above the

18 Plan section, there's a statement, "The child is at high

19 risk," and "high risk" is in bold type, "high risk for

20 further/ongoing poor medical/nutritional status in his

21 current environment.  Therefore, DCS has been

22 contacted."

23          And that's the point you and I just made.

24 You would agree with that statement?

25    **A.    Yes.**



70

1    Q.    And that is the same point that you told the

2  DCS workers in that conference with Nurse Practitioner

3  Chico when you met with them in the conference room on

4  December 26th, 2018; correct?

5    **A.    Correct.**

6    Q.    DCS specifically asked you what your opinion

7  was, and what you shared with them is consistent with

8  this statement, that Kenan is at high risk for

9  further/ongoing poor medical/nutritional status in his

10  current environment?

11    **A.    That is correct.**

12    Q.    If I can ask you to turn to page 1096.  On this

13  page is a consultation report from Dr. Vinay, V-I-N-A-Y,

14  Bandla, B-A-N-D-L-A.  Dr. Bandla, he was the GI doctor;

15  correct?

16    **A.    Correct.**

17    Q.    Okay.  And this is a consult on

18  December 24th, 2018, probably earlier in the day from

19  when you first saw Kenan or at least what you charted in

20  your first progress note.  I think your first progress

21  note is somewhere around late morning or the noon hour

22  or even in the afternoon, and Dr. Bandla would have done

23  his consult on the 24th in the morning; am I correct?

24    **A.    The time we enter our notes isn't always the**

25  **time that we see patients, so I don't specifically**

Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

71

1    remember, but, yeah -- I don't know who saw him first.

2    Q.    Okay.  But Dr. Bandla would have been one of

3    the consults that you certainly were conversing with and

4    discussing Kenan's care with; correct?

5    A.    Correct.

6    Q.    So on the next page, 1097, in the second full

7    paragraph, the first sentence states, according to

8    Dr. Bandla, "He is on the GAPS," G-A-P-S, all capitals,

9    "diet for leaky gut.  He is on a very limited diet at

10   home."

11           The GAPS diet, did you yourself look into

12   that or know what that was or was it really about the

13   specific foods and lack of proper nutrition that was

14   your focus?

15   A.    I can't remember exactly the -- GAPS is an

16   acronym for the foods that you're supposed to avoid, so,

17   like, gluten, like, dairy.  There's a lot of things that

18   you avoid, and it's when you have patients who appear to

19   have a lot of intolerances or GI issues around foods,

20   then you'll try a GAPS diet, which is where you limit a

21   large portion of foods, and then you slowly start adding

22   them back in.  So generally, this was done -- would be

23   done with the consultation with GI, so I wouldn't do

24   this, but --

25   Q.    Okay.

72

1    **A.    -- yeah, this was occurring already.**

2    Q.    If I can ask you to turn to page 1040.

3         MR. CONNELLY:  1040?

4    Q.    BY MR. CROWN:  I'm sorry.  1140.  My mistake.

5    1140.

6    **A.    Okay.**

7    Q.    So for context, this starts the Nutrition

8    Documents section of this medical chart for Kenan, and

9    the first entry is on December 19, 2018, but I'm going

10   to ask you to skip forward now, and again, if you need

11   it to refer back, by all means, do so, but I'd like you

12   to go forward to page 1156.

13        Actually, if I can, let's go back to

14   page 1143 for a moment.  We will get to 1156, but let's

15   go to 1143.  In this nutritional note from

16   December 19th, towards the bottom it states, "Patient

17   with severe malnutrition due to dietary restrictions.

18   Majority of all nutritional intake comes from

19   New Zealand lamb shanks, marrow and broth.  This is

20   nutritionally inadequate even if the daily kcal needs

21   are being met.  Patient has physical findings suggestive

22   of multiple micronutrient deficits."

23        That certainly is something that you would

24   have reviewed before you first saw Kenan on

25   December 24th, and that's consistent with your treatment

73

1   and findings of Kenan; correct?

2                    MR. CONNELLY:  Form and foundation.

**3      A.      Correct.**

4      Q.    BY MR. CROWN:  You would agree with the

5   statement that Kenan suffered from severe malnutrition?

**6      A.      Correct.**

7      Q.    And again, since it's due to dietary

8   restrictions and not an otherwise medical condition, the

9   cause ultimately falls to Mom's diet for Kenan?

10                    MR. CONNELLY:  Form and foundation.

**11     A.    I mean, ultimately, yes, yes, the context at**

**12   this time, that was the leading differential that we**

**13   were operating on while investigating other**

**14   possibilities.**

15     Q.    BY MR. CROWN:  Right.

16                    If you can go forward to page 1144.  In

17   the first paragraph, "Mother does not seem aware of the

18   severity of patient's nutritional status and has

19   feelings of resistance to expanding the diet and

20   providing patient with micronutrient supplements."

21                    Is that consistent with how you found

22   Jessica Kahraman?

**23     A.      Yes, this also was my experience.**

24     Q.    Can you turn to page 1146.  At the top it

25   states, "Nutrition communications.  Yesterday's calorie

1  count sheet provided by RN.  Mom had filled out sheet,

2  and nutrition information for meatballs is not

3  verifiable via food nutrition label."

4          That, again, is a note that would have

5  preceded you, but you're looking at the nutrition notes,

6  so is that consistent with or at least something that

7  you found significant?

8    **A.    Yeah, so there was ongoing conversations I was**

9  **having with Nutrition.  So the SCAN team through the**

10  **nutritionists and the nurses had kind of -- had set up**

11  **basically what they wanted to see as far**

12  **as, like, meeting his nutritional needs and expectations**

13  **from Mom to show these good faith efforts and things of**

14  **her trying new foods.**

15          **The reports I was getting from Nutrition**

16  **and from the nurses is that Mom was making kind of token**

17  **gestures, in their opinion, but not -- not really**

18  **meeting the spirit and that whenever, like, push came to**

19  **shove, she would -- she would not concede to allow him**

20  **to eat to his fill, so, you know -- yes.**

21    Q.    Now, if I ask you to go to page 1056 (sic), and

22  I will tell you this is now a registered dietician by

23  the name of Lindsey Manz, M-A-N-Z, and it appears that

24  you would have had discussions with her.

25          And on page 1156, towards the top it says,



75

1    "RD repeatedly reviewed the following with Mom.  Current

2    diet is not nutritionally adequate.  This is not an

3    acceptable long-term diet.  We need to continue to

4    introduce foods for a very balanced diet.  We will not

5    stop giving one food because a new food is introduced.

6    Current amounts of non-meat foods are insufficient and

7    are not age appropriate.  A new food should be offered

8    daily.  Mom must report any 'intolerance reactions' to

9    staff members immediately.  We will be following

10   physician's orders."

11              And I know that right after, it says,

12   "Discuss with hospitalist."  So I'm reading this to you

13   to see if you have a recall of your interaction with the

14   Registered Dietician Manz and if this kind of triggers

15   further thoughts on your part?

16   A.    This is the -- from, again, SCAN team and

17   dietician, nursing, the orders that we were -- had put

18   in place.  Basically, these were the rules that we

19   wanted Mom to follow to basically move the patient

20   along, you know, improve his condition, get him geared

21   towards going home and show, you know -- and what we got

22   Mom at one point, I think, to agree to, yeah.

23              My general feeling was the nurses and

24   nutritionists were saying that Mom wasn't -- she was

25   very resistant.  And then I talked to SCAN team, also,

1 that Mom was resistant when we actually started doing

2 these things.  When it came time to do them, that they

3 were getting a lot of pushback.

4    Q.    Pushback, is another way to say that a

5 tug-of-war?

6             MR. CONNELLY:  Form.

7    A.    Yeah.  I mean, yes, but, I mean, all

8 interactions with parents, there's a bit of a give and

9 take, you know, where you offer your medical opinion,

10 and sometimes they don't want it, and then you

11 compromise, but there wasn't -- there was a difficult

12 reaching a compromise here.

13    Q.    BY MR. CROWN:  And again, ultimately, the focus

14 has to be on Kenan's safety and well-being.  Fair

15 statement?

16    A.    Yes.

17    Q.    Now, in this next section, it says, "Discuss

18 with hospitalist."  And given the date, that would be

19 you.  "TPN is inappropriate.  Suspected vitamin

20 deficiencies, recommendations for vitamin studies and

21 supplementation are in the chart.  Physician advised

22 that we are currently awaiting DCS for a hold on the

23 patient.  This way, Mom will not be able to take the

24 patient home against medical advice and we can more

25 easily have control over care."



1          So that's a pretty strong --

2     A.    Yeah.

3     Q.    -- entry there.  Can you elaborate from your

4  perspective?

5     A.    So from -- and this is a conversation I had

6  with Mom.  TPN is not something you want to be on

7  long-term to meet your nutritional needs.  We do it only

8  when we absolutely have to because it can cause liver

9  injury, liver failure.  So that's what she means by,

10  "TPN is inappropriate."

11          So in a patient where we feel like their

12  gut is able -- we can give them all their needed

13  nutrition through their GI tract, that TPN is

14  inappropriate, and so they need to be weaned off.

15  That's what that statement is about.

16          And, yeah, I remember her expressing to me

17  just strongly her concerns that Mom is not cooperative

18  or working with her and that she was very concerned

19  about this patient going home with Mom.

20          MR. CONNELLY:  Can I just ask real quick,

21  what does TPN stand for?  I might have missed it

22  earlier.

23     A.    Total parenteral nutrition, and parenteral

24  means, like, through an IV.

25          MR. CONNELLY:  Okay.  Thank you.

78

1    Q.    BY MR. CROWN:  So again, so this being

2  the 26th, and there's concerns that Kenan cannot be just

3  taken out of the hospital by Mom and that the medical

4  team wants -- with involvement with DCS, is to keep

5  Kenan and protect him from the malnutrition state that

6  Mom has caused him; correct?

7                  MR. CONNELLY:  Form and foundation.

8    **A.    I mean, their concern as -- as we were**

9  **initiating these measures and these measures were put in**

10 **place and we're getting increased resistance from Mom,**

11 **there was concern from the staff that she would try to**

12 **leave with Kenan now that his condition had improved and**

13 **that his -- would be back in the same place or**

14 **potentially worse place if something didn't change.**

15   Q.    BY MR. CROWN:  And when you were meeting at

16 some point in that conference room on December 26th --

17   **A.    Uh-huh.**

18   Q.    -- and the DCS investigator is asking you your

19 medical opinion, you're expressing what you just told us

20 here today at your deposition, that there's real concern

21 that if Kenan goes back home with Mom and there's no

22 intervention, he's going to be in a worse condition?

23                  MR. CONNELLY:  Form and foundation.

24   **A.    Yes, that is what I expressed.**

25   Q.    BY MR. CROWN:  Continuing on page 1157, you see



79

1   it's reported by the nutritionist, "Kcal results are at

2   risk for inaccuracy as the intakes were being completed

3   by Mom and not by staff members.  Mom is not reliable

4   and we cannot rule out that recorded intakes were not

5   falsified by Mom."

6                Is that something that you recall and is

7   consistent with your interactions with Mom and your

8   medical input?

9                MR. CONNELLY:  Form and foundation.

10  **A.    So the -- what I recall is nurses were supposed**

11  **to verify and weigh whatever Mom -- parents are bringing**

12  **in food from home.  It's supposed to be weighed and**

13  **verified by a nurse prior to -- and then documented by**

14  **the nurse.  There was, like, a card, like, in the door**

15  **or something.**

16               **And the nurses kept expressing to me that**

17  **Mom was feeding the patient and not telling them and Mom**

18  **was just filling out the sheet.  So the nurses were**

19  **expressing the fact that they had no way to know for**

20  **sure if the patient was actually getting what Mom was**

21  **saying or if she was exaggerating what was being given.**

22  **So when nurses would come, I would just ask them to**

23  **document their interactions.**

24  Q.    BY MR. CROWN:  In the next paragraph, there's a

25  statement, "Patient is severely malnourished."



80

1          And again, that's something that you made

2    a finding of as the medical doctor that was part of the

3    treatment team for Kenan; correct?

4        **A.    Correct.**

5        Q.    About three lines down, it says, "The patient's

6    gut is functioning.  There are no contraindications to

7    providing full nutrition through the gut."

8              Now, that was significant to you as in the

9    course of the three days you were seeing Kenan, you were

10   trying to see is there some other alternative

11   explanation for this state of malnutrition, but here we

12   see no contraindications providing full nutrition;

13   correct?

14       **A.    Correct.  That's why GI got involved.  GI was**

15   **consulted to help determine if there is some sort of,**

16   **you know, basis for him -- even if -- let's say if he**

17   **were getting adequate nutrition via eating it, if it was**

18   **passing through, if he's having diarrhea or some other**

19   **issues, and so based on what I remember from GI, they**

20   **didn't find anything that would explain the degree of**

21   **malnutrition, and then Nutrition is also here also**

22   **supporting that statement.**

23       Q.    Which leads to the next paragraph, "Unsafe for

24   discharge.  Mom does not seem to be able to grasp that

25   she is withholding adequate nutrition from the child.

81

1  Mom is also exhibiting manipulative behaviors.  She

2  stated, 'You agree that we will just give him food and

3  that it will take a long time to increase amounts, so we

4  will do that in outpatient instead of giving Elecare,'"

5  E-L-E-C-A-R-E, "'or Neocate,'" N-E-O-C-A-T-E, close

6  quote.

7          "RD repeatedly explained to Mom that we

8  will follow physician's orders with starting formula if

9  needed.  Patient must demonstrate adequate nutritional

10  intake with weight gain while in the hospital.  We will

11  not drap out the amount of time" -- is that -- is "drap"

12  the right word there?

13  **A.    I think that's a typo.**

14  Q.    Yeah, it should be drop.

15  **A.    I think it's drag.**

16  Q.    Drag.  Oh.

17          MS. DEAN:  Or draw.

18  **A.    Or draw.**

19  Q.    BY MR. CROWN:  "We will not draw out the amount

20  of time that inadequate nutrition is being provided as

21  this is harmful to the patient."

22          So again, this is right in line with when

23  you're meeting with DCS, so I assume you agree with this

24  paragraph, it was part of your discussions, and if you

25  can elaborate, I'd appreciate that.

1    A.    This is -- this is my -- it's kind of hard to,

2   like -- yes, this is my general experience through my

3   interactions with Mom, that I felt like there was some

4   token gestures to participate in his care and some

5   concessions and then a feeling of, "But I kind of really

6   want to do my own thing."

7              Yeah, this kind of encapsulates my

8   experience.  There was -- the understanding with Mom,

9   though -- so we didn't say Mom had to do Elecare or

10  Neocate.  This was just part of the discussion or

11  recommendations from Nutrition.

12             I discussed with Mom that that would be

13  one possible way to help him meet his nutritional needs

14  without having to add a whole bunch of foods.  Mom

15  didn't like that plan, so we were pursuing a different

16  plan, but then Mom also wasn't achieving his nutritional

17  needs based on that per what RD was saying, so we were

18  kind of in a stalemate, so to speak.  We weren't making

19  progress.

20   Q.    And Kenan's in a medical compromise, and

21  there's no physiologic reason for that medical

22  compromise.  It is induced by Mom's insufficient,

23  inadequate diet for Kenan; correct?

24             MR. CONNELLY:  Form and foundation.

25   A.    I mean, that was the leading diagnosis at the

1 time, yes.

2    Q.    BY MR. CROWN:  So at the bottom of this

3 page, 1157, the very first recommendation is DCS hold,

4 and that was something that you supported as the

5 treating hospitalist, pediatric doctor?

6    **A.    Yeah, I did not think it was safe for this**

7 **patient to go home with Mom at that time.**

8    Q.    And when you met with the DCS investigator on

9 December 26th in that conference room, you advised them

10 that you supported a DCS hold on Kenan?

11            MR. CONNELLY:  Form and foundation.

12    **A.    I don't remember what my -- like I said in my**

13 **earlier statement, that was my specific recommendation,**

14 **that at least DCS takes medical decision-making power so**

15 **we can feed him and determine if he actually had any**

16 **true allergies or not.**

17    Q.    BY MR. CROWN:  Explain that a little bit more.

18 You -- you were supporting DCS to take over medical

19 decision-making for Kenan?

20    **A.    So I -- I mean, I'm not a DCS worker, so I**

21 **don't know all the ins and outs of what each step meant,**

22 **but I felt like if Mom went home, based on Mom's**

23 **understanding and her desires, she was going to again**

24 **put him on this restrictive diet and he was going to**

25 **worsen, and that would be potentially life or**



1    limb-threatening.

2              I didn't -- my suspicion was that, again,

3    Mom was doing this due to incorrectly perceived

4    allergies and intolerances, so my recommendation was

5    that -- and then Mom wouldn't allow us to proceed with

6    actually testing the patient with some of these foods or

7    very, very minimal concessions to do so.

8              So then my recommendation was that DCS

9    take over decisions on what the patient could eat or

10   not.  I don't know -- and then that was kind of up to

11   them on how to proceed with that, but that was my

12   recommendation.

13   Q.    If I can ask you to turn to page 1161.  Now,

14   this is past the time of your involvement, I believe.  I

15   just want to verify that with you.  These are notes from

16   December 28, 2018, I believe that was a Friday, and

17   there was a conference as reported on this page.

18              "The registered dietician was present for

19   a care conference meeting with Mom, Dad, Dr. Nourani,

20   Case Management, Social Worker Ashley, SCAN NP and M.D.

21   and DCS."  You're not the M.D. that would have attended

22   that conference; correct?

23   A.    Correct.

24   Q.    Okay.  If I can ask you to turn to page 9.  It

25   will be at the front of Exhibit Number 1.  Now, this is



85

1  in the Discharge Summary, and as indicated, Kenan was

2  discharged to foster care pursuant to Court order on

3  January 7th, 2019.

4            And we see on this page Discharge

5  Information, and there's a series of diagnoses, and

6  that's, again, consistent with the diagnoses that were

7  in place when you were treating Kenan 12-24-18, 12-25-18

8  and 12-26-18; correct?

9      **A.    Correct.**

10     Q.    And ultimately, the discharge plan to a foster

11 family was also consistent with your recommendations

12 that he not be discharged home to his Mom without any

13 intervention or supervision; correct?

14           MR. CONNELLY:  Form and foundation.

15     **A.    Yeah -- well, that wasn't my final**

16 **determination to make as for who he went -- at that**

17 **time, the determination was he was not safe to go home**

18 **at the time of my meeting with DCS.  What happened after**

19 **that is out of my control.**

20     Q.    BY MR. CROWN:  Sure.

21           If I can ask you to turn to page 10.

22 About 10 lines down, there's a sentence in this

23 Discharge Summary, and again, I want to see if it just

24 jogs any memory with you.  It says, "After the care

25 conference, DCS decided to take custody of Kenan and his



86

1  twin brother and parents were asked to leave the

2  hospital."

3          Do you recall when you were involved

4  directly with Kenan's care any points where, you know,

5  there was some direction for Mom or Dad to be asked to

6  leave Kenan's room or, as stated here, asked to leave

7  the hospital?

8      **A.    Not when I was in his -- or when he was in my**

9  **care, no.**

10     Q.    Okay.

11     **A.    This happened afterwards.**

12     Q.    I'll ask you to turn to page 41.  Page 41 is

13  titled Depart Summary Documents, and when we go down to,

14  Suspected Child Abuse, "Date:  12-26-2018; working;

15  Confirmation:  Confirmed," that would be the date where

16  you were in charge of Kenan's care, and I would assume

17  that that's your finding; correct?

18     **A.    I don't remember if I was the one that added**

19  **this diagnosis code or not.**

20     Q.    Certainly, it's consistent with everything

21  you've been describing --

22     **A.    Yes.**

23     Q.    -- to us here today --

24     **A.    Yes.**

25     Q.    -- at your deposition?

87

1    **A.    I would agree with that diagnosis.**

2    Q.    Okay.  If I can ask you to turn to page 65.

3  Under the section Clinical Diagnoses, the very first

4  one, "Suspected child abuse.  Diagnosis date,

5  12-26-2018.  Confirmation:  Confirmed," same answer,

6  you're not sure if you entered that or not, but you

7  would agree with that diagnosis?

8    **A.    Yes.**

9              MR. CROWN:  Dr. Stewart, that's all the

10 questions I have for you.  I want to thank you for your

11 testimony here today.

12             **THE WITNESS:  You're welcome.**

13

14                    EXAMINATION

15 BY MS. JUDD:

16   Q.    Dr. Stewart, I do have just a few questions for

17 you.  Let me introduce myself.  My name is Pamela Judd,

18 and I represent Southwest Human Development.  You

19 testified to a great extent today (indiscernible) --

20             (Discussion off the record.)

21   Q.    BY MS. JUDD:  And, Dr. Stewart, I was saying

22 that you've testified to a great extent about Kenan's

23 medical case that you were involved with in December of

24 2018.  In addition to testifying based on the medical

25 records you've seen today, do you have a personal



88

1  recollection of this child's case?

2    **A.    After reviewing things, it's hard to separate**

3  **out what I know from reviewing and what I remember, but**

4  **I do remember, like, interactions and things separately,**

5  **yes.**

6    Q.    Does this case stand out in your mind from

7  other children that you've treated?

8    **A.    Yes.**

9    Q.    Why is that?

10   **A.    It's pretty rare, so it's a very unique**

11  **situation and difficult, you know -- difficult**

12  **discussions, difficult questions to answer, and, you**

13  **know, weighs on you when you're asked to make decisions**

14  **about a child's future like this.**

15   Q.    And when you said it's very rare, what are you

16  referring to?  What was rare?

17   **A.    The rare situation where you have a parent who,**

18  **you know, is very attentive and loving and caring for a**

19  **child and whatever degree of abuse or harm is**

20  **unintentional in a way where it's not being -- you know,**

21  **when you -- like, most common forms of abuse and neglect**

22  **come either in the form of some inflicted harm or trauma**

23  **by a parent or neglect as in just not seeking care and**

24  **being dismissive or forgetful of a child.**

25           **Neither of those really applied here.**



1    This is a more rare situation where Mom's misperceptions

2    of a situation was leading to harm, but it wasn't due

3    directly -- the terms "abuse" -- like, there's harm

4    being done, but it wasn't, like, an intentional intended

5    harm.  So that's where the rare part is where that --

6    that doesn't happen super frequently in the hospital.

7        Q.    And you attributed this to Mother's

8    misappreciation of what was occurring with regard to the

9    child's diet; is that accurate?

10       A.    Yeah, at the time, that was my suspicion.

11   Again, I -- when the decision to start introducing food

12   started to occur, I was no longer in his care, but that

13   was my suspicion.

14       Q.    And you spent -- is it true that you spent some

15   time trying to counsel or get through to Mother about

16   the concerns you had with his limited diet?

17       A.    Yes.  Again, like, my -- yes, yeah, I feel like

18   I tried.  Yeah, I talked to Mom.  I tried to work with

19   her and partner with her, like, while he was in the

20   hospital to see if she would let us try some things.  I

21   mean, I think -- I mean, there was some efforts to try a

22   few things I can't remember.  Yeah, that was the

23   attempt.

24       Q.    In addition to yourself, were the other

25   providers at the hospital also trying to have these



90

1   conferences or discussions with the mother relating to

2   the food restrictions contributing to Kenan's condition?

3              MR. CONNELLY:  Form and foundation.

4        **A.    I don't remember specifically what their**

5   **involvement were in that aspect.  I feel like the**

6   **nutritionists were trying to partner, trying to suggest**

7   **new foods to try from my discussions with them, but it**

8   **was a long time ago.**

9        Q.    BY MS. JUDD:  And earlier you testified as to

10  there were rules you wanted the mom to follow to move

11  the patient along and that the mom was very resistant

12  and you were getting a lot of pushback.  Is the person

13  you were getting the pushback from the mother?

14       **A.    Yes.**

15       Q.    And was she -- when you said she was -- you

16  were getting pushback, was it that she would not listen

17  to you or that she did not comprehend?  Can you describe

18  what you meant by "pushback"?

19       **A.    It's more that she disagreed.  She felt that**

20  **she knew better than, you know -- just generally, there**

21  **was a disagreement.  I feel like she understood.  I**

22  **didn't feel like -- I felt actually like she was very**

23  **intelligent, and she -- I think she had a background in**

24  **nutrition science.**

25              **She also was a nutritionist or registered**

91

1  dietician, so I don't think there was any issue on her

2  understanding what was said.  It's more just a

3  disagreement on treatment and risks and things like

4  that, so that's where a lot of the attempts to try to

5  compromise were happening.

6      Q.    And do you personally feel that you were ever

7  able to get through to the mother about the dietary

8  needs that Kenan had that weren't being met?

9              MR. CONNELLY:  Form and foundation.

10     A.    I don't think -- no, I don't think Mom ever --

11 no.

12     Q.    BY MS. JUDD:  So, no, you were not able to get

13 through to her?

14     A.    No, I don't think so.

15             MS. JUDD:  I have no further questions.

16 Thank you for your time, Dr. Stewart.

17             MR. CONNELLY:  Okay.  I have a few

18 questions.

19

20                    EXAMINATION

21 BY MR. CONNELLY:

22     Q.    Just to follow up a couple of questions that

23 Ms. Judd was asking, the mother, Jessica, she wasn't

24 dismissive of everything the hospital was trying to do;

25 right?



**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.

92

1    A.    Yeah, I'd say she wasn't complete dismissive,

2    yeah.

3    Q.    There was some disagreement, but she wasn't

4    completely dismissive of everything that you were trying

5    to do at the hospital; right?

6    A.    Yeah, I feel like there was some give and take

7    happening, yes.

8    Q.    And at the time that you were interacting with

9    the mother and the child, the parents still had

10   guardian -- DCS had not taken custody of the child;

11   right?

12   A.    Correct.

13   Q.    So the parents were the people to be talking to

14   about what you wanted to do, what the plan was for the

15   child, what the medical plan was for the child and what

16   kind of things you wanted to do from a medical

17   perspective; correct?

18   A.    Yes.

19   Q.    And were there times that you had to ask for

20   and receive written consents for anything you were doing

21   from the parents?

22   A.    Not that I recall.

23   Q.    Okay.  So you never had a situation where the

24   parents refused to give you or the mother refused to

25   give you written consent for anything you wanted to do;

93

1    right?

2    **A.    Yeah, as far as I remember, correct.**

3    Q.    And Mr. Crown near the end of his questioning

4    took you through some early pages in the Exhibit 1, so

5    let's just look at page 10 for a minute.  We've heard

6    today that one of the presenting conditions was some

7    cardiac -- cardiac issues, some pulmonary issues, right,

8    and Mr. Crown kept saying that you were attributing all

9    of those things to malnutrition.  That's not correct,

10   though, is it?

11   **A.    It's -- our working diagnosis at the time was**

12   **that it was due to malnutrition.  That's what Dr. Miga**

13   **articulated to me was our working diagnosis, but we**

14   **hadn't ruled out anything.**

15   Q.    Right.

16   **A.    Yeah.**

17   Q.    And even at the time that the child was

18   discharged, you hadn't ruled out things that could have

19   been causing the pulmonary hypertension that were other

20   than malnutrition; right?

21   **A.    Well, at the time that -- I wasn't -- I didn't**

22   **discharge him.**

23   Q.    Right.

24   **A.    But at the time that I saw him, we hadn't ruled**

25   **everything out.**



Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

94

1    Q.    Right.

2            And then if you just look at page 10,

3    there is -- I guess the second paragraph, it says,

4    "After speaking to cardiology, the cause of his

5    pulmonary hypertension is still under investigation and

6    needs further follow-up."  Do you see that?

7    **A.    Sorry.  Where?**

8    Q.    I guess it's the second paragraph.  I mean,

9    it --

10   **A.    Okay.  Yeah.**

11   Q.    It's hard to distinguish paragraphs on this

12   page, but do you see where I'm speaking about?

13   **A.    Yes, uh-huh.**

14   Q.    All right.  And so at the time that he was

15   discharged in January of 2019, there was still no

16   understanding of what the cause of the pulmonary

17   hypertension was; correct?

18   **A.    Yeah, there had been no final determination.**

19   Q.    No final determination.

20           So you can't sit here and testify today

21   that the pulmonary hypertension was caused by

22   malnutrition, can you?

23           MR. CROWN:  Object to form.

24   **A.    So when I had the patient at the time, I**

25   **wouldn't -- it's kind of a -- in medicine, when you**

1    offer a diagnosis, it's -- it's what's called your

2    working diagnosis where you say this is most probable.

3    But in medicine, there's always -- it's one in a

4    million -- you know, there's some other thing.

5              So when you asked, like, could -- based on

6    the history, based on his exam, based on his clinical

7    findings, it would be appropriate in medicine to give

8    him the diagnosis of malnutrition and to say -- like,

9    it's, like, saying by far the most likely cause of his

10   pulmonary hypertension, heart failure, but that doesn't

11   rule out everything.

12      Q.    BY MR. CONNELLY:   Right.

13      A.    So it's kind of -- I think there's a difference

14   between how maybe medical terms, how we would term it

15   verse the legal.   I don't know.

16      Q.    Well, all I know is the records here say that

17   the cause of the pulmonary hypertension is under

18   investigation and needs further follow-up; right?

19      A.    Yeah, that's appropriate, yeah.

20      Q.    Do you know what further follow-up, if any, was

21   done on the pulmonary hypertension to determine its

22   cause?

23      A.    No.  Talking about discharge or when we come

24   off service, we no longer follow the patients.  It falls

25   to the subspecialists.

96

1    Q.    All right.  Now, you talked about malnutrition,

2   and if you'll look at page 7 -- I'm sorry.  Keep your

3   finger on page 7.  We'll come back to that.

4            I need you to look at page 59.  Do you

5   understand that the physical examination and other

6   history here was taken at the time of admission to

7   Banner?

8    A.    Yes.

9    Q.    All right.  And at the time of admission on

10  December 18th of 2018, Kenan's weight was 18.2

11  kilograms --

12   A.    Uh-huh.

13   Q.    -- correct?

14   A.    Uh-huh.

15            MS. DEAN:  That's "yes"?

16   Q.    BY MR. CONNELLY:  Is that a "yes"?

17   A.    Yes.

18   Q.    18.2 kilograms calculates out to 40.12 pounds.

19  Do you -- do you agree with that?  Can you --

20   A.    Yes.

21   Q.    -- do that conversion in your head?

22   A.    Yep.  That sounds accurate, yes.

23   Q.    Okay.  I mean, I used a conversion calculator,

24  and that's what it comes out to.

25            And isn't it true that for a six-year-old,

1   the normal weight that you would expect a six-year-old

2   to weigh is 36 to 60 pounds?

3       A.      So I'd have to see it on a growth chart.  The

4   context that's missing here, though, is that he was

5   fluid overloaded, so he had fluid -- significant fluid

6   edema.  So if a significant portion of his weight is due

7   to retaining fluid due to heart failure, which you'd

8   expect, then you would have to diuresis him and then

9   actually get a dry weight.

10              So it's not uncommon that we get patients

11  with, like, kidney failure, for instance, who have,

12  like, one or two kilos' worth of excess fluid weight on

13  them that isn't their --

14      Q.      Okay.

15      A.      -- normal fluid --

16      Q.      So you --

17      A.      -- weight.

18      Q.      I'm sorry.  I didn't mean to step on you.  Were

19  you done?

20      A.      Yeah, that's -- yeah, go ahead.

21      Q.      Okay.  So let's assume that this 18.2 kilograms

22  includes a kilogram or two of fluid weight.  Okay.  If

23  we -- so if we go to 17.2 kilograms, 17.2 kilograms

24  would be 37.9 pounds; right?

25      A.      Uh-huh.

98

1    Q.    Is that a "yes"?

2    **A.    Yes.**

3    Q.    And 37 pounds is still within the normal weight

4    range for a child at six years old with a normal growth

5    rate; right?

6    **A.    Yes, assuming one kilogram of fluid, yes.**

7    Q.    Okay.  Do you know whether a -- what you called

8    a dry weight was ever done?

9    **A.    I don't remember what that weight would have**

10   **been, but he was getting daily weights.**

11   Q.    All right.  If we were to assume that 2

12   kilograms were weight -- were water, we get down to 16.2

13   kilograms, which is 35.7 pounds, which is just below the

14   low end of the 36 to 60 pounds; right?

15            MS. DEAN:  Foundation.  Do you have a

16   reference for the scale you're using?

17            MR. CONNELLY:  Yeah, I'm using children's

18   hospital -- Children's Wisconsin -- a chart by --

19   published by Children's Wisconsin hospital.

20            MS. DEAN:  Answer, if you know.

21            MR. CROWN:  And I'm going to also object

22   to foundation.

23   **A.    Without doing the math, I can take your word**

24   **for it.  It's kilogram -- it's kilograms times 2.2,**

25   **roughly, will get you pounds.  The -- so it's -- and**



99

1    it's not just weight for age.  It's also weight for

2    length.  So the way we do it in the hospital and the way

3    the nutritionists do it is they plot patients on a

4    growth chart and they look at his current weight, and

5    they also look at trajectory.

6                So another way that you would determine

7    failure to thrive would be if a patient was crossing

8    percentiles.  So, like, for instance, if a patient was

9    at the 90th percentile and then got sick with something

10   and then dropped down to the 20th percentile, that would

11   still consider -- could be considered malnutrition or

12   failure to thrive.

13               It would still be in the normal range of

14   weight for their age, but the fact that they've had such

15   a drastic drop in their weight or if they've even lost

16   height, then that would trigger a concern for

17   malnutrition.

18   Q.    BY MR. CONNELLY:  Okay.

19   A.    So --

20   Q.    And do you know why the height's not indicated

21   here on this record?

22   A.    No, I don't know.  I mean --

23               MS. DEAN:  It is on -- I mean, it does

24   appear in the record, but...

25               MR. CONNELLY:  Well, what page are you

100

1   looking at?

2          MS. DEAN:  I'm looking at page 7.

3          MR. CONNELLY:  Yeah, on page 7, right, the

4   height is 86.5 centimeters, which is 37.9 inches.

5   **A.    So the best determination for his malnutrition**

6   **would be actually to look at points plotted on a growth**

7   **chart.**

8   Q.    BY MR. CONNELLY:  And did anybody at Banner do

9   that?

10  **A.    Yes.  I have a recollection of looking at his**

11  **growth chart, but --**

12  Q.    Okay.  You haven't seen it in any of the

13  records today; right?

14  **A.    Huh-uh, no.**

15  Q.    Okay.

16  **A.    That would be the best way.**

17  Q.    And so when he came into the hospital, he

18  weighed 18.2 kilograms, and then on the 24th, when we

19  begin looking at your records, if you look at page 997,

20  his weight is down to 17.7 kilograms.  Do you see that?

21  **A.    Yes, uh-huh.**

22  Q.    And is that a dry weight or does that still

23  reflect there being some water weight in there?

24  **A.    It's hard to -- I can't know just by looking at**

25  **a weight.  It's -- so it's a weight.  It's also how a**

101

1  patient looks, so, you know, if they have edema.  So it

2  would be, like, the whole exam, so maybe --

3      Q.    Okay.  Do you agree with me, though, that 17.7

4  kilograms is lower than 18.2 kilograms?

5      A.    Yes.

6      Q.    And then at the time that he was discharged on

7  January 7th, that's page 7, at that time, he weighed 18

8  kilograms; right?

9      A.    Yes.

10     Q.    So from the time that he came into the hospital

11 on December 24th -- or, excuse me, December 18th of 2018

12 to the time that he was discharged on January 7th of

13 2019, there wasn't much movement in his weight, was

14 there?

15     A.    No.

16     Q.    And in fact, he lost .2 kilograms between

17 December 18th and January 7th; right?

18     A.    That is correct.

19     Q.    So was he malnourished at the time that he was

20 discharged?  If your testimony is that he was

21 malnourished at the time that he was admitted --

22     A.    Uh-huh.

23     Q.    -- was he then malnourished at the time that he

24 was discharged?

25     A.    No, because, again, you have to take it all in

1  context of, you know, the fluid management, so amount of

2  fluid that he had when he came into the hospital.  And

3  so generally, when we have patients who come into the

4  hospital and we're trying to determine if they're

5  malnourished or failure to thrive, there's multiple

6  things you look at.  You don't just pick a weight at

7  start and weight at finish.

8           So before you can send a kid home, you

9  want them eating sufficient calories documented by the

10 dietician.  You generally want to take whatever their

11 base -- their lowest weight is in the hospital and then

12 you want to see a couple of days where they're

13 increasing weights.  And I wasn't the doctor who

14 discharged, but general -- in general practice, a kid

15 who has failure to thrive, you want at least two days of

16 documented weight gain.

17    Q.    Okay.  And you're unable to testify as you're

18 sitting here today about two days of documented weight

19 gain; right?

20    A.    Correct.  I was not his doctor at the time.

21    Q.    Okay.  So you don't know whether that occurred

22 or not as you're sitting here today?

23    A.    Correct.

24    Q.    All right.  And as you've noted -- I think

25 maybe you didn't note this exactly, but it was the

103

1  parents who brought the child into the hospital to begin

2  with; right?

**3      A.    Correct, yes.**

4      Q.    It wasn't DCS and it wasn't some third party.

5  It was the parents who brought the child in because they

6  were concerned about his health and well-being; correct?

**7      A.    Correct.**

8      Q.    And you've testified here today that there was

9  nothing in Mother that you saw where she was

10  intentionally causing any harm or medical issues; right?

**11     A.    Correct.**

12     Q.    And although you used the word "fictitious"

13  when you were describing some of the -- allergies, was

14  it?

**15     A.    Sensitivities.**

16     Q.    -- the sensitivities or the tolerances to food,

17  although you used the word "fictitious," you weren't

18  suggesting that Mother was a Munchausen parent, were

19  you?

**20     A.    Yeah -- no.  Munchausen by proxy is -- is --**

**21  wouldn't apply here.**

22     Q.    Or fictitious disorder --

23             MR. CROWN:  I'm sorry.  Doctor, were you

24  done with your answer?

**25     A.    Not -- not quite.  Sorry.**

104

1              MR. CROWN:  Okay.

2     Q.    BY MR. CONNELLY:  Well, that's fine --

3              MR. CROWN:  No, no, no, no.

4     Q.    BY MR. CONNELLY:  -- but when we're talking --

5              MR. CROWN:  No, no, no.

6     Q.    BY MR. CONNELLY:  -- about Munchausen by

7  proxy --

8              MR. CROWN:  He gets to finish his answer.

9     Q.    BY MR. CONNELLY:  -- we're also talking about

10  fictitious disorder --

11             MR. CROWN:  I want our record clear.

12  Please finish your answer.

13             Then you can ask your next question.

14  That's the rules.

15             MR. CONNELLY:  You know what, I appreciate

16  it, but that's not a proper objection.

17             MR. CROWN:  Well, sure, it is.  I'm not

18  going to --

19             MR. CONNELLY:  No, it's not.

20             MR. CROWN:  -- this in the moment.

21     A.    So Munchausen by proxy suggests a certain

22  intentionalness about Mom to seek some sort of primary

23  or secondary gain, like attention seeking would be a

24  primary gain.  So I don't think that that would apply.

25  It's hard to say just after the three days I spent with

Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

105

1  Mom.

2          Fictitious disorder gets a little grayer,

3  but also would imply, like, an intentional -- like,

4  intentional making up of symptoms in order to -- for

5  whatever reason, attention or getting the medical

6  community involved, whatever.  So I don't feel like

7  Mom -- I believe that the symptoms that Mom was

8  describing and seeing to her appeared real and

9  legitimate.

10     Q.    BY MR. CONNELLY:  Right.

11     A.    Yeah.

12     Q.    So you never made a diagnosis of Munchausen by

13  proxy or a fictitious disorder in the mother; right?

14     A.    No, I did not.

15     Q.    And in fact, you would be -- you wouldn't be

16  qualified to make that kind of a diagnosis, would you?

17     A.    No, that --

18          MR. CROWN:  Objection to form and

19  foundation.

20     A.    Yeah, that wouldn't -- that's not -- I could

21  say, like, I suspect that this is what's going on.

22     Q.    BY MR. CONNELLY:  Sure.

23     A.    I wouldn't say that in this situation, but

24  let's say I did have a situation where I suspected, I

25  could say that that's -- but I'm not Mom's doctor.  I'm

106

1   not -- I'm not her therapist to diagnose her with that

2   condition.

3       Q.    And that's a mental health diagnosis, isn't it?

4       A.    Yes.

5       Q.    And you're not a psychologist or a psychiatrist

6   or a mental health doctor; right?

7       A.    Correct.  What I would diagnose would be

8   suspected child abuse or child abuse, and then it would

9   be secondary to suspected Munchausen by proxy.  That's

10  what I would document, but I wouldn't make -- I wouldn't

11  be diagnosing Mom with -- I'm not her doctor.

12      Q.    And -- and in this case, you're not saying

13  suspected child abuse secondary to Munchausen or

14  fictitious disorder; correct?

15      A.    That would not be -- at that time and then also

16  at present, that's not the diagnosis I would use with

17  Mom.

18      Q.    Okay.  Just so I'm clear about your background,

19  at the time that you started at -- at the time that you

20  saw Kenan in December of 2018, you had been board

21  certified for -- you said you were certified in October

22  or November of 2018; right?

23      A.    Yes.

24      Q.    Do you remember when it was?

25      A.    I'd have to look at my board certification.

1    Q.    Okay.  So at best, you were board certified for

2  maybe two months at the time that you first saw Kenan in

3  2018; right?

4    **A.    Uh-huh.**

5    Q.    Is that a "yes"?

6    **A.    Yes.**

7    Q.    And when were you licensed in Arizona?

8    **A.    So I was licensed -- I had a resident license**

9  **in 2015, so I was practicing under a resident license**

10  **in 2015.**

11    Q.    Right.

12    **A.    And then I received my own license in -- for --**

13  **as an attending in 2018.**

14    Q.    And do you remember what month that was?

15    **A.    It would have been probably August, July or**

16  **August.  I started at Banner August 1st, so it would**

17  **have had to have been before August 1st --**

18    Q.    Okay.

19    **A.    -- like July, June or July.**

20    Q.    So as far as being a licensed physician in

21  Arizona at the time that you saw Kenan, that had only

22  occurred maybe, at best, four months before you saw

23  Kenan as the hospitalist; correct?

24    **A.    That's correct.**

25    Q.    And you said there's a subspecialty available

1  for pediatric hospitalists, but you're currently not

2  certified in that subspecialty; right?

3  **A.    No, I'm eligible, and I sit for the exam in**

4  **November.**

5  Q.    And you were not certified in that subspecialty

6  in December of 2018; correct?

7  **A.    Correct.**

8  Q.    And during the time that you were caring for

9  Kenan, did you ever reach out to his primary-care

10  physician about your diagnosis of malnutrition or

11  failure to thrive?

12  **A.    So specifically, are you talking, like, his**

13  **clinic doctor?**

14  Q.    Yeah, like, the doctor he had been seeing on a

15  regular basis since he was born.

16  **A.    No, I did not call his clinic.**

17  Q.    Okay.  And that doctor would be a mandated

18  reporter; right?

19  **A.    Yes.**

20  Q.    And he would be mandated to report any

21  suspicion of failure to thrive or malnutrition; correct?

22  **A.    Correct.**

23  Q.    And are you aware of any prior reports of

24  suspicion of malnutrition or failure to thrive made by

25  the primary-care physician?



1    A.    I'm not.

2    Q.    You're not part of the SCAN team at Banner, are

3 you?

4    A.    No.

5    Q.    And you testified earlier that SCAN team's

6 involvement was significant to you in the way you

7 approached the case.  Is that a fair summary of your

8 earlier testimony?

9    **A.    Yeah, I mean, it was a factor in how I took**

10 **care of Kenan.**

11    Q.    And when the -- when the SCAN team is involved,

12 right away what you know is that somebody believes that

13 this child has been abused or neglected; correct?

14    **A.    Yes, that there's at least some -- that there's**

15 **a concern of a social contribution, so something at**

16 **home, so parent or family members contribute to the**

17 **patient's condition, yes.**

18    Q.    Okay.  And so the first time that you get

19 involved in the case and have any conversation with the

20 mother is at a time when you've got in the back of your

21 mind that this child has been abused or neglected by

22 this woman; right?

23    **A.    Yeah, yes.**

24    Q.    Now, you said a couple of times during your

25 testimony that without medical intervention, that Kenan



1  would have been facing a life-threatening situation, and

2  I'm just wondering if you can put some time parameters

3  around that.

4           Let's say that Kenan hadn't come into the

5  hospital on December 18th.  His mother hadn't brought

6  him into the hospital.  Given what you know about the

7  conditions he had upon his admission to the hospital,

8  how long would he have been able to live with those

9  conditions?

10          MS. DEAN:  Foundation.

11     **A.    It's a much better question for Dr. Miga to**

12  **answer since he, you know, deals with these types of**

13  **problems more specifically, so I can't really say**

14  **without -- it would be kind of hazarding a guess.**

15  **Maybe, like, 12 months, a year, I don't know, or less.**

16     Q.    BY MR. CONNELLY:  12 months to a year?

17     **A.    Yes, that's -- that's, like, my generous**

18  **contribution, would be that.  Beyond a year with no**

19  **change in his diet, yeah, maybe about a year.**

20     Q.    All right.  So not a day or two days.  A year

21  or so?

22     **A.    I don't know.  I don't know, yeah.**

23     Q.    Okay.  We saw --

24          MR. CONNELLY:  Are you okay, Larry?  Do

25  you need a break?



111

1          MR. CROWN:  No.  Thank you.

2      Q.    BY MR. CONNELLY:  We saw your orders, and those

3  begin on page 179.  I'm just wondering -- they begin on

4  page 179, and of the pages that Mr. Crown's included

5  here, they go from 179 to 191.  Which of those orders

6  are testing for food allergies or sensitivities?

7      **A.    So none of these orders would test for those**

8  **specifically.**

9      Q.    Okay.

10     **A.    The -- I think there was one that's called**

11 **pancreatic lipase.  Yeah, pancreatic elastase, that's**

12 **looking for, like, cystic fibrosis.**

13     Q.    And that's on page 184?

14     **A.    Yeah.**

15     Q.    That's looking for what?

16     **A.    Cystic fibrosis.**

17     Q.    Cystic fibrosis.

18     **A.    Or -- or other causes of -- like, other causes**

19 **of malnutrition, like malabsorption in the gut.**

20     Q.    Okay.  But other than that, there are no tests

21 that you ordered to test for food allergies or

22 sensitivities?

23     **A.    No.  So at Banner Children's, we don't do the**

24 **allergy testing, so part of the plan was for Mom to**

25 **return back to Phoenix Children's Hospital to allergy**



112

1    immunology department to do specific allergy testing.

2    Q.    Okay.  And do you know if that was done or not?

3    A.    No, I do not.

4    Q.    Okay.  Did you do -- are there any tests in

5    these pages, 179 to 191, where you're testing for

6    urinary mycotoxins?

7    A.    No.

8    Q.    Okay.  So there was no testing that you did to

9    determine whether there were any -- the presence of any

10   mycotoxins that would be caused by mold; correct?

11   A.    Correct.

12   Q.    And do you agree with me that if someone has

13   the presence of mold toxins in their body, that it can

14   cause some of the symptoms that Kenan had upon admission

15   to the hospital?

16         MR. CROWN:  Objection, form and

17   foundation.

18   A.    So I've never seen that, so I have difficulty

19   answering that.  Dr. Miga might be a better one to

20   answer that one as a subspecialist.

21   Q.    BY MR. CONNELLY:  Okay.  And you agree you're

22   not a microbiologist; right?

23   A.    Correct.

24   Q.    You're not a mycologist; right?

25   A.    Correct.

113

1    Q.    You've never studied mold or other fungi; is

2    that right?

3    **A.    Correct.**

4    Q.    You're not a neurologist.  You're not trained

5    in mold-related illnesses; right?

6    **A.    Correct.**

7    Q.    Did anybody at Banner who was a mycologist

8    examine Kenan at all?

9    **A.    Not to my recollection, no.**

10    Q.    Are there such people on staff at Banner?

11            MS. DEAN:  Foundation.

12    **A.    There -- at that time, we had infectious**

13    **disease specialists, but we didn't have a mycologist on**

14    **staff that I -- not a pediatric mycologist.**

15    Q.    BY MR. CONNELLY:  Okay.  So you don't know

16    whether or not close exposure to black mold for a

17    lengthy period of time can cause muscle weakness or

18    lethargy, for instance; right?

19            MR. CROWN:  Object to form and foundation.

20    **A.    Yeah, I don't -- I can't say specifically.**

21    Q.    BY MR. CONNELLY:  And you don't know if it

22    could lead to symptoms that might reduce appetites;

23    right?

24    **A.    Correct.  It's not my area of expertise.  It's**

25    **a rare enough condition that they don't --**

114

1    Q.    There's no question pending, Doctor.

2          Now, on page 1085 is a discussion about

3    the diet that the kids were on down at the bottom there

4    where it talks about Dad reports that Kenan -- I'm

5    sorry.  That's not what I was looking for.

6          Right below that, regarding nutrition, Dad

7    reports about the New Zealand lamb and all that; right?

8    Do you see that?

9    **A.    Uh-huh.**

10         MR. CROWN:  What page are you on?

11         MR. CONNELLY:  1085.

12   Q.    BY MR. CONNELLY:  Is it your understanding or

13   do you know whether the parents were on the same diet,

14   eating the same foods that the children were eating?

15   **A.    I'm not sure actually.**

16   Q.    Did you ever ask Mother or Father that?

17   **A.    I did not.**

18   Q.    Okay.

19   **A.    Not to my recollection.**

20   Q.    Did either Mother or Father look

21   malnutrition -- malnourished to you?

22   **A.    Not to my memory.**

23   Q.    And you were able to -- you saw and spoke to

24   Mother a number of times; right?

25   **A.    Yes.**

115

1     Q.    And did you see and speak with Father as well?

2     A.    Yes.

3     Q.    Okay.  And on this page right above the Other

4   on the Development, it says, "The child's development

5   was unremarkable.  Dad reports that Kenan achieved

6   normal developmental milestones at age-appropriate

7   intervals."  Do you see that?

8     A.    Yes.

9     Q.    And do you have any reason to dispute that?

10     A.    No.

11     Q.    In fact, you never obtained the records from

12   the children's primary-care physician to determine

13   whether or not the children had been meeting their

14   developmental milestones at age-appropriate intervals;

15   right?

16     A.    Not to my recollection, no.

17     Q.    Okay.  And that would be something that would

18   be kind of important to your diagnosis of failure to

19   thrive, wouldn't it?

20            MR. CROWN:  Objection to form and

21   foundation.

22     A.    It depends on -- like, failure to thrive can

23   start at any time.  So if you're talking about

24   developmental milestones, if he, you know, had normal

25   development through the first four years of life and met



1  all of his milestones and then the malnutrition, failure

2  to thrive started at some point later than that, and at

3  that point, he completed the majority of his primary

4  neurological development, and then mainly at this point,

5  let's say in the last year before he came in, is more of

6  an issue of height and weight, then he could still meet

7  the -- he could -- both things could be true where he

8  met his milestones, but then now he's showing signs of

9  malnutrition and failure to thrive.

10    Q.    BY MR. CONNELLY:  Okay.  And do you agree with

11  me that if the parents had the child on this GAPS diet

12  or a special diet and the children are meeting their

13  milestones, that there wouldn't be any reason for the

14  parents to suspect that there was anything deficient in

15  the diet; right?

16             MR. CROWN:  Objection to form and

17  foundation.

18    A.    So as long as the diet was the same since -- I

19  mean, you'd have to look at when -- I mean -- you're

20  asking me to put myself in the position of the parents.

21  Just, like -- so if I saw them in clinic and they had

22  made no changes to the diet, let's say, over a longer

23  period of time and then the changes started to happen

24  later and there didn't seem like there was a time

25  condition, then, yeah, you wouldn't necessarily

1  attribute it to the diet.

2          If the diet was becoming increasingly

3  restrictive and coincided with changes in height and

4  weight, then you would be suspicious.  And it's --

5  again, it's a long time ago, so it's hard to -- hard to

6  remember exactly what the time course was that Mom put

7  forth when speaking to her.

8  Q.    BY MR. CONNELLY:  And if the presence of the

9  mold infestation in the house was discovered after this

10 hospitalization, would it be reasonable for the children

11 to be tested and to consider whether the mold had been

12 an issue in Kenan's presenting problems in December of

13 2018?

14          MR. CROWN:  Objection --

15          MS. DEAN:  Form and foundation.

16          MR. CROWN:  -- form and foundation.

17 A.    That would be a better special -- question for,

18 like, a mycologist or someone who specializes in those

19 types of investigations, so I don't know specifically

20 which test that they would run or investigate.

21          The line of thinking is -- at the time

22 was, yeah -- so if Kenan in that situation wasn't

23 improving, then -- or -- you know, then -- with typical

24 interventions or the most -- like, when we start your

25 working diagnosis, you're starting to treat, and they

1    **fail to respond, then you start looking for the really**

2    **rare, weird things.**

3    Q.    BY MR. CONNELLY:  All right.  Now, but if the

4    child is outside of the home --

5    **A.    Uh-huh.**

6    Q.    After he leaves this hospital here in January

7    of 2019, he doesn't go back home; right?

8    **A.    Uh-huh.**

9    Q.    He goes into foster care?

10   **A.    Uh-huh.**

11   Q.    You understand that; right?

12   **A.    Yes, yes.**

13   Q.    And then it's discovered that there's mold in

14   the home.

15   **A.    Uh-huh.**

16   Q.    Do you think that it would be a good idea --

17   DCS has custody of the children now; right?

18   **A.    Uh-huh, uh-huh.**

19   Q.    Do you understand that?

20   **A.    Yes.**

21   Q.    Okay.  Would it be a good idea for DCS to then

22   come back either to PCH or to Banner or to some

23   mycologist to say, "Please test these children for mold

24   to see if they have toxins in their body and to tell us

25   whether or not the level of toxins might have caused

1  some of these issues with Kenan"?

2              MS. DEAN:  Form and foundation.

3              MR. CROWN:  Objection to form and

4  foundation.

5     A.    So -- so in medicine, we're trained to think

6  along the lines of probability.  So, like, is it

7  possible, yeah.  You're talking about a one in a million

8  situation.  Like, it's rare enough that, like, medical

9  schools and residencies, mold in houses isn't really

10 something that's stressed because it's so rare.  Is it

11 possible, yes.  Is it likely, no, it's not likely.  But

12 again, better question, I mean, calling a mycologist and

13 asking them, I mean, sure, that's --

14    Q.    BY MR. CONNELLY:  It makes sense?

15    A.    -- not a bad idea.  Is that typical or

16 standard -- that would be more or less above and beyond

17 the typical, but, yeah, I don't have a problem with it.

18    Q.    If you're still looking for answers to issues

19 you haven't resolved, you should look at all

20 possibilities, shouldn't you?

21    A.    Yeah, I think that's -- that's a reasonable

22 statement.

23    Q.    There's been some discussion today about -- or

24 Mr. Crown had you looking at a bunch of statements about

25 Mom's conduct in relation to the nutrition being given

120

1   at the hospital.  He had you look at page 146 (sic), but

2   he didn't have you look at the statement in the

3   nutritional communications.  Let me know when you're

4   there, page 1146.  I'm sorry.  I said 146, but I meant

5   1146.

6        A.    Yep, I'm there.

7        Q.    We've seen today that a lot of the notations

8   that were made about caloric intake and all were made by

9   Mother, right --

10       A.    Uh-huh.

11       Q.    -- while he was in the hospital?

12             Is that a "yes"?

13       A.    Yes.

14       Q.    And here in this paragraph at the very top,

15   there's a bunch leading up to this statement there.  The

16   second to last sentence, Mom had made estimates of 1,118

17   calories, 56 grams of protein, 92 grams of fat in the

18   lamb meatballs and other things that he had been fed.

19   And then it says, "To verify data using USDA database

20   nutrition for -- excuse me, let me restart.

21             "To verify data using USDA database for

22   nutrition analysis, Mom's estimates appear to be

23   accurate."  Did I read that correctly?

24       A.    Yes, uh-huh.

25       Q.    Okay.  So do you know why -- you see a bunch of

121

1    language that's stricken out below that section there?

2    **A.    Yes.**

3    Q.    Do you know why that's all stricken out?

4    **A.    Usually means the author is saying it was**

5    **entered in error.**

6    Q.    Okay.  And -- but on December 22nd of 2018,

7    Tracey Chacon -- is she the nutritionist or he?

8    **A.    I can't remember who Tracey was.**

9          MS. DEAN:  If you know.

10   **A.    Looks like a nutritionist.  I don't know.**

11   Q.    BY MR. CONNELLY:  Okay.  But in any event, the

12   estimates that Mother had been making for the calories,

13   at least here, were accurate; right?

14   **A.    Yes.**

15   Q.    She wasn't making it up?

16   **A.    Per Tracey's report, yes.**

17   Q.    Okay.  All right.  Now, you said a couple of

18   times that as far as a discharge plan goes, that you

19   wanted to ensure -- your goal would be to ensure that

20   there was a safe discharge plan that would take into

21   consideration Kenan's needs and make sure he was getting

22   the caloric intake that you believe he needed in order

23   to put on weight and to stimulate growth and all; right?

24   **A.    Correct.**

25   Q.    Did you specifically tell DCS that the child

122

1  could not go home with his mother under any

2  circumstances?

3      **A.    I did not --**

4          MR. CROWN:  Objection to form, foundation.

5      **A.    I did not specifically say that.**

6      Q.    BY MR. CONNELLY:  Okay.  So if Kenan had gone

7  home with in-home services in place, such as a

8  nutritionist that was coming out on a regular basis and

9  visits by DCS on a regular basis to weigh the child to

10  see if he was gaining weight, would that have addressed

11  your discharge objectives?

12          MS. DEAN:  Form and foundation.

13          MR. CROWN:  Objection to the form,

14  foundation.

15      **A.    Presumably, yes.**

16      Q.    BY MR. CONNELLY:  Okay.  And there would have

17  been plenty of time within a short period of time to

18  know whether or not he was getting the calories that he

19  needed to thrive because he would have been gaining

20  weight; right?

21          MS. DEAN:  Foundation.

22      **A.    Yeah, I mean, as if -- like, we'll do that**

23  **sometimes where patients or parents want to go home and**

24  **the parents are, you know, adherent to our plan and**

25  **patient's doing well and they're going to have close**

123

1    follow-up with their primary-care doctors and have

2    serial weights checked, you know, every week, they're

3    not in heart failure.  Yeah, we do that, yeah.

4        Q.    BY MR. CONNELLY:  Okay.  And that's something

5    that could have been implemented in this case, don't you

6    think?

7                MR. CROWN:  Objection to form and

8    foundation.

9                MS. DEAN:  Foundation.

10       A.    Yeah, in the overall context and what I was

11   being told by nurses and by dieticians and concerns

12   about Mom's -- like, in the normal context, it's

13   difficult to do that on a Mom who's being very resistant

14   to the interventions that we're implementing.

15               I mean, she wasn't fully resistant, but

16   when you're getting a lot of friction, it makes you more

17   uneasy to implement that plan.  But that discussion

18   could have happened.  I mean, I was asked to offer my

19   professional opinion when I spoke with DCS.  As far as

20   what actually happens thereafter is out of my hands.

21       Q.    BY MR. CONNELLY:  Okay.  And your professional

22   opinion wasn't that these children cannot under any

23   circumstances go home and live in a home with the

24   mother?

25       A.    No, that's not my professional -- that's not my



124

1    job to make that determination.

2      Q.    No.  But I'm talking about when you -- you just

3    said that you offered your professional --

4      A.    Yeah.

5      Q.    -- opinion to DCS.

6      A.    Yeah, my professional -- yeah, that was not --

7    I did not say under no circumstances ever could this

8    child ever go home with Mom.

9      Q.    And you weren't saying that when he was being

10   discharged in January that under no circumstances should

11   he be returned home to the mother?

12     A.    I was no -- I was no longer the doctor --

13     Q.    Okay.

14     A.    -- seeing him, so no.

15     Q.    But on December 26th, then, when you had the

16   conversation with Ms. Chico and whoever from DCS was

17   there, you didn't say to DCS that, "There are no

18   circumstances that I can think of under which this child

19   would be safe to be discharged to home with the mother"?

20                MS. DEAN:  Form and foundation.

21                MR. CROWN:  Join.

22     A.    That, I would agree that that was not what I

23   said, that's correct.

24     Q.    BY MR. CONNELLY:  Okay.  And DCS in talking

25   with you about possible discharge plans for the child

1   never said and never asked you, "If we put a

2   nutritionist in place and we conduct -- you know, the

3   parents have to get the child weighed weekly and we're

4   going to have a DCS case worker, case manager on an

5   in-home dependency check on the child every so often to

6   make sure he's gaining weight," that was never offered

7   to you as a -- as a possible solution?

8                   MS. DEAN:  Form and foundation.

9                   MR. CROWN:  Objection to form and

10  foundation.

11      **A.    So not to me.  The person who would have**

12  **been -- would have been the doctor who took over and**

13  **actually had the discharge, that would have been the**

14  **person to have that --**

15      Q.    BY MR. CONNELLY:  Okay.

16      **A.    -- discussion with, but not with me.**

17      Q.    Okay.

18      **A.    That didn't happen with me.**

19      Q.    Okay.  So what did DCS -- tell me if you recall

20  what DCS was saying to you about what they thought

21  should happen with the child.

22                  MR. CROWN:  Objection --

23                  MS. DEAN:  Foundation.

24                  MR. CROWN:  -- to form and foundation.

25      **A.    I don't -- I don't remember -- I don't remember**

126

1    **them -- they just were kind of asking our opinions on**

2    **general concerns on, like, disposition at that time and**

3    **where we were headed with the hospitalization.  They**

4    **didn't really offer their own views on what should**

5    **happen.**

6    Q.    BY MR. CONNELLY:  So DCS never said to you,

7    "This is what we're thinking of doing with the child."

8    Did they discuss --

9    **A.    No.**

10    Q.    -- did they discuss Munchausen by proxy or

11    fictitious disorder with you in regards to Mother?

12    **A.    I don't remember.  I don't think so.**

13              MS. DEAN:  Tom, if you have a bunch more,

14    we probably should take a break.

15              MR. CONNELLY:  We can take a break.  I

16    don't have a bunch more, but if you want a break, we can

17    take a five-minute break.

18              MS. DEAN:  Yeah, we've been going quite a

19    while here.  Can we take a short break?

20              MR. CONNELLY:  Yeah, that's fine.  That's

21    fine.

22              THE VIDEOGRAPHER:  We are off the record.

23    The time is 1:20 p.m.

24              (Recessed from 1:20 p.m. until 1:30 p.m.)

25              THE VIDEOGRAPHER:  We're back on the

127

1  record.  The time is 1:30 p.m.

2      Q.    BY MR. CONNELLY:  We were talking a little bit

3  about your discussion with DCS.  So if we could look

4  at 1156, I just want to tie this up a little bit with

5  this record.  You're there?

6      **A.    Yes.**

7      Q.    Okay.  About middle of the page, it says,

8  "Discussed with hospitalist."

9                That was you; right?

10     **A.    Yes.**

11     Q.    The third bullet point, "Physician advised that

12  we are currently awaiting DCS for a hold on the

13  patient."

14                First of all, I'm sorry, who made this

15  note?  Lindsey, M-A-N-Z, RD, that's the dietician?

16     **A.    Yes, Lindsey Manz, she was the dietician.**

17     Q.    She's the one that made this note?

18     **A.    Yes.**

19     Q.    Okay.  And then the second sentence in that

20  bullet point says, "This way, Mom will not be able to

21  take the patient home" -- AMA means against medical

22  advice; right?

23     **A.    Yes.**

24     Q.    -- "and we can more easily have control over

25  care."

128

1          So this isn't about your discussion with

2   DCS.  It was a discussion that you had with the

3   dietician?

4       **A.     Yeah, so this would be after the dietician --**

5   **after Lindsey expressed her concerns to me, then she**

6   **would have, I guess, made this note.**

7       Q.    Okay.  If we can look at page 41, this is the

8   Depart Summary Documents, and it says in here,

9   "Suspected child abuse," and gives a date of

10  December 26, 2018, "Diagnosis type:  Working;

11  Confirmation:  Confirmed; Clinical DX:  Suspected child

12  abuse."  Medical is the classification.

13          Now, you're not saying with this record

14  that the child was definitely being medically abused.

15  It's a suspicion and not a -- not a full-on diagnosis

16  that this is actually happening; right?

17      **A.     Yeah, it's kind of confusing.  So, yes, the**

18  **diagnosis is that we suspect child abuse.**

19      Q.    Okay.

20      **A.     But not the diagnosis of child abuse.**

21      Q.    Right.

22          And so then even when it says

23  "confirmation, confirmed," what's been confirmed is that

24  you have a suspicion of child abuse, but you're not

25  saying that child abuse has actually occurred; right?



129

1    A.    Yeah, at this -- correct, at this point, that

2  is what we're saying.

3    Q.    Okay.  On page 59, this is the -- there's a

4  physical examination that was done at the time that the

5  child was admitted to the hospital; right?

6    A.    Yes.

7    Q.    And for the cardiovascular, it says, "Normal

8  rate, regular rhythm, no murmur, good pulses equal in

9  all extremities."  And the neurologic says, "Alert,

10  oriented.  Bilateral lower extremities with no

11  antigravity movement noted."

12              First of all, on the cardiovascular, that

13  seems all normal to me, so where does the cardiovascular

14  issue come in?  Where's it identified?

15    A.    Pulmonary hypertension can't always be

16  diagnosed.  It doesn't always have a murmur or a change

17  in heart rate.  Again, you'd have to ask Dr. Buttram.

18  It's Dr. Buttram who did this exam.  So pulmonary -- the

19  pulmonary hypertension were based on his constellation

20  of findings, but then the diagnosis was made on the

21  cardiac catheterization by Dr. Miga.

22    Q.    Okay.  And are Dr. Buttram or Dr. Miga, are

23  either of them part of the child abuse team at Banner?

24    A.    No.

25    Q.    On page 998 under CV -- and again, that stands

130

1    for cardiovascular; right?

2      **A.    Yes.**

3      Q.    -- it says, "Continue sildenafil, 20

4    milligrams" -- what does PO mean?

5      **A.    By mouth.  Stands for per oral.**

6      Q.    Okay.  Three times a day.

7              Sildenafil is the active ingredient in

8    Viagra; right?

9      **A.    Correct.**

10     Q.    So what was it prescribed here to do?

11     **A.    Cause pulmonary vasodilation, so decrease the**

12   **pressure in the pulmonary vasculature.  So --**

13     Q.    And in layman's terms, what's it doing?

14     **A.    Lowering the blood pressure in the lungs.**

15     Q.    Okay.  And is that -- is that a regular use of

16   sildenafil or is that an off-label use?

17     **A.    Well, my -- so it's regular in that we do it**

18   **routinely in patients with pulmonary hypertension.  It**

19   **may be an off-label use because -- you'd have to ask**

20   **Dr. Miga if that's off label or if there is a specific**

21   **indication, but most -- or a large number of drugs that**

22   **we use in children are actually off label because they**

23   **don't specifically do the studies in the children.  They**

24   **do them in adults.**

25     Q.    Okay.  Let's look at the next page, 1000.

131

1  Maybe it's not the next page, but page 1000.  There are

2  some allergies that are identified on the right -- in

3  the right column.  Do you see that?

4      **A.    Yes.**

5      Q.    Are those allergies that were identified and

6  confirmed at the hospital or were those reported by

7  Mother?

8      **A.    I'd have to -- so when you look in the system,**

9  **it will actually say who reports, but most often it's**

10 **usually just reported by parent, family member.**

11     Q.    But looking at this record, you can't tell

12 whether these are what were reported by Mother or what

13 were identified and confirmed by the hospital?

14     **A.    Correct.**

15     Q.    As far as -- on page 1001, there's a paragraph

16 that had carried over from the previous page.  Mr. Crown

17 had asked you some questions about the last part of this

18 carryover paragraph.  One thing that's noted in here is

19 that patient's appetite has increased and Mom is wanting

20 to stop the medication that's identified there.  That's

21 the thyroid hormone; right?

22     **A.    Correct.**

23     Q.    Hormone, I mean.

24          That's one of the effects of that drug is

25 it increases the patient's appetite; right?

132

1      A.     It can, yes.

2      Q.     And can it increase the patient's appetite to

3  the point where the -- that the patient might want to

4  overeat?

5      **A.     So theoretically, yeah, if you're taking super**

6  **physiologic -- if you're overdosing on it basically,**

7  **yeah, it would give you an abnormally high metabolism,**

8  **so that was Mom's concern, and that's why I called**

9  **endocrinology, and they did not think that that would be**

10 **likely at the dose he was on.**

11     Q.     Okay.  I'm going to just mark a couple of

12 exhibits real quick.  Let me just ask you this question,

13 maybe I won't even mark this, but do you -- are you

14 familiar at all with the mold variety of Aspergillus?

15 That's A-S-P-E-R-G-I-L-L-U-S.

16     **A.     Uh-huh, Aspergillus, yes.**

17     Q.     Okay.  What do you know about Aspergillus?

18            MR. CROWN:  Objection to form and

19 foundation.

20     **A.     So Aspergillus can cause -- I have seen it in**

21 **some patients, usually patients with leukemia or on**

22 **chemotherapy.  Most commonly, it can cause pneumonia, so**

23 **fungal pneumonias.  You can also get fungal infections**

24 **in other organs, like in the liver from it.  But**

25 **primarily, it's an infection of immunocompromised**



133

1  patients.

2      Q.    BY MR. CONNELLY:  Okay.  And there was nothing

3  that you did at the hospital to determine whether or not

4  that fungus was present in Kenan; right?

5      A.    I did not specifically send any Aspergillus

6  testing or fungal testing, no.

7      Q.    Do you know a doctor by the name of Scott

8  Jensen?

9      A.    No, not to my recollection.

10     Q.    Okay.  So you're not aware that he's the

11  children's primary-care physician; right?

12     A.    No.

13          MR. CONNELLY:  Okay.  I'm going to go

14  ahead and mark Exhibit 2.

15          (Exhibit No. 2 was marked.)

16          (Discussion off the record.)

17     Q.    BY MR. CONNELLY:  Go ahead and take a minute to

18  read that, Doctor.  It's a short paragraph.

19          MS. JUDD:  Can you provide the Bates label

20  for Exhibit 2.

21          MR. CONNELLY:  You know what, I'm sorry,

22  it doesn't have a Bates label.  Let me see.  I did get

23  an email this morning.  Let me see if there's a Bates

24  label on that one.  Yeah, TURNER_000321.

25          MS. JUDD:  Thank you.

134

1   Q.    BY MR. CONNELLY:  Let me know when you've read

2   through it, Doctor.

3   **A.    I've read it.**

4   Q.    So Dr. Jensen says that the issue about the

5   exposure to black mold could explain muscle weakness and

6   lethargy.  Do you have any reason to dispute what

7   Dr. Jensen said?

8             MR. CROWN:  Objection to form.

9             MS. DEAN:  Form and foundation.  Just for

10  the record, this is dated 6-3-2019.

11            MR. CONNELLY:  Yes.

12  **A.    No, I do not.**

13  Q.    BY MR. CONNELLY:  Okay.  And he suggests, as

14  you have, that a physician specializing in mold should

15  be consulted.  You agree with that if there was a

16  concern that long exposure to black mold might have been

17  part of the problem here?

18            MR. CROWN:  Objection to form and

19  foundation.

20            MS. DEAN:  Form.

21  **A.    So I'm always an advocate for patient --**

22  **parents seeking second opinions, third opinions, so I**

23  **would not oppose that.**

24  Q.    BY MR. CONNELLY:  Then Dr. Jensen says, "There

25  are mold detoxification enzyme issues that individuals

135

1    can have that explain susceptibility to mold-related

2    illness."

3                Do you agree or disagree with that?

4                MR. CROWN:  Objection, form, foundation.

5                MS. DEAN:  Form, foundation.

6    **A.    I have no reason to disagree with his**

7    **recommendation.**

8    Q.    BY MR. CONNELLY:  Then he says, "If the issues

9    they are having resolve outside the home, it would

10   provide reasonable suspicion as well for a plausible

11   explanation for their illness."

12               When he's saying "they" and "their," he's

13   talking about Kenan and Dylan.  Do you take any issue

14   with that last sentence?

15               MS. DEAN:  Form.  So he's here as a fact

16   witness to comment on his own care, but this is --

17               MR. CONNELLY:  Yeah.

18               MS. DEAN:  -- things -- this is going on a

19   year later.

20               MR. CONNELLY:  I'm asking him if he agrees

21   or disagrees from a medical perspective with this

22   statement.

23               MR. CROWN:  I join in form and foundation.

24               MR. CONNELLY:  Okay.

25   **A.    I don't -- I don't -- again, so this is an area**

Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.

136

1    of expertise that is not mine, so if somebody has some

2    medical knowledge or experience or recommendation, I

3    don't have any reason to oppose this.

4                MR. CONNELLY:  All right.  And I'll just

5    note for the record that June of 2019 is six months

6    later, not a year later, later from Dr. Stewart's

7    involvement.

8    Q.    BY MR. CONNELLY:  And then the only other thing

9    I'm going to do here today, Doctor, is just show you

10   Exhibit 3 and what we'll mark as Exhibit 3.  I don't

11   have -- this is not anything that's been produced

12   previously.

13               MS. DEAN:  Do you have an extra one, Tom?

14               MR. CONNELLY:  Oh, sorry.

15               MS. DEAN:  Thank you.

16               MR. CONNELLY:  But it is the doctor's

17   LinkedIn.  If you want to look on LinkedIn for him, and

18   all I want to do -- go ahead and give him the exhibit.

19               MR. CROWN:  You're saying this has not

20   been produced?

21               MR. CONNELLY:  It has not been produced.

22               MR. CROWN:  So this is the first time

23   we're seeing it?

24               MR. CONNELLY:  First time we're seeing it.

25   Q.    BY MR. CONNELLY:  And my question is -- I think

1   my only question is, Doctor, is this your LinkedIn

2   account?

3       **A.      Yeah, it appears to be me, yes.**

4       Q.      And as far as the experience that's identified

5   here, outside of not having your employment at Banner on

6   here, is the rest of the experience noted correct?

7       **A.      Everything else on here is correct.**

8       Q.      And it says here in your research experience

9   that you spent two years in microbiology lab studying

10  Yersinia pestis from 2009 to 2011 and that you are a

11  teaching assistant for microbiology and pathophysiology.

12  Is that right?

13      **A.      Yes.**

14      Q.      And what is the Yersinia pestis?

15      **A.      It's the bacteria the causes the bubonic**

16  **plague.**

17      Q.      Okay.  But you're not a microbiologist; right?

18      **A.      No.**

19      Q.      Okay.

20              MS. DEAN:  Is that right?

21      **A.      Yeah, that's correct.**

22              MR. CONNELLY:  I don't have anything else.

23              MR. CROWN:  I have a few follow-up

24  questions.

25              MR. CONNELLY:  Thank you, Doctor.

138

1    A.    You're welcome.

2

3                    FURTHER EXAMINATION

4  BY MR. CROWN:

5    Q.    Dr. Stewart, you made a statement in response

6  to Attorney Connelly's questions, in medicine, doctors

7  are taught to think along lines of probability.  Do you

8  remember that?

9    A.    Yes.

10    Q.    Explain in a little more detail what that

11  means.

12    A.    Well, there's a certain acknowledgment that,

13  you know, we don't know everything.  There's many things

14  that we thought about medicine.  So the question -- I

15  can't remember exactly the question I got, but, like, is

16  it possible.

17              The answer in medicine and science is, you

18  know, you can pretty much always say, yes, is it

19  possible.  So we operate more like is it probable or is

20  it likely rather than the question of is it possible.

21    Q.    Sure.

22              And isn't it a fair corollary that when

23  one has the probability of what's causing a certain

24  constellation of symptoms in a patient and that is

25  medically known to be the root cause that's established

139

1  in medicine of what can cause this constellation of

2  symptoms, when one has that working probability, one

3  does not endlessly go searching for alternative

4  possibilities to speculate on if there's another cause

5  out there; correct?

6            MR. CONNELLY:  Form and foundation.

7      **A.    That -- I mean, that is correct how medicine is**

8  **practiced.  Along the lines of, like, as long as**

9  **patients are responding and things are consistent with**

10 **the working diagnosis, then that wouldn't lead you to**

11 **necessarily go chasing zebras, is the term in medical**

12 **circles.**

13     Q.    BY MR. CROWN:  And your answer anticipated my

14 next question.  So when one has a working diagnosis

15 based on probabilities --

16     **A.    Uh-huh.**

17     Q.    -- that medical science recognizes as

18 established probabilities and then you start treating a

19 patient along the line of those probabilities and you

20 get a positive response, it confirms the working

21 probable diagnosis; correct?

22            MR. CONNELLY:  Form and foundation.

23     **A.    Correct.**

24     Q.    BY MR. CROWN:  That's the case here with Kenan.

25 He was presented to the emergency room in a very

140

1  severely compromised medical state.  He had his right

2  ventricle that wasn't working, he had pulmonary

3  hypertension, he had other conditions, as we have a long

4  list, and he was placed into the pediatric intensive

5  care unit of a well-established pediatric hospital.

6  Fair statement?

7              MR. CONNELLY:  Form and foundation.

8      **A.    Yes.**

9      Q.    BY MR. CROWN:  And as the root cause of this

10  constellation of symptoms in Kenan is being developed,

11  malnutrition becomes the leading working diagnosis to a

12  reasonable degree of medical probability; correct?

13              MR. CONNELLY:  Form and foundation.

14     **A.    Correct.**

15     Q.    BY MR. CROWN:  And then as Kenan is being

16  treated in the intensive care unit, he is improving with

17  proper nutrition, adding food into his diet, supporting

18  him with oxygen and allowing him to come out of this

19  severe state and improve to the point where he's able to

20  be discharged from the PICU and onto a floor where you

21  come to see him; correct?

22              MR. CONNELLY:  Form and foundation.

23     **A.    Correct.**

24     Q.    BY MR. CROWN:  So when those improvement --

25  improvements take place, then the medical team, of which

1  you're one, continues with the proper nourishment

2  because you're getting a prominent response; correct?

3              MR. CONNELLY:  Form and foundation.

4      **A.    Correct.**

5      Q.    BY MR. CROWN:  And, Doctor, as I said, Kenan's

6  medical chart for this hospitalization is 1,592 pages.

7  There is a team of doctors in addition to you.  You see

8  him for three days, December 24th, December 25th,

9  December 26th of 2018.  We have mentioned Dr. Sandra

10 Buttram that's involved in the care; correct?

11     **A.    Correct.**

12     Q.    Dr. Miga?

13     **A.    Correct.**

14     Q.    I think there's a Dr. Luma or Luna?

15     **A.    The emergency room physician.**

16     Q.    There's a team of nurses?

17     **A.    Correct.**

18     Q.    There's other doctors, a GI doctor; am I

19 correct?

20     **A.    Correct.**

21     Q.    And the entire team comes to the conclusion

22 that the most likely cause of Kenan's severe symptoms is

23 malnutrition; correct?

24              MR. CONNELLY:  Form and foundation.

25     **A.    That was the consensus among speaking with my**

142

1  colleagues and peers.

2      Q.    BY MR. CROWN:  The medical team is not raising

3  the issue that there's some mold mycotoxin or toxicosis

4  that is taking place in Kenan as an alternate

5  explanation for the right heart failure, pulmonary

6  hypertension, failing to thrive; am I correct?

7                  MR. CONNELLY:  Form and foundation.

8      **A.    That's correct.  That was not put forth at the**

9  **time of hospitalization.**

10     Q.    BY MR. CROWN:  I don't see anywhere in the

11  records that even one doctor on this whole team

12  considered mold, whether it be from Aspergillus, whether

13  it be from any other type of mold, whether, again, it be

14  some mycotoxicosis from being exposed to mold, no doctor

15  in this large team at this reputable children's hospital

16  is considering mold as the real cause behind Kenan's

17  severe compromise; correct?

18                  MR. CONNELLY:  Form and foundation.

19     **A.    So when he was in my care, that was not put**

20  **forth as a possible explanation.**

21     Q.    BY MR. CROWN:  Now, if you turn to page 1157.

22  I think it's 1157.  Yes, page 1157.  We see in this

23  nutritional note that patient is severely malnourished.

24  That was a diagnosis made to a reasonable degree of

25  medical probability by the medical team; correct?



143

1    A.    Correct.

2    Q.    And you're one of the members of the medical

3    team, and you fully support that diagnosis to a

4    reasonable degree of medical probability; correct?

5    A.    Correct.

6    Q.    In fact, that is your personal diagnosis -- I

7    mean, you're part of the team, but your personal

8    diagnosis is that Kenan was severely malnourished to a

9    reasonable degree of medical probability; correct?

10   A.    Correct.

11   Q.    And then we see that the patient's gut is

12   functioning and there are no contraindications to

13   providing full nutrition through the gut; correct?

14   **A.    Correct.  At that time, we did not see any**

15   **evidence that he was not absorbing nutrition.**

16   Q.    And because of the interactions with Mom and

17   Mom trying to explain the restrictive diet she had on

18   her six-year-old son, it was concluded by the medical

19   team that it was unsafe to discharge Kenan back to his

20   mother without any type of intervention or any type of

21   supervision; correct?

22            MR. CONNELLY:  Form and foundation.

23   **A.    I kind of feel like I've clarified this a few**

24   **times where it's like I -- I was not the one discharging**

25   **him, so I wasn't asked -- like, my opinion -- I was**



1    **asked to give my opinion on was there a risk for him**

2    **going home at that time where he was at and what my --**

3    **and where we were stuck in the situation we were at in**

4    **the hospital.**

5        Q.    BY MR. CROWN:  Sure.

6        **A.    Yeah.**

7        Q.    Sure.

8            And it was at that time that you were

9    expressing your opinions that --

10       **A.    Yeah, that if he went home right then and there**

11   **on TPN and not achieving the goals set up by Nutrition,**

12   **that there was significant risk, yes.**

13       Q.    Sure.

14           Counsel had asked you a question, and if

15   you remember, I objected, and then he said there was no

16   question pending, and I wrote it down, so I just wanted

17   to ask you.  It was on the subject of mold, and you

18   started off by saying "rare enough condition," and then

19   he stopped you, and I don't know if that's enough to

20   give you the context to complete your answer or not, and

21   if not, that's fine.

22       **A.    Well, I mean, so -- I mean --**

23           MR. CONNELLY:  Form and foundation if

24   that's a question.

25           Go ahead, Doctor.



1      A.      Yeah, it's -- I mean, the context, like, in

2    explaining, like, we do see mold infections.  Like, the

3    most common is, like, Valley fever here in Arizona, so

4    we do see that.  I have seen Aspergillus or

5    aspergillosis in patients.

6                    And so the characteristic findings in

7    Kenan -- like, this -- that would be a very, very rare

8    presentation for somebody with, say, Aspergillus

9    infection.  He didn't have any hallmark signs or

10   symptoms.

11                   THE REPORTER:  Any what?

12     A.      Signs or symptoms to suggest aspergillosis.

13   And as far as, like, the black mold, that specific

14   question, that's not something that gets talked about

15   much in the medical literature -- like, education

16   process through medical school and residency because

17   it's rare enough.

18     Q.      BY MR. CROWN:  But what does get talked about

19   regularly is the effects of severe malnutrition;

20   correct?

21                   MR. CONNELLY:  Form and foundation.

22     A.      That is correct.

23     Q.      BY MR. CROWN:  And we have a diagnoses list

24   that includes acute right heart failure, failure to

25   thrive, anasarca, right ventricular dysfunction, ketotic

146

1  hypoglycemia, lower extremity weakness, pleural

2  effusion, pulmonary hypertension, retarded development,

3  suspected child abuse.  All of those diagnoses are

4  consistent with severe malnutrition; correct?

5             MR. CONNELLY:  Form and foundation.

6      **A.    Correct.**

7      Q.    BY MR. CROWN:  And that's why malnutrition was

8  the probable and leading diagnosis to explain Kenan's

9  severe compromised health condition on admission and

10 through his hospital course; correct?

11            MR. CONNELLY:  Form and foundation.

12     **A.    Correct.**

13     Q.    BY MR. CROWN:  By you and by the medical team

14 at Banner Children's Hospital; correct?

15            MR. CONNELLY:  Form and foundation.

16     **A.    Correct.**

17            MR. CROWN:  Thank you.  No further

18 questions.

19            MS. JUDD:  I have nothing further.

20            MR. CONNELLY:  I don't need to -- I don't

21 think I need to re-ask questions I've already asked.

22 I'll just ask one question, though, Doctor.

23            (Next page, please.)

24

25

147

1                        FURTHER EXAMINATION

2  BY MR. CONNELLY:

3    Q.    You were never asked to consider under what

4  conditions the child could be returned home to the

5  mother if there were interventions that were put in

6  place to track his feeding and weight gain; correct?

7    **A.    No, I was never asked.**

8              MR. CONNELLY:  Okay.  Thank you.  I don't

9  have any other questions.

10              MS. DEAN:  We will read and sign.

11              THE VIDEOGRAPHER:  We are off the record.

12  The time is 1:59 p.m.  This concludes the deposition of

13  Dr. Ryan Stewart.

14              (1:59 p.m.)

15

16

17

18        _____

19                      RYAN STEWART, M.D.

20

21

22

23

24

25



**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.

148

1          CERTIFICATE OF CERTIFIED REPORTER

2

3          BE IT KNOWN that the foregoing proceedings were
taken before me; that the witness before testifying was
duly sworn by me to testify to the whole truth; that the
4    foregoing pages are a full, true and accurate record of
the proceedings, all done to the best of my skill and
5    ability; that the proceedings were taken down by me in
shorthand and thereafter reduced to print under my
6    direction.

7

8          I CERTIFY that I am in no way related to any of
the parties hereto nor am I in any way interested in
the outcome hereof.

9

10          [X]  Review and signature was requested; any
changes made by the witness will be attached to the
original transcript.
11          []    Review and signature was waived/not
required.

12

13          I CERTIFY that I have complied with the ethical
obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
14    J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 11th
of March, 2024.

15                    /s/ Jennifer Hanssen
16                    Jennifer Hanssen, RPR
                    Certified Reporter
17                    Arizona CR No. 50165

18          *          *          *          *

19          I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
complied with the ethical obligations set forth in ACJA
20    7-206 (J)(1)(g)(1) through (6).

21

22                    /s/ Pamela A. Griffin
    _____
23    GRIFFIN GROUP INTERNATIONAL
    Registered Reporting Firm
    Arizona RRF No. R1005
24

25



149

1  GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY

2  3200 East Camelback Road Suite 177 Phoenix, Arizona 85018

3  Kahraman vs The State of Arizona-Video Recorded Deposition of Ryan-Stewart, M.D.-February 26, 2024

4  Errata & Signature due no later than April 19, 2024.

5
7    PAGE  LINE  CORRECTIONS/CHANGES          REASON
8    ____  ____  _____  _____

9    ____  ____  _____  _____

10   ____  ____  _____  _____

11   ____  ____  _____  _____

12   ____  ____  _____  _____

13   ____  ____  _____  _____

14   ____  ____  _____  _____

15   ____  ____  _____  _____

16   ____  ____  _____  _____

17   ____  ____  _____  _____

18   ____  ____  _____  _____

19   ____  ____  _____  _____

20   ____  ____  _____  _____

21   ____  ____  _____  _____

22   ____  ____  _____  _____

23   ____  ____  _____  _____

24        _____         _____

25        SIGNATURE OF WITNESS                 DATE











**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.





**Kahraman vs**
**The State of Arizona**

**Video Recorded Deposition of Ryan Stewart, M.D.**





**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.



**Kahraman vs**
**The State of Arizona**

**Video Recorded Deposition of Ryan Stewart, M.D.**



Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.









**Kahraman vs**
**The State of Arizona**

**Video Recorded Deposition of Ryan Stewart, M.D.**



**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.





Kahraman vs
The State of Arizona

Video Recorded Deposition of Ryan Stewart, M.D.







**Kahraman vs**
**The State of Arizona**

Video Recorded Deposition of Ryan Stewart, M.D.





# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Jessica Kahraman, et al.,   )
                            )
        Plaintiffs,         )
                            )
vs.                         ) Case No.:
                            ) CV-22-00375-PHX-SRB
The State of Arizona,       )
et al.,                     )
                            )
        Defendants.         )
                            )



DEPOSITION OF SARAH KRAMER



Bellingham, Washington
September 13, 2024
10:05 a.m.



REPORTED BY:              CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR Certified Reporters
AZ CR No. 50200           17505 N. 79th Avenue
                          Suite 301-C
                          Glendale, AZ 85308
(Certified Copy)          (480) 429-7573

2

1                 DEPOSITION OF SARAH KRAMER

2    commenced at 10:05 a.m., on September 13, 2024,

3    Videoconference via Zoom, Bellingham, Washington,

4    before Kristy A. Ceton, RPR, CRR, Arizona Certified

5    Court Reporter No. 50200.

6

7                           *  *  *

8

9    APPEARANCES:

10        For the Plaintiffs:

11            MILLS & WOODS LAW, PLLC
             By:  Thomas A. Connelly, Esq.
12            5055 North 12th Street
             Suite 101
13            Phoenix, Arizona 85014

14        For the Defendants:

15            BRUECKNER SPITLER SHELTS, PLC
             By:  Larry Crown, Esq.
16            8355 East Hartford Drive
             Suite 200
17            Scottsdale, Arizona 85255

18

19

20

21

22

23

24

25

1              MR. CONNELLY:  Okay.  Thank you.

2         Thank you, Larry.

3

4                     EXAMINATION

5    BY MR. CROWN:

6         Q.   Okay.  Sarah, I want to ask you about the

7    four documents that you reviewed in preparation for

8    this deposition, and they have been marked in this

9    case as Exhibits 201, 203, 204, and 208.

10             Now, I want to start with 201, which is

11   the order for ex parte removal of children, and as

12   part of that exhibit, is the application and

13   declaration for ex parte removal of children that

14   Counsel has asked you about.

15             So the first page of this document is the

16   actual court order that authorized DCS to temporarily

17   take custody of Kenan and Dylan Kahraman.  Am I

18   correct?

19        A.   Yes.

20        Q.   And that court order was issued pursuant

21   to statute, A.R.S. 8-821(a), which -- which is

22   regarding removal of children under these types of

23   circumstances, correct?

24        A.   Correct.

25        Q.   And the basis for the removal was set

188

1    forth in your application and declaration for

2    ex parte removal of children; am I correct?

3        A.   Yes.

4        Q.   And the reasons that were set forth in

5    your summary were based on the information and

6    diagnoses that were told to you by the medical team

7    at Cardon's Children's Hospital, correct?

8            MR. CONNELLY:  Form and foundation.

9        Q.   BY MR. CROWN:  And DCS --

10       A.   Yes.

11       Q.   And DCS became involved because the

12   Cardon's team of treating doctors who were treating

13   Kenan had indicated their concerns about medical

14   neglect, correct?

15           MR. CONNELLY:  Form and foundation.

16           THE WITNESS:  Correct.

17       Q.   BY MR. CROWN:  Okay.  And then this is a

18   document --  The application and the declaration that

19   you submitted for ex parte removal is a document that

20   you declared under oath under the penalty of perjury;

21   am I correct?

22       A.   Correct.

23       Q.   And so then when the order is issued, it

24   is based on what is your sworn testimony to obtain

25   this initial temporary removal order, correct?

189

1    A.    Correct.

2    Q.    Okay.  Now, the next document I would

3  like you to look at would be that first court order,

4  which is Exhibit 204.  And that is an order that was

5  issued by Commissioner Shellie Smith, Judge of the

6  Superior Court, on January the 4th, 2019; am I

7  correct?

8    A.    Yes.

9    Q.    Okay.  And in that order, it discusses

10  setting a preliminary and protective conference, a

11  preliminary and protective hearing all on January 9th

12  before Judge Udall; am I correct?

13    A.    Yes.

14    Q.    And this order would have provided notice

15  to Jessica Kahraman, the boys' mother, and Ahmet

16  Kahraman, the boys' father, correct?

17        MR. CONNELLY:  Form and foundation.

18        THE WITNESS:  Correct.

19    Q.    BY MR. CROWN:  Okay.  Now, prior to this

20  order being issued, there was supposed to be a team

21  decisionmaking meeting in which the mother, Jessica

22  Kahraman, and the father, Ahmet Kahraman, were

23  advised and invited to attend, correct?

24    A.    Correct.

25    Q.    Did either the mother or the father of

Deposition of Sarah Kramer                                    September 13, 2024

190

1     the boys attend the team decisionmaking meeting?

2          A.   No, they did not.

3          Q.   Was that significant in going forward

4     from that point with regard to the continuing custody

5     of the boys that the parents didn't show up to that

6     TDM?

7               MR. CONNELLY:  Form and foundation.

8               THE WITNESS:  Yes.  A TDM is a team

9     decisionmaking meeting where we discuss the concerns,

10    the strengths of a family, and what needs to happen

11    moving forward, which is safety planning, placement.

12    It's a -- a team decisionmaking meeting about those

13    topics.

14              So because they did not attend, we

15    weren't able to discuss those things at that time.

16              And the parents were also not speaking

17    with the Department at that time either.

18         Q.   BY MR. CROWN:  Explain that a little bit

19    more, that the parents were not speaking with the

20    Department at this time; meaning, you know, we're

21    talking late December and early January -- late

22    December, 2018/early January, 2019.

23              Explain a little bit more about the

24    parents not communicating with the Department.

25         A.   They --  After the removal occurred, they

1    --  I'm trying to recall the specific statement they

2    would make.  I know it's in my court report if I were

3    to refer to that.  But they had found a group that

4    was providing them advice on how to work with -- work

5    with the Department when removals occur.

6              And they were choosing not to engage in

7    conversations with the Department and would also

8    send -- around this time would send back documents

9    that were served to them with writing over it saying,

10   like, not accepting it.  I can't recall the specific

11   terms, but it would be in my court report.

12        Q.   Without taking the time to show you all

13   those documents -- and I can assure you, they've been

14   marked as exhibits -- would some of the language in

15   those returned documents be "We are not bound by this

16   contract and we will not abide to these court

17   orders"?

18              MR. CONNELLY:  Form and foundation.

19              THE WITNESS:  Yes.

20        Q.   BY MR. CROWN:  In fact, I'm going to

21   quote one of the pages from -- in Exhibit 209, which,

22   like I said, I'm not going to show you, but it was

23   attached to one of Jessica Kahraman's affidavits that

24   was filed on January 14th, 2019, with the Court.  And

25   I'm just trying to refresh your memory.

192

1              In big black dry marker, she wrote on

2      every page, "I do" -- of your report that was filed

3      with the Court that was dated January 8th, 2019.  She

4      wrote, "I do not accept the terms or conditions of

5      your contract."

6              Is that something that you generally

7      remember?

8          A.   Yes.

9              MR. CONNELLY:  Form and foundation.

10         Q.   BY MR. CROWN:  Now, back to Exhibit 204.

11     The Court issued this order based on verified

12     allegations in the petition for dependency; am I

13     correct?

14         A.   Yes.

15         Q.   And so the Court issued orders continuing

16     that Kenan and Dylan were temporary wards of the

17     Court and they were placed in the physical custody of

18     DCS; am I correct?

19         A.   Yes.

20         Q.   Okay.  And they found a continuation of

21     the children in the home would be contrary to the --

22     the Court found continuation of the children in the

23     home would be contrary to the children's welfare,

24     correct?

25         A.   Correct.

Deposition of Sarah Kramer                        September 13, 2024

193

1        Q.    And the Court further found that based on

2    verified allegations, that reasonable efforts had

3    been made to prevent removal of the children from the

4    home, and the Court stated the basis for that

5    finding; am I correct?

6        A.    Yes.

7        Q.    The Court appointed the Casa program

8    coordinator to be involved as an advocate for the

9    children, correct?

10       A.    Correct.

11       Q.    The Court ordered that the foster care

12   review board would be involved on behalf of the

13   children, correct?

14       A.    Correct.

15       Q.    The Court ordered that counsel was

16   appointed for both Jessica Kahraman and Ahmet

17   Kahraman, separate counsel for each; am I correct?

18       A.    Yes.

19       Q.    And there was also a guardian ad litem

20   appointed on behalf of the children, correct?

21       A.    Yes.

22       Q.    And the Casa -- the foster care review

23   board, attorneys for Mother and Father and the

24   guardian ad litem, those are all parties that are

25   independent of -- of you in your role as investigator

194

1    and the Department, correct?

2           A.   Correct.

3           Q.   Now, Exhibit 203 is the report that you

4    prepared to the juvenile court and filed on

5    January 8th of 2019, regarding the preliminary

6    protective hearing and/or initial dependency hearing;

7    am I correct?

8           A.   Yes.

9           Q.   And this is the type of report that you,

10   as a DCS investigator, prepare and file it with the

11   Court in advance of that first -- or what would be

12   the second court hearing for the preliminary

13   protective hearing.  And we know in this case, it

14   happened on January 9th, 2019, correct?

15          A.   Correct.

16          Q.   Okay.  So, again, without needing to read

17   through this report, and Counsel was discussing it

18   with you at various points of your deposition today,

19   you give a report to the Court that you present the

20   reasons for DCS's involvement.  And a lot of the

21   content in that section comes from the medical

22   records and information you received from the medical

23   team that were treating Kenan, correct?

24               MR. CONNELLY:  Form and foundation.

25               THE WITNESS:  Correct.

1          Q.   BY MR. CROWN:  And also -- it also

2    discusses when Dylan was brought to the hospital and

3    he was examined, and the findings of those

4    examinations were reported in the Cardon medical

5    records, correct?

6               MR. CONNELLY:  Form and foundation.

7               THE WITNESS:  Correct.

8          Q.   BY MR. CROWN:  And so you were relying as

9    part of your investigation and ultimate decisions

10   that you made from this medical team that was

11   evaluating both Kenan in the hospital with the

12   constellation of his symptoms and the findings when

13   Dylan was examined, correct?

14              MR. CONNELLY:  Form and foundation.

15              THE WITNESS:  Yes.

16         Q.   BY MR. CROWN:  In what was Section 2E

17   that is titled "Describe why continued temporary

18   custody is necessary," the very last sentence of that

19   section -- I'm going to read it -- states, "Since

20   removal from the parents' care, the children's eating

21   and medical status have improved."

22              And that's information that you received

23   from the doctors that were treating Kenan and who had

24   examined Dylan, correct?

25              MR. CONNELLY:  I'm sorry, Larry.  What

1    page?  Exhibit 203.  What page?

2              MR. CROWN:  It would be page 213.

3              MR. CONNELLY:  Okay.  Thank you.

4              THE WITNESS:  Yes.  From medical

5    providers overseeing the children's care and contact

6    with their caregivers at the time.

7         Q.   BY MR. CROWN:  So with the intervention

8    that occurred at Cardon's and then with the removal

9    of the children from their parents, the children's

10   status in the brief period of your involvement were

11   improvement, correct?

12        A.   Correct.

13        Q.   So the decline in both boys' health,

14   particularly Kenan's, that decline was halted and

15   there was improvement from the proper nutrition and

16   support that was given to Kenan while in the

17   hospital, and then Dylan and then both boys after

18   their removal, correct?

19              MR. CONNELLY:  Form and foundation.

20              THE WITNESS:  Correct.

21        Q.   BY MR. CROWN:  Your -- your section on

22   page 18, DCS Specialist Conclusions, was a decision

23   you made based on the totality of information that

24   your investigation had produced, correct?

25              MR. CONNELLY:  Form and foundation.

1                THE WITNESS:  Correct.

2           Q.   BY MR. CROWN:  And in addition to that,

3      your recommendations and this report before filing

4      with the Court was submitted and reviewed by your

5      supervisor, Sarah Mendez, correct?

6           A.   Correct.

7           Q.   And both -- you signed on this report on

8      page 19, and Sarah Mendez signed this report on page

9      20, correct?

10          A.   Correct.

11          Q.   In fact, at all times, all of the

12     decisions and your work in this case while you were

13     involved with the boys was always reviewed by your

14     immediate supervisor and, where necessary and

15     required, by Sarah Mendez's supervisor, correct?

16          A.   Correct.

17          Q.   And then the last exhibit to show you is

18     Exhibit 208.  That's the Court order from January 9th

19     of 2019.  And that was a hearing before Judge David

20     Udall.  And you attended that; am I correct?

21          A.   Correct.  I attended the hearing.

22               MR. CONNELLY:  Which exhibit, Larry?

23               MR. CROWN:  208.

24          Q.   BY MR. CROWN:  And in this order -- and

25     the parents attended as well.  In fact, there was a

1    large number of people attended.  The attendance page

2    is on page 2 of that order.  And it includes Jessica

3    Kahraman as mother, and father, Ahmet Kahraman.  Am I

4    correct?

5         A.   Yes.

6         Q.   And the parents entered their denial, you

7    see on page 3, to the petition, and advised the Court

8    that they wished to contest the allegations in the

9    petition, correct?

10         A.   Correct.

11         Q.   And the Court, having heard both sides

12    present their position that day, entered an order

13    that continued the boys as temporary wards of the

14    Court.

15              Do you see that on page 3?  Am I correct?

16         A.   Yes.

17         Q.   And at the top of page 4, the Court

18    found, "The Department of Child Safety had made

19    reasonable efforts to prevent the removal of the

20    children from the home --

21              THE COURT REPORTER:  Sorry, Larry.  Can

22    you start that over and slow down?

23              MR. CROWN:  Sure.

24              THE COURT REPORTER:  Thanks.

25              MR. CROWN:  Sorry.

199

1          Q.   BY MR. CROWN:   At the top of page 4 of

2     Exhibit 208, the Court found that "The Department of

3     child safety had made reasonable efforts to prevent

4     the removal of the children from the home, and that

5     continuation in the home would be contrary to the

6     welfare of the children," or that it was reasonable

7     to make no efforts to maintain the children in the

8     home.

9               The Court made that finding, correct?

10         A.   Correct.

11         Q.   And then the matter was continued and set

12    affirming the dependency.

13              And the next phase of having the next

14    hearing was set in this order.  We know those things

15    changed subsequent to your involvement.

16              But the next hearing would have been set.

17    And all of that is done pursuant to statute, correct?

18              MR. CONNELLY:  Form and foundation.

19              THE WITNESS:  Correct.

20         Q.   BY MR. CROWN:  Okay.  And then this order

21    pretty much is the point where you're no longer

22    involved as the investigator and now the case is

23    transferred to the ongoing team which involved

24    Madison Bell and her supervisor, Mecca Temple; am I

25    correct?

1          A.    Yes.   The case transfer would have

2     occurred around this time.

3          Q.    During your involvement in this case, did

4     you at all times act pursuant to Arizona statutes and

5     court orders?

6                MR. CONNELLY:   Form and foundation.

7                THE WITNESS:   Yes.

8          Q.    BY MR. CROWN:   Was there a reasonable

9     basis for all the actions you took in this case?

10               MR. CONNELLY:   Form and foundation.

11               THE WITNESS:   Yes.

12         Q.    BY MR. CROWN:   Did you ever deliberately

13    misrepresent or -- misrepresent any information to

14    the courts?

15               MR. CONNELLY:   Form and foundation.

16               THE WITNESS:   No.

17         Q.    BY MR. CROWN:   At any time, did you act

18    unlawfully, unwarrantedly, or in an unfounded manner

19    while you were involved in this case?

20               MR. CONNELLY:   Form and foundation.

21               THE WITNESS:   No.

22         Q.    BY MR. CROWN:   Did you ever act arbitrary

23    or unreasonably toward the boys or their parents

24    while you were involved in this case?

25               MR. CONNELLY:   Form and foundation.

```
1                 THE WITNESS:  No.
2                 MR. CROWN:  All the questions I have.
3                 MR. CONNELLY:  Just a couple follow-up,
4       Ms. Kramer.
5
6                       FURTHER EXAMINATION
7       BY MR. CONNELLY:
8            Q.   First of all, do you have these exhibits
9       in front of you?
10           A.   I can pull them up.  Give me one moment.
11      Okay.
12           Q.   On Exhibit 201, I'm just curious whether
13      any of this handwriting is yours?
14           A.   Which one?  I don't know them by their
15      numbers.  Can you --
16           Q.   Oh.
17           A.   -- give me the title of the document,
18      please?
19           Q.   Yeah.  "Order for Ex Parte Removal of
20      Children."  There's a lot of underlining and
21      numbering.
22                MR. CROWN:  Tom, I'll represent, as you
23      well know, this was an exhibit from one of the
24      affidavits that Jessica Kahraman had filed with the
25      Court.  And so my understanding from what was filed
```

202

1    is that the black highlight or the black markers were

2    made by her.

3              MR. CONNELLY:  Okay.

4              MR. CROWN:  And that just happened to be

5    the copy that I used in preparing Exhibit 201.

6              MR. CONNELLY:  Okay.  I --

7              MR. CROWN:  If you look at the top, that

8    Exhibit E, that's her handwriting.  And so that's --

9    that's my understanding.

10             MR. CONNELLY:  Okay.  All right.  Very

11   good.  Thank you.

12        Q.   BY MR. CONNELLY:  All right.  So you were

13   asked about the TDM that the parents did not attend.

14   Would there have been a different result if the

15   parents attended the TDM?  In other words, would you

16   have returned -- delivered them to the custody of the

17   parents?

18             MR. CROWN:  Objection to form and

19   foundation.

20             THE WITNESS:  I can't speculate as to

21   what would have occurred if they did attend the TDM

22   and what the result of that would have been.

23        Q.   BY MR. CONNELLY:  And you agree with me

24   that you're not allowed to use the parents' lack of

25   voluntary cooperation with the Department against

203

1    them in any way, right?

2              A.   Can you repeat that?  I apologize.  There

3    was the feedback, so it was difficult to understand.

4              Q.   You're not allowed to use the parents'

5    lack of cooperation with the Department against them

6    in any way, are you?

7                   MR. CROWN:  Objection to form and

8    foundation.

9                   THE WITNESS:  In general, lack of

10   cooperation correlates to child safety, then it may

11   be encompassed in that.  But, in general, overall, a

12   parent choosing not to communicate or to cooperate is

13   not directly used against a parent unless it's

14   directly related to child safety.

15             Q.   BY MR. CONNELLY:  All right.  And on

16   Exhibit 204, which is the Order Setting Hearings on

17   Dependency Petition and Temporary Orders.

18             A.   Okay.

19             Q.   On page 4, Counsel asked you about the

20   finding that reasonable efforts have been made to

21   prevent removal of the children from the home.  Have

22   you ever had a Court deny to make that finding in a

23   case where the children have already been taken into

24   temporary custody?

25                  MR. CROWN:  Objection to form.

1          THE WITNESS:  In my professional

2   experience with the Department of Child Safety, in my

3   role, no.

4          Q.   BY MR. CONNELLY:  And on Exhibit 208,

5   which is a minute entry, the preliminary protective

6   hearing minute entry dated January 9th, 2019.

7          A.   Okay.

8          Q.   On page 4, at the top where the Court

9   finds that the Department of Child Safety have made

10   reasonable efforts to prevent the removal of the

11   children from the home and that a continuation of the

12   home would be contrary to the welfare of the

13   children, and that it was reasonable to make no

14   efforts to maintain the children in the home.

15          In your professional career at the

16   Department of Child Safety, have you ever had a

17   juvenile court refuse to make that finding?

18          A.   In my capacity, no.

19          Q.   And then Counsel asked you some questions

20   about the children improving -- comments that you

21   made in the report to the Court about children's

22   condition improving.

23          If the children have health issues that

24   are at least partly related to living their whole

25   lives in a mold-infested home, you would expect their

1    health conditions to improve following their removal

2    from that home, wouldn't you?

3              MR. CROWN:  Objection.  Form and

4    foundation.

5              THE WITNESS:  I can't speak as to that,

6    as mold was not a consideration or involved during my

7    time on the case.

8         Q.   BY MR. CONNELLY:  And you can't speak

9    from general knowledge or commonsense?

10        A.   I am not trained in mold or surrounding

11   information of that to make a determination.  It's

12   not my expertise.

13             MR. CONNELLY:  All right.  Thank you.  I

14   don't have any other questions.

15             Larry?

16             MR. CROWN:  No more questions.  We

17   will -- we'll reserve signature.

18             THE COURT REPORTER:  Same orders as last

19   time?

20             MR. CROWN:  Yes.

21         (The proceedings concluded at 5:25 p.m.)

22

23             _____

24             SARAH KRAMER

25

206

```
 1    STATE OF ARIZONA      )
                            ) ss.
 2    COUNTY OF MARICOPA    )

 3

 4              BE IT KNOWN that the foregoing
      proceedings were taken by me, KRISTY A. CETON, a
 5    Certified Reporter, in and for the County of
      Maricopa, State of Arizona; that the witness before
 6    testifying was duly sworn to testify to the whole
      truth; that the questions propounded to the witness
 7    and the answers of the witness thereto were taken
      down by me in shorthand and thereafter reduced to
 8    typewriting under my direction; that the witness
      requested reading and signing said deposition; that
 9    the foregoing pages are a true and correct transcript
      of all proceedings had, all done to the best of my
10    skill and ability.
                I FURTHER CERTIFY that I am in no way
11    related to any of the parties hereto, nor am I in any
      way interested in the outcome hereof.
12              I FURTHER CERTIFY that I have complied
      with the ethical obligations set forth in ACJA
13    7-206(J)(1)(g)(1) and (2).

14

15    Kristy A. Ceton                    50200_____
      Certified Reporter                 CR Number

16          Kristy A. Ceton

17    _____
      Certified Reporter Signature      Date  09/30/2024

18

19              I CERTIFY that this Registered Reporting
      Firm has complied with the ethical obligations set
      forth in ACJA 7-206(J)(1)(g)(1) and (2).

20

21    Carrie Reporting, LLC             R1064
      Registered Reporting Firm         RRF No.

22          Traci Loftis

23    _____
      Registered Reporting Firm         Date  09/30/2024
24    Signature

25
```

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 198 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

1

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

JESSICA KAHRAMAN, et al.,          )
                                   )
        Plaintiffs,                )
                                   )
                                   )
             vs.                   )   No.
                                   )   CV-22-00375-PHX-SRB
                                   )
THE STATE OF ARIZONA,              )
et al.,                            )
                                   )
        Defendants.                )
_____    )


VIDEORECORDED DEPOSITION OF MADISON BELL

VOLUME III

Phoenix, Arizona
August 23, 2024
8:42 a.m.


Prepared by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS               Certified Reporters
Registered Professional Reporter 17505 N. 79th Avenue
Certified Realtime Reporter     Suite 301-C
Certified Realtime Captioner    Glendale, AZ 85308
AZ CR No. 50574                 (480) 429-7573
NM CCR No. 614


(COPY)

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 199 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

5

E X H I B I T S

| EXHIBIT: | DESCRIPTION | PAGE |
|---|---|---|
| 65 | Progress Report to the Juvenile Court; Bates Nos. AZ-KAHRAMAN 000419 - 443 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 263 |
| 66 | Progress Report to the Juvenile Court; Bates Nos. AZ-KAHRAMAN 000444 - 467 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 269 |
| 67 | Progress Report to the Juvenile Court; Bates Nos. AZ-KAHRAMAN 000468 - 486 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 295 |
| 68 | Progress Report to the Juvenile Court; Bates Nos. AZ-KAHRAMAN 000487 - 500 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 311 |
| 201 | Order for Ex-Parte Removal of Children; Bates Nos. AZ-KAHRAMAN 027693 - 27697 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 327 |
| 202 | Affidavit; Bates Nos. AZ-KAHRAMAN 00027556 - 27560 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 331 |
| 203 | Report to the Juvenile Court for Preliminary Protective Hearing and/or Initial Dependency Hearing | 332 |
| 204 | Order Setting Hearings on Dependency Petition and Temporary Orders | 334 |
| 205 | Affidavit; Bates Nos. AZ-KAHRAMAN 026898 - 26947 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 341 |

(Continued.)

```
 1                    E X H I B I T S
      EXHIBIT:            DESCRIPTION              PAGE
 2
        206   Affidavit;                            342
 3            Bates Nos. AZ-KAHRAMAN 027866 - 27940
              CONFIDENTIAL
 4            SUBJECT TO PROTECTIVE ORDER

 5      207   Compliance with Rule 47.3 of          344
              ARJCP Bates No. AZ-KAHRAMAN 027617
 6            CONFIDENTIAL
              SUBJECT TO PROTECTIVE ORDER
 7
        208   Minute Entry, Preliminary Protective  345
 8            Hearing
              Bates Nos. AZ-KAHRAMAN 028165 - 28170
 9            CONFIDENTIAL
              SUBJECT TO PROTECTIVE ORDER
10
        209   Affidavit;                            348
11            Bates Nos. AZ-KAHRAMAN 027342 - 027411
              CONFIDENTIAL
12            SUBJECT TO PROTECTIVE ORDER

13      210   Affidavit; Challenge of my Rights,    349
              Status, Standing & Jurisdiction, a
14            Notice of Discovery of Fraud and
              Impropriety; An Abatement; a Demand for
15            Remedy; and a Claim for Compensation;
              Bates Nos. AZ-KAHRAMAN 027248 - 27337
16            CONFIDENTIAL
              SUBJECT TO PROTECTIVE ORDER
17
        211   Affidavit;                            349
18            Bates Nos. AZ-KAHRAMAN 027001 - 27002
              CONFIDENTIAL
19            SUBJECT TO PROTECTIVE ORDER

20      212   Affidavit;                            350
              Bates Nos. AZ-KAHRAMAN 027005 - 27006
21            CONFIDENTIAL
              SUBJECT TO PROTECTIVE ORDER
22
        213   Affidavit;                            350
23            Bates Nos. AZ-KAHRAMAN 027441 - 27444
              CONFIDENTIAL
24            SUBJECT TO PROTECTIVE ORDER

25                       (Continued.)
```

CARRIE REPORTING, ████████████████

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 201 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

7

1                        E X H I B I T S
     EXHIBIT:              DESCRIPTION                    PAGE
2
     214   Affidavit;                                   351
3          Bates Nos. AZ-KAHRAMAN 027414 - 27433
           CONFIDENTIAL
4          SUBJECT TO PROTECTIVE ORDER

5    215   Affidavit;                                   352
           Bates Nos. AZ-KAHRAMAN 027455 - 27469
6          CONFIDENTIAL
           SUBJECT TO PROTECTIVE ORDER
7
     216   Addendum Report to Juvenile Court            354
8
     217   Minute Entry, Pretrial Conference            356
9
     218   Affidavit;                                   358
10         Bates Nos. AZ-KAHRAMAN 027479 - 27483
           CONFIDENTIAL
11         SUBJECT TO PROTECTIVE ORDER

12   219   Order sealing court record;                  359
           Bates Nos. AZ-KAHRAMAN 028116 - 28120
13         CONFIDENTIAL
           SUBJECT TO PROTECTIVE ORDER
14
     220   Affidavit;                                   359
15         Bates Nos. AZ-KAHRAMAN 027564 - 27566
           CONFIDENTIAL
16         SUBJECT TO PROTECTIVE ORDER

17   221   Affidavit;                                   360
           Bates Nos. AZ-KAHRAMAN 027567 - 27571
18         CONFIDENTIAL
           SUBJECT TO PROTECTIVE ORDER
19
     222   Minute Entry;                                361
20         Bates Nos. AZ-KAHRAMAN 031758 - 31760
           CONFIDENTIAL
21         SUBJECT TO PROTECTIVE ORDER

22   223   Minute Entry, Evidentiary Hearing -          364
           Non-Delinquency
23
     224   Minute Entry, Order                          365
24

25                        (Continued.)

E X H I B I T S

EXHIBIT:                    DESCRIPTION                          PAGE

  225    Foster Care Review Board Findings and          366
         Recommendations

  226    Emergency Motion for Court Order to            368
         have the Children seen by Dr. Melanie
         Alarcio, Pediatric Neurologist, and
         Tested and Treated for Toxins under her
         care

  227    DCS's Objection to Further Unnecessary         368
         Medical Procedures

  228    GAL's Response to Father's Emergency           369
         Motion for Court to have the Children
         seen by Dr. Melanie Alarcio, Pediatric
         Neurologist, and Tested and Treated for
         Toxins under her care

  229    Minute Entry, Ruling;                          369
         Bates Nos. AZ-KAHRAMAN 031268 - 31271
         CONFIDENTIAL
         SUBJECT TO PROTECTIVE ORDER

  230    Motion for Reconsideration of Ruling           370
         re: Father's Emergency Motion for Court
         Order to have the Children seen by
         Dr. Melanie Alarcio, Pediatric
         Neurologist, and Tested and Treated for
         Toxins under her care

  231    Father's Initial Dependency                    370
         Adjudication Disclosure Statement;
         Bates Nos. AZ-KAHRAMAN 027580 - 27583
         CONFIDENTIAL
         SUBJECT TO PROTECTIVE ORDER

  232    DCS's Dependency Initial Disclosure            371
         Statement;
         Bates Nos. AZ-KAHRAMAN 027584 - 27598
         CONFIDENTIAL
         SUBJECT TO PROTECTIVE ORDER

(Continued.)

```
 1                        E X H I B I T S
          EXHIBIT:             DESCRIPTION                    PAGE
 2
            233   Mother's Initial Dependency                 371
 3                Adjudication Disclosure Statement;
                  Bates Nos. AZ-KAHRAMAN 027599 - 27605
 4                CONFIDENTIAL
                  SUBJECT TO PROTECTIVE ORDER
 5
            234   Letter dated July 26, 2019 re: KK;          371
 6                (Illegible Bates range)

 7          235   Letter dated July 26, 2019 re: DK;          372
                  (Illegible Bates range)
 8
            236   Minute Entry, Order Denying Motion for      373
 9                Reconsideration;
                  Bates Nos. AZ-KAHRAMAN 031272 - 31273
10                CONFIDENTIAL
                  SUBJECT TO PROTECTIVE ORDER
11
            237   Objection to the Court's Consideration      374
12                of Dr. Carter's Opinion in Ruling on
                  Parents Motion;
13                Bates Nos. AZ-KAHRAMAN 030915 - 30929
                  CONFIDENTIAL
14                SUBJECT TO PROTECTIVE ORDER

15          238   Minute Entry, Status Conference;            374
                  Bates Nos. AZ-KAHRAMAN 031773 - 31778
16                CONFIDENTIAL
                  SUBJECT TO PROTECTIVE ORDER
17
            239   Letter;                                     375
18                Bates Nos. PLW_00491 - 507

19          240   Report to Juvenile Court for Permanency     376
                  Hearing
20
            241   Juvenile Court Report;                      377
21                Bates Nos. AZ-KAHRAMAN 031310 - 31314
                  CONFIDENTIAL
22                SUBJECT TO PROTECTIVE ORDER

23                          (Continued.)

24

25
```

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 204 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

10

E X H I B I T S

| EXHIBIT: | DESCRIPTION | PAGE |
|---|---|---|
| 242 | DCS's Response to Mother's Motion for Clarification and Additional Disclosures dated 12/13/19; Bates Nos. AZ-KAHRAMAN 031391 - 31395 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 378 |
| 243 | DCS's First Supplemental Disclosure Statement; Bates Nos. AZ-KAHRAMAN CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 379 |
| 244 | Motion to Dismiss the Amended Dependency Hearing; Bates Nos. AZ-KAHRAMAN 029939 - 29966 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 380 |
| 245 | Mother's First Supplemental Dependency Adjudication Disclosure Statement; Bates Nos. AZ-KAHRAMAN 027610 - 27616 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 380 |
| 246 | DCS's Second Amended Dependency Petition | 380 |
| 247 | Minute Entry, Oral Argument Dependency found as to Parents | 381 |
| 248 | Motion for Change in Physical Custody; Bates Nos. AZ-KAHRAMAN 029868 - 29893 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 384 |
| 248 A | DCS's Objection to Mother's Rule 59 Motion; Bates Nos. AZ-KAHRAMAN 030930 - 030941 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 384 |

(Continued.)

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 205 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

11

E X H I B I T S

EXHIBIT:                        DESCRIPTION                        PAGE

249   Father's Objection to Mother's Motion        385
      for Change of Physical Custody;
      Bates Nos. AZ-KAHRAMAN 031195 - 31199
      CONFIDENTIAL
      SUBJECT TO PROTECTIVE ORDER

250   Offer of Proof in Support of Request         385
      for Evidentiary Hearing;
      Bates Nos. AZ-KAHRAMAN 028125 - 28128
      CONFIDENTIAL
      SUBJECT TO PROTECTIVE ORDER

251   ASFA Findings re: Reasonable Efforts to      386
      Finalize the Permanency Plan

252   Progress to the Juvenile Court               386

253   Emergency Motion for Reconsideration         387
      and for a Ruling;
      Bates Nos. AZ-KAHRAMAN 029476 - 29483
      CONFIDENTIAL
      SUBJECT TO PROTECTIVE ORDER

254   Motion for Injunctive Relief;                388
      Bates Nos. AZ-KAHRAMAN 029251 - 29266
      CONFIDENTIAL
      SUBJECT TO PROTECTIVE ORDER

255   Minute Entry;                                388
      Bates Nos. AZ-KAHRAMAN 031764 - 31767
      CONFIDENTIAL
      SUBJECT TO PROTECTIVE ORDER

256   Minute Entry;                                389
      Bates Nos. AZ-KAHRAMAN 031274 - 31276
      CONFIDENTIAL
      SUBJECT TO PROTECTIVE ORDER

257   CASA Court Report;                           390
      Bates Nos. AZ-KAHRAMAN 031315 - 31320
      CONFIDENTIAL
      SUBJECT TO PROTECTIVE ORDER

                         (Continued.)

E X H I B I T S

| EXHIBIT: | DESCRIPTION | PAGE |
|---|---|---|
| 258 | Minute Entry, Evidentiary Hearing;<br>Bates Nos. AZ-KAHRAMAN 028142 - 28148<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 390 |
| 259 | Father's Objection to Mother's Motion<br>for Injunctive Relief;<br>Bates Nos. AZ-KAHRAMAN 031200 - 31203<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 391 |
| 260 | Father's Objection to Mother's Motion<br>to Disclose Redacted Minute Entry in<br>Case JS19309 to the Parties in this<br>Case;<br>Bates Nos. AZ-KAHRAMAN 031204 - 31207<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 391 |
| 261 | Mother's Joint Reply Regarding Mother's<br>Motion for Injunctive Relief - Madison<br>Bell;<br>Bates Nos. AZ-KAHRAMAN 031615 - 31629<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 392 |
| 262 | Father's Objection to Mother's Motion<br>for Injunctive Relief and Motion for<br>Sanctions;<br>Bates Nos. AZ-KAHRAMAN 031208 - 31210<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 392 |
| 263 | Minute Entry, Under Advisement Ruling;<br>Bates Nos. AZ-KAHRAMAN 031277 - 31287<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 393 |
| 264 | Minute Entry, Ruling | 397 |
| 265 | Progress Report to the Juvenile Court | 398 |

(Continued.)

E X H I B I T S

| EXHIBIT: | DESCRIPTION | PAGE |
|---|---|---|
| 266 | CASA Court Report;<br>Bates Nos. AZ-KAHRAMAN 031321 - 31324<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 399 |
| 267 | Rebuttal to CASA Susan Stark's Report;<br>Bates Nos. AZ-KAHRAMAN 028129 - 28134<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 399 |
| 268 | Minute Entry, Report and Review Hearing;<br>Bates Nos. AZ-KAHRAMAN 031598 - 31601<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 399 |
| 269 | Addendum to Mother's Concurrent Motion for CPC to Both Parents | 400 |
| 270 | GAL's Response to Mother's Rebuttal to CASA Susan Stark's Report and Request to Remove CASA;<br>Bates Nos. AZ-KAHRAMAN 031548 - 31551<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 400 |
| 271 | GAL's Response to and Objection to Mother's Motion for Change of Physical Custody to Both Parents;<br>Bates Nos. AZ-KAHRAMAN 031544 - 31547<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 400 |
| 272 | DCS's Response and Objection to Mother's Motion for Change of Physical Custody to Both Parents;<br>Bates Nos. AZ-KAHRAMAN 031555 - 31558<br>CONFIDENTIAL<br>SUBJECT TO PROTECTIVE ORDER | 400 |

(Continued.)

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 208 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

14

E X H I B I T S

| EXHIBIT: | DESCRIPTION | PAGE |
|---|---|---|
| 273 | Father's Objection to Mother's Concurrent Motion for CPC to Both Parents; Bates Nos. AZ-KAHRAMAN 031211 - 31212 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 401 |
| 274 | Minute Entry; Bates Nos. AZ-KAHRAMAN 031291 31293 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 401 |
| 275 | Minute Entry, Evidentiary Hearing; Bates Nos. AZ-KAHRAMAN 028149 - 28152 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 401 |
| 276 | Minute Entry, Evidentiary Hearing | 402 |
| 277 | DCS's Response and Objection to Mother's Motion for the Court to Order DCS to Provide Appropriate Services to Advance Family Reunification: To Immediately Remove SWHD and Move to a Family Reunification Team; Bates Nos. AZ-KAHRAMAN 031591 - 31597 CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER | 402 |
| 278 | Progress to the Juvenile Court | 403 |
| 279 | Mother's Objection to the Court's Consideration of the DCS Report at the Scheduled Hearing | 403 |
| 280 | CASA Court Report; Bates Nos. AZ-KAHRAMAN 031325 - 31328 CONFIDENTIAL -SUBJECT TO PROTECTIVE ORDER | 404 |
| 281 | Minute Entry, Dependency Petition Dismissed | 404 |

* * *

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 209 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

15

1          VIDEORECORDED DEPOSITION OF MADISON BELL

2    commenced at 8:42 a.m. on August 23, 2024, at the law

3    offices of GILLESPIE, SHIELDS & TAYLOR, 7319 NORTH 16TH

4    STREET, SUITE 100, PHOENIX, ARIZONA, before MICHAELA

5    HERMAN DAVIS, a Certified Reporter, in and for the County

6    of Maricopa, State of Arizona.

7

8                          * * *

9                  A P P E A R A N C E S

10   FOR THE PLAINTIFF:

11          MILLS + WOODS LAW PLLC
            BY: MR. THOMAS A. CONNELLY
12              5055 NORTH 12TH STREET
                SUITE 101
13              PHOENIX, ARIZONA 85014

14
            GILLESPIE, SHIELDS & TAYLOR
15          BY:  MS. NATALIE NEWELL
                7319 NORTH 16TH STREET
16              SUITE 100
                PHOENIX, ARIZONA 85020
17

18   FOR THE DEFENDANT:

19          BRUECKNER SPITLER SHELTS, PLC
            BY:  MR. LARRY J. CROWN
20              8355 EAST HARTFORD DRIVE
                SUITE 200
21              SCOTTSDALE, ARIZONA 85255

22

23   ALSO PRESENT:

24          SAMANTHA ELLIOTT, VIDEOGRAPHER
            NAVEK BAIRD
25          JESSICA KAHRAMAN

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 210 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

323

1      A.    Yes.

2      Q.    They draft pleadings and file those

3   pleadings with the court?

4      A.    Yes.

5      Q.    And when other attorneys involved in the

6   case, whether representing parents or children, they --

7   and those attorneys will file pleadings, the assistant

8   attorney general will prepare and file with the court

9   responsive pleadings; correct?

10     A.    Correct.

11     Q.    And they, too, follow court orders; correct?

12           MR. CONNELLY:  Form and foundation.

13           THE WITNESS:  Yes.

14  BY MR. CROWN:

15     Q.    Now, when a court makes a particular child a

16  ward of the court, does the court control the pendency

17  of these proceedings?

18           MR. CONNELLY:  Form and foundation.

19           THE WITNESS:  Yes.

20  BY MR. CROWN:

21     Q.    They have control over the children once

22  designating them as wards of the court; correct?

23           MR. CONNELLY:  Form and foundation.

24           THE WITNESS:  Yes.

25           ///

1  BY MR. CROWN:

2      Q.    Did you have any authority over the final

3  decision regarding custody or placement with children,

4  or is that for the court?

5                  MR. CONNELLY:  Form and foundation.

6                  THE WITNESS:  That's for the court.

7  BY MR. CROWN:

8      Q.    Okay.  Now, in dependency proceedings, there

9  are, in addition to the court, there are independent

10  parties that are also appointed and involved for the

11  children's best interest; am I correct?

12     A.    Correct.

13     Q.    One of those independent parties -- and I

14  say "independent," independent from you -- is the CASA;

15  correct?

16     A.    Correct.

17     Q.    What does the CASA stand for?

18     A.    It's a court-appointed special advocate.

19     Q.    And so it's the court appointing another

20  person that is separate and apart from DCS?

21     A.    Yes.

22     Q.    Okay.  And is there a Foster Care Review

23  Board that is involved with regard to children that are

24  the subject of dependency proceedings?

25     A.    Yes.

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 212 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

325

1      Q.    And that's separate from the CASA?

2      A.    Yes.

3      Q.    And what is the -- who appoints the Foster

4   Care Review Board to be involved?

5      A.    The courts.

6      Q.    Can there also be guardian ad litems that

7   are appointed by the court?

8      A.    Yes.

9      Q.    And are they involved on behalf of the

10  children?

11     A.    Yes.

12     Q.    And does the CASA file reports with the

13  court?

14     A.    Yes.

15     Q.    Does the Foster Care Review Board file

16  reports with the court?

17     A.    Yes.

18     Q.    And does the guardian ad litem file reports

19  with the court?

20     A.    No.  I mean, they -- they can, but they

21  typically don't.

22     Q.    Okay.  Do they file pleadings at times?

23     A.    Yes.

24     Q.    Okay.  And, again, all those entities or

25  parties are independent from your role as an ongoing

1    DCS case worker; correct?

2                    MR. CONNELLY:  Form and foundation.

3                    THE WITNESS:  Correct.

4    BY MR. CROWN:

5        Q.    And we talked about that the attorney

6    general is -- has assistant attorney generals that will

7    file pleadings as attorneys for DCS; correct?

8        A.    Correct.

9        Q.    And then in cases such as this one, the

10   parents have attorneys; correct?

11       A.    Correct.

12       Q.    And sometimes each parent has their own

13   attorney; correct?

14       A.    Yes.

15       Q.    And they are certainly independent from DCS

16   and you as an ongoing caseworker; correct?

17       A.    Correct.

18       Q.    And then Southwest Human Development is also

19   involved in cases, and they were involved in this case;

20   correct?

21       A.    Correct.

22       Q.    Are they independent of DCS and you as an

23   ongoing DCS caseworker?

24       A.    Yes.

25       Q.    And doctors, such as the doctors at Cardon

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 214 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

327

1    Children's Hospital, are they also independent of DCS?

2        A.    Yes.

3        Q.    And when they see suspected neglect or abuse

4    and they make a report to DCS, that's done independent

5    of DCS; correct?

6        A.    Correct.

7        Q.    There are certainly times when DCS may

8    initiate an investigation, but in this case, medical

9    doctors that are specifically assigned to a children's

10   hospital that specializes in treating children made the

11   initial report to DCS; correct?

12       A.    Yes.

13       Q.    Let's go through these exhibits.

14             (Deposition Exhibit No. 201 was marked for

15             identification.)

16   BY MR. CROWN:

17       Q.    Exhibit -- the first exhibit is Exhibit 201.

18   And while I know that some of these exhibits have been

19   shown to you, as I've stated, I put these together in a

20   chronological order from the time DCS first became

21   involved in this matter and the court was involved,

22   right through the termination proceedings.

23             So basically this being the first

24   document in this chronological history in the Kahraman

25   case, this was a document that was filed on

1  December 28, 2018, and it's titled the Order for Ex
2  Parte Removal of Children.
3          And that would be for Dylan and Kenan
4  Kahraman; am I correct?
5      A.   Yes.
6      Q.   Now, who prepared this order for ex parte
7  removal of the Kahraman children?
8      A.   So Sarah is the one that made the application
9  for it, and then it was granted by -- by the judge who
10 was -- there's -- when -- when they do have patients
11 for removal, there's like a judge who is assigned --
12     Q.   Sure.
13     A.   -- for, like, windows of time, so it was the
14 judge who was assigned for that.
15     Q.   So the very first page of this is a court
16 order that was issued by Judge Melissa Zabor; correct?
17     A.   Correct.
18     Q.   And Judge Zabor, as the judge, made a
19 finding that she found probable cause existed to
20 believe that "the temporary custody is clearly
21 necessary to protect Dylan and Kenan Kahraman from
22 suffering abuse or neglect."
23          And then she made specific findings that
24 we see on that page; correct?
25     A.   Correct.

1      Q.   And it's this order that gives DCS the

2   judicial authority to then take custody of the

3   children; correct?

4      A.   Correct.

5      Q.   Now, the next pages of this was the

6   affidavit Sarah Kramer, and her role was the DCS

7   investigator; correct?

8      A.   Correct.

9      Q.   So you having reviewed the file, this is one

10   of the documents you would have reviewed as you are

11   having the file transitioned to you; correct?

12      A.   Correct.

13      Q.   And you were able to see Sarah Kramer's

14   affidavit, and in this, she is stating under oath to

15   the court that she believes probable cause exists and

16   she sets forth her reasons as being that Kenan was

17   severely malnourished, she describes the history of

18   Kenan's presentation at Cardon Children's Hospital,

19   what the doctors found, and, ultimately, she included

20   all that in her statement which goes on for several

21   pages.

22            And -- am I correct?

23            MR. CONNELLY:  Form and foundation.

24            THE WITNESS:  Yes.

25            ///

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 217 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

330

1  BY MR. CROWN:

2      *Q.*    And she sets forth the basis that she

3  believes establish probable cause; correct?

4      *A.*    Yes.

5      *Q.*    And she summarizes what the doctors are

6  stating at -- that are actually treating Kenan in the

7  hospital; correct?

8      *A.*    Yes.

9      *Q.*    And then we also see, if you go to page 3 of

10  this affidavit, that she references that Dylan was

11  examined by Dr. Miga on December 24, 2018; correct?

12      *A.*    Yes.

13      *Q.*    And she reports that Dylan had significant

14  malnutrition as a result of a very restrictive GAPS

15  diet; correct?

16              MR. CONNELLY:  Where are you?

17              MR. CROWN:  I'm on what is page 3 of 4 of

18  Sarah Kramer's --

19              MR. CONNELLY:  Okay.

20              MR. CROWN:  -- affidavit.

21  BY MR. CROWN:

22      *Q.*    And in the middle of that top paragraph, it

23  is stated that Dr. Miga reported to DCS that Dylan had

24  significant malnutrition as a result of a very

25  restrictive GAP diet; correct?

1       *A.*    Correct.

2       *Q.*    Okay.  And then ultimately, this

3   affidavit -- and Sarah goes before Judge Zabor.  Judge

4   Zabor would swear her in and under oath, she describes

5   why she's applying for the ex parte removal, and Judge

6   Zabor ruled that she had established probable cause and

7   issued the order of ex parte removal on December 28th

8   of 2018; correct?

9               MR. CONNELLY:  Form and foundation.

10              THE WITNESS:  Correct.

11              (Deposition Exhibit No. 202 was marked for

12          identification.)

13  BY MR. CROWN:

14      *Q.*    So now if I ask you to go to 2000 --

15  Exhibit 202.  This is a document that was filed in the

16  court by Jessica Kahraman that was dated January 3,

17  2019.

18              And is this an affidavit that when you

19  reviewed the court file and materials that had been

20  filed with the court, that you reviewed this particular

21  document?

22      *A.*    Yes.

23      *Q.*    Okay.  So this was Jessica Mann Kahraman

24  stating that she is a living woman and she does

25  believe -- in paragraph 1 -- that Sarah Kramer is a

1   private contractor.

2               On paragraph 2, she stated that "I

3   require this woman, Sarah Kramer, to swear under the

4   penalty of perjury that she has firsthand knowledge of

5   my wrong."

6               And in paragraph 5, she stated that "Any

7   failure to do so will be considered a trespass, and she

8   will charge $5,000 a day per biological property."

9               And the "biological property" she was

10  referring to was her two sons, Dylan and Kenan;

11  correct?

12      A.   Correct.

13               MR. CONNELLY:  Form and foundation on that

14  last one.

15  BY MR. CROWN:

16      Q.   Well, did you have an understanding as to

17  who Jessica Kahraman was referencing as her "biological

18  property"?

19      A.   Yes.

20      Q.   Who was that?

21      A.   Those would be her children.

22               MR. CONNELLY:  Form and foundation.

23               (Deposition Exhibit No. 203 was marked for

24          identification.)

25               ///

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 220 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

333

 1  BY MR. CROWN:

 2      Q.    If you can go to Exhibit 203, this was the

 3  report to the juvenile court that was prepared and

 4  filed with the court by Sarah Kramer as the DCS

 5  investigator; correct?

 6      A.    Correct.

 7      Q.    And this is a report that you would have

 8  reviewed as you were taking the case over as part of

 9  your workup, if you will, and starting point; correct?

10      A.    Correct.

11      Q.    And this is a report that is something that

12  investigators routinely file with the court and this,

13  in this case, is that initial report that was filed

14  with the court after the ex parte removal; correct?

15      A.    Correct.

16      Q.    Now, can you turn to what is page 10 of

17  Exhibit 202.

18              MR. CONNELLY:   203?

19              MR. CROWN:   I'm sorry, 203.  Yes, thank you.

20  BY MR. CROWN:

21      Q.    Exhibit 203.

22      A.    Yeah.

23      Q.    On page 10, there is a Section D and it

24  states:  "A TDM meeting was scheduled for January 3,

25  2019.  The parents reported to DCS specialist by e-mail

 1   that they were choosing not to attend the meeting.  The
 2   meeting remained scheduled, and the parents did not
 3   show."
 4           "TDM" is a team decisionmaking meeting;
 5   correct?
 6       A.    Correct.
 7       Q.    Okay.  And can you turn to what is page 13.
 8           On page 13, the last sentence of the top
 9   paragraph before Section 3 states:  "Since removal from
10   the parent's care, the children's eating and medical
11   status have improved."
12           And is that something that you reviewed
13   as the case was being transitioned to you?
14       A.    Yes.
15           (Deposition Exhibit No. 204 was marked for
16           identification.)
17   BY MR. CROWN:
18       Q.    Exhibit 204 is the court order that was
19   issued by Judge Udall in the juvenile dependency
20   proceeding Number JD532206; am I correct?
21       A.    Yes.
22       Q.    And this order is titled Order Setting
23   Hearings on the Pendency Petition and Temporary orders.
24           Is that correct?
25       A.    Yes.

1      Q.    So Judge Udall issued this order, and it was

2  filed with the clerk of the court.  If you just turn to

3  page 9, we can see that this order was entered on

4  January 4th of 2019; correct?

5      A.    Yeah.  And I don't actually think this was

6  ordered by Judge Udall.  I think this was just ordered

7  to have the court hearing set in front of Judge Udall.

8      Q.    Oh, okay.

9      A.    I don't think it's usually that --

10     Q.    Okay.

11     A.    -- the assigned judge that does the initial

12  order.

13     Q.    And it actually looks -- and I thank you for

14  that clarification.

15            It looks like Commissioner Shellie Smith

16  signed this order that's Exhibit 204; right?

17     A.    Correct.

18     Q.    Okay.  But let's just review some of the

19  provisions of this order.

20            This order set the preliminary protective

21  conference for the 9th day of January, 2019; correct?

22     A.    Yes.

23     Q.    It set a preliminary protective hearing for

24  January 9th of 2019; correct?

25     A.    Yes.

1        Q.    It set it before Judge Udall, as you just
2    pointed out?
3        A.    Yes.
4        Q.    And these are all statutory requirements.
5    When there's been a removal of children from their
6    parents, this type of order is following the statutes
7    in Arizona; correct?
8        A.    Yes.
9        Q.    Okay.
10              MR. CONNELLY:   Form and foundation.
11   BY MR. CROWN:
12       Q.    At the top of page 2, it is further ordered
13   setting an initial dependency hearing on January 9,
14   2019, before Judge Udall; correct?
15       A.    Yes.
16       Q.    And then it is ordered that Dylan Kahraman
17   is made a temporary ward of the court; right?
18       A.    Yes.
19       Q.    What does that mean to DCS?  Is -- Dylan is
20   not a ward of DCS; he's a ward of the court?
21       A.    Correct.
22       Q.    So that means that the court is going to
23   have, control, as it says right here, "legal care,
24   custody and control."  You're a temporary ward of the
25   court, but the court is then committing that legal

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 224 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

337

 1   care, custody and control to the Department of Child

 2   Safety; am I correct?

 3        A.    Correct.

 4        Q.    And so Dylan then, by court order, is placed

 5   in the physical custody of DCS?

 6        A.    Correct.

 7        Q.    Okay.  And the same provision was provided

 8   in the next paragraph for Kenan; that Kenan was a

 9   temporary ward of the court and the court committed

10   Kenan to the legal care, custody and control of DCS;

11   correct?

12        A.    Correct.

13        Q.    Then the court found that, based upon the

14   verified allegations of the petition, that continuation

15   of the children in the home would be contrary to the

16   children's welfare; correct?

17        A.    Correct.

18        Q.    "This finding is based on the following

19   facts:  The parents have stated strong beliefs

20   regarding their children's diet and medical care," and

21   not to read everything that's here, but to highlight,

22   looking at line 4:

23              "The child, Kenan, was hospitalized in

24   December 2018 due to congestive heart failure and

25   pulmonary hypertension which was suspected to be tied

1  to his malnutrition.  Despite this, the parents were

2  observed refusing to feed the children.  The child in

3  the hospital, when he reported that he was hungry,

4  mother expressed concern to medical staff that she

5  'could not keep up,' with the child's hunger and

6  provided him food consistent with a strict diet."

7          Line 13:  "Mother also opposed

8  recommendations that the child be given new foods and

9  formula to supplemental his nutrition based on her

10  belief that the child had food allergies.

11          "Of additional concern is the parents'

12  report that both children have been unable to walk for

13  approximately the past two months.  The parents

14  believed that this was caused either by falls or

15  exposure to dry erase markers at school and began to

16  homeschool the children.

17          "Mother admitted that had she obtained

18  wheelchairs for the children despite there being no

19  medical recommendation that they were necessary."

20          Now, that was in the court order, and, I

21  take it, when you took over the case as an ongoing

22  caseworker, you read this court order?

23  A.    Yes.

24  Q.    And these are findings by the court?

25          MR. CONNELLY:  Form and foundation.

1  BY MR. CROWN:

2      *Q.*   Correct?

3      *A.*   Correct.

4      *Q.*   On page 4, line 8:  "The court found that

5  based upon the verified allegations of the petition,

6  that reasonable efforts have been made to prevent

7  removal of the children from the home.  This finding is

8  based on the following facts:  The department scheduled

9  a team decisionmaking meeting with the parents for

10  January 3, 2019, to review --

11              THE COURT REPORTER:  I need you to slow

12  down.

13              MR. CROWN:  Oh, sorry.

14  BY MR. CROWN:

15      *Q.*   "The department scheduled a team

16  decisionmaking meeting with the parents for January 3,

17  2019, to review the safety and placement of the

18  children.  Though the parents were notified of the

19  meeting, they did not attend."

20              And then in the next paragraph:  "The

21  court found that it was in the best interest of the" --

22  "that there was going to be placement of the children

23  in their best interest because there are no identified

24  family members who are willing or able to care for the

25  child at this time."

1           And so -- and that's something you read
2   when you were taking over this case?
3       A.   Yes.
4       Q.   And then we see on page 5 at line 7, the
5   court ordered that a CASA program coordinator be
6   referred to.
7           And then at line 11:  "It's further
8   ordered that the Foster Care Review Board review this
9   matter within six months."
10          So those are two of the entities that are
11  ordered by the court to be involved independent of DCS;
12  correct?
13      A.   Yes.
14      Q.   And they too, their role is to act in the
15  best interest of the children that are made wards of
16  the court; correct?
17          MR. CONNELLY:  Form and foundation.
18          THE WITNESS:  Yes.
19  BY MR. CROWN:
20      Q.   And then on page 8 the court appointed Megan
21  Haywood --
22          MR. CROWN:  Megan is M-E-G-A-N; Haywood,
23  H-A-Y-W-O-O-D.
24          THE COURT REPORTER:  You need to slow down
25  for me.

1           MR. CONNELLY:  Sure.

2           THE COURT REPORTER:  It's been a long day.

3   BY MR. CROWN:

4       Q.    -- to be the guardian ad litem; correct?

5       A.    Correct.

6       Q.    And then the court appointed lawyers for

7   Jessica Kahraman and Ahmet Kahraman; correct?

8       A.    Yes.

9       Q.    Okay.  So there's lots of people appointed

10  to be involved for the benefit of Kenan and Dylan in

11  addition to DCS; correct?

12          MR. CONNELLY:  Form and foundation.

13          THE WITNESS:  Correct.

14          (Deposition Exhibit No. 205 was marked for

15      identification.)

16  BY MR. CROWN:

17      Q.    Can you look at Exhibit 205?

18          This is an affidavit that Jessica Mann

19  Kahraman filed with the court on January 8, 2019.

20          And is this a document that you reviewed

21  as part of the documents you're reviewing when you

22  became involved?

23      A.    Yes.

24      Q.    Okay.  Now, although it says on page 2

25  that -- starts 1 of 90 and we'll see a later affidavit,

1  there are pages missing, but this is what was in the
2  court.
3         Anyway, having made that representation,
4  on page 2 of 90 of this exhibit, it states in the right
5  section that "Above all else, I, Jessica Mann Kahraman,
6  in and from the beginning, invoke my right of
7  self-determination, I invoke my right of redress of
8  grievances, and I hereby stand as a belligerent
9  claimant upon these rights as required."
10        And that's something you would have
11 read --
12    A.    Correct.
13    Q.    -- when reviewing this document?
14        (Deposition Exhibit No. 206 was marked for
15        identification.)
16 BY MR. CROWN:
17    Q.    If you can look at Exhibit 206.
18        This exhibit was also filed with the
19 court by Jessica Kahraman on January 8, 2019.  And page
20 2 says:  "Attention:  David Udall."
21        Now, that's the judge that was going to
22 hear the initial dependency hearing on January 9th, the
23 next day; correct?
24    A.    Correct.
25    Q.    So this document was filed with the court.

1    And if I ask you to turn to what is the third page of

2    this document, there's an affidavit from Jessica

3    Kahraman that appears to repeat the one we reviewed

4    that, again, is making allegations regarding Sarah

5    Kramer and that she considers the "failure to return

6    the biological property to be a trespass and she will

7    charge $5,000 a day if they are not returned."

8              Correct?

9         A.   Correct.

10        Q.   And then there's several documents attached

11   to this, and in the interest of time, I'm not going to

12   ask you to read them.  Anyone that looks at this

13   exhibit can read what they say.

14             Now, the next exhibit is Numbered 207.

15             MR. CONNELLY:  Are you going to go through

16   all 80 something?

17             MR. CROWN:  I am.  Based on -- based on your

18   questioning --

19             THE COURT REPORTER:  Hold on.  Okay.

20             MR. CROWN:  Based on your questioning, I

21   feel it's just important.  I mean, you've said about

22   stipulation.  Some will be with very little or no

23   questions, but your -- your three days of questions

24   require it.

25             MR. CONNELLY:  I didn't ask her any

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 231 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

344

1    questions about any of this stuff.

2              THE COURT REPORTER: I'm not a machine, so

3    I'm running out of gas here.

4              MR. CROWN:  Okay.  I'm going to do the best

5    I can to move through it.

6              MR. CONNELLY:  Are you on 207 now?

7              MR. CROWN:  Exhibit 207.

8              (Deposition Exhibit No. 207 was marked for

9         identification.)

10   BY MR. CROWN:

11        Q.   This is a document that was filed with the

12   court; am I correct?

13        A.   Yes.

14        Q.   And it's titled Compliance with Rule 47.3 of

15   the Arizona Rules of Juvenile Court Procedure, and it

16   says that the court has reviewed the paperwork --

17              THE COURT REPORTER:  You have to slow down.

18              MR. CROWN:  Okay.

19   BY MR. CROWN:

20        Q.   It states:  "The court has reviewed the

21   paperwork provided in support of Arizona Department of

22   Child Safety's petition for dependency, and the court

23   finds the department has complied with Rule 47.3."

24              Correct?

25        A.   Correct.

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 232 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

345

1            (Deposition Exhibit No. 208 was marked for
2         identification.)
3    BY MR. CROWN:
4         Q.    Exhibit 208, this is a court order from
5    Judge David Udall that was issued on January 9, 2019.
6    And it's something that you would have reviewed as you
7    were coming into the case; am I correct?
8         A.    I didn't -- I didn't review this minute entry
9    because I was present for this hearing.
10        Q.    Oh, okay.
11        A.    So I -- yeah, I didn't --
12        Q.    Okay.
13        A.    -- review -- review it because I was there.
14        Q.    Okay.
15             Well, this -- I mean, counsel's indicated
16    he will stipulate that this is the court order, and
17    since you were there and I see you were present, let me
18    just see if this order is consistent with what you
19    heard the judge rule in open court.
20             Sarah Kramer was there as the
21    investigator, and you attended as the ongoing
22    caseworker that had been assigned to this matter;
23    correct?
24        A.    Correct.
25        Q.    And then we see that the -- DCS and the

1  State was represented by Assistant Attorney General

2  Katie Martoncik; correct?

3       *A.*    Yes.

4       *Q.*    And then we see on page 2 that the court

5  affirmed the appointment of Megan Haywood as the

6  guardian ad litem for the children; correct?

7       *A.*    Correct.

8       *Q.*    We see at the top of page 3 that "The court

9  found that mother and father both understand their

10  rights and have knowingly, intelligently and

11  voluntarily chosen to waive their right to counsel and

12  proceed on their own behalf in all further

13  proceedings."

14            And you were present in court when that

15  finding was made; correct?

16       *A.*    Correct.

17       *Q.*    So the court then relieved Suzanne Nicholls,

18  as attorney for father, and relieved Bernadette Burick,

19  B-U-R-I-C-K, as attorney of record for mother; correct?

20       *A.*    Correct.

21       *Q.*    Now, it says in the next line:  "Mother and

22  father wish to contest the allegations of the

23  petition."

24            So the court ordered entering a denial to

25  the petition on behalf of father and mother; correct?

1       *A.*     Correct.

2       *Q.*     So they were disputing by denying the

3  allegations that were made to remove the children and

4  the basis for the court making them -- making the

5  children temporary wards of the court; right?  They

6  were disputing it?

7       *A.*     Correct.

8       *Q.*     Okay.  Services were to be offered to mother

9  and father.

10              And then despite the parents entering

11  their denial and advising the court they wish to

12  contest the allegation, the court then entered an order

13  continuing the children as temporary wards of the

14  court; correct?

15      *A.*     Correct.

16      *Q.*     And then at the top of page 4, the court

17  found that "The Department of Child Safety has made

18  reasonable efforts to prevent the removal of the

19  children from the home and that continuation in the

20  home would be contrary welfare of the children or that

21  it was reasonable to make no efforts to maintain the

22  children in the home."

23              And you were present in court as Judge

24  Udall made that finding; correct?

25      *A.*     Yes.

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 235 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

348

1           (Deposition Exhibit No. 209 was marked for
2           identification.)
3    BY MR. CROWN:
4        Q.   Exhibit 2000 -- not 2000 -- 209.  My
5    correction.
6              Exhibit 209 is an affidavit that was
7    filed by Ahmet Kahraman on January the 14th, 2019, and
8    in this affidavit, he states that "Sarah Kramer and
9    Sarah Mendez unlawfully took 'our biological
10   property.'"
11             And that's something you would have read;
12   correct?
13       A.   Correct.
14       Q.   And in paragraph 2:  "Ahmet demanded the
15   immediate return of 'our biological property.'"
16   Correct?
17       A.   Correct.
18       Q.   On the next page, paragraph 4, Ahmet states
19   the unlawful seizure of our biological property is an
20   infringement of his first amendment right; correct?
21       A.   Correct.
22       Q.   And he signed that under oath and he -- he
23   presented a series of documents or attachments as
24   Exhibit 1, and on each page, he wrote in a thick, black
25   marker the phrase, "I do not accept the terms and

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 236 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

349

1    conditions of your contract."

2                    And these were the forms and the

3    pleadings that had been issued and filed in the court;

4    correct?

5                    MR. CONNELLY:  Form and foundation.

6                    THE WITNESS:  Correct.

7                    (Deposition Exhibit No. 210 was marked for

8            identification.)

9    BY MR. CROWN:

10       Q.    The next exhibit is Number 210.  And this

11   document was filed on January 14th of 2019 by Jessica

12   Kahraman; and as I referenced earlier, there was an

13   exhibit that references pages 1 through 90, and this

14   exhibit does provide all 90 pages.

15                   And, again, this is the one where on

16   page 2 she said that she has the right to

17   self-determination, a right to redress of grievances,

18   and she stands as a belligerent claimant upon these

19   rights.

20                   And that's a document you would have

21   reviewed; correct?

22       A.    Correct.

23                   (Deposition Exhibit No. 211 was marked for

24           identification.)

25           ///

1  BY MR. CROWN:

2      Q.    The next Exhibit is 211.  And this was an

3  affidavit that Jessica Mann Kahraman filed, and it's

4  dated January 14, 2019.

5              And it, again, references a -- this

6  woman, Sarah Kramer and, again, demanding the return of

7  biological property or she will charge Sarah Kramer

8  $5,000 a day; correct?

9      A.    Correct.

10             (Deposition Exhibit No. 212 was marked for

11         identification.)

12  BY MR. CROWN:

13     Q.    Exhibit 212 is an affidavit that was filed

14  by Jessica Kahraman with the court on January 14, 2019,

15  and --

16             MR. CROWN:  Bless you.

17  BY MR. CROWN:

18     Q.    And it states pretty much the same language,

19  but it's referencing Sarah Mendez as the subject of

20  this affidavit; correct?

21     A.    Correct.

22     Q.    And again, this is a document you would have

23  reviewed as part of the case file; correct?

24     A.    Yes.

25             (Deposition Exhibit No. 213 was marked for

1             identification.)

2    BY MR. CROWN:

3        Q.    Exhibit 213 is an affidavit by Ahmet

4    Kahraman who states that he -- he filed this affidavit

5    with the court on January 15, 2019.  He states that

6    "He's a competent living man of sound mind."

7                 In paragraph 4, he states that he is sui

8    juris, and as we see, again, it was filed -- it was

9    signed on January 15, 2019.

10                And this is a document you read as part

11   of the file that you were taking over; correct?

12       A.    Yes.

13                (Deposition Exhibit No. 214 was marked for

14           identification.)

15   BY MR. CROWN:

16       Q.    Next exhibit is 214.  It is an affidavit

17   that was filed about the court on January 16th of 2019.

18                It says on page 2:  "Attention:  David

19   Udall."  It has a service list that includes, on

20   page 3, Kathleen Martoncik, Office of the Attorney

21   General; Megan Haywood, who we know is the guardian ad

22   litem; the Foster Care Review Board; Sarah Kramer.  And

23   then there's -- attached to that is the body of the

24   affidavit from Jessica Mann Kahraman; am I correct?

25       A.    Yes.

1      Q.   And that's the document you would have
2   reviewed because it was in the court file; correct?
3      A.   And this one was also mailed to me as well.
4   I got this --
5      Q.   Oh, okay.
6      A.   -- one myself.
7      Q.   And was it mailed to you by either Ahmet or
8   Jessica?
9      A.   Yes.
10      Q.   Okay.  Oh, and this Jessica's -- so Jessica
11   mailed it to you directly?
12      A.   Yes.
13           (Deposition Exhibit No. 215 was marked for
14           identification.)
15   BY MR. CROWN:
16      Q.   Okay.  The next exhibit, 215, is an
17   affidavit filed by Jessica Kahraman with the court on
18   January 24, 2019.  And again, page 2 says "David Udall"
19   and gives that same case Number JD532206; correct?
20      A.   Correct.
21      Q.   And on the third page, it says:  "Comes now
22   affiant."  And it says:  "Notice of Filing in Civil
23   Superior Court."
24           And this is yet another affidavit from
25   Jessica Kahraman.  And if we look at what is -- the

Case 2:22-cv-00375-SRB  Document 217-2  Filed 12/16/24  Page 240 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

353

 1  Bates stamp number in this is -- ends with the
 2  numbers 27459.  She is telling the court, "I affirm
 3  here" -- it's an affidavit under oath -- "there's no
 4  valid claim against me."
 5              And that's what she's telling the court,
 6  and she demands the immediate return of my biological
 7  property.  It would be at the end of that paragraph
 8  that's numbered 1.
 9              And that's something you would have read;
10  correct?
11      A.   Yes.
12      Q.   Then if we go towards the end of this
13  exhibit --
14              MR. CONNELLY:  Bates number?
15              MR. CROWN:  Yeah, the Bates number is 27464.
16              MR. CONNELLY:  464.
17  BY MR. CROWN:
18      Q.   And so this page is titled Affidavit
19  Demanding Dismissal and it's filed by Ahmet Kahraman
20  and it says, "In the matter of D.K. and K.K. Kahraman,"
21  and it's to the Honorable David Udall; correct?
22      A.   Correct.
23      Q.   And the language in that affidavit is
24  similar to what Jessica Kahraman's affidavit stated,
25  the front part of that exhibit; correct?

1       A.    Yes.

2       Q.    And you read it as part of your work as the

3    assigned ongoing caseworker?

4       A.    Yes.

5             (Deposition Exhibit No. 216 was marked for

6             identification.)

7    BY MR. CROWN:

8       Q.    Exhibit 216 is dated January 25, 2019, and

9    this is an addendum report to the juvenile court, and

10   this was prepared by you as an addendum to Sarah

11   Kramer's first progress report that was filed -- it

12   wasn't a progress report; it was the initial report

13   that was filed on January 8th of 2019.  Correct?

14      A.    Yes.

15      Q.    And this is where you updated the court

16   based on your early involvement in this case; correct?

17      A.    Yes.

18      Q.    So in the first paragraph, the last

19   sentence, you reported that "Dylan and Kenan enjoy

20   sharing a room but do enjoy having their own time."

21            Correct?

22      A.    Correct.

23      Q.    You reported to the court on how they are

24   doing in the foster home, how they are doing at school,

25   and you noted that Dr. Miga had reported on January 24,

1  2019, that Kenan's right ventricular heart failure had

2  been resolved; correct?

3      *A.*    Correct.

4      *Q.*    And again, in the interest of time, we don't

5  need to read every word, but this is you giving an

6  update to the court.  And I take it that when you filed

7  this, copies of what you filed are sent and received by

8  Jessica Kahraman and Ahmet Kahraman; correct?

9              MR. CONNELLY:  Form and foundation.

10             THE WITNESS:  Typically.  I -- I know there

11 was a protective order put into the case.  I don't recall

12 exactly when it was put in.  I know it was put in early

13 on, so ...

14 BY MR. CROWN:

15     *Q.*    I mean, they are representing themselves at

16 this point or -- or they have a group that they were

17 working with, but it's certainly available to them as

18 parents representing themselves; correct?

19             MR. CONNELLY:  Form and foundation.

20             THE WITNESS:  Correct.

21 BY MR. CROWN:

22     *Q.*    I mean, it's in the court file, so they

23 could have access to this document?

24             MR. CONNELLY:  Form and foundation.

25             THE WITNESS:  Yes.

1          (Deposition Exhibit No. 217 was marked for

2          identification.)

3  BY MR. CROWN:

4      Q.    Okay.  Exhibit 217.  This is a court order

5  by Judge Udall dated January 29, 2019, and it was --

6  the pretrial conference hearing in a contested -- the

7  contested dependency hearing was set.

8          And you attended this hearing; correct?

9      A.    Yes.

10     Q.    And so you're familiar with the court order?

11  You're familiar what the court ordered in open court;

12  correct?

13     A.    Correct.

14     Q.    And it shows that Jessica Kahraman was

15  present, Ahmet Kahraman was present, and all the others

16  that were in court are all listed there; correct?

17     A.    Correct.

18     Q.    And then the second paragraph on page 2

19  states that "The mother, Jessica Kahraman, hands the

20  assistant attorney general" --

21          THE COURT REPORTER:  You have to slow down.

22          MR. CROWN:  Okay.

23          THE COURT REPORTER:  I cannot --

24          MR. CROWN:  Sorry.

25          THE COURT REPORTER:  -- keep up with you.

 1 | BY MR. CROWN:
 2 |     *Q.*    "The mother, Jessica Kahraman, hands the
 3 | assistant attorney general a document which appears to
 4 | be a civil lawsuit that she's filed against the
 5 | assistant attorney general, the court and several other
 6 | individuals."
 7 |                 And you were present in court when she
 8 | was basically serving them with a lawsuit?
 9 |     *A.*    Correct.
10 |     *Q.*    And then the next paragraph states that "The
11 | mother, Jessica Kahraman, requested dismissal with
12 | extreme prejudice and demands the immediate return of
13 | her biological property."
14 |                 And then the next statement:  "The
15 | father, Ahmet Kahraman, demands immediate return of his
16 | biological property."
17 |                 Now, you being in court, who was the
18 | biological property that was being referred to by Ahmet
19 | and Jessica Kahraman?
20 |                 MR. CONNELLY:  Form and foundation.
21 |                 THE WITNESS:  The children.
22 | BY MR. CROWN:
23 |     *Q.*    The mother objected and stated she is sui
24 | juris; the father, Ahmet, indicated he is sui juris;
25 | and the court set the matter for dependency

 1   adjudication for June 3rd of 2019; am I correct?

 2        A.   Yes.

 3             (Deposition Exhibit No. 218 was marked for

 4         identification.)

 5   BY MR. CROWN:

 6        Q.   Okay.  And the -- Exhibit 218.  This is an

 7   affidavit that Jessica Kahraman filed with the court on

 8   January 31, 2019; and on page 2, it is titled Affidavit

 9   of Trespass upon my property."

10             In paragraph numbered 1, she claims that

11   "Multiple men and women actors are attempting to use a

12   private court to trespass upon my property by way of

13   theft.  I require the immediate return of my biological

14   property."

15             And this is a document that you read;

16   correct?

17        A.   Yes.

18        Q.   And were you aware of who Jessica Kahraman

19   is referring to as her "biological property"?

20        A.   Her children.

21             MR. CONNELLY:  Which document are you on

22   right now?

23             MR. CROWN:  218.

24             MR. CONNELLY:  Oh, okay.

25             And form and foundation to that last

1  question, please.

2          (Deposition Exhibit No. 219 was marked for

3      identification.)

4  BY MR. CROWN:

5      Q.    Exhibit 219.  Appears to be another document

6  that was filed in court by the Kahramans.

7          MR. CONNELLY:  Form.

8  BY MR. CROWN:

9      Q.    And it's court documents, and it is dated

10 February 5th of 2019.  And again, in black marker, it

11 states:  "Your offer to contract is not accepted."  And

12 that's a quote, and it's written on every one of the

13 pages that makes up Exhibit 2019.

14         MR. CONNELLY:  Form.

15 BY MR. CROWN:

16     Q.    And my question to you is:  Is this a

17 document that you would have read and been familiar

18 with in your work as an ongoing caseworker?

19         MR. CONNELLY:  Form and foundation.

20         THE WITNESS:  Yes.

21         (Deposition Exhibit No. 220 was marked for

22     identification.)

23 BY MR. CROWN:

24     Q.    Exhibit 220.  This is an affidavit that

25 Jessica Kahraman filed with the court dated February 5,

1    2019, and it is an affidavit requiring authority to

2    act.  And this is Jessica Kahraman stating that "I

3    claim that Kathleen Martoncik is a woman acting as the

4    attorney general and working in a private capacity,"

5    and the rest of the document speaks for itself.

6              But is this a document that you would

7    have reviewed in your work on this case?

8         A.   Yes.

9              (Deposition Exhibit No. 221 was marked for

10             identification.)

11   BY MR. CROWN:

12        Q.   The next exhibit, 221, is a document that

13   Jessica Kahraman filed with the court.  It is dated

14   February 12, 2019.  The date of filing, the very front

15   page states, "Attention:  Jennifer E. Green" with the

16   case number.

17             Jennifer Green was the judge that was

18   assigned to this case after Judge Udall; correct?

19        A.   Correct.

20        Q.   And from the point of her assignment, Judge

21   Jennifer Green remained the judge that presided over

22   this case until the dependency petition and action was

23   terminated on November 9, 2020; correct?

24        A.   Correct.

25        Q.   So from this point on, we're going to see

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 248 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

361

 1  the rulings and filings that were made before Judge

 2  Jennifer Green; correct?

 3       A.   Correct.

 4       Q.   Okay.  And this is an affidavit, as we see

 5  on page 2, where Jessica Kahraman has Jennifer E. Green

 6  as the subject, stating:  "I do believe this woman,

 7  Jennifer E. Green, a woman acting as a judge..."

 8            And in paragraph 4, she states:  "I

 9  require this woman, Jennifer E. Green, show findings of

10  fact and conclusions of law."

11            And then she submits pictures of her

12  sons; am I correct?

13       A.   Correct.

14       Q.   And I -- I take it that when she's

15  referencing her "biological property," the pictures of

16  her two sons would be as exhibits to depict who her

17  biological property is that she's referring; correct?

18            MR. CONNELLY:  Form.

19            THE WITNESS:  Correct.

20            MR. CONNELLY:  And foundation.

21            (Deposition Exhibit No. 222 was marked for

22       identification.)

23  BY MR. CROWN:

24       Q.   Exhibit 222 is a court order by Judge

25  Jennifer Green that she issued on February the 12th,

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 249 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

362

1    2019, and this is a -- and by the way, the last

2    affidavit was a document you would have reviewed as

3    your work as an ongoing caseworker?

4         *A.*    Yes.

5         *Q.*    Okay.  This exhibit, 222, is a minute entry

6    from Judge Green that states:  "The court will address

7    two pleadings and a series of 12 affidavits that were

8    recently filed by mother and/or came to the court's

9    attention."

10             Number 1:  "Your offer is contract is not

11   accepted," and an e-mail sent to Judge Udall's judicial

12   assistant.  And then it says:  "The court is in receipt

13   of several pages e-mailed to the prior assigned

14   division," that states in marker, in writing in marker,

15   "Your offer is not -- your offer to contract was not

16   accepted."

17             And then the court continues analyzing

18   these pleadings.  And then at the top of page 2, the

19   court states:  "The juvenile court is not in business

20   of 'contracting with' litigants."

21             And then the court in paragraph 2 stated

22   that -- summarized the pleadings by Jessica Kahraman

23   advising that she is sui juris and an Arizona State

24   National.

25             Paragraph 3, she references 12 affidavits

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 250 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

363

1   filed from January 9, 2019 to February 5, 2019, and

2   then the court discusses further on page 2.

3              And then the court issues its order on

4   page 3:  "It is ordered denying these pleadings for the

5   reasons set forth above."

6              And, again, you had received these

7   documents, you had reviewed these documents, and then

8   you reviewed the court order that denied these

9   pleadings as issued by Judge Green; correct?

10      *A.*    Correct.

11             THE COURT REPORTER:  I'm closing down at 8

12   o'clock.  I can't go -- it's been 11 hours.

13             MR. CROWN:  I'm --

14             THE COURT REPORTER:  And is Tom going to

15   have more questions?

16             MR. CONNELLY:  I'm not -- I'm not taking

17   issue with anything these documents say and if you want to

18   have her testify that she's reviewed all of these

19   documents.  I don't see why you have to go through them

20   one by one.

21             MR. CROWN:  I mean --

22             MR. CONNELLY:  And we're not taking any

23   issue --

24             MR. CROWN:  Let's not --

25             MR. CONNELLY:  -- with all of this.

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 251 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

364

1    MR. CROWN:  Let's not make -- let's not make

2    this -- I'm going to do the best I can.  I have been very

3    patient for three days.  I have listened and I have been

4    very, very patient.  I want to finish.  I don't want to

5    come back for a fourth day, and I have my reasons for

6    doing what I'm doing.  And I should be allowed to do this.

7    If you can just bear with me, and I'm moving

8    fast, as you can.

9    THE COURT REPORTER:  It's been almost 12

10   hours and I am not a machine.  And I'm sorry, I don't have

11   any control over any of the timing of any of this.  I'm --

12   I'm not a machine, I can't -- we haven't eaten since 11.

13   I'm doing -- I'm doing the best I can as well.

14   MR. CROWN:  Let's take a short break.

15   THE VIDEOGRAPHER:  Off the record at 7:12.

16   (WHEREUPON, a brief recess was taken from

17   7:12 p.m. to 7:16 p.m.)

18   (Deposition Exhibit No. 223 was marked for

19        identification.)

20   BY MR. CROWN:

21   Q.    Exhibit 223 is a court order from Judge

22   Green from December 13, 2019, and this was about

23   improper use of social media by the Kahramans.  And on

24   page 2, it shows that you were sworn in and you

25   testified; correct?

1    *A.*   Correct.  But I think this was February 13,
2    not December.
3    *Q.*   If I said -- February 13, 2019.
4    *A.*   Okay.
5    *Q.*   And Jessica Kahraman was sworn but did not
6    testify; correct?
7              MR. CONNELLY:  Where are you looking?
8              MR. CROWN:  Page 3.
9              MR. CONNELLY:  Page 3.  Thank you.
10             THE WITNESS:  Correct.
11   BY MR. CROWN:
12   *Q.*   And then the court found that it rejected
13   mother's argument that the court lacked jurisdiction
14   for the reasons stated on the record.
15             Am I correct?
16   *A.*   Correct.
17   *Q.*   And then on page 4, the court found mother
18   and father in contempt of court.
19   *A.*   Correct.
20             (Deposition Exhibit No. 224 was marked for
21         identification.)
22   BY MR. CROWN:
23   *Q.*   Exhibit 224.  This is another order from
24   Jennifer Green that you would have reviewed, and it
25   references a pleading that is a series of statements or

1   demands from the mother; correct?

2       A.   Correct.

3       Q.   And then Judge Jennifer Green denied any

4   relief sought by the mother's affidavit; correct?

5       A.   Correct.

6            (Deposition Exhibit No. 225 was marked for

7            identification.)

8   BY MR. CROWN:

9       Q.   And then on May 7th of 2019, Exhibit 225 is

10  the Foster Care Review Board findings and

11  recommendation; correct?

12      A.   Correct.

13      Q.   And this document was filed by the court;

14  correct?

15      A.   Correct.

16      Q.   You didn't have -- you didn't prepare this

17  report?

18      A.   Correct.

19      Q.   And this is the board saying that they found

20  the out-of-home placement was necessary.  That's

21  paragraph 2.

22      A.   Yes.

23           MR. CONNELLY:  Form and foundation.

24  BY MR. CROWN:

25      Q.   Essentially, the court was agreeing -- not

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 254 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

367

1   the court.  The Foster Care Review Board was agreeing

2   that out-of-home placement was proper, and the board

3   made the determination that placement -- that the

4   placement is safe, appropriate, and least restrictive;

5   correct?

6       *A.*    Correct.

7                MR. CONNELLY:  Form and foundation.

8   BY MR. CROWN:

9       *Q.*    And on page 3 of 7, paragraph 7, the board

10  made a determination that the established target date

11  for the completion of the permanency goal is not

12  realistic, believing that it would take a longer period

13  of time to follow the plan towards reunification;

14  correct?

15      *A.*    Correct.

16               MR. CONNELLY:  Where was that?  I'm sorry.

17  Paragraph -- page 3 of 7, paragraph 7?

18               MR. CROWN:  7, yes.

19  BY MR. CROWN:

20      *Q.*    And then the Foster Care Review Board

21  summarized an interview with the biological mother and

22  then an interview with you; am I correct?

23      *A.*    Correct.

24      *Q.*    So that means that the Foster Care Review

25  Board has a representative that interviews you as part

 1    of your work and involvement in the case and

 2    independently interviewed Jessica Kahraman?

 3        A.    It's -- it's not so much of an interview.

 4    They let you speak -- provide your own updates, and

 5    then if they have follow-up questions, they do ask

 6    follow-up questions, but it's not like an interview

 7    style.

 8              (Deposition Exhibit No. 226 was marked for

 9         identification.)

10    BY MR. CROWN:

11        Q.    Okay.  If you can -- Exhibit 226.

12              Because Jessica Kahraman was claiming

13    that mold was the cause of the symptoms in her sons,

14    and Ahmet at that time as well, Exhibit 226 is an

15    emergency motion for the court to have the children

16    seen by a Dr. Melanie Alarcio; correct?

17        A.    Correct.

18        Q.    And this was filed by attorney Suzanne

19    Nicholls who was representing father, Ahmet; correct?

20        A.    Correct.

21              (Deposition Exhibit No. 227 was marked for

22         identification.)

23    BY MR. CROWN:

24        Q.    Exhibit 227 was the response pleading to

25    have Dr. Alarcio do mold testing on the children.  And

1    this was filed by the assistant attorney general

2    Kathleen Martoncik; correct?

3         A.   Correct.

4         Q.   So there was of a dispute between Ahmet's

5    motion and the State's response; correct?

6         A.   Correct.

7              (Deposition Exhibit No. 228 was marked for

8              identification.)

9    BY MR. CROWN:

10        Q.   And then in Exhibit 228, the guardian ad

11   litem filed a response to the father's emergency

12   motion.  And the guardian ad litem is independent of

13   DCS and the Attorney Generals' Office; correct?

14        A.   Correct.

15        Q.   And they also opposed the testing of the

16   children; correct?

17        A.   Correct.

18        Q.   And the guardian ad litem suggested to the

19   court that all medical records, medical opinions, home

20   mold testing and treatment be provided to an on-staff

21   Phoenix Children's Hospital specialist for their

22   independent review; correct?

23        A.   Correct.

24              (Deposition Exhibit No. 229 was marked for

25              identification.)

1   BY MR. CROWN:

2       *Q.*   And that was Exhibit 228.

3              And Exhibit 229 is the court's ruling on

4   Ahmet's emergency motion.  And the court noted that

5   mother agreed with father's position on page 1, and

6   then the court noted at the bottom of page 2 that it

7   was presented with conflicting evidence; correct?

8       *A.*   Correct.

9       *Q.*   And then on page 3, the court stated that

10  "GAL offered a unique solution to allow a Phoenix

11  Children's Hospital specialist, who has no prior

12  involvement with the case, to review all the records

13  and make a recommendation."

14             And that's what the court ordered to take

15  place; correct?

16      *A.*   Correct.

17             (Deposition Exhibit No. 230 was marked for

18             identification.)

19  BY MR. CROWN:

20      *Q.*   Now, Exhibit 230 was a motion for

21  reconsideration of that very order.  And that was

22  filed, again, by Ahmet through his attorney, Suzanne

23  Nicholls; correct?

24      *A.*   Yes.

25             (Deposition Exhibit No. 231 was marked for

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 258 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

371

1          identification.)
2   BY MR. CROWN:
3       Q.    And then Exhibit 231 is the father's initial
4   disclosure statement in this dependency petition or
5   proceedings; correct?
6       A.    Correct.
7              (Deposition Exhibit No. 232 was marked for
8              identification.)
9   BY MR. CROWN:
10      Q.    Exhibit 232 is DCS's dependency initial
11  disclosure statement under the Rules of Procedure;
12  correct?
13      A.    Correct.
14             (Deposition Exhibit No. 233 was marked for
15             identification.)
16  BY MR. CROWN:
17      Q.    Exhibit 233 is mother's dependency
18  disclosure statement; correct?
19      A.    Correct.
20             (Deposition Exhibit No. 234 was marked for
21             identification.)
22  BY MR. CROWN:
23      Q.    And then Exhibit 234 is a report by Dr. Jodi
24  Carter who is the doctor at Phoenix Children's Hospital
25  that was assigned to do the records review regarding

 1   the court's order for mold testing; correct?

 2       *A.*   Correct.

 3       *Q.*   And Dr. Carter's report was given to the

 4   court; correct?

 5       *A.*   Yes.

 6       *Q.*   Dr. Carter concluded she did not believe

 7   that Kenan Kahraman should undergo further testing for

 8   mold-related illness at this time.

 9           MR. CONNELLY:  Form and foundation to the

10   question before this last one.

11   BY MR. CROWN:

12       *Q.*   All right.  Well, was Dr. Carter's report

13   filed with the court?

14       *A.*   Yes.

15           (Deposition Exhibit No. 235 was marked for

16           identification.)

17   BY MR. CROWN:

18       *Q.*   Okay.  And then Exhibit 235 --

19           MR. CONNELLY:  Form and foundation.

20   BY MR. CROWN:

21       *Q.*   -- is Dr. Carter's --

22           THE COURT REPORTER:  I'm sorry, what number

23   did you say?

24           MR. CROWN:  235.

25   BY MR. CROWN:

1        Q.    And this is Dr. Carter's report regarding

2   her review of Dylan Kahraman's records pursuant to that

3   court order; correct?

4        A.    Correct.

5        Q.    And Dr. Carter concluded that she did not

6   believe that Dylan Kahraman should undergo further

7   testing for mold-related illness at this time; correct?

8        A.    Correct.

9        Q.    And that was, again, a report filed with the

10  court; correct?

11              MR. CONNELLY:  Form and foundation.

12              THE WITNESS:  Correct.

13              (Deposition Exhibit No. 236 was marked for

14         identification.)

15  BY MR. CROWN:

16       Q.    Exhibit 236 is a minute entry dated

17  August 5, 2019 from Judge Green where the mother asked

18  the court to reconsider its prior denial of a request

19  to appoint Dr. Alarcio.  And the court stated its

20  reasoning, and then it affirmed its prior order and

21  denies the motion for reconsideration.  Correct?

22       A.    Correct.

23       Q.    The court in -- on page 2 stated that the

24  court affirmed its previous concern that mother's

25  doctors were recommending different tests.  The court

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 261 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

374

1  noted that Dr. Miga, the children's cardiologist and

2  the physicians assistant, Ms. Rattle, both opined that

3  further testing is unnecessary.

4              And, again, that was something that you

5  would have been reviewing as part of your continuing

6  work in this case?

7      A.   Correct.

8              (Deposition Exhibit No. 237 was marked for

9          identification.)

10 BY MR. CROWN:

11     Q.   Exhibit 237 is a pleading that was filed by

12 Jessica Kahraman through her attorney, DeeAn Gillespie.

13 And so now Attorney Gillespie is involved on behalf of

14 Jessica Kahraman; correct?

15     A.   Yes.

16     Q.   And this pleading is titled Objection to the

17 Court's Consideration of Dr. Carter's Opinion in Ruling

18 on Parent's Motion.

19             And so they were challenging Dr. Carter

20 and this is a very lengthy pleading and it was filed

21 with the court to consider; correct?

22     A.   Correct.

23             (Deposition Exhibit No. 238 was marked for

24         identification.)

25         ///

 1  BY MR. CROWN:

 2       Q.    And then Exhibit 238, there was a status

 3  conference for Judge Green on September 10, 2019.

 4             You were present; the parties were

 5  present; Kathleen Martoncik was present.  Correct?

 6       A.    Correct.

 7       Q.    And the court set the matter for a

 8  mediation; am I correct?

 9       A.    Yes.

10             (Deposition Exhibit No. 239 was marked for

11        identification.)

12  BY MR. CROWN:

13       Q.    Then we come to Exhibit 239, and this is the

14  report of Dr. Kelly.  And this report ultimately was

15  submitted to the court for its consideration; am I

16  correct?

17             MR. CONNELLY:  Form and foundation.

18             THE WITNESS:  Yes.

19  BY MR. CROWN:

20       Q.    And counsel has asked you a lot of questions

21  about this, and at points -- at times, you cut and

22  pasted portions of this report into your report;

23  correct?

24       A.    Correct.

25       Q.    But this entire report was filed with the

1    court; correct?

2         *A.*    Yes.

3              (Deposition Exhibit No. 240 was marked for

4         identification.)

5    BY MR. CROWN:

6         *Q.*    Okay.  Exhibit 240 is the report that you

7    filed to the court that's dated December 6th of 2019;

8    correct?

9         *A.*    Correct.

10        *Q.*    Many portions of this report, you testified

11   that -- were cut and pasted from others; correct?

12        *A.*    Correct.

13        *Q.*    And then there's portions where you were

14   able to provide your recommendations and opinions;

15   correct?

16        *A.*    Correct.

17        *Q.*    And that's part of your job is to provide

18   your recommendation as a DCS ongoing case worker;

19   correct?

20        *A.*    Correct.

21        *Q.*    But your recommendations are reviewed by a

22   supervisor; correct?

23        *A.*    Correct.

24        *Q.*    And that was Mecca Temple; correct?

25        *A.*    Correct.

1    Q.    And then, ultimately, when you filed this
2    report with the court, lots of people get your report,
3    including all those that are independently involved in
4    making decisions in the best interest of the children;
5    correct?
6    A.    Correct.
7    Q.    And that includes the attorney general, the
8    guardian ad litem, the mother's attorney, the father
9    and his attorney.  Everyone gets your report?
10    A.    Correct.
11            (Deposition Exhibit No. 241 was marked for
12            identification.)
13    BY MR. CROWN:
14    Q.    Exhibit 241 was the report by the
15    court-appointed advocate, Susan Stark, and this is
16    dated December 16, 2019.
17            Now, Ms. Stark is not employed by DCS;
18    correct?
19    A.    Correct.
20    Q.    And if we go to what is page 3 of her report
21    to the court, she recommended that Kenan and Dylan
22    remain wards of the court and they remain in the
23    current placement; correct?
24    A.    Correct.
25    Q.    And again, everybody who's involved for the

 1  children get a copy of CASA Susan Stark's report;
 2  correct?
 3      *A.*    Correct.
 4              (Deposition Exhibit No. 242 was marked for
 5          identification.)
 6  BY MR. CROWN:
 7      *Q.*    Then the next exhibit, 242, was DCS's
 8  Response to Mother's Motion For Clarification and
 9  Additional Disclosures.
10              And on page 2, starting at line 19, I
11  want to read this, and -- and see if this was part of
12  the DCS position.
13              "Mother further alleges the department
14  did not provide a factual basis or sufficient notice
15  that mother has factitious disorder by proxy.  This is
16  untrue.
17              "At this time, the department has not
18  alleged that mother has been diagnosed with factitious
19  disorder by proxy, nor is the department aware of
20  whether mother has such a diagnosis.  This does not
21  preclude the department from alleging this in the
22  future if it becomes warranted by the evidence.
23  However, the department has never alleged that the
24  mother has factitious disorder by proxy."
25              Now, that was the attorney general

1    presenting the court the DCS position on factitious

2    disorder; correct?

3         A.    Correct.

4         Q.    And that --

5               MR. CONNELLY:  Form and foundation.

6    BY MR. CROWN:

7         Q.    And -- and that was -- in your role, that

8    was your position; correct?

9         A.    Correct.

10              MR. CONNELLY:  I'm sorry.  The question was,

11   "in her role" --

12              MR. CROWN:  In her role as the ongoing

13   caseworker, that was her position.

14              MR. CONNELLY:  What is stated on lines 19

15   through 27 --

16              MR. CROWN:  Yes.

17              MR. CONNELLY:  -- on page 2?

18              MR. CROWN:  Yes.

19              MR. CONNELLY:  Okay.

20              (Deposition Exhibit No. 243 was marked for

21         identification.)

22   BY MR. CROWN:

23        Q.    And then the next exhibit, 243, is a

24   supplemental disclosure that was listing as a witness

25   Dr. Ryan Stewart, who is one of the pediatric doctors

1  that was treating Kenan during his hospitalization in

2  December and January 2018 and '19; correct?

3      *A.*    Correct.

4              (Deposition Exhibit No. 244 was marked for

5              identification.)

6  BY MR. CROWN:

7      *Q.*    Then the next exhibit, 244, was a motion

8  filed by Jessica Kahraman to dismiss the amended

9  dependency petition -- and it's a very lengthy

10 pleading; 28 pages total -- and stated multiple reasons

11 that they presented to the court, by way of this

12 motion, to dismiss the dependency petition; correct?

13     *A.*    Correct.

14             (Deposition Exhibit No. 245 was marked for

15             identification.)

16 BY MR. CROWN:

17     *Q.*    And then the next exhibit, 245, is mother's

18 first supplemental dependency disclosure statement;

19 correct?

20     *A.*    Correct.

21             (Deposition Exhibit No. 246 was marked for

22             identification.)

23 BY MR. CROWN:

24     *Q.*    And then Exhibit 246 is the Second Amended

25 Dependency Petition that was filed on January 6th, and

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 268 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

381

 1  that was the subject of the hearing that took place
 2  that day; correct?
 3       A.   Correct.
 4             (Deposition Exhibit No. 247 was marked for
 5          identification.)
 6  BY MR. CROWN:
 7       Q.   Exhibit 247 was the hearing before Judge
 8  Green on the dependency petition; am I correct?
 9       A.   Correct.
10       Q.   And this particular hearing is known as
11  the adjudication hearing; correct?
12       A.   Correct.
13       Q.   And you were present; your supervisor, Mecca
14  Temple was present; and all the other parties are
15  listed as being present.  Correct?
16       A.   Yes.
17       Q.   Okay.  Now, the father maintained his denial
18  but stipulated to the evidence, and the mother did not
19  contest the evidence; correct?
20       A.   Correct.
21       Q.   Even with that pending motion, the mother,
22  at this hearing, Jessica Kahraman, did not contest the
23  dependency petition; correct?
24       A.   Correct.
25       Q.   And I take it that Petitioner's Exhibits 1

 1 | and 2 that are marked for identification were reports
 2 | that were prepared by initially Sarah Kramer, and then
 3 | your report of December 6th of 2019; correct?
 4 |                     MR. CONNELLY:  Form and foundation.
 5 |                     THE WITNESS:  Correct.
 6 | BY MR. CROWN:
 7 |     Q.    Well, you know that to be the case, that
 8 | Exhibits 1 and 2 are the Sarah Kramer report from
 9 | January 8, 2019 and your report to the court dated
10 | December 6, 2019; correct?
11 |     A.    Correct.
12 |     Q.    And the mother did not contest those two
13 | reports; correct?
14 |     A.    Correct.
15 |     Q.    And then the court, at the top of page 3,
16 | found that the father knowingly, intelligently,
17 | voluntarily waived his arrive to trial and stipulated
18 | to the evidence.  And the court found the father is
19 | unable to parent the child due to neglect; correct?
20 |     A.    Correct.
21 |     Q.    And the court made the same findings with
22 | regard to Jessica Kahraman; that "The court finds,
23 | pursuant to the Rules of Procedure, that the allegation
24 | of neglect in the dependency petition is true by a
25 | preponderance of the evidence," and then proceeded to

1  find that the mother knowingly, intelligently, and

2  voluntarily waived her right to trial; correct?

3     *A.*   Yes.

4     *Q.*   And, again, your -- the Exhibits 1 and 2

5  were admitted against the mother; correct?

6     *A.*   Correct.

7     *Q.*   The court finds mother is unable to parent

8  the child due to neglect and that the allegation of

9  neglect is true by a preponderance of the evidence.

10          And then the court ordered making the

11 children wards of the court as dependent children

12 committed to the care, custody, and control of the

13 Department of Child Safety; correct?

14    *A.*   Yes.

15    *Q.*   Okay.  And then at the bottom of page 4, the

16 court found the Department of Child Safety had made

17 reasonable efforts to prevent the removal of the

18 children from the home when a continuation in the home

19 would be contrary to the welfare of the children --

20          THE COURT REPORTER:  Can you please slow

21 down?

22 BY MR. CROWN:

23    *Q.*   -- and the continuation in the home would be

24 contrary to the welfare of the children; correct?

25    *A.*   Correct.

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 271 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

384

1           (Deposition Exhibit No. 248 was marked for
2           identification.)
3    BY MR. CROWN:
4        Q.   And then a month later, Exhibit 248, mother
5    filed a motion for change in physical custody, and she
6    filed a motion seeking that the children be returned to
7    her; correct?
8        A.   Yes.
9        Q.   Okay.  And, again, this is a very lengthy
10   pleading.  It was filed by her attorney, DeeAn
11   Gillespie, and set forth the reasons that -- to the
12   court, by way of this motion; correct?
13       A.   Correct.
14           (Deposition Exhibit No. 248A was marked for
15           identification.)
16   BY MR. CROWN:
17       Q.   And then in Exhibit 248A, and that's where I
18   said I doubled up, DCS opposed it, and this is a
19   pleading that was filed with the court by the Attorney
20   Generals' Office through Kathleen Martoncik; correct?
21       A.   Yes.
22       Q.   And you were meeting with Kathleen Martoncik
23   at this point in time and being part of the assigned
24   members from DCS that was establishing the DCS
25   position; correct?

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 272 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

385

1        *A.*    Correct.

2        *Q.*    But you weren't the only one responsible for

3    the DCS position and objecting to mother's Rule 59

4    motion; correct?

5        *A.*    Correct.

6        *Q.*    All those other parties that we talked about

7    were involved in the physical custody of the children;

8    correct?

9        *A.*    Correct.

10              (Deposition Exhibit No. 249 was marked for

11          identification.)

12    BY MR. CROWN:

13        *Q.*    And then Exhibit 249 is the father objected

14    to mother's motion for change of physical custody, and

15    he joined in DCS's objection to the mother's Rule 59

16    motion; correct?

17        *A.*    Correct.

18        *Q.*    And those reasons are set forth in

19    Exhibit 249; correct?

20        *A.*    Correct.

21              (Deposition Exhibit No. 250 was marked for

22          identification.)

23    BY MR. CROWN:

24        *Q.*    Exhibit 250 was a pleading titled Offer of

25    Proof in Support of Request for Evidentiary Hearing.

 1  And this was, again, filed on behalf of Jessica

 2  Kahraman through her attorney.  And there was an offer

 3  of proof about Dr. Scott Jensen and Becky Plotner and

 4  all these other names that counsel had discussed with

 5  you and shown reports.

 6            And they made an offer of proof as to

 7  what these witnesses would say in court; correct?

 8       A.   Correct.

 9            (Deposition Exhibit No. 251 was marked for

10            identification.)

11  BY MR. CROWN:

12       Q.   And then Exhibit 251 is an ASFA finding

13  document that was filed with the court and signed by

14  the court.  And it states here -- and this is, again,

15  pursuant to federal and state statutes; correct?

16       A.   Correct.

17       Q.   And ASFA findings are regarding reasonable

18  efforts to finalize the permanency plan, and the court

19  found that DCS has made reasonable efforts to finalize

20  the permanency plans currently in effect by Dylan

21  and -- for Dylan and Kenan.  Correct?

22       A.   Yes.

23            (Deposition Exhibit No. 252 was marked for

24            identification.)

25            ///

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 274 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

387

 1   BY MR. CROWN:
 2        Q.    Exhibit 252 is your progress report to the
 3   court dated April 27, 2020; correct?
 4        A.    Correct.
 5        Q.    And it was in this document, as counsel
 6   referenced, that the DCS position was now to change the
 7   plan to severance and adoption in regards to mother
 8   only; correct?
 9        A.    Correct.
10        Q.    And the reasons are stated in this report;
11   correct?
12        A.    Correct.
13        Q.    And this was filed with the court?
14        A.    Yes.
15              (Deposition Exhibit No. 253 was marked for
16          identification.)
17   BY MR. CROWN:
18        Q.    Exhibit 253 is an emergency motion for
19   reconsideration filed by Jessica Kahraman through her
20   attorney.  And it was asking the court to reconsider
21   DCS's motion -- or granting DCS's motion to preclude
22   the testimony of Dr. Eli Newberger.
23              Now, earlier, you mentioned that the
24   court was aware and familiar with Dr. Newberger and his
25   involvement in this case; correct?

1          A.   Correct.

2          Q.   And the court made the ruling that, for this

3    hearing, Dr. Newberger would not be permitted to

4    testify in that.  But this motion was basically asking

5    for leave to testify, and it was filed on May 11, 2020;

6    correct?

7                    MR. CONNELLY:  Form and foundation.

8                    THE WITNESS:  Yes.

9                    (Deposition Exhibit No. 254 was marked for

10              identification.)

11   BY MR. CROWN:

12         Q.   Okay.  Exhibit 254 was a motion for

13   injunction relief filed against you on May 11th.  And

14   that's the day before there was an evidentiary hearing

15   on the Rule 59 motion; correct?

16         A.   Correct.

17         Q.   Now, the injunction was that Jessica

18   Kahraman filed a motion, through her attorney, to have

19   you removed from the case and were seeking the court

20   order to do just that; correct?

21         A.   Correct.

22         Q.   And they stated many, many reasons in here,

23   and it's a 16-page pleading; correct?

24         A.   Correct.

25                   (Deposition Exhibit No. 255 was marked for

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 276 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

389

1              identification.)

2    BY MR. CROWN:

3         Q.    The next exhibit, 255, was a minute entry by

4    the court dated May 11, 2020.  And on page 3 at the

5    bottom of page, the court ordered that it will preclude

6    the admission of the report because it was disclosed

7    two business days prior to the May 12th hearing.

8              And that was the report of Dr. Newberger;

9    correct?

10        A.    Correct.

11             (Deposition Exhibit No. 256 was marked for

12        identification.)

13   BY MR. CROWN:

14        Q.    Exhibit 256 is another minute entry dated

15   May 11, 2020.  And at the bottom of page 2 of this

16   order, the court stated its order taking no action on

17   mother's notice of intent to record, other than to note

18   that "DCS appropriately warned mother that she may be

19   in violation of service provider's policies if she, in

20   fact, recorded her interactions during services."

21             Now, counsel was asking you questions

22   about that, but this is a court order that addressed

23   that; correct?

24        A.    Correct.

25             MR. CONNELLY:  Form and foundation.

1              (Deposition Exhibit No. 257 was marked for
2          identification.)
3    BY MR. CROWN:
4         Q.    Exhibit 257 was the CASA report of Susan
5    Stark that was filed May 12, 2020, which is the day of
6    evidentiary hearing.
7              And if you turn to the last page for
8    recommendations, the CASA basically recommended that
9    Dylan and Kenan remain wards of the court and supported
10   DCS's recommendation that the case plan be changed to
11   severance and adoption for the mom; am I correct?
12        A.    Correct.
13             (Deposition Exhibit No. 258 was marked for
14         identification.)
15   BY MR. CROWN:
16        Q.    Okay.  On page 258 -- not page 258.
17   Exhibit 258, this is the minute entry of Judge Green
18   for the evidentiary hearing that was heard pursuant to
19   Rule 59.  And Jessica Kahraman was sworn and she
20   testified at that hearing; correct?
21        A.    Correct.
22        Q.    And you testified at that hearing; correct?
23        A.    Correct.
24        Q.    And Dr. Kelly Rodriguez, who counsel has
25   asked you a lot questions about, Dr. Kelly Rodriguez

1    testified at the hearing; correct?

2        A.    Correct.

3        Q.    And the court took judicial notice of the

4    family court matter; correct?

5        A.    Correct.

6        Q.    And then in that hearing, as we see at the

7    bottom of page 4, that's when the department moved for

8    the change of the case plan to severance and adoption?

9        A.    Correct.

10       Q.    And we see that the guardian ad litem and

11   mother objected but the father and CASA did not object;

12   correct?

13       A.    Correct.

14       Q.    And then the matter was taken under

15   advisement.

16             (Deposition Exhibit No. 259 was marked for

17         identification.)

18   BY MR. CROWN:

19       Q.    And then the next exhibit, 259, is father's

20   objection to mother's motion for injunctive relief,

21   which was a motion asking that the court remove you as

22   caseworker in this matter; correct?

23       A.    Yes.

24             (Deposition Exhibit No. 260 was marked for

25         identification.)

Case 2:22-cv-00375-SRB Document 217-2 Filed 12/16/24 Page 279 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

392

1  BY MR. CROWN:

2      *Q.*   Next document, Number 60[sic], is father's

3  objection to mother's motion to disclose a redacted

4  minute entry from another case; correct?

5      *A.*   Correct.

6              (Deposition Exhibit No. 261 was marked for

7          identification.)

8  BY MR. CROWN:

9      *Q.*   Exhibit 261 was mother's joint reply

10  regarding her motion for injunctive relief to have you

11  removed; correct?

12     *A.*   Correct.

13     *Q.*   And this is also a long pleading, 14 pages.

14             MR. CONNELLY:  Is that a question?

15             MR. CROWN:  No.

16  BY MR. CROWN:

17     *Q.*   Am I right?

18     *A.*   Yes.

19             (Deposition Exhibit No. 262 was marked for

20         identification.)

21  BY MR. CROWN:

22     *Q.*   And then Exhibit 262 is a pleading that the

23  father objected to the motion for injunctive relief and

24  made a motion for sanctions against mother for that

25  motion; correct?

1      *A.*    Correct.

2              (Deposition Exhibit No. 263 was marked for

3          identification.)

4   BY MR. CROWN:

5      *Q.*    And then Exhibit 263 is the minute entry

6   that Judge Green issued from the Rule 59 hearing that

7   was under advisement.  And in this, it's a lengthy

8   order summarizing the history of the case, medical

9   diagnoses regarding Kenan, information about Dylan, and

10  literally walking through, you know, that

11  hospitalization phase in December 2018 and '19.

12             And then at the bottom of page 3, the

13  court stated that in November 2019, "The court finds

14  evidence that demonstrated mother was both on track to

15  reunify and that suggested mother still did not fully

16  comprehend the seriousness that her own actions played

17  in her children's somewhat shocking physical condition

18  when they were brought to Cardon's Hospital."

19             Am I correct?

20     *A.*    Yes.

21     *Q.*    On page 4, the court found that as of

22  November 2019, there was compelling evidence to show

23  that mother both understood the error of her ways in

24  putting the children on a restricted diet and that she

25  was not prepared to parent the children safely because

1    she was blaming the children's poor and dangerous

2    health on mold, Kenan's thyroid condition, food

3    sensitivities, stress and chemical exposure.

4           So you're -- you're certainly -- were

5    aware of those findings by the court?

6       A.   Yes.

7       Q.   And then at the bottom of page 4, the court

8    said, based on case notes from February and March 2020,

9    the court found, as it did in November 2019, that there

10   was compelling evidence to show that mother both

11   understood the error of her ways and that she was not

12   prepared to parent the child -- children safely due to

13   not accepting responsibility for her role in their

14   poor, physical condition.

15          And that was a position that you had

16   taken and the Attorney Generals' Office had taken in

17   this matter; correct?

18      A.   Correct.

19      Q.   The court then highlighted evidence it found

20   compelling, and it highlighted Dr. Oakley on page 5 and

21   Dr. Rodriguez on page 5; am I correct?

22      A.   Correct.

23      Q.   And then when discussing Dr. Rodriguez, the

24   court said:  "Although Dr. Rodriguez worked on honesty

25   with mother, mother never shared with her own

1  psychologist that she was having trouble in her

2  marriage.  The court finds this peculiar and evidence

3  that even during moments of clarity and realization,

4  mother withheld significant matters from Dr. Rodriguez

5  that she and father were divorcing."

6            And then the court found credible

7  Dr. Rodriguez's assessment that mother has taken

8  responsibility for her decisions that contributed to

9  her children's extraordinary physical condition.

10           Now, counsel was asking you a lot of

11 questions, and it appears that you testified and the

12 court was making findings on your testimony; correct?

13           MR. CONNELLY:  Form and foundation.

14           THE WITNESS:  Correct.

15 BY MR. CROWN:

16    Q.   At the top of page 6, the court found that

17 mother's willingness to chase down theories about

18 things like mold, bacteria, and dry erase markers

19 served as a detriment to her ability to make sound

20 decisions.

21           Again, that's a consistent finding with

22 the DCS position; correct?

23           MR. CONNELLY:  Form and foundation.

24           And where are you reading from?

25           MR. CROWN:  Top of page 6.

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 283 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

396

1          MR. CONNELLY:  Okay.

2          THE WITNESS:  Yes.  Correct.

3  BY MR. CROWN:

4      Q.    And then the court found enlightening the

5  conversations between Dr. Rodriguez, Carla White and

6  the DCS case manager, Madison Bell.  And the court

7  found all three seemed to agree that prior to

8  reunification, mother needed to demonstrate her ability

9  to make medical decisions and needed to be the medical

10  gatekeeper.

11          And then the court discussed Dr. Kelly's

12  report.  And then ultimately, on page 7, the court

13  said -- the court found Dr. Kelly's opinions to be

14  credible; correct?

15     A.    Yes.

16     Q.    And then the court summarized your testimony

17  and SWHD senior program manager's testimony.  And then

18  on page 8, the court summarized and made findings

19  regarding mother's testimony; correct?

20     A.    Correct.

21     Q.    And then on page 99, the court stated that

22  it considered all the testimony and evidence and the

23  court made a finding that you were credible in your

24  position on behalf of DCS and the children; am I

25  correct?

 1          A.    Correct.

 2          Q.    And the court found that the mother, after

 3    weighing the evidence, had not met her burden in this

 4    case.

 5               MR. CONNELLY:  Is that a question?

 6    BY MR. CROWN:

 7          Q.    Am I correct?

 8          A.    Yes, that's correct.

 9          Q.    And then the court went on to -- on page 10,

10    so -- it ordered denying the motion for change of

11    physical custody and further ordered denying DCS's

12    request to change --

13               THE COURT REPORTER:  You have to slow down.

14               MR. CROWN:  Sorry.

15    BY MR. CROWN:

16          Q.    -- And the court ordered denying DCS's

17    request to change the case plan determination and

18    adoption.  Correct?

19          A.    Correct.

20          Q.    So family reunification remained the case

21    plan; correct?

22          A.    Correct.

23               (Deposition Exhibit No. 264 was marked for

24          identification.)

25               ///

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 285 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

398

 1 | BY MR. CROWN:
 2 |     *Q.*   264.  This was the ruling dated July 9, 2020
 3 | where the court denied Jessica Kahraman's motion to
 4 | remove you from this case.  And the court, at the
 5 | bottom page 2 stated it was unable to find in the
 6 | record any evidence that the court found that DCS had
 7 | not provided mother with a meaningful opportunity to
 8 | reunify.
 9 |             And then the court discussed mother's
10 | citation to the report by Dr. Newberger; correct?
11 |     *A.*   Correct.
12 |     *Q.*   And then the court concluded that DCS had
13 | made reasonable and diligent efforts to provide
14 | reunification services to mother and that your efforts
15 | were not unlawful or unreasonable; correct?
16 |     *A.*   Correct.
17 |     *Q.*   And therefore, the court denied mother's
18 | request for injunctive relief; correct?
19 |     *A.*   Correct.
20 |             (Deposition Exhibit No. 265 was marked for
21 |        identification.)
22 | BY MR. CROWN:
23 |     *Q.*   Page -- or -- Exhibit 265 is the case report
24 | or the progress report that you filed in the juvenile
25 | court; correct?

1      *A.*     Correct.

2             (Deposition Exhibit No. 266 was marked for

3         identification.)

4    BY MR. CROWN:

5      *Q.*     Exhibit 266 is the CASA report; correct?

6      *A.*     Correct.

7             (Deposition Exhibit No. 267 was marked for

8         identification.)

9    BY MR. CROWN:

10     *Q.*     Exhibit 267 was a rebuttal to the CASA

11   report that was filed by Jessica Kahraman through her

12   attorney, DeeAn Gillespie; correct?

13     *A.*     Correct.

14            (Deposition Exhibit No. 268 was marked for

15        identification.)

16   BY MR. CROWN:

17     *Q.*     Exhibit 268 is a court order dated

18   August 14th of 2020, where the court ordered that the

19   children still remain wards of the court and affirming

20   legal custody and placement orders; correct?

21     *A.*     Correct.

22     *Q.*     And the court found, on page 3, that the

23   Department of Child Safety has made reasonable efforts

24   to finalize the permanency plan for the children;

25   correct?

Case 2:22-cv-00375-SRB Document 217-2 Filed 12/16/24 Page 287 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

400

1        *A.*    Correct.

2               (Deposition Exhibit No. 269 was marked for

3           identification.)

4    BY MR. CROWN:

5        *Q.*    And Exhibit 269 is an addendum to mother's

6    concurrent motion for CPC to both parents; correct?

7        *A.*    Correct.

8               (Deposition Exhibit No. 270 was marked for

9           identification.)

10    BY MR. CROWN:

11        *Q.*    270 was the guardian ad litem's response to

12    mother's rebuttal to CASA, Susan Stark's report, and a

13    request to remove CASA?

14        *A.*    Correct.

15               (Deposition Exhibit No. 271 was marked for

16           identification.)

17    BY MR. CROWN:

18        *Q.*    271 was the guardian ad litem's response to

19    an objection to mother's motion for change of physical

20    custody filed with the court; correct?

21        *A.*    Correct.

22               (Deposition Exhibit No. 272 was marked for

23           identification.)

24    BY MR. CROWN:

25        *Q.*    272 is DCS's response and objection to

1    mother's motion for change of physical custody to both

2    parents.  Again, this issue was being litigated before

3    the court; correct?

4        A.    Correct.

5                (Deposition Exhibit No. 273 was marked for

6                identification.)

7    BY MR. CROWN:

8        Q.    273 is father's objection to mother's

9    concurrent motion for CPC to both parents; correct?

10       A.    Correct.

11               (Deposition Exhibit No. 274 was marked for

12               identification.)

13   BY MR. CROWN:

14       Q.    274, August 26th court order.  That, again,

15   the court made rulings and declined to remove the CASA

16   from the case and denied mother's request to remove

17   CASA tucked inside its rebuttal to CASA Susan Stark's

18   report; correct?

19       A.    Correct.

20               (Deposition Exhibit No. 275 was marked for

21               identification.)

22   BY MR. CROWN:

23       Q.    Okay.  275 -- we are almost done --

24   August 31, 2020, there was an evidentiary hearing, and

25   the court granted father's motion for change of

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 289 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

402

1  physical custody for the reasons stated on the record;
2  correct?
3      *A.*   Correct.
4              (Deposition Exhibit No. 276 was marked for
5          identification.)
6  BY MR. CROWN:
7      *Q.*   And then on September 15th, there was
8  another evidentiary hearing.  That's Exhibit 276.  And
9  Dr. Eli Newberger testified to the court; correct?
10     *A.*   Correct.
11     *Q.*   Dr. Ann Schroeckstein testified; correct?
12     *A.*   Correct.
13     *Q.*   Dr. Celice Korsten testified; correct?
14     *A.*   Correct.
15     *Q.*   And these are the three doctors that counsel
16 was asking you a lot of questions on; am I correct?
17     *A.*   Correct.
18              (Deposition Exhibit No. 277 was marked for
19         identification.)
20 BY MR. CROWN:
21     *Q.*   And then 277 was DCS's response to mother's
22 motion for the court to order DCS to provide
23 appropriate services.  And that's a pleading that,
24 again, you were familiar with?
25     *A.*   Yes.

Case 2:22-cv-00375-SRB    Document 217-2    Filed 12/16/24    Page 290 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

403

1              (Deposition Exhibit No. 278 was marked for
2          identification.)
3    BY MR. CROWN:
4        Q.   Exhibit 278 is the last progress report you
5    did to the court dated 10/30/2020.  And counsel asked
6    you about it, and obviously it speaks for itself?
7        A.   Correct.
8        Q.   280, the CASA report that was filed by Susan
9    Stark dated November 9th.
10             MR. CONNELLY:  Hold on a minute.  Did you --
11   did I miss you doing 279?
12             THE WITNESS:  I missed it too.
13             MR. CROWN:  Oh, I'm sorry.  It got out of
14   order.  Let me -- let me do that.
15             (Deposition Exhibit No. 279 was marked for
16          identification.)
17   BY MR. CROWN:
18       Q.   279 is mother's objection to the court's
19   consideration of the DCS report; correct?
20       A.   Yes.
21       Q.   And that was filed on November 6th of 2020.
22             So, again, here's the mother stating
23   reasons why the court should not follow your report;
24   correct?
25             MR. CONNELLY:  Form and foundation.

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 291 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

404

```
 1                  THE WITNESS:  Correct.
 2                  (Deposition Exhibit No. 280 was marked for
 3           identification.)
 4   BY MR. CROWN:
 5        Q.   Exhibit 280 was that CASA report, and CASA
 6   report included Susan Stark's recommendations to the
 7   court; correct?
 8        A.   Correct.
 9                  (Deposition Exhibit No. 281 was marked for
10           identification.)
11   BY MR. CROWN:
12        Q.   And then Exhibit 281 is a court order dated
13   November 9, 2020 by Judge Green.  And that is the final
14   order in this case because Judge Green dismissed the
15   dependency petition and issued initial temporary orders
16   in the family court matter, as that's where the case
17   would shift to; correct?
18        A.   Correct.
19        Q.   Okay.  Now I'm just going to have some
20   wrap-up questions, and then I'm going to be done.
21                  Was all the conduct that you performed
22   and activities you performed in this case -- and by
23   "this case," I mean, the -- the dependency petition
24   case and your involvement, were they lawful?
25                  MR. CONNELLY:  Form and foundation.
```

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 292 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

405

1                    THE WITNESS:  Yes.

2    BY MR. CROWN:

3        Q.    Were you following statutory requirements

4    and procedures and protocols?

5                    MR. CONNELLY:  Form and foundation.

6                    THE WITNESS:  Yes.

7    BY MR. CROWN:

8        Q.    And did you follow the court orders to the

9    best of your ability?

10                   MR. CONNELLY:  Form and foundation.

11                   THE WITNESS:  Yes.

12   BY MR. CROWN:

13       Q.    Counsel asked you a lot about your actions.

14   Did you have a reasonable basis for all the actions you

15   took in this case as the ongoing caseworker?

16                   MR. CONNELLY:  Form and foundation.

17                   THE WITNESS:  Yes.

18   BY MR. CROWN:

19       Q.    Did you intentionally misrepresent any of

20   information to the court at any time, either through

21   testimony or through your reports?

22       A.    No.

23       Q.    Did you ever deliberately misrepresent

24   anything with a personal animus against Jessica

25   Kahraman?

1          MR. CONNELLY:  Form and foundation.
2          THE WITNESS:  No.
3   BY MR. CROWN:
4      Q.    At all times did you act reasonably and in
5   the best interest of Kenan and Dylan Kahraman?
6          MR. CONNELLY:  Form and foundation.
7          THE WITNESS:  Yes.
8   BY MR. CROWN:
9      Q.    Did you ever deliberately ignore exculpatory
10  evidence?
11         MR. CONNELLY:  Form and foundation.
12         THE WITNESS:  No.
13  BY MR. CROWN:
14     Q.    There's an allegation that you acted with --
15  in an unwarranted and unfounded way in conducting your
16  "investigation" into Jessica Kahraman's fitness to
17  parent.
18         Do you agree --
19         THE COURT REPORTER:  To what?
20  BY MR. CROWN:
21     Q.    Fitness to parent.
22     A.    Can you repeat the question one more time?
23     Q.    Yes, I'll restate it.
24         Did you ever act in an unwarranted and
25  unfounded way towards Jessica Kahraman and her fitness

Case 2:22-cv-00375-SRB   Document 217-2   Filed 12/16/24   Page 294 of 647
VIDEORECORDED DEPOSITION OF MADISON BELL, 08/23/2024, VOLUME III

407

1  to parent?
2              MR. CONNELLY:  Form and foundation.
3              THE WITNESS:  No.
4  BY MR. CROWN:
5      Q.   Did you ever act in any way that was
6  arbitrary or unreasonable?
7              MR. CONNELLY:  Form and foundation.
8              THE WITNESS:  No.
9  BY MR. CROWN:
10     Q.   Did you deliberately ignore reports of
11  Dr. Oakley, Dr. Newberger, or Dr. Schroeckstein?
12             MR. CONNELLY:  Form and foundation.
13             THE WITNESS:  No.
14  BY MR. CROWN:
15     Q.   And as we saw, those not only were the
16  records supplied to the court, but they all testified
17  to the court during the pendency of this petition;
18  correct?
19             MR. CONNELLY:  Form and foundation.
20             THE WITNESS:  Correct.
21  BY MR. CROWN:
22     Q.   Did you hire Dr. Kelly merely to agree with
23  DCS to keep Dylan and Kenan from Jessica Kahraman?
24     A.   No.
25     Q.   Did you at any time unreasonably interfere

1  with Jessica Kahraman's attempts to visit her boys,

2  regain custody, or misrepresent information to the

3  juvenile court when attempting to terminate Jessica's

4  parental rights?

5           MR. CONNELLY:  Form and foundation.

6           THE WITNESS:  No.

7  BY MR. CROWN:

8      Q.   And as we saw, the attempt was a motion that

9  was made at the May 12th hearing which was stated

10 that such a motion be made, and the court denied it;

11 correct?

12     A.   Correct.

13     Q.   And at any time did you ever misrepresent or

14 mislead the juvenile court in this matter?

15           MR. CONNELLY:  Form and foundation.

16           THE WITNESS:  No.

17           MR. CROWN:  Thank you.

18           MR. CONNELLY:  Just super quick.

19           MR. CROWN:  Wait.  Wait.

20           MR. CONNELLY:  Oh, I thought you were done.

21           MR. CROWN:  I think I am.

22           I pass the witness.

23              E X A M I N A T I O N

24 BY MR. CONNELLY:

25     Q.   Okay, real quick.

# EXHIBIT 5

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF ARIZONA

3

4   JESSICA KAHRAMAN, et al.,

5       Plaintiffs,

6   vs.                          No. CV-22-00375-PHX-SRB

7   THE STATE OF ARIZONA,
    et al.,

8

9       Defendants.

10

11

12

13          DEPOSITION OF MECCA ARISA TEMPLE

14             Phoenix, Arizona
               September 4, 2024
15               10:21 a.m.

16

17

18

19

20  **CERTIFIED COPY**

21

22  Reported by:                 CARRIE REPORTING, LLC
    CARRIE A. CARIATI            Certified Reporters
23  Certified Professional Reporter  17505 North 79th Avenue
    Certified Realtime Reporter  Suite 301-C
24  Arizona CR No. 50355         Glendale, Arizona 85308
    New Mexico CCR No. 613       (480)429-7573
25  ████████████████████

1                          I N D E X

2    WITNESS:            EXAMINATION                        PAGE

3    MECCA ARISA TEMPLE

4              EXAMINATION BY MR. CONNELLY              5
               EXAMINATION BY MR. CROWN               253
5              EXAMINATION BY MR. CONNELLY           330

6

7                        E X H I B I T S

8    DEPOSITION
     EXHIBITS              DESCRIPTION                      PAGE
9
     69     Department of Child Safety Supervisory      58
10          Case Progress Review - Ongoing,
            Bates AZ-KAHRAMAN000530-535,
11          CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12   70     Department of Child Safety Supervisory      59
            Case Progress Review - Ongoing,
13          Bates AZ-KAHRAMAN000536-544,
            CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
14
     71     Department of Child Safety Supervisory     100
15          Case Progress Review - Ongoing,
            Bates AZ-KAHRAMAN000545-553,
16          CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17   72     Department of Child Safety Supervisory     108
            Case Progress Review - Ongoing,
18          Bates AZ-KAHRAMAN000554-562,
            CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
19
     73     Department of Child Safety Supervisory     117
20          Case Progress Review - Ongoing,
            Bates AZ-KAHRAMAN000563-571,
21          CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

22   74     Department of Child Safety Supervisory     124
            Case Progress Review - Ongoing,
23          Bates AZ-KAHRAMAN000581-589,
            CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

24

25

1                    E X H I B I T S (continued)

2  DEPOSITION
   EXHIBITS            DESCRIPTION                        PAGE
3
     75    Department of Child Safety Supervisory          138
4          Case Progress Review - Ongoing,
           Bates AZ-KAHRAMAN000590-599,
5          CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

6    76    Report to the Juvenile Court for               223
           Preliminary Protective Hearing and/or
7          Initial Pendency Hearing,
           Bates AZ-KAHRAMAN000399-418,
8          CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

9

10

11

12                  RECORD REQUESTED MARKED

13                       PAGE:LINE

14                         65:9
                          111:6
15                        208:5

16

17

18

19

20

21

22

23

24

25

*DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024*

```
 1              DEPOSITION OF MECCA ARISA TEMPLE was taken on
 2   September 4, 2024, commencing at 10:21 a.m. at the law
 3   offices of Gillespie, Shields & Taylor, 7319 North 16th
 4   Street, Phoenix, Arizona, before CARRIE A. CARIATI, RPR,
 5   CRR, a Certified Reporter in the State of Arizona and New
 6   Mexico.
 7
 8                    A P P E A R A N C E S
 9   FOR THE PLAINTIFFS:
10   MILLS + WOODS LAW PLLC
     BY: MR. THOMAS A. CONNELLY
11   5055 NORTH 12TH STREET
     SUITE 101
12   PHOENIX, ARIZONA 85014
13
     GILLESPIE, SHIELDS & TAYLOR
14   BY: MS. NATALIE NEWELL
     7319 NORTH 16TH STREET
15   PHOENIX, ARIZONA 85020
16
     FOR THE DEFENDANT:
17
     BRUECKNER SPITLER SHELTS, PLC
18   BY: MR. LARRY J. CROWN
     8355 EAST HARTFORD DRIVE
19   SUITE 200
     SCOTTSDALE, ARIZONA 85255
20
21
22
23
24
25
```

```
 1                                    Phoenix, Arizona
                                      September 4, 2024
 2                                    10:21 a.m.

 3                     MECCA ARISA TEMPLE,

 4  a witness herein, having been first duly sworn by the

 5  Certified Court Reporter to speak the truth and nothing

 6  but the truth, was examined and testified as follows:

 7

 8                        EXAMINATION

 9  BY MR. CONNELLY:

10      Q.    Good morning.  Will you please state your name

11  and spell it for the record.

12      A.    Mecca Arisa Temple.  M-E-C-C-A, A-R-I-S-A.

13  Temple is T-E-M-P-L-E.

14      Q.    And you know why you are here today?

15      A.    Yes.

16      Q.    Have you read the complaint in this case?

17      A.    Yes.

18      Q.    When did you do that?

19            MR. CROWN:  Objection.  Calls for

20  attorney/client privilege.

21            You can generally ask [sic] when you read

22  it, but any other question is going to be subject to

23  attorney/client privilege.

24            MR. CONNELLY:  All I asked was when did you

25  read it.
```

```
 1              MR. CROWN:  Right.
 2              MR. CONNELLY:  Yeah.
 3  BY MR. CONNELLY:
 4      Q.   So when did you read it?
 5              THE WITNESS:  Can I --
 6              MR. CROWN:  You can answer.
 7              THE WITNESS:  Okay.
 8              I believe at the -- the first time I
 9  reviewed the case with Mr. Crown.
10  BY MR. CONNELLY:
11      Q.   Okay.  Did you read the complaint on your own at
12  any time?
13      A.   I don't recall if I did.
14      Q.   Okay.  When did you -- so you met with Mr. Crown
15  in preparation for your deposition, right?
16      A.   Correct.
17      Q.   And when was that?
18      A.   In March and then last week.
19      Q.   And when you met with Mr. Crown in March, how
20  long did you meet with him?
21      A.   A couple hours.
22      Q.   What about when you met with him last week?
23      A.   The same, a couple hours.
24      Q.   So in total, you spent four or five hours with
25  Mr. Crown?
```

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1      A.    I would probably say that's about right.

2      Q.    And was anyone else present for these meetings?

3      A.    No.

4      Q.    Have you reviewed documents as well?

5      A.    Yes.

6      Q.    What documents did you review?

7      A.    Reviewed the -- Mr. Crown's exhibits, I believe

8   there is about 80, and then all the exhibits that you

9   showed Madison.

10     Q.    And did you take those home and read through

11  them --

12     A.    No.

13     Q.    -- or just went through them at Mr. Crown's

14  office?

15     A.    That is correct.

16     Q.    Did you talk to Madison Bell about her

17  deposition?

18     A.    No.

19     Q.    Did you speak with anybody else at DCS about the

20  fact that you are being deposed?

21     A.    My supervisor.

22     Q.    Who is that?

23     A.    Kirk Villasenor.

24     Q.    When did you have that conversation?

25     A.    Last week when I told him I was going to be

1   needing the day off.

2       Q.   Time off?

3       A.   Um-hum.

4       Q.   Did you have any substantive conversation with

5   him about it?

6       A.   No.

7       Q.   So you are still employed with DCS?

8       A.   I am.

9       Q.   And you have not reviewed any documents or

10  anything about the case on your own in preparation for

11  today?

12      A.   No.

13      Q.   When was the last time -- before you met with

14  Mr. Crown, when was the last time you looked at any of the

15  case documents?

16      A.   It has been a few years.

17      Q.   Have you been deposed before?

18      A.   One time.

19      Q.   When was that?

20      A.   Approximately 2019.

21      Q.   And was that in a case where DCS was a

22  defendant?

23      A.   No.  That was in a criminal case.

24      Q.   Criminal case.  Were you a witness or a party?

25      A.   I was still working with -- it was part of my

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1  DCS role on a DCS case.

2       *Q.*  What kind of case was it?

3       *A.*  A criminal case.

4       *Q.*  Yeah.  But I mean, what was the charge?

5       *A.*  Sex abuse.

6       *Q.*  And you were a supervisor on the case?

7       *A.*  I was the case manager.

8       *Q.*  Okay.  And you said that was in 2019?

9       *A.*  Correct.

10      *Q.*  Did you also give sworn testimony at trial in

11  that case?

12      *A.*  No.

13      *Q.*  Have you ever -- before this case, have you ever

14  been a defendant in a lawsuit?

15      *A.*  No.

16      *Q.*  So just generally for today, what we are going

17  to do is I am going to ask you some questions about the

18  Kahraman case.  You were a supervisor on that case.  And

19  if you don't understand a question I ask, just let me know

20  and I will try to rephrase the question.

21            All our questions and answers have to be

22  verbal -- no shaking of the heads or huh-uhs or uh-huhs --

23  yes or no, those sort of things.

24      *A.*  Okay.

25      *Q.*  The court reporter is taking it all down.  Try

```
 1   not to talk over each other so that she gets a clean
 2   record.  She will let us know if we're not doing a good
 3   job of that, believe me.
 4               If you need to take a break, just let me
 5   know, we can take a break.  As long as you answer whatever
 6   question might be outstanding at the time, we will go
 7   ahead and take a break if you need a break for any reason.
 8   I hope to get through what I want to get through today in
 9   about four hours.  A lot of that will depend on how you
10   answer the questions, if you answer the questions.
11               Sometimes deponents don't answer the
12   question that's asked and I have to ask it over and over
13   again.  So some of that will be depend on what you do.
14   But that's my goal, is to try to be done in about four
15   hours.  I don't know if Larry is going to take you through
16   80-some documents or not, but that's up to him.
17               And that's about it for the ground rules.
18   Let's start with just a little bit of your personal
19   background.
20               Are you married?
21       A.    I am.
22       Q.    How long have you been married?
23       A.    Over 20 years.
24       Q.    Do you have kids?
25       A.    Yes.
```

```
 1        Q.    How many kids?

 2        A.    Three.

 3        Q.    Boys, girls?

 4        A.    One girl, two boys.

 5        Q.    What are their ages?

 6        A.    23, 20, and 12.

 7        Q.    Who is 12, boy or girl?

 8        A.    Boy.

 9        Q.    So who is your oldest?

10        A.    The 23-year-old, Destiny.  She is a girl.

11        Q.    But I mean -- girl.  Okay.  So you got a girl,

12   and then a boy, and then another boy.

13              Any of them have any developmental issues

14   like autism or anything like that?

15        A.    My daughter is deaf in one ear.

16        Q.    But no autism --

17        A.    No.

18        Q.    -- or no developmental delays?

19        A.    No.

20        Q.    No special needs or anything like that?

21        A.    No.

22        Q.    I mean, other than special needs, obviously, for

23   the hearing issue.

24        A.    No.

25        Q.    Okay.  Have you been divorced at all?
```

1    *A.*    No.

2    *Q.*    Have you ever testified in a dependency trial?

3    *A.*    Yes.

4    *Q.*    When was the last time you did that?

5    *A.*    I believe this year.

6    *Q.*    Was that in your role as a supervisor?

7    *A.*    Correct.

8    *Q.*    What kind of case was that?

9    *A.*    There has been a few, so I don't recall exactly.

10    *Q.*    How many times would you say you have testified

11   in dependency trials as a supervisor?

12    *A.*    As a supervisor, probably over ten times.

13    *Q.*    And that's over what period of time?

14    *A.*    From 2016 to the present.

15    *Q.*    And what about as a case manager?

16    *A.*    Probably over 20 times, approximately, from 2007

17   to 2016.

18    *Q.*    We have not received the production of personnel

19   records yet, so let's go through your education a little

20   bit.

21             First of all, did you -- how long have you

22   been in Arizona?

23    *A.*    Since 2005.

24    *Q.*    You moved from where?

25    *A.*    California.

1       Q.    What part of California?

2       A.    Altadena.

3       Q.    Is that up near San Francisco, the Bay Area?

4       A.    Southern California, near Pasadena.

5       Q.    Pasadena.  So that's in Orange County?

6       A.    No.  Los Angeles County.

7       Q.    I was just in Orange County myself recently.  I

8  have some relatives there.

9       A.    Oh.

10      Q.    So you then you went to high school and

11 graduated high school in California, right?

12      A.    That is correct.

13      Q.    And where did you go to college?

14      A.    I went to Pasadena City College for two years in

15 1997, and I got --

16      Q.    So from '97 to '99?

17      A.    Correct.

18      Q.    Did you get an associate's degree?

19      A.    I did.

20      Q.    In what?

21      A.    Sociology.

22      Q.    And then what?

23      A.    I went to Kaplan College for a bachelor's

24 degree.

25      Q.    Where is that?

14

```
 1        A.    It was online.

 2        Q.    Online.  Okay.  For a bachelor's of --

 3        A.    Criminal justice.

 4        Q.    So a Bachelor of Science in --

 5        A.    Criminal justice.

 6        Q.    -- criminal justice.

 7              And that was when?

 8        A.    I graduated in -- that was a while ago.  That

 9   was about 2007, I believe.

10        Q.    When did you start there?

11        A.    Probably around 2005.

12        Q.    So what you did you do for those years between

13   Pasadena City College and Kaplan College?

14        A.    Moved to Texas and then to Kentucky.

15        Q.    Were you working?

16        A.    Off and on.

17        Q.    Were you working in sociology at all, in the

18   field?

19        A.    No.  No.

20        Q.    What were you doing for work?

21        A.    In Texas I did not work, and then in Kentucky I

22   worked at Winn-Dixie, it's a grocery store.

23        Q.    Just as a cashier or something?

24        A.    Yep.

25        Q.    When were attending Kaplan College online, were
```

  1  you also working?

  2      *A.*    Yes.

  3      *Q.*    What were you doing for work?

  4      *A.*    When I moved to Arizona in '05, I worked at

  5  Ikea.  And then in 2007, I worked at Chase -- well, 2006

  6  at Chase.

  7      *Q.*    When, I'm sorry?

  8      *A.*    2006 at Chase Bank, customer service.  And then

  9  2007, I started at DCS.

 10      *Q.*    So you moved to Arizona in 2005?

 11      *A.*    Correct.

 12      *Q.*    And then 2005, you were working at Ikea and

 13  taking courses online at Kaplan College?

 14      *A.*    Correct.

 15      *Q.*    And then do you have a master's degree?

 16      *A.*    I do.

 17      *Q.*    When did you start work on your master's degree?

 18      *A.*    I graduated from my first master's -- well, I

 19  started in approximately 2010, and I graduated 2012 with a

 20  master's degree in administration of justice and security

 21  from University of Phoenix.

 22      *Q.*    Master's in administration of justice?

 23      *A.*    And security.

 24      *Q.*    What does that prepare you for?  What kind of a

 25  career?

1     A.    They -- we had sociology courses, psychology

2   courses, and then a lot of criminal justice courses.

3     Q.    Was there a plan that you wanted to do in

4   getting that degree, a particular job that you were aiming

5   for in getting that degree?

6     A.    Well, wanting to work with children, and then I

7   also wanted to work in criminal justice.  When I was at

8   Kaplan, I also got a crime scene technician certificate

9   because I also wanted to go that route.

10     Q.    Okay.  So you said your first master's.  What is

11   your second master's?

12     A.    A master's in social work from ASU.

13     Q.    When did you get that?

14     A.    I graduated in May of this year.

15     Q.    When did you start?

16     A.    In 2020.

17     Q.    2020 to May of 2024?

18     A.    Correct.

19     Q.    So you were doing that part time?

20     A.    Correct.

21     Q.    Did the Department pay for that?

22     A.    Yes.

23     Q.    Did the Department pay for your master's at the

24   University of Phoenix?

25     A.    No.

1    *Q.*    And so during the time that you were a

2    supervisor on this case, you had not earned a master's in

3    social work?

4    *A.*    Correct.

5    *Q.*    But you did have your master's in administration

6    of justice and security, correct?

7    *A.*    Correct.

8    *Q.*    And so as far as any kind of work that is

9    related to your -- in some way related to your post high

10   school education, the only job would be the job at DCS; is

11   that right?

12   *A.*    Yes.

13   *Q.*    I can ask it a different way as well.  You said

14   that the last job you had before you started at DCS was at

15   Chase Bank, right?

16   *A.*    Correct.

17   *Q.*    Were you working in the security department

18   there or as a teller or what were you doing at Chase Bank?

19   *A.*    It was online customer service.

20   *Q.*    Okay.  Not that this has anything to do with

21   anything, but I know someone who works at Chase Bank, and

22   her job is to like follow up on robberies when a bank is

23   robbed, which sounds kind of cool.  And, I mean, like she

24   gets an alert when there is a robbery in progress, so kind

25   of cool.

1          So you said you have a certificate in crime

2     scene -- as a crime scene technician.  Do you have any

3     other certificates?

4          A.    No.

5          Q.    Are you a licensed social worker?

6          A.    Not yet, no.

7          Q.    And you are not like a licensed associate

8     counselor --

9          A.    No.

10         Q.    -- or a licensed professional counselor?

11         A.    No.

12         Q.    So you don't have any licenses or certifications

13     in social work or counseling, correct?

14         A.    Correct.

15         Q.    Do you have any certifications in forensic

16     interview training?

17         A.    No.

18         Q.    And so there are no other certifications other

19     than the crime scene tech certification that you have,

20     right?

21         A.    Correct.

22         Q.    And you don't have any Ph.D.s or anything

23     either, right?

24         A.    No.  No.

25         Q.    Other than -- well, do you have any training in

1    behavorial health?

2        A.    Yes.

3        Q.    And tell me what that consists of.

4        A.    Well, I have the case manager training, the core

5    training at the start of working at DCS.  We are also

6    required to take trainings throughout.  I also have the

7    supervisor core training.

8        Q.    And those trainings, the core trainings you are

9    talking about, have a component which includes education

10   about behavorial health?

11       A.    Yes.

12       Q.    And behavorial health in what way?

13       A.    Working with children with disabilities,

14   trainings on substance abuse, domestic violence, and then

15   there is also trainings that we did throughout the year

16   that also covered behavorial health or different topics.

17       Q.    And that's all training at DCS, right?

18       A.    Either DCS or outside trainings that I either

19   went on my own or were offered through DCS.

20       Q.    And when you went to trainings on your own, DCS

21   paid for those?

22       A.    No.

23       Q.    What kind of trainings did you take on your own

24   while you were working at DCS?

25       A.    Trauma training, trainings on diversity,

1  trainings on like identifying different kinds of drugs.

2        *Q.*    Identifying different kinds of drugs?

3        *A.*    Correct.

4        *Q.*    By looking at them or by the way people are

5  acting?

6        *A.*    Both.  And also like slang for teenagers, things

7  like that.  I have done trainings on child abuse.

8        *Q.*    And these are all trainings that you have done

9  outside of DCS?

10       *A.*    Correct.

11       *Q.*    That you paid for yourself?

12       *A.*    Correct.  Or were free.

13       *Q.*    Or were free.  So trauma, diversity, recognizing

14  drugs.

15       *A.*    Substance abuse, child abuse, physical abuse.

16       *Q.*    Wouldn't substance abuse, child abuse, and

17  physical abuse be things that you would be trained on at

18  DCS?

19       *A.*    I was.

20       *Q.*    But you just wanted to -- do you have so many

21  training hours a year that you have to satisfy?

22       *A.*    No.

23       *Q.*    And so you took these trainings outside of DCS

24  just for your own personal advancement?

25       *A.*    And to use at work.

1    *Q.*   Do you keep a record of all the training you

2    took outside of DCS?

3    *A.*   I do.

4    *Q.*   And so if we were to ask for certificates of

5    completion or whatever course materials for trainings you

6    took outside of DCS, you have that, you have those

7    documents?

8    *A.*   Yes.  Yes.  I would have to find them, but yes,

9    I do have them.

10    *Q.*   Were you asked to gather and give to the lawyers

11    any documents in this case?

12    *A.*   Documents at work, yes.

13    *Q.*   What kind of documents did you gather?

14    *A.*   I would say court reports, I believe that was --

15    court reports or things that were missing from ...

16                MR. CROWN:  So -- so you understand, you

17    have just invaded attorney/client privilege.  Mecca at my

18    request was trying to fill in my file as I was getting up

19    to speed.  So there is no missing documents from DCS.

20                MR. CONNELLY:  Okay.  All right.

21                MR. CROWN:  I saw you writing.  I want to

22    make sure that there's no issue here.  She was helping me

23    build my personal file and would've given me part of what

24    represents Exhibits 201 to 281.  But that was an

25    attorney/client request, not something -- okay?  Just so

1  you know.

2          MR. CONNELLY:  Okay.  Thanks for clearing

3  that up because it did --

4          MR. CROWN:  I know.  I understand.  There's

5  not that issue.

6          MR. CONNELLY:  Thank you.  All right.  Very

7  good.  I will take your representation at face value.

8  BY MR. CONNELLY:

9     Q.   So have you had any education or training in how

10 mold toxins affect the human body?

11    A.   No.

12    Q.   Have you had any education or training in how

13 the thyroid works?

14    A.   No.

15    Q.   Have you had any education or training on the

16 function of the thyroid as it relates to the digestion of

17 food and nutrients?

18    A.   No.

19    Q.   Or the function of the thyroid in relation to

20 childhood development?

21    A.   No.

22    Q.   Have you had any education or training regarding

23 the effect of mold toxins on the thyroid?

24    A.   No.

25    Q.   Have you had any education or training on

 1   Munchausen by proxy?

 2       A.   Yes.

 3       Q.   Describe that training to me.

 4       A.   I believe, if I recall correctly, it was an

 5   office training, just on the protocol if we get a case

 6   that comes in like that, that that's suspected.  If I

 7   recall, that's all the training that I have had.

 8       Q.   And when was that, do you remember?

 9       A.   I don't recall when it was.  It would have been

10   prior to 2020.

11       Q.   Prior to 2020?

12       A.   Correct.

13       Q.   But you don't remember whether it was -- do you

14   remember whether it was prior to 2018?

15       A.   Yes.  Because it was a case that I had that I

16   had asked about additional training.

17       Q.   So you had a case prior to 2018 that was a

18   Munchausen by proxy case?

19       A.   As a case manager, yes.

20       Q.   So that would have been sometime between 2007

21   and 2016?

22       A.   It would have been between, I would say, 2011

23   and 2016.

24       Q.   In that case, was the parent diagnosed with

25   Munchausen by proxy?

1      A.    Yes.

2      Q.    And do you recall who diagnosed the parent with

3  Munchausen by proxy?

4      A.    Yes.

5      Q.    Was that Dr. Kelly?

6      A.    No.

7      Q.    Who was it?

8      A.    Dr. Brenda Bursch.

9      Q.    Brenda -- could you spell the last name?

10     A.    B-U-R-S-C-H, I believe.

11     Q.    Is that someone internal at DCS or was that

12  someone outside of DCS?

13     A.    Outside of DCS.

14     Q.    When you were a case manager, did you have any

15  other cases of Munchausen by proxy?

16     A.    No.

17     Q.    You said that you asked for additional training

18  when you had that case as a case manager, right?

19     A.    Correct.

20     Q.    Then did the -- and you said it was an office

21  training.  What does that mean?

22     A.    Like when we get new policies or procedures, we

23  go over it, we review them, have discussions about them so

24  that we're, you know, understanding of what we need to do.

25     Q.    And so, if I am understanding you correctly, the

1  training that you had in relation to Munchausen was what

2  the policies and procedures and protocols were at DCS for

3  handling the Munchausen case; is that right?

4      *A.*    Correct.

5      *Q.*    And it was not training about the disease

6  itself; is that fair?

7      *A.*    Not the office one, no, was not about the

8  disease specifically itself.

9      *Q.*    Have you ever had training about the disease

10  itself?

11      *A.*    Not that I recall, no.

12      *Q.*    And at the time that you had the training, was

13  it referred to as Munchausen or was it referred to as

14  factitious disorder?

15      *A.*    If I recall correctly, it would have been around

16  the time, I believe, when they were moving away from the

17  Munchausen to factitious, calling it factitious.

18      *Q.*    So when that change was occurring was when you

19  were getting trained?

20      *A.*    Correct.

21      *Q.*    And then sometime later, another move occurred

22  where factitious disorder started to be called medical

23  child abuse, right?

24      *A.*    Correct.

25      *Q.*    So medical child abuse, factitious disorder, and

 1 | Munchausen by proxy are all the same thing, right?
 2 |           MR. CROWN:  Objection to form and
 3 | foundation.
 4 |           THE WITNESS:  I would think it is about the
 5 | same thing.
 6 | BY MR. CONNELLY:
 7 |     Q.   Okay.  You said that you got this office
 8 | training about protocols, and I think Madison Bell
 9 | testified about this, but I want to get your testimony on
10 | the issue.
11 |           Does the office have written policies and
12 | protocols for handling Munchausen cases?
13 |     A.   We do.
14 |     Q.   And today -- well, let's go back to 2018.  In
15 | 2018 did the office have written policies and procedures
16 | and protocols for handling Munchausen cases?
17 |     A.   Yes.
18 |     Q.   And at that time you were calling it -- it was
19 | being called factitious disorder, right?
20 |     A.   I think it was going from Munchausen to
21 | factitious at the time.
22 |     Q.   And the same protocols applied to both?
23 |     A.   I believe there were some changes, but
24 | specific-wise, I don't remember.
25 |     Q.   And it was also sometimes called -- because in

1  the records, you see, sometimes it is called medical child

2  abuse as well.  Are there separate protocols for

3  factitious disorder and medical child abuse or are they

4  the same protocols?

5      A.    Now we just have medical child abuse.

6      Q.    And so now, in 2024, the protocol is for

7  something called medical child abuse, right?

8      A.    Correct.

9      Q.    And you no longer have protocols for something

10 that is called factitious disorder?

11     A.    Correct.

12     Q.    And you no longer have protocols for something

13 that is called Munchausen by proxy?

14     A.    Correct.

15     Q.    But the protocols for medical child abuse would

16 apply to a parent who is diagnosed by a medical

17 professional as having Munchausen by proxy, right?

18             MR. CROWN:  Objection to form and

19 foundation.

20             THE WITNESS:  Well, I don't think they

21 would be diagnosed with Munchausen now.

22 BY MR. CONNELLY:

23     Q.    They might be diagnosed with factitious

24 disorder, right?

25     A.    Correct.

1    Q.    And if there is a parent that's diagnosed with

2    factitious disorder, then the medical child abuse

3    protocols at the Department would apply to handling that

4    case, right?

5    A.    Correct.

6    Q.    And then are there separate protocols for

7    handling cases of medical neglect?

8    A.    I don't recall if it is separate.

9    Q.    So you can't tell me right now whether there are

10   separate protocols for child medical neglect or whether

11   the same protocols for medical abuse applied in cases of

12   medical neglect?

13   A.    Correct.

14   Q.    Have you ever, to your knowledge, been exposed

15   to a mold-infested environment?

16              MR. CROWN:  Objection to form and

17   foundation.

18              THE WITNESS:  No.

19   BY MR. CONNELLY:

20   Q.    So based on what you told me earlier about your

21   work experience, it's fair to say that you didn't have any

22   work experience that was directly related to working as a

23   child protection specialist at DCS, right?

24   A.    When I started there?

25   Q.    Yes.

1        *A.*    Correct.

2        *Q.*    And you started there in 2007?

3        *A.*    Yes.

4        *Q.*    And did you apply for the job or were you

5    recruited somehow?

6        *A.*    I applied.

7        *Q.*    When you applied, did you apply for any

8    particular position?

9        *A.*    As a specialist, as a case manager.

10        *Q.*    So you were applying to be an ongoing case

11    manager, not an investigator?

12        *A.*    Just case manager in general.  They don't

13    differentiate; when you apply, it's either -- you just

14    apply as a specialist.

15        *Q.*    And then so you were hired.  When you were

16    hired, do you get to decide whether you go into

17    investigations or ongoing, or do they assign you to one of

18    the two?

19        *A.*    If I recall at that time, I believe you had to

20    have some kind of experience to go into investigations.

21    But when you are in the core training, they decide if you

22    are going to ongoing or investigation.

23        *Q.*    So the Department decides?

24        *A.*    Correct.

25        *Q.*    Because in 2007 you would have had a bachelor's

1  in criminal justice.  Would that have been enough, as far
2  as -- I know it is not exactly experience, but it is
3  education.  Would that have been enough for you to be an
4  investigator, do you know?
5      A.   I believe so.  But you had to have at least a
6  bachelor's to be a specialist.
7      Q.   Well, that's what you had, isn't it?
8      A.   Yes.
9      Q.   Well, did you have any interest in being an
10  investigator instead of an ongoing?
11      A.   No.
12      Q.   Okay.  So in 2007, you start at DCS, and you go
13  through three months or so of training, right?
14      A.   Correct.
15      Q.   And they assign you to be an ongoing case
16  manager, right?
17      A.   Yes.
18      Q.   And I think you said earlier you were an ongoing
19  case manager from 2007 to 2016?
20      A.   Correct.
21      Q.   And then did you rise from a Case Specialist I
22  to Case Specialist II, III, did you make all those
23  advancements?
24      A.   I did.  And I -- then there was a Case
25  Manager IV position I did that also.

1    *Q.*    And what is the difference between like Case
2  Manager III and a Case Manager IV?

3    *A.*    At IV you had to be -- you would be responsible
4  for mentoring, also, the people that came into the unit.

5    *Q.*    And did you say you were IV for a while?

6    *A.*    Yes.

7    *Q.*    And then you became a supervisor?

8    *A.*    Correct.

9    *Q.*    You became a supervisor in -- when?

10   *A.*    I was on special assignment from the end of 2015
11  as a supervisor.  My supervisor went out.  So I did
12  special assignment from 2015 to 2016, when I was then
13  hired as a supervisor, not on special assignment.

14   *Q.*    When you were on special assignment as a
15  supervisor, were you -- did you also have an ongoing
16  caseload as a case manager?

17   *A.*    I had a few cases that I transitioned to the
18  other members of the unit over approximately three months.

19   *Q.*    So then by the time -- do you remember when in
20  2015 it was that you --

21   *A.*    I would probably say August, September.

22   *Q.*    So by the end of the year 2015, you had assigned
23  all your ongoing case manager cases to others?

24   *A.*    Correct.

25   *Q.*    And you were then just doing supervision?

```
 1      A.   Correct.
 2      Q.   And then you were hired as supervisor in 2016 or
 3   2017?
 4      A.   2016.
 5      Q.   When in 2016?
 6      A.   I believe May.  About May, June.
 7      Q.   And are you still supervisor?
 8      A.   Yes.
 9      Q.   So from May of 2016 to the present?
10      A.   Correct.
11      Q.   And what level of supervisor?  Are there levels?
12      A.   There are not.
13      Q.   What would be the next step up?
14      A.   Program manager.
15      Q.   Have you ever applied for a program manager?
16      A.   No.
17      Q.   So in 2018, in December of 2018 -- since May of
18   2016 you have been a supervisor for ongoing case managers,
19   right?
20      A.   Correct.
21      Q.   Have you worked as a supervisor or been in a
22   supervisory role in any other areas or departments of DCS?
23      A.   No.
24      Q.   So then in December of 2018, you were a
25   supervisor for ongoing case managers, right?
```

*DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024*

1      A.    Correct.

2      Q.    And do you recall that when you started at DCS,

3  you took an oath to support the Constitution of the United

4  States and the Constitution and laws of the State of

5  Arizona?

6      A.    I don't recall taking an oath, no.

7      Q.    Do you recall signing a piece of paper that had

8  an oath that included the statement that you would support

9  the Constitution of the United States and the Constitution

10 and laws of the State of Arizona?

11     A.    I don't recall if I signed anything like that,

12 no.

13     Q.    Okay.  Now, as a case manager and also as a

14 supervisor, you have annual performance reviews, right?

15     A.    Correct.

16     Q.    As an ongoing case manager, were -- did you ever

17 have any negative performance reviews?

18     A.    No.

19     Q.    What about as a supervisor --

20     A.    No.

21     Q.    -- have you ever had any negative performance

22 reviews?

23     A.    I have not.

24     Q.    Who conducts your performance review as

25 supervisor?

| | | |
|---|---|---|
| 1 | *A.* | My supervisor, the program manager. |
| 2 | *Q.* | And right now it's the person you mentioned |
| 3 | earlier; I forget the name? | |
| 4 | *A.* | Kirk Villasenor. |
| 5 | *Q.* | Kirk Villasenor. |

6            And in 2018, 2019, 2020, it was Terry Reed;
7    is that right?
8        *A.*    Tracy Reed.
9        *Q.*    Tracy Reed.
10       *A.*    Yes.
11       *Q.*    And is Tracy with a C-E-Y or just C-Y, do
12    you know?
13       *A.*    C-Y.
14       *Q.*    C-Y.
15       *A.*    R-E-E-D.
16       *Q.*    And she was your program manager for the whole
17    time you were assigned to the Kahraman case, right?
18       *A.*    Correct.
19       *Q.*    When you are being evaluated as a program
20    manager, do the ongoing case managers that you supervise
21    provide any input into that evaluation process?
22       *A.*    No.
23       *Q.*    It's just between you and the program manager?
24       *A.*    Correct.
25       *Q.*    All right.  Now, why don't you describe for me

1   what your role is as a ongoing case supervisor.

2       A.   What my role is?

3       Q.   Yeah.

4       A.   I am responsible for typically six to seven case

5   managers.  I am responsible for a certain level of

6   training.  I am also responsible for mentoring, going out

7   in the field and shadowing, attending court, approving

8   court reports.

9                We also staff each case at least once a

10  month, reviewing files, reviewing records, communicating

11  with providers, assisting with -- assisting the case

12  managers with tough cases, anything and everything to help

13  their job be easier.

14      Q.   Was this case considered a tough case?

15               MR. CROWN:  Objection to form and

16  foundation.

17               THE WITNESS:  I would say it was a tougher

18  one.

19  BY MR. CONNELLY:

20      Q.   You said that you oversee six to seven case

21  managers, right?

22      A.   Correct.

23      Q.   And how many -- what's the average caseload for

24  those case managers?

25      A.   I would say between 25 and 29 kids.

1       Q.    Between 25 to 29 children?

2       A.    Correct.

3       Q.    And so that may be any number of cases --

4       A.    Correct.

5       Q.    -- right?  So it goes more by the number of

6    children?

7       A.    Yes.

8       Q.    All right.  So -- and is that average -- would

9    that average have been the same for -- in like 2019, 2020,

10   and 2021?

11      A.    It fluctuates.  So it could have been a little

12   bit higher, it could have been a little bit lower.

13      Q.    What is the highest number of children any of

14   your case managers were responsible for in that time frame

15   of 2019 to 2022?

16      A.    I would have said the most would have probably

17   been about 30, 30 kids.

18      Q.    And what's the fewest?

19      A.    Probably closer to the 25.

20      Q.    So that 25 to 30 range is a good -- as far as

21   average goes --

22      A.    Yes.

23      Q.    -- for those years?

24      A.    Yes.

25      Q.    And so let's just take the midpoint and let's

1   just say 27.  So if you had seven case managers and they

2   all had 27 children, that would be 189 children.

3        A.    I did only have six, though, six case managers.

4        Q.    Oh, you said six to seven?

5        A.    Well, currently I have seven.  But it usually

6   averages six to seven.

7        Q.    So six case managers, 27 children, is 162

8   children.  With a case manager having 25 to 30 children,

9   can you give me an estimate of -- I know family sizes

10  vary, but can you give me an estimate of separate case

11  that would represent, an average?

12       A.    I mean, you can say anywhere from 19 cases.

13       Q.    So --

14       A.    It just depends.

15       Q.    You think the average maybe that each case

16  manager is carrying is about 19 cases?

17       A.    I would say that's a fair number.

18       Q.    So you would be responsible for about 114, on

19  average?

20       A.    Yes.

21       Q.    Overseeing 114 cases?

22       A.    Yes.

23       Q.    And do all of those cases start out as

24  dependency cases?  Are all those dependency cases?

25       A.    Yes.  Ongoing only takes dependency cases.

1    *Q.*    So those are all out-of-home dependency cases,
2  right?

3    *A.*    Correct.

4    *Q.*    So they all have petitions pending in juvenile
5  court, right?

6    *A.*    Correct.

7    *Q.*    And some of those cases moved to severance,
8  right?

9    *A.*    Right.

10    *Q.*    So let's talk a little bit, in a little more
11  detail, about some of the things you said you do in your
12  role as an ongoing case manager supervisor.  You said you
13  are responsible for some training.  What kind of training
14  do you -- are you responsible for in your role as a
15  supervisor?

16    *A.*    When the case managers come out of their core
17  training, they are given an ongoing skills matrix that we
18  have to complete by their first 22 weeks.

19            So there's different tasks in our computer
20  system that they have to -- I have to make sure they can
21  do: an understanding of like the differences between an
22  impending and a present danger, working with families of
23  diverse cultures, how to do certain things, how to write a
24  court report, how to generate a court report, how to
25  conduct themselves in certain meetings, court etiquette.

1    Q.    How to conduct themselves in what kind of

2  meetings?

3    A.    Children/family team meetings, which are CFTs; a

4  meeting with the parents; a child contact.

5    Q.    And so you say that you have to assess them

6  after 24 weeks following their core training on these

7  items.  Is there actual training that you do with them

8  then?  Do you have a session where you bring all of your

9  supervisees in and say, "Today we are going to talk about

10 impending versus future present danger"?

11   A.    We do.  We do unit meetings that we do once a

12 month, and then we also do group supervision with the

13 entire ongoing, where we pick a topic and then we go over

14 that topic with all of the ongoings in the office.

15   Q.    How many people is that?

16   A.    About 20.

17   Q.    And when you say "in the office," do you mean in

18 different satellite office locations?

19   A.    No.  Like, at that time we were considered Tempe

20 office.  So we have three ongoing units.  So we would

21 schedule for the three ongoing units and the supervisors,

22 and we would go and like meet in a conference room.

23   Q.    In Tempe?

24   A.    Correct.

25   Q.    But then there are other DCS ongoing offices in

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1  other locations of the valley, right?

2      A.    Yes.

3      Q.    So when you would have the meetings that you are

4  talking about, the global meetings, it would just be for

5  the ongoing case managers and supervisors in the Tempe

6  office?

7      A.    Correct.

8      Q.    Have you ever led a meeting where the difference

9  between an impending versus a present danger was the

10 topic?

11     A.    Led a meeting?

12     Q.    Yeah.

13     A.    I don't think so, no.

14     Q.    So I guess another way to ask the question is:

15 Did you ever present a training that was focused on the

16 difference between impending versus present danger?

17     A.    Currently, yes.

18     Q.    No, not currently.  In 2019 to 2022?

19     A.    No.  No.

20     Q.    And when you say that there are some -- one of

21 the things you have to assess for is how the case managers

22 are able to interact with families of diverse cultures,

23 does that include like different religions such as Muslims

24 or Hindus?

25     A.    It does.

1       *Q.*   And have you ever led any meetings or trainings

2   about dealing with families of a Muslim culture?

3       *A.*   Yes.

4       *Q.*   When was that?

5       *A.*   That is like an ongoing thing that I do.  I am

6   Muslim, so that is something that -- just in working with

7   different cultures and different -- like wearing the

8   scarves and being appropriate in asking the questions,

9   male and female interactions, things like that.

10      *Q.*   In this case the Kahramans -- Mr. Kahraman was

11  of Turkish descent; do you remember that?

12      *A.*   I do.

13      *Q.*   And the family practiced Muslim practices?  I

14  don't know how ...

15      *A.*   Islam.  Islamic, you would say.  They practice

16  Islamic practices.

17      *Q.*   Yeah.  I think he talked about Muslim practices

18  in one instance.  But in any event, I guess, what, then,

19  are the similarities with -- are there similarities

20  between Muslim and Islamic practices?

21      *A.*   It is the same.

22      *Q.*   And the reason I said he is of Turkish of

23  descent, because -- and you said you're Muslim.  And I was

24  going to ask what your -- what your background is as far

25  as, you know, where you're descended from?

```
 1        A.    I mean, I was born in the United States, as were
 2   my parents.  But they converted to Islam before I was
 3   born.
 4        Q.    And what is your family's heritage?
 5        A.    Like going back to Ghana?
 6        Q.    So that's what I am asking is -- yeah.
 7        A.    Yeah.  Okay.
 8        Q.    Ghana.  So African?
 9        A.    Correct.
10        Q.    Okay.  As opposed to Turkish or Moroccan.
11              What about court report writing, have you
12   led trainings about court report writing?
13        A.    Yes.
14        Q.    And we agree that one of the things that DCS
15   personnel are trained on, ongoing personnel, as far as
16   court report writing is that the reports are to be fair
17   and balanced?
18        A.    Correct.
19        Q.    They are not supposed to be biased in any way
20   for or against parents, right?
21        A.    We are supposed to just state the facts.
22        Q.    State the facts, including those things that
23   refute the allegations of abuse or neglect that brought
24   the case in to DCS, right?
25        A.    Correct.
```

1    Q.   And then as an ongoing case manager -- or excuse

2   me, supervisor, what is your role in preparing the reports

3   that are ultimately submitted to the Court?

4    A.   Once the case manager completes the report, then

5   I review them.  If there is corrections to be made and it

6   is merely grammatical things, I will change it.  If it is

7   wording or specific things -- there are specific things

8   left out, I will give it back to them with my corrections,

9   and then they will correct it and I will check it again.

10    Q.   And so when you say if there are things that are

11   left out, like what kind of things are you looking for?

12    A.   Like testing dates missing, agency names

13   missing, safety concerns are not clear, and just if there

14   is a service missing.

15    Q.   Are you ever looking to see whether there is

16   information or evidence that has been gathered that tends

17   to refute the allegations of abuse or neglect to ensure

18   that they are included in the report?

19    A.   Like if progress has been made?

20    Q.   That would be an instance, I suppose, sure.

21    A.   I mean, if progress is made and the report is

22   still -- it doesn't account for that progress, then yes.

23    Q.   What if there are reports prepared by experts

24   for the parents that refute allegations of neglect or

25   abuse, whatever the case may be, and you know they exist,

1  do you look to see whether they are included in the
2  report?

3      A.    We do, yes.

4      Q.    And if you see that they are not included in the
5  report, what do you do?

6      A.    It would depend on -- like if it was a question,
7  I would also use my supervisor if there was a question
8  about something being included.  But usually we would just
9  cut and paste, like from their reports.  We would not
10 summarize because that language is very specific.  So we
11 would just cut and paste from the reports.

12     Q.    And we will see that a little bit later as far
13 as the cut-and-pasting goes.  When I was asking Madison
14 Bell about some of the language, she said that is just cut
15 and pasted right from the report.

16            But part of what you are doing is you are
17 looking to make sure that the report that is prepared by
18 the case manager is fair and balanced and includes
19 information that tends to both support the allegations and
20 also refute the allegations, right?

21     A.    Correct.

22     Q.    And so would you characterize your role as a
23 supervisor, in relation to court reports, as just being a
24 person who rubber-stamps what the case manager has done,
25 or do you take an active role in ensuring the accuracy and

1  the -- well, let's start there, with ensuring the accuracy

2  of the report?

3      *A.*    I usually verify, I do like spot checks.  So if

4  there was a PSI service, I would double -- I would check

5  PSI and make sure --

6      *Q.*    And what does PSI stand for?

7      *A.*    Physician services, it is the drug testing.

8              So I would go on their website, and I would

9  make sure that that's reflected in the court report,

10  making sure that matches.

11      *Q.*    Making sure that the result that is reported in

12  the court report is what is the result on the actual

13  document itself?

14      *A.*    Correct.

15      *Q.*    So you are not just taking everything at face

16  value that is written, you are doing some work to

17  investigate whether what is being reported is correct and

18  accurate?

19      *A.*    Correct.

20      *Q.*    And have you ever had the instance where you

21  know that there was an expert engaged by a parent who --

22  whose opinion was -- you know, either that -- that was

23  favorable to the parent and tended to refute the

24  allegations weren't included in the Court report?

25      *A.*    Not a specific situation I could recall.

1          MR. CONNELLY:  We have been going for a

2    little bit over -- slightly over an hour.  Does anybody

3    need a break?

4          MR. CROWN:  Yeah, we'll take five minutes.

5          (Recess ensued from 11:23 a.m. until

6    11:34 a.m.)

7    BY MR. CONNELLY:

8        Q.    Back to your role as a case supervisor, with

9    about 114 cases, I would assume that you are not able to

10   read every motion, response, and reply that is filed in

11   every case; is that fair?  Is that accurate?

12       A.    I try to be as updated as I can be.

13       Q.    Right.  But you don't read every motion, every

14   response, every reply in every case, right?

15       A.    I mean, I would say I try to skim it.  I would

16   skim.  But I did try to read everything that was sent to

17   me, everything that I reviewed.  It's normal to review a

18   case and review what is on the court site.  I would not

19   say I remember word for word, but I do try to review.

20       Q.    You said things that are sent to you.  What kind

21   of things get sent to you?

22       A.    At times we get motions or rulings that are

23   filed with the Court e-mailed from the Court, e-mails from

24   attorneys, service providers.  Usually I'm included -- on

25   all of the service providers sent to the case manager, the

 1   supervisor is usually included.

 2        Q.    So do you read every report that every service

 3   provider sends to the case manager?

 4        A.    Not every.

 5        Q.    How do you decide what to read and whatnot to

 6   read?

 7        A.    I would say I skim everything, but I am not -- I

 8   fully read things that come up in the court report, psych

 9   evals, visitation reports.  Things that could impact a

10   case, I would try to read.

11        Q.    So, for instance, in this case did you read

12   Dr. Kelly's report?

13        A.    At the time, yes.

14        Q.    Did you read Dr. Newberger's report?

15        A.    I believe I have.

16        Q.    Did you read Dr. Schroeckenstein's report?

17        A.    Schroeckenstein?  I don't recall if I -- I

18   remember the name; I don't recall the -- if I read it.

19        Q.    Did you read -- do you recall that Dr. Rodriguez

20   was the assigned therapist to Mother for most of time that

21   she was receiving individual therapy?  Did you read all of

22   those monthly reports?

23        A.    I believe I have, yes.

24        Q.    Did you read the reports of Dr. Korsten, who

25   took over after Dr. Rodriguez?

```
 1        A.    Celice?

 2        Q.    Celice.

 3        A.    I believe I did read them at the time.

 4        Q.    Did you read Dr. Oakley's two psychological

 5   evaluations of Mother?

 6        A.    Yes.

 7        Q.    Did you read her psychological evaluation of

 8   Father?

 9        A.    Yes.

10        Q.    And in this case there were a lot of motions

11   filed.  Do you recall there being a lot of motions filed

12   in the dependency case?

13        A.    Yes.

14        Q.    Did you read all the motions, all the briefs in

15   this case?

16        A.    I don't know if I read specifically word for

17   word, but I would say skimmed.

18        Q.    Skimmed, okay.  And what does that mean for you

19   when you skim?

20        A.    Like reading fast.

21        Q.    Reading fast, but not reading the whole thing,

22   just trying to get the gist?

23        A.    Yes.

24        Q.    Maybe read a little bit of the beginning, a

25   little bit of the end, to see what they are talking about?
```

```
 1      A.    Even in the middle, just like sometimes a book.
 2  Yeah.
 3                  MR. CONNELLY:  This is off the record.
 4                  (Recess ensued from 11:38 a.m. until
 5  11:39 a.m.)
 6  BY MR. CONNELLY:
 7      Q.    Let me go back to the very beginning.  I asked
 8  you some questions about your background and all.  What I
 9  didn't ask, and I usually do, is:  How old are you?
10      A.    I am 45.
11      Q.    So you were born in?
12      A.    '79.  July 9th.
13      Q.    So in January of 2019, you would have been how
14  old?
15      A.    29?  About 29, 30.  You said 2019?
16      Q.    So about five years ago, so you would have been
17  40ish?
18      A.    Yeah.
19      Q.    39, 40?
20      A.    Yeah.
21      Q.    And you have been married since 2004?
22      A.    '2.
23      Q.    2002.  Okay.
24                  Going back to the items you listed in your
25  role as an ongoing case supervisor, you mentioned
```

1  shadowing as something you do.  Can you describe shadowing

2  for me?

3      A.    Sitting in on a court hearing, sitting in on a

4  parent meeting with a case manager, going out in the field

5  with them to do child contact, to go to a court hearing

6  because at that time we were going in person.

7      Q.    So in this case, did you do any shadowing of

8  Madison Bell?

9      A.    Yes.

10     Q.    What shadowing of Madison Bell did you do?

11     A.    I attended, I believe, CFTs with her.  I

12  attended some of the court hearings.  I believe I went to

13  at least one home visit.

14     Q.    That would have been ...

15     A.    With the boys.

16     Q.    With the boys and the father?

17     A.    No.

18     Q.    Or the foster home?

19     A.    Foster.

20           That's probably -- and the meetings with --

21  when there was meetings with Southwest, with the

22  visitation team, I would participate in some of those as

23  well.

24     Q.    Do you remember how many of those you

25  participated in?

1        A.    Probably just a few, two or three.

2        Q.    When you say meetings with Southwest Human

3   Development, do you mean when Madison Bell was meeting

4   with them or when the mother was meeting with them?

5        A.    They would do -- I don't recall what they called

6   it, like sessions after to debrief or discuss progress or

7   concerns, meetings like that.

8        Q.    So it would have been a meeting where Southwest

9   was there, Madison Bell was there, and the mother was

10   there?

11        A.    I don't believe that Jessica was there at the

12   time.

13        Q.    So it was just a debriefing between the

14   Department and Southwest?

15        A.    Correct.

16        Q.    You do know that there were debriefings

17   between -- with Southwest and the mother --

18        A.    Correct.

19        Q.    -- right?

20        A.    Yes.

21        Q.    Did you attend any of those?

22        A.    I don't believe those were for us to attend.  I

23   believe they were just between the team at Southwest and

24   Mom.

25        Q.    And when you had these meetings with Southwest,

```
1   was Madison Bell always there?
2       A.    Yes.
3       Q.    And how many times did you meet with Southwest
4   and Madison Bell?
5       A.    Probably two or three.
6       Q.    Did you make a record, any kind of record of
7   that?
8       A.    I mean, I would say I would hope there is a case
9   note, but I don't recall.
10      Q.    And if you made a note about that meeting, it
11  would have been in the notes and communications file,
12  right?
13      A.    It would have been in the case notes.
14      Q.    Right.  Case notes.  And those are -- are those
15  the same -- is that the same file as what is called the
16  notes and communications file?
17            I will just show you real quick, and you
18  can tell me if this is what you are talking about or not.
19  It is Exhibit 62?
20      A.    It would be more like this one.
21      Q.    Right.  So it would be an entry that would be
22  found in the notes and communications.  You see at the top
23  here where it's called Notes and Communications, right?
24      A.    Well, it looks like they are including status
25  communications, which is the communication part, and then
```

1    notes -- it must be the way they compile this when they

2    send it out.  But, yes, just the notes.

3         Q.   Well, let me ask this, then:  Do you have an

4    independent recollection of making a written record of

5    these meetings that you attended with Southwest Human

6    Development?

7         A.   Not an independent recollection, no.

8         Q.   And is it something that you make a habit or a

9    practice of doing when you attend those kind of meetings?

10        A.   Yes.

11        Q.   And so would you expect that, even though you

12   don't have an independent recollection of doing so, that

13   you would have done so in this case?

14        A.   Potentially, unless Madison was doing the note

15   and we were together.  Then it could have been where she

16   did the note and I just reviewed it.

17        Q.   And if she wrote the note and you reviewed it,

18   the note itself reflects both that she wrote it and that

19   you reviewed it, right?

20        A.   Probably not.  It would just say that she wrote

21   it.

22        Q.   Okay.  And so -- so then let's -- all right.  So

23   if you -- for instance, if you look at page 27 of 110,

24   which ends in a Bates label that ends in 71 at the bottom,

25   but if you go to page 27, you see that the note is

1    identified as a staffing note.  Do you see that?

2        *A.*    Yes.

3        *Q.*    Created by Madison Bell, right?

4        *A.*    Correct.

5        *Q.*    And then it says -- there's a heading that says

6    what the note is about or what the staffing is about, and

7    it identifies the family members that it's about, right?

8        *A.*    Yes.

9        *Q.*    And it says who it is with?

10       *A.*    Correct.

11       *Q.*    So if there was a staffing with -- about the

12   Kahramans with you, Madison Bell, and Southwest Human

13   Development, under the "With" heading it would include

14   you, Madison Bell, and Southwest Human Development, right?

15       *A.*    I believe the "With" is only -- our system has

16   changed.  I don't think that Southwest could have gone in

17   there.  I think that was just for internal.

18       *Q.*    Well, I don't mean that Southwest would have had

19   anything to do with creating the note, but wouldn't the

20   writer of the note identify that it was a meeting with ...

21       *A.*    No.  What I am saying is our system, I don't

22   believe that we had the ability to put Southwest in that

23   box, in that area, so that's why it is underneath for the

24   present.

25       *Q.*    And what about if you were there?

1    *A.*    I should be under the "With."

2    *Q.*    You would be under the "With"?

3    *A.*    If I was there, yeah.

4    *Q.*    If you were there?

5    *A.*    Yes.

6    *Q.*    And so if there are notes where she is having a

7    staffing with, for instance, Dr. Rodriguez and Carla White

8    from Southwest Human Development and she doesn't identify

9    you as being a person in the "With" column, then we -- can

10   we assume that you were not there?

11   *A.*    I would say that would be accurate.

12   *Q.*    For instance, let me just ask you to look at

13   page 70.

14   *A.*    Out of 110?

15   *Q.*    Yes, please.  Do you see that this one is a

16   staffing about Jessica Kahraman, and then if you look at

17   the next page, it was a staffing that Madison Bell had

18   with Carla White at Southwest Human Development.

19            You are not identified under the "With,"

20   and she doesn't note that you were there when she says

21   that she spoke with Carla White, right?

22   *A.*    Correct.

23   *Q.*    We would expect to see an entry similar to

24   something like this if there were meetings between you,

25   Madison Bell, and representatives of Southwest Human

1  Development, right?

2      A.   Correct.

3      Q.   And so you agree with me that if there were

4  those kind of meetings, that this is the file that they

5  would be reflected in?

6      A.   Yes.

7      Q.   And if we don't see any kind of meetings like

8  that reflected in here, where you were present or

9  identified as being present, can we then take from that

10 that there were no meetings with Southwest Human

11 Development and Madison Bell for which you were present?

12     A.   Yes.  I mean, according to the notes, yes.  Like

13 I would say according to what documentation there is, then

14 yes.

15     Q.   And I want to make sure, are you testifying or

16 are you not -- are you testifying that you have a specific

17 recollection of those meetings occurring, or you don't

18 know and they might not have occurred?

19     A.   From my best recollection, I was present at some

20 meetings.

21     Q.   With Southwest Human Development and Madison

22 Bell?

23     A.   Correct.

24     Q.   And they are either going to -- if I sit down

25 and look through this file, searching specifically for

1  meetings where you are present with Southwest Human
2  Development, they should be in here, right?
3      A.   From my best recollection, yes.
4      Q.   And if they are not in here, then what are we to
5  make of that fact?  Can we assume that they didn't
6  actually occur, that you are misremembering?
7              MR. CROWN:  Objection.  Form and
8  foundation.
9              THE WITNESS:  Or that my name was left out.
10 BY MR. CONNELLY:
11     Q.   And if Madison Bell made a note like that, is it
12 something that you would get notice of to review?
13     A.   No.
14     Q.   So -- so your recollection is that you sat in on
15 some meetings like that and they should be reflected in
16 here, and if they are not in here then -- where you are
17 identified, then your testimony is that Madison Bell
18 forgot to identify you as a participant?
19     A.   Potentially.  Like we could assume that.
20     Q.   Okay.  You said that one of the things you do in
21 your role is that you staff cases monthly.  What does that
22 mean?
23     A.   Just discussing the case with the case managers,
24 discussing progress, if we still see safety concerns.
25     Q.   And does that result in any written product?

1    *A.*    At that time, I don't believe we were doing a

2    written staffing note.  I don't recall what we were using

3    at that time because it is something totally different

4    now.

5    *Q.*    Does that result in a supervisory case progress

6    review?

7    *A.*    Could you show it to me?

8    *Q.*    Yeah, I will show you one of these, and you can

9    tell me if this is a work product from your monthly

10   staffing.  So this is -- it is going to be 69, yeah.  So I

11   will go ahead and mark this one, I guess.

12                    (Deposition Exhibit No. 69 was marked for

13   identification by the reporter.)

14   BY MR. CONNELLY:

15   *Q.*    So this will be Exhibit 69.  What I have given

16   you is a document that is labeled "Department of Child

17   Safety Supervisory Case Progress Review - Ongoing," and

18   this one is for a meeting date of January 29, 2019, in

19   this case between you and Madison Bell.

20                    So my question is:  You said that there

21   is -- my question before was whether there was a written

22   product that results out of your monthly case staffings.

23   And so my question now is:  Is this what results as part

24   of your monthly case staffings?

25   *A.*    I mean, it's typically signed.  I -- and I don't

 1    have any recollection of this.
 2        Q.    So you don't have any recollection of creating
 3    this report at all, right?
 4        A.    No.
 5        Q.    And we see that in looking at this that it is
 6    broken up into different -- there are different areas
 7    within the gray boxes that have topics for discussion,
 8    right?
 9        A.    Correct.
10        Q.    And then along the left margins, there are
11    columns that ask whether follow-up is required, yes, no,
12    or not applicable, right?
13        A.    Yes.
14        Q.    And we see that none of the boxes are checked
15    and there are comments in each area following the bulleted
16    prompts and there are not any comments at all throughout
17    this document, right?
18        A.    Correct.
19        Q.    And like you noted, it is not signed at all,
20    right?
21        A.    Correct.
22        Q.    Now, let me show you what we will mark as
23    Exhibit 70.
24              (Deposition Exhibit No. 70 was marked for
25    identification by the reporter.)

```
 1    BY MR. CONNELLY:
 2        Q.    This is the same report, but it's for a meeting
 3    dated February 22nd of 2019.  And do you see that this one
 4    is different than Exhibit 69, in that some of the
 5    follow-up boxes are checked and there is some comments in
 6    the Comment section of some of the subject areas, right?
 7        A.    Yes.
 8        Q.    This one is not signed either, right?
 9        A.    Correct.
10        Q.    So do you recall creating this report in
11    February of 2019?
12        A.    I don't.
13        Q.    Is this a report that it would be your
14    responsibility to create?
15        A.    Yes.
16        Q.    And what's the intention of this report?  What's
17    its purpose?
18        A.    To make sure we are reviewing the cases monthly
19    and going over all -- not necessarily all historical
20    information, but some historical and current information
21    to make sure cases are moving.
22        Q.    What happens with this report after you create
23    it?
24        A.    I believe it was uploaded into, at the time, our
25    computer system, which was CHILDS.
```

1    Q.   And then what?  Does anybody above you review it
2  or it's just the piece of documentation?
3    A.   We will put it into CHILDS, and then if there
4  was a records request, this would be part of disclosure,
5  it would be these notes.
6    Q.   So if there was a records request in a
7  dependency case or a later lawsuit like this?
8    A.   Then this -- correct.  Or it would be if the
9  attorneys were -- or if we were doing disclosure, this
10  would be part of disclosure.
11    Q.   So is this something, though, that -- you said
12  that at your monthly case staffings, you discuss the case
13  with the case manager, you discuss whether there were any
14  changes in safety plans or services or anything else,
15  right?
16    A.   Correct.
17    Q.   And if you see, for instance, on Exhibit 70, the
18  first discussion area is safety and risk assessment, and
19  it includes the Prompt No. 1 and then some bullet points
20  under it.  And then the Comments section is where you
21  write in your comments in response to these prompts and
22  bullet points, right?
23    A.   I mean, that's what it looks like, yes.
24    Q.   And you agree with me that it also looks like
25  that for the comment on No. 1 that begins on the first

 1  page and carries over to page 4, that what you did was --
 2  looks like you just cut-and-pasted from information that
 3  was written somewhere else in the system?
 4      A.   That's -- I mean, that's what it looks like.
 5      Q.   You didn't draft all this just anew, right, you
 6  copied it from --
 7      A.   It looks like it is from a court report.
 8      Q.   Right.  That's what it looks like to me, too.
 9  It looks like the same stuff that is in a court report.
10  And it doesn't necessarily answer the prompt, do you agree
11  with me?
12           The prompt says:  Discuss the assessment of
13  all 17 safety threats and the need for continued removal
14  or an in-home safety plan.
15           And then three are a bunch of bullet points
16  that flesh that out even a little more about what you
17  should be discussing in this response to this first
18  prompt.  And all this -- all the comment really does is
19  regurgitate what was in the first court report and, you
20  know, what DCS has in its system about the first few days
21  that Kenan was in the hospital, right?
22      A.   Right.
23      Q.   It doesn't really do any discussion of safety
24  threats per se, it just repeats what was in the Court
25  report and what was used as part of going to get the

1    Court-authorized removal order, right?

2        *A.*    Correct.

3                MR. CROWN:  Objection.  Form and

4    foundation.

5    BY MR. CONNELLY:

6        *Q.*    And then you checked the box that there is no

7    follow-up required.  What does that mean?

8        *A.*    I mean, that would typically mean that there is

9    no follow-up.

10       *Q.*    Then the -- so the next discussion area in the

11   safety and risk assessment is No. 2 on this fourth page.

12   And it says:  Discuss whether the safety plan for each

13   child is sufficient to control all current safety threats

14   and is least intrusive.  And then there are some bullet

15   points under that.

16               Do you see that?

17       *A.*    I do.

18       *Q.*    And then in response to that prompt, there is no

19   comment at all, right?

20       *A.*    Right.

21       *Q.*    And it says that there is no follow-up required,

22   you checked the "no" box, right?

23       *A.*    Yes.

24       *Q.*    And so I guess I am wondering, when you are

25   having your staff case -- when you are having your monthly

1  case staffings, and in this particular case you are having

2  them with Madison Bell, do you use this document at all as

3  a template to guide that discussion?

4      A.    I mean, honestly, my recollection is I do not

5  remember this form.  Our supervisory forms have changed

6  quite a few times over the last few years.  But, yes, they

7  are typically as a template, I just don't recall this

8  form.

9      Q.    Okay.  And, you know, if I were to take you

10 through all of the ones that I have here that were

11 produced in this case, they are all the same format, you

12 know, as far as it looks the same, you know, except the

13 only difference would be the comments sections.

14            And so do you go through when you are

15 having your monthly staffing and touch on all the topics

16 that are outlined in this document, in this form?

17     A.    Yes.  Because we have like a -- like a -- kind

18 of like a workbook we work through that goes through these

19 same questions.  It's like a supervision handbook where we

20 would go through -- it is like when you have a training

21 and you have like a workbook that you train off of.  It's

22 similar to that for what we have.

23     Q.    So when you are doing the staffing, you have got

24 this workbook that you are talking about, you have got it

25 open and you are looking at it and you are working with

 1   it?
 2        A.    Right.  Correct.
 3        Q.    Is that in paper form or is that online?
 4        A.    Paper.
 5        Q.    So you have got this workbook that you are
 6   working through --
 7                    MR. CONNELLY:  And will you mark this
 8   section right here.
 9                    (Record requested to be marked.)
10   BY MR. CONNELLY:
11        Q.    You got this workbook that you are working
12   through.  And you are working through it with the case
13   manager, right?
14        A.    Correct.
15        Q.    And you are touching on these topics and asking
16   for input on progress or status on each one of these
17   topics, right?
18        A.    Correct.
19        Q.    Are you at the same time entering information
20   online into this form or into some other area online that
21   then gets migrated to this form and populates this form?
22        A.    I don't recall how these forms were at the time,
23   if they were just electronic or sent through e-mail, I
24   don't recall.
25        Q.    And so, then, at your monthly staffings, if you

 1  are not inputting something online at the time, do you
 2  come back later and input information into this report?
 3      A.   Like if I took a note and then I went back at a
 4  separate time and enter it online?  I mean, that's what I
 5  do now, at times.  So it could have been.  Because we are
 6  not reviewing one case at a time, we are reviewing a few,
 7  so ...
 8      Q.   So when you are doing your monthly case
 9  staffings, you are not just meeting with one case manager,
10  you are meeting with more than one at that time?
11      A.   No.  One case manager, multiple cases back to
12  back.
13      Q.   Sure.  And your practice is to take handwritten
14  notes during those meetings?
15      A.   It would depend on the time that we have set if
16  I was entering on the computer or entering on a note and
17  then going back in and putting it in the computer.
18      Q.   So we see on this particular exhibit,
19  Exhibit 70, that the only place where there's a comment in
20  the discussion area is on this first discussion area,
21  Safety and Risk Assessment, and then Prompt No. 1.
22           Would you agree with me that there are not
23  any comments for Safety and Risk Assessment Prompt No. 2,
24  3, or 4?
25      A.   No, not until the end.

1      Q.    Right.  And we will get to the end, but I just
2   want to work through this methodically.  So you agree that
3   there are no comments in discussion area about Safety and
4   Risk Assessment Prompts No. 2, 3, and 4, right?
5      A.    No.
6      Q.    Meaning, yes, you agree with --
7      A.    I mean I do agree with you, correct.
8      Q.    And then as far as Engagement and Contacts With
9   Parents and Children, Prompts No. 5, 6, and 7, there are
10  no comments, right?
11     A.    Correct.
12     Q.    And regarding Permanency Planning for Out of
13  Home Cases Only, Prompts No. 8, 9, and 10, there are no
14  comments, right?
15     A.    Correct.
16     Q.    And in Prompts No. 11 and 12 on that same topic
17  and Prompts 13, 14, and 15, there are no comments, right?
18     A.    Correct.
19     Q.    And then at the end, as you noted, there is a
20  box that says:  Document any follow-up activities required
21  prior to next review.
22            And you have got some information contained
23  in there, right?
24     A.    Correct.
25     Q.    And there, you say -- do you remember writing

1  what you see in here, before we get to other questions?

2      A.   No.

3      Q.   But it would have been you who would have

4  written this information into here, right?

5      A.   I mean, it seems like it would be, yes, because

6  it says supervisor.

7      Q.   And so you wouldn't have had a secretary or a

8  case manager do it, right?

9      A.   No.  No.

10     Q.   So you say here:  2/2019, concerns regarding

11 medical neglect, parents are refusing to engage in all

12 services.

13          And then you go on for a couple of

14 sentences there.  And then you talk a little bit about

15 what is going on in court, right?

16     A.   Right.

17     Q.   And you note that a dependency trial is in June.

18          And then you say:  As of 2/21, parents have

19 contacted the CM -- meaning case manager, right?

20     A.   Correct.

21     Q.   Meaning Madison Bell, right?

22     A.   Yes.

23     Q.   Parents have contacted the case manager, and

24 parents -- and they reported they want the intake, intake

25 is being held on 2/22.

1              All that means is that the parents have now
2    decided that they are going to engage in services and
3    communicate with DCS and participate in the process,
4    right?
5         A.   Correct.
6         Q.   And then the next thing says that MGPs -- that
7    means maternal grandparents, right?
8         A.   Correct.
9         Q.   -- have contacted case manager regarding visits.
10   Right?
11        A.   Correct.
12        Q.   And then you note -- you do not note any
13   follow-up activity in the area where there is that
14   heading, right?
15        A.   Correct.
16        Q.   And there is no signature or date reviewed,
17   right?
18        A.   Correct.
19        Q.   So at least from this, we know that as of
20   February 21st, that the parents have asked to get involved
21   in services and the maternal grandparents have contacted
22   the Department about visits, right?
23        A.   Correct.
24        Q.   And those are things that you would have
25   discussed during the monthly case meetings that you were

1  having with Madison Bell in regard to this case, right?

2      A.    Correct.

3      Q.    And there were things you would have talked to

4  her about in her other cases as well, maybe, right?

5      A.    Correct.

6      Q.    Those are the kind of things you discuss?

7      A.    Correct.

8      Q.    We will come back to a couple more of these, but

9  I just want to go through a couple more of these things

10 you identified as what you do as a case supervisor?

11     A.    All right.

12     Q.    You said that you review files and records.  Can

13 you flesh that out for me a little bit, what do you do in

14 that regard?

15     A.    When we get a file from investigations, we would

16 review all the paperwork they have in the file, and then

17 we would review anything that was currently in the

18 electronic file at the time.

19     Q.    And you do that only at the time that the case

20 is first assigned?

21     A.    For the file, yes.  But then ongoing -- there is

22 an ongoing review of documents.

23     Q.    And so tell me about that.

24     A.    Like usually I am copied on service provider

25 reports, psychological evaluations sent through e-mail,

 1  certain communications.

 2       Q.    What kind of communications?

 3       A.    Phone, e-mails.

 4       Q.    And that's only if the case manager decides to

 5  copy you on those things, right?

 6       A.    Yes.  Or if somebody reaches out to me and asks

 7  for a meeting with the case manager.

 8       Q.    If a parent or a grandparent were to contact

 9  you?

10       A.    Correct.  Or a service provider.

11       Q.    Or a service provider.  Okay.

12             And then what about things that are filed

13  with the Court?

14       A.    That would just be going on the court site and

15  reviewing them, if they are not like e-mailed.

16       Q.    Now, as far as the investigations file, when a

17  case is first assigned to you, do you then go in and read

18  the -- what do you read when a case is first assigned to

19  you as far as the investigations file?

20       A.    The hard copy file.

21       Q.    And so that includes things like what?

22       A.    The original court report, the preliminary court

23  report, the CAR would have been in there, the initial

24  petition is usually in there, the kids' rapid responses

25  are usually in there, the hotline report, any services

1    that have already been started prior to us getting it

2    usually are in the file when we first get it.

3        Q.    And do you read all of those things or do you

4    just skim those things?

5        A.    No.  I read the file.

6        Q.    So you read the whole file?

7        A.    Yes.

8        Q.    At the time that it is assigned to you?

9        A.    Correct.

10       Q.    And you do that for all 114 cases you have?

11       A.    Yes.  Because I used to tab the files, tab the

12   sections so the case managers knew where to look.  So I

13   would have to read every section.

14       Q.    And what would you tab for the case managers?

15       A.    Like a tab like this, I would put "preliminary

16   report," or the child's name, rapid response, notice to

17   provider, things like that.

18       Q.    And then the other thing you said you do is you

19   assist the case manager with tough cases.  What do you do

20   to assist the case manager differently with tough cases

21   from what you would normally do as a supervisor?

22       A.    Sometimes if it is going over different

23   processes of why the kids came into care, we would look at

24   that; having tough conversations; sometimes we role-play,

25   having a tough conversation or meeting a client for the

 1   first time, we role-play.

 2       Q.   Did you role-play any tough conversations in

 3   this case?

 4       A.   Not that I recall, no.

 5       Q.   Did you role-play meeting with the parents for

 6   the first time?

 7       A.   If I recall correctly, we talked about the

 8   Father being from Turkey and that aspect, a little bit

 9   about Mom and Dad's relationship from what we knew at the

10   time.

11       Q.   What time are you talking about?

12       A.   Like when we first got the case.

13       Q.   Okay.

14       A.   And like how the parents were not wanting to

15   participate in the -- like the comments and the things

16   about the biological property.  We would talk about

17   different ways to handle conversations or interactions

18   with the parents.

19       Q.   And when did you first get assigned the case?

20       A.   It would have been -- I don't recall the month,

21   though, but I think it was, I believe, 2018.

22       Q.   Well, the temporary custody was taken

23   December 28th of 2018, if that helps you recall.

24       A.   So probably it would have been January of 2019,

25   then.

1    Q.    When the case was first assigned to you, did you
2    have any conversations with Sarah Kramer?
3    A.    We typically do a transfer dialogue with her
4    supervisor and her, myself, and the assigned ongoing case
5    manager.  So we would have had a transfer dialogue to
6    discuss the case.
7    Q.    Do you recall the transfer dialogue in this
8    case?
9    A.    I don't recall.
10    Q.    Normal practice is to have a transfer dialogue
11    with the investigator, the investigator's supervisor, you,
12    and the ongoing case manager?
13    A.    Correct.
14    Q.    So in this case, if there was a transfer
15    dialogue, it would have been with you, Madison Bell, Sarah
16    Kramer, and Sarah Mendez?
17    A.    Correct.
18    Q.    But you don't have a specific recollection of
19    that transfer dialogue?
20    A.    I do not.
21    Q.    Do you have any recollection of anything that
22    Sarah Kramer or Sarah Mendez told you about the case?
23    A.    Verbally, no.
24    Q.    Did either of them tell you that this was a
25    Munchausen or a factitious disorder case?

1    A.    Not that I recall, no.

2    Q.    And so then what's the first thing you would

3  have done on having the case assigned to you?

4    A.    Assigned it to Madison in the system; reviewed

5  what was in our CHILDS system; and then once we got the

6  file, I would have reviewed the file.

7    Q.    And does the -- you say "the file," you are

8  talking now again about the hard copy file that you

9  described a minute ago?

10    A.    Correct.  Yes.

11    Q.    And when you say you would have reviewed what is

12  in the CHILDS system, you are talking about the electronic

13  system?

14    A.    Correct.

15    Q.    And is there stuff in the electronic system that

16  is different from what is in the hard copy file?

17    A.    There shouldn't be.  But like if case notes were

18  not printed out and put in the file, you would find the

19  case notes from the investigation in the electronic file.

20    Q.    Okay.  What about medical records, do you review

21  medical records when you first get a case?

22    A.    If they are in the file, yes, and then sometimes

23  if they -- they usually e-mail them.  So I would read it

24  like that.

25    Q.    Did you review any medical records in this case?

1      A.    I recall some initial reports from, I believe,
2   Cardon's.  I recall those initial -- some of those initial
3   reports.
4      Q.    When did you review those?
5      A.    Probably in the time that we got the case, in
6   the first month or so, I would have reviewed those.
7      Q.    And what would you have been looking for?
8      A.    Just reading.  Just -- just reading, not
9   necessarily looking for something specific, but just
10  reviewing them.
11     Q.    And do you take everything in the medical report
12  to be correct and accurate?
13     A.    We rely on experts, so I would say yes.
14     Q.    You -- do you recognize that medical records
15  often contain erroneous information?
16            MR. CROWN:  Objection to form and
17  foundation.
18            THE WITNESS:  I mean, I would say
19  potentially.
20  BY MR. CONNELLY:
21     Q.    For instance, do you take at face value
22  everything that a staff person or a nurse might say
23  regarding an interaction between a parent or a grandparent
24  that occurred at a hospital?
25            MR. CROWN:  Objection to form and

 1  foundation.

 2              THE WITNESS:  I mean, if they are the only

 3  person present, they are the ones interacting with the

 4  parent at that time and the kids, those would be the

 5  reports that we review.

 6  BY MR. CONNELLY:

 7      Q.  And would you take that record as being a true

 8  and accurate account of what happened between the nurse,

 9  let's say, and the parent?

10              MR. CROWN:  Objection to form and

11  foundation.

12              THE WITNESS:  I would say yes.

13  BY MR. CONNELLY:

14      Q.  What if the parent disputed the characterization

15  in the medical record?

16              MR. CROWN:  Objection to form and

17  foundation.

18              THE WITNESS:  I guess they -- I am not

19  sure.  I guess they would just dispute it, I'm not ...

20  BY MR. CONNELLY:

21      Q.  For instance, in this case the medical record

22  says that Kenan was only being fed 500 calories per day;

23  the parents say they were feeding him 2,000 calories a

24  day, 500 calories per meal.

25              And do you recall ever hearing from the

 1 | parents that they were feeding the child 2,000 calories a
 2 | day and not 500?
 3 |             MR. CROWN:  Objection to form and
 4 | foundation.
 5 |             THE WITNESS:  I believe just from reviewing
 6 | records or reviewing the court reports, I recall that.
 7 | But that would be it.
 8 | BY MR. CONNELLY:
 9 |     Q.   Do you remember that the allegation that the
10 | child was fed only 500 calories per day was one of the
11 | allegations that was used to get the Court-ordered
12 | removal?
13 |     A.   Do you have -- I mean, I would say if that's on
14 | the CAR -- could you show me the CAR?
15 |     Q.   I don't know if I -- well, it's one of Larry's.
16 | Yeah, we will show it to you in a minute.
17 |             MR. CROWN:  It's Exhibit 201.
18 |             MR. CONNELLY:  201.
19 | BY MR. CONNELLY:
20 |     Q.   So -- well, I will show you the preliminary
21 | report to the Court, Exhibit 203; and if you look at
22 | the -- this paragraph here.
23 |             MR. CROWN:  Is there an exhibit number?
24 |             MR. CONNELLY:  203.
25 |

 1  BY MR. CONNELLY:
 2      *Q.*   You will see there in Exhibit 203 -- and is it
 3  okay if I come over and look over your shoulder because I
 4  don't have an extra copy?
 5      *A.*   Yes.
 6      *Q.*   Do you see there where it says:  He is getting
 7  an average of 500 calories a day at home.  Do you see
 8  that?
 9      *A.*   I do.
10      *Q.*   Now, the parents have long disputed that and
11  said that he was getting 2,000 calories a day.  And so --
12  and if you look through that report, you won't see
13  anywhere in there where it reports that the parents
14  dispute that he was only getting 500 calories a day.
15              And so my question is:  When what the
16  parents say is in contrast to what the doctors are saying,
17  do you give any credence to what the parents are saying or
18  do you just believe the doctors?
19              MR. CROWN:  Objection to form and
20  foundation.
21              THE WITNESS:  Typically in this section
22  that says "Parents Response" is where Mom or Dad would
23  have disputed it, and the case manager would have wrote it
24  in this part because that is typically where they go.  And
25  I don't see that.  So I don't know if they did dispute it

1  at the time.  Maybe it was after she generated this

2  report.

3  BY MR. CONNELLY:

4      Q.   Okay.  That's a fair enough point.  And so let's

5  follow that.

6              Let's assume that at the time that the

7  report was generated, the author didn't know that the

8  parents said 500 calories a day is wrong, they were

9  getting 2,000 calories a day, but it is later said to

10  doctors and to the case manager that the report of

11  500 calories a day is wrong and it was actually

12  2,000 calories a day.

13              Is that information, then, that should be

14  updated in a court report?

15              MR. CROWN:  Objection to form and

16  foundation.

17              THE WITNESS:  Well, here on those labs, it

18  says that Mom said he got 2,000 the day before, and she

19  did write that here, on this last part.

20  BY MR. CONNELLY:

21      Q.   And you agree that that is something that should

22  be reported to the Court, right?

23      A.   Yes.  If the response is different from the

24  allegations that we got, it should be in that section.

25  Because that's the parents' interview with the case

 1  manager.

 2      *Q.*    Okay.  And then what if --

 3              MR. CROWN:  What page was that on?

 4              MR. CONNELLY:  Pardon?

 5              MR. CROWN:  For the record, what page was

 6  that on for the -- so we have it in the record?

 7              MR. CONNELLY:  It's on page 9 of the

 8  report.

 9  BY MR. CONNELLY:

10      *Q.*    And then if the -- so but that doesn't get to --

11  that doesn't get to the crux of the question.  The crux of

12  the question is:  In this case the hospital was saying the

13  child was malnourished because he was only getting

14  500 calories a day; the parents are saying:  No, he is

15  getting 2,100 calories a day.  Temporary custody was taken

16  because Kenan had a heart issue that the doctors were

17  saying was related and caused by malnutrition.

18              You following me so far?

19      *A.*    Yes.

20      *Q.*    And you know those facts, right?

21      *A.*    Yes.

22      *Q.*    I am not telling you anything you don't know,

23  right?

24      *A.*    Correct.

25      *Q.*    And so the question becomes:  Do you believe the

1  parents' report that they're giving them 2,100 calories a

2  day, or do you discount that because the doctors are

3  saying:  No, it is 500, the kid is malnourished and the

4  malnourishment is leading to this heart problem?

5             MR. CROWN:  Objection to form and

6  foundation.

7             THE WITNESS:  I mean, I would say we rely

8  on the expert, not just eating the calories, but if they

9  said the kids were malnourished, we would rely on the

10  expert regardless of calories.

11  BY MR. CONNELLY:

12     Q.  And so would you continue to repeat the 500

13  calories a day?

14             MR. CROWN:  Objection to form and

15  foundation.

16             THE WITNESS:  A lot of times in those

17  reports, that first section was cut and paste into

18  subsequent reports.  So I would say in that regard, yes,

19  but only repeated in that top section.

20             MR. CONNELLY:  So we have been going a

21  little over two hours.  I am little hungry myself.  Let's

22  stop now and take a little bit of a lunch break.

23             MR. CROWN:  Right.  Okay.

24             (Recess ensued from 12:36 p.m. until

25  1:53 p.m.)

 1 | BY MR. CONNELLY:
 2 |     Q.   Ms. Temple, before we broke for lunch, we were
 3 | talking about your role as a supervisor.  And we talked a
 4 | little bit about some of the information in the early
 5 | court report about what the doctors were saying versus
 6 | what the parents were saying.  And one thing you said, I
 7 | want to follow up on.  You said that what you do is that
 8 | you rely on experts.
 9 |               Do you remember that?
10 |     A.   I do.
11 |     Q.   And the Department engages many experts when
12 | there is a dependency case that's being handled, right?
13 |     A.   Correct.
14 |     Q.   You engage experts to provide therapy to the
15 | parents, right?
16 |     A.   Correct.
17 |     Q.   You engage experts to provide therapeutic visits
18 | between the parents and the children, right?
19 |     A.   Yes.
20 |     Q.   You engage experts to do psychological
21 | evaluations of parents, right?
22 |     A.   Yes.
23 |     Q.   And in other cases you might engage other
24 | experts, but I think I have covered the experts that were
25 | engaged by the Department in this case.

```
 1                   Haven't I included them all?
 2        A.   I believe so.
 3        Q.   There were individual therapists, there were
 4   therapists for the children as well?
 5        A.   Correct.
 6        Q.   There were the therapeutic visits and there were
 7   psychological examinations?
 8        A.   Correct.
 9        Q.   You also engaged Dr. Kelly --
10        A.   Correct.
11        Q.   -- as an expert to determine whether or not the
12   mother was a Munchausen parent, right?
13                   MR. CROWN:  Objection to form and
14   foundation.
15                   THE WITNESS:  He was doing an evaluation.
16   I wouldn't say it was for the Munchausen.
17   BY MR. CONNELLY:
18        Q.   Well, factitious disorder at that time is what
19   you were calling it, right?
20        A.   I don't recall that being the reason for the
21   referral, though.
22        Q.   But he was an expert that was engaged by the
23   Department, right?
24        A.   He is.
25        Q.   And then the defense engaged Dr. Newberger?
```

1       *A.*    Yes.

2       *Q.*    And Dr. Schroeckenstein, right?

3       *A.*    Correct.

4       *Q.*    And then at some point in time in 2020, Jessica

5   Kahraman engaged Celice Korsten to take over for

6   Dr. Rodriguez, right?

7       *A.*    Correct.

8       *Q.*    And she was paying for that herself; the

9   Department wasn't paying for Korsten, correct?

10      *A.*    I don't believe that we were, no.

11      *Q.*    Your testimony was that you rely on experts, and

12  in this case Dr. Rodriguez -- were you aware that

13  Dr. Rodriguez, in August of 2019, reported to Madison Bell

14  that Mother had met the treatment goals and wanted to

15  close out Mother's counseling services?

16              MR. CROWN:  Objection to form and

17  foundation.

18              THE WITNESS:  Is that on the report?

19  BY MR. CONNELLY:

20      *Q.*    It's -- it's in an e-mail where Dr. Rodriguez

21  says that to her, and it is -- it is in a record where she

22  wanted to close out services.

23              MR. CROWN:  Objection to form and

24  foundation.

25

 1  BY MR. CONNELLY:

 2      *Q.*   Did Madison Bell ever tell you that?

 3              MR. CROWN:  Objection to form and

 4  foundation.

 5              THE WITNESS:  Do you have the e-mail?

 6  BY MR. CONNELLY:

 7      *Q.*   My question is:  Did Madison Bell ever tell you

 8  that Dr. Rodriguez wanted to close out Mother's therapy in

 9  August 2019 because she had met her goals?

10              MR. CROWN:  Objection to form and

11  foundation.

12              THE WITNESS:  I mean, if you have the

13  e-mail.  But other than that, I don't recall.

14  BY MR. CONNELLY:

15      *Q.*   Independent of any e-mail, my question to you

16  is:  What did Madison Bell tell you?  Did Madison Bell

17  tell you that Dr. Rodriguez wanted to close out services

18  in August of 2019?

19              MR. CROWN:  Objection to form and

20  foundation.

21              THE WITNESS:  Not that I recall.

22  BY MR. CONNELLY:

23      *Q.*   And were you aware, then, that in October of

24  2019, that Madison Bell gave Dr. Rodriguez new treatment

25  goals for Mother to work on?

1          MR. CROWN:  Objection to form and
2    foundation.
3          THE WITNESS:  That, I don't recall.  But
4    typically, if you start with certain goals, you can
5    reassess and new goals may be added.
6    BY MR. CONNELLY:
7       Q.   New goals, but not a reworking of the prior
8    goals, right?
9       A.   Unless they still weren't met.
10      Q.   And were you aware that Dr. Rodriguez indicated
11   that Mother had met the second set of goals and wanted to
12   close out but wasn't able to close out?
13         MR. CROWN:  Objection to form and
14   foundation.
15         THE WITNESS:  Not that I recall, no.
16   BY MR. CONNELLY:
17      Q.   And so were you aware that when Celice Korsten
18   came on, there were a third set of goals that were
19   prepared for Mother to work on?
20      A.   Not that I recall, no.
21      Q.   When -- so you don't recall having any
22   conversation with Madison Bell in or around August of 2018
23   about Mother's therapy with Dr. Rodriguez?
24      A.   Not without something to refer back to, but not
25   just off my general recollection, no.

 1      Q.   So the reliance on experts, then, is it just up

 2  to the case manager whether they want to rely on a

 3  therapist who says, "I want to close out services"?

 4               MR. CROWN:  Objection to form and

 5  foundation.

 6               THE WITNESS:  No.

 7  BY MR. CONNELLY:

 8      Q.   What does the case manager have to do if the

 9  expert says, "I want to close out services," but the case

10  manager doesn't think services should be closed out?

11      A.   Generally, I would say that the expert is the

12  one that dictates when you close out.  If there is no

13  longer a clinical reason for them to be open, they have

14  to -- are supposed to close out, like, ethically.  It's

15  not up to DCS.

16      Q.   But so it would be outside of DCS policies for a

17  case manager to decide that services shouldn't be closed

18  out, that they're -- that the parent hasn't met the goals

19  and therefore services should continue?

20      A.   I would -- that's a long sentence or question

21  you just said.

22      Q.   Let me see if I can rephrase the question for

23  you.

24               If the therapist is saying that the patient

25  has met the goals, "The parent has met the goals and I

 1   want to close out services," what authority does the case
 2   manager have to say, "I disagree and therapy should
 3   continue," or "I disagree and here are some revised
 4   treatment goals"?
 5       A.   I would say that that is a potential, to say, "I
 6   disagree and here's why," and potentially have a
 7   conversation about it.  But typically if the therapist
 8   says the goals are met and there are no new concerns, the
 9   therapy would close.
10       Q.   And what would your role be in that
11   decision-making process?
12       A.   For a therapist to close out or for DCS to say
13   we don't agree?
14       Q.   That DCS doesn't agree.
15       A.   I mean, I would say potentially -- usually I
16   would say a case manager would come -- we would discuss a
17   case and they would say:  The therapist is saying they are
18   ready to close out.  I don't agree.  Here's why.  Can we
19   have a discussion with the therapist?
20            I would say that's like a hypothetical.
21       Q.   And so in this case, in or around August of
22   2019, did you have a conversation with Madison Bell where
23   she said, "Dr. Rodriguez wants to close out; I don't
24   agree.  Can we staff this question?"
25       A.   Not that I recall, no.

1      Q.    Around that time, between August and October of

2   2019, did Madison Bell ever come to you and say,

3   "Dr. Rodriguez has said that Mother has met her first set

4   of treatment goals" or, you know, "Mother has met the

5   treatment goals, I disagree, and I have got some new

6   treatment goals that I want Mother to work on, can we

7   staff that question?"

8              Did that occur?

9      A.    Not that I recall, no.

10     Q.    In August to October of 2019, did Madison Bell

11  come to you or send you an e-mail or anything that said,

12  "Here are some new treatment goals that I want Mother to

13  work on with Dr. Rodriguez?"

14     A.    I recall an e-mail about new treatment goals,

15  but nothing about Dr. Rodriguez stating she was ready to

16  close.

17     Q.    And did you review new treatment goals and

18  approve new treatment goals?

19     A.    I don't approve treatment goals.  That's the

20  therapist.  They establish the treatment plan with the

21  client.

22     Q.    So I will show you an e-mail where if Madison

23  Bell sends treatment goals to the therapist -- what's that

24  all about then?

25              MR. CROWN:  Objection to form and

1  foundation.

2              THE WITNESS:  So we have unit psychologists

3  that are in our offices.  So sometimes when parents go

4  into counseling, we meet with those psychologists using

5  any like evaluation we have and coming up with like

6  objectives or goals that could be incorporated to the

7  therapy, and then we provide that to the therapist.

8  BY MR. CONNELLY:

9      Q.  Did you participate in any staffings with

10  Madison Bell and the unit therapist about Jessica

11  Kahraman?

12              MR. CROWN:  Objection to form and

13  foundation.

14              THE WITNESS:  Not that I recall.

15  BY MR. CONNELLY:

16      Q.  So you don't recall any staffing that you were

17  involved in, in August -- any time between August to

18  October of 2019, where there was a discussion with the

19  unit therapist about Jessica Kahraman's treatment goals?

20      A.  No.  And I am not always included in those unit

21  consultant conversations.

22      Q.  But in this case you don't recall?

23      A.  No.

24      Q.  And then similarly, when Jessica transitioned to

25  Celice Korsten, is it fair to say that you don't recall

1  any consultation between -- that you were involved with,

2  with Madison Bell and the unit therapist about what the

3  treatment goals should be in relation to Mother's

4  treatment with Celice Korsten?

5       A.   No.  I don't recall that either.

6       Q.   Madison Bell mentioned the name of three unit

7  therapists.  Do you know who the unit therapist was at the

8  time, in 2019, near the end, any time from August to

9  mid-2020?

10      A.   Haggar.

11      Q.   Dr. Haggar, H-A-G-A-R?

12      A.   Two Gs.

13      Q.   Was there only one unit therapist or were

14  there --

15      A.   Usually we have two.

16      Q.   Do you know who the second one was?

17      A.   I can't think -- no, I don't recall who the

18  second one was.

19      Q.   And I think you testified that you don't have to

20  approve a change in treatment goals?

21      A.   No.

22      Q.   And am I also hearing it correctly that you

23  don't have to be informed of a change in treatment goals?

24      A.   Correct.

25      Q.   And if a case manager believes that a therapist

```
 1  who wants to close out because the client has met the
 2  goals is incorrect, you don't necessarily have to be
 3  informed of that either?
 4              MR. CROWN:  Objection to form and
 5  foundation.
 6              THE WITNESS:  If the therapist is going to
 7  close out, I don't have to be informed of it, that is what
 8  you are asking?
 9  BY MR. CONNELLY:
10      Q.   No.  I am asking:  If the case manager disagrees
11  with the therapist who wants to close out, do you have to
12  be informed and staff that issue?
13              MR. CROWN:  Objection to form and
14  foundation.
15              THE WITNESS:  No.
16  BY MR. CONNELLY:
17      Q.   So the therapist can decide that issue on her
18  own?
19      A.   Correct.
20      Q.   Going back to the time that you were assigned
21  the case -- when did you first learn about the existence
22  of the case?
23      A.   I would say probably December of 2018.
24      Q.   And how did it come to your attention?
25      A.   Usually we are notified when a report comes in
```

1   or an investigation is underway if a case is potentially

2   coming to ongoing so we know who is next up to be assigned

3   and so -- also so we can get them included in the initial

4   like court hearing, TDM; if there is a TDM, we like them

5   to be on to meet the parents in the beginning.

6       *Q.*   And so you would be notified by somebody in

7   investigations that there is a case that's probably going

8   to roll over to an ongoing?

9       *A.*   The supervisor.

10      *Q.*   So in this case Sarah Mendez would have come to

11  you and said:  We have got a case that's going to be

12  ongoing?

13      *A.*   Not come to me.  There is an e-mail that's sent

14  out saying we have a dependency.  We also have a

15  dependency board on the wall of dependencies.

16      *Q.*   And you talked earlier today about the one

17  Munchausen case you had when you were an ongoing

18  caseworker?

19      *A.*   Correct.

20      *Q.*   As a supervisor, have you been a supervisor for

21  cases that were Munchausen cases?

22      *A.*   No.

23      *Q.*   As a supervisor, have you had cases where

24  Dr. Kelly, Michael Kelly, was involved or engaged by the

25  Department?

1    A.    I -- I believe he did the evaluation on the case
2    that I had.
3         Q.    The Munchausen case that you had?
4         A.    Oh, no.  That was Dr. Bursch.
5         Q.    Yeah, that's what you said earlier.
6         A.    So no.
7         Q.    So as far as a case manager -- or excuse me --
8    supervisor, other than this case, Dr. Kelly wasn't engaged
9    in any other cases that you were a supervisor for?
10        A.    Correct.
11        Q.    Have you always been Madison Bell's supervisor?
12        A.    Yes.
13        Q.    Madison Bell testified that there were three
14   Munchausen cases that she had where Dr. Kelly was engaged.
15              Is that different than your recollection?
16        A.    I don't recall three.
17        Q.    When you first learned about the case in
18   December of 2018, did Madison Bell learn about it at the
19   same time?
20        A.    Probably.
21        Q.    Did you have a conversation with her about
22   assigning her to the case?
23        A.    I probably did.  She was probably the most
24   senior person in our unit at that time.
25        Q.    Did she volunteer to take the case?

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1    *A.*    No.

2    *Q.*    Did she have a reputation in the Department for

3    handling Munchausen cases?

4    *A.*    No.

5    *Q.*    Do you recall any conversations with Madison

6    Bell that you had with her in December of 2018 about

7    taking the case?

8    *A.*    No.

9    *Q.*    If you look at -- I will show you Exhibit 5.

10   This is an e-mail sent to you in December, on December 31

11   of 2018, by Sarah Kramer, and she says that it's a medical

12   neglect case and that Maddie -- and that's a reference to

13   Madison Bell, right?

14   *A.*    Correct.

15   *Q.*    "Maddie is interested in working this case and

16   talked to Mecca about it.  You can confirm this with

17   Mecca."  The e-mail was sent to you and Sarah Kramer and

18   also Carly Celotto -- Celotto, C-E-L-O-T-T-O.

19   *A.*    Yep.

20   *Q.*    Who is she?

21   *A.*    Carly was the program specialist.

22   *Q.*    Program specialist?  What is a program

23   specialist?

24   *A.*    They do a lot of numbers, but then also they

25   keep track of like dependencies coming from

 1  investigations; they update our dependency board, our
 2  visual one and then an online one.
 3      Q.   So program specialist would have to know who was
 4  assigned to a case as an ongoing matter?
 5      A.   Yes.
 6      Q.   All right.  It says that "Maddie is interested
 7  in working the case and talked to Mecca about it."
 8           Does that refresh any recollection about a
 9  conversation you had with Madison Bell?
10      A.   No.
11      Q.   Would you say that she volunteered for the case
12  or you recruited her for the case?
13           MR. CROWN:  Objection to form.
14           THE WITNESS:  No.
15  BY MR. CONNELLY:
16      Q.   To -- neither of those happened?
17      A.   To neither.
18      Q.   But you identified her as a person for the case
19  because of her superiority of experience over other
20  ongoing managers that you had at the time?
21      A.   Correct.
22      Q.   Did the fact that this was a medical neglect
23  case play any role in that decision?
24      A.   Possibly for not giving it to a newer person.
25      Q.   If you look at Exhibit 6, this is just an e-mail

1    from you to Madison Bell and some others telling her that

2    this is a medical neglect case.  Was there anything else

3    that went along with this e-mail, any attachments or

4    anything, any links?

5        A.    I believe Freddy is -- at the time, she was

6    doing service requests.  So I am thinking that either she

7    was doing a service request or she did the contract for

8    Dr. Kelly.  That's the only thing I could think of is

9    Freddy's role.

10       Q.    You're talking about Freddy Robinson?

11       A.    Yes.  She was not in our office.  She was like

12   in central office.

13       Q.    And Amy Schmidt was a secretary in your office,

14   right?

15       A.    Correct.

16       Q.    And who was -- decided to get Dr. Kelly

17   involved?

18       A.    I believe that was part of the protocol when

19   handling a medical neglect case.  Supposed to get a -- get

20   an experienced psychologist who has worked on cases like

21   that before to do the eval.  Because we didn't currently

22   contract with anybody in Arizona to do it.

23       Q.    And the protocol -- we were talking about

24   protocols earlier.

25       A.    Correct.

1    *Q.*   And so is this the medical abuse protocol that

2    you are talking about or a separate medical neglect

3    protocol?

4    *A.*   It might have been the same at the time.

5    *Q.*   And were there other doctors besides Dr. Kelly

6    that were available or that the Department could choose

7    from?

8    *A.*   Not that I recall, no.

9    *Q.*   So Dr. Kelly was the only doctor that the

10   Department had to go to do -- to handle cases of medical

11   neglect or medical child abuse?

12            MR. CROWN:  Objection to foundation.

13            THE WITNESS:  From what I recall at that

14   time, yes.

15   BY MR. CONNELLY:

16   *Q.*   Now, if you look at Exhibit 7, you see that at

17   the bottom Madison Bell sends an e-mail to you and asks

18   you to reach out to Shannon Williams to get a contract

19   with Dr. Kelly started for Kahraman.

20            Do you see that?

21   *A.*   I do.

22   *Q.*   And so then you -- in the e-mail above that, you

23   say:  Done.

24            Is that something, then, that is one of

25   your roles, one of the things you do as a supervisor in

 1 | these cases is get the doctor under contract?

 2 |     *A.*    I would have only e-mailed Shannon, and she is

 3 | the one that does the contracts.  So she would have

 4 | reached out to him to get like his curriculum vitae, his

 5 | resume, his pricing.  She would have done all that.  That

 6 | just has to come from a supervisor to her.

 7 |     *Q.*    I see.  Okay.  So, in essence, you are approving

 8 | the initiation of a contract with Dr. Kelly for this case?

 9 |     *A.*    Right.  But not like finalizing a contract.

10 |     *Q.*    Right.  You are not finalizing a contract, but

11 | you are approving getting him involved?

12 |     *A.*    Correct.

13 |     *Q.*    And that's something that can only be done by a

14 | supervisor, right?

15 |     *A.*    Correct.

16 |             MR. CONNELLY:  Let's mark Exhibit 71.

17 |             (Deposition Exhibit No. 71 was marked for

18 | identification by the reporter.)

19 | BY MR. CONNELLY:

20 |     *Q.*    Exhibit 71 is the supervisory progress review

21 | for March of 2019.  And you will notice that this first

22 | section is the same from what we looked at earlier,

23 | Exhibits 69 and 70, right?

24 |     *A.*    Yes.

25 |     *Q.*    And the rest of it is still the same, in that

 1  there are no comments on any of these other sections, and
 2  the only place where there is anything different is on
 3  page 8 where it says, "Document any follow-up activities
 4  required prior to next review," right?
 5      A.   Correct.
 6      Q.   And again, you would have filled this out,
 7  right?
 8      A.   Yes.
 9      Q.   And one of the things that you wrote in this
10  report that is different from the prior two is at the last
11  two lines here, you write:  Referrals for psychological
12  evaluations have been made.
13               Do you see that?
14      A.   I do.
15      Q.   That would have been the referral to Dr. Oakley,
16  right?
17      A.   I am not sure.
18      Q.   Because the next line says:  The referral for
19  evaluations through Dr. Kelly is in process.
20               Right?
21      A.   Right.
22      Q.   So you are not sure whether the first sentence
23  refers to evaluations by Dr. Oakley or if it's meaning
24  Dr. Kelly; is that right?
25      A.   Correct.

1    Q.    Okay.  And if it was for Dr. Kelly, the purpose

2    would be to be evaluating for whether Munchausen or

3    factitious disorder was involved, right?

4    A.    No.

5    Q.    No?  What would it be for?

6    A.    To evaluate for medical neglect.

7    Q.    And so what would he be evaluating for?  What

8    does that mean, to evaluate for medical neglect?

9    A.    Like reviewing all the records of previous

10   hospital stays, court reports, interviewing Mother, and

11   then him making his own assessment based on that.

12   Q.    Dr. Kelly is a psychologist, right?

13   A.    Correct.

14   Q.    He is not a medical doctor, right?

15   A.    I don't believe he is a medical doctor, no.

16   Q.    So his assessment of medical records isn't going

17   to help him make a determination about whether medical

18   neglect occurred, right?

19          MR. CROWN:  Objection to form and

20   foundation.

21          THE WITNESS:  I mean, I don't know what his

22   process is.  But I know that it is the review of records,

23   interviewing the parents, and then he makes his

24   assessment.

25

 1  BY MR. CONNELLY:

 2      Q.   And his assessment is going to be to determine

 3  whether or not the parent suffers from any mental health

 4  disorder, right?

 5      A.   That's part of it, correct.

 6      Q.   He is not going to make an assessment to whether

 7  the medical records demonstrate that medical neglect

 8  occurred, right?

 9              MR. CROWN:  Objection to form and

10  foundation.

11              THE WITNESS:  From my recollection, I

12  believe he uses the parent interview to fill in gaps and

13  answer questions that he may have about records.  That's

14  what the parent interview part is for also.

15  BY MR. CONNELLY:

16      Q.   Right.  But he is not -- he may want to

17  interview the parent to fill in questions he has about

18  statements made in a medical record, but he is not

19  assessing the medical records and the statement the

20  parents make to fill in the gaps to determine whether or

21  not medical neglect occurred, right?

22      A.   I mean, I wouldn't necessarily agree with that.

23  I think that's part of what he does.

24      Q.   How does he assess whether or not medical

25  neglect occurred if he is not a medical doctor?

1    *A.*    Well, he reviews the records -- I mean, that

2  would partially probably have to be a question for him and

3  his process.  But I just think from review, from what I

4  have -- from what I know, review and an interview with the

5  parents is what he does.

6    *Q.*    And then he determines whether or not the parent

7  has any mental health disorders, right?

8    *A.*    He can make recommendations for treatment.

9    *Q.*    Treatment of a mental health disorder?

10   *A.*    Yeah.

11   *Q.*    Right.

12   *A.*    Yep.

13   *Q.*    He is not making recommendations for medical

14  treatment of any children, right?

15   *A.*    No.

16   *Q.*    He is not making recommendations for medical

17  treatment of a parent, right?

18   *A.*    Correct.

19   *Q.*    He is making an assessment of whether or not the

20  parent suffers from a mental health disorder that might

21  lead them to be neglectful or abusive, right?

22            MR. CROWN:  Objection to form and

23  foundation.

24            THE WITNESS:  I believe that's part of it,

25  yes.

```
 1  BY MR. CONNELLY:
 2      Q.   And in the case of medical neglect, he is
 3  assessing for whether or not the parent is a Munchausen
 4  parent or just neglectful because of some other mental
 5  health disorder, right?
 6      A.   I mean, typically on their reports, they put the
 7  reason why they are assessing the client.  So if the top
 8  didn't say he was assessing for a medical child abuse,
 9  then I would say that he wasn't.
10      Q.   If you look at Exhibit 34 in that binder.
11      A.   34?
12      Q.   34.
13      A.   Or 34B?
14      Q.   No.
15      A.   Because there's 34B.
16      Q.   I don't know why that is.  34.
17      A.   34 is the one by Dr. Oakley.
18      Q.   No.  34 should be Dr. Kelly.
19      A.   34B.
20      Q.   I don't know -- somebody got an exhibit
21  confused.
22              MR. CROWN:  I will agree with you.  In the
23  notebook you gave her to look at, there is a tab; written
24  on a piece of Post-it, it says 34B.  That is the
25  December 2nd report of Dr. Kelly.  For the record, we
```

1  agree that that is the real 34.

2              MR. CONNELLY:  Yes, good.

3              MR. CROWN:  And with that said, she has the

4  December 2, 2019, report of Dr. Kelly before her.

5              MR. CONNELLY:  Okay.  Good.

6  BY MR. CONNELLY:

7      Q.   And you see that on this first page, the first

8  question he is asked to address is:  Does the parent

9  suffer from a mental illness, personality disorder,

10  thought disorder, sign of psychosis, substance abuse

11  disorder, mental deficiency, retardation, et cetera, per

12  the DSM?  If so, how does this impact her ability to

13  parent at this time?

14              Right?

15      A.   Correct.

16      Q.   He doesn't say anything at all in these

17  questions about assessing for medical neglect or medical

18  child abuse, right?

19      A.   Correct.

20      Q.   He is just assessing for whether or not the

21  mother suffers from a mental -- I'm just going to

22  abbreviate it to a mental illness or a mental disorder

23  that impacts her ability to parent, right?

24      A.   Correct.

25      Q.   Do you agree with me that if the case is being

1  handled as a medical neglect case and you are asking a

2  psychologist to determine whether or not the parent

3  suffers from my mental disorder that impacts her ability

4  to parent in a medical neglect case, that what is being

5  asked is whether or not the parent is a Munchausen parent?

6          MR. CROWN:  Objection to form and

7  foundation.

8          THE WITNESS:  I would say no to that.

9  BY MR. CONNELLY:

10     Q.   Okay.  Which report is in there as Exhibit 34,

11  what's the date?

12     A.   It's February 20th of 2020.

13     Q.   Okay.  Thank you.

14          Was there some discussion that occurred in

15  the Department that you were involved in, in February or

16  March of 2019, where you had discussed whether you wanted

17  Dr. Kelly to assess for factitious disorder?

18          MR. CROWN:  Objection to form and

19  foundation.

20          THE WITNESS:  Not that I recall, no.

21  BY MR. CONNELLY:

22     Q.   Do you recall having any conversations or

23  staffings with Madison Bell where she said she wanted him

24  to assess for factitious disorder?

25     A.   No.

 1          MR. CROWN:  Objection to form and

 2  foundation.

 3  BY MR. CONNELLY:

 4      Q.    Did you have any conversations with him,

 5  Dr. Kelly, where he said he wanted to assess for

 6  factitious disorder?

 7      A.    No.

 8          MR. CONNELLY:  Let's mark Exhibit 72.

 9              (Off the record.)

10              (Deposition Exhibit No. 72 was marked for

11  identification by the reporter.)

12  BY MR. CONNELLY:

13      Q.    Exhibit 72 is the supervisory case review for --

14  dated April 3rd of 2019.

15              First of all, do you agree with me, again,

16  that there's no change in all the preceding pages and

17  sections until we get to that last section at the end?

18      A.    That is correct.

19      Q.    And in this section, what has changed is mostly

20  down at the bottom of this section -- well, the third

21  paragraph, "Parents are participating in therapeutic

22  visits with Southwest Human Development," right?

23      A.    Correct.

24      Q.    It says:  Referrals for Ph.D. level counseling

25  have been submitted.

1          This is a referral to Dr. Oakley, right?

2      A.    Not Dr. Oakley.

3      Q.    Not Dr. Oakley?

4      A.    No.  Because she didn't do counseling.  It would

5  have been Dr. Rodriguez.

6      Q.    That's right.  Ph.D. level counseling, that's

7  right.

8          But then when we get to the psych consult,

9  it says:  Psych consult has requested a doctor who speaks

10 Turkish to do the evaluation to account for any cultural

11 considerations.

12         And that's in regard to Father, right?

13     A.    Correct.

14     Q.    Then you say:  The referral for the evaluations

15 through Dr. Kelly is in process to evaluate the factitious

16 disorder.

17         Do you see that?

18     A.    I do.

19     Q.    And you wrote that, right?

20     A.    I mean, it's not signed.

21     Q.    None of them are signed.

22     A.    Yeah.

23     Q.    But you testified earlier that it was your job

24 and yours alone to do these reports, right?

25     A.    Correct.

1       *Q.*   So you would have wrote this, right?

2       *A.*   Correct.

3       *Q.*   So does this refresh your recollection as to any

4    conversations that were had at the Department about

5    Dr. Kelly evaluating for a factitious disorder?

6       *A.*   No.

7       *Q.*   But you agree with me that's what it says,

8    right?

9       *A.*   That's what it says, yes.

10      *Q.*   Okay.  And if that's what you were going to be

11   wanting Dr. Kelly to do, is that something that you as a

12   supervisor would need to be involved in and make a

13   determination about?

14      *A.*   I mean, I would say yes.

15      *Q.*   Let me ask you to look at Exhibit 37.  37 -- oh,

16   I'm sorry, these are areas of concern for counseling.

17   That's not what I am interested in.  Sorry.  39, please.

18   Exhibit 39 are the questions for psychological and

19   psychiatric evaluation of adults.

20              And you are -- see at the first page of

21   Exhibit 39 is in regard to Jessica Kahraman, right?

22      *A.*   Yes.

23      *Q.*   Do you know when this was filled out?

24      *A.*   I do not.  Because there was a page that would

25   have been written from a unit psychologist with the date

1  on it.  But this is likely before we made any referrals

2  for a psychological evaluation.  Whether it was Dr. Oakley

3  or Dr. Kelly, we would have done this first.

4       Q.   So let me make sure I understand.

5            MR. CONNELLY:  Mark this.

6            (Record requested to be marked.)

7  BY MR. CONNELLY:

8       Q.   Before the referral is made for a psychological

9  evaluation, it is staffed with the unit psychologist?

10      A.   Correct.

11      Q.   And the unit psychologist signs off on these

12  questions for the psychological evaluation?

13      A.   Correct.  They would have filled this out.

14      Q.   The unit psychologist would have filled out this

15  form?

16      A.   Correct.

17      Q.   And if you look at the second part of

18  Exhibit 39, if you flip that page, do you see there is a

19  different style of form, right?

20      A.   Yes.

21      Q.   Madison Bell testified that there was a period

22  in time where these forms changed, these referral

23  questions for psychological evaluations.

24            Do you remember that?

25      A.   When the questions changed?

1    Q.   When the -- when the nature of this form
2  changed.
3    A.   Yes -- well, yes.  Because we used to have to do
4  our own packet.  So these are the forms.
5    Q.   Well, but what I'm saying is, the first two
6  pages of this exhibit are different in the way they look
7  and in the way that they are organized than the rest of
8  this exhibit, right?
9    A.   Correct.
10   Q.   They are -- but both styles are talking about
11  questions, referral questions for a psychological
12  evaluation, right?
13   A.   Correct.  I believe -- at the top, I believe
14  that's our form number, and then the date --
15   Q.   9/14?
16   A.   -- is the -- and then 4/19.
17   Q.   So in April of 2019 is when the form changed?
18   A.   At least when the form was made, yes.
19   Q.   And so we know that Dr. Oakley evaluated Jessica
20  in April of 2019.  So it would have been just second style
21  of form that would have been used at that time, right?
22   A.   Well, hers, I think, was 2020.
23   Q.   There were two.
24   A.   Oh, okay.
25   Q.   One in April of 2019 and one in February of

1   2020.

2       *A.*    So if the evaluation was written in April of

3   2019, it probably would have been this one.

4       *Q.*    And on that one -- when you say "that one," so

5   the record is clear, we are talking about the first page?

6       *A.*    First page.  Correct.

7       *Q.*    Is there an area or another page where the unit

8   psychologist signs it and dates it?

9       *A.*    Yes.

10      *Q.*    Do you know why that was not produced in this

11  lawsuit?

12      *A.*    I believe it's in the court record, in the

13  dependency court record.

14      *Q.*    But you are telling me -- and I want to make

15  sure because I am going to ask your lawyer to produce

16  it -- you are telling me that there exists a signed and

17  dated signature page by the unit psychologist who filled

18  out this referral question form?

19      *A.*    From my recollection at that time, yes.

20      *Q.*    Okay.  And then the same would be true in

21  relation to the -- starting with page 3, for this style of

22  form, if you go to the -- if you go to the last page, it

23  is -- the last page is titled Unit Consultation Summary.

24              And this is a page that the unit

25  psychologist would have filled out, right?

1      A.    I don't know if it looked exactly like this.
2  Some type it and don't do this, handwritten.  I wouldn't
3  be a hundred percent sure which form they would have used.
4      Q.    But there would be something that is signed and
5  dated by the unit psychologist?
6      A.    From my recollection, yes.
7      Q.    So if we were to ask for that, we ought to be
8  able to get it, right?
9      A.    If there was one, yes.
10      Q.    And is there any instance in which there would
11  not be something signed and dated by the unit
12  psychologist?
13              MR. CROWN:  Objection to form and
14  foundation.
15  BY MR. CONNELLY:
16      Q.    And by "something," I mean when a referral is
17  being made for psychological services.
18      A.    The only way that I believe it would be, if --
19  there was a period of time where if it was court ordered
20  for a psychological, we did not have to have the unit
21  consultant sign off.
22      Q.    And if it was court ordered, would the unit
23  consultant still generate the referral questions?
24      A.    Yes.
25      Q.    Is Dr. Kelly still being used by the Department?

```
 1        A.   I don't know.

 2        Q.   Have you been involved in any other cases as a

 3   supervisor after this Kahraman case where Dr. Kelly was

 4   involved?

 5        A.   No.

 6        Q.   Are you aware of how much it costs the

 7   Department to get Dr. Kelly's report?

 8        A.   No.

 9        Q.   If it cost $30,000, would that be something that

10   would surprise you?

11             MR. CROWN:  Objection to form and

12   foundation.

13             THE WITNESS:  I wouldn't have any clue as

14   to what it cost; we --

15   BY MR. CONNELLY:

16        Q.   It costs -- I'm sorry.

17        A.   Yeah.  No, we didn't -- we don't get any like

18   statements like that.

19        Q.   You are not involved in the pricing?

20        A.   No.

21        Q.   Is there any kind of budget that is assigned to

22   a case that the caseworker, the case manager, and you have

23   to work within?

24        A.   No.

25        Q.   So the budget, as far as DCS is concerned, for
```

1 engaging service providers and experts is unlimited?

2           MR. CROWN:  Objection to form and

3 foundation.

4           THE WITNESS:  I would say whatever service

5 we can put in, even if it is multiple referrals, to help a

6 family we put it in.

7 BY MR. CONNELLY:

8     *Q.*  You don't concern yourselves with what the cost

9 is?

10     *A.*  No.

11     *Q.*  And as far as engaging experts to prove the

12 allegations of abuse or neglect, you don't concern

13 yourselves with what the cost is, right?

14     *A.*  No.  We are not involved with the cost.

15     *Q.*  And there is no policy at the Department that

16 says you cannot exceed a certain dollar level in engaging

17 experts on a particular dependency case?

18     *A.*  Not known on my level, no.

19     *Q.*  And have you ever had a program manager come to

20 you and say, "This case is costing too much," or "You are

21 engaging too many experts"?

22     *A.*  No.

23     *Q.*  Did -- what kind of involvement did your program

24 manager have in this case as far as overseeing what was

25 being done and directing what should be done?

1    *A.*   I would say just if there was a staffing and she
2    was included on it with the like AG's office, if the AG
3    reached out to her or reached out to the PM to say like:
4    You need to staff this.  But that's generally -- that
5    would be the involvement.
6         *Q.*   Were you aware that the Department was going to
7    get a Turkish-speaking psychologist to evaluate
8    Mr. Kahraman but didn't because they deemed it too
9    expensive?
10   *A.*   I know that we were looking because we were -- I
11   recall doing Google searches, but I don't recall about the
12   cost.
13        *Q.*   I am going to just, I think, go through a couple
14   more of your supervisory reports, even though it is going
15   to take us a little bit out of time-sequence order.  We
16   are going to do these, but then we will come back and talk
17   about things that occurred before some of these, okay?
18   *A.*   Okay.
19   *Q.*   Do you follow me?
20   *A.*   Yes.
21             MR. CONNELLY:  So I am going to mark as
22   Exhibit 73 the next report I want to look at.
23             (Deposition Exhibit No. 73 was marked for
24   identification by the reporter.)
25

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1  BY MR. CONNELLY:

2      Q.    This is the report dated May 7th of 2019.  And,

3  again, you agree with me that everything is the same until

4  we get to that last section?

5      A.    Yes.

6      Q.    Is there any time when you come back and either

7  change the first section there or answer any of the other

8  sections?

9      A.    Usually those are -- we are having those

10  conversations verbally, so I am just not sure.

11      Q.    Would you agree with me, then, that what it

12  looks like is that it's this last section where you kind

13  of update what you had talked about in any particular

14  monthly status review with the case manager?

15      A.    And some like cut-and-paste and just add a

16  little bit, more current.

17      Q.    So some of it is cut-and-paste and some of it is

18  you are writing it yourself?

19      A.    Correct.

20      Q.    And so in Exhibit 73, some of it carries over,

21  some of it never changes, like the first thing you say

22  here concerns regarding medical neglect.  That has not

23  changed at all in all these reports, right?

24      A.    Correct.

25      Q.    But you do note that the psychological

1    evaluation for Mom is completed and that Mother is

2    completing counseling with Rodriguez.  Do you see that?

3        *A.*    I do.

4        *Q.*    Then there's some stuff that is redacted out.  I

5    assume it has to do with Father.  I don't know why it is

6    reacted, but it is.  On the next page you see that "The

7    referral for evaluations through Dr. Kelly is in process

8    to evaluate the factitious disorder.  He has all of the

9    current records."

10                    Do you see that?

11       *A.*    I do.

12       *Q.*    And then, it says:  CM is working on requesting

13   medical records.

14                    Do you know what medical records you

15   decided need to be requested at this time?

16       *A.*    I believe we had an ongoing like court ruling or

17   something to request the boys' medical records on an

18   ongoing basis and getting all the -- like all their other

19   disclosure, the visitation reports.

20       *Q.*    I'm sorry, what was the date you said about the

21   medical records?  I didn't ...

22       *A.*    The ongoing medical records, like the boys'

23   ongoing -- like updated records.  And then -- that's what

24   I believe the medical record part is.

25       *Q.*    Was there any discussion about getting medical

1    records from before Kenan was admitted to Cardon's in

2    December of 2018, like from Therapeutic Nutrition,

3    Dr. Johari, or from Dr. Jensen?

4        A.    I believe -- I am not certain of the doctors'

5    names, but I believe so.  But that would have been listed

6    on Dr. Kelly's evaluation, the list of all the records he

7    got.  So if it was for him, it would be on there.

8        Q.    Okay.  I see what you are saying.  So if at this

9    time in May of 2019, she is requesting more records, the

10   purpose would have been to give them to Dr. Kelly, right?

11       A.    For Dr. Kelly and for the Court, for disclosure

12   for the Court and all the parties to have.

13       Q.    Okay.  And if they were given to Kelly, he would

14   have listed them.  Did you yourself review any medical

15   records from Dr. Jensen or Dr. Johari?

16       A.    I mean, review, yes.  I wouldn't say that I

17   specifically could recall anything on there, but ...

18       Q.    So, for instance, your review, you wouldn't have

19   looked at them to determine whether or not the children

20   were gaining weight consistently throughout their

21   childhood up until the time that Kenan was hospitalized in

22   December 2018; is that fair?

23       A.    You said requested or reviewed?

24       Q.    No, reviewed.

25       A.    Reviewed.  Prior to what, or just throughout the

1  course of the case?

2      Q.   Let me ask the question over again.  As far as

3  the children's records for the doctors that they saw prior

4  to the time that Kenan went into the hospital in December

5  of 2018, would you have reviewed those records -- because

6  at Cardon's, they say malnutrition, right, and failure to

7  thrive, right?

8      A.   Correct.

9      Q.   Would you have been reviewing the records from

10 the doctors prior to that admission to determine whether

11 or not the children were consistently gaining weight

12 throughout the time of those visits?

13             MR. CROWN:  Objection to form and

14 foundation.

15             THE WITNESS:  I mean, throughout the case

16 or at the start?

17 BY MR. CONNELLY:

18     Q.   Whenever it was that you were reviewing the

19 records for Dr. Jensen and Dr. Johari.

20     A.   If we would have had them and requested them,

21 yes.  But I don't recall what we had from prior to them

22 coming into our care.

23     Q.   And so then if you had them and you reviewed

24 them, my question is:  Would you have assessed them,

25 looked at them to determine whether or not there was a

 1 | history of the children progressing in their weight gains
 2 | and whether or not their weight was, you know, somewhere
 3 | in the growth chart for children their age?
 4 |             MR. CROWN:  Objection to form and
 5 | foundation.
 6 |             THE WITNESS:  I don't recall.
 7 | BY MR. CONNELLY:
 8 |     Q.   Do you agree with me that if those records
 9 | demonstrate that the children were consistently gaining
10 | weight and that their weights throughout their
11 | development -- from the time they were two to the time
12 | they were six and Kenan went to the hospital, their
13 | weights were within the growth chart, that that would tend
14 | to refute allegations of medical neglect that caused
15 | malnutrition?
16 |             MR. CROWN:  Objection to form and
17 | foundation.
18 |             THE WITNESS:  I would say no.
19 | BY MR. CONNELLY:
20 |     Q.   Why not?
21 |     A.   Because we got the report from Cardon's in
22 | December.  So we would not have been able to go back and
23 | review any of that prior to December.
24 |     Q.   But you --
25 |             MR. CROWN:  Were you done with your answer?

1           THE WITNESS:  Yes.

2   BY MR. CONNELLY:

3       Q.   But you eventually got those records.  And what

4   I am saying is:  When you got them, did you look at them

5   critically with that as a question in your mind, how were

6   these children progressing with their weight up until the

7   time that Kenan was hospitalized?

8           Is that something that would have occurred

9   to you, that you would have looked at?

10      A.   I would say no.

11      Q.   Do you see back in Exhibit 73 that one of --

12  that the last paragraph there, you note that Father seems

13  to have some control issues.

14          Do you see that?

15      A.   Yes.

16      Q.   And is that something that you noticed or

17  something that Madison Bell was telling you or where did

18  that come from?

19      A.   I believe that was just something with Madison's

20  conversations with Father, from his interactions with the

21  children.  I think, yeah, that's ...

22      Q.   Okay.  So it is coming from Madison Bell, based

23  on her interactions and conversations that she overheard

24  between him and the children; is that what you are saying?

25      A.   That would be part of it, some of it.

1          MR. CONNELLY:  Mark Exhibit 74.

2          (Deposition Exhibit No. 74 was marked for

3    identification by the reporter.)

4    BY MR. CONNELLY:

5        *Q.*    And this is your monthly report dated July 31,

6    2019.  And you agree with me again that everything is the

7    same until we get to that last section, right?

8        *A.*    Correct.

9        *Q.*    Sorry to keep repeating myself on that, but I

10   just wanted to -- I want you to verify those things.

11          Now, this talks about an independent

12   assessment by PCH regarding the mold issue.  Now, if you

13   look at Exhibit 63 in that book that you have, you are

14   going to keep that -- you are going to be referring back

15   to it, Exhibit 74.

16          63 is an addendum report to the juvenile

17   court dated January 25, 2019, right?

18       *A.*    Yes.

19       *Q.*    And this is a report that you and Madison Bell

20   authored, right?

21       *A.*    Correct.

22       *Q.*    And you would have reviewed this like -- in the

23   manner you testified about earlier, right?

24       *A.*    That I review, and if there is corrections?

25       *Q.*    Right.

1    A.    Yes.

2    Q.    You would have reviewed it for any obvious

3    misstatements or if there was something missing that you

4    thought should be included in it, right?

5    A.    Correct.

6    Q.    You don't just take it and rubber-stamp it,

7    right?

8    A.    No.

9    Q.    You that see on the first page, in the second

10   paragraph, it talks about, near the end of the paragraph,

11   that K.K., meaning Kenan Kahraman, attended a cardiologist

12   appointment on 1/24/2019.

13              Do you see where I am?

14   A.    I do.

15   Q.    And then it talks about what Dr. Miga reported.

16              Did you ever talk to Dr. Miga?

17   A.    No.

18   Q.    And then there's a quote, and it goes on for a

19   couple of sentences.  So this is something that was cut

20   and pasted from a medical record by Dr. Miga, right?

21   A.    Correct.

22   Q.    And Dr. Miga writes, regarding Kenan his right

23   ventricular heart failure has resolved.  So this is a

24   month later from the time he was hospitalized.

25              "This is a very rapid response to therapy

 1  and somewhat atypical, and supports a diagnosis of

 2  secondary pulmonary hypertension and not a primary

 3  pulmonary hypertension."

 4              Do you see that?

 5      A.    I do.

 6      Q.    So he is saying, first of all, this is somewhat

 7  atypical, meaning out of the ordinary; do you agree?

 8      A.    Correct.

 9      Q.    He also says this is a very rapid response,

10  right?

11      A.    He did.

12      Q.    Very rapid response to therapy.  So, again, the

13  response is atypical, out of the ordinary, right?

14      A.    Yes.

15      Q.    And then Dr. Miga says:  The exact etiology is

16  unclear, but may very likely be related to his nutritional

17  status.

18              Did I read that correctly?

19      A.    Yes.

20      Q.    So do you agree with me that when he says the

21  exact etiology is unclear, he is saying that we can't tell

22  what caused the right ventricular heart failure or the

23  primary pulmonary hypertension, right?

24              MR. CROWN:  Objection to form and

25  foundation.

```
 1            THE WITNESS:  Yeah, I think that's what he
 2   is saying.
 3   BY MR. CONNELLY:
 4       Q.   Right.  That's what he is saying.  He is saying:
 5   We can't tell, it may likely be related to nutritional
 6   status, but we can't tell, we are not certain, right?
 7       A.   Yes.
 8            MR. CROWN:  Objection to form and
 9   foundation.
10   BY MR. CONNELLY:
11       Q.   I'm sorry, do you agree?
12       A.   I would say yes, he says it is unclear.
13       Q.   Right.  And so this is in January of 2019.  In
14   April of 2019, the parents discover that their house is
15   infested with black mold and has been since the time that
16   they moved in, right?
17       A.   Yes.
18       Q.   And you don't dispute that the house was
19   infested with mold, do you?
20            MR. CROWN:  Objection to form and
21   foundation.
22            THE WITNESS:  No.
23   BY MR. CONNELLY:
24       Q.   And so then it is in April where the parents
25   say:  We just found out we have been living in a
```

*DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024*

1  mold-infested house, we think this may have had something

2  to do with the children's health status and their

3  inability to absorb nutrients, and we would like to have

4  them tested for mold toxicity.

5            Given that Dr. Miga is saying the etiology

6  of the heart issue and the pulmonary issue is unknown or

7  unclear, why would the Department object or oppose the

8  mold testing?

9            MR. CROWN:  Objection.  Form and

10  foundation.

11            THE WITNESS:  I believe that because of all

12  the tests and things that the boys have gone through,

13  which is the reason we objected, which the Court

14  ultimately overruled and ordered a review of the records,

15  I believe, based off the kids' attorney -- the kids' best

16  interest attorney.

17  BY MR. CONNELLY:

18      Q.   The Court just said let somebody else decide

19  they should be mold tested, the Court didn't say that they

20  should be mold tested?

21            MR. CROWN:  Objection to form and

22  foundation.

23  BY MR. CONNELLY:

24      Q.   My question is:  Why did the Department even

25  oppose the mold testing?

1    A.    Because the amount of tests that the kids had
2    already been through, and we had to take a position.
3    Q.    And what is it -- first of all, when you said
4    the amount of tests they had already been through, what
5    are you talking about?
6    A.    The amount of doctors' appointments.  The boys,
7    if I recall, were very afraid of the doctor.  They didn't
8    want to go.  They were getting poked and prodded and they
9    were tired of it, and that was causing additional issues.
10   Q.    Are you talking about after they had been taken
11   into custody?
12   A.    Through their normal course of doctors'
13   treatments, evaluating all the concerns from PCH, yes.
14   Q.    So Kenan was getting poked a lot while he was at
15   Banner, right?  Blood was being drawn?
16   A.    From what I recall, yes.
17   Q.    And then when he was released from Banner, there
18   were regular blood draws being made for him, right?
19   A.    From what I recall.
20   Q.    And do you know why?
21              MR. CROWN:  Objection to form and
22   foundation.
23              THE WITNESS:  I believe that his doctors,
24   when he went, were recommending it.
25

 1 | BY MR. CONNELLY:

 2 |     Q.   Right.  So it was the -- the doctors who were

 3 | following up on the treatment he got at Banner were the

 4 | ones that were poking him more and taking more blood to

 5 | determine whether or not the issues that they saw were

 6 | resolving, right?

 7 |               MR. CROWN:  Objection to form and

 8 | foundation.

 9 |               THE WITNESS:  Yes.

10 | BY MR. CONNELLY:

11 |     Q.   And Dylan wasn't having the same experience that

12 | Kenan was because Dylan was never hospitalized with any

13 | health problems, right?

14 |               MR. CROWN:  Objection to form and

15 | foundation.

16 |               THE WITNESS:  I mean, not at that time.

17 | But he was on the way or potentially was on the way to

18 | having to be hospitalized.

19 | BY MR. CONNELLY:

20 |     Q.   Well, he was examined by Dr. Miga in December of

21 | 2018, right?

22 |     A.   I believe so.

23 |     Q.   And Dr. Miga said -- and another doctor at

24 | Banner said there is no reason this child should be --

25 | needs to be hospitalized, right?

```
 1                MR. CROWN:  Objection to form and
 2     foundation.
 3                THE WITNESS:  I don't recall specifically.
 4     BY MR. CONNELLY:
 5          Q.   And Dr. Miga said, "Follow up in a year," right?
 6                MR. CROWN:  Objection to form and
 7     foundation.
 8                THE WITNESS:  I don't recall if he said a
 9     year.
10     BY MR. CONNELLY:
11          Q.   So what's your basis for saying that he was on
12     his way to being hospitalized?
13          A.   Just from the reports I have read and that Dylan
14     [sic] was already hospitalized and --
15          Q.   Kenan was already hospitalized?
16          A.   Well, Kenan was already hospitalized.  That's
17     just from my recollection.
18          Q.   And as far as reports you read, which reports
19     are you talking about?
20          A.   The initial reports from PCH, court reports.
21          Q.   What report from PCH said the child needs to be
22     hospitalized?
23          A.   No.  Not that it said he needed to be
24     hospitalized, that his medical records.
25          Q.   Your testimony is that there were medical
```

1  records for Dylan that indicated he needed to be

2  hospitalized?

3      A.   No.  That there were also concerns for him and

4  his nutrition.

5      Q.   Really?  Your testimony is that you read a PCH

6  medical record that expressed concern for Dylan's

7  nutrition?

8      A.   If I recall.  I am not a hundred percent sure.

9      Q.   Okay.  I have not seen a medical record by PCH

10  that had any concerns for Dylan regarding his nutrition.

11      A.   Okay.

12      Q.   And you agree with me that PCH never made a

13  hotline call about Dylan with concerns for malnutrition,

14  right?

15      A.   Not that I recall.

16            MR. CROWN:  Objection to form and

17  foundation.

18  BY MR. CONNELLY:

19      Q.   Okay.  So the concern -- the reason the

20  Department opposed mold testing was because they didn't

21  want the children to undergo another blood draw?

22      A.   Not another blood draw.

23      Q.   Well, what other kind of pokes would there be?

24  Let me rephrase the question.

25            Do you know what is involved in testing for

1   mold toxicity?

2        A.    No.

3        Q.    So then how can you make an informed decision

4   about whether to oppose mold testing or not?

5        A.    Well, that was not specifically me, like we get

6   a court order.  If it is a court order, I have to staff

7   with my supervisor.  So I am not the sole person in saying

8   we object to things like that.

9        Q.    Then, let me ask another question.  Was there a

10  staffing where the question of whether or not the boys

11  should be tested for mold was discussed that you were a

12  part of?

13       A.    Possibly with the Attorney General.

14       Q.    What's your recollection, did it occur or did it

15  not occur?

16       A.    I don't recall if it did.

17       Q.    And if a staffing like that occurred, would

18  there be a record of it in the notes and communications

19  file?

20       A.    No.  Because if it was with the attorney, it

21  wouldn't be in there.

22       Q.    Do you agree with me that if mold testing had

23  been done and it showed that the children had mold toxins

24  in their body, that that would offer an additional -- or

25  it would offer some sort of explanation for the etiology

 1  of the nutritional status?

 2              MR. CROWN:  Objection to form and

 3  foundation.

 4              THE WITNESS:  I think that that was

 5  already -- that the judge made a decision based on the GAL

 6  and had a review of the records.  So I can't answer --

 7  BY MR. CONNELLY:

 8      Q.   That's not my question.

 9      A.   I am not an expert on anything to do with mold,

10  so I don't know.

11      Q.   I appreciate that, and I am not asking you to be

12  an expert.

13              I am just saying, if there was mold testing

14  done and an expert did the mold testing and the expert

15  determined that there was the presence of mold toxins in

16  the boys' bodies, might that provide some additional

17  explanation for the etiology of the heart failure that

18  Dr. Miga says the etiology is unclear?

19              MR. CROWN:  Objection to form and

20  foundation.

21              THE WITNESS:  I believe that's outside of

22  me making a suggestion.

23  BY MR. CONNELLY:

24      Q.   Okay.

25      A.   That would -- that would have to be reviewed

1  with a doctor, not -- that would be something I don't

2  know.

3      Q.   Do you agree with me that if there was mold

4  tests that were done and it came back and it said that the

5  boys had mold toxins present in their body, that that

6  would be a fact or information that would tend to refute

7  the allegations of medical neglect?

8              MR. CROWN:  Objection to form and

9  foundation.

10             THE WITNESS:  I would say no.

11  BY MR. CONNELLY:

12     Q.   On the second page of Exhibit 74 -- or not the

13  second page but the next page, the second page of your

14  last section here -- by the way, did you have any role in

15  deciding who the person was at PCH that would be engaged

16  to answer the question of whether mold testing should be

17  done?

18     A.   No.

19     Q.   Again, your report notes that Dr. Kelly is in

20  the process to evaluate factitious disorder.

21             You see it in there and it has not been

22  removed, right?

23     A.   Correct.

24     Q.   And that he has all the current records.  Again,

25  you note:  Father seems to have some control issues.

1           And then you indicate that a staffing was

2    held.

3           Do you know what staffing is being referred

4    to?  And were you a participant?

5      A.   I believe likely this was me and Madison.

6      Q.   You and Madison?

7      A.   Correct.

8      Q.   And it would have occurred sometime close to the

9    date of this report?

10     A.   July 31st.

11     Q.   Of 2019, right?

12     A.   Yes.

13     Q.   And you see that what you note in here -- now,

14   these are your words, right?  This is not a cut-and-paste

15   job here that we are talking about, where you recount

16   about the staffing that was held, right?

17     A.   Correct.

18     Q.   And you note that:  Father is dismissive of

19   Mother and her opinions.

20           Right?

21     A.   Yes.

22     Q.   You note that:  Brothers always talk about

23   missing Mom and don't talk about Dad the same way.

24           Right?

25     A.   Yes.

1    Q.   And you note that:  Father tries to interrogate
2    the kids.
3              Right?
4    A.   Yes.
5    Q.   And then:  They say things that they say things
6    Father wants to hear.
7              You wrote that, too, right?
8    A.   Yes.  Typos and all.
9    Q.   Typos and all.  It should say:  They say things
10   that --
11   A.   Father wants to hear.
12   Q.   -- Father wants to hear, right?  Yeah.  Or that
13   they think Father wants to hear or whatever, yeah.
14              But the impression, from Madison Bell at
15   least, was that Father is dismissive of Mother's opinions
16   and interrogates the boys and the boys are really kind of
17   walking on eggshells around him, right?
18   A.   At that time.
19   Q.   And did you yourself observe the boys and the
20   father interacting at all at any time?
21   A.   I believe only at reunification is when I
22   observed it.
23   Q.   So at no time during the ongoing case before
24   reunification with Father did you ever observe any of
25   their interactions?

1    *A.*    No.

2    *Q.*    Did you ever have any independent -- or not

3    independent, but any contact with Father that you were

4    involved in that maybe the kids were not present for?

5    *A.*    I vaguely recall meeting with him with Madison

6    or having a phone call, but that's ...

7    *Q.*    Do you recall when that was?  Was it earlier in

8    the case or was it closer to reunification with Father?

9    *A.*    I think it was potentially closer to

10   reunification.

11   *Q.*    Okay.  Is it fair to say that you didn't have

12   any interactions with Father prior to reunification that

13   provided you with the ability to assess Father and his

14   appropriateness for reunification?

15   *A.*    No, I did not.

16             MR. CONNELLY:  Let's mark Exhibit 75.

17             (Deposition Exhibit No. 75 was marked for

18   identification by the reporter.)

19   BY MR. CONNELLY:

20   *Q.*    So Exhibit 75 is your monthly case review, it's

21   dated August 19, 2019.  Again, everything up to that last

22   section is the same from the prior reports, right?

23   *A.*    Correct.

24   *Q.*    Now, it says in here, on the first page of that

25   section:  Psychological evaluation Mom completed.  Mom was

 1   diagnosed with OCD.

 2              Now, I know these reports aren't going

 3   anywhere except if there's a lawsuit.  But what I want to

 4   know is:  Where did you come up with the diagnosis that --

 5   or that Mother was diagnosed with OCD?

 6              MR. CROWN:  Objection as to form and

 7   foundation.

 8              THE WITNESS:  I believe from the reports.

 9   BY MR. CONNELLY:

10       Q.   Dr. Oakley, right?

11       A.   I believe so.

12       Q.   So if you turn to Exhibit 40, and if you go to

13   Psychology, and if you go to the page 19, what Dr. Oakley

14   says at the bottom of page 19:  Overall, Ms. Kahraman

15   meets the criteria for the following diagnosis, traits of

16   obsessive-compulsive personality disorder.

17              Do you see that?

18       A.   Correct.  I do.

19       Q.   She is not diagnosing her with OCD, right?

20       A.   I mean, not specifically.

21       Q.   And if you look -- right.  Not specifically,

22   right, so there is no diagnosis of OCD, right?

23              MR. CROWN:  Objection to form and

24   foundation.

25

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

```
 1   BY MR. CONNELLY:
 2       Q.   If you need to look up two paragraphs from where
 3   we were just looking, midway through the paragraph that
 4   starts "records from her time at the hospital."
 5               Do you see that?
 6       A.   I do.
 7       Q.   About halfway through that paragraph, there is a
 8   sentence that begins:  It appears as though she has.
 9               Do you see that, the fifth line down from
10   the top of that paragraph, "it appears as though"?
11       A.   I don't know what page it is.
12       Q.   Page 19.
13       A.   Oh, I am on the wrong page.
14       Q.   Page 19, the fifth line down from the second
15   full paragraph, "it appears as though she has" ...
16       A.   Okay.
17       Q.   "It appears as though she has some traits which
18   are consistent with obsessive-compulsive personality
19   disorder.  There is not enough evidence, however, to
20   support a full diagnosis."
21               Did I read that correctly?
22       A.   Yes.
23       Q.   So there is no diagnosis of OCD, right?
24       A.   Correct.
25       Q.   So when you say in your monthly report that
```

1  Mother was diagnosed with OCD, that's incorrect, right?

2      A.    From my training and -- what I understand is

3  even if there is traits, you have to treat her as if she

4  has OCD through her therapy because the traits is what

5  they would have to treat.  So they would have to treat her

6  like she had it during therapy.

7      Q.    So you dismiss Dr. Oakley's diagnosis, which is

8  there is not enough evidence to support a full diagnosis

9  of OCD?

10     A.    No, I didn't dismiss it.  We would have given

11  this full report to the psychologist, to the therapist

12  doing her therapy, so they would have been able to read

13  that it said traits.

14     Q.    And if you reported to the Court that Mother was

15  diagnosed with OCD, that would be an incorrect report to

16  the Court, right?

17     A.    If we did that, yes.

18     Q.    You agree with me, though, that Dr. Oakley does

19  not diagnose Mother with OCD?

20     A.    Correct.

21     Q.    And on the next page, page 20, in answer to

22  Question No. 1, it says:  Ms. Kahraman was not given any

23  mental health diagnoses.

24             Right?

25     A.    Correct.

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1    Q.    And then in answer to Question No. 2, the second
2  line, the second sentence, she says:  She appears
3  generally quite capable of parenting and has gone above
4  and beyond to demonstrate that she loves her children and
5  wants to do what is best for them.
6              Right?
7    A.    Yes.
8    Q.    And then in answer to Question 6 -- Should the
9  parent be referred for a psychiatric evaluation --
10  Dr. Oakley says:  A psychiatric evaluation does not seem
11  necessary at this time.
12              Right?
13    A.    Correct.
14    Q.    And then in answer to No. 7, Additional
15  Concerns, she says:  There is not sufficient evidence to
16  suggest that Ms. Kahraman was intentionally harming them.
17              Right?
18    A.    That's what she said, yes.
19    Q.    Now, do you recall that throughout the course of
20  Ms. Kahraman's therapy, she was being -- that the reason
21  Madison Bell wouldn't let the therapist close out the
22  therapy and wouldn't go from therapeutic visits to parent
23  aid visits or unsupervised visits was because Mother was
24  not saying that it was the diet -- the GAPS diet alone
25  that led to the hospitalization of Kenan?

1      A.   I believe that we wanted not to close out.  We
2  wanted her to acknowledge her role in her -- the kids'
3  malnutrition.
4      Q.   And Dr. Rodriguez and Dr. Korsten both reported
5  that she acknowledged her role, right?
6      A.   I believe it was only partially.  And it was
7  still -- but the mold was still brought up as an issue,
8  even when she did acknowledge.
9      Q.   And why was that bad?
10     A.   Because that had already been ruled out.  There
11  was no testing --
12     Q.   No -- right.  There was no testing.  It hadn't
13  been ruled out, right?
14     A.   Well, PCH said there --
15           MR. CROWN:  Objection to form and
16  foundation.
17           Go ahead.
18           THE WITNESS:  -- was, like, no need for the
19  testing.
20  BY MR. CONNELLY:
21     Q.   But mold had not been ruled in or out as a
22  contributing factor to what led to the boys -- led to
23  Kenan being hospitalized, right?
24           MR. CROWN:  Objection to form and
25  foundation.

 1                    THE WITNESS:  I would say that the -- the
 2    medical experts said they didn't need the additional
 3    testing and that mold couldn't be responsible for their
 4    condition.
 5    BY MR. CONNELLY:
 6        Q.   Did you consult with a mold expert on the
 7    question?
 8                    MR. CROWN:  Objection to form and
 9    foundation.
10                    THE WITNESS:  If the Court would have
11    ordered us to do that, we would have.
12    BY MR. CONNELLY:
13        Q.   Not my question.
14        A.   We did not, except the one through PCH.
15        Q.   And that person, there's no evidence that she
16    was a mold expert, right?
17                    MR. CROWN:  Objection to form and
18    foundation.
19                    THE WITNESS:  Not that I recall, no.
20    BY MR. CONNELLY:
21        Q.   And you remember when Dr. Miga said it's unclear
22    what caused this child's heart issue and -- and pulmonary
23    issue, right?
24                    MR. CROWN:  Objection.  Form and
25    foundation.

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

```
 1              THE WITNESS:  He -- that's what he said,
 2   yes.
 3   BY MR. CONNELLY:
 4       Q.   You continue to note in this report that
 5   Dr. Kelly is still in the process of evaluating factitious
 6   disorder, right?
 7       A.   As a cut-and-paste, yeah.
 8       Q.   Pardon me?
 9       A.   It was cut-and-paste.
10       Q.   From your prior reports, right?
11       A.   Right.  Which shouldn't have been in there.
12       Q.   And you don't say that he is evaluating for
13   medical neglect; you say he is evaluating for factitious
14   disorder, right?
15       A.   That's what I say.  But his report doesn't say
16   that.
17       Q.   No.  His report doesn't come out and use those
18   words.
19              He says he is evaluating for any mental
20   health disorders in the DSM that might impact the mother's
21   ability to parent, right?
22       A.   Correct.
23       Q.   And he doesn't say that he is evaluating for
24   medical neglect, either, does he?
25       A.   Correct.
```

1    Q.    And then it says here -- on the second page of

2    this, you know, last section, there is a paragraph that

3    starts with:  K.K. was diagnosed.

4              Do you see that?

5    A.    Yes.

6    Q.    "K.K. was diagnosed with congestive heart

7    failure, but it is being treated."  It says then, a couple

8    sentences on:  The heart failure is connected to

9    malnutrition.

10             Do you see that?

11   A.    I do.

12   Q.    Is that something you cut and pasted or is that

13   something you wrote yourself?

14   A.    I believe that is something I wrote.

15   Q.    And when you wrote that, did you have the

16   recollection about what you wrote in the December

17   report -- or the January report to the Court where

18   Dr. Miga says the exact etiology of the heart failure and

19   the pulmonary hypertension is unclear --

20             MR. CROWN:  Objection.

21   BY MR. CONNELLY:

22   Q.    -- but may very likely be related to nutritional

23   status?

24             MR. CROWN:  Objection.  Form.  Foundation.

25             And that doesn't say what you keep

```
 1  saying.  All of your questions on this --
 2              MR. CONNELLY:  It says:  The exact etiology
 3  is --
 4              MR. CROWN:  No, it actually doesn't.
 5              MR. CONNELLY:  I'm reading it.
 6              MR. CROWN:  No.
 7              MR. CONNELLY:  The exact --
 8              MR. CROWN:  Of what?
 9              MR. CONNELLY:  -- etiology is --
10              MR. CROWN:  Of what?
11              MR. CONNELLY:  -- unclear --
12              MR. CROWN:  Of what?
13              (Reporter clarification.)
14              MR. CONNELLY:  Of what?  Of what comes
15  before, Larry?
16              MR. CROWN:  Yeah, the response, the
17  favorable response that nutrition had.  You keep
18  misreading this.  There's a misstating --
19              MR. CONNELLY:  Well, we will ask Dr. Miga
20  about it, so don't worry about it.
21              MR. CROWN:  I hope you do.  Please notice
22  that deposition.
23  BY MR. CONNELLY:
24      Q.   My question, again, is:  When you wrote that the
25  heart failure is connected to malnutrition, did you have a
```

1  recollection of what you wrote in -- or the quote that you

2  inserted into the January report to the Court where

3  Dr. Miga says, "The exact etiology is unclear but may very

4  likely be related to his nutritional status"?

5      A.    I mean, in a sense, that's what he said, what I

6  wrote.

7      Q.    In a sense, right?

8      A.    That it's connected to --

9      Q.    Well, in the sense that it may be connected to

10  malnutrition, right?

11              MR. CROWN:  Objection to form and

12  foundation.

13  BY MR. CONNELLY:

14      Q.    Not that it is necessarily connected to

15  malnutrition, do you agree with that?

16              MR. CROWN:  Objection to form and

17  foundation.

18              THE WITNESS:  Sorry.  Could you ask me

19  again what ...

20              (The following requested portion of the

21  record was read back by the reporter:)

22              "QUESTION:  Well, in the sense that it may

23  be connected to malnutrition, right?

24              "Not that it is necessarily connected to

25  malnutrition, do you agree with that?"

```
 1              MR. CROWN:  Again, objection to form and
 2   foundation.
 3              THE WITNESS:  I mean, I would just agree
 4   with what -- the way he put it.  I wouldn't -- I don't
 5   have any way to change it.
 6   BY MR. CONNELLY:
 7       Q.   Right.  You don't have any medical knowledge one
 8   way or the other to say that what Dr. Miga wrote is wrong
 9   or right, right?
10       A.   Correct.
11              MR. CONNELLY:  And, Larry, you can notice
12   up the deposition just as easily as I can of Dr. Miga.
13              MR. CROWN:  I can read a medical record,
14   and I know when someone is misstating a question.
15              MR. CONNELLY:  I know how --
16              MR. CROWN:  That's my objection.
17              MR. CONNELLY:  I know how English works and
18   how one sentence refers to the antecedents, so ...
19              MR. CROWN:  Yeah, well, that being said,
20   you are misquoting Dr. Miga's finding.  And that sentence
21   is a quote, and he can explain the quote, but it is not
22   hers to do.  Anyway, that's it.  Keep asking your
23   questions.
24   BY MR. CONNELLY:
25       Q.   Staffing was held, you note, right?
```

1      A.    Yes.

2      Q.    And you have in all this other stuff that we saw

3   earlier about Father being dismissive and interrogating

4   the boys and the boys just trying to tell him what they

5   think he wants to hear.

6                 And then you say in the next paragraph, the

7   second line:  They are eating all foods.

8                 Do you see that?

9      A.    Yes.

10     Q.    And by this time, in August of 2019, the parents

11  have been having therapeutic visits with Southwest Human

12  Development and bringing meals or having meals brought in,

13  right?

14     A.    Correct.

15     Q.    And they have been ordering a wide variety of

16  food, right?

17     A.    From my recollection, yes.

18     Q.    Yeah.  It has been -- for months, they have been

19  providing a broad diet to the boys, right?

20     A.    Correct.

21     Q.    And so there's no continuing implementation of a

22  strict GAPS-based diet, right?

23     A.    Correct.

24     Q.    Would you agree with me that by this time the

25  mother has demonstrated a willingness to feed the boys a

1   broad and varied nutritious diet?

2       *A.*   I believe that she did, not specifically by her

3   choice or not by her suggestion, but yes.

4       *Q.*   Is there any reason you think that the mother

5   would not want the boys to eat a varied and broad

6   nutritious diet?

7       *A.*   Well, at the start of the dependency, she

8   didn't.

9       *Q.*   Because she was -- the boys were having food

10  reactions, right?

11      *A.*   I believe according to Mom.

12      *Q.*   According to Mom and according to others.  If

13  you read any of the declarations by the rehabilitation

14  providers, you would see that they also observed food

15  reactions in the boys.

16              But the question in August of 2019 is

17  whether Mom is able to provide a wide and varied diet,

18  right?

19              MR. CROWN:  Objection to form and

20  foundation.

21              THE WITNESS:  I mean, that's -- that's one

22  of the, like, rules, I would say, with the therapeutic

23  visits is because they came in with those food issues.  So

24  that would have been one of the goals, so ...

25

1  BY MR. CONNELLY:

2      Q.   Right.  And Mother is demonstrating that.  You

3  are also aware that Mother went on her own and took

4  nutrition courses, college level, at ASU, right?

5              MR. CROWN:  Objection to form and

6  foundation.

7              THE WITNESS:  No, I am not --

8  BY MR. CONNELLY:

9      Q.   You are not aware of that?

10     A.   -- aware of that.

11     Q.   Madison Bell didn't tell you that?

12     A.   I don't recall conversation or certificates

13  about that at all.

14     Q.   Okay.  So you are not aware that Mother took

15  courses at ASU and got As in them, in the nutrition

16  courses?

17              MR. CROWN:  Objection to form and

18  foundation.

19              THE WITNESS:  Not during our dependency,

20  no.

21  BY MR. CONNELLY:

22     Q.   Oh, yeah, during this dependency.

23     A.   Nope.

24     Q.   And so then you are also not aware that Mom was

25  working with a nutritionist during this dependency and

 1  that she provided letters from that nutritionist
 2  describing the work that they had been doing together?
 3       A.    Was that Plotner?
 4             MR. CROWN:  Objection to form and
 5  foundation.
 6  BY MR. CONNELLY:
 7       Q.    No.
 8       A.    Not that I recall specifically, no.
 9       Q.    You said something about OCD traits would be
10  something that the therapists would have to work on,
11  right?
12       A.    Yes.
13       Q.    So if you will look at Exhibit 41.
14       A.    It's empty right here.
15       Q.    Oh.
16             MR. CONNELLY:  Well, we have been going for
17  almost four hours.  So let's take a little break and we'll
18  get that exhibit.
19             MR. CROWN:  Sounds good.
20             (Recess ensued from 3:43 p.m. until
21  3:52 p.m.)
22  BY MR. CONNELLY:
23       Q.    I asked you to look at Exhibit 41.  Do you have
24  that in front of you?
25       A.    No.

```
 1                    MR. CROWN:  You have not given it to her
 2   yet.
 3                    MR. CONNELLY:  Well, it's in that --
 4                    MR. CROWN:  It is not in the notebook.
 5                    MR. CONNELLY:  Oh.  That's right.  I'm
 6   sorry.  Okay.
 7                    MR. CROWN:  Would you like me to --
 8                    MR. CONNELLY:  No.  She's getting --
 9                    MR. CROWN:  I have a copy of it right here
10   if you want to not waste time.  Do you want me to give her
11   my copy?
12                    MR. CONNELLY:  I'm looking for mine right
13   now.  I don't know where mine went.
14                    MR. CROWN:  I have it.
15                    MR. CONNELLY:  No, she's got a copy.
16                    MR. CROWN:  All right.  I have a copy,
17   so ...
18                    MR. CONNELLY:  Here's my copy, okay.
19   BY MR. CONNELLY:
20       Q.  So here's Exhibit 41.  My question is -- well,
21   yeah, take a minute to look at it.
22                    So you have taken a look at it?
23       A.  Yes.
24       Q.  Do you recognize this as a treatment plan by
25   Dr. Rodriguez?
```

1    *A.*    I do.

2    *Q.*    Can you point me to the identified issues for

3 treatment where it says "traits of OCD" or anything that

4 you are asserting are treatment goals related to traits

5 for OCD?

6    *A.*    The personality traits on No. 2 because OCD is a

7 personality disorder, so it would fall under there.

8    *Q.*    And is there a policy or procedure -- a written

9 policy or procedure at DCS that says:  We must treat

10 parents for traits of any mental health disorders, even if

11 they are not diagnosed with those mental health disorders?

12    *A.*    No.

13    *Q.*    So it is an informal thing?

14    *A.*    Not informal.  I mean, we would have provided

15 Dr. Rodriguez with the psychological evaluation, so she

16 would have come up with these identified issues, based on

17 that, with Mom.

18    *Q.*    And would Madison Bell have said to

19 Dr. Rodriguez that she needs to be treated for OCD because

20 Dr. Oakley identified traits consistent with OCD but did

21 not make a diagnosis?

22    *A.*    No.  She just would have just been provided with

23 the psychological and any other background she requested.

24    *Q.*    Do you think that treating a parent for a

25 condition they have not been diagnosed with is

 1   overmedicalization?

 2       A.   Well, that would likely be against the

 3   doctor's -- like her own oath of treating.

 4       Q.   I'm sorry, her own what?

 5       A.   Like a doctor -- a therapist is not supposed to

 6   treat a client for something they don't have.

 7       Q.   Right.

 8       A.   So -- but it said traits, so that's why it

 9   says -- I would think that it says personality traits for

10   that reason.

11       Q.   And because it said traits without a formal

12   diagnosis, that's why you wrote in your report that she

13   was diagnosed with OCD?

14       A.   That was probably a typo in my report, in my

15   clinical, yes.

16       Q.   Okay.  And since we are on the topic of

17   Dr. Rodriguez, if you look at Exhibit 10, we were talking

18   earlier about Dr. Rodriguez wanting to close out services

19   in August of 2019.

20            What is your role in preparing reports to

21   the foster care review board?

22       A.   10 is missing, also, in here.

23            MR. CROWN:  Again, in the interest of time,

24   would you like me to show her my 10?

25            MR. CONNELLY:  Sure.  Go ahead, please.

 1              MR. CROWN:  So I will show her my copy.

 2    And just so you know, I have a little yellow highlight, no

 3    parenthetical notes, so -- it's got an e-mail on

 4    November 5, 2019, from Ashley Stanton.

 5              MR. CONNELLY:  At 506 at the top?  Yeah,

 6    that's it.

 7              MR. CROWN:  And it's the Bates stamp

 8    numbers KAHRAMANAZ 5380 to 5384.  All right.

 9    BY MR. CONNELLY:

10        Q.    So the first question is:  What is your role in

11    reports to -- drafting reports to the foster care review

12    board?

13        A.    Only if the case manager is going to be out or

14    has a conflict would I draft a report for the foster care

15    review board.

16        Q.    And you see that what we have in this exhibit

17    are a series of e-mails, mostly between Madison Bell and

18    Ashley Stanton, who I understand is a liaison for the

19    FCRB, right?

20        A.    Correct.

21        Q.    And you are copied on an e-mail dated

22    October 22, 2019, from Ashley Stanton to Madison Bell and

23    some others?

24        A.    Correct.

25        Q.    Where she is reminding everybody that there's an

1    FCRB review scheduled for November 5, 2019, right?

2        A.    Correct.

3        Q.    And she is asking that the report be submitted,

4    right?

5        A.    "If you are not able to attend in person, you

6    can send a statement."

7        Q.    And you see, then, on November 5th of 2019,

8    starting on the first page and carrying over for the next

9    two and a half pages, that Madison Bell submitted some

10   information to Ms. Stanton, right?

11       A.    Correct.

12       Q.    She didn't copy you, though, right?

13       A.    Correct.

14       Q.    And then, if you will note, on the second page

15   there is a heading for Mother, Jessica Kahraman; do you

16   see that?

17       A.    Yes.

18       Q.    And then if you read the second sentence, it

19   says:  Ms. Kahraman's therapist wanted to close her out of

20   services successfully; however, upon review of the

21   documents, treatment goals were not met.

22              So this is one of the places where it is

23   noted by Madison Bell herself that Dr. Rodriguez wanted to

24   close out services, and I am telling you that that

25   occurred in August of 2018.

 1                     And then it says:  New specific treatment
 2    goals were sent to the therapist in October of 2019.
 3                     Do you see that?
 4                     MR. CROWN:  Objection to form and
 5    foundation.
 6                     THE WITNESS:  Because it doesn't state she
 7    was ready to close out in August of 2018.
 8    BY MR. CONNELLY:
 9         Q.    No.  But --
10         A.    You are --
11         Q.    I am telling you that that's when it happened.
12                     The point being is Madison Bell never told
13    you that Dr. Rodriguez wanted to close Jessica Kahraman
14    out of services successfully, did she?
15                     MR. CROWN:  Objection to form and
16    foundation.
17    BY MR. CONNELLY:
18         Q.    In -- in 2019, in the summer or fall of 2019,
19    right?
20         A.    Well, it doesn't specifically say that.  It
21    says:  However, upon review of the documents.
22                     I don't know who reviewed them, if it was
23    Madison reviewing with the therapist and they felt the
24    goals were not met --
25         Q.    Let's start over.  Let me ask you to read the

1    second sentence out loud.

2    *A.*    "Ms. Kahraman's therapist wanted to close her

3    out of services successfully; however, upon review of the

4    documents, the treatment goals were not met."

5    *Q.*    Period.  All right.

6              The first clause of the sentence says:

7    Ms. Kahraman's therapist wanted to close her out of

8    services successfully.

9              Right?

10   *A.*    Yes.

11   *Q.*    So do you agree with me that there was some

12   communication from the therapist to Madison Bell where the

13   therapist said to Madison Bell, "I want to close out

14   Jessica Kahraman from services successfully," because the

15   only way she would be wanting to close her out

16   successfully is because she had met the treatment goals

17   that had been submitted and prepared to that point, right?

18             MR. CROWN:  Objection to form and

19   foundation.

20             THE WITNESS:  I would say potentially, yes.

21   BY MR. CONNELLY:

22   *Q.*    You see the next sentence, then, where it says:

23   New specific treatment goals were sent to the therapist in

24   October 2019.

25   *A.*    I do.

1      Q.    Now, going back to the first clause of the first
2   sentence:  Did Madison Bell ever tell you, in any time
3   between August and October of 2019, that Dr. Rodriguez
4   wanted to close out Jessica Kahraman successfully?
5                MR. CROWN:  Objection to form and
6   foundation.
7                THE WITNESS:  Not that I recall.
8   BY MR. CONNELLY:
9      Q.    Okay.  And then if you look at Exhibit 41 in
10   conjunction with Exhibit 44, you can take one of them
11   out -- well, Exhibit 41 is not in there; we just gave you
12   that one.
13      A.    Right.  That one's gone.  And 44?
14      Q.    44, yes.  Is that in there?
15      A.    No.
16      Q.    Oh, no.
17                MR. CROWN:  What else do you need now?
18                MR. CONNELLY:  44, please, Larry.
19                MR. CROWN:  Okay.  I have it.
20                THE WITNESS:  Up through 49 is not there,
21   if we get to that.
22                MR. CONNELLY:  Well, I don't think we are
23   going to be -- well, I don't think we are going to be --
24   okay.  We might deal with 45, too, but right now it's
25   just --

1           MR. CROWN:  44 is a progress note.

2           MR. CONNELLY:  8/19 progress report.

3           MR. CROWN:  Is it -- KAHRAMAN 8455 is the

4    Bates stamp to 8458?

5           MR. CONNELLY:  Yes.  Um-hum.

6           MR. CROWN:  Okay.  Showing you, for

7    counsel, Exhibit 44.

8           MR. CONNELLY:  Thank you, Larry.  You are

9    very accommodating.

10          MR. CROWN:  I just want to move it along

11   with no problems.

12   BY MR. CONNELLY:

13      Q.   You see that -- okay.  You agree with me this is

14   a progress report for August 2019 by Dr. Rodriguez

15   regarding Jessica Kahraman?

16      A.   Yes.

17      Q.   And you see that in Exhibit 41, that Exhibit 41

18   is the treatment plan and the Success of Progress Towards

19   Goal heading, that column, is what the therapist is saying

20   what needs to be done in order to successfully meet each

21   goal.

22           Do you agree?

23      A.   Yes.

24      Q.   And then when you look at Exhibit 44, and you

25   turn to the second page, in the section that says Other

1   Significant Client and Family Information -- do you see

2   that?

3        A.   I do.

4        Q.   Do you agree with me that the success of

5   progress towards goals identified on Exhibit 41 -- and

6   there are five of them -- are reprinted in that section of

7   Exhibit 44, and then they are each followed by bullet

8   points?

9                So, for instance, if you want to follow

10  along with me on Exhibit 41, in that third column, the

11  first success of progress towards goals is stated as:

12  Ms. Kahraman will identify at least three ways in which

13  medical neglect impacts children and at least three

14  methods to resolve.

15               Right?

16       A.   I see that.

17       Q.   And then when you look over on Exhibit 44, in

18  the first sentence in that section I identified for you on

19  the second page --

20       A.   Yes.

21       Q.   -- it says:  Ms. Kahraman will identify at least

22  three ways in which medical neglect impacts children and

23  at least three methods to resolve.

24               Right?

25       A.   I see that.

1    *Q.*   And then below that sentence are seven bullet

2   pointed items, right?

3    *A.*   Yes.

4    *Q.*   Do you agree with me this is the therapist

5   saying -- demonstrating how Ms. Kahraman has met this

6   goal?

7                MR. CROWN:  Objection to form and

8   foundation.

9                THE WITNESS:  I mean, you can make an

10  assumption.  It doesn't say that, that she met the goals.

11  BY MR. CONNELLY:

12   *Q.*   Is that a reasonable assumption?

13                MR. CROWN:  Objection to form and

14  foundation.

15                THE WITNESS:  That she met the goal?

16  BY MR. CONNELLY:

17   *Q.*   Yeah.  That these are ways that the therapist is

18  showing that Mother met the goal?

19                MR. CROWN:  Objection to form and

20  foundation.

21                THE WITNESS:  I mean, she identified --

22  it's -- I mean, I would say that she has made some

23  progress, reading that.

24  BY MR. CONNELLY:

25   *Q.*   Right.  And this is the therapist's analysis of

 1   Mother's progress towards this goal, right?

 2      A.   Right.

 3      Q.   And she has identified these seven things that

 4   Mother has said or done in her therapy to demonstrate

 5   completion of that goal, right?

 6                MR. CROWN:  Objection to form and

 7   foundation.

 8                THE WITNESS:  Well, I don't think it's --

 9   and I don't think it is demonstrating.  It is just

10   identifying.

11   BY MR. CONNELLY:

12      Q.   Well, that's all she was asked to do, was

13   identify.  The goal says:  Ms. Kahraman will identify at

14   least three ways in which medical neglect impacts children

15   and at least three methods to resolve?

16      A.   Well, that is the therapist asking her to

17   identify.  So, yes, she did.

18      Q.   The therapist is reporting as of August 2019

19   Mother has -- this is the progress she has made towards

20   this goal, correct?

21      A.   Correct.

22      Q.   And she does that for each of the five goals

23   that are on the treatment plan, right?

24                MR. CROWN:  Objection to form and

25   foundation.

1          THE WITNESS:  I mean, yeah, she is listing

2     out the goals and what Mom has done to identify it.

3     BY MR. CONNELLY:

4          Q.    Right.  And are you aware of in your -- you said

5     earlier that you reviewed the progress reports that you

6     received every month, right?

7          A.    From -- for visitation?

8          Q.    No, from parents' therapists.  You said you

9     would receive those as well as the case manager, right?

10         A.    If I did receive them, yes, I did review them.

11         Q.    And so in your review of the reports submitted

12    by Dr. Rodriguez, do you recall that this was the first

13    report in which she did anything like this in this section

14    of the report where she identified the goals and showed

15    Mom's progress or completion of those goals?

16         A.    I don't recall if this is the only one that has

17    those listed.

18         Q.    And do you see, on the third page, that area

19    where it says Therapeutic Areas of Concern?

20         A.    I do.

21         Q.    And there is nothing noted in there, right?

22         A.    Correct.

23         Q.    And in the recommendations and comments, she

24    says:  Ms. Kahraman appears to be taking steps to develop

25    and grow, and willing to learn as much as she can in order

1    to bring her sons back into her care.

2              Right?

3    A.    Correct.

4    Q.    But you don't -- you don't read this report as

5    Dr. Rodriguez saying that Mother has met the treatment

6    goals that are identified in the treatment plan; is that

7    right?

8    A.    No.  That is correct.

9    Q.    But you agree that Madison Bell has reported to

10   the FRCB in November that the therapist wanted to close

11   her out successfully, right?

12              MR. CROWN:  Objection to form and

13   foundation.

14              THE WITNESS:  That's what Madison said.

15   This report doesn't say that, though.

16   BY MR. CONNELLY:

17   Q.    That's what Madison said, right.  That was my

18   question.

19   A.    Yeah.

20   Q.    Madison also said that the therapist was given

21   new goals, right?

22   A.    Correct.

23   Q.    So I am assuming you don't have Exhibit 43 in

24   that binder, right?

25   A.    No.

1           MR. CONNELLY:  So, Larry, if you would,

2    please.  It's the document KAHRAMAN 8574.

3           MR. CROWN:  And 8575?

4           MR. CONNELLY:  And 8575, yes.

5    BY MR. CONNELLY:

6      Q.    You see that this Exhibit 43 is an e-mail dated

7    October 15th of 2019 from Madison Bell to Dr. Capps-Conkle

8    and Dr. Rodriguez, right?

9      A.    Yes.

10     Q.    She doesn't copy you on it, right?

11     A.    Correct.

12     Q.    And you testified earlier that you didn't have

13   any discussion with her or any staffing with her about

14   generating new goals for the parents, right?

15     A.    Not that I recall.

16     Q.    And what she says in the first line is:  Hello,

17   I have redone the goals for therapy, if you could make

18   these into therapy goals and send it back, that would be

19   appreciated.

20           Then she has new goals for Father and new

21   goals for Mother, right?

22     A.    Yes.

23     Q.    And your testimony is that you didn't have any

24   role in developing this second set of goals, right?

25     A.    Not that I recall.  Because that would not have

 1   been something that Madison would have done.  She could

 2   have done it with the unit psychologist, came up with

 3   treatment goals.  Because if you are going off of Mom's

 4   past ones that we just looked at, this is like the next

 5   step.  She identified all this, now you need to

 6   demonstrate.  That's the process.

 7       Q.   Where does it say in the goals for Mother

 8   that -- the first new goal for Mother says:  Ms. Kahraman

 9   will demonstrate insight into the medical issues that her

10   children do and do not have based upon documented medical

11   evidence, right?

12       A.   Yes.

13       Q.   And the next three goals say Ms. Kahraman will

14   explore -- she will explore three topics that Madison Bell

15   has here, right?  Right?

16       A.   Yes.

17       Q.   That's not demonstrating anything, is it?

18       A.   Well, the first one says "demonstrate."

19       Q.   The first one says "demonstrate."  The other

20   three say explore, right?

21       A.   Yes.

22       Q.   So how do you show successful completion of

23   exploring a topic?

24       A.   However the therapist showed.  I mean, her

25   meeting and talking with the therapist, having

 1  discussions, looking at their diagnosis previously, how

 2  they are now.  Those are all discussions that they could

 3  explore.

 4      Q.    And here, there were no diagnoses.  And if the

 5  therapist does what you just said, engages in conversation

 6  with the mother about these issues, and the therapist is

 7  then satisfied that Mother has explored these topics and

 8  demonstrated insight and says, "I want to close her out of

 9  services," then that should be the end of it, right?

10      A.    Not necessarily.

11      Q.    It is up to the case manager to decide again

12  whether or not Mother should be closed out?

13      A.    No.

14      Q.    Who decides?

15      A.    The therapist.

16      Q.    The therapist decides unless the case manager

17  overrides the therapist's decision?

18      A.    I have not seen anything where Dr. Rodriguez --

19  besides Madison's --

20      Q.    That's not my question.

21      A.    -- what she said, I have not seen --

22            MR. CROWN:  Can she finish her answer?

23            MR. CONNELLY:  No.  Because it is not an

24  answer to the question I asked.

25            MR. CROWN:  When she gets to finish, you

 1  can re-ask it.

 2              Go ahead and let's make the record.

 3              THE WITNESS:  I have not seen anything that

 4  says Dr. Rodriguez was ready to close out, in her words.

 5              MR. CONNELLY:  Move to strike as

 6  nonresponsive.

 7              THE WITNESS:  Okay.

 8  BY MR. CONNELLY:

 9      Q.   The question is --

10              MR. CONNELLY:  Will you read my question

11  back.

12              (The following requested portion of the

13  record was read back by the reporter:)

14              "QUESTION:  The therapist decides unless

15  the case manager overrides the therapist's decision?"

16              THE WITNESS:  We cannot override a

17  therapist's recommendation.

18  BY MR. CONNELLY:

19      Q.   Okay.  We saw that -- okay.  I'm not going to

20  argue with you about it.

21              MR. CONNELLY:  Now, Larry, can you share

22  your Exhibit 45 with her?  Should be the last one we need

23  to do.

24              MR. CROWN:  Sure.  No. 45 is KAHRAMAN 8451

25  to 8454.

```
 1   BY MR. CONNELLY:
 2       Q.   You recognize this as Dr. Rodriguez's
 3   September 2019 progress report?
 4       A.   Yes.
 5       Q.   And do you see the entry dated September 4,
 6   2019?
 7       A.   Yes.
 8       Q.   And she says, in the second -- third sentence:
 9   Therapist advised Ms. Kahraman her case manager is not
10   satisfied with meeting her goals.
11              Do you see that?
12       A.   Yes.
13       Q.   So this is the first session that Ms. Kahraman
14   had with -- yeah -- that Ms. Kahraman had with
15   Dr. Rodriguez after the August report, right?
16       A.   Yes.
17       Q.   And Dr. Rodriguez is saying to Jessica that
18   Madison Bell is not satisfied that you have met your
19   goals, right?
20       A.   That's what it says, yes.
21       Q.   And taking this along with Madison Bell's
22   admission to the FRCB that the therapist wanted to close
23   her out successfully, can we agree that Dr. Rodriguez told
24   Madison Bell in -- at the end of August or in early
25   September that she wanted to close out Ms. Kahraman
```

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1  successfully for meeting her goals?

2           MR. CROWN:  Objection to form and

3  foundation.

4  BY MR. CONNELLY:

5      Q.   I see you smiling in there.  Strike that.

6      A.   I would just say it says that the case manager

7  is not satisfied with meeting her goals.

8      Q.   Right.  The implication being that the therapist

9  has said to the case manager that she has met her goals,

10 right?

11          MR. CROWN:  Objection to form and

12 foundation.

13          THE WITNESS:  I mean, we could assume.

14 BY MR. CONNELLY:

15     Q.   We don't even have to assume, do we?  We can

16 just take what Madison Bell wrote in November, what the

17 therapist writes here, and what Madison Bell writes in

18 October about new goals, and we can reasonably conclude,

19 without even asking Dr. Rodriguez, that the conversation

20 was, "I want to close her out" -- the conversation in

21 August or early September, before September 4th, was, "I

22 want to close her out successfully because she has met her

23 goals," right?

24          MR. CROWN:  Objection to form and

25 foundation.

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

```
 1              THE WITNESS:  I -- I would just say we try
 2   to rely on facts.  And if it doesn't say it -- it's not
 3   documented, it didn't happen.  So I don't --
 4   BY MR. CONNELLY:
 5       Q.   It is documented.  Madison Bell documented?
 6       A.   Well, she said it, but she's not the therapist.
 7   And if the therapist felt she met her goals, then the
 8   therapist should have backed it up and said that this
 9   should be closed.
10       Q.   Okay.  I understand you have to protect your
11   people.
12              MR. CROWN:  Objection.  Move to strike.
13   BY MR. CONNELLY:
14       Q.   Did you know that -- and maybe you don't know
15   this, but --
16              MR. CROWN:  Are you done with 45?
17              MR. CONNELLY:  Yeah.
18   BY MR. CONNELLY:
19       Q.   Did you know that Kenan was kept in the hospital
20   for four days longer than he needed to be because DCS was
21   trying to find placement for him?
22              MR. CROWN:  Objection to form and
23   foundation.
24              THE WITNESS:  I don't recall if he was.
25
```

```
 1  BY MR. CONNELLY:
 2      Q.   Okay.  Take a look at Exhibit 2.
 3               Going back to the mold thing, my question
 4  is:  This is a letter dated June 3, 2019, from Dr. Jensen.
 5  After the mold was discovered, he wrote letters that were
 6  provided to the Department.
 7               And I am just wondering whether you saw
 8  this letter at the time, where he says:  There are mold
 9  detoxification enzyme issues that individuals can have
10  that explain susceptibility to mold-related illness.  It
11  is imperative they be evaluated and this be explored
12  further.  If the issues they are having resolve outside
13  the home, it would provide reasonable suspicion, as well,
14  for a plausible explanation for their illness.
15               And, again, the question is:  Do you recall
16  seeing this letter at the time, in June of 2019?
17               MR. CROWN:  Objection to form and
18  foundation.
19               THE WITNESS:  I don't recall.
20  BY MR. CONNELLY:
21      Q.   And does this refresh your recollection about
22  whether or not you were involved in any staffing in --
23  around this time -- and, really, I mean, April to June of
24  2019 -- where the mold issue was staffed?
25               MR. CROWN:  Objection to form and
```

 1  foundation.

 2              THE WITNESS:  I don't recall.

 3  BY MR. CONNELLY:

 4      Q.   All right.  And since we are at that time period

 5  of June, July 2019, let me ask you to take a look at

 6  Exhibit 8.  You see at the bottom July 19, 2019, it starts

 7  out with -- as an e-mail from Amy Schmidt to Tracy Reed,

 8  copying you and Madison Bell, regarding a therapeutic

 9  visitation extension for Jessica Kahraman, right?

10      A.   Yes.

11      Q.   And then Tracy asks:  Why is Southwest Human

12  Development wanting an extension?

13              Because by this time, Mother has been

14  having therapeutic visits with the boys for at least six

15  months, right?

16      A.   Correct.

17      Q.   And the authorizations only go for six months

18  and they have to be renewed every six months, right?

19      A.   Correct.

20      Q.   Tracy is asking why.  Madison responds:  The

21  parents are continuing to perpetuate illness in their

22  children.

23              Do you know what she meant by that?

24      A.   No.

25      Q.   The children had not been in the care of the

1   parents since December of 2018, right?

2       A.   Correct.

3       Q.   Can you describe for me how the parents could

4   perpetuate illness in children that they don't have in

5   their custody?

6               MR. CROWN:  Objection to form and

7   foundation.

8               THE WITNESS:  And I didn't write that.

9   BY MR. CONNELLY:

10      Q.   I know.

11      A.   So I wouldn't make an assumption as to what she

12  meant.

13      Q.   Okay.  So you don't know what she meant by that?

14      A.   No.

15      Q.   Can you, just from your own experience, describe

16  for me a way in which a parent could perpetuate an illness

17  in a child that they don't have custody of?

18              MR. CROWN:  Objection to form and

19  foundation.

20              THE WITNESS:  During visitation, constantly

21  asking them about cuts or scratches that they have, asking

22  them if it hurts, are they okay, repeatedly, over and over

23  again.  I think that's one way.

24  BY MR. CONNELLY:

25      Q.   Okay.  And we don't have a case of abuse here;

 1    there are not cuts and scratches involved.

 2                All right.  But you don't know what she

 3    means by that?

 4         A.    No.

 5         Q.    And with everything you know about the case, you

 6    don't know what she meant by that; is that accurate?

 7         A.    I think -- I mean, I would just think it is

 8    something from the visitation reports.

 9         Q.    And from the visitation reports that you read,

10    do you have any understanding of what she meant by that

11    statement?

12         A.    Not without looking at them.

13         Q.    And then she says:  Dr. Kelly is continuing his

14    evaluation for factitious disorder.

15                Right?

16         A.    I see that.

17         Q.    So can we agree that Dr. Kelly was evaluating

18    whether Mother was a Munchausen parent?

19         A.    No.

20         Q.    Now take a quick look at Exhibit 29.  This is an

21    e-mail where J.T. Long and Acqui -- joint investigations

22    liaison -- is tracking medical child abuse cases.

23                Do you agree this was not a medical child

24    abuse case?

25         A.    Correct.

1      *Q.* So do you know why he is reaching out to you and
2   Madison to ask about the case in that context?
3                  MR. CROWN:  Objection to form and
4   foundation.
5                  THE WITNESS:  Possibly some protocol that
6   OSBY had at the time to reach out.  But not specifically,
7   no.
8   BY MR. CONNELLY:
9      *Q.* Okay.  Then did you have any conversations with
10  J.T. Long in response to this e-mail?
11                 MR. CROWN:  Objection to form and
12  foundation.
13                 THE WITNESS:  I mean, I don't recall if we
14  did.
15  BY MR. CONNELLY:
16     *Q.* Okay.
17     *A.* I mean, it -- I don't recall if we did.
18     *Q.* Okay.  That's all I wanted to know.
19                 Take a look at Exhibit 11.  Do you see that
20  in November, on November 19th of 2019, Dr. Kelly sent
21  Madison Bell a draft of his report?  Did she share this
22  draft with you?
23     *A.* Yes.
24     *Q.* So you saw a draft of Dr. Kelly's report?
25     *A.* Yes.

1    Q.    Did you make any changes or suggest any changes
2    to Dr. Kelly?
3    A.    No.  I wouldn't have -- we wouldn't have looked
4    for changes, only to clarify or explain any recommendation
5    or comments he made.
6    Q.    Did you ask him to do that?
7    A.    Not to my recollection.
8    Q.    Now, going back to the beginning of the case for
9    a minute, the decision to place the boys in an out-of-home
10   placement was made before you were involved, right?
11   A.    Correct.
12   Q.    Did you play any role in that decision to place
13   them in an out-of-home placement?
14   A.    No.
15   Q.    So at the time that you received the case
16   officially, the children had been placed in foster care,
17   right?
18   A.    Correct.
19   Q.    And that was a decision that was made by the
20   investigative team, right?
21   A.    And the Court.
22   Q.    Well, in the sense that the investigators said:
23   We are taking temporary custody of this child and we want
24   to put him in foster care.
25                 Right?

1      A.    Yes.

2            MR. CROWN:   Objection to form and

3   foundation.

4   BY MR. CONNELLY:

5      Q.    When you get a case as an ongoing supervisor,

6   and the child has already been placed in some out-of-home

7   placement and in particular, in this case, in foster care

8   placement, do you have any ability at that time, at the

9   time that you receive the case, to reevaluate the

10  placement and decide to place the child somewhere else,

11  like in-home or with a relative?

12     A.    Immediately after?

13     Q.    Yeah.

14     A.    Yes.

15     Q.    So immediately upon receiving a case, you can

16  reassess and change the placement?

17     A.    Well, usually when we do the transfer dialogue,

18  if we have a concern that a different plan could have been

19  explored, we would talk through that at the transfer

20  dialogue.

21     Q.    And earlier you said -- do you recall any of the

22  transfer dialogue in this case?

23     A.    Not specifically, no.

24     Q.    Do you recall whether you explored an in-home

25  placement with a safety plan as part of the transfer

 1  dialogue?

 2      *A.*    I believe that there was a TDM also -- the

 3  transfer dialogue, I don't recall.  But also, at the TDM,

 4  that is a conversation that is generally had also to

 5  explore in-home, if there was a TDM.

 6      *Q.*    I know there was a TDM later in the case.  So

 7  there was -- right.  The initial TDM, the parent didn't go

 8  to because it was at the time they were following all that

 9  stuff at the advice of some advocates.  The next TDM

10  occurred sometime later.

11              So you don't recall whether, at the

12  transfer dialogue, there was any discussion of the

13  propriety of doing an in-home placement with a safety plan

14  and services?

15      *A.*    Correct.

16              MR. CROWN:  Objection to form and

17  foundation.

18  BY MR. CONNELLY:

19      *Q.*    And you don't recall whether, at the transfer

20  dialogue, there was a discussion about placing the

21  children in a kinship placement --

22              MR. CROWN:  Objection to form and

23  foundation.

24  BY MR. CONNELLY:

25      *Q.*    -- with maternal grandparents, for instance?

1      A.    Not at that time, no.

2      Q.    Are you saying not at that time, the discussion

3   did not occur or you don't recall if it occurred?

4      A.    Well, a lot of times, those conversations occur

5   at the initial TDM.  So when we do the transfer

6   dialogue -- well, if it would have went to in-home at that

7   time, we wouldn't have had a transfer dialogue because it

8   would have went to a different office, so ...

9      Q.    Okay.  The question is, though -- we have

10  already talked about the in-home and the transfer

11  dialogue, and you said you don't recall whether in-home

12  was discussed or not?

13     A.    Correct.

14     Q.    We can assume, I guess, from what you just said

15  that it was not discussed, or if it was discussed, it was

16  rejected because they remained out of home, right?

17     A.    Correct.

18     Q.    Was there a discussion about placement with the

19  maternal grandparents at the transfer dialogue?

20               MR. CROWN:  Objection to form and

21  foundation.

22               THE WITNESS:  I don't recall discussing

23  placement.

24  BY MR. CONNELLY:

25     Q.    At all?

1    A.    Not initially.

2    Q.    And so is it fair to say that the first time

3    there was any consideration that you were involved in

4    about placement other than foster placement would have

5    been at the six months after being in care or six months

6    after the parents were engaging in services?

7    A.    I mean, that's when we would like reassess and

8    Madison would update her FFA.

9    Q.    Right.

10    A.    But I don't believe that we were at that point,

11    to -- and I don't believe there were any other relatives

12    presented to us.

13    Q.    There are not any more relatives what?

14    A.    Presented to us to be assessed.

15    Q.    Well, that's where we are going right now.

16    That's a topic I want to discuss a little bit.  Try to get

17    you out of here around the time I said I would.

18            So, first of all, did you ever have any

19    conversations with the maternal grandparents, Dottie Mann

20    or Mr. Mann?

21    A.    I don't believe so, no.

22    Q.    And if we look at Exhibit 20, Exhibit 20 is

23    Assessment and Plans, right?

24    A.    Yes.

25    Q.    And this is where the reassessments would be

1   done at those six-month intervals, right?

2       A.   Correct.

3       Q.   And so you see on page 7 of 64, there was a

4   reassessment done on September 30th of 2019, right?

5       A.   Yes.

6       Q.   And it was one that you approved, right?

7       A.   Yes.

8       Q.   Now, when there's a reassessment done, tell me

9   about that process.  What happens?

10      A.   There is a -- the family function assessment,

11  the FFA, is what Madison would complete and then I would

12  review it.  So there is different sections in there.  It

13  assesses if there is still an impending danger, what the

14  concerns are, what are the behavior changes we are looking

15  for.  That's all listed in there.

16      Q.   And Madison Bell completes that and you then

17  review it; is that how it goes?

18      A.   Correct.

19      Q.   Do you have any consultation while she is

20  preparing it or do you just review it when she has got it

21  done?

22      A.   I review it when it is done, and then if I have

23  questions, I would ask her whatever questions I had before

24  I would approve it.

25      Q.   And beyond that, would you do -- is there any

 1  kind of independent work that you would do other than

 2  reading it and asking her questions?

 3      A.    No.  If there was -- if there was a discrepancy

 4  or a wording or something that I received that conflicted,

 5  we would discuss it.

 6      Q.    Okay.  So let's look at what we have got here on

 7  this assessment.  The FFA begins on page 8 of 64, right?

 8      A.    It does.

 9      Q.    And it talks about the children's functioning

10  and the adults' functioning, right?

11      A.    Yes.

12      Q.    And then there is a Section B on page 10 of 64,

13  and it is labeled Caregiver Protective Capacities, right?

14      A.    Correct.

15      Q.    And then this is assessed for both Mother and

16  Father, right?

17      A.    Yes.

18      Q.    And then there are like a yes-or-no assessment

19  on different aspects of the parents' behavorial

20  capacities, I guess, their cognitive capacities, and

21  emotional capacities, right?

22      A.    Correct.

23      Q.    And a "no" is a bad thing as far as a parent --

24  as far as a parent is concerned, right?

25      A.    We don't look at it as a bad thing, just like an

 1   area to improve.

 2        Q.   But if it is a "no," it counts against a

 3   reunification or an in-home with a safety plan, right?

 4        A.   No.  Because we can do an in-home with a safety

 5   plan if there is a responsible adult.

 6        Q.   Okay.

 7        A.   Even if it is a "no."

 8        Q.   Okay.  If you look at the next page, Section C

 9   is the Safety Decision, and it says:  Unsafe, at least one

10   child is in impending danger.

11                  Do you see that?

12        A.   I do.

13        Q.   We are now ten months beyond temporary custody.

14   Who -- which child was in impending danger in September of

15   2019?

16        A.   Both.

17        Q.   Well, it says that at least one child.

18        A.   That's a -- like a pre- -- like if you check

19   "unsafe," that's the only option it is going to say, at

20   least one child, for how the system was at the time.

21        Q.   So there is not an option to say all children?

22        A.   Correct.

23        Q.   So the options are either safe or unsafe, at

24   least one child is in impending danger?

25        A.   Correct.

1    Q.    What was the impending danger in September of

2  2019?

3    A.    Without looking at them, from memory, I couldn't

4  quote it to you.  But it says caregiver is -- it's a

5  medical word.  I don't remember the specific wording.

6    Q.    I'm sorry.  It is a --

7    A.    I don't remember the specific wording.  But

8  there's a medical -- there's a -- I don't recall the

9  specific impending danger without looking at them.

10    Q.    Without looking at what?

11    A.    Because we have a -- we have a guide that shows

12  you each impending danger, breaks it down for you.

13    Q.    And where is that -- where is that guide?

14    A.    Like it is part of our policy.

15    Q.    So there are policies and procedures about

16  impending dangers?

17    A.    That we have -- because we have specific ones.

18  I think there is 17.  So there's -- or 16.  There's

19  different impending dangers.  Like, there's one to do with

20  mental health and substance abuse, there is another one to

21  do with like sex abuse, there is another one to do with

22  harm and intimidation to a child.  There is different

23  ones.

24    Q.    And you can't remember which one applied in

25  September of 2019 to these children?

1   *A.*   I mean, I can't recall now because I don't have
2   my guide in front of me.  I don't claim to memorize all of
3   that, so ...
4   *Q.*   Well, but you have done trainings on impending
5   danger versus present danger, right?
6   *A.*   Correct.
7   *Q.*   But I don't fault you for not memorizing all 17
8   impending dangers, if you are saying that's how many there
9   are.  But given what you know about the nature of this
10  case, as you are sitting here right now, you cannot tell
11  me what the impending danger was, just in layman's terms?
12  *A.*   Well, it had to do with the medical neglect.
13  *Q.*   And so it had to specifically do with the GAPS
14  diet?
15  *A.*   Not specifically the GAPS diet.  Just the
16  following of that, the refusal to consider anything else,
17  the continuation of the conversation about mold.  All of
18  those played into that.
19  *Q.*   So in September of 2019, now we have got a
20  history of the parents feeding the boys a wide and broad
21  and varied nutritious diet, right?
22  *A.*   Not on their own.  Supervised.  So, yes,
23  supervised.
24  *Q.*   And the mother wasn't given the chance to
25  provide meals on her own, right?

1      A.    Because that is a progression.

2      Q.    Okay.  Well, fine.  She was not allowed to this

3  point to do that, was she?

4      A.    No.  Because she did not make the behavior

5  changes to do that.

6      Q.    Well, you don't know whether she did or not

7  because you didn't give the opportunity to demonstrate

8  whether or not she had, right?

9            MR. CROWN:  Objection to form and

10  foundation.

11            THE WITNESS:  No.  That's not accurate.

12  BY MR. CONNELLY:

13      Q.    Well, she had gone and taken nutrition courses

14  on her own, right?

15      A.    Which you say she did.

16      Q.    Yes, I am making it up.

17      A.    It was listed in her treatment report, though.

18      Q.    Right.  And they brought food for the boys that

19  were -- you can't deny the fact that they brought food

20  that was a broad diet, a varied diet, including all four

21  food groups, and was nutritious as far as conventionally

22  considered, right?

23            MR. CROWN:  Objection to form and

24  foundation.

25            THE WITNESS:  I believe that they were

```
 1  given lists of what the boys had been eating and
 2  recommendations from the Southwest team.  And, yes, when
 3  they were allowed to bring food, they brought what the
 4  boys were currently eating.
 5  BY MR. CONNELLY:
 6      Q.   Right.  So they couldn't have done any more to
 7  demonstrate their willingness to provide a wide and varied
 8  diet, right, they did -- to that point, they had done all
 9  they could do to demonstrate willingness to provide a
10  broad and varied diet?
11      A.   Okay.
12           MR. CROWN:  Objection to form and
13  foundation.
14  BY MR. CONNELLY:
15      Q.   Do you agree?
16      A.   I would agree, to some extent.
17      Q.   Right.  They -- there was nothing more they
18  could do because they were not allowed to do any more to
19  that point, right?
20           MR. CROWN:  Objection to form and
21  foundation.
22  BY MR. CONNELLY:
23      Q.   Are you going to answer that question?
24      A.   I would say if they would have made more
25  progress, then they would have been able to sooner.
```

 1      Q.   And what more progress -- so the more progress
 2   that you wanted them to -- you wanted to see was them not
 3   talking about mold?
 4      A.   Well, not that I wanted to see.  I was not the
 5   deciding factor in those kids moving anywhere.  That is
 6   the Court; they make the decision if the kids go home.
 7   That's not our decision.
 8      Q.   We all know that's a fantasy.
 9              MR. CROWN:  Objection.
10   BY MR. CONNELLY:
11      Q.   The Court does what the Department wants it to
12   do.
13      A.   No.
14              MR. CROWN:  Objection.  Move to strike.
15              THE WITNESS:  Not at all.
16              MR. CROWN:  And I am glad to have your
17   comments reviewed just now.  I am sure courts would like
18   to review what you just said about the court system.
19   BY MR. CONNELLY:
20      Q.   My question to you, Ms. Temple, is --
21              MR. CROWN:  No, you keep going.  You keep
22   insulting the courts.  Go ahead.  Make your record.
23   BY MR. CONNELLY:
24      Q.   In April of 2019, Dr. Oakley said:  There's not
25   sufficient evidence to suggest that she is reinforcing

1    them intentionally or is gaining any personal benefit from

2    the children being sick.

3              So Dr. Oakley is saying that -- and when I

4    read this, she is saying that there is no reason to

5    believe that the mother would not continue feeding a broad

6    and varied diet because she has -- she is not gaining any

7    benefit and she is not trying to make her children sick.

8              So the concern that you have kind of

9    expressed here today, that they are only bringing a broad

10   diet because we are making them and they wouldn't do it if

11   they were on their own, how do you justify that?

12   A.    Because they were not doing it on their own.

13   They didn't do it until we got involved.

14   Q.    And they -- and once you got involved, they

15   couldn't do it on their own because they were not allowed

16   to do it on their own, right?

17   A.    Father progressed to doing it on his own.

18   Q.    Father is a whole different story, which we will

19   either get to or we won't with the time we have left

20   today.  But -- all right.

21             Well, your testimony is that the impending

22   danger had to do with the medical issues that brought them

23   into care, right?

24   A.    Correct.

25   Q.    And isn't it true that impending danger is to be

1   evaluated at the time the reassessment is being made and

2   not based on what happened at the time custody was taken?

3       A.   Well, there are times that impending danger

4   stays the same.  It doesn't always change.  So there could

5   be that impending danger throughout the entire case.

6       Q.   And how -- how does that work?  If the parents

7   don't have custody, how could an impending danger that

8   existed while the child was in the parents' custody

9   continue, for two years, to be a reason to keep the

10  children away from the mother?

11      A.   Because if they have not demonstrated that they

12  have resolved that impending danger, then that impending

13  danger still exists.

14      Q.   And even though there were two therapists saying

15  that Mother has met her treatment goals, she disavowed the

16  GAPS diet, she has taken nutrition courses, she has

17  demonstrated the ability to feed the boys a wide and

18  varied diet and be glad they are eating a wide and varied

19  diet, that was not enough, right?

20              MR. CROWN:  Objection to form and

21  foundation.

22              THE WITNESS:  That was not enough for the

23  Court.

24  BY MR. CONNELLY:

25      Q.   I don't care about the Court.  I care about the

1  Department.  That was not enough for the Department, was
2  it?
3              MR. CROWN:  Objection to form and
4  foundation.
5              THE WITNESS:  It is not just doing therapy.
6  It is not just doing therapy, checking a box.  It is not
7  just I am bringing a wide variety of food; I'm checking a
8  box.  It's the totality of the behavior change.
9              You are talking those behavior changes,
10 there's a change of attitude, there is a change of
11 motivation, you are able to have a conversation with the
12 parent and they can express remorse about why their kids
13 came into care; that did not happen with Mom.
14 BY MR. CONNELLY:
15     Q.    And I am going to suggest to you that the
16 therapists disagreed with what you just said, that it is
17 only the Department who maintained that view.
18     A.    Okay.
19     Q.    And I am going to suggest to you and ask you:
20 Isn't it true that it was because the mother continued to
21 say, you know what, I believe mold was a contributing
22 factor?
23              That was the whole hold up, wasn't it?
24     A.    No.
25              MR. CROWN:  Objection to form and

1    foundation.

2    BY MR. CONNELLY:

3        *Q.*    And because the Department believed Mother was a

4    Munchausen parent, right?

5        *A.*    No.

6                MR. CROWN:  Objection to form and

7    foundation.

8    BY MR. CONNELLY:

9        *Q.*    Why didn't you consider putting a safety plan in

10   place in September of 2019?

11       *A.*    And who would be the responsible adult?

12       *Q.*    The maternal grandmother.

13       *A.*    I believe she was aligned with Mother and not

14   aligned with the Department, and if you are not aligned

15   with the Department, you cannot be a safety monitor.

16       *Q.*    And what does it mean aligned with the

17   Department?

18       *A.*    You have to acknowledge the concerns that we

19   have with the parent, you have to be able to redirect

20   them, you have to be able to have a conversation with

21   them.  The parent also has to be able to let you redirect

22   them as well.

23       *Q.*    And did you ever talk to the maternal

24   grandmother about those issues?

25       *A.*    No.

 1      Q.    And in this case, we are talking about the GAPS
 2  diet, right?
 3      A.    Not just the GAPS diet.
 4      Q.    What else are we concerned about?
 5      A.    Relying on medical providers that gave false
 6  information.
 7      Q.    And do you fault a parent for relying on a
 8  medical provider -- when a parent takes a child to a
 9  medical provider, they are doing that in order to get the
10  advice of the medical professional, right?
11      A.    But what if they don't take the child to a
12  medical provider, and it is only over the phone and the
13  provider does not see the children?
14      Q.    So in that case, the parent can't rely on the
15  medical advice?
16      A.    I mean, they should rely with caution.
17      Q.    But they have the right to rely?
18      A.    As a parent, if the child is in your care, you
19  have the right to rely on that.  But you also have a right
20  as a parent to make -- is this good advice that I am
21  listening to, or is this advice that I need to get a
22  second opinion on?
23      Q.    And in that regard, if the advice is:  If your
24  children are having reactions to food, try a limited diet
25  and then introduce new foods progressively as they go

1   along so you can determine whether or not what foods are

2   giving them the reactions, right, and while you are doing

3   that, you are going to regular pediatric visits and the

4   boys are gaining weight and they are within the growth

5   curve, isn't -- in that set of circumstances, is a parent,

6   then, to discount the advice that she's getting about the

7   GAPS diet?

8               MR. CROWN:  Objection to form and

9   foundation.

10              THE WITNESS:  We only got involved when the

11  hospital got involved.  So I don't -- we can't evaluate

12  things happened prior to us getting involved.

13  BY MR. CONNELLY:

14      Q.   Wow.  Is that your belief?

15      A.   How -- why wouldn't it be?

16      Q.   Because the Department has a responsibility

17  under the law to do a prompt and thorough investigation of

18  all facts which both support and refute the allegations of

19  neglect.

20      A.   Okay.

21      Q.   Which would mean talking to people who provided

22  services to the children and saw whether or not they had

23  reactions to food.  It would mean looking at the pediatric

24  records from Dr. Jafri and Dr. Jensen to see if they were

25  gaining weight on the diet they were on, right?

1       *A.*    Okay.

2       *Q.*    Back to the question of whether or not you ever

3  talked to the grandmother yourself.  Did you ever talk to

4  the grandmother yourself?

5       *A.*    I believe I said I have not.

6       *Q.*    All right.  And did you look at any of the

7  information or -- information that was in the file in

8  relation to the grandmother?

9       *A.*    I don't know what was in the file in relation to

10  the grandmother.

11       *Q.*    You said that when you -- when you took the case

12  over, that you reviewed the electronic record and the hard

13  copy record, right?

14       *A.*    Correct.

15       *Q.*    So look at Exhibit 23.  This is an e-mail that

16  the grandmother sent to Sarah Kramer on January 3 of 2019.

17  And she is talking about the team planning meeting, and I

18  am sure she is meaning the TDM that was scheduled for that

19  day.

20              But what she says at the ends of that first

21  paragraph is:  I cannot fully support all of Jessica's

22  decisions, but neither can I accept evidence that has thus

23  far been presented against her.  I only want to do what is

24  best for Dylan and Kenan and for their emotional and --

25  well as physical well-being.

1        Did you ever see this e-mail when you were
2   reviewing the file?
3        A.   Not that I recall, no.
4        Q.   So from this e-mail, it doesn't sound like the
5   grandmother is completely aligned with all of her
6   daughter's decisions regarding the boys.  Do you agree?
7             MR. CROWN:  Objection to form and
8   foundation.
9             THE WITNESS:  I don't know if she is or
10  not.  She didn't come to the meeting.  She could have came
11  by herself.
12  BY MR. CONNELLY:
13       Q.   She was not invited.
14       A.   Well, she knew about it.
15       Q.   You want to argue with me about things, then,
16  you know, that's fine.
17       A.   I'm not trying to argue --
18             MR. CROWN:  Objection.  Form --
19             THE WITNESS:  -- with you.  I'm just --
20             MR. CROWN:  -- and foundation.
21             THE WITNESS:  -- reading that, you know.
22             MR. CROWN:  Move to strike.  Refrain from
23  the comments.  Let's move it on.
24  BY MR. CONNELLY:
25       Q.   You agree she says:  I cannot fully support all

 1  of Jessica's decisions.

 2              Right?

 3      A.    But neither can I accept them, either.

 4      Q.    Neither can I accept evidence that has thus far

 5  been presented against her --

 6      A.    Right.

 7      Q.    -- and the only evidence presented against her

 8  thus far were the Banner medical records, right?  There

 9  was not anything else.

10              MR. CROWN:  Objection to form and

11  foundation.

12  BY MR. CONNELLY:

13      Q.    Right?

14      A.    Well, I mean, I am not sure what information she

15  had.

16      Q.    Well, what information did the Department have

17  that was -- that related to medical neglect?

18      A.    We had documentation from Phoenix -- from

19  Cardon.

20      Q.    From Cardon's, from Banner's, right?

21      A.    Correct.

22      Q.    Right.  That was the only evidence that was

23  presented thus far and -- and whatever was stated in the

24  application for the court ordered removal, right, and we

25  don't even know if the grandmother saw that, do we?

1       *A.*    Only if Mother showed her.

2                   MR. CROWN:  Objection to form and

3       foundation.

4       BY MR. CONNELLY:

5       *Q.*    Let me ask you to look at Exhibit 22.  This is

6       a -- let me know when you are there.  Are you there?

7       *A.*    I am.

8       *Q.*    So this is a string of e-mails in May of 2019,

9       before we get to the reevaluation in September of 2019.

10      And it starts with you kind of saying on May 30th of

11      2019 -- let's see if there are any of these that are out

12      of order.  Yeah.  Okay.

13                  So these are a little -- so actually these

14      aren't in -- let's look at the first page because that's

15      the first e-mail.  These are the first e-mails in this

16      string, it appears.

17                  So if you -- if you are looking on the

18      first page, there is an e-mail from Tracy Reed to Sarah

19      Kramer and Madison Bell, subject line: Forward: Dylan and

20      Kenan Kahraman kinship appeal.

21                  So the grandmother was making an appeal

22      regarding placement, I guess.  And then Madison responds,

23      and she doesn't copy you, but she says:  Grandmother was

24      observed by the hospital staff to be aligned with the

25      parents in refusing to give the child food, even when he

1   was begging for food.  The child's congestive heart

2   failure was caused by malnutrition.

3                Do you see that?

4        A.   I do.

5        Q.   And then if we look at the page that ends in 978

6   at the bottom, the Bates label down there, 978.  Are you

7   there?

8        A.   Yes.

9        Q.   At the bottom, there is e-mail from Madison Bell

10  to you, May 30th of 2019, subject:  Kenan - Cardon

11  Children's.pdf.

12               Do you see that?

13       A.   I do.

14       Q.   So there apparently was an attachment to this

15  e-mail, and she is directing you to page 34.

16               Do you see that?

17       A.   Page 34, I see that.  I see where it says

18  page 34.

19       Q.   And then you respond.  Do you remember what was

20  on page 34 of whatever she sent to you?

21       A.   I believe that is the e-mail reference in this

22  page, the note from Sara, because these dates are prior to

23  that.

24       Q.   But it looks like, to me, she attached -- this

25  e-mail to you, she attached a PDF?

1    A.    Yes.

2    Q.    And she is telling you page 34.  And you write

3    back to her, I assume after reviewing page 34 of whatever

4    you sent to her -- she sent to you and you say:  I don't

5    know if that is valid enough to deny.  Have you asked them

6    about that statement?  You may need to talk to them about

7    this.

8              Do you see that?

9    A.    I do.

10   Q.    And so you were saying -- I believe, and you

11   tell me if I am wrong or right -- you were asking her to

12   talk to the grandmother about whether she refused to give

13   the child food at the hospital, right?

14   A.    Correct.

15   Q.    And then she writes to you:  She denied that it

16   ever happened, right?

17   A.    Correct.

18   Q.    And then Madison Bell, that day, had asked Sarah

19   Kramer:  Where is the documentation from Cardon's that

20   Grandmother refused to give Kenan food?

21              And then she says, "I just e-mailed" --

22   then Kramer says:  I just e-mailed the one note that I

23   remember it being in.

24              I am assuming that is supposed to be

25   page 34, right?

1           MR. CROWN:  Objection to form and

2    foundation.

3           THE WITNESS:  I think Kramer's was a case

4    note and the Cardon's was a medical record.  Page 34.

5    BY MR. CONNELLY:

6       Q.   So Madison says that the grandmother denied that

7    what is reported as having occurred at the hospital didn't

8    happen?

9       A.   Correct.

10      Q.   And so in this situation we have got a -- one

11   person saying that didn't happen and we have got a medical

12   record that says this is what happened?

13      A.   Correct.

14      Q.   And so the Department is going to believe the

15   medical record?

16      A.   Well, I don't think that it is -- we believe the

17   medical record.  I believe they were denied and they

18   appealed, and then our PM, Tracy, would have usually met

19   with the grandma, went over the appeal ...

20      Q.   You didn't have any conversations with the

21   grandmother?

22      A.   No.  I don't handle appeals like that.  My

23   supervisor does that.

24      Q.   And your review was that a note in the hospital

25   record that grandmother appears to be aligned with the

1   parents and refused to give food wasn't enough to deny
2   placement with the grandmother, right?
3               MR. CROWN:  Objection to form and
4   foundation.
5               THE WITNESS:  I believe my statement was
6   just -- was that Madison needed to talk to the grandmother
7   and clarify it and figure out what was going on at the
8   time.
9   BY MR. CONNELLY:
10      Q.    Right.  You say:  I don't know if that is valid
11  enough to deny.
12              What are you referring to?  What is not
13  valid enough to deny?
14      A.    Whatever I read from what she sent me.
15      Q.    And I thought you said earlier what she sent you
16  was what is on the first page of this, the statement that
17  Grandmother was observed by hospital staff, et cetera?
18      A.    Well, when you look at it -- because they are
19  out of order, if you look at the time when Madison
20  e-mailed me, she had not asked Sarah for the notes, or she
21  had asked five minutes before, but Sarah didn't respond
22  until 6:00 p.m.  So I believe it is two different notes.
23      Q.    All right.  And so if we assume just for a
24  minute that the hospital note says that Grandmother
25  refused to give the child food when he was begging for

1   food, that in your mind -- that statement in the hospital

2   record would not be enough to deny placement with the

3   grandmother, that in and of itself, right, there has to be

4   a conversation with the grandmother about it, right?

5       A.   Because I don't -- I don't recall what I read in

6   that Cardon's record to say that I don't think that's

7   valid enough.

8       Q.   Right.  And if we take what Madison Bell says,

9   what was in that record was that Grandmother was observed

10  by hospital staff to be refusing to give the child food,

11  even though he was begging for food, right?  I guess it

12  would be helpful to have this "Kenan - Cardon

13  Childrens.pdf."

14          Do you still have access to your e-mails?

15      A.   I do.

16      Q.   And you would be able to access this e-mail and

17  give us the PDF?

18      A.   When we moved offices, I did have a laptop that

19  crashed in like 2020 -- 2020, so potentially.

20      Q.   Well, e-mails are not stored on your laptop;

21  they are stored on servers somewhere, housed by the

22  Department.  So you ought to be able to access this

23  e-mail, right?

24      A.   I mean, I would think so.

25      Q.   I am going to ask you:  Will you access this

1  e-mail and send the PDF to your -- to Mr. Crown so he can

2  send it to us so we can see what page 34 is of that PDF?

3      *A.*   Okay.

4              MR. CONNELLY:  Will you mark this, please.

5              (Record requested to be marked.)

6  BY MR. CONNELLY:

7      *Q.*   Well, then, continuing on, if you look at

8  Exhibit 24.

9              24, it appears to at least go in the order

10 we are used to seeing strings of e-mail, with the first

11 one in the string being last in the document.  So if you

12 turn to the third page of the document, there is an e-mail

13 dated May 28, 2019, from Dottie Mann to Tracy Reed, right?

14     *A.*   Correct.

15     *Q.*   With the subject of Dylan and Kenan Kahraman

16 Kinship Appeal, right?

17     *A.*   Yes.

18     *Q.*   And she identifies herself to Ms. Reed as the

19 grandmother to Dylan and Kenan, who were removed for

20 medical neglect.

21              And she says:  When I appealed for my

22 husband and me for kinship custody of the boys, I was

23 immediately denied.  On Thursday, May 23, I appealed by

24 phone to case specialist Madison Bell for reconsideration.

25 I was again immediately denied.  When I inquired about the

1    next step, Ms. Bell gave me your name and told me that I

2    should fill out the forms attached to the letter of denial

3    and submit it to you.  That same letter, however, says

4    that I should next request a conflict resolution

5    conference by contacting you/supervisor.  No one from DCS

6    has so much as interviewed me.

7                   And she asks:  What should I do next?

8                   Do you see all that?

9        A.    I do.

10       Q.    So she made an appeal, she was denied.  She

11   called Maddie Bell, she was denied again.  So she is now

12   sending this e-mail to Tracy Reed.  And then you see the

13   next e-mail is Tracy Reed sending an e-mail to Sarah

14   Kramer and to Madison Bell, asking one of them or both of

15   them to let her know why these people were denied before I

16   call them.

17                   Do you see that?

18       A.    I do.

19       Q.    Then Madison Bell sends an e-mail that same day,

20   May 29, at 8:27 a.m., and says:  Grandmother was observed

21   by the hospital staff to be aligned with the parents in

22   refusing to give the child food, even when he was begging

23   for food.  The child's congestive heart failure was caused

24   by malnutrition.

25                   Do you see that?

1      A.   I do.

2      Q.   And then Tracy Reed sends an e-mail in response

3  to Madison Bell and copies you, and she says:  I just

4  spoke with her.

5           Meaning the grandmother, do you agree?

6      A.   Yes.

7      Q.   "Please make sure that we have ALL" -- the word

8  "all" in caps -- "documentation backing up the best

9  interest of the children.  We need to continue to reassess

10 all family.  I spoke to her and she was adamant she would

11 not align or agree with how the parents were caring for

12 the kids as she was not aware it was harming them.  We

13 need to make sure we have fully assessed and not be so

14 adamant that we cannot ever view them as placement again."

15           Do you see that?

16     A.   I do.

17     Q.   And then you send an e-mail to Madison Bell:  I

18 thought that you told me they were appropriate and they

19 were getting visits with Drew" -- meaning Drew Kaplan at

20 Southwest Human Development, right?

21     A.   Correct.

22     Q.   -- "before the parents agreed to visit."

23           Madison says to you:  They were appropriate

24 to engage in visitation, not for placement.  I was hopeful

25 they could be placement in the future, once they realized

1  everything that was going on and how their actions were

2  affecting the children as well.

3              Do you see that?

4      A.   I do.

5      Q.   And then Madison -- and then you sent an e-mail

6  to Sarah Kramer where you say:  Sarah, do you recall if

7  the grandparents were aligned with the parents in the

8  hospital?

9              And then you quote what Maddie Bell said to

10  you, right?

11     A.   Correct.

12     Q.   Okay.  Going back to Ms. Reed's e-mail of

13  Wednesday, May 29th, what did you ever do to reassess the

14  maternal grandmother for placement?

15     A.   After this, I don't recall if we did reassess

16  her.

17     Q.   And even though your program manager says that

18  you have to continue to reassess all family, there was

19  never a reassessment of the grandmother as placement,

20  right?

21              MR. CROWN:  Objection to form and

22  foundation.

23              THE WITNESS:  Not that I specifically

24  recall.

25

 1 | BY MR. CONNELLY:
 2 |     *Q.*   And if a reassessment had been done, there would
 3 | be documentation backing up that reassessment, right?
 4 |     *A.*   Correct.
 5 |     *Q.*   And if we don't find any documentation about a
 6 | reassessment, we can conclude that a reassessment was
 7 | never done, right?
 8 |                 MR. CROWN:  Objection to form and
 9 | foundation.
10 |                 THE WITNESS:  Yeah.  I just don't recall if
11 | one was done.
12 | BY MR. CONNELLY:
13 |     *Q.*   And as you are sitting here today, do you recall
14 | any documentation that you received or reviewed that would
15 | be sufficient to deny the grandparents as placement for
16 | the children in September of 2019?
17 |                 MR. CROWN:  Objection to form and
18 | foundation.
19 |                 THE WITNESS:  I don't recall.
20 | BY MR. CONNELLY:
21 |     *Q.*   Did you ever see anything other than page 34
22 | that's referred to as anything to suggest that the
23 | parents -- the grandparents were not adequate placement?
24 |                 MR. CROWN:  Objection to form and
25 | foundation.

 1              THE WITNESS:  Not that I can recall.

 2   BY MR. CONNELLY:

 3       Q.   And you see that the grandmother -- we saw that

 4   the grandmother has stated that -- she stated that she did

 5   not agree with all her daughter's decisions regarding the

 6   children, right?

 7       A.   Correct.

 8       Q.   And Tracy Reed says that in her conversation

 9   with the grandmother, she was adamant she would not align

10   or agree with how the parents were caring for the kids,

11   right?

12       A.   I see that.

13              MR. CROWN:  Objection to form and

14   foundation.

15   BY MR. CONNELLY:

16       Q.   And do you have any reason to disbelieve the

17   grandmother in her statement in that regard?

18              MR. CROWN:  Objection to form and

19   foundation.

20              THE WITNESS:  I mean, I -- this was from my

21   supervisor, so I wouldn't have any reason to doubt that.

22   BY MR. CONNELLY:

23       Q.   Right.  You wouldn't have any reason to doubt

24   what your supervisor is saying about what the grandmother

25   said, right?

1      A.   Right.

2      Q.   And do you accept what the grandmother said as

3  being about how the grandmother really felt and would act?

4              MR. CROWN:  Objection to form and

5  foundation.

6              THE WITNESS:  I don't know.  I never met

7  her.

8  BY MR. CONNELLY:

9      Q.   And you never followed up yourself with the

10  grandmother, right?

11     A.   Not -- from my recollection, I don't recall if I

12  did.

13     Q.   And did you ask Madison Bell to interview the

14  grandmother?

15     A.   I think the e-mail you just showed, I said she

16  needed to follow up with her.

17     Q.   And she followed up with her, and what did the

18  grandmother tell Madison Bell?

19              MR. CROWN:  Same objection to form and

20  foundation.

21              THE WITNESS:  I don't know if that's -- we

22  didn't have an e-mail from that.

23  BY MR. CONNELLY:

24     Q.   Yeah.  No, she said that the grandmother was

25  adamant that she didn't refuse the child food in the

1   hospital or that that didn't happen --

2       A.   Correct.

3       Q.   -- right?

4       A.   That's what it says.

5       Q.   So in September of 2019, what evidence did you

6   have that the grandparents were not appropriate placement?

7       A.   I don't recall.

8            MR. CROWN:  Objection to form and

9   foundation.

10           THE WITNESS:  I don't recall if we had

11  other information at that time.

12  BY MR. CONNELLY:

13      Q.   And if you -- if you did have other information,

14  would that be reflected in your reassessment in

15  Exhibit 20?

16      A.   For the grandparents?

17      Q.   Yeah.

18      A.   Typically not.  Because the FFA is for parents

19  and the kids, not for -- we would not include a

20  grandparent in there.

21      Q.   Well, so when you are doing a reassessment of

22  placement, don't you consider the placement preferences

23  that are laid out in the statute?

24      A.   We do.

25      Q.   And the first one is with the parents, right?

1    *A.*    Correct.

2    *Q.*    Second one is with --

3    *A.*    I believe the grandparent.

4    *Q.*    -- grandparents, right?

5    *A.*    Um-hum.  Correct.

6    *Q.*    So the grandparents are the second most favored

7    placement?

8    *A.*    Correct.

9    *Q.*    And so when you are doing an assessment of a

10   child who is in foster care, living with strangers, aren't

11   you assessing whether or not there is -- whether or not

12   they can be placed with a parent or a grandparent?

13                MR. CROWN:  Objection to form and

14   foundation.

15                THE WITNESS:  Sure.  But you also have to

16   look at the needs.  They were in a DDD foster home.  So we

17   would also have to make sure that Grandmother could meet

18   those needs.

19   BY MR. CONNELLY:

20   *Q.*    Do you agree with me -- I don't see anywhere in

21   here where you are making an assessment of placement with

22   the grandparents, right?

23   *A.*    We likely wouldn't put that in a FFA.  There is

24   not a spot in the FFA for assessment of grandparent.

25   *Q.*    Is there someplace else in the DCS child system

1   where you would make note of having reassessed placement

2   with the grandparents and determined that it was

3   inappropriate with the backup documentation?

4       A.   Well, we usually do background checks, then we

5   do a home study, and then if those are both favorable, we

6   potentially would do a TDM to discuss the children being

7   removed -- moved to that placement.

8       Q.   And so if we don't see a home study being done,

9   we can conclude from that that you did not reassess the

10  grandparents as placement in September of 2019, right?

11      A.   I don't recall if we did or not.

12      Q.   So when Tracy Reed says, "We need to continue to

13  reassess all family," what does that look like

14  practically, on the ground, for you and Madison Bell?

15  What do you need to be doing, continue -- continuously?

16      A.   Well, asking the parents if there is relatives

17  they want us to assess, doing background checks, and doing

18  home studies.

19      Q.   So if we don't see background checks for the

20  grandparents or home studies for the grandparents, then we

21  can assume you never reassessed the grandparents?

22              MR. CROWN:  Objection to form and

23  foundation.

24              THE WITNESS:  I -- I don't know if I have

25  it.  But I wouldn't say for 100 percent sure.  I just

 1  don't recall.

 2  BY MR. CONNELLY:

 3      Q.    And if we don't see anything in the record where

 4  you are reassessing the grandparents, then it is safe for

 5  us to conclude that you were continuing to not place the

 6  children with the grandparents because of the record --

 7  the note in the hospital records on page 34, right?

 8      A.    No.  And that's not the only way that kids can

 9  be placed with grandparents.  Parents are able to file

10  motions to move kids to relative placement through their

11  attorneys.

12      Q.    That's all well and good, but I am talking about

13  what your program manager is telling you to do in relation

14  to continuing to reassess all family and making sure that

15  you have fully assessed and not be so adamant that we

16  can't ever view them as placement again.

17      A.    Correct.

18      Q.    I want to see the evidence of you doing that in

19  the record.  Where am I going to find it?

20      A.    I don't know.

21      Q.    And if we don't find anything along those lines,

22  we can conclude you didn't do it, right?

23            MR. CROWN:  Objection to form and

24  foundation.

25            THE WITNESS:  Well, I believe this e-mail

1    from Tracy is to Madison.  So I would have to double-check

2    to see if any of that was done.  I don't recall.

3    BY MR. CONNELLY:

4        Q.    All right.  Well, look at Exhibit 25, then,

5    please.  Oh, are you there?

6        A.    I am.

7        Q.    Okay.  25 is another string of e-mails, and some

8    of the -- them are the ones we have already looked at.

9    And so everything leading up to the first page, we have

10   already seen.  Do you want to look at those to verify

11   that?

12       A.    I looked at them.

13       Q.    So everything, we have -- those pages, we have

14   already seen?

15       A.    Correct.

16       Q.    On the first page here, on May 30th, you write

17   to Madison.  After she tells you that they were

18   appropriate to engage in visitation but not placement, you

19   say to her:  Okay.  Please give me the documentation of

20   what you told Tracy so I can provide her with this

21   information.  Otherwise, we need to do the full home study

22   and background checks.

23              Do you see that?

24       A.    Correct.  I do.

25       Q.    And then Madison says:  Let me see if Sarah has

1  it written.  I requested Banner records back in March, and

2  I still haven't gotten them.

3             Do you know whether she ever got them?

4    A.    I don't recall if she did.

5    Q.    All right.  If we look at Exhibit 27.

6    A.    27?

7    Q.    Yeah.  Have you ever seen this before,

8  Declaration of Dottie Mann?

9    A.    I don't recall if I have seen this.

10   Q.    It's dated May 2 of 2020, so it's at a time when

11 you were on the case.

12             In any event, if you look at No. 6,

13 paragraph No. 6, she says:  I was never particularly happy

14 with the limitations imposed on the boys' food by their

15 mother.  We had many a conversation on the topic.

16 However, time and again, I would see reactions in the

17 boys.  Yes, I did see rashes, major and minor, and

18 puffiness around the eyes, et cetera.  With Kenan, it

19 seemed most particularly to be stomachaches,

20 sleeplessness, and feeling yucky.

21             And she talks about Dylan.  And then she

22 says -- so again, my question is just did you read this

23 document at the time, and if so, what did you do with it?

24   A.    I don't recall.

25   Q.    You don't recall seeing it?

1       *A.*   I don't recall seeing it.

2       *Q.*   And you don't recall if you took any action in

3   response to it, right?

4       *A.*   No.

5       *Q.*   Let me ask you to go to Exhibit 67, please.

6   Exhibit 67 is an August 4, 2020, report to the Court.

7               And you were involved in preparing this

8   report, right?

9       *A.*   I think that I -- I did not sign this one, if I

10  recall correctly.

11      *Q.*   Well, your name is on the last page.

12      *A.*   It is, but it is not signed.  I think this one

13  is signed by somebody else.  I think I was out of the

14  office at this time, for this one.

15      *Q.*   And you mean -- what do you mean, out of the

16  office?

17      *A.*   Like on vacation.

18      *Q.*   All right.  Well, you see that in Section III,

19  Roman numeral III (a) on page 3 of the report, it says:

20  The maternal grandparents were assessed as placement;

21  however, were denied due to not understanding the safety

22  concerns and allowing -- and aligning themselves with the

23  parents by refusing to provide food to K.K. when he was

24  hungry.

25              Do you see that?

1    A.   I do.

2    Q.   So this is the carryover of what we saw in those

3    string of e-mails, right, the note -- the hospital note

4    saying that Grandmother refused to provide him food in the

5    hospital, right?

6    A.   Correct.

7    Q.   So is there any documentation of the parents

8    being denied due to not understanding the safety concerns?

9              MR. CROWN:  Objection to form and

10   foundation.

11             THE WITNESS:  The grandparents?

12   BY MR. CONNELLY:

13   Q.   Yeah.

14   A.   They would have gotten a denial from Tracy.

15   Q.   My question to you is:  Is there any evidence in

16   the DCS record that you can point me to that I can go look

17   at which shows that the parents were denied due to not

18   understanding the safety concerns?

19             And you are saying there should be a letter

20   from Tracy Reed to the grandparents?

21   A.   Well, when they get denied, they get a denial

22   letter, so, yes.  Because my last e-mail that we looked

23   at, I had told Madison to do the home study and background

24   checks.  And then, this report, I was not in the office.

25   Q.   This -- do you agree with me that the language

 1  we are looking at in that section is typically cut and
 2  pasted from report to report?
 3      A.    I would say, no, it shouldn't necessarily be,
 4  unless it remains current.
 5      Q.    Unless it never changes, right?  Let me ask you
 6  this question:  If this -- if this same language
 7  appeared -- well, it does appear.  If you look at
 8  Exhibit 60 --
 9              (Off the record.)
10  BY MR. CONNELLY:
11      Q.    Can you go to Exhibit 63 in the binder that you
12  have, and can you go to Section 3(a).  Here you go.
13              Oh, there is no Section 3(a)?
14              MR. CROWN:  No, there's not.
15  BY MR. CONNELLY:
16      Q.    Okay.  So if you go to -- let's mark Exhibit 76.
17              (Deposition Exhibit No. 76 was marked for
18  identification by the reporter.)
19  BY MR. CONNELLY:
20      Q.    And you were involved in preparing this report,
21  right?
22      A.    No.
23      Q.    You weren't?
24      A.    This is an investigation report.
25      Q.    Okay.  You reviewed this report when you took

1    over the case, right?

2        *A.*    Yes.

3        *Q.*    And you see that in Section 3(a) on page 13, as

4    to extended family members, Sarah Kramer writes:  There

5    are no identified family members who are willing or able

6    to care for the children at this time.

7                   That's not true, right, because the

8    maternal grandmother was willing?

9                   MR. CROWN:  Objection to form and

10   foundation.

11   BY MR. CONNELLY:

12       *Q.*    She goes on and says:  The maternal grandmother,

13   Dorothy Mann, is involved with caring for the children

14   frequently and has a significant relationship with the

15   children.  Ms. Mann is aware of the diet the children are

16   on but has not intervened.  On 12/23/18, Ms. Mann was in

17   K.K. hospital room when he stated several times how hungry

18   he was.  Ms. Mann refused to feed him and told him he had

19   to wait.  The Department has denied Ms. Mann as a kinship

20   placement.

21                   Do you see that?

22       *A.*    I do.

23       *Q.*    And then we saw the appeal, right, from Dorothy

24   Mann where she says that she didn't agree with all the

25   decisions of her daughter and that she wants to do what is

 1  in the children's best interests?  And we saw the string

 2  of e-mails where she denied that she refused the child

 3  food in the hospital, right?

 4      A.    Where Madison said when she talked to her, yes.

 5      Q.    When both Madison and Tracy Reed talked to

 6  her --

 7      A.    Correct.

 8      Q.    -- she was adamant that what was reported by the

 9  hospital didn't happen, right?

10      A.    (No audible response.)

11      Q.    Yes?

12      A.    I don't know if Tracy's e-mail says that,

13  but ...

14      Q.    Tracy's e-mail said that she was adamant that

15  that did not happen.  Both of them said that.

16              (Off the record.)

17  BY MR. CONNELLY:

18      Q.    So then let's look at December.  Exhibit 64,

19  please.

20              MR. CROWN:  December the 6th.

21  BY MR. CONNELLY:

22      Q.    All right.  Exhibit 64.  You are there, right?

23      A.    Yeah.

24      Q.    So first of all, let's look at the second page,

25  the second full paragraph.  Are you there, second page,

1  second full paragraph?

2      A.   Yes.

3      Q.   You see on the fourth line down, there's a

4  sentence that says:  He is getting an average of

5  500 calories a day at home.

6              Do you see that?

7      A.   I do.

8      Q.   We talked about that before.  And then you

9  pointed out to me that the mother's statement about

10 getting 2,100 calories a day was included in that document

11 we were looking at before, which was a -- which was the

12 preliminary report to the Court, right?

13     A.   Correct.

14     Q.   Can you show me where in here that information

15 is carried over and reported to the Court so the Court is

16 fully apprised of the parents' dispute of that fact?

17     A.   It's not in this one.

18     Q.   It's not in this one?  So it was deliberately

19 taken out by you or Madison Bell, right?

20     A.   The section --

21              MR. CROWN:  Objection to form and

22 foundation.

23              THE WITNESS:  The section that it is in

24 that preliminary report is not in that report.  It is a

25 different section.

1   BY MR. CONNELLY:

2       Q.   But you do have a duty to be fair and unbiased

3   in your reports to the Court, right?

4       A.   And they were.

5       Q.   You have a duty to inform the Court about

6   information that not only supports the allegations of

7   neglect but that refutes the allegations, right?

8       A.   Correct.

9       Q.   One of the allegations is that the children were

10  malnourished, right?

11      A.   Correct.

12      Q.   And you are saying to the Court that -- by

13  including this information, you are saying that the child

14  was malnourished because he was only getting 500 calories

15  a day at home, right?

16              MR. CROWN:  Objection.  Form and

17  foundation.

18              THE WITNESS:  And the Court already had the

19  preliminary report, so they saw what the parents -- their

20  dispute on that report.

21  BY MR. CONNELLY:

22      Q.   They also saw this paragraph that you cut and

23  pasted and left in this report?

24      A.   Right.  But there was additional information.

25      Q.   This is all cut and pasted.  It is the same

1    information that was in the preliminary report.  At least,
2    this paragraph is the same.  So why wouldn't you --
3        A.    Well, not all of it is the same.  The part in
4    the preliminary report is the parents' response to the
5    allegations, which is not a section in a progress --
6    permanency report.
7        Q.    That shouldn't mean that the Court shouldn't be
8    informed of information that refutes the allegation,
9    right?
10       A.    They were informed in the first court report on
11   January 8th.
12       Q.    So it is okay to take it out of the subsequent
13   reports and not continue to remind the Court that there is
14   information that refutes the allegation of neglect?
15       A.    I believe --
16              MR. CROWN:  Objection to form and
17   foundation.
18              THE WITNESS:  I believe that the Court
19   would review the first court report --
20   BY MR. CONNELLY:
21       Q.    You think that every --
22       A.    -- in every section.  Because the section is not
23   in this report, so it wouldn't fit in the section that you
24   are referring to.
25       Q.    And so there's no obligation for the Department,

 1    when it is the telling the Court the reason for DCS

 2    involvement, to say to the Court:  This is what we allege,

 3    but the parents have refuted this allegation?

 4         *A.*    That would have been their chance, at a

 5    dependency trial, to refute an allegation in the initial

 6    dependency report, which they did not do.

 7         *Q.*    So you don't consider it to be judicial

 8    deception to take out the information where the parents

 9    are saying the children were getting 2,100 calories a day?

10         *A.*    No.  Because that was in the first report.

11         *Q.*    And in a case that is two years long, you are

12    expecting the Court is going to recall all the information

13    that was provided to it in a preliminary report?

14              MR. CROWN:  Objection to form.

15              THE WITNESS:  I am expected to recall it

16    five years after having a report.  So I would say, yes,

17    they are responsible to read everything that comes across

18    their desk.

19    BY MR. CONNELLY:

20         *Q.*    And likewise for you, right?

21         *A.*    Yes.

22         *Q.*    So getting to Section 3(a), this is the first

23    time where it is reported that the grandparents were

24    assessed as placement, however, were denied due to not

25    understanding the safety concerns and aligning themselves

```
 1   with the parents by refusing to provide food to K.K. when
 2   he was hungry, right?
 3       A.    Correct.
 4       Q.    And so the only assessment was that done by
 5   Madison Bell, where she asked Sarah Kramer to provide her
 6   with the evidence of -- or the record where Grandmother
 7   was reported as refusing the child food, right?
 8       A.    Well, she was once denied by Sarah in
 9   investigations.
10       Q.    And she appealed?
11       A.    And she appealed.  And then she was again denied
12   in October/November by Tracy.
13       Q.    Okay.  And you are --
14       A.    That's just from those e-mails that we looked
15   at.
16                  (Recess ensued from 5:48 p.m. until
17   5:50 p.m.)
18   BY MR. CONNELLY:
19       Q.    So do you know for a fact that Tracy Reed sent a
20   letter of denial to the parents -- to the grandparents?
21                  MR. CROWN:  Objection to form and
22   foundation.
23   BY MR. CONNELLY:
24       Q.    So in March of 2019, Sarah Kramer sends a
25   notification of being denied to the grandparents because
```

1   of what she reported to the Court in Exhibit 76, that --

2   on page 13, I believe it was, right, yeah -- that she knew

3   about the diet and didn't intervene and that she was in

4   the hospital room and refused the child food.

5              And then Dorothy Mann appeals in May, which

6   we have seen, and she was -- she said she was immediately

7   denied, and then she appealed to Madison Bell and then she

8   was denied again.  She contacted Ms. Reed, and then we

9   don't see any other letters going to Ms. Mann.

10             So as you are sitting here today, do you

11  have a recollection that Tracy Reed sent a letter of

12  denial?

13       A.    She would have had to because we don't send

14  appeals, that comes from the PM.  So Tracy would have sent

15  a denial for the appeal.  That would have been her role.

16  So the grandmother can't appeal to a case manager or a

17  supervisor.

18       Q.    So I guess my question is in January -- or

19  excuse me, in December of 2019, the case report we were

20  just looking at -- or excuse me -- yeah, the report to the

21  Court we were just looking at is the first time we see

22  language that is in these later reports appears where it

23  says that the grandparents were denied due to not

24  understanding the safety concerns.

25             Is that another way of saying that the

1  grandmother knew the child was on the GAPS diet and didn't
2  intervene?
3              MR. CROWN:  Objection to form and
4  foundation.
5              THE WITNESS:  Where are you reading?
6  BY MR. CONNELLY:
7      Q.   I am reading in Exhibit 64 on page 4, 3(a),
8  where it says:  Maternal grandparents were assessed as
9  placement, however, were denied due to not understanding
10 the safety concerns in aligning themselves with the
11 parents by refusing to provide food to K.K. when he was
12 hungry.
13             So there are two things here:  Not
14 understanding safety concerns and aligning themselves with
15 the parents by refusing food when he was hungry in the
16 hospital.
17             I am asking -- and so far the only thing we
18 have seen is a letter from Sarah Kramer denying because
19 the grandmother knew that the boys were on the diet and
20 didn't intervene and because she was observed and reported
21 to be observed in the hospital refusing the boy food.
22             We have not seen any other denial letters.
23 We have seen the e-mail traffic back and forth between you
24 and Tracy and Madison and Sarah regarding the
25 grandmother's appeal in May 2019.

1           So it seems to me -- and there's no home

2    study, and there's no background check.  So there was no

3    assessment of the grandparents prior to May of 2019 or

4    after May of 2019, no assessment other than what Sarah

5    Kramer did.  Sarah Kramer, we don't see a background check

6    from her or home study from her.  We just see what she

7    says to the Court in the report we looked at.

8           And then for the first time in December of

9    2019, you and Madison Bell are addressing the topic to the

10   Court.  And as far as I can gather, when you say the

11   maternal grandparents were assessed as placement, you are

12   referring to the assessment that Sarah Kramer did and you

13   are saying that they were denied due to not understanding

14   the safety concerns.

15          And I am asking:  Is the statement that

16   they were denied due to not understanding the safety

17   concerns a rewording of Sarah Kramer saying that the

18   grandparents knew about the diet and did not intervene?

19          MR. CROWN:  Objection to form and

20   foundation.

21          THE WITNESS:  I don't believe that this is

22   a rewording.

23   BY MR. CONNELLY:

24   *Q.*   So then the part where it says "denied due to

25   not understanding the safety concerns," what's the

1  evidence of that and what's it referring to?

2      A.    Potentially the appeal from Tracy, when Tracy

3  again denied her in October of 2019.

4      Q.    And what were the safety concerns that the

5  grandparents did not understand?

6      A.    From what I recall, the concerns with Mom taking

7  the children to providers that are not, like, licensed,

8  putting them on a diet that was restricting them.

9      Q.    And so this is all in reference to the GAPS

10  diet?

11      A.    I mean, I don't know if there were other

12  conversations with Grandma that -- or another -- I don't

13  know if home study was done or if background checks were

14  done.

15      Q.    And if they were done, you agree with me that

16  they would be in the record and they would have been

17  produced to us in this case, right?

18                MR. CROWN:  Objection to form and

19  foundation.

20                THE WITNESS:  I would say yes.

21                MR. CONNELLY:  Okay.  And so make a note,

22  Larry, I am going to ask you to produce any background

23  checks or home studies done on the grandparents.  I am

24  going to ask you to produce any letters from Tracy Reed or

25  anyone else denying the grandparents' appeal to be

1   placement for the boys.

2   BY MR. CONNELLY:

3       Q.   And if we were to take the time to go through

4   all of the reports that you and Madison Bell authored

5   following this December 2019 report, we will see that same

6   language is in that Section 3(a), it never changes.

7               For instance, if you look at one of the

8   last reports to the Court is Exhibit 67, the August 4,

9   2020, report, and if you go look at page 3, you agree with

10  me that the first paragraph of Section 3(a) in the

11  August 4, 2020, report is exactly the same as the

12  paragraph -- the first paragraph in Section 3(a) of the

13  December 6, 2019, report, right?

14      A.   Correct.  But I did not sign the August 2020

15  report.

16      Q.   I understand you didn't sign it.

17      A.   Right.

18      Q.   But your name is on it and it was provided to

19  the Court, right?

20      A.   Not with my signature.

21      Q.   Not with your signature, but with your name?

22      A.   Because that's how it prints out.

23      Q.   And if we are going to be that way about it,

24  then Exhibit 64 doesn't have your signature on it either,

25  does it?

1    *A.*   But I know I was in town at that time.

2    *Q.*   But it doesn't have your signature on it, does

3    it?

4             MR. CROWN:  Just because your copy that you

5    marked doesn't have a signature -- there is a signed

6    version, you just have not shown it to her.

7             Can we move it on, Tom?  You were supposed

8    to pass the witness already.  Are you going to do that

9    soon?  Are you going to keep to your promise?

10             MR. CONNELLY:  I have already broken my

11   promise.

12             MR. CROWN:  You sure have.

13             MR. CONNELLY:  I sure have.

14   BY MR. CONNELLY:

15    *Q.*   And you said that you saw Dr. Newberger's report

16   when it was sent around, right?  Correct?

17    *A.*   Correct.

18    *Q.*   And there are no court reports that you make

19   where you cut and paste any of the language from

20   Dr. Newberger's report and present it to the Court, right?

21    *A.*   Correct.

22    *Q.*   You were asked by Father several times after he

23   was given custody of the boys to pay, like, his electric

24   bill or his Southwest Gas bill and some other -- to give

25   him money to pay for rent and everything too, right?

1                    Do you remember that?

2        A.    I mean, we do have services that do stipends for

3    parents and we do have housing subsidies.  So it wouldn't

4    be out of the norm.

5        Q.    And you approved those requests to the father

6    for financial assistance, right?

7        A.    If he did get them, I am just one part of the

8    approval process.

9        Q.    But you are part of the approval process, you

10   are one step in the process, right?

11       A.    Correct.

12       Q.    And at your step, you approved it, right?

13       A.    If he did receive them.  I don't recall what he

14   received.

15       Q.    Whether he received or not is a different

16   question of whether you approved the request.

17             You approved the request at your level,

18   right?

19       A.    If he got them.  I do not recall if he got them.

20       Q.    I am not asking if he --

21       A.    If he would have got them --

22       Q.    -- actually got them.  I am asking, when he

23   requested them, at your level of approval, you approved

24   the request, yes?

25       A.    I approve -- I approve for -- it doesn't come

1   from us.  The housing subsidy comes from us; we have
2   contractor providers that do stipends for parents.  So if
3   he was involved in one of those services, then, yes, he
4   would have got a stipend.
5       Q.   Whatever approval was needed from you in that
6   process, you gave it, right?
7       A.   If he got them.  I don't recall if he got them.
8       Q.   I think we are having a misunderstanding about
9   the question but --
10      A.   I understand the question.
11      Q.   Then why aren't you answering it?
12      A.   I did.
13              MR. CROWN:  She is.
14              MR. CONNELLY:  She is answering --
15              MR. CROWN:  Let's not debate it.  Ask the
16  question, she will answer it, we are going to move on.
17              MR. CONNELLY:  She is not answering the
18  question.
19  BY MR. CONNELLY:
20      Q.   Next question is:  There was a time when it was
21  decided to move for severance of Mother's parental rights,
22  right?
23      A.   It was requested.
24      Q.   And what role did you play in -- was there a
25  staffing, then, in relation to severance?

1    A.    We have to staff all severances with the

2    Attorney General.

3    Q.    And --

4    A.    And we --

5    Q.    I'm sorry.

6    A.    No.  If we -- we have to staff to see if we have

7    grounds to request a change of case plan.

8    Q.    And before you go to the Attorney General, was

9    there a staffing just internal in DCS?

10   A.    No.

11   Q.    Were you part of the staffing with the Attorney

12   General?

13   A.    I believe so.

14   Q.    And what were the reasons that severance was

15   being requested?

16   A.    I don't recall the grounds that we came up with.

17   Q.    Did you agree with their -- the decision to

18   request severance?

19   A.    Yes.

20   Q.    And why did you agree with the decision to

21   request severance?

22   A.    Because at that time we had been involved for a

23   significant period of time and no significant progress had

24   been made by Mother.

25   Q.    And the -- the time we're talking about is -- is

1   it August that you make that request -- no.  So it's May

2   or -- if you look at Exhibit 66, this is the April 27,

3   2020, report to the Court, right?

4        A.   Yes.

5        Q.   And you were involved in submitting -- preparing

6   and submitting this report to the Court, right?

7        A.   Yes.

8        Q.   And if we look at near the end on page 22, the

9   recommended -- Section 7(c), the recommended permanency

10  goal is severance and adoption in regards to Mother only,

11  right?

12       A.   Correct.

13       Q.   So at this time, Mother has been in services for

14  over a year, since March of 2019, right?

15       A.   Correct.

16       Q.   She has had two therapists who say that she has

17  met the therapy goals, right?

18       A.   I don't recall Dr. Korsten's goals to say if she

19  had met that.

20       Q.   I can show you letters from Dr. Korsten if you

21  need me to refresh your recollection.  But Dr. Korsten

22  said that she's met her therapy goals, and Dr. Rodriguez,

23  we saw, said that she met her therapy goals, right?

24       A.   I don't think she said she met them.

25       Q.   Okay.  We are not going to have that debate

 1   again.

 2        *A.*   Okay.

 3        *Q.*   Do you recall, Dr. Oakley had assessed Mother

 4   for the second time in February of 2020 at the

 5   Department's request, right?

 6        *A.*   Yes.

 7        *Q.*   And again, Dr. Oakley did not make any mental

 8   health diagnoses for Mother.  Do you remember that?

 9        *A.*   I don't recall that.

10        *Q.*   Do you recall Dr. Oakley saying that

11   Ms. Kahraman has demonstrated that she is capable of

12   seeking services for the children and getting them the

13   support they need?

14        *A.*   Can you tell me what exhibit that is?

15        *Q.*   It is Exhibit 54.

16             That's not in there?  54 is not in there?

17        *A.*   No.

18             MR. CONNELLY:  Do you have a copy, Larry?

19             MR. CROWN:  I do.

20             MR. CONNELLY:  Would you please let her use

21   it?

22             MR. CROWN:  Tom, how much longer?  We are

23   finishing tonight, by the way.  This is not going into

24   another day.  And I told you I have questions.  So we are

25   finishing.

```
 1                    MR. CONNELLY:  I never said we're not.
 2                    MR. CROWN:  Okay.  But I know our court
 3  reporter may have a different view, and -- I am asking
 4  you:  When are you going to be passing the witness?
 5                    MR. CONNELLY:  Well, we are getting there,
 6  and very quickly.
 7  BY MR. CONNELLY:
 8      Q.   I want to talk about severance.  So we are going
 9  to talk about severance.
10                    And so Dr. Oakley evaluated Ms. Kahraman in
11  February at the Department's request a second time, right?
12      A.   Yes.
13      Q.   And Dr. Oakley doesn't identify any reasons that
14  the mother is not a caring and capable parent, does she?
15                    MR. CROWN:  Objection to form and
16  foundation.
17                    THE WITNESS:  Well, it says that she could
18  benefit from continuing counseling, additional insight,
19  and support to remind her to stick with the changes.
20  BY MR. CONNELLY:
21      Q.   And is any of that a reason to seek severance of
22  her parental rights?
23      A.   To seek severance?
24      Q.   Yeah.
25                    MR. CROWN:  Objection to form and
```

 1    foundation.

 2                    THE WITNESS:  I mean, when we staffed it,

 3    we felt that we had grounds.

 4    BY MR. CONNELLY:

 5        Q.    Pardon me?

 6        A.    When we staffed it, we felt that we had grounds,

 7    and the Court ultimately denied us changing the case plan.

 8        Q.    And thank god the Court did that.  But I want to

 9    know:  What was the basis?

10                    What were your grounds in the light of the

11    two -- the two therapists that you engaged for Mother,

12    Ph.D.-level therapists, both saying that she is a capable

13    parent and has met her treatment goals; in light of

14    Dr. Oakley saying that Ms. Kahraman has been able to be

15    more accepting of the medical evidence that contradicts

16    her previous beliefs; of Dr. Oakley saying while various

17    parties have expressed concern that Ms. Kahraman will

18    return to a strict diet for the boys if they are placed in

19    her care, she described that she will feed them a mostly

20    healthy balanced diet with occasional snacks and treats,

21    which is appropriate, she stated that she now recognizes

22    the value of more traditional medical care, she added that

23    she can be more accepting of medical providers' opinions,

24    rather than feeling as though she has to be a

25    collaborator; in light of Dr. Oakley saying that she

1   appears to be more accepting of medical evidence and her

2   role in the children's health problems at this time; in

3   light of Dr. Oakley saying Ms. Kahraman has demonstrated

4   that she is capable of seeking services for the children

5   and getting them the support they need; in light of

6   Dr. Oakley saying that Ms. Kahraman has acknowledged that

7   malnutrition from their diet was mostly responsible; in

8   light of Dr. Oakley saying that Ms. Kahraman has likely

9   demonstrated as much as possible, given the current

10  limitations of her interactions with the children,

11  Dr. Oakley also said that the next step may include having

12  her more -- her having more flexibility in her

13  interactions with the children, particularly as it relates

14  to food and her focus on their physical health; in light

15  of Dr. Oakley saying loosening the restrictions related to

16  her interactions with the children will help her better

17  demonstrate if she is able to make ongoing measurable

18  changes and that a psychiatric evaluation does not seem

19  warranted; in light of all of that and the mother

20  providing the boys with the broad and varied diet to the

21  limit she was allowed to do so; in light of Mother

22  presenting to the Department and her therapist written

23  coping skills and how she would react and handle the

24  situation if the boys had a reaction to food or if they

25  had some medical emergency or issue that arose such as a

1    focal seizure?

2              What were the grounds in April of 2020 for

3    seeking severance of her parental rights?

4         A.   I don't recall what the grounds were.

5         Q.   Was there any professional or any expert that

6    the Department engaged in this entire dependency matter

7    that agreed that the mother's parental rights should be

8    severed?

9         A.   We don't consult experts for that.

10        Q.   If you look at Exhibit 62 on page 65, there's a

11   note that starts on page 65, at the bottom of it, about a

12   staffing between Madison and Father, right, and it carries

13   over to the next page, right?

14        A.   She did a walk-through of his house.

15        Q.   And the note says it is a staffing, right?  Do

16   you see where I am talking about, at the bottom of page 65

17   of 110, event date, 3/17/2020; note type, staffing with

18   Madison Bell and Ahmet Kahraman?

19        A.   I don't see "staffing."  I am on -- 65 of 110?

20        Q.   Yeah.  "Note type, staffing."

21        A.   Oh.  I do see that.

22        Q.   And it carries over to the next page and she

23   says she met him in his home to discuss the case, right,

24   as well as to do a walk-through, right?

25        A.   Correct.  Likely, it should have said "parent

 1  contact."

 2      Q.   Nevertheless.

 3      A.   Yeah.

 4      Q.   At the bottom of this big, long paragraph, the

 5  last two lines, you see where it says:  Father is in

 6  agreement with continuing a case plan of family

 7  reunification for himself.

 8           Right?

 9      A.   Okay.

10      Q.   Do you see that?

11      A.   I do.

12      Q.   And then it says:  But would like to have a case

13  plan of severance and adoption for Ms. Kahraman.

14           Do you see that?

15      A.   I do.

16      Q.   And this was about a month or so before you

17  submitted the court report in April of -- April 27, 2020,

18  right?  So were you asking for severance because that was

19  part of Father's desire and his safety plan for the boys?

20           MR. CROWN:  Objection to form and

21  foundation.

22           THE WITNESS:  No.

23  BY MR. CONNELLY:

24      Q.   And as you are sitting here today, you cannot

25  articulate to me the basis for such a major request from a

```
 1   court?
 2        A.    I believe that's when we staffed with our
 3   Attorney General, and that would be for them to present
 4   the grounds.
 5        Q.    It would be for them to present the grounds to
 6   the Court because they are the ones that stand up and say,
 7   "We are asking for severance," but why was the
 8   Department -- the Department has to go to the AG and say,
 9   "We want to sever," right?
10        A.    We would go and say, like, "We want to staff the
11   case."
12        Q.    For severance?
13        A.    "To see if we have grounds for severance."
14        Q.    Right.  So before you even go to the AG, you put
15   together what you believe are the grounds that support
16   severance of the parental rights, right?
17        A.    No.  The attorney identifies the grounds.  We
18   don't -- we are not attorneys.
19        Q.    I know you're not attorneys.
20        A.    The attorneys identify the grounds.
21        Q.    You have to -- is the only reason you were
22   asking for termination of parental rights was because of
23   the time in care, because it was more than 15 months in
24   care?
25        A.    That is only one ground.  Typically, you need
```

 1   two.

 2        Q.   So what was the other -- what was the other

 3   basis?

 4        A.   It could have been failure to protect.  I don't

 5   recall.  Because we didn't get that far because the judge

 6   denied it.

 7        Q.   But you had to have something that you were

 8   presenting that you were -- okay.

 9        A.   When we go to court, we ask to change the case

10   plan.  The Court doesn't ask, "What are your grounds?"

11        Q.   I am not concerned with what happened in court.

12        A.   Okay.

13        Q.   I want to know what the thinking was in the

14   Department about why we want to sever this woman's

15   parental rights?

16        A.   That there are failed -- a lack of progress.

17   There is not behavior changes.  There's discrepancies in

18   her therapy.  There's discrepancies in the therapeutic

19   visits.

20        Q.   And those discrepancies being what?

21        A.   Not giving the therapist full and accurate

22   information of what is going on with her.

23        Q.   Because she didn't tell the therapist that she

24   was wanting to get a divorce before the father filed for

25   divorce himself, right?

1    *A.*    She was presenting it as if their relationship
2  was good and going great.  So that's being deceitful to
3  your therapist.

4    *Q.*    And so that's a grounds for severing parental
5  rights?

6    *A.*    It's a ground for her not making progress in her
7  therapy.

8    *Q.*    But the therapist ultimately said she has met
9  all her treatment goals and she should be discharged from
10  therapy.

11              MR. CROWN:  Objection to form and
12  foundation.

13              THE WITNESS:  But the therapist didn't even
14  have full and accurate information disclosed by Mother.

15  BY MR. CONNELLY:

16    *Q.*    Okay.

17    *A.*    And that's why we have court oversight.

18    *Q.*    Thank God.

19              MR. CROWN:  Move to strike the last
20  statement.

21  BY MR. CONNELLY:

22    *Q.*    Are you aware of the ACCEPTS model for therapy?

23    *A.*    I have not heard the acronym in a while, so ...

24    *Q.*    Were you aware that the ACCEPTS model was what
25  Southwest Human Development was evaluating Mother based

1   on?

2       A.    That's part of their program, yes.

3       Q.    But they are not mental health providers, are

4   they?

5       A.    I believe a lot of the providers were, and the

6   person that oversaw that program was a medical provider or

7   a licensed --

8       Q.    You are talking about Drew Kaplan?

9       A.    Drew Kaplan, and I think there was another lady

10  also involved, Suzanne.

11      Q.    But all they are doing, Southwest Human

12  Development, is facilitating therapeutic visits, right?

13      A.    Correct.

14      Q.    They're not providing therapy to the mother,

15  right?

16      A.    Not therapy, no.

17      Q.    And they are not assessing her for a mental

18  health disorder, right?

19      A.    That's not their role.  No.

20      Q.    That's not their role.

21            Then why are they using a model of therapy

22  that is used be with people who have been diagnosed with

23  Munchausen to assess whether Mother is making progress in

24  therapeutic visits?

25      A.    That's their program.  I don't know.

1    Q.   Okay.  Take a look at Exhibit 33.  This is

2  Father -- it starts out with Father asking for a

3  recommendation or a verification letter from the

4  Department to help his mother through U.S. immigration to

5  help him parent the child that you were -- children that

6  you were putting in his custody.

7              And Madison, on September 1st, asks you if

8  this is something she can do.  And then you say that you

9  don't think the Department should get involved, it could

10  be seen as being biased because Mother's case is still

11  ongoing.

12              Do you see that?

13    A.   I do.

14    Q.   And then Tracy Reed asks what the paternal

15  grandmother's involvement is, and you say that the kids

16  were returned to Dad and she is coming to help him with

17  the transition, right?

18    A.   Correct.

19    Q.   And then you follow that up.  And we are in

20  September of 2020 now, the case has been in DCS since

21  December of 2018, and you are still calling this a

22  factitious case that is highly contested, right?

23    A.   I did say that -- or write that.

24    Q.   And this is language that you have used

25  consistently from early in your involvement in the case,

 1 | right?
 2 |            MR. CROWN:  Objection to form and
 3 | foundation.
 4 |            THE WITNESS:  Between myself and the
 5 | Department, not anything disclosed to the Court or
 6 | disclosed to anybody that did an evaluation.
 7 | BY MR. CONNELLY:
 8 |     Q.   Right.  Inside the Department, you are looking
 9 | at this case as a factitious disorder case?
10 |     A.   That's not what I said.
11 |     Q.   What is the sentence you wrote on September 1,
12 | 2020, at 8:26 a.m.?
13 |     A.   I think that was just a quick e-mail back and --
14 |     Q.   What did you write?
15 |     A.   You just read what I wrote.
16 |     Q.   I want you to read it.
17 |     A.   "This is a factitious case and highly
18 | contested."
19 |     Q.   Right.  You wrote those words, right?
20 |     A.   It says my e-mail.
21 |     Q.   You could have wrote, "This is a medical neglect
22 | case and is highly contested," right?
23 |     A.   I could have.
24 |     Q.   But you wrote that "This is a factitious case,"
25 | right?

```
 1                    THE WITNESS:  Yes.
 2                    MR. CONNELLY:  I don't have any other
 3    questions.
 4                    MR. CROWN:  Let's take a short break.
 5                    (Recess ensued from 6:25 p.m. until
 6    6:38 p.m.)
 7
 8                         EXAMINATION
 9    BY MR. CROWN:
10         Q.   Mecca, you joined DCS in 2007?
11         A.   Yes.
12         Q.   And what was your position at that time?
13         A.   Ongoing case manager.
14         Q.   And as an ongoing case manager, did you do the
15    type of work that once there had been a DCS
16    investigator -- or at that time it might have been called
17    CPS -- when there was already the removal, that was done
18    by the investigation team, correct?
19         A.   True.
20         Q.   And then a dependency petition would be filed,
21    and it is the job of the ongoing case manager to then work
22    the case during the pendency of the juvenile court
23    proceedings, correct?
24         A.   Correct.
25         Q.   Did you do case planning as an ongoing case
```

1    manager?

2        *A.*    Yes.

3        *Q.*    Did you do family reunification type work?

4        *A.*    Yes.

5        *Q.*    Did you -- were you involved with services being

6    provided?

7        *A.*    Yes.

8        *Q.*    And when necessary, was there -- did you work

9    with alternatives if there was not going to be family

10   reunification?

11       *A.*    Yes.

12       *Q.*    You were involved in preparing reports to the

13   Court from DCS?

14       *A.*    Correct.

15       *Q.*    And as you told us, you testified in court in

16   many dependency cases, correct?

17       *A.*    Correct.

18       *Q.*    In 2015, you were promoted to ongoing case

19   supervisor?

20       *A.*    Yes.

21       *Q.*    And you have been and currently are an ongoing

22   case supervisor with DCS?

23       *A.*    Yes.

24       *Q.*    In addition to DCS's involvement with a case

25   such as this, are there other independent Court-appointed

1   parties and individuals that are also working with the

2   Court in the best interest of the children?

3       A.    Yes.

4       Q.    Is one such person a CASA?

5       A.    Yes.

6       Q.    What is the role of the CASA?

7               MR. CONNELLY:  Form and foundation.

8               THE WITNESS:  They are Court-Appointed

9   Special Advocates.  They are designed to meet and advocate

10  for the kids.  They are able to meet with the parents,

11  review records.

12  BY MR. CROWN:

13      Q.    And do they prepare reports that are filed with

14  the Court?

15      A.    They do.

16      Q.    And are those reports prepared by them

17  independent of DCS?

18      A.    Yes.

19      Q.    Is there the involvement of the Court-appointed

20  foster care review board?

21      A.    Yes.

22      Q.    What is the role of the foster care review

23  board?

24      A.    They do a review of the case generally every

25  six months and then provide a report to the Court.

1    Q.    And are they independent of DCS?

2    A.    Yes.

3    Q.    Is there guardian ad litems appointed for the

4  children?

5    A.    Yes.

6    Q.    And as we will see in this case, a guardian ad

7  litem was appointed for Dylan and Kenan, correct?

8    A.    Yes.

9    Q.    What is the role of the guardian ad litem?

10              MR. CONNELLY:  Form and foundation.

11              THE WITNESS:  They advocate for the best

12  interest of the child -- of the children.

13  BY MR. CROWN:

14    Q.    Do they file reports and pleadings with the

15  Court?

16    A.    Yes.

17    Q.    And you mentioned the involvement of the

18  Attorney General.  What is the role of the Attorney

19  General, in the state of Arizona, in a juvenile dependency

20  proceeding?

21              MR. CONNELLY:  Form and foundation.

22              THE WITNESS:  They represent the Department

23  of Child Safety.

24  BY MR. CROWN:

25    Q.    And then in a case such as this, the parents

```
 1   have their attorneys?
 2        A.    Yes.
 3        Q.    And particularly here, there was a mother and a
 4   father, and they each had attorneys of their own, correct?
 5        A.    Yes.
 6        Q.    And how about Southwest Human Development, what
 7   was their role?
 8        A.    To provide the therapeutic visitation.
 9        Q.    And they are independent of DCS?
10              MR. CONNELLY:  Form and foundation.
11              THE WITNESS:  Yes.
12   BY MR. CROWN:
13        Q.    And then also in a case such as this, there were
14   doctors and nurse practitioners at the Cardon Children's
15   hospital that notified DCS that they suspected medical
16   neglect or potentially medical abuse, correct?
17              MR. CONNELLY:  Form and foundation.
18              THE WITNESS:  Correct.
19   BY MR. CROWN:
20        Q.    And they assembled, based on their findings and
21   opinions, a SCAN team, correct?
22        A.    Correct.
23        Q.    Do you know what a SCAN team is?
24        A.    I do.
25        Q.    And so was -- did DCS's involvement begin with
```

 1   phone calls from these specialists in providing child
 2   healthcare in the setting of the children's hospital?
 3                   MR. CONNELLY:  Form and foundation.
 4                   THE WITNESS:  To the hotline.
 5   BY MR. CROWN:
 6       Q.   And then once they call DCS, and DCS assigns an
 7   investigator --
 8       A.   Correct.
 9       Q.   -- that precedes your involvement, correct?
10       A.   Correct.
11       Q.   And then at some point, we know that the Court
12   ordered that a doctor be selected by Phoenix Children's
13   Hospital to assess whether the children needed additional
14   mold testing, correct?
15       A.   Correct.
16       Q.   And again, were the doctors at Cardon Children's
17   hospital independent of DCS?
18       A.   They are.
19       Q.   And were -- the doctor that was also involved at
20   Phoenix Children's Hospital independent of DCS?
21                   MR. CONNELLY:  Form and foundation.
22                   THE WITNESS:  Yes.
23   BY MR. CROWN:
24       Q.   And during these proceedings, as we are going to
25   go through, there were multiple evidentiary hearings,

1  correct?

2      *A.*    Correct.

3      *Q.*    And they were conducted in the juvenile court,

4  presided over by juvenile court judges?

5      *A.*    Correct.

6      *Q.*    And there was expert witnesses that were

7  appointed by the Court that presented reports to the Court

8  and also testified, correct?

9                    MR. CONNELLY:  Form and --

10                   THE WITNESS:  Correct.

11                   MR. CONNELLY:  -- foundation.

12                   (Reporter clarification.)

13                   MR. CONNELLY:  Can you just, after he asks

14  a question --

15                   THE WITNESS:  Yes.

16                   MR. CONNELLY:  -- pause for just a second.

17  BY MR. CROWN:

18      *Q.*    And there was also independent -- as we know in

19  the plaintiff's case, independently retained experts,

20  correct?

21                   MR. CONNELLY:  Form and foundation.

22                   THE WITNESS:  Correct.

23  BY MR. CROWN:

24      *Q.*    And they provided reports and testified to the

25  Court, correct?

1          MR. CONNELLY:  Form and foundation.

2          THE WITNESS:  Correct.

3    BY MR. CROWN:

4          Q.    I am going to show you, just a starting place,

5    Exhibit 201.  Now, there was some documents and reports

6    that were generated by the initial investigator Sarah

7    Kramer and her supervisor who oversaw Sarah Kramer's work,

8    Sarah Mendez, correct?

9          A.    Correct.

10         Q.    But when you came involved as the ongoing

11   supervisor of Madison Bell, who was the ongoing

12   caseworker, you reviewed everything that was in the file,

13   as you said, correct?

14         A.    Correct.

15         Q.    So Exhibit 201 is the order for ex parte removal

16   of the children, also known as a CAR for court-approved

17   [sic] removal, correct?

18         A.    Correct.  Court authorized.

19         Q.    Court-authorized removal.

20               And we see on page 1 of Exhibit 201, Judge

21   Melissa Zabor, Z-A-B-O-R, signed an order that granted

22   authority to DCS to remove Dylan and Kenan Kahraman,

23   correct?

24         A.    Correct.

25         Q.    So DCS acted with court authority to remove

 1  Dylan and Kenan, correct?

 2      *A.*   Correct.

 3      *Q.*   And to do so, DCS found probable cause exists to

 4  believe that temporary custody was clearly necessary to

 5  protect Dylan and Kenan, correct?

 6              MR. CONNELLY:  Form and foundation.

 7              THE WITNESS:  Correct.

 8  BY MR. CROWN:

 9      *Q.*   Now, on -- on page 3 of Exhibit 201, Counsel

10  asked you about the findings of Dr. Miga regarding Dylan

11  that was reported.

12              And it states here that Dr. Miga examined

13  Dylan on December 24, 2018, and he reported that Dylan had

14  significant malnutrition as a result of a very restrictive

15  GAPS diet.  Mr. [Sic] Miga has concerns about Dylan's

16  inability to walk and stated it could be behavorial and

17  may be related to his underlying malnutrition.

18              Dr. Miga reported that, quote, Although he

19  doesn't have any evidence of pulmonary hypertension, given

20  the similarities to his brother's condition, he remained

21  concerned he could develop pulmonary hypertension in the

22  future and the ECG had abnormal results likely related to

23  his nutritional deficits, close quote.

24              So that was included to Sarah Kramer in the

25  probable cause statement to the Court, correct?

 1      A.   Correct.

 2      Q.   And DCS, in part, relied on what Dr. Miga had

 3 stated about Dylan in the totality of the circumstances

 4 that were being evaluated with regard to Kenan's condition

 5 and Dylan's condition, correct?

 6                MR. CONNELLY:  Form -- form and foundation.

 7                THE WITNESS:  Correct.

 8 BY MR. CROWN:

 9      Q.   Now, I am going to stay with the chronology.  So

10 I am now going to show you Exhibit 204.

11                And Exhibit 204 is a court order that set

12 hearings on the dependency petition and temporary orders;

13 am I correct?

14      A.   Correct.

15      Q.   And that's a document that you reviewed,

16 correct?

17      A.   Correct.

18      Q.   And this is an order that was signed by Judge --

19 Commissioner Shellie Smith of the Superior Court, correct?

20      A.   Correct.

21      Q.   So again, when a judge like Judge Smith issues

22 an order in this case, does DCS follow this order?

23                MR. CONNELLY:  Form and foundation.

24                THE WITNESS:  Yes.

25

 1   BY MR. CROWN:

 2       Q.   And do these orders give the authority for DCS

 3   to take the actions it does when children become wards of

 4   the Court?

 5                   MR. CONNELLY:  Form and foundation.

 6                   THE WITNESS:  Yes.

 7   BY MR. CROWN:

 8       Q.   And so in this order -- we are going to

 9   highlight that on page 1, there is a preliminary

10   protective conference set for the 9th day of January 2019,

11   correct?

12       A.   Correct.

13       Q.   And likewise, a preliminary protective hearing

14   was set for January 9, 2019, before Judge Udall, correct?

15       A.   Correct.

16       Q.   And Judge Udall was the initial judge that this

17   was assigned to once these initial orders had been sent,

18   correct?

19                   MR. CONNELLY:  Form and foundation.

20                   THE WITNESS:  Correct.

21   BY MR. CROWN:

22       Q.   And on page 2, we see that Judge Smith ordered

23   that Dylan was a temporary ward of the Court?

24       A.   Yes.

25       Q.   And placed Dylan in the physical custody of DCS,

1    correct?

2        *A.*    Correct.

3        *Q.*    Kenan was ordered to be made a temporary ward of

4    the Court?

5        *A.*    Correct.

6        *Q.*    And Kenan was placed in the physical custody of

7    DCS, correct?

8        *A.*    Yes.

9        *Q.*    The Court found that, based on the verified

10   allegations in the petition, the continuation of the

11   children in the home would be contrary to the children's

12   welfare.

13               And this finding was based on following

14   facts:  Parents have stated strong beliefs regarding

15   children's diet and medical care, that Kenan was

16   hospitalized in December 2018 due to congestive heart

17   failure and pulmonary hypertension which was suspected to

18   be tied to his malnutrition.

19               And then there is a continuing detailed

20   recitation based on the medical findings that were made by

21   the doctors at Cardon Children's hospital, correct?

22               MR. CONNELLY:  Form and foundation.

23               THE WITNESS:  Correct.

24   BY MR. CROWN:

25       *Q.*    On page 4 of this exhibit, the Court further

1  found that, based upon verified allegations, that

2  reasonable efforts had been made to prevent removal of the

3  children from the home.  This finding is based on the

4  following facts:  The Department scheduled a team

5  decision-making meeting with the parents for January 3,

6  2019, to review the safety and placement of the children;

7  and although the parents were notified of the meeting,

8  they did not attend.

9              And that's a court finding, correct?

10      A.    Correct.

11      Q.    The Court also made findings with regard to the

12  Department's attempts to identify and assess placement

13  with the children's grandparent or another member of the

14  children's extended family, and the Court found that it

15  was in the children's best interest at this time that the

16  children be placed with another supervising -- or

17  supervised residential location because no identified

18  family members were willing or able to care for the

19  children at this time, correct?

20      A.    Correct.

21      Q.    On page 5, the Court then appointed a CASA and

22  stated that the matter was referred to the CASA program

23  coordinator to appoint an advocate for the children,

24  correct?

25      A.    That's correct.

1    *Q.*    The Court then ordered that the foster care

2   review board be involved within six months of the

3   out-of-home placement and every six months thereafter, as

4   long as the children remained in out-of-home care, right?

5    *A.*    Correct.

6    *Q.*    And then moving to page 8, the Court ordered --

7   appointed Megan Haywood, H-A-Y-W-O-O-D, to be the

8   children's guardian ad litem, correct?

9    *A.*    Correct.

10    *Q.*    And the Court ordered two different individual

11   attorneys to be appointed, one lawyer for the father and

12   one lawyer for the mother, correct?

13    *A.*    Correct.

14    *Q.*    Now moving to Exhibit 208, this is the

15   January 19, 2019, court order, and it comes at a time that

16   you were now getting involved in taking over the case from

17   the initial investigation team, and it was now going to be

18   in the hands of you and Madison as the ongoing team,

19   correct?

20    *A.*    Correct.

21    *Q.*    And this court order that was issued by Judge

22   Udall shows that the order would be sent to the foster

23   care review board, the DCS specialist, legal advocate,

24   legal defender, and -- and a series of people that

25   attended that hearing, correct?

1    A.    Yes.

2    Q.    And they were on the circulation list to receive

3    this court order, correct?

4    A.    Correct.

5    Q.    And so the Court noted that in court, Sarah

6    Kramer was present, Madison Bell was present, and Katie

7    [sic] Martoncik -- who was the assistant Attorney General

8    that was actively working this case and assigned to this

9    case, at least through 2019 and probably early 2020,

10   correct?

11   A.    Correct.

12   Q.    And then, again, what the Court did was it

13   ordered affirming the appointment of Megan Haywood as the

14   guardian ad litem, correct?

15   A.    Correct.

16   Q.    Then the Court, on page 3 of this order, made

17   the following finding regarding Mother and Father, that

18   they both understood their rights and they have knowingly,

19   intelligently, and voluntarily chosen to waive their right

20   to counsel and proceed on their own behalf, correct?

21   A.    Correct.

22   Q.    So they were offered, by the Court, lawyers and

23   they waived their right to those lawyers, correct?

24                 MR. CONNELLY:  Form and foundation.

25                 THE WITNESS:  Correct.

1  BY MR. CROWN:

2      Q.   Then the Court noted that Mother and Father

3  wished to contest the allegations in the petition and the

4  Court ordered entering their denial to the petition,

5  correct?

6      A.   Correct.

7      Q.   And then the Court ordered denying the requests

8  of the Mother and Father requesting to proceed on their

9  own behalf.  So the Court made additional findings in that

10 regard, correct?

11     A.   Correct.

12     Q.   And the Court ordered continuing the children as

13 temporary wards of the Court and committing their care,

14 custody, and control to DCS, correct?

15     A.   Correct.

16     Q.   But DCS would always be required to be acting

17 pursuant to the Court's ultimate oversight, supervision,

18 and control and management of the children's best

19 interest, correct?

20                 MR. CONNELLY:  Form and foundation.

21                 THE WITNESS:  Correct.

22 BY MR. CROWN:

23     Q.   Because they were wards of the Court, not wards

24 of DCS, correct?

25                 MR. CONNELLY:  Form and foundation.

```
 1                THE WITNESS:  Correct.
 2    BY MR. CROWN:
 3        Q.    Then at the top of page 4, the Court found that
 4    the Department of Child Safety has made reasonable efforts
 5    to prevent the removal of the children from the home and
 6    that continuation in the home would be contrary to the
 7    welfare of the children or that it was reasonable to make
 8    no efforts to maintain the children in the home.
 9                And you read that in that order, correct?
10        A.    Correct.
11        Q.    Let's move to Exhibit 16.  Now, Exhibit 16 would
12    be the addendum report to the juvenile court that was
13    after that initial report that Sarah Kramer prepared that
14    Counsel showed you earlier, correct?
15                MR. CONNELLY:  I'm sorry, Larry, which,
16    Exhibit 216?
17                MR. CROWN:  216, yes.
18    BY MR. CROWN:
19        Q.    And then this addendum, it was prepared by
20    Madison Bell and you signed it, approving it as
21    supervisor, correct?
22        A.    Correct.
23        Q.    Now, Counsel discussed with you a notation here
24    in the second paragraph on page 1.  In the last four lines
25    of the second paragraph, it states the following:  Kenan
```

1   attended a cardiologist appointment on January 24, 2019.

2   Dr. Miga reports, quote, His right ventricular heart

3   failure has resolved.  This is a very rapid response to

4   therapy and somewhat atypical and supports a diagnosis of

5   secondary pulmonary hypertension and not a primary

6   pulmonary hypertension.  The exact etiology is unclear.

7   It may very likely be related to his nutritional status,

8   close quote.

9            Now, that quotation is quoting verbatim the

10  report of Dr. Miga, correct?

11       A.   Correct.

12       Q.   Now, Dr. Miga is the board-certified

13  cardiologist who made that finding in his records, and you

14  are certainly not here to explain exactly what Dr. Miga

15  meant by these findings, correct?

16            MR. CONNELLY:  Form and foundation.

17            THE WITNESS:  Correct.

18  BY MR. CROWN:

19       Q.   Counsel was trying to ask you about the exact

20  etiology of the underlying severe malnutrition that Kenan

21  had and all the related consequences that put him in the

22  intensive care unit was that etiology was unclear.

23            My general question to you is:  It was

24  clear from all the records at Cardon Children's hospital

25  that Kenan was suffering from severe malnutrition,

```
 1  correct?
 2                  MR. CONNELLY:  Form and foundation.
 3                  THE WITNESS:  Correct.
 4  BY MR. CROWN:
 5      Q.   And this could be easily interpreted that
 6  Dr. Miga was stating that the rapid response that Kenan
 7  had to treatment and being given a normal diet and a wide
 8  array of foods and, you know, more calories and hospital
 9  support with intravenous fluids -- that he was referring
10  here to the rapid response being atypical because of how
11  well he did once he was given normal foods, correct?
12                  MR. CONNELLY:  Form and foundation.
13                  THE WITNESS:  Correct.
14  BY MR. CROWN:
15      Q.   And again, it would be for -- and I made the
16  same objections to him.  It would be for Dr. Miga to tell
17  us that.  But since he asked you these things, you know,
18  we can look at this.  And what -- the point he is making
19  is, is that this rapid positive response supports that --
20  the diagnosis of secondary pulmonary hypertension versus
21  primary pulmonary hypertension, correct?
22      A.   Correct.
23      Q.   And as Kenan continued to progress and improve,
24  there was never a diagnosis of underlying primary
25  pulmonary hypertension that you are aware of, correct?
```

 1                    MR. CONNELLY:  Form and foundation.

 2                    THE WITNESS:  Not that I recall, no.

 3    BY MR. CROWN:

 4        Q.   So the pulmonary hypertension that was part of

 5    the constellation of severe conditions that Kenan had when

 6    presented to Cardon Children's hospital resolved when he

 7    was in the temporary ward of the state and the physical

 8    custody of DCS and he was being given proper nutrition,

 9    correct?

10                    MR. CONNELLY:  Form and foundation.

11                    THE WITNESS:  Correct.

12    BY MR. CROWN:

13        Q.   There was a point where Kenan improved, where he

14    was walking, he was no longer wheelchair bound, and it was

15    the same with Dylan, correct?

16                    MR. CONNELLY:  Form and foundation.

17                    THE WITNESS:  That's correct.

18                    MR. CONNELLY:  I will just note for the

19    record, Larry, that I didn't say that the -- you seemed to

20    indicate that I was saying that the -- where he says

21    somewhat atypical -- I never said that that didn't apply

22    to the very rapid response.

23                    MR. CROWN:  Oh, okay.  I thought you were

24    implying that the pulmonary hypertension was somewhat

25    atypical.  If you are not suggesting -- and again,

 1  Dr. Miga would explain that.

 2              MR. CONNELLY:  Yeah.

 3              MR. CROWN:  But as we exchanged on the

 4  record at the time, and I appreciate your comments now, I

 5  disagreed with how you were reading that passage.

 6              MR. CONNELLY:  I thought your disagreement

 7  was with the way I was reading the last sentence about the

 8  etiology.

 9              MR. CROWN:  Right, right.  The etiology, I

10  do disagree with you.

11              MR. CONNELLY:  Okay.

12              MR. CROWN:  I believe that he is saying the

13  exact etiology of the rapid response.  You were implying

14  -- I think it is very clear in all the records, and I will

15  state this, that it's severe malnutrition that was the

16  cause of Kenan's severe condition when he was at Cardon's.

17              You and I can disagree on that.

18              MR. CONNELLY:  I don't necessarily agree

19  with that.

20              MR. CROWN:  I know you don't.

21              MR. CONNELLY:  I don't necessarily disagree

22  with that.  I disagree with the fact that the only cause

23  of any malnutrition was the GAPS diet.  That's what I

24  disagree with.  There are a constellation of factors that

25  could have contributed to that.

1            MR. CROWN:  Not the ones you have raised.

2            MR. CONNELLY:  One of those being mold.

3            MR. CROWN:  No.  Actually not.  That's

4   actually junk science, and you should know that.  So is

5   white board erasers and --

6            MR. CONNELLY:  It's not junk science.

7            (Reporter clarification.)

8            MR. CONNELLY:  The white board erasers is a

9   red herring.

10            MR. CROWN:  Yeah, well, it was -- it was in

11   these records.  But that said, I am glad we have had a

12   chance to address these.

13   BY MR. CROWN:

14       Q.   Exhibit 225.  Exhibit 225 is a report that is

15   titled Arizona Supreme Court Foster Care Review Board

16   Findings and Recommendations.

17            And this is a document that was filed with

18   the juvenile court on May 7, 2019, correct?

19       A.   Correct.

20       Q.   And there is a series of questions in this -- in

21   these findings.  And I am going to ask you about just a

22   few.  Question 2 on page 2:  The board makes a

23   determination that continuation of the children in

24   out-of-home placement is necessary.

25            And they say "yes," correct?

1      *A.*   Correct.

2      *Q.*   The board makes a determination that there is an

3    appropriate permanency goal for each child.

4                   And they say "yes," correct?

5      *A.*   Correct.

6      *Q.*   And then on page 3, Question 7:  At the time of

7    the review, the board makes a determination that the

8    established target date for the completion of the

9    permanency goal is realistic.

10                   And they say "no."  And they say:  The

11   agency's established target date is unrealistic for the

12   needs of the child.

13                   Am I correct?

14     *A.*   Correct.

15     *Q.*   So here, the foster care review board disagreed

16   with DCS; they are saying that you are going to need a

17   longer period of time before there could be the completion

18   of the reunification plan, correct?

19                   MR. CONNELLY:  Form and foundation.

20                   THE WITNESS:  Correct.

21   BY MR. CROWN:

22     *Q.*   And then Question 10:  The board makes a

23   determination that there are significant service gaps or

24   system problems.

25                   And they say "no"?

1       A.    Correct.

2       Q.    And then, the last part of this report, they

3  report according to parent, and they had interviewed the

4  biological mother separate from DCS, correct?

5       A.    Correct.

6       Q.    And then they note these in 19 numbered

7  sentences, correct?

8       A.    They are usually -- we are usually in the same

9  room, but, yes.

10       Q.    But they write this report independent?

11       A.    Correct.

12       Q.    And same thing with Madison Bell?

13       A.    Correct.

14       Q.    And then ultimately, Madison reported is -- in

15  Sentence No. 16:  The children are doing great, correct?

16       A.    Correct.

17       Q.    Exhibit 229 is an order from the Court, that now

18  we have -- and she has been on the case for a while after

19  Judge Udall, Jennifer Green, correct?

20       A.    Correct.

21       Q.    And she was probably assigned to this case from

22  Judge Udall either late January or early February, but I

23  moved ahead to show you her order of June 25, 2019.

24             So she issued a ruling.

25

1         MR. CONNELLY:  What exhibit are you on?

2         MR. CROWN:  It is Exhibit 229.

3   BY MR. CROWN:

4      Q.    And so you had indicated you reviewed pleadings.

5             And so the father, Ahmet Kahraman, had filed

6   an emergency motion for a court order to have the children

7   seen by Dr. Melanie Alarcio to test both boys for mold,

8   correct?

9      A.    Correct.

10     Q.    And the father asked the Court to order the

11  children to be seen by Dr. Alarcio, a pediatric

12  neurologist, for the purpose of testing the children for

13  toxins related to mold exposure, correct?

14     A.    Yes.

15     Q.    DCS objected, and we see that in No. 2, and they

16  filed a pleading.  So the Court summarized the DCS

17  position, correct?

18     A.    Correct.

19     Q.    And that pleading was prepared and filed by the

20  Attorney General in this case, correct?

21     A.    Correct.

22     Q.    And then the Court is presented -- and the Court

23  stated it is presented with conflicting evidence.  And

24  then the Court, on page 3, notes that the guardian ad

25  litem filed a pleading on this -- Father's emergency

1    motion, correct?

2        *A.*    Correct.

3        *Q.*    And the guardian ad litem, as the Court found,

4    offered a unique solution: to allow a PCH specialist who

5    has no prior involvement with this case to review all the

6    medical records and make a recommendation as to whether

7    additional testing was warranted.

8                    Correct?

9        *A.*    Correct.

10       *Q.*    So the guardian ad litem, independent of DCS,

11   filed another recommended solution, which the Court said

12   was a unique solution, correct?

13       *A.*    Correct.

14       *Q.*    And the Court agreed with the guardian ad litem,

15   and so the Court ordered that an experienced physician

16   associated with PCH but not associated with this case will

17   review records and render a recommendation, and an

18   independent review will give the Court critical guidance

19   in assessing whether additional testing was warranted,

20   correct?

21       *A.*    Correct.

22       *Q.*    And then if we go to Exhibit 234, we see that

23   PCH designated Dr. Jodi Carter to perform the records

24   review.  And Dr. Carter issued two reports.  One is

25   Exhibit 234, dated July 26, 2019, and regarding Kenan.

1          And Dr. Carter opined as follows:  In my

2   opinion, Kenan doesn't need testing for mold-related

3   illness at this time.

4               Correct?

5     A.    Correct.

6     Q.    And that was filed with the Court?

7     A.    Yes.

8     Q.    And then Exhibit 235, also a report dated

9   July 26, 2019, Dr. Carter stated:  In my opinion, Dylan

10  does not need testing for mold-related illness at this

11  time.

12               Correct?

13    A.    Correct.

14    Q.    Now, that was filed in the Court, and then it

15  was challenged by Jessica Kahraman; am I correct?

16    A.    Yes.

17    Q.    She had joined in Ahmet's emergency motion, and

18  now that Dr. Carter issued these reports, she was asking

19  the Court to reconsider the order for PCH to do a records

20  review only and not allow testing, correct?

21    A.    Correct.

22    Q.    And so the Court notes on page 1:  Mother asked

23  the Court to reconsider its prior denial of her request to

24  appoint Dr. Alarcio to test and treat toxins.

25               And the Court stated it is concerned about

 1   the breadth of Mother's request for Dr. Alarcio to test
 2   and treat toxins as, quote, she may deem appropriate,
 3   close quote.

 4             And then the Court continued on page 2,
 5   stating that the Court's concerns remain in the face of
 6   Mother's motion for reconsideration.  The Court deemed
 7   Mother's request as too broad and far-reaching, with the
 8   limited amount of information the Court has at this point,
 9   the Court does not view it wise to grant Mother a blanket
10   order allowing any doctor to test and treat toxins as she
11   may deem appropriate.

12             And so the Court found that appointing a
13   disinterested but qualified doctor at Phoenix Children's
14   Hospital to determine if further testing is warranted
15   addresses Mother's concern about someone being biased
16   rendering an opinion, correct?

17        A.   Correct.

18        Q.   And for all those reasons, the Court affirmed
19   its prior order.

20             So again, they challenged it, and the Court
21   denied their motion for reconsideration, correct?

22             MR. CONNELLY:  Form and foundation.

23             THE WITNESS:  Correct.

24             MR. CONNELLY:  What exhibit was that, by
25   the way?

1          MR. CROWN:  That was 236.

2    BY MR. CROWN:

3      Q.   Now, Exhibit 240.  Exhibit 240 is the report to

4    the juvenile court for permanency hearing.

5          And this was a report that would have been

6    prepared by Madison Bell, and ultimately would have been

7    signed first by Madison and then you as her supervisor,

8    correct?

9      A.   Correct.

10     Q.   Now, on page 3 of this exhibit, it states in

11   section 2, Safety Planning B:  Dylan and Kenan Kahraman

12   are residing in an out-of-home care in a licensed DDD

13   foster home.

14         And the children were safe and they were

15   doing well in this DDD foster home, correct?

16         MR. CONNELLY:  Form and foundation.

17         THE WITNESS:  Correct.

18   BY MR. CROWN:

19     Q.   In Section 2(d), it is stated that Mrs. Kahraman

20   recognized and articulates that her behaviors are causing

21   physical and emotional harm to Kenan and Dylan.

22         And that's something you would have

23   reviewed, correct?

24     A.   Correct.

25     Q.   On page 21 in Section 6:  It is noted in

1  Section 8 that Mr. and Mrs. Kahraman have four hours of

2  supervised therapeutic visitation every week.  Mr. and

3  Mrs. Kahraman --

4              (Reporter clarification.)

5  BY MR. CROWN:

6      Q.   I said, in Section 6(a), it is stated:  Mr. and

7  Mrs. Kahraman have four hours of supervised therapeutic

8  visitation every week.  Mr. and Mrs. Kahraman also attend

9  their children's doctor appointments.

10             And that was something that you reviewed

11  and signed off on, correct?

12     A.   Correct.

13     Q.   There was a -- in Section 7, a family

14  reunification with a target date of 3/27/2020, correct?

15     A.   Correct.

16     Q.   And at this time, it was recommended that Dylan

17  and Kenan remain in their licensed foster home while

18  Mr. and Mrs. Kahraman continue to work through

19  reunification services, correct?

20     A.   Correct.

21     Q.   And then in Section 8, it was stated by Madison

22  Bell:  It is this case manager's opinion that the children

23  remain in out-of-home care.

24             Correct?

25     A.   Correct.

 1       Q.   Now, again, that is one of several opinions and
 2   recommendations that are filed with the Court, correct?
 3                 MR. CONNELLY:  Form and foundation.
 4                 THE WITNESS:  Correct.
 5   BY MR. CROWN:
 6       Q.   You approved this as Madison Bell's supervisor,
 7   correct?
 8       A.   Correct.
 9       Q.   But other -- all those other independent persons
10   and agencies that the Court appointed, they are also
11   filing recommendations with the Court, correct?
12                 MR. CONNELLY:  Form and foundation.
13                 THE WITNESS:  Correct.
14   BY MR. CROWN:
15       Q.   And ultimately, it is for the Court to decide
16   which opinions to accept, reject, or accept in part and
17   reject in part, correct?
18       A.   Correct.
19       Q.   Because that's the function of the Court.
20       A.   Correct.
21                 MR. CONNELLY:  Form.
22                 I didn't know that was a question.  It
23   sounded like a statement.
24                 Form and foundation.
25                 MR. CROWN:  It was a question.

 1                    MR. CONNELLY:  Form and foundation to the

 2   question.

 3   BY MR. CROWN:

 4       Q.   So now in Exhibit 241 -- this is the CASA court

 5   report that was filed on December 12, 2019, in the

 6   Superior Court, correct?

 7       A.   Correct.

 8       Q.   And the CASA, on page 1 of this exhibit, noted

 9   at the bottom:  Since they have entered foster care, the

10   boys have eaten a wide variety of foods without any

11   adverse reactions.  They are now thriving and can walk,

12   run, and jump.  Physicians have opined that their

13   disabilities were likely the result of malnutrition and

14   deconditioning.

15                    Correct?

16                    MR. CONNELLY:  Form and foundation.

17                    THE WITNESS:  Correct.

18   BY MR. CROWN:

19       Q.   So when -- so that's an independent report and

20   they are basically seeing the progress and history similar

21   to DCS but independent of DCS, correct?

22                    MR. CONNELLY:  Form and foundation.

23                    THE WITNESS:  Correct.

24   BY MR. CROWN:

25       Q.   Then, on page 3 of the report under the section

 1  titled Reasonable Efforts, CASA states:  The case plan
 2  goal is family reunification.  DCS has made reasonable
 3  effort to achieve the goals.
 4               MR. CROWN:  Form and --
 5  BY MR. CROWN:
 6       Q.   And that's something you reviewed, correct?
 7               MR. CONNELLY:  Form and foundation.
 8               THE WITNESS:  Correct.
 9  BY MR. CROWN:
10       Q.   And under the recommendation section, No. 1 says
11  that Kenan and Dylan Kahraman remain wards of the Court
12  committed to the care, custody, and control of DCS.
13               And that was CASA's recommendation,
14  correct?
15       A.   Correct.
16       Q.   Exhibit 246.  Exhibit 246 is the second amended
17  dependency petition.
18               And this was filed by the Attorney
19  General's office in the juvenile court, correct?
20       A.   Correct.
21       Q.   And it was this petition that the adjudication
22  hearing went forth on, correct?
23               MR. CONNELLY:  Form and foundation.
24  BY MR. CROWN:
25       Q.   This second amended petition?

1    A.    Correct.

2    Q.    So now if we go to Exhibit 247, this is a court

3    order issued by Judge Jennifer Green on December 6, 2020.

4          And this was the order from the adjudication

5    hearing, correct?

6    A.    Correct.

7    Q.    The Court noted you were in court, Madison Bell

8    was in court, this hearing was handled by Assistant

9    Attorney General Janet Johnson, who now took this case

10   over from Kathy Martoncik, correct?

11   A.    Correct.

12   Q.    Now, we see lots of other people that were

13   present, including both Jessica Kahraman, Ahmet Kahraman,

14   and their attorneys, correct?

15   A.    Correct.

16   Q.    And the Court made several findings, and I am

17   going to note a few of them here.

18         Father maintains his denial but stipulates

19   to the evidence, correct?

20   A.    Correct.

21   Q.    And Mother doesn't contest, correct?

22   A.    Correct.

23   Q.    Now, in your experience, when a parent wants to

24   present evidence at an adjudication hearing, they are

25   allowed to do so, correct?

1    A.    Correct.

2    Q.    It becomes an evidentiary hearing before a

3 Court.  But the parents both decided not to present

4 evidence, correct?

5    A.    Correct.

6    Q.    Then the Court on page 3 made the following

7 finding, that the father knowingly, intelligently, and

8 voluntarily waived his right to a trial and stipulated to

9 the evidence, correct?

10    A.    Correct.

11    Q.    The Court finds that the father is unable to

12 parent the children due to neglect, correct?

13    A.    Correct.

14    Q.    And the Court finds that, pursuant to the rules

15 of procedure for the juvenile court, that the allegation

16 of neglect in the dependency petition is true by a

17 preponderance of the evidence, correct?

18    A.    Correct.

19    Q.    Then the Court went on to address Jessica

20 Kahraman.  And the Court found that Mother has knowingly,

21 intelligently, voluntarily waived her right to a trial and

22 submitted the issue of dependency, correct?

23    A.    Correct.

24    Q.    And that was her decisions that she made

25 directly to the Court, correct?

1    *A.*    Correct.

2    *Q.*    Now, you were in court.  The Court, I am sure,

3    is asking her a series of questions and making sure she

4    understands her rights to a trial, her right to testify

5    and the right to present evidence, correct?

6    *A.*    That's correct.

7    *Q.*    And then because she waived it, the Court made

8    the finding knowingly, intelligently, and voluntarily

9    waived her right to a trial, correct?

10                   MR. CROWN:  Form and foundation.

11                   THE WITNESS:  Correct.

12   BY MR. CROWN:

13   *Q.*    Then the Court found that Mother is unable to

14   parent the children due to neglect and stated the reasons:

15   Mother failed to seek appropriate medical care for the

16   children, and since the children have come into the --

17   into care, Mother has failed to take sufficient

18   responsibility for her actions, specifically regarding the

19   children's malnutrition, correct?

20   *A.*    Correct.

21   *Q.*    And that's the Court's finding, correct?

22   *A.*    Correct.

23   *Q.*    And they had every opportunity to challenge

24   this, and they waived their right?

25                   MR. CONNELLY:  Form and foundation.

```
 1                    THE WITNESS:  Correct.
 2   BY MR. CROWN:
 3       Q.    Then the Court found that, pursuant to the Rules
 4   of Procedure, that the allegation of neglect in the
 5   dependency petition is true by a preponderance of the
 6   evidence regarding Mother, correct?
 7       A.    Correct.
 8       Q.    So now the Court, on the top of page 4, stated:
 9   It is ordered making the children wards of the Court as
10   dependent children to the care, custody, and control of
11   the Department of Child Safety.
12                    Correct?
13       A.    Correct.
14       Q.    So the status of being temporary wards of the
15   Court is now removed and they are, at this point, made
16   permanent wards of the Court until further court orders,
17   correct?
18       A.    Correct.
19       Q.    And the case plan is family reunification,
20   correct?
21       A.    Correct.
22       Q.    And so DCS is now ordered to follow these court
23   orders by the Court, correct?
24                    MR. CONNELLY:  Form and foundation.
25                    THE WITNESS:  Correct.
```

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1   BY MR. CROWN:

2       Q.   And the Court, at the bottom of page 4, stated

3   that the Court finds that the Department of Child Safety

4   has made reasonable efforts to prevent the removal of the

5   children from the home and the continuation in the home

6   would be contrary to the welfare of the children or that

7   it was reasonable to make no efforts to maintain the

8   children in the home, correct?

9       A.   Correct.

10      Q.   Let's go to Exhibit 251.  Exhibit 251 is -- asks

11  for findings.  And this is something that is required by

12  both federal and state law; am I correct?

13      A.   Correct.

14      Q.   And this is an order that was issued by a judge

15  of the Superior Court.  I cannot make out the name, but it

16  was an order that was issued, done in open court on the

17  20th day of February 2020, and it was filed with the clerk

18  of the Superior Court on March 2, 2020.

19              And the Court hereby finds that DCS has

20  made reasonable efforts to finalize the permanency plan

21  currently in effect for Dylan and Kenan, correct?

22      A.   Correct.

23      Q.   Exhibit 252 is the next progress report that was

24  filed to the juvenile court by DCS.

25              And it was prepared by Madison Bell,

 1  correct?

 2      *A.*   Correct.

 3      *Q.*   And you signed -- you approved it by signing

 4  your name as Madison's supervisor, correct?

 5      *A.*   Yes.

 6      *Q.*   Now, on page 22, in Section 7, it states:  For

 7  permanency goals, Section 8, family reunification with a

 8  target date of 9/27/2020.

 9              And then it says, in Section C:

10  Recommended goal and target date if different than the

11  current goal.

12              And it says:  Severance and adoption in

13  regards to Mother only.

14              Correct?

15      *A.*   Correct.

16      *Q.*   So this was a decision that was the result of

17  that staffing meeting you talked about that you attended,

18  Madison Bell attended, and representatives of the Attorney

19  General attended, correct?

20      *A.*   Correct.

21      *Q.*   And there may have been others but certainly

22  you, Madison, and the Assistant Attorney General, correct?

23      *A.*   That is correct.

24      *Q.*   And as far as the reasons for the recommended

25  change in the permanency goal, it is summarized in

1   Section D, correct?

2        A.   Correct.

3        Q.   And in the interest of time I'm not going to

4   read every word, but that's what Section D is for, it is

5   explaining the reason for the recommended change in the

6   permanency goal that Counsel was asking you about,

7   correct?

8        A.   That is correct.

9        Q.   And again, it is not a memory contest, it's not

10  a word contest, but that's what is stated and that's what

11  was filed with the Court, correct?

12       A.   Correct.

13       Q.   And then Section 8 is a section titled DCS

14  Specialist's Conclusions.  And there's additional

15  recommendations and basis that is supporting the DCS

16  decision to request severance and adoption regarding

17  Mother only, correct?

18       A.   Correct.

19       Q.   And again, Jessica Kahraman clearly disagreed

20  with this, correct?

21       A.   Correct.

22            MR. CONNELLY:  Form and foundation.

23  BY MR. CROWN:

24       Q.   But it was for the Court to ultimately make the

25  decision on DCS's request, correct?

1      *A.*   Correct.

2      *Q.*   Exhibit 257 is the CASA court report that was

3   filed with the Court -- it was filed with the clerk with a

4   stamp of May 12, 2020.  It was prepared in advance of the

5   May 12, 2020, hearing; am I correct?

6               MR. CONNELLY:  Form and foundation.

7               THE WITNESS:  That is correct.

8   BY MR. CROWN:

9      *Q.*   Now, on page 3 of this exhibit, there is a

10  section titled Opinions and/or Concerns.  And the first

11  sentence states:  I believe the mother knew what she was

12  doing when she restricted her children's diets and

13  understands the relationship between nutrition and

14  disease, as evidenced by these facts.

15              And then it lists a fairly lengthy

16  discussion by the CASA in support of their position,

17  correct?

18     *A.*   Correct.

19     *Q.*   And again, that's independent of DCS, correct?

20              MR. CONNELLY:  Form and foundation.

21              THE WITNESS:  Correct.

22  BY MR. CROWN:

23     *Q.*   In the fourth paragraph in this section, the

24  CASA states:  History shows that the boys began to thrive

25  shortly after they were taken into DCS care.  They were in

1  wheelchairs when they started, and within two months on a

2  varied diet, they were running and jumping all over.

3                Now, that's consistent with what DCS was

4  finding and concluding, correct?

5      A.    That is correct.

6      Q.    And then on the next page of the report, it

7  says:  My role and goal is to represent what I believe is

8  in the best interest of these boys.

9                And so their recommendation in No. 1 is

10  that Kenan and Dylan remain wards of the Court committed

11  to the care and custody and control of DCS.  And, No. 7,

12  that the case plan goal of family reunification be

13  affirmed for the dad, but that the case plan goal be

14  changed to severance and adoption for the mom, correct?

15      A.    Correct.

16      Q.    Exhibit 258 is the Court order issued by Judge

17  Jennifer Green on May 12, 2020, where -- it is the order

18  from the evidentiary hearing that was pursuant to Rule 59,

19  correct?

20      A.    Correct.

21      Q.    Now, as we're going to see, there was a total of

22  three Rule 59 evidentiary hearings in this case, correct?

23                MR. CONNELLY:  Form and foundation.

24                THE WITNESS:  Correct.

25

```
 1   BY MR. CROWN:
 2       Q.   So this was the first of those three.  And it
 3   was based on Mom's motion for a change in physical
 4   custody, correct?
 5                   MR. CONNELLY:  Form and foundation.
 6                   THE WITNESS:  Correct.
 7   BY MR. CROWN:
 8       Q.   Page 2, it is noted that the mother testified.
 9   So she was present in court.  Madison Bell testified,
10   correct?
11       A.   Correct.
12       Q.   Dr. Kelly Rodriguez testified, correct?
13       A.   Correct.
14       Q.   And Counsel asked you questions about
15   Dr. Rodriguez's report, and she testified to the Court,
16   correct?
17       A.   Correct.
18       Q.   The Court took judicial notice that there was a
19   family court matter that was now pending based on the
20   divorce proceedings between Ahmet Kahraman and Jessica
21   Kahraman, correct?
22       A.   Correct.
23       Q.   The Court allowed the mother to file a reply
24   brief, and the Court said it read and considered the DCS
25   child safety specialist report, correct?
```

1    *A.*    Correct.

2    *Q.*    And then it noted that the Department moved for

3    a change of case plan to severance and adoption regarding

4    the mother, correct?

5    *A.*    Correct.

6    *Q.*    Now, there was further discussion, which was

7    both sides representing their positions, some in favor,

8    some opposition, correct?

9    *A.*    Yes.

10   *Q.*    And it's noted here that the GAL, the guardian

11   ad litem, and the mother objected, and the father and CASA

12   did not object to a change of the plan for Mother,

13   correct?

14   *A.*    Correct.

15   *Q.*    The Court again found that the Department of

16   Child Safety has made reasonable efforts to finalize the

17   permanency plan for the children, correct?

18   *A.*    Correct.

19   *Q.*    And then the Court took the matter under

20   advisement.  And then we move to Exhibit 263.

21            Exhibit 263 is that under-advisement ruling

22   from the Rule 59 evidentiary hearing that was completed on

23   May 12, 2020, correct?

24            MR. CONNELLY:  Form and foundation.

25            THE WITNESS:  Correct.

1   BY MR. CROWN:

2       Q.    Then on page 2, the Court summarized the

3   significant medical condition that Kenan was diagnosed

4   with when he was brought to Cardon Children's hospital on

5   December 18th of 2018, correct?

6       A.    Correct.

7       Q.    The doctors had diagnosed Kenan with pulmonary

8   hypertension, acute right heart failure, failure to

9   thrive, anasarca -- A-N-A-S-A-R-C-A -- right ventricular

10  dysfunction, ketotic -- K-E-T-O-T-I-C -- hypoglycemia,

11  lower extremity weakness, pleural effusion, retarded

12  development following protein-calorie malnutrition,

13  unspecified severe protein-calorie malnutrition.

14             And then the Court noted that the

15  children's daily caloric intake was 500 calories, and the

16  doctors asserted it should be 1,500 calories per day,

17  correct?

18      A.    Correct.

19      Q.    And again, as we saw, Mother had testified at

20  that hearing, correct?

21      A.    Correct.

22      Q.    And then moving through the history, the Court

23  further noted the findings, particularly on page 3, of

24  Dr. Stewart from December 26, 2018, correct?

25      A.    Correct.

1    *Q.*    And these are things that DCS was relying on,
2    correct?
3    *A.*    That is correct.
4    *Q.*    And then DCS investigated the case, and they
5    discovered that Mother and Father were consulting with an
6    out-of-state naturopath named Becky Plotner, correct?
7    *A.*    Correct.
8    *Q.*    And Ms. Plotner never met the boys in person,
9    correct?
10                MR. CONNELLY:  Form and foundation.
11                THE WITNESS:  That is correct.
12   BY MR. CROWN:
13   *Q.*    And the Court noted those findings.
14                At the bottom of page 3, the Court made
15   this finding:  In November 2019, the Court finds evidence
16   that demonstrated Mother was both on track to reunify and
17   that suggested Mother still did not fully comprehend the
18   seriousness that her own actions played in her children's
19   somewhat shocking physical condition when they were
20   brought to Cardon's in December 2018.
21                And again, that's a finding that you read
22   and that helped guide you in your future supervision of
23   Madison Bell in this case, correct?
24                MR. CONNELLY:  Form and foundation.
25                THE WITNESS:  Correct.

 1  BY MR. CROWN:

 2      *Q.*    And page 4, the last four -- last five lines of

 3  that paragraph:  The Court finds as of November 2019,

 4  there was compelling evidence to show that Mother both

 5  understood the error of her ways in putting the children

 6  on a restrictive diet and that she was not prepared to

 7  parent the children safely because she was blaming the

 8  children's poor and dangerous health on mold, Kenan's

 9  thyroid condition, food sensitivities, stress, and

10  chemical exposure.

11              And so, I mean, Counsel has asked you a lot

12  of those questions, but here's the Court addressing all

13  those and rejecting them, correct?

14              MR. CONNELLY:  Form and foundation.

15              THE WITNESS:  Correct.

16  BY MR. CROWN:

17      *Q.*    Then at the bottom of page 4, the Court stated

18  that based on case notes from February and March of 2020

19  the Court finds, as it did in November 2019, that there

20  was compelling evidence to show that Mother both

21  understood the error of her ways and that she was not

22  prepared to parent the children safely due to not

23  accepting responsibility for her role in their poor

24  physical condition, correct?

25      *A.*    Correct.

 1              MR. CONNELLY:  Where are you at right now?

 2              MR. CROWN:  The bottom of page 4.

 3    BY MR. CROWN:

 4       Q.    Then the Court, to continue making its lengthy

 5    order, stated it reviewed the evidence, and the Court

 6    highlighted additional testimony and evidence it found

 7    compelling, correct?

 8       A.    Correct.

 9       Q.    And then Counsel asked you about Dr. Oakley.

10              And the Court summarized Dr. Oakley's

11    findings and reports, correct?  So evidence about

12    Dr. Oakley was -- that was presented to the Court,

13    correct?

14       A.    Yes.

15       Q.    Then Dr. Rodriguez testified.  And Dr. Rodriguez

16    stated that the children could be returned to Mother with

17    a safety plan in place and a medical gatekeeper.

18    Dr. Rodriguez asserted the mother would not put the

19    children back on the GAPS diet.

20              She believed that the DCS case manager's

21    opinion that Mother would consider GAPS is a

22    misrepresentation of Mother's actual view.  Dr. Rodriguez

23    maintained that Mother understood that Kenan's condition

24    was life-threatening and that medical intervention saved

25    Kenan's life.

1            So this, again, is the Court summarizing
2    testimony it received, and Dr. Rodriguez testified under
3    oath, correct?
4                 MR. CONNELLY:  Form and foundation.
5                 THE WITNESS:  Correct.
6    BY MR. CROWN:
7        Q.    And then the Court in the next paragraph stated
8    that Mother never shared with her own psychologist that
9    she was having trouble in her marriage.  The Court found
10   this peculiar and evidence that even during moments of
11   clarity and realization, Mother withheld significant
12   matters from Dr. Rodriguez that she and Father were
13   divorcing and that Mother was consulting another
14   therapist, and Dr. Rodriguez was unaware Mother was
15   involved in a new romantic relationship.
16            So, again, that's evidence.  Dr. Rodriguez
17   testified, and the Court is making findings as the trier
18   of fact, correct?
19       A.    Correct.
20       Q.    In the next paragraph, the Court found credible
21   Dr. Rodriguez's assessment that Mother has taken
22   responsibility for her decisions that contributed to her
23   children's extraordinary physical condition when they were
24   admitted to Cardon's in December of 2018, but does not
25   believe she harmed her children.

1          So, again, when you as a supervisor receive
2   this type of order, you rely on it and it guides how you
3   are going to supervise the continuing ongoing case
4   management by DCS, correct?
5                    MR. CONNELLY:  Form and foundation.
6                    THE WITNESS:  That is correct.
7                    THE COURT REPORTER:  I need a break.
8                    MR. CROWN:  Okay.
9                    (Recess ensued from 7:35 p.m. until
10  7:43 p.m.)
11  BY MR. CROWN:
12      Q.    So continuing with our review of Exhibit 263,
13  which is the June 11, 2020, court order, at the bottom of
14  page 5 -- we were discussing this -- the Court stated that
15  it remained concerned that as recently as April 2020,
16  Mother was still discussing the impact of mold and Kenan's
17  thyroid condition and his poor physical condition.
18  Finally, the Court finds credible the notion from
19  Dr. Rodriguez that Mother, quote, would not be in the
20  position today if she had not been going down rabbit
21  holes, close quote.
22          Again, that's a finding you reviewed and
23  you took into account because you were supervising Madison
24  Bell, correct?
25                    MR. CONNELLY:  Form and foundation.

1        THE WITNESS:  Correct.

2   BY MR. CROWN:

3        Q.   The Court continued by stating that the Court

4   finds that Mother's willingness to chase down theories

5   about things like mold, bacteria, and dry erase markers

6   serves as detriment to her ability to make sound

7   decisions.

8                And again, that is a finding by the Court

9   that you took into account, correct?

10               MR. CONNELLY:  Form and foundation.

11               THE WITNESS:  Correct.

12  BY MR. CROWN:

13       Q.   Continuing on page 6:  The Court found

14  enlightening the conversations between Dr. Rodriguez,

15  Carla White, and the DCS case manager Madison Bell.  All

16  three seemed to agree that prior to reunification, Mother

17  needed to demonstrate her ability to make medical

18  decisions based in fact.  All three agreed that Mother

19  needed a, quote, medical gatekeeper, close quote, outside

20  of her parents, to ensure her medical decisions for the

21  children were based in fact.

22               Further, Dr. Rodriguez expressed concern

23  about Mother parenting without a medical gatekeeper in

24  place.  The Court found credible Dr. Rodriguez's take on

25  Mother's acceptance and responsibility in this matter,

1   that Mother has -- Mother, quote, has taken responsibility

2   for her decision-making, but she will not say that she has

3   intentionally starved or harmed her children.

4            And then the Court noted that Dr. Rodriguez

5   opined that the safety plan should include Mother

6   identifying, quote, the additional support she has outside

7   of the family, close quote, and for them to know, quote,

8   her decision-making process and having a written plan

9   before making decisions, looking at the facts, and

10  discussing with an objective person, close quote.

11           And again, all those findings are things

12  you read as you continued to supervise Madison Bell,

13  correct?

14           MR. CONNELLY:  Form and foundation.

15           THE WITNESS:  Correct.

16  BY MR. CROWN:

17      Q.   And the Court discussed Dr. Kelly.  And we know

18  that Dr. Kelly testified by Zoom, and the Court found

19  Dr. Kelly's opinions to be credible, as stated on page 7.

20  And then the Court discussed Madison Bell's testimony and

21  the Southwest Health Development senior program manager's

22  testimony.

23           And then starting on page 8, the Court

24  discussed Jessica Kahraman's testimony in a section titled

25  Mother's Testimony, am I correct?

```
 1      A.    Correct.

 2      Q.    And the Court summarized the significance of

 3   what it found as the judge of Jessica Kahraman's sworn

 4   testimony and used adjectives such as we see on page 9,

 5   top paragraph, third line, where the Court stated again:

 6   The Court finds perplexing that Mother is still blaming

 7   mold for the boys' condition.

 8            Correct?

 9      A.    Correct.

10      Q.    Then the Court stated:  The Court has considered

11   all testimony and evidence in this matter.

12            Remember when Counsel asked you about how

13   in the early report, that initial report, it was reported

14   about 500 calories, and then later section, about

15   2,100 calories?

16      A.    Yes.

17      Q.    And later reports didn't have that same section

18   in the report.  But here's the Court receiving the

19   mother's testimony and then stating the Court has

20   considered all the testimony and evidence in this matter.

21            Was that the point you were making earlier,

22   that you would expect the Court to be reviewing the whole

23   file?

24            MR. CROWN:  Form and foundation.

25            THE WITNESS:  Yes.
```

 1 | BY MR. CROWN:
 2 |     *Q.*    And Counsel was saying, Don't you think you
 3 | should remind the Court, and this says the Court has
 4 | considered all the testimony and evidence in this matter,
 5 | correct?
 6 |                 MR. CONNELLY:  Form and foundation.
 7 |                 THE WITNESS:  Correct.
 8 | BY MR. CROWN:
 9 |     *Q.*    And that's your -- consistent of what the Court
10 | was doing in performing its role as the Court presiding
11 | with jurisdiction over this particular dependency matter,
12 | correct?
13 |                 MR. CONNELLY:  Form and foundation.
14 |                 THE WITNESS:  Correct.
15 | BY MR. CROWN:
16 |     *Q.*    The judge stated that Mother has only taken
17 | partial responsibility for her actions.  Mother's
18 | references on March 27, 2020, to being thankful for
19 | everything Ms. Plotner did for her boys and mentioning
20 | mold as a factor recently as March or April 2020 undercut
21 | her acceptance of responsibility.
22 |                 Again, a finding by the Court, correct?
23 |                 MR. CONNELLY:  Form and foundation.
24 |                 THE WITNESS:  Yes.
25 |

1  BY MR. CROWN:

2      Q.    The Court continued towards -- the

3  second-to-last paragraph on page 9:  The Court is also

4  concerned about whether Mother has the ability to

5  recognize when her children are in medical distress and

6  need medical attention.  The Court finds little evidence

7  to demonstrate she now has the common sense to seek

8  medical attention when appropriate.  In this respect, the

9  Court finds credible Dr. Kelly's assessment.

10             And then, it said:  The Court agrees with

11  Dr. Rodriguez, Carla White, and Madison Bell that a

12  medical gatekeeper must be in place prior to returning the

13  children to Mother's care.

14             The Court is addressing all these factors

15  and testimony as it's making its findings of fact,

16  correct?

17      A.    Yes.

18      Q.    Then, in the last paragraph, it says:  The Court

19  has weighed the evidence and find that Mother has not met

20  her burden in this case.

21             So again, she was the one that filed the

22  Rule 59 motion, and the Court stated she did not meet her

23  burden to return physical custody to her, correct?

24             MR. CONNELLY:  Form and foundation.

25             THE WITNESS:  Correct.

1  BY MR. CROWN:

2      *Q.*   And that's the Court's order.  DCS has to follow

3  that court order, correct?

4                MR. CONNELLY:  Form and foundation.

5                THE WITNESS:  Correct.

6  BY MR. CROWN:

7      *Q.*   The Court found that there was a substantial

8  risk of harm to the children's physical, mental, and

9  emotional health because Mother has not shown she can seek

10  appropriate medical attention for the children or that she

11  would act in the children's mental and emotional best

12  interests.  Very recently, she did not attend a CFT

13  meeting because she was prohibited from recording the

14  meeting.  This shows she is still putting her own wants

15  before her children.

16                And that was a finding you read, correct?

17                MR. CONNELLY:  Form.

18                THE WITNESS:  Yes.

19  BY MR. CROWN:

20      *Q.*   Now, Counsel was asking you:  This case is

21  really only about the GAPS diet.

22                But, in fairness, isn't it about all of the

23  things that the Court articulated in this June 11, 2020,

24  order?

25      *A.*   Yes.

 1      Q.   Then the Court continued on page 10, and the

 2   Court stated it considered DCS's request for a change in

 3   the case plan to termination and adoption, and the Court

 4   denied DCS's request to change the case plan to

 5   termination and adoption, correct?

 6      A.   Correct.

 7      Q.   So the case plan for Mother and Father remained

 8   reunification, correct?

 9      A.   Yes.

10      Q.   Counsel at one point asked you:  It's commonly

11   known that all judges in juvenile court are just rubber

12   stamps for DCS.

13               Do you remember that?

14               MR. CONNELLY:  Form and foundation.

15               THE WITNESS:  I do remember that.

16               MR. CROWN:  I took issue with that, and I'm

17   going to take issue right now.

18               MR. CONNELLY:  I take issue with the

19   characterization of what I said.

20   BY MR. CROWN:

21      Q.   Here was the Court disagreeing with DCS's

22   request to sever the boys from their mother, correct?

23      A.   Correct.

24      Q.   In Exhibit 264, that is a order dated July 9,

25   2020, from Judge Green.  And Mother had filed a motion for

1  injunctive relief to remove Madison Bell as the ongoing

2  caseworker in this case, correct?

3      *A.*   Yes.

4      *Q.*   And the Court on page 2 stated it was unable to

5  find in the record any evidence that the Court found that

6  DCS had not provided Mother with meaningful opportunity to

7  reunify.

8              And you read that finding, correct?

9      *A.*   Yes.

10     *Q.*   And so the Court on page 3 found that DCS has

11  made reasonable and diligent efforts to provide

12  reunification services to Mother and denied Mother's

13  request for injunctive relief to remove Madison Bell,

14  correct?

15     *A.*   Correct.

16     *Q.*   And with Madison staying on the case, as of this

17  date in July 2020, you stayed on the case as her

18  supervisor, correct?

19     *A.*   Correct.

20     *Q.*   Now, Exhibit 265 is the next progress report.

21  And this is the one that Counsel showed you an unsigned

22  copy, but you were saying you were out of town.

23              So we see on the last page of this exhibit

24  it is signed as a DCS supervisor by Taylor Ferguson for

25  Mecca Temple, correct?

1      *A.*    Correct.

2      *Q.*    And you were not saying it is not that you

3    disagree with anything in this report, you are simply

4    pointing out that another supervisor signed it on your

5    behalf because you were out of town, correct?

6      *A.*    Yes.

7      *Q.*    And then in Section 8 DCS, under their

8    recommendations, was now recommending:  It is respectfully

9    recommended that Dylan and Kenan be placed in the physical

10   custody of their Father, Ahmet Kahraman.

11              Correct?

12     *A.*    Yes.

13     *Q.*    So by this point in the history of this case,

14   DCS had determined that Ahmet had satisfied and met his

15   goals and so he was a fit parent suitable for taking

16   physical custody of his sons, correct?

17              MR. CONNELLY:  Form and foundation.

18              THE WITNESS:  Correct.

19   BY MR. CROWN:

20     *Q.*    But that by itself doesn't mean that Ahmet

21   automatically gets physical custody; it still has to go to

22   the court for a court order, correct?

23     *A.*    That's correct.

24     *Q.*    And then Exhibit 266 was the CASA court report

25   that was filed with the Court on August 12, 2020.

 1              And on page 2 in the opinion of the CASA,

 2   it is stated:  It is this CASA's opinion that Ms. Kahraman

 3   continues to lack insight into how her actions and

 4   behaviors, not just the diet, led to the deterioration of

 5   the boys' health, causing unnecessary physical and

 6   emotional suffering.  Disturbing reports of internal

 7   hydrotherapy a month before Kenan's admission for heart

 8   failure and Mother's report that Kenan had a colonic the

 9   day before admission are reflected in the records.

10              So again, in the interest of time not

11   reading everything, but you received a copy.  But again,

12   this is the independent report of the CASA to the Court?

13       *A.*   Correct.

14       *Q.*   And then the recommendations by the CASA were

15   that the motion for change in physical custody of both

16   boys to their Father be granted.

17              And so that was the CASA recommendation

18   consistent with the DCS recommendation, correct?

19       *A.*   Correct.

20       *Q.*   Now, if we go to 268, this is a court order by

21   Judge Green dated 8/14 of 2020, and it is titled Report

22   and Review Hearing.

23              On page 2, it states:  The Department moved

24   for a change in physical custody of the children to

25   Father.  The Court finds that the children continue to be

 1    dependent according to the statutes.  It is ordered that

 2    the above-named children remain a ward of the Court in the

 3    legal care and custody and control of the Department of

 4    Child Safety.  The Court finds that there is still need

 5    for out-of-home care based upon the information presented.

 6              And then the Court finds on page 3 that the

 7    Department of Child Safety has made reasonable efforts to

 8    finalize the permanency plan for the children.

 9              You read all that, correct?

10        A.    Correct.

11        Q.    And the Court set this matter for the second

12    Rule 59 evidentiary hearing in this case on August 31,

13    2020, correct?

14        A.    Correct.

15        Q.    Now we move to Exhibit 275.  And Exhibit 275 --

16    I'm sorry.  274, let's go to 274 first.  274 is an order

17    by Judge Green dated August 26, 2020.  And this was a

18    ruling based on several pleadings that were filed.

19              One was the mother, Jessica Kahraman, filed

20    a document called Rebuttal to CASA Susan Stark's Report,

21    we just reviewed.  And then DCS filed a response and

22    objection.  And the guardian ad litem filed a response to

23    Mother's rebuttal.  And both DCS and the guardian ad litem

24    said they objected to Mother's request to remove the CASA.

25              And so the Court stated:  Tucked deep into a

1  pleading entitled Rebuttal to CASA Susan Stark's Report,

2  on page 5 in the last sentence, the mother asked the Court

3  to remove the CASA from this case.  The Court wonders how

4  serious a request this is based on the fact that the

5  request is not mentioned in the caption or the first

6  paragraph of Mother's pleading.

7            You read that, correct?

8      *A.*   Correct.

9      *Q.*   Continue on the top of page 2:  In fact, the

10 Court only knew about the request due to the objections

11 filed by DCS and the GAL in the captions of their

12 responses.

13           And then the Court stated:  The Court has

14 reviewed all the pleadings.  The Court finds that the

15 context of Mother's unusual request is helpful during the

16 pendency of this case.  Mother has asked the Court to

17 remove the DCS case worker, to remove Southwest Human

18 Development as her service provider, and has refused to be

19 assessed by Dr. Michael Kelly.

20           Mother alleges as to the CASA that the CASA

21 should review several important case documents to address

22 the CASA's concerns.  Mother asserted that the CASA's

23 conversations with the children are outside the

24 appropriate scope of her role.

25           And that's something you would have read,

1 correct?

2     *A.*   Correct.

3     *Q.*   The Court then summarized DCS's objection to

4 removing the CASA and next summarized the guardian ad

5 litem 's objection.  And then the Court found that the

6 CASA has identified the children's best interest and

7 advocated for the children in court, that the CASA reports

8 in this matter have been helpful to the Court, as this

9 case has presented a dizzying -- D-I-Z-Z-Y-I-N-G -- series

10 of events and some issues of first impression for the

11 Court.

12           And the Court continued and ultimately, the

13 Court on page 3 stated:  The CASA has been a steady hand

14 as this case has unfolded.  The CASA has regularly

15 attended the court hearings and met with the children.

16 The CASA's work in this case has assisted the Court.

17           Again, things that you read and relied on

18 as the Court made these findings, correct?

19     *A.*   Correct.

20     *Q.*   And then ultimately, the Court ruled that it

21 declined to remove the CASA from this case and ordered

22 denying Mother's request to remove the CASA tucked inside

23 its Rebuttal to CASA Susan Stark's Report.

24           And you read that, correct?

25     *A.*   Correct.

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1    *Q.*   So now we go to 275.  And this is the order of

2    Judge Green dated August 31, 2020, which is the second of

3    the three Rule 59 motions for change of physical custody.

4                   And the second one was the hearing that was

5    set on DCS's motion for change of physical custody of the

6    children to Father, Ahmet Kahraman, correct?

7    *A.*   Correct.

8    *Q.*   And the Court noted that it was in receipt of

9    Mother's motion for change of physical custody, and the

10   Court set that matter for another date and time, to hear

11   Mother's motion, correct?

12   *A.*   Correct.

13   *Q.*   And then the Court proceeded by the evals as to

14   DCS motion for change of custody, all the exhibits that

15   were filed.  Mother objected, and so the mother was

16   contesting Father's motion -- or the DCS motion for change

17   of physical custody.

18                   And ultimately, the Court ordered granting

19   the motion of change of physical custody to Ahmet,

20   correct?

21   *A.*   Correct.

22   *Q.*   Okay.  Exhibit 276 was the Court's order from

23   September 15, 2020.

24                   And this was the order from the third of

25   three Rule 59 motions, on Mother's motion for change of

 1   physical custody, correct?

 2        *A.*   Correct.

 3        *Q.*   So this was the second motion that Jessica

 4   Kahraman had filed for change of physical custody pursuant

 5   to Rule 59, correct?

 6        *A.*   Correct.

 7        *Q.*   And the Court noted that Dr. Eli Newberger was

 8   sworn and testified, correct?

 9        *A.*   Correct.

10        *Q.*   And so his 64-page report that was disclosed in

11   May of 2020 was presented to the Court, and then his sworn

12   testimony was presented, correct?

13                  MR. CONNELLY:  Form and foundation.

14                  THE WITNESS:  Correct.

15   BY MR. CROWN:

16        *Q.*   Dr. Ann Schroeckenstein, Dr. Celice Korsten all

17   testified.

18                  And the Court notes that, correct?

19        *A.*   Correct.

20        *Q.*   And then the Court took the matter under

21   advisement, correct?

22        *A.*   Correct.

23        *Q.*   Now, Exhibit 278 is the last of the progress

24   reports that DCS filed with the Court.  And this was

25   prepared by Madison Bell.

1              It was signed in approval by you as

2   Madison's supervisor?

3       *A.*   Correct.

4       *Q.*   And Section 8 was the DCS specialist's

5   conclusions and ultimately recommending that -- this

6   matter now being that Ahmet was being a safe and

7   appropriate parent, recommending that the dependency can

8   be terminated with that finding, correct?

9       *A.*   Sure.

10      *Q.*   And the recommendation would mean that Ahmet

11  would have physical custody and control of the boys and

12  that DCS recommended that Mom still had supervised visits,

13  correct?

14      *A.*   Correct.

15      *Q.*   Based on the fact that Mom had not progressed to

16  the level of being able to safely and independently have

17  physical custody and control of the boys, but Ahmet had,

18  correct?

19              MR. CONNELLY:  Form and foundation.

20              THE WITNESS:  Correct.

21  BY MR. CROWN:

22      *Q.*   And then the mother objected.  If we look at

23  Exhibit 279, Mother filed an objection to the Court's

24  consideration of that very report.

25              And the Court received that objection,

1    correct?

2        *A.*    Correct.

3        *Q.*    In Exhibit 280, the CASA filed a report after

4    the November 9, 2020, hearing.

5                And the CASA, on page 3, ultimately said

6    that the case plan goal is family reunification; DCS has

7    made reasonable efforts to achieve this goal.

8                And that was the CASA telling that to the

9    Court, correct?

10                MR. CONNELLY:  Form and foundation.

11                THE WITNESS:  Correct.

12    BY MR. CROWN:

13        *Q.*    And then the recommendation, they recommended

14    that both boys remain in the physical custody of their

15    father, Ahmet Kahraman, correct?

16        *A.*    Correct.

17        *Q.*    And then the Court issued the last order -- as

18    Exhibit 281 -- Judge Green, dated November 9, 2020.  And

19    this order is titled Report and Review Hearing, Dependency

20    Petition Dismissed, Temporary Family Court Orders Entered.

21                So those three things are covered by this

22    order, correct?

23        *A.*    Correct.

24        *Q.*    On page 2, the Court ordered dismissing the

25    dependency action, releasing the children from the

1  wardship of the Court and relieving DCS of further

2  responsibility for the children, correct?

3       A.   Correct.

4       Q.   Would that end your involvement as a supervisor

5  in the ongoing portion of this case?

6       A.   Correct.

7       Q.   That would end Madison Bell's involvement?

8       A.   Correct.

9       Q.   That would end DCS's involvement?

10      A.   Correct.

11      Q.   And then the Court further ordered that --

12  relieving the foster care review board and all

13  court-appointed attorneys and guardian ad litems for their

14  responsibility in this case, correct?

15      A.   Correct.

16      Q.   So that means the CASA, the foster care review

17  board, and the guardian ad litem, all relieved, correct?

18      A.   Correct.

19      Q.   Now, the Court then issued temporary orders in

20  the family court matter that was now taking -- they had

21  had jurisdiction over the divorce, and now the boys were

22  going to be subject to the family court's jurisdiction,

23  correct?

24      A.   Correct.

25      Q.   And the Court noted at the bottom of page 2:

 1  This matter has been under the exclusive jurisdiction of

 2  the juvenile court -- top of page 3 -- the matter came

 3  before the juvenile court based upon the petition for

 4  dependency filed on January 3, 2019.  During the course of

 5  the proceedings, each parent was offered a variety of

 6  services designed to address the issues presented.

 7            Correct?

 8      A.    Correct.

 9      Q.    And the Court summarized that the father

10  successfully remediated the identified issues and there no

11  longer exist any legal or factual basis for the children

12  to remain wards of the Court, correct?

13      A.    Correct.

14      Q.    Is that because once there is one fit parent,

15  there is no longer a need to have the dependency, correct?

16            MR. CONNELLY:  Form and foundation.

17            THE WITNESS:  That's correct.

18  BY MR. CROWN:

19      Q.    But as for Mother, the Court found that there

20  remained several concerns, including the following:

21  whether she completed all of her treatment goals with

22  Southwest Human Development, including whether she fully

23  took responsibility for her role in what happened with the

24  children; whether she is ready for unsupervised parenting

25  time, she currently has supervised parenting time and no

1    provider who has supervised her during parenting time has

2    opined that she is ready for unsupervised parenting time;

3    whether she is prepared to make medical decisions for the

4    children based on facts and science.

5         *A.*    Correct.

6         *Q.*    It's the Court's finding.  So again, I want to

7    emphasize because Counsel asked you a lot of questions

8    about these other providers.

9              Here's the Court finding that no provider

10   who has supervised her during parenting time has opined

11   that she is ready for unsupervised parenting time,

12   correct?

13                MR. CONNELLY:  Form and foundation.

14                THE WITNESS:  Correct.

15   BY MR. CROWN:

16        *Q.*    And that's consistent with how you viewed it, as

17   one component part in this overall dependency proceeding,

18   correct?

19        *A.*    Correct.

20        *Q.*    The Court said:  To be clear, Mother has made

21   strides since this case opened and has engaged in

22   supervised visitation with the children, which has been

23   going well.  But, the Court said, however, Mother had not

24   remedied all of her outstanding issues and she contests

25   these temporary orders.  For all these reasons, the Court

1  orders DCS to file the following three pleadings

2  confidentially for the benefit of the family court judge:

3  the very first and most recent DCS court report and

4  Mother's objection to the last court report.

5           And DCS, of course, followed that court

6  order, correct?

7       *A.*   Correct.

8       *Q.*   Then the Court, in the temporary legal

9  decision-making authority section, said it is ordering

10 that Father, Ahmet Kahraman, is awarded temporary sole

11 legal decision-making authority and that the children

12 shall reside with their Father, correct?

13      *A.*   Correct.

14      *Q.*   The Court addressed supervision of parenting

15 time, filing of a total of five records, and notice to the

16 parents.  And then the later finding of the Court on

17 page 5 state:  The Court finds that all outstanding

18 motions are moot in this matter as the case has been

19 dismissed.

20           Correct?

21      *A.*   Yes.

22      *Q.*   And among those motions that were pending at the

23 time of this termination was Mother's second request under

24 Rule 59 to change physical custody.

25           The evidentiary hearing was heard on

1    September 15, 2020, and the Court declared all such

2    motions to be moot, correct?

3        *A.*    Correct.

4        *Q.*    Can I ask you to look at Exhibit 40.  Counsel

5    was asking you about a report from Dr. Oakley.

6                And as we have already seen, going way past

7    this, Dr. Oakley testified, the Court evaluated her

8    credibility and ultimately made findings of fact regarding

9    her testimony, correct?

10       *A.*    Correct.

11       *Q.*    But in paragraph -- so on page 21 of this

12   exhibit, the section that's titled Additional Issues, and

13   we turn to Section 7.

14               MR. CONNELLY:  Page 21?

15               MR. CROWN:  Page 21.

16   BY MR. CROWN:

17       *Q.*    And I just want to read this to you because

18   Counsel showed you this report:

19               Dr. Oakley concluded that there is concern

20   that Mother is continuing to deny medical neglect, despite

21   evidence suggesting that both children have been able to

22   walk, eat a variety of foods, be exposed to white board

23   markers, have improved overall physical health, and have

24   gained weight since they have been removed from their

25   parents' care.  There is not sufficient evidence to

 1  suggest that Ms. Kahraman was intentionally harming them,
 2  yet it seems as though Ms. Kahraman's fears and rigidity
 3  have been interfering with the children's health and
 4  growth.
 5              Again, something that was in this exhibit
 6  and presented ultimately to the Court, correct?
 7              MR. CONNELLY:  Form and foundation.
 8              THE WITNESS:  Correct.
 9  BY MR. CROWN:
10     Q.   Now, in all these records -- or in all these
11  hearings that were held by the Court, I did not see that
12  Dr. Scott Jensen or Dr. Jafri ever testified.
13              Are you aware of whether they ever
14  testified for the Court?
15     A.   I don't believe they did.
16     Q.   And Counsel asked you about them, and among the
17  things he asked you -- and I want to clarify something.
18              He said:  Did you -- as an ongoing
19  supervisor, did you ever direct Madison Bell or review
20  yourself these prior pediatric records of Kenan and Dylan
21  from their birth in 2012 through before their -- before
22  Kenan's hospitalization?
23              And he went through a series of things
24  about quoting -- or paraphrasing the statute about prompt
25  and thorough investigation, although that's -- you are not

 1  involved in the prompt and thorough investigation stage,
 2  am I right?
 3      A.   Correct.
 4      Q.   With that being said, he was telling you about
 5  that, and I wrote it down.  He got done with a question,
 6  and you go:  Okay.
 7              And I just want to make sure:  Were you
 8  saying you agreed with him in some way that DCS had not
 9  conducted a prompt and thorough investigation, or were you
10  speaking, as people often do, you're kind of
11  acknowledging, I heard your question, with the word
12  "okay."
13              And I don't want the record to be
14  misunderstood, so why don't you explain.
15              MR. CONNELLY:  Form and foundation.
16              THE WITNESS:  It is like just a response to
17  say I heard you, kind of keep going.
18  BY MR. CROWN:
19      Q.   Right.  But your "okay" should not be
20  interpreted as meaning, yes, I agree with the premise of
21  your question?
22              MR. CONNELLY:  Form and foundation.
23              THE WITNESS:  Correct.
24  BY MR. CROWN:
25      Q.   It was more:  I just heard your question and I

 1  understood the entirety of your question, but I am not

 2  agreeing with it, by the word "okay"?

 3              MR. CONNELLY:  Form and foundation.

 4              THE WITNESS:  Correct.

 5  BY MR. CROWN:

 6      Q.    Mecca, did you act at all times lawfully in this

 7  case?

 8              MR. CONNELLY:  Form and foundation.

 9              THE WITNESS:  Yes.

10  BY MR. CROWN:

11      Q.    Did you follow the Arizona statutes that apply

12  to dependency proceedings in this case and DCS's

13  involvement in this case based on your role as a

14  supervisor in the ongoing phase?

15              MR. CONNELLY:  Form and foundation.

16              THE WITNESS:  Yes.

17  BY MR. CROWN:

18      Q.    Did you follow court orders?

19              MR. CONNELLY:  Form and foundation.

20              THE WITNESS:  Yes.

21  BY MR. CROWN:

22      Q.    Was there a reasonable basis for all the actions

23  you took as a supervisor?

24              MR. CONNELLY:  Form and foundation.

25              THE WITNESS:  Yes.

```
 1  BY MR. CROWN:
 2       Q.   Did you ever misrepresent any information to the
 3  Court?
 4                   MR. CONNELLY:  Form and foundation.
 5                   THE WITNESS:  No.
 6  BY MR. CROWN:
 7       Q.   Did you ever deliberately misrepresent any
 8  information to the Court?
 9                   MR. CONNELLY:  Form and foundation.
10                   THE WITNESS:  No.
11  BY MR. CROWN:
12       Q.   Did you ignore exculpatory evidence?
13                   MR. CONNELLY:  Form and foundation.
14                   THE WITNESS:  No.
15  BY MR. CROWN:
16       Q.   Did you ever act unlawfully?
17                   MR. CONNELLY:  Form and foundation.
18                   THE WITNESS:  No.
19  BY MR. CROWN:
20       Q.   Did you ever act unwarrantly?
21                   MR. CONNELLY:  Form and foundation.
22                   THE WITNESS:  No.
23  BY MR. CROWN:
24       Q.   Did you ever act with an unfounded in -- an
25  unfounded basis regarding your role as a supervisor in
```

```
 1  this case?
 2              MR. CONNELLY:  Form and foundation.
 3              THE WITNESS:  No.
 4  BY MR. CROWN:
 5      Q.   Did you act arbitrarily?
 6              MR. CONNELLY:  Form and foundation.
 7              THE WITNESS:  Which technically means?
 8  BY MR. CROWN:
 9      Q.   "Arbitrarily" means with no basis, just --
10      A.   No.
11              MR. CONNELLY:  Form and foundation.
12  BY MR. CROWN:
13      Q.   Did you act unreasonably?
14              MR. CONNELLY:  Form and foundation.
15              THE WITNESS:  No.
16  BY MR. CROWN:
17      Q.   Did you ignore the reports of Dr. Oakley,
18  Dr. Newberger, and Dr. Schroeckenstein?
19              MR. CONNELLY:  Form and foundation.
20              THE WITNESS:  No.
21  BY MR. CROWN:
22      Q.   Did you hire Dr. Kelly to merely agree with DCS?
23              MR. CONNELLY:  Form and foundation.
24              THE WITNESS:  No.
25
```

```
 1  BY MR. CROWN:
 2      Q.   Did you interfere with Jessica Kahraman's
 3  attempts to visit the boys?
 4              MR. CONNELLY:  Form and foundation.
 5              THE WITNESS:  No.
 6  BY MR. CROWN:
 7      Q.   Did you interfere with Jessica Kahraman's
 8  efforts to regain custody of the boys?
 9              MR. CROWN:  Form and foundation.
10              THE WITNESS:  No.
11  BY MR. CROWN:
12      Q.   And did you misrepresent information to the
13  juvenile court when attempting to terminate Jessica
14  Kahraman's parental rights?
15              MR. CROWN:  Form and foundation.
16              THE WITNESS:  No.
17              MR. CROWN:  That's all the questions I
18  have.
19
20                    EXAMINATION
21  BY MR. CONNELLY:
22      Q.   Do you know what happened when the case
23  transferred to the family court after DCS ended its
24  involvement?
25              MR. CROWN:  Objection to form and
```

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

```
 1  foundation.
 2                  THE WITNESS:  No.
 3  BY MR. CONNELLY:
 4      Q.   So you are unaware that very soon after the case
 5  was in family court, Mother was given unsupervised visits,
 6  right?
 7                  MR. CROWN:  Objection to form and
 8  foundation.
 9                  THE WITNESS:  Correct.  I didn't know about
10  that.
11  BY MR. CONNELLY:
12      Q.   Did you know that Father voluntarily
13  relinquished his parental rights and the mother has sole
14  legal custody of the children?
15                  MR. CROWN:  Objection to form and
16  foundation.
17                  THE WITNESS:  No.
18  BY MR. CONNELLY:
19      Q.   What do you think about that?
20                  MR. CROWN:  Objection to form and
21  foundation.
22  BY MR. CONNELLY:
23      Q.   That after -- what do you think about the fact
24  that after the Department advocated for Father to be the
25  custodial parent, he then voluntarily relinquished his
```

 1  rights?
 2              MR. CROWN:  I am going to instruct her not
 3  to answer.
 4              Don't answer.
 5              It is a purely argumentative question.
 6  She's not going to answer it.
 7              MR. CONNELLY:  I think I am entitled to --
 8              MR. CROWN:  No, you're not.
 9              MR. CONNELLY:  I think I am entitled to an
10  answer to the question.
11              MR. CROWN:  No, you are not.  Because you
12  would have to educate her on about five hours of what
13  happened in the family court.  So I'm going to instruct
14  her not to answer.
15              MR. CONNELLY:  I think it is an improper
16  instruction.  So I just want to put that on the record.
17              Few other things.  I am going to go
18  quickly.
19              THE REPORTER:  No, you are not.
20  BY MR. CONNELLY:
21      Q.    As far as Exhibit 204 goes, this is an order
22  that was drafted by the Attorney General's office and not
23  the Court, right?
24      A.    Correct.
25      Q.    And if you turn to page 4, Counsel was asking

1  you about findings that the Court made on page 4.  And

2  DCS -- or excuse me, the Attorney General's office drafted

3  the two findings that we find on page 4, not the Court,

4  right?

5       A.   Well, it says the Court finds.

6       Q.   The question is:  The Court didn't draft this

7  order and it didn't draft these findings, the Attorney

8  General's office drafted them, right?

9            MR. CROWN:  Objection.  Form and

10 foundation.

11 BY MR. CONNELLY:

12      Q.   Do you agree with me that this document is on

13 attorney -- has the Attorney General's office in the

14 caption of the document, indicating that they drafted it

15 and submitted it to the Court?

16      A.   Correct.

17      Q.   And on page 4, you don't see any strike-outs or

18 handwritten insertions, right?

19      A.   No.  I believe the Court does the handwriting on

20 the first page.

21      Q.   Okay.  The Court didn't change these findings at

22 all that were drafted and submitted to the Court by the

23 Attorney General's office, right?

24      A.   Correct.

25      Q.   And as far as all the other findings -- or --

1   well, no.  As far as all the orders, all those orders were

2   drafted by the Attorney General's office and not revised

3   by the Court, right?

4        A.    Correct.

5        Q.    Exhibit 208.  Have you ever -- I'm sorry.

6              If you go to the fourth page, Counsel asked

7   you about the Court finding, at the very top where it

8   says:  The Court finds that the Department of Child Safety

9   has made reasonable efforts to prevent the removal of the

10  children from the home and that continuation in the home

11  would be contrary to the welfare of the children and that

12  it was reasonable to make no efforts to maintain the

13  children in the home.

14             And at this time in 2019, you had been

15  working at the Department for 12 years, right?

16       A.    Yes.

17       Q.    As a case manager and as a supervisor combined

18  in that 12 years, right?

19       A.    Correct.

20       Q.    And in those 12 years, have you ever seen the

21  Court not make this finding of reasonable efforts?

22             MR. CROWN:  Objection to the form and

23  foundation.

24             THE WITNESS:  Yes.

25

 1 | BY MR. CONNELLY:
 2 |     *Q.*    In what circumstance?
 3 |     *A.*    Potential -- a TCN expiring and the child not
 4 | being returned or a petition not being filed.  And
 5 | possibly prior to us doing the CAR.
 6 |     *Q.*    So in the case where DCS clearly violated time
 7 | requirements in the -- in the law, the Court found that
 8 | DCS did not act reasonably?
 9 |     *A.*    Correct.
10 |     *Q.*    And how many times have you seen a court reject
11 | this finding?
12 |              MR. CROWN:  Objection to form and
13 | foundation.
14 | BY MR. CONNELLY:
15 |     *Q.*    Just the one time?
16 |     *A.*    The one time that I can recall.
17 |     *Q.*    So one time in 12 years.  It was only one time
18 | in 12 years that you had a court --
19 |     *A.*    Personally for me, yes.
20 |     *Q.*    Right.  Exhibit 216.  This was the addendum
21 | report where the etiology language appears.  And Merriam
22 | Webster defines "etiology" as the cause of a disease or
23 | abnormal condition.
24 |              Did you -- do you understand that to be the
25 | definition of "etiology"?

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

1          MR. CROWN:  Objection to form and

2   foundation.

3          THE WITNESS:  Yes.

4   BY MR. CONNELLY:

5      Q.   And so the use of the word "etiology" in its

6   definition would refer to the etiology of the disease or

7   abnormal condition, the heart failure or the pulmonary

8   hypertension, right?

9          MR. CROWN:  Objection to form and

10  foundation.

11         THE WITNESS:  I would say, yes, the heart

12  failure.

13  BY MR. CONNELLY:

14     Q.   Exhibit 225, this is the FRC review board.  On

15  page 3, No. 7, what was the established target date?

16     A.   Typically it would have been six months from

17  removal.

18     Q.   But there's nowhere in here where it states what

19  the target date is that the FRCB is finding to not be

20  realistic, right?

21     A.   We would have e-mailed them the case plan,

22  that's where they would have got that date, or off a court

23  report.

24     Q.   Okay.  And you are saying typically that would

25  be a six-month date?

1       A.    Yes.

2       Q.    But you can't tell me right now whether it was

3  six months or a year, right?  You think it was six months,

4  though, is that what you are saying?

5       A.    Yes.

6       Q.    There is also a statement that -- or no, no, no.

7            We see -- Counsel showed you some reports,

8  there are some of these exhibits where the statement was

9  that once the boys were taken into DCS custody, that they

10 are -- that they were eating well and their health was

11 improving, right?

12      A.    Yes.

13      Q.    Do you remember that?

14      A.    Yes.

15      Q.    And do you agree that if children are living in

16 a mold-infested environment and they are then removed from

17 that environment, if they had medical issues that were

18 related to the mold, you would expect that once they were

19 removed from that environment, that they would begin to

20 improve medically, right?

21           MR. CROWN:  Objection to form and

22 foundation.

23           THE WITNESS:  I don't have any knowledge

24 about mold.

25

```
 1   BY MR. CONNELLY:
 2       Q.   You have common sense, though, right?
 3       A.   I do.
 4       Q.   And the jurors have common sense, and you are
 5   aware that the Court instructs jurors that they can rely
 6   on their common sense, right?
 7               MR. CROWN:  Objection to form and
 8   foundation.
 9               THE WITNESS:  I just don't feel comfortable
10   giving an opinion on mold.
11   BY MR. CONNELLY:
12       Q.   My question is:  Does common sense suggest to
13   you that if children are living in a mold-infested
14   environment and experiencing health problems, that their
15   health will improve once they are removed from that
16   mold-infested environment?
17               MR. CROWN:  Objection to form and
18   foundation.
19               THE WITNESS:  I don't -- I don't have a
20   comment.
21   BY MR. CONNELLY:
22       Q.   You do have common sense, though, right?
23               MR. CROWN:  Objection.
24               Don't answer that.
25               Move on.  Argumentative and insulting.
```

 1 | Let's go.
 2 |            MR. CONNELLY:  It is insulting that she
 3 | can't answer that question --
 4 |            MR. CROWN:  Move on.
 5 |            MR. CONNELLY:  That's what's insulting.
 6 |            MR. CROWN:  Move on.  It is 8:28.  Let's
 7 | go.
 8 | BY MR. CONNELLY:
 9 |    Q.    In Exhibit 229, the Court didn't require the PCH
10 | specialist to be -- or the PCH doctor, who was going to
11 | give another opinion on the mold testing issue, to be a
12 | mold specialist, did she?
13 |            MR. CROWN:  Objection.  Form and
14 | foundation.
15 |            THE WITNESS:  I don't recall if it stated
16 | that.
17 | BY MR. CONNELLY:
18 |    Q.    Exhibit 246 is the second amended dependency
19 | petition.  And in relation to the second amended
20 | dependency petition, you were asked questions about
21 | Exhibit 247, which is the Court's rulings in the
22 | dependency matter.
23 |            And you recall that in the second amended
24 | petition, that the allegations of abuse and the factual
25 | allegations that relate to medical abuse were all stricken

1   out of the petition, right?

2       *A.*    That the abuse and the neglect was left.

3       *Q.*    Right.  Abuse was stricken out, right?

4       *A.*    Correct.

5       *Q.*    And only neglect was left, right?

6       *A.*    Correct.

7       *Q.*    And if you look at page -- like pages 5, 6, and

8   7, and then also pages 8, 9, 10, the factual allegations

9   that relate to medical abuse were stricken out, right?

10      *A.*    I don't recall without having to go through and

11  read all of it.

12      *Q.*    Well, let's just look at page 5.  The allegation

13  that the parents have stated strong beliefs regarding

14  their children's diet and medical care was stricken out,

15  right?

16              I am looking at page -- line 1 and 2.  Do

17  you see --

18      *A.*    Yes.

19      *Q.*    -- that was stricken out?

20              And then starting on line 5, for example,

21  the parents have the children on a strictly restrictive

22  diet and both children have been assessed by medical

23  providers as being malnourished was stricken out of the

24  petition, right?

25      *A.*    Yes.

1      *Q.*   And the allegations on -- that begin on line 9

2   or between lines 9 and 10 where it says the -- this

3   provider -- well, let's start before that, I guess.

4           Parents claimed -- on line 7 -- that their

5   children's diet was being managed by an out-of-state

6   provider, Becky Plotner, who specialized in the GAPS diet.

7   This provider never saw the children in person and is not

8   medically licensed.  The records provided from Ms. Plotner

9   indicate that she relied solely on Mother's reports

10  regarding the children's symptoms and what the children

11  were eating.

12           That was all stricken out, right?

13     *A.*   Stricken as in crossed out but doesn't mean it

14  didn't happen.

15     *Q.*   Stricken out from the dependency petition?

16     *A.*   Yes.

17     *Q.*   There were no longer allegations being made in

18  the dependency petition that the Court was going to rule

19  on in Exhibit 247, right?

20     *A.*   If -- correct.

21     *Q.*   And then you are aware, are you not, that the

22  finding of neglect was -- was -- well, in Exhibit 247,

23  where it says on the second page that Mother does not

24  contest, that's because there was an agreement between the

25  mother and the Department or the Attorney General's office

1  that she was going to stipulate to a finding of neglect,
2  right?
3              MR. CROWN:  Objection to form and
4  foundation.
5              THE WITNESS:  I mean, that's usually what
6  the amended petitions are for.
7  BY MR. CONNELLY:
8      Q.   Because a parent is going to stipulate to a
9  finding, right?
10     A.   Correct.
11     Q.   And that's why Mother didn't object to the
12 ability to present evidence and not do it, right?
13     A.   I don't know why Mother didn't contest.
14     Q.   I am not asking you why she decided to
15 stipulate.  But the fact that this hearing was held and
16 she did not contest was because of stipulation?
17             MR. CROWN:  Objection.
18             THE WITNESS:  Well, Father's says
19 stipulation.  Mom's doesn't.  Mom's just says she doesn't
20 contest.
21 BY MR. CONNELLY:
22     Q.   But Mother was part of the agreement to
23 stipulate to a finding of neglect, do you remember that?
24             MR. CROWN:  Objection to form and
25 foundation.

```
 1                  THE WITNESS:  Not specifically, no.
 2   BY MR. CONNELLY:
 3        Q.    Exhibit 251.
 4                  MR. CROWN:  Hang on one second.
 5   BY MR. CONNELLY:
 6        Q.    This is -- these are findings that were drafted
 7   by the Attorney General's office, right?
 8        A.    Correct.
 9                  MR. CROWN:  Objection to form and
10   foundation.
11   BY MR. CONNELLY:
12        Q.    Not drafted by the Court, right?
13        A.    Not drafted by the Court, correct.
14        Q.    And have you ever seen in your -- at this time,
15   and this was March of 2020 -- so 13 years that you had
16   been working at the Department by this time, right?
17        A.    Correct.
18        Q.    In those 13 years, have you ever seen a court
19   reject findings of -- ASPA findings that were being
20   requested here?
21                  MR. CROWN:  Objection to form and
22   foundation.
23                  THE WITNESS:  I have seen them withheld
24   from certain -- from hearings and then later, the ASPA was
25   granted.  But I don't recall any being rejected.
```

 1  BY MR. CONNELLY:

 2      Q.   Exhibit 257.  This is one of the many CASA

 3  reports.  You were directed to page 3 where it talks about

 4  the boys running and jumping as being something that they

 5  never did when they were in the care of the parents.

 6              Were you aware that the boys, when they

 7  were in the parents' care, were playing sports?

 8              MR. CROWN:  Objection to form and

 9  foundation.

10  BY MR. CONNELLY:

11      Q.   Did you know that?

12      A.   Not when -- not when they were in the parents'

13  care.  When they came into our care, brought them into the

14  hospital, they were not doing those things.

15      Q.   So my question is do you -- are you aware that

16  all the time they were in the parents' care up until

17  October of 2018, that the boys were involved in sports and

18  in activities and running and jumping, and it was only in

19  October of 2018 when they began to have mobility issues?

20              Were you aware of that?

21              MR. CROWN:  Objection to form and

22  foundation.

23              THE WITNESS:  I don't recall them being

24  involved in that before the dependency started.

25

 1  BY MR. CONNELLY:

 2      *Q.*   So you don't know that they were involved in

 3  Taekwondo before the dependency, right?

 4              MR. CROWN:  Objection to form and

 5  foundation.

 6              THE WITNESS:  I do not recall that, no.

 7  BY MR. CONNELLY:

 8      *Q.*   Oh, and by the way, isn't it true that the CASA

 9  in this case was interested in taking custody of the boys?

10              MR. CROWN:  Objection to form and

11  foundation.

12              THE WITNESS:  Not that I recall.  It is not

13  uncommon, not for a CASA, but for like a -- if a kid is in

14  a group home, the group home staff, it comes up.

15  BY MR. CONNELLY:

16      *Q.*   Counsel showed you Exhibit 263, which is -- oh,

17  before we go to there, let's go to 258.

18              On page 5 of Exhibit 258, down near the

19  bottom, the Court finds the Department of Child Safety has

20  made reasonable efforts to finalize the permanency plan

21  for the children.

22              This was in May of 2020, so 13 years, you

23  had been working for the Department.  In those 13 years,

24  had you ever seen a court refuse to make finding of

25  reasonable efforts to finalize a permanency plan?

DEPOSITION OF MECCA ARISA TEMPLE, 09/04/2024

```
 1      A.    Just withheld.  Not rejected.
 2      Q.    Withheld for a time being and then granted,
 3  right?
 4      A.    Correct.
 5      Q.    And these findings that the Department asks for
 6  from the Court regarding its reasonable efforts, they are
 7  all in relation to the Department receiving -- its ability
 8  to receive funds from the federal government, right?
 9             MR. CROWN:  Objection to form and
10  foundation.
11             THE WITNESS:  I believe that's a part of
12  it.
13  BY MR. CONNELLY:
14      Q.    And so now Counsel was asking you a lot of
15  questions about Exhibit 263, which is the Court's under
16  advisement ruling regarding a Rule 59 motion.
17             And these rulings were all made in June of
18  2020, right?
19      A.    Correct.
20      Q.    And it was in August of 2020 that the Department
21  sought to return physical custody of the boys to the
22  father, right?
23      A.    August -- yes, that is correct.
24      Q.    And then it was November 2020 that it was
25  ultimately ordered by the Court, right?
```

1      *A.*   I believe that was in November.

2      *Q.*   And in June of 2020, you already knew that you

3   were going to be moving to returning physical custody to

4   the father, right?

5               MR. CROWN:  Objection to form and

6   foundation.

7               THE WITNESS:  No.

8   BY MR. CONNELLY:

9      *Q.*   Well, in any event, in June of 2020 -- Counsel

10  kept asking you whether these rulings and findings by the

11  Court guided you in your ongoing management of -- of

12  Madison Bell and your role as a supervisor.

13              Isn't it the case that by this time, you

14  were aware that you were not really going to be on the

15  case much longer and that there had been much more

16  involvement in the case prior to June of 2020 than there

17  was going to be after June of 2020, right?

18              MR. CROWN:  Objection to form and

19  foundation.

20              THE WITNESS:  I don't recall ever thinking

21  like that.

22  BY MR. CONNELLY:

23     *Q.*   Take a look at Exhibit 247.

24     *A.*   247?

25     *Q.*   Yes.

1      A.    That's the other book.

2      Q.    Page 4 of 247.  Page 4.  There's a finding at

3  the bottom of the page that the Court finds the Department

4  of Child Safety made reasonable efforts to prevent the

5  removal of the children, blah, blah, blah.

6            Have you ever had a court refuse to make

7  that finding?

8      A.    I believe that's the one I indicated just

9  withheld.  But typically those are usually done during the

10  investigation part.

11     Q.    So this is January of 2020, so you were not

12  involved yet, is that it?

13     A.    No.  Because usually we don't take a year or two

14  to have a dependency finding.  So usually the removal is

15  at the initial stage relating to initial dependency.

16     Q.    I didn't think I asked you about this one, so

17  that's why I'm asking.

18            In your experience, have you ever seen the

19  Court reject this finding?

20     A.    No.

21     Q.    And then Exhibit 274, please -- or before that,

22  268.  Page 3, please.

23            The finding that -- the first -- the

24  finding there at the top:  The Court finds that the

25  Department of Child Safety has made reasonable efforts to

1    finalize the permanency plan for the children.

2              Have you ever had a court, in all your

3    experience, reject that finding?

4        A.    Not reject, no.

5        Q.    And then, finally, let's look at 274 real quick.

6              On the second page, this is the request --

7    or the rebuttal to the CASA's report and the -- Counsel

8    directed you to this.

9              The Court says -- about your request to

10   remove CASA, that is in the mother's objections to the

11   CASA report, the Court says:  In fact, the Court only knew

12   about the request due to the objections filed by DCS and

13   the GAL where each mentioned their objections in the

14   captions of their responses.

15             And the DCS and the GAL, in their

16   responses, indicated that, in Mother's objection, that

17   Mother was making a request to remove CASA?

18             Do you agree with me that the language that

19   the Court writes, that the Court only knew about that

20   request was because of the title of the objections filed

21   by DCS, indicates that the Court did not closely read the

22   mother's objections to the CASA report?

23             MR. CROWN:  Objection to form and

24   foundation.

25             In fact, you know what, I am going to

1   instruct you not to answer.

2               That's -- it's pure argumentative.  You are

3   now asking her to second-guess the Court.  No.  Move on.

4               MR. CONNELLY:  I am only asking her --

5               MR. CROWN:  Yeah, move on.  Take it to the

6   judge.  I would love -- would love for you to take that

7   one to the judge.  Let's go.

8               MR. CONNELLY:  You know what, Larry, you

9   are so ridiculous.  You point this out, and then when I

10  show this absurdity of the statement by the Court, you

11  want to instruct her not to answer.  That's a BS basis.

12              MR. CROWN:  All right.  Go ahead.  Answer.

13              MR. CONNELLY:  That's a BS basis.

14              MR. CROWN:  You know what, ask her.  Ask

15  her.  Let's see.  You can have the answer.  I withdraw my

16  objection.  Go ahead.

17              You want to read the question back.

18              (Off the record.)

19              (The following requested portion of the

20  record was read back by the reporter:)

21              "QUESTION:  Do you agree with me that the

22  language that the Court writes that the Court only knew

23  about the request was because of the title of the

24  objections filed by DCS indicates that the Court did not

25  closely read the mother's objections to the CASA report?"

1            THE WITNESS:  I would say no.

2            MR. CONNELLY:  Okay.  I have no other

3   questions.

4            MR. CROWN:  Read and sign.

5            (Proceedings adjourned at 8:47 p.m.)

6

7            _____

8                 MECCA ARISA TEMPLE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2              I HEREBY CERTIFY that the foregoing deposition
     was taken by me pursuant to notice; that I was then and
3    there a Certified Court Reporter for the State of Arizona,
     and by virtue thereof authorized to administer an oath;
4    that the witness before testifying was duly sworn by me to
     testify to the whole truth and nothing but the truth;
5    pursuant to request, notification was provided that the
     deposition is available for review and signature; that the
6    questions propounded by counsel and the answers of the
     witness thereto were taken down by me in shorthand and
7    thereafter transcribed through computer-aided
     transcription under my direction, and that the foregoing
8    typewritten pages contain a full, true, and accurate
     transcript of all proceedings had upon the taking of said
9    deposition, all done to the best of my skill and ability.
              I FURTHER CERTIFY that I am in no way related to
10   nor employed by any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
11            I FURTHER CERTIFY that I have complied with the
     ethical obligations set forth in ACJA Sections
12   (J)(1)(g)(1) and (2).
              DATED at Phoenix, Arizona, this 4th day of
13   November, 2024.

14   _____
     CARRIE A. CARIATI
15   Registered Professional Reporter
     Certified Realtime Reporter
16   Certified LiveNote Reporter
     Certificate No. 50355

17

18            I CERTIFY that this Registered Reporting Firm
     has complied with the ethical obligations set forth in
19   ACJA Sections (J)(1)(g)(1) and (2).

20

              DATED at Phoenix, Arizona, this 4th day of
21   November, 2024.

22

23   _____
     Registered Reporting Firm R1064
     CARRIE A. CARIATI, Owner

24

25