Exhibit L    **EXHIBIT 201**

# ORDER FOR EX-PARTE REMOVAL OF CHILDREN
## Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2018-01846

COUNTY OF ORIGIN Maricopa

DCS CASE ID 608484

TO ANY DCS REPRESENTATIVE IN THE STATE OF ARIZONA

Proof by application and declaration having been made this date 12/28/2018 before me by Sarah Kramer of the Department of Child Safety ("DCS"), and on the basis of the evidence presented in such application and declaration, and pursuant to A.R.S. §8-821(A). I find probable cause exists to believe that temporary custody is clearly necessary to protect the following children Dylan Kahraman and K.K. Kahraman from suffering abuse or neglect. I further find, for the reasons indicated below and pursuant to A.R.S. §8-821 (A), that probable cause exists to believe that it is contrary to the children's welfare to remain in the home. (3)

☑ Failure to protect a child(ren) from abuse or neglect (4)
☑ Mental health issues (5)
☑ Risk of abuse or neglect of child(ren) (6)
☑ Unfit or unsafe home environment for child(ren) (7)

Therefore, **IT IS ORDERED** granting DCS's request for authorization to remove D.K. Kahraman and K.K. Kahraman and authorizing DCS to remove these children. (8)

_Melissa Zabor_
_____
Hon. Melissa Zabor

12/28/2018 3:08 PM



CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER                                                 AZ-KAHRAMAN027693

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILDREN
## Superior Court of Arizona for Maricopa County

REMOVAL REQUEST #  RR2018-01846

COUNTY OF ORIGIN Maricopa

DCS CASE ID 608484

I, Sarah Kramer, hereby affirm the following statement of facts:

1.  I am employed by the Arizona Department of Child Safety. By virtue of my education, training and experience I am qualified and authorized to conduct child abuse and neglect investigations. I am currently assigned to investigate the case involving the children named in this application and declaration for removal, or am that person's supervisor. I make this declaration in support of this application. Further, I have the following qualifications: Bachelor of Social Work from ASU (2013)
Masters of Social Work - Child Welfare Specialization from ASU (2014)
Department of Child Safety Investigator (2014 - current)

2.  This application and declaration is in support of for ex-parte removal of the following children:

| Child Name | DOB | Sex | ICWA Status |
|---|---|---|---|
| D.K. Kahraman | ████ 2012 | M | No |
| K.K. Kahraman | ████ 2012 | M | No |

3.  The mother(s) is/are:
The mother of D.K. Kahraman is Jessica Kahraman
The mother of K.K. Kahraman is Jessica Kahraman

4.  The father(s) is/are:
The father of D.K. Kahraman is Ahmet Kahraman
The father of K.K. Kahraman is Ahmet Kahraman

5.  The legal guardian(s) is/are:
The legal guardian of D.K. Kahraman and K.K. Kahraman is None or Unknown

6.  Probable cause exists to believe that temporary custody is clearly necessary to protect the children from suffering abuse or neglect, and it is contrary to the children's welfare to remain in the home under A.R.S. §8-821(A). Specifically, Specific present danger condition(s) or impending danger threat(s) for each child listed on this application:

Child requires immediate medical attention, and the absence of medical treatment could seriously affect the child's health and well-being; such as a child who is severely malnourished, dehydrated

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILDREN
## Superior Court of Arizona for Maricopa County

or failure to thrive.

Circumstances that require temporary custody including a detailed account of circumstances and supporting facts:

Children, K.K. and D.K. resides with their parents, Jessica and Ahmet.

K.K. was admitted to Cardon Children's Medical Center on 12/18/18 after his parents brought him in. K.K. was found to be "extremely swollen." K.K. has lost his ability to walk over the last three months. When K.K. was admitted he had low blood sugar and ketones in his urine. Mother reported to the hospital that over the past two weeks prior to 12/18/18, Kenan has had "seizure like activity," but that she did not take him to the doctor. Kenan was diagnosed with pulmonary hypertension, right heart failure, malnourishment and anasarca (severe swelling from his organs not working). The malnourishment is contributing to Kenan's heart failure. K.K. is receiving oxygen support, which he is responding well to. On 12/25/2018, Dr. Bandla, a pediatric GI doctor, reported that "K.K. seems to be malnourished due to severe dietary restriction based on mom's suspicions and research." On 12/26/2018, Dr. Stewart reported that he has a strong suspicion for medical neglect or medical child abuse. K.K. has also been diagnosed with failure to thrive. Maria Chico with SCAN team completed an assessment with the family. On 12/20/18, it was stated "the child is at high risk for further/ongoing poor medical/nutritional status in his current environment." K.K. remains hospitalized for his medical issues. Per medical professionals, his current diet is not nutritionally adequate to meet his nutritional needs. The current amounts of non-meat foods parents feed the child are insufficient and not age appropriate. K.K. also requires ongoing increases in portion sizes. Dr. Manz, a pediatric nutritionist, stated that mother does not seem to be able to grasp that she is withholding adequate nutrition form the child. Medical doctors have recommended that K.K. receive supplemental formula but mother did not agree to this. Mother has agreed to try some new foods for the children but the portion sizes have been a teaspoon or ½ cup. Dr. Stewart reported that K.K. would likely take adequate intake for his nutritional needs if mother would stop limiting his intake. Medical staff have overheard K.K. state he was hungry and be denied food by mother, father, and maternal grandmother. K.K. lost weight for several days while hospitalized where mother was responsible for all of the children's food intake.

The parents report that they have used the Gut and Psychology Syndrome (GAPS) diet for their children for two years. This diet has different stages and the children are still in stage one after two years. The GAPS diet has additional foods that are recommended through the GAPS diet. Mother reported that they consult with a GAPS expert in Georgia but this doctor has not seen the children in person. The parents report using this diet due to their children's significant food intolerances and chemical sensitivities. The children do not have an official diagnosis for their food intolerances. Father reported that he children eat lamb from New Zeeland, carrots, and beets. He stated that "here and there we are trying other options." The children receive four meals a day and one snack. Their diet consist of lamb meat, meat stock/brother, carrots, and beets. They will receive a "quarter to half an egg yolk off and on." In a single day, each child eats about four cups broth, four cups meat, ¼ cup carrots, and a ¼ cup beets. They also have probiotics and drink water.

## APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILDREN
### Superior Court of Arizona for Maricopa County

On 12/21/18, the Department instructed mother to bring D.K. to the hospital to be evaluated by the morning of 12/24/18. She brought D.K. to the Cardon Children's Medical Center on 12/23/18. Routine laboratory diagnostic testing revealed electrolyte abnormalities. He has not been walking for two months and relies on a wheel chair or his parents for mobility. He will scoot around to be mobile on his own. Medical documentation states that Dylan's inability to walk is likely due to de-conditioning and behavioral constraints. He was previously evaluated by Orthopedics who found no knee instability. D.K. did not present with an acute condition that would require inpatient hospitalization. The emergency room physical stated he is concerned about his nutritional status and weakness, however it is being worked up as an outpatient and he would not benefit from hospitalization. The cardiologist, Dr. Miga, saw D.K. on 12/24/2018. He reported that D.K. has a normal heart rate and has no evidence of pulmonary hypertension. He reported that Dylan has significant malnutrition as a result of a very restrictive GAPS diet. Mr. Miga has concerns about D.K. 's inability to walk and stated it could be behavioral and may be related to his underlying malnutrition. Dr. Miga reported that "although he does not have any evidence of pulmonary hypertension, given the similarities to his brother's condition I remain concerned he could develop pulmonary hypertension in the future. ECG had abnormal results likely related to his nutritional deficits."

K.K. and D.K. have been reportedly healthy until the last few months. Both children stopped walking within weeks of each other around September/October. Mother reported the children each had injuries from falling that caused them to stop walking. Mother has taken the children to medical providers since they stopped walking but there was no evidence of an injury to diagnose. They have received physical therapy weekly since October. K.K. has not made progress. D.K. has made some progress and he can now take a few assisted steps. Medical professionals report the children have been de-conditioned. The children were withdrawn from school in October due to their medical issues and are now homeschool.

Specific reasons why a less intrusive option is not feasible or sufficient to manage the safety of the child in the home and why remaining in the home is contrary to the child's welfare:

Both children stopped walking within weeks of each other in October due to different falls. Both have received physical therapy. Dylan has made slow progress as he can now take a couple steps but remains de-conditions. K.K. has not made progress. Kenan is currently hospitalized for failure to thrive and pulmonary hypertension. The children are fed a very restrictive diet which consistently includes lamb, meat broth/stock, carrots, and beets. Parents report the children have significant food intolerances and chemical sensitivities. The parents report trying to introduce small amounts (drops or teaspoons) of new foods to the children over the last two years but they have reactions such as behavior changes, pain, or rashes. Medical professionals have notified parents that this diet is not sufficient to meet Kenan's needs. The parents are unwilling to make immediate changes to the diet to have it meet K.K. s needs. Dylan is fed the same diet as K.K. and has been assessed to have nutritional deficits and at risk of developing pulmonary hypertension like his brother has.

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILDREN
## Superior Court of Arizona for Maricopa County

7.  I, Sarah Kramer, declare under penalty of perjury that the information contained within this application and declaration is true and correct to the best of my knowledge and belief.

12/28/2018 2:52 PM

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
AZ-KAHRAMAN027697

# EXHIBIT 202

Affidavit

Comes now Affiant, Jessica Mann; Kahraman, a living woman, Presenting as Evidence of the following facts.

1. I do believe this woman, Sarah Kramer, is a private contractor of a private company that is under contract for the Title IV-E funds and not for wrongs;

2. I require this woman, Sarah Kramer, to swear under the penalty of perjury that she has first-hand knowledge of any wrong done by me;

3. Any information given by me was done under threat, duress and coercion under the guise that DCS was a government entity and not a private corporation. I do not wish to work with private companies or accept any benefits or services;

4. There has never been any abuse or neglect of my biological property; {See Exhibits A and B}

5. If this woman, Sarah Kramer, believes my claim is not true, she must make a claim in the form of an affidavit under oath or affirmation and under the penalty of perjury within seven days. Any failure to do so will be considered a trespass and I will charge $5,000 a day per biological property to be paid immediately; {See Exhibits A and B}

Verification

I hereby declare, certify and state, pursuant to the penalties of perjury under the laws of the United States, and by the provisions of 28 USC § 174 that all of the above and foregoing representations are true and correct to the best of my knowledge, information and belief.

Executed in Mesa, Arizona this 3rd day of January 2019.

EXHIBIT 202
BELL
8-23-24 HHb

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027556

_Jessica Mann; Kahraman a woman_

Jessica Mann; Kahraman

Notary

On this 3 day of Jan , 20 19 ; before me Jessica Mann Kahraman the subscriber, affiant,

personally appeared to me know to be the living man described in and who executed the

foregoing instrument and swore before me that he executed the same of his free will act and

deed.

_Fatima Soto_

Notary

My commission expires: 10/04/2022

| FATIMA SOTO |
| Notary Public - Arizona |
| Maricopa County |
| Commission # 553682 |
| My Commission Expires October 04, 2022 |

Mailed via US Mail on Jan 3, 2019, Sent Certified
return receipt and witnessed by Sandra L. Miller

_Sandra L. Miller_

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027557

Affidavit

Comes now Affiant, Jessica Mann; Kahraman, a living woman, Presenting as Evidence of the following facts.

1.  I do believe this woman, Sarah Mendez, is a private contractor of a private company that is under contract for the Title IV-E funds and not for wrongs;

2.  I require this woman, Sarah Mendez, to swear under the penalty of perjury that she has first-hand knowledge of any wrong done by me;

3.  Any information given by me was done under threat, duress and coercion under the guise that DCS was a government entity and not a private corporation. I do not wish to work with private companies or accept any benefits or services;

4.  There has never been any abuse or neglect of my biological property; {See Exhibits A and B}

5.  If this woman, Sarah Mendez, believes my claim is not true, she must make a claim in the form of an affidavit under oath or affirmation and under the penalty of perjury within seven days. Any failure to do so will be considered a trespass and I will charge $5,000 a day per biological property to be paid immediately; {See Exhibits A and B}

Verification

I hereby declare, certify and state, pursuant to the penalties of perjury under the laws of the United States, and by the provisions of 28 USC § 174 that all of the above and foregoing representations are true and correct to the best of my knowledge, information and belief.

Executed in Mesa, Arizona this *3rd* day of *January* 20 *19*.

AZ-KAHRAMAN027558

_Jessica Mann; Kahraman_ _a woman_

Jessica Mann; Kahraman

### Notary

On this 3 day of Jan , 20 19 ; before me Jessica Mann Kahraman the subscriber, affiant,

personally appeared to me know to be the living man described in and who executed the

foregoing instrument and swore before me that he executed the same of his free will act and

deed.

_Fatima Soto_
Notary

My commission expires: 10/04/2022

FATIMA SOTO
Notary Public - Arizona
Maricopa County
Commission # 553682
My Commission Expires October 04, 2022

Mailed via US Mail on January 3, 2019,
sent certified return receipt and witnessed
by Sandra L. Miller

_Sandra L. Miller_

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027559

Exhibit E

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027560

CT01200 (5/18)

# REPORT TO THE JUVENILE COURT
# FOR
# PRELIMINARY PROTECTIVE HEARING
# AND/OR
# INITIAL DEPENDENCY HEARING

**Court Case Number**    JD532206          **Date of Report**    01/08/2019

**Case Name**    KAHRAMAN, JESSICA      **ID**    608484

**A.**    **Name and Date of Birth for Each Child Subject to This Court Case Number:**

      3874373 KAHRAMAN, DYLAN        DOB: 09/27/2012
      3874372 KAHRAMAN, KENAN        DOB: 09/27/2012

**B.**    **Child or Children Subject to This Report If Different From Above:**

Not applicable.

**C.**    **Family Composition:**

Jessica Kahraman aka Mann (mother)
Ahmet Kahraman (father)
Dorothy Mann (maternal grandmother)

**I.**    **REASON FOR DCS INVOLVEMENT**

   **A.**    **Description of the dangerous condition(s) currently occurring within the family that require Department involvement (include evidence of abuse or neglect); including how the parent, guardian or custodian's behaviors cause the child to be unsafe and, if applicable, why the child(ren) was removed from the parent, guardian or custodian's custody**

On 12/18/2018, Kenan was admitted to Cardon Children's Medical Center following a "two month history of inability to walk, 3-week history of chest pain, facial swelling, periodic abdominal pain, and 2 weeks of increasing lethargy." Kenan was admitted to the PICU. A cardiac cath was completed on 12/21/18 which confirmed pulmonary hypertension. Nutrition was consulted and Kenan was started on TPN until it was determined he was able to gain weight if fed a recommended amount of calories. Kenan was diagnosed with acute right heart failure, failure to thrive, anasarca, right ventricular dysfunction, ketotic hypoglycemia, lower extremity weakness, pleural effusion, pulmonary hypertension, retarded development following protein-calorie malnutrition, unspecified severe protein-calorie malnutrition."

On 12/20/2018, the SCAN team at the hospital was consulted for an evaluation. Several reasons for the evaluation were noted, including "the

EXHIBIT 203
BELL
8-23-24 MM

child's current highly regimented diet does not provide sufficient caloric intake for normal growth/development and has contributed to his extremely poor nutritional status." There was also concern that mother reported seeing "parasites" in Kenan's stool and did not seek follow up care for this. There was a "recent evaluation at PCH neurology for the inability to walk that resulted in recommendations for MRI, NCV, EMG – which parents deferred due to fears of general anesthesia." It was noted in the evaluation that "the medical team is concerned that the child's health has been directly impacted by parent's belief system that values natural adult therapeutics in lieu of accepted pediatric standards of care. Unfortunately, this has likely resulted in the child's current critical cardiac status, overall poor nutritional state and deconditioning that has lead to an inability to ambulate." Maria Chico reported that "the child is at high risk for further/ongoing poor medical/nutritional status in his current environment."

The parents report that they have used the Gut and Psychology Syndrome (GAPS) diet for their children for two years. This diet has different stages and the children are still in the initial stage after two years. Mrs. Kahraman reported that they consult with a GAPS expert in Georgia but this individual has not seen the children in person. The parents report using this diet due to their children's "significant food intolerances and chemical sensitivities." The children do not have an official diagnosis for their food intolerances. Mr. Kahraman reported that the children eat lamb from New Zealand, carrots, and beets. He stated that "here and there we are trying other options." The children receive four meals a day and one snack. Their diet consists of lamb meat, meat stock/broth, carrots, and beets. They will receive a "quarter to half an egg yolk off and on." In a single day, each child eats about four cups broth, four cups meat, ¼ cup carrots, and a ¼ cup beets. They also have probiotics and drink water.

On 12/24/18, the pediatric GI doctor, Vinay Bandla, completed an initial consult. Dr. Bandla noted that Kenan "is able to eat four small meatballs, ¼ of an egg yolk, and approximately 1 teaspoon of shredded vegetables cooked in lamb broth at a time. He drinks four cups of lamb broth per day. He is getting an average of 500 cal/day at home. Per today's bedside RN, mom is restricting his food and water intake despite his complaints of being hungry. RD has been consulted and the plan is to introduce one new food into his diet every day." The calorie goal is 1500 cal/day. Dr. Bandla noted "For the past 2 weeks he has been complaining of pain around his rectum. Mom has been performing massage and states his rectum feels swollen." Dr. Bandla stated "Kenan seems to be malnourished due to severe dietary restriction based on moms suspicions and research. No evidence to support 'leaky gut' theory in the literature."

On 12/26/2018, a nutritional follow-up was completed by Lindsey Manz RD. Mrs. Kahraman reported that she is not notifying the staff of the reactions

Kenan is having "because they are not worried about anything short of anaphylaxis." Mrs. Kahraman stated that she "wants to continue with offering foods by mouth, but with slow progression over weeks or months in the outpatient setting." Mrs. Kahraman was not in agreement with the timeline medical providers developed to have Kenan gain weight. The RD reviewed that the "current diet is not nutritionally adequate, this is not an acceptable long-term diet." The RD also reviewed that the "current amounts of non-meat foods are insufficient and are not age appropriate."

Medical staff have overheard Kenan state he was hungry and be denied food by his mother, father, and maternal grandmother. Kenan did not gain weight for several days while hospitalized during a timeframe where parents were responsible for all of Kenan's food intake. After the recommendation by the RD, agreed to try some new foods for Kenan but the portion sizes were small, such as a teaspoon or ½ cup.
On 12/26/2018, Dr. Ryan Stewart stated "mom states the patient is again overly hungry and she can't provide enough food to keep patient full, despite the fact his belly is distended." Dr. Steward wrote "Have a strong suspicion for medical neglect or medical child abuse. Patient's appetite has increased, and mom is wanting to stop the levothyroxine to avoid having to feed him so much. Mom also still convinced the pulmonary hypertension is due to patient's exposure to white board markers. The patient would likely take adequate PO intake for his nutritional needs if mom would stop limiting his intake. Also suspect feeding "intolerance" symptoms are fictitious as they are based solely on mom's reports and not supported by nurse observations. Mom refuses to relinquish any control of the patient's food options, and refuses supplemental formulas due to 'corn syrup, maltose, and GMO's being present in them.'"

On 12/28/2018, the Department requested a Court Authorized Removal (CAR) and it was granted. The Department took temporary custody of the children on this day.

Starting 12/28/18 in the evening, Kenan was fed a diet based on the dietician's recommended meal plan from the hospital. Between 12/28/18 and 01/02/2019, Kenan was introduced to all food groups. He tolerated new and different types of food with no allergies noted. On 01/02/19, Christina Woods NP noted that Kenan is "tolerating a regular diet" and is taking 1500 cal/day. She noted "his weight has increased since admission." Kenan did not have any rash, anaphylaxis, nausea, vomiting, or diarrhea while being introduced to new foods.

Kenan has a twin brother, Dylan, who resides in the home. On 12/21/18, the Department requested that Mr. and Mrs. Kahraman bring Dylan to Cardon Children's Medical Center (CCMC) to be evaluated by the morning of 12/24/18. She brought Dylan to the CCMC on 12/23/18. Dylan did not present with an

acute condition that would require inpatient hospitalization. The doctors reviewed Dylan's records from Phoenix Children's Hospital. Dr. Shah wrote "At this time, I do not feel this patient has any acute condition that would require inpatient hospitalization. I remain concerned about his nutritional status and weakness, however it is being worked up as an outpatient and I do not believe he would benefit from hospitalization."

Dylan was also seen by the cardiologist, Dr. Miga, and SCAN team, Maria Chio NP, on 12/24/18. Per Maria Chico NP's note on 12/24/18, "Routine laboratory diagnostic testing revealed electrolyte abnormalities." Dylan has not been walking for two months and relies on a wheelchair or his parents for mobility. Dylan will scoot around to be mobile on his own. Dylan was found to have functional gait abnormality and it was stated that "Dylan's inability to walk is likely due to de-conditioning and behavioral constraints...It is likely that Dylan inability to ambulate is due to de-conditions, since he has only been utilizing a wheel chair for the past 2 months. In addition, Dylan has developed a presumption of pain with ambulation and is fearful of leg movement." It was noted that "Dylan was evaluated by Orthopedics and found no knee instability; his exam was normal at that time. Per mom's request, she obtained a wheelchair for Dylan and the child has not made any progress with regard to PT. Since that time, the child has complained of pain when standing and states he is unable to walk." Dr. Miga reported that Dylan "was previously evaluated by the orthopedic surgeon at Banner and at Phoenix Children's Hospital and does not have any orthopedic diagnosis. He has been on a very restrictive GAPS diet for several years and has had significant failure to thrive." He also noted "multiple laboratories were obtained and he was found to have low pre-albumin and mildly elevated sedimentation rate." Dr. Miga found that Dylan has a normal heart rate and has no evidence of pulmonary hypertension. Mr. Miga stated "Dylan has significant malnutrition as a result of a very restrictive GAPS diet. He and his brother have limited nutritional intake due to their "food intolerance." He is stuck in the first stages of the GAPS diet and has not progressed in years." Dr. Miga reported concerns about Dylan's inability to walk and stated it could be behavioral and "may be related to his underlying malnutrition." Dr. Miga documented that "although he does not have any evidence of pulmonary hypertension, given the similarities to his brother's condition I remain concerned he could develop pulmonary hypertension in the future. His abnormal ECB is likely related to his nutritional deficits."

A CAR was granted on 12/28/2018 and the Department took temporary custody of Dylan. Dylan was placed in a licensed foster home. Since 12/28/18, Dylan has tried all food groups (dairy, meat, grains, gluten, fruits, vegetables, ect) and has not presented with any reactions to the newly introduced foods. Dylan has not reported any pain in his body, including his legs or knees, even when he has been taking steps. On 01/04/2019, DCSS spoke with Dylan in-person. He reported he feels good and his body has not felt yucky at all while trying new foods. Dylan reported he is sleeping well.

The children are vulnerable as they rely on their parents for their basic needs and protection. They are not able to seek their own medical care or understand their medical needs. Although the children are not currently in school, various DDD providers are in the home on a weekly basis whom work directly with the children. Mr. and Mrs. Kahraman do not have sufficient protective capacities to ensure their children's safety. Mr. And Mrs. Kahraman do not recognize the safety threat and have not developed a realistic plan to address the threat. This situation is likely to continue without intervention as the parents do not acknowledge the concerns for malnutrition due to the children's restrictive diet. Parents reported that the children are on this diet due to significant food intolerances and chemical sensitivities. The children have been introduced to new foods and have not presented with any reactions that parents reported the children have when they eat foods outside of their specific diet. The parents have taken the children to various medical providers in the last six months, including chiropractor, physical therapist, orthopedist, naturopathic pediatrician, and a neurologist. The Department is in the process of requesting prior medical records for Dylan and Kenan. Several of these visits with medical providers were reviewed by Cardon Children's Medical Center during Kenan's hospital stay.

**B.     Parent/guardian/custodian's verbal or written response to the allegations**

On 12/21/2018, DCSS Kramer interviewed father, Ahmet Kahraman, in-person at his home. Mr. Kahraman reported that Dylan and Kenan have been receiving physical therapy two times a week. They both had falls that have caused then to stop walking. Mr. Kahraman stated they went to Phoenix Children's Hospital (PCH) for nuero and the doctor said rheumatology. The children have been on the GAPS diet for two years. They eat lamb from New Zealand, carrots, and beets. Mr. Kahraman reported that "here and there" they are trying other options for foods. As soon as they have a food they are intolerant to, they will have itchy eye or mood changes. The children have chiropractic alignments. They also receive probiotics. The children's doctor is Dr. Scott Jensen. They saw him in the last month.

On 12/26/18, DCSS Kramer interviewed mother, Jessica Kahraman, in-person at Cardon Children's Medical Center. Mrs. Kahraman reported that on 10/01/18, Kenan was at school. He was walked at school, tripped, fell, and hurt his knee. He was walking okay afterwards. This was after Dylan got hurt so Mrs. Kahraman was not sure if Kenan did this because of Dylan getting attention. The next Friday, Mrs. Kahraman went to pick up Kenan from school. She was informed by school staff that Kenan was refusing to walk. His right knee hurt. The teacher said that he fell again. Kenan said that he tripped over a kid's backpack and fell on his knees on the tile. Mrs. Kahraman stated she met with school staff about this. Kenan had to pee in a jar for one day due to

his right knee hurting and refusing to walk. A couple weeks prior to this, another kid pushed Kenan on the basketball court several times and hurt his knees. Mrs. Kahraman stated she talked to the teacher and Mrs. Kahraman requested that Kenan sit out of recess and read a book to keep him safe. Since the children started school, they have gotten cold virus. Dylan was supposed to have an appointment with orthopedics around this time and Kenan had one too. Kenan had an x-ray done. The doctor stated he may have severely bruise the patella bone. The doctor did not see anything on the imaging and said to give it two weeks. For a while, Kenan could barely move. Mrs. Kahraman used topical herbs. She did not want him to miss a lot of school so she got him a wheelchair so he could continue to attend school. He had a follow-up appointment with Dr. Bowman who pushed him to walk a little bit. Kenan was still in pain so physical therapy was considered for him. Dylan was already going to Advanced Neurological Rehabilitation (ANR). The physical therapist assessed Kenan. Initially she said it was just an injury but they could work with movement. Kenan's pain lasted longer than Dylan's pain. The pain was just in Kenan's knees. The orthopedic doctor said it takes 6-8 weeks. Kenan has been in a wheelchair since 10/02/18. They were taking the kids to school in their wheelchairs but it was becoming difficult. On 10/30/18, Mrs. Kahraman took the children out of school until they could heal. On 11/2/18, the physical therapist saw Kenan showing the same weakness as Dylan in his quads and hipflexers.

Dylan hurt himself at Taekwondo on 07/01/18. Mrs. Kahraman did not see it happen but she knows he was running on the mats before class, tripped, and fell. The instructor picked up Dylan but he would not bear weight on his legs and his leg buckled. He said his ankle and knee hurt. Mrs. Kahraman took him to a pediatric chiropractor who said he is fine and is in fear because of pain. Dylan progressed to normal within a few days. He was back in Taekwondo within two weeks and was good. After starting school, Dylan tripped on another kid's legs. He tripped and fell. He said his knee also hurt while they were bowling. In movement (PE), Dylan said his knee hurt. Dylan did not have a major injury during these times but did trip several times. Over Labor Day weekend, maternal grandmother was watching the kids while Mrs. Kahraman was at work. Maternal grandmother said Dylan was not weight bearing on his right leg. In early September, Mrs. Kahraman took Dylan to the orthopedic at Banner and a PA. They said it was an MCL sprain. The doctor said it was consistent with being injured. Dylan could walk but with a lot of pain. The doctor said to bring him back in two weeks. About one week later, his left leg hurt and there was tingling about his right ankle. The doctor said "he's fine" and said to give it 6-8 weeks and come back if it is still an issue. Dylan has been in a wheelchair since September. Mrs. Kahraman kept him out of school for a few days. The doctor said they could do a wheelchair but it was not the best option. Mrs. Kahraman decided to rent one for school. She thought this issue was not normal so she asked for an order for physical therapy. She took him to Foothills Sports Medicine in Gilbert to complete an assessment with

Blake. Dylan didn't present to be consistent with a MCL sprain. Blake stated it may be a sprained patella ligament and maybe he reinjured the Taekwondo injury from July. Dylan completed 1-2 sessions at this place but that is when he developed the pain in the left leg and the spot of tingling so an orthopedic needed to check it out. This occurred prior to Dylan using a wheelchair. Mrs. Kahraman was not entirely sure about the sequence of events and dates for Dylan. Dylan was seen at Phoenix Children's Hospital because Banner did not give answers. Dr. Bowman was not sure about the injury. He said neurology but the family already had a neurology appointment three months ago. Banner was not taking new patients for neuro so Mrs. Kahraman researched physical therapists and found a neuro PT location.

To address any concerns about something be deficient in the children's diet, they did a blood test with Dr. Jensen. Mrs. Kahraman that test took the nutritional piece out of the mobility issue.

Mrs. Kahraman reported the children have been on the GAPS diet for about two years. When she was pregnant, she was on five rounds of antibiotics and she believes this has caused gut issues for the boys. She nursed them for 2.5 years after they were born. Prior to weaning them, they ate everything. Mrs. Kahraman stated there were definitely dairy allergies as Kenan would projective vomit and his face would swell with dairy. Mrs. Kahraman reported that more food sensitivities came up. She researched reactions online. For example, blueberries would make the children "super hyper." The skins of fruits and vegetables was increasing issues for the kids. Kenan would get head pain with eggs, ect. Gradually, it got to a point where there were so many intolerances that the children had. Kenan wanted to eat but knew what foods caused issues so he did not eat for 1-2 days. Mrs. Kahraman stated they did feeding therapies but this did not help. Kenan got sick and all he wanted to eat was whole eggs and apples. He woke up with red and swollen feet when he was about three years old. She took him to the ER at Banner, They said it was not neuro and to follow-up with the pediatrician. They then saw Cindy at Autism Research for three years. They had ongoing labs and supplements through this place. Mrs. Kahraman told Cindy that something was wrong with the boys. In their labs, their uric acids were really high which indicates inflammation. Mrs. Kahraman found that fructose was causing it. She tried different food categories. Cindy did not help with the diet. Mrs. Kahraman called doctors in Arizona but they did not help. She did research online and found a doctor in Georgia, Becky Plotner, who specialized in the GAPS diet. Becky Plotner has connections in the UK and Russia with the GAPS diet. Mrs. Kahraman started with meat and broth. She would gradually add things back in to their diet. Mrs. Kahraman stated they were "whole different kids" with this diet change. They were calm and did not cry. She noticed a big difference. The kids were then progressing but not tolerating more foods. Dylan has similar sensitivities but can tolerate more foods than Kenan. Mrs. Kahraman discussed that it is a difficult balance having to be fair between the kids even

though Dylan can tolerate more than Kenan. For example, Dylan can he ghee (butter with dairy removed) and a drop of whey. Mrs. Kahraman explained her process of "desensitization" for introducing the children to food. Examples of this process are dipping a knife, scratching a fork, a drop of it, ect.

Mrs. Kahraman consults with Becky Plotner who is a naturopathic doctor in Georgia. They discuss what the kids are eating, growth, behaviors, bowel movements, and goals to increase their tolerances. Mrs. Kahraman reported that everyone is raving about how her kids are doing now.

