**EXHIBIT** 226
BELL
8-23-24

1   OFFICE OF THE PUBLIC ADVOCATE
2   Suzanne M. Nicholls, State Bar No. 027121
    106 East Baseline Road, 1st Floor
3   Mesa, Arizona 85210
    (602) 372-2815
4   Fax: (602) 372-8919
5   Email: suzanne.nicholls@maricopa.gov

6   *Attorney for Father*

7          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8              IN AND FOR THE COUNTY OF MARICOPA

9                        JUVENILE DIVISION

10

11  In the Matter of:                    CASE NO: JD532206

12  DYLAN KEMAL KAHRAMAN,          **EMERGENCY MOTION FOR COURT**
    D.O.B. 09/27/12                **ORDER TO HAVE THE CHILDREN SEEN**
13                                 **BY DR. MELANIE ALARCIO, PEDIATRIC**
    KENAN TROY KAHRAMAN,           **NEUROLOGIST, AND TESTED AND**
14  D.O.B. 09/27/12                **TREATED FOR TOXINS UNDER HER**
15                                 **CARE**

16                                 **EXPEDITED RULING REQUESTED**

17
                                   **CONTESTED**
18
19  Person(s) under 18 years of age.   (Honorable Jennifer E. Green)

20          COMES NOW, Father, AHMET KAHRAMAN, by and through undersigned

21  counsel, hereby respectfully requests this Court grant his request that the Children,

22
    Dylan and Kenan, be seen by Dr. Melanie Alarcio, pediatric neurologist, and be tested
23
24  and treated for toxins under her care as may be appropriate as quickly as possible. The

25  reasons for this Motion are set forth below.

26          The Children were taken into custody by the Department of Child Safety

27
    (Department or DCS) on or about December 28, 2018, based on DCS's allegations that
28

the parents were medically neglecting the Children. DCS claims that the parents over-treated and/or under-treated medical conditions with the Children. The Children have suffered numerous symptoms and conditions over their lifetime leading the parents to seek out treatment of the Children by numerous doctors in an effort to help the Children get well and live a normal life. The parents have denied and continue to deny any mistreatment of the Children. Instead, the parents continue to try to seek out answers to help the Children get healthy and flourish.

To this end, after the Children were taken by DCS, the parents discovered that there was a leak present in the wall between the Children's bedroom and bathroom, in the long-time family home, which also tested positive for serious strains of mold. (*See* MoldEx Report, dated 4/12/19, attached hereto as Exhibit 1 and incorporated by reference herein; Environmental Testing Group, Inc. MI&T Report, dated 5/2/19, attached hereto as Exhibit 2 and incorporated by reference herein.) The presence of these serious strains of mold constituted a health hazard requiring the parents to move out of the family home while remediation took place.

On April 22, 2019, the parents notified DCS (providing a mold report) and requested that the Children be immediately tested for the toxins as it could explain their health conditions and lead to proper treatment. (*See* Email from S. Nicholls to K. Martonick, et al., dated 4/22/19, attached hereto as Exhibit 3 and incorporated by reference herein.) The parents also requested the Department use Dr. Malenie Alarcio, a pediatric neurologist formerly with Phoenix Children's Hospital, to conduct the tests and any necessary follow up treatment based on information that she is a local specialist who is well-versed in and experienced in this area. (*Id.*) Subsequently, undersigned

counsel also filed the report from MoldEx in a Notice of Disclosure on May 6, 2019, which was sent to all the parties.

While remediation work was underway and awaiting a response from DCS, another leak and more mold was found in another part of the family home requiring further remediation. (*See* Environmental Testing Group, Inc. MI&T Report, dated 5/15/19, attached hereto as Exhibit 4 and incorporated by reference herein.) Both reports from Environmental Testing Group, Inc. MI&T were also filed with the Court in a Notice of Disclosure, dated May 21, 2019, and provided to the parties.

After receiving no response from DCS or its attorney, Father's counsel had an in-person conversation with DCS's assigned attorney on or about May 17, 2019. Father's counsel again requested that DCS conduct the necessary testing and that the Children be seen by Dr. Alarcio stressing that time is of the essence. It was not until May 28, 2019, that DCS responded at all to the parents' request. (*See* Email between K. Martonick and S. Nicholls, et al, dated 5/28/19 to 6/6/19, attached hereto as Exhibit 5 and incorporated by reference herein.) The Department's response consisted of asking for the parents' blood work and indicating that the DCS doctors indicated there are no blood tests that can be done. (*Id.* at pp 4-5.)

In response, Father's counsel provided a list of specific blood tests that can be performed, as identified by Dr. Alarcio, to identify these type of toxins. (*Id.* at 3.) Father again requested the Children be seen by Dr. Alarcio, stressing the importance and urgency of getting this testing done, based on Dr. Alarcio's indication that it can take upwards of 30 days to get these blood results back and that the farther you go out from exposure can, of course, affect the outcome of the tests. (*Id.*) Father also requested a

specific reason why DCS is refusing to have the Children seen by Dr. Alarcio (*id.*), which DCS still has not provided.

A letter from the family physician was also provided to the parties and filed with the Court, in a Notice of Disclosure on June 7, 2019, which further stresses the necessity and importance of having the Children tested and treated for the mold exposure. (*See* Letters from Scott Jensen, MD, Jensen Family Medicine, re: Kenan and Dylan, dated 6/3/19, attached hereto as Exhibit 6 and incorporated by reference herein.) In addition, Mother's physician is treating Mother for the mold exposure and concurs with the necessity of the Children receiving testing and treatment. (*See* Lettter from Ronald Peters, MD, MPH, MindBody Medicine Center, dated 6/7/19, attached hereto as Exhibit 7 and incorporated herein.)

During this time, parents' counsel consulted with Dr. Alarcio who verified that mold exposure could explain the issues the Children have had/are having, and that she would want to review the Children's medical history and records, perform the necessary blood work, complete an exam of the Children, along with any other necessary medical procedures/processes to make the determination. Dr. Alarcio spent approximately five years as an Attending Physician at Phoenix Children's Hospital, Division of Child Neurology; currently is a Partner/Pediatric Neurologist locally at AZ NeuroRecovery Treatment Innovation Center, LLC; and has been practicing doctor now for over 30 years specializing in pediatric neurology. (*See* Cirriculum Vitae for Melanie Ann C. Burgo-Alarcio, MD, FMAPS, attached as Exhibit 9 and incorporated by reference herein.) Parents invited DCS and/or its attorney to reach out to Dr. Alarcio to verify this

information (*see* Exhibit 5 at p. 3); but it is unclear if they have taken the opportunity to do so.

Numerous doctors have now indicated that the presence of the severe mold in the family home could very well explain most, if not all, of the Children's symptoms and conditions, and that identification and treatment is necessary to their health and well-being. Further, since that time, more mold was identified in another area of the home requiring a third remediation which is ongoing. (*See* Environmental Testing Group, Inc. MI&T Report, dated 6/8/19, attached hereto as Exhibit 8 and incorporated by reference herein.)

To date, DCS has failed to explain why: (1) it is not immediately having the necessary blood work done; (2) it will not allow Dr. Alarcio to see the Children, review their medical records to date, and perform the necessary blood work to determine proper diagnoses and course of treatment. Instead, it has simply objected to the parents' repeated and reasonable requests without any explanation. (*See* Exhibit 5.) DCS is interfering in the proper care and treatment of the Children and are preventing the parents from demonstrating that they are not medically neglecting or otherwise mistreating their Children. DCS is not acting in the best interest of the Children by refusing and/or causing significant delay in the necessary testing and treatment of the Children.

Based upon all of the above, Father respectfully requests this Court grant his request that the Children, Dylan and Kenan, be seen by Dr. Melanie Alarcio, pediatric neurologist, and be tested and treated for toxins under her care as may be appropriate.

Positions were requested from all of the parties via email on June 6, 2019.

Kathleen Martoncik, Attorney for the Department, **objects**; DeeAn Gillespie, Attorney for Mother, **concurs and joins in the Motion**; and Kinda Johnson-Hurd, Guardian ad Litem for the Children, has not responded as of the time of the signing of this Motion.

Respectfully submitted this _18th_ day of June, 2019.

_____
Deputy Public Advocate

ORIGINAL filed this _18th_ day of June, 2019, and a COPY delivered to:

Honorable Jennifer E Green
Maricopa County Superior Court
1810 S LEWIS COURTROOM 3 STE 1077
Mesa, AZ 85210

COPIES electronically delivered
this _18th_ day of June, 2019, to:

Kathleen Martoncik
Gregory Coordes
Assistant Attorney General
PSSSEF@azag.gov; kathleen.martoncik@azag.gov; gregory.coordes@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
JohnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

DeeAn Gillespie
DGillespie@gillaw.com; Mailroom@gillaw.com
*Attorney for Mother*

Madison Bell
DCS Case Manager
madison.bell@azdcs.gov

By _____

KAHRAMAN007060

6

OFFICE OF THE PUBLIC ADVOCATE
Suzanne M. Nicholls, State Bar No. 027121
106 East Baseline Road, 1st Floor
Mesa, Arizona 85210
(602) 372-2815
Fax: (602) 372-8919
Email: suzanne.nicholls@maricopa.gov
*Attorney for Father*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

JUVENILE DIVISION

| | |
|---|---|
| In the Matter of: | No. JD532206 |
| DYLAN KEMAL KAHRAMAN, <br> D.O.B. 09/27/12 <br> KENAN TROY KAHRAMAN, <br> D.O.B. 09/27/12 | **ORDER CHILDREN BE SEEN BY DR. MELANIE ALARCIO, PEDIATRIC NEUROLOGIST, AND TESTED AND TREATED FOR TOXINS UNDER HER CARE** |
| Person(s) under 18 years of age. | (Honorable Jennifer E. Green) |

Having reviewed Father's Motion,

**IT IS ORDERED** granting Father's motion.

**IT IS FURTHER ORDERED** that DCS shall immediately work to have the Children seen by Dr. Melanie Alarcio, including any testing and treatment she determines is appropriate;

**IT IS FURTHER ORDERED** that DCS shall supply Dr. Alarcio with any and all of the Children's medical or other records as Dr. Alarcio deems necessary in the treatment and care of the Children.

Signed this date _____

_____
Superior Court Juvenile Division

CLERK OF THE
SUPERIOR COURT
FILED

K. Rosenow    DEP

2019 JUN 19  PM 4: 06

1    MARK BRNOVICH
2    Attorney General

3    KATHLEEN E. MARTONCIK
4    Assistant Attorney General
     State Bar No. 023982
5    CFP/PSS
     120 W. 1st Avenue, 2nd Floor
6    Mesa, Arizona 85210
7    Telephone: (602) 771-4000
     PSSSef@azag.gov
8
9    Attorneys for the Department of Child Safety

10              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11              IN AND FOR THE COUNTY OF MARICOPA

12   In the Matter of:                    No. JD532206
13
14   ▮D.K.▮▮▮▮ KAHRAMAN            **DCS'S OBJECTION TO FURTHER**
         d.o.b. ▮▮▮ 2012           **UNNECESSARY MEDICAL**
15   KENAN TROY KAHRAMAN           **PROCEDURES**
         d.o.b. ▮▮▮ 2012
16
17   Person(s) under 18 years of age.   (Honorable Jennifer E Green)

18        The Department of Child Safety (DCS or the Department), by and through

19   undersigned counsel, hereby objects to the parents' request to submit ▮D.K.▮▮▮

20   KAHRAMAN and ▮K.K.▮▮▮ KAHRAMAN to additional blood testing to test for
21
22   mold exposure and further examination by Dr. Alarcio.  The Department's objection is

23   supported by the opinions medical personnel currently treating the children.  6/7/2019

24   Medical Note from D. Miga, attached hereto as Exhibit 1 and incorporated herein by

25   reference; 6/6/1019 Letter from E. Rattle, attached hereto as Exhibit 2 and incorporated

26   herein by reference.
27

28

EXHIBIT 227
BELL
8-23-24 MHb

When these children came into care, they were severely malnourished, resulting in K.K. experiencing near-fatal congestive heart failure. At the time they came into care, both boys were using wheelchairs despite the fact that there was no documented medical reason for the use of wheelchairs. Dylan's physical therapist noted that his range of motion and seated exercises were normal and D.K. did not note any pain when doing exercises in a seated or prone position. It was further noted that Dylan's refusal to ambulate was likely the result of deconditioning. D.K. was noted to indicate pain only when prompted by Mother.

Mother publicly claimed that the boys had autism, food intolerances, unexplained immobility, and other health problems. She noted suspected causes such as the use of white board markers in the children's classroom, which resulted in her removing them from school. Parents now claim that the health issues suffered by the boys are the result of mold exposure.

The treating medical professionals have indicated that there is no blood test that would definitively determine whether the children were exposed to mold. There are tests to determine whether the children are allergic to mold and there is a special read of Kenan's echocardiogram to determine whether there was fungus in the heart, which might lead to the conclusion that his cardiac issues were linked to mold exposure. When DCS responded to the parents with this information and asked for the parents' blood tests, which would have shed light on whether there were additional tests that the treating professionals might have overlooked, the response was that parents had not had testing performed. *See* Exhibit 5 to Father's motion. Now, attached to Father's motion, there is

information that Mother had a *urine* test[1] done that gave information to her treating physician about the likelihood of exposure to mold. *See* Exhibit 7 to Father's motion. Furthermore, upon reaching out to Dr. Alarcio's office to inquire further about the type of testing that she envisioned for the boys, the DCS case manager was told that Dr. Alarcio would not have any conversation with DCS about the anticipated testing or treatment without DCS paying her a consulting fee. Given the past unnecessary treatments under parents' care and the vastly improved condition of the children since they have been removed, DCS is hesitant to submit these children to further unnecessary medical testing and evaluation without excellent reason. Dr. Alarcio has refused to provide any reason or explanation at all and the medical providers currently treating the children indicate that the requested evaluation is, indeed, unnecessary.

Dr. Miga has had the specialized read of Kenan's echocardiogram conducted and specifically indicates that there is no indication that ▮K.K.▮ s heart failure was due to mold exposure. Exhibit 1. Dr. Miga further stands by his opinion that the harm to ▮K.K.▮ was specifically the result of malnutrition at the hands of the parents. *Id*. Both Dr. Miga and treating physician's assistant Elizabeth Rattle indicate that there is no need for further unnecessary testing. *Id*.; Exhibit 2. Parents' current request is an attempt to reach through the dependency case to continue the medical neglect of these children. The children are presently making not disrupt the progress the children are making excellent progress and that progress should not be disrupted by again subjecting them to

---

[1] After receiving the information about the urine test conducted for Mother, DCS has reached out to the treating medical professionals to determine whether they believe that it is in the children's best interest to conduct the mycotoxin urine test identified by Mother's medical records.

unnecessary medical evaluations.  Mother's own physician has already foreshadowed the result if the children tests are normal by claiming that any progress the children have made is the result of having been removed from the mold exposure.  This myopic explanation does not take into consideration the malnutrition the children suffered, the fact that there is no fungal growth in Kenan's heart, or the fact that even before removal Dylan's physical therapist was noting concerns that there was no physical explanation for his refusal to walk.  The Department respectfully requests that the Court continue to protect these children from over medicalization and deny parents' requests.

RESPECTFULLY SUBMITTED this __19__ day of June, 2019.

MARK BRNOVICH
Attorney General

for KATHLEEN E. MARTONCIK
Assistant Attorney General
Robert Kupec #010656

CLERK OF THE
SUPERIOR COURT
FILED

S. Mohammed DEP

2019 JUN 25 AM 11: 19

EXHIBIT 228

BELL
8-23-24

1  ROSE MARIE PENA-LYNCH
   Office of the Legal Advocate
2  KINDA V. JOHNSON-HURD
   Deputy Legal Advocate
3  State Bar No. 027621
   3800 North Central, Suite 1500
4  Phoenix, AZ  85012
   (602) 506-4131
5  johnsonk010@mail.maricopa.gov

6  Guardian ad Litem for the Minor Child

**Office
of the
Legal
Advocate**

Firm Bar No. 441200

3800 North Central
Suite 1500
Phoenix, AZ  85012

(602) 506-5379

Fax
(602) 506-0019

7          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8              IN AND FOR THE COUNTY OF MARICOPA

9

10  In the matter of:                    No. JD532206

11  DYLAN KEMAL KAHRAMAN          **GAL's RESPONSE TO FATHER'S
    d.o.b. ████ 2012               EMERGENCY MOTION FOR COURT TO
12                                  HAVE THE CHILDREN SEEN BY DR.
                                    MELANIE ALARCIO, PEDIATRIC
    K.K. ████ KAHRAMAN             NEUROLOGIST, AND TESTED AND
13  d.o.b. ████ 2012               TREATED FOR TOXINS UNDER HER
                                    CARE**
14

15  Person(s) under 18 years of age.   (Honorable Jennifer E. Green)

16

17          The Guardian ad Litem (GAL), objects in part and agree in part to the

18  Father's Emergency Motion for the Court to have the children seen by Dr. Melanie

19  Alarcio and tested and treated for toxins under her care.  There has been confirmed

20  testing of mold exposure in the home where the children were residing.  A second

21  opinion seems reasonable in such case.

            Father argues that the parents should be allowed to show that they did not neglect

    their children.  According to A.R.S. §8-846(A),…if a child has been removed from the

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031343

**Office**
**of the**
**Legal**
**Advocate**

Firm Bar No. 441200

3800 North Central
Suite 1500
Phoenix, AZ 85012

(602) 506-5379
Fax
(602) 506-0019

1  home, the court shall order the department to make reasonable efforts to provide services

2  to the child and the child's parents.  Further under Subsection (B) it provides that "If the

3  court determines that services supplemental to those provided through the Department

4  are available from another source at no cost to this state, the court may order the services

5  on agreement of the provider.

6      In this case, the Department have had the children seen by a provider whose

7  opinion is that the children do not require additional testing for mold exposure.   The

8  parents disagree with this assessment and are thus, requesting for the Department to

9  allow a second provider make an assessment. The Department should not be responsible

10  for payment of any additional review of the mold exposure, which was satisfied with

11  Dr. Miga.  However, the parents' rights are still intact in this matter and should be

12  considered to an extent.  If the parents would like a second opinion that should provide

13  all records and prior testing to the doctor of their choice and have that doctor make a

14  written opinion.  It is understandable that the Department pauses at the parents' medical

15  requests  due  to  the  allegations  of  this  case.    Additionally,  there  has  been  no

16  documentation provided from the doctor recommended by the parents that he/she is of

17  the medical opinion that testing of the children is necessary at this stage.

18      While I agree, that the children should not be subjected to any unnecessary

19  testing, a second opinion by an independent physician may be necessary in this case.    I

20  suggest that the all medical records, medical opinions, home mold testing and treatment

21  documents, past medical testing, and past treatment be provided to an on-staff Phoenix

Children Hospital specialist who practices in the applicable area of medicine in order to

2

AZ-KAHRAMAN031344

**Office**
**of the**
**Legal**
**Advocate**

Firm Bar No. 441200

3800 North Central
Suite 1500
Phoenix, AZ 85012

(602) 506-5379
Fax
(602) 506-0019

1  make a recommendation of whether the children should require additional testing or

2  assessment. If there is an associated fee for an additional assessment, payment should

3  be at the expense of the parents as they are the parties requesting the additional opinion

4  and the Department has provided reasonable efforts in obtaining medical treatment of

5  the children. That physician should make a written determination of his/her

6  recommendations, recommendations should be disclosed to all parties in a reasonable

7  time, and parties should comply with those recommendation.

8  Therefore, the GAL is not in agreement with Father's motion of the

9  specific doctor named but, is in agreement that a second opinion by a third party doctor

10  be conducted to determine if additional testing is necessary at this point.

11  RESPECTFULLY SUBMITTED this 25th day of JUNE, 2019.

12

13  ROSE MARIE PENA-LYNCH
OFFICE OF THE LEGAL ADVOCATE

14

15  By _____

16  Kinda V. Johnson-Hurd
Deputy Legal Advocate

17

18

19

20

21

3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031345

**Office
of the
Legal
Advocate**

Firm Bar No. 441200

3800 North Central
Suite 1500
Phoenix, AZ 85012

(602) 506-5379
Fax
(602) 506-0019

1   Original of the foregoing filed
    this of 25ᵗʰ day of JUNE 2019, to:

2

3   Copy of the foregoing Petition and
    Notice of the Hearing electronically and hand-delivered

4   this 25ᵀᴴ day of JUNE, 2019 to:

5   Honorable Jennifer E. green
    Maricopa County Superior Court

6   Juvenile Court Southeast Facility
    1810 South Lewis Street

7   Mesa, Arizona 85210

8   Clerk of the Court
    Maricopa County Superior Court

9   Juvenile Court Southeast Facility
    1810 South Lewis Street

10   Mesa, Arizona 85210

11   Kathleen Martoncik
    kathleen.martoncik@azag.gov

12   Assistant Attorney General

13   DeeAn Gillespie Strub
    DGillespie@gillaw.gcom

14   Attorney for Mother

15   Suzanne M Nicholls
    Suzanne.nicholls@maricopa.gov

16   Attorney for Father

17   Madison Bell
    Madison.bell@azdcs.gov

18   Case Manager

19

20   by _____

21

4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031346



EXHIBIT 229
BELL
8-23-24  MHD

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

Clerk of the Superior Court
*** Filed ***
8:00 AM

JUN 26 2019

JD532206                                              6/25/2019

                                                CLERK OF THE COURT
HONORABLE JENNIFER E. GREEN              K. Scanlon
                                                Deputy

IN THE MATTER OF:

D.K.          KAHRAMAN              KINDA  JOHNSON-HURD
  F1149031
  DOB: 9/27/2012
KENAN TROY KAHRAMAN
  F1149032
  DOB: 9/27/2012


                                        KATHLEEN  MARTONCIK

                                        DEEAN  GILLESPIE STRUB

                                        SUZANNE M NICHOLLS


                                        CASA
                                        DCS SPECIALIST - CENTRAL REGION


                              RULING

        The court has received Father's Emergency Motion for Court Order to Have the Children
Seen by Dr. Melanie Alarcio, Pediatric Neurologist, filed June 18, 2018; DCS's Objection, filed
June 19,2019; and Guardian Ad Litem (GAL)'s Response to Father's Emergency Motion, filed
June 25, 2019.   Mother agreed with Father's position.

        Father asked the court to rule on this in an expedited fashion; the court is leaving on its
summer vacation tomorrow for 1.5 weeks, and as such, will rule on this matter today. The court
is concerned that delaying ruling on this motion until the court returns on July 8, 2019 could
impact the potential testing requested, and the trial dates set for August 12, 13, and 14, 2019,
which were set on February 13, 2019.

        Father asked the court to order the children be seen by Dr. Melanie Alarcio, a pediatric
neurologist, for the purpose of testing the children for toxins related to mold exposure in the

Docket Code ORDERENTERED        Form XPJDBlankME                        Page 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER                            AZ-KAHRAMAN031268

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              6/25/2019

parents' home. Father asked the court to order this "as quickly as possible." (Motion at
1.) Father asserted that Dr. Alarcio identified specific tests that "can be done to test for several
markers in the blood, including, but may not be limited to: TGF Beta 1, MSH, VEGF, MMP9,
plus HLA DRB1, DRB345 and DQB1." (Exhibit 5 attached to Father's Motion at 3.) The court
is concerned that this list of tests Father asked the court to order did not come directly from Dr.
Alarcio herself, and that the request was characterized as tests that "can be done" rather than
tests that were recommended by Dr. Alarcio for a specific medical purpose. Father's request is
also supported by Dr. Scott Jensen, who generically asserted the children's mold exposure could
explain muscle weakness and lethargy. (Exhibit 6 attached to Father's Motion.) He urged "[i]t
is imperative they be evaluated and this be explored further." (Id.) Father's request was also
supported by Dr. Ronald Peters, Mother's physician, who suggested the boys receive "urinary
mycotoxin tests to confirm the diagnosis" and that Dr. Alarcio conduct the evaluation, which
should include genetic markers for "susceptibility to mold-related illness." (Exhibit 7 to Father's
Motion.)

       DCS objected. DCS urged the court to deny the request for additional testing for the
following reasons: 1) the children's treating doctor and physician's assistant (PA) "have
indicated that there is no blood test that would definitively determine whether the children were
exposed to mold" (DCS's Response at 2); 2) parents refused to provide their own blood tests
(Id.); 3) attempts to discuss the matter with Dr. Alarcio were met with a demand for payment by
Dr. Alarcio (Id. at 3); and 4) parents have not identified a compelling reason to subject the
children to additional testing, especially given the fact that the children have improved
dramatically after being removed from the parents' home (Id.). The children's treating pediatric
cardiologist, Dr. Daniel Miga, explained that Kenan's health issues were due to malnutrition by
the parents, and both he and the PA, Elizabeth Rattle, asserted that further testing is
unnecessary. (Id.) Dr. Miga stated in his clinical note that "[Kenan's] parents raised the
concern his pulmonary hypertension was related to mold exposure. He has had multiple
echocardiograms as part of his evaluation and there has never been any evidence of a fungal
infection. . . There is no evidence his condition is related to mold exposure and there is no
indication to obtaining testing regarding this issue." (Exhibit 1 to DCS's Response.) Elizabeth
Rattle of Angel Pediatrics opined that "I do not see a need for further bloodwork to check for
mold. Both boys are thriving and doing very well now and very unlikely that mold contributing
to their previous symptoms." (Exhibit 2 to DCS's Response.)

       The court is presented with conflicting evidence about whether additional testing is
appropriate. Although Dr. Peters recommended "urinary mycotoxin tests," these were not the
tests recommended by Dr. Alarcio. Further, he recommended testing for genetic markers. The
court is unfamiliar with such testing, however, the issue remains: how would identifying genetic
markers for "susceptibility to mold-related illness" assist the court in determining whether mold,

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031269

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    6/25/2019

not malnutrition, played a role or was the cause of the boys' muscle weakness and lethargy?
Finally, is Dr. Peters aware of the echocardiogram testing already done by Dr. Miga, and if so,
does that testing suggest any reason for additional testing?

The GAL offered a unique solution: allow a PCH specialist who has no prior
involvement with this case review all of the medical records, and make a recommendation as to
whether additional testing is warranted. The court does not want to subject the children to
unnecessary testing, but also wants the parents to get their fair opportunity to explore the mold
issue. The court finds the solution suggested by the GAL strikes a balance between these two
important concerns. Other questions arise: 1) are the tests suggested by Dr. Alarcio generally
accepted in the medical community to give the court guidance as to whether the children have
been exposed to mold? and 2) would it be helpful to have the parents tested?

The court finds that having an experienced physician associated with PCH but not
associated with this case review the records and render a recommendation. An independent
review will give the court critical guidance in assessing whether additional testing is warranted.

IT IS ORDERED that DCS will facilitate an assessment by a physician to determine *if
additional testing is warranted* to determine if the children have been exposed to mold.

IT IS FURTHER ORDERED that DCS will identify a physician employed by Phoenix
Children's Hospital who has not had prior involvement in this case to conduct the review.

IT IS FURTHER ORDERED that if there is an expense for this assessment (not the
additional testing, if additional testing is recommended), DCS will bear that expense.

IT IS FURTHER ORDERED that DCS will provide to the reviewing physician the
following: copies of the children's medical records related to the reasons for removal; relevant
parents' medical records; letters from physicians who have supported or declined to support
additional testing for mold exposure; the mold report for the parents' residence; emails from
counsel for Father that suggest what tests Dr. Alarcio believes are appropriate in this case; and
the first and most recent DCS court reports.

IT IS FURTHER ORDERED issuing a protective order on the DCS court reports
disclosed to the physician and her staff in this matter. No one is to disseminate any information
contained in the reports to anyone unconnected with the review as set forth in this order. All
DCS court reports are to be shredded within 30 days of completion of the assessment.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031270

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    6/25/2019

IT IS FURTHER ORDERED that because trial is set for August 12-14, 2019 in this matter, that the assessment must be completed and DCS will disclose it to the court and all parties by the close of business on **Friday, July 26, 2019.**

IT IS FURTHER ORDERED that DCS work quickly to ascertain what PCH doctor would be qualified to conduct such an assessment consistent with this order, and disclose the name of the person identified to all parties as soon as is practical.

IT IS FURTHER ORDERED that DCS work quickly to gather all relevant material set forth above in order to expedite the review of all of the records, and that DCS disclose to all parties what material it has collected for the doctor's review prior to the doctor's review to allow the parties to supplement the material, if appropriate.


