CLERK OF THE
SUPERIOR COURT
FILED

S. Mohammed DEP
2019 DEC 26 AM 11: 23

EXHIBIT 244
BLL
8-23-24 MAD

1   DeeAn Gillespie Strub, Esq. Bar No. 009987
2   **GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK**
3   7319 North 16th Street
    Phoenix, AZ 85020
    Tel. (602) 870-9700
4   Fax (602) 870-9783
5   *Attorney for Jessica Kahraman, Respondent*
6
7   Send all correspondence to
    mailroom@gillaw.com
8
              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
9
                **IN AND FOR THE COUNTY OF MARICOPA**
10
                          **JUVENILE DIVISION**
11
    In re the Matter of:                    Case No.: JD532206
12
    D.K.  KAHRAMAN,                   **MOTION TO DISMISS THE**
13  D.O.B     /12                     **AMENDED DEPENDENCY**
                                       **PETITION**
14
    K.K.  KAHRAMAN,                   *(Assigned to the Hon. Jennifer E.*
15  D.O.B     /12                      *Green)*
16
    Person(s) under 18 years of age.
17
18
19
20
21          On December 13, 2019, Mother filed a motion for clarification in which
22  Mother requested that DCS clarify its factual allegations that it asserted supported
23  its petition that this Court find Mother's children dependent as to her. This Court
24  ordered DCS to respond to Mother's motion by December 20, 2019. In apparent
25  lieu of a response, DCS filed an amended dependency petition. The factual
26  allegations asserted in the petition, however, do not, even if assumed true, satisfy
27
28
                                        1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029939

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

the statutory elements that DCS must prove in order for this Court to find that

Mother's children are dependent as to her. Thus, Mother respectfully requests

that this Court to dismiss the amended dependency petition. Under Ariz. R. P.

Juv. Ct. 55(E)(2), after dismissing a dependency petition, the court must "return

the child to the parent." Therefore, Mother also respectfully requests that this

Court order that her children be immediately returned to her. This motion is

supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   **The allegations in the dependency petition fail to satisfy any of the
     statutory elements DCS is required to prove in order for this Court to
     find that Mother's children are dependent as to her.**

In proving an alleged dependency, DCS is limited to the factual allegations

stated in its petition. *See Carolina H.*, 232 Ariz. at 571 ¶ 11 (holding that a court

cannot amend a dependency petition to conform to the evidence). As relevant

here, Arizona law defines a dependent child as one "whose home is unfit by

reason of abuse, neglect, cruelty or depravity by a parent." A.R.S. § 8–

201(15)(a)(iii) (emphasis added). In the amended dependency petition, the

petition alleges: "Mother is *unable* to parent due to neglect." (Amend. Pet. at 5.)

(emphasis added). As defined in the statute, "neglect" is: "The inability or

unwillingness of a parent, guardian or custodian of a child to provide that child

with supervision, food, clothing, shelter or medical care if that inability or

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029940

unwillingness causes unreasonable risk of harm to the child's health or welfare, except if the inability of a parent, guardian or custodian to provide services to meet the needs of a child with a disability or chronic illness is solely the result of the unavailability of reasonable services." A.R.S. § 8-201(25)(a)[1].

Based on the asserted allegation of dependency, in order to prove that Mother's children are dependent, the State must prove:

1. Mother is unable to provide one or both of her children with supervision; or

2. Mother is unable to provide one or both of her children with food; or

3. Mother is unable to provide one or both of her children with clothing; or

4. Mother is unable to provide one or both of her children with shelter; or

5. Mother is unable to provide one or both of her children with medical care; and

6. The children's home is unfit due to the inability of Mother to provide supervision or food or clothing or shelter or medical care.

---

[1] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

3

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029941

The amended dependency petition fails to set forth any factual basis that, even if assumed to be true, would satisfy the statutory elements required in order for a court to find that Mother's children are dependent as to her. As the Arizona Court of Appeals has observed:

> A dependent child can also be defined as a child whose home is unfit because of neglect, abuse, cruelty, or depravity of a parent. A.R.S. § 8-201(15)(a)(iii). When a parent's conduct or behavior cannot be proven improper in accordance with a subsection that provides for expressly prohibited behavior, we must be vigilant in ensuring that the basic care provision in A.R.S. § 8-201(15)(a)(i) is not interpreted so broadly as to capture conduct that may be subjectively improper or ineffective, but adequate nonetheless.

*Aaron W. v. DCS*, 2019 WL 4695887, *7, ¶ 33 (Ariz. App. Sep. 26, 2019) (unpublished).[2]

Here, DCS's factual allegations do not support the statutory basis asserting for dependency. Rather, DCS makes factual allegations of conduct by Mother that DCS may view as subjectively improper or ineffective, but which are nonetheless, conduct that fails to show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care. The Arizona Court of Appeals has noted that the language of A.R.S. § 8-201(15)(a)(iii) only survives a constitutional vagueness challenge "because it utilizes commonly understood terms which give clear notice of the standard to be applied in the adjudication proceeding." *Ibid.* (internal quotation marks omitted). Applying the clear,

---

[2] A copy of the opinion is attached herein as Exhibit A.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029942

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

commonly understood terms of the statute, and not interpreting the language so broadly as to capture conduct that may subjectively be ineffective, it is clear that DCS has failed to assert any factual allegations that show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS first alleges: "The parents have stated strong beliefs regarding their children's diet and medical care." (Amend. Pet. at 5.) Most parents love their children and want what is best for them. As such, the vast majority of parents have strong beliefs regarding their children's diet and medical care. This factual allegation, even if true, would not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care. Parents simply do not neglect their children by having strong beliefs about their children's diet and medical care.

DCS next alleges that "the care or lack thereof that [parents] have provided the children as a result has interfered with the children's health and development." (Amend. Pet. at 5.) First, even after being given the opportunity to clarify its allegations, this factual allegation is still hopelessly vague. DCS appears to be simultaneously alleging that the parents provided the children with care *or* that parents did not provide the children with care. Since both assertions cannot be true, this factual allegation is meaningless and must be disregarded. The State cannot infringe on a fundamental right based on an allegation that a parent either

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029943

did "A" or did not do "A." Either one or the other must necessarily be true. Mother cannot possibly defend against such a vague allegation, nor could such an allegation possibly serve as a basis for a finding of dependency.

DCS next alleges that the "parents have the children on a strictly restrictive diet." Many parents, especially parents of children who have sensitivities or allergies to certain foods, have their children on a restricted diet. While Mother's decision to put her children on a restrictive diet in an attempt to improve their health was not effective, it was also not neglectful. Parents do not neglect their children when they make the best decisions they can for their children's health but later, with the benefit of hindsight, it is determined that another decision would have been more beneficial. Mother placing her children on a diet that she believed benefitted them did not and cannot constitute Mother being unable to provide her children with food. This allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges that "Parents claim that their children's diet was being managed by an out-of-state provider, Becky Plotner, who specialized in the GAPS diet." (Amend. Pet. at 5.) The fact that the parents sought a specialist to assist them in managing their children's diet does not support any of the statutory elements for dependency due to neglect. Many parents seek out a specialist to

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029944

guide them when their children have health issues. A parent cannot be deemed legally neglectful simply by the act of consulting a specialist for their child. This allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges that Becky Plotner "never saw the children in person and is not medically licensed." (Amend. Pet. at 5.) Again, this fact does not support any of the statutory elements for dependency due to neglect. Many parents seek help for the children from providers who may not be local and who may not be able to examine their child in person. This fact does not render any conduct by Mother neglectful. Neither does the fact that Ms. Plotner is not medically licensed. Many good and caring parents seek help for their children from alternative medical providers, from naturopaths or nutritionist. A parent cannot be deemed neglectful simply by seeking help from an alternative medical provider who may not be a licensed doctor. This allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges that Ms. Plotner "relied solely on Mother's reports regarding the children's symptoms and what the children were eating." This fact does not render any conduct by Mother neglectful. Many providers will rely on a parent's reports of their child's symptoms and conduct. There is nothing about this completely standard behavior that most likely occurs hundreds of times a

7

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029945

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

day across the state, that in this particular instance, can be deemed to render Mother neglectful of her children. This allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next states: "It appears that Mother was providing incomplete information to Ms. Plotner, as the records indicate a greater variety of foods being fed to the children and in greater amounts." (Amend. Pet. at 5.) Appearances are, of course, necessarily subjective. DCS's allegation of how things may appear to some unidentified person is not a factual allegation at all, and so cannot serve as a basis for a finding of dependency. The State cannot infringe on Mother's fundamental right to her children by simply alleging that some circumstance appeared to some unidentified person.

DCS next alleges: "A July 2018 entry from Ms. Plotner indicates that the children are eating "ample amounts, full plate three times a day." ( Amend. Pet. at 5.) Even if assumed to be true, this fact does not support any of the statutory elements for dependency due to neglect. This allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges: "Hospital records do not support this assertion." (Amend. Pet. at 5.) Even if assumed to be true, the fact that hospital records would

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029946

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

not support the assertion that the children ate "full plate three times a day," would not support any of the statutory elements for dependency due to neglect. For most parents, it is difficult, if not impossible, to get their children to eat a full plate of food, three times a day. Children are picky eaters. Children are difficult eaters. The scene depicted in the movie "A Christmas Story," of the Mother trying to get her son to eat his oatmeal at breakfast by telling him that he should eat because they are children starving in other countries, is a scene that is played out in many homes, every day, across the country. The fact that Mother's children, like many other children, did not eat a full plate, three times a day, is not in any way indicative of Mother neglecting her children. This allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges, that K.K. "was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension, which was suspected to be tied to his malnutrition." (Amend. Pet. at 5.) Far from supporting its allegations of dependency, this fact actually demonstrates that Mother was able to get her children medical care. DCS misses some steps however, in alleging that K.K. s medical issues were "suspected" to be caused by his malnutrition and making a factual allegation that would satisfy a statutory basis for dependency. Suspicion is necessarily subjective, and Mother cannot defend against a suspicion. A finding

9

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029947

of dependency cannot be based on the suspicion that some unidentified person may have possessed at some unidentified time. Furthermore, DCS does not allege, nor could it, that even if K.K. was malnourished, and even if this malnourishment caused his medical issues, that the malnourishment resulted from Mother being unable to provide K.K. with food. Even if this allegation is assumed true, DCS still would not have satisfied its statutory burdens.

DCS next alleges: "Mother expressed concern to medical staff that she 'could not keep up' with the child's hunger and providing him food consistent with his strict diet." (Amend. Pet. at 5.) A mother expressing concerns to medical staff about her child's needs is not indicative of neglect. Many parents, when their child is receiving medical care, will express concerns to their child's medical providers because of their concern for their child. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges that Mother "requested a medication for hypothyroid be stopped and/or reduced because she believed that the child was too full and bloated to eat." (Amend. Pet. at 5.) A mother making request to medical providers based on her concern for her child is not indicative of neglect. Many parents, when their child is receiving medical care, will make requests of their child's medical providers because of their concern for their child. Even if assumed to be

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

10

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029948

true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care. On the contrary, it shows that Mother was able to provide her child with medical care because it shows that the child was receiving medical care.

DCS next alleges that Mother "was opposed to recommendation that the child be given new foods and formula to supplement his nutrition, based on her belief that the child has food allergies and/or would be receiving too many calories." (Amend. Pet. at 6.) A mother opposing a medical recommendation based on her concern that the action would have negative consequences for her child is not indicative of neglect. Many parents, when their child is receiving medical care, will be opposed to the recommendations of medical providers because of their concern for their child. This conduct fails to satisfy the statutory definition of neglect. On the contrary, under Arizona law: "All parental rights are reserved to a parent of a minor child without obstruction or interference from this state." A.R.S. 1-602(A) One of the statutorily enumerated rights of parents is the "right to make health care decisions" for their child. A.R.S. 1-602(A)(5). A parent does not neglect their child by exercising their statutory right to make medical decisions for their child. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

11

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029949

DCS next alleges: "While K.K. was hospitalized, Mother attended meetings with K.K.'s doctors in which parents were told that K.K. needed to be fed more food and a greater variety of food." Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care. On the contrary, it shows that Mother was able to provide her child with medical care because it shows that the child was receiving medical care.

DCS next alleges: "Mother would agree to provide additional food, but would severely limit the amount of the additional foods that she was providing." (Amend. Pet. at 6.)  Many parents who have children with food sensitivities or food allergies will severely limit the amount of a new food they provide to their child, in order to determine how their child will react to the new food and to limit the consequences of a negative reaction. Such action is reasonable and in no way indicative of neglect. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges: "Mother was reporting reactions and sensitivities to the newly introduced foods that were not independently observed by hospital staff." Usually, parents spend more time with their children than unnamed "hospital staff," and because of the love and care parents have for their children, will tend

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

12

to observe them more closely and be more attuned to changes than unnamed "hospital staff." The fact that Mother observed and reported reactions and sensitivities that unnamed "hospital staff" did not observe is not in any way indicative of neglect. A parent cannot be deemed neglectful for reporting observations of their child to medical providers that medical providers do not independently observe. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges:

1. "There was also a concern that Mother would feed the child and document it without allowing the medical staff to verify what was being fed to K.K. ▮ (Amend. Pet. at 6.)

2. "This resulted in a concern that Mother was over-estimating the child's caloric intake per day." (Amend. Pet. at 6.)

3. "Of additional concern is the parents' report that both children have been unable to walk for approximately the past two months." (Amend. Pet. at 6.)

4. "there are concerns that Mother has reported serious symptoms in the children, but failed to obtain timely medical care and/or follow medical recommendations for further evaluation." (Amend. Pet. at 7.)

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029951

5. "There is additional concern that the children only report pain when asked by Mother and that Mother has reported various symptoms that have not been observed by medical providers." (Amend. Pet. at 7.)

None of these statements of "concerns" of unidentified persons can in any way satisfy DCS's statutory burden. Concerns are inherently subjective; they are not factual. Mother cannot defend against whether some unidentified person had a concern at some unidentified time. DCS cannot satisfy its statutory burden to prove its factual allegations based simply on the concerns at some unidentified point of some unidentified persons. DCS's allegation that some unidentified persons were "concerned" is not a factual allegation at all, and so cannot serve as a basis for a finding of dependency. The state could not charge a person with burglary merely based on an assertion that some unidentified person was "concerned' that the defendant committed a burglary. Neither can the state satisfy its statutory burden to prove that Mother neglected her children by alleging that some unidentified persons were "concerned" about her conduct. Even if it is assumed true that some unidentified persons at some unidentified point had the alleged concerns, these assertions do not support any of the statutory elements for dependency due to neglect.

DCS also alleges: "Mother refused to allow ▮K.K.▮ to receive nutrition (SIC) through formula supplements, due to her concerns regarding the ingredients in

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029952

the formulas." (Amend. Pet. at 6.) Many parents who have children with food sensitivities or food allergies, and even those that do not, are concerned about the ingredients in their children's food. A parent cannot be deemed neglectful simply for refusing to feed their children something with ingredients that they did not believe were good for their child. Such action is reasonable, in no way indicative of neglect, and taken, to some degree, by nearly every parent in America nearly every day. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges that the parents believed that the children were unable to walk "for approximately the past two months," due to "either falls or exposure to dry erase markers at school and began to home school the children." (Amend. Pet. at 6.) First, for the two months prior to the filing of the amended dependency petition, the children have been able to walk and parents have not claimed otherwise. Even assuming, however, that the children were unable to walk during some other two-month-period, which the petition fails to allege, and the parents believed the children were experiencing a negative reaction to exposure to a toxin in their school environment, and so chose to remove them from that environment, this fact is in no way indicative of neglect. Most parents, if they believe that their children are being harmed, will remove them from that harmful situation. A

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

15

AZ-KAHRAMAN029953

parent taking action to remove their child from an environment they believe is harmful to the child is not action that satisfies the statutory definition of neglect. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges: "Mother admitted that she obtained wheelchairs for the children, despite there being no medical recommendation that they were necessary." Even if, as DCS alleges, there was no recommendation from a medical provider that the wheelchairs were necessary, there is no allegation that Mother did not believe that the wheelchairs were necessary for her children. Mother believed that her children had a need and so she fulfilled that need. A parent fulfilling a perceived need for their child is not action that satisfies the statutory definition of neglect. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges: "The parents sought medical evaluation by a neurologist, but did not follow the neurologist's recommendations for further evaluation." Parents, however, are not legally obligated to follow every recommendation of a medical doctor in order to keep the State from taking their children. As stated above, one of the statutorily enumerated rights of parents is the "right to make health care decisions" for their child. A.R.S. 1-602(A)(5). A parent does not neglect

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

16

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029954

their child by exercising their statutory right to make medical decisions for their child. DCS does not allege, nor could it, that Mother not following through on the neurologist's recommendation for further evaluation amounted to an inability on Mother's part to provide medical care to her child. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges: "Since removal from the parents' care the children's eating and medical status have improved." (Amend. Pet. at 7.) There are numerous reasons that could explain the children's improvement, and most of these reasons have nothing to do with whether or not Mother neglected her children. In the petition, DCS does not contend otherwise. One possible explanation for the children's improvement is that the children have not been exposed to harmful mold since being removed. Since moving out of the home and ending her own exposure to mold, Mother's health has also improved. Additionally, since being in DCS's care, Mother has been able to feed her children and has fed them a wide variety and amount of food. This circumstance may very well have been achieved without DCS interfering in this family. In short, even if assumed to be true, the fact that the children have improved over time, the exact expected result, does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

17

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029955

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

DCS next alleges: "Mother has participated in some services since the removal of her children, including counseling." (Amend. Pet. at 7.) This fact is true, and this fact does not support any of the statutory elements for dependency due to neglect.

DCS next alleges: "Mother, however, has refused to acknowledge that malnutrition was a primary cause of Kenan's heart failure." (Amend. Pet. at 7.) This fact is true, because it has not been established that malnutrition was a cause, let alone the primary cause, of K.K. s heart failure. The fact that Mother does not concede to DCS's allegations is not a ground for finding Mother's children dependent. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges: "Most recently Mother has stated that she believes that the issues were caused by mold exposure and/or thyroid issues." (Amend. Pet. at 7.) This fact is true. Based on the evidence, Mother believes that many of her children's medical issues were caused by mold exposure and/or thyroid issues, though she is not ruling anything out because there is a lack of medical certainty about what caused her children's issues and she wants to ensure that her children are healthy. The fact that Mother has this belief is not indicative of neglect. DCS may not agree with Mother, but that disagreement does not in any way render

18

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029956

Mother neglectful under the statute. Rather, in making this allegation, DCS is attempting "to capture conduct that may be subjectively improper or ineffective, but adequate nonetheless." *Aaron W.*, 2019 WL 4695887, *7, ¶ 33. Thus, even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

DCS next alleges: "Medical professionals have stated repeatedly that they do not believe K.K. s heart failure was caused by mold exposure." (Amend. Pet. at 7.) The fact that some unnamed "medical professionals" have allegedly "stated repeatedly" that K.K. s heart failure was caused by mold exposure does not in any way render Mother neglectful. Medical professionals do not always agree. In this case, for example, there are some medical professionals that have stated that they do believe that K.K. s heart failure was caused by mold exposure. The fact that some unnamed medical professionals have stated their opinion does not support any of the statutory elements for dependency due to neglect. Even if assumed to be true, this allegation does not show that Mother is unable is to provide her children with supervision, food, clothing, shelter, or medical care.

The amended dependency petition fails to set forth any factual basis that, even if assumed to be true, would satisfy the statutory elements required in order for a court to find that Mother's children are dependent as to her. Under the statute, none of DCS's factual assertions, even if assumed true, would support a

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029957

finding of dependency due to the home being unfit by reason of neglect. Thus, the amended dependency petition must be dismissed.

## II. The amended dependency petition must be dismissed because the State has failed to allege that it can satisfy its burdens under A.R.S. § 1-601 (B).

### A. The State is statutorily required to satisfy its burden under A.R.S. § 1-601(B).

"The right of parents to direct and control the upbringing of their children is one of America's foundational constitutional principles." *Trisha A. v. DCS*, 247 Ariz. 84, 92 ¶ 35 (BOLICK, J (dissenting)). In A.R.S. § 1-601, titled the "Parent's Bill of Rights," "[o]ur state's elected representatives enshrined those rights in statute..." *Id.* at ¶ 36. A.R.S. § 1-601(A) establishes that "[t]he liberty of parents to direct the upbringing ... of their children is a fundamental right." A.R.S. § 1-601(B) provides that DCS "shall not infringe on these rights without demonstrating that the compelling governmental interest as to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." The State has a statutory duty to apply A.R.S. § 1-601 (B) when it seeks to have a child declared dependent. First, the language of A.R.S. § 1-601(B) makes its application mandatory to all state actions that involve the infringement of a parent's fundamental right. Second, under the well-established law for the interpretation of statutes, A.R.S. § 1-601(B) and A.R.S. § 8-201(15) must be applied together.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029958

### 1. The language of A.R.S. § 1-601(B) makes it application mandatory in all cases where DCS seeks to infringe on a parent's fundamental right.

A.R.S. § 1-601(B) provides that DCS "*shall not* infringe on these rights without demonstrating that the compelling governmental interest as to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." (emphasis added). In enacting A.R.S. § 1-601 (B) the legislature chose to use the term "shall." As the Arizona Court of Appeals has repeatedly held, the use of the term "shall" most often renders a directive mandatory. *See, e.g., Democratic Party v. Ford,* 228 Ariz. 545, 548, ¶9 (App. 2012); *City of Chandler v. Ariz. Dep't of Transp.,* 216 Ariz. 435, 438, ¶10 (App. 2007); *State v. Jackson,* 210 Ariz. 466, 471, ¶21 (App. 2005); *In re Maricopa County Superior Court No. MH2003-000240,* 206 Ariz. 367, 369, ¶7 (App. 2003). "A dependency petition invokes the authority of the court to act on behalf of a child who is alleged to be a dependent child." Ariz. R. P. Juv. Ct. 48(A). When the State files a dependency petition, it unquestionably seeks to infringe on the fundamental rights of parents. Since DCS is seeking to infringe on a parent's fundamental right when it seeks to have a child declared dependent, the legislature has mandated that DCS comply with A.R.S. § 1-601(B). Thus, in a dependency proceeding, the statute mandates that DCS must demonstrate that the compelling governmental interest as to the child involved is of the highest order, that its infringement is narrowly tailored,

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

21

AZ-KAHRAMAN029959

and that its infringement is the least restrictive means of furthering the government's interest.

### 2. Under well-established principles of statutory interpretation, A.R.S. § 1-601(B) and A.R.S. § 8-201(15) must be construed together.

"In the interpretation of a statute the primary duty of the Court is to give effect to the legislative intent." *State ex rel. Flournoy v. Mangum*, 113 Ariz. 151, 152 (1976). In all cases where it is called upon to construe a statute, a court first looks "to the plain language" of the statute, "giving effect to every word and phrase, and assign[ing] to each word its plan and common meaning." *Ponderosa Fire Dist. v. Coconino County*, 235 Ariz. 597, 601 ¶ 24 (App. 2014). If the language is "clear and unambiguous," a court applies it "without resorting to other methods of statutory interpretation." *Id.* In construing a statute, a court must construe related statutes together. *See State ex. Rel. Dep't of Econ. Sec. v. Hayden*, 210 Ariz. 522, 523 ¶ 7 (2005). Furthermore, a court cannot refuse to apply a statute as written simply as a matter of policy preference because "it is for the Legislature not [a] court to make those policy determinations." *Doty-Perez v. Doty-Perez*, 245 Ariz. 229, 235 ¶ 26 (App. 2018).