Mrs. Kahraman reported that Kenan will eat meat stock with New Zealand lamb shanks. The New Zealand lamb is more pure. If he has any other meat, it causes an extreme reaction of screaming, depression, ect. He will eat the meat, marrow, and broth. Kenan drinks four cups of broth a day. He will have egg yolk "off and on." Mrs. Kahraman clarified that it is ¼ to ½ of a boiled egg yolk that he is fed. Kenan will eat different vegetables, including broccoli, cauliflower, beets, carrots, and rutabaga. When these vegetables are tried, it is in "little bits" where they are graded on a cheese grader. Before he started attending school, they pushed vegetable and was increasing his stemming behavior. Mrs. Kahraman clarified that these behaviors would include him rocking back and forth of the ground, licking his finger, and sensory issues. Mrs. Kahraman reported that she has tried fruits off and on too. Two times this year she has tried ¼ apple and a couple blueberries. Two minutes after eating this, Kenan was screaming in pain and bloated. Dylan did not have a reaction. Mrs. Kahraman stated there are not any vitamins or minerals in vegetables and fruits that are not in meat. She stated they spend three hours every other night preparing food. Mrs. Kahraman stated the children have always been on the lower end of the growth chart.

Dylan eats New Zealand lamb shanks, stock, beets, and carrots. The beets and carrots are shredded and boiled in the broth so it helps with the digestion. He will have little bits of egg yolk but not every day. Dylan gets angry and grump when he has egg yolk, which is not typical behavior for him. Kenan will cry and gets sad.

Kenan does not sleep with new foods. He gets itchy, sniffling, and his knees and back hurt. AT the hospital today, he tried potatoes and 3 teaspoons of a baked apple. He did not like the skin of the potatoes. He tried lentils today but did not like them. Now that he is in the hospital eating new foods, his heart rate increases when he is eating. Kenan has also had trouble sleeping and is itchy since being in the hospital.

Mrs. Kahraman reported that initially, the hospital promised they were going to solve the problem with Kenan. Kenan's appetite increased because of thyroid medication. She stated there is lack of help from the nutritionist right now. Today, the dietician said they are going to push through any reactions that

Kenan has because they are at a hospital. Mrs. Kahraman reported that she has met with tons of doctors to consult regarding Kenan's diet.

Mrs. Kahraman reported that Kenan's symptoms recently are possibly from chemical reactions from school. She tried to get the neuro appointment moved up. They tired having a different doctor call but it didn't work so they went to the Phoenix Children's Hospital (PCH) ER on 11/2. There were no heart or lung issues, just mobility. Kenan's inflammatory markers were high "because he was exposed to chemicals" so the neuro appointment was bumped up to 11/8. There were no immediate concerns. The protocol is rheumatology but it was three months out. In the last few weeks, the children have been to the chiropractor, allergist, and Dr. Jensen.

Kenan can get off of the couch by himself but he is afraid to stand. The children were attending music therapy but that stopped when they started school. They have been getting occupational therapy in-home since they were 22 months old. It is one time a week. In regards to their homeschool curriculum, they use Saxon for math and Journeys.

In regards to the children's food sensitivities, it has been more discussions with doctors rather than a diagnosis.

Mrs. Kahraman calculated that Kenan got 2100 calories yesterday and 500 calories of TPN. She thinks that the synthroid medication stimulated his metabolism. When asked about the hospital's statement of the calorie count of Kenan's normal diet, Mrs. Kahraman stated the first time they added it up it was 1100 calories but there have been days Kenan does not want to eat because he doesn't feel well.

In a normal day, the children eat 4 cups of meat, 4 cups brother, ¼ cup each of carrots and beets, water, and probiotics. Kenan recently started eating a couple meatballs. Kenan does not like to drink the brother. Sometimes Mrs. Kahraman will give a couple drops of sauerkraut juice.

**C.    Family history of involvement with the Department or other child welfare agencies**

The family does not have prior history with DCS.

12/19/2018 - CURRENT REPORT
Kenan (6y) and Dylan (6y) reside with mother, Jessica Kahraman and father, Ahmet Kahraman.  Kenan is currently at Cardon Children's Medical Center. Kenan was admitted to Cardon Children's Medical Center on 12/18/18 after he was found to be "extremely swollen." Kenan has lost his ability to walk over the last three months.  Kenan has been diagnosed with pulmonary hypertension, congestive heart failure, malnourishment, and anasarca (severe swelling from

his organs not working). The malnourishment is contributing to Kenan's heart failure. When Kenan was admitted he had low blood sugar and ketones in his urine. Mother has refused some of the medications that the doctor has prescribed while in the hospital due to her not knowing where they are coming from.  At this time, Kenan not receiving those medications is not life threatening. Mother reported that over the past two weeks, Kenan has had "seizure like activity," but that she did not take him to the doctor.

Six weeks ago, Kenan was seen in the emergency department at Phoenix Children's Hospital due to swelling that was causing him to not be able to walk. At that time a neurology work up was done and it was recommended that mother follow up with the rheumatology.  Mother and father never followed up. Dylan has had similar failure to walk "around the same time as Kenan."  Kenan and Dylan are in physical therapy and Dylan is doing better.  The cardiologist has scheduled an Echocardiogram for Dylan to ensure he is not having the same issues as Kenan.

Kenan and Dylan are given a limited amount of food to eat due to mother restricting what they eat.  Mother explained that she does this due to their having allergies.  Kenan and Dylan are on a gluten free, carbohydrate free, and dairy free diet.  Dylan has not been observed.

**D.    Services and supports provided to the family to prevent removal and outcomes of services and supports**

A TDM Meeting was scheduled for 01/03/2019. The parents reported to DCS Specialist (DCSS) by email that they were choosing not to attend the meeting. The meeting remained scheduled and the parents did not show.

**E.    If the family has Native American heritage, efforts to identify and contact the child's tribe and confirm the child's membership status**

Not applicable.

**II.    SAFETY PLANNING**

**A.    If applicable, efforts to locate each missing parent**

Not applicable.

**B.    Description of the current safety plan, including the location and living arrangement of the child, the actions that are necessary to control the dangerous condition(s), when those actions and/or services are needed, and the adults responsible for carrying out the actions**

Dylan and Kenan are in the temporary legal custody of DCS. They are placed in a licensed CDH/DDD foster home who will ensure each of their basic needs are met. All contact between parents and children must be approved by DCS and supervised by DCS or DCS designee.

**C.   Efforts to implement the least intrusive plan that is sufficient to control the dangerous conditions; and for Indian children, the active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and the outcome(s) of these efforts**

Question #1: Is there a combination of safety actions and/or services capable of sufficiently controlling the identified danger threats, and are there sufficient resources within the family network or community to control the identified threats? NO.

Question #2: Are the parents, guardians, or custodians willing for an in-home or combination safety plan to be implemented and have they demonstrated that they will cooperate with the responsible adults, safety service providers, and safety actions identified in the safety plan? NO.

Question #3: Is the home environment calm and consistent enough for an in-home safety plan to be implemented and for responsible adults and/or safety service providers to be in the home safely? NO.

Question #4: Can an in-home safety plan and the use of in-home safety actions and/or services sufficiently control impending danger without the results of outside professional evaluations (substance abuse, psychiatric/psychological, medical)? NO.

Question #5: Do the parents, guardians, or custodians have a suitable place to reside where an in-home or combination safety plan can be implemented? YES.

**D.   The conditions for return as described in the safety plan (only applicable if the child is not residing with a parent or guardian and is assessed as unsafe due to impending danger)**

#1: A responsible adult will need to be in the home at all times to monitor Mr. and Mrs. Kahraman's behaviors and provide for the children's needs should they be observed to be putting their children in a situation that could harm them.

#2: Mr. and Mrs. Kahraman are willing to allow for safety services in the home and demonstrate an openness to cooperate with whatever level of involvement from safety service providers is required to ensure child safety.

#2: Mr. and Mrs. Kahraman are open to having an honest discussion about the reason for a safety plan and what the safety plan would involve regarding the children's safety and the need for a safety plan.

#3: Mr. and Mrs. Kahraman no longer express or behave in such a way that will reasonably disrupt an in-home safety plan, express acceptance of the in-home safety plan and concern for child; and safety actions and/or services are sufficient for monitoring and managing their behavior as necessary.

#4: Mr. Kahraman has participated in the recommended evaluations and the results provide sufficient information to understand how the danger threats manifest within the family.

#4: Mrs. Kahraman has participated in the recommended evaluations and the results provide sufficient information to understand how the danger threats manifest within the family.

E.  **Describe why continued temporary custody is necessary**

The parents have stated strong beliefs regarding their children's diet and medical care. The care or lack thereof that they have provided the children as a result has interfered with the children's health and development. For example, the parents have the children on a strictly restrictive diet. Kenan has been assessed by medical professionals as malnourished. Dylan has been assessed by medical professionals to have nutritional deficiencies. Kenan was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension, which was suspected to be tied to his malnutrition. Despite this, the parents were observed refusing to feed the child in the hospital when he reported that he was hungry. Mrs. Kahraman expressed concern to medical staff that she "could not keep up" with the child's hunger and providing him food consistent with his strict diet. She requested that a medication for hypothyroid be stopped because she believed that the child was too full and bloated to eat. Mrs. Kahraman was also opposed to recommendations that the child be given new foods and formula to supplement his nutrition, based on her belief that the child has food allergies and/or would be receiving too many calories. Of additional concern is the parents' report that both children have been unable to walk for approximately the past two to three months. The parents believed that this was caused either by falls or exposure to dry erase markers at school and began to home school the children. Mrs. Kahraman admitted that she obtained wheelchairs for the children, despite there being no medical recommendation that they were necessary. The parents sought medical evaluation by a neurologist, but did not follow the neurologist's recommendation for further evaluations. Recently, medical providers have opined that both children's inability to walk is likely due to deconditioning and

behavioral constraints.  Furthermore, there are concerns that Mrs. Kahraman has reported serious symptoms in the children, but failed to obtain timely medical care and/or follow medical recommendations for further evaluation. There is additional concern that Kenan only reported pain when asked by Mrs. Kahraman and that she has reported various symptoms that have not been observed by medical providers.  There is concern that Mr. Kahraman is not involved in medical and dietary decision making regarding the children and that he defers to Mrs. Kahraman, to the children's detriment.  Since removal from the parents' care the children's eating and medical status have improved.

## III.  IDENTIFICATION, LOCATION, AND ENGAGEMENT OF EXTENDED FAMILY MEMBERS OR OTHER CONNECTIONS

### A.  Results of efforts to identify, locate, contact, and engage adult relatives of the child, including grandparents, great-grandparents, adult siblings, parents, or step-parents who have custody of any siblings, aunts, uncles and first cousins, and persons who have a significant relationship with the child. Include information, if known, about the person's willingness to be a potential placement

There are no identified family members who are willing or able to care for the children at this time. Maternal grandmother, Dorothy Mann, is involved with caring for the children frequently and has a significant relationship with the children. Ms. Mann is aware of the diet the children are on but has not intervened. On 12/23/18, Ms. Mann was in Kenan's hospital room when he stated several times how hungry he was. Ms. Mann refused to feed him and told him he had to wait. The Department has denied Ms. Mann as a kinship placement.

### B.  Description of the child's important connections, including information provided by the child, parents, and/or guardians

The children's important connections include their parents, maternal grandmother, and various service providers that they have weekly contact with.

### C.  Contact between the child and the child's relatives, friends, former  foster parents and any connections the child identifies; and if contact is restricted, the reasons why

All contact between the children and relatives or connections must be approved by DCS. The Department will assess these contacts as they are identified.

### D.  Efforts to maintain cultural connections, including opportunities for the child to build cultural awareness and involvement

The Department will encourage the licensed placements to expose the children to cultural opportunities. The Department will continue to discuss cultural connections with the family.

## IV. CHILD'S FUNCTIONING, SERVICES, AND LIVING ARRANGEMENT

### A. Physical, developmental, and behavioral health needs assessment and services, including coordination of services with the RBHA

Dylan is a six-year-old boy who likes elephants and loves to play with Legos. Dylan is diagnosed with autism but is high functioning. At the time of DCS involvement, Dylan is not enrolled in behavioral health services. Dylan is enrolled in DDD and participates in the Early Childhood Autism intervention plan where he receives speech therapy, occupational therapy, physical therapy, and habilitation. Since September 2018, Dylan has not been able to walk and has received twice weekly physical therapy outside of the home. Dylan is currently able to take assisted steps, get off/on the couch, scoot, and crawl.

Kenan is an 6-year-old boy who likes giraffes and loves to play with Legos. Kenan was recently diagnosed with failure to thrive and pulmonary hypertension. He is on several medications as a result of his medical conditions. Upon discharge from the hospital on 01/07/19, Kenan is on nasal cannula oxygen. Kenan is not able to ambulate and relies on a wheelchair for mobility for the last two months. He was receiving physical therapy prior to his hospitalization in December 2018. Kenan is also enrolled in DDD for autism and receives occupational therapy, physical therapy, and habilitation. A Rapid Response assessment will be completed.

### B. Education and social development needs assessment and services, including efforts to ensure educational stability

Dylan and Kenan are in Kindergarten. From August to October 2018, both children attending a charter school. Mr. and Mrs. Kahraman decided to homeschool the children starting in October 2018. DCS is in the process of reviewing their prior education records to continue meeting their educational needs.

### C. For youth age fourteen or older in out-of-home care, efforts or plans to assess and provide services to support the youth's preparation for Adulthood

Not applicable.

**D.    Description of the type of living arrangement and whether it is consistent with the Department's placement preferences; if the child is not living in the home of a grandparent, other relative, or person who has a significant relationship with the child, the reasons why such placement has not been identified or is contrary to the child's best interest**

Dylan is placed in a Child Development Home (CDH) through DDD. Kenan is placed in a CDH with a nurse through DDD. These placements are the least restrictive placements available at this time.

**E.    Description of any assistance or services provided to the caregiver(s) to enhance their capacity to provide appropriate care and supervision**

The Department is providing CMDP, standard allowances, Rapid Response assessments, RBHA coordination, and case management.

**F.    If the child has a sibling in out-of-home placement, description of efforts made to place siblings together; and if not placed together, the specific reasons why placement did not occur or reasons why this would be contrary to the child's or a sibling's safety or well-being**

Initially, Dylan was placed in a licensed CDH home. The Department requested an overcapacity approval but this request was denied due to DDD licensing requirements. Upon his release from the hospital on 01/04/2019, Kenan was on oxygen and licensing requirements state he must be placed in a CDH home with a nurse. The Department is continuing to assess if this placement can be a placement for both children. If they are not able to, the Department will continue to identify a placement where the children can reside together.

**G.    If placement with sibling(s) is not possible, efforts to facilitate frequent visitation or contact with siblings; and if frequent visitation or contact with siblings is not recommended, the reasons why this would be contrary to the child's or sibling's safety or well-being**

While the children are placed in separate placements, the Department will coordinate with the placements to encourage sibling contact. The children will see each other during supervised visits with the parents.

**H.    Efforts to provide an Indian child with an appropriate living arrangement in accordance with ICWA guidelines**

Not applicable.

**I.   If out-of-state placement is appropriate and in the best interest of the child, state why (include ICPC and/or out-of-state visitation status)**

An out-of-state placement is not appropriate or in the best interest of the children as both parents reside in Arizona. There are also no known family members who reside out-of-state.

## V.   PARENT FUNCTIONING, ADDITIONAL ASSESSMENT, AND INITIAL SERVICES

**A.   Description of each parent's, guardian's, or custodian's protective capacities**

MOTHER (Jessica Kahraman):

BEHAVIORAL
History of protecting: Yes
Takes action: Yes
Controls impulses: Yes
Sets aside own needs for children: Yes
Demonstrates adequate skills as caregiver: No
Adaptive/ assertive as caregiver: No

COGNITIVE
Plans and articulates a plan to protect the children: No
Is self-aware as a parent/caregiver: No
Is intellectually able to fulfill responsibilities: Yes
Recognizes threats: No
Recognizes children's needs: No
Understands own protective role: Yes

EMOTIONAL
Meets own emotional needs: Unknown
Resilient as a caregiver: Yes
Tolerant as a caregiver: Yes
Is stable: Yes
Expresses love, empathy, sensitivity for children: Yes
Is positively attached with children: Yes
Is aligned with and supports children: Yes


FATHER (Ahmet Kahraman):

BEHAVIORAL
History of protecting: Yes
Takes action: Yes
Controls impulses: Yes

Sets aside own needs for children: Yes
Demonstrates adequate skills as caregiver: No
Adaptive/ assertive as caregiver: No

COGNITIVE
Plans and articulates a plan to protect the children: No
Is self-aware as a parent/caregiver: No
Is intellectually able to fulfill responsibilities: Yes
Recognizes threats: No
Recognizes children's needs: No
Understands own protective role: Yes

EMOTIONAL
Meets own emotional needs: Unknown
Resilient as a caregiver: Yes
Tolerant as a caregiver: Yes
Is stable: Yes
Expresses love, empathy, sensitivity for children: Yes
Is positively attached with children: Yes
Is aligned with and supports children: Yes

**B.    Description of assessments, services, and/or supports provided or offered to each parent, guardian, or custodian since the child's removal to remedy the need for temporary custody (including date of evaluations scheduled or completed) and proposed case plan services**

Based on the initial Family Functioning Assessment that was completed, the following services are being offered to Mr. and Mrs. Kahraman. The final case plan will be developed with the family within 60 days.

Therapeutic visitation, psychological evaluations, and any recommendations from the psychological evaluations.

**C.    Services or supports requested by, or on behalf of a parent or guardian, and if not provided, the reasons why**

Mr. and Mrs. Kahraman have not requested any supports or services. Per an email from Mrs. Kahraman, she stated "I do not consent to the terms and conditions of your services and will not contract with you for services."

**VI.    PROPOSED PERMANENCY/CASE PLAN GOAL AND PARENTING TIME (VISITATION) PLAN**

**A.    Proposed case plan goal and target date**

Family Reunification with a target date of July 2019.

B.  **Proposed concurrent case plan goal and target date, if applicable**

Not applicable.

C.  **Current or proposed plan for parenting time (visitation) between the child and each of their parents, guardians or custodians**

Mr. and Mrs. Kahraman will receive supervised visitation through a therapeutic visitation provider.

D.  **Describe the results of any visitation that has occurred between the child and a parent, guardian, or custodian since removal**

On 01/07/19, DCSS Kramer emailed Mr. and Mrs. Kahraman notifying them of a scheduled supervised visitation on 01/08/19. DCSS requested that Mr. and Mrs. Kahraman respond by 9:00am on 01/08/19 stating they agree to follow the visitation guidelines provided in the email. DCSS did not receive a response by phone or email. The visit was cancelled.

## VII.  DCS SPECIALIST'S CONCLUSIONS

The Department respectfully recommends that the children, Kenan and Dylan Kahraman, continue to be made temporary wards of the court due to the impending danger threat of medical neglect. The parents have stated strong beliefs regarding their children's diet and medical care. The care or lack thereof that they have provided the children as a result has interfered with the children's health. At this time, the criteria for an in-home safety plan are not met. The least restrictive intervention is an out-of-home dependency. The children are placed in licensed foster care.

## VIII.  RECOMMENDATIONS:

A.  **Agency**

It is respectfully recommended that Kenan and Dylan Kahraman be made a ward(s) of the court, committed to the care, custody, and control of the Arizona Department of Child Safety.

It is further respectfully recommended that Kenan and Dylan Kahraman be placed in the physical custody of DCS with appropriate medical, social, and educational authorizations.

If the child is in out-of-state placement, it is further respectfully recommended that the court find that the out-of-state placement continues to be appropriate and in the best interest of the child.

**B.**    **Financial:**

It is respectfully recommended that beginning (date) _____ , the parents listed below be assessed the following amounts on a monthly basis per child as the contribution towards the cost of foster care:

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

**C.**    **Reasonable Efforts Findings**

It is respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to prevent or eliminate the need for removal and to make it possible for the child to safely return home.

If the child is an Indian child, it is further respectfully recommended that the court find that Arizona Department of Child Safety has made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

If the child is an Indian child, it is further respectfully recommended that the court find that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

It is further respectfully recommended that the court approve the proposed case plan.

**Respectfully submitted:**    *Sarah Kramer*

**Name/Title**    Sarah Kramer, MSW

Page    Preliminary Protective/ Initial Dependency Hearing
20

DCS Specialist
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**    480-659-6364
**Date:**    01/08/19

**Approved by:**

**Name/Title**    Sarah Mendez
Program Supervisor
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**    480-659-6648
**Date:**    01/08/19

Case Name:    KAHRAMAN, JESSICA        ID:    608484

1  | MARK BRNOVICH
   | Attorney General
2
3  | ROBERT KUPEC
   | Assistant Attorney General
4  | State Bar No. 010656
   | CFP/PSS
5  | 120 W. 1st Avenue, 2nd Floor
   | Mesa, Arizona 85210
6  | Telephone: (602) 771-4000
7  | PSSSef@azag.gov

8  Attorneys for the Department of Child Safety

9          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
10
11            IN AND FOR THE COUNTY OF MARICOPA

12  In the matter of:                    No. JDS32206

13  DYLAN KEMAL KAHRAMAN          **ORDER SETTING HEARINGS ON**
14    d.o.b. 09/27/2012            **DEPENDENCY PETITION AND**
    KENAN TROY KAHRAMAN          **TEMPORARY ORDERS**
15    d.o.b. 09/27/2012

16  Person(s) under 18 years of age.   (Honorable _____)

17
18          Upon a verified petition alleging the children to be dependent and that the interests
19  of the children requires immediate action:

20          IT IS ORDERED setting a Preliminary Protective Conference for the 9 day of
21  January , 20 19 , at 8:15 A.m., to be held at 1810 South Lewis Street, Mesa,
22
23  Arizona 85210, before the Facilitator _____.

24          IT IS FURTHER ORDERED setting a Preliminary Protective Hearing for the 9
25  day of January , 20 19 , at 9 A.m., to be held at 1810 South Lewis Street,
26  Mesa, Arizona 85210, before the Honorable Judge Udall .
27
28

EXHIBIT 204

1    ⎵IT IS FURTHER ORDERED setting an Initial Dependency Hearing for **9** day of

2    *January*, 20**19**, at **9** **A**.m., to be held at 1810 South Lewis Street, Mesa,

3    Arizona  85210, before the Honorable *Judge  Udall*_____.

4
5    IT IS FURTHER ORDERED setting a Publication Hearing for the ___ day of

6    _____, 20___, at ____ ___.m., to be held at 1810 South Lewis Street, Mesa,

7    Arizona  85210, before the Honorable _____.

8    ⎵IT IS FURTHER ORDERED setting a Permanency Hearing for DYLAN KEMAL

9
10   KAHRAMAN, KENAN TROY KAHRAMAN for the **18** day of *November*,

11   20**19**, at **8:30 A**.m., to be held at 1810 South Lewis Street, Mesa, Arizona  85210,

12   before the Honorable *Judge  Udall*_____.

13        **FAILURE TO COMPLY WITH THESE ORDERS MAY RESULT**
14        **IN THE COURT FINDING YOU IN CONTEMPT OF COURT**

15   IT IS ORDERED that, pending the hearing, DYLAN KEMAL KAHRAMAN is

16   made a temporary ward of the Court, committed to the legal care, custody, and control of
17
18   the Department of Child Safety (DCS or the Department) and placed in the physical

19   custody of DCS.

20   IT IS ORDERED that, pending the hearing, KENAN TROY KAHRAMAN is

21   made a temporary ward of the Court, committed to the legal care, custody, and control of
22
23   the Department of Child Safety (DCS or the Department) and placed in the physical

24   custody of DCS.

25   THE COURT FINDS, based upon the verified allegations of the Petition that

26   continuation of the children in the home would be contrary to the children's welfare.  This
27
28   finding is based on the following facts: The parents have stated strong beliefs regarding

2

their children's diet and medical care. The care or lack thereof that they have provided the children as a result has interfered with the children's health and development. For example the parents have the children on a strictly restrictive diet and both children have been assessed by medical providers as being malnourished. The child, KENAN, was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension, which was suspected to be tied to his malnutrition. Despite this, the parents were observed refusing to feed the child in the hospital when he reported that he was hungry. Mother expressed concern to medical staff that she "could not keep up" with the child's hunger and providing him food consistent with his strict diet. She requested that a medication for hypothyroid be stopped because she believed that the child was too full and bloated to eat. Mother also was opposed to recommendations that the child be given new foods and formula to supplement his nutrition, based on her belief that the child has food allergies and/or would be receiving too many calories. Of additional concern is the parents' report that both children have been unable to walk for approximately the past two months. The parents believed that this was caused either by falls or exposure to dry erase markers at school and began to home school the children. Mother admitted that she obtained wheelchairs for the children, despite there being no medical recommendation that they were necessary. The parents sought medical evaluation by a neurologist, but did not follow the neurologist's recommendation for further evaluations. Recently, medical providers have opined that both children's inability to walk is likely due to deconditioning and behavioral constraints. Furthermore, there are concerns that Mother has reported serious symptoms in the children, but failed to obtain timely medical care

and/or follow medical recommendations for further evaluation. There is additional concern that the children only report pain when asked by Mother and that Mother has reported various symptoms that have not been observed by medical providers. There is concern that Father is not involved in medical and dietary decision making regarding the children and that he defers to Mother, to the children's detriment. Since removal from the parents' care the children's eating and medical status have improved.

THE COURT FURTHER FINDS, based upon the verified allegations of the Petition, that reasonable efforts have been made to prevent removal of the children from the home. This finding is based on the following facts: The Department scheduled a Team Decision Making meeting with the parents for January 3, 2019 to review the safety and placement of the children. Although the parents were notified of the meeting, they did not attend.

THE COURT FURTHER FINDS, based upon the verified allegations of the Petition, that the Department made attempts to identify and assess placement with the children's grandparent or another member of the children's extended family, including a person who has a significant relationship with the children, but such placement is not in the children's best interests at this time because there are no identified family members who are willing or able to care for the child at this time The children's current placement is the least restrictive consistent with the children's best interests.

IT IS ORDERED that DCS and the placement are authorized to consent to social and authorized educational activities for the children.

IT IS FURTHER ORDERED that no person shall remove or cause the removal of the children from the State of Arizona without prior written approval of DCS.

IT IS FURTHER ORDERED that DCS is authorized to consent for the children to leave the jurisdiction of the Court for travel within the United States for a period not to exceed thirty days.

IT IS FURTHER ORDERED that, pursuant to Rule 3, Ariz. R.P. Juv. Ct., this matter be referred to the CASA Program Coordinator to determine the appropriateness of an appointment of an advocate for the children.

IT IS FURTHER ORDERED that the Foster Care Review Board review this matter within six months of out-of-home placement and at least every six months thereafter as long as the children remain in out-of-home care to determine what efforts have been made by DCS to carry out the plan for permanent placement. The review period for out-of-home placement includes time the above-named children have been in voluntary out-of-home placement.

IT IS FURTHER ORDERED that the parent(s) or legal guardian(s) provide the DCS Child Safety Worker or its attorney with a recent educational history (including the name(s) and location(s) of the school(s) the children named in the Petition recently attended and the grade in which the children were most recently enrolled). The parent(s) or legal guardian(s) shall also provide or confirm the dates of birth of the children named in the Petition.

IT IS FURTHER ORDERED that in the event of any of the following circumstances, a relative, stepparent or foster parent with whom the children live (but not

staff of a group home or other residential facility) shall have authority to act as the IDEA parent:

1.  Neither the public education agency, an early intervention provider or DCS can locate the parent;

2.  The parent or legal counsel for the parent tells the public education agency, DCS or one of its attorneys that the parent will not act as the IDEA parent;

3.  There is a no contact order against the parent as to a child in issue; or

4.  The public education agency or Arizona early intervention provider has made reasonable attempts to get a parent to respond to its requests to act as the IDEA parent and fails to obtain a response or any cooperation from the parent.

IT IS FURTHER ORDERED that any Regional Behavioral Health Authority (RBHA), health plan, medical, dental or mental health provider/professional, hospital, clinic, laboratory, pharmacy, medical facility or other health care provider that has provided or is providing treatment or services to DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN shall, upon written request, provide the children's guardian ad litem and/or the children's attorney with copies of paper and electronic medical, health, dental, mental health, genetic test, communicable disease (including HIV-related information) records of this child in DCS's legal custody. The records may be provided in any medium that is acceptable to the entity or individual providing the records. RBHAs are to provide the children's guardian ad litem and/or the children's attorney with the names of any service providers for the children. All individuals and

entities covered by this Order are also permitted to speak with the children's guardian ad litem and/or the children's attorney. The children's guardian ad litem and/or children's attorney shall not request records as to these children after the period of representation in this matter ends.

IT IS FURTHER ORDERED that the parent(s) or legal guardian(s) provide to this Court, at the Preliminary Protective Hearing and/or the Initial Dependency Hearing: the names, type of relationship, and all available information necessary to locate persons related to the children or who have a significant relationship with the children. Persons related to the children include the children's grandparents, great-grandparents, brothers or sisters of whole or half-blood, aunts, uncles and first cousins. If the parent(s) or legal guardian(s) do not have sufficient information available to locate a relative or person with a significant relationship with the children, the parent or guardian must inform this Court of this fact. The parent(s) or legal guardian(s) must inform DCS immediately if the parent(s) or guardian(s) becomes aware of information related to the existence or location of a relative or person with a significant relationship with the children.

**You are hereby advised that your failure to appear without good cause may result in a finding that you waived your legal rights and have admitted the allegations in the Petition. In addition, if you fail to appear without good cause, the hearings may go forward in your absence and may result in an adjudication of dependency, termination of your parental rights or the establishment of a permanent guardianship based upon the record and evidence presented to the Court, as well as an order of paternity, suspension or termination of an existing**

current child support order, custody, or change of custody in a consolidated family law matter and an order for child support if paternity has been established.    You are also advised that if a child is under three years of age, within six months after removal from the home, the Court will determine whether you have substantially neglected or willfully refused to participate in reunification services offered by DCS. In addition, you are hereby advised that substantially neglecting or willfully refusing to remedy the circumstances that cause your child to be in an out-of-home placement, including refusing to participate in reunification services, is a ground for termination of parental rights.

## APPOINTMENT OF COUNSEL – CHILDREN

☑ IT IS FURTHER ORDERED appointing _Megan Haywood_ , as ☑ Guardian ad Litem for the children; and appointing _____, as ☐ counsel for the children.

## APPOINTMENT OF COUNSEL – OTHER PARTIES

☑ IT IS FURTHER ORDERED assigning _Bernadette Buriek_, as counsel for JESSICA WREN KAHRAMAN A.K.A. JESSICA W MANN pending the decision of the Court at the hearing.  The determination of appointment of counsel may require the completion of a financial affidavit.

☑ IT IS FURTHER ORDERED assigning _Suzanne Nichols_, as

counsel for <u>AHMET KAHRAMAN</u> pending the decision of the Court at the hearing. The determination of appointment of counsel may require the completion of a financial affidavit.

DATED this _____4_____ day of _____January_____, 2019.