Jun 25, 2019
DATE                          HONORABLE JENNIFER E. GREEN


Docket Code ORDENTERED          Form XPJDBlankME                    Page 4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031271

1   OFFICE OF THE PUBLIC ADVOCATE
2   Suzanne M. Nicholls, State Bar No. 027121
    106 East Baseline Road, 1st Floor
3   Mesa, Arizona 85210
    (602) 372-2815
4   Fax: (602) 372-8919
    Email: suzanne.nicholls@maricopa.gov
5
6   *Attorney for Father*





7           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
8
9               IN AND FOR THE COUNTY OF MARICOPA
10
                        JUVENILE DIVISION
11
    In the Matter of:                    CASE NO: JD532206
12
    D.K.         KAHRAMAN,               **MOTION FOR RECONSIDERATION OF**
13  D.O.B.    12                         **RULING, DATED 6/25/19, RE: FATHER'S**
    K.K.         KAHRAMAN,               **EMERGENCY MOTION FOR COURT**
14  D.O.B.    12                         **ORDER TO HAVE THE CHILDREN SEEN**
                                         **BY DR. MELANIE ALARCIO, PEDIATRIC**
15                                       **NEUROLOGIST, AND TESTED AND**
16                                       **TREATED FOR TOXINS UNDER HER**
                                         **CARE**
17
18  Person(s) under 18 years of age.     **CONTESTED**
19                                       (Honorable Jennifer E. Green)
20
21          COMES NOW, Father, AHMET KAHRAMAN, by and through undersigned
22  counsel, respectfully requests the Court reconsider its Ruling, dated June 25, 2019, and
23  filed on June 26, 2019. It its Ruling, the Court denied Father's request that the Children,
24  D.K.   and K.K.   be seen by Dr. Melanie Alarcio to be tested and treated for
25  toxins as she may deem appropriate, and the Court's order requiring DCS to have
26  another doctor at Phoenix Children's Hospital (PCH) review documents to determine if
27
28  testing is necessary by July 26, 2019. The reasons for this Motion are set forth below.

Father incorporates by reference all facts and legal arguments set forth in the Emergency Motion, filed on June 18, 2019. In addition, Father believes it is important to clarify misstatements and/or misrepresentations made in DCS' filed objection which appear to have been relied upon by the Court in issuing its Ruling, and several concerns expressed by the Court.

First, on Page 2, Paragraph 1 of the Ruling, the Court expressed "concern that this list of tests Father asked the court to order did not come directly from Dr. Alarcio herself" and that the language chosen by Father's counsel included the statement, "tests that 'can be done' rather than tests that were recommended by Dr. Alarcio for a specific medical purpose." Father respectfully points the Court to Page 3, Lines 22 to 24 and Page 4, Lines 15 to 20 of Father's Emergency Motion to support the fact that Father, through undersigned counsel, was, in fact, attempting to relay that Dr. Alarcio did recommend that the tests outlined be performed during her phone consultation with Parents' counsel and based on the documents and information she had reviewed. In fact, Parents' counsel asked Dr. Alarcio if she would serve as a medical expert on the case given her knowledge and experience in the area; however, she declined and, therefore, there is no written opinion. Dr. Alarcio did express a willingness and desire to serve as a treating physician, including examining the Children, reviewing records and medical histories, perform the tests and treat the Children as may be necessary depending on the outcome of the tests. Father's counsel asks the Court to forgive any perceived clumsiness in counsel's chosen words in her attempt to explain to the Court that Dr. Alarcio did recommend the tests outlined be performed for the specific medical purpose

of determining if the toxic mold exposure could explain the Children's medical issues and lead to proper treatment of the conditions.

Second, in referencing DCS's objection to the Motion, the Court indicates that the "parents refused to provide their own blood tests" and cites to DCS's Objection at Page 2. (Ruling at Page 2, Paragraph 2.) However, the parents never refused to submit to a blood test for mold, nor did DCS say or elude that they did in its Objection. (*See* Father's Emergency Motion at Exhibit 5; DCS Objection at 2:23-28.) Instead, Father simply advised DCS that he had not done any blood tests in response to DCS's attorney asking for copies because the attorney was under the mistaken impression that the parents had done blood testing. (Father's Emergency Motion at Exhibit 5, pp. 4-6.)

Third, it appears that the Court may be calling in to question Dr. Alarcio's credibility because of the inaccurate representation of the facts by DCS in its Objection indicating that "Dr. Alarcio has refused to provide any reason or explanation at all" and that somehow a medical professional requiring a consultation fee before providing a medical opinion is somehow nefarious. (*See* DCS Objection at 3:4-14; Ruling at Page 2, Paragraph 2.) The parents invited the Department to contact Dr. Alarcio to verify her credentials and the specific course of testing and/or treatment she recommends for the Children. (*See* Father's Emergency Motion at Exhibit 5, p3.) DCS's attorney notes that the Case Manager contacted "Dr. Alarcio's office [and] was told that Dr. Alarcio would not have any conversation with DCS about anticipated testing or treatment without DCS paying her a consulting fee." (DCS Objection at 3:4-8.)

It is not uncommon for professionals, including medical professionals, to require a consultation fee before rendering a professional opinion to someone–akin to an in

office exam, meeting with a doctor or a legal consultation. Dr. Alarcio also required a consultation fee of $200 before speaking with Parents' counsel, which the Parents willingly paid before having any idea what Dr. Alarcio's answers would be on the issues. This fee seems reasonable as Dr. Alarcio is a highly qualified and experienced pediatric neurologist (see Father's Emergency Motion at 4:20-28 and Exhibit 9) who worked previously as an Attending Physician at PCH and now has her own practice making her an unbiased and disinterested medical provider. Surely, the Department could have paid the $200.00 consultation fee to actually discuss the issues with Dr. Alarcio as did the parents. The doctor did not "refuse to provide any reason or explanation at all"; she, in reality, indicated she would provide "reason[s] or explanation[s]" and discuss the issues with DCS after it paid the consultation fee.

Father understands that DCS is paying an out-of-state psychiatrist, Dr. Kelly, somewhere around $400 per hour to conduct a medical records review in hopes that he will buttress PCH's and the Department's narrative of factitious disorder. Instead of spending $200 to consult with a wholly unbiased and qualified medical doctor regarding the Children's documented exposure to severe, toxic mold likely throughout most, if not all, of their lifetimes (which in turn could either exonerate the Parents and provide clear direction in the medical treatment of the Children, or provide further medical evidence to support its own allegations of abuse or neglect), DCS chooses to turn a blind eye to the existence of the severe mold in the family home despite disclosure of evidence documenting it. Further, this conduct demonstrates a refusal by DCS to seriously consider that the toxic mold may very likely be the cause of the issues in this case and not as a result of neglect or abuse by the parents (violation of duty to investigate); and

violates DCS's ongoing duty to "coordinate services . . . , strengthen the family and provide prevention, intervention and treatment services." A.R.S. §§ 8-451(B), -453.

DCS is violating all of these duties in this case by refusing to have the simple blood test done on the Children and failing to ensure proper care and treatment are provided to the Children as a result of their exposure to dangerous, toxic molds in the family home. The Parents maintain that DCS's conduct amounts not only to withholding evidence, but is essentially tantamount to the destruction of evidence. This is a significant interference in and violation of the Parents' Due Process rights.

Fourth, pointing to evidence that the Children have made improvements in their health since being removed from the toxic mold environment that was unknown to exist in the family home at the time of removal only further supports the reality that the Children's medical conditions are explained by the effect of toxic mold on their bodies. (DCS Objection at 3:8-11; Ruling at Page 2, Paragraph 2.) If an individual is allergic to or susceptible to reactions to something (such as toxic mold) in the environment, it makes sense that if that "something" (toxic mold) is removed totally from the environment, the reactions, symptoms and/or conditions would improve and/or completely resolve. Instead of openly considering this very likely possibility, DCS relies upon and limits its investigation in to the mold issue by obtaining a self-serving, biased statement from the very same doctor who is claiming the parents have neglected or abused the child, K.K. and a newly treating physician's assistant that has supported Dr. Miga's position. (DCS Objection at 1:22-27, 3:13-21; *see also,* Ruling at Page 2, Paragraph 2.) DCS fails to provide any curriculum vitae or other evidence of either Dr.

Miga's or the physician assistant's qualifications and experience to assess toxin related issues in children and the various systems of the body. (DCS Objection.)

Next, both the Court and DCS express a desire to prevent the Children from undergoing unnecessary treatment. (DCS Objection at 3:8-11; Ruling at Page 3, Paragraph 2.) This is a concern that the Parents' wholeheartedly share. They have not and are not seeking out unnecessary treatment of their twin boys. Instead, they are continuing to try to find the cause of the Children's medical issues in the hopes of finally helping the boys get and stay healthy. They do not take lightly the amount of testing the Children have had to undergo while in their care and at the direction of DCS, and understand the anxiety and pain it causes the Children. However, the existence of severe, toxic mold in the family home when the Children lived there most of their lives requires that the testing be performed so proper treatment can be undertaken as may be deemed necessary by a qualified doctor—that is in the best interest of the Children.

Finally, the Court issued several orders that it believed balanced the interests at issue in this case. (Ruling at Pages 3-4.) Father respectfully disagrees with the Court and requests that it reconsider because the orders do not provide "the parents [with] a fair opportunity to explore the mold issue", violates the Parents Due Process rights and will not afford a trial on the merits. (*Id.*) The Court ordered that a PCH on-staff doctor be selected by DCS, that the PCH on-staff physician perform an independent review of documents outlined by the Court and provided by DCS, and that the on-staff PCH doctor is only assessing "*if additional testing is warranted* to determine if the children have been exposed to mold." (*Id.*) Unfortunately, by requiring an on-staff doctor of the very hospital who is accusing and holding fast to its prior findings of abuse or neglect

6

AZ-KAHRAMAN028757

by the parents presents a conflict of interest and will lead to a biased review. The in-house doctor is a co-worker of those already involved; is under pressure to conform to PCH's current, unyielding position; and is paid by the same entity. In addition, DCS (by way of its legal custodian status) is the agency paying the medical expenses to PCH and its staff which is also unyielding in maintaining it allegations of abuse or neglect against the Parents.

All of these serious issues can be resolved by the use of Dr. Alarcio who previously served as a staff doctor with the PCH for many years prior to going into private practice and is highly qualified in this area of medicine. Dr. Alarcio would offer an unbiased opinion, is not pressured by co-workers or the same money source, and has no relationship with the Parents (other than having spoken with Parents' counsel one time). The parents are entitled to obtain an unbiased opinion from a doctor that is currently not under the influence of PCH or DCS.

Moreover, the order to simply review to determine if "additional testing is warranted" only further serves to delay the testing, interferes in the collection of exculpatory evidence, and violates the Parents' Due Process rights. As outlined in Father's Emergency Motion, Dr. Alarcio advised that it takes approximately a month to get the blood toxin results back. The Court set forth a deadline of July 26, 2019, for the on-staff PCH doctor to advise whether he or she believe toxin testing is even "warranted." (Ruling at Page 3, Paragraph 4 and Page 4, Paragraph 1.) That means that if the PCH doctor determines testing should be completed, results of those tests would very likely not be received until approximately September, 2019, depending on how quickly the Children could get in to get the testing done. This is well past the currently

scheduled trial[1], and would also be five months since the toxic mold issue was identified and Father requested immediate testing for the Children, leading to further destruction of evidence and violation of Due Process rights.

The last two paragraphs of the Court's order requires DCS to identify the on-staff PCH doctor to conduct the review and disclose the identity to the parties "as soon as is practical," and to disclose the collected materials for review to the parties prior to the doctor's review so that supplementation could be provided if necessary. (Ruling at Page 4, Paragraphs 2-3.) These orders, however, fail to provide a date certain deadline to ensure a meaningful opportunity to challenge the selected in-house PCH doctor or supplement materials.

Lastly, the Ruling issues a protective order on the materials to be provided to the PCH in-house doctor and then requires that "[a]ll DCS court reports are to be shredded within 30 days of completion of the assessment." (Ruling at Page 3, Paragraph 8.) This is problematic for trial preparation and cross-examination of the reviewing doctor as may be necessary in this case. Witnesses need to know what they have reviewed, be able to refer back to them, show them to defense counsel if necessary, among possibly other reasons retention is necessary in order to ensure due process of law. While Father understands the Court is trying to protect the confidential nature of the information contained in juvenile cases, this order respectfully goes too far and is not necessary in light of the confidentiality laws of Title 8, HIPAA regulations, and the protective order already placed on the documents earlier in the Court's order.

---

[1] Father has filed a simultaneous motion to continue to trial in part related to this issue.

Based upon all of the above, Father respectfully requests this Court reconsider and overturn its Ruling, filed on June 26, 2019, and grant Father's requests that the Children be seen by Dr. Melanie Alarcio to be tested and treated for toxins under her care as she may deem appropriate as quickly as possible.

Positions were requested from all of the parties via email. Kathleen Martoncik, Attorney for the Department; and Kinda Johnson-Hurd, Guardian ad Litem for the Children **object**; and DeeAn Gillespie, Attorney for Mother, **concurs and joins in the Motion**.

Respectfully submitted this _11th_ day of July, 2019.

Suzanne Nicholls
Deputy Public Advocate

1    ORIGINAL filed this 11th day of
2    July, 2019, and a COPY delivered to:

3    Honorable Jennifer E Green
     Maricopa County Superior Court
4    1810 S LEWIS COURTROOM 3 STE 1077
5    Mesa, AZ 85210

6    COPIES electronically delivered
7    this 11th day of July, 2019, to:

8    Kathleen Martoncik
     Gregory Coordes
9    Assistant Attorney General
10   PSSSEF@azag.gov; kathleen.martoncik@azag.gov; gregory.coordes@azag.gov
     *Attorney for DCS*
11
     Kinda Johnson-Hurd
12   JohnsonK010@mail.maricopa.gov
13   *Guardian ad litem for Children*

14   DeeAn Gillespie
15   DGillespie@gillaw.com; Mailroom@gillaw.com
     *Attorney for Mother*
16
     Madison Bell
17   DCS Case Manager
18   madison.bell@azdcs.gov

19   By

20

21

22

23

24

25

26

27

28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028761

CLERK OF THE
SUPERIOR COURT
FILED

*M. Carter* DEP

2019 JUL 16 PM 4: 50

1  OFFICE OF THE PUBLIC ADVOCATE
2  Suzanne M. Nicholls, State Bar No. 027121
   106 East Baseline Road, 1st Floor
3  Mesa, Arizona 85210
   (602) 372-2815
4  Fax: (602) 372-8919
5  Email: opa-depmes@maricopa.gov
   suzanne.nicholls@maricopa.gov
6

EXHIBIT 231
BELL
8-23-24 MM

7  *Attorney for Father*

8          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9             IN AND FOR THE COUNTY OF MARICOPA

10                        JUVENILE DIVISION

11

12  In the Matter of:                    CASE NO: JD532206

13  D.K. ████ KAHRAMAN,                  **FATHER'S INITIAL DEPENDENCY**
    D.O.B. ████ 12                       **ADJUDICATION DISCLOSURE**
14  K.K. ████ KAHRAMAN,                  **STATEMENT**
    D.O.B. ████ 12
15                                       (DXT August 12-14, 2019 at 1:30 p.m.)

16                                       (Honorable Jennifer Green)

17  Person under 18 years of age.

18          Father, AHMET KAHRAMAN, by and through undersigned counsel, hereby

19
    submits this Disclosure Statement pursuant to Rule 44 of the Arizona Rules of Procedure
20
    for the Juvenile Court. Father will supplement this disclosure statement as new information
21
    is discovered.
22

23  **I.    UNCONTESTED ISSUES**
24
          A. The Children, D.K. ████ KAHRAMAN and K.K. ████
25
             KAHRAMAN, were born on ████ 2012.
26

27

28

AZ-KAHRAMAN027580

B. JESSICA WREN KAHRAMAN AKA JESSICA W MANN is the mother of the Children.

C. AHMET KAHRAMAN is the natural father of the Children.

D. The Children were taken into temporary custody by the Arizona Department of Child Safety ("DCS" or "Department") pursuant to court order on or about December 28, 2018.

E. The Indian Child Welfare Act does not apply as the children are not "Indian Children" as defined by the Act.

II. **CONTESTED ISSUES OF LAW AND FACT WHICH MAY BE MATERIAL OR APPLICABLE.**

A. Whether the allegations in the Dependency Petition are proven by a preponderance of the evidence.

B. Whether the Children are dependent as defined by A.R.S. §§8-201(15), -201.01(B), et seq.

III. **WITNESSES**

A. AHMET KAHRAMAN, Father

Expected to testify regarding the allegations in the dependency petition, and any other relevant matters.

B. DR. ELI NEWBERGER
132 Lime Kiln Rd
Lenox, MA  01240
enewberger@comcast.net

Expected to testify regarding medical issues in the case, medical care, services for the family and children, toxicity issues, and any other relevant matters.

C. KEN FOSTER, Inspector
Environmental Testing Group, Inc.

MI&T Mold Inspection and Testing
(855)600-6653

Expected to testify regarding mold and toxicity issues, and any other relevant matters.

D. BRUCE WESCOGAME
Everclear Environmental Solutions
(480)528-3882

Expected to testify regarding mold and toxicity issues, and any other relevant matters.

E. Any witnesses identified by on-going discovery.

F. Counsel reserves the right to call any witness listed by any other party.

## IV.    EXHIBITS

A.    Any and all supplemental information that is disclosed and/or discovered after the disclosure deadline which may have a relevant bearing on the issues presented.

B.    Any and all documents disclosed during the discovery process, including, but not limited to, materials contained in Father's Notice of Disclosures related to the entire case JD532206.

C.    Any and all exhibits used at any other proceeding in this matter.

D.    Any and all pleadings filed during the course of this action.

E.    Any and all such exhibits as may be reasonably necessary to impeach, contest or explain trial exhibits and/or testimony of any witnesses.

F.    Counsel reserves the right to introduce any exhibit listed by any other party.

## V.    NOTICE

Father reserves the right to supplement this initial disclosure statement should discovery provide the name of additional witnesses whose testimony and/or exhibits which may be material and relevant in this matter.

1    Respectfully submitted this _16th_ day of July, 2019.

2

3

4    SUZANNE M. NICHOLLS
     Deputy Public Advocate

5

6    ORIGINAL filed this _16th_ day of
7    July, 2019, and a COPY delivered to:

8    Honorable Jennifer E Green
9    Maricopa County Superior Court
     1810 S LEWIS COURTROOM 3 STE 1077
10   Mesa, AZ 85210

11   COPIES electronically delivered
12   this _16th_ day of July, 2019, to:

13   Kathleen Martoncik
14   Gregory Coordes
     Assistant Attorney General
15   PSSSEF@azag.gov; kathleen.martoncik@azag.gov; gregory.coordes@azag.gov
16   *Attorney for DCS*

17   Kinda Johnson-Hurd
     JohnsonK010@mail.maricopa.gov
18   *Guardian ad litem for Children*

19   DeeAn Gillespie
20   DGillespie@gillaw.com; Mailroom@gillaw.com
21   *Attorney for Mother*

22   Madison Bell
     DCS Case Manager
23   madison.bell@azdcs.gov

24

25   By _V. Carbajal_

26

27

28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

4

AZ-KAHRAMAN027583

CLERK OF THE
SUPERIOR COURT
FILED

D. Garcia        DEP

2019 JUL 17 AM 11: 13

1   MARK BRNOVICH
2   Attorney General

3   KATHLEEN E. MARTONCIK
4   Assistant Attorney General
    State Bar No. 023982
5   CFP/PSS
    120 W. 1st Avenue, 2nd Floor
6   Mesa, Arizona 85210
    Telephone: (602) 771-4000
7   PSSSef@azag.gov
8   Attorneys for the Department of Child Safety

EXHIBIT 232

BEL
8-23-24

9           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

10             IN AND FOR THE COUNTY OF MARICOPA

11

12  In the Matter of:                    No. JD532206

13  D.K.              KAHRAMAN           **DCS'S DEPENDENCY INITIAL**
       d.o.b.      2012                  **DISCLOSURE STATEMENT**
14  K.K.            KAHRAMAN
15     d.o.b.     2012

16  Person(s) under 18 years of age.     (Honorable Jennifer E Green)

17          The Department of Child Safety (DCS or the Department), by and through

18  undersigned counsel, hereby submits its initial disclosure statement pursuant to Rule
19
20  44(B)(2), Arizona Rules of Procedure for the Juvenile Court, (ARPJC).  The Department

21  will supplement its disclosure statement pursuant to Rule 44(F) ARPJC and Rule 26,

22  Arizona Rules of Civil Procedure, as new information is discovered.

23
                   I.  **Uncontested Issues of Fact Deemed Material**
24
25  A.      The children's names and dates of birth are D.K.           KAHRAMAN, date

26  of birth: September 27, 2012; and K.K.             KAHRAMAN, date of birth: September

27  27, 2012.

28

B.      The child, ███ KAHRAMAN, was taken into temporary custody on January 4, 2019.

C.      The child, ███ KAHRAMAN, was taken into temporary custody on January 4, 2019.

D.      The children live in Maricopa County, Arizona and/or the allegations arose in Maricopa County, Arizona and this court has jurisdiction over this matter.

E.      JESSICA WREN KAHRAMAN is the natural mother of the children and her date of birth is August 29, 1972.

F.      AHMET KAHRAMAN, whose date of birth is April 18, 1981, is the natural father of the children as paternity has been established.

G.      The Indian Child Welfare Act does not apply.

H.      The Department has made reasonable efforts to prevent removal.

## II.  Contested Issues of Fact Which May Be Material or Applicable

Whether the allegations in the Dependency Petition are true and whether the parents are willing and/or able to effectively parent the children.

## III.  Contested Issues of Law Which May Be Material or Applicable

Whether the children are dependent children as defined by A.R.S. § 8-201(15) et seq.

## IV.  Witnesses

1.      SARAH KRAMER
2.      SARAH MENDEZ (SUPERVISOR)
3.      MADISON BELL
4.      MECCA TEMPLE (SUPERVISOR)
        DCS Child Safety Workers

Expected to testify to the allegations of the dependency petition, the matters contained in the court reports, the services offered to the family, the family's participation in those services, and the continuing need for DCS involvement. They will also testify to their observations, recommendations and conclusions, including the children's present well being and what is in the best interest of the children. They will also testify to statements of the parents, observations regarding the parent/child relationship, the ability of the parents to provide proper and effective parental care and control, and any other relevant matters.

5.    JESSICA WREN KAHRAMAN
      Mother

Expected to testify to the allegations of the dependency petition, her current willingness and ability to provide proper parental care and control, and any other relevant matters.

6.    AHMET KAHRAMAN
      Father

Expected to testify to allegations of the dependency petition, his current willingness and ability to provide proper parental care and control, and any other relevant matters.

7.    FOSTER PARENTS
      Confidential

Expected to testify regarding the child's best interests and their willingness to provide a permanent home for the child.

8.    DANIEL MIGA, MD
      Initial Physician

9.    MARIA CHICO
      Social Worker
      Banner Health Clinic - Department of Pediatric Cardiology
      1432 South Dobson, Suite 512
      Mesa AZ 85202
      Phone: (480) 412-6336

10.   Ryan Bryce Miller, MD
      Orthopedic Surgery
      1432 South Dobson Road, Suite 304
      Mesa AZ 85202
      (480) 412-7400

Expected to testify to the nature and probable cause of the children's physical injuries and any other relevant matters.

11. DR. JARED MUENZER
jmuenzer@phoenixchildrens.com

12. DR. JODI CARTER
jcarter@phoenixchildrens.com

13. SHASH PATAL
spatel11@phoenixchildrens.com

14. ANN TOGEN
atongen@phoenixchildrens.com
Treating Physicians
Phoenix Children's Hospital
1919 E. Thomas Road
Phoenix AZ  85016

15. MARY OAKLEY, PSY.D.
Psychologist
Stride Psychology
2600 E. Southern Ave., Ste. C3
Tempe, AZ 85282
Ph: (480) 839-6264  / Fax: (480) 839-2115
Email: mary.oakley@stridepsych.com

Expected to testify to the psychological evaluation of the mother, including opinions, conclusions, recommendations and observations, and any other relevant matters.

16. Dr. MICHAEL KELLY
Psychologist
michaelbriankelly@gmail.com

Expected to testify to the psychological evaluation of the parents, including opinions, conclusions, recommendations and observations, and any other relevant matters

17. KELLY RODRIGUEZ, LAC, CCTP
Threapist
Buwalda Psychological Services
1405 E. Guadalupe Rd.
Tempe 85283
Fax: 480-967-0174, 480-921-3314
Email: krodriguez@buwaldapsychologicalservices.com

Expected to testify to the psychological therapy of the mother, including opinions, conclusions, recommendations and observations, and any other relevant matters.

18.  ELIZABETH CAPPS-CONKLE, PSY.D
     Psychologist
     Buwalda Psychological Services, Inc.
     2039 S. Mill Ave., Suite B
     Tempe Arizona 85282
     480-921-3314, Fax: 480-967-0174
     Email: ecapps-conkle@buwaldapsychologicalservices.com

Expected to testify to the psychological evaluation of the father, including opinions, conclusions, recommendations and observations, and any other relevant matters.

19.  CARLA WHITE, MSW
     Southwest Human Development
     Family Support Services
     2850 N. 24th Street
     Phoenix Arizona 85008
     602-266-5976, Fax: 602-633-8369
     Email: cwhite@swhd.org

20.  DRUE KAPLEN SLEKMANN
     Southwest Human Development
     Family Support Services
     2850 N. 24th Street
     Phoenix Arizona 85008
     602-266-5976, Fax: 602-633-8369
     Email: dsiekmann@swhd.org

21.  SUZANNA M. SCHUNK, LCSW
     Consultant
     Southwest Human Development
     Family Support Services
     2850 N. 24th Street
     Phoenix, AZ 85008
     (602) 266-5976, Fax: (602) 274-8952
     Donsuz3@gmail.com
     Sschunk@swhd.org

22.  Dr. Blake Scoresby, PT
     ROC Physical Therapy

5656 S. Power Rd., Suite 139
Gilbert, Arizona 85295
480-272-7797, Fax: 480-704-3903
Email: blake_scoresby@rocphysicaltheraphy.com

23.     TO BE NAMED
        Parent Aide

Expected to testify to the parenting services offered to the mother/father, her/his participation in those services, including any conclusions and/or recommendations. He/She will also testify to the continuing need for DCS involvement, and any other relevant matters.

24.     TO BE NAMED
        Counselor

Expected to testify to the counseling services offered to the mother/father, the mother/father's participation in those services, including any opinions, conclusions, recommendations or observations. He/She will also testify to the continuing need for DCS involvement, and any other relevant matters.

25.     CUSTODIAN OF RECORDS
        Banner Health
        1432 South Dobson, Suite 512
        Mesa AZ 85202
        Phone: (480) 412-6336
        nicole.cable2@bannerhealth.com

Expected to provide a foundation for the admission of its records and any other relevant matters.

26.     CUSTODIAN OF RECORDS
        Phoenix Children's Hospital
        Attn: PCH Legal/ROI
        1919 E. Thomas Road
        Phoenix AZ 85016
        Fax: 602-933-2469
        Email: himrecordsrequests@phoenixchildrens.com

Expected to provide a foundation for the admission of its records and any other relevant matters.

27.    CUSTODIAN OF RECORDS
Advanced Center Autism for Treatment
1769 South Pheasant Drive
Gilbert AZ 85295
(480) 773-4511

Expected to provide a foundation for the admission of its records and any other relevant matters.

28.    CUSTODIAN OF RECORDS
Angel Pediatrics
4747 North 7th Street
Phoenix Arizona 85014
623-551-0442, Fax: 623-551-0830

Expected to provide a foundation for the admission of its records and any other relevant matters.

29.    CUSTODIAN OF RECORDS
Anthem School
41020 N Freedom Way,
Phoenix, AZ 85086
623-376-3700, Fax: 623-376-3780

Expected to provide a foundation for the admission of its records and any other relevant matters.

30.    CUSTODIAN OF RECORDS
Baio Enterprises Developmental Therapies
1745 S. Alma School Rd., Suite 145
Mesa Arizona 85210
480-963-3634, Fax: 480-855-8384
Expected to provide a foundation for the admission of its records and any other relevant matters.

31.    CUSTODIAN OF RECORDS
Director of Student Affairs - Kirstin Porter
kristin.porter@basised.com
Basis Schools, Inc.
Chandler Primary-North Campus
1800 East Chandler Blvd.
Chandler Arizona 85225
Fax: 480-907-6812

Expected to provide a foundation for the admission of its records and any other relevant matters.

32.   CUSTODIAN OF RECORDS
      Bioveda Health and Wellness Center

      Expected to provide a foundation for the admission of its records and any other relevant matters.

33.   CUSTODIAN OF RECORDS
      Center for Autism Research and Education
      4045 East Union Hills, Suite 116
      Phoenix Arizona 85050
      602-277-2273, Fax: 602-277-2283

      Expected to provide a foundation for the admission of its records and any other relevant matters.