Since both A.R.S. § 1-601(B) and A.R.S. § 8-201(15) contain legislative mandates that must be followed when DCS seeks to declare a child dependent, any interpretation of Arizona's statutory scheme for dependency must include an

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

22

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029960

interpretation of the requirements of A.R.S. § 1-601(B). Thus, under Arizona statutory law, in order for the State to infringe on the fundamental right of a parent—by seeking to assume authority over their child—the State must demonstrate that declaring a child dependent involves an interest of the highest order, that the dependency is narrowly tailored, and that dependency is the least restrictive means of achieving the compelling government interest.

**B. Under the federal constitution, the State is required to satisfy its burdens under A.R.S. § 1-601(B).**

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). Nearly a century ago, in *Meyer v. Nebraska*, the Supreme Court "held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children'." *Id.* at 65 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).) Since *Meyer*, the Supreme Court has "made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981).

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

23

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029961

The Supreme Court has "long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'" *Troxel*, 530 at 65 (plurality opinion) (quoting *Glucksberg*, 521 U.S. 702, 719 (1997)). "The Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* (internal quotation marks omitted).

"The government may not interfere with [a parent's] fundamental right unless a court finds that: (1) the parent is unable to parent the child for any reason defined by statute; and (2) the parent has been afforded due process." *Carolina H. v. ADES*, 232 Ariz. 569, 571 ¶ 6 (App. 2013) (emphasis added). Thus, to properly invoke the authority of the court to infringe on the fundamental right of a parent, the State must not only provide evidence to prove its alleged statutory grounds for dependency, but also prove that the parent was afforded due process. Although DCS unquestionably has a legitimate interest in protecting children, in determining whether state action complies with due process, a court is not asked "to evaluate the legitimacy of DCS ends." *Stanley v. Illinois*, 405 U.S. 645, 652 (1972). Rather, a court must "determine whether the means used to achieve these ends are constitutionally defensible." *Id.* In Arizona, Arizona's legislature has established an extensive procedural system that seeks to ensure that the means used to achieve DCS's ends are constitutionally defensible. *Logan B. v. DCS*, 244

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

24

Ariz. 532, 538 ¶ 16 (App. 2018) (quoting *Ruben M. v. ADES,* 230 Ariz. 236, 240 ¶ 21 (App. 2012). Part of these procedural protections include a requirement that the State comply with A.R.S. § 1-601(B).

Due process requires that the legislatively mandated procedural protections be followed before the State's infringement of a parent's fundamental rights will be deemed to comport with due process. *Logan B.,* 244 Ariz. at ¶ 16 (citing *Michael J. v. Ariz. Dep't of Econ. Sec.,* 196 Ariz. 246, 248 ¶ 12 (2000).) The federal constitution requires that, before a juvenile court find a child dependent, that it find that DCS has met every burden that Arizona's legislature has mandated, including those mandated under A.R.S. § 1-601(B).

**C. Under Arizona's constitution, the State is required to satisfy its burdens under A.R.S. § 1-601(B).**

Although there is a great emphasis on the protections offered under the Federal Constitution, "our history. . . demands that we not ignore the Arizona Constitution." *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n,* 160 Ariz. 350, 355–56 (1989). "[S]tate constitutions were intended in our republican system of government to serve as the primary bulwarks for freedom, and along with the Federal Constitution to provide a 'double security' for the rights of the people." Clint Bolick, Vindicating the Arizona Constitution's Promise of Freedom, 44 Ariz. St. L.J. 505, 506 (2012). As the Arizona Supreme Court has made clear:

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029963

> Our citizens adopted the Arizona Constitution by popular election. Arizona enacted its declaration of rights before the United States Supreme Court adopted the doctrine of incorporation, applying the federal Bill of Rights to the states. Thus, our framers and people must have intended the Arizona declaration of rights to be the main formulation of rights and privileges conferred on Arizonans.

*Mountain States*, 160 Ariz. at 355–56.

Arizona's Constitution guarantees that "[n]o person shall be deprived of life, liberty, or property without due process of law." Ariz. Const. art. II, § 4. Arizona courts have "construed provisions of the state constitution more broadly than analogues in the Federal Constitution" to provide increased protection for certain rights. Clint Bolick, Vindicating the Arizona Constitution's Promise of Freedom, 44 Ariz. St. L.J. 505, 506 (2012). Thus, even if the due process clause of the federal constitution does not mandate that the State satisfy the procedural requirements of A.R.S. § 1-601(B), the due process clause of Arizona's constitution does.

"A hallmark of the rule of law is that our courts provide a level playing field for every individual." *Trisha A.*, 247 Ariz. at 92 ¶ 34 (BOLICK, J (dissenting)) (citing Lassiter, 452 U.S. at 28). Parents faced with the "destruction of their family" have a "critical need for procedural protections." *Santosky*, 455 U.S. at 753. In Arizona, the obstacles faced by parents in overcoming DCS's awesome power to infringe on their fundamental rights makes it vital to due process that the procedural safeguards instituted by the people's representatives be strictly

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7752

26

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029964

adhered to. One of these procedural safeguards is the requirement that the State satisfy its statutory burdens under A.R.S. § 1-601(B).

### D. DCS has not set forth its factual basis for satisfying A.R.S. § 1-601(B) in its petition; thus, the petition must be dismissed.

Here, the State has not discussed its statutory and constitutional burdens under A.R.S. § 1-601(B) at all. The statute is not even mentioned in the amended dependency petition. This is so even though Mother brought this glaring omission to DCS's attention in her motion for clarification. In its amended dependency petition, DCS has not alleged any factual basis that it claims will satisfy its burdens under A.R.S. § 1-601(B). As stated above, in proving an alleged dependency, DCS is limited to the factual allegations stated in the petition. *See Carolina H.*, 232 Ariz. at 571 ¶ 11. Since the amended petition does not contain any factual allegations that will allow DCS to satisfy its burdens under A.R.S. § 1-601(B), as a matter of law, DCS will not be able to meet its statutory burden under A.R.S. § 1-601(B), and thus will not be able to satisfy its statutory burden to prove that Mother's children are dependent as to her. Thus, the amended petition must be dismissed, and Mother's children immediately returned to her.

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ✦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ✦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029965

III.    **Positions of the parties**.

In compliance with the rules of procedure for the juvenile court, the positions of the parties were requested. Father does not take a position. DCS objects and the GAL has not responded at the time of filing.

**RESPECTFULLY SUBMITTED** this 26th day of December, 2019

By: _K. Reeves for_
DeeAn Gillespie Strub
Attorney for Mother

ORIGINAL e-filed this 26th day of December, 2019.

COPIES emailed this same date to:

Honorable Jennifer E. Green
Maricopa County Superior Court

Katie Martoncik
Assistant Attorney General
PSSSEF@azag.gov; Kathleen.martoncik@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
johnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

Suzanne Nicholls
Suzanne.Nicholls@Maricopa.Gov
*Attorney for Father*

GILLESPIE, SHIELDS, GOLDFARB, TAYLOR & HOUK
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

28

AZ-KAHRAMAN029966

CLERK OF THE
SUPERIOR COURT
FILED
*Sargant Kep* DEP
2019 DEC 27 PM 4: 26

1

2  DeeAn Gillespie Strub, Esq. Bar No. 009987
**GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
3  7319 North 16th Street
Phoenix, AZ 85020
4  Tel. (602) 870-9700
Fax (602) 870-9783
5  *Attorney for Jessica Kahraman, Mother*

EXHIBIT 245
BELL
8-23-24 MHb

6

7  Send all correspondence to
mailroom@gillaw.com

8

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
9
IN AND FOR THE COUNTY OF MARICOPA
10
JUVENILE DIVISION
11

12  In re the Matter of:                     Case No.: JD532206

13  D.K. ▮▮KAHRAMAN,              **MOTHER'S FIRST**
14  D.O.B.▮▮/12                            **SUPPLEMENTAL DEPENDENCY**
                                                          **ADJUDICATION DISCLOSURE**
15                                                        **STATEMENT**
     K.K. ▮▮KAHRAMAN,
16  D.O.B.▮▮/12                            (Trial Set to Begin on January 8,
                                                          2020 at 1:30PM)
17
     Person(s) under 18 years of age.
18                                                   (*Assigned to the Hon. Jennifer E.*
19                                                   *Green*)

20

21

22        Mother, Jessica Kahraman, submits her First Supplemental Dependency

23  Adjudication Disclosure Statement as follows:

24
     **I.        UNCONTESTED ISSUES**
25

26        1.  The children, D.K. ▮▮ Kahraman and K.K. ▮▮ Kahraman

27  were born on September 27, 2012.

28

1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027610

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

2. Jessica Kahraman is the natural Mother of the children.

3. Ahmet Kahraman is the natural Father of the children.

4. The children were taken into temporary custody by the Department pursuant to Court Order on or about December 28, 2018.

5. ICWA does not apply as the children are not "Indian Children" as defined by the Act.

## II.   CONTESTED ISSUES OF LAW AND FACT WHICH MAY BE MATERIAL OR APPLICABLE

1. Whether the allegations in the Dependency Petition are proven by a preponderance of the evidence.

2. Whether the children are dependent as defined by A.R.S. §8-201(15) – 201.01(B), et.seq.

## III.   WITNESSES

1. Mother, Jessica Kahraman. Expected to testify regarding the allegations in the dependency petition and any other relevant matters.

2. Dorothy Mann, Maternal Grandmother. T: 480-567-4696.   Expected to testify regarding her observations of Mother and Father's parenting, Mother's attunment with the kids, Mother's acknowledgment that there no longer needs to be any diet restrictions for the children and any and all other relevant matters.

GILLESPIE, SHIELDS, GOLDFARB &TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027611

GILLESPIE, SHIELDS, GOLDFARB &TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

3. William "Jerry" Mann. T: 480-205-0653. Expected to testify regarding her observations of Mother and Father's parenting, Mother's attunment with the kids, Mother's acknowledgment that there no longer needs to be any diet restrictions for the children and any and all other relevant matters.

4. Sandra Miller. 593 W. Mariposa St., Chandler, AZ 85225. Expected to testify consistent with her February 19, 2019 correspondence disclosed on April 12, 2019 and any and all other relevant matters.

5. Becca Wilson, SWHD visitation supervisor. Expected to testify regarding her observations of visitation, Mother's attunement with the kids and Mother having no restrictions on the children's diet.

6. Gwenyth Kelly, SWHD. gkelly@swhd.org. Expected to testify regarding her observations of visitation, Mother's attunes with the kids and Mother having no restrictions on the children's diet.

7. Dr. Mary Oakley, psychologist. Expected to testify regarding Mother's psychological evaluation and any relevant matters.

8. Becky Plotner. becky.nourishingplot@hotmail.com. Expected to testify regarding the boys nutrition and any other relevant matters.

9. Dr. Kelly Rodriguez, Mother's Counselor at Buwalda. Expected to testify regarding counseling services provided to Mother and any other relevant matters.

3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027612

GILLESPIE, SHIELDS, GOLDFARB &TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

10. Dr. Scott Jensen. T: 480-677-3688. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

11. Dr. Cindy Schneider, Center for Austism Research and Education. T: 602-277-2273. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

12. Dr. Asma Jafri, Ronald I. Jones Pediatrics. T: 480-222-8080. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

13. Danielle Schmidt, Habilitation Provider. T: 480-274-2073. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters. She will further testify regarding her knowledge of the child's food sensitives and her personal observations of K.K. s sensitivity to certain foods and personally observed these reactions including rashes and redness under eyelids. She will further testify that she spoke with DCSS on December 28, 2018.

14. Shannon Southwick, Habilitation Provider. T: 480-226-3877. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

15. Ellyn Belcastro, Occupational Therapy Provider. T: 630-880-1590. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

16. Firishta Gheyasi Cubillo, Habilitation Provider. T: 520-900-7989. Expected to testify regarding her observations of the boys in the family home, services provided and any other relevant matters.

17. Kim Armstrong, DDD Support Coordinator. T: 602-542-0419. Expected to testify regarding his observations of the boys, services provided and any other relevant matters. She will further testify about her conversations with the DCSS worker on December 27, 2018.

18. Nikki McCants, PT – Arizona Neurologic Rehab. T: 480-699-4845. Expected to testify regarding her observations of the boys, services provided and any other relevant matters.

19. Eric Bowman, DO – PCH Orthopedic Doctor. T: 602-933-3003. Expected to testify regarding medical treatment, care and services for the children and any other relevant matters.

20. Dr. Ron Peters – Mind Body Medicine. T: 480-607-7999. Expected to testify regarding mold testing for Mother and any other relevant matters.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

5

AZ-KAHRAMAN027614

21. Ken Foster, Inspector – Environmental Testing Group. MI&T Mold Inspection Testing. T: 855-600-6653. Expected to testify regarding mold and toxicity issues, and any other relevant matters.

22. Bruce Wescogame. Everclear Environmental T: 480-528-3882. Expected to testify regarding mold and toxicity issues, and any other relevant matters.

23. Any witnesses disclosed by any other party.

## IV.    EXHIBITS

1. Any any all documents disclosed during the discovery process, including but not limited to materials, contained in Mother's Disclosures relating to the entire case JD532206.

2. Any and all exhbits used at any other proceeding in this matter.

3. Any and all pleadings filed during the couse of this action.

4. Any and all exhibits as may be reasomanly necessary to impeach, contest of explain trial exhibits and/or testimony of any witnesses.

5. Mother reserves the right to ontroduce any exhibit listed by any other party.

6. Any and all supplemental information disclosed and/or discovered after the disclosure deadline which may have a relevant hearing on the issues presented.

GILLESPIE, SHIELDS, GOLDFARB &TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN027615

V.    NOTICE

Mother reserves the right to supplement this initial disclosure statement should discovery provide the name of additional witnesses whose testimony and/or exhibits which may be material and relevant in this matter.

**RESPECTFULLY SUBMITTED** this 27th day of December, 2019.

By: X. Reeves FOR
DeeAn Gillespie Strub
Attorney for Mother

ORIGINAL filed this 27th day of
December, 2019, and a COPY delivered to:

Honorable Jennifer E. Green
Maricopa County Superior Court

COPIES electronically delivered this same day to:

Katie Martoncik
Assistant Attorney General
PSSSEF@azag.gov ; Kathleen.martoncik@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
johnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

Suzanne Nicholls
Suzanne.nicholls@maricopa.gov
*Attorney for Father*

By Stacy Hayes

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

7

AZ-KAHRAMAN027616

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CLERK OF THE
SUPERIOR COURT
FILED

*M. Cortez*    DEP

2020 JAN -6 PM 2: 48

EXHIBIT 246
BELL
8-23-24 MHD

1  MARK BRNOVICH
   Attorney General
2

3  KATHLEEN E. MARTONCIK
   Assistant Attorney General
4  State Bar No. 023982
   JANNA JOHNSON
5  Assistant Attorney General
   State Bar No. 030792
6  CFP/PSS
7  120 W. 1st Avenue, 2nd Floor
   Mesa, Arizona 85210
8  Telephone: (602) 771-4000
   PSSSef@azag.gov
9

10 Attorneys for the Department of Child Safety

11          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

12             IN AND FOR THE COUNTY OF MARICOPA

13

14 In the Matter of:                    No. **JD532206**    *8-KEM*
                                        SECOND
15 DYLAN KEMAL KAHRAMAN            **DCS'S ~~SECOND THIRD~~ AMENDED**
      d.o.b. 09/27/2012            **DEPENDENCY PETITION**
16 KENAN TROY KAHRAMAN
      d.o.b. 09/27/2012            **(OUT OF HOME)**
17

18

19 Person(s) under 18 years of age.    **(Honorable Jennifer Green)**

20      Petitioner, the Department of Child Safety (DCS or the Department), by and

21 through undersigned counsel, hereby alleges upon information and belief:

22

23                              **I.**
                          **Jurisdiction**
24

25      The Juvenile Court has exclusive original jurisdiction over dependency matters

26 pursuant to A.R.S. § 8-202(B).    The Superior Court has original jurisdiction in

27 proceedings to establish paternity pursuant to A.R.S. § 25-801.

28                                1

## II.
## Venue

Venue in this county is proper pursuant to A.R.S. §§ 8-206(A) and 25-802 as Maricopa County is the residence of the children and/or the acts of dependency are alleged to have occurred in Maricopa County.

## III.
## Identity of Children, Placement and Applicability of the Indian Child Welfare Act

A.   DYLAN KEMAL KAHRAMAN:

    1.   DYLAN KEMAL KAHRAMAN is a male child whose date of birth is September 27, 2012.

    2.   DYLAN KEMAL KAHRAMAN is a dependent child within the provisions of A.R.S. § 8-201(15).

    3.   DYLAN KEMAL KAHRAMAN is currently placed with DCS..

    4.   DYLAN KEMAL KAHRAMAN is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4).

B.   KENAN TROY KAHRAMAN

    1.   KENAN TROY KAHRAMAN is a male child whose date of birth is September 27, 2012.

    2.   KENAN TROY KAHRAMAN is a dependent child within the provisions of A.R.S. § 8-201(15).

    3.   KENAN TROY KAHRAMAN is currently placed with DCS.

4.     KENAN TROY KAHRAMAN is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4).

## IV.
## Parties

The following individuals are alleged to be the parents, guardians, and/or Indian Custodians of the children who are the subject of this Petition, upon information and belief:

A.     JESSICA WREN KAHRAMAN A.K.A. JESSICA W MANN is the mother of DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN.

1.     Her date of birth is August 29, 1972.

2.     Her address is 1718 S Longmore, unit 95, Mesa, Arizona 85202.  Her phone number is (480) 455-9899.

B.     AHMET KAHRAMAN is the father of DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN.

1.     His date of birth is April 18, 1981.

2.     His address is 1718 S Longmore, unit 95, Mesa, Arizona 85202.  His phone number is (430) 320-9689.

3.     He is married to JESSICA WREN KAHRAMAN A.K.A. JESSICA W MANN.

4.     He has established his paternity of DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN.  He is named on the children's birth certificates.

3

5.      He does not have a child support order as to DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN.

## V.
### Temporary Custody

Upon information and belief, DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN were taken into temporary physical custody on December 28, 2018, at 5:22 p.m., as authorized by an order of the Superior Court dated December 28, 2018. The Superior Court authorization and DCS's application for court authorization are attached to this Petition.

## VI.
### Allegations

A.      Upon information and belief, DCS alleges that DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN, are dependent due to ~~abuse and/or~~ neglect as to JESSICA WREN KAHRAMAN A.K.A. JESSICA W MANN.

1.      Mother is unable to parent due to neglect.  Mother should have known that her children were in medical decline prior to late December 2018 and should have taken additional steps to get her children appropriate medical care.  For example, Mother reported seeing parasites in at least one of the children's stool in November 2018, but did not take immediate action to report the issue to proper medical professionals.  Since removal, Mother has not taken sufficient responsibility for her actions that led to the children's medical issues.

4

Mother is unable to parent due to abuse and/or neglect. The parents have stated strong beliefs regarding their children's diet and medical care. The care or lack thereof that they have provided the children as a result has interfered with the children's health and development. For example the parents have the children on a strictly restrictive diet and both children have been assessed by medical providers as being malnourished. Parents claim that their children's diet was being managed by an out-of-state provider, Becky Plotner, who specialized in the GAPS diet. This provider never saw the children in person and is not medically licensed. The "records" provided from Ms. Plotner indicate that she relied solely on Mother's reports regarding the children's symptoms and what the children were eating. It appears that Mother was providing incomplete information to Ms. Plotner, as the records indicate a greater variety of foods being fed to the children and in greater amounts. A July 2018 entry from Ms. Plotner indicates that the children are eating "ample amounts, full plate three times a day." Hospital records do not support this assertion. The child, KENAN, was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension, which was suspected to be tied to his malnutrition. Despite this, the parents were observed refusing to feed the child in the hospital when he reported that he was hungry. Mother expressed concern to medical staff that she "could not keep up" with the child's hunger and providing him food consistent with his strict diet. She requested that a

medication for hypothyroid be stopped and/or reduced because she believed that the child was too full and bloated to eat. Mother also was opposed to recommendations that the child be given new foods and formula to supplement his nutrition, based on her belief that the child has food allergies and/or would be receiving too many calories. While Kenan was hospitalized, Mother attended meetings with Kenan's doctors in which parents were told that Kenan needed to be fed more food and a greater variety of food. Mother would agree to provide additional food, but would severely limit the amount of the additional foods that she was providing. Mother was reporting reactions or sensitivities to the newly introduced foods that were not independently observed by hospital staff. There was also a concern that Mother would feed the child and document it without allowing the medical staff to verify what was being fed to Kenan. This resulted in a concern that Mother was over-estimating the child's caloric intake per day. Mother refused to allow Kenan to receive nutrition through formula supplements, due to her concerns regarding the ingredients in the formulas. Of additional concern is the parents' report that both children have been unable to walk for approximately the past two months. The parents believed that this was caused either by falls or exposure to dry eraser markers at school and began to home school the children. Mother admitted that she obtained wheelchairs for the children, despite there being no medical recommendation that they were necessary. The parents sought medical evaluation by a neurologist, but did not follow the neurologist's recommendation for further evaluations. Recently,

medical providers have opined that both children's inability to walk is ~~likely due to deconditioning and behavioral constraints. Furthermore, there are concerns that Mother has reported serious symptoms in the children, but failed to obtain timely medical care and/or follow medical recommendations for further evaluation. There is additional concern that the children only report pain when asked by Mother and that Mother has reported various symptoms that have not been observed by medical providers. Since removal from the parents' care the children's eating and medical status have improved. Mother has participated in some services since the removal of her children, including counseling. Mother, however, has refused to acknowledge that malnutrition was a primary cause of Kenan's heart failure. Most recentlyMother has stated that she believes that the issues were caused by mold exposure and/or thyroid issues. Medical professionals have stated repeatedly that they do not believe Kenan's heart failure was caused by mold exposure.~~

B.    Upon information and belief, DCS alleges that DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN, are dependent due to ~~abuse and/or~~ neglect as to AHMET KAHRAMAN.

1.    ~~Father is unable to parent due to abuse and/or neglect~~ **Father is unable to parent the children due to neglect. The Department maintains that Father relied on providers, some of whom were unlicensed, and other individuals for medical advice and dietary information related to his minor children. The**

parents have stated strong beliefs regarding their children's diet and medical care. Mother is a licensed acupuncturist and sought most, if not all, of the children's medical care and diet based on what Father believed to be a more comprehensive understanding of medical terms and issues than Father, who has no medical training and does not understand medical terms. Father relied on and followed medical and naturopathic professional opinions regarding proper diet and medical care to care for the children. The advice given and followed by Father led to malnourishment and other serious medical issues for the children. The child, Kenan, was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension. Both children were also in wheelchairs that were not medically necessary. Since removal from the parents' care the children's eating and medical status have improved.

Father unreasonably relied on unlicensed providers, Mother, whom Father claims has medical knowledge, and other individuals for medical advice and dietary information related to his minor children. The parents have stated strong beliefs regarding their children's diet and medical care. The advice given and followed by Father led to malnourishment and other serious medical issues for the children. The child, Kenan, was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension. While Kenan was hospitalized, Father attended meetings with Kenan's doctors in which parents were told that Kenan needed to be fed more food and a greater variety of food. Father allowed Mother to continue to make decisions for the child's health, including refusal to provide

adequate food and nutrition, despite having been briefed about the detriment by the doctors. Father was also observed to refuse food to Kenan in the hospital despite the child's statement that he was still hungry. Both children were also in wheelchairs that were not medically necessary. Since removal from the parents' care the children's eating and medical status have improved. In recent services, such as counseling, Father has continued to note that he does not believe that Mother did anything wrong and has failed to acknowledge that he should have intervened for the health of his children.