_____
JUDGE OF THE SUPERIOR COURT
COMMISSIONER SHELLIE SMITH

9

**Name of Person Filing:** Jessica Mann; Kahraman
**Address:** 1718 S Longmore 95
**City, State, Zip Code:** Mesa AZ 85202
**Day/Evening Telephone:** (480) 455 / 9899

CHRIS DEROSE, CLERK
BY                                      DEP
M. Cortez
FILED
2019 JAN -8 AM 9: 03

FOR CLERK'S USE ONLY

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

IN THE MATTER OF:

JD532206

Case Number: CT2018 - 105538

Title of Document:
Affidavit

☐ **RESTRICTED**

# See attached document



EXHIBIT 205
BELL
8-23-24  rth2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026898

# SUPERIOR COURT
# IN AND FOR THE COUNTY OF MARICOPA, STATE OF ARIZONA

### A Private for profit governmental services Corporation

| | |
|---|---|
| STATE OF ARIZONA - DUN AND BRADSTREET | ) |
| #072459266 | ) |
| ARIZONA DEPARTMENT OF CHILD SAFETY | ) |
| Dun and Bradstreet #078291672 | ) |
| A private registered legal business entity | ) |
| A subsidiary corporation of UNITED STATES Corporation | ) |
| Two De Facto for Profit Governmental Services Corporations | ) |

**VS**

| | | |
|---|---|---|
| JESSICA MANN KAHRAMAN | dba | ) |
| An artificial entity created through fraud, | | ) |
| and Unlawful Conversion of natural Name | | |
| by the STATE OF ARIZONA | | |
| A living Woman unlawfully Convicted, | | |
| the woman being involuntarily held as surety | | |
| appearing By special appearance of Jessica Mann; Kahraman | | |
| A Living Soul, A woman of GOD, Bondservant of Christ, Non Personam, Sui Juris | | |
| a Non-representative/Non-agent | | |

CC: US Army Provost Marshal General, Notified in Writing
CC: US Commerce Secretary, Notified in Writing
CC: UN Secretary of Human Rights, Notified in Writing

---

## This in its entirety is,
## a Living Testimony in form of an Affidavit;
## a Challenge of my Rights, Status, Standing & Jurisdiction;
## a Notice of Discovery of Fraud and Impropriety;
## An Abatement;
## a Demand for Remedy; and a Claim for Compensation.

---

**Notice to principal is notice to agent, Notice to agent is notice to principal.**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026899

**I hereby pray to God for relief and command the
administrator as public servant of "We the People"
to read this thoroughly, completely and with comprehension,
this document is of a very serious nature and is not frivolous.**

**There will be no presumptions or assumptions,
no Tacit agreements, no waiver of rights, no hearsay,
no lawyering or attornment from the bench.
I am asking only for Truth, Facts, Honor and Fair Justice.**

## Rights

Above all else, I, Jessica Mann; Kahraman,, in and from the beginning, invoke

my right of **self determination** which is considered to be the foundational

stone of all human rights. I hereby invoke my right of **redress of grievances**.

 **I hereby stand as a belligerent claimant upon these rights as required**

The Supreme Court said that the "rights of life and personal liberty are the

natural rights of man. To secure these rights ... governments are instituted

among men" U.S. v. Cruikshank, 92 U.S. 542, 2 Otto 542, 23 L. Ed. 588

The individual Rights guaranteed by our Constitution and treaties cannot be

compromised or ignored by our government or by **its courts**.

For example, in United States v. Johnson, 76 F. Supp. 538, 539 (D. Pa. 1947),

Federal District Court Judge James Alger Fee ruled that,

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026900

..."The privilege against self-incrimination is neither accorded to the passive resistant, nor to the person who is ignorant of his rights, nor to one indifferent thereto. It is a FIGHTING clause. Its benefits can be retained only by sustained COMBAT. It cannot be claimed by attorney or solicitor. It is valid only when insisted upon by a BELLIGERENT claimant in person."  McAlister vs. Henkel, 201 U.S. 90, 26 S.Ct. 385, 50 L.Ed. 671;  Commonwealth vs. Shaw, 4 Cush. 594, 50 Am.Dec. 813;

Orum vs. State, 38 Ohio App. 171, 175 N.E. 876.
"The one who is persuaded by honeyed words or moral suasion to testify or produce documents rather than make a last ditch stand, simply loses the protection. He must refuse to answer or produce, and test the matter in contempt proceedings, or by habeas corpus." [Emphasis added.]

<u>Notice the verdict's confrontational language in these Cases:</u>
"fighting", "combat", and most surprising, "belligerent". Did you ever expect to ever read a Federal Court condemning people for being "passive" or "ignorant"? Did you ever expect to see a verdict that encouraged people to be "belligerent" in COURT...?
Better go back and re-read that extraordinary verdict. And commit it to memory, for it succinctly describes the essence of the American legal system.

Clearly, we must do SOMETHING, for as Sir Edmund Burke said,
"The only thing necessary for evil to triumph is for good men to do nothing."

"The presumption of Liberty, rights we retain for ourselves. Freedom lies in everyone's heart, but it must do more than just lie there." Judge Napolitano

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026901

"Whereas it is essential, if man is not to be compelled to have recourse, as a last resort, to rebellion against tyranny and oppression, that human rights should be protected by the rule of law,"

(Excerpt of Preamble of - Universal Declaration of Human Rights)

"The States Parties to the present Covenant, Considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world, Recognizing that these rights derive from the inherent dignity of the human person, Recognizing that, in accordance with the Universal Declaration of Human Rights, the ideal of free human beings enjoying civil and political freedom and freedom from fear and want can only be achieved if conditions are created whereby everyone may enjoy his civil and political rights, as well as his economic, social and cultural rights, Considering the obligation of States under the Charter of the United Nations to promote universal respect for, and observance of, human rights and freedoms, Realizing that the individual, having duties to other individuals and to the community to which he belongs, is under a responsibility to strive for the promotion and observance of the rights recognized in the present Covenant."

(Preamble - International Covenant on Civil and Political Rights)

---

By the grace of God almighty, and through the supremacy clause of the Constitution and the below-listed treaties of supreme law, it is I alone, who shall determine my status, standing, honor and jurisdiction.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026902

Article. VI.  Clause 2: This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, **shall be the supreme Law of the Land; and the Judges in <u>every State</u> shall be bound thereby**, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

Clause 3: The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.

**<u>I hereby invoke and stand upon all my natural rights, given by my God,</u>** which are written in the documents listed below. These, and all others, are universally known as supreme law of the land:

- The Holy Bible, KJV 1611    **GOD's Law's** are **Superior Law**
- 1215  Magna Charta
- 1606 The First Charter of Virginia
- 1620  Mayflower Compact
- 1628  Petition of Rights
- 1641  Grand Remonstrance
- 1689  English bill of rights
- 1765 The Declaration of rights in congress at New York
- 1774 The Declaration of rights in congress at Philadelphia
- 1775 The Declaration of Arms
- 1776 The Virginia Declaration of rights

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026903

- 1776  Declaration of Independence
- 1777 the Articles of Confederation
- 1783  Treaty of Peace
- 1787  Northwest Ordinance
- 1789  The Constitution for the united States of America
- 1791 The Bill of Rights
- 1868 The Constitution of The United States of America
- 1864, 1929 and 1949 The Geneva Conventions
- 1948 The Universal Declaration of Human Rights
- 23 March 1976 The International Covenant of Civil and Political Rights, Articles 1-27*

I, hereby and forever **stand firm** upon these **natural rights** listed above, giving the free man of god, one of "We the People", the state National, Limited Diplomatic Immunity as per the Geneva convention, in that he has done no harm to another. If I, have unknowingly harmed another let that living Man, Woman, or Child, come forward claim under sworn oath and under the penalty of perjury, and I'll explain, ask for repentance, seek forgiveness, and make amends or rebut.

## International Covenant on Civil and Political Rights (ICCPR):
### (partial list of applicable rights) Article

<u>1</u>

1. All peoples have the right of self-determination. By virtue of that right they freely determine their political status and freely pursue their economic, social and cultural development.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026904

3. The States Parties to the present Covenant, including those having responsibility for the administration of Non-Self-Governing and Trust Territories, shall promote the realization of the right of self-determination, and shall respect that right, in conformity with the provisions of the Charter of the United Nations.

## Article 2

1.    Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

2.    Where not already provided for by existing legislative or other measures, each State Party to the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws or other measures as may be necessary to give effect to the rights recognized in the present Covenant.

3.    Each State Party to the present Covenant undertakes:

(a)    To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b)    To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;

(c)    To ensure that the competent authorities shall enforce such remedies when granted.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026905

## Article 3

The States Parties to the present Covenant undertake to ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant.

## Article 5

1. Nothing in the present Covenant may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any of the rights and freedoms recognized herein or at their limitation to a greater extent than is provided for in the present Covenant.

2. There shall be no restriction upon or derogation from any of the fundamental human rights recognized or existing in any State Party to the present Covenant pursuant to law, conventions, regulations or custom on the pretext that the present Covenant does not recognize such rights or that it recognizes them to a lesser extent.

## Article 6

Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

## Article 7

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

*(There is EXCESSIVE torture, cruel, inhuman & degrading treatment and punishment in our jails & prisons! [See 1971 Stanford Prison Experiment. "Power corrupts, and absolute power corrupts absolutely!")*

## Article 8

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026906

1.  No one shall be held in slavery; slavery and the slave-trade in all their forms shall be prohibited.

2.  No one shall be held in servitude.

3.

(a) No one shall be required to perform forced or compulsory labour;

<u>(What about the Prison Industrial Complex's role in Human Trafficking and Racketeering? [There are contract$ and bond$ that require prisoners to fill the beds of jails and prisons {Human Warehouses}!]) (Some jails are even OWNED by county judges like!)</u>

## <u>Article 9</u>

1.  Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.

2.  Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him.

3.  Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release. It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings, and, should occasion arise, for execution of the judgement.

4.  Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

5.  Anyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026907

## Article 10

1. All persons deprived of their liberty **shall be treated with humanity and with respect for the inherent dignity of the human person**.

3. The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status.

## Article 11

**No one shall be imprisoned merely on the ground of inability to fulfill a contractual obligation.**

## Article 12

1. Everyone lawfully within the territory of a State shall, within that territory, have the right to liberty of movement and freedom to choose his residence.

2. Everyone shall be free to leave any country, including his own.

## Article 14

1.    All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The press and the public may be excluded from all or part of a trial for reasons of morals, public order or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; **but any judgement rendered in a criminal case**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026908

or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the guardianship of children.

    2.    **Everyone charged with a criminal offense shall have the right to be presumed innocent until proved guilty according to law**.

    3.    In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality: (a) To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;

(b)    To have adequate time and facilities for the preparation of his defense and to communicate with counsel of his own choosing;

(c)    To be tried without undue delay;

(d)    **To be tried in his presence, and to defend himself in person** or through legal assistance of his own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;

(e) **To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;**

(f)    To have the free assistance of an interpreter if he cannot understand or speak the language used in court;

(g)    **Not to be compelled to testify against himself or to confess guilt.**

    5.    Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.

    6.    When a person has by a final decision been convicted of a criminal offense and when subsequently his conviction has been reversed or **he has been pardoned on the ground that a new or newly discovered fact shows**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026909

**conclusively that there has been a miscarriage of justice**, the person who has suffered punishment as a result of such conviction **shall be compensated** according to law, unless it is proved that the nondisclosure of the unknown fact in time is wholly or partly attributable to him.

7.    No one shall be liable to be tried or punished again for an offense for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

## Article 15

1.    **No one shall be held guilty of any criminal offense on account of any act or omission which did not constitute a criminal offense**, under national or international law, at the time when it was committed. Nor shall a heavier penalty be imposed than the one that was applicable at the time when the criminal offense was committed. If, subsequent to the commission of the offense, provision is made by law for the imposition of the lighter penalty, the offender shall benefit thereby.

2.    Nothing in this article shall prejudice the trial and punishment of any person for any act or omission which, at the time when it was committed, was criminal according to the general principles of law recognized by the community of nations.

## Article 17

1.    **No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honor and reputation.**

2.    Everyone has the right to the protection of the law against such interference or attacks.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026910

**Article 18**

1.    Everyone shall have the right to freedom of thought, conscience and religion. This right shall include freedom to have or to adopt a religion or belief of his choice, and freedom, either individually or in community with others and in public or private, to manifest his religion or belief in worship, observance, practice and teaching.

2.    No one shall be subject to coercion which would impair his freedom to have or to adopt a religion or belief of his choice.

**Article 19**

1.  Everyone shall have the right to hold opinions without interference.

2.  Everyone shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice.

---

**I get that, the STATE OF ARIZONA through its Unlawful Conversion created the ALL CAPITAL fiction variation of the christian name my PARENTS gave me. The STATE didn't create anything that is real and living. It was GOD who created me. It was GOD who endowed my parents with the ability to co-create with Him to bring me into this world and to raise me.**

**The government public servants are TRUSTEES.**

**I am the BENEFICIARY.**

**One of "We the People" creators of Government.**

**Now let's see what the Constitution has to say about our Rights.**

**BILL OF RIGHTS.**

**SECTION I.**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026911

Paragraph I. <u>All government, of right, originates with the people, is founded upon their will only,</u> and is instituted solely for the good of the whole. <u>Public officers are the trustees and servants of the people, and, at all times, amenable to them</u>.

Par. II. <u>Protection to person and property is the paramount duty of government, and shall be impartial and complete</u>.

Par. III. No person shall be deprived of life, liberty, or property, except by due process of law.

Par. IV. <u>No person shall be deprived of the right to prosecute or defend his own cause in any of the Courts of this State, in person,</u> by attorney, or both.

I am not a federal citizen. I am a State National and claim my Nationality as such. Arizona is a member nation State of the union.

A Declaration of independence was a Declaration of Trust. A constitution is how a CORPORATION OR TRUST operates, The Articles Of Confederation was also a Constitution.

Grantor: WE THE PEOPLE
Beneficiary: We the people
TRUSTEE: PUBLIC OFFICERS
Look up "Trustee". YOU CANNOT USE TRUSTEE WITHOUT IT BEING A TRUST. That Sums it up right there.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026912

This is the PUBLIC OFFICERS CONTRACT.  THE CONSTITUTION IS THE TRUST INDENTURE FOR THE PUBLIC OFFICERS AKA. SERVANTS TO THE BENEFICIARY.

## Here I shall stand, rescinding all past contracts, agreements

## or

## waivers of rights for Cause of Fraud.

I, Jessica Mann; Kahraman,, hereby repudiate, revoke and rescind any waiver I may have previously made of these rights, unknowingly, unwittingly, under duress, under coercion, forced upon me through fearful scare tactics, under lies, under any false assumption or presumption, or through any perceived Tacit agreement, or by any signature, which may have been used by a fictional corporate officer registered by my all caps name of some fraudulently created dead entity, or vessel lost at sea, or transmitting utility, created by government and recorded as Human Resources and used as Human Capital by an investment bond or note created in Dog Latin Glossa NAME through fraud and personage of a bonded and insured birth registration that is Sold on the market under a CUSIP # through U.S. treasury bonds bundled in an LEI, and regulated by the SEC. See GMEIUtility.org or fidelity.com

See also Department of Fiscal Services web pages


American Jurisprudence 2nd 1964 vol. 16  § 373 **Rights of Contract**
Liberty of contract involves, as one of its essential attributes, the right to terminate contracts, Valid contracts are property and as such are protected from being taken without just compensation. The United States Supreme Court has stated that freedom to contract is the essence of freedom from undue restraint

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026913

on the right to contract.  Other courts have stated that the liberty to make contracts includes the corresponding right to refuse to accept a contract or to assume such liability as may be proposed. The right of liberty of contract is inherent and inalienable. It belongs to everyone by the law of the land; every man has the right freely to deal, or to refuse to deal, with his fellow men. Pg. 706 – 707

American Jurisprudence 2nd 1964 vol. 16 § 362 **Nature of Right guaranteed**
The right of property is a fundamental, natural, inherent, and inalienable right... In fact, it does not owe its origin to the constitutions which protect it, for it existed before them. It is sometimes characterized judicially as a sacred right, the protection of which is one of the most important objects of government. Pg. 691

This Means to take away one's RIGHT TO REFUSE CONTRACT with anyone is to take away "The right of property" A Right that's guaranteed... and un-a-lien-able!

---

## U.S.C. Title 18 § 241: Conspiracy Against Rights

If two or more persons conspire to injure, oppress, threaten or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or If two or more persons go in disguise on the highway, or on the premise of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured - They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026914

## U.S.C. Title 18 § 242: Deprivation of Rights Under Color of Law

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1000 or imprisoned not more than one year, or both; and if bodily injury results shall be fined under this title or imprisoned not more than 10 years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

The Supreme Court has warned:

"Because of what appear to be Lawful commands on the surface, many citizens, because of their respect for what appears to be law, are cunningly coerced into waiving their rights, due to ignorance." (U.S. v. Minker, 350 U.S. 179, 187)

## Challenge of Standing

Only a righteous and lawful, Living man or woman can have standing! Only a man or woman is born alive. Only a man or woman has unalienable rights!

These rights, given by God, are superior law. These rights are referenced in the multiple documents and treaties listed above and are known in this UNITED STATES as supreme law.

**All government, corporations, agencies, agents, officers, in every level of government and in every state, county, municipality, and in every capacity, must obey this Constitution and these treaties if they are brought forward into the light. For this, SUNLIGHT is the best disinfectant.**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026915

No Legal Person, Entity created under The Dog Latin ALL-CAPS name, a vessel, a transmitting utility, a corporation, can stand, as all are dead, they have NO standing, they can not speak, they can NOT be the creditor, they can NOT be the holder in due course.

"Ens legis. L. Lat. A creature of the law; an artificial being, as contrasted with a natural person. Applied to corporations, considered as deriving their existence entirely from the law." Black's Law Dictionary, Fourth Edition, 1951

Genesis 2:7 **And the LORD God formed man of the dust of the ground, and breathed into his nostrils the breath of life; and man became a living soul.**

**I,** Jessica Mann; Kahraman,, **as a woman, as a living soul, Stand upon my rights and refuse to be held as the surety for the bond in trust.**

## Challenge of Status

Being a woman of God, a living soul, of flesh and blood, of sound mind, intelligent and of competent nature, the creditor, beneficiary and holder in due course of the trust. I am, an honorary member and proud descendent of "We the People" as creator and arbitrator of government. My DNA existed upon these shores before government. I am NOT one artificially created by government such as "Citizen", "Person", or "Resident".

For it is my estate and the estates of my fathers and grandfathers, back many years, as I am alive upon the land. I am the holder in due course, the rightful beneficiary, and I hereby command the administrator as the fiduciary to settle and dismiss this matter.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026916

I have previously repudiated my citizenship via affidavit to the President of the UNITED STATES, the Secretary of State and the Attorney General, of the UNITED STATES. As well as to the Attorney General of the STATE wherein I was born upon the Land. I am a State National, a Bloodline American, one of "We the People" of these the united "States of America".

Again, I am not a U.S. Citizen, but I am a State National, as described in USC 8 § 1101 (a) 21 with limited diplomatic immunity as one who created government as per Geneva Conventions.
As a "non-resident alien," to DISTRICT OF COLUMBIA, or to the IMF, my estate and/or trust is, as described in 26 USC § 7701 (a)(31), as a TAX-EXEMPT "foreign estate or trust."

"A 'citizen of the United States' is a civilly dead entity operating as a co-trustee and co-beneficiary of the PCT (public Charitable Trust), the constructive, Cestui Que Vie trust of US INC. Under the 14th Amendment, which upholds the debt of the USA and US INC."
**Congressional Record, June 13, 1967, pp. 15641-15646**

The Defendant, As Charged above, is described as a DEAD ENTITY. As such, it has no Labor to earn on its own, through its own efforts, or its own blood, sweat and tears, so is therefore IN-capable on its face of giving remedy to the STATE OF ARIZONA CORPORATION. Nor can the fictional entity, the STATE OF ARIZONA bring its jurisdiction against the man. Only against the "person" which I refute as fraud, because it is a creation of the State.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026917

"I set out on this ground which I suppose to be self evident, 'that the earth belongs in usufruct to the living,' that the dead have neither powers nor rights over it."     Thomas Jefferson in letter to James Madison; criticizing the new constitution September 6th 1789

At some point in time, one recognizes the fraud. As I the woman, have awakened to the fact that it is I, the living woman whose blood, sweat and tears, of her labor, the woman's, that has been fraudulently held as the surety and as the debtor, when in reality it is I, that is truly the holder in due course and the actual creditor.

But Alas! The government corporation deems that the man is "LOST AT SEA" by his very (E)state, while his employees (the Government, Corporations) steal the fruits of his labor.

I, would like to remind you that the act of either remaining a "U.S. citizen" or becoming one is a voluntary, revocable act according to the U.S. Supreme Court in the case of United States v. Cruikshank, 92 U.S. 542. All citizenship is a product of intent and domicile, and it has never been my intent to be a "U.S. citizen" as defined in 8 U.S.C. §1401 while it has always been my intent to be a "national" per 8 U.S.C. §1101(a)(21) but not a STATUTORY "U.S. citizen" per 8 U.S.C. §1401:

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026918

## **Challenge of Jurisdiction**

In Genesis 1: 26-28 God gave man(kind) dominion over the three Jurisdictions: Land, Air, Water, and everything therein. This became the origin of LAW.

Latter Moses brought down from the mount the Ten Commandments this became known also as God's law.

### **And then, there came the following: The first three Testamentary Trusts**

- In 1455, The Romanus Pontifex;
- in 1481, The Aeterni Regis;
- in 1537, The Convocation;

...all of the first three testamentary trusts combined set the **specific** three jurisdictions of the LAW...

**Land;**  Common Law, of "we the people" natural, man/woman, national in nature. Originally King of Spain as trustee but later given to all mankind.

**Air;**  Ecclesiastical law, Canon law, moral, souls, trusts, global in nature. Vatican as trustee.

**Water;**  Admiralty law or Commerce; shipping, vessels, ports, goods, tax, international in nature. Contractual in nature. Persons, Entities, Corporations, Employees, residents. British Monarchy as trustee. The Crown inc. The BAR Association.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026919

These are the **ONLY** three jurisdictions, all with their **separate and distinct languages.**

### *Definition of "jurisdiction":*     Juris,

means **"law"** + **diction**, means **"words"**.

The words you use determine in which of the three jurisdictions **you stand.** We are not well-educated through the governments public schools, and its Public propaganda educational system. We learn only what they want us to learn. And because the overwhelmingly vast majority of government leaders are BAR Association members, then why are we not taught the language and Jurisdictions differences of LAW?  Why are we are not taught <u>the law</u>?  Why?

In fact, it seems this and other pieces of the puzzle were <u>hidden on purpose</u>, as a way to dumb us down to facilitate the taxing of the poor, through our courts, in order to make a **profit.   I ask,** **Can this be constructive fraud?**
**It's definitely not full and honest disclosure of the facts.**

Here is an Example of
    **Land / Common jurisdiction   vs.   Water / Admiralty / Commerce jurisdiction:**

**Example Sentence #1** Land / Common jurisdiction

    As one of the "We the People" a free man, I travel, in private, upon the roadways, in my automobile or carriage or by any other means that I determine expedient, in safety and without molestation, while being secure in my property and my papers, using only my passport, as my protection and my identification, as is my right of locomotion. I am lawful.

**<u>VS</u>**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026920

**Example Sentence #2** Water / Admiralty / Commerce jurisdiction

As a person, a entity, a citizen, a resident, through privilege of contract with government, I drive or operate my motor vehicle upon the highways when in possession of a drivers license, I am operating in commerce if I am following all rules, codes, statutes, ordinances, (which are all corporate by-laws) I am legal. *

*(Only applies when hauling Passengers for hire, or goods for resale in interstate commerce or for public servants in the performance of their official duties)

Sentences above are examples of two distinct jurisdictions of land and water! Man has dominion, man has jurisdiction over all things.
All Law is but merely, land, Air, or Water.

According to Genesis 1:26-28 in The Holy Bible, "[I] God said, Let us make man in our image, after our likeness: and let them have dominion.... So God created man in his own image, in the image of God created he him; male and female created he them.  And God blessed them, and God said unto them, Be fruitful, and multiply, and replenish the earth, and subdue it: and have dominion over the fish of the sea and over the fowl of the air, and over every living thing that moveth upon the earth."

According to Genesis 1:26-28 in The Holy Bible, God bestows man with dominion and jurisdiction over all things—but NOT over other man.

The Bar Association routinely, incorrectly or purposely, exchanges the word "venue" and other words, replacing them with the word "jurisdiction" to confuse the people, the State Nationals, and the citizens.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026921



**CONGRESS DECLARES BIBLE "THE WORD OF GOD"**

PUBLIC LAW 97-280—OCT. 4, 1982

Public Law 97-280
97th Congress

96 STAT. 1211

**Joint Resolution**

Authorizing and requesting the President to proclaim 1983 as the "Year of the Bible".

Whereas the Bible, the Word of God, has made a unique contribution in shaping the United States as a distinctive and blessed nation and people;

Whereas deeply held religious convictions springing from the Holy Scriptures led to the early settlement of our Nation;

Whereas Biblical teachings inspired concepts of civil government that are contained in our Declaration of Independence and the Constitution of the United States;

Whereas many of our great national leaders—among them Presidents Washington, Jackson, Lincoln, and Wilson—paid tribute to the surpassing influence of the Bible in our country's development, as in the words of President Jackson that the Bible is "the rock on which our Republic rests";

Whereas the history of our Nation clearly illustrates the value of voluntarily applying the teachings of the Scriptures in the lives of individuals, families, and societies;

Whereas this Nation now faces great challenges that will test this Nation as it has never been tested before; and

Whereas that renewing our knowledge of and faith in God through Holy Scripture can strengthen us as a nation and a people: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President is authorized and requested to designate 1983 as a national "Year of the Bible" in recognition of both the formative influence the Bible has been for our Nation, and our national need to study and apply the teachings of the Holy Scriptures.

Approved October 4, 1982        Scriptures for America, P. O. Box 766, LaPorte, Colo. 80535

Ephesians 6:12 KJV
**For we wrestle not against flesh and blood, but against principalities, against powers, against the rulers of the darkness of this world, against spiritual wickedness in high places.**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026922

**Governments have no jurisdiction over man. Governments have jurisdiction only over artificial entities and <u>Over its own employees</u>.**

"Inasmuch as every government is an artificial person, an abstraction, and a creature of the MIND ONLY with other artificial persons. The <u>imaginary</u>, having neither <u>actuality nor substance</u>, is foreclosed from creating and attaining parity with the <u>tangible</u>. The legal manifestation of this is that NO government, as well as any law agency, aspect, court, etc., can concern itself with anything other than Corporate, Artificial Persons and the Contracts between them." (emphasis added). S.C.R. 1795, Penhallow v. Doane's Administrators 3 U.S. 54; 1 L.Ed 57; 3 Dall. 54, Supreme Court of the United States 1795, [Not the "United States Supreme Court" -ed.]

<u>"No sanction can be imposed absent proof of jurisdiction"</u>

Stanard v. Olesen, 74 S. Ct.768

<u>"Once challenged, jurisdiction cannot be 'assumed', it must be proved to exist."</u>

Stuck v. Medical Examiners, 94 Ca2d 751.211 P2s 389

<u>"Jurisdiction, once challenged, cannot be assumed and must be TIMELY PROVEN, AND EMPHATICALLY DECIDED. ".</u>  Maine v. Thiboutot, 100 S. Ct. 2502

<u>"The law requires proof of jurisdiction to appear on the record of the administrative agency and all administrative proceedings."</u>  Hagans v. Lavine, 415 U.S. 533

**If any tribunal finds absence of proof of jurisdiction over person and subject matter, <u>the case must be dismissed."</u>**

Louisville R.R. v. Motley, 211 U.S. 149, 29 S. Ct. 42

**Page 25 of 90**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026923

**Under the Federal Rules of Civil Procedure 12b 6, the prosecution has failed to provide adequate proof that the parties involved in this situation are actually corporate entities. There is ample proof that the prosecution and other agents are actually corporations.**

Title 28 USC 3002 Section 15A states United States is a Federal Corporation and not a government, including the Judicial Procedural Section.

In numerous cases, SCOTUS has said in summary:

1) that since governments chose to incorporate themselves, they must abide by the same rules as any other corporations.

2) that governments are now de facto, as corporations; and that they pass no laws, but only corporate bylaws called rules, codes, statutes, executive orders, ordinances and policies.

3) that all rules, codes, statutes, executive orders, ordinances and policies, are "colored/colorable" and governed only by the <u>consent of the governed</u> and through the fraudulent creation and unlawful conversion of man-kind into a legal Person, Citizen, Resident. Obtained through TACIT Agreement and not honorable contract.

**A court has no jurisdiction to determine its own jurisdiction,** for a basic issue in any case before a tribunal is its power to act, and a court must have the authority to decide that question the first instance." Rescue Army v. Municipal Court of Los Angeles, 171 P2d 8: 331 US 549, 91 K, ed, 1666m 67 S, Ct, 1409

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026924

I, **Jessica Mann; Kahraman,,** **a living soul, a woman, do not consent to this type of fraud. I am governed by my GOD, his beloved Son, Jesus Christ, the guidance of the Holy Spirit, and the dictates of my own conscience.**

As Clearly stated herein as a Latter Day Saint, my faith and beliefs are clear;

### Doctrine & Covenant 98

A long established Published Document, Obeyed by Millions... Therefore Law.

4 And now, verily I say unto you concerning **the laws of the land**, it is my will that my people should observe to do all things whatsoever I command them. 5 And that **law of the land** which **is constitutional**, supporting that **principle of freedom in maintaining rights and privileges**, belongs to **all mankind**, and is justifiable before me.

6 Therefore, **I, the Lord**, justify you, and your brethren of my church, **in befriending that law which is the constitutional law of the land**; 7 And as pertaining to law of man, whatsoever is more or less than this, cometh of evil.

8 **I, the Lord God, make you free, therefore ye are free indeed; and the law also maketh you free.**

9 Nevertheless, when the wicked rule the people mourn.

10   Wherefore, honest men and wise men should be sought for diligently, and good men and wise men ye should observe to uphold; otherwise whatsoever is less than these cometh of evil.

11   And I give unto you a commandment, that ye shall forsake all evil and cleave unto all good, that ye shall live by every word which proceedeth forth out of the mouth of God.

12   For he will give unto the faithful line upon line, precept upon precept; and I will try you and prove you herewith.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026925

**The constitution** clearly states that only congress can pass laws, yet since incorporated every act of congress has a line in it that reads,

> "this act shall not effect any rights thus previously established".

**This means congress cannot pass any ex-post facto laws.**

WHAT DO YOU THINK THE LAW IS?

16 Am Jur 2d, Sec 177 late 2d, Sec 256:

The general misconception is that any statute passed by legislators bearing the appearance of law constitutes the law of the land. The U.S. Constitution is the supreme law of the land, and any statute, to be valid, must be in agreement. It is impossible for both the Constitution and a law violating it to be valid; one must prevail. This is succinctly stated as follows:

The General rule is that an unconstitutional statute, though having the form and name of law is in reality no law, but is wholly void, and ineffective for any purpose; since unconstitutionality dates from the time of its enactment and not merely from the date of the decision so branding it. An unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed.