34.   CUSTODIAN OF RECORDS
      Dobson Pediatric Center
      2058 S. Dobson Rd., Suite 6
      Mesa Arizona 85202
      480-820-4507, Fax: 480-491-2439

      Expected to provide a foundation for the admission of its records and any other relevant matters.

35.   CUSTODIAN OF RECORDS
      East Valley Children's Center
      3200 S. George Drive
      Tempe, Arizona 85282
      480-839-9097, Fax: 480-839-1762
      Expected to provide a foundation for the admission of its records and any other relevant matters.

36.   CUSTODIAN OF RECORDS
      Jensen Family Medicine
      21321 E. Octillo Rd. #123
      Queen Creek, Arizona 85142
      480-677-3688, fax: 480-677-8293

      Expected to provide a foundation for the admission of its records and any other relevant matters.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

37.   CUSTODIAN OF RECORDS
      Melmed Center
      4848 East Cactus Road, Suite 940
      Scottsdale Arizona 85254
      480-443-0050, Fax: 480-443-4018

      Expected to provide a foundation for the admission of its records and any
      other relevant matters.

38.   CUSTODIAN OF RECORDS
      Nelson Pediatric Therapy
      1930 E Southern Ave.
      Tempe, Arizona 85282
      480-456-0719, Fax: 480-456-0163

      Expected to provide a foundation for the admission of its records and any
      other relevant matters.

39.   CUSTODIAN OF RECORDS
      Neurologic Music Therapy Services of Arizona
      2702 N. Third Street, Suite 1000
      Phoenix, Arizona 85004
      602-840-6410, Fax: 602-840-6431

      Expected to provide a foundation for the admission of its records and any
      other relevant matters.

40.   CUSTODIAN OF RECORDS
      La Frontera – Empact Rapid Response
      618 S. Madison Dr.
      Tempe, AZ 85281
      Ph: 480-784-1514
      Fax: 480-967-3528
      clinicalrecords@lafrontera-empact.org

      Expected to provide a foundation for the admission of its records and any
      other relevant matters.

41.   CUSTODIAN OF RECORDS
      Recharge Your Life

      Expected to provide a foundation for the admission of its records and any
      other relevant matters.

42. CUSTODIAN OF RECORDS
Sunrise Therapy Services
4045 E Union Hills Drive Suite 110
Phoenix Arizona 85050
602-485-4444, Fax: 480-451-7780

Expected to provide a foundation for the admission of its records and any other relevant matters.

43. CUSTODIAN OF RECORDS
Jewish Family & Children's Services
4747 N. 7th Street, Ste. 1
Phoenix, AZ 85014
Fax: 602-253-7065, Fax 602-264-1806, 602-279-7655
Doreen; Doreen.Petrillo@jfcsaz.org

Expected to provide a foundation for the admission of its records and any other relevant matters.

44. CUSTODIAN OF RECORDS
Foothills sports medicine physical therapy
East Valley Gilbert-Mesa
1414 N. Cooper Rd
Gilbert AZ 85233
480-505-8140

Expected to provide a foundation for the admission of its records and any other relevant matters.

45. CUSTODIAN OF RECORDS
ROC Physical Therapy
5656 S. Power Rd., Suite 139
Gilbert, Arizona 85295
480-272-7797, Fax: 480-704-3903

Expected to provide a foundation for the admission of its records and any other relevant matters.

46. The Department gives notice that it intends to introduce evidence of the child's statements regarding abuse or neglect, pursuant to Arizona Rules of Evidence 807, Arizona Rules of Procedure for the Juvenile Court 45(E), and A.R.S. § 8-237.

47.    Counsel reserves the right to call any witness listed by any other party.

## V. Exhibit List

1.    All Child Safety Worker reports, supplements, addendums, with all attachments; and all correspondence reflecting remedial services offered to the family.

2.    All reports and records from all service providers, physicians, health care professionals, hospitals, clinics, laboratories, pharmacies, medical facilities, or any other health care provider that has provided or is providing treatment or services to the family, including but not limited to the records of SWHD, Buwalda, Banner Hospital, PCH, Advanced Center Autism, Angel Pediatrics, Anthem School, Baio Enterprises, Chandler Primary, Bioveda, Center for Autism, Dobson Pediatrics, East Valley Children's, Jenson Family Medicine, Melmed, LaFrontera Rapid Response, Recharge Your Life, Sunrise Therapy, Nelson Pediatric, NMTSA, ROC Physical Therapy, and Foothills sports medicine physical therapy. All reports and records, including but not limited to those from Dr. Kelly, Dr. Oakley, Dr. Rodriquez, Dr. Capps-Conkle, Dr. Miga, Maria Chico, Dr. Jared Muenzer, Dr. Jodi Carter, Shash Patal, Ann Togen, Carla White, Suzanne Shunk and Drue Siekmann.

3.    All police reports and records, including Police Department Report, photographs and supplements, pursuant to Arizona Rules of Evidence, Rule 902(4).

4.    All criminal reports and records, including but not limited to those records from the Maricopa County Superior Court, pursuant to Arizona Rules of Evidence, Rule 201, 902(4) and 1005.

5.    The Department gives notice that it intends to introduce certified domestic records of regularly conducted activity, pursuant to Arizona Rules of Evidence, Rule 902(11).

6.    The Department gives notice that it intends to introduce all DCS reports, reports and records of any party or participant, or any person with whom the children are or may be residing with.  In addition to any evidence of the out-of-court statements or nonverbal conduct of the children regarding acts of abuse or neglect perpetrated on the children, pursuant to Rule 45(C)(D)(E), ARPJC.

7.    Counsel reserves the right to introduce any exhibit listed by any other party.

8.    Counsel reserves the right to call rebuttal witnesses if needed.

## VI.  Requests/Notices

1.    It is requested that this Court take judicial notice of any order, plea agreement, judgment of guilt and sentencing and other documents and reports included in the Maricopa County Superior court files.

2.    The Department reserves the right to supplement this disclosure statement and list of witnesses/exhibits should discovery provide additional relevant exhibits or the name of additional witnesses whose testimony may be material and relevant in this matter.

3.    If a party objects to the admission of an exhibit, the party shall file a notice of objection and the specific grounds for each objection and provide a copy of the notice to all parties and the court within ten (10) days of receipt of the list of exhibits.  Specific

1    objections or grounds not identified in the notice of objection shall be deemed waived,

2    unless otherwise ordered by the court.  Rule 44(B)(2)(e), Ariz.R.Juv.P.

3

4              RESPECTFULLY SUBMITTED this _____ day of July, 2019.

5                        MARK BRNOVICH
                         Attorney General
6

7                        *Kathleen E. Martoncik*

8                        KATHLEEN E. MARTONCIK
                         Assistant Attorney General
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027596

1   ORIGINAL of the foregoing filed
2   this _ℓℓ_ day of July, 2019, with:

3   Clerk of the Court
    Maricopa County Superior Court
4   Juvenile Court Southeast Facility
5   1810 South Lewis Street
    Mesa, AZ 85210

6

7   COPY of the foregoing hand-delivered
    this _ℓℓ_ day of July, 2019, to:

8

9   Honorable Jennifer E Green
    Maricopa County Superior Court
10  Juvenile Court Southeast Facility
    1810 South Lewis Street
11  Mesa, AZ 85210

12  COPIES of the foregoing electronically served
13  this _ℓℓ_ day of July, 2019, to:

14  Megan Haywood, Esq.
15  222 N. Central Avenue
    Suite 154
16  Phoenix, AZ 85004
    Haywoodm@mail.maricopa.gov
17  Guardian Ad Litem for the Child/ren

18
    DeeAn Gillespie Strub, Esq.
19  Gillespie Shields & Associates PC
20  7319 N 16th St Suite 100
    Phoenix, AZ 85020
21  DGillespie@gillaw.com
    Attorney for Mother
22

23  Suzanne M Nicholls, Esq.
    Office of the Public Advocate
24  106 E. Baseline Rd
25  Mesa, AZ 85210
    Suzanne.Nicholls@maricopa.gov; OPASEFDisclosure@mail.maricopa.gov
26  Attorney for Father

27

28

AZ-KAHRAMAN027597

1

2

Madison Bell
DCS Child Safety Worker
Madison.bell@azdcs.gov

3

4

5

6

Susan Stark
3131 West Durango Street
Phoenix, AZ 85009
Susan.Stark@maricopacasa.org
Court Appointed Special Advocate

7

8

9

dcs/JD532206/HDM#8020487

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027598

1   DeeAn Gillespie Strub, Esq. Bar No. 009987
2   David Nowakowski, Esq. Bar No. 035068
    **GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK**
3   7319 North 16th Street
4   Phoenix, AZ 85020
    Tel. (602) 870-9700
5   Fax (602) 870-9783
6   *Attorney for Jessica Kahraman, Respondent*

7
8   Send all correspondence to
    mailroom@gillaw.com

9
10          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
11          **IN AND FOR THE COUNTY OF MARICOPA**
12                      **JUVENILE DIVISION**

13  In re the Matter of:                    Case No.: JD532206

14  D.K.    KAHRAMAN,                        **MOTHER'S INITIAL**
15  D.O.B.    /12                            **DEPENDENCY ADJUDICATION**
                                             **DISCLOSURE STATEMENT**
16  K.K.    KAHRAMAN,
17  D.O.B.    /12                            (Currently Set for August 12 – 14,
                                             2018 at 1:30PM)
18  Person(s) under 18 years of age.
                                             *(Assigned to the Hon. Jennifer E.*
19                                           *Green)*
20
21
22          Mother, Jessica Kahraman, submits her list of witnesses and exhibits as
23
24  follows:
25
        **I.      UNCONTESTED ISSUES**
26
        1.  The children, D.K.    Kahraman and K.K.    Kahraman
27
28      were born on September 27, 2012.

1                                           AZ-KAHRAMAN027599

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CLERK OF THE SUPERIOR COURT FILED
DEP
2019 JUL 25 PM 4: 36

EXHIBIT 233
BELL
8-23-24 

2. Jessica Kahraman is the natural Mother of the children.

3. Ahmet Kahraman is the natural Father of the children.

4. The children were taken into temporary custody by the Department pursuant to Court Order on or about December 28, 2018.

5. ICWA does not apply as the children are not "Indian Children" as defined by the Act.

## II.    CONTESTED ISSUES OF LAW AND FACT WHICH MAY BE MATERIAL OR APPLICABLE

1. Whether the allegations in the Dependency Petition are proven by a preponderance of the evidence.

2. Whether the children are dependent as defined by A.R.S. §8-201(15) – 201.01(B), et.seq.

## III.   WITNESSES

1. Mother, Jessica Kahraman. Expected to testify regarding the allegations in the dependency petition and any other relevant matters.

2. Becca Wilson, SWHD visitation supervisor. Expected to testify regarding her observations of visitation, the relationship

3. Dr. Mary Oakley, psychologist.  Expected to testify regarding Mother's psychological evaluation and any relevant matters.

4. Dr. Kelly Rodriguez, Mother's Counselor at Buwalda

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027600

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

5. Dr. Scott Jensen. T: 480-677-3688. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

6. Timothy Lane, PA with Dr. Jensen. T: 480-677-3688. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

7. Dr. Shabana Jessani, Melmed Center. T: 480-443-0050. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

8. Dr. Cindy Schneider, Center for Austism Research and Education. T: 602-277-2273. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

9. Dr. Asma Jafri, Ronald I. Jones Pediatrics. T: 480-222-8080. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

10. Dana Kallerud, Basis Chandler Primary North. T: 480-798-6447. Expected to testify regarding her observations of the boys in school and any other relevant matters.

11. Danielle Schmidt, Habilitation Provider. T: 480-274-2073. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

12. Stephanie Reihl, Habilitation Provider. T: 480-227-0628. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

13. Shannon Southwick, Habilitation Provider. T: 480-226-3877. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

14. Ellyn Belcastro, Occupational Therapy Provider. T: 630-880-1590. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

15. Firishta Gheyasi Cubillo, Habilitation Provider. T: 520-900-7989. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

16. Nikki McCants, PT – Arizona Neurologic Rehab. T: 480-699-4845. Expected to testify regarding her observations of the boys, services provided and any other relevant matters.

17. Eric Bowman, DO – PCH Orthopedic Doctor. T: 602-933-3003. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

18. Dr. Ron Peters – Mind Body Medicine. T: 480-607-7999. Expected to testify regarding mold testing for Mother and any other relevant matters.

4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027602

19. Sam Hinze, Tennis Instructor. T: 602-524-5024. Expected to testify regarding the boys ability to play tennis and any other relevant matters.

20. Brandon Niskikawa, DDD Support Coordinator. T: 602-542-0419. Expected to testify regarding his observations of the boys, services provided and any other relevant matters.

21. Daniela Zomier and Emily Okamura, Neurologic Music Therapist. T: 602-840-6431. Expected to testify regarding her observations of the boys, services provided and any other relevant matters.

22. Ken Foster, Inspector – Environmental Testing Group. MI&T Mold Inspection Testing. T: 855-600-6653. Expected to testify regarding mold and toxicity issues, and any other relevant matters.

23. Bruce Wescogame. Everclear Environmental T: 480-528-3882. Expected to testify regarding mold and toxicity issues, and any other relevant matters.

24. Dr. Eli Newberger, 132 Lime Kiln Rd., Lenox MA. 01240. enemberger@comcast.net. Expected to testify regarding medical issues, medical care, services for the family and children, toxicity issues and any other relevant matters.

25. Any witnesses disclosed by any other party.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027603

IV.    **EXHIBITS**

1.    Any any all documents disclosed during the discovery process, including but not limited to materials, contained in Mother's Disclosures relating to the entire case JD532206.

2.    Any and all exhbits used at any other proceeding in this matter.

3.    Any and all pleadings filed during the couse of this action.

4.    Any and all exhibits as may be reasomanly necessary to impeach, contest of explain trial exhibits and/or testimony of any witnesses.

5.    Mother reserves the right to ontroduce any exhibit listed by any other party.

6.    Any and all supplemental information disclosed and/or discovered after the disclosure deadline which may have a relevant hearing on the issues presented.

V.    NOTICE

Mother reserves the right to supplement this initial disclosure statement should discovery provide the name of additional witnesses whose testimony and/or exhibits which may be material and relevant in this matter.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

6

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027604

**RESPECTFULLY SUBMITTED** this 25th day of July, 2019.

By: _For Jeff Mclean_

DeeAn Gillespie Strub
Attorney for Mother

ORIGINAL filed this 25ᵗ day of
July, 2019, and a COPY delivered to:

Honorable Jennifer E. Green
Maricopa County Superior Court
1810 S. Lewis Courtroom 3 STE 1077
Mesa, AZ 85210

COPIES electronically delivered
this 25ᵗ day of July, 2019 to:

Katie Martoncik
Assistant Attorney General
PSSSEF@azag.gov
Kathleen.martoncik@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
johnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

Suzanne Nicholls
Opa-depmes@maricopa.gov
Suzanne.nicholls@maricopa.gov
*Attorney for Father*

By _____

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

7

AZ-KAHRAMAN027605

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER





July 26, 2019

Ms. Madison Bell
DCS Specialist
Arizona Department of Child Safety
1201 S. Alma School Road
Mesa, AZ 85210

      **Re:**   **Kenan Kahraman**
             **DOB: 9/27/2012**

Dear Madison Bell:

At your request, I am respectfully submitting my opinion on whether or not Kenan Kahraman should submit to testing for mold related illness.

**In my opinion, Kenan does not need testing for mold related illness at this time.**

I have performed a complete and thorough review of Kenan's medical records. Please see the attached summary for details.

In brief, Kenan is a 6 year old male twin (Twin B) with history of high functioning autism. As a toddler, Kenan was placed by his parents on a severely restricted diet in order to counteract physical and emotional symptoms that his parents believed were due to food allergies, toxin exposures, microbial imbalances and other sensitivities. By six years of age, Kenan's daily intake was limited to approximately 500 kcal/day and consisted solely of New Zealand lamb meatballs, New Zealand lamb broth, beets, carrots and egg yolks.

In December 2018, Kenan presented to Cardon Children's Medical Center with severe protein-calorie malnutrition, congestive heart failure due to malnutrition, pulmonary hypertension due to malnutrition, and progressive weakness. With medical therapies and nutritional rehabilitation, Kenan resolved his congestive heart failure, pulmonary hypertension and weakness. He was discharged in January 2019 to foster care where, according to the available records, he continues to thrive on a regular diet without restriction.

According to the Encyclopedia Britannica, mold is "a conspicuous mass of mycelium (masses of vegetative filaments, or hyphae) and fruiting structures produced by various fungi (kingdom

Fungi)."[1] For purposes of this discussion, the terms mold and fungi should be thought of interchangeably.

Mold and fungi are commonly found in indoor environments. There are currently no established standards for safe indoor fungi levels or levels that impart health risks. There is, however, a published practical guide for interpreting reports from inspections or investigations of indoor molds.[2]

The majority of fungi do not cause disease in humans with normal immune systems.  In contrast, immunocompromised individuals (e.g. those with advanced HIV, those on immunosuppressant medications, those receiving chemotherapy) are at increased risk for fungal infections.

**Kenan Kahraman has a normally functioning immune system and is not on any immunosuppressant medications. For these reasons, he is not at any increased risk for opportunistic fungal infection.**

All fungi are capable of producing toxins (mycotoxins).  The presence of a toxin-producing fungus in any given environment does not ensure that mycotoxins are being produced.  Most of the descriptions of mycotoxicosis (disease resulting from mycotoxin exposure) in humans are as a result of ingesting (or eating) moldy food like rye or millet.[3]

**Due to the extreme limitations of Kenan's diet prior to his placement in foster care, he is not at risk for having ingested any rye or millet contaminated with mycotoxins.**

Illness resulting from the inhalations (or breathing in) of mycotoxins has not been demonstrated or substantiated as a cause of disease. Inhalation of fungal toxins and other fungal debris can occur, but it requires the production of an aerosol that contains fungal fragments, such as in an occupational setting (e.g. cleaning farm silos). This type of exposure is unlikely to occur outside of an occupational setting. Reports from the American College of Environmental and Occupational Medicine and the Institute of Medicine concluded that evidence does not support the contention that mycotoxin-related illness occur via inhalation in non-occupational settings, and the relationship between mycotoxin inhalation exposure and adverse health effects even in occupational settings is controversial.[4]

**In my opinion Kenan has not had an occupational level of exposure to mycotoxins.**

Tests for the presence of mycotoxins in serum or urine have not been validated for use in the diagnosis of established fungi-related disorders. Nor has testing for antibodies to mycotoxins in serum or testing for fungus-specific immunoglobulin A (IgA) or immunoglobulin M (IgM), as

---

[1] (Encyclopaedia Brittanica, 2019)
[2] (Horner WE, 2008)
[3] (Hardin BD, 2003)
[4] (Committee on Damp Indoor Spaces and Health, Insitute of Medicine of the National Academies, 2004); (Hardin BD, 2003); (Mazur LJ, 2006)

GRAY 000050

humans are not known to mount immunologic responses to mycotoxins as part of any disease process.[5]

Several defined disorders involve *hypersensitivity* (or immunologically-mediated) reactions to fungi; however this is a completely different physiologic mechanism than that thought to be attributed to mycotoxins. These include asthma, allergic rhinitis, hypersensitivity pneumonitis, allergic bronchopulmonary aspergillosis and allergic fungal rhinosinusitis.

Patients presenting with symptoms of asthma, hypersensitivity pneumonitis, rhinitis, or rhinosinusitis would have some or all of the following symptoms: chronic cough, respiratory distress, chronic nasal congestion, chronic nasal discharge, fever, malaise, bloody sputum, chronic sinus pressure and/or chronic eye irritation. These patients should have specific testing to confirm a mold hypersensitivity reaction.

**Kenan Kahraman has no history of, or signs and symptoms consistent with, asthma, allergic rhinitis, hypersensitivity pneumonitis, allergic bronchopulmonary aspergillosis or allergic fungal rhinosinusitis in his medical records.**

As part of the medical record review, I have also reviewed a letter from Dr. Ronald Peters of the MindBody Medicine Center. Dr. Peters is Jessica Kahraman's doctor. Jessica Kahraman is Kenan Kahraman's mother. In his letter, Dr. Peters describes Mrs. Kahraman as suffering from headaches, recurrent sore throats, tender axillary lymph nodes, hand tremors, finger and toe numbness, poor hand-eye coordination, chronic fatigue, muscle weakness, stiffness and disturbed sleep. While I am saddened to hear that Mrs. Kahraman is suffering, none of these symptoms are specific for either mycotoxin ingestion, inhalation or fungal hypersensitivity.

Dr. Peters believes that Mrs. Kahraman has "increased immune sensitivity" and "mast cell activation" based on an elevated histamine level. It should be noted that while histamine is produced by mast cells, it is also produced by other cells – basophils, neutrophils, and platelets. Also, the most specific available marker for mast cell activation is a serum tryptase level, not a histamine level.[6]

Dr. Peters references a urine MycoTOX panel from Great Plains Laboratory showing elevated mycophenolic acid levels. As referenced above, tests for the presence of mycotoxins in urine have not been validated for use in the diagnosis of established fungi-related disorders. The results of this test therefore have no diagnostic value.

Dr. Peters documents that he has started Mrs. Kahraman on a treatment protocol designed by Dr. Ritchie Shoemaker for her supposed mycotoxicity. It should be noted that in 2004 the FDA charged Dr. Shoemaker with seven violations and ordered him to stop injecting patients with a veterinary drug not licensed for human use (see attached "Warning Letter").

It should also be noted that in 2013, the Maryland Board of Physicians found that Dr. Shoemaker "failed to meet the standard of care" when treating patients and demanded that Dr. Shoemaker be placed on probation for a minimum of two years "with terms and conditions" should he resume the

---

[5] (Center for Disease Control, 2011); (Bush RK, 2006)
[6] (Valent P, 2012)

practice of clinical medicine (see attached "Consent Order"). Dr. Shoemaker opted to stop practicing clinical medicine after this ruling.

Based on the above, I respectfully disagree with Dr. Peters that Kenan has a urinary mycotoxin test.

In summary, I do not believe that Kenan Kahraman should undergo further testing for mold related illness at this time.

Sincerely,

*/s/Jodi P. Carter, MD, FAAP*

Jodi P. Carter, MD, FAAP
Chief Clinical Integration Officer, Phoenix Children's Hospital

## References

Bush RK, P. J. (2006). The Medical Effects of Mold Exposure. *J Allergy Clin Immunol, 117*(2), 326.

Center for Disease Control. (2011, February 7). *Morbidity Mortality Weekly Reports*. Retrieved from Case
    Definitions for Chemical Poisonings:
    http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5401a1.htm

Committee on Damp Indoor Spaces and Health, Insitute of Medicine of the National Academies. (2004).
    *Damp Indoor Spaces and Health.* Washington DC: The National Academies Press.

Encyclopaedia Brittanica. (2019, July 22). Retrieved from Encyclopaedia Brittanica, Inc.:
    https://www.britannica.com/science/mold-fungus

Hardin BD, K. B. (2003). Adverse Human Health Effects Associated with Molds in the Indoor
    Environment. *J Occup Environ Med, 45*(5), 470.

Horner WE, B. C. (2008). Guide for Interpreting Reports from Inspections/Investagations of Indoor
    Mold. *J Allergy Clin Immunol, 121*(3), 592.

Mazur LJ, K. J. (2006). Spectrum of Noninfectious Health Effects from Molds. *Pediatrics, 118*(6), e1909.

Valent P, A. C. (2012). Definitions, Criteria and Global Classification of Mast Cell Disorders with Special
    Reference to Mast Cell Activation Syndromes: A Consensus Proposal. *Int Arch Allergy Immunol,
    157*(3), 215.

GRAY-0000033





July 26, 2019

Ms. Madison Bell
DCS Specialist
Arizona Department of Child Safety
1201 S. Alma School Road
Mesa, AZ 85210

**Re: Dylan Kahraman**
**DOB: 9/27/2012**

Dear Madison Bell:

At your request, I am respectfully submitting my opinion on whether or not Dylan Kahraman should submit to testing for mold related illness.

**In my opinion, Dylan does not need testing for mold related illness at this time.**

I have performed a complete and thorough review of Dylan's medical records. Please see the attached summary for details.

In brief, Dylan is a 6 year old male twin (Twin A) with history of autism and global developmental delay. As a toddler, Dylan was placed by his parents on a severely restricted diet in order to counteract physical and emotional symptoms that his parents believed were due to food allergies, toxin exposures, microbial imbalances and other sensitivities. By six years of age, Dylan's daily intake was limited to New Zealand lamb meatballs, New Zealand lamb broth, beets, carrots and egg yolks.

In December 2018, Dylan's twin brother Kenan presented to Cardon Children's Medical Center with severe protein-calorie malnutrition, congestive heart failure due to malnutrition, pulmonary hypertension due to malnutrition, and progressive weakness. With medical therapies and nutritional rehabilitation, Kenan resolved his congestive heart failure, pulmonary hypertension and weakness. He was discharged in January 2019 to foster care where, according to the available records, he continues to thrive on a regular diet without restriction. Dylan was also taken into foster care in January 2019 and is also thriving on a regular diet without restriction.

According to the Encyclopedia Britannica, mold is "a conspicuous mass of mycelium (masses of vegetative filaments, or hyphae) and fruiting structures produced by various fungi (kingdom

GRAY 000030

Fungi)."[1] For purposes of this discussion, the terms mold and fungi should be thought of interchangeably.

Mold and fungi are commonly found in indoor environments. There are currently no established standards for safe indoor fungi levels or levels that impart health risks. There is, however, a published practical guide for interpreting reports from inspections or investigations of indoor molds.[2]

The majority of fungi do not cause disease in humans with normal immune systems. In contrast, immunocompromised individuals (e.g. those with advanced HIV, those on immunosuppressant medications, those receiving chemotherapy) are at increased risk for fungal infections.

**Dylan Kahraman has a normally functioning immune system and is not on any immunosuppressant medications. For these reasons, he is not at any increased risk for opportunistic fungal infection.**

All fungi are capable of producing toxins (mycotoxins). The presence of a toxin-producing fungus in any given environment does not ensure that mycotoxins are being produced. Most of the descriptions of mycotoxicosis (disease resulting from mycotoxin exposure) in humans are as a result of ingesting (or eating) moldy food like rye or millet.[3]

**Due to the extreme limitations of Dylan's diet prior to his placement in foster care, he is not at risk for having ingested any rye or millet contaminated with mycotoxins.**

Illness resulting from the inhalations (or breathing in) of mycotoxins has not been demonstrated or substantiated as a cause of disease. Inhalation of fungal toxins and other fungal debris can occur, but it requires the production of an aerosol that contains fungal fragments, such as in an occupational setting (e.g. cleaning farm silos). This type of exposure is unlikely to occur outside of an occupational setting. Reports from the American College of Environmental and Occupational Medicine and the Institute of Medicine concluded that evidence does not support the contention that mycotoxin-related illness occur via inhalation in non-occupational settings, and the relationship between mycotoxin inhalation exposure and adverse health effects even in occupational settings is controversial.[4]

**In my opinion Dylan has not had an occupational level of exposure to mycotoxins.**

Tests for the presence of mycotoxins in serum or urine have <u>not</u> been validated for use in the diagnosis of established fungi-related disorders. Nor has testing for antibodies to mycotoxins in serum or testing for fungus-specific immunoglobulin A (IgA) or immunoglobulin M (IgM), as

---

[1] (Encyclopaedia Brittanica, 2019)
[2] (Horner WE, 2008)
[3] (Hardin BD, 2003)
[4] (Committee on Damp Indoor Spaces and Health, Insitute of Medicine of the National Academies, 2004); (Hardin BD, 2003); (Mazur LJ, 2006)

humans are not known to mount immunologic responses to mycotoxins as part of any disease process.[5]

Several defined disorders involve *hypersensitivity* (or immunologically-mediated) reactions to fungi; however this is a completely different physiologic mechanism than that thought to be attributed to mycotoxins. These include asthma, allergic rhinitis, hypersensitivity pneumonitis, allergic bronchopulmonary aspergillosis and allergic fungal rhinosinusitis.

Patients presenting with symptoms of asthma, hypersensitivity pneumonitis, rhinitis, or rhinosinusitis would have some or all of the following symptoms: chronic cough, respiratory distress, chronic nasal congestion, chronic nasal discharge, fever, malaise, bloody sputum, chronic sinus pressure and/or chronic eye irritation. These patients should have specific testing to confirm a mold hypersensitivity reaction.