The parents have stated strong beliefs regarding their children's diet and medical care. The care or lack thereof that they have provided the children as a result has interfered with the children's health and development. For example the parents have the children on a strictly restrictive diet and both children have been assessed by medical providers as being malnourished. The child, KENAN, was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension, which was suspected to be tied to his malnutrition. Despite this, the parents were observed refusing to feed the child in the hospital when he reported that he was hungry. Mother expressed concern to medical staff that she "could not keep up" with the child's hunger and providing him food consistent with his strict diet. She requested that a medication for hypothyroid be stopped because she believed that the child was too full and bloated to eat. Mother also was opposed to recommendations that the child be given new foods and formula

to supplement his nutrition, based on her belief that the child has food allergies and/or would be receiving too many calories. Of additional concern is the parents' report that both children have been unable to walk for approximately the past two months. The parents believed that this was caused either by falls or exposure to dry erase markers at school and began to home school the children. Mother admitted that she obtained wheelchairs for the children, despite there being no medical recommendation that they were necessary. The parents sought medical evaluation by a neurologist, but did not follow the neurologist's recommendation for further evaluations. Recently, medical providers have opined that both children's inability to walk is likely due to deconditioning and behavioral constraints. Furthermore, there are concerns that Mother has reported serious symptoms in the children, but failed to obtain timely medical care and/or follow medical recommendations for further evaluation. There is additional concern that the children only report pain when asked by Mother and that Mother has reported various symptoms that have not been observed by medical providers. There is concern that Father is not involved in medical and dietary decision making regarding the children and that he defers to Mother, to the children's detriment. Since removal from the parents' care the children's eating and medical status have improved.

## VII.
### Aggravating Circumstances

Pursuant to A.R.S. §§ 8-841(B)(5) and 8-846(D)(1), DCS has not yet made a determination or cannot determine at this time whether aggravating circumstances exist as to JESSICA WREN KAHRAMAN A.K.A. JESSICA W MANN and/or AHMET KAHRAMAN.

## VIII.
### Facts Supporting Contrary to the Welfare of the Children Finding

Continuation of the children in the home would be contrary to the children's welfare. The parents have stated strong beliefs regarding their children's diet and medical care. The care or lack thereof that they have provided the children as a result has interfered with the children's health and development. For example the parents have the children on a strictly restrictive diet and both children have been assessed by medical providers as being malnourished. The child, KENAN, was hospitalized in December 2018 due to congestive heart failure and pulmonary hypertension, which was suspected to be tied to his malnutrition. Despite this, the parents were observed refusing to feed the child in the hospital when he reported that he was hungry. Mother expressed concern to medical staff that she "could not keep up" with the child's hunger and providing him food consistent with his strict diet. She requested that a medication for hypothyroid be stopped because she believed that the child was too full and bloated to eat. Mother also was opposed to recommendations that the child be given new foods and formula to supplement his nutrition, based on her belief that the child has food allergies and/or would be receiving too many calories. Of additional concern is the parents' report that

11

both children have been unable to walk for approximately the past two months. The parents believed that this was caused either by falls or exposure to dry erase markers at school and began to home school the children. Mother admitted that she obtained wheelchairs for the children, despite there being no medical recommendation that they were necessary. The parents sought medical evaluation by a neurologist, but did not follow the neurologist's recommendation for further evaluations. Recently, medical providers have opined that both children's inability to walk is likely due to deconditioning and behavioral constraints. Furthermore, there are concerns that Mother has reported serious symptoms in the children, but failed to obtain timely medical care and/or follow medical recommendations for further evaluation. There is additional concern that the children only report pain when asked by Mother and that Mother has reported various symptoms that have not been observed by medical providers. There is concern that Father is not involved in medical and dietary decision making regarding the children and that he defers to Mother, to the children's detriment. Since removal from the parents' care the children's eating and medical status have improved.

## IX.
## Facts Supporting Reasonable Efforts Finding

It is further requested that the Court find, based upon the verified allegations of the petition, that reasonable efforts have been made to prevent removal of the children from the home. The Department scheduled a Team Decision Making meeting with the parents for January 3, 2019 to review the safety and placement of the children. Although the parents were notified of the meeting, they did not attend.

## X.
## Facts Supporting Relative or Non-Relative Placement

The Department made attempts to identify and assess placement with the children's grandparent or another member of the children's extended family, including a person who has a significant relationship with the children, but such a placement is not in the children's best interests at this time because there are no identified family members who are willing or able to care for the child at this time. The children's current placement is the least restrictive consistent with the children's best interests.

## XI.
## Financial Responsibility for the
## Support of the Child

The parent(s) should pay an appropriate amount as determined by law for the care, maintenance and support of the children while in care pursuant to A.R.S. §§ 8-241, 8-243 and 8-243.01.

## XII.
## Education

With regard to possible special education issues of any child named herein who is not placed with a parent, or for any child subsequently removed from a parent(s) physical custody, DCS hereby requests an order providing that:

1.     In the event a public education agency or Arizona early intervention provider advises DCS that it needs to locate a parent of any child named in this petition to serve as the Individuals With Disabilities Education Act

(IDEA) parent for that child and a parent can no longer be located by DCS; or

2.  In the event the parent or legal counsel for the parent tells the public education agency, or DCS/its legal counsel that the parent will not serve as the IDEA parent for the child named in this petition; or

3.  If the parent is subject to a no contact order as to any of the children; or

4.  If a public education agency or an Arizona early intervention provider following reasonable efforts to try and get a parent to respond to its requests to act as the IDEA parent for any child named in this petition, fails to obtain a response or any cooperation of a parent, an adult relative, stepparent, or foster parent with whom the child lives (but not staff of a group home or other residential facility) shall have authority to serve as the IDEA parent.

The IDEA parent represents the children's special education interests under Parts B or C of the IDEA. The purpose of such representation is to ensure that a child with a suspected/known disability receives prompt assessment and evaluation for eligibility for early intervention services or appropriate educational services, which may include special education and related services designed to meet the child's unique needs.

## REQUEST FOR RELIEF

Based upon the foregoing allegations, immediate action is required.

WHEREFORE, DCS requests this Court find and/or order that:

1.   The Juvenile Court has jurisdiction over the subject matter and, after proper service on the parents, guardians, and/or Indian custodians, the persons before this Court;

2.   Venue is proper in this county;

3.   The children are temporary wards of the Court, placed in the care, custody, and control of DCS, 3003 North Central Avenue, Phoenix, Arizona 85012, and;

   a. Placing DYLAN KEMAL KAHRAMAN in the physical custody of DCS;

   b. Placing KENAN TROY KAHRAMAN in the physical custody of DCS;

4.   Continuation of the children in the home would be contrary to the the children's welfare;

5.   Reasonable efforts have been made to prevent removal of the children from the home;

6.   The Department made attempts to identify and assess placement with a grandparent or extended family, including a person who has a significant relationship with the children and such a placement is not in the children's best interest at this time;

7.   The children are not Indian children as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4);

8.   A Preliminary Protective Hearing be set pursuant to A.R.S. § 8-824, an Initial Dependency Hearing pursuant to A.R.S. §§ 8-842 and 8-843, a

Publication Hearing, and a Permanency Hearing pursuant to A.R.S. § 8-862;

9.   The matter be assigned to the Court-Appointed Special Advocate (CASA) Program to determine if it is appropriate for the assignment of an advocate;

10.  The matter be assigned to the Foster Care Review Board (FCRB) to perform the duties required by statute;

11.  All persons are prohibited from removing the children from the State of Arizona without prior written approval of DCS;

12.  Any judgment and orders for the care, paternity, custody, support or such other relief, as the children's welfare and the interests of the State may require under the provisions of Title 8 and Title 25 of the Arizona Revised Statutes;

13.  That the parent(s) or legal guardian(s) shall provide the DCS Child Safety Worker or its attorney with a recent educational history (including the name(s) and location(s) of the school(s) each child named in the Petition recently attended and the grade in which each child was most recently enrolled.)  The parent(s) or legal guardian(s) shall also provide or confirm the date of birth of each child named in the Petition;

14.  An individual other than a biological or adoptive parent is authorized to act as the IDEA parent under the circumstances delineated herein;

15.  All medical, dental and mental health providers, health plans, Regional Behavioral Health Authorities (RBHAs), as well as other Health Insurance

Portability and Accountability Act (HIPAA) covered providers who have provided any services to the children, make available to any guardian ad litem for the children and/or attorney for the children the various medical, dental, mental health, genetic and other health care records of the children;

16. The allegations in this Petition are true by a preponderance of the evidence and that the children are dependent to all alleged parents, guardians, and/or Indian custodians as defined by A.R.S. § 8-201(15), and that the children be made wards of the court committed to the care, custody, and control of DCS;

17. The parent, guardian, or Indian custodian be advised as follows;

    a. Failure to appear without good cause may result in a finding that the parent, guardian or Indian custodian has waived his/her legal rights and admitted the allegations in the dependency petition;

    b. That hearings may go forward in his/her absence and may result in an adjudication of dependency, permanent guardianship or termination of parental rights based upon the record and evidence presented to the Court, as well as an order of paternity, suspension or termination of an existing current child support order, custody, or change of custody in a consolidated family law matter and an order for child support if paternity has been established;

    c. Proceedings for permanent guardianship pursuant to A.R.S. §§ 8-871 and 8-872 or proceedings for termination of parental rights pursuant

to A.R.S. § 8-533 may be initiated based upon the grounds set forth in statute or for failure to participate in reunification services; and

d.  If a child is under three years of age, within six months after removal from the home, the Court will determine whether the parent, guardian or Indian custodian has substantially neglected or willfully refused to participate in reunification services offered by DCS; admonish the parent, guardian, or Indian custodian that substantially neglecting or willfully refusing to remedy the circumstances that cause a child to be in an out-of-home placement, including refusing to participate in reunification services, is a ground for termination of parental rights; and

18.  That the parent(s) or legal guardian(s) provide to this Court, as required by A.R.S. § 8-841(D)(5), at the Preliminary Protective Hearing and/or the Initial Dependency Hearing:  the names, type of relationship, and all available information necessary to locate persons related to the children or who have a significant relationship with the children.  Persons related to the children include the children's grandparents, great-grandparents, brothers or sisters of whole or half-blood, aunts, uncles and first cousins. If the parent(s) or legal guardian(s) do not have sufficient information available to locate a relative or person with a significant relationship with the children, the parent or guardian must inform this Court of this fact. The parent(s) or legal guardian(s) must inform DCS immediately if the parent(s) or

18

guardian(s) becomes aware of information related to the existence or location of a relative or person with a significant relationship with the children.

19.   Notice is given that if DCS has temporary custody of a child or legal custody pursuant to a court order, it has the authority to consent to: evaluation and treatment for emergency conditions that are not life threatening; routine medical and dental treatment and procedures, including early periodic screening diagnosis and treatment services, and services by health care providers to relieve pain or treat symptoms of common childhood illnesses or conditions; surgery; blood transfusions; general anesthesia; and testing for the presence of the Human Immunodeficiency Virus (HIV). A.R.S. § 8-514.05(C).

20.   Notice is given that DCS is proposing to substantiate any allegations of abuse and/or neglect contained in the dependency petition for placement in the DCS Central Registry. The DCS Central Registry is a confidential list of DCS findings that tracks abuse and neglect. If the court finds your child dependent based upon allegations of abuse and/or neglect contained in the dependency petition, you will be placed in the DCS Central Registry. *See* A.R.S. § 8-804.

///

///

///

21.    Notice is given that under the Arizona Rules of Family Law Procedure 5.1(E), during any dependency/guardianship proceeding in the juvenile division, the assigned juvenile division may suspend, modify, or terminate a child support order for current support if the parent entitled to receive the child support no longer has legal or physical custody of the child, and, except in Title IV-D cases may make appropriate orders regarding any past due support or child support arrears.  The assigned juvenile division may direct that the wage assignment be quashed or modified.

RESPECTFULLY SUBMITTED this ___6th___ day of January, 2020.

MARK BRNOVICH
Attorney General

*Kathleen E. Martoncik*

KATHLEEN E. MARTONCIK
Assistant Attorney General

20

1   ORIGINAL of the foregoing filed
    this ___6th___ day of January, 2020, to:

2

3   Clerk of the Court
    Maricopa County Superior Court
    Juvenile Court Southeast Facility
4   1810 South Lewis Street
5   Mesa, AZ 85210

6   Copy of the foregoing hand-delivered
7   this ___6th___ day of January, 2020, to:

8   Honorable Jennifer E Green
9   Maricopa County Superior Court
    Juvenile Court Southeast Facility
10  1810 South Lewis Street
    Mesa, AZ 85210
11

12  Copies of the foregoing electronically mailed this
    ___6th___ day of January, 2020, to:
13

14  Kinda Johnson-Herd
    JohnsonK010@mail.maricopa.gov
15  Guardian Ad Litem for the Children

16  DeeAn Gillespie Strub
17  DGillespie@gillaw.com
    SHayes@gillaw.com
18  Attorney for Mother

19  Suzanne M Nicholls
20  Suzanne.Nicholls@maricopa.gov
    OPASEFDisclosure@mail.maricopa.gov
21  Attorney for Father

22  Madison Bell
23  madison.bell@azdcs.gov
    Case Manager
24

25  Susan Stark
    Susan.Stark@maricopacasa.org
26  Court Appointed Special Advocate

27  _____
    JD532206/HDM#8448070
28

                            21

**EXHIBIT 247**
BELL
8-23-24 Mtb

Clerk of the Superior Court
*** Filed ***
8:00 AM

JAN **17** 2020

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

JD532206

1/6/2020

HONORABLE JENNIFER E. GREEN

CLERK OF THE COURT
K. Scanlon
Deputy

IN THE MATTER OF:

D.K.           KAHRAMAN
F1149031
DOB: 9/27/2012
K.K.          KAHRAMAN
F1149032
DOB: 9/27/2012

KINDA  JOHNSON-HURD

KATHLEEN  MARTONCIK

DEEAN  GILLESPIE STRUB

SUZANNE M NICHOLLS

CASA
DCS SPECIALIST - MARICOPA EAST
REGION
DCS - PSRT - DISTRICT 1

ORAL ARGUMENT
DEPENDENCY FOUND AS TO MOTHER JESSICA KAHRAMAN
AND FATHER AHMET KAHRAMAN

Prior to the hearing commencing, Emine Fougner was sworn in as an interpreter.

1:32 p.m.  This matter is digitally recorded in Courtroom 3.

Docket Code HRG                     Form JDPTCDep                          Page 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028156

# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

JD532206                                                    1/6/2020

This is the time set for Oral Argument.

Present: Assistant Attorney General Gregory Coordes; Assistant Attorney General Kathleen Martoncik; Assistant Attorney General Janna Johnson; Madison Bell, DCS Child Safety Specialist; Mecca Temple, DCS Child Safety Specialist; Kinda Johnson-Hurd, guardian ad litem for the children; Deean Gillespie Strub, counsel for Mother; Jessica Kahraman, Mother; Suzanne Nicholls, counsel for Father; Ahmet Kahraman, Father; Emine Fougner, interpreter; and CASA.

LET THE RECORD REFLECT the court has read the Admonition pursuant to Arizona Rule of Juvenile Procedure Rule 41(F).

The court is informed Mother's pending motions are moot.

The court is provided with prospective second and third amended dependency petitions.

Discussion is held.

The parties agree to proceed with the third amended petition, which shall be filed as the second amended dependency petition.

Father maintains his denial but stipulates to the evidence.

Mother does not contest.

Petitioner's Exhibits 1 and 2 are marked for identification.

1:50 p.m. The court stands in recess.

1:59 p.m. Court reconvenes. All parties are present as previously stated.

2:04 p.m. Mother, counsel for Mother and Assistant Attorney General Gregory Coordes exit the courtroom.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028157

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              1/6/2020

THE COURT FINDS Father knowingly, intelligently, and voluntarily waives his right to a trial and stipulates to the evidence.

Petitioner's Exhibits 1 and 2 are admitted into evidence regarding Father.

As to the neglect allegation,

THE COURT FINDS Father is unable to parent the children due to neglect. Father relied on medical advice that led to malnourishment and other medical issues for the children.

Based on the matters presented,

THE COURT FINDS, pursuant to the Rules of Procedure for the Juvenile Court, that the allegation of neglect in the dependency petition is true by a preponderance of the evidence and the children are dependent as to Father as defined by the Arizona Revised Statutes.

2:13 p.m. Mother, counsel for Mother and Assistant Attorney General Gregory Coordes enter the courtroom.

THE COURT FINDS Mother has knowingly, intelligently, and voluntarily waived her right to a trial and submits the issue of dependency.

Petitioner's Exhibit 1 is admitted into evidence as to Mother.

Over Mother's objection,

Petitioner's Exhibit 2 is admitted into evidence as to Mother.

As to the neglect allegation,

THE COURT FINDS Mother is unable to parent the children due to neglect. Mother failed to seek appropriate medical care for the children, and since the children have come into care, Mother has failed to take sufficient responsibility for her actions, specifically regarding the children's malnutrition.

THE COURT FINDS, pursuant to the Rules of Procedure for the Juvenile Court, that the allegation of neglect in the dependency petition is true by a preponderance of the evidence and the children are dependent as to Mother as defined by the Arizona Revised Statutes.

Docket Code HRG                    Form JDPTCDep                    Page 3

AZ-KAHRAMAN028158

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    1/6/2020

IT IS ORDERED making the children wards of the court as dependent children committed to the care, custody and control of the Department of Child Safety.

The court proceeds to Disposition Hearing at this time with respect to Mother and Father.

The case plan is Family Reunification.

Further discussion is held.

IT IS ORDERED the Department meet with Father this week regarding ETG testing.

IT IS ORDERED if any party has the children's passports or any outstanding application for passports, they are to be turned in to the Department within 24 hours.

IT IS ORDERED Mother notify counsel by 1/10/2020 if she is in possession of Father's passport.

THE COURT FINDS that the services are necessary and reasonable.

IT IS ORDERED approving the case plan and services as outlined.

IT IS ORDERED affirming current legal custody and placement orders.

THE COURT FINDS that there is a need for out-of-home care based upon the information presented, foster care being necessary to protect the children's welfare.

IT IS ORDERED reassigning this matter to the Foster Care Review Board to review this matter at least every six months as long as the children remain in out-of-home care to determine what efforts have been made by the Department of Child Safety to carry out the plan for permanent placement.

THE COURT FINDS that the Department of Child Safety has made reasonable efforts to prevent the removal of the children from the home and that continuation in the home would be contrary to the welfare of the children, or that it was reasonable to make no efforts to maintain the children in the home.

Docket Code HRG                    Form JDPTCDep                          Page 4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028159

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                1/6/2020

IT IS ORDERED vacating the Dependency - Adjudication

| | | | |
|---|---|---|---|
| on | 1/8/2020 | at | 1:30 PM |
| and | 1/9/2020 | at | 1:30 PM |
| and | 1/13/2020 | at | 1:30 PM |
| and | 1/14/2020 | at | 2:00 PM |
| and | 1/15/2020 | at | 1:30 PM |
| before | Honorable Jennifer E. Green | | |

IT IS ORDERED setting this matter for Dependency - Uncontested Report & Review

on      4/20/2020
at      10:00 AM
before  Honorable Jennifer E. Green
at the Maricopa County Juvenile Court Center
Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

The DCS child safety specialist shall provide a report to the court and the parties at least fifteen (15) days prior to the hearing which shall address:
1. The placement of the child;
2. The services being provided to the child and family;
3. The progress the parties have made in achieving the case plan goals; and
4. Whether the child continues to be dependent.

Any party seeking an evidentiary hearing on any issue shall file a motion requesting that the matter be set for a contested hearing. The motion shall identify the issues to be litigated, the names and addresses of all witnesses and the estimated time the parties will need to present evidence. The court may reset the matter or proceed with the hearing as scheduled.

IT IS ORDERED, pursuant to Arizona Revised Statutes, that any and all schools, school districts and personnel thereof shall fully cooperate with juvenile probation officers, DCS child safety specialists, and attorneys or guardian ad litem or court appointed special advocates representing a child in a dependency or delinquency action by allowing access by them to all educational records of the child, including but not limited to records pertaining to school, attendance, behavior, academic progress, and psychological evaluations, and shall discuss the contents and meaning thereof with them to assist them in the preparation, implementation, and completion of a rehabilitation and treatment plan for the child.

2:41 p.m.  Court adjourns.

Docket Code HRG                    Form JDPTCDep                    Page 5

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028160

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    1/6/2020

This Courtroom utilizes an electronic recording system for the court's record.  If a court reporter is needed, a written request must be filed with the Clerk of the Court and a copy provided to the assigned judicial officer at least 72 hours before the commencement of the proceeding.

To order a copy of the audio record on compact disc (CD), please call Juvenile Court Administration (Durango facility - 602-506-4533/Southeast facility - 602-506-2544).  There will be a fee of $30 for each copy of the Superior Court proceedings.  All copies will be provided using court-supplied media.

WARNING

As a parent, it is your responsibility to cooperate with all services offered, and work toward return of your children.  A failure to do so, within a reasonable period of time, may mean losing your children forever through termination of your rights and adoption.

_January 16, 2020_
DATE

_[signature]_
HONORABLE JENNIFER E. GREEN

Docket Code HRG                    Form JDPTCDep                    Page 6

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028161

CLERK OF THE
SUPERIOR COURT
FILED
A. RODRIGUEZ, DEP

2020 FEB 19 PM 4: 24



1   DeeAn Gillespie Strub, Esq. Bar No. 009987
2   **GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
3   7319 North 16th Street
    Phoenix, AZ 85020
    Tel. (602) 870-9700
4   Fax (602) 870-9783
5   *Attorney for Jessica Kahraman, Respondent*

6   Send all correspondence to
7   mailroom@gillaw.com

8            **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9               **IN AND FOR THE COUNTY OF MARICOPA**

10                        **JUVENILE DIVISION**

11  In re the Matter of:                    Case No.: JD532206

12  ▮D.K.▮ KAHRAMAN,                        **MOTION FOR CHANGE IN**
13  D.O.B.▮▮12                               **PHYSICAL CUSTODY**

14  ▮K.K.▮ KAHRAMAN,                        *(Assigned to the Hon. Jennifer E.*
15  D.O.B.▮▮12                               *Green)*

16  Person(s) under 18 years of age.
17

18

19

20          Respondent Jessica Kahraman (Mother) hereby files pursuant to Arizona

21  Rule of Juvenile Procedure 59, for a change in the physical custody of her minor

22  children ▮D.K.▮ and ▮K.K.▮ To be clear, this motion is *not* asking the Court to

23  dismiss the dependency; rather, Mother is requesting an in-home dependency

24

25  with her. As explained below, placement of the children with Mother is the least

26  restrictive infringement of her fundamental, parental rights and the return of
27

28

                                    1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

Mother's children to her care would not create a substantial risk of harm to her children's physical, mental or emotional health or safety.

Pursuant to Rule 59(B), Mother requests that this Court schedule a hearing to take evidence on this motion and that such a hearing be set to occur within thirty days of this motion. This motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    **Factual Background.**

**A. Circumstances preceding the State's seizure of Mother's children.**

When Mother's children, D.K. and K.K. were 20 months old, Dr. Cindy Schneider, MD, diagnosed them with impaired gut health, poor nutrient absorption, and impaired ability to clear the body of toxins. After some time, dissatisfied with her children's improvement, Mother sought out additional medical guidance. On the recommendation of Dr. Scott Jensen, MD, Mother began providing her children with a special diet, known as GAPS. After some improvement, when her children started kindergarten, Mother noticed that her children's health had begun to decline once again.

Mother sought medical help for her children. She had them seen by their pediatrician, and, at his recommendation, the children were seen by licensed therapists and orthopedic specialist. Mother also took her children to the

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

emergency room at Phoenix Children's Hospital when the children's medical condition required emergency medical help.