Such a statute leaves the question that it purports to settle just as it would be had the statute not been enacted. Since an unconstitutional law is void, the general principles follow that it imposes no duties, confers no rights, creates no office, bestows no power or authority on anyone, affords no protection, and justifies no acts performed under it.....

A void act cannot be legally consistent with a valid one. An unconstitutional law cannot operate to supersede any existing valid law. Indeed, insofar as a statute

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026926

runs counter to the fundamental law of the land, it is superseded thereby. No one Is bound to obey an unconstitutional law and no courts are bound to enforce it.

It exposes, that private BAR attorneys have been indoctrinated into believing that we have a lawful system of justice, which we do not. Their job today is to prevent the American people from understanding our reality and to keep us all locked into the legal system BAR attorneys created and were trained to implement. Our current 'legal system' is a fraud and it works to their benefit and to our detriment. This truth was confirmed by Karen Hudes, former World Bank Attorney, during an interview. "Former World Bank Attorney exposes the bankers and the BAR"

Ms Hudes correctly stated that:

"I don't want to believe that all of these lawyers and the American Bar Association are pulling a fast one on everybody like this, but I have no choice – that's the way it is. If that's the way it is, I'd rather admit that's the way it is than sit there being a dupe."

She goes on to say that...

"the ABA [American Bar Association] has lost all total credibility and they should apologize to the American people for what it is they have been doing. And they should disband!"

Ms. Hudes further explains what has happened to our legal system during an interview titled: "Information on the 13th Amendment"  that Ms. Hudes referred to: "The Missing 13th Amendment".

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026927

Both our government and our courts are playing Chess, while telling the people the game is Checkers. If We the People wish to restore our unalienable birth rights, we need to learn to play Chess.

## FRAUD

The thing about fraud is this: At some point in time, it must be recognized, learned, and vitiated. Only then is justice obtained. Only then is Liberty achieved.

Please let me explain the Claim above so you may rule any and all contracts pertaining to this matter and any previous matters of the court pertaining to this man Void Ab Initio.

### The Living story of the Fraud of the Cestui Que Vie Act of 1 666

My Mother, a woman, a living soul, created by God, of flesh and blood, very much alive; went into the "foundling" (a safe place to abandon a child) hospital believing she would get care but instead was falsely declared indigent, a pauper.

Then... Having recently undergone the extreme duress of a major medical trauma commonly known as childbirth, and under the influence of painkillers, being anxious to go home to her comfortable bed, in order to pursue a happy life with her beautiful, newly born baby.
She unknowingly filled out some dubious and unexplained forms put before her. By the presumptive Tacit agreement of government she was coerced into signing them as an "informant", (one who gives someone up to another), and as a citizen, as a person, as a resident by historical definitions of a "city employee", a

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026928

"dead legal entity or office of person", and "as someone there temporarily to do business".

And... My innocent mother thus failing to recognize the lifelong consequences of her actions as there was no "Full and Honest Disclosure" nor any "Meeting of the Minds" which surely Vitiates any contract.

This form that my mother signed was fraudulently used to create a document of title, a Bond, a Insured Security, and was then sent to the Department of Human Resources registered as human capital, Slavery jointly by the foundling Hospital and by the STATE.

This Action created a Copyright infringement and Unlawful Conversion of given Christian born Name converted to birthed NAMES and bonded, their attached CUSIP #'s attached to the CESTUI QUE VIE trust, all "look alike sound a like" names, a constructive fraud.

*It was a fraud created by powerful and corrupt groups of controlling men.*

Since JESSICA WREN MANN AS SHOWN ON BIRTH RECORD B102-72-024570

Was Fraudulently created by STATE OF ARIZONA, with its creation (berthed)

date as recorded on the 29TH, Day of AUGUST, 1972 as Instrument File No.

13286, of Official Records of MARICOPA COUNTY, Department of Human

Resources of the STATE OF ARIZONA. With its Own unique CUSIP

##redacted##. is also Dead.  STATE OF ARIZONA has no remedy available to

its Fictionally Dead Entity.

While I, Jessica Mann; Kahraman,, Born alive on the different date of 29th,

day of August 1972 at 9:56 p.m. upon the Land Jurisdiction known as Arizona, a

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026929

De Jure republic, was, as its signatory officer, (person) without "full and honest disclosure" of what that meant, was a minor at the time and not a valid party to the contract.

As mentioned above, at some point in time one recognizes the fraud as the man, the living soul, this child of god, has done and has awoke to the fact that it is his blood, sweat, and the tears and pains of his labor, the man's, that has been fraudulently held as the surety and the debtor when he is truly the holder in due coarse and the actual creditor...

But No, he is deemed "LOST AT SEA" by his very co-trustee of his own (E)state while his employees (Government Corporations) steals from the fruits of his labor.

Then through this fraud tried to make the Man, the living soul, a signatory officer (into a "PERSON") a fraudulently created dead dog Latin entity, an unknowing party to the Bankrupt Corporation the UNITED STATES and STATE of ARIZONA subsidiary, all just more constructive fraud.

I ask you this; Is the Man and Living soul an Executor to, a Beneficiary of, or in any other way, is he one who enjoys any financial benefit to this Cestui Que Vie Trust estate?

Or, does one have to call in a federal bankruptcy judge to dissolve the Cestui Que Vie Trust and settle and claim the estate / the minor account?

Or, does one just claim it by asking the administrator, as the law states?

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026930

These private secret trusts are set up under Canonum De Ius Positivum Canons of Positive Law....

Canon 2048

Since 1933, when a child is borne in a State (Estate) under inferior Roman law, three (3) Cestui Que (Vie) Trusts are created upon certain presumptions, specifically designed to deny the child forever any rights of Real Property, any Rights as a Free Person and any Rights to be known as man and woman rather than a creature or animal, by claiming and possessing their Soul or Spirit.

Canon 2049

Since 1933, upon a new child being borne, the Executors or Administrators of the higher Estate willingly and knowingly convey the beneficial entitlements of the child as Beneficiary into the 1st Cestui Que(Vie) Trust in the form of a Registry Number by registering the Name, thereby also creating the Corporate Person and denying the child any rights as an owner of Real Property.

Canon 2050

Since 1933, when a child is borne, the Executors or Administrators of the higher Estate knowingly and willingly claim the baby as chattel to the Estate. The slave baby contract is then created by honoring the ancient tradition of either having the ink impression of the feet of the baby onto the live birth record, or a drop of its blood as well as tricking the parents to signing the baby away through the deceitful legal meanings on the live birth record. This live birth record as a promissory note is converted into a slave bond sold to the private reserve bank of the estate and then conveyed into a 2nd and separate Cestui Que (Vie) Trust

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026931

per child owned by the bank. Upon the promissory note reaching maturity and the bank being unable to "seize" the slave child, a maritime lien is lawfully issued to "salvage" the lost property and itself monetized as currency issued in series against the Cestui Que (Vie) Trust.

## Canon 2051

Each Cestui Que Vie Trust created since 1933 represents one of the 3 Crowns representing the 3 claims of property of the Roman Cult, being Real Property, Personal Property and Ecclesiastical Property and the denial of any rights to men and women, other than those chosen as loyal members of the society and as Executors and Administrators.

## Canon 2052

The Three (3) Cestui Que Vie Trusts are the specific denial of rights of Real Property, Personal Property and Ecclesiastical Property for most men and women, corresponds exactly to the three forms of law available to the Galla of the Bar Association Courts. The first form of law is corporate commercial law is effective because of the 1st Cestui Que Vie Trust. The second form of law is maritime and trust law is effective because of the 2nd Cestui Que Vie Trust. The 3rd form of law is Talmudic and Roman Cult law is effective because of the 3rd Cestui Que Vie Trust of Baptism.

## Canon 2053

The Birth Certificate issued under Roman Law represents the modern equivalent to the Settlement Certificates of the 17th century and signifies the holder as a pauper and effectively a Roman Slave. The Birth Certificate has no direct relationship to the private secret trusts controlled by the private banking

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026932

network, nor can it be used to force the administration of a state or nation to divulge the existence of these secret trusts.

Canon 2054

As the Cestui Que Vie Trusts are created as private secret trusts on multiple presumptions including the ongoing bankruptcy of certain national estates, they remain the claimed private property of the Roman Cult banks and therefore cannot be directly claimed or used.

Canon 2055

While the private secret trusts of the private central banks cannot be directly addressed, they are still formed on certain presumptions of law including claimed ownership of the name, the body, the mind and soul of infants, men and women. **Each and every man and woman has the absolute right to rebuke and reject such false presumptions as the holder of their own title.**

Canon 2056

**Given the private secret trusts of the private central banks are created on false presumptions, when a man or woman makes clear their Live Borne Record and claim over their own name, body, mind and soul, any such trust based on such false presumptions ceases to have any property.**

Canon 2057

**Any Administrator or Executor that refuses to immediately dissolve a Cestui Que (Vie) Trust, upon a Person establishing their status and competency, is guilty of fraud and fundamental breach of their fiduciary duties requiring their immediate removal and punishment..**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026933

## Canon 2124

When a person has re-established their competent living status, then by law the Cestui Que (Vie) Trust is dissolved and they return to being acknowledged as a beneficiary or a some higher standing if a trust. In either case, it is both unlawful and a serious fraud against the law to seek Income Taxes once the Cestui Que Vie is dissolved and no (dead) body corporate exists to use as argument for rent.

## Canon 2127

When a person has re-established their competent living status, then no Cestui Que (Vie) Trust may exist in their place. Therefore, a Company must be formed as a Trust instead of a Cestui Que Vie and company tax cannot be charged for rent under its present form.

## QUESTION FOR THE PROSECUTION:

IS IT TRULY YOUR HONEST INTENTION TO DEFRAUD ME OR INJURE ME IN ANY WAY OR IS IT YOUR INTENT TO CONSPIRE OR DENY ME ANY BASIC GOD-GIVEN, GUARANTEED CONSTITUTIONAL and INTERNATIONAL RIGHTS, HERE?

## Wherefore, here now comes my Living Testimony:

My Living Testimony, in the form of and part of this Affidavit shall be truth in fact upon the record. It is presented to the best of my knowledge and belief, and is sworn under oath and the penalty of perjury. It is un-rebutted, precept by precept, and shall become judgment upon the record.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026934

1) I, <u>Jessica Mann; Kahraman</u>,, a living soul, a woman of GOD, Sui Juris, having only just recently learned of the fraud committed by the courts, the BAR Association, and those of perceived authority claiming to represent this De Facto Government, A foreign Corporation, calling itself the UNITED STATES. Its subsidiary corporation the STATE OF ARIZONA. Who having created a false fictional entity known as, JESSICA WREN MANN, that it is this, fictional Entity being charged as such.

NOM DE GUERRE, PERSONATE false person name is a breach of the supreme law treaty of the International Covenant of Civil and Political Rights, Part 1, Amendments 1-27. It is in breach of U.S.C. Title 18: §1342: [Point 1 A - d] the use of Fiction names against <u>living-souls</u> is a breach of U.S.C Title18 §1341 [Point 1 A - e] to cause a Fraud and Swindle. For the defendant(s) by showing their true identity in upper and lowercase lettering with punctuation, the court is in breach of F.R.C.P. RULE:10(a): [Point 1 A - f] using the proper name of the Party, and a breach of F.R.C.P. RULE: 17, [Point 1 A - g] only the real party of concern can be sued in the admiralty.

2) I, <u>Jessica Mann; Kahraman</u>,, hereby Demand a Dismissal with extreme prejudice, as I am <u>NOT</u>, nor have I ever been that fictional Entity called as JESSICA WREN MANN AS SHOWN ON BIRTH RECORD B102-72-024570, which was created by you, the UNITED STATES, the STATE of ARIZONA and <u>Not</u> I, and that was further perpetrated through fraud upon my Mother, and upon myself at my Birth.

See Birth Certificate or Certificate of Live Birth

3) I, <u>Jessica Mann; Kahraman</u>,, state for the record, that I am of sound Mind and Body and having good Mental Faculties, I hereby state that I <u>Believe</u> that I, a living soul, exist upon the LAND Jurisdiction given to all

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026935

Mankind by GOD, as stated in Genesis, and NOT of any other jurisdiction of the AIR, or WATER. (LAW = Land, Air, Water). As such I have Mailed my "Affidavit of Repudiation of Citizenship" to the President, State Department, Department of Justice, and recorded my Names upon the Land through a Deed of Re-Conveyance along with my Patent of Nativity in the county of my Birth.

I Believe that I Served Notice to "the powers that be" that I am alive and that I claim the Cestui Que Vie BIRTH CERTIFICATE TRUST account, (Title 31 U.S. Code 1321/1322), is what we are supposed to do. - Nationality Act, 1940.

4) I, Jessica Mann; Kahraman,, State for the record that I am a State National, Foreign to the De Facto UNITED STATES Corporation. Its foreign agents must register under the 1938 Foreign Agent Registration Act which is Constitution law from Federal Immigration and Original Constitution Nationality Act Section 8 USC 1324(a)(1)(A)(iv)(b)(iii).   the Americans living in these states are NOT "domestic" with respect to the "United States" ---- UCC 9 (307) h states the following  "The location of the United States: the United States is located in the District of Columbia...." I have also filed An "affidavit of repudiation of citizenship" to the secretary of state of the UNITED STATES, to the president of the UNITED STATES, and to the attorney general of the UNITED STATES, and to the Attorney General of the STATE OF ARIZONA.  I have also recorded upon the land of the county of Cache my "Patent of Nativity" Showing that my ancestors my very DNA lived upon the land before this government even existed.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026936

5) I, Jessica Mann; Kahraman,, State I, am also a ambassador servant of Christ. According to Public Law 97-280 whereby Congress declared the Bible the word of God, that puts the laws of The Creator on effect.

6) I, Jessica Mann; Kahraman,, do hereby declare that I do NOT Consent to any Presumptions or Assumptions or Hearsay on your part but only on Truth and Facts.

Every State law must conform in the first place to the Constitution of the United States, and then to the subordinate constitutions of the particular state; and if it infringes upon the provisions of either, it is so far void." Houston v. Moore, 18 US 1, 5 L.Ed 19 (1840). It is abiding truth that "nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp v. Ohio,367 U.S. 643, 659 (1961). HARRIS V. NEW YORK U.S. Supreme Court·401 U.S. 222 (1971). The U.S. Supreme Court has ruled that a natural individual entitled to relief is entitled to free access to its judicial tribunals and public offices in every State in the Union (2 Black 620, see also Crandell v. Nevada, 6 Wall 35. Plaintiff should not be charged fees, or costs for the lawful and constitutional right to petition this court in this matter in which he is entitled to relief, as it appears that the filing fee rule was originally implemented for fictions and subjects of the State and should not be applied to the Plaintiff who is a natural individual and entitled to relief. Hale v. Henkel, 201 U.S. 43]   HALE v. HENKEL 201 U.S. 43 at 89 (1906) Hale v. Henkel was decided by the united States Supreme Court in 1906. The opinion of the court states: "The "individual" may stand upon "his Constitutional Rights" as a CITIZEN. He is entitled to carry on his "private" business in his own way. "His power to contract is unlimited." He owes no

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026937

duty to the State or to his neighbors to divulge his business, or to open his doors to an investigation, so far as it may tend to incriminate him. He owes no duty to the State, since he receives nothing there from, beyond the protection of his life and property. "His rights" are such as "existed" by the Law of the Land (Common Law) "long antecedent" to the organization of the State", and can only be taken from him by "due process of law", and "in accordance with the Constitution." "He owes nothing" to the public so long as he does not trespass upon their rights.  " HALE V. HENKEL 201 U.S. 43 at 89 (1906) Hale v. Henkel is binding on all the courts of the United States of America until another Supreme Court case says it isn't. No other Supreme Court case has ever overturned Hale v. Henkel None of the various issues of Hale v. Henkel has ever been overruled since 1906, Hale v. Henkel has been cited by the Federal and State Appellate Court systems over 1,600 times! In nearly every instance when a case is cited, it has an impact on precedent authority of the cited case. Compared with other previously decided Supreme Court cases, no other case has surpassed Hale v. Henkel in the number of times it has been cited by the courts. "The rights of the individuals are restricted only to the extent that they have been voluntarily surrendered by the citizenship to the agencies of government."

7) I, Jessica Mann; Kahraman do hereby declare as a woman, living soul, that I am Sui Juris and demand that I, be recognized as such.
   "Merely being native born within the territorial boundaries of the United States of America does not make such an inhabitant, a Citizen of the United States subject to the jurisdiction of the Fourteenth Amendment."
   Elk v. Wilkins, Neb, 5s.ct.41,112 U.S. 99, 28 L. Ed. 643

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026938

8)  I, Jessica Mann; Kahraman, declare I am NOT Pro Se. That I am as stated
    Sui Juris, that I am not here in any representative position. Except as a
    woman. I do NOT wish to have an attorney or public pretender, they are the
    very reason I'm here now in this position. I do NOT Consent.
    Affiant has no record or evidence that if Affiant fires any attorney it should
    ever be questioned, as per; Barr v Day, 124 Wn. 2d 318, at 328 (1994)
    "Attorney when fired, is fired without question." "It is a clearly established
    principle of law that an attorney must represent a corporation, it being
    incorporeal and a creature of the law. An attorney representing an artificial
    entity must appear with the corporate charter and law in his hand. A person
    acting as an attorney for a foreign principal must be registered to act on the
    principal's behalf." See, Foreign Agents Registration Act" (22 USC § 612 et
    seq.); Victor Rabinowitz et. at. v. Robert F. Kennedy,376 US 605. "Failure to
    file the "Foreign Agents Registrations Statement" goes directly to the
    jurisdiction and lack of standing to be before the court, and is a felony
    pursuant to 18 USC §§ 219, 951. The conflict of law, interest and allegiance
    is obvious. A Lawyer can not make a claim to your rights , Only you can.
    Federal District Court Judge James Alger Fee's mind blowing assertion in
    United States v. Johnson, 76 F. Supp. 538 (M.D. Pa. 1947)

9)  I, Jessica Mann; Kahraman,, I, am NOT a "PERSON". I am NOT, a "US
    CITIZEN". I, am NOT an EMPLOYEE of the STATE, UNITED STATES,
    UNITED NATIONS, or the DISTRICT of COLUMBIA, and therefore I am NOT
    subject to its rules, codes, and statutes. I, do NOT Consent and I, do NOT
    Pledge my Allegiance to any other, than my GOD, for it is by his Grace alone,
    that I, shall live. "Since in common usage, the term `person' does not
    include the sovereign, statutes employing the phrase are ordinarily construed
    to exclude it." U.S. v. General Motors Corporation, D.C. Ill, 2 F.R.D. 528,

**Page 41 of 90**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026939

530: In "common usage the word `person' does not include the sovereign, and statutes employing the word are generally construed to exclude the sovereign." Church of Scientology v. US Department of Justice, 612 F.2d 417 @425 (1979): "the word `person' in legal terminology is perceived as a general word which normally includes in its scope a variety of entities other than human beings., see e.g. 1, U.S.C. § para 1." In the 1935 Supreme Court case of Perry v. US (294 US 330) the Supreme Court found that: "In United States, sovereignty resides in people... the Congress cannot invoke the sovereign power of the People to override their will as thus declared.",

10) I, Jessica Mann; Kahraman,, declare I, am NOT a Resident of the District of Columbia or any "districts" so claimed by "The Corporation" and/or any of its Zip Codes calling itself the "UNITED STATES" or any Appellation thereof. I do NOT consent.

Every State law must conform in the first place to the Constitution of the United States, and then to the subordinate constitutions of the particular state; and if it infringes upon the provisions of either, it is so far void." Houston v. Moore, 18 US 1, 5 L.Ed 19 (1840). It is abiding truth that "nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." Mapp v. Ohio,367 U.S. 643, 659 (1961). HARRIS V. NEW YORK U.S. Supreme Court 401 U.S. 222 (1971). The federal Constitution makes a careful distinction between natural born Citizens and citizens of the United States** (compare 2:1:5 with Section 1 of the so-called 14th Amendment). One is an unconditional Sovereign by natural birth, who is endowed by the Creator with certain unalienable rights; the other has been granted the revocable privileges of U.S.** citizenship, endowed by the Congress of the

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026940

United States**. One is a Citizen, the other is a subject. One is a Sovereign, the other is a subordinate. One is a Citizen of our constitutional Republic; the other is a citizen of a legislative democracy (the federal zone). Notice the superior/subordinate relationship between these two statuses.

11) I, Jessica Mann; Kahraman,, having recently learned of the fraud, do state for the record that "THERE IS NO CONTRACT" with the "UNITED STATES", "STATE OF ARIZONA", "ANY COURT", "JUDGE", "ATTORNEY", "ADMINISTRATOR", "AGENT" or "POLITICIAN" thereof. That I am rescinding all signatures. That there has never been present the 8 elements of a contract or any Full and Honest disclosure. Nor was there ever a time where I was not under threat and duress. Neither was there, both I, and another(s) wet ink signatures on any such document(s). I, do NOT Consent. See Below 8 Elements of a contract

1. Parties competent to contract

The parties to a contract should be competent, being of the age of consent, of sound mind, not disqualified from contracting by any law to which s/ he is subject. A flaw in capacity may be due to minority, lunacy, idiocy, drunkenness, or dissimilarity of kind. The parties should be of the same kind, being either legal fiction actors, or natural living men/women, allowing more than two parties, but never a mixture of these kinds and their respective jurisdictions.

2. Free and genuine consent

The consent of the parties to the agreement must be free and genuine. The consent of the parties should not be obtained by misrepresentation, fraud, undue

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026941

influence, coercion or mistake. If the consent is obtained by any of these means, then the contract is not valid or legally/lawfully enforceable.

## 3. Full disclosure

When negotiating a contract, full disclosure is the step of providing all material information, or telling the "whole truth", about any matter which may influence the decision-making of the other party or parties before they decide to enter into a contract. If either party fails to make full disclosure, the contract is null and void.

## 4. Valuable consideration

The consideration is something of value possessed by the parties that is brought to the contract table. This something of value is bargained for and given in exchange for a promise or a performance. The parties must each receive a benefit and each suffer a detriment. To be enforceable, a contract must have valuable consideration. A contract is unenforceable if it has insufficient or unequal consideration without agreement.

## 5. Certainty of terms

The Terms and Conditions of the contract must be fully disclosed and agreed upon, and must be certain and fixed. Any subsequent variation of terms must be agreed.

## 6. Meeting of the minds

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026942

Barker and the Case of the Marshalsea, Lord Coke laid the foundation for the doctrine of judicial immunity." Floyd & Barker, 77 Eng. Rep. 1305 (1607; The Case of the Marshalsea, 77 Eng. Rep. 1027 (1612) were both cases right out of the Star Chamber.

Coke's reasoning for judicial immunity was presented in four public policy grounds:

1. Finality of judgment;

2. Maintenance of judicial independence;

3. Freedom from continual calumniations; and,

4. Respect and confidence in the judiciary.

The Marshalsea presents a case where Coke denied a judge immunity for presiding over a case in assumpsit.

Assumpsit is a common-law action for recovery of damages for breach of contract. Coke then explained the operation of jurisdiction requirement for immunity:

"[W]hen a Court has

(a) jurisdiction of the cause, and proceeds iverso ordine or erroneously, there the party who sues, or the officer or minister of the Court who executes the precept or process of the Court, no action lies against them. But...

(b) when the Court has not jurisdiction of the cause, there the whole proceeding is [before a person who is not a judge], and actions will lie against them without any regard of the precept or process..."

It's one big serpent isn't it ?

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026943

Definition of serpent - a large snake., a sly or treacherous person, especially one who exploits a position of trust in order to betray it.

Definition of serpent. 1a archaic : a noxious creature that creeps, hisses, or stings. b : snake. 2 : devil sense 1. 3 : a treacherous person.

A serpent is a snake. ... Serpents have represented qualities ranging from evil to fertility to poison throughout history, and even today the symbol of medicine is a staff entwined by a serpent. The Latin root is serpentem, "creeping thing," from serpere, "to creep." A serpent is a snake

All deceptive and all tricks of the legal trade ... serpent like

**Extrinsic Evidence:**     Extrinsic Fraud is commonly associated with Legal Malpractice in that it happens in a means wherein your attorney merely engages in Willful Suppression of critical Material Evidence.

**Conspiracy:**     Many cases where your own attorney is actually decided to take on your case with the Intention of actually Working In Concert with the opposing party.     Although that may seem like a heinous act and is all to common and even widely accepted by the powers that govern their authority such as the court staff, the State Bar and the sitting Judicial Officer.

**All Members of the same union... The Conspiracy of the BAR
Lady Justice is hereby pronounced... DEAD**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026944

## Conclusion

"Your Honor, administrator, my bond is being used to fund these proceedings. I wish to subrogate the case contract, eliminate the record, and dismiss all charges with extreme prejudice."   I wish to live a free inhabitant.

"I Pray to God, to direct this administrator of this case contract to be dismissed with prejudice and the proceedings to be eliminated from the record and for the Prosecutor to pay me three times damages for my harm suffered and inconvenience in bringing false charges."

(In addition to the STATE OF ARIZONA's cost of $1440. Per DAY)   If he fails to do so, he is in Dishonor and you can ask the Bailiff to arrest him for Gross Negligence and Fraud Upon the Court.

1) "Notice to Clerk" I hereby Mandate you to record this Affidavit and Demand as one of we the people that it be made available on The record under the above referenced case #, so it may be put on the public record and **found**, and the record **corrected,** until such time of my dismissal and release.

2) The use of notary below is for the explicit purpose of both a **"Jurat Certificate"** and for **"Identification"**, and such use does not grant any "jurisdiction" to anyone other than I, for or on my own behalf. definition/meaning of jurisdiction  juris = law  diction = words

I, Jessica Mann; Kahraman,, as Principal Creditor, and Beneficiary of the Cestui Que Vie trust by Special Appearance only, do hereby appoint you judge and administrator as trust fiduciary and command you to settle this matter.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026945

On my knees before God, through his beloved Son, Jesus Christ, and the Holy Spirit, a man, A servant of the Lord. Amen.

Proceeding hereby and forever as Sui Juris, a Non Representative, Non Agent, Non Personam, by all rights and all powers as ordered by the 9th and 10th amendment of Bill of Rights and Bill of Provisions by The United States of America Constitution. And in accord with the supreme treaties listed in this document including the ICCPR. (1976) Signed by United States 1993.

As One of We the People, I, do hereby politely and with honor, command you, our public servant to follow this Mandate directive and **Void Ab Initio.** **FOR CAUSE, STATUS, STANDING, FRAUD AND lack of JURISDICTION.**

## PER; 28 U.S. Code § 1746 - Unsworn declarations under penalty of perjury

(1) If executed without the United States:    "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.
Executed on ___January 7, 2019___ . (date)

**without prejudice, and without recourse, I, hereby place my Autograph below**

Jessica Mann; Kahraman,,

## FURTHER I SAYETH NOT.

This document is now hereby publicly published and placed upon the record. You have 21 days to respond. This Affidavit un-rebutted shall become the judgement. I will then publicly publish your responses or your non responses.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026946

## Notary as JURAT CERTIFICATE

Arizona **State of** }

Maricopa **County** }

On January 07, 2019 _____ date before me,

Tammie Proctor , a Notary Public, personally appeared

**Jessica Mann; Kahraman who proved to me on the basis of satisfactory evidence to be the woman whose Name is subscribed to the within instrument and acknowledged to Me that he executed the same in his authorized capacity,**

**And that by his autograph(s) on the instrument the man executed, the instrument.**

**I certify under PENALTY OF PERJURY under the lawful laws of Arizona State and the STATE OF ARIZONA that the foregoing paragraph is true and correct. WITNESS my hand and official seal.**

Signature

of Notary / Jurat                    seal



NOTARY PUBLIC
STATE OF ARIZONA
Maricopa County
TAMMIE PROCTOR
My Commission Expires March 22, 2022

**Notice to agents is notice to principal, Notice to principal is notice to agent.**

**This is <u>The End</u> of this affidavit;  Only, the Additional pages of the Certified proof of service and the Certified Judgement of un-rebutted Affidavit may be Bound to this document.**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN026947

**Name of Person Filing:** *Jessica Kahraman*
**Address:**
**City, State, Zip Code:**
**Day/Evening Telephone:**

CHRIS DEROSE, CLERK
BY *M. Cortez* DEP

FILED

2019 JAN -8 AM 9: 49

FOR CLERK'S USE ONLY

## SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

**IN THE MATTER OF:**

*Kahraman*

**Case Number:** *JD 532206*

**Title of Document:**
*Documents*

☐ **RESTRICTED**

# See attached document



CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027866



Attn: David K. Udall
Re: CT 2018 — 105538

JD 532206

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027867

Affidavit


Comes now Affiant, Jessica Mann; Kahraman, a living woman, Presenting as Evidence of the following facts.

1. I do believe this woman, Sarah Kramer, is a private contractor of a private company that is under contract for the Title IV-E funds and not for wrongs;

2. I require this woman, Sarah Kramer, to swear under the penalty of perjury that she has first-hand knowledge of any wrong done by me;

3. Any information given by me was done under threat, duress and coercion under the guise that DCS was a government entity and not a private corporation. I do not wish to work with private companies or accept any benefits or services;

4. There has never been any abuse or neglect of my biological property; {See Exhibits A and B}

5. If this woman, Sarah Kramer, believes my claim is not true, she must make a claim in the form of an affidavit under oath or affirmation and under the penalty of perjury within seven days. Any failure to do so will be considered a trespass and I will charge $5,000 a day per biological property to be paid immediately; {See Exhibits A and B}

Verification

I hereby declare, certify and state, pursuant to the penalties of perjury under the laws of the United States, and by the provisions of 28 USC § 174 that all of the above and foregoing representations are true and correct to the best of my knowledge, information and belief.

Executed in Mesa, Arizona this _3rd_ day of _January_ 20_19_.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027868

Exhibit A



CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Exhibit B



CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dept child safety
Sarah Kramer
1201 S Alma School Rd
Mesa AZ 85210    1100

9590 9402 4633 8323 9315 11

2. Article Number (Transfer from service label)

7018 2290 0001 7133 4440

PS Form 3811, July 2015 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X M Cenady
☐ Agent
☐ Addressee

B. Received by (Printed Name)
Michelle Cunacty
C. Date of Delivery
1-3-19

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt

---

**U.S. Postal Service**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

MESA, AZ 85210

| Certified Mail Fee | $3.45 |
| $ | $2.75 | Z 8303 0069 04 |
| Extra Services & Fees (check box, add fee as appropriate) | |
| ☐ Return Receipt (hardcopy) | $ $0.00 |
| ☐ Return Receipt (electronic) | $ $0.00 | Postmark Here |
| ☐ Certified Mail Restricted Delivery | $ $0.00 |
| ☐ Adult Signature Required | $ $0.00 |
| ☐ Adult Signature Restricted Delivery $ | |
| Postage | $0.50 |
| $ | |
| Total Postage and Fees | $6.70 | 12/31/2018 |
| $ | |

Sent To
Dept Child Safety Sarah Kramer
Street and Apt. No., or PO Box No.
1201 S Alma School Rd 1100
City, State, ZIP+4
Mesa AZ 85210

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7018 2290 0001 7133 4440

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027871

Affidavit

Comes now Affiant, Jessica Mann; Kahraman, a living woman, Presenting as Evidence of the following facts.