**Dylan Kahraman has no history of, or signs and symptoms consistent with, asthma, allergic rhinitis, hypersensitivity pneumonitis, allergic bronchopulmonary aspergillosis or allergic fungal rhinosinusitis in his medical records.**

As part of the medical record review, I have also reviewed a letter from Dr. Ronald Peters of the MindBody Medicine Center. Dr. Peters is Jessica Kahraman's doctor. Jessica Kahraman is Dylan Kahraman's mother. In his letter, Dr. Peters describes Mrs. Kahraman as suffering from headaches, recurrent sore throats, tender axillary lymph nodes, hand tremors, finger and toe numbness, poor hand-eye coordination, chronic fatigue, muscle weakness, stiffness and disturbed sleep. While I am saddened to hear that Mrs. Kahraman is suffering, none of these symptoms are specific for either mycotoxin ingestion, inhalation or fungal hypersensitivity.

Dr. Peters believes that Mrs. Kahraman has "increased immune sensitivity" and "mast cell activation" based on an elevated histamine level. It should be noted that while histamine is produced by mast cells, it is also produced by other cells – basophils, neutrophils, and platelets. Also, the most specific available marker for mast cell activation is a serum tryptase level, not a histamine level.[6]

Dr. Peters references a urine MycoTOX panel from Great Plains Laboratory showing elevated mycophenolic acid levels. As referenced above, tests for the presence of mycotoxins in urine have not been validated for use in the diagnosis of established fungi-related disorders. The results of this test therefore have no diagnostic value.

Dr. Peters documents that he has started Mrs. Kahraman on a treatment protocol designed by Dr. Ritchie Shoemaker for her supposed mycotoxicity. It should be noted that in 2004 the FDA charged Dr. Shoemaker with seven violations and ordered him to stop injecting patients with a veterinary drug not licensed for human use (see attached "Warning Letter").

It should also be noted that in 2013, the Maryland Board of Physicians found that Dr. Shoemaker "failed to meet the standard of care" when treating patients and demanded that Dr. Shoemaker be placed on probation for a minimum of two years "with terms and conditions" should he resume the

---

[5] (Center for Disease Control, 2011); (Bush RK, 2006)
[6] (Valent P, 2012)

Madison Bell
July 26, 2019
Page 4

practice of clinical medicine (see attached "Consent Order"). Dr. Shoemaker opted to stop practicing clinical medicine after this ruling.

Based on the above, I respectfully disagree with Dr. Peters that Dylan has a urinary mycotoxin test.

In summary, I do not believe that Dylan Kahraman should undergo further testing for mold related illness at this time.

Sincerely,

*/s/Jodi P. Carter, MD, FAAP*

Jodi P. Carter, MD, FAAP
Chief Clinical Integration Officer, Phoenix Children's Hospital

GRAY-000033

## References

Bush RK, P. J. (2006). The Medical Effects of Mold Exposure. *J Allergy Clin Immunol, 117*(2), 326.

Center for Disease Control. (2011, February 7). *Morbidity Mortality Weekly Reports*. Retrieved from Case Definitions for Chemical Poisonings: http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5401a1.htm

Committee on Damp Indoor Spaces and Health, Insitute of Medicine of the National Academies. (2004). *Damp Indoor Spaces and Health*. Washington DC: The National Academies Press.

Encyclopaedia Brittanica. (2019, July 22). Retrieved from Encyclopaedia Brittanica, Inc.: https://www.britannica.com/science/mold-fungus

Hardin BD, K. B. (2003). Adverse Human Health Effects Associated with Molds in the Indoor Environment. *J Occup Environ Med, 45*(5), 470.

Horner WE, B. C. (2008). Guide for Interpreting Reports from Inspections/Investagations of Indoor Mold. *J Allergy Clin Immunol, 121*(3), 592.

Mazur LJ, K. J. (2006). Spectrum of Noninfectious Health Effects from Molds. *Pediatrics, 118*(6), e1909.

Valent P, A. C. (2012). Definitions, Criteria and Global Classification of Mast Cell Disorders with Special Reference to Mast Cell Activation Syndromes: A Consensus Proposal. *Int Arch Allergy Immunol, 157*(3), 215.

Clerk of the Superior Court
*** Filed ***
8:00 AM
8/6/2019

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                      8/5/2019

HONORABLE JENNIFER E. GREEN                    CLERK OF THE COURT
                                                                M. Brady
                                                                Deputy

IN THE MATTER OF:

D.K. KAHRAMAN                                     KINDA JOHNSON-HURD
    F1149031
    DOB: 9/27/2012
KENAN TROY KAHRAMAN
    F1149032
    DOB: 9/27/2012

                                                 KATHLEEN MARTONCIK

                                                 DEEAN GILLESPIE STRUB

                                                 SUZANNE M NICHOLLS

                                                 CASA
                                                 DCS SPECIALIST - MARICOPA EAST
                                                 REGION

MINUTE ENTRY

        The court has reviewed Counsel for Mother's Motion for Reconsideration, filed July 11,
2019, and DCS's Response to Father's Motion for Reconsideration, filed July 22, 2019.

        Mother asked the court to reconsider its prior denial of her request to appoint Dr. Alarcio
to test and treat toxins "as she may deem appropriate" in this dependency case. DCS objected,
urging the court to affirm its prior order appointing a third, independent doctor from Phoenix
Children's Hospital who has no prior involvement with the case to opine as to whether additional
testing is warranted to determine if the children have been exposed to mold.

        The court is concerned about the breadth of Mother's request for Dr. Alarcio to test and
treat toxins "as she may deem appropriate" when a) the matter is set for a dependency trial on

Docket Code ORDERTERED              Form XPJDBlankME                         Page 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

JD532206                                                    8/5/2019

August 12-14, 2019; b) Mother proposed no restraint as to the nature or cost of Dr. Alarcio's testing; and c) there was no information presented that the tests proposed by Dr. Alarcio were generally accepted in the medical community as appropriate tests in these unique circumstances, as the court indicated in its June 25, 2019 order. The court's concerns remain in the face of Mother's Motion for Reconsideration. The court deemed Mother's request as too broad and far-reaching with the limited amount of information the court has at this point. The court does not view it wise to grant Mother a blanket order allowing any doctor to test and treat toxins "as she may deem appropriate" without a nexus supporting Mother's theory of the case –specifically, that the presence of mold in the family home caused ██D.K.██ and ██K.K.██ to be severely malnourished. The court affirms its previous concern that Mother's doctors were recommending different tests. The court also notes that Dr. Miga, the children's cardiologist, and the Physician's Assistant Ms. Rattle both opined that further testing is unnecessary.

The court finds that appointing a disinterested but qualified doctor at Phoenix Children's Hospital to determine if additional testing is warranted addresses Mother's concerns about someone biased rendering an opinion.

For all of these reasons, the court affirms its prior order and denies the Motion for Reconsideration.

_____
Aug 5, 2019
DATE

_____
HONORABLE JENNIFER E. GREEN

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031273



DeeAn Gillespie Strub, Esq. Bar No. 009987
Kristina Reeves, Bar No. 031171
**GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK**
7319 North 16th Street
Phoenix, AZ 85020
Tel. (602) 870-9700
Fax (602) 870-9783
*Attorney for Jessica Kahraman, Respondent*

Send all correspondence to
mailroom@gillaw.com

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

**JUVENILE DIVISION**

| | |
|---|---|
| In re the Matter of: | Case No.: JD532206 |
| ██████ KAHRAMAN, D.O.B. 09/27/12 | **OBJECTION TO THE COURTS CONSIDERATION OF DR. CARTER'S OPINION IN RULING ON PARENTS MOTION** |
| K.K. ██████ KAHRAMAN, D.O.B. ████/12 | |
| Persons under 18 years of age. | *(Assigned to the Hon. Jennifer E. Green)* |

Parents, Jennifer Kahraman (Mother), objects to the opinion of Dr. Jodi P

Carter, Phoenix Children's Hospital. This Court should reject the opinion and

grant Mother's motion that the children be tested to determine the extent of the

physical effects their exposure to toxic mold had on them. This objection is

supported the following Memorandum of Points and Authorities.

1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030915

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    Factual and Procedural Background.

Mother and Father are the parents of ███ and ███ Kahraman (DOB 9/27/2012.) ███ and ███ are twins. Despite Mother's and Father's efforts to provide ███ and ███ with the best medical care possible, unfortunately, ███ and ███ have a history of health issues. Parents have been actively working with health care professionals over a number of years to address these problems.

DCS has taken ███ and ███ from their parents. DCS has justified the State's interference with this family by claiming that the children's health problems are a result of malnutrition. Parents dispute that they have ever failed to provide their children with sufficient nutrition.

Recently, toxic mold was discovered in the family home. Through testing, it was determined that exposure to this toxic mold resulted in negative health effects in Parents. It is Parents' sincere believe that this toxic mold may have also resulted in negative health effects in the children. By DCS's own account, the children's health has steadily improved since being removed from the toxic mold exposure.

In order to ensure that the children's health issues were appropriately treated, Father filed an "Emergency Motion to Have the Children Seen by Dr.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030916

Melanie Alarcio" (Emergency Motion), so that Dr. Alarcio could determine what effects the children's exposure to toxic mold has had on their health. DCS objected to Parents obtaining this necessary health information on their children. The GAL, howver, agreed that a second opinion could be warranted.

On June 25, 2019, this Court ordered that DCS provide certain documentation to a Phoenix Children's Hospital (PCH) physician with no prior involvement with the case, whom DCS would designate. (M.E. of 6/25/19 at 3.) That physician was to evaluate the documentation provided by DCS and provide an opinion, based on that documentation, regarding whether the children should be assessed to determine the effect of toxic mold exposure on their health.

Despite the cout's order that DCS disclose the name of the designated physician to the parties "as soon as is practical," (M.E. of 6/25/19 at 4), DCS did not disclose Dr. Carter's identity until July 19, 2019. DCS also did not provide Parents with the documentation it provided to Dr. Carter until after that documentation had been provided, thereby preventing Parents from having the opportunity to object to the documentation before it was provided.

On July 26, 2019, DCS provided the report of Dr. Jodi P Carter of PCH. In that report, Dr. Carter opined that the children should continue to receive medical treatment without any information as to the extent their exposure to toxic mold may have had, being obtained.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030917

## II.     Medical background and Terminology

Dr. Carter's recommendation uses many terms and phrases with which this court has indicated it is unfamiliar. Understanding the precise terminology is essential to understanding Dr. Carter's opinion as well as understanding this objection. Therefore, Mother offers the following definitions and explanations to terms by Dr. Carter in stating her opinion:

1.  Allergies: a disease in which a person's immune system reacts to a foreign substance by producing antibodies to the substance. (Mayo Clinic, *Diseases & Conditions: Allergies*, December 10, 2018, available at https://www.mayoclinic.org/diseases-conditions/allergies/symptoms-causes/syc-20351497);

2.  Autoimmune condition: a disease in which a person's own immune system reacts to naturally occurring substances and creates antibodies towards them, causing the body to attack itself. *See* Mirriam-Webster Dictionary, *Autoimmune*, https://www.merriam-webster.com/dictionary/autoimmune, last accessed 8/6/2019.);

3.  Disease[1]: "a condition . . . that impairs normal functioning and is typically manifested by distinguishing signs and symptoms." See

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

---

[1]Medical terminology students are often reminded that the word means "dis- ease", or "not at ease." As noted above, allergies are considered a disease. (mayo clinic website);

4

AZ-KAHRAMAN030918

Mirriam-Webster   Dictionary,   *Disease*   https://www.merriam-webster.com/dictionary/disease, last accessed 8/6/2019.);

4.  IgM, IgD, IgG, IgA, and IgE: These are the five types of human antibodies. The different types have some differences and may respond to different things, but they are all a response of the human immune system (immunologic responses). Schroeder, Harry W, Jr et al, *Structure and Function of Immunoglobulins*, J Allergy Clin Immunol., 2010 Feb, available                                                                    at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3670108/.);

5.  Immunologic response: a response of the human immune system, or any time a person's immune system is activated.

6.  Mycotoxin: a chemical produced by some microfungi that are capable of causing disease and death in humans and other animals. Bennett, J. W., et al., *Mycotoxins*, Clin Microbiol Rev. 2003 Jul, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC164220/.)

In addition to the above definitions, it is also noted that, in stating her opinion, Dr. Carter uses some terms interchangeably, although the terms refer to different things. For example, Dr. Carter switches from the term "mold exposure" and "mytotoxin exposure" without explination. Mold exposure, however, is not the same thing as mytotoxin exposure, although they may be related. Mold

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030919

exposure is also not the same thing as a fungal infection. Although a patient must first be exposed to mold before they can develop a fungal infection, a fungal infection is not the only effect of mold exposure, nor will a fungal infection necessarily follow from mold exposure.    As Dr. Carter's reference notes: "[a]dverse health effects [to mold] may occur through allergic, infectious, irritant, or toxic processes." (Mazur LJ, K. J. *Spectrum of Noninfectious Health Effects from Molds.* Pediatrics, abstract (2006).) Furthermore, there is a difference between exposure to mold "spores" and exposure to mold "fragments." As stated by a reference cited by Dr. Carter,    "[m]old spores and fragments affect the inflammatory response differently." (Committee on Damp Indoor Spaces and Health, Insitute of Medicine of the National Academies, *Damp Indoor Spaces and Health,* 134, (2004).)  Due to Dr. Carter's term switching and innacurate response to the question, it is difficult, if not impossible, to discern her actual opinion.

A simple analyagy can help illustrate the problem with Dr. Carter's specific responses in her opinion.  When a parent asks a child, "did you eat your dinner?" and the child responds, "I ate my mashed potatoes," that child's response may be technically accurate. The child may have eaten their mashed potatoes, but if dinner was meatloaf, peas, mashed potatoes and jello, then the child's response is not an accurate response to the question asked. Dr. Carter talks about eating the

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030920

mashed potatoes, then about eating jello, but never answers whether dinner was eaten.

**III.     Dr. Carter's opinion is irrelevant because Dr. Carter did not address the questions posed by this Court.**

In considering whether the twins should have further mold testing, this Court identified four questions that it wanted answered to assist it in appropriately ruling on Parent's motion. Those questions were :

1. "[W]ould identifying genetic markers for 'susceptibility to mold-related illness' assist the court in determining whether mold, not malnutrition, played a role or was the cause of the boys' muscle weakness and lethargy?" (M.E. of 6.25.19 at 2);

2. "[I]s Dr. Peters aware of the echocardiogram testing already done by Dr. Miga, and if so, does that testing suggest any reason for additional testing?" (M.E. of 6.25.19 at 2);

3. "Are the tests suggested by Dr. Alarcio generally accepted in the medical community to give the court guidance as to whether the children have been exposed to mold?" (M.E. of 6.25.19 at 3); and

4. "[W]ould it be helpful to have the parents tested?" (M.E. of 6.25.19 at 3).

Dr. Carter's opinion did not answer any of this Court's questions.[2]

**A. Dr. Carter does not discuss if identifying genetic markers for susceptibility to mold-related illness would assist the court.**

---

[2] Except for minor changes such as the names and a few details such as the alleged daily caloric intake for K.K.  the date D.K.  was taken into foster care and the report that he is "thriving", the report for K.K.  Kahraman and D.K.  Kahraman are essentially identical and will be referred to collectively as "Dr. Carter's opinion."

7

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030921

Dr. Carter's opinion does not discuss genetic markers for mold-related illness at all.

**B. Dr. Carter does not discuss whether the Dr. Peters was aware of the echocardiogram testing.**

There is no discussion of an echocardiogram at all in Dr. Carter's opinion.

**C. Dr. Carter does not discuss whether the tests recommended by Dr. Alarcio are generally accepted in the medical community.**

Dr. Carter states: "[t]ests for the presence of mycotoxins in serum or urine have not been validated for use in the diagnosis of established fungi-related disorders." (Report at 2.) Dr. Carter does not provide any citation or references to support this statement. Thus, its accuracy cannot be assessed by Parents. Her unverifiable assertion regarding the use of mycotoxins in fungi-related disorders, however, is irrelevant. Dr. Alarcio did not recommend tests for the presence of mycotoxins. Dr. Alcario recommended, and Parents requested, a genetic test. Dr. Carter did not address the question of the acceptableness of the requested genetic tests.

Dr. Carter next stated: "[n]or has testing for antibodies to mycotoxins in serum or testing for fungus-specific immunoglobulin A (IgA) or immunoglobulin M (IgM) [been validated], as humans are not known to mount immunologic responses to mycotoxins as part of any disease process." (Report at 3.) Dr. Carter's assertion is not supported by any of her cited sources, and is in fact refuted by

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

8

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030922

some of the sources she cites. Allergies are considered a disease (*See supra* section II (1)). As noted above, in laymans terms, an immunologic response is any time that your immune system is activated. The production of imminoglobulins are reactions of the body's immune system. (*See supra* section II (4)). For example, a person's allergic reaction to a substance can be caused by an immune globulin E (IgE) response. (Encylclopeida Brittanica, *Food Allergies and Intolerances*, https://www.britannica.com/science/nutritional-disease/Food-drug-interactions#ref849044, last accessed 8/6/2019).    According to Dr. Carter's source, "Allergic responses to indoor molds may be immunoglobulin E (IgE) or immunoglobulin G (IgG) mediated, and both types of response are associated with exposure to indoor molds." (Hardin BD, K. B. *Adverse Human Health Effects Associated with Molds in the Indoor Environment*, J Occup Environ Med, 1, (2003)). Another of Dr. Carter's sources states "[t]he cause-and-effect relationship between mold exposure and allergic and infectious illnesses is well known." (Mazur LJ, K. J., *Spectrum of Noninfectious Health Effects from Molds*. Pediatrics, abstract, (2006).) Dr. Carter's assertion that the body does not use the immune system as a response to mold exposure is simply wrong.

Last, Dr. Carter states: "[t]here is, however, a published practical guide for interpreting reports from inspections or investigations of indoor molds." (Report at 2.) While this is true, it is irrelevant. Dr. Carter does not explain the relevance

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030923

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

of a report instructing building inspectors on the best practices for finding and identifying the type of mold in a building to medical tests to identify if a patient has been exposed to mold, and none is apparent. To the extent that Dr. Carter was attempting to imply that the practical guide should be used for medical diagnostic purposes, that implication is expressly refuted in the guide. In the guide, after noting the inspector should provide the client with a "long list of possible health consequences" from the mold found in the structure, the report then warns, "[i]t should be emphasized that health consequences should be left to physicians." (Horner WE, B. C. *Guide for Interpreting Reports from Inspections/Investagations of Indoor Mold.* J Allergy Clin Immunol, 596 (2008).) The fact that there is a guide for building inspectors with regard to mold may be technically true, but it is irrelevant and misleading.

**D. Dr. Carter does not discuss whether it would be helpful to have the parents tested.**

Although Dr. Carter does not discuss whether it would be helpful if Parents were tested, Dr. Carter does attempt to cast aspersions on diagnosis. She states: "recurrent sore throats, tender axillary lymph nodes, hand tremors, finger and toe numbness, poor-hand eye coordination, chronic fatigue, muscle weakness, stiffness and disturbed sleep" are not "specific for either mycotoxin ingestion, inhalation, or fungal hypersensitivity." (Report at 3). According to Dr. Carter, Mother's symptoms could not be the result of exposure to toxic mold, because,

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030924

the only possible allergic response to mold exposure is "asthma, allergic hinitis, hypersensitivity pneumotitis, allergic pronchopulmonary aspergillosis or allergic fundal rhinosinusitis." (*Id.*) Dr. Carter's assertion, however, is refuted by the very sources she cites in her opinion. According to one reference: "[i]n addition [to the normal allergy symptoms], outcomes not generally associated with an allergic response—including nervous-system effects, suppression of the immune response, hemorrhage in the mucous membranes of the intestinal and respiratory tracts, rheumatoid disease, and loss of appetite—have been reported in people who work or live in buildings that have microbial growth." (Committee on Damp Indoor Spaces and Health at 125). A study of rats exposed to a certain mold found that the rats had a necrosis of the liver, fibrosis of the pancreas, and an increased rate of multiple types of tumors. (*Id.* at 154.) Thus, Dr. Carter is incorrect when she states that Mother's symptoms cannot possibly be due to Mother's exposure to mold.

**E. Dr. Carter does not address the children specifically, but instead relies upon generalities for her recommendation.**

Dr. Carter states: "[t]he majority of fungi do not cause disease in humans with normal immune systems," and then states that the children have a normal functioning immune system, so they are not at increased risk for any

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030925

opportunistic fungal infection. (Report at 2.) Dr. Carter's assertion fails for numerous reasons.

First, her assertion that the children have a normal functioning immune system is false. According to the medical reports provided to Dr. Carter, both children have an autoimmune disorder, which, by definition, is not a "normal functioning immune system."

Second, even if the children did each have a normal functioning immune system, the amount of "risk" they face is ireelevant in determining if the children *actually* had an adverse reaction to mold. For example, neuroblastoma is a rare form of cancer found mainly in young children. The risk that a child may develop neuroblastoma is "very rare" even among the group with the highest risk factor, young children, (Cancer.org, *Risk Factors for Neuroblastoma*, https://www.cancer.org/cancer/neuroblastoma/causes-risks-prevention/risk-factors.html, last accessed 8/6/2019), but yet around 800 new cases are diagnosed every year in the United States, (Cancer.org, *Key Statistics About Neuroblastoma*, https://www.cancer.org/cancer/neuroblastoma/about/key-statistics.html, last accessed 8/6/2019). The fact that a medical problem is rare is not dispositive of whether it has occurred. Doctors do not diagnose patients by statistical analysis. They diagnosis patients by actually testing the patient.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

12

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Dr. Carter also opines that actually testing the children to get an accurate diagnosis should not be done because, according to her, "most of the descriptions of" mold exposure "are as a result of. . . eating moldy food." (Report at 2.) But, although it may be true that MOST mold exposure is from eating moldy food, that fact is not dispositive of whether here, the children suffer from exposure to mold. The question before the court is not whether the children ate moldy food but whether they are suffering from mold-related health problems. As one of the references cited by Dr. Carter  stated: "[e]xposure to mold can occur through inhalation, ingestion, and touching moldy surfaces. . . . The cause-and-effect relationship between mold exposure and allergic and infectious illnesses is well known." (Spectrum of noninfectious health effects from mold, Abstract). The fact that Dr. Carter doubts that the twins ate moldy food does not address the question of if the twins are suffering from  a mold-related disease. Dr. Carter engages in this faulty analysis multiple times in her report.

## IV.    Conclusion

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) "Few forms of state action are both so severe and so irreversible" as the State's termination of parental rights. *Santosky*, 455 U.S. at 759. Mother and

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

13

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030927

Father should be given every chance to prove their case and protect their right to the care, custody, and control of their children. Dr. Carter's opinion would deny Mother and Father this right, and do so based on questionable, faulty, and misleading information. Thus, Mother and Father object to this Court's consideration of Dr. Carter's opinion in ruling on their motion.

   **RESPECTFULLY SUBMITTED** this 6th day of August, 2019

     **GILLIESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK**

     By: _____
       DeeAn Gillespie Strub
       Kristina Reeves
       Attorney for Respondent

ORIGINAL e-filed this _____ day of
August, 2019, and a COPY delivered to:

Honorable Jennifer E. Green
Maricopa County Superior Court

COPIES electronically delivered
this _____ day of August, 2019 to:

Katie Martoncik
Assistant Attorney General
PSSSEF@azag.gov
Kathleen.martoncik@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
johnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

GILLIESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

14

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030928

1  Suzanne Nicholls
2  *Attorney for Father*
3
4  By _____
5
6
7
8
9
10

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

15

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030929



Clerk of the Superior Court
*** Electronically Filed ***
9/23/2019 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                               9/10/2019


                                         CLERK OF THE COURT
HONORABLE JENNIFER E. GREEN                    P. Bryant
                                               Deputy


IN THE MATTER OF:

<span style="background:black">D.K.</span> KAHRAMAN                    KINDA  JOHNSON-HURD
  F1149031
  DOB: 9/27/2012
<span style="background:black">K.K.</span> KAHRAMAN
  F1149032
  DOB: 9/27/2012


                                         KATHLEEN  MARTONCIK

                                         DEEAN  GILLESPIE STRUB

                                         SUZANNE M NICHOLLS


                                         DCS SPECIALIST - MARICOPA EAST
                                         REGION


                        STATUS CONFERENCE

        3:04 p.m.  This matter is digitally recorded in Courtroom 3.

        This is the time set for a Monthly Pretrial Status Conference.

        Present:  Assistant Attorneys General Gregory Coordes and Kathleen Martoncik;
Madison Bell, DCS child safety specialist; Kinda Johnson-Hurd, guardian ad litem for the
children; April Maxwell, appearing on behalf of DeeAn Gillespie Strub, counsel for Mother;
Mother Jessica Kahraman; Suzanne Nicholls, counsel for Father; Father Ahmet Kahraman;
Victoria Allison, DCS child safety specialist; and Lauren Richter, Abrienda Hansen, and Janna
Johnson, observing.


Docket Code STATUSCONF              Form JDHearing                          Page 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER                          AZ-KAHRAMAN031773

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                  9/10/2019

LET THE RECORD REFLECT the court has read the Admonition pursuant to Arizona Rule of Juvenile Procedure Rule 41(F).

Discussion is held regarding discovery and disclosure issues.

The Department reports the CHILDS records have been disclosed, however the CSRA is not in the CHILDS disclosure, but will be provided 9/13/2019.

Counsel for Father has received a CD copy from the Department.

Counsel for Father requests text messages sent between the case managers and others, referrals for children's services, and any other outstanding referrals, the full referral packets, all disclosure between 1/13/2019 through 3/23/2019, and anything after 8/10/2019.

IT IS ORDERED the Department and Mother will disclose any text messages between the DCS case managers and others no later than close of business, 9/17/2019.

IT IS ORDERED the Department will send an email, by close of business 9/17/2019, as to whether the investigator, Sarah Kramer, may have sent text messages to anyone associated with this case, and request the text messages in order to disclose them to the parties.

The Department indicates any referrals that were made by the Department have been disclosed, however the children's services are through the RBHA.

IT IS ORDERED directing the Department to reach out to the RBHA and request copies of all referrals and full referral packets with attachments and set forth a time table by which they should be expected and disclose to the parties in the 9/17/2019 email.

The Department will be completing a new batch run this Friday 9/13/2019 regarding the CHILDS records.

After the Department receives the disk of the new batch run, the Department will complete a thorough review to ensure it is complete.

The Department will disclose the new batch run of CHILDS to all parties no later than Friday 9/20/2019, through file share.

Docket Code STATUSCONF              Form JDHearing                    Page 2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031774

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              9/10/2019

Regarding Imaging and Labs,

The Department has received the imaging from Banner/Cardon Children's, will redact the information, and provide the CD to the parties no later than 9/18/2019.

The Department would like the parents to review the imaging CD and report to the Department if they believe there is anything missing, no later than 9/27/2019.

IT IS ORDERED counsel for Mother and counsel for Father will email the Department by 9/30/2019 to report what may be missing from the imaging CD.

Counsel for Mother makes an oral motion for the court to sign a Release of Information for imaging and medical records.

Discussion is held.

IT IS ORDERED denying counsel for Mother's request to Order the Release of Records.

The Department work with Mother and Father in order to obtain the leg x-rays that were taken between Sept/Oct 2018 from Phoenix Children's Hospital of both boys.

Mother and counsel for Mother will work with the Department to obtain records regarding Becky Plotner's treatment of the children.

The Department requests a list of counsel for Father's interviews that have been scheduled.

IT IS ORDERED directing counsel for Father re-forward her emails regarding who she wants to interview to the Department, including a list of the interviews that are already scheduled.

The parties will work together to schedule interviews of the medical professionals involved in the case.

The Department is obtaining a report from Dr. Kelly, however, Dr. Kelly wants to review Ms. Plotner's records from Georgia first before he finalized his report.

When Mother reaches out to Ms. Plotner to obtain her records, she will also work to set up a phone interview of Ms. Plotner.

Docket Code STATUSCONF              Form JDHearing                       Page 3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031775

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    9/10/2019

Discussion is held regarding the parents receiving insurance records indicating that
K.K. is still receiving oxygen.

The Department reports K.K. hasn't received oxygen since February 2019.

Counsel for Mother reports the redelivery for the oxygen started June, July, and August.

IT IS ORDERED Mother and Father will disclose the insurance records to the
Department regarding being billed for oxygen, by 9/17/2019.

The Department will review the records and respond by 9/24/2019 via email.

3:54 p.m. DeeAn Gillespie Strub enters the courtroom and announces for the record.

Discussion is held regarding therapy goals for Father and Mother.

Counsel for Father requests a Mediation.

Counsel for Mother requests a Mediation.

IT IS ORDERED the Department will follow up with the Mediation supervisor, Amy
Steemke, regarding whether she is willing to conduct both Mediations.