In December 2018, Mother brought K.K. to Cardon's Children's Hospital (Cardon). At Cardon, K.K. was treated by Dr. Miga. At Dr. Miga's instruction, Mother began feeding K.K. a variety of additional, new foods and ensured that the caloric count set by Dr. Miga was either met or exceeded. As instructed, Mother documented the meals and foods she fed to K.K. however, due to the Christmas holidays, Cardon's had limited medical staff and K.K.'s meals were not consistently observed by hospital staff.

Despite Mother's efforts to implement Dr. Miga's instructions, another doctor at Cardon's, Dr. Stewart, determined that Mother should no longer be permitted to make medical decisions for her children. Before making this determination, Dr. Stewart had never spoken with Dr. Miga. As the primary doctor responsible for K.K.'s medical care, Dr. Miga was most familiar with the facts, and he never determined that DCS involvement was warranted.

Due to Dr. Stewart's determination, DCS became involved and Mother's children were taken into custody by DCS.

**B. Mother's efforts to get her children back.**

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029870

Since DCS took her children, Mother has undertaken significant efforts to get her children back and has progressed to the point where she can care for her children.

In sum, Mother's efforts have included the following:

1.  Mother has taken eleven parenting classes;

2.  Mother has completed three nutrition classes, one through Mesa Community College that is advanced for registered dietitians;

3.  Mother joined and attended a women's self-esteem group weekly for nine (9) months, which is facilitated by a licensed clinical therapist, specifically to work toward her DCS goal;

4.  Mother has participated in individual psychotherapy with Dr. Kelly Rodriguez, on a weekly basis since May 1, 2019; and

5.  Mother has been fully compliant with all DCS requirements and followed all of DCS's recommendations.

Many of these are individual elective efforts. Mother has not done them merely because they were requested or even expected of her. She has done these of her own volition for the purpose becoming the best Mother she can be to her children.

Through Mother's efforts, she had made significant progress. Through her therapy with Dr. Rodriguez, she has demonstrated insight into the numerous

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

4

AZ-KAHRAMAN029871

factors that may have contributed to the dependency, taken responsibility for her choices, and made the realization that she must take ongoing action to better herself as a parent and prioritize her own self-care. Additionally, evidence produced at an evidentiary hearing will show that Mother has achieved the following:

1. Mother now recognizes where she placed too much trust in the advice of the children's physician. With the help of the services she has received, she now sees that she should have been more proactive to push the children through their dietary problems and that her reliance on the GAPS-diet practitioners was ill-advised;

2. Mother has learned greatly from registered dietitian Alyssa Simpson. With her help, Mother has put together menus for the children that embrace a varied diet without any dietary restriction;

3. Mother now recognizes that she did not take the gravity of the situation seriously enough before, relying on input that she now recognizes was not healthy for the children;

4. Mother is now much more comfortable with the children eating typical food and sees it as the proper way for them to be healthy and adequately nourished, and to feel more accepted and confident. Mother has learned

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029872

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

to appreciate the social connection through food with the children's peers and in the family home;

5. As a result of the above, Mother has been permitted to feed the children from Door Dash twice weekly during visits since February 2018, with the children's choices being encouraged. She no longer restricts their diets in any fashion, and recognizes that they are thriving with proper nutritional intake.

6. Mother has actively engaged in supervised visitation with her children twice weekly for one year, and consistently receives reports from visit supervisors, praising her demonstration of positive parenting, comfort during mealtimes, and a mutually loving bond with her children;

7. She has learned healthy boundaries in her marriage, which unfortunately were sorely lacking before. In November, Mother asked Father for a divorce. The marriage dissolution matter is currently pending.

8. Mother acknowledges the immense stress in her life because of the multiple situations that have been pulling on her. She has taken advantage of this learning experience to widen her support network of family, friends, therapists, women's support group, dietitian, and the children's doctors, Dr. Miga and Dr. Jafri.

6

AZ-KAHRAMAN029873

9. In the most recent DCS Court Report of December 6, 2019, DCS expressed concerns regarding Mother's belief that mold exposure could have caused or contributed to the children's nutritional sensitivities. Mother no longer resides in the residence where the mold contamination was discovered very recently, and for which she and her husband received medical care. Mother has been working with her individual therapist, Dr. Kelly Rodriguez, and now realizes and accepts that her children's malnutrition was due to multiple factors which included them being on the GAPS diet. While Mother remains understandably concerned about the adverse impact that mold exposure can have on children and adults, she does not believe that mold exposure was the sole or primary cause of her children's malnutrition.

## 2. Legal Argument.

Mother seeks to have her children placed with her pursuant to Rule 59 and A.R.S. § 8-514. As explained below, placement with their Mother is the least restrictive placement available consistent with K.K. and Dylan's best interests. DCS cannot satisfy its burden to prove, by clear and convincing evidence, that deviation from the statutorily mandated order of preference in A.R.S. § 8-514 is in

7

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

K.K. and Dylan's best interest. Thus, under A.R.S. § 8-514, K.K. and D.K. must be placed with their Mother.

Furthermore, the return of Mother's children to her care would not create a substantial risk of harm to her children's physical, mental or emotional health or safety. Thus, under Rule 59, K.K. and D.K. must be placed with Mother.

### A. Principles of Statutory Interpretation.

The method of interpreting statutes and ordinances is well-established. "In the interpretation of a statute the primary duty of the Court is to give effect to the legislative intent." *State ex rel. Flournoy v. Mangum,* 113 Ariz. 151, 152 (1976). In all cases where it is called upon to construe a statute, a court must first look "to the plain language" of the statute, "giving effect to every word and phrase, and assign[ing] to each word its plan and common meaning." *Id.* at 602 ¶ 24; *see also Bilke v. State,* 206 Ariz. 462, 464-65, ¶ 11 (2003) (A court gives statutes' words their "usual and commonly understood meaning unless the legislature clearly intended a different meaning.") If the language is "clear and unambiguous," a court applies it "without resorting to other methods of statutory interpretation." *Id.* If, however, the "language is ambiguous," then a court "attempt[s] to determine the legislative intent by interpreting the statute as a whole, considering its place in the relevant statutory scheme, as well as the statute's subject matter, historical background, effects and consequences, and spirit and purpose." *Id.*

GILESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029875

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

(internal quotation marks omitted). In construing a statute, a court must construe related statutes together. *See State ex. Rel. Dep't of Econ. Sec. v. Hayden*, 210 Ariz. 522, 523, ¶ 7 (2005).

In interpreting a statute, "[w]hen an ambiguity or contradiction exists," a court will seek "to determine legislative intent by interpreting the statutory scheme as a whole." *UNUM Life Ins. Co. of Am. v. Craig*, 200 Ariz. 327, 330 ¶ 12 (2001). "If neither the statute's text nor the statement of legislative intent resolves the exact issue before [the court], [the court] must resolve any ambiguity by considering the legislature's overall purposes and goals in enacting the body of legislation in question." *Id.* (internal quotation marks omitted.)

The Arizona Court of Appeals has made clear that a court cannot refuse to apply a statute as written simply as a matter of policy preference because "it is for the legislature—not [the] court—to make those policy determinations." *Doty-Perez v. Doty-Perez*, 245 Ariz. 229, 235, ¶ 26 (App. 2018). As the Court of Appeals has noted: "When a state expresses such an interest through particular legislation, its policy judgments are entitled to judicial deference." *Ariz. Dep't of Econ. Sec. v. Lee ex. rel. Cty. of Maricopa*, 228 Ariz. 150, 153, ¶ 13 (App. 2011).

**B. Under A.R.S. § 8-514 (2018), DCS must find that a less restrictive placement is not consistent with a child's best interests before placing a child in a more restrictive placement.**

9

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029876

From September 2006 to August 2018, A.R.S. § 8-514(B) required that, when DCS takes from parents their right to decide where their child shall live, DCS has to place a child "in the least restrictive type of placement available, consistent with the *needs* of the child." (emphasis added). It then provided a statutorily defined order for placement preference. Nothing in the statute defined what factors DCS was required to consider in determining which placement was the least restrictive type of placement that was consistent with the needs of the child. In *Antonio P. v. Ariz. Dep't of Econ. Sec.*, the Court of Appeals considered whether—under A.R.S. § 8-514(B) (2007)—when determining whether DCS has fulfilled its statutory obligations in placing a child, DCS was required to place the child with the placement in the highest statutory order of priority that was consistent with the needs of the child. 218 Ariz. 402 (2008). The court held that DCS was not so required. It held that the statutorily defined order of placement merely set forth a "choice or estimation above another" to consider when analyzing if a placement is "consistent with the needs of the child." *Id.* at 405 ¶12 (App. 2008). The statute did not, the court held, "mandate that the order of preference be strictly followed when a placement is not consistent with the needs of the child." *Id.*

In 2018, the legislature made significant amendments to A.R.S. § 8-514. Under current law, when DCS takes from parents their right to decide where their child shall live, DCS must place a child "in the least restrictive type of placement

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029877

available, consistent with the *best interests* of the child." A.R.S. § 8-514(B) (emphasis added). The legislature also added a new subsection to the statute, in which it set forth eleven statutory factors that DCS must consider when determining which placement is the least restrictive placement that is consistent with the best interests of the child. A.R.S. § 8-514(G).

A court must "presume the legislature is aware of existing case law when it passes a statute, and [it] further presume[s] that when the legislature amends a statute, it intended to change the existing law. *State v. Chandler*, 244 Ariz. 336, 338, ¶ 7 (App. 2017), review denied (May 8, 2018) (internal brackets and internal citation omitted); *see also City of Phoenix v. Glenayre Elecs., Inc.*, 242 Ariz. 139, 144 ¶ 19 (2017) ("[W]e presume that the legislature, when it passes a statute, knows the existing laws." (*quoting Daou v. Harris*, 139 Ariz. 353, 357 (1984)))." Since the legislature is presumed to have intended to change the existing law when it amends a statute, once the legislature amended A.R.S. § 8-514, prior case law, such as *Antonio P., supra*, which had set forth an interpretation of the statute prior to its amendment, became no longer good law.

Additionally, a court must "interpret statutory language in view of the entire text, considering the context and related statutes on the same subject." *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019). A statute related to A.R.S. § 8-514, which also addresses the subject of the State's infringement on the

11

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029878

fundamental rights of parents[1] is A.R.S. § 1-601, entitled the "Parent's Bill of Rights." The Parent's Bill of Rights went into effect in 2010, two years after *Antonio P.* was decided. That statute requires that the "state. . .or any other governmental entity shall not infringe upon" a parent's constitutional rights without demonstrating that it "is not otherwise served by a less restrictive means." *Bentley v. Bldg. Our Future*, 217 Ariz. 265, 271 (App. 2007).

"It is a well-established rule of statutory construction that statutes are to be construed together and that legislative construction of the meaning of certain words in one act is entitled to consideration in construing the same words appearing in another act." *Anthony Inv. Co. v. Arizona Dep't of Econ. Sec.*, 132 Ariz. 176, 179 (App. 1982) (citing *Washington National Insurance Company v. Employment Security Commission*, 61 Ariz. 112, 144 P.2d 688 (1944).). In A.R.S. § 1-601, the legislature used the similar term "less restrictive." Thus, any interpretation of the term "least restrictive" as used in A.R.S. § 8-514 must be an interpretation which allows A.R.S. § 1-601 to be interpreted as consistent with A.R.S. § 8-514, in order

---

[1] Nearly a century ago, in *Meyer v. Nebraska*, the Supreme Court "held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).) Given the extensive Supreme Court precedent on this issue, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id.* at 66.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

12

to allow the statutes to be construed together. *See State ex. Rel. Dep't of Econ. Sec. v. Hayden*, 210 Ariz. 522, 523, ¶ 7 (2005). ("In construing a statute, this Court construes related statutes together.") Since *Antonio P.* was decided prior to the legislature's passing of A.R.S. §1-601, for this reason as well, it is no longer good law.

In amending A.R.S. § 8-514, the legislature stated its view of the requirements of the law. First, the legislature stated its intention that under the law, "DCS is required to place a child in the least restrictive type of available placement." (Exhibit 1 (Legislative abstract for SB 1473).) The legislature then clarified its view that under the law, the "placement of a child must adhere to a statutorily defined order of placement." (*Id.*) Applying the well-established rules for statutory interpretation, it is clear that the language of the newly amended statute achieves the legislature's intent.

In construing statutes, "[w]ords and phrases shall be construed according to the common and approved use of the language. Technical words and phrases and those which have acquired a peculiar and appropriate meaning in the law shall be construed according to such peculiar and appropriate meaning." A.R.S. § 1–213 (2002). In the law, the phrase "least restrictive" is a term of art that signals that the subject matter is intruding upon a constitutionally protected right. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 705 (2014) (Government must

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

13

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

demonstrate they used the least restrictive means when burdening the exercise of religion); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (The government did not establish that the controlled substances law restricted the right to free exercise of religion in the "least restrictive" way.) *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 476 (1989) (Government must demonstrate they used the least restrictive means when burdening commercial speech); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 13 (1981) (Government must consider the "least restrictive of the person's personal liberty" for disabled persons.); A.R.S. § 41-1493.01 (C)(2) (Government may only infringe upon the free exercise of religion if it is "[the least restrictive" means); A.R.S. § 15-1864 (the government may only infringe upon a student's free speech if it is the "least restrictive" means); A.R.S. § 36-788 (A) (during a state of war or emergency, the government may only quarantine using the "least restrictive" means.)

Because A.R.S. § 8-514 (2018) is a new statute, there are no Arizona cases interpreting it. Other states with similar statutes, however, have interpreted their own state statutes. While their opinions are not binding on this court, they offer persuasive authority. *See State v. Dean*, 226 Ariz. 47, 53 ¶ 19 (App. 2010) ("Legal precedents from other jurisdictions [are] informative.")

Wyoming's statute on the placement of children mirrors A.R.S. § 8-514. It states that the relevant State agency must "arrange for care and supervision of the

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

14

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

child in the most appropriate and *least restrictive* setting necessary to meet the child's needs." Wyo. Stat. Ann. § 14-3-208 (a)(iii) (emphasis added). Similar to A.R.S. § 8-514, the State agency in Wyoming "shall" place the child with family relations if it is in the child's best interests. Wyo. Stat. Ann. § 14-3-208 (a)(iii). The Wyoming Family Services Manual also mirrors A.R.S. § 8-514, stating: "DFS shall consider relative/kinship families as the placement of preference[.]" *In re JW*, 2010 WY 28, ¶ 21 (Wyo. 2010).

In interpreting its statutes, the Wyoming Supreme Court concluded: "as a matter of ageless tradition, as a matter of federal law, and as a matter of Wyoming law, there exists a compelling preference. . . [for] placement with nuclear or extended family members." *In re JW*, 2010 WY 28, ¶ 27 (Wyo. 2010). "[G]iven the high stakes in play here," the Wyoming Supreme Court reversed a lower court decision that failed to provide preference to kinship placement when the kinship was determined to be suitable placement. *Id.*

Other states have reached the same conclusions, finding that, not only as a matter of "ageless tradition," and federal law, but also under their own state law that placement with family is a less restrictive placement than placement outside of family. *See e.g. In Interest of J.B.*, 924 N.W.2d 537 (Iowa Ct. App. 2018) (reversing a child placement with a non-relative in part because "[r]elative placements are among the least restrictive dispositions"); *Ex parte W.T.M.*, 851 So. 2d 55, 61 (Ala.

15

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029882

Civ. App. 2002) (plurality opinion) (analyzing the statutory requirement for a preference for family in the least restrictive setting, findings as to foster mother's excellent care did not overcome preference for relative placement.)

An interpretation of A.R.S. § 8-514 as merely setting forth a consideration in determining what placement is most in a child's best interest is inconsistent with both the language of A.R.S. § 8-514 and with the language of A.R.S. § 1-601. "A cardinal principle of statutory interpretation is to give meaning, if possible, to every word and provision so that no word or provision is rendered superfluous." *Arizona Chapter of the Associated Gen. Contractors of Am. v. City of Phoenix*, No. CV-19-0158-PR, 2019 WL 3312165, at *2 (Ariz. July 24, 2019). To interpret A.R.S. § 8-514(B) as merely requiring DCS to consider the statutorily listed order of preference as part of its consideration in determining which placement is in the best interest of the child, reads the requirement that the placement also be "the least restrictive type of placement available" out of the statute. It renders that portion of the statute superfluous. If the statute merely required DCS to consider the statutory order of preference in reaching a determination as to best interest, the statute would state: "The department shall place a child consistent with the best interest of the child. The order for placement preference is as follows:" But that is not what the statute says. DCS cannot merely consider an order of preference and make a decision as to the placement it finds most consistent with

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

16

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029883

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

the best interests of the child. Rather, DCS must place the child in the "least restrictive type of placement available." That phrase must be considered, and must it be considered to do some work in the statute.

Consistent with federal law, and with the laws of other States, Arizona's legislature's use of the term "least restrictive" in A.R.S. § 8-514 shows that it intended to limit the State's ability to infringe upon the fundamental, constitutional rights of parents. By requiring the State to place a child in the least restrictive placement available that was consistent with a child's best interests, the statute requires that before DCS may place a child with a person in a lower priority category, it must first determine that placement with a higher statutory preference is not in the child's best interests. An interpretation of A.R.S. §8-514 as intending to limit the State's ability to infringe upon the fundamental, constitutional rights of parents to the least restrictive means available to serve the State's interest in protecting children is consistent with A.R.S. § 1-601's requirement that the State not infringe on the fundamental liberty interest of parent without "demonstrating," that the State's interest is "not otherwise served by a less restrictive means." A.R.S. § 1-601(b).

**C. DCS bears the burden of proving that its placement decision complies with state law.**

A.R.S. § 8-514(B) places the burden upon DCS to place a child in the least restrictive placement that is consistent with the best interest of the child. The

17

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029884

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

current placement does not fulfill DCS's statutory obligation. "In a case where the placement of a young child is at issue, allocation of the burden of proof" "is an issue of vital importance." *Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, 534 (App. 2015) (citing *In re Alexandria P.*, 228 Cal.App.4th 1322 (2014). Here, Arizona's legislature has delineated placement preferences for dependent children. DCS must adhere to this delineated placement preference unless the statutorily mandated preference is determined to not be consistent with the best interests of the child. Within the text of the statute, Arizona's legislature has put forth neither a standard of proof applicable to a decision to deviate from the delineated order of placement nor allocated that burden. Because "the statute's text nor the statement of legislative intent resolves the exact issue before [the court], [the court] must resolve any ambiguity by considering the legislature's overall purposes and goals in enacting the body of legislation in question." *UNUM Life Ins. Co. of Am. v. Craig*, 200 Ariz. 327, 330 ¶ 12 (2001). (internal quotation marks omitted.) Here, the legislature's stated purpose and goal was to ensure that children were placed in the least restrictive placement available by placing such a requirement on DCS and putting forth the legislature's views as to the placements it determined were least restrictive by setting forth a statutorily mandated order of placement. Thus, the amended statute puts forth a strong state policy that, where possible, children should be placed with family members.

18

AZ-KAHRAMAN029885

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

Because A.R.S. § 8-514 (2018) is a new statute, there are no Arizona cases interpreting it. A statute similar to A.R.S. § 8-514, however, exists under federal law. As A.R.S. § 8-514 dictates a statutory order of preference for placement of dependent children in Arizona, 25 U.S.C. § 1915 dictates a statutory order of preference for placement of dependent Indian children. The intent of both statutes is to mandate the placement of dependent children to accord with the legislature's preferences. "In the interpretation of a statute the primary duty of the Court is to give effect to the legislative intent." *State ex rel. Flournoy v. Mangum*, 113 Ariz. 151, 152 (1976). The Arizona Court of Appeals has held that to effectuate Congress' intent in 25 U.S.C. § 1915, a party seeking to deviate from the statute's preferences bears the burden of proving that such deviation is in the child's best interests. *Gila River Indian Cmty. v. Dep't of Child Safety*, 238 Ariz. 531, 535 (App. 2015). Given that both A.R.S. §8-514 and 25 U.S.C. § 1915 have the same intent, to effectuate the legislature's intent in A.R.S. § 8-514, a party seeking to deviate from the statute's preferences bears the burden of proving that such deviation is in the child's best interests. Since, here, DCS is seeking to deviate from the statute's preferences, it bears the burden of proving that such deviation is in K.K. and Dylan's best interests.

Additionally, in A.R.S. § 1-601(B), Arizona's legislature placed the burden on the State to "demonstrate" that it's infringement of a parent's fundamental

19

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029886

right to their child "is not otherwise served by a less restrictive means." Thus, under A.R.S. § 1-601 (B), the State must prove that, in placing a child, it placed the child in the less restrictive placement available. It would make no sense if, for the same issue—whether DCS's placement is the least restrictive placement available consistent with the best interest of the children—DCS bears the burden under A.R.S. § 1-601 and a party challenging DCS bears the burden under A.R.S. § 8-514. Under such an interpretation, the burdens would have the effect of cancelling each other out, and leaving no one with the burden. A.R.S. § 8-514 cannot be interpreted to lead to such an absurd result. Construing the statutes together, as this Court must, DCS has the burden of demonstrating that its deviation from the statutory placement preference is necessary to protect the child's best interests.

Finally, in *Gila River Indian Cmty*, the court determined that the standard of proof for a party seeking to deviate from the statute is clear and convincing evidence. *Id.* at 535-36, ¶ 18. There is no compelling argument why a lesser standard of proof should apply to a State's attempt to deviate from a state statute mandating an order of preference for placement of dependent children than to a State's attempt to deviate from a federal statute mandating an order of preference for placement of dependent children. Thus, the standard by which DCS must prove that its deviation from the state statute is in the child's best interest is clear and convincing evidence.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029887

**D. The evidence will show that placing K.K. and D.K. with Mother is the least restrictive placement that is consistent with their best interest.**

Arizona's legislature has made the policy determination that the State must place children in the least-restrictive placement available:

> The department shall place a Child in the least restrictive type of placement available, consistent with the needs of the Children. The order for placement preference is as follows:
> 1. With a parent
> 2. With a grandparent
> 3. In kinship care with another member of the child's extended family, including a person who has a significant relationship with the child.
> 4. In licensed family foster care.

(A.R.S. § 8-514 (B).)

As the Arizona Court of Appeals has held: "When a state expresses such an interest through particular legislation, its policy judgments are entitled to judicial deference." *Ariz. Dep't of Econ. Sec. v. Lee ex. rel. Cty. of Maricopa*, 228 Ariz. 150, 153 ¶ 13 (App. 2011). As held by the Arizona Supreme Court: "It has been repeatedly emphasized that courts should bend over backwards, if possible, to maintain the natural ties of birth." *Bechtel v. Rose In & For Maricopa Cty.*, 150 Ariz. 68, 73 (1986) (internal quotation marks omitted). The Arizona legislature agrees. In Arizona, the people's representatives made the policy determination that whenever possible, children are to remain with their natural family. The Arizona legislature

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029888

has determined, consistent with the beliefs and values of Arizonans, that family matters.

In accordance with the statute, each degree of placement must be considered in turn. First and foremost, children should be placed with a parent. Mother is able and willing to care for her children.  Thus, the least restrictive placement applicable here is with Mother. DCS bears the burden of proving, by clear and convincing evidence, that deviation from the statutorily mandated order of placement is warranted. DCS cannot meet its burden here.

**E. DCS cannot satisfy its burden to prove, by clear and convincing evidence, that deviation from the statutorily mandated order of placement preference is consistent with** K.K. **and Dylan's best interest.**

As stated above, when the legislature amended A.R.S. § 8-514, it added subsection (G). In that subsection, the legislature set forth eleven different statutory factors that must be considered in determining whether a placement is the least restrictive placement available that is consistent with the best interests of the child.