1. I do believe this woman, Sarah Mendez, is a private contractor of a private company that is under contract for the Title IV-E funds and not for wrongs;

2. I require this woman, Sarah Mendez, to swear under the penalty of perjury that she has first-hand knowledge of any wrong done by me;

3. Any information given by me was done under threat, duress and coercion under the guise that DCS was a government entity and not a private corporation. I do not wish to work with private companies or accept any benefits or services;

4. There has never been any abuse or neglect of my biological property; {See Exhibits A and B}

5. If this woman, Sarah Mendez, believes my claim is not true, she must make a claim in the form of an affidavit under oath or affirmation and under the penalty of perjury within seven days. Any failure to do so will be considered a trespass and I will charge $5,000 a day per biological property to be paid immediately; {See Exhibits A and B}

Verification

I hereby declare, certify and state, pursuant to the penalties of perjury under the laws of the United States, and by the provisions of 28 USC § 174 that all of the above and foregoing representations are true and correct to the best of my knowledge, information and belief.

Executed in Mesa, Arizona this *3rd* day of *January* 20 *19*.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027872

_Jessica Mann; Kahraman a woman_

Jessica Mann; Kahraman

Notary

On this 3 day of Jan , 20 19 ; before me Jessica Mann Kahraman the subscriber, affiant,

personally appeared to me know to be the living man described in and who executed the

foregoing instrument and swore before me that he executed the same of his free will act and

deed.

_Fatima Soto_

Notary

My commission expires: 10/04/2022

FATIMA SOTO
Notary Public - Arizona
Maricopa County
Commission # 553682
My Commission Expires October 04, 2022

Mailed Via US Mail on January 3, 2019,
Sent Certified return receipt and witnessed
by Sandra L. Miller

_Sandra L. Miller_

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027873

Exhibit A



Exhibit B



CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027874

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dept of Child safety
Sarah Mendez
Sarah Kramer
1201 S Alma School Rd 1100
Mesa AZ 85210

9590 9402 4361 8190 3747 52

2. Article Number (Transfer from service label)

7018 2290 0000 4443 0798

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

x M anaely    ☐ Agent
               ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
                                  12 19

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053       Domestic Return Receipt



U.S. Postal Service™
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at www.usps.com®

Certified Mail Fee    $3.45
$                                    0069
Extra Services & Fees (check box, add fee as appropriate)    04
☐ Return Receipt (hardcopy)    $
☐ Return Receipt (electronic)    $    $0.00
☐ Certified Mail Restricted Delivery    $    $0.00    Postmark
☐ Adult Signature Required    $    $0.00    Here
☐ Adult Signature Restricted Delivery $
Postage    $0.50
$
Total Postage and Fees    $6.70
$                          12/31/2018

Sent To    Dept child safety Sarah Mendez
Street and Apt. No., or PO Box No.    201 S Alma School Rd 1100
City, State, ZIP+4®    Mesa AZ 85210

PS Form 3800, April 2015 PSN 7530-02-000-9047        See Reverse for Instructions

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027875

Affidavit

Comes now Affiant, Jessica Mann; Kahraman, a competent living woman of sound mind and body. I am a summa cum laude graduate with a Masters degree in Traditional Oriental Medicine. I am currently licensed by the State of Arizona (L.Ac. 0740) as an Acupuncturist, formerly licensed by the State of California as an Acupuncturist (L.Ac. 11657) and am Nationally Certified in Acupuncture by the National Certification Commission for Acupuncture (Dipl.Ac. 28103). My undergraduate education is in Psychology at University of California, Santa Barbara. I graduated with Honors from Westlake High School. I'm presenting the **evidence** of **truth** and **facts** as following. I am rebutting the boxes checked on the Document titled, "ORDER FOR EX-PARTE REMOVAL" based on misrepresentation of facts.

1. I am demanding the immediate release of our biological property. {See Exhibits A and B}

2. It is **EMERGENT** that they be returned to our loving care. K.K. Kahraman, a boy, our boy, biological property exhibit B's health status declined dramatically after our removal from the hospital (without court order), and after administration of foods and medications that were not well-tolerated by his body. Reactions were suppressed with Tylenol and other undisclosed medications given to K.K. Kahraman, a boy, while our medical rights were illegally stripped. As demonstrated in his final labs {See Exhibit C}, and detailed by Cindy Schneider, a woman acting as medical doctor and biomedical specialist, his liver function has declined significantly. Upon admission, one liver enzyme was low and the other normal. At discharge, both AST and ALT are alarmingly high. She further indicates he has become anemic, likely from all the blood draws. His monocyte count is elevated, which may indicate an infection. His branch chain aminos are elevated, which means he is not getting enough B6; the active form he requires is P5P. His MCV is elevated, which indicates a need for folate. K.K. Kahraman, a boy, requires the 5MTHF form due to MTHFR genetic mutation. There were no IgG reactions to the foods tested, which rules out specific allergies, but not sensitivities, which she says the men and women of Cardon Children's Hospital medical staff don't understand. She further stated that mitochondrial function is abnormal, indicating immediate need for mitochondrial testing to assess true genetic disorders, malnutrition, illness, and toxic exposures. {See Exhibit D}

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027876

3.  There is no cause for temporary custody to protect ▮D.K.▮ and ▮K.K.▮ Kahraman, boys from abuse or neglect. Neither child was found at home. ▮D.K.▮ was healthy, and he was removed from our care at the hospital without a warrant. ▮K.K.▮ was removed from our custody while checked in and admitted at the hospital. We had checked him in to the hospital of our own free will and volition. There was no present or impending danger for ▮D.K.▮ nor was any medical treatment immediately rendered when they took him. {See Exhibit E}

4.  We are a loving family {See Exhibit F} who provides abundant nutrition, medical care, affection and safety both inside and outside our home. Our biological properties do not have histories of repeated trauma, hospital visits, x-rays, bruises, or broken bones. No medical providers have reported any suspicion of abuse or neglect. In fact, several have expressed their observations:

-   A June 25, 2014 report by a Nicoletta Calorie, a woman acting as occupational therapist, comments, "▮D.K.▮ is an adorable boy who has a **loving family that is concerned for his well-being.**"

-   Kevin Ross, a man acting as chiropractor indicates, "I wanted to give input regarding Jessica Karhaman, I have had the privilege of having her family in my office for just over 1 year (12/14/17)…I have found her nothing but **consistently loving and caring for her boys,** She has always been most concerned for their well being and always **open for advice and suggestions** that I provided. When situations arose that were outside of my knowledge base, she has always been willing to investigate further for the best of her family."

-   Becky Plotner, a woman acting as naturopath states, "never in my life have I seen a more level headed, fact based person who cares so deeply for her children…the only concern I could possibly see is she does too much – too much time cooking for her kids, sitting and playing, discussing with her children and finding out how they are doing and too much time at the playground or afterschool activity while maintaining a full time job. That's not normal."

-   Shannon Southwick, woman acting as our former habilitation provider says, during my time with the family, I observed two loving parents always very attentive to their children's needs…always being proactive about their development. I never witnessed any sort of neglect or withholding food at any time. ▮D.K.▮ and ▮K.K.▮ were on a healthy and clean diet consisting of only organic fresh fruits and vegetables, and top-quality protein, vitamins and herbs. The parenting I witnessed was nothing but exceptional."

-   Firishta Gheyasi, a woman acting as Early Childhood Master indicates, "over the four years of knowing the Kahraman family, I can attest that Jessica and Ahmet have provided nothing but great parenting and care toward

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027877

their children and they were very actively involved in the boys' ECA program. Jessica and Ahmet have been very attentive to the boys' medical and nutritional care."

- Ellyn Belcastro, a woman acting as occupational therapist says, "the parents are very involved in their care and do whatever they can to carryover their therapy goals. The boys are always happy and I can tell they are loved very much...the boys enjoy their meals that their parents and caregivers provide for them...I'm baffled that anyone would think someone else would be a better parent to these boys." {See Exhibit G}

5. There are no mental health issues. I, Jessica Mann; Kahraman, a woman, I am a competent and loving mother with no history of psychological or emotional disorders. I am not medicated, and don't require psychological care. I am an independent business woman with a successful acupuncture and Chinese medicine practice. My husband, Ahmet; Kahraman, a man, has his diploma from Simav Cumhuriyet High School, and is employed in a management level position with The Phoenician by Marriott, a five-star resort. He is a competent and loving man, with no history of psychological or emotional disorders. He is not medicated and does not require psychological care. Our biological properties, D.K. Kahraman and K.K. Kahraman, boys, are highly functional boys with advanced cognitive abilities and an abundance of support to enhance their sensory, emotional and educational development. They did not require any medications (prior to Cardon Children's Hospital). They do not require psychological care. They recently attended Basis Chandler Primary North Charter School as kindergartners, where they achieved Honor Roll.

6. There is no risk of abuse or neglect of our biological properties. We are an attentive and loving man and woman who provide all the care and attention they need to develop, optimally – physically, mentally and emotionally. They have always received regular preventative and incidental care from a broad mix of natural and allopathic professionals. When needed, we have taken them to the emergency room for urgent treatment.

7. Our home is neither unfit nor unsafe. The boys have their own room, with comfortable beds (placed on the floor to prevent injury from rolling out), a closet full of clothes, shelves full of books, and shelves full of toys. {See Exhibit H} They have constant care and attention from myself, Jessica Mann; Kahraman, a woman, Ahmet: Kahraman, a man; habilitation care providers for 35 hours per week, professional therapists contracted with DDD,

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
AZ-KAHRAMAN027878

as well as extended family close by, including their grandmother, grandfather, great aunt and great uncle, men and women who are all actively and lovingly involved in their lives. {See Exhibit I}

8. Therefore, it is unlawful that our sons and Biological property: ▉D.K.▉ Kahraman exhibit A and ▉K.K.▉ Kahraman exhibit B were removed from our loving care. They were removed from our custody without a proper warrant or due process. ▉D.K.▉ Kahraman, a boy was not in any harm or danger, but was healthy. ▉K.K.▉ Kahraman, a boy, had been willingly brought to the hospital for medical help. He did not remain at home. We demand their immediate return.

9. In Sarah Kramer's Affidavit she makes quotations without any reference to the source of those statements. {See Exhibit J}

10. On July 2, 2018, ▉D.K.▉ Kahraman, a boy, our boy, our son, and biological property exhibit A, was running and playing with children at taekwondo and twisted his right ankle and knee. He complained of right ankle and right knee pain, with lingering knee pain. {See Exhibit K} I called his chiropractor from the taekwondo facility and made the next available appointment on July 4, 2018. Kevin Ross, DC, a man acting as chiropractor, said ▉D.K.▉ Kahraman, a boy, was fine, adjusting his low back and hips, and saying that it was typical boy injuries from being active. He was unable to walk without pain for two days but resumed full and normal activity from July 16 to August 15, 2018, including returning to taekwondo. {See Exhibit L}

11. There were many indications that the boys were thriving, prior to starting school on August 1, 2018. Becky Plotner, a woman acting as naturopath and certified GAPS practitioner makes the following notes:

   • July 18, 2018 "Tae kwon do. Tennis. Playground and thriving…strong and thriving."

   • June 1, 2018 "Continuing to thrive…showing normal markers."

   • May 10, 2018 "Boys appear strong. Giggly, happy. Sent a video of boys drawing pictures and playing with toys. Age appropriate and appear to be thriving. Strong legs. Enjoy the day without care or concern."

   • February 26, 2018 "Thriving and strong at tennis and martial arts..joyful thriving boys. Sent a video of boys playing, laughing, joyful, vibrant, full of life."

   • August 23, 2017 "Continuing to thrive…progressing well." {See Exhibit M}

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027879

12. Both boys have an extensive history of food reactions, for which we sought help from several practitioners. We were always trying new foods and attempting to expand their diets. Most recently, we consulted with Lisa Madigan, a woman acting as a licensed acupuncturist and certified practitioner of NAET Allergy Elimination Technique. {See Exhibit N} We continue to work through sensitivity reactions with Kevin Ross, a man acting as chiropractor and allergy clearing specialist. {See Exhibit O}. Becky Plotner, a woman acting as naturopath and certified GAPS practitioner makes the following notes: {See Exhibit P}

- January 26, 2018: "Eating ample amounts...Boys show great progress without more advanced foods...Progressing forward with easier to digest foods."

- December 5, 2017: "enjoyed turkey. Adding it into the regular mix...When introduces other foods, feet pain, joint swelling, itching eyes, 'body feels yucky' and grumpiness returns. When tries foods out of the regular, itching and redness begins. Sleep is altered, even with mother sleeping in the room they are extremely fussy and waking at night. Returning to consistent foods."

- October 10, 2017: "trying milk kefir, starting with whey...New Zealand lamb stock. Marrow bones. Ghee, soft yolks. Eating platefuls of meat from New Zealand lamb but not touching much else. Mother is pushing beets and starting carrots. Onion still continues in the soup as does garlic."

- June 26, 2017: Tried a little sliver of garlic – they reacted...Tolerating yolks...organ meats – stopped because they were moving too fast. Each time it was increased too quickly pain developed, feet pain, joint pain, fussy, night waking increase."

- September 14, 2016: "Added beets, not sure if K.K. showing issues from beets. Can only get him to eat beets every two days...Dillan (sic) taking in about one tablespoon of beets, can eat them every meal, K.K. takes about two teaspoons two times a day, complains his feet hurt after eating beets. Not tolerating one drop of kraut juice, cause itchy eyes, joint pain...Lemon juice made lip pain worse, pain and licking heightened."

- July 15, 2016 "Liposomal vitamin c shows great symptoms. Fussy. Feet pain, joint pain, itchy eyes. Trouble sleeping continues."

- May 24, 2016: "Frustrating responses, nose running, itching eyes, trouble sleeping. Histamine responses to Whole Foods lamb. Tried other meats. Tried Whole Foods chicken (corn and soy feed), Tried lamb and goat from halal market – gave night terrors, rubbing eyes, sore throat, legs hurt, eyelids red and swollen,

AZ-KAHRAMAN027880

waking constantly at night. Stopped onion, garlic probiotic to find a baseline. Flushing cheeks, red

eyelids. Introduced Carlson's fish oil at night. Showing potential corn responses, flaring."

- May 16, 2016: Increased kraut juice. Joint pain appeared and became very pronounced. Whole body pain developed. Throwing tantrums. Stopped kraut juice. Began ginger tea for prokinetic properties...Feet still hurting, gave tart cherry juice – hurts tummy."

- May 9, 2016: Kenan's food sensitivities: rubbing eyes, salicylate reactions, trouble processing milk, vomiting with many foods...removed problematic foods, specifically dairy and gluten. Made long cooked bone broth – tongue swelling. Amine sensitivity considered. Sensitivities continued to worsen. Tolerates lamb, vegetables, brothers split apple. Started potato...Increased apple and eggs. Removed potato due to stomach pain, itching, trouble sleeping...started feeding lots of vegetables. Began complaining about feet. Sleep trouble increased – stopped sleeping from 10:30 p.m. to 2:30 a.m. Complained of headaches, tummy aches, feet pain...removed sulfur foods. Added back in fruit...Appeared to tolerate lamb, green beans, and digestive enzymes. Added broccoli, cauliflower. Headaches began but got better when eggs were removed. Added asparagus and potato. Glutamate concerns continue to rise. Folate and folate foods showed great fussiness...Bloating. Eczema, behavior with Sulphur foods, including garlic and onion. Complains throat yucky."

- We tried an NAET allergy elimination treatment at two years old, but they boys had extreme reactions.

13. On August 15, 2018, D.K. Kahraman, a boy, our boy, and Biological property exhibit A: complained of right hip pain after rolling off our couch onto padded mats.  We took him to Kevin Ross, DC, a man acting as a chiropractor, the following day, and was told he was fine. He adjusted his hips. {See Exhibit L}

14. On August 22, 2018 (after family bowling activity) D.K. Kahraman, a boy, complained of right leg pain from mid-calf to mid-thigh. We took him to Kevin Ross, DC, a man acting as a chiropractor, who said it was "extreme muscle soreness," which was consistent with teaching D.K. Kahraman, a boy, to bowl between his legs for the first time, in the preceding few days". {See Exhibit L}

15. On August 23, 2018 while exiting the hallway from school, I observed D.K. Kahraman, a boy, our boy, and Biological property, see exhibit A: trip over another child's outstretched legs and fall onto one of his knees on the tile.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027881

16. At some point between August 24 and 31, 2018, D.K. Kahraman, a boy, was limping when I picked him up from school. He indicated he had fallen in Movement (physical education) and hurt his knees. He showed improvement within 24 hours and resumed normal walking;

17. On August 31, 2018, Dorothy Mann, a woman who is my mother, was babysitting D.K. Kahraman, and K.K. Kahraman, boys, in our home. When I returned home, she advised me D.K. Kahraman, a boy, had been unable to stand or walk, since seated on the floor, playing a game. She indicated there were no injuries or complaints of pain prior to his attempt to stand.

18. We allowed him to rest over the Labor Day weekend, and took him to Kevin Ross, a man, acting as chiropractor on September 3, 2018. {See Exhibit L} We also took him to Jessica, a woman acting as nurse practitioner at Ronald l. Jones Pediatrics, to get a referral for orthopedics. Jessica felt it was safe for D.K. Kahraman, a boy to walk and resume activities at school, barring sports and recess. {See Exhibit Q} There was some improvement, so he returned to school on September 5, 2018. He had pain and instability in his right knee only, which was consistent with his previous taekwondo injury. This same day, we were able to get an appointment for D.K. Kahraman, a boy, at Banner Desert Orthopedics with Ryan Miller, man acting as orthopedist. He advised us D.K. Kahraman, a boy's ligaments and bones seemed ok, though we were concerned that he could barely walk and was very emotional. He advised him to rest and come back if it got any worse. He offered a wheelchair if needed, but we agreed with the doctor's advice that we did not want D.K. Kahraman, a boy, to become dependent on it or deconditioned. The chart notes for this visit specifically mention: "Suspected Abuse/Neglect Observation: No signs or symptoms observed…Actual/Potential Malnutrition/Inadequate Nutrition: None." Ryan Miller, a man acting as orthopedic doctor then states, "Patient comes in to the clinic under their own power. **Well developed and well nourished.** Normal Mood and affect. Walks with mildly asymmetric gait. **No apparent distress.**" Lastly, Ryan Miller, a man acting as orthopedic doctor notes, "His exam is fairly benign and **I do not see anything dangerous going on**. This point I have recommended advancing activity as tolerated. They will call back if they need a wheelchair. I think he can continue with his physical therapy that he gets through the state. Again, they will return if symptoms are not resolving." {See Exhibit R}

19. Concerned we were missing something, I took D.K. Kahraman, a boy, to a comprehensive 45-minute consultation and assessment at Foothills Sports Medicine, where we saw Blake Scoresby, a man acting as a

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027882

physical therapist. Blake advised us ██D.K.██ Kahraman, a boy's joint seemed stable, though he could barely walk,

without pain, or discomfort. Blake suggested ██D.K.██ may have subluxed his patella during his July 2, 2018 injury,

and that may have caused pain that would not show any indications of bruising or swelling. He remarked that

██D.K.██ Kahraman, a boy, had general ligament laxity, a normal condition, which might predispose him to injury;

20. On September 10, 2018, I rented a wheelchair for ██D.K.██ Kahraman, a boy, while awaiting another visit with

Banner Desert Orthopedics. ██D.K.██ Kahraman a boy, was clearly in pain with walking, and we did not want him

to continue to miss school or get further injured. We continued to encourage walking short distances while in the

safety of our home. We went for a follow-up visit with Kevin Ross, a man, acting as chiropractor. {See Exhibit

L}

21. On September 12, 2018, ██D.K.██ Kahraman, a boy, began to complain of pain in both knees, and his gait appeared

unstable. We took ██D.K.██ back to Banner Desert Orthopedics, where he saw, Marcus Wilkins, a man acting as

Physician Assistant. We reported ██D.K.██ Kahraman, a boy, had pain in both patellas, and that tingling had

developed in his ankles bilaterally, as well as tingling in both patellas. We also mentioned tenderness in medial

thigh bilaterally with palpation. He told us that this was consistent with reinjury of his right knee, that we should

expect recovery to take 6-8 weeks, and that compensatory pain in the left knee was common due to limping.

Again, it was noted: "Suspected Abuse/Neglect Observation: **No signs or symptoms observed**…Actual/Potential

Malnutrition/Inadequate Nutrition: **None**." {See Exhibit S}

22. On September 17, 2018, we took ██D.K.██ Kahraman, a boy, to see Blake Scoresby, a man acting as Physical

Therapist at Foothills Sports Rehabilitation. He stated ██D.K.██ Kahraman, a boy, "demonstrates good rehab

potential due to young age and **family support**. We scheduled a follow-up appointment, but ██D.K.██ Kahraman, a

boy became anxious about returning, mentioning pain in his medial thighs and tingling at his ankles. Following up

by text message, Blake Scoresby, a man acting as physical therapist, said that it didn't fit the pattern of what he's

worked with in Sports Medicine, so he was not sure he was the best person to help. We began searching for

someone experienced in neurological physical therapy, since we had been unable to expedite the neurologist

appointment and did not want to risk pushing through a neurological concern. {See Exhibit T}

AZ-KAHRAMAN027883

23. On September 19, 2018, we took ▉D.K.▉ Kahraman, a boy, to see a man, Timothy Lane, acting as Physician

Assistant at Jensen Family Medical, our family doctor. We pointed out two soft lumps on Dylan's shins, for

which an ultrasound was advised and completed that same day at Simon Med. The results were reported to be

harmless lipomas (fatty deposits). We had expressed concern to Timothy Lane, a man acting as Physician

Assistant, that perhaps ▉D.K.▉ Kahraman, a boy's food sensitivities were affecting his nutrition, and asked if that

could be contributing to his pain and recent falls. Timothy Lane, a man acting as Physician Assistant, ordered a

Spectra Cell micronutrient panel, to assess not only food intake, but what nutrients were actually being absorbed

into the cells. This test would take six weeks to come back, so we took ▉D.K.▉ Kahraman, a boy, that same day to

have the blood work done. {See Exhibit U} The results later showed generally great nutritional status, except for

some copper and K2 deficiency. The results negated our concern for deficiency in zinc, calcium, vitamin D3, or

Vitamin C. {See Exhibit V} Timothy Lane, a man acting as Physician Assistant, advised making an appointment

with a neurologist.


24. I called numerous neurology clinics in attempt to get an appointment without delay, including:

- Banner Desert: I was advised they were not accepting new patients due to staff shortage;

- Phoenix Children's Hospital: We made an appointment on February 14, 2019, the next available opening;

- Dr. Alarcio at AZ Neuro Recovery Treatment Innovations, on recommendation from Dr. Cindy

  Schneider, a woman acting as our former biomedical ME. We were placed on a waiting list, as Dr.

  Alarcio was not accepting new patients;

- Many other clinics based on Jensen Family Medical referral and web reviews, to find that most do not see

  children who are 6, or only do so for headache pain;


25. On Sunday, September 23, 2018, I took ▉D.K.▉ Kahraman and ▉K.K.▉ Kahraman, boys, to my parents' house to

play, leaving him next to Dorothy Mann, woman, who is also his grandmother, and ▉K.K.▉ Kahraman, his brother

in a soft leather chair in the playroom. Before I reached my car, I heard crying, running back inside, to find that

▉D.K.▉ Kahraman, a boy, had slipped out of the chair while chasing a balloon with his brother, falling

approximately 1.5 feet on to industrial carpeting. At this time, ▉D.K.▉ Kahraman, a boy, cried and complained of

pain in his left knee. I immediately took him home, applied ice, and called to make another appointment for the

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027884

next day. I slept at his bedside to ensure he was ok and comforted, not further injuring himself by rolling off his

mattress or externally rotating his leg.

26. On September 24, 2018, I took D.K. Kahraman, a boy to see Eric Bowman, a man acting as a pediatric

orthopedist. He did not suspect any fracture, and based on manual assessment, told us it was likely a medial

collateral ligament sprain of his left knee. He felt that D.K. Kahraman, a boy could start with a knee

immobilizer brace for a week. We were advised to follow-up in a week, for which we set an appointment of

October 1, 2018. {See Exhibit W}

27. Due to Dylan's sensory aversions, we found he was unwilling to tolerate the brace, and we followed up by phone

with a woman, acting as Medical Assistant for Eric Bowman, a man, acting as an orthopedist. We were advised

that we could continue to have him wear the less restrictive brace we had at home and move his appointment up to

Friday, September 28, 2018. We were also offered the choice of taking him on our own to Simon Med for

imaging. We agreed to do both, taking him to Simon Med for left knee x-rays that day. Because the x-ray was

reported to be negative for any fractures, according to the office Eric Bowman, a man acting as orthopedist, we

canceled the September 28, 2018 appointment and kept the original October 1, 2018 appointment. We called just

before leaving for that appointment and were told by PCH administrative staff that there had been a

miscommunication and that appointment had been canceled. We rescheduled for October 5, 2018.

28. We made continuous efforts to expedite the neurology appointment, including asking Dr. Scott Jensen, a man, to

call the doctor-to-doctor line at Phoenix Children's Hospital to express his concerns for immediate appointment;

asking Nikki McCants, a woman acting as neurologic physical therapist to call the doctor to doctor line to

expedite the appointment, as well as calling myself. At one point, PCH hired a new neurologist, and our

appointment was moved up to December, which was still not satisfactory to us. {See Exhibit X}

29. In rebuttal to Exhibit E, line item number 1, K.K. Kahraman, a boy, suddenly lost his ability to walk on Friday,

October 5, 2018 at which time he sustained injury due to a substantial fall over another child at school, landing on

his right knee, which was diagnosed as severe bruising of the distal end of the femur, by Dr. Eric; Bowman, a man

acting as an orthopedic physician on Monday, October 8, 2018. {See Exhibit Y} The incident was verbally

discussed with school staff, on October 5, 2018, formally reported in writing on October 6, 2018, and was the

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

subject of a meeting with school staff members on Tuesday, October 16, 2018 at Basis Chandler Primary North.

{See Exhibit Z} K.K. Kahraman, a boy, was also subsequently evaluated and treated by other medical

professionals for this injury, including Dr. Daniel Crawford, a man acting as Neurologist at Phoenix Children's

Hospital {See Exhibit A1}; Emergency Room staff, men and women at Phoenix Children's Hospital,  Becky

Plotner, N.E., a woman acting as a naturopath and National GAPS diet educator, and as well as Nikki McCants, a

woman acting as a Physical Therapist at Advanced Neurologic Rehabilitation. {See Exhibit B1}


30. On October 8, 2018, we brought D.K. Kahraman, a boy to see Nikki McCants, a woman acting as physical

therapist at Advanced Neurologic Rehabilitation. She supported our concerns for D.K. Kahraman, a boy's

weakness and pain, and we discussed all of us wanting to expedite the neurology appointment. Nikki McCants, a

woman, acting as physical therapist, said she would ask her colleagues for ideas to expedite the appointment, and

we discussed an eight-week plan to restore much of his function in that period of time. Instructions given in

follow-up appointments were, "continue following up with Dylan's medical specialists and to continue with

skilled physical therapy." {See Exhibit C1} On a few occasions, we asked Nikki McCants, a woman acting as

physical therapist, for her thoughts as to how to expedite the neurology appointment. Her suggestion was to

contact Christine Kwasnica, a physiatrist, as a possible back-door referral to a neurologist. We immediately

contacted her office and were advised our primary care physician needed to submit a referral with supportive

medical notes to determine medical necessity of the appointment. We continued to work with Scott Jensen, a man

acting as medical doctor and primary care physician to submit this request for both boys. Ms. Kwasnica, a woman

acting as physiatrist, accepted our request after thorough review of their file, and an appointment was set for

December 18, 2018. We contacted her office the preceding Friday to advise them that D.K. Kahraman, a boy,

was nearly walking and that K.K. Kahraman, a boy had not been feeling well enough to attend physical

therapy. Her office advised rescheduling the appointment for January 22, 2019, with which we were encouraged.

{See Exhibit D1} Nikki McCants, woman acting as physical therapist, advised us that since D.K. Kahraman, a

boy, was making adequate progress, that she did not find it necessary to go to the Emergency Room. She said that

if he started to decline, she would recommend doing so at that time. This recommendation was never made, but at

such time as she recommended it for K.K. Kahraman, a boy, on November 1, 2018, we asked her to write the

ER referral letter for both boys.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027886

31. On October 18, 2018, both boys were brought back to Scott Jensen, a man acting as medical doctor, at Jensen Family Medicine in effort to enlist his help in expediting the neurology appointment and seeing if he had any other concerns regarding the boys' mobility. On October 31, I followed up with him again by patient portal, urging him to call Phoenix Children's Hospital again, out of concern for Kenan's slower progression. {See Exhibit E1}

32. On November 1, 2018, Ahmet; Kahraman, a man, took ██ Kahraman, a boy to his afternoon physical therapy appointment with Nikki McCants, a woman acting as physical therapist. He called me right afterward and stated that she recommended taking ██ Kahraman, a boy to Phoenix Children's Hospital Emergency Room to try to expedite the neurology appointment, since she was starting to see signs of progressive hip flexor and quadriceps weakness than ██ Kahraman, a boy had previously shown. {See Exhibit F1} We complied with her advice the following morning.