IT IS ORDERED setting this matter for Mediation - Dependency (with Amy Steemke)
regarding Mother

    on      10/4/2019
    at      1:30 PM
    before  Southeast Mediation
    at the Maricopa County Juvenile Court Center
    Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

Docket Code STATUSCONF              Form JDHearing                    Page 4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031776

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              9/10/2019


        IT IS ORDERED setting this matter for Mediation - Dependency (with Amy Steemke)
regarding Father

                on      10/4/2019
                at      3:30 PM
                before  Southeast Mediation
                at the Maricopa County Juvenile Court Center
                Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

        IT IS ORDERED affirming the Conference - Status

                on      10/22/2019
                at      10:45 AM
                before  Honorable Jennifer E. Green
                at the Maricopa County Juvenile Court Center
                Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

        IT IS ORDERED affirming the Conference - Status

                on      11/19/2019
                at      11:15 AM
                before  Honorable Jennifer E. Green
                at the Maricopa County Juvenile Court Center
                Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

        IT IS ORDERED affirming the Conference - Pretrial - Contested Dependency

                on      12/16/2019
                at      10:45 AM
                before  Honorable Jennifer E. Green
                at the Maricopa County Juvenile Court Center
                Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031777

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                          9/10/2019

IT IS ORDERED affirming the Dependency - Permanency Planning/Age 3-17 Years

on      12/16/2019
at      10:45 AM
before  Honorable Jennifer E. Green
at the Maricopa County Juvenile Court Center
Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

IT IS ORDERED affirming the Dependency - Adjudication

on      1/8/2020     at    1:30 PM
and     1/9/2020     at    1:30 PM
and     1/10/2020    at    1:30 PM
and     1/14/2020    at    1:30 PM
and     1/15/2020    at    1:30 PM
before  Honorable Jennifer E. Green
at the Maricopa County Juvenile Court Center
Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

This Courtroom utilizes an electronic recording system for the Court's record. If a court reporter is needed, a written request must be filed with the Clerk of the Court and a copy provided to the assigned judicial officer at least 72 hours before the commencement of the proceeding.

To order a copy of the audio record on compact disc (CD), please call Juvenile Court Administration (Durango facility - 602-506-4533/Southeast facility - 602-506-2544). There will be a fee of $30 for each copy of the Superior Court proceedings. All copies will be provided using Court-supplied media.

4:04 p.m. Court adjourns.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031778

December 2, 2019

Ms. Madison Bell
Arizona Department of Child Safety
1201 S Alma School Rd
Mesa, AZ 85210

RE:    *Ms. Jessica Kahraman*

Dear Ms. Bell:

This report is in response to your request for my evaluation of the above case. I have been asked to address the following questions:

1.  Does the parent suffer from a mental illness/personality disorder/thought disorder/signs of psychosis/substance abuse disorder/mental deficiency/retardation etc. per the DSM? If so, how does this impact her ability to parent at this time?

2.  What is the prognosis that the parent will be able to demonstrate minimally adequate parenting skills in the foreseeable future?

3.  What psychological factors does the parent possess that may be related to alcoholism, substance abuse and/or other addictive behavior? What is her potential for alcohol/substance abuse and/or addictive behavior?

4.  Is the child in the care of this parent likely to be at risk in any way? If so, explain.

5.  Are there any mental health services that could be provided to improve the parent's condition? If so, what specific services are recommended? If therapy is recommended, what should the therapy address?

6.  What level of supervision is needed for contact/visitation? Why? Are any limitations or restrictions needed? Why?



CAUTION IS RECOMMENDED IN THE DISSEMINATION OF THIS REPORT
GIVEN ITS SENSITIVE NATURE

Jessica Kahraman
Date of Birth: 08/29/1972

## SUMMARY:

It is my opinion, with reasonable medical certainty, that allowing Ms. Jessica Kahraman to care for her sons, Dylan and Kenan, places them in significant danger for additional harm.

It is also my opinion that additional recommendations must be followed to determine if Ms. Kahraman is psychotic and/or has other mental health conditions that are preventing her from parenting the boys safely.

It is my opinion that Ms. Kahraman needs mental health treatment services, like those described in the opinion section of this report, in order to make enough progress toward the goal of reunification with Dylan and Kenan.

## SOURCES OF INFORMATION:

1. Banner Health records, multiple authors and dates;

2. East Valley Children's Center records, multiple authors and dates;

3. Arizona Department of Health and Human Services Newborn Screening Reports for Dylan and Kenan dated 10/05/2012 and 10/17/2012;

4. Melmed Center records, multiple authors and dates;

5. Bright Horizons Rehab Therapy records, multiple authors and dates;

6. Records from Dr. Cindy Schneider's Center for Autism Research, multiple authors and dates;

7. Arizona Pediatric Eye Specialists records from Dr. Jerald Underdahl, dated 04/07/2014;

8. Arizona Otolaryngology Consultants note by Dr. Nathan Page, dated 05/02/2014;

9. Phoenix Children's Hospital records, multiple authors and dates;

10. Bioveda Health and Wellness Center documents, multiple authors, dated 03/23/2015;

11. Records from the office of Dr. Stephen Davidson, DO, multiple authors and dates;

12. Nelson Pediatric Therapy records, multiple authors and dates;

13. Records from the office of Becky Plotner, ND, multiple dates;

2

Jessica Kahraman
Date of Birth: 08/29/1972

14. BASIS Chandler Primary – North Campus records, multiple authors and dates;

15. Records from the office of Scott M. Jensen, MD, multiple authors and dates;

16. Letter from occupational therapist Ellyn Jones from Sunrise Therapy dated 06/26/2017;

17. Neurologic Music Therapy Services of Arizona records, multiple authors and dates;

18. Records from Recharge Your Life, the office of chiropractor Kevin Ross, multiple authors and dates;

19. Baio Enterprises records, multiple authors and dates;

20. La Frontera, Arizona records from Tori Papp, LAC, multiple dates;

21. Southwest Human Development, Inc. records, multiple authors and dates;

22. Psychological Evaluation for Ms. Jessica Kahraman by Dr. Mary Oakley dated 04/16/2019;

23. Records from Suzanne Nichols, OPA, multiple authors and dates;

24. Buwalda Psychological Services records by Dr. Kelly Rodriguez, multiple dates;

25. MindBody Medicine Center records from Dr. Ronald Peters, multiple dates;

26. Email from Ms. Susan Stark, CASA to DCS Specialist Ms. Madison Bell dated 11/05/2019.

PLW_000493

Jessica Kahraman
Date of Birth: 08/29/1972

## OPINION:

1. <u>Does the parent suffer from a mental illness/personality disorder/thought
disorder/signs of psychosis/substance abuse disorder/mental deficiency/retardation
etc. per the DSM? If so, how does this impact her ability to parent at this time?</u>

I cannot opine on whether Ms. Kahraman meets Diagnostic Statistical Manual of
Mental Disorders, Fifth Edition (DSM-5) criteria for a mental disorder because she
deferred meeting with me, and I was not granted access to her entire medical record.
However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman's
behavior toward her sons raises concerns for mental illness, and that regardless of the
cause of Ms. Kahraman's behavior, she is currently incapable of providing safe and
adequate care to her boys. The following evidence supports my opinion:

1.1. Ms. Kahraman's assertion that Dylan and Kenan have multiple food and
chemical sensitivities places them in danger. The following evidence supports my
opinion:

1.1.1. The Rapid Response Clinical Diagnostic Summary dated 01/02/2019 by
Tori Pap, LAC includes the following excerpt:

Placement stated that the child has been sleeping well in his current
placement. Placement stated, "He even took a nap on Monday
[12/31/2018] afternoon." Placement stated that the child shares a room
with her two foster children. Placement denied any reports of nightmares
from the child. Placement stated that the child "has never looked sad or
cried or isolated himself." Placement stated, "He is super behaved, very
well spoken. He has been reading books to my girls." Placement stated
that the child's appetite is "ravenous." Placement stated, "They told me to
just give him all this diet because he hadn't had food. She had him on
some special diet called the GAPS diet so he was only getting lamb, beets,
and carrots, and some broth I guess. They didn't want him to have any
dairy and gluten." Placement stated that the child's mother reported that
the child has a chemical imbalance and the food causes stomach pain and
rashes on his body. Placement stated, "I've seen nothing."

Placement stated that she has allowed the child to try small portions of
food off of his previous diet plan. Placement stated, "He is so hungry all
the time. I feel really bad all the time." Placement stated that the child has
had a bowel movement every day and he has not had diarrhea. Placement
stated that the child's general mood is "happy."

Ms. Pap's discussion with Dylan's foster placement indicates that Ms.
Kahraman's concerns about food and chemical sensitivities are unwarranted.

PLW_000494

Jessica Kahraman
Date of Birth: 08/29/1972

1.1.2.   The Emergency Department Report by Jayson Luma, MD dated
12/18/2019 relates the following about Kenan's presentation:

> This is a 6-year-old male who comes in with the mother and father who
> report a convoluted disjointed history of a child whose had multiple
> "chemical allergies" throughout his life however on or about October 2 he
> and his fraternal twin brother began to decline in a rapid fashion with
> respect to walking and since then this child has not walked. The mother
> reports that "he is not immunized. I see a family practitioner Dr. Jensen
> and a naturopathic doctor which I am sure you do not agree with. I myself
> from an acupuncturist and we have him on a certain beef stock diet called
> a gap diet. We believe he is being exposed to certain chemicals such as the
> markers from the dry erase boards at school and because of this is so
> sensitive that he does not walk anymore."

Dr. Luma adds:

> The mother further goes on to state that "I think it is just chemical
> sensitivity but we really want to just make sure his liver is normal today."
> Interestingly both this child and his older brother on or around the same
> time had rapid decline. The older brother is now "walking fairly normally
> but these kids were in taekwondo and played avid tennis just before all
> this." The mother reports that this child has had complaints of bilateral
> feet pain but has not had any red or stiff swollen joints.

Ms. Kahraman's conclusion that "certain chemicals such as the markers from
the dry erase boards at school" are responsible for Kenan's inability to walk is
alarming. The records show that Kenan's health problems during the Winter
of 2018 were due to malnourishment. It is unclear whether Ms. Kahraman's
statements related to Kenan's chemical sensitivities reflect attempts to evade
detection of abuse or serves as evidence that she has lost touch with reality.

1.1.3.   Ms. Kahraman's email to Dr. Cindy Schneider on 03/10/2015 is evidence
that her thinking about the cause of Dylan and Kenan's alleged health
problems is based on illogical and false information. For example, UMs.
Kahraman writes:

> I have my own suspicions that their sensitivities are not due to anything
> more than severe yeast, maybe some bacteria from the hospital (their first
> exposure to any bacteria, since I had IV [antibiotics] at birth) and likely
> parasites, since many children with autism have them.

> I've been reading more about candida, and it seems that a perfect storm
> has existed that caused mine and their yeast to get so bad. Among factors
> we've discussed, I learned that yeast flourishes during periods where
> estrogen drops and progesterone spikes; I've lived in this state for 2.5

5

Jessica Kahraman
Date of Birth: 08/29/1972

years since nursing has completely suppressed my estrogen. Also, I never considered it, but I know my husband has yeast issues that are probably being continually passed to me, as well as were likely passed to the boys, as I've read the father's gut health also affects that babies'. This does help me to understand why we have not seen the improvement we expected?

We are down to one feeding per day. I plan to fully wean in two weeks. We did try SCD for a day, but it was too much stress for a variety of reasons, and I decided to wait and do GAPS after weaning. I believe we are at a relative standstill until we get their yeast under control, which can only happen through a full gut healing diet. I believe the reason they cannot tolerate any B vitamins is because of their salicylate sensitivity, which Feingold lists as high in salicylates. I've also even read that salicylates can impair mitochondrial function in people who are sensitive to them. I'm wondering if that's why implementing P5P seemed to affect their labs negatively instead of positively?

Ms. Kahraman's contention that "a perfect storm has existed that caused mine and their yeast to get so bad" is unsubstantiated. For instance, Kenan's laboratory studies that were collected five days before Ms. Kahraman sent the above referenced email did not contain evidence of excessive yeast or parasites. It is unclear whether Ms. Kahraman's email was intended to deceive Dr. Schneider into believing the boys were ill or if an undiagnosed mental health condition caused her to misperceive their health status.

1.1.4.  Ms. Kahraman restricted Kenan and Dylan's diet despite the potential for causing malnutrition. The following evidence supports my opinion:

1.1.4.1.  Ms. Kahraman's email to Dr. Cindy Schneider on 6/24/2014 includes the following excerpt:

> It's become a big priority to resolve Kenan's phenol sensitivities. He's been eating little besides beef for several weeks now. He might eat peas or green beans once or twice, then start reacting to them, too, and refuse further food. It's pretty clear that he's avoiding food because he doesn't feel well when he eats most of it: salicylates, amines, glutamates, [and] oxalates all seem to cause rather immediate illness. Their need to avoid gluten, dairy, grains, most [illegible word], and all processed foods leaves nearly zero low phenol options – for them or me. So, he eats nothing or the same 3 things over and over. I really like Julie personally, but $700 later, we are no closer to finding a solution for Kenan's eating concerns. Avoiding nearly all foods is no longer a workable solution, and I really worry about his dwindling nutritional intake [and] mine.

Ms. Kahraman adds:

6

Jessica Kahraman
Date of Birth: 08/29/1972

Are there deficiencies in cofactors, like molybdenum, that might be supplemented? Short of a feeding therapist we don't know who else to turn to and I doubt that's the answer, since it seems less sensory [and] more biomedical. Otherwise, is it safe for him physically [and] mentally to subsist on the same 2-3 foods, and how long is reasonable to continue this before he ends up on an IV? That's my fear. Plus, my husband [and] family are all begging me to let him eat 'normal food' as they believe this crazy dietary restriction is to blame for his lack of interest in food.

We've talked about it with our [pediatrician and] he ordered food allergy testing through Quest. I know this isn't going to catch the problem.

The email reply from Dr. Schneider to Ms. Kahraman on 06/25/2014 relates:

No, he can't survive on his current diet. He must eat other foods. Please continue to avoid gluten and casein but relax all other food restrictions other than those that cause obvious reactions.

Ms. Kahraman was aware that restricting her boys' nutritional intake for extended periods of time would cause harm.

1.1.4.2.    An email from Ms. Kahraman to Dr. Cindy Schneider on 01/12/2015 relates:

I read in an excerpt from Andy Cutler's Amalgam Illness that mercury toxic people can have sulfur food intolerance due to mobilization of mercury caused by raising cysteine levels and excess [illegible word], rather than a direct allergy/intolerance to sulfur foods. He says that for these people, avoidance of high thiol [sic] foods is important to prevent mobilization of mercury and subsequent symptoms. I do notice that our boys have much better stools when they don't eat vegetables, and that all the veggies they eat are on his thiol list (and give them pasty to watery stools, depending on the quality and frequency with which they are eaten).

I know it's not advisable for vitamin-deficient toddlers to avoid veggies, but do you have concerns about high thiol foods mobilizing mercury in them? I'm concerned we're doing more harm than good with the veggies?

7

Jessica Kahraman
Date of Birth: 08/29/1972

Ms. Kahraman's desire to reduce Kenan and Dylan's vegetable intake despite concerns over vitamin deficiencies illustrates how her irrational concerns about the boys' health placed them in harm's way.

1.1.4.3.    The pediatric gastroenterology service notes by Dr. Vinay Bandla and Nurse Practitioner Christina Woods on 12/25/2018 reports the following about Kenan:

> He is on the GAPS diet for leaky gut. He is on a very limited diet at home. He is histamine intolerant. He has to have low salicylate foods so his fruits are peeled. He is not able to tolerate any oils or herbs. He used to eat a whole peeled apple every day but that was too much for him so they were removed from his diet. Mom will now allow him to eat a fourth of an apple at birthday parties or other occasions when cake is being served. She may give him two blueberries as a special treat, but 20 minutes later he will be screaming in pain because he is unable to tolerate fructose. He eats Lamb, broth from Lamb, Lamb bone marrow, beats, carrots, and egg yolk. Everything he eats is homemade and organic. He is able to eat four small meatballs, 1/4 of an egg yolk, and approximately 1 teaspoon of shredded vegetables cooked in lamb broth at a time. He drinks 4 cups of lamb broth per day. He is getting an average of 500 cal/day at home. Per today's bedside RN, mom is restricting his food and water intake despite his complaints of being hungry. RD has been consulted and the plan is to introduce one new food into his diet every day. Mom is considering trialing lentils or small potatoes that contain less amounts of starch for carbohydrates. She has given him half a teaspoon of rutabaga yesterday and today.

Ms. Kahraman's concerns about her children having food sensitivities was used as a rationale for the diet that caused them to become malnourished.

The above evidence illustrates how Ms. Kahraman's concerns about the boys having chemical sensitivities caused harm.

1.2. Ms. Kahraman's statements about Kenan being infested with parasites are unsupported by objective data and raise concerns for Kenan's safety if he is returned to her. For example:

1.2.1.    An email from Ms. Kahraman to Kenan's chiropractor, Dr. Kevin Ross, on 12/04/2018 relates, "Saturday: Had a focal seizure (first ever) upon waking and pooped and vomited parasites. Seemed better afterward, but awoke with facial edema." Ms. Kahraman adds:

> Sunday: Had another focal seizure in the early morning, and hit his head on the counter, though I think he's ok. Complained of head pain (left

PLW_000498

Jessica Kahraman
Date of Birth: 08/29/1972

occipital) for a couple of days afterward. No signs of concussion and it didn't seem hard enough. Awoke Sunday with swollen feet, and has had ever since. Gave him a dilute drop of lemon juice, very lethargic all day. He had tummy pain again Sunday night, two longer focal seizures back to back and passed parasites and vomited a liver fluke.

Ms. Kahraman's decision to defer taking Kenan to the hospital despite allegedly observing him have seizures, vomit up liver flukes, and pass parasites in his stool defies common sense.

1.2.2.  Dr. Sandra Buttram's note dated 12/19/2018 includes the following excerpt:

With each of these episodes he vomited a "liver fluke" and passed stool with visible "parasites" per mother. Each of these episodes was brief lasting only a couple of minutes. Episode #2 he fell sideways while he was sitting on the toilet and bumped his head on the counter but mother was right there and was able to break the fall. She felt that these episodes were due to the toxin buildup in his body and that the emesis and stool output were ridding his body of "toxins."

Dr. Buttram adds, "Emesis was nonbilious nonbloody but contained 'liver fluke.' No hematochezia or melena. Loose stools with 'parasites' frequent. Numerous food sensitivities. Passed 'gallstones' 3-4 weeks ago." Ms. Kahraman's reports that Kenan has been vomiting liver flukes, passing parasites in his stool, and passing gallstones in his stool are unsubstantiated and alarming.

1.2.3.  Kenan's laboratory tests from 12/21/2018 are negative for stool ova and parasites and Clostridium difficile related diarrhea. It is unlikely Kenan's stool ova and parasites test would have been negative if Ms. Kahraman's descriptions of him vomiting up and defecating parasites were accurate.

1.2.4.  The records I reviewed indicate that Ms. Kahraman is the only person to have witnessed Kenan vomiting a liver fluke and passing parasites in his stool around the time of his hospitalization in December of 2018.

It is my opinion, with reasonable medical certainty, that Ms. Kahraman's statements about Kenan experiencing parasite infestation leading up to being hospitalized in December of 2018 are inaccurate. Furthermore, the unusual nature of Ms. Kahraman's claims and lack of supporting laboratory data raises concerns that she was attempting to deceive Kenan's treatment providers or had lost touch with reality.

9

PLW_000499

Jessica Kahraman
Date of Birth: 08/29/1972

1.2.5.  Ms. Kahraman's assertion that Kenan was likely infested with parasites in
March of 2015 was unfounded and consistent with her pattern of making
inaccurate claims about Kenan's health. For example:

1.2.5.1.    An email from Ms. Jessica Kahraman to Dr. Cindy Schneider on
03/10/2015 includes the following excerpt:

> We sent off Kenan's stool test last Wednesday, so you should be
> getting those results in a couple of weeks. I have my own suspicions
> that their sensitivities are not due to anything more than severe yeast,
> maybe some bacteria from the hospital (their first exposure to any
> bacteria, since I had IV [antibiotics] at birth) and likely parasites, since
> many children with autism have them. I think their stomach acid is
> probably very low due to their yeast, and this has not enabled them to
> defend against anything.

The rationale for Ms. Kahraman's concerns that Kenan and his brother
Dylan's alleged "sensitivities" are due to "severe yeast," "maybe some
bacteria from the hospital (their first exposure to any bacteria, since I had
IV [antibiotics] at birth)," and "likely parasites, since many children with
autism have them" does not appear to have been based on objective data.

1.2.5.2.    The parasitology report for specimens collected on 03/03/2015 and
resulted on 03/18/2015 relates, "No Ova or Parasites seen." The report
adds that a parasitology [Elisa immunoassay] for "Cryptosporidium,"
"Giardia lamblia," and "Entamoeba histolytica/dispar" are "Negative."

1.2.5.3.    The bacteriology report for specimens collected on 03/03/2015 and
resulted on 03/18/2015 conveys that there was no growth on mycology.

1.2.5.4.    Dr. Cindy Schneider's note dated 03/25/2015 reports, "No growth
on mycology" and "No ova or parasites."

It is unclear whether Ms. Kahraman's concerns about her children being
infested with parasites represent attempts to deceive care providers and/or are
the result of underlying mental health difficulties.

1.3. Ms. Kahraman's statements about witnessing Kenan have multiple seizures
during the winter of 2018 yet not taking to the hospital immediately afterward is
cause for concern. For instance:

1.3.1.  Ms. Kahraman's email to chiropractor, Dr. Kevin Ross, on 12/04/2018
includes the following excerpt:

> <u>Saturday:</u> Had a focal seizure (first ever) upon waking and pooped and
> vomited parasites. Seemed better afterward, but awoke with facial edema.

10

PLW_000500

Jessica Kahraman
Date of Birth: 08/29/1972

Homeopathic Sabadil pellets brought it down. Gave tiny bits of Mg glycinate and had ground turkey that night, which perked him up like his normal self (though still a bit swollen) for about 2 hours, then complained of knee pain and chest [symptoms] returned. I had given the turkey with homeopathic histaminum drops, which seemed to make things worse not better (20% alcohol that I burned off). Sunday: Had another focal seizure in the early morning, and hit his head on the counter, though I think he's ok. Complained of head pain (left occipital) for a couple of days afterward. No signs of concussion and it didn't seem hard enough. Awoke Sunday with swollen feet, and has had ever since. Gave him a dilute drop of lemon juice, very lethargic all day. He had tummy pain again Sunday night, two longer focal seizures back to back and passed parasites and vomited a liver fluke.

It is alarming that Ms. Kahraman did not seek immediate medical attention for Kenan despite witnessing him have seizures for the first time in his life.

1.3.2.   A progress note by Shanna Tarjeft, NP dated 12/05/2018 relates:

Saw a chiro yesterday, pooped 6 times yesterday, MCS after starting school - immobilization, edema, liver problems, heart palpitations, 3 focal seizures in the last 1 month. Pulled both kids from school and they feel better. Going through "detox and when not pooping feels worse."

The above note is evidence that Ms. Kahraman did not seek emergency medical attention for Kenan despite his allegedly having multiple seizures within the previous month.

Ms. Kahraman's report that Kenan had new onset seizures in the setting of being infested with multiple parasites (*author's note: later laboratory testing showed that Kenan was not infested with parasites*) yet did not seek urgent medical care raises concerns about her credibility.

1.4. Ms. Kahraman's was unreliable when asked about Kenan's calorie intake during the hospitalization in December of 2018. For example:

1.4.1.   A note by Michael Stewart, MD dated 12/26/2018 reports the following:

The patient's weight is down again today 17.02 kg to 16.82 kg, highest was 18.22 kg. Mom believes this is due to the patient getting too much thyroid hormone, and she believes the patient is receiving 2000-2500 calories per day based on her calculations. Spoke to the dietician who feels the patient is not getting this many calories and is also not getting enough folic acid.

1.4.2.   Dr. Mona Nourani's 12/28/2019 progress note for Kenan relates:

11

PLW_000501

Jessica Kahraman
Date of Birth: 08/29/1972

> We had an extensive meeting the SCAN team, parents, social work and
> DCS and dietician and risk management. we discussed the importance of
> introducing new foods and nutrition intake and how there is a disconnect
> between the calories that parents believe he is consuming and what the
> dietician has witness. we also expressed that since it is very important for
> calorie count we can provide a balance diet through hospital foods which
> can help him get the adequate nutrition. however father and mother were
> very resistant and they very insistent on bringing food from home and
> making several trips to get food from home.

1.4.3. The nutrition follow up note by Laura Veleta, RD dated 12/28/2018
includes the following excerpt:

> Mom reports she has provided Kenan with variety of foods such as
> hardboiled eggs, broccoli, baked apples, and green beans last few days.
> Also states she believes he is consuming close to 2500 kcals/day, to which
> Dad chimed in pt ate 1.5 lbs of lamb yesterday. RDN stated recent calorie
> counts indicating pt was eating closer to 1200 kcals/day and that Kenan
> has also continued to lose weight rather than gain.

The above records indicate that Ms. Kahraman repeatedly overestimated Kenan's
calorie intake during the December 2018 hospitalization. Such overestimates, if
not caught by hospital staff and allowed to continue, could have interfered with
Kenan's recovery.

1.5. Ms. Kahraman's inability to acknowledge that the primary cause of Kenan's
medical problems was malnourishment due to an inadequate diet is evidence that
she is unable to care for her children safely and raises concerns that she may be
delusional (*author's note: a delusion is a false belief that is maintained despite
overwhelming evidence to the contrary*). For example:

1.5.1. A note by Dr. Ryan Stewart dated 12/25/2018 conveys:

> Have a strong suspicion for medical neglect or medical child abuse.
> Patient's appetite has increased, and mom is wanting to stop the
> levothyroxine to avoid having to feed him so much. Mom also still
> convinced the pulmonary hypertension is due to patient's exposure to
> white board markers. The patient would likely take adequate PO intake for
> his nutritional needs if mom would stop limiting his intake. Also suspect
> feeding "intolerance" symptoms are fictitious as they are based solely on
> mom's reports and not supported by nurse observations.

Dr. Stewart's revelation that Ms. Kahraman is "still convinced the pulmonary
hypertension is due to [Kenan's] exposure to white board markers" despite

12

PLW_000502

Jessica Kahraman
Date of Birth: 08/29/1972

clear evidence of malnutrition and having already been already told by Kenan's doctors that he was malnourished, is cause for great concern.

1.5.2. The email from Dylan and Kenan's Court Appointed Special Advocate (CASA), Ms. Susan Stark, to DCS specialist Ms. Madison Bell and Ms. Leslie Blakley on 11/05/2019 reports:

> The parents followed me out of the room and called after me to wait. Jessica wanted to know if I was 'on their side for reunification' because, she said, "I previously thought you were."
>
> I told her that was the plan. She said she misses them and loves them so much. I said, "the boys love you and want to be back together, too."
>
> Then she positioned herself directly in front of me and said, "I just want to be sure you are on our side." I said to her, "You are a well educated woman. I don't understand how you think it was ok not to feed your kids fruits and vegetables, grains, or dairy." She said, "I was trying to give them a little bit of ghee (butter)." The father said they were trying to give them little bits of onions."
>
> Jessica looked me squarely in the eye and said, "They were getting everything they needed. All the nutrition they needed."
>
> "But Kenan had heart failure." I said. "He had fluid in his lungs, and in his belly!"
>
> Jessica said, "That was because of his thyroid and the mold!"

Ms. Kahraman's claim that Kenan's heart failure, the fluid in his lungs, and fluid in his belly was brought on by thyroid problems and mold in the setting of adequate nutrition is inconsistent with the medical record.

Ms. Kahraman's comments about the cause of Kenan's deteriorating health raise concerns that she is harboring irrational beliefs about her children and/or being deceptive in ways that place them in danger.

2. <u>What is the prognosis that the parent will be able to demonstrate minimally adequate parenting skills in the foreseeable future?</u>

It is my opinion, with reasonable medical certainty, that Ms. Kahraman is currently unable to demonstrate minimally adequate parenting skills. Ms. Kahraman will require continued mental health treatment and appropriate supervision to determine if she can demonstrate minimally adequate parenting skills in the foreseeable future. Please see the examples of Ms. Kahraman's behavior in this report and the

PLW_000503

Jessica Kahraman
Date of Birth: 08/29/1972

accompanying chronological summary of records for evidence supporting my opinion.

3. <u>What psychological factors does the parent possess that may be related to alcoholism, substance abuse and/or other addictive behavior? What is her potential for alcohol/substance abuse and/or addictive behavior?</u>

I have not been provided information indicating that Ms. Kahraman may be suffering from a substance use disorder.