**1. A.R.S. § 8-514(G)(1)-permanence.**

In the statutory list of priorities, the legislature chose to list the child's interest in permanence as first and foremost. Placement with Mother would provide permanence to her children. The evidence will show that the children's

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

22

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029889

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

current placement is not willing to adopt the children if reunification efforts fail and is not a permanent option. Thus, this factor favors placement with Mother.

**2.  A.R.S. § 8-514(G)(2)-wishes of the parent and child.**

Second only to the child's interest in permanence are the wishes of the parent and the child. Mother's wish is to have her children with her. Mother will present expert testimony that it is the children's wish to be with their mother. Thus, this factor favors placement with Mother.

**3.  A.R.S. § 8-514(G)(3)-relationship with the child.**

A mother's bond with her child is one of the most sacred and cherished bonds in society. No one could have more significant relationship with her children than Mother has. Thus, this factor favors placement with Mother.

**4.  A.R.S. § 8-514(G)(4)-proximity to parent's home.**

Mother's home is in close proximity to Father's home.

**5.  A.R.S. § 8-514(G)(5)-strength of parenting style.**

As outlined above, Mother has made significant progress and has accepted her responsibility for the circumstances for which her children came into care. Mother is a fit and able parent to her children. Thus, this factor favors placement with Mother.

**6.  A.R.S. § 8-514(G)(6)-ability to interact with the birth family.**

23

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029890

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

Mother will testify that despite her on-going marital issues with Father, she is willing and able to facilitate her children having a relationship with Father. Thus, this factor favors placement with Mother.

### 7. A.R.S. § 8-514(G)(7)-placement of siblings and A.R.S. § 8-514(G)(8)-willingness to maintain sibling relationships.

Mother wants both of her children with her. Thus, these factors favor placement with Mother.

### 8. A.R.S. § 8-514(G)(9)-fit within the family.

K.K.███s and Dylan's fit within a foster family could never and would never come close to the fit they have within their own family. Thus, this factor favors placement with mother.

### 9. A.R.S. § 8-514(G)(10) and (11).

Because neither K.K.███ nor D.K.███ have chronic behavioral health needs, A.R.S. § 8-514(G)(10) is not applicable in this case. Because they are not Indian,[2] A.R.S. § 8-514 (G)(11) is not applicable in this case.

### F. The evidence will show that placing K.K.███ and D.K.███ with their mother would not create a substantial risk of harm to the child's physical, mental or emotional health or safety.

Mother has worked hard with her therapists and other professionals to learn what actions she took and failed to take that led DCS to make the decision to take her children. She has accepted responsibility for those decisions and will

[2] 25 U.S.C. 1915 sets forth placement preferences for Indian children.

24

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029891

not make those decisions again. She has learned about nutrition and has worked with a nutritionist to ensure that her children will receive a complete and well-rounded diet. Kenan's and Dylan's physical, mental and emotional health and safety would not be at risk by them being in their mother's care. Continuing to keep K.K. and D.K. from their mother, however, does pose a substantial risk to their mental and emotional health. Study after study has shown that when children are involuntarily separated from their parents, the result is traumatic and lasting harm. As one commentator has stated:

> The evidence about the harm of involuntarily separating children from their parents is so overwhelming that Dr. Charles Nelson, professor of pediatrics at Harvard Medical school, concluded: "There's so much research on this that if people paid attention at all to the science, they would never do this."

Sankaran, Vivek, et al., "*A Cure Worse Than the Disease? The Impact of Removal on Children and Their Families*," 102 Marq. L. Rev. 1161, 1167 (2019)[3].

"Research clearly establishes the profound and irreparable damage family separation can inflict on children." *Id.* at 1161. Returning K.K. and D.K. to their mother will stop them from continuing to have to suffer the emotional trauma that they are experiencing as a result of being separated from their mother.

---

[3] A copy of this law review article is attached as Exhibit 2.

25

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029892

**III. Position of the parties.**

Counsel for DCS, Father and the Guardian Ad Litem object to this motion.

**RESPECTFULLY SUBMITTED** this 19th day of February 2020.

By: _____

Kristina Reeves
Attorney for Mother

ORIGINAL of the foregoing filed this ___19th___
day of February, 2020.

COPIES emailed this same date to:

Honorable Jennifer E. Green
Maricopa County Superior Court

Katie Martoncik
Assistant Attorney General
PSSSEF@azag.gov; Kathleen.martoncik@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
johnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

Suzanne Nicholls
Suzanne.Nicholls@Maricopa.Gov
*Attorney for Father*

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

26

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029893

1    MARK BRNOVICH
2    Attorney General

3    KATHLEEN E. MARTONCIK
4    Assistant Attorney General
     State Bar No. 023982
5    CFP/PSS
     120 W. 1st Avenue, 2nd Floor
6    Mesa, Arizona 85210
7    Telephone: (602) 771-4000
     PSSSef@azag.gov
8

9    Attorneys for the Department of Child Safety

CLERK OF THE
SUPERIOR COURT
FILED

*M. Cortez*    DEP

2020 FEB 26 PM 4: 43

EXHIBIT
248-A
BELL
8-23-24

10    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11    IN AND FOR THE COUNTY OF MARICOPA

12

13    In the Matter of:                          No. JD532206

14    DYLAN KEMAL KAHRAMAN            **DCS'S OBJCTION TO MOTHER'S**
         d.o.b. ████ 2012              **RULE 59 MOTION**
15    K.K.        KAHRAMAN
16       d.o.b. ████ 2012

17    Person(s) under 18 years of age.       (Honorable Jennifer E. Green)

18         The Department of Child Safety (DCS or the Department), through undersigned

19    counsel, objects to Mother's Rule 59 motion to return the children to her care.  The

20    Court found a dependency in January 2020 and, on the record, made detailed factual

21

22    findings about Mother's failure to seek appropriate medical care for her children and her

23    failure to take sufficient responsibility for her actions, specifically regarding the

24    children's malnutrition.  Mother's behavior in the past sixty days has not changed

25    drastically enough to safeguard the children's health in her care or to warrant a change

26

27    of physical custody to her home. If anything, her actions have become more

28    unpredictable and she has continued to blame others for her situation, both current and

      past.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030930

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. Factual Background

#### a. Medical History

A detailed review of the children's medical records from birth was conducted by Dr. Michael Kelly and a summary of that review was attached to his December 2, 2019 report in this case.  12/2/19 M. Kelly report, attached hereto as Exhibit 1; summary of children's medical records, attached hereto as Exhibit 1A.  As early as November 2012, when K.K. was six weeks old, there is evidence of Mother eschewing professional medical advice in favor of her own opinion.  When told to go to urgent care for her febrile infant, she took K.K. but then called the pediatrician claiming that the physician's assistant at urgent care "didn't know what he was talking about" and it was "a waste of time." She was told to take K.K. to Cardon Children's Emergency Room for further follow up but there is no record that she took K.K. to be seen.

In the pediatrician notes through 2013, the records describe the boys as healthy and note only that immunizations are being refused by the parents.  On June 5, 2013 Mother fed K.K. honeydew and noted some swelling in his face.  She called the pediatrician and then took him to the emergency room.  The emergency room notes indicate that this is NOT a true allergy and that Mother was counseled that foods such as strawberries, melon, and papaya should not be given to children until at least two years of age.  The children continue to be reported as healthy, with only minor viruses and fevers, although the doctors continue to warn the parents about the ramifications of not immunizing the boys, throughout 2013 and into 2014.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030931

On January 15, 2014, the pediatrician note describes the boys as being spoken to in both English and a bit of Turkish and the boys seem to understand both. "Appropriate language skills for age are described, although ▆▆▆ is said to be a bit wordier than ▆▆▆ Exhibit 1A at 9. Both boys are described as being healthy. *Id.* On February 21, 2014, ▆▆▆ is seen at Melmed "accompanied today by his mother for concerns regarding his temperament, his language delays as well as the fact that he does seem to be doing some balancing activities with his toys. She also has concerns that the child may be showing signs of autism. She, at today's visit, has also expressed concerns that his right foot may be introverted which, in turn, could be contributing to some of his physical movements. Many of Dylan's concerns became prominent when he was 13 months old for which his family did seek the services of Dr. Cindy Schneider earlier this month. His mother stated that she could possibly be having metal exposure as a result of which dietary changes were recommended for the parent. She is also gluten and dairy free." *Id.* None of the concerns reported to Melmed had been listed in the previous pediatric notes.

On March 12, 2014, an e-mail from Mother to Cindy Schneider demonstrates that Mother even questioned the medical providers on which she is now asking the Court to rely. In the e-mail Mother is questioning whether she could be passing her own metal exposure to her children through breastmilk despite the fact that she has already been told by the provider that this was not a concern. Exhibit 1A at 12. In the pediatric records Mother had actually admitted that she wanted to eliminate middle of the night breast feeding. 10/23/13 note Exhibit 1A at 8.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030932

The March 31, 2014 note indicates that Dr. Cindy Schneider may not have received an accurate history from Mother. For instance, it is reported in that note that D.K. was "blue" at birth. Exhibit 1A at 12. Compared to the birth records, which stated simply that Twin B was "less vigorous and active but improved quickly" (K.K. was Twin B). Mother also reports that K.K. had to be taken to the emergency room after being given yogurt and cream – there are no documents for these visits. Exhibit 1A at 13. She leaves out, however, the documented visit to the emergency room for the reaction to honeydew where she was counseled that it was not a true allergy and a child should not be given melon before age two.

This misinformation given by Mother to medical providers early in the children's lives are just a few examples of the long history of misinformation that lead to misdiagnoses and malnutrition of both children. Due to concerns Mother had about autism, the boys were started on the GAPS diet but due to alleged food sensitivities, many foods were withheld and the boys were not progressed through the GAPS diet as would normally be recommended. By the fall of 2018 both boys were in wheelchairs, despite the fact that there was no physical need for the wheelchairs and at least one physical therapist opined that the refusal to walk by D.K. was due to deconditioning. Exhibit 2.

In December 2018, K.K. was admitted to Cardon Children's Medical Center for severe malnutrition. Upon entry into the emergency room, Mother blamed Kenan's lack of walking on being exposed to certain chemicals such as dry erase markers at school. Exhibit 1A at 98. Initial cardiac review by Dr. Daniel Miga on December 18, 2018 noted that Kenan's "pre-albumen level is low consistent with poor nutrition. He has

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030933

clinical right heart failure but has additional symptoms which are inconsistent with this diagnosis." *Id.* at 101.  Follow-up from Dr. Miga on December 19, 2018 indicates a diagnosis of "severe pulmonary hypertension with secondary right ventricular dysfunction and acute heart failure." *Id.* at 105.  Dr. Miga was later asked about the cause of Kenan's cardiac failure and he was unequivocal in saying that the issue was caused by malnutrition.  June 7, 2019 Note by D. Miga, attached hereto as Exhibit 3.

A nursing note from Cardon Medical Center from December 18, 2018 documents Mother's prompting to K.K. to give medical provider's different information.  Exhibit 1A at 101 (K.K. reports no pain to the nurse until Mother prompts twice that he was having leg cramps and K.K. agrees with Mother; nurse again asks K.K. if he is in pain and K.K. says no; nurse offers Tylenol for pain and Mother says child cannot take Tylenol, which conflicts with pediatrician records). Registered Dietician notes document concerns that Mother does not seem to be aware of the severity of Kenan's malnutrition and that she continues to be resistant to expanding his diet to provide appropriate macronutrients.  Exhibit 1A at 102.  The dietician goes on to note that Kenan's diet prior to hospitalization consisted of "virtually zero vitamin A, C, or D, very low levels of thiamin, riboflavin, niacin, B6, EFAs, vitamin E and is high in cholesterol." *Id.*  While Mother claims in her motion that she was feeding a variety of foods and that, due to the holidays, the medical staff at Cardon Medical Center were simply negligent in noticing that she was doing so, she provides no documentation of this.  There are no photographs of K.K. eating celery or oranges.  The additional food that was provided to K.K. was provided in miniscule amounts, such that K.K. was constantly complaining of hunger.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030934

Ultimately, given Mother's resistance to improving Kenan's diet, the Department took custody of both children and this dependency action was commenced. Upon temporary custody being court ordered through the court authorized removal process, both boys were immediately allowed to resume a normal diet, both boys were encouraged to resume normal activities and not use their wheelchairs, and both boys were enrolled in school. Since the removal, there have been no noted food intolerances – although there are some preferences – and the children take great pride in being able to make decisions about their food and eat a wide variety of foods. The children have been deemed not to need services through DDD. For all intents and purposes, since removal from Mother's care, these boys have gotten to be healthy, whole little boys.

### b. History of Services

While Mother's motion correctly recites the list of services that she has participated in during the course of this case, she fails to place appropriate weight on behavioral changes rather than mere participation in services. While there is certainly something to be said for showing up for counseling and the other services offered through the Department of Child Safety, it is the ultimate change that a parent makes and implements into his or her life that determines whether or not it is safe for a child to return to the care of that parent. That is precisely why the Safe AZ language focuses more on behavioral changes and conditions for return when discussing healthy families and moves away from the idea of "checking boxes" for participating in services.

Mother has been offered a psychological evaluation, an opportunity to speak with Dr. Kelly, and an updated psychological evaluation after Dr. Kelly's report became available and Father was willing to speak with the psychologist. Mother participated in

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030935

the psychological evaluation but did not take responsibility for her part in her children's medical needs. 4/16/19 Evaluation by M. Oakley, attached hereto as Exhibit 4. That evaluation noted a high level of defensiveness such that her testing was skewed. Exhibit 4 at 16-18. As noted below, if Mother's current narrative is to be believed, she was not honest with the psychologist who conducted the psychological evaluation. In addition, Mother actively denied that she withheld food from K.K. and blamed his hunger on the medicine that he was given in the hospital. She also continued to endorse the narrative that K.K. was experiencing rashes, stomach aches and itching when new foods were introduced to him in the hospital. To the extent that any of this was present, the medical staff did not believe that it signified a true allergy and did not believe that it warranted cessation of introduction of foods, as Mother continually requested. Mother declined to speak to Dr. Kelly. It is unknown whether Mother appeared for her updated psychological evaluation.

Mother has consistently participated in counseling with Dr. Kelly Rodriguez since May 2019. Recently, however, after Dr. Kelly's report was disclosed and much of the medical information was digested for Father, perhaps for the first time by anyone other than Mother, in a way he could understand it, Father came to the realization that Mother had been providing misinformation to medical providers about their children for a long time and took action to end his marriage to Mother. Only then did it come to light that the parents had been living separately for some time. After Father began divorce proceedings, Mother made allegations of Father being physically and sexually abusive, drinking to excess, being emotionally abusive, hacking into her e-mail account, and keying her car. However, it also became clear that in the eight months prior, Mother

had not been forthcoming with her counselor or the psychologist who conducted the psychological evaluation about her marriage or her living situation.  Recent notes from Mother's counselor raise concerns about Mother's past dishonesty with the counselor. Mother's counseling notes at note 1/8/2020, attached hereto as Exhibit 5.

Previously, Mother had not taken responsibility for her children's malnutrition – blaming it primarily on mold exposure, thyroid issues, poor medical advice, or other ancillary issues.  In the most recent counseling records, nothing has changed – she still does not take responsibility for her own actions.  In the January 8, 2020 session she indicates that she put too much trust in the "doctor" out of Georgia.  Exhibit 5.  In reality, the practitioner from Georgia was an unlicensed provider who never saw the children and received all of her information about the children from Mother.  She was **not** a doctor.  In the January 15, 2020 session, Mother claims that the reason that she appeared to be controlling was because she was trying to cover for her husband.  *Id*.  It also focused on the fact that Mother had been receiving other individual therapy from somewhere without telling Dr. Rodriguez and why this was a problem.  *Id*. In the January 22, 2020 Mother is still blaming the children's issues on mold, absorption issues, and dry erase markers.  *Id*.  The January 29, 2020 session indicates that a portion of the Dr. Kelly report was discussed but it does not indicate that Mother took responsibility for her children's malnutrition. *Id*.  Dr. Rodriguez raises concerns that Mother "appears to be blaming others including her husband for the ***current*** issues." *Id*. at 3 (emphasis added). Therefore, in addition to not taking responsibility for the reasons that her children are in care, she is not taking responsibility for the other issues in her personal life.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030937

While Mother may have put together varied menus, there is no reason to believe that she will appropriately feed and care for her children in her care when she has not once taken responsibility for her actions in putting them in harm's way in the first place. The most recent therapeutic visitation notes from Southwest Human Development indicate that the parents have "do not view their actions as abusive nor have they acknowledged their responsibility as to what ███ and ███ have suffered. Mrs. Kahraman has mentioned she believes the mold in their home may have been the contributing factor to ███ being hospitalized." November visitation records at 20 of 21, attached hereto as Exhibit 6. While Mother may do just fine providing varied food in a supervised setting, there is a real concern about what may happen to the health and safety of her children in an unsupervised setting, given her lack of accountability.

## II. Legal Argument

There is no doubt that the least restrictive setting for a child is legally and emotionally preferable and mandated. However, the Court is required to make the least restrictive determination in the best interest of the children – not simply because a parent demands it and certainly not in a vacuum. While Mother's motion attempts to highlight her so-called changes, she has not submitted any documentation of those changes. On the contrary, every single provider raises concerns about the fact that Mother is placing blame on others and eschewing her own responsibility.

Mother's motion cites case law from nearly a century ago documenting a parent's constitutional right to raise their children. This is, of course, well established and time honored. However, so is the child's right to life, liberty, and the pursuit of happiness. In Arizona, the Court must consider the children's best interest above

9

AZ-KAHRAMAN030938

everything else once a dependency has been found. *Dept. of Child Safety v. Beene*, 332 P.3d 47, 51, 235 Ariz. 300, 304 (App. 1st Div. 2014), *as amended* (July 30, 2014) ("In dependency and severance proceedings, the child's best interests are paramount." (internal citations omitted)); *Arizona Dept. of Econ. Sec. v. Lee ex rel. County of Maricopa*, 264 P.3d 34, 37, 228 Ariz. 150, 153 (App. 1st Div. 2011) ("the Child's health and safety must be given paramount consideration..."). Here, Mother has not done anything to assure the Court that her children will be safe in her care.

## III. Conclusion

The Department urges the Court to deny Mother's Rule 59 Motion and continue the children in their current placement as wards of the Court.

RESPECTFULLY SUBMITTED this 26th day of February, 2020.

MARK BRNOVICH
Attorney General

KATHLEEN E. MARTONCIK
Assistant Attorney General

ORIGINAL of the foregoing filed
this 26th day of February, 2020, with:

Clerk of the Court
Maricopa County Superior Court
Juvenile Court Southeast Facility
1810 South Lewis Street
Mesa, AZ 85210

Copy of the foregoing hand-delivered
this 26th day of February, 2020, to:

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030939

Honorable Jennifer E. Green
Maricopa County Superior Court
Juvenile Court Southeast Facility
1810 South Lewis Street
Mesa, AZ 85210

Copies of the foregoing mailed this
26th day of February, 2020 to:

Kinda Johnson-Hurd, Esq.
Kinda.Johnson-Hurd@Maricopa.Gov
Guardian Ad Litem for the Children

DeeAn Gillespie Strub, Esq.
DGillespie@gillaw.com
Attorney for Mother

Suzanne M Nicholls, Esq.
Suzanne.Nicholls@maricopa.gov
OPASEFDisclosure@mail.maricopa.gov
Attorney for Father

Madison Bell
madison.bell@azdcs.gov
Case Manager

Susan Stark
Susan.Stark@maricopacasa.org
Court Appointed Special Advocate

KEM/JD532206/HDM#8557570

11

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030940

**EXHIBIT 1**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN030941



1   OFFICE OF THE PUBLIC ADVOCATE
2   Suzanne M. Nicholls, State Bar No. 027121
    106 E Baseline Rd
3   Mesa, AZ 85210
    Phone: (602) 372-2815
4   Email: suzanne.nicholls@maricopa.gov
5   opa-DepMes@maricopa.gov

6   *Attorney for Father*

7              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8                   IN AND FOR THE COUNTY OF MARICOPA

9                             JUVENILE DIVISION

10

11  In the Matter of:                          CASE NO: JD532206

12  ▮▮▮▮▮▮ KAHRAMAN,                           **FATHER'S OBJECTION TO**
13  D.O.B. ▮▮▮ 2012                            **MOTHER'S MOTION FOR**
    K.K. ▮▮▮▮▮ KAHRAMAN,                       **CHANGE OF PHYSICAL**
14  D.O.B. ▮▮▮ 2012                            **CUSTODY**

15

16  Person(s) under 18 years of age.          (Honorable Jennifer E. Green)

17        Father, AHMET KAHRAMAN, by and through undersigned counsel, hereby

18  objects to Mother's Motion for Change of Physical Custody (Motion), filed and served
19
20  upon undersigned counsel on February 19, 2020. Father requests this Court deny said

21  motion for the reasons stated herein.

22        Father joins in DCS's Objection to Mother's Rule 59 Motion, filed and served on
23
    February 26, 2020. In addition, Father notes that Mother continues to make false
24
25  allegations against Father in her efforts to place blame on others and to distract from the

26  fact that she has not made the necessary behavioral changes to keep the Children safe. In

27  conjunction with this continued historic behavior, Mother also continues to provide

28

misinformation, twisting facts and sometimes completely omitting relevant facts. For instance, Mother eludes that she was unhappy in her marriage and infers she filed for divorce. (Motion at 6:16-21.) However, Mother's own prior disclosures of her texts with Father show that she was mounting an attack on Father (including falsely accusing Father of numerous things as outlined in DCS's Objection), trying to manipulate him and his thinking, but also telling him that they should not actually act upon any change in their marriage until the dependency matter was over. Mother indicated she believed it was better for their case – Mother's continuing efforts to manipulate and control what other's perceptions, including the Court's, are of her. However, through Father's work with providers in this case and Dr. Kelly's report, Father has realized Mother's manipulation and filed for divorce, actively managing how the Children are informed so as to limit any trauma to the Children along with the DCS case manager and placement.

More concering is how Mother is coloring her interactions with Dr. Miga and other hospital personnel still today. In her Motion, Mother claims she was compliant with Dr. Miga's recommendations and fully cooperated with recommendations from medical personnel. The medical records and interviews of Dr. Miga and other medical personnel collectively conducted by Mother's counsel, Father's counsel and the Department's attorneys in this case, directly contradict these assertions. By these assertions, Mother is demonstrating that she still does not take accountability for her prior actions that resulted in the Children suffering malnutrition and other more serious medical conditions. Mother refused to feed the Children as instructed by Dr. Miga and other medical professionals

2

AZ-KAHRAMAN031196

which ultimately resulted in DCS deciding it had to remove the Children to keep them safe. She still does not admit this.

Mother's lack of recognition of the serious issue is further demonstrated by Mother's statement that "Mother now recognizes that she placed too much trust in the advice of the children's physician. . . . [S]he now sees that she should have been more proactive to push the children through their dietary problems . . ." (Motion at 5:8-13.) First, Mother refused to follow the Children's doctors' advice at Cardon's Children, Dr. Miga, Dr. Stewart and others. Mother, in fact, did not trust them at all and insisted on continuing to feed the Children the way she wanted to and insisted that the Children suffered adverse reactions to food when trained medical professionals seeing the Children first-hand were telling her that was false. Mother has continued in this position for the entirety of this case, until evidently, she filed her Motion. Further, Mother is still insisting that the Children had "dietary problems" when numerous medical professionals have shown that not to be the case, and in the face of the fact that the Children immediately resumed eating regular food when in DCS custody and have completely recovered without adverse reactions.