33. On November 2, 2018, we brought both ██ and ██ Kahraman, boys, to the Emergency Department at Phoenix Children's Hospital. Initially, the woman acting as doctor said she did not have concerns about the boys' mobility that would warrant additional care. She advised us to follow up with neurology and continue physical therapy. She decided to ask her colleague for a second opinion. Timmothy Zebbons, a man acting as supervising medical doctor described ██ Kahraman, a boy as "**alert, well nourished, well appearing**" in his report. He felt it would be beneficial to do blood work, which was completed at that time for both boys. The labs showed elevated SED rates for both boys, an indicator of inflammation. There were no other concerns mentioned. The woman, acting as ER doctor, said that because CPK was normal, this ruled out a muscle wasting disorder, and that protocol was to follow up with rheumatology. We questioned the nurse as to this recommendation, in the absence of rheumatological signs, such as redness and swelling in the joints. She agreed it did not fit the usual pattern, and agreed to assist us with expediting the neurology appointment. We declined their suggestion to complete a lower body x-ray and vitamin C lab, since we had completed both of those tests within the last 30 days. No other concerns for nutritional status, neglect, or abuse were noted. {See Exhibit G1}

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027887

34. On November 8, we took ▌D.K.▐ and ▌K.K.▐ Kahraman, boys, to see Daniel Crawford, a man acting as neurologist at Phoenix Children's Hospital. Upon examination, the man named Daniel Crawford described ▌D.K.▐ Kahraman, a boy as **"well developed; well nourished; no apparent distress."** He indicated "the presentation was quite peculiar and does not localize well to a specific neurologic etiology." He indicated that if the weakness were due to neurologic pathology that he would expect to see weakness in the lower extremities as well, which neither boy exhibited. He mentioned factors such as immobility in the wheelchairs at school and stress could not be ruled out, but suggested seeing rheumatology and genetics. {See Exhibit H1} Because the wait for rheumatology was three months, he suggested we do an EMG study under sedation, starting with just ▌D.K.▐ Kahraman, a boy, so as not to waste three months during which we could be testing. Because he did not express concern for neurologic pathology, because ▌D.K.▐ Kahraman, a boy continued to progress in physical therapy, and out of concern for his sensitivity to anesthesia, we chose to schedule the appointment for Thursday, February 14, 2019. This was the next available appointment offered after November, which did not give us time to follow his continued improvement, in the absence of emergent neurological concern. Since labs had been drawn at PCH within the last 30 days, Daniel Crawford, a man acting as neurologist, suggested we do further labs while under sedation. We made the appointment with Phoenix Children's Hospital genetics, for which we appeared on December 28, 2018. (We were rescheduled by PCH staff until January 14, 2018 since ▌K.K.▐ Kahraman, a boy was hospitalized during that time.) {See Exhibit I1} On December 24, 2018, upon examination by Maria Chico, a woman, acting as nurse practitioner (formerly with the neurology department), she concurred that ▌D.K.▐ Kahraman, a boy's presentation did not appear to be of neurological pathology, but fear and deconditioning, verbally stating, "you're much better than your brother, aren't you?" Further, ▌K.K.▐ Kahraman, a boy, was examined by a man, Jeremy Timothy, acting as Banner neurologist. He stated, in his December 19, 2018 report, "I doubt this has a neuromuscular cause," adding, "recommend the patient get physical therapy." {See Exhibit J1}

35. On December 4, 2018, we reached out to Kevin Ross, a man acting as chiropractor to see if there was anything he could do to help. On December 5, 2018 we brought ▌K.K.▐ Kahraman, a boy, to Kevin Ross, a man acting as chiropractor's office. He encouraged us to support his liver function, including acupuncture at home, and follow-up care with his office on December 6, 2018. {See Exhibit L}

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027888

36. On December 5, 2018, K.K. Kahraman, a boy, was taken back to Jensen Family Medical, due to our concerns of edema, fatigue, chest discomfort and seizure-like activity, and concern for their multiple chemical sensitivities and potential exposure at school. Zhanna Tarjeft, a woman acting as Nurse Practitioner noted, "behavior and affect are normal…Chest CTA. Cor RRR without murmurs and normal PMI." She stated she did not have concern for his condition, including his cardiac or respiratory function. She indicated the edema was mild, and that she would not have been aware of it unless we had expressed our observed change. I requested this woman acting as Nurse Practitioner order labs for K.K. Kahraman, a boy, to determine what could be causing his symptoms. Blood work was ordered, and we immediately took him to the in-office phlebotomist. The woman acting as phlebotomist stated she believed she would have difficulty drawing blood from the patient at that time, and suggested trying another day. Labs were therefore deferred. The woman acting as Nurse Practitioner instructed us to "follow up if not better in 2-4 weeks." {See Exhibit K1}

37. Over the next thirteen days, K.K. Kahraman, a boy, did not appear to be in any further distress. We had already consulted with numerous medical doctors and observed his symptoms to be impacted by changes in his diet, sleep patterns, and frequency of bowel movements. He had periods of no edema, no chest discomfort, and improved appetite. His food preferences changes, and with it, came new sensitivity reactions. We observed bowel movement regularity greatly affected his symptoms and comfort. During this period, we maintained regular email and text contact with both Becky Plotner, a woman acting as our naturopath, as well as local visits with Kevin Ross, a man acting as chiropractor: December 6, 10, and 13, 2018 with continual improvements noted in kidney and liver function. Both of these men and women acting as practitioners have known K.K. Kahraman, a boy for some time, and were familiar with his typical food reactions and sensitivities. Both practitioners expressed there was something at school that seemed to trigger both boys' sensitivities, but that neither had concern for any heart or lung issues at the time of care. {Exhibit L}

38. On December 18, 2018, we decided that K.K. Kahraman needed more extensive evaluation than what our local practitioners had been able to provide. We brought him willingly to Cardon Children's Medical Center, out of concern for his increased edema the last two days, increased fatigue, and lack of appetite.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027889

39. In rebuttal to Exhibit E, line item number 2, when ██ K.K. ██ Kahraman, a boy, was admitted he had low blood sugar due to lack of appetite the previous two days, and food sensitivity reactions causing abdominal discomfort and lack of appetite. He had ketones in his urine (noted to be "low" at 20 mg/dL), which is a normal metabolic state, with MedLine Plus indicating "the body needs to break down fats and fatty acids for fuel…An abnormal result may also be due to: fasting (such as was the case due to lack of appetite for two days prior)…high protein or low carbohydrate diet…" {See Exhibit L1} Routine diagnostic testing revealed electrolyte abnormalities, due to lack of appetite the previous two days, these levels were <u>NOT</u> present when he was tested at Phoenix Children's Hospital on November 2, 2018.

40. In rebuttal to Exhibit E, line item number 3, occurring three times between November 29, 2018 and December 2, 2018, ██ K.K. ██ Kahraman, a boy had "seizure like activity" for which **we consulted two medical professionals.** On November 29, we consulted our naturopath whom advised that it was likely due to electrolyte imbalance, which we were able to correct with mineral water. Because the episodes were just a few seconds in duration, did not cause any difficulty breathing or result in any after effects, it was logical that electrolytes were the explanation. He had no further "seizure like activity" after that, but we did follow up with our family doctor at the next available appointment on December 5, 2018. ██ K.K. ██ Kahraman, a boy, was taken to Jensen Family Medical, men and women acting as family medical doctors, functional medicine doctors, and GAPS Diet specialists. The examining woman, Zhanna Tarjeft, acting as a Physician Assistant stated she had no concerns about ██ K.K. ██ Kahraman, a boy's heart or respiration, noted mild edema that she stated was not concerning to her, and ordered blood work upon my request. Seizure like activity was discussed, but it had remitted and was not deemed concerning by the woman acting as the Physician Assistant, in presentation or frequency. {See Exhibit K1}

41. In rebuttal to Exhibit E, line item 5 diagnosing him with malnourishment, I have been provided all bloodwork from the time of diagnosis and there are no markers that definitively diagnose malnourishment. Dr. Daniel; Miga, a man, acting as a cardiologist indicated ██ K.K. ██ Kahraman, a boy's albumin levels were normal, an indicator of adequate dietary protein consumption. He also reported that prealbumin levels were low (noted to be only 5 mg/dL out of recommended laboratory range). According to University of Rochester Medicine (URM), "The prealbumin screen is a blood test that used to be used to see if you are getting enough nutrition in your diet. This

AZ-KAHRAMAN027890

may be because you have a chronic condition. Or it may be because you have an infection or inflammation, or you suffered a trauma." {See Exhibit M1} K.K. Kahraman, a boy showed signs of inflammation, including elevated SED rate and knee pain. He also experienced recent traumas including bullying at school, significant knee injury, and an intense period of medical assessments, including blood work and being pushed to stand through knee pain. URM further states , "Test results may vary depending on your age, gender, health history, the method used for the test, and other things. Your test results may not mean you have a problem...What might affect my test results? Infection, inflammation, or recent trauma may affect your test results. This could make them more difficult to figure out. Experts suggest people in the hospital who are tested for prealbumin be tested twice. This should be done 3 to 5 days apart, for more accurate results." Mr. Ravi Prasad, a man acting as a cardiologist at Cardon Children's Hospital, stated that within a few days of starting K.K. Kahraman, a boy, on Milrinone, heart medication, that his prealbumin levels had increased, at which point we had made no dietary changes, except supporting his increased appetite with our foods from home.

42. In rebuttal to Exhibit E, line item 6, on December 25, 2018, Sarah Kramer, a woman, states that Mr. Bandla, a man acting as a pediatric gastrointestinal doctor, reported that "K.K. Kahraman, a boy, seems to be malnourished due to severe dietary restriction based on mom's "suspicions and research." Mr. Bandla, a man, met with us on this date, and indicated that he was aware we had seen his former colleague, Mr. Bonfante, a man acting as a pediatric gastrointestinal specialist at Banner Desert Medical Center several years prior, in effort to identify causes for his abundance of food sensitivities. Mr. Bandla, a man, agreed to order allergy tests and stool tests to assist us in narrowing K.K. Kahraman, a boy's safe food options. He stated that IgE tests gave limited information and felt that combining that with a skin allergy test would assist us in determining true allergies, but that it would not diagnose food sensitivities. We discussed stool tests and recruitment of an allergist to determine the underlying causes of K.K. Kahraman, a boy's high level of food sensitivity. We discussed conditions such as eosinophilic esophagitis as possible underlying causes. I was open to his advice, and there was no discussion of any research or suspicions.

43. In rebuttal to Exhibit E, line item 7: Sarah Kramer, a woman, reports that on December 26, 2018, Mr. Stewart, a man acting as a hospitalist reported that he has a strong suspicion for medical neglect or medical abuse. This is an

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027891

unsubstantiated claim that was not spoken in my presence, nor did Mr. Stewart, a man, express concern for the boys' medical care. There are no reports on record by Mr. Stewart.

44. We regularly work with habilitation providers and therapists contracted with Department of Developmental Disabilities to provide care in our home. All of these providers are bound by mandatory reporting laws. None of them have ever reported suspicion of abuse or neglect, including: Danielle Schmidt, Brittney von Borstel, Melissa Sorensen, Jennifer Otis, Melissa Morales, Shannon Southwick, Stephanie Reihl, Firishta Gheyasi, Valerie Smith, Camille Patterson, and Alison, women who act as habilitation providers; nor Ellyn Jones, Elaine Woidke, Hope Cross, Laura Miller, Ashleigh Sando, or Tanya Weiner, Daniela Zormier or Emily Okamura, women who act as therapists . There have never been reports of suspected abuse or neglect by any previous man or woman acting as medical care provider to our biological property, including Cindy Schneider, Asma Jafri, Stephen Davidson, Kevin Ross, Scott Jensen, Timothy, Zhanna, Neil Aaron, Daniel Crawford, Shabana Jessani, Becky Plotner, Mr. Bonfante, the men and women acting as ER doctors at Phoenix Children's Hospital or in previous visits to Cardon Children's Hospital ER department. On the contrary, men and women acting as medical providers for the boys have written statements that negate any suspicion of abuse or neglect. {See Exhibit G }

45. In rebuttal to Exhibit E, line item 8, ▮K.K.▮ Kahraman, a boy, was not previously diagnosed with failure to thrive, only "short stature." Previous men and women acting as doctors for ▮K.K.▮ Kahraman, a boy, reported adequate growth rate. His small stature is typical of the Turkish side of our family, to include Ahmet; Kahraman, a man of 5'6", his father, a man of 5'6" and his mother, a woman of 5'2". In reviewing past growth chart scores, it is noted that ▮K.K.▮ Kahraman, a boy's stature and weight have typically hovered around the 5-10 percentile range, which indicates steady growth at a short stature. {See Exhibit N1}

46. In rebuttal to Exhibit E, line item 9 and 10, neither child is or was at risk for ongoing poor nutritional status. ▮D.K.▮ Kahraman, a boy, was healthy and in no danger. We are committed to following up with medical staff, to expanding their diet under the assistance of an allergist, and demonstrated concern for ▮K.K.▮ s medical status by bringing him to Cardon Children's Hospital for assistance, of our own free will.

47. In rebuttal to Exhibit E, line item 9, Sarah Kramer, a woman, states that on December 20, 2018, it was stated that

"the child is at high risk for further/ongoing poor medical/nutritional status in his current environment," and yet

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

his environment at that time was the hospital, to which we willingly brought him for help ensuring his well-being and safety.

48. On December 21, 2018, Sarah Kramer, a woman, presented us with an allegation of "neglect." We were misled under the false pretense that we were required to allow Sarah Kramer, a woman, into our home to interview ███ Kahraman, a boy, our boy, our biological property exhibit A. She went to our house after 9:30 at night, keeping him awake waiting. She required Ahmet; Kahraman, a man to wait outside while she questioned ███ Kahraman, a boy, then questioned him. Any information given by Ahmet; Kahraman, a man or by ███ Kahraman, a boy, was done under threat, duress and coercion under the guise that DCS was a government entity and not a private corporation. We do not wish to work with private companies or accept any benefits or services;

49. In rebuttal to Exhibit E, line item 10, ███ Kahraman, at the time of this ex parte order being signed on December 28, 2018, ███ Kahraman, a boy, was reported to us to be in stable condition. As of December 26, 2018, we were advised during medical rounds that ███ Kahraman, a boy, was being kept in the hospital to ensure adequate weight gain while off supplemental IV nutrition.

50. In rebuttal to Exhibit E, line item 11, Sarah Kramer, a woman, indicates that per medical professionals, his current diet is not nutritionally adequate to meet his nutritional needs. This matter was discussed at length with the medical team, and we made immediate effort to introduce both new foods and larger quantities, as indicated on the attached dietary log. {See Exhibit O1} We met with the dietician and agreed that we would push through food reactions to achieve the variety in diet we were asked to provide, and assured it would be a safe place for ███ Kahraman, a boy to safely have a reaction. We agreed to add one new food per day, and to increase quantities. We exceeded that recommendation by adding 2 or more new foods per day, and increasing quantities, though reactions were observed. I specifically asked which macronutrients or micronutrients were felt to be lacking so we could better provide the diet the team felt would be optimal. Due to the Christmas holiday, we did not meet with the dietician again until December 27, 2018. At this time, she advised, and we agreed, that we would prefer ███ Kahraman, a boy, receive his nutrition from whole foods, rather than a meal replacement powder. I agreed that reactions would be better managed in foods from home than a powder, with thirty or more new ingredients.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER
AZ-KAHRAMAN027893

We told the dietician that we would offer unlimited quantities of varied foods from home, and specifically agreed upon the addition of lentils, potatoes, green beans, and turkey. We fulfilled that agreement and more, offering avocado, whole eggs, rutabaga, broccoli, increased broth, and unlimited quantities of all. The dietician and cardiologist asked us to provide a caloric intake of 1500–1800 calories per day, which we exceeded by 500–700 calories per day.

51. In rebuttal to Exhibit E, line item 12, Sarah Kramer, a woman, reports that Dr. Manz, a man or woman acting as pediatric nutritionist, stated that I did not grasp I was withholding adequate nutrition from the child. I have always had available and offered a wide variety of foods to K.K. Kahraman, a boy. He was encouraged to eat as much as he desired, and if he requested more, myself or my husband, Ahmet; Kahraman, drove the 5 minute drive home to provide more of the food he requested. The wait time for our food was no more than twenty minutes, which is substantially less than the typical hour-long wait for hospital cafeteria food, as reported by Kim, a woman, acting as nurse. K.K. Kahraman, a boy's tolerated foods were self-restricted by his food reactions and digestive discomfort, for which we have a history of seeking help, with little success. We were most disappointed that the hospital staff were also unable to assist with food reactions, telling us to ignore anything less than anaphylaxis and mask the symptoms with medications.

52. In rebuttal to Exhibit E, line item 13: Sarah Kramer, a woman, claims that medical doctors have recommended that K.K. Kahraman, a boy, receive supplemental formula but mother did not agree to this. Sarah Kramer, a woman, was not present for any such conversations, nor has she provided the source of this comment. I discussed on multiple occasions, with Daniel Miga, a man acting as cardiologist, Mr. Stewart, a man acting as hospitalist, and Anna, a woman, acting as dietician, that we are open to formulas if they became necessary. The aforementioned men and women acting in the aforementioned capacities were in agreement that food should be the primary source of nutrition, and that they did not wish to use a supplemental formula due to decreased absorption and less likelihood of tolerance and sustainability. We all concurred that first, we would try to meet K.K. Kahraman, a boy's dietary needs with whole food nutrition. If a supplement became necessary, Daniel Miga, a man acting as cardiologist asked for recommendations from our naturopath. We suggested supplement called "Physician's Elemental Diet, Elemental Powder for GI Dysfunction." We also brought a sample of

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027894

Metagenics UltraGI Replenish to the hospital, to try if advised. {See Exhibit P1} We also later talked with Anna, a woman acting as dietician about their organic option called Harvest, that we were open to trying – again being advised by Anna, a woman acting as dietician, that whole foods would be her preference. TPN (Total Parenteral Nutrition) IV was started to supplement ▮K.K.▮ Kahraman, a boy's caloric intake, which was not discussed with us first. Concerned, I sought out Dr. Lin, who explained the dangers of refeeding syndrome when such a large caloric increase was attempted with food. I thanked him for explaining it to me, and did not contest the TPN drip that was administered for at least four or five days. When we met with Mr. Bandla, a man acting as pediatric gastrointestinal specialist, he advised his goal was to remove Kerian; Kahraman, a boy, from TPN as soon as possible due to its toxic effect on the liver.

53.   In rebuttal to Exhibit E, line item 14, claiming the portion sizes of new foods have been a teaspoon to half a cup, we at first proceeded cautiously, as agreed upon with the dietician, to assess food reactions. ▮D.K.▮ and ▮K.K.▮ Kahraman, boys, have historically reacted to quantities as little as 1/8 teaspoon of foods. After a couple of days of proceeding cautiously and observing reactions, doctors advised us that the need for nutrition outweighed the risk of reactions. We understood and began to progress more quickly, both in quantity and in variety. Nurses were weighing and measuring our food and observing the boys eating, and at no point were we instructed that quantities or calories were inadequate – particularly insofar as they vastly exceeded the goal of 1500-1800 daily calories stated by numerous men and women, acting as doctors and dieticians, including Daniel Miga and Anna. They further well-exceeded the hospital diet plan that was drawn up on December 28, 2018, with a daily caloric value of 1433. {See Exhibit Q1}

54. In rebuttal to Exhibit E, line items 15-16, at no point was ▮K.K.▮ Kahraman, a boy's food intake limited by us. Neither Mr. Stewart, a man acting as doctor, nor Sarah Kramer, a woman, were present during mealtimes, nor do they have firsthand knowledge of the claim that Sarah Kramer, a woman, is making. There was always plenty of different types of food for ▮K.K.▮ Kahraman, a boy, to eat, that were brought several times a day, freshly prepared from scratch at home. Myself, my husband, and my mother always allowed ▮K.K.▮ Kahraman, a boy, to eat what he wished, even despite food sensitivity reactions and bloated belly. I expressed concern to the medical staff, including Mr. Stewart, a man acting as hospitalist, Ms. Nourani, a woman acting as hospitalist, and the dietician

AZ-KAHRAMAN027895

that ▮K.K.▮ Kahraman, a boy, might not be absorbing his nutrition, since we were well-exceeding the caloric recommendations and still not achieving the weight gain we were aiming for. I repeatedly asked for macronutrient and micronutrient goals to make adjustments accordingly, if they felt his nutritional needs were still not being met. None were provided to me for several days. At such time as they were, it was during a meeting on Friday morning, December 28, 2018. Anna provided me the menu that was recommended for ▮K.K.▮ Kahraman, a boy, and it was offered to us that we could change out similar items. It is worth noting this prescribed diet has a daily caloric value of **1433 kcalories**, which is far less than what ▮K.K.▮ Kahraman, a boy was eating while we prepared and served his food at the hospital. {See Exhibit Q1}

55. In rebuttal to Exhibit E, line item 17, we consult with a certified GAPS practitioner in Georgia, because she is a woman acting as naturopath, who specializes in difficult cases of gut malabsorption and food intolerance. We also have a certified GAPS practitioner locally that they boys see, but he is not as well versed in the diet as a woman who acts as our naturopath, Becky Plotner. He is also a man acting as medical doctor and functional medicine practitioner, so he serves as our family practitioner. An affidavit is submitted by our certified GAPS practitioner in Georgia that explains the boys' unique gut issues, and the dangers of pushing foods through intolerance and malabsorption. {See Exhibit Q2} Their diet consists of lamb, meat stock, carrots, beets, egg yolks, and other vegetables, as well as fruits and other meats as tolerated. Their food sensitivities and broad GAPS parameters are the only limitation to their diets; they prefer to eat foods they know don't make them feel unwell. We are always trying to expand their diet and give them opportunities to try new things and have tried the support of various practitioners and supplements to facilitate tolerance.

56. In rebuttal to Exhibit E, line item 18: Sarah Kramer, a woman states that ▮D.K.▮ Kahraman, a boy, has not been walking for two months and relies on a wheelchair or his parents for mobility. He will scoot around to be mobile on his own. ▮D.K.▮ Kahraman, a boy, has progressed dramatically from extreme bilateral knee pain and total immobility in September 2018 to walking several steps with the aid of parallel support bars. ▮D.K.▮ Kahraman, a boy, continues to progress as expected, according to a woman, Nikki McCants, acting as neurologic physical therapist, with his regular physical therapy appointments, which he attends accompanied by myself, Ahmet; Kahraman, a man, and at times. Additionally, we are occasionally accompanied by Danielle Schmidt, a woman

AZ-KAHRAMAN027896

acting as habilitation provider, so she can integrate the activities into the boys' home program. Sarah Kramer, a woman, also states that medical documentation states that Dylan's inability to walk is likely due to deconditioning and behavioral constraints. D.K. Kahraman, a boy's use of a wheelchair at school was necessary to reduce pain levels and allow him to attend school. Sitting in a chair at school all day was also concerning to us, and that is the reason we sought regular twice weekly neurologic physical therapy, with which we saw progressive reconditioning and self-mobility. We agree that D.K. Kahraman, a boy, developed fear of pain with walking, due to his acute period of inflammation, and that he will benefit from the in-home services in place in our home, including intensive habilitation, occupational therapy, and outside physical therapy, to encourage him to work through his fear of pain. {See Exhibit R1}

57. In rebuttal to Exhibit E, line item 19, Sarah Kramer, a woman, says the emergency room physical stated he is concerned about his nutritional status and weakness, however it is being worked up as an outpatient and he would not benefit from hospitalization. Upon meeting with Mr. Shah, a man acting as emergency room doctor, he indicated that D.K. Kahraman, a boy, "looked great." It was only after calling Daniel Miga, a man acting as cardiologist and Maria Chico, a woman acting as nurse practitioner, that he said further testing was being requested. At the conclusion of this appointment, whereby we were there for four hours, Mr. Shah, a man acting as emergency room doctor, advised that D.K. Kahraman, a boy's assessment was not concerning, with a normal EKG, normal urinalysis, and normal bloodwork, except the following: low pre-albumin and elevated SED rate (which was 34mm/ hr.H), a dramatic improvement in this value as compared to the visit at Phoenix Children's Hospital on November 2, 2018. This would indicate reducing levels of inflammation. D.K. Kahraman, a boy's CPK was negative, which suggests an absence of muscular wasting. {See Exhibit S1}

58. In rebuttal to Exhibit E, line item 20: Sarah Kramer, woman, notes that Daniel Miga, a man, reported that D.K. Kahraman, a boy, has significant malnutrition as a result of a very restrictive GAPS diet. It is well-documented that D.K. Kahraman, a boy, has always struggled with food sensitivity reactions {See Exhibit P} and impaired GI health/malabsorption {See Exhibit T1}. His diet has never been restricted by the wide variety of food allowed on the GAPS diet, but by his intolerance and significant reactions to most foods. Furthermore, a highly specified micronutrient test at the cellular level was conducted in October 2018, which negated the claim that D.K. Kahraman, a boy, is significantly malnourished, showing only deficiencies in copper and vitamin K2. {See

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027897

Exhibit Mr. Miga, a man acting as cardiologist explained to us that D.K. Kahraman, a boy, showed no signs of cardiac or respiratory abnormality, but advised us to keep a close eye on him in the future, for which we agreed to bring him back to Mr. Miga, a man acting as cardiologist, in 2019. It is then falsely reported by Sarah; Kramer, a woman, that D.K. Kahraman, a boy's ECG had abnormal results. Mr. Miga, a man acting as cardiologist, informed us that his **ECG was completely normal** and follow-up would be for continued screening.

59. In rebuttal to Exhibit E, line item 21, K.K. Kahraman, a boy has made progress. Nikki McCants, a woman, regularly updated us, stating that he would progress, then plateau, then progress – two steps forward and one step back, but that overall there was continued forward progress. While decreased pain levels and increased mobility are noted, we remained concerned that his progress was not as rapid as anticipated. We followed all advice of the woman, Nikki McCants, acting as their physical therapist, including applying for consideration of care with Physiatrist Christine Kwasnica, continued efforts to expedite the neurology appointment for both boys (including enlisting the help of Scott Jensen, a man acting as medical doctor, Nikki McCants, a woman acting as physical therapist, and making numerous calls ourselves to both the appointments and doctor-to-doctor/nurse line to express the urgency of the concern.) On November 1, 2018, Nikki McCants, a woman acting as physical therapist, advised that she would write a letter to bring to Phoenix Children's Hospital Emergency Room Department, asking them to see the boys and expedite the appointment. We followed her advice and both D.K. and K.K. Kahraman, boys were examined the following morning at PCH ER, whereby it was advised that admission was not needed, but that they would assist in expediting the appointment with Daniel Crawford, a man acting as neurologist. Deconditioning has occurred due to the unfortunate effects of being seated in a wheelchair at school while their pain resolved. That's why it's been so important to us to have them in a twice weekly physical therapy program, and we look forward to incorporating Dr. Kwasnica's services in February.

60. On December 26, 2018, Sarah Kramer, a woman, spent an hour and a half interviewing me. At no time was I advised that I was not obligated to talk to her. She also interviewed K.K. Kahraman, a boy, our biological property. Any information given by me or by K.K. Kahraman, a boy, was done under threat, duress and coercion under the guise that DCS was a government entity and not a private corporation. I do not wish to work with private companies or accept any benefits or services;

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027898

61. On December 26, 2018, men and women acting as medical staff blamed us for failure to elicit weight gain in K.K. Kahraman, a boy. We had complied with all instructions, including adding variety to his diet, increasing his calories to well in excess of 1500-1800 kcal per day (at 2100+ kcal per day). There were still no macronutrient guidelines given, nor micronutrient deficiencies suggested that were any basis for concern. I expressed concern that given our full compliance with dietary instructions that he was not gaining weight. I was never shown the scale weight, but K.K. Kahraman, a boy, was visibly larger and bloated in his torso, and had reduced frequency of bowel movements. I requested checking thyroid hormones again to ensure the level of medication accurate and asked to consider testing for malabsorption, which has been observed in previous labs. {See Exhibit E.XXXIX} The following day, we increased food intake even further, with K.K. Kahraman, a boy taking in close to 2500 kcal of food, in addition to the Total Parenteral Nutrition of 500 kcal. At this point, K.K. Kahraman, a boy gained some weight, and held the same weight through Friday, December 26, 2018. He was bloated and uncomfortable, yet still eating non-stop all day.

62. On December 27, 2018, Sarah Kramer, a woman, called me and said there would be a meeting the following day to discuss the expectations for K.K. Kahraman, to be discharged. On December 28, 2018, myself, Jessica; Kahraman, a woman and Ahmet; Kahraman, a man were brought to a room with the entire medical team, Sarah Kramer, a woman and Sarah Mendez, a woman. Again, we were defrauded into thinking we had to comply and agree to medical procedures with which we were opposed. This was done under threat, duress and coercion under the guise that DCS was a government entity and not a private corporation. We do not wish to work with private companies or accept any benefits or services, and we do not consent to the medical procedures that were imposed upon our biological property that violated our right to make medical decisions for our biological property, including statements that K.K. Kahraman, a boy would be given Tylenol to suppress the pain of food reactions, and that he would undergo an endoscopy under sedation, despite their claims that he was tolerating foods just fine. We were advised that our biological property would be fed from the cafeteria, instead of being allowed to bring organic, unprocessed, nourishing food from home, without chemicals that triggered his sensitivities.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027899

63. Immediately following this meeting and a brief meeting with Anna, a woman acting as dietician, Sarah Kramer, a woman and Sarah Mendez, a woman called me back into the conference room, during which time Ahmet; Kahraman, a man, returned home to ███ Kahraman, our biological property. Sarah Kramer, a woman, accused me of repeatedly following a pattern of agreeing to something and not following through, citing false allegations of failing to feed ███ Kahraman, a boy, the required number of calories, stating it was my fault he had not gained weight, and accusing us of restricting food. The nurses watched ███ Kahraman, a boy eat and weighed his food, so they were fully aware we were cooperative and following instructions. Sarah Kramer, a woman, was never present at any of these feedings and has no first-hand knowledge of what or how much we fed our biological property. There are many factors that affect weight gain, including synthetic thyroid hormone they started administering to ███ Kahraman, a boy as well as gut malabsorption. Taking all of this into account, there was still weight gain on Thursday, December 27, and maintenance on December 28, 2018. She further cited that I refused Tylenol when offered for discomfort experienced by ███ Kahraman, a boy's food reactions at night. It was offered by women acting as nursing staff, but he was not in pain such that I would choose to risk liver toxicity in my highly sensitive boy. That is my right as his parent. Lastly, Sarah Kramer, a woman, claimed that my refusal of cafeteria food was denying him food that was more nutritionally balanced. Besides being full of processed food chemicals, potentially gluten and dairy, to which he is highly sensitive, the possibility of pork products in his food violates Ahmet; Kahraman, a Turkish Muslim man's religious beliefs. The sensitivity reactions would be unpredictable due to the number of additives, flavorings, fillers and GMO products. For this reason, Daniel Miga, a man acting as cardiologist; Anna, woman acting as dietician and several men and women acting as medical staff had given us the choice of bringing our own food instead of forcing cafeteria food, which made my boy, ███ Kahraman, cry when they took over his diet on Friday, December 28, 2018. These allegations were untrue, speculative, and these women, Sarah Kramer and Sarah Mendez had no authority to take my biological property, as they did on this night. We were not served with any warrants and were misled by the fraudulent representation of themselves as a government agency. They required Ahmet;

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027900

Kahraman, a man to bring our biological property, ██D.K.██ Kahraman, a boy to them at Cardon

Children's Hospital. DCS took our boy, our biological property with the false representation that they

were a government agency acting under properly executed legal procedure. We have not seen or heard

from our boy since that night. We do not know if he is safe or where he stays.

64. Sarah Kramer and Sarah Mendez, women, followed me to my boy, ██K.K.██ Kahraman's hospital where he had

been left unattended by the nurse, crying. He cried, "mama, why did you leave me?" which made me emotional,

knowing ██K.K.██ Kahraman, a boy would be left alone and unprotected. Sarah Mendez, a woman, snapped at me

that if I was going to cry in front of ██K.K.██ Kahraman, a boy that I would be immediately removed from the

hospital. I asked who was going to take him to the restroom, change his clothes and help him sleep at night. I was

told I could remain in the hospital "more often than not" but that we would have no rights to make decisions

regarding his medical care or food and that if we protested with anything the hospital staff said that we would be

immediately removed.

65. In rebuttal to Exhibit E, line item 23: Sarah Kramer, a woman, states that a less intrusive option is not feasible or

sufficient to manage the safety of the child in the home and why remaining in the home is contrary to the child's

welfare. There is no indication as to which child she is referring, but ██D.K.██ Kahraman, was found to be in no

distress, and we willingly complied with all screenings recommended by Daniel Miga, a man acting as

cardiologist, and Sarah Kramer, a woman. ██K.K.██ Kahraman did not remain in the home and was willingly

brought to Cardon Children's Hospital for help, on our own volition, and prior to ██D.K.██ and ██K.K.██ Kahraman,

boys, being unjustly taken from our loving care. No child was in danger of neglect at any time.