4. <u>Is the child in the care of this parent likely to be at risk in any way? If so, explain.</u>

It is my opinion, with reasonable medical certainty, that Kenan and Dylan are at risk for serious harm if returned to Ms. Kahraman's care. Evidence supporting my opinion includes, but is not limited to, Ms. Kahraman's belief that the boys' health problems are due to sensitivities to environmental chemicals and mold rather than inadequate nutrition, her unsubstantiated claims that Kenan has been infested with parasites, and her reports of chronic food intolerances that were shown to be false once the children were removed from her home.

5. <u>Are there any mental health services that could be provided to improve the parent's condition? If so, what specific services are recommended? If therapy is recommended, what should the therapy address?</u>

I carefully considered whether Ms. Kahraman's current treatment program was optimal based on the findings and recommendations from Dr. Mary Oakley's psychological evaluation dated 04/16/2019. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley. It is also my opinion that Ms. Kahraman may benefit from additional mental health services as she progresses toward reunification with her sons.

Evidence supporting my concern that Ms. Kahraman may have mental health problems beyond what was described in Dr. Oakley's report includes the following:

5.1. The results from Dr. Oakley's psychological testing indicated that Ms. Kahraman's evaluation may be limited in accuracy. For example, Dr. Oakley included the following summary of her performance on the Personality Assessment Inventory (PAI):

> *With respect to positive impression management, her pattern of responses suggests considerable defensiveness in responding. In particular, she appears motivated to portray herself as being exceptionally free of common shortcomings to which most individuals will admit. As a result, she will be quite reluctant to admit to minor faults, perhaps not even willing to admit these faults to herself. Accompanying this reluctance may be a tendency to*

14

PLW_000504

Jessica Kahraman
Date of Birth: 08/29/1972

> minimize any negative impact that her actions may have on other people, and
> also on herself. Given the high level of defensiveness, the clinical scale profile
> is likely to reflect significant distortion and minimization of difficulties in
> certain areas. **Regardless of the cause, the test results are unlikely to be a
> valid reflection of the respondent's experience.**

Dr. Oakley's interpretation of Ms. Kahraman's PAI suggests that the results were
unlikely to be valid and that additional investigation may be necessary.
Furthermore, Dr. Oakley's summary of Ms. Kahraman's performance on the
Millon Clinical Multiaxial Inventory (MCMI) includes the following excerpt:

> Ms. Kahraman's response pattern suggest an effort to present a socially
> acceptable front and resistance to admitting personal shortcomings. The
> interpretive narrative is probably reasonably valid but may fail to represent
> certain features of her symptoms and/or character. It appears as though Ms.
> Kahraman responded to testing items as she would like others to see her, not
> as she is.

Dr. Oakley's interpretation of Ms. Kahraman's performance on the MCMI also
indicates that she minimized any mental health related difficulties she is having.

Dr. Oakley's interpretation of Ms. Kahraman's psychological testing indicating
that she may not have been forthcoming, Dr. Oakley's limited record review, and
Ms. Kahraman's strange statements about the cause of her children's health
difficulties are concerning for serious mental health difficulties that have not been
detected or addressed. It is recommended that Dr. Oakley, and/or another
psychologist experienced in conducting neuropsychological evaluations in
forensic settings, be provided access to this report and the accompanying
chronological summary of records to determine if additional testing would be
beneficial in clarifying Ms. Kahraman's diagnosis.

5.2. Additional records are required to help determine whether Ms. Kahraman may be
suffering from physical and/or mental health conditions that impact her ability to
safely parent Dylan and Kenan. For instance, a letter dated 06/07/2017 by Ronald
Peters, MD, MPH includes this excerpt:

> Jessica is a 46-year-old woman who came to my office on May 2, 2019
> complaining since April of headaches, recurrent sore throat, tender axillary
> lymph nodes, hand tremors, finger and toe numbness and poor hand-eye
> coordination. Prior to this she developed chronic fatigue, muscle weakness
> and stiffness, and disturbed sleep during the previous two years. She also
> complained of severe emotional stress over the past one year due to multiple
> health problems for her twin children, 6 years old, both of which are autistic
> and have had multiple new medical problems since beginning school in
> August. Jessica believed that water damage in her home, including the

15

PLW_000505

Jessica Kahraman
Date of Birth: 08/29/1972

bathroom next to the boy's bedroom, had exposed the family to mold and mold mycotoxins.

Dr. Peters' summary of Ms. Kahraman having experienced difficulties that include "finger and toe numbness and poor hand-eye coordination," and "chronic fatigue, muscle weakness and stiffness, and disturbed sleep over the previous two years" suggests that she may be suffering from an undiagnosed mental health condition or physical ailment. It is recommended that Ms. Kahraman allow DCS to access her medical record in order to help rule out the presence of psychiatric and/or medical conditions that may prevent her from providing adequate care to her boys.

5.3. Ms. Kahraman would benefit from continued psychotherapy designed to improve her insight and address inappropriate care she provided to Dylan and Kenan. Specific recommendations for psychotherapy include the following:

5.3.1. Ms. Kahraman's treatment should include psychotherapy focused on increasing her level of awareness and insight in order to help prevent relapse of abusive behaviors. Indicators of successful treatment include the following:

5.3.1.1. The abuser admitting to the abuse, including specific details.

5.3.1.2. The abuser can experience an appropriate emotional response to the harm caused to the child.

5.3.1.3. The abuser develops better coping skills.

5.3.1.4. The abuser demonstrates an ability to abstain from the abusive behaviors over an extended period.

Ms. Kahraman may also benefit from inclusion of a narrative approach to understanding and altering her life trajectory. Dialectical Behavioral Therapy (DBT) or Mentalization Based Therapy (MBT) may be of benefit to Ms. Kahraman.

5.3.2. Ms. Kahraman is likely to benefit from participation in a parent skills training program like the interventions recommended below:

5.3.2.1. Interventions like the Triple P Positive Parenting Program and Parent Management Training (PMT) are effective in improving parenting skills, reducing child maltreatment, and decreasing the frequency in which at risk youth must be removed from their homes. It is recommended that Ms. Kahraman participate in a parent coaching type intervention (e.g., PMT) when her treatment team (e.g., individual therapist, psychiatrist, supervised visit leaders, etc.) and DCS Case Manager agree it is appropriate.

16

PLW_000506

Jessica Kahraman
Date of Birth: 08/29/1972

     5.3.2.2.   Continued therapeutic supervised visitation with immediate feedback and coaching is also recommended. Such approaches have been shown to be effective in reducing negative parent-child interactions and the incidence of abuse.

  5.3.3.  Ms. Kahraman may benefit from consultation with a psychiatrist to determine if she has an underlying mental disorder (e.g., psychosis, anxiety, depression) that is negatively impacting her ability to parent her boys in a safe manner.

6. <u>What level of supervision is needed for contact/visitation?  Why?  Are any limitations or restrictions needed? Why?</u>

It is my opinion that the standard protocol for therapeutic supervised visitation used by DCS must be followed in order to ensure Dylan and Kenan's safety. Dylan and Kenan's parents should not be allowed to supply food during visits. Ms. Kahraman's continued denial of the cause of Kenan's health problems and her role in precipitating them and records indicating that she may have misrepresented Kenan's calorie count in the hospital, of her role in precipitating the boys removal from her care, medical records indicating that she may have misrepresented Kenan's calorie count during his hospital stay necessitate that the parents not be allowed to supply food during visits.

The opinions described in this report are based on the information provided to me as noted in the sources of information above. If additional sources of information are made available to me in the future, I would consider them in my opinion.

Respectfully submitted,

Michael B. Kelly, M.D.

17

PLW_000507

CT05000 (7/19)

# REPORT TO THE JUVENILE COURT
# FOR
# PERMANENCY HEARING



**Court Case Number**    JD532206                **Date of Report**    12/06/2019

**Case Name**    KAHRAMAN, JESSICA        **Case ID**    608484

**A.    Name and date of birth for each child subject to this court case number.**

3874373 Dylan Kahraman            DOB: 09/27/2012
3874372 Kenan Kahraman            DOB: 09/27/2012

**B.    Child or children subject to this report, if different from above.**

N/A

**C.    Family composition.**

Jessica Kahraman - Mother
Ahmet Kahraman - Father
Dylan Kahraman - Child
Kenan Kahraman - Child

**D.    If the family has or may have American Indian tribal affiliation, efforts to identify and contact the child's tribe and confirm the child's membership status or eligibility for membership.**

N/A

**I.    REASON FOR DCS INVOLVEMENT**

**A.    Description of the dangerous condition(s) currently occurring within the family that require Department involvement; including how the parent, guardian, or custodian's behaviors cause the child to be unsafe or at substantial risk of harm and, if applicable, why the child(ren) are removed from the parent, guardian, or custodian's custody.**

On 12/18/2018, Kenan was admitted to Cardon Children's Medical Center following a "two month history of inability to walk, 3-week history of chest pain, facial swelling, periodic abdominal pain, and 2 weeks of increasing lethargy." Kenan was admitted to the PICU. A cardiac cath was completed on 12/21/18 which confirmed pulmonary hypertension. Nutrition was consulted and Kenan was started on TPN until it was determined he was able to gain weight if fed a recommended amount of calories. Kenan was diagnosed with acute right heart failure, failure to thrive, anasarca, right ventricular dysfunction, ketotic hypoglycemia, lower extremity weakness, pleural effusion, pulmonary hypertension, retarded development following protein-calorie malnutrition, unspecified severe protein-calorie malnutrition."

On 12/20/2018, the SCAN team at the hospital was consulted for an evaluation. Several reasons for the evaluation were noted, including "the child's current highly regimented diet

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 107 of 142

Page 2 Perm Hearing Rept. To Juv Court

does not provide sufficient caloric intake for normal growth/development and has contributed to his extremely poor nutritional status." There was also concern that mother reported seeing "parasites" in Kenan's stool and did not seek follow up care for this. There was a "recent evaluation at PCH neurology for the inability to walk that resulted in recommendations for MRI, NCV, EMG – which parents deferred due to fears of general anesthesia." It was noted in the evaluation that "the medical team is concerned that the child's health has been directly impacted by parent's belief system that values natural adult therapeutics in lieu of accepted pediatric standards of care. Unfortunately, this has likely resulted in the child's current critical cardiac status, overall poor nutritional state and deconditioning that has led to an inability to ambulate." Maria Chico reported that "the child is at high risk for further/ongoing poor medical/nutritional status in his current environment."

The parents report that they have used the Gut and Psychology Syndrome (GAPS) diet for their children for two years. This diet has different stages and the children are still in the initial stage after two years. Mrs. Kahraman reported that they consult with a GAPS expert in Georgia but this individual has not seen the children in person. The parents report using this diet due to their children's "significant food intolerances and chemical sensitivities." The children do not have an official diagnosis for their food intolerances. Mr. Kahraman reported that the children eat lamb from New Zealand, carrots, and beets. He stated that "here and there we are trying other options." The children receive four meals a day and one snack. Their diet consists of lamb meat, meat stock/broth, carrots, and beets. They will receive a "quarter to half an egg yolk off and on." In a single day, each child eats about four cups broth, four cups meat, ¼ cup carrots, and a ¼ cup beets. They also have probiotics and drink water.

On 12/24/18, the pediatric GI doctor, Vinay Bandla, completed an initial consult. Dr. Bandla noted that Kenan "is able to eat four small meatballs, ¼ of an egg yolk, and approximately 1 teaspoon of shredded vegetables cooked in lamb broth at a time. He drinks four cups of lamb broth per day. He is getting an average of 500 cal/day at home. Per today's bedside RN, mom is restricting his food and water intake despite his complaints of being hungry. RD has been consulted and the plan is to introduce one new food into his diet every day." The calorie goal is 1500 cal/day. Dr. Bandla noted "For the past 2 weeks he has been complaining of pain around his rectum. Mom has been performing massage and states his rectum feels swollen." Dr. Bandla stated "Kenan seems to be malnourished due to severe dietary restriction based on moms suspicions and research. No evidence to support 'leaky gut' theory in the literature."

On 12/26/2018, a nutritional follow-up was completed by Lindsey Manz RD. Mrs. Kahraman reported that she is not notifying the staff of the reactions Kenan is having "because they are not worried about anything short of anaphylaxis." Mrs. Kahraman stated that she "wants to continue with offering foods by mouth, but with slow progression over weeks or months in the outpatient setting." Mrs. Kahraman was not in agreement with the timeline medical providers developed to have Kenan gain weight. The RD reviewed that the "current diet is not nutritionally adequate, this is not an acceptable long-term diet." The RD also reviewed that the "current amounts of non-meat foods are insufficient and are not age appropriate."

Medical staff have overheard Kenan state he was hungry and be denied food by his mother, father, and maternal grandmother. Kenan did not gain weight for several days while hospitalized during a timeframe where parents were responsible for all of Kenan's food intake. After the recommendation by the RD, agreed to try some new foods for Kenan but

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 108 of 142

Page 3  Perm Hearing Rept. To Juv Court

the portion sizes were small, such as a teaspoon or ½ cup.

On 12/26/2018, Dr. Ryan Stewart stated "mom states the patient is again overly hungry and she can't provide enough food to keep patient full, despite the fact his belly is distended." Dr. Steward wrote "Have a strong suspicion for medical neglect or medical child abuse. Patient's appetite has increased, and mom is wanting to stop the levothyroxine to avoid having to feed him so much. Mom also still convinced the pulmonary hypertension is due to patient's exposure to white board markers. The patient would likely take adequate PO intake for his nutritional needs if mom would stop limiting his intake. Also suspect feeding "intolerance" symptoms are fictitious as they are based solely on mom's reports and not supported by nurse observations. Mom refuses to relinquish any control of the patient's food options, and refuses supplemental formulas due to 'corn syrup, maltose, and GMO's being present in them."

Since being removed from the home in December 2018, Kenan and Dylan have been introduced to all food groups and have not had any rash, anaphylaxis, nausea, vomiting, diarrhea or any pain in their body. Dylan and Kenan have resided in a foster home and attended school where white board markers are used daily and there have been no reports of any intolerances due to the use of the white board markers.

Mrs. and Ms. Kahraman has reported that they believe that the heart failure and inability to walk have been caused by the black mold that was found in their home. Ms. and Mr. Kahraman have been informed by the cardiologist, Dr. Miga on numerous occasions that the heart failure was caused by malnutrition, however they are choosing to not listen to the medical professionals. Dr. Miga reported that if the heart failure was caused by black mold, then there would be fungal growth on the heart valves, however this was not seen on the EKGs completed by Dr. Miga.

It is concerning that upon completion of the review of the children's medical records, there are concerns that placing the children in the home of Ms. Kahraman places them at significant danger for additional harm. It is also concerning that Ms. Kahraman either is intentionally attempting to evade detection or has lost touch with reality due to what she reports to the doctors and her lack of follow up of medical needs, such as seizures.

## II.    SAFETY PLANNING

### A.    If applicable, efforts to locate missing parent(s).

The whereabouts of Mrs. and Ms. Kahraman are known at this time.

### B.    The current safety plan, the actions that are necessary to control the dangerous condition(s), when those actions are needed, the adults responsible for carrying out the actions, and any supportive resources to support the safety actions.

Dylan and Kenan Kahraman are residing in out of home care in a licensed DDD foster home.

### C.    Efforts to implement the least intrusive plan that is sufficient to control the dangerous conditions, including explanation of why the safety threats can or cannot be managed in the home; and for American Indian children, the active efforts to provide services designed to prevent the breakup of the Indian family and the

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 109 of 142

Page 4  Perm Hearing Rept. To Juv Court

**outcome of these efforts.**

The safety threats are unable to managed in the home due to there being no appropriate safety monitor that can reside in the home.

**D.    If applicable, the conditions for return as described in the safety plan.**

Mrs. Kahraman recognizes and articulates that her behaviors are causing physical and emotional harm to Kenan and Dylan.
Mrs. Kahraman displays genuine remorse and has open and honest conversations regarding her behavior.
Mrs. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits.
Mrs. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mrs. Kahraman will allow the safety monitor to re-direct her.
Mrs. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so she, Mr. Kahraman, Dylan and Kenan, safety monitors and providers are safe.

Mr. Kahraman recognizes and articulates that Mrs. Kahraman's behaviors and Mr. Kahraman's lack of intervention are causing physical and emotional harm to Kenan and Dylan and displays and ability to protect his children
Mr. Kahraman displays genuine remorse and has open and honest conversations regarding his behavior.
Mr. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits.
Mr. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mr. Kahraman will allow the safety monitor to re-direct him.
Mr. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so he, Mrs. Kahraman, Dylan and Kenan, safety monitors and providers are safe.

**III.    IDENTIFICATION, LOCATION, AND ENGAGEMENT OF EXTENDED FAMILY MEMBERS AND OTHER IMPORTANT CONNECTIONS (only applicable for children in out-of-home care)**

**A.    Results of efforts to identify, locate, contact, and engage adult relatives of the child, including grandparents, great-grandparents, adult siblings, parents, step-parents who have custody of any siblings, aunts, uncles, first cousins, and persons who have a significant relationship with the child; and if known, information about each person's willingness to be a potential out-of-home caregiver for the child.**

Maternal grandparents were assessed as placement, however were denied due to not understanding the safety concerns and aligning themselves with the parents by refusing to provide food to Kenan when he was hungry.

Maternal great uncle has expressed an interest in being placement for the children on a long term basis if needed, however he resides in an retirement community and would have

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 110 of 142

Page 5   Perm Hearing Rept. To Juv Court

to purchase a new home in order to have the children placed in his care. If the children need permanent placement, the uncle is willing to purchase a new house.

**B.   Description of the child's important connections, including information provided by the child, parents, and/or guardians; and efforts to maintain these connections.**

Maternal grandparents are allowed to attend 2 visits a month with the children in order to continue the relationship. Maternal great uncle has expressed a desire to see the children, however mother has denied him being able to attend visitation.

**C.   Description of contact between the child and the child's relatives, friends, former foster parents and any connections the child identifies; and if contact is restricted, the reasons why.**

Dylan and Kenan have supervised visitation with their parents and maternal grandparents at this time.

**D.   Efforts to maintain cultural connections, including opportunities for the child to build cultural awareness, identity, and involvement.**

Ms. and Mr. Kahraman can bring cultural activities and traditions to visit to share with the children. Paternal grandparents will video call into visitation from Turkey. Foster placement shares the same religious beliefs as Mr. Kahraman as is educating the children on the Islamic faith.

## IV.   CHILD FUNCTIONING, SERVICES, AND LIVING ARRANGEMENT

**A.   The child's physical, developmental, and emotional functioning; including the child's medical, dental, behavioral health, and developmental needs and services.**

Dylan is 7 years old and is placed in the same foster home as his twin brother, Kenan Kahraman. Dylan enjoys spending time with his brother, Kenan and his foster brother. Dylan used to have a fear of dogs, however now is no longer afraid of placement's dog. Dylan is open with JFCS for behavioral health services. Dylan engages in individual counseling as well as some sessions with his brother Kenan. The therapist is working with Dylan on speaking up for himself and emotional expression. Dylan is currently enrolled with DDD and ALTCS. Dylan is currently being re-evaluated for DDD and ALTCS as his autism diagnosis does not affect his daily life. He may not meet criteria for DDD and ALTCS enrollment. Dylan was re-evaluated for Autism on 09/24/2019. The doctor reported that he is showing no signs of autism but does not want to remove the Autism diagnosis due to not knowing what the previous doctor had seen in the boys. Dylan has expressed that he controls his food now and not his parents.

Kenan is 7 years old and is placed in the same foster home as his twin brother, Dylan Kahraman. Dylan enjoys spending time with his brother, Dylan and his foster brother. Kenan used to have a fear of dogs, however now is no longer afraid of placement's dog. Dylan is open with JFCS for behavioral health services. Kenan engages in individual counseling as well as some sessions with his brother Dylan. The therapist is working with Kenan on emotional expression and his anger. Kenan expressed anger towards his father by scratching him out of photos. Kenan is currently enrolled with DDD and ALTCS. Kenan is

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 111 of 142

Page 6  Perm Hearing Rept. To Juv Court

currently being re-evaluated for DDD and ALTCS as his autism diagnosis does not affect his daily life. He may not meet criteria for DDD and ALTCS enrollment. Kenan was re-evaluated for Autism on 09/24/2019. The doctor reported that he is showing no signs of autism but does not want to remove the Autism diagnosis due to not knowing what the previous doctor had seen in the boys. Kenan has expressed that he controls his food now and not his parents. Kenan's heart failure has completely resolved itself since being on a proper diet.

B.  **The child's academic status and social development, including the child's needs and services, and efforts to ensure the child's educational stability.**

Dylan and Kenan are both currently in first grade and there are no concerns noted. Dylan and Kenan's teacher have reported that they are reading above grade level and they have been invited to test into the gifted program at the school.

C.  **For youth age fourteen or older in out-of-home care, efforts and plans to assess and provide services to support the youth's preparation for adulthood.**

N/A

D.  **History of living arrangements (placements), including the length of time the child has been in out-of-home care (if applicable), and the type and dates of each living arrangement.**

Dylan
12/28/2019-01/11/2019: DDD Licensed Foster Home
01/11/2019-Current: DDD Licensed Foster Home (with Kenan)

Kenan
12/28/2019-01/07/2019: Cardon's Children Medical Center
01/07/2019-Current: DDD Licensed Foster Home (with Dylan)

E.  **Description of the child's current living arrangement, including the type; whether this living arrangement is consistent with the Department's placement preferences; and if the child is in out-of-home care and not living in the home of a grandparent, other relative, or person who has a significant relationship with the child, reasons why such placement has not been identified or is contrary to the child's best interest.**

Dylan and Kenan reside in a licensed DDD foster home.

F.  **If the child is an Indian child, efforts to place the child according to ICWA placement preferences and active efforts to provide culturally appropriate services.**

N/A

G.  **If the child has a sibling in out-of-home care, efforts to place siblings together; and if not placed together, the specific reasons why placement did not occur or reasons why this would be contrary to the child's or sibling's safety or well-being.**

Dylan and Kenan are placed together.

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 112 of 142

Page 7  Perm Hearing Rept. To Juv Court

H.  **If placement with sibling(s) is not possible, efforts to facilitate frequent visitation or contact with siblings; and if frequent visitation or contact with siblings is not recommended, state reasons why this would be contrary to the child's or a sibling's safety or well-being.**

N/A

I.  **If out-of-state placement is appropriate and in the best interest of the child, the reasons why (include ICPC and/or out-of-state visitation status).**

N/A

J.  **Description of any assistance or services provided to the caregiver(s) to enhance their capacity to address the child's needs and provide appropriate care and supervision.**

Dylan and Kenan have ALTCS and CMDP insurance to provide for all medical, dental and vision needs. Dylan and Kenan's foster placement is provided with standard and monthly allowances as well as daycare when needed.

K.  **Description of the Department's and out-of-home caregiver's efforts to implement reasonable and prudent parent standards to allow the child to participate in age and developmentally appropriate extracurricular, enrichment, cultural, and social activities.**

Dylan and Kenan participate in age appropriate activities with their foster family, including family vacations. Dylan and Kenan are both engaged in karate.

## V.  PARENT FUNCTIONING AND CASE PLANNING

A.  **The behavioral changes necessary in order for the parent, guardian, or custodian to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as described in the case plan).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).

Ms. Kahraman will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children.

Ms. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers in order to gain insight into her children's needs and how to respond appropriately. Ms. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Mother will need to acknowledge the reasons why her children came into care and accept responsibility.

Mr. Kahraman will need to report medical history and conditions accurately,(free from

Case 2:22-cv-00375-SRB     Document 217-6     Filed 12/16/24     Page 113 of 142

Page 8  Perm Hearing Rept. To Juv Court

exaggeration or falsifying in order to prevent unnecessary medical treatment).

Mr. Kahraman will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman.

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility.

**B.    Each parent's, guardian's, or custodian's progress, or lack of progress, toward achieving necessary behavioral changes (including changes in caregiver protective capacities or family protective factors).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).- Not Met

Ms. Kahraman will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children. - Not Met

Ms. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers in order to gain insight into her children's needs and how to respond appropriately. Ms. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Mother will need to acknowledge the reasons why her children came into care and accept responsibility. - Not Met

Mr. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment). - Not Met

Mr. Kahraman will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman. - Not Met

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility. - Not Met

**C.    Services and supports provided to assist in achievement of the behavioral changes identified in the case plan; and the participation in, and outcome of, those services and supports.**

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 114 of 142

Page 9  Perm Hearing Rept. To Juv Court

Jessica Kahraman

Therapeutic Visitation, with Ahmet Kahraman

Ms. and Mr. Kahraman were assigned to Southwest Human Development for therapeutic visitation in January 2019.

Carla White reached out to Ms. Kahraman by phone on 01/14/2019 to schedule her intake. No return phone call was received. Ms. White reached out on 01/16/2019 by email to schedule an intake. Ms. Kahraman responded on 01/16/2019 to the email and reported "We do not agree to the terms and conditions of your services, and are not contracting. We do not consent. We demand the immediate return of our biological property."

The Department kept the referral open for visitation in hopes that the parents would engage in visitation. The Department opened up the referral to maternal grandparents to visit with the children due to the lack of contact with the parents. Maternal grandparents completed an intake on 02/11/2019. however would not sign the intake forms.

No contact was heard from the parents until 02/21/2019 when they requested visitation with their children. Ms. and Mr. Kahraman completed their intake on 02/22/2019. During the first visitation, the children showed off how they could run and jump, mentioned that Kenan did not need oxygen anymore and the boys do not need wheelchairs. Kenan mentioned that he only missed Ms. Kahraman and would only say goodbye to Ms. Kahraman.

Mr. and Mrs. Kahraman missed no visitation during March 2019. Southwest Human Development reported:

The parents and children showed excitement in seeing each other during visits this month evidenced by their extended embraces, laughter, and verbal affection. The parents brought different board games, card games, and Lego sets that they have previously played as a family with at their home. The children's maternal grandparents attended two visits this month and showed enthusiasm when they saw them. Mrs. Kahraman has involved the children in what they will be eating for dinner and the children eat well and often ask for second portions. The parents completed the Nurturing Parenting APPI Scale which will help SWHD Visitation Team create a lesson plan on which Nurturing Parenting activities will be most appropriate to introduce. The parents attended a Child and Family Team meeting this month where many updates were provided on the children on how their medical state and eating habits have improved. It was noted that Dylan ran 35 plus laps at his school's fun run and has been very active at his placement. It was noted Kenan has a healthy appetite often asking for more before finishing his first plate of food and the pulmonologist ordering a decrease on his medications and he had minimal concerns. It was mentioned when the boys do not feel well that they present different behaviorally than what they verbally express. Mr. Kahraman affirmed that when they were in their care that the boys would actively play with him while Mrs. Kahraman may be at work and then when she returned home they presented as ill. Mrs. Kahraman confirmed this as well and attested it to them being more comfortable with expressing their illness with her as she is Mom.

On 04/02/2019 it is noted "While playing with the toy crane, Dylan needed some help in picking up the weights. His mother provided assistance, but at one point, seemed to

Case 2:22-cv-00375-SRB   Document 217-6   Filed 12/16/24   Page 115 of 142

Page 10  Perm Hearing Rept. To Juv Court

purposefully move the weights to where Dylan could not be successful in picking up the weight. Later, Ms. Kahraman inquired to Dylan if he practiced writing his letters on paper or on the white board. Dylan responded the white board, then told his mother that they "had to" use markers. This is significant as Mrs. Kahraman has reported that her children became ill an unable to walk due to environmental exposures, specifically white board markers."

Southwest Human Development noted the following for April 2019:

During month of April, the family engaged in a variety of activities an engaged in meal time with one another. The children enjoy spending time in conversation during mealtime. The boys speak with enthusiasm when sharing about their day at school, daily activities, or recalling memories. The boys enjoy activities that the parents bring from home and imaginative play. The parents join in their play and for the most part follow their lead. During mealtime the boys have recalled periods where their food was controlled and have stated their parents can no longer control their food. They observably enjoy the variety of foods they are trying, however they show signs of food insecurity as they over eat. The boys have begun to explore their current circumstances by asking questions of their mother and father, such as, when they will go home or why Kenan was left at the hospital. Mrs. Kahraman is primarily observed to provide the children with reassurance when they ask questions. Mr. Kahraman has been observed to become defensive when addressing the children's questions regarding food control and dismissive of Mrs. Kahraman's suggestion. Mr. Kahraman often responds in a defensive nature to visitation staff. He demonstrates impatience with the children, his wife, and the visit staff.