Additionally, Mother relies almost exclusively on A.R.S. § 8-514, at best mistakenly and at worst misleading the Court regarding the appropriate burden of proof and controlling law. Mother seems to assert solely that DCS carries the burden to prove that the Children should not be returned to her because of the least restrictive placement requirements. (Motion at 7:19 – 25:23.) Instead, pursuant to Rule 59 of the Arizona Rules of Procedure for the Juvenile Court, Mother carries the burden to prove, as the movant,

3

AZ-KAHRAMAN031197

1  "that return of the child[ren to her] would not create a substantial risk of harm to the

2  child[ren]'s physical, mental or emotional health or safety" by a preponderance of the

3  evidence. ARPJC Rule 59(A) & (E)(1). Further, Arizona statutory and case law is clear;

4  thus, law from other states are nonapplicable or relevant. Mother has not and cannot prove

5  that the return of the Children would not create a substantial risk of harm as she has failed

6  to demonstrated a current and historic recognition of her issues and the ability to

7

8  appropriately manage the care of the Children.

9       Therefore, Father respectfully requests the Court deny Mother's Motion.

10      Respectfully submitted this _2772_ day of February, 2020.

11

12

13                                  SABRINA AYERS FISHER
                                    OFFICE OF THE PUBLIC ADVOCATE
14

15                          By _____

16                                  SUZANNE M. NICHOLLS
                                    Deputy Public Advocate
17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031198

ORIGINAL filed this 27ᵗʰ day of
February, 2020, and a COPY delivered to:

Honorable Jennifer E. Green
Maricopa County Superior Court
1810 S Lewis Courtroom 3 Ste 1077
Mesa, AZ 85210

COPIES electronically delivered
this 27ᵗʰ day of February, 2020, to:

Kathleen Martoncik
Janna Johnson
Assistant Attorney General
PSSSEF@azag.gov; kathleen.martoncik@azag.gov; Janna.Johnson@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
JohnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

DeeAn Gillespie
DGillespie@gillaw.com; Mailroom@gillaw.com
*Attorney for Mother*

Madison Bell
madison.bell@azdcs.gov
*DCS Case Manager*

By _____

5

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031199



1  DeeAn Gillespie Strub, Esq. Bar No. 009987
2  **GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
   7319 North 16th Street
3  Phoenix, AZ 85020
   Tel. (602) 870-9700
4  Fax (602) 870-9783
5  *Attorney for Jessica Kahraman*

6  Send all correspondence to
7  mailroom@gillaw.com

8          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9              **IN AND FOR THE COUNTY OF MARICOPA**

10                       **JUVENILE DIVISION**

11  In re the Matter of:                    Case No.: JD532206

12
13  D.K.███ KAHRAMAN,              **OFFER OF PROOF IN SUPPORT**
    D.O.B.████/12                  **OF REQUEST FOR**
14                                 **EVIDENTIARY HEARING**

15  K.K.███ KAHRAMAN,              *(Assigned to the Hon. Jennifer E.*
    D.O.B.███/12                   *Green)*
16
17  Person(s) under 18 years of age.

18
19
20          Respondent/Mother, Jessica Kahraman ("Mother"), providers her Offer of

21  Proof in Support of her Request for Evidentiary Hearing and will call the

22  following witnesses to provide testimony in support of her MCPC / Rule 59

23
24  Motion.

25          1)      Scott Jensen, MD: will testify the boys were growing appropriately

26  and improving with GAPS diet. He will also testify regarding other contributing

27
28  factors that led to K.K.███s medical condition.

                                    1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028125

*Sidebar (rotated):* GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

2)    Becky Plotner, Certified GAPS Practitioner: will testify that Mother sought her consult to improve the boys' food tolerances, that she advised Mother regarding environmental factors that may have been factors in their health condition, and that she identified parasites in the boys' stools and advised they were signs of healing.

3)    Cindy Schneider, MD: will testify that that both boys showed signs of impaired nutrient absorption and detox ability before they started GAPS. She will testify regarding other attributing factors in the boys' health conditions.

4)    Laura Jochai, licensed therapist will testify that Mother began discussing marital concerns in August and September of 2019. She will testify that Mother read her the divorce letter she would later give to Father in November 2019. She will also testify as to Mother's participation and progress in individual and group therapies. She will confirm that she was aware of Mother's concurrent therapy with Dr. Rodriguez and does not feel it was inappropriate.

5)    Ronald Peters, MD, MPH: will testify that he specializes in mold exposure, that he examined and ordered lab testing for both Father and Mother, and the results of same. He will also testify that mold exposure shows up differently depending on genetics, and that Mother also demonstrated symptoms of mold exposure, for which she was treated. He will further testify that Mother's

2

AZ-KAHRAMAN028126

labs showed resolution of her thyroid condition upon removal from the mold contamination.

6)    Nikki McCants, DPT of Advanced Neurologic Physical Therapy: will testify that she specializes in pediatric neurological physical therapy and treated both boys twice weekly. She will testify from her notes and other documentation that both boys showed signs of significant pain and inability to walk. She will testify that she referred the children to PCH when K.K.█ s patterns of progressive weakness began to mimic those of D.K.█

7)    Shabana Jessani, MD of Melmed Center: will testify she is a Developmental Pediatrician specializing in the treatment of autism. She will testify regarding her personal observations of the boys and that both boys were diagnosed with autism.

8)    Dr. Mary Oakley: will testify regarding her evaluation of Mother and the information contained in her evaluation reports.

9)    Dottie and Jerry Mann, Mother's parents: will testify that Father admitted to excessive alcohol consumption, that Mother discussed her concerns with them long before Father filed for divorce, that they observed the boys' interactions with their Father during visits, and that they both heard Father discuss his detailed plans to take the boys out of the country.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

3

AZ-KAHRAMAN028127

**RESPECTFULLY SUBMITTED** this _28_ day of February, 2020.

For
By: _____

DeeAn Gillespie Strub
Attorney for Mother

ORIGINAL filed this _28_ day of
February, 2020.

COPIES emailed this same date to:

Honorable Jennifer E. Green
Maricopa County Superior Court

Katie Martoncik
Assistant Attorney General
PSSSEF@azag.gov
Kathleen.martoncik@azag.gov
*Attorney for DCS*

Kinda Johnson-Hurd
johnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

Suzanne Nicholls
Suzanne.Nicholls@Maricopa.Gov
*Attorney for Father*



GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

4

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028128

1
2

MARK BRNOVICH
Attorney General

CLERK OF THE
SUPERIOR COURT
FILED
M. Cortez    DEP
2020 MAR -2  AM 10: 07

3
4

KATHLEEN E. MARTONCIK
Assistant Attorney General

5

State Bar No. 023982
CFP/PSS



EXHIBIT 251

6

120 W. 1st Ave., 2nd Floor
Mesa, Arizona 85210

7

602-771-4000
PSSSEF@azag.gov

8

9    Attorneys for the Department of Child Safety

10          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11              IN AND FOR THE COUNTY OF MARICOPA

12

13

In the Matter of:

No. JD532206

14

DYLAN KEMAL KAHRAMAN
     d.o.b. 09/27/2012

**ASFA FINDINGS RE: REASONABLE
EFFORTS TO FINALIZE THE
PERMANENCY PLAN**

15

KENAN TROY KAHRAMAN
     d.o.b. 09/27/2012

16

17

Person(s) under 18 years of age.

(Honorable Kristin Culbertson)

18          Upon Motion of the Department of Child Safety (DCS or the Department) and

19   good cause appearing; as well as the matters presented in all DCS Court Reports and at

20

21   all hearings conducted in this case; and pursuant to 45 C.F.R. § 1356.21(b)(2) and

22   A.R.S. §§ 8-829 and 8-862(B)(2) THIS COURT HEREBY FINDS that the DCS has

23   made reasonable efforts to finalize the permanency plan(s) currently in effect for

24   DYLAN KEMAL KAHRAMAN and KENAN TROY KAHRAMAN.

25   ///

26

27   ///

28

The Department, in order to finalize the permanency plan(s) has offered, made referrals for, provided, and/or requested the following services:

- ☐ Adoption Services
- ☒ Allowances and Subsidies
- ☒ Behavioral Health Assessment and/or Treatment
- ☒ Case Management Services
- ☐ Child Care
- ☒ Developmental Disabilities Services
- ☐ Early Childhood Assessment and Services
- ☒ Medical and Dental Services
- ☒ Parent Aide/Parenting Services
- ☐ Parent Locate Services
- ☒ Placement Services
- ☐ Substance Abuse Assessment and/or Treatment
- ☐ Transportation Services
- ☒ Visitation Services
- ☐ Young Adult Services

DONE IN OPEN COURT this _24th_ day of _Febuary_, _2020_.

_____
Judge of the Superior Court

CT04400 (7/19)

# PROGRESS REPORT TO THE JUVENILE COURT

**Court Case Number**   JD532206                    **Date of Report**   04/27/2020

**Case Name**          KAHRAMAN, JESSICA          **Case ID** 608484

**A.  Name and date of birth for each child subject to this court case number.**

3874373 KAHRAMAN, DYLAN          DOB: 09/27/2012
3874372 KAHRAMAN, KENAN          DOB: 09/27/2012

**B.  Child or children subject to this report if different from above.**

N/A

**C.  Family composition.**



Jessica Kahraman -  Mother
Ahmet Kahraman - Father
Kenan Kahraman - Child
Dylan Kahraman - Child

**D.  If the family has or may have American Indian tribal affiliation, efforts to identify and contact the child's tribe and confirm the child's membership status or eligibility for membership.**

N/A

**I.    REASON FOR DCS INVOLVEMENT**

**A.    Description of the dangerous condition(s) currently occurring within the family that require Department involvement; including how the parent, guardian, or custodian's behaviors cause the child to be unsafe or at substantial risk of harm and, if applicable, why the child(ren) are removed from the parent, guardian or custodian's custody.**

It is concerning that upon completion of the review of the children's medical records, there are concerns that placing the children in the home of Ms. Kahraman places them at significant danger for additional harm. It is also concerning that Ms. Kahraman either is "intentionally attempting to evade detection or has lost touch with reality" due to what she reports to the doctors and her lack of follow up of medical needs, such as seizures.

Since the release of Dr. Kelly's report, there have been opposite reactions from the parents. Ms. Kahraman denies that anything in the report in true and that if she had been allowed to meet with Dr. Kelly, the result would be different. Ms. Kahraman was offered many times, however she has declined. Ms. Kahraman reports she has no problem meeting with him, however her attorney has directed her not to. Ms. Kahraman has not taken accountability for her children's health decline and Kenan's heart failure being caused by the GAPS diet she had them on,

despite being told that her children cannot survive on this diet. Ms. Kahraman has not been forthcoming in her counseling with Dr. Rodriguez. Dr. Rodriguez reports that mother is not taking full accountability and reports that mother is very intelligent. Dr. Rodriguez reports that she feels as though Ms. Kahraman is only saying what DCS and Dr. Rodriguez want to hear and that she knows how to word things to make it appear as though she is not doing anything wrong.

Mr. Kahraman has been angry since reviewing and comprehending Dr. Kelly's report. Mr. Kahraman is angry that Ms. Kahraman would harm his children, as he never expected the person he married and the mother of his children to cause harm to them. Mr. Kahraman has reported that he does not trust mother around the children and does not want her to have custody of them. Mr. Kahraman is processing Dr. Kelly's report with his therapist and working on how to protect the children from Ms. Kahraman.

Mr. Kahraman has filed for divorce and the parents are now living separately.

Ms. Kahraman is continuing to disagree with Dr. Kelly's report and spends more time dissecting and trying to explain away the concerns that DCS and providers have by sending numerous emails detailing why what DCS and the providers say is inaccurate or taken out of context. Ms. Kahraman is not open to critical feedback or discussion, which is what Dr. Oakley reported would be necessary in order for a positive prognosis of being able to safely parent her children in the future. Ms. Kahraman continues to blame a variety of outside sources for the malnutrition and are struggling to let go of some control regarding the children's medical needs.

## II.    SAFETY PLANNING

### A.    If applicable, efforts to locate missing parent(s).

The whereabouts of Ms. and Mr. Kahraman are known at this time.

### B.    The current safety plan, including whether it is an in-home plan or out-of-home plan, the actions that are necessary to control the dangerous condition(s), when those actions are needed, the adults responsible for carrying out the actions, and any supportive resources to support the safety actions.

Dylan and Kenan Kahraman are residing in out of home care in a licensed DDD foster home.

### C.    Efforts to implement the least intrusive plan that is sufficient to control the dangerous conditions, including explanation of why the safety threats can or cannot be managed in the home; and for American Indian children, the active efforts to provide services designed to prevent the breakup of the Indian family and the outcome of these efforts.

The safety threats are unable to managed in the home due to there being no appropriate responsible adult that can reside in the home.

### D.    If applicable, the conditions for return as described in the safety plan.

Mrs. Kahraman recognizes and articulates that her behaviors are causing physical and emotional harm to Kenan and Dylan.

Mrs. Kahraman displays genuine remorse and has open and honest conversations regarding her behavior.

Mrs. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits.

Mrs. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mrs. Kahraman will allow the safety monitor to re-direct her.

Mrs. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so she, Mr. Kahraman, Dylan and Kenan, safety monitors and providers are safe.

Mr. Kahraman recognizes and articulates that Mrs. Kahraman's behaviors and Mr. Kahraman's lack of intervention are causing physical and emotional harm to Kenan and Dylan and displays and ability to protect his children

Mr. Kahraman displays genuine remorse and has open and honest conversations regarding his behavior.

Mr. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits.

Mr. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mr. Kahraman will allow the safety monitor to re-direct him.

Mr. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so he, Mrs. Kahraman, Dylan and Kenan, safety monitors and providers are safe.

## III.    IDENTIFICATION, LOCATION, AND ENGAGEMENT OF EXTENDED FAMILY MEMBERS AND OTHER IMPORTANT CONNECTIONS (only applicable for children in out-of-home care)

**A.    Results of efforts to identify, locate, contact, and engage adult relatives of the child, including grandparents, great-grandparents, adult siblings, parents, step-parents who have custody of any siblings, aunts, uncles, first cousins, and persons who have a significant relationship with the child; and if known, information about each person's willingness to be a potential out-of-home caregiver for the child.**

Maternal grandparents were assessed as placement, however were denied due to not understanding the safety concerns and aligning themselves with the parents by refusing to provide food to Kenan when he was hungry.

Maternal great uncle has expressed an interest in being placement for the children on a long term basis if needed, however he resides in an retirement community and would have to purchase a new home in order to have the children placed in his care. If the children need permanent placement, the uncle is willing to purchase a new house.

**B.    Description of the child's important connections, including information provided by the child, parents, and/or guardians; and efforts to maintain these connections.**

Maternal grandparents are allowed to attend 2 visits a month with the children in order to continue the relationship. Maternal great uncle has expressed a desire to see the children, however mother has denied him being able to attend visitation.

**C. Description of contact between the child and the child's relatives, friends, former foster parents and any connections the child identifies; and if contact is restricted, the reasons why.**

Dylan and Kenan have supervised visitation with their parents and maternal grandparents at this time. All contact is currently virtual based on COVID-19

**D. Efforts to maintain cultural connections, including opportunities for the child to build cultural awareness, identity, and involvement.**

Ms. and Mr. Kahraman can bring cultural activities and traditions to visit to share with the children. Paternal grandparents will video call into visitation from Turkey. Foster placement shares the same religious beliefs as Mr. Kahraman as is educating the children on the Islamic faith.

## IV. CHILD FUNCTIONING, SERVICES, AND LIVING ARRANGEMENT

**A. The child's physical, developmental, and emotional functioning; including the child's medical, dental, behavioral health, and developmental needs and services.**

Dylan is 7 years old and is placed in the same foster home as his twin brother, Kenan Kahraman. Dylan enjoys spending time with his brother, Kenan and his foster brother. Dylan used to have a fear of dogs, however now is no longer afraid of placement's dog. Dylan is open with JFCS for behavioral health services. Dylan engages in individual counseling as well as some sessions with his brother Kenan. Dylan will be beginning family therapy with Mr. Kahraman. The therapist is working with Dylan on speaking up for himself and emotional expression. Dylan has expressed that he controls his food now and not his parents.

Kenan is 7 years old and is placed in the same foster home as his twin brother, Dylan Kahraman. Dylan enjoys spending time with his brother, Dylan and his foster brother. Kenan used to have a fear of dogs, however now is no longer afraid of placement's dog. Dylan is open with JFCS for behavioral health services. Kenan engages in individual counseling as well as some sessions with his brother Dylan. The therapist is working with Kenan on emotional expression and his anger. Kenan expressed anger towards his father by scratching him out of photos. Kenan will be beginning family therapy with Mr. Kahraman. Kenan has expressed that he controls his food now and not his parents. Kenan's heart failure has completely resolved itself since being on a proper diet.

**B. The child's academic status and social development, including the child's needs and services, and efforts to ensure the child's educational stability.**

Dylan and Kenan are both currently in first grade and there are no concerns noted. Dylan and Kenan's teacher have reported that they are reading above grade level and they have been invited to test into the gifted program at the school.

Due to COVID 19, Dylan and Kenan are being homeschooled.

**C.    For youth age fourteen or older in out-of-home care, efforts and plans to assess and provide services to support the youth's preparation for adulthood.**

N/A

**D.    History of living arrangements (placements), including the length of time the child has been in out-of-home care (if applicable), and the type and dates of each living arrangement.**

Dylan
12/28/2019-01/11/2019: DDD Licensed Foster Home
01/11/2019-Current: DDD Licensed Foster Home (with Kenan)

Kenan
12/28/2019-01/07/2019: Cardon's Children Medical Center
01/07/2019-Current: DDD Licensed Foster Home (with Dylan)

**E.    Description of the child's current living arrangement, including the type; whether this living arrangement is consistent with the Department's placement preferences; and if the child is in out-of-home care and not living in the home of a grandparent, other relative, or person who has a significant relationship with the child, the reasons why such placement has not been identified or is contrary to the child's best interest.**

Dylan and Kenan reside in a licensed DDD foster home.

**F.    If the child is an Indian child, efforts to place the child according to ICWA placement preferences and active efforts to provide culturally appropriate services.**

N/A

**G.    If the child has a sibling in out-of-home care, efforts to place siblings together; and if not placed together, the specific reasons why this did not occur or reasons why this would be contrary to the child's or sibling's safety or well-being.**

N/A

**H.    If placement with sibling(s) is not possible, efforts to facilitate frequent visitation or contact with siblings; and if frequent visitation or contact with siblings is not recommended, the reasons why this would be contrary to the child's or a sibling's safety or well-being.**

N/A

**I.    If out-of-state placement is appropriate and in the best interest of the child, the reasons why (include ICPC and/or out-of-state visitation status).**

N/A

**J.    Description of any assistance or services provided to the caregiver(s) to enhance their capacity to address the child's needs and provide appropriate care and supervision.**

Dylan and Kenan have CMDP insurance to provide for all medical, dental and vision needs. Dylan and Kenan's foster placement is provided with standard and monthly allowances as well as daycare when needed.

**K.    Description of the Department's and out-of-home caregiver's efforts to implement reasonable and prudent parent standards to allow the child to participate in age and developmentally appropriate extracurricular, enrichment, cultural, and social activities.**

Dylan and Kenan participate in age appropriate activities with their foster family, including family vacations. Dylan and Kenan are both engaged in karate.

**V.    PARENT FUNCTIONING AND CASE PLANNING**

**A.    The behavioral changes necessary in order for the parent, guardian, or custodian to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as described in the case plan).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).

Ms. Kahraman  will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children.

Ms. Kahraman  will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers  in order to gain insight into her children's needs and how to respond appropriately. Ms. Kahraman  will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Mother will need to acknowledge the reasons why her children came into care and accept responsibility.

Mr. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).

Mr. Kahraman  will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman.

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow

recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility.

**B.    Each parent's, guardian's, or custodian's progress, or lack of progress, toward achieving necessary behavioral changes (including changes in caregiver protective capacities or family protective factors).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).- Not Met

Ms. Kahraman  will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children. - Not Met

Ms. Kahraman  will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers  in order to gain insight into her children's needs and how to respond appropriately. Ms. Kahraman  will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Mother will need to acknowledge the reasons why her children came into care and accept responsibility. - In Progress

Mr. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment). - In Progress

Mr. Kahraman  will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman. - In Progress

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility. - In Progress

**C.    Services and supports provided to assist in achievement of the behavioral changes identified in the case plan; and the participation in, and outcome of services and supports.**

Jessica Kahraman

Therapeutic Visitation, with Ahmet Kahraman

Southwest Human Development noted the following in November 2019:

Mr. and Mrs. Kahraman supplied several clothing items for the children this month in lieu of the weather changing. Kenan and Dylan regularly show excitement upon greeting their parents, exchange affection throughout the visitation, and have

positive interactions during the visit. The children spent much time engaging in building Legos and some outdoor play. The children expressed some experiences they had at school and foster placement. As a response, Mr. and Mrs. Kahraman initiated problem solving techniques and developed solutions for the children to use in both environments. Mr. and Mrs. Kahraman spend much of their time during the visitation interacting with the children and minimally interact with one another. Mr. and Mrs. Kahraman resumed Nurturing Parenting Curriculum this month. They were introduced to Chapter 9, Ages and Stages: School aged (ages 6-12). This chapter focused on increasing parent's awareness about children's abilities. Mr. Kahraman appeared guarded at the beginning but added to the discussion as it continued. When discussing the children's current physical development, Mr. and Mrs. Kahraman reported they believed the children are behind their peers. Mrs. Kahraman shared that the children have overcome a lot of their balance issues and are closer to average. When discussing the children's intellectual development, Mrs. Kahraman shared that both of the children are learning how to problem solve very well. Mr. Kahraman added that he sees them problem solve a lot when playing with Legos and looking for specific pieces. When discussing the children's social and emotional development, Mrs. Kahraman noted that they are getting along with each other better. Mrs. Kahraman sent an email to Associate Director Kelly to gain clarity on establishing trust in feeding. Mrs. Kahraman relayed it being unclear as to why the restrictions of not handling food were placed initially, providing the children with healthy portion sizes during mealtime, and SWHD and DCS claims of diarrhea and vomiting following mealtimes. Families enrolled in therapeutic supervised visitation at SWHD are all provided the same visitation guidelines that are recognized by the American Professional Society on the Abuse of Children (APSAC). The guidelines focus around monitoring during visitation, location of visitation, gift giving, conversations during visitation, and handling of food, drinks candy, gum, lotions, and ointments. The guidelines are implemented to ensure all children's physical and emotional well-being during visitation. From April-July 2019 the parents were encouraged to focus on proper portion sizes as the children would often eat their meal rapidly in addition to portions from their parents' or grandparents' meals. Dylan has been observed to vomit once during visitation following mealtime; however, the cause could not be confirmed. Both children have been observed to have diarrhea and spend extended periods in the bathroom following mealtime as well. In August, it was observed that children began eating more slowly and having smaller portion sizes. Both Mr. and Mrs. Kahraman have been receptive to feedback in establishing appropriate portion sizes and encouraging the children to "listen to their bodies." It was determined in October, Mr. and Mrs. Kahraman be able to transition to handling food. As families make progress, visitation guidelines in relation to food handling are assessed and evaluated. Proper assessment and evaluation will continue to determine if it is appropriate for the parents to prepare and/or bring outside food for visitation.

Southwest Human Development noted the following for December 2019:

Mr. and Mrs. Kahraman regularly attended visits this month. Kenan and Dylan routinely arrived excited and cheerful to their visits, running to their parents, initiating physical affection, maintaining close proximity with their parents throughout the visit, voicing wanting to return to their home with them, and

appearing upbeat throughout the visit. Mr. and Mrs. Kahraman enforced structure during the visit enforcing toileting time, play of the children's choice, mealtime, grooming (nail cutting), and usually followed up by outdoor play (weather permitting). Mr. and Mrs. Kahraman spent individual time with both children encouraging and practicing social skills during the visit and how to implement the skills outside of the visit, such as, at school or in the community. Both children engaged in conversation with their parents willingly sharing about events that have occurred outside of visitation time and recalling past memories. Mr. and Mrs. Kahraman brought previous items from their home encouraging past traditions to celebrate the holiday season to which the children delighted in. Mr. and Mrs. Kahraman and the maternal grandparents celebrated the holiday together by providing the children with presents, engaging in mealtime, and engaging in craft activities.