66. In rebuttal to Exhibit E, line item 24: Sarah Kramer, a woman, states that ██K.K.██ Kahraman, a boy has not made

progress. We have seen improvements in ██K.K.██ Kahraman, a boy's pain levels and has become more self-

motivated to move about in our home. We now understand that there were other factors contributing to his slow

recovery, and we are optimistic that continued medical support, he can quickly regain his strength in his twice

weekly physical therapy program.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027901

67. In rebuttal to Exhibit E line item 25: Sarah Kramer, a woman states that the boys are fed a very restrictive diet. The boys' diets are limited only by their food intolerances and sensitivities. The GAPS diet provides for a wide variety of foods that would easily meet any dietician's recommendations.

68. In rebuttal to Exhibit E, line item 26, we are absolutely committed to making immediate changes to the diet to have it meet K.K. Kahraman, a boy's needs. We demonstrated this while in Cardon Children's Hospital by introducing several new/reaction-inducing foods including: avocado, new potato, lentils, rutabaga, broccoli, green beans, and whole eggs. We did this willingly and cooperatively with the dietician, understanding that the food reactions K.K. Kahraman, a boy experienced, were of less concern than the nutritional needs of his heart. Reactions were reported to nursing staff, but we were able to boost his daily caloric intake to 2100-2500 calories daily, well exceeding the dietician's diet of 1433 calories, and the caloric goal range of 1500-1800, as stated by Daniel Miga, a man acting as cardiologist. D.K. Karhaman, a boy eats a similar diet to K.K. Kahraman, a boy, but does tolerate some foods better than K.K. Kahraman, a boy, and we continue to offer those choices accordingly. As referenced previously, D.K. Kahraman, a boy's Spectra Cell micronutrient analysis did not indicate significant nutritional deficiencies – only copper and vitamin K2 that were discussed with his primary care physician. {See Exhibit U} These nutrients do not pose risk of pulmonary hypertension, but we are very much in agreement with Daniel Miga, a man acting as cardiologist, that it is prudent to keep an eye on D.K. Kahraman, a boy's cardiac and respiratory function by following up for regular screening exams. We demonstrated our support of this by willingly bringing D.K. Kahraman, a boy to his office on December 24, 2018 to complete the recommended echocardiogram (ECG). Efforts to increase both boys' tolerated foods and reduce sensitivity reactions are well-documented, including appointments with Kevin Ross, a man acting as chiropractor and allergy clearing specialist (who teaches this technique nationwide), with Lisa Madigan, a woman acting as licensed acupuncturist and NAET Allergy Elimination Technique practitioner, and Becky Plotner, a woman acting as naturopath and certified GAPS practitioner/national lecturer. In her report of October 8, 2018, Nikki McCants, a woman acting as physical therapist states, "parents have been trying to increase D.K. Kahraman, a boy's) micronutrient density in food but he has a lot of food sensitivities."

69. We stayed by K.K. Kahraman, our boy's side, except when they kicked us out of the room during all meals. K.K. Kahraman a boy, told us they fed him muffins, sausage links, and blue Power Ade, while alleging that our

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

natural, homecooked food, including beets, carrots, rutabaga, potato, grass-fed lamb, pastured turkey, avocado, green beans, and meat stock was not nutritious enough. Maranda Masterson, a woman acting as nurse, blamed me for allowing the urinals to accumulate in the restroom after calling to the desk for someone to pick them up. Marie, a woman acting as Aide, kept all the lights on in the room and the blinds completely open, denying our request to sleep peacefully. We were told that this was, so they could see the monitors, which are lit. Even in PICU, they made efforts to dim the lights and permit us to sleep – a need that anyone could understand for a boy with medical needs. Instead, they medicated him. K.K. Kahraman, a boy, cried that his tummy hurt, and Maranda brought three different medications that were undisclosed despite my request. She administered them with apple juice, which also makes his tummy hurt. He cried that he didn't like it, but she kept telling him, "it's ok," and forcing him to take it anyway. All night, the vitals monitor alarms went off, beeping incessantly due to K.K. Kahraman, a boy's low heart rate. None of the women acting as nurses came to check on him. He slept anyway, now sedated and groggy.

70. Our boy, K.K. Kahraman, reported that he did not like the hospital's food and begged me to feed him from home. He awoke hungry and waited over an hour for the tray to be delivered. I asked Kim, a woman, if this was the typical wait for meals. She said that it was typically an hour, but longer today because they were busy. I told her my boy was hungry and asked if I could feed him our food from the room. She said no, let him cry for an hour that he was hungry, then kept it next to her outside while working on the computer for another ten minutes after it arrived – all the while we were falsely blamed for denying K.K. Kahraman food.

71. Later that day, on December 29, 2018, I returned to the room with my husband, Ahmet; Kahraman, a man, after we'd been removed for an hour of feeding time. We pleasantly asked K.K. Kahraman, a boy, what he had eaten for lunch. Maranda, a woman acting as nurse, scolded us that we were not allowed to ask our biological property what he had eaten for meals and claimed we were stressing him out. I told her that as his parents, we had a right to know what they were feeding him and what medications were being given. She again denied our right to speak freely with our boy. Later that night, after being removed for a feeding again, we returned to K.K. Kahraman, a boy, who voluntarily shared what he'd eaten for dinner. We began to see Maranda, a woman, making many trips back and forth down the hall. We were told K.K. Kahraman was to have a blood culture due to fever, despite the fact he was not even warm. We all waited for over an hour, with my boy scared of yet another needle. When Maranda, a woman acting as nurse, finally arrived, she was accompanied by a man acting as security officer, a

AZ-KAHRAMAN027903

man acting as police officer, and a woman acting as social worker. We were made to leave the room, escorted by security and police. My boy cried hysterically, begging me to sleep with him and to stay with him. The woman acting as social worker said that we were being required to leave due to speaking with our biological property about his food. I asserted that this was our right as parents, and she instructed us to contact our case worker for readmission to the hospital the following day. Ahmet; Kahraman, a man asked the man acting as police officer for a court order signed by the judge. He as told that there was no court order, since this involved DCS, and that there was paperwork available downstairs. The men, acting as security, followed us all the way to our cars, never providing the required court order. I called the hospital desk to ask them to bring our belongings downstairs for pickup, but we were told the desk was unreachable and to call back the next day.

72. On December 30, 2018, I contacted Sarah Kramer, a woman, to make arrangements to return to our boy, K.K. Kahraman. I did not receive a return call. I called the hospital several times to arrange to pick up our belongings. Later that afternoon, they provided some of our things, but a tablet and a calendar were removed from the room and have still not been returned.

73. Since this time, we have been denied phone and visitation rights to D.K. and K.K. Kahraman, boys, our boys, and biological property. Sarah Kramer, a woman, initially told us we would be permitted to talk to them on Monday, but she lied and denied us our rights. We were not even advised when K.K. Kahraman, a boy, was discharged from the hospital on Thursday, January 3, 2019. I found out on my own through the Banner patient portal, and when I received a call from Home Health services to arrange delivery of oxygen for our boy to an unknown location.

74. I hereby demand the return of our biological property. {See exhibits A and B} K.K. Kahraman, a boy is in dire need of appropriate medical care, as his recent labs are showing that his body is not handling the overwhelm of foods, medications and synthetic vitamins. He needs to see a metabolic specialist as soon as possible. We don't know where they are, if they are ok, or if they are together.

AZ-KAHRAMAN027904

75. Any man or woman who denies my claim is true must write an affidavit sworn under the penalty of

perjury, and having first hand knowledge of the facts. Any man or woman makes statements without

first hand knowledge commits trespass upon the name of I. {See Exhibits A and B}


## Verification

I hereby declare, certify and state, pursuant to the penalties of perjury under the laws of the United States, and

by the provisions of 28 USC § 174 that all of the above and foregoing representations are true and correct to the

best of my knowledge, information and belief.

Executed in Mesa, Arizona this _8th_ day of _January_ 20 _1_ 9.

Jessica Mann; Kahraman


## Notary

On this _8_ day of _January_, 2019 _ ; before me _Jessica Mann; Kahraman_ the subscriber, affiant, personally

appeared to me know to be the living ~~man~~ described in and who executed the foregoing instrument and swore
woman

before me that he executed the same of ~~his~~ free will act and deed.
her

Notary

My commission expires: _11/8/2020_

ARIEL HUTCHINSON
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires Nov. 8, 2020

AZ-KAHRAMAN027905



Exhibit A

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027906



Exhibit B

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027907

Exhibit C

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027908

View all for this result

### Anion Gap  Learn more about this 🗗

**8**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 4 - 16    ›

View all for this result

### Magnesium  Learn more about this 🗗

**2.1 mg/dL**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 1.5 mg/dL - 2.5 mg/dL    ›

View all for this result

### Calcium  Learn more about this 🗗

**9.2 mg/dL**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 8.8 mg/dL - 10.4 mg/dL    ›

View all for this result

### Phosphorus  Learn more about this 🗗

**5.1 mg/dL**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 3.6 mg/dL - 6.1 mg/dL    ›

View all for this result

### Protein, Total  Learn more about this 🗗

**6.5 g/dL**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 5.4 g/dL - 7.6 g/dL    ›

View all for this result

### Albumin  Learn more about this 🗗

**3.6 g/dL**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 3.6 g/dL - 5.1 g/dL    ›

View all for this result

### Alb/Glob Ratio  Learn more about this 🗗

**1.2**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 1.0 - 2.0    ›

View all for this result

### Bilirubin Total  Learn more about this 🗗

**0.3 mg/dL**

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 0.2 mg/dL - 1.3 mg/dL    ›

View all for this result

### AST  Learn more about this 🗗    *Liver function*

**37 U/L**    ›

**Date:** Dec 31, 2018 05:20 a.m. MST     **Reference Range:** 10 U/L - 50 U/L

View all for this result

### ALT  Learn more about this 🗗

**53 U/L (High)**    ›

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**Date:** Dec 31, 2018 05:20 a.m. MST          **Reference Range:** 5 U/L - 41 U/L

View all for this result

**Alkaline Phos** Learn more about this 🗗

86 U/L (Low)                                                                               >

**Date:** Dec 31, 2018 05:20 a.m. MST          **Reference Range:** 131 U/L - 189 U/L

View all for this result

## CHEM MISC

**Triglycerides** Learn more about this 🗗

48 mg/dL                                                                                   >

**Date:** Dec 31, 2018 05:20 a.m. MST          **Reference Range:** <= 74 mg/dL

## PROT-IMMUNO-TUMOR

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**WBC** Learn more about this 🖸

**4.6 K/MM3**                                                                                                           ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 4.5 K/MM3 - 13.5 K/MM3

**RBC** Learn more about this 🖸

**3.40 M/MM3 (Low)**                                                                                                    ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 4.00 M/MM3 - 5.30 M/MM3

*Anemic*

**HGB** Learn more about this 🖸

**10.4 g/dL (Low)**                                                                                                     ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 11.5 g/dL - 14.5 g/dL

**HCT** Learn more about this 🖸

**33.2 %**                                                                                                              ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 33.0 % - 43.0 %

**MCV** Learn more about this 🖸

**98 fL (High)**                                                                                                        ›

*folate deficient*

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 76 fL - 90 fL

**MCH** Learn more about this 🖸

**30.6 pg**                                                                                                             ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 25.0 pg - 31.0 pg

**MCHC** Learn more about this 🖸

**31.3 g/dL**                                                                                                           ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 31.0 g/dL - 37.0 g/dL

**RDW-CV** Learn more about this 🖸

**18.1 % (High)**                                                                                                       ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 11.0 % - 15.0 %

**RDW-SD** Learn more about this 🖸

**64.5 fL (High)**                                                                                                      ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 38.0 fL - 49.0 fL

**Nucleated RBCs, Automated** Learn more about this 🖸

**0 %**                                                                                                                 ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: <= 0 %

**Platelet** Learn more about this 🖸

**257 K/MM3**                                                                                                           ›

Date: Dec 29, 2018 06:30 p.m. MST                          Reference Range: 130 K/MM3 - 450 K/MM3

**MPV** Learn more about this 🖸

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027911

https://mybanner.iqhealth.com/person/Y552oSKySPX3Ki2l/health-record/results/

**9.7 fL**         >

**Date:** Dec 29, 2018 06:30 p.m. MST      **Reference Range:** 9.0 fL - 12.0 fL

## WBC Differential

**Differential Method**   Learn more about this 🗗

**Scan**        >

**Date:** Dec 29, 2018 06:30 p.m. MST

## Absolute Cell Counts (#)

**Neutrophils #**   Learn more about this 🗗

**2.0 K/uL**        >

**Date:** Dec 29, 2018 06:30 p.m. MST      **Reference Range:** 0.8 K/uL - 8.0 K/uL

**Lymphocytes #**   Learn more about this 🗗

**1.9 K/uL**        >

**Date:** Dec 29, 2018 06:30 p.m. MST      **Reference Range:** 1.5 K/uL - 6.5 K/uL

**Monocytes #**   Learn more about this 🗗

**0.6 K/uL**    *Viral Infection*      >

**Date:** Dec 29, 2018 06:30 p.m. MST      **Reference Range:** 0.2 K/uL - 0.9 K/uL

**Eosinophils #**   Learn more about this 🗗

**0.0 K/uL**        >

**Date:** Dec 29, 2018 06:30 p.m. MST      **Reference Range:** 0.0 K/uL - 0.6 K/uL

**Basophils #**   Learn more about this 🗗

**0.0 K/uL**        >

**Date:** Dec 29, 2018 06:30 p.m. MST      **Reference Range:** 0.0 K/uL - 0.2 K/uL

**Immature Granulocytes #**   Learn more about this 🗗

**0.0 K/uL**        >

**Date:** Dec 29, 2018 06:30 p.m. MST      **Reference Range:** 0.0 K/uL - 0.1 K/uL

## Percentages (%)

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**Neutrophils %**  Learn more about this ☑

**42**

Date: Dec 29, 2018 06:30 p.m. MST                                                                              ❯

**Lymphocytes %**  Learn more about this ☑

**42**

Date: Dec 29, 2018 06:30 p.m. MST                                                                              ❯

**Monocytes %**  Learn more about this ☑

**13**              *Viral infection*                                                                          ❯

Date: Dec 29, 2018 06:30 p.m. MST

**Eosinophils %**  Learn more about this ☑

**1**

Date: Dec 29, 2018 06:30 p.m. MST                                                                              ❯

**Basophils %**  Learn more about this ☑

**1**

Date: Dec 29, 2018 06:30 p.m. MST                                                                              ❯

**Immature Granulocytes %**  Learn more about this ☑

**0.4 %**

Date: Dec 29, 2018 06:30 p.m. MST                                                                              ❯

## Slide Review Findings

**RBC Morphology**  Learn more about this ☑

See Note (Abnormal)        *Anemic*                                                                           ❯

Date: Dec 29, 2018 06:30 p.m. MST                        Reference Range:  Normal

**Platelet Estimate**  Learn more about this ☑

**Normal**                                                                                                     ❯

Date: Dec 29, 2018 06:30 p.m. MST                        Reference Range:  Normal

## CHEM GENER

**Glucose Level**  Learn more about this 🖸

**83 mg/dL**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  60 mg/dL - 100 mg/dL

View all for this result

**BUN**  Learn more about this 🖸

**9.5 mg/dL**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  5.0 mg/dL - 25.0 mg/dL

View all for this result

**Creatinine**  Learn more about this 🖸

**0.20 mg/dL (Low)**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  0.50 mg/dL - 0.90 mg/dL

View all for this result

**eGFR (non-African Descent)**  Learn more about this 🖸

**See Comment mL/min/1.73 m2**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  >= 60 mL/min/1.73 m2

View all for this result

**eGFR (African Descent)**  Learn more about this 🖸

**See Comment mL/min/1.73 m2**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  >= 60 mL/min/1.73 m2

View all for this result

**BUN/Creat Ratio**  Learn more about this 🖸          *Kidney function*

**48 (High)**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  10 - 28

View all for this result

**Sodium**  Learn more about this 🖸

**140 mmol/L**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  134 mmol/L - 147 mmol/L

View all for this result

**Potassium**  Learn more about this 🖸

**4.1 mmol/L**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  3.6 mmol/L - 5.3 mmol/L

View all for this result

**Chloride**  Learn more about this 🖸

**104 mmol/L**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  95 mmol/L - 108 mmol/L

View all for this result

**CO2**  Learn more about this 🖸

**28 mmol/L**  〉

**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  20 mmol/L - 28 mmol/L

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027914

## BASIC VITAL SIGNS

**AVPU**  Learn more about this ⬀

**Alert and responsive**  ❯

**Date:**  Jan 02, 2019 04:56 p.m. MST

View all for this result

**Temperature C**  Learn more about this ⬀

**36.4 DegC**  ❯

**Date:**  Jan 02, 2019 04:00 p.m. MST

View all for this result

**Temperature Site**  Learn more about this ⬀

**Axillary**  ❯

**Date:**  Jan 02, 2019 04:00 p.m. MST

View all for this result

**Heart Rate**  Learn more about this ⬀

**86 bpm**  ❯

**Date:**  Jan 02, 2019 04:00 p.m. MST

View all for this result

**Heart Rate Site**  Learn more about this ⬀

**Monitor**  ❯

**Date:**  Jan 02, 2019 04:00 p.m. MST

View all for this result

**Respirations**  Learn more about this ⬀

**22 br/min**  ❯

**Date:**  Jan 02, 2019 04:00 p.m. MST

View all for this result

**Mean Arterial Pressure**  Learn more about this ⬀

**71 mmHg**  ❯

**Date:**  Jan 02, 2019 07:32 a.m. MST

**Vital Signs Comment**  Learn more about this ⬀

**PEWs 0**  ❯

**Date:**  Jan 02, 2019 04:00 p.m. MST

View all for this result

## Blood Pressure

**Systolic Blood Pressure / Diastolic Blood Pressure**  Learn more about Systolic Blood Pressure ⬀
Learn more about Diastolic Blood Pressure ⬀

**100 / 62 mmHg**  ❯

**Date:**  Jan 02, 2019 07:32 a.m. MST

## OXYGENATION VITAL SIGNS

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027915

**WBC** Learn more about this 📄

**4.6 K/MM3** >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 4.5 K/MM3 - 13.5 K/MM3

View all for this result

**RBC** Learn more about this 📄

3.40 M/MM3 (Low) >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 4.00 M/MM3 - 5.30 M/MM3

View all for this result

**HGB** Learn more about this 📄 *anemic*

10.4 g/dL (Low) >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 11.5 g/dL - 14.5 g/dL

View all for this result

**HGB, Point of Care** Learn more about this 📄

10.5 g/dL (Low) >

Date: Dec 21, 2018 12:37 p.m. MST Reference Range: 11.5 g/dL - 14.5 g/dL

View all for this result

**HCT** Learn more about this 📄

**33.2 %** >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 33.0 % - 43.0 %

View all for this result

**HCT, Point of Care** Learn more about this 📄

31.0 % (Low) >

Date: Dec 21, 2018 12:37 p.m. MST Reference Range: 33.0 % - 43.0 %

View all for this result

**MCV** Learn more about this 📄

98 fL (High) *folate deficiency* >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 76 fL - 90 fL

View all for this result

**MCH** Learn more about this 📄

**30.6 pg** >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 25.0 pg - 31.0 pg

View all for this result

**MCHC** Learn more about this 📄

**31.3 g/dL** >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 31.0 g/dL - 37.0 g/dL

View all for this result

**RDW-CV** Learn more about this 📄

18.1 % (High) >

Date: Dec 29, 2018 06:30 p.m. MST Reference Range: 11.0 % - 15.0 %

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027916

View all for this result

**RDW-SD**  Learn more about this [

**64.5 fL (High)**                                                                                              ›

**Date:** Dec 29, 2018 06:30 p.m. MST                     Reference Range:  38.0 fL - 49.0 fL

View all for this result

**Nucleated RBCs, Automated**  Learn more about this [

**0 %**                                                                                                        ›

**Date:** Dec 29, 2018 06:30 p.m. MST                     Reference Range:  <= 0 %

View all for this result

**Platelet**  Learn more about this [

**257 K/MM3**                                                                                                  ›

**Date:** Dec 29, 2018 06:30 p.m. MST                     Reference Range:  130 K/MM3 - 450 K/MM3

View all for this result

**MPV**  Learn more about this [

**9.7 fL**                                                                                                     ›

**Date:** Dec 29, 2018 06:30 p.m. MST                     Reference Range:  9.0 fL - 12.0 fL

View all for this result

## WBC Differential

**Differential Method**  Learn more about this [

**Scan**                                                                                                       ›

**Date:** Dec 29, 2018 06:30 p.m. MST

View all for this result

## Absolute Cell Counts (#)

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027917

**Neutrophils #**   Learn more about this ☒

**2.0 K/uL**                                                                                                         ›
Date:   Dec 29, 2018 06:30 p.m. MST                         Reference Range:   0.8 K/uL - 8.0 K/uL
View all for this result

**Lymphocytes #**   Learn more about this ☒

**1.9 K/uL**                                                                                                         ›
Date:   Dec 29, 2018 06:30 p.m. MST                         Reference Range:   1.5 K/uL - 6.5 K/uL
View all for this result

**Monocytes #**   Learn more about this ☒

**0.6 K/uL**   Viral infection                                                                      ›
Date:   Dec 29, 2018 06:30 p.m. MST                         Reference Range:   0.2 K/uL - 0.9 K/uL
View all for this result

**Eosinophils #**   Learn more about this ☒

**0.0 K/uL**                                                                                                         ›
Date:   Dec 29, 2018 06:30 p.m. MST                         Reference Range:   0.0 K/uL - 0.6 K/uL
View all for this result

**Basophils #**   Learn more about this ☒

**0.0 K/uL**                                                                                                         ›
Date:   Dec 29, 2018 06:30 p.m. MST                         Reference Range:   0.0 K/uL - 0.2 K/uL
View all for this result

**Immature Granulocytes #**   Learn more about this ☒

**0.0 K/uL**                                                                                                         ›
Date:   Dec 29, 2018 06:30 p.m. MST                         Reference Range:   0.0 K/uL - 0.1 K/uL
View all for this result

## Percentages (%)

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027918

**Neutrophils %**  Learn more about this 🔗

· **42**

**Date:**  Dec 29, 2018 06:30 p.m. MST

View all for this result

**Lymphocytes %**  Learn more about this 🔗

**42**

**Date:**  Dec 29, 2018 06:30 p.m. MST

View all for this result

**Monocytes %**  Learn more about this 🔗

**13**   *Viral infection*

**Date:**  Dec 29, 2018 06:30 p.m. MST

View all for this result

**Eosinophils %**  Learn more about this 🔗

**1**

**Date:**  Dec 29, 2018 06:30 p.m. MST

View all for this result

**Basophils %**  Learn more about this 🔗

· **1**

**Date:**  Dec 29, 2018 06:30 p.m. MST

View all for this result

**Immature Granulocytes %**  Learn more about this 🔗

**0.4 %**

**Date:**  Dec 29, 2018 06:30 p.m. MST

View all for this result

### Slide Review Findings

**RBC Morphology**  Learn more about this 🔗

See Note (Abnormal)

**Date:**  Dec 29, 2018 06:30 p.m. MST         **Reference Range:**  Normal

**Platelet Estimate**  Learn more about this 🔗

**Normal**

**Date:**  Dec 29, 2018 06:30 p.m. MST         **Reference Range:**  Normal

### MISC HEMO

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

### Retic %  Learn more about this ☑

4.1 % (High)

**Date:** Dec 25, 2018 04:19 a.m. MST                     **Reference Range:** 0.7 % - 2.8 %

### Retic #  Learn more about this ☑

136 K/ul

**Date:** Dec 25, 2018 04:19 a.m. MST                     **Reference Range:** 26 K/ul - 168 K/ul

### Immature Retic Fraction (IRF)  Learn more about this ☑

15.6 %

**Date:** Dec 25, 2018 04:19 a.m. MST                     **Reference Range:** 2.5 % - 16.0 %

### Retic Hgb Equivalent [RET-He]  Learn more about this ☑

36.1 pg

**Date:** Dec 25, 2018 04:19 a.m. MST                     **Reference Range:** 30.5 pg - 41.0 pg

### Sed Rate  Learn more about this ☑

2 mm/hr

**Date:** Dec 19, 2018 05:00 a.m. MST                     **Reference Range:** 0 mm/hr - 10 mm/hr

### Iron  Learn more about this ☑

56 ug/dL

**Date:** Dec 25, 2018 04:19 a.m. MST                     **Reference Range:** 28 ug/dL - 136 ug/dL

### Transferrin  Learn more about this ☑

196.0 mg/dL (Low)

**Date:** Dec 25, 2018 04:19 a.m. MST                     **Reference Range:** 203.0 mg/dL - 360.0 mg/dL

### Trans % Sat  Learn more about this ☑

22.5 %

**Date:** Dec 25, 2018 04:19 a.m. MST                     **Reference Range:** 15.0 % - 50.0 %

### Ferritin  Learn more about this ☑

253 ng/mL

**Date:** Dec 26, 2018 03:45 a.m. MST                     **Reference Range:** 18 - 370

## GENERAL COAGULATION

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027920

MyBanner - Results

**PT**  Learn more about this ☑

14.8 second(s) (High)

Date: Dec 18, 2018 01:25 p.m. MST

Reference Range:  9.4 second(s) - 12.5 second(s)                                    ❯

**INR**  Learn more about this ☑

1.3 (High)

Date: Dec 18, 2018 01:25 p.m. MST

Reference Range:  0.9 - 1.1                                    ❯

**APTT**  Learn more about this ☑

25.6 second(s)

Date: Dec 18, 2018 01:25 p.m. MST

Reference Range:  24.0 second(s) - 36.5 second(s)                                    ❯

## GLUCOSE POINT OF CARE

**Glucose POC**  Learn more about this ☑

102 mg/dL (High)

Date:  Dec 21, 2018 12:37 p.m. MST

View all for this result

Reference Range:  60 mg/dL - 100 mg/dL                                    ❯

**Glucose Comments POC**  Learn more about this ☑

Bedside Glucose

Date: Dec 19, 2018 07:54 a.m. MST

View all for this result                                    ❯

**Specimen Type POC**  Learn more about this ☑

Capillary

Date: Dec 19, 2018 07:54 a.m. MST

View all for this result                                    ❯

## CHEM GENER

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027921

**Glucose Level**  Learn more about this 📤

**83 mg/dL**                                                                                          ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  60 mg/dL - 100 mg/dL
View all for this result

**BUN**  Learn more about this 📤

**9.5 mg/dL**                                                                                        ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  5.0 mg/dL - 25.0 mg/dL
View all for this result

**Creatinine**  Learn more about this 📤

0.20 mg/dL (Low)                                                                                     ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  0.50 mg/dL - 0.90 mg/dL
View all for this result

**eGFR (non-African Descent)**  Learn more about this 📤

**See Comment mL/min/1.73 m2**                                                                       ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  >= 60 mL/min/1.73 m2
View all for this result

**eGFR (African Descent)**  Learn more about this 📤

**See Comment mL/min/1.73 m2**                                                                       ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  >= 60 mL/min/1.73 m2
View all for this result

**BUN/Creat Ratio**  Learn more about this 📤        *Kidney function*

48 (High)                                                                                            ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  10 - 28
View all for this result

**Sodium**  Learn more about this 📤

**140 mmol/L**                                                                                       ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  134 mmol/L - 147 mmol/L
View all for this result

**Sodium, POC**  Learn more about this 📤

**138 mmol/L**                                                                                       ›
**Date:**  Dec 21, 2018 12:37 p.m. MST          **Reference Range:**  135 mmol/L - 145 mmol/L
View all for this result

**Potassium**  Learn more about this 📤

**4.1 mmol/L**                                                                                       ›
**Date:**  Dec 31, 2018 05:20 a.m. MST          **Reference Range:**  3.6 mmol/L - 5.3 mmol/L
View all for this result

**Potassium, POC**  Learn more about this 📤

**3.5 mmol/L**                                                                                       ›
**Date:**  Dec 21, 2018 12:37 p.m. MST          **Reference Range:**  3.5 mmol/L - 5.2 mmol/L

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER                                              AZ-KAHRAMAN027922

View all for this result

### Chloride  Learn more about this 🗹

**104 mmol/L**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 95 mmol/L - 108 mmol/L

View all for this result

### CO2  Learn more about this 🗹

**28 mmol/L**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 20 mmol/L - 28 mmol/L

View all for this result

### Anion Gap  Learn more about this 🗹

**8**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 4 - 16

View all for this result

### Magnesium  Learn more about this 🗹

**2.1 mg/dL**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 1.5 mg/dL - 2.5 mg/dL

View all for this result

### Calcium  Learn more about this 🗹

**9.2 mg/dL**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 8.8 mg/dL - 10.4 mg/dL

View all for this result

### Ionized Calcium, POC  Learn more about this 🗹

**3.80 mg/dL (Low)**      ›

**Date:** Dec 21, 2018 12:37 p.m. MST      **Reference Range:** 4.52 mg/dL - 5.28 mg/dL

View all for this result

### Phosphorus  Learn more about this 🗹

**5.1 mg/dL**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 3.6 mg/dL - 6.1 mg/dL

View all for this result

### Uric Acid  Learn more about this 🗹

**5.7 mg/dL (High)**      ›

**Date:** Dec 25, 2018 04:19 a.m. MST      **Reference Range:** 2.0 mg/dL - 5.5 mg/dL

### Protein, Total  Learn more about this 🗹

**6.5 g/dL**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 5.4 g/dL - 7.6 g/dL

View all for this result

### Albumin  Learn more about this 🗹

**3.6 g/dL**      ›

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** 3.6 g/dL - 5.1 g/dL    AZ-KAHRAMAN027923

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**Alb/Glob Ratio**  Learn more about this 🗗

**1.2**      ❯

**Date:**  Dec 31, 2018 05:20 a.m. MST        **Reference Range:** ˙1.0 - 2.0

View all for this result

**Bilirubin Total**  Learn more about this 🗗

**0.3 mg/dL**      ❯

**Date:**  Dec 31, 2018 05:20 a.m. MST        **Reference Range:** 0.2 mg/dL - 1.3 mg/dL

View all for this result

**Lipase Level**  Learn more about this 🗗

**23 U/L**      ❯

**Date:**  Dec 18, 2018 01:25 p.m. MST        **Reference Range:** 16 U/L - 63 U/L

**AST**  Learn more about this 🗗

**37 U/L**      ❯

**Date:**  Dec 31, 2018 05:20 a.m. MST        **Reference Range:** 10 U/L - 50 U/L

View all for this result

**ALT**  Learn more about this 🗗

**63 U/L (High)**      ❯

**Date:**  Dec 31, 2018 05:20 a.m. MST        **Reference Range:** 5 U/L - 41 U/L

View all for this result

**Alkaline Phos**  Learn more about this 🗗

**86 U/L (Low)**      ❯

**Date:**  Dec 31, 2018 05:20 a.m. MST        **Reference Range:** 131 U/L - 189 U/L

View all for this result

**CK, Total**  Learn more about this 🗗

**170 U/L (High)**      ❯

**Date:**  Dec 19, 2018 06:30 p.m. MST        **Reference Range:** <= 159 U/L

View all for this result

**CKMB**  Learn more about this 🗗

**2.26 ng/mL**      ❯

**Date:**  Dec 19, 2018 06:30 p.m. MST        **Reference Range:** <= 6.73 ng/mL

**% CKMB Index**  Learn more about this 🗗

**1.3 %**      ❯

**Date:**  Dec 19, 2018 06:30 p.m. MST

**NT-proBNP**  Learn more about this 🗗

**1143 pg/mL (High)**      ❯

**Date:**  Dec 25, 2018 04:19 a.m. MST        **Reference Range:** <= 124 pg/mL

View all for this result

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027924

**Ammonia**   Learn more about this ✍

13 umol/L (Low)        ›

Date: Dec 19, 2018 12:35 p.m. MST      Reference Range: 16 umol/L - 60 umol/L

**Lactic Acid, Venous**   Learn more about this ✍

1.7 mmol/L        ›

Date: Dec 19, 2018 05:00 a.m. MST      Reference Range: 0.5 mmol/L - 2.2 mmol/L

**CHEM MISC**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027925

**Tyrosine, Plasma** Learn more about this 🗗

91 umol/L

**Date:** Dec 19, 2018 06:30 p.m. MST                    Reference Range: 31-108    >

**Valine, Plasma** Learn more about this 🗗

324 umol/L (High)