On 05/11/2019 it was noted "Manager White transported the children back to placement and feedback was postponed. Manager White transported the children back to their placement. During transportation Kenan and Dylan used pretend phones and talked with each other. Kenan and Dylan had conversation surrounding "We only ate lamb soup because it was healthiest for us." Kenan added, "That's what gave me the heart condition. Now I make decisions over my food." Manager White agreed with Kenan that he was now able to select foods of his choice. Kenan stated his Mom, Dad, Grandmother, and Grandfather feed him the lamp soup. Kenan and Dylan's conversation became violent. Kenan stated, "Too many labels. I want to slice the doctors in half." Dylan replied, "We're going to go back to the hospital and light a match at those doctors." Kenan stressed that he was poked 14 times. Manager White validated Kenan and Dylan's feelings and let them know it was not appropriate to harm others. Kenan and Dylan continued to repeat what pain they wanted to inflict on the doctors."

Southwest Human Development noted the following for May 2019:

Mr. and Mrs. Kahraman continue to bring enjoyable activities for the children and remain engaged throughout the visit. Both Dylan and Kenan are enjoying the new foods their parents are providing and have steadily demonstrated they are having more security around food. They have shown the ability to eat more slowly and have smaller portions during two visits this month. Eating with their parents often surfaces topics for Dylan and primarily Kenan about prior food restrictions. This month Kenan stated his belief that lamb meatballs gave him meat failure. Mr. and Mrs. Kahraman remain consistent in their statements that the children's reactions to food have seemingly improved and that their restrictive diet was not the cause of their medical problems. Mr. Kahraman at times appears critical in his comments about the children's condition and what occurs at the foster home. Mrs.

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 116 of 142

Page 11  Perm Hearing Rept. To Juv Court

Kahraman communicates her progress by indicating which parenting courses and nutrition classes she has taken and enrolling in individual counseling. It is Mrs. Kahraman's belief she has made progress and inquired about moving forward with unsupervised parenting time. Per the psychological evaluation, there is still concern that Mrs. Kahraman is continuing to deny medical neglect, despite evidence suggesting that both children have been able to walk, eat a variety of foods, be exposed to white board markers, have improved overall physical health, and have gained weight since being removed from their parent's care. Mr. Kahraman's role in the care of the children is not clearly defined, however he appears to standby mother's beliefs about the children's health.

Southwest Human Development noted the following for June 2019:

Mr. and Mrs. Kahraman continue to bring enjoyable activities for the children and remain engaged throughout the visit. The family spends majority of the visit in the play the children enjoy, such as, Legos, a board game, and some imaginative play. The boys communicate the activities they have engaged in this month and the parents show interest. It is suggested Mr. Kahraman continue be mindful of asking the children about their foster placement environment and location of the activities they participate in. Mr. Kahraman was given examples of using "I Wonder" statements instead of constant interrogation of questions. Both Dylan and Kenan are continuing to enjoy the new foods their parents are providing and have steadily demonstrated they are having more security around food. The boys are continuing to learn when their bodies are full and are reminded by Mrs. Kahraman to "listen to their bodies." The boys are usually offered a portion of their parent's (and their grandparent's when they attend visits) food in addition to their own. It was recommended to both parents to be mindful of portion sizes and setting healthy boundaries. Both parents have noted seeing small physical signs that the boys are reacting to the foods they are eating. The small physical signs have not been observed by visitation supervisors. Mr. and Mrs. Kahraman remain consistent in their statements that the children's restrictive diet was not the cause of their medical problems. Mr. and Mrs. Kahraman attest that the mold in their home could have been the cause for the boys' hypersensitivity to the chemicals at school and that it wasn't the chemicals that contributed to their illness. Notably, on a few occasions this month Kenan has mentioned being exposed to white board markers and being able to use markers now. Both parents have acknowledged the boys' coordination and that they trip often during visits when they walk. Mr. Kahraman reminds Kenan to walk flat on his feet and shared the cause of him walking on his toes is due to his Autism.

Southwest Human Development noted the following for July 2019:

Mr. and Mrs. Kahraman brought activities the boys were interested in. Much of the activities this month highlighted around the movie, Toy Story 4. Mr. and Mrs. Kahraman mentioned they went to watch the movie and engaged in conversation with the boys surrounding the movie. The maternal grandparents continue to visit with the boys and the boys engage with them when prompted. The boys show engagement throughout the visit and their physical affection shown towards each other. Mr. and Mrs. Kahraman remain consistent in their statements that the children's reactions to food have seemingly improved and that their restrictive diet was not the cause of their medical problems. They are continuing to work on appropriate boundaries in relation to food and appropriate portion sizes for the children as they regularly offer their food as well. Mr. Kahraman voiced concern that the boys are being threatened to not say or do anything during visits. Both parents continue to highlight

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 117 of 142

Page 12 Perm Hearing Rept. To Juv Court

Kenan's toe walking and have asked the visit supervisor to pay close attention and make note of it when it occurs. The focus of toe walking referenced frequently by Mr. and Mrs. Kahraman, appears to come from their desire to have Kenan back in OT/PT, and their reported views that toe walking is a symptom of Autism.

Southwest Human Development noted the following for August 2019:

Mr. and Mrs. Kahraman continue to bring enjoyable activities for the children and remain engaged throughout the visit. Both Dylan and Kenan are enjoying the new foods their parents are providing and have steadily demonstrated they are having more security around food. They are eating more slowly and are having smaller portions. Eating with their parents often surfaces topics for Dylan and primarily Kenan about prior food restrictions and Kenan believing lamb meatballs gave him heart failure. Mr. and Mrs. Kahraman remain consistent in their statements that the children's reactions to food have seemingly improved and that their restrictive diet was not the cause of their medical problems. Mr. Kahraman appears to be more receptive to conversations about the foster placement and communicating his concerns in a more positive manner.

Southwest Human Development noted the following for September 2019:

Mr. and Mrs. Kahraman continue to bring enjoyable activities for the children and remain engaged throughout the visit. Both parents reassure the children that they have love them and validate their feelings. Mr. Kahraman utilizes "I Wonder statements" to show interest in the boys' weekend activities, school day, and their interests. Mrs. Kahraman assists the boys with processing their feelings when they express fear, uncertainty, and ask questions. Mrs. Kahraman has been asked by Mr. Kahraman to minimize engaging in talking with the boys while building their Legos as it distracts them. The boys have not verbally identified that Mrs. Kahraman's conversation distracts them. It has been observed that Mrs. Kahraman uses this space as an opportunity to check in with the children. It is suggested that Mrs. Kahraman be able to continue to use this space as it fosters and nurtures their relationship. If either child responds in a manner that he doesn't want to engage in a conversation then Mrs. Kahraman can follow their cue. It is recommended both parents continue utilizing positive discipline strategies such as logical consequences and giving choices are helpful for both Dylan and Kenan, but more so Kenan when he appears to have difficulty regulating his body. Mr. and Mrs. Kahraman remain consistent in ordering a variety of foods during mealtime and encouraging the children to try new foods. The children routinely try a variety of foods and do not show limitations in what their parents have ordered for dinner. Mr. Kahraman expressed relief in meeting the foster placement at a genetics appointment this month. Mr. Kahraman and Mrs. Kahraman wish to continue to open the lines of communication more with the children's foster placement. This month, Kenan has made comments regarding his experience in the hospital, his heart failure, how many needles he has been stuck with in past, and specifically requested to not have lamb meatballs for his birthday dinner. On a trip to the science center Kenan completely avoided the large walk-through exhibit of the heart. During Kenan's cardiologist appointment this month, Kenan received an EKG and an Echocardiogram on his heart. The EKG results came back as normal and the hypertension had resolved itself. Dr. Miga stated he would like to begin reducing Kenan's Sildenafil, but could not discontinue the medication all at once. Kenan would begin by reducing his medication to twice a day, return to the doctor in two months to ensure they could reduce again and he should be completely off the medication in three to four months. Dr. Miga reported Kenan would have no activity

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 118 of 142

Page 13 Perm Hearing Rept. To Juv Court

restrictions. Mrs. Kahraman asked Dr. Miga if Kenan's CT scan results need to be rechecked because of the "ground glass nodules" in his lungs. Mrs. Kahraman noted they had found mold in the home, and felt this was the reason for the nodules. Dr. Miga reported that the scans were completely normal and the nodules were not concerning.

Southwest Human Development noted the following in October 2019:

Mr. and Mrs. Kahraman have transitioned to handling the children's food during mealtime and it was observed to be a smooth transition for the family. Mr. and Mrs. Kahraman maintained following the children's lead in play as they engaged in outdoor play, playing soccer, or building Legos throughout visits this month. The children presented with positive effects, initiated physical and verbal affection, showed delight in spending time with their parents, and were excited about losing teeth this month. Mr. and Mrs. Kahraman shared in the children's excitement when they lost their teeth and brought coins for them to take home in place of their teeth. Dylan and Kenan exhibited enthusiasm when seeing their grandparents and showed enjoyment in the Halloween celebration. Mrs. Kahraman pointed out that Kenan was "stimming" in which he was laying on the floor, tapping his leg and Mrs. Kahraman redirected him to change his position to sitting crisscross applesauce. Stimming is a self-stimulatory behavior that includes repetitive movements and usually is a behavior that calms anxiety or nervousness. It is encouraged Mrs. Kahraman avoid labeling Kenan's behaviors as such, as labeling can become a part of a child's self-image or have a huge impact on their self-esteem. Ms. Kahraman can identify with Kenan that he is tapping his leg and ask a follow up question, such as, "How are you feeling?" Customarily, Mrs. Kahraman does well processing emotions and talking about different emotions with the children during the visits. During the Halloween visit, the parents were in some disagreement about the transition to go and shoot bow and arrows as opposed to cleaning up the pumpkin painting activity. The parents were encouraged to develop a level of mutual understanding about the flow of the visit to minimize having and sharing differences of opinion in front of the children. The parents inquired about ways to address differences of opinions that present in the moment; and it was recommended that in the moment one person join the other or they take an opportunity to talk separate from the children. Both parents were open to that feedback and reported that differences of opinion do not happen often for them.

Individual Counseling

Ms. Kahraman was referred to individual counseling with Dr. Heather de Soler on 04/10/2019, however Ms. Kahraman requested a change in therapist due to reported conflict with the therapist by her counsel.

Ms. Kahraman was referred to individual counseling with Buwalda on 04/16/2019. Ms. Kahraman completed her intake on 05/01/2019 with Dr. Kelly Rodriguez. Dr. Rodriguez worked on building rapport with Ms. Kahraman during May 2019. Ms. Kahraman reported to Dr. Rodriguez that the children have food sensitivities and she believed that it was caused by the mold in their home. Dr. Rodriguez went over Ms. Kahraman's psychological evaluation with her at this time. Ms. Kahraman acknowledged the OCD traits that she possesses and were noted in the evaluation. Ms. Kahraman reported that she does not believe that she intentionally medically neglected her children. Ms. Kahraman reported that she does not agree with 2 of the treatment goals that have her taking accountability for her role in the medical neglect of her children.

In June 2019, Ms. Kahraman expressed that she read more of the psychological evaluation and agreed with the statement that she takes on the entire burden for a lot of tasks regarding her family and that she was going to work on allowing others to assist so she does not feel so overwhelmed.

In July 2019, Ms. Kahraman focused on expressing her frustrations with her case and utilizing coping skills through this time. Ms. Kahraman expressed frustration regarding evaluations that would be completed, however it is unknown which evaluations she was referring to.

In August 2019, Ms. Kahraman and Dr. Rodriguez discussed her therapy goals. Ms. Kahraman reports that she feels as though the diagnosis of malnutrition was inaccurate. Dr. Rodriguez asked Ms. Kahraman if she was open to the idea that mold was not the cause of the difficulties of her children. Ms. Kahraman reported that she was open to that but she does believe that it was mold. Dr. Rodriguez also asked Ms. Kahraman if she was open to acknowledging the GAPS diet being the cause of the children's difficulties. Ms. Kahraman stated that she was open to this statement and she had no intention of harming her children.

On 08/28/2019, Dr. Rodriguez requested to successfully discharge Ms. Kahraman from individual counseling due to all of her treatment goals being met. This case manager expressed concern that Ms. Kahraman can explain why medical neglect can effect children, however fails to see how the medical neglect of her children has effected them. Ms. Kahraman cannot see how her actions have affected her children. Ms. Kahraman continued to blame the mold for her children's difficulties despite numerous doctors reporting that it is not mold. It is concerning that Ms. Kahraman is continuing to not listen to the doctors who are treating her children and are improving under their care. Due to this, more specific treatment goals were created for Ms. Kahraman:

1. Mrs. Kahraman will demonstrate insight into the medical issues that her children do and do not have based upon documented medical evidence.

2. Mrs. Kahraman will explore how the over medicalization/malnutrition has impacted her children's lives.

3. Mrs. Kahraman will explore guidelines for medical providers treating their own family members.

4. Mrs. Kahraman will explore her own individual recollection of children's reactions to foods/pain/medical needs etc.

In September 2019, Dr. Rodriguez reported that DCS was not satisfied with her meeting her goals. Dr. Rodriguez submitted for an extension to continue to work on the treatment goals.

In October 2019, Ms. Kahraman took the treatment goals to her attorney and did not feel comfortable signing the treatment plan.

In November 2019, Dr. Rodriguez and Ms. Kahraman started working on the new treatment goals. In regards to the first goal; Ms. Kahraman reported "Mother has observed no food reactions that are significant enough to warrant any food restrictions" however Ms.

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 120 of 142

Page 15 Perm Hearing Rept. To Juv Court

Kahraman has reported that she has seen no food reactions and there have been no food reactions from any provider or placement of the children.

Mother also stated "mother and doctor agreed with his statements that 1) The boys likely had more severe autism as smaller children, that 2) the implementation of services during formative years facilitated great improvement in their development, that 3) Kenan's thyroid condition was likely a significant factor in his autism presentation, and that 4) the boys would likely continue to improve and eventually outgrow their diagnosis, now that Kenan's thyroid condition had been properly diagnosed and medicated." However, this was never stated by Dr. Eric Hejibeli.

Ms. Kahraman reported to Dr. Rodriguez "Mother agrees with the expert opinion of Geneticist, who indicated 1) Kenan's failure to thrive diagnosis (rendered only at the hospital, not by treating pediatricians) was likely due to his undiagnosed thyroid condition. 2) Mother understands that PCH Genetics is not equipped to evaluate for mold, food or chemical sensitivity." However, the geneticist never stated statement 1 and in regards to statement 2, the doctor reported that there is no test for mold sensitivities as genetics only looks at DNA.

Ms. Kahraman also reported to Dr. Rodriguez that "Mother agrees with the expert opinion of Dr. Miga which states that Kenan was suffering malnutrition at the time of hospitalization on December 18, 2018. Mother agrees with Dr. Miga's points expressed in the interviews of October 2019 with counsel, whereby Dr. Miga indicated he believed that 1) mold was a partial factor in the boys' health decline, that 2) he did not believe Mother experienced any secondary benefit to seeking medical care for the boys and was not motivated by anything other than her love and concern for their well-being, that 3) medical providers who cared for the boys, including PCH ER in November and MD Scott Jensen in December, should have caught the medical issues arising in the boys, and they failed to. Mother believes she and Dr. Miga shared a positive and collaborative relationship during Kenan's hospitalization, whereby she followed all agreed upon parameters with calories and feeding, with Dr. Miga's consent to bring food from home to feed Kenan that met these caloric needs." however there are also concerns with these statements. Ms. Kahraman was not present for this conversation with Dr. Miga and it is concerning that DCS attorneys report that point 1 was not stated during the interview. It is also concerning that Ms. Kahraman is only reporting what is fitting her narrative and not reporting that in the same interview, Dr. Miga reported that the children were starved.

Mother reported to Dr. Rodriguez "Mother willingly agreed to all recommended treatment by hospital staff at the meeting of December 28, 2018, including cafeteria food, administration of any medication or procedures that Kenan might need to manage his pain or condition, and a sedated endoscopy to assess food sensitivities." It is concerning that mother is reporting that she willingly agreed to all treatment, when she refused to provide the children with food and only wanted to feed them food from home.

Psychological Evaluation

Ms. Kahraman completed a psychological evaluation on 04/16/2019 with Dr. Mary Oakley.

Dr. Oakley made the following observations:

Case 2:22-cv-00375-SRB     Document 217-6     Filed 12/16/24     Page 121 of 142

Page 16 Perm Hearing Rept. To Juv Court

Ms. Kahraman was referred for a psychological evaluation by DCS. Ms. Kahraman noted that the allegations of medical neglect made against her are untrue. She denied that her children's strict diet resulted in them receiving too few calories, despite medical providers believing otherwise.  Furthermore, Ms. Kahraman denied a history of mental health symptoms or having received mental health treatment. She noted that her mood is typically stable and even keeled. She noted that her only ongoing source of stress is the DCS case and having her children out of her home.  Measures of cognitive ability indicated Ms. Kahraman's intelligence was estimated to be in the Above Average (IQ=111) range. Thus, it is unlikely that she has any cognitive limitations which would interfere with her parenting. Her reading level was high enough for independent administration of the remaining assessments. Measures of personality indicate that Ms. Kahraman likely responded in a defensive manner, denying minor faults and shortcomings to which most people admit. Her PAI score was invalid. Her MCMI score was deemed questionably valid, but may underestimate and symptoms or maladaptive characterological traits. Scores indicate that she is defensive to admit to problems. She is likely to blame herself when things go wrong. She is worried about expressing feelings, for fear of losing emotional control. She may be insecure and express blame of herself when problems arise. She is likely to be rigid and to hold to rules and regulations out of comfort. She may be overly focused on minor details, onto which she holds tight to avoid anxieties and other uncomfortable feelings. She views things according to rules, regulations, and customs and becomes upset with change and novel concepts. She may present as overly confident, but internally feels insecure.
It is not uncommon for individual taking assessments for similar purpose to obtain questionably valid scores based on defensiveness. Ms. Kahraman's results, however, seemed to be more defensive than do most people's, particularly on the PAI. As such, the full extent of her mental health and personality functioning may not be completely clear. She apparently has been functioning fairly well, as indicated by her maintaining consistent housing and employment while she cares for her children, as well as by her having people in her life who support her and view her as a stable, good person. Records from her time at the hospital with Kenan and interactions with DCS employees suggests that Ms. Kahraman may be meticulous and particular, especially as it relates to her children's eating habits. This observation is consistent with her testing results that suggest she is likely to be somewhat rigid and focus on details, rules, and regulations and not adjusting well to change, potentially to manage some anxieties. It appears as though she has some traits which are consistent with obsessive compulsive personality disorder. There is not enough evidence, however, to support a full diagnosis. It is likely that her rigidity and reluctance to delegate contributed to her difficulties in introducing new foods and a higher calorie diet to Kenan, despite the advice of medical professionals. It is clear that Ms. Kahraman values natural, holistic remedies and values a healthy lifestyle; it seems as though her beliefs may have become too extreme, potentially due to her rigid personality traits. Interestingly, throughout the evaluation, Ms. Kahraman never mentioned the particular diet which she had apparently been following for her children. No other mental health diagnoses appear appropriate at this time. There is some concern that Ms. Kahraman's children were both not walking for a length of time and will bring up health issues to her and not others. It is possible that she may be somewhat overprotective, particularly regarding her children's physical health, wellness, and symptoms, and that, as a result, she is inadvertently reinforcing the sick role in her children. There is not sufficient evidence to suggest that she is reinforcing them intentionally or is gaining any personal benefit from the children being sick.

Ms. Kahraman was not given any mental health diagnoses. She was noted to have traits

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 122 of 142

Page 17 Perm Hearing Rept. To Juv Court

consistent with Obsessive-Compulsive Personality Disorder in that she might be particularly rigid and perfectionistic and adhere strictly to rules, regulations, or ideas. This is likely why she has been so focused on her children's health and fearful of increasing their exposure to new foods and increased calories. She seems to be hyper focused on health and nutrition. She also may have inadvertently reinforced her children complaining of physical ailments or injuries. If she is not able to recognize these traits, they could result in similar patterns in the future.

Ms. Kahraman's prognosis is dependent on her openness for accepting feedback and implementing positive change. She appears generally quite capable of parenting and has gone above and beyond to demonstrate that she loves her children and wants to do what is best for them. Yet, she still fails to acknowledge her role in her children's health problems, despite evidence indicating that her children have been able to tolerate new foods, to be physically active, and to be fine even when exposed to white board markers.

Ms. Kahraman appears to be quite motivated to have her children return to her care. She has taken numerous parenting classes, particularly related to food and nutrition. Yet, she has not made any acknowledgement of her role in her children's illness, even if it was unintentional.

Ms. Kahraman reported that she has enrolled in individual counselling services. If she is open to feedback and to gaining insight into her role in DCS involvement and regarding her rigidity to matters of health and diet, her symptoms can improve.

Ms. Kahraman reported that she has been referred for individual counseling services. It is advised that she follow through with these symptoms. Goals of treatment should include gaining insight into her maladaptive personality traits including rigidity and adherence to specific regulations, particularly as it relates to her children's health and diets. Treatment can help her take accountability in her role in DCS involvement. Ms. Kahraman also expressed interest in participating in family therapy. Family treatment may help her learn new ways of interacting with her children, particularly as it relates to their health and diets. She could benefit from learning how to not reinforce a sick role in her children, while still being nurturing and open.

There is concern that Mother is continuing to deny medical neglect, despite evidence suggesting that both children have been able to walk, eat a variety of foods, be exposed to white board markers, have improved overall physical health, and have gained weight since they have been removed from their parents' care. There is not sufficient evidence to suggest that Ms. Kahraman was intentionally harming them. Yet, it seems as though Ms. Kahraman's fears and rigidity have been interfering with the children's health and growth. Mother clearly cares for her children and has made some behavioral attempts to do what she needs to in order to be reunited, including participating in DCS services and taking additional parenting classes. With treatment she will hopefully be able to gain insight into her role and into some of her rigidity so that she can resume parenting without exposing her children to risk and revert back to her previous habits.

Records Review Evaluation with Dr. Michael Kelly

Dr. Kelly completed his evaluation on 12/02/2019. Dr. Kelly noted the following:

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 123 of 142

Page 18  Perm Hearing Rept. To Juv Court

It is my opinion, with reasonable medical certainty, that allowing Ms. Jessica Kahraman to care for her sons, Dylan and Kenan, places them in significant danger for additional harm. It is also my opinion that additional recommendations must be followed to determine if Ms. Kahraman is psychotic and/or has other mental health conditions that are preventing her from parenting the boys safely.
It is my opinion that Ms. Kahraman needs mental health treatment services, like those described in the opinion section of this report, in order to make enough progress toward the goal of reunification with Dylan and Kenan.

I cannot opine on whether Ms. Kahraman meets Diagnostic Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) criteria for a mental disorder because she deferred meeting with me, and I was not granted access to her entire medical record. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman's behavior toward her sons raises concerns for mental illness, and that regardless of the cause of Ms. Kahraman's behavior, she is currently incapable of providing safe and adequate care to her boys. (Please see pages 4-13 of the evaluation attached for his evidence that supports his opinion) Dr. Kelly reports in the 10 pages that Ms. Kahraman's concerns about food and chemical sensitivities are unwarranted. Dr. Kelly states "It is unclear whether Ms. Kahraman's statements related to Kenan's chemical sensitivities reflect attempts to evade detection of abuse or serves as evidence that she has lost touch with reality." and "Ms. Kahraman was aware that restricting her boys' nutritional intake for extended periods of time would cause harm." Dr. Kelly noted "Ms. Kahraman's decision to defer taking Kenan to the hospital despite allegedly observing him have seizures, vomit up liver flukes, and pass parasites in his stool defies common sense."

It is my opinion, with reasonable medical certainty, that Ms. Kahraman is currently unable to demonstrate minimally adequate parenting skills. Ms. Kahraman will require continued mental health treatment and appropriate supervision to determine if she can demonstrate minimally adequate parenting skills in the foreseeable future. Please see the examples of Ms. Kahraman's behavior in this report and the Jessica Kahraman Date of Birth: 08/29/1972 accompanying chronological summary of records for evidence supporting my opinion.

It is my opinion, with reasonable medical certainty, that Kenan and Dylan are at risk for serious harm if returned to Ms. Kahraman's care. Evidence supporting my opinion includes, but is not limited to, Ms. Kahraman's belief that the boys' health problems are due to sensitivities to environmental chemicals and mold rather than inadequate nutrition, her unsubstantiated claims that Kenan has been infested with parasites, and her reports of chronic food intolerances that were shown to be false once the children were removed from her home.

I carefully considered whether Ms. Kahraman's current treatment program was optimal based on the findings and recommendations from Dr. Mary Oakley's psychological evaluation dated 04/16/2019. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley. It is also my opinion that Ms. Kahraman may benefit from additional mental health services as she progresses toward reunification with her sons.

It is my opinion that the standard protocol for therapeutic supervised visitation used by DCS must be followed in order to ensure Dylan and Kenan's safety. Dylan and Kenan's parents should not be allowed to supply food during visits. Ms. Kahraman's continued denial of the

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 124 of 142

Page 19 Perm Hearing Rept. To Juv Court

cause of Kenan's health problems and her role in precipitating them and records indicating that she may have misrepresented Kenan's calorie count in the hospital, of her role in precipitating the boys removal from her care, medical records indicating that she may have misrepresented Kenan's calorie count during his hospital stay necessitate that the parents not be allowed to supply food during visits.

Father, Ahmet Kahraman

Individual Counseling

Mr. Kahraman was assigned to Dr. Elizabeth Capps-Conkle on 04/10/2019 and completed his intake on 04/23/2019.

In May 2019, Mr. Kahraman reported "Father reported his belief the children are reacting to the foods they are eating and indicated this was seen through them being sick constantly with the flu, colds, stuffy noses, coughing and sneezing. He believed his children have skin rashes on their faces related to food intake." and "Client indicated he defers to his wife regarding medical concerns because she has a medical degree in acupuncture. He acknowledged he does not understand medical terms. He agree to work on goals, but does not agree with what they say. Client did not utilize any support from the interpreter during this session."

In June 2019 it was noted "We began looking at the CSRA as provided by the Department on page 2 regarding the current report. He indicated he does not agree with DCS lies. Therapist addressed the lies, and asked if he thought everyone was lying. He was asked what the actual medical doctors wrote in the records, rather than the DCS interpretation. He stated he did not know, and was unsure if his attorney had the medical records. He was encouraged to follow up on this. He spoke of the mold condition in his home, and he was still working to get it all cleared out. He stated mold exposure can make people sensitive to foods, and this exposure may have led to their concerns with the boys. He reported he and his wife worked with a student of the person who created the GAPS diet to feed the children the healthiest food options they could tolerate. He stated his wife was in regular contact with this GAPS diet specialist. He denied any intention to malnourish the children. We again discussed the importance of him looking at the actual medical records to see if they indicate the conditions were causes by malnutrition."

Dr. Capps-Conkle noted "Father remains open to the therapy process. He continues to express denial of medical neglect, as he was taking his children to the doctor. He denies intention to malnourish the children, and that they had been working with a GAPS provider in consultation. He believes the medical issues were caused by mold exposure, and the Department will not allow the children to have a blood test to determine this."

In July 2019, Mr. Kahraman reported "He expressed concern that the goals assume guilt, and it appears those goals are similar to his individual therapy goals regarding "medical neglect". He does not agree with the allegations and dependency has not been determined. He reported frustration that he had not received any medical records regarding the children since January and he had no idea how things were going with the children. He maintains the conditions were caused by the mold in the home that has now been rectified." and "Regarding the sixth goal related to his wife being controlling, he thinks this goal is ridiculous because he is a Turkish man, and that is not how Turkish culture works."

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 125 of 142

Page 20 Perm Hearing Rept. To Juv Court

In August 2019, Dr. Capps Conkle asked Mr. Kahraman what if the GAPS diet caused the problems in the children? Father stated his belief that they were misled by other doctors that the diet would help them. He reported the children's pediatrician was also a GAP diet practitioner and did not notice any problems. He stated he was open to other causes, but wanted to rule out the mold. He stated they have followed what their doctor told them to do in terms of diet.

In September 2019, it was noted "Client reported the Geneticist felt Failure to Thrive could be caused by thyroid issues and did not believe genetic testing was warranted. The geneticist did not have the tools to check for environmental factors." It is concerning that Mr. Kahraman is reporting the same result of the geneticist regarding the thyroid as Ms. Kahraman even though this conversation never occurred.