Mr. and Mrs. Kahraman were provided a copy of NPP Lesson, Chapter, on raising the parent's ability to establishing nurturing parenting routines with their children, as Mr. Kahraman reported he had to go to work. NPP lessons were offered during future feedback sessions and Mr. Kahraman reported being unable to stay due to his employment. NPP lessons can be offered prior to visit should Mr. Kahraman's employment be a barrier to staying following the visit.

During visitation this month, Mr. Kahraman openly discussed his opposition of a new staff in the presence of the children. Staff intervention was necessary to prompt Mr. Kahraman to cease his opposition in the presence of the children. Mr. Kahraman vocalized with Manager White his opposition and his concerns surrounding new staff being unable to understand his culture and "mess up" the court reports. Manager White communicated with Mr. Kahraman staff availability altering and the need for another staff to cover a visit to ensure a visit isn't cancelled. Mr. Kahraman's phone usage appeared to increase during this visitation as he was absent during some the visit for significant periods of time. It is encouraged that Mr. Kahraman be present during the visit and minimize on showcasing his frustrations during visitation.

At the end of the month Manager White was informed by Mrs. Kahraman that she would be filing an OOP and visits would need to be separated. At this time, Manager White had minimal information regarding the need to separate the visits; however accommodated the separation due to OOP being filed. The boys were provided minimal information regarding the separated visits and it was addressed in an age appropriate manner. Mrs. Kahraman has requested to speak with staff to determine the most appropriate way to go about sharing the change in visitation with the children which will be scheduled for the future. A current schedule to separate visits will be determined and both parents will be informed of the ongoing schedule.

Southwest Human Development noted the following for January 2020:

Mr. and Mrs. Kahraman transitioned to separate visits on the last visit of December (12/30/2019) and have maintained separate visits through January. Mr. and Mrs. Kahraman communicated the separate visits to children as individual special time they would share with their "Mama and Baba." Dylan and Kenan inquired about the separation during visitation regularly and appeared satisfied with the responses provided by both their parents. The team determined the children would discuss

Progress Report to Juvenile Court

their separation with their parents on 2/6/2020 at a DCS office, Mrs. Kahraman would lead the discussion, followed by the children having a therapy appointment should they need to further process the information.

Mr. and Mrs. Kahraman continued similar activities in visitation as previously done, such as, engaging in mealtime, organized play, imaginative play, and outdoor play. The boys showed delight in seeing their parents and spending time with them, evidenced as running towards them and embracing them with affection. Mrs. Kahraman appeared challenged with structuring her visits with the boys and managing time to allow for eating, play, clean up, and preparation for karate.

Mr. Kahraman communicated his thoughts on the events that led Dylan and Kenan into DCS custody and voiced that he shared his opposition with Mrs. Kahraman repeatedly that the children's food intake was insufficient; though, she would not accept his feedback. This statement differs from that of what he reported during SWHD intake in February of 2019; where he articulated his agreement with the children's food intolerances, their physical reactions to certain foods, and the children's display of limitations in the area of coordination which led to many "trips and falls." Most recently, Mr. Kahraman expressed his delight in the children's continued improvements in growth and the variety of foods they eat without complications. Mrs. Kahraman verbalized she plead no contest to the allegations and is eager to show that the medical concerns that were once present have been alleviated and wanting to show there are happy times ahead. Progress continues to be observed during visitation that no visible challenges occur when the children eat the variety of foods that are purchased by Mr. or Mrs. Kahraman for mealtimes and they often eat majority of the food. Mr. and Mrs. Kahraman still remind Dylan and Kenan to listen to their bodies to help them recognize when they are full. Kenan, particularly, is reminded to slow down in his eating and prompted to take smaller bites as he has been observed to rapidly eat. It is recommended that further exploration during visitation feedback sessions and the parent's therapy sessions include the deconstruction of the events and actions surrounding their narrative of the children's illness in favor of their acknowledgement of the alternative narrative of the children's improved health and wellness that would support appropriate parenting and safety.


Individual Counseling

In November 2019, Dr. Rodriguez and Ms. Kahraman started working on the new treatment goals. In regards to the first goal; Ms. Kahraman reported "Mother has observed no food reactions that are significant enough to warrant any food restrictions" however Ms. Kahraman has reported that she has seen no food reactions and there have been no food reactions from any provider or placement of the children.

Mother also stated "mother and doctor agreed with his statements that 1) The boys likely had more severe autism as smaller children, that 2) the implementation of services during formative years facilitated great improvement in their development, that 3) Kenan's thyroid condition was likely a significant factor in his autism presentation, and that 4) the boys would likely continue to improve and eventually outgrow their diagnosis, now that Kenan's thyroid condition had been properly

diagnosed and medicated." However, this was never stated by Dr. Eric Hejibeli.

Ms. Kahraman reported to Dr. Rodriguez "Mother agrees with the expert opinion of Geneticist, who indicated 1) Kenan's failure to thrive diagnosis (rendered only at the hospital, not by treating pediatricians) was likely due to his undiagnosed thyroid condition. 2) Mother understands that PCH Genetics is not equipped to evaluate for mold, food or chemical sensitivity." However, the geneticist never stated statement 1 and in regards to statement 2, the doctor reported that there is no test for mold sensitivities as genetics only looks at DNA.

Ms. Kahraman also reported to Dr. Rodriguez that "Mother agrees with the expert opinion of Dr. Miga which states that Kenan was suffering malnutrition at the time of hospitalization on December 18, 2018. Mother agrees with Dr. Miga's points expressed in the interviews of October 2019 with counsel, whereby Dr. Miga indicated he believed that 1) mold was a partial factor in the boys' health decline, that 2) he did not believe Mother experienced any secondary benefit to seeking medical care for the boys and was not motivated by anything other than her love and concern for their well-being, that 3) medical providers who cared for the boys, including PCH ER in November and MD Scott Jensen in December, should have caught the medical issues arising in the boys, and they failed to. Mother believes she and Dr. Miga shared a positive and collaborative relationship during Kenan's hospitalization, whereby she followed all agreed upon parameters with calories and feeding, with Dr. Miga's consent to bring food from home to feed Kenan that met these caloric needs." however there are also concerns with these statements. Ms. Kahraman was not present for this conversation with Dr. Miga and it is concerning that DCS attorneys report that point 1 was not stated during the interview. It is also concerning that Ms. Kahraman is only reporting what is fitting her narrative and not reporting that in the same interview, Dr. Miga reported that the children were starved.

Mother reported to Dr. Rodriguez "Mother willingly agreed to all recommended treatment by hospital staff at the meeting of December 28, 2018, including cafeteria food, administration of any medication or procedures that Kenan might need to manage his pain or condition, and a sedated endoscopy to assess food sensitivities." It is concerning that mother is reporting that she willingly agreed to all treatment, when she refused to provide the children with food and only wanted to feed them food from home.

In December 2019, Dr. Rodriguez reports:

Ms. Kahraman's responses to goals 3 and 4 in her own words:
Goal 3:
Mrs. Kahraman will explore guidelines for medical providers treating their own family members.
Dylan and Kenan were under the care of licensed pediatricians (M.D.'s) from birth through the present. These doctors occasionally referred us to see licensed specialists, with whom we followed up.

The boys were under the care of a licensed Orthopedic Doctor, through referrals

from their pediatrician/family doctor (M.D.) due to leg pain, tingling, and impaired gait. The orthopedic doctor wrote orders for wheelchairs through the insurance. The boys were under the care of a licensed Doctor of Physical Therapy for their leg pain, tingling and impaired gait, through referrals from their licensed orthopedic specialist (PCH). The boys were examined by licensed ER doctors at PCH through a referral from their Doctor of Physical Therapy, based on her concern for progressive weakness and neurological signs in both boys. The boys were under the care of a licensed Developmental Pediatrician (M.D.) for concerns regarding developmental delays, discussed with their pediatrician. This pediatrician referred them for standardized diagnostic testing at an autism treatment center, through which they were diagnosed with autism under DSM IV and V criteria. The boys were under the care of licensed therapists through prescription from their Developmental Pediatrician: Licensed Speech and Language Therapist (Dylan only); Licensed Occupational Therapist; Licensed Physical Therapist; Licensed Neurologic Music Therapist.

Goal 4:
Mrs. Kahraman will explore her own individual recollection of children's reactions to foods/pain/medical needs etc.
Dylan and Kenan tolerated nearly all foods until approximately 2 years of age. After this time, and especially since weaning them at 2.5 years (at which point they no longer received antibodies from my breastmilk), they became progressively sensitive to foods. Reactions included face and body rashes, red ears, itchy eyes and ears, insomnia (falling asleep at 11 or 12 at night or waking every couple of hours at night), extended periods of inconsolable crying, extended periods of tantrums and anger, itchy back, eczema patches (Dylan), darkness around the eyes, extremely bloated tummy and tummy pain that caused crying, swollen tongue that occasionally impaired ability to speak, responses from both boys when asked their bodies felt: "so yucky all over," "my throat hurts," "my head hurts," etc. Besides Mother, others who observed reactions included Father, habilitation providers, therapists, and grandmother. Prior to September 2018, Dylan and Kenan had very little pain. Kenan occasionally complained of calf and foot pain over the
past couple of years, but it did not prevent either of them from regularly participating in typical sports for their age – quite competently. Beginning in September-October 2018, both boys began complaining of knee and shin pain. Kenan reported his knees were making him fall down. Dylan reported tinging in his lower legs and pain in his hips. Besides Mother, others who observed this and/or heard the boys complain about it include Father, habilitation providers, therapists, physical therapist, doctors, school teachers/nurse and grandmother.
Prior to September 2018, Dylan and Kenan did not require modifications to their daily activities, aside from the previously mentioned food reactions. In September 2018 (Dylan) and October (Kenan) became unable to walk without instability, pain and tingling. Their licensed orthopedic doctor prescribed a wheelchair, to enable them to attend school. Both boys refused to urinate at school to avoid the pain of standing. Both boys refused to walk due to sharp pain, tingling and instability. Besides Mother, others who observed reactions included Father, habilitation providers, therapists, doctors, and grandmother.

In January 2020, the therapist noted the following concerns:

Ms. Kahraman has not been forthcoming with therapist.
Ms. Kahraman appears to be blaming others including her husband for the current issues.
CM advised she was not aware Ms. Kahraman was receiving individual therapy with another therapist, as Ms. Kahraman reported to this therapist.

In February 2020, the therapist noted the following concerns:

Ms. Kahraman indicates due to problems in her marriage, which she said has been occurring for years, (and only recently shared with therapist), and indicates this is a contributing factor to involvement with DCS. She also has stated she has fear her husband will take the children to Turkey, and his statements indicating he knows how to make things go away, and he knows important people.
-Due to recently learning Ms. Kahraman has not been forthcoming, concerns of her being forthcoming continue.

In March 2020, the therapist noted the following concern:

Therapist received Ms. Kahraman's updated psychological evaluation, therapy notes, and meeting with CM and visit supervisor, which will be addressed with Ms. Kahraman.

Psychological Evaluation

Ms. Kahraman completed an updated evaluation on 02/20/2020. Dr. Oakley made the following observations:

Ms. Kahraman was referred for a psychological re-evaluation by DCS. During her previous evaluation, Ms. Kahraman did not endorse any significant mental health symptoms. Her scores on testing measures were invalid and questionably valid, based on Ms. Kahraman presenting herself in a favorable light and denying problems. It was noted that the full extent of her difficulties was likely not completely clear. Ms. Kahraman was not given any formal diagnoses; she was noted to have traits consistent with Obsessive-Compulsive Personality Disorder based on her being meticulous, rigid, and inflexible. It was further noted that she may have reinforced a sick role in her children, but there was not enough information to suggest that she was doing it intentionally or intentionally harming the children or feigning medical symptoms in the children. It was also noted that Ms. Kahraman continued to deny any accountability for the children's medical issues. A report from Dr. Kelly suggests that Ms. Kahraman required follow up to determine if she is "psychotic and/or has other mental health conditions." It suggested that she may have been deceitful, been trying to cover up abuse, may have "lost touch with reality," was having irrational beliefs about the children, or may be delusional. He further stated, "it is my opinion, with reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley." He cited the invalid and questionably valid test results, limited record review, and Ms. Kahraman's "strange

statements about the cause of the children's health difficulties." Dr. Kelly requested a follow-up evaluation and provided recommendations for Ms. Kahraman's treatment.

During the current evaluation, Ms. Kahraman described that, in hindsight, she can see that she was extremely stressed prior to the children being removed from her care. She explained that Father was not particularly involved with raising the children, that she was tending to Father's needs, that she was isolated from her support system, she was not getting enough sleep because the children were keeping her up, and that she was working on top of caring for the children and home. She described that she was told that her children were particularly sick, and that she became consumed with finding ways to help them, including conducting a lot of independent research, serving in a consulting capacity with the children's multiple medical providers, not following her instincts, and becoming overly reliant on certain medical provider's information. Ms. Kahraman admitted that she was driven by fear and that she became particularly rigid and inflexible. She admitted that her rigidity and hyper focus on the children's diet contributed to their malnutrition and medical issues.

Ms. Kahraman described that at the time of the current evaluation, she was feeling pretty good. She endorsed ongoing fear about the future of her case and frustration that her children have not been returned to her care but that she has not been given more direction about what she needs to do. Yet, she was able to recognize that the case has given her time to be introspective and to make some positive changes in her life. She seemed more relaxed and at ease than she did during the previous evaluation. Ms. Kahraman described that she is much healthier and more grounded than she was in the past.

Ms. Kahraman's previous test results indicate that her IQ is estimated to be in the above average range and that her word reading score was high enough for independent administration of the remaining psychological evaluations. She denied any experiences that time that would be likely to result in a change of scores; as such, the testing was not repeated. On the MMPI, Ms. Kahraman's response style suggested that she answered in a consistent manner and that she did not seem to over or under-endorse symptoms; her resulting profile is probably a fairly reliable clinical picture. Ms. Kahraman did not obtain any clinical elevations and her scores were not indicative of any significant mental health symptoms or diagnoses. She endorsed a sense of well-being. Ms. Kahraman's test results have been fairly consistent with her presentation during her two clinical interviews; during the first assessment, her results were guarded and she minimized issues, which was consistent with her closed off body language and minimization of fault. During the second evaluation, her scores were deemed to be more valid and she was observed to be more open, to take accountability for her role in the child's health issues, and to be more relaxed and well adjusted.

Ms. Kahraman seems to be making progress and has recognized how her rigidity and inflexibility have had a negative impact on her children. She appears to have gained some insight into how her actions, and inaction, contributed to her children's health problems. She admitted that the children's diet was responsible for their malnutrition. She acknowledged that she should have taken Kenan to the doctor sooner, that she had too many different medical providers who were not in communication, and that she was experiencing a significant amount of stress at the time. Ms. Kahraman described that she became too dependent on the diet and

her provider's advice regarding the diet because it was the first time she had been given hope about the children's future.

As such, it appears as though Ms. Kahraman was experiencing significant anxiety at the time the children were removed from the home and taken into care. She described feeling desperate to try to help her children, to the point that she was singularly focused on their diet and the opinions of a provider who apparently said she could help them, to the extent that she made poor decisions and did not follow her instincts. When considering this and additional medical information, it is possible that Ms. Kahraman was experiencing delusions (fixed beliefs that are not amenable to change in light of conflicting evidence) related to her son's health. This option appears more likely a possibility than the idea that she intentionally harmed the children. It appears, however, that at this time, Ms. Kahraman has been able to be more accepting of the medical evidence that contradicts her previous beliefs. Furthermore, Ms. Kahraman has not demonstrated any other signs of psychosis. Her history of anxiety may have been responsible for some of the medical concerns she previously endorse about herself. Medical follow-up is advised if she continues to experience significant physiological symptoms.

Ms. Kahraman continued to speak of heath factors that she believes may have contributed to the children's health difficulties and was overly elaborative. It is possible that she is holding on to some of her previous beliefs, yet, she is able to see that she made mistakes and to described what she needs to do differently in the future. While various parties have expressed concern that Ms. Kahraman will return to a strict diet for the boys if they are placed in her care, she described that she will feed them a mostly healthy, balanced diet with occasional snacks and treats, which is appropriate. She also described that she is no longer hyper focused on all natural medical care and household products. She stated that she now recognizes the value of more traditional medical care that saved Kenan. She added that she can be more accepting of medical provider's opinions, rather than feeling as though she has to be a collaborator.

Overall, Ms. Kahraman meets criteria for the following diagnoses:
Traits of Obsessive-Compulsive Personality Disorder
History of Anxiety Disorder
History of Delusional Disorder (Possible)

Ms. Kahraman was still noted to have traits consistent with Obsessive Compulsive Personality Disorder. She described, and her test results and her test results and presentation support, that she has been making progress in recognizing the traits and not letting them consume her beliefs and actions. Ms. Kahraman endorsed a history of significant anxiety, occurring prior to when the children were removed from her care. It is also noted that she may have been experiencing a Delusional Disorder at that time, though she appears to be more accepting of medical evidence and her role in the children's health problems at this time.

Ms. Kahraman, and others, have described that the children are healthy. Though, they have been diagnosed with Autism Spectrum Disorder, which is not a curable condition. Ms. Kahraman has demonstrated that she is capable of seeking services for the children and getting them the support they need. She needs to demonstrate that she is capable of not getting hyper focused or stressed if an issue does arise. Mother has a pattern of becoming hyper focused on the health of

the children and then adhering to rigid guidelines. She admitted to these patterns; she described that she has gained insight into her attitudes and behaviors, and that she has been much less rigid as of late. Ms. Kahraman further expressed that she was desperate for answers and support previously, in part due to high anxiety and lack of support. She was able to recognize that her anxiety was recognized and likely wore off on the children. Ms. Kahraman described that she has made positive changes for herself, which she believes will have a positive impact on her children, if they are returned to her care.

Ms. Kahraman's prognosis appears to be improved since her last psychological evaluation. It continues to be dependent on her willingness to be open to gaining insight regarding her role in her children's health issues, and her ability to make the necessary changes as a result. Ms. Kahraman still spoke at length about the children's medical issues, and suggested that there may have been some underlying issues that contributed to their issues. Yet, she acknowledged that malnutrition from their diet was mostly responsible.

Ms. Kahraman has demonstrated that she is invested in having the children returned to her care. Records have suggested that she has done well at visits and that she has likely demonstrated as much as possible given the current limitations of her interactions with the children. Mother explained that she is willing to make changes. The next steps may include her having more flexibility in her interactions with the children, particularly as it relates to food and her focus on their physical health. Eventually, if they are going to be returned to her care, Ms. Kahraman will need to demonstrate that she can choose appropriate meals for the children. It would be best to do this in a step-wise fashion. Mother also needs to continue to accept that the children are strong and healthy, and to not reinforce symptoms or ailments in the children. Ms. Kahraman would benefit from continuing with her mental health treatment. She described that she has made significant personal progress. She would benefit, however, from additional insight to help her understand her role in this case. She also could benefit from support to remind her to stick with the changes she has made and not resume her previous patterns of rigidity and inflexibility, especially if she is getting more time or freedoms with the children.
Some sort of mediation or family services would be beneficial if the children are to be returned to both homes. They family needs a parenting plan so that the children have similar routines and rules while in the two different homes; this is particularly important given the children's Autism diagnosis. Mother expressed interest in co-parenting with Father, though was somewhat worried about how he would interact with her. Father expressed disinterest in co-parenting.

It appears that Ms. Kahraman has been given the services that she needs to be successful; she has also participated in additional services on her own accord. Loosening the restrictions related to her interactions with the children will help her better demonstrate if she is able to make ongoing, measurable changes. This will need to occur if the children are to be returned to Ms. Kahraman's care.

Records Review Evaluation with Dr. Michael Kelly

Dr. Kelly completed his evaluation on 12/02/2019. Dr. Kelly noted the following:

It is my opinion, with reasonable medical certainty, that allowing Ms. Jessica Kahraman to care for her sons, Dylan and Kenan, places them in significant danger for additional harm.
It is also my opinion that additional recommendations must be followed to determine if Ms. Kahraman is psychotic and/or has other mental health conditions that are preventing her from parenting the boys safely.
It is my opinion that Ms. Kahraman needs mental health treatment services, like those described in the opinion section of this report, in order to make enough progress toward the goal of reunification with Dylan and Kenan.

I cannot opine on whether Ms. Kahraman meets Diagnostic Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) criteria for a mental disorder because she deferred meeting with me, and I was not granted access to her entire medical record. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman's behavior toward her sons raises concerns for mental illness, and that regardless of the cause of Ms. Kahraman's behavior, she is currently incapable of providing safe and adequate care to her boys. (Please see pages 4-13 of the evaluation attached for his evidence that supports his opinion) Dr. Kelly reports in the 10 pages that Ms. Kahraman's concerns about food and chemical sensitivities are unwarranted. Dr. Kelly states "It is unclear whether Ms. Kahraman's statements related to Kenan's chemical sensitivities reflect attempts to evade detection of abuse or serves as evidence that she has lost touch with reality." and "Ms. Kahraman was aware that restricting her boys' nutritional intake for extended periods of time would cause harm." Dr. Kelly noted "Ms. Kahraman's decision to defer taking Kenan to the hospital despite allegedly observing him have seizures, vomit up liver flukes, and pass parasites in his stool defies common sense."

It is my opinion, with reasonable medical certainty, that Ms. Kahraman is currently unable to demonstrate minimally adequate parenting skills. Ms. Kahraman will require continued mental health treatment and appropriate supervision to determine if she can demonstrate minimally adequate parenting skills in the foreseeable future. Please see the examples of Ms. Kahraman's behavior in this report and the Jessica Kahraman Date of Birth: 08/29/1972 accompanying chronological summary of records for evidence supporting my opinion.

It is my opinion, with reasonable medical certainty, that Kenan and Dylan are at risk for serious harm if returned to Ms. Kahraman's care. Evidence supporting my opinion includes, but is not limited to, Ms. Kahraman's belief that the boys' health problems are due to sensitivities to environmental chemicals and mold rather than inadequate nutrition, her unsubstantiated claims that Kenan has been infested with parasites, and her reports of chronic food intolerances that were shown to be false once the children were removed from her home.

I carefully considered whether Ms. Kahraman's current treatment program was optimal based on the findings and recommendations from Dr. Mary Oakley's psychological evaluation dated 04/16/2019. However, it is my opinion, with

reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley. It is also my opinion that Ms. Kahraman may benefit from additional mental health services as she progresses toward reunification with her sons.

It is my opinion that the standard protocol for therapeutic supervised visitation used by DCS must be followed in order to ensure Dylan and Kenan's safety. Dylan and Kenan's parents should not be allowed to supply food during visits. Ms. Kahraman's continued denial of the cause of Kenan's health problems and her role in precipitating them and records indicating that she may have misrepresented Kenan's calorie count in the hospital, of her role in precipitating the boys removal from her care, medical records indicating that she may have misrepresented Kenan's calorie count during his hospital stay necessitate that the parents not be allowed to supply food during visits.

Father, Ahmet Kahraman

Individual Counseling

In November 2019, it is reported "Both Therapist and Father are aware there may be adjustments to the treatment goals once he completes his psychological evaluation. Father does not agree with the term "medical neglect". Father is becoming increasingly agitated with the therapy process. He continues to express denial of medical neglect, as he was taking his children to the doctor. He denies intention to malnourish the children, and that they had been working with a GAPS provider in consultation. He believes the medical issues were caused by mold exposure, and the Department will not allow the children to have a blood test to determine this. He is open to the possibility that something other than mold caused the problems, but would like mold to be ruled out. He is no longer stating concern with the validity of the medical records.