**Date:** Dec 19, 2018 06:30 p.m. MST                    Reference Range: 130-307    >

*Needs*
*P5P* (handwritten)

**Isoleucine, Plasma** Learn more about this 🗗

142 umol/L (High)

**Date:** Dec 19, 2018 06:30 p.m. MST                    Reference Range: 33-97    >

**Leucine, Plasma** Learn more about this 🗗

259 umol/L (High)

**Date:** Dec 19, 2018 06:30 p.m. MST                    Reference Range: 65-179    >

**Phenylalanine, Plasma** Learn more about this 🗗

66 umol/L

**Date:** Dec 19, 2018 06:30 p.m. MST                    Reference Range: 38-86    >

**Tryptophan, Plasma** Learn more about this 🗗

57 umol/L

**Date:** Dec 19, 2018 06:30 p.m. MST                    Reference Range: 30-94    >

**Interpretation (Amino Acids), Plasma** Learn more about this 🗗

See comment

**Date:** Dec 19, 2018 06:30 p.m. MST    >

**Carnitine, Total** Learn more about this 🗗

46 umol/L

**Date:** Dec 21, 2018 09:45 a.m. MST                    Reference Range: 32-62    >

**Carnitine, Free** Learn more about this 🗗

29 umol/L

**Date:** Dec 21, 2018 09:45 a.m. MST                    Reference Range: 25-54    >

**Esterified/Free Ratio** Learn more about this 🗗

0.57 (High)

**Date:** Dec 21, 2018 09:45 a.m. MST                    Reference Range: 0.09-0.35    >

**Carnitine, Esters** Learn more about this 🗗

17 umol/L (High)

**Date:** Dec 21, 2018 09:45 a.m. MST                    Reference Range: 4-12    >

**Cholesterol** Learn more about this 🗗

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027926

MyBanner - Results

241 mg/dL (High)

**Date:** Dec 18, 2018 01:25 p.m. MST      **Reference Range:** <= 169 mg/dL ❯

**Triglycerides** Learn more about this 📄

48 mg/dL ❯

**Date:** Dec 31, 2018 05:20 a.m. MST      **Reference Range:** <= 74 mg/dL

View all for this result

**Thiamine (B1)** Learn more about this 📄

< 7 nmol/L ❯

**Date:** Dec 19, 2018 12:35 p.m. MST

**Acylcarnitine Plasma Interpretation** Learn more about this 📄

See comment ❯

**Date:** Dec 21, 2018 10:15 a.m. MST

**Acetlycarnitine, C2** Learn more about this 📄

22.56 nmol/mL (High) ❯

**Date:** Dec 21, 2018 10:15 a.m. MST      **Reference Range:** 2.6-15.5

**Propionylcarnitine, C3** Learn more about this 📄

0.40 nmol/mL ❯

**Date:** Dec 21, 2018 10:15 a.m. MST      **Reference Range:** < 0.94 nmol/mL

**Iso-Butylcarnitine, C4** Learn more about this 📄

0.23 nmol/mL ❯

**Date:** Dec 21, 2018 10:15 a.m. MST      **Reference Range:** < 1.22 nmol/mL

**Methylmalonylcarnitine, C4DC** Learn more about this 📄

0.03 nmol/mL (High) ❯

**Date:** Dec 21, 2018 10:15 a.m. MST      **Reference Range:** < 0.02 nmol/mL

**Isovaleryl-/2-methylbutyrylcarnitine, C5** Learn more about this 📄

0.09 nmol/mL ❯

**Date:** Dec 21, 2018 10:15 a.m. MST      **Reference Range:** < 0.30 nmol/mL

**Tigyl/methylcrotonylcarnitine, C5:1** Learn more about this 📄

< 0.02 nmol/mL ❯

**Date:** Dec 21, 2018 10:15 a.m. MST      **Reference Range:** < 0.02 nmol/mL

**Glucarylcarnitine, C5DC** Learn more about this 📄

0.02 nmol/mL ❯

**Date:** Dec 21, 2018 10:15 a.m. MST      **Reference Range:** < 0.04 nmol/mL

**OH-Isovalerylcarnitine, C5OH** Learn more about this 📄

0.05 nmol/mL (High)

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027927 ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.03 nmol/mL

### Hexanoylcarnitine, C6  Learn more about this 🗗

**0.08 nmol/mL**                                                                                              ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.10 nmol/mL

### Adipoylcarnitine, C6DC  Learn more about this 🗗

**< 0.02 nmol/mL**                                                                                          ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.02 nmol/mL

### OH-Hexanoylcarnitine, C6OH  Learn more about this 🗗

**< 0.02 nmol/mL**                                                                                          ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.05 nmol/mL

### Octanoylcarnitine, C8  Learn more about this 🗗

**0.14 nmol/mL**                                                                                              ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.35 nmol/mL

### Octenoylcarnitine, C8:1  Learn more about this 🗗

**0.02 nmol/mL**                                                                                              ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 1.15 nmol/mL

### Suberylcarnitine, C8DC  Learn more about this 🗗

0.02 nmol/mL (High)                                                                                          ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.02 nmol/mL

### Decanoylcarnitine, C10  Learn more about this 🗗

**0.25 nmol/mL**                                                                                              ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.33 nmol/mL

### Decenoylcarnitine, C10:1  Learn more about this 🗗

**0.04 nmol/mL**                                                                                              ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.64 nmol/mL

### Dodecanoylcarnitine, C12  Learn more about this 🗗

**0.08 nmol/mL**                                                                                              ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.13 nmol/mL

### Dodecenoylcarnitine, C12:1  Learn more about this 🗗

**0.05 nmol/mL**                                                                                              ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.19 nmol/mL

### OH-Dodecanoylcarnitine, C12OH  Learn more about this 🗗

**< 0.02 nmol/mL**                                                                                          ❯

Date: Dec 21, 2018 10:15 a.m. MST                              Reference Range: < 0.02 nmol/mL

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER                                      AZ-KAHRAMAN027928

**Tetradecanoylcarnitine, C14**  Learn more about this 🗗

**0.03 nmol/mL**                                                          >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.06 nmol/mL

**Tetradecenoylcarnitine, C14:1**  Learn more about this 🗗

**0.03 nmol/mL**                                                          >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.48 nmol/mL

**Tetradecadienoylcarnitine, C14:2**  Learn more about this 🗗

**< 0.02 nmol/mL**                                                        >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.09 nmol/mL

**OH-Tetradecanoylcarnitine, C14OH**  Learn more about this 🗗

**< 0.02 nmol/mL**                                                        >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.02 nmol/mL

**OH_Tetradecenoylcarnitine, C14:1-OH**  Learn more about this 🗗

0.02 nmol/mL (High)                                                      >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.02 nmol/mL

**Hexadecanoylcarnitine, C16**  Learn more about this 🗗

**0.08 nmol/mL**                                                          >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.17 nmol/mL

**Hexadecenoylcarnitine, C16:1**  Learn more about this 🗗

**0.02 nmol/mL**                                                          >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.05 nmol/mL

**OH-Hexadecanoylcarnitine, C16OH**  Learn more about this 🗗

**< 0.02 nmol/mL**                                                        >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.02 nmol/mL

**OH-Hexadecenoylcarnitine, C16:1-OH**  Learn more about this 🗗

0.02 nmol/mL (High)                                                      >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.02 nmol/mL

**Stearoylcarnitine, C18**  Learn more about this 🗗

0.12 nmol/mL (High)                                                      >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.08 nmol/mL

**Oleoylcarnitine, C18:1**  Learn more about this 🗗

0.28 nmol/mL (High)                                                      >

**Date:**  Dec 21, 2018 10:15 a.m. MST                    **Reference Range:**  < 0.27 nmol/mL

**Lineooylcarnitine, C18:2**  Learn more about this 🗗

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027929

MyBanner - Results

**0.03 nmol/mL**                                    ›

Date: Dec 21, 2018 10:15 a.m. MST            Reference Range: < 0.14 nmol/mL

### OH-Oleooylcarnitine, C18:1-OH   Learn more about this 

**< 0.02 nmol/mL**                                    ›

Date: Dec 21, 2018 10:15 a.m. MST            Reference Range: < 0.02 nmol/mL

### OH-Linoleoylcarnitine, C18:2-OH   Learn more about this 

**< 0.02 nmol/mL**                                    ›

Date: Dec 21, 2018 10:15 a.m. MST            Reference Range: < 0.02 nmol/mL

### OH-Butyrylcarnitine, C4OH   Learn more about this 

0.07 nmol/mL (High)                                ›

Date: Dec 21, 2018 10:15 a.m. MST            Reference Range: < 0.05 nmol/mL

### Vitamin B12 Level   Learn more about this 

> 2000 pg/mL (High)                                ›

Date: Dec 19, 2018 12:35 p.m. MST            Reference Range: 232 - 1245

## ENDOCRINOLOGY

### T4 Free   Learn more about this 

0.56 ng/dL (Low)                                ›

Date: Dec 18, 2018 01:25 p.m. MST            Reference Range: 0.90 ng/dL - 1.40 ng/dL

### TSH   Learn more about this 

11.16 uIU/mL (High)                               ›

Date: Dec 18, 2018 01:25 p.m. MST            Reference Range: 0.50 uIU/mL - 5.40 uIU/mL

### Vitamin D, 25 Hydroxy   Learn more about this 

11.9 ng/mL (Low)                                ›

Date: Dec 26, 2018 03:45 a.m. MST            Reference Range: >= 20.0 ng/mL

View all for this result

## PROT-IMMUNO-TUMOR

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027930

## C Reactive Protein  Learn more about this 📤

**< 0.6 mg/L**

**Date:** Dec 19, 2018 05:00 a.m. MST            **Reference Range:** <= 4.9 mg/L

## Prealbumin  Learn more about this 📤

**15 mg/dL (Low)**

**Date:** Dec 25, 2018 04:19 a.m. MST            **Reference Range:** 20 mg/dL - 40 mg/dL

View all for this result

## C3, Complement  Learn more about this 📤

**67 mg/dL (Low)**

**Date:** Dec 18, 2018 01:25 p.m. MST            **Reference Range:** 90 - 180

## Complement, Total (CH50)  Learn more about this 📤

**46 U/mL**

**Date:** Dec 18, 2018 01:25 p.m. MST            **Reference Range:** 31-60

## ARTERIAL BLOOD GASES

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027931

**pH, ABG POC**  Learn more about this ⬀

7.47 (High)                                                                                              ›

**Date:** Dec 21, 2018 12:37 p.m. MST          **Reference Range:** 7.35 - 7.45

View all for this result

**PCO2, ABG POC**  Learn more about this ⬀

31 mmHg (Low)                                                                                           ›

**Date:** Dec 21, 2018 12:37 p.m. MST          **Reference Range:** 35 mmHg - 45 mmHg

View all for this result

**PO2, ABG POC**  Learn more about this ⬀

409 mmHg (High)                                                                                         ›

**Date:** Dec 21, 2018 12:37 p.m. MST          **Reference Range:** 76 mmHg - 100 mmHg

View all for this result

**Total CO2, ABG POC**  Learn more about this ⬀

23 mmol/L (Low)                                                                                         ›

**Date:** Dec 21, 2018 12:37 p.m. MST          **Reference Range:** 35 mmol/L - 45 mmol/L

View all for this result

**HCO3(Bicarb), ABG POC**  Learn more about this ⬀

23 mmol/L                                                                                               ›

**Date:** Dec 21, 2018 12:37 p.m. MST          **Reference Range:** 22 mmol/L - 28 mmol/L

View all for this result

**O2 Sat, ABG POC**  Learn more about this ⬀

100 %                                                                                                   ›

**Date:** Dec 21, 2018 12:37 p.m. MST          **Reference Range:** >= 95 %

View all for this result

## VENOUS BLOOD GASES

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027932

**pH, VBG POC**  Learn more about this 📤

**7.44**                                                                                      ❯

**Date:** Dec 21, 2018 12:33 p.m. MST                    Reference Range: 7.35 - 7.45

View all for this result

**PCO2, VBG POC**  Learn more about this 📤

**29 mmHg (Low)**                                                              ❯

**Date:** Dec 21, 2018 12:33 p.m. MST                    Reference Range: 41 mmHg - 51 mmHg

View all for this result

**PO2, VBG POC**  Learn more about this 📤

**43 mmHg**                                                                         ❯

**Date:** Dec 21, 2018 12:33 p.m. MST                    Reference Range: 30 mmHg - 45 mmHg

View all for this result

**Total CO2, VBG POC**  Learn more about this 📤

**21 mmol/L**                                                                       ❯

**Date:** Dec 21, 2018 12:33 p.m. MST                    Reference Range: 20 mmol/L - 28 mmol/L

View all for this result

**HCO3(Bicarb), VBG POC**  Learn more about this 📤

**20 mmol/L (Low)**                                                          ❯

**Date:** Dec 21, 2018 12:33 p.m. MST                    Reference Range: 22 mmol/L - 28 mmol/L

View all for this result

**Base Excess, VBG POC**  Learn more about this 📤

**-4.0 mmol/L (Low)**                                                       ❯

**Date:** Dec 21, 2018 12:33 p.m. MST                    Reference Range: -2.5 mmol/L - 2.5 mmol/L

View all for this result

**O2 Sat, VBG POC**  Learn more about this 📤

**81 % (High)**                                                                       ❯

**Date:** Dec 21, 2018 12:33 p.m. MST                    Reference Range: 60 % - 80 %

View all for this result

## URINE DRUGS

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**Amphetamine Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Barbiturate Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Benzodiazepine Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Cannabinoid (THC) Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Cocaine Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Methadone Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Opiate Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Oxycodone Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**Phencyclidine Screen, UR** Learn more about this 🗗

**Negative**        ❯

Date: Dec 18, 2018 12:43 p.m. MST       Reference Range: Negative

**DSAU Comment** Learn more about this 🗗

**See Note**        ❯

Date: Dec 18, 2018 12:43 p.m. MST

## METALS

MyBanner - Results

**Zinc Level**  Learn more about this 🗗

**91 mcg/dL**

Date:  Dec 25, 2018 04:19 a.m. MST                    Reference Range:  25 - 148

View all for this result

## URINALYSIS

>

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027935

MyBanner - Results

**Color, UR**  Learn more about this 🖸

**Yellow**                                                                              ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Yellow

**Appearance, UR**  Learn more about this 🖸

Hazy (Abnormal)                                                                         ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Clear

**Glucose, UR**  Learn more about this 🖸

**Negative mg/dL**                                                                      ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Negative

**pH, UR**  Learn more about this 🖸

**6.0**                                                                                 ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: 5.0 - 9.0

**Ketones, UR**  Learn more about this 🖸

20(Small) mg/dL (Abnormal)                                                              ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Negative

**Protein, UR**  Learn more about this 🖸

30 mg/dL (Abnormal)                                                                     ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Negative

**Bilirubin, UR**  Learn more about this 🖸

**Negative**                                                                            ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Negative

**Blood, UR**  Learn more about this 🖸

0.20(Moderate) mg/dL (Abnormal)                                                         ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Negative

**Urobilinogen, UR**  Learn more about this 🖸

**Normal mg/dL**                                                                        ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Normal

**Specific Gravity, UR**  Learn more about this 🖸

**1.021**                                                                               ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: 1.005 - 1.030

**Nitrite, UR**  Learn more about this 🖸

**Negative**                                                                            ❯

Date: Dec 18, 2018 12:43 p.m. MST                    Reference Range: Negative

**Leukocyte esterase, UR**  Learn more about this 🖸

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027936

**Negative mg/dL**                                                                                      ›

Date:  Dec 18, 2018 12:43 p.m. MST                    Reference Range:  Negative

**WBC, UR**  Learn more about this 🖸

6-10 /HPF (Abnormal)                                                                                    ›

Date:  Dec 18, 2018 12:43 p.m. MST                    Reference Range:  0 /HPF - 5 /HPF

**RBC, UR**  Learn more about this 🖸

3-10 /HPF (Abnormal)                                                                                    ›

Date:  Dec 18, 2018 12:43 p.m. MST                    Reference Range:  0 /HPF - 2 /HPF

**Non-Squamous Epithelial, UR**  Learn more about this 🖸

1-5 /HPF                                                                                                ›

Date:  Dec 18, 2018 12:43 p.m. MST                    Reference Range:  0 /HPF - 5 /HPF

**Mucus, UR**  Learn more about this 🖸

Present /HPF (Abnormal)                                                                                 ›

Date:  Dec 18, 2018 12:43 p.m. MST                    Reference Range:  None

**UR, CHEM/HEMO**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

**Sodium, UR**  Learn more about this 🖸

**25 mmol/L**                                                                                    ❯

**Date:**  Dec 18, 2018 12:43 p.m. MST

**Na, Normalized to Creat**  Learn more about this 🖸

**24 mmol/g creat**                                                                              ❯

**Date:**  Dec 18, 2018 12:43 p.m. MST                        **Reference Range:**  20 mmol/g creat - 225 mmol/g creat

**Potassium, UR**  Learn more about this 🖸

**39 mmol/L**                                                                                    ❯

**Date:**  Dec 18, 2018 12:43 p.m. MST

**K, Normalized to Creat**  Learn more about this 🖸

**41 mmol/g creat**                                                                              ❯

**Date:**  Dec 18, 2018 12:43 p.m. MST                        **Reference Range:**  15 mmol/g creat - 95 mmol/g creat

**Chloride, UR**  Learn more about this 🖸

**40 mmol/L**                                                                                    ❯

**Date:**  .Dec 18, 2018 12:43 p.m. MST

**Cl, Normalized to Creat**  Learn more about this 🖸

**44 mmol/g creat**                                                                              ❯

**Date:**  Dec 18, 2018 12:43 p.m. MST                        **Reference Range:**  30 mmol/g creat - 250 mmol/g creat

**Creatinine, UR**  Learn more about this 🖸

**94.1 mg/dL**                                                                                   ❯

**Date:**  Dec 18, 2018 12:43 p.m. MST                        **Reference Range:**  19.0 mg/dL - 280.0 mg/dL

View all for this result

## UR, MISCELLANEOUS

**Organic Acid Quant, UR**  Learn more about this 🖸

**See Report**                                                                                   ❯

**Date:**  Dec 19, 2018 05:30 a.m. MST

## STOOLS

**Occult Blood, ST**  Learn more about this 🖸

Positive (Abnormal)                                                                              ❯

**Date:**  Dec 25, 2018 06:58 p.m. MST                        **Reference Range:**  Negative

**Stool WBC Lactoferrin**  Learn more about this 🖸

**Negative**                                                                                     ❯

**Date:**  Dec 21, 2018 09:45 a.m. MST                        **Reference Range:**  Negative

## MISC LAB TESTS

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027938

**Procalcitonin, Sepsis**  Learn more about this 🔗

**0.1 ng/mL**       ❯

Date:  Dec 19, 2018 05:00 a.m. MST        **Reference Range:**  <= 0.5 ng/mL

**Esoteric Test Name**  Learn more about this 🔗

The value for this result cannot be displayed. Contact your provider to obtain this information.      ❯

Date:  Dec 19, 2018 05:00 p.m. MST

**Esoteric Test Status**  Learn more about this 🔗

**See Report**      ❯

Date:  Dec 19, 2018 05:00 p.m. MST

**Quest Nichols Misc Test Name**  Learn more about this 🔗

The value for this result cannot be displayed. Contact your provider to obtain this information.      ❯

Date:  Dec 18, 2018 06:45 p.m. MST

**Quest Nichols Misc Test Result**  Learn more about this 🔗

**REPORT**      ❯

Date:  Dec 18, 2018 06:45 p.m. MST

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027939

Gmail - Labs

M Gmail

Exhibit D

Jessica Kahraman <jmkahraman@gmail.com>

**Labs**
1 message

**Cindy Schneider** <cschneider@center4autism.org>
To: Jessica Kahraman <jmkahraman@gmail.com>

Sun, Jan 6, 2019 at 11:07 PM

Hi Jessica,

Here is a brief summary of Kenan's labs:

Kenan's liver function has deteriorated dramatically. One liver enzyme was low and one was normal on admission. Both AST and ALT are alarmingly elevated now.
He is profoundly vitamin D deficient
He became anemic while in the hospital, likely from multiple blood draws
His sedimentation rate improved—this is a marker of inflammation
His monocyte count is elevated—this may indicate a viral infection
His B12 level is elevated.
His branched chain amino acids are elevated. This means he was not getting enough B6. The active form of B6 is P5P, which would be even better.
His MCV is elevated. This indicates a B12 and/or folate deficiency, so I'm guessing it's folate. They will think he needs folic acid, but 5MTHF would be far superior. Does he have an MTHFR mutation?
He has no food allergies. This does not rule out sensitivities, which can still be significant.
As I thought, his mitochondrial tests are still very abnormal. This can occur with true mitochondrial disorders, malnutrition, illness, and/or toxic exposures.

K.K. needs a comprehensive mitochondrial workup and consultation with a metabolic specialist. Dr. Richard Frye, a neurologist at PCH, is an expert in this field. I can't think of anyone more qualified to investigate this possibility, and it is critical that they do. Mitochondrial disorders can present as heart disease.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027940

## SUPERIOR COURT OF THE STATE OF ARIZONA
## MARICOPA COUNTY JUVENILE COURT

CHRIS DEROSE, CLERK
BY _____ DEP
**FILED**

In the Matter of    <u>Person or Persons under 18 years of age</u>

**2019 JAN -8  PM 5: 17**



| | |
|---|---|
| <span style="background:black">D.K.</span> Kahraman (09/27/2012) | ) |
| Kenan Kahraman (09/27/2012) | ) |
| | ) |
| | ) |
| | ) |
| | ) |

JD **532206**

### COMPLIANCE WITH RULE 47.3 OF
### THE ARIZONA RULES OF JUVENILE
### COURT PROCEDURE

In the Matter of   <u>Parents</u>

| | | |
|---|---|---|
| Jessica Kahraman (08/29/1972) | ) | **Mother** _____ |
| Ahmet Kahraman (04/18/1981) | ) | **Father** _____ |
| | ) | **Father** _____ |
| | ) | **Father** _____ |
| | ) | **Father** _____ |

The Court has reviewed the paperwork provided in support of the Arizona Department of Child Safety's Petition for Dependency.  The Court finds that the Department:

✓ ____HAS

____HAS NOT

complied with Rule 47.3 of the Arizona Rules of Juvenile Court Procedure.

This Order shall remain in full force and effect until further order of the Court.

1-4-2019

_____
Date

_____
Honorable
Superior Court Judge

Docket Code: DOC – Document
(LRD: 09/17/18)



EXHIBIT
207
BELL
8-23-24

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027617

Clerk of the Superior Court
*** Electronically Filed ***
1/10/2019 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                          1/9/2019

                                          CLERK OF THE COURT
HON. DAVID K. UDALL                            M. Brady
                                               Deputy

IN THE MATTER OF:

D.K.          KAHRAMAN            MEGAN J HAYWOOD
F1149031
DOB: 9/27/2012
K.K.          KAHRAMAN
F1149032
DOB: 9/27/2012

                                 LISA BODDINGTON

                                 BERNADETTE BURICK

                                 JESSICA WREN KAHRAMAN
                                 1718 S LONGMORE UNIT 95
                                 MESA AZ 85202

                                 SUZANNE M NICHOLLS

                                 AHMET KAHRAMAN
                                 1718 S LONGMORE UNIT 95
                                 MESA AZ 85202

                                 FOSTER CARE REVIEW BOARD
                                 DCS SPECIALIST - CENTRAL REGION
                                 LEGAL ADVOCATE-JUVENILE
                                 LEGAL DEFENDER-JUV-SEF
                                 PUBLIC ADVOCATE-JUVENILE-
                                 DEPENDENCY

PRELIMINARY PROTECTIVE HEARING

**EXHIBIT 208**
BELL
8-23-24 nhp

Docket Code IDH                Form JDInitDepHrg                Page 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028165

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                        1/9/2019

INITIAL DEPENDENCY HEARING
DEPENDENCY CONTESTED

9:29 a.m.  This matter is digitally recorded in Courtroom 6.

This is the time set for Preliminary Protective Hearing on a Dependency Petition filed 1/3/2019.

This is also the time set for Initial Dependency Hearing on a dependency petition filed 1/3/2019.

Present:  Assistant Attorney General Katie Martoncik; Guardian ad Litem for the children, Megan Haywood; DCS Child Safety Specialist, Sarah Kramer and Madison Bell; proposed counsel for Mother, Bernadette Burick; proposed counsel for Father, Suzanne Nicholls; Mother, Jessica Kahraman; Father, Ahmet Kahraman; friends of family.

The Court is advised the Preliminary Protective Conference did not proceed.

All attendees of the hearing are admonished by the Court from disclosing any personally identifiable information mentioned in the proceedings and that doing so shall be deemed in contempt of court.

LET THE RECORD REFLECT that the Department, through their agent, has provided Mother and Father with a copy of the dependency petition.

IT IS ORDERED affirming the appointment of Megan Haywood as guardian ad litem for the children, D.K. Kahraman and K.K. Kahraman, in all further proceedings in this matter.

Mother makes an oral request to represent herself in all further proceedings.

Father makes an oral report to represent himself in all further proceedings.

Upon inquiry by the Court, Mother and Father both deny having taken any drugs, alcohol or medication affecting lucidity within the last twenty-four (24) hours.

Mother and Father are advised of their rights to counsel in this matter.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028166

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    1/9/2019

Mother and Father both advise the Court that the contemplated waiver is not the result of any force, threats or promises.

THE COURT FINDS that Mother and Father both understand their rights and have knowingly, intelligently, and voluntarily chosen to waive their right to counsel and proceed on their own behalf in all further proceedings.

IT IS ORDERED relieving Suzanne Nicholls and the Office of the Public Advocate as counsel of record for Father in all further proceedings.

IT IS ORDERED relieving Bernadette Burick and the Office of the Legal Defender as counsel of record for Mother in all further proceedings.

Service is accepted and defects are waived by Mother and Father.

Mother and Father wish to contest the allegations of the petition.

IT IS ORDERED entering a denial to the petition on behalf of Mother and Father.

This matter is not subject to the Indian Child Welfare Act.

The Department moves to assign advisory counsel to Mother and Father.

Discussion is held.

IT IS ORDERED denying the request as Mother and Father request to proceed on their own behalf.

Services to be offered to Mother and Father will be psychological evaluations and therapeutic visitation. Visitation is available while a therapeutic visitation provider is assigned.

Form I, Notice to Parent in Dependency Action, is read and provided to both parents. Mother and Father indicate their understanding of same.

IT IS ORDERED continuing the children, D.K. ███ Kahraman and K.K. ███ Kahraman, as temporary wards of the Court, committed to the care, custody and control of the Department of Child Safety.

Docket Code IDH                    Form JDInitDepHrg                    Page 3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028167

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    1/9/2019

THE COURT FINDS that the Department of Child Safety has made reasonable efforts to prevent the removal of the children from the home and that continuation in the home would be contrary to the welfare of the children, or that it was reasonable to make no efforts to maintain the children in the home.

IT IS ORDERED setting this matter for Conference - Pretrial - Contested Dependency regarding the parents

on      1/29/2019
at      9:00 AM
before  Honorable David K. Udall
at the Maricopa County Juvenile Court Center
Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

NOTICE

If a party fails to appear for the Pretrial Conference, the failure to appear may be deemed as an admission to all the facts in the petition and the Court may proceed to an adjudication of the ultimate issues.

If the petitioner fails to appear, the failure to appear may be deemed as a failure to prosecute and this matter may be dismissed.

If a party or a party's attorney fails to obey a pretrial order, or fails to appear at a Pretrial Conference, or is substantially unprepared to participate in the Conference or if a party or party's attorney fails to participate in good faith, the Court, upon motion or on its own initiative, may make such orders with regard to such conduct as are just, including among others, any of the orders provided in Rule 44 of the Rules of Procedure for the Juvenile Court.

The Department provides the Court, Mother and Father with a Motion for Protective Order.

Discussion is held.

Over Mother and Father's objection,

IT IS ORDERED granting DCS's Motion for Protective Order all in accordance with the formal written Order signed by the Court on 1/9/2019 and filed (entered) by the Clerk on 1/9/2019.

Docket Code IDH                    Form JDInitDepHrg                    Page 4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028168

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    1/9/2019

IT IS ORDERED that Mother, Father, representatives and/or interested parties shall remove any personal identifying information, photographs, etc. that have been posted online.

IT IS FURTHER ORDERED Mother, Father, representatives and/or interested parties shall not post any personal identifying information, photographs, etc. online.

IT IS ORDERED affirming the Dependency - Permanency Planning/Age 3-17 Years

on      11/18/2019
at      8:30 AM
before  Honorable David K. Udall
at the Maricopa County Juvenile Court Center
Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

This Courtroom utilizes an electronic recording system for the Court's record. If a court reporter is needed, a written request must be filed with the Clerk of the Court and a copy provided to the assigned judicial officer at least 72 hours before the commencement of the proceeding.

To order a copy of the audio record on compact disc (CD), please call Juvenile Court Administration (Durango facility - 602-506-4533/Southeast facility - 602-506-2544). There will be a fee of $30 for each copy of the Superior Court proceedings. All copies will be provided using Court-supplied media.

9:44 a.m.  Court adjourns.

Filed:
        Mother for Protective Order
        Order Granting DCS's Motion for Protective Order
        Verification

WARNING

As a parent, it is your responsibility to cooperate with all services offered, and work toward return of your children. A failure to do so, within a reasonable period of time, may mean losing your children forever through termination of your rights and adoption.

Docket Code IDH                    Form JDInitDepHrg                    Page 5

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028169

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                          1/9/2019

IT IS ORDERED, pursuant to Arizona Revised Statutes, that any and all schools, school districts and personnel thereof shall fully cooperate with juvenile probation officers, DCS child safety specialists, and attorneys or guardian ad litem or Court appointed special advocates representing a child in a dependency or delinquency action by allowing access by them to all educational records of the child, including but not limited to records pertaining to school, attendance, behavior, academic progress, and psychological evaluations, and shall discuss the contents and meaning thereof with them to assist them in the preparation, implementation, and completion of a rehabilitation and treatment plan for the child.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028170