In October 2019, it is reported "He stated strongly that he will not accept guilt, and does not feel the medical issues were related to diet/nutrition, but mold. He has remained consistent in this expression throughout his sessions. He expressed his belief that all symptoms were related the mold exposure." Dr. Capps-Conkle reported "Father is becoming somewhat agitated with the therapy process. He continues to express denial of medical neglect, as he was taking his children to the doctor. He denies intention to malnourish the children, and that they had been working with a GAPS provider in consultation. He believes the medical issues were caused by mold exposure, and the Department will not allow the children to have a blood test to determine this. He is open to the possibility that something other than mold caused the problems, but would like mold to be ruled out. He has expressed belief that the medical records could have been edited prior to release. During the first session in November 2019, Father agreed to sign the updated therapy goals. He appeared to want to discuss the goals to have them completely quickly. He agreed there was a medical issue related to mold and still requests a mold test. He was now willing to accept Dr. Miga's medical reports that the heart condition was related to malnutrition and no longer had any concern with the validity of the medical records. He expressed that he and his wife together decided on medical care and they made mutual decisions. He asks his wife to explain medical terms that he does not understand. He felt this was a misunderstanding on the part of the hospital staff when Father asked them to speak with his wife when he did not understand some of the terms they were using. Father did not understand the term "over medicalization" and Therapist indicated she would ask for more information about how the Department meant this term. The interpreter indicated that in Turkish, this terms means the overuse of medications to solve problems. Father stated he sought medical care for the children and they were unable to tolerate many foods. He had no explanation for the children's inability to walk. Father did not understand the fourth goal, and stated the children acted the same way with both he and his wife. He denied any difference in symptoms whether or not his wife was present. Therapist stated she would follow up on this question as well. Therapist noted the stark difference in Father's agreeability as compared to the week before and Father stated he had conferred with his attorney."

Psychological Evaluation

Mr. Kahraman was scheduled to complete a psychological evaluation with Dr. Mary Oakley on 04/16/2019 with a Turkish interpreter. Mr. Kahraman chose not to participate in this evaluation due to his preference of the evaluation being completed with a Turkish provider. There is not a Turkish psychologist who completes psychological evaluations in the state of

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 126 of 142

Page 21  Perm Hearing Rept. To Juv Court

Arizona. This case manager looked outside of the state of Arizona. On 09/20/2019, a Turkish psychologist was located in California that is able to completed the evaluation. A single case contract was attempted with this provider. The provider did not agree to the contract due to disagreement over costs of travelling to Arizona in case there was a need to testify.

**D.   Describe any extraordinary circumstances that cause interruption or delay in the provision of completion of reunification services.**

Mr. and Mrs. Kahraman refused to participate in services offered by the Department from 12/28/2019 until 02/21/2019. Mr. and Mrs. Kahraman responded to all outreach attempts with "We do not agree to the terms and conditions of your services, and are not contracting. We do not consent. We demand the immediate return of our biological property."

**E.   Other issues or orders required by the court.**

N/A

**VI.   PARENTING TIME (VISITATION)**

**A.   The plan for parenting time (visitation) for each parent and child; including the frequency, length, location, level of supervision, why a less restrictive level of supervision is not sufficient to ensure child safety, and the plan for progressive parenting time.**

Mr. and Mrs. Kahraman have 4 hours of supervised therapeutic visitation every week. Mr. and Mrs. Kahraman also attend their children's doctor appointments.

**B.   Attendance at, and results of, parenting time (visitation) between each child and parent, guardian, or custodian since the last report to the court.**

Mr. and Mrs. Kahraman have been consistent with their visitation.

**VII.   PERMANENCY GOAL AND CONCURRENT PLANNING**

**A.   Permanency goal and target date, including a description of the most appropriate plan for the child and why other plans are not appropriate (attach case plan).**

Family Reunification with a target date of 03/27/2020

**B.   Concurrent goal and target date, including a description of activities initiated to implement the concurrent plan, if applicable.**

N/A

**C.   Recommended permanent living arrangement and efforts made to identify and finalize the living arrangement.**

It is recommended that Dylan and Kenan remain in their licensed foster home while Mr. and Mrs. Kahraman continue to work through reunification services.

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 127 of 142

Page 22  Perm Hearing Rept. To Juv Court

D.  **Recommendation of whether reunification services should or should not be continued and why.**

Reunification services should be continued as the parents are actively participating in services.

E.  **If applicable, description of any compelling reason that termination is not in the child's best interest.**

Mr. and Mrs. Kahraman are actively engaging in services in order to reunify with their children.

## VIII.  DCS SPECIALIST'S CONCLUSIONS

It is this case manager's opinion that the children remain in out of home care. It is also this case managers conclusion that Family Reunification remains the most appropriate case plan due to the parents participation in services. It is concerning that it is documented that Ms. Kahraman was not honest with the children's symptoms and medical testing results with providers and that Ms. Kahraman reports that the children had seizures and vomiting liver flukes but did not have them receive emergency medical care. It is concerning that despite multiple providers reporting the children were malnourished and Dr. Miga reporting that the children were starved, the parents continue to deny the doctors' concerns and diagnosis of the children. The parents are encouraged to be open with providers about the doctor's concerns of malnutrition and providing inaccurate information to providers.

## IX.  RECOMMENDATIONS

A.  **Agency**

**It is respectfully recommended that** Dylan and Kenan Kahraman **remain a ward(s) of the court, committed to the care, custody, and control of the Arizona Department of Child Safety.**

**It is further respectfully recommended that** Dylan and Kenan Kahraman **be placed in the physical custody of** DCS **with appropriate medical, social, and educational authorizations.**

**If the child is in out-of-state placement, it is further respectfully recommended that the court find that the out-of-state placement continues to be appropriate and in the best interest of the child.**

B.  **Financial**

**It is respectfully recommended that beginning (date)          , the parents listed below be assessed the following amounts on a monthly basis per child as the contribution towards the cost of foster care:**

**(parent name)          be assessed $          monthly for each of the following children:**

Case 2:22-cv-00375-SRB    Document 217-6    Filed 12/16/24    Page 128 of 142

Page 23  Perm Hearing Rept. To Juv Court

(parent name)          be assessed $          monthly for each of the following children:

(parent name)          be assessed $          monthly for each of the following children:

(parent name)          be assessed $          monthly for each of the following children:

(parent name)          be assessed $          monthly for each of the following children:

C.  **Reasonable Efforts Findings**

It is respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to eliminate the need for continued out-of-home placement and to make it possible for the child to safely return home.

It is further respectfully recommended that the court find that the Arizona Department of Child Safety had made reasonable efforts to place the child in a timely manner in accordance with the permanency plan and to finalize the permanent placement of child.

It is further respectfully recommended that the court approve the permanent case plan.

Respectfully submitted:

Name/Title  Madison Bell DCS Specialist
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**          480-656-9306
**Date:**  12/06/2019

Approved by:

Name/Title  Mecca Temple DCS Supervisor
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**          480-656-9427
**Date:**  12/06/2019

**Case Name**  KAHRAMAN, JESSICA     **Case ID**  608484





CLERK OF THE
SUPERIOR COURT
FILED
A. RODRIGUEZ, DEP

2019 DEC 12   PM 4: 20

## CASA COURT REPORT

**Court HearingDate:** 12/16/19
**CASA:** Susan Stark
**County:** Maricopa
**JD No:** JD532206
**#/Placements:** 2 each
**Contact Hours:** 233.00

| CHILD(REN)'S NAME | AGE |
|---|---|
| ▆▆ Kahraman | 7 |
| ▆▆ Kahraman | 7 |

## BRIEF HISTORY:

▆▆ and ▆▆ Kahraman were taken into the temporary physical custody of the Arizona Department of Child Safety (DCS) on December 28, 2018. Allegations as to both parents, Mother Jessica Kahraman and Father Ahmet Kahraman, were an inability to parent due to abuse and/or neglect. It was determined that their strong belief regarding the children's diet and medical care interfered with the children's normal health and development.

The boys were initially placed in separate licensed foster homes because ▆▆ required a higher level of care. They are now placed together in the same Licensed DDD Foster Home.

I was appointed as CASA by Court Order dated May 28, 2019.

Information in this report is current as of December 10, 2019.

## ASSESSMENTS:

At the time the boys were taken into temporary DCS custody on December 28, 2018, each had weaknesses that prevented them from walking. ▆▆ had been, and continued to be, hospitalized since December 18 for life-threatening congestive heart failure, pulmonary hypertension, fluid in his abdomen, hypothyroidism, and failure to thrive. He spent about three weeks in the hospital. During that hospitalization, the mother insisted on feeding him only food brought from home. Care providers soon realized that the parents had only fed the boys a severely restricted diet consisting of lamb, broth, carrots, beets, and an occasional 1/2 egg yolk, for the previous two years. The mother cited food allergies, redness, swelling, and pain when she offered other foods. She opposed giving ▆▆ other foods or formula due to his food intolerances, sugars, and too many calories.

Since they entered foster care, the boys have eaten a wide variety of foods, without any adverse reactions. They are now thriving and can walk, run, and jump. Physicians have opined that their disabilities were likely the result of malnutrition and deconditioning. Dr. M has noted that, since ▆▆ was taken into care, his

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031310

growth can now be documented on the normal growth and development charts for young boys.

This CASA has spent hours with the boys since June. I see them almost every week. They are always interested, excited, and easily engaged in the activity of the day. The boys both do very well in school. They are very articulate and thoughtful when they speak. For example, when I gave ███ a choice, between two options, his answer was, "Neither (this), nor (that)," and proceeded to tell me what he would do and why. When we played a puzzle of the United States, they wanted to know where Washington, Lincoln, and Beethoven were born. ███ asked if I could play Beethoven while they worked the puzzle. They are polite and well-mannered children.

They have good appetites, especially enjoy the salad bar, and have not had any adverse reactions to food. When ███ saw Jello for the first time, he asked what it was, what it does, and where it came from. They explored it with their fingers first, much like toddlers and described it as slippery, slimy, vibrating, and hard to hold onto. And they noted it was different than hair gel. Since the boys have been eating a general diet, I have noticed their hair has changed. Kenan's hair was fine and fuzzy, sparse, when I first met him six months ago. ███ had more hair, but it was also fine, and dull. When I compare their pictures from six months ago to today, I can see that they both have fuller, thicker, and shinier hair now.

Both boys have stated a strong aversion to lamb and have both said they'll never eat it again. They believe it caused Kenan's heart failure. They also told me their grandmother only fed them lamb soup at her house. At every visit, inevitably one of the boys will bring up a discussion about the lamb, heart failure, hospitals and/or needles. ███ was also distressed about how sick ███ was, and from being separated from him for so long, This week, after a fun day, ███ asked ███ if he knew that he wore a 'pulse ox' everyday, all the time, when he was in the hospital. When ███ asked what it did, ███ said it told them when my heart rate went too high and, "it went too high alot!" One weekend in September, ███ described a big black cloud that tried to get him in his bed the night before. He said it kept calling him stupid. He ran to the bathroom, but could see it's sword under the door. He said it kept telling him he was stupid, even after he woke up. The next week it, he said when it came back, he poked its eyes and threw him out the window. Occasionally, ███ tells me the cloud tries to come back. At times, I think he feels scared, overwhelmed and maybe depressed. The boys can have fun, but they are still traumatized by what has happened in their lives.

According to the family visitation notes of 04-16-19, ███ yelled at his mother after two servings of spaghetti, saying, "You don't control our food anymore. We do!." ███ was also documented, at that meeting, to be hitting his father many times and did not answer when asked why he was doing that. He also stated during that meeting that they, "can't eat lamb anymore because it caused Kenan's heart failure." Despite the feelings and beliefs that ███ expressed about lamb that day, after the 09-27-19 CFT meeting, the father stood up and announced that he was, "sick of hearing that lamb gave ███ heart failure. Lamb is good food. It is good meat."

At the FCRB meeting on November 5, 2019, the mother explained that she is still not able to bring food in from home, saying she has, "never poisoned the kids, nor has she ever been accused of poisoning them." In response, Southwest Human Development (SWHD) allowed the parents to set up the boys' mealtimes during their visitations, with foods always delivered from an outside source. SWHD explained that foods could not be brought from home because, 'persons who are suspected of factitious disorder, have a disproportionate likelihood, of poisoning their children in order to induce symptoms while the child is in protective custody.' The mother confronted me, after that FCRB meeting, wanting to know if I was still on their side, to get the kids back. She persisted, and then stood directly in front of me saying, "I need to know you are on our side."

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031311

When I asked her why she thought it okay not to feed her kids fruits and vegetables, dairy or grains, she said she was going to try to give them ghee, (a form of butter). Mr. Kahraman responded, saying that they, "were going to try giving them some onion." The mother then insisted that, "they were getting all they needed. All the nutrition they needed." That the fluid in Kenan's heart, lungs, and belly, "was from exposure to mold and the thyroid problem."

The mother has been getting counseling, but only recently has the father begun counseling with a Turkish-speaking therapist. DCS persevered until they found an appropriate, and acceptable, Turkish therapist that the father requested.

Medical and hospital records have been obtained dating back to when the boys were newborns. And appropriate consultations have been done, since the boys entered custody.

## REASONABLE EFFORTS:
The case plan goal is Family Reunification. DCS has made Reasonable Efforts to achieve the goals.

## OPINIONS and/or CONCERNS:
The children are thriving in foster care, doing very well in school and, in six months, I have not noticed any illness more serious than common colds. They have good appetites, eat a wide variety of foods, and have no adverse reactions. Because of improved nutrition, their hair has changed from fine and dull, to thick and shiny, in the last six months.

The boys remain disturbed by memories of heart failure, lab tests, needles and lamb, as evidenced by the fact that they consistently bring it up every time we are together. Sometimes, the medical jargon and experiences they talk about, make them sound like old people.

I am concerned that the parents deny responsibility for what happened to the boys and believe in something that is untrue. The mother upholds her belief, despite evidence to the contrary, that mold and hypothyroidism caused Kenan's heart failure and pulmonary edema. Her position is detrimental to the well-being of her children because it ignores the fact that K.K. nearly succumbed to life-threatening illnesses that experts believe were caused by malnutrition.

It disturbs me that the mother was able to convince two other adults, the father and maternal grandmother, to also perpetrate this unusual form of maltreatment of the children.

At this point, the boys haven't been vaccinated against any childhood illnesses. This is flu season and flu vaccinations could protect or reduce symptoms that occur from exposure to the flu.

## RECOMMENDATIONS:
1. That K.K. and D.K. Kahraman remain wards of the Court, committed to the care, custody, and control of DCS.
2. That K.K. and D.K. remain in their current placement.
3. That services currently in place be continued.
4. That the boys get flu shots.
5. That the parents be encouraged to participate in counseling and all case plan tasks.
6. That supervised visits continue.
7. That the case plan goal of Family Reunification be affirmed, with parental awareness that non-compliance

AZ-KAHRAMAN031312

could result in a change of goals, including possible severance of their parental rights.

**RESOURCES:**
**Persons of Interest and/or Interviewed Since Last Report:**
Children
Parents
Foster Mother
DCS case manager
FCRB
East Valley Children's Center.
Angel Pediatrics.
Cardon Children's hospital K.K.
Phoenix Children's Hospital.
Dr Jody Carter's letter of opinion.
Dr Becky Plotner ND.
East Valley Children's Center.
Center for Autism.
Dr. Mary Oakley

**Records Reviewed Since Last Report:**
Comprehensive Child Safety Evaluation dated 12-18-18.
Records from JCFS.
Records from Southwest Human Development.
Dr. Michael Kelly's review and recommendations.
Banner Records for D.K.
Banner records for K.K.
School records
All documents filed with the Juvenile Court

**"THIS DOCUMENT IS DISCLOSED PURSUANT TO RULE 44(a)(3),RULES OF PROCEDURE OF THE JUVENILE COURT, AND IS OTHERWISE CONFIDENTIAL PURSUANT TO A.R.S. § 8 - 522(F), RULE 47(A), RULES OF PROCEDURE OF THE JUVENILE COURT, AND ACJA § 7 - 101(G).THIS DOCUMENT CANNOT BE DISCLOSED EXCEPT UPON ORDER OF THE COURT OR AS OTHERWISE PROVIDED BY LAW."**

**Respectfully submitted,**

**Susan Stark**
**Court Appointed Special Advocate**



# CASA COURT REPORT
## DISTRIBUTION FORM

**CASA**
FOR CHILDREN
MARICOPA COUNTY

| | | | |
|---|---|---|---|
| Kahraman | 532206 | | 12-16-19 |
| CASE NAME | JD# | | HEARING DATE |
| | | | 12-10-19 |
| Susan Stark | | | DATE SUBMITTED |
| CASA | | | |

| DISTRIBUTION DATE | | | EMAIL ADDRESS | |
|---|---|---|---|---|
| 12-12-19 | Hon. Jennifer Green | HEARING OFFICER | n/a | |
| 12-12-19 | Shelby DeMassari | JUDICIAL ASSISTANT | n/a | |
| 12-12-19 | Madison Bell | DCS CASE MANAGER | madison.bell@azdcs.gov | |
| 12-12-19 | Kinda Johnson-Hurd | CHILDREN'S GAL | oladep@maricopa.gov | |
| 12-12-19 | DeeAn Gillespie Strub | MOTHER'S ATTORNEY | mailroom@gillaw.com | |
| 12-12-19 | Suzanne Nicholls | FATHER'S ATTORNEY | suzanne.nicholls@maricopa.gov | |
| 12-12-19 | FCRB | | rptfcrb@courts.az.gov | |
| 12-12-19 | AAG | | psssef@azag.gov | |
| 12-12-19 | Court Clerk | | Hand-delivered | |

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031314

MARK BRNOVICH
Attorney General

GREGORY D. COORDES
Assistant Attorney General
State Bar No. 032922
KATHLEEN E. MARTONCIK
Assistant Attorney General
State Bar No. 023982
CFP/PSS
120 W. 1st Avenue, 2nd Floor
Mesa, Arizona 85210
Telephone: (602) 771-4000
PSSSef@azag.gov

Attorneys for the Department of Child Safety

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| In the Matter of: | No. JD532206 |
| D.K.          KAHRAMAN<br>d.o.b.        2012<br>KENAN TROY KAHRAMAN<br>d.o.b.        2012 | **DCS'S RESPONSE TO MOTHER'S MOTION FOR CLARIFICATION AND ADDITIONAL DISCLOSURES, DATED 12/13/19** |
| Person(s) under 18 years of age. | (Honorable Jennifer E Green) |

The Department of Child Safety (DCS or the Department), by and through undersigned counsel, hereby responds to Mother's Motion for Clarification and Additional Disclosures, Dated 12/13/2019 (Mother's Motion for Clarification). The Department requests that the Court deny Mother's Motion for Clarification in its entirety. There are two issues addressed in Mother's Motion for Clarification: (1) insufficient notice due to lack of specificity in the Dependency Petition; and (2) The Department's alleged failure to comply with the Parents' Bill of Rights. The first issue is moot due to

the Department's amended pleadings. The second issue does not apply in dependency cases.

**1.  The issue of clarification in the Department's pleadings is moot due to the Department's amended pleadings.**

The Department has provided sufficient notice to the parents through its pleadings regarding the basis for a dependency as to the children D.K. and K.K. Mother alleges that the Department did not provide sufficient notice to her in the Dependency Petition due to the Department alleging "abuse and/or neglect." This issue is moot. The Department has contemporaneously filed its First Amended Dependency Petition on December 20, 2019. In its Amended Dependency Petition, the Department only alleges neglect as to Mother and Father. The Amended Dependency Petition clearly sets out a factual basis for the dependency both at the time of the original filing on January 3, 2019, and a factual basis for an ongoing dependency as to Mother and Father. Mother's complaint that she is not certain whether the Department is seeking an abuse finding or a neglect finding as the basis for a dependency is no longer an issue.

Mother further alleges the Department did not provide a factual basis or sufficient notice that Mother has factitious disorder by proxy. This is untrue. At this time, the Department has not alleged that Mother has been diagnosed with factitious disorder by proxy, nor is the Department aware of whether Mother has such a diagnosis. This does not preclude the Department from alleging this in the future if it becomes warranted by the evidence. However, the Department has never alleged that Mother has factitious disorder by proxy. Dr. Michael B. Kelly is expected to testify that the records indicate that Mother may suffer from a mental illness that would impede Mother's ability to be a

minimally adequate parent. This witness has been known to the parties since at least August 2019 and the report was disclosed earlier in December 2019, providing parties with sufficient notice of his opinions. Dr. Kelly's report dated December 2, 2019 does not include a diagnosis of factitious disorder by proxy. It is unclear to the Department where the basis alleging that the Department is going to be alleging factitious disorder by proxy at the Dependency Trial. Furthermore, the Department has disclosed and coordinated witness interviews for parents' counsel with multiple medical professions that are expected to testify regarding the neglect that the children suffered while in the parents' care. The Department has provided the parents with sufficient notice as to the basis for the dependency.

## 2. The Parents' Bill of Rights statutes do not apply to this case.

The Parents' Bill of Rights do not apply to cases of alleged abuse or neglect of children. Even though parental rights are protected under A.R.S. Section 1-601, those protections have limits. Specifically, A.R.S. Section 1-602(B) states:

> This section does not authorize or allow a parent to engage in conduct that is unlawful or to abuse or neglect a child in violation of the laws of this state. This section does not prohibit courts, law enforcement officers or employees of a government agency responsible for child welfare from acting in their official capacity within the scope of their authority. This section does not prohibit a court from issuing an order that is otherwise permitted by law.

The Department of Child Safety is the governmental agency responsible for child welfare. A.R.S. Section 8-451. The Department is alleging that the parents neglected D.K. and K.K. and has exercised its authority pursuant to Arizona law and filed

the appropriate Dependency Petition in the instant case. As such, the parents' Bill of Rights does not apply here.

Instead, Arizona Revised Statute Title 8 is the applicable statutory authority governing this case. Title 8 authorizes the Department to remove the children due to the alleged neglect and open a dependency action in the Maricopa County Juvenile Court. There is nothing in Title 8 requiring compliance with the parents' Bill of Rights outside of disclosure of information. There is further nothing requiring that the Department put in its pleadings that it is complying with Parents' Bill of Rights, including A.R.S. Sec. 1-601. Therefore, Mother's argument that the Department failed to meet its burden of disclosing compliance with A.R.S. Sec. 1-601 is invalid.

### 3. Conclusion

The Department has filed its first Amended Dependency Petition contemporaneously with this Response, clarifying that it is only alleging neglect as to both parents. Also, the Parents' Bill of Rights does not apply to this case because the Department has alleged that the parents have neglected the children. Therefore, the Department respectfully requests this Court deny Mother's Motion for Clarification in its entirety.

RESPECTFULLY SUBMITTED this _28_ day of December, 2019.

MARK BRNOVICH
Attorney General

GREGORY D. COORDES
Assistant Attorney General

| | |
|---|---|
| 1 | ORIGINAL of the foregoing filed |
| 2 | this _20 th_ day of December, 2019, to: |
| 3 | Clerk of the Court |
| 4 | Maricopa County Superior Court |
|   | Juvenile Court Southeast Facility |
| 5 | 1810 South Lewis Street |
| 6 | Mesa, AZ 85210 |
| 7 | Copy of the foregoing hand-delivered |
| 8 | this _20 th_ day of December, 2019, to: |
| 9 | Honorable Jennifer E Green |
|   | Maricopa County Superior Court |
| 10 | Juvenile Court Southeast Facility |
| 11 | 1810 South Lewis Street |
|    | Mesa, AZ 85210 |
| 12 | |
| 13 | Copies of the foregoing electronically mailed this _20 th_ day of September, 2019, to: |
| 14 | |
| 15 | Kinda Johnson-Herd |
|    | JohnsonK010@mail.maricopa.gov |
| 16 | Guardian Ad Litem for the Children |
| 17 | DeeAn Gillespie Strub |
|    | DGillespie@gillaw.com |
| 18 | SHayes@gillaw.com |
| 19 | Attorney for Mother |
| 20 | Suzanne M Nicholls |
| 21 | Suzanne.Nicholls@maricopa.gov |
|    | OPASEFDisclosure@mail.maricopa.gov |
| 22 | Attorney for Father |
| 23 | Madison Bell |
| 24 | madison.bell@azdcs.gov |
|    | Case Manager |
| 25 | |
| 26 | Susan Stark |
|    | Susan.Stark@maricopacasa.org |
| 27 | Court Appointed Special Advocate |
| 28 | JD532206/HDM#8428733 |

CLERK OF THE
SUPERIOR COURT
FILED
5 Jessen    DEP
2019 DEC 24  PM 3:59

EXHIBIT 243
Bell
8-23-24 MM

1  MARK BRNOVICH
2  Attorney General

3  KATHLEEN E. MARTONCIK
4  Assistant Attorney General
   State Bar No. 023982
5  CFP-PSS
   120 W. 1st Avenue, 2nd Floor
6  Mesa AZ 85210
7  (602) 771-4000
   Attorney for the Department of Child Safety
8

9             IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

10              IN AND FOR THE COUNTY OF MARICOPA

11   In the Matter of:                      JD 532206

12   D.K.           KAHRAMAN          **DCS' FIRST SUPPLEMENTAL**
13     d.o.b.      2012                **DISCLOSURE STATEMENT**
14   KENAN TROY KAHRAMAN
       d.o.b.      2012
15

16   Person(s) under 18 years of age.     (Honorable Jennifer E. Green)

17        The Department of Child Safety (DCS or the Department), hereby supplements its

18   initial disclosure statement pursuant to Rule 44(F), Arizona Rules of Procedure for the

19   Juvenile Court, (ARPJC), by adding the following newly discovered witnesses and exhibits

20   to its lists:

21

22                        **I.    WITNESSES**

23        1.    RYAN MICHAEL STEWART, MD
24              Banner Health
25              1432 South Dobson, Suite 512
                Mesa AZ 85202
26              Phone: (480) 412-6336, Fax: (602) 747-4528
27              cc'd:  candace.mcclue@bannerhealth.com

28

Expected to testify to the nature and probable cause of the children's physical injuries, medical needs and any other relevant matters.

2.    CUSTODIAN OF RECORDS
Sonora Quest Laboratories
Attn: Legal
1255 t Washington St.
1256  Phoenix, AZ  85281
FAX: 602-685-5013
Ph: Karen Wheeler, 602-685-5000 (main#)

Expected to provide a foundation for the admission of its records and any other relevant matters.

3.    CUSTODIAN OF RECORDS
Banner Gateway Medical Center-
Radiology Imaging Department
Fax:    480-543-2583, Ph: 480-543-2617

Expected to provide a foundation for the admission of its records and any other relevant matters.

4.    CUSTODIAN OF RECORDS
United Cerebral Palsy of Central Arizona Laura
Dozer Center
1802arkside Ln
1803   Phoenix, AZ 85027-1322
Phone: (602)313-8830, Fax: 602-944-1658

Expected to provide a foundation for the admission of its records and any other relevant matters.

5.    Counsel reserves the right to call any witness listed by any other party.

## II.    EXHIBITS

1.    All child safety worker correspondence, reports and records, including attachments.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027607

2.    All reports and records of all medical, mental health and other service providers, including but not limited to those from United Palsy, Banner Hospitals, Sonora Quest Labs and any and all of Jessica and Ahmet Kahraman's social media outlets.

3.    All reports and records, including but not limited to those of Dr. Stewart.

4.    The Department gives notice that it intends to introduce certified domestic records of regularly conducted activity, pursuant to Arizona Rules of Evidence, Rule 902(11).

5.    The Department gives notice that it intends to introduce all DCS reports, reports and records of any party or participant, or any person with whom the child is or may be residing with.  In addition to any evidence of the out-of-court statements or nonverbal conduct of the child regarding acts of abuse or neglect perpetrated on the child, pursuant to Rule 45(C)(D)(E), Arizona Rules of Procedure for the Juvenile Court, (ARPJC).

6.    Counsel reserves the right to introduce any exhibit listed by any other party.

RESPECTFULLY submitted this ___ day of December, 2019.

MARK BRNOVICH
Attorney General


KATHLEEN E. MARTONCIK
Assistant Attorney General

1    ORIGINAL of the foregoing filed

2    this _2 4_ day of December, 2019, with:

3    Clerk of the Court

4    Juvenile Court Center
     1810 S. Lewis Street

5    Mesa, Arizona 85210

6    COPY of the foregoing hand-delivered

7    this _2 4_ day of December, 2019, to:

8    Honorable Jennifer E. Green

9    Juvenile Court Center
     1810 S. Lewis Street

10   Mesa, Arizona 85210

11   COPIES of the foregoing electronically served

12   this _2 4_ day of December, 2019, to:

13   DeeAn Gillespie Strub

14   DGillespie@gillaw.com
     Attorney for Mother

15

16   Kinda Johnson-Hurd
     Johnsonk010@maricopa.gov

17   Guardian ad litem for the child

18

19   Suzanne Suzanne M. Nicholls
     Suzanne.Nicholls@Maricopa.Gov

20   opasefdisclosure@maricopa.gov
     Attorney for Father

21

22   Susan Stark
     Susan.Stark@maricopacasa.org

23   Court Appointed Special Advocate

24   Madison Bell

25   Madison.bell@azdcs.gov
     Case Manager

26

27

28   #8432801 / supp dss / dcs/ 532206 12-24-19