During the first session in November 2019, Father agreed to sign the updated therapy goals. He appeared to want to discuss the goals to have them completely quickly. He agreed there was a medical issue related to mold and still requests a mold test. He was now willing to accept Dr. Miga's medical reports that the heart condition was related to malnutrition and no longer had any concern with the validity of the medical records. He expressed that he and his wife together decided on medical care and they made mutual decisions. He asks his wife to explain medical terms that he does not understand. He felt this was a misunderstanding on the part of the hospital staff when Father asked them to speak with his wife when he did not understand some of the terms they were using. Father did not understand the term "over medicalization" and Therapist indicated she would ask for more information about how the Department meant this term. The interpreter indicated that in Turkish, this terms means the overuse of medications to solve problems. Father stated he sought medical care for the children and they were unable to tolerate many foods. He had no explanation for the children's inability to walk. Father did not understand the fourth goal, and stated the children acted the same way with both he and his wife. He denied any difference in symptoms whether or not his wife was present. Therapist stated she would follow up on this

question as well. Therapist noted the stark difference in Father's agreeability as compared to the week before and Father stated he had conferred with his attorney.

In December 2019 it is reported "He has gained new perspective regarding his wife's behaviors, and that she has tried to control and manipulate the entire process, even with the doctors at the hospital. He stated he does not believe the same things as his wife. He has no doubts or regrets for the end of the relationship. We discussed his safety plan if the children were returned to his care, with regard to the children's Mother. He stated he would not allow her contact because she is dangerous and almost killed his child. He would not trust her to make decisions about the children. He also agreed to attend a therapy session with the children's therapists and Mother to inform the children about the divorce. In reference to the prior progress note, the Dr. Miga letter discussed was an electronic medical record dated 6/7/2019 13:55
MST from an encounter at AZE PedCard Glendale Thunderbird.

In January 2020, it is reported "Beginning in January 2020, Father disclosed that he was divorcing his wife and agreed that she is dangerous to the children. He has gained new perspective regarding his wife's behaviors, and that she has tried to control and manipulate the entire process, even with the doctors at the hospital. He stated he does not believe the same things as his wife. He has no doubts or regrets for the end of the relationship. We discussed his safety plan if the children were returned to his care, with regard to the children's Mother. He stated he would not allow her contact because she is dangerous and almost killed his child. He would not trust her to make decisions about the children. He also agreed to attend a therapy session with the children's therapists and Mother to inform the children about the divorce. He will participate in a psychological evaluation in February 2020 also, and will move up to Parent Aide services soon.

In February 2020, it is reported "Father has reported positive visits with the PA in the community, has obtained housing, and maintains a positive and future focus with regard to his children. He maintains his concerns for Mother's belief systems as unhealthy and dangerous for the children/ An additional authorization for individual therapy services will be requested to incorporate any additional treatment goals that may be generated by his psychological evaluation.

In March 2020, the following was reported:
Father maintains his concerns for Mother's belief systems as unhealthy and dangerous for the children. An additional authorization for individual therapy services was requested to incorporate any additional treatment goals that were generated by his psychological evaluation.

Psychological Evaluation

Mr. Kahraman completed a psychological evaluation with an interpreter present on 2/19/2020. Dr. Oakley noted the following:

Mr. Kahraman was referred for a psychological evaluation by DCS. He denied current or past symptoms consistent with a mental health diagnosis. He further

denied a history of participating in mental health treatment prior to DCS involvement. He described his mood is generally positive and happy; he added that he has been feeling more hopeful as of late because his only significant stressor is the DCS case and he believes he is making progress. Mr. Kahraman reported that he has been participating in individual counseling for the duration of the DCS case to discuss how to protect the children, including healthy eating habits. He further noted that, more recently, he has been seeing a second therapist related to his divorce; this therapist helps him understand the divorce processes and to process the relationship. Mr. Kahraman described his counseling experiences as positive; he believes that he has been making progress and gaining insight. Mother has made allegations that Ms. Kahraman has a drinking problem. He denied the claim, though admitted that he consumed alcohol more frequently once the children were removed from his care; he denied a history of alcohol abuse. He does have a history of one DUI charge. Yet, Mr. Kahraman has apparently been doing UA screenings which do not indicate that he has been drinking. Testing results indicate that Mr. Kahraman's cognitive abilities are estimated to be in the average range of functioning. There is no indication that he has any cognitive abilities which would interfere with his ability to parent. Mr. Kahraman's MMPI questions were read to him by the interpreter. His responses yielded an invalid profile due to underreporting problems that most people admit to. It is possible that this response style was due to the translation of questions. Furthermore, Ms. Kahraman described that the Turkish language is much more direct and to the point, which also may have contributed. Either way, there were no test results available. Mother has described that Mr. Kahraman is angry and has been vindictive since they separated. She further described that he has low tolerance for the children. Mr. Kahraman denied these claims. There were no reports or observations from the current evaluation or records to support Mother's claims. Yet, there is no valid testing to be utilized for the evaluation to provide further insight. Because Mr. Kahraman denied experiencing any mental health symptoms, and there was no indication from records or testing to suggest otherwise, he was not given any mental health diagnoses, aside from Tobacco Use Disorder. His diagnoses were noted to be deferred; more information could change the conclusions.

Overall, Mr. Kahraman meets criteria for the following diagnoses:
305.1 – Tobacco Use Disorder Diagnosis Deferred

Mr. Kahraman admitted that he was not persistent enough when he had concerns about the children's health and eating habits. He explained that he expressed his concerns to Mother, but that she did not respond to his concerns and continued to take charge and control the situation. Mr. Kahraman further admitted that because Mother has a medical background and he is not familiar with medical terminology, that he deferred medical decisions to Mother. He expressed anger at Mother because he believes that she is responsible for the children's health issues. He acknowledged that he did not protect the children and stated that, now that he has more insight, he is willing to do whatever it takes to protect the children. He described that he does not want the children to be around Mother and that he does not intend to coparent.

Mr. Kahraman reported that he smokes cigarettes. He noted that he intends to

quit. He needs to ensure that he does not smoke around the children so that he does not expose them to the harmful effects of second hand smoke. No other diagnosis were given at this time. Mother has described that Father is angry and short-tempered. Mr. Kahraman admitted that he is angry with Mother for hurting the children. He denied that he is generally angry or short with the children.

Mr. Kahraman acknowledged that he has previously deferred all medical decisions to Mother. If the children are to be returned to his care, he will need to take over the medical decision making. The boys have diagnoses of Autism Spectrum Disorder, which is not a curable condition. It is likely that they will need additional services in the future. Mother has described that Father was not particularly involved with the children and that he had a short-temper with them. Mr. Kahraman denied these claims and stated that he has been an active part of the children's lives and that he enjoys his time with the children. There were no records to suggest that Father was inappropriate with the children. Mr. Kahraman stated that he intends to parent the children independently. This will be an adjustment to his lifestyle if it occurs. He described that he has support. Otherwise, he may be required to coparent. It is unclear how well he will coparent and if he will be able to put the children's needs above his own emotions.

Mr. Kahraman's prognosis is fair. He has apparently gained insight regarding the case. Furthermore, he has taken accountability for his actions and described that he is willing to protect the children. There is some concern how well he will be able to coparent, if it comes down to that.

Mr. Kahraman has been transitioning to more privileges with the children. It is advised that this trend continue, as long as things continue to go well. He should be included in any medical appointments so that he can get in the habit of being an active participant.
Furthermore, Mr. Kahraman would benefit from continuing with individual counseling services to help him cope with the adjustment of having the children more time and on his own. Treatment should address coping skills to utilize if he becomes overwhelmed. He should also be encouraged to address his anger with Mother in treatment, and any resulting behaviors. Treatment should address different types of relationship violence. If the children are going to be returned to both homes, some sort of mediation or family services would be beneficial. They family needs a parenting plan so that the children have similar routines and rules while in the two different homes; this is particularly important given the children's Autism diagnoses. Mother expressed interest in coparenting with Father. Mr. Kahraman expressed disinterest in coparenting.

Parent Aide

Mr. Kahraman completed his intake for parent aide services on 02/18/2020. Mr. Kahraman completed one skill session for February 2020, which focuses on proper nutrition and meal planning. In February and March 2020, father has attended all visitation and skill sessions. The parent aide reports that father is open and engaging in the skill sessions. Mr. Kahraman is flexible with his children and allows for them to lead the visit and provide ideas on things they would like to do.

Currently, visits are virtual due to COVID-19

## VI.    PARENTING TIME (VISITATION)

**A.    The plan for parenting time (visitation) for each parent and child; including the frequency, length, location, level of supervision, why a less restrictive level of supervision is not sufficient to ensure child safety, and the plan for progressive parenting time.**

Ms. Kahraman currently has 4 hours of therapeutic visitation through Southwest Human Development. These visits occur at the SWHD visitation center.

Mr. Kahraman currently has 4 hours of visitation through a parent aide. These visits occur in Mr. Kahraman's home.

Due to the COVID-19 concerns, visitation for both parents is currently virtual, however once approved, in person visitation will continue.

**B.    Attendance at, and results of, parenting time (visitation) between each child and parent, guardian, or custodian since the last report to the court.**

Mr. Kahraman has consistently attended all visitation.

Ms. Kahraman was consistently attending visitation, however on 4/22/2020, mother informed all parties that she intended to record the visitation and feedback sessions. This is a violation of Southwest Human Development policy, so visitation has been unable to occur because of this.

## VII.    PERMANENCY GOAL AND CONCURRENT PLANNING

**A.    Permanency goal and target date (attach case plan).**

Family Reunification with a target date of 09/27/2020.

**B.    Concurrent goal and target date, including a description of activities initiated to implement the concurrent plan, if applicable.**

N/A

**C.    Recommended permanency goal and target date, if different than the current permanency goal.**

Severance and Adoption in regards to mother only.

**D.    Reason for recommended change in permanency goal, if applicable.**

The children have been in out of home for 16 months, with minimal progress been made by mother, Ms. Kahraman. When the children, were brought into care, Kenan was diagnosed with congestive heart failure due to malnutrition, caused by the diet that was being fed to him. Ms. Kahraman is unwilling or is unable to acknowledge the full role that she had in the children's malnutrition. Ms. Kahraman has continued the same controlling behaviors with DCS, Southwest Human

Development and her therapist. Ms. Kahraman is focused on checking off boxes and placing blame on Mr. Kahraman and trying to show that Mr. Kahraman is less fit than she is to parent the children. Ms. Kahraman has not made meaningful behavior changes. It is a significant concern that Ms. Kahraman does not appear to internalizing what service providers are trying to educate her on.

## VIII.   DCS SPECIALIST'S CONCLUSIONS

This case manager respectfully recommends that the case plan of family reunification be affirmed for Mr. Kahraman and the case plan change to severance and adoption for Ms. Kahraman.

It is this case manager's conclusion that Dylan and Kenan Kahraman remain in out of care. It is also this case manager's conclusion that family reunification is appropriate for Mr. Kahraman, however is not appropriate for Ms. Kahraman. As stated above, Ms. Kahraman is unable or unwilling to take full responsibility for her role in the declined health of her children, in which Kenan ended up in the PICU with heart failure. Ms. Kahraman is a significant safety concern to her children with the choices she makes on their behalf in regards to their health and well-being.

Mr. Kahraman has made progress towards his case plan goals and has taken steps to protect the children from Ms. Kahraman. Mr. Kahraman has filed for divorce from Ms. Kahraman. Mr. Kahraman has been flexible with his children's needs and cooking them a variety of foods.

## IX.   RECOMMENDATIONS

### A.   Agency

**It is respectfully recommended that** Dylan and Kenan Kahraman **remain a ward(s) of the court, committed to the care, custody and control of the Arizona Department of Child Safety.**

**It is further respectfully recommended that** Dylan and Kenan Kahraman **be placed in the physical custody of** DCS **with appropriate medical, social, and educational authorizations.**

**If the child is in out-of-state placement, it is further respectfully recommended that the court find that the out-of-state placement continues to be appropriate and in the best interest of the child.**

### B.   Financial

**It is respectfully recommended that beginning (date) \_\_\_\_\_ , the parents listed below be assessed the following amounts on a monthly basis per child as the contribution towards the cost of foster care:**

**(parent name) \_\_\_\_\_ be assessed $ \_\_\_\_\_ monthly for each of the following children: \_\_\_\_\_**

Progress Report to Juvenile Court

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

### C.    Reasonable Efforts Findings

It is respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to eliminate the need for continued out-of-home placement and to make it possible for the child to safely return home.

It is further respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to place the child in a timely manner in accordance with the permanency plan and to finalize the permanent placement of the child.

It is further respectfully recommended that the court approve the permanent case plan.

Respectfully submitted:

**Name/Title**   Madison Bell DCS Specialist
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**   480-656-9306
**Date:**   04/27/2020

Approved by:

**Name/Title**   Mecca Temple DCS Program Supervisor
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**   480-656-9427
**Date:**   04/27/2020

**Case Name:** KAHRAMAN, JESSICA   **Case ID:** 608484

CLERK OF THE
SUPERIOR COURT
FILED

~~Sharon~~ DEP

2020 MAY 11 PM 4:29

1 | **GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
2 | 7319 North 16th Street
Phoenix, Arizona 85020
3 | Telephone: (602) 870-9700
Fax: (602) 870-9783
4 | Email: mailroom@gillaw.com
5
6 | **DeeAn Gillespie Strub #009987**
*Attorney for Respondent*

EXHIBIT
253
BELL
8-23-24  MHb

7 | IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
8 | IN AND FOR THE COUNTY OF MARICOPA
9

10 | In re: the matter of:                    | No. JD532206
11 | D.K.▨ KAHRAMAN
12 | (d.o.b. 9/27/12),                         | **EMERGENCY MOTION FOR RECONSIDERATION AND FOR A RULING**
13 |
14 | K.K.▨ KAHRAMAN
(d.o.b. 9/27/12),                         | ...
15 | Persons under 18 years of age.   | *(Assigned to the Hon. Jennifer Green)*
16

17 | Jessica Kahraman ("Mother") respectfully request that this Court reconsider

18 | its order granting DCS's motion to preclude the testimony of Dr. Eli Newberger.

19 | Mother also respectfully requests that this Court issue a ruling on her previously

20 | filed motion to exclude the report of Dr. Kelly and preclude the testimony of Dr.

21 | Kelly, and her motion to compel disclosure by DCS. This motion is supported by

23 | the following Memorandum of Points and Authorities.

24 | **MEMORANDUM OF POINTS AND AUTHORITIES**

25

26 | **I.    Relevant Factual Background.**

27

28

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

1

AZ-KAHRAMAN029476

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

On August 5, 2019, Parents filed a joint motion in limine "to preclude the testimony of Dr. Kelly in any hearing related to this matter, as well as any opinions, reports, or other evidence originating from Dr. Michael Kelly." Based on representations made by DCS at a hearing on August 6, 2019, this Court ruled that the motion was moot and did not address the merits of the motion. (M.E. of 8/6/19.) After Mother learned that DCS did intend to call Dr. Kelly to testify at future proceedings, and after DCS had already provided a copy of Dr. Kelly's report to providers in this case, on December 13, 2019, Mother filed a motion to exclude the report of Dr. Kelly and renewed her motion to preclude the testimony of Dr. Kelly. This Court, however, has not yet ruled on either of Mother's motions.

On April 23, 2020, Mother filed a motion asking this Court to compel certain disclosures by DCS. This Court has not yet ruled on Mother's motion.

Parents initially jointly retained Dr. Newberger in 2019. Dr. Newberger was originally retained by both parents back in 2019, so the knowledge of his existence as an expert in the case has been known to counsel for many months, and he is not, as the Court has been informed, a last-minute surprise witness. His name was actually put forward by Father's counsel as someone whose expertise would be beneficial to the Court. At that time, Dr. Newberger gave a verbal report for both parents' counsel, indicating he did not believe the parents had intentionally harmed the children. After a comprehensive review of the medical records in this

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029477

matter, he affirmed his belief that this was a case where the parents had unfortunately relied on non-scientific providers.

In order to expedite the return of her children, Mother agreed to stipulate to the dependency, believing she had made significant progress in coming to understand how her misplaced judgment had impacted her children. In the last few months, however, Mother has recognized that DCS has brought the full brunt of its resources to bear against Mother, allowing DCS to spend a considerable sum to recruit Dr. Michael B. Kelly as an expert witness against her. Because there had been no action on her motion to preclude Dr. Kelly, Mother reengaged with Dr. Newberger in April in the hopes that he could help refute Dr. Kelly's unreliable report and anticipated unreliable testimony. Undersigned counsel gave the parties notice as soon as Dr. Newberger was reengaged in April 2020.

Unfortunately, the ability of counsel to obtain the necessary materials and provide them to Dr. Newberger, and for Dr. Newberger to conduct his necessary due diligence, was hampered by the conditions caused by the current pandemic, and the shelter-in-place order in place throughout most of the country during April 2020.

Furthermore, the unfortunate timing is also due to Dr. Newberger's report being thorough and lengthy, due to the volume and complexity of the medical records to be reviewed. Additionally, Dr. Kelly's report consists of a further 197

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029478

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

pages (17 pages of narrative with an exhibit of 180 pages), all prepared by Dr. Kelly, according to his pre-hearing interview. (Incidentally, this interview was conducted on Friday, 5/8/2020, and lasted approximately 45 minutes, as he had not allotted any more time.) Dr. Newberger's expert opinion is needed to provide expert testimony to address and refute issues raised by Dr. Kelly. Undersigned counsel received Dr. Newberger's report on May 7, 2020, and provided it to all parties within a few minutes of it being received. Dr. Newberger's delay in producing his report (submitting it on 5/7/20 rather than the anticipated 5/5/20) was due to the complexity of this matter and his desire to be comprehensive and accurate. The delay was most unfortunate, but simply unavoidable.

On May 7, 2020, after receiving Dr. Newberger's report, DCS immediately filed a motion to preclude his report and his testimony. This Court ruled on DCS' motion without giving Mother an opportunity to respond. Regrettably, DCS' motion omitted to mention the fact that the parties had been coordinating to facilitate an interview with Dr. Eli Newberger for today at noon (see Exhibit A).

Undersigned counsel has attempted to work with all parties to ensure that they had an interview opportunity with Dr. Newberger this afternoon. Undersigned emailed the parties to remind them of the scheduled interview and ask if they still intended to participate. Despite Ms. Nichols' previous expression of availability for 5/11/20, she withdrew her availability this morning, in part due

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029479

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

to her withdrawing from the case. Father's new attorney, Ms. Metelits, expressed she could not participate because she was new to the case and unprepared. At the last minute, Ms. Johnson-Hurd also indicated her inability to participate, not having previously contributed to the conversation from last week. After the interview time had elapsed, AAG Janna Johnson responded that they would not be proceeding with the interview either, claiming insufficient time to prepare.

Dr. Newberger has agreed to be available for interview the remainder of today and tomorrow morning. Undersigned will work with the parties to ensure they have the opportunity to interview Dr. Newberger.

## II.    Argument.

The juvenile court has the authority to place a dependent child in out-of-home care only if placing the child "with the child's parents is contrary to the child's welfare." *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17–18, 444 P.3d 258, 266–67 (App. 2019) (quoting A.R.S. § 8-845(A).) Because the "circumstances" causing out-of-home placement "'address the most serious instances of parental abuse, neglect, or incapacity,' the reason causing out-of-home placement must be one that indicates parental unfitness. *Id.* (quoting Alma S. v. DCS, 245 Ariz. 146, 150, ¶¶ 9–10, 425 P.3d 1089, 1093 (2018).) Although Mother regrets the unfortunate timing of Dr. Newberger's report, Dr. Newberger would present expert testimony that there is no circumstance here indicating Mother is unfit to parent her children,

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029480

so placing her children in out-of-home care is not legally justified. His testimony is essential for this Court to reach a just and correct decision.

In tomorrow's hearing, no less than Mother's fundamental right to parent is at stake. "To be meaningfully heard, a parent seeking modification of his or her dependent child's placement must be allowed to present evidence." *Angel J. v. Udall in & for Cty. of Maricopa*, No. 1 CA-SA 19-0150, 2019 WL 4451075, at *2 (Ariz. Ct. App. Sept. 17, 2019) (citing *Cruz v. Garcia*, 240 Ariz. 233, 237, ¶ 16 (App. 2016) (holding that when child's best interests are at issue in family-law case, due process requires court to permit the parties to present evidence)).

Among the sanctions the juvenile court may impose for untimely disclosure of a witness is preclusion of the witness. Ariz. R. P. Juv. Ct. 44(G). The sanction for untimely disclosure "should be in accordance with the intent of [the juvenile rules], as set forth in Rule 36." *Id.* Rule 36, Ariz. R. P. Juv. Ct., states: "The rules should be interpreted in a manner designed to protect the best interests of the child, giving paramount consideration to the health and safety of the child." *Austin N. v. Dep't of Child Safety*, No. 2 CA-JV 2017-0113, 2017 WL 4857411, at *3 (Ariz. Ct. App. Oct. 26, 2017) (citing *Lashonda M. v. Ariz. Dep't of Econ. Sec.*, 210 Ariz. 77, ¶ 19 (App. 2005)). While Mother regrets that the circumstances and timing of Dr. Newberger is not ideal, given the fundamental rights at issue, Mother requests that this Court reconsider its order to preclude Dr. Newberger's

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029481

essential testimony. In any dependency proceeding, a child's best interest as paramount. *See Dep't of Child Safety v. Beene*, 235 Ariz. 300, 304 (App. 2014). Dr. Newberger's testimony will provide necessary and essential evidence supporting Mother's argument that returning her children to her is in her children's best interest. Dr. Newberger's complete report and testimony are vital for the Court to determine what is truly in the children's best interests. The sanction of precluding his testimony is not in accordance with the intent of the juvenile rules.

**III.  Positions of the parties.**

Suzanne Nichols and Kinda Johnson-Hurd expressed their objections to this motion. Other positions have yet to be received.

**IV.  Conclusion.**

Mother apologizes for the less-than-ideal timing of the disclosure of Dr. Newberger's report. Mother respectfully, requests, however, that she be permitted to present his report and testimony in order to provide essential evidence to this Court. Mother requtest the Court rule today so that if the testimony and report of Dr. Newberger are allowed, she can coordinate an interview of Dr. Newberger by other parties.

Alternatively, if this Court precludes the report and testimony of Dr. Newberger, for the reasons explained in Mother's previous two motions to preclude the testimony of Dr. Kelly, Mother asks that this Court also preclude the

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

7

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029482

1  report and testimony of Dr. Kelly.

2  Respectfully submitted this 11 day of May, 2020.

3

4  **GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**

5

6  DeeAn Gillespie Strub
   *Attorney for Jessica Kahraman*

7

8

9  ORIGINAL filed this 11 day of May, 2020.

10  COPIES emailed this same date to:

11

12  Honorable Jennifer E. Green
    *Maricopa County Superior Court*

13

14  Gregory Coordes
    Janna Johnson

15  *Assistant Attorneys General*
    gregory.coordes@azag.gov

16  janna.johnson@azag.gov

17

18  Kinda Johnson-Hurd
    *Guardian ad Litem*

19  johnsonK010@mail.maricopa.gov

20

21  Suzanne Nicholls
    *Attorney for Father*

22  suzanne.nicholls@maricopa.gov

23  Rachel Metelits

24  *New Attorney for Father*
    rachel.metelits@maricopa.gov

25

26

27

28

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

8

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER