

EXHIBIT 254
BELL
8-23-24 MHB

CLERK OF THE SUPERIOR COURT
FILED
MAY 11 2020  4:30PM
S. Maave Sefo, Deputy

**GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax:  (602) 870-9783
Email: mailroom@gillaw.com

**DeeAn Gillespie Strub #009987**
*Attorney for Respondent*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

In re: the matter of:

D.K.  KAHRAMAN
(d.o.b. 9/27/12),

K.K.  KAHRAMAN
(d.o.b. 9/27/12),

Persons under 18 years of age.

No. JD532206

**MOTION FOR INJUNCTIVE RELIEF**

*(Assigned to the Hon. Jennifer Green)*

It is well-established that DCS caseworkers have a legal obligation arising under the United States Constitution, Arizona Constitution, and Arizona statutory law to make reasonable efforts to reunify children with their parents for the entire time that children are in the custody of the State. DCS caseworker, Madison Bell, has and continues, to exercise her authority is an arbitrary and unreasonable manner that is contrary to the law. It is also well-established that injunctive relief is the proper remedy when state actors exercise their power in an arbitrary or unreasonable manner. Therefore, Jessica Kahraman ("Mother") asks that this Court enjoin DCS from continuing have Madison Bell as the assigned caseworker in this matter. This motion is supported by the following

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029251

Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    **Applicable Law**

    **A. Mother's constitutional, fundamental right to the custody of her children.**

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). Nearly a century ago, in *Meyer v. Nebraska*, the Supreme Court "held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children'..." *Id.* (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).) Given the extensive Supreme Court precedent on this issue, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66.

Since *Meyer*, the decisions of the Supreme Court have "made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Dep't of Social Services*, 452 U.S. 18, 27 (1981).

Mother has a protected, fundamental liberty interest in the "care, custody, and management of" her child. *Stewart v. Superior Court*, 163 Ariz. 227, 229 (App.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029252

1989) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). This interest "does not evaporate simply because" Mother has not been a "model parent[]" or because she "lost temporary custody" of her children to the State. *Santosky*, 455 U.S. at 753. It is "not disputed that state intervention" in the relationship "between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Santosky*, 455 U.S. at 753 (1982) (internal quotations omitted).

Although there is a great emphasis on the protections offered under the Federal Constitution, "our history. . . demands that we not ignore the Arizona Constitution." *Mountain States Tel. & Tel. Co. v. Arizona Corp. Comm'n*, 160 Ariz. 350, 356 (1989). "[S]tate constitutions were intended in our republican system of government to serve as the primary bulwarks for freedom, and along with the Federal Constitution to provide a 'double security' for the rights of the people." Clint Bolick, *Vindicating the Arizona Constitution's Promise of Freedom*, 44 Ariz. St. L.J. 505, 506 (2012). As the Arizona Supreme Court has made clear:

> Our citizens adopted the Arizona Constitution by popular election. Arizona enacted its declaration of rights before the United States Supreme Court adopted the doctrine of incorporation, applying the federal Bill of Rights to the states. Thus, our framers and people must have intended the Arizona declaration of rights to be the main formulation of rights and privileges conferred on Arizonans.

*Mountain States*, 160 Ariz. at 355–56 (internal citations omitted).

Arizona's Constitution guarantees that "[n]o person shall be deprived of life, liberty, or property without due process of law." Ariz. Const. art. II, § 4. Arizona courts have "construed provisions of the state constitution more broadly than analogues in the Federal Constitution" to provide increased protection for

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029253

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

certain rights. Clint Bolick, *Vindicating the Arizona Constitution's Promise of Freedom*, 44 Ariz. St. L.J. 505, 506 (2012). The fundamental rights of parents is one area where Arizona courts have construed the due process clause of Arizona's Constitution more broadly than its federal counterpart. For example, in 1981, the United States Supreme Court held that, in proceedings brought to terminate parental rights, parents do not have a right to counsel under the due process clause of the Federal Constitution. *Lassiter v. Department of Social Services of Durham County, North Carolina,* 452 U.S. 18 at 31. After *Lassiter*, however, Arizona's appellate courts have consistently continued to recognize a constitutional due process right to the appointment of counsel in termination proceedings. *See e.g. Bob H. v. Arizona Dept. of Econ. Sec.,* 225 Ariz. 279, 282 ¶ 14 (App. 2010) ("Mother's right to counsel in a severance proceeding is afforded by statute and the due process clause." (internal citation omitted)); *Daniel Y. v. Arizona Dept. of Econ. Sec.,* 206 Ariz. 257, 260 ¶ 14 (App. 2003) ("That is not to say, however, that the right to counsel in a severance proceeding is not of constitutional dimension. We have indicated that it is."); *Denise H. v. Arizona Dept. of Econ. Sec.,* 193 Ariz. 257, 259 ¶ 6 (App. 1998) ("An indigent parent against whom a petition has been filed has the right to appointed counsel, but that right is afforded by statute, A.R.S. § 8–225(B), and the Due Process Clause.") Since, under *Lassiter*, the right to counsel cannot arise under the federal due process clause, it must arise under Arizona's due process clause. Thus Arizona, like numerous other jurisdictions, has recognized that, in the area of parental rights, our state constitution provides greater protection than that provided by the federal constitution. *See e.g. J.B. v. Florida Dept. of Children & Families,* 170 So. 3d 780, 791 (Fla. 2015) ("the right to counsel in [parental rights termination] proceedings

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029254

under the state constitution stems from" that constitution's due process clause);
*In re Welfare of J.M.*, 130 Wash. App. 912, 921 (2005) (holding same); *In re K.L.C.*,
12 P.3d 478, 480 n2 (Ok. App. 2000) (holding same); *V.F. v. State*, 666 P.2d 42, 47-
48 (Alaska 1983) (holding same).

Furthermore, Arizona's legislature has codified the fundamental rights of parents into Arizona law. In the "Parent's Bill of Rights," A.R.S. § 1-601(A), it states: "The liberty of parents to direct the upbringing, education, health care and mental health of their children is a fundamental right." The statute requires that, "[t]his state…shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." A.R.S. § 1-601(B). This statute creates a continuing obligation on the State to ensure that its infringement on a parent's fundamental right to custody of their child is narrowly tailored and that the State's interest could not be otherwise served by less restrictive means. This statute thus further restricts the State's lawful authority to infringe on a parent's fundamental right to their child.

## B. The State's legal obligations to make reasonable efforts to reunite the family.

Both the United States Supreme Court and the Arizona Court of Appeals have made clear that in dependency proceedings: "Until a parent is deemed unfit and unable to correct the problem, it remains in the child's best interests to unite the child with the parent." *Donald W.*, 247 Ariz. at 23, ¶ 48 (App. 2019) citing *Santosky v. Kramer*, 455 U.S. 745, 760 (1982).

When DCS removes a child, "because the child is already in agency custody, [DCS] [] has the power to shape the historical events that form the basis for

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029255

termination." *Santosky*, 455 U.S. at 763. This fact grants DCS enormous power and control to dictate dependency proceedings. But "[a] hallmark of the rule of law is that our courts provide a level playing field for every individual." *Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 92 ¶ 34 (BOLICK, J (dissenting)) (citing *Lassiter*, 452 U.S. at 28). Thus, parents faced with the "destruction of their family" have a "critical need for procedural protections." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). In Arizona, Arizona's legislature has established extensive procedural safeguards that seek to ensure that the State's ability to take a child from a parent is limited and that DCS complies with constitutional requirements. It is essential that these procedural safeguard be followed in order for a State's infringement on a parent's fundamental rights to comport with due process. *Logan B. v. DCS*, 244 Ariz. 532, 538 ¶ 44 (App. 2018) (citing *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248 ¶ 12 (2000)). The obstacles faced by parents in overcoming DCS's awesome power to infringe on their fundamental rights makes it vital to due process that the legal safeguards instituted by the people's representatives to restrict DCS's power be strictly adhered to. Thus, the constitution requires that when DCS takes from a parent their child, that they do so only in compliance with the law.

As the agency responsible for the care of Mother's children, one of these essential constitutional safeguards is the recognition that "DCS has a constitutional obligation to attempt to unite" Mother with her children. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 24 ¶ 46 (App. 2019). DCS's constitutional and statutory obligations necessitate that it "make reasonable efforts to preserve the family." *Donald W.*, 247 Ariz. at 24 ¶ 46 (App. 2019) (citing *Marina P. v. ADES*, 214 Ariz. 326, 333, ¶ 37, 152 P.3d 1209, 1216 (App. 2007); *Santosky*, 455 U.S. at 753-54,

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029256

102 S.Ct. 1388 ("When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."). "A 'reasonable effort' requires DCS 'to undertake measures with a reasonable prospect of success.'" *Id.* (quoting *Mary Ellen C. v. ADES*, 193 Ariz. 185, 192 (App. 1999)).

The Arizona Court of Appeals has made clear that DCS simply offering services to a parent is insufficient to satisfy its constitutional and statutory obligations; rather DCS is required to make actual, reasonable efforts. *Donald W.*, 247 Ariz. at 19 ¶ 47. DCS must make reasonable efforts to "provide services that have a reasonable prospect of success to remedy the circumstances as they arise *throughout the time-in-care period.*" *Donald W.*, 247 Ariz. at 23 ¶ 50 (emphasis in the original). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Donald W.*, 247 Ariz. at 23, ¶ 49. Efforts are not reasonable "when they undermine the parent." *Id.*

At the "very least," reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* at 20, ¶ 50. The court of appeals has made clear that, in determining whether DCS has complied with the law and made reasonable efforts to reunite a parent with their children, a juvenile court must view the "totality of the circumstances" and review DCS's actions during the entirety of time the child has been in DCS's care. *Id.* at 19 ¶ 49.

As discussed below, a review of the totality of circumstances in this case demonstrates that, as caseworker, Ms. Bell has not undertaken, and continues to

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029257

fail to undertake even the minimum of the reasonable efforts she is legally required to take. Rather, Ms. Bell continues to repeatedly act to undermine Mother's efforts to reunite with her children. As a matter of law, efforts are not reasonable when "they undermine the parent." *Id.* In failing to make reasonable efforts to reunite Mother and her children, Ms. Bell is failing to comply with the law and she is exercises her power in an arbitrary and unreasonable manner. Injunctive relief is required in order to ensure DCS's compliance with the law.

### C. Injunctive relief is the appropriate remedy.

"[DCS] and [the] courts should do everything in their power to keep the family together and not destroy it." *Matter of Appeal in Pima Cty., Juvenile Action No. S-111*, 25 Ariz. App. 380, 387 (App. 1975). In this case, Ms. Bell's unjustified and unreasonable bias against Mother "does not justify the leviathan power of DCS to descend upon" the family and destroy it. *Id.* This Court has the authority and obligation to ensure DCS's compliance with the law.

It is well established in Arizona that a court has the authority to enjoin a state actor when they engage in conduct that is unlawful. *Boruch v. State ex rel. Halikowski*, 242 Ariz. 611, 617, ¶ 18 (App. 2017) (citing *Crane Co. v. Ariz. State Tax Comm'n*, 63 Ariz. 426, 445 (1945) (court empowered to grant injunction when public officers exceed their authority or act beyond their power), overruled in part on other grounds by *Valencia Energy Co. v. Ariz. Dep't of Revenue*, 191 Ariz. 565, (1998); *Berry v. Foster*, 180 Ariz. 233, 235, 883 P.2d 470, 472 (App. 1994) (superior court empowered to enjoin a school board from investigating and censuring a member of the board when neither the state constitution nor applicable statutory scheme expressly or impliedly authorized the board to investigate or censure a board member). "*Wales v. Tax Commission*, 100 Ariz. 181, 412 P.2d 472 (1966),

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029258

explicitly recognized that a court may enjoin acts by public officers who have authority to act, but arbitrarily or unreasonably exercise their authority." *Boruch*, 242 Ariz. at 618, ¶ 27. In that case, "although the court declined to issue the injunction and ordered the Attorney General to reevaluate the appropriateness of the disclosure of the information, the court nevertheless held it could grant injunctive relief." *Id.* at ¶ 28 (citing *Wales, supra*). "In so ruling, the court acknowledged the Attorney General was entrusted with a certain amount of discretionary power, and that generally a court should not enjoin a public officer's exercise of discretionary power." *Ibid.* "But, the court stated this principle did not apply when a public officer exercises that power in an arbitrary or unreasonable manner..." The court noted:

> An injunction [ ] is an appropriate remedy to determine whether rights have been or will be affected by the arbitrary or unreasonable action of an administrative officer or agent. If there is an abuse of discretionary power, the judiciary has the duty to restrain the same.

*Ibid.* (citation omitted) (quoting *Wales, supra*). "Thus, a court can enjoin a public officer's arbitrary or unreasonable exercise of discretion." *Ibid; see also Rivera v. City of Douglas*, 132 Ariz. 117, 119 (App. 1982) (injunction is an appropriate remedy to determine whether rights have been or will be affected by arbitrary or unreasonable action of an administrative officer).

Since *Wales*, Arizona has placed some limits on a court's inherent authority to grant injunctive relief. A.R.S. § 12–1802(6) bars injunctive relief when it is sought to prevent a state actor from exercising the duties of a public office "in a lawful manner." *Boruch v. State ex rel. Halikowski*, 242 Ariz. 611, 617 (App. 2017) (quoting A.R.S. § 12–1802(6)). "A.R.S. § 12–1802(6) is inapplicable," however, when state actors act "unlawfully" by "exceed[ing] their authority or exercis[ing] discretionary authority in an unreasonable or arbitrary manner." *Id.* "To    sum up: Arizona case law demonstrates A.R.S. § 12–1802(6) does not bar injunctive

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

9

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029259

relief when public officers act 'unlawfully' by either exceeding their authority or exercising discretionary authority arbitrarily or unreasonably." *Id.* at ¶ 30.

Ms. Bell has exercised her discretionary authority arbitrarily and unreasonably, and contrary to constitutional and statutory law. Ms. Bell's continued failure to make reasonable efforts are in violation of Mother's constitutional rights. The only appropriate remedy is for this Court to enjoin DCS from continuing have Ms. Bell as the assigned caseworker during these proceedings.

## II.    Maddison Bell has exercised, and continue to exercise, her discretionary authority arbitrarily and unreasonably.

Throughout the history of this case, Ms. Bell has demonstrated an arbitrary animus against Mother. This animus has been noted by Dr. Eli Newberger, an expert in this case. In his recent report, Dr. Newberger stated:

> Notwithstanding abundant evidence of Mother's compliance with DCS' requirements, has unhesitatingly provided her boys with a variety of food, participated in all recommended services, proactively educated herself on a higher level with nutritional education, **Ms. Bell appears unable to see her as a competent, safe parent who manifests a loving and close bond with her boys.**

(Exhibit A (Dr. Newberger's Report) at 44 (emphasis added).)

Ms. Bell's arbitrary, negative opinion of Mother has been constant, despite her receipt of considerable, positive information about Mother that Ms. Bell has received from multiple providers. In her case report to the court dated April 27, 2020, Ms. Bell recommended a change of case plan to severance and adoption with regard to Mother. Ms. Bell repeatedly misstated facts, and made blatant misrepresentations to the court, in order to bolster her arbitrary and unfounded

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029260

narrative that Mother presents a clear and present danger to her children. For example, Ms. Bell stated that Mother "has not been forthcoming in her counseling with Dr. Rodriguez. Dr. Rodriguez reports that Mother is not taking full accountability… Dr. Rodriguez reports that she feels as though Ms. Kahraman is only saying what DCS and Dr. Rodriguez want to hear…" (4/27/20 DCS Case Report at 2). Dr. Rodriguez's own recollection of events, as memorialized in her 5/1/20 case note, however, directly contradicts Ms. Bell's assertions in several places:

> Madison asked therapist if therapist believed Ms. Kahraman could parent the boys today, and **therapist stated yes**, with a safety plan in place…

> Madison went on and asked therapist more questions from yesterday (even though she was present), such as Ms. Kahraman taking responsibility, and therapist stated **Ms. Kahraman has taken responsibility for the decisions** she made, and that **she has not done anything to intentionally harm her children**. Carla asked again about coping skills, and therapist stated again, Ms. Kahraman has them…

> Therapist asked if Ms. Kahraman has met her goals, and stated she has come a long way, and wanted to address her outside support system, identify decision-making process (such as writing it out/looking at facts, etc.), and **she has met her goals in general**…

(Exhibit B (5/1/20 *Buwalda Case Note*) at 1 (all emphasis added).) The reality of Dr. Rodriguez's 5/1/20 statement is far from the bleak assessment provided by Ms. Bell. Not only do Dr. Rodriguez's notes demonstrate a profound discrepancy between what she told Ms. Bell and what Ms. Bell provided to the Court, they also highlight some peculiar behaviors on Ms. Bell's part. Ms. Bell repeatedly asked Dr. Rodriguez questions which she had previously answered the day

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029261

before at a recorded interview which Ms. Bell attended. It appeared as though Ms. Bell was fishing for different answers. Ms. Bell's attempts to undermine Mother's efforts to reunite with her children were unreasonable.

As Dr. Newberger, who has thoroughly reviewed current information on this case, opined:

> I find it remarkable that caseworker Madison Bell changed the DCS case plan to severance in the course of the last three weeks. Ms. Bell did not consider the scope of information available. She appears to be rigidly stuck in a false narrative that Mother is dangerous, delusional and harmful to her children... As well, Ms. Bell has failed to acknowledge Mother has been extraordinarily open to change and enhance her parenting capacity.

(Exhibit A (Dr. Newberger's Report) at 44.)

Unfortunately, Ms. Bell also repeated the same misrepresentations in her report to the Foster Care Review Board on May 5, 2020. Ms. Bell again claimed that Mother had not taken sufficient responsibility for her actions and that she was still a danger to her children, despite having clearly heard Dr. Rodriguez's professional opinion stating the exact opposite on both April 31 and May 1, 2020. Ms. Bell's attempts to again undermine Mother's efforts to reunite with her children were unreasonable.

Ms. Bell's requested change of case plan to severance and adoption was never reviewed with Southwest Human Development case manager Carla White. Undersigned counsel interviewed Ms. White on April 31, 2020, and Ms. Bell attended. Ms. White unequivocally stated on that occasion that it was not in the boys' best interests to be severed from their Mother. She was genuinely surprised that Ms. Bell had taken that position.

Ms. Bell is not only unfairly hypercritical of Mother, she has also been

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

12

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029262

unreasonable in her efforts to undermine Mother's efforts to reunite with her children by being inappropriately dismissive of Mother's concerns regarding Father. When Mother and Father separated in late 2019, Mother met with Ms. Bell and the attorneys general representing DCS to inform them of her impending separation from Father. At that time, Mother shared with them statements that both she and her parents had heard Father make concerning his intent to kidnap the boys and take them to Turkey. Rather than taking Mother's concerns seriously, Ms. Bell claimed Mother was simply trying to deflect DCS's critical attention from her to Father. Undersigned recently learned, however, that at the time Mother voiced her concerns, DCS had previously been made aware of Father's threats to take the children to Turkey very early in this case. Rex Lambert, Ms. Kahraman's uncle, witnessed Father's threats and contacted the ombudsman to express his concerns. DCS caseworker Sarah Langley contacted Mr. Lambert. This occurred in January 2019.[1] Mr. Lambert and Ms. Kahraman's mother and father have all issued sworn declarations attesting to what they heard Mr. Kahraman say. Based on the information Ms. Bell had, her dismissal of Mother's concerns was unreasonable.

Rather than make efforts to reunite Mother with her children, Ms. Bell has also gone to extraordinary and unreasonable lengths to try to destroy this family. In the spring of 2019, Ms. Bell received a positive psychological evaluation of Mother from Dr. Mary Oakley. Unsatisfied that Dr. Oakley's report failed to give her what she needed in order to find the children dependent as to Mother, Ms. Bell orchestrated the retention of Dr. Michael B. Kelly, a California expert with whom she has worked multiple times. DCS has paid Dr. Kelly $33,800 for a report that is forensically unreliable. Ms. Bell did not provide Dr. Kelly with all of the

---

[1] Despite requests for documentation of this report, DCS has failed to disclose any of the appertaining records.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029263

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

relevant information. For example, she did not provide him with the significant and pivotal records of Dr. Nikki McCants, which document objective third party observation of the boys' physical challenges in the months prior to DCS removing Mother's children from her, nor did Ms. Bell ever interview Dr. McCants. A review of Dr. McCants' records reveals they do not support DCS' false narrative against Mother. (See Exhibit C (Dr. McCants' records).)

Dr. Newberger further attested in his report that Ms. Bell's unreasonable actions have enabled Father's dysfunction and need for control. In Dr. Newberger's expert opinion, Ms. Bell's actions have amounted to "domestic violence by proxy," because Ms. Bell has unreasonably sought to use the courts to control and punish Mother. (Exhibit A at 45).

As Dr. Newberger observed: "It appears the more Mother stands up for herself and demands accuracy, the greater the DCS' retaliatory conduct against her becomes." (*Id.* at 44). Ms. Bell's unreasonable and arbitrary actions in this case are contrary to constitutional and statutory law, and are a violation of Mother's fundamental, constitutional rights. The Court should enjoin DCS from continuing to assign Ms. Bell as the caseworker in this case.

## III.    Position of the parties.

Positions have been requested by all parties.  The attorney general objects. The GAL and counsel for Father have not responded with a position.

## IV.    Conclusion.

A parent "has an 'inalienable right' to parent his child 'without obstruction or interference from this state.'" *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 20 ¶ 36 (App. 2019) (quoting ARS 1-602 (A).) This "right to raise one's children is a

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029264

fiercely guarded right in our society and law, and a right that should be infringed upon only under the most compelling circumstances." *In the Interest of E. G. L. B.*, 342 Ga. App. 839, 840 (App. 2017) (internal citations and quotation marks omitted) ). The State's actions when infringing upon the "natural parent-child relationship," are ones that "must be scrutinized deliberately," to ensure that such awesome power is "exercised most cautiously." *Id.* Ms. Bell's actions in this case are an abuse of her authority. In order to ensure future compliance with the law, and the protections of Mother's fundamental rights, Mother asks that this Court enjoin DCS from continuing to assign Ms. Bell as the caseworker in this action.

Respectfully submitted this <u>11</u> day of May, 2020.

> **GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
>
> DeeAn Gillespie Strub
> *Attorney for Jessica Kahraman*

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029265

ORIGINAL filed this __11__ day of May, 2020.

COPIES emailed this same date to:

Honorable Jennifer E. Green
*Maricopa County Superior Court*

Gregory Coordes
Janna Johnson
Kathleen Martoncik
*Assistant Attorneys General*
Katheen.martoncik@azag.gov
gregory.coordes@azag.gov
janna.johnson@azag.gov

Kinda Johnson-Hurd
*Guardian ad litem for Children*
johnsonK010@mail.maricopa.gov

Suzanne Nicholls
*Attorney for Father*
suzanne.nicholls@maricopa.gov



GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN029266



EXHIBIT 255
BELL
8-23-24 MHD

Clerk of the Superior Court
*** Electronically Filed ***
5/12/2020 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                                5/11/2020

CLERK OF THE COURT
HONORABLE JENNIFER E. GREEN                        P. Bryant
                                                                     Deputy

IN THE MATTER OF:

D.K.          KAHRAMAN                          KINDA  JOHNSON-HURD
F1149031
DOB: 9/27/2012
K.K.          KAHRAMAN
F1149032
DOB: 9/27/2012

                                                        JANNA LEE JOHNSON

                                                        DEEAN  GILLESPIE STRUB

                                                        SUZANNE M NICHOLLS

                                                        CASA
                                                        DCS SPECIALIST - MARICOPA EAST
                                                        REGION

MINUTE ENTRY

        The court has received and reviewed DCS's Motion to Preclude Witness Testimony, filed
May 8, 2020.  DCS asked the court to preclude the testimony of Mother's expert witness, Dr.
Newberger, at a Rule 59 evidentiary hearing set for May 12, 2020.  DCS informed the court that
counsel for Mother untimely disclosed a 64-page expert report when it sent the report to all
parties at 3:56 p.m. on May 7, 2020.  The court notes that this is an unusual Rule 59 hearing in
that Mother's pleading was filed on February 19, 2020, but counsel for Mother waived the Rule
59(B) requirement that hearings be set within 30 days of the request for return of the child
because she wanted to file a Reply and the court so accommodated the request.  The court notes
that any further continuance of this Rule 59 hearing would run even more afoul of the 30-day
requirement, despite the parties' consent to do so in February.  Accordingly, the court is
extremely hesitant to grant any further continuances of this hearing.

Docket Code RULING                       Form XPJDBlankME                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              5/11/2020


The fact of the 30-day requirement weighs heavily in favor of holding the hearing on May 12, 2020.   Further, the court views holding the hearing as acting in the best interests of the children, to ascertain whether return of the children to Mother is appropriate.   The court views its options as a) preclude Dr. Newberger's report and testimony due to extraordinarily late disclosure rendering DCS unable to prepare for the expert, and hold the hearing as scheduled, especially in light of counsel for Mother's unrealistic requirement that the matter be reset within 30 days; or b) grant a continuance to allow the parties to carefully consider the expert's newly disclosed report and an opportunity to interview Dr. Newberger after consideration of that report, knowing it is highly likely that such a continuance would result in a hearing set outside 30 days.

Second, despite counsel for Mother's assurances that the report would be disclosed on May 5, 2020, the report was not disclosed until the end of day (3:56 p.m.) on May 7, 2020.  This gave DCS and the other parties two court days (two business days) to digest a  64-page expert report.  The late disclosure may or may not be in violation of Rule 44(1) requirement "any document received by or prepared by the party thereafter shall be disclosed within five (5) days of receipt or preparation."   The court has no knowledge of the date of when the expert's report was received or prepared, and as such, the court will be eager for the parties to supplement the record; the court notes that the report was disclosed inside the five-day period contemplated by Rule 44(B).  The court also has no information about why counsel for Mother waited months to secure an expert's report in the context of a Rule 59 hearing that in normal course would have been held 30 days after the pleading was filed. The court only knows that counsel for Mother failed to mention anything about the expert in its pleadings, and only alerted DCS and other parties to the existence of an expert in mid-April, fewer than 30 days before the Rule 59 hearing.  No reasonable attorney can be expected to digest a 64-page report in two business days.  The court also noted that despite the late disclosure, counsel for DCS gave counsel for Mother availability to set up an interview of the expert; counsel for DCS alleged that counsel for Mother did not respond to its request to set up the interview.  Further, counsel for DCS reached out directly to Dr. Newberger, and DCS maintained that Dr. Newberger did not respond its request to set up an interview.  These non-responses by counsel and the expert are unprofessional at a minimum, and put DCS and other parties in an unfair position to prepare for the hearing.  Counsel's extraordinarily late disclosure combined with non-responses to DCS's offer to interview the expert weighs in favor of precluding Dr. Newberger's testimony and report as a sanction contemplated by Rule 44(G).

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031765

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                5/11/2020

A third consideration, however, is that counsel for Mother is only willing to continue the Rule 59 hearing if it can be reset within 30 days. This is a perplexing position given that the court is in this unfortunate situation due to counsel for Mother's untimely disclosure of a lengthy expert report. The court views resetting this hearing within 30 days of May 12, 2020 due to the many lawyers' schedules, and another unique facet to this case: Father's lawyer Suzanne Nicholls has recently been appointed by Governor Ducey to serve as a Judge on the Maricopa County Superior Court. The court takes judicial notice of an email sent by Presiding Judge Joseph Welty that indicates Ms. Nicholls takes the bench on May 18, 2020. This fact is important, because if the court continues this Rule 59 hearing, counsel for Father would be getting a new lawyer. It would be highly unlikely that the new lawyer would be ready to represent Father in this highly litigious dependency case within 30 days, much less a case with a newly disclosed 64-page expert report. This fact weighs heavily in favor of not granting a continuance, especially given counsel for Mother's insistence that the matter be reset to within 30 days. The court also finds counsel for Mother's non-response to interviews with Dr Newberger curious given the insistence on holding the hearing within 30 days of the hearing date, if the court granted the continuance. Due to counsel for Mother's unique position in this regard, this court does not view granting a continuance to allow the parties to interview Dr. Newberger as an option, because the court is unable to reset this matter within 30 days.

In weighing all of these considerations, the court will affirm the Rule 59 hearing set for May 12, 2020 at 1:30 p.m. The court considered granting a continuance, but will not grant one for the following reasons: 1) the 30-day time period set forth in Rule 59; 2) the court's view that resolving Mother's outstanding Rule 59 motion is in the best interests of the children so they might be returned to Mother, if appropriate; 3) a continuance will only delay a hearing that should have been set in March 2020, but for counsel for Mother's then-position that excluding time was appropriate; 4) Mother's position that any reset must be within 30 days of May 12, 2020, otherwise Mother would object to a continuance; 5) the reality that any continuance would be well beyond 30 days given the court's own schedule and the necessary appointment of a new lawyer for Father due to Ms. Nicholls's appointment to the Superior Court; and 6) counsel for Mother's extremely late disclosure of a 64-page expert report that should have been disclosed well before May 7, 2020 at 3:56 p.m. renders all parties unable to meaningfully consider the expert's opinions and cross-examine the witness at the hearing.

As far as precluding the expert's report in the context of a Rule 59 hearing, the court will preclude the admission of the report because it was disclosed approximately two business days prior to the May 12, 2020 evidentiary hearing and counsel for Mother and the expert failed to respond to DCS's reasonable request to interview the expert prior to the hearing. This ruling has no impact on Dr. Newberger's ability to testify in future hearings, and encourages the parties to work together to set up an interview if his testimony might be sought in future hearings.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031766

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                          5/11/2020

For the reasons set forth above,

IT IS ORDERED granting the request to preclude Dr. Newberger's report and testimony in the Rule 59 hearing.

IT IS FURTHER ORDERED denying the request to continue the Rule 59 evidentiary hearing.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031767



EXHIBIT 258
BELL
8-23-24  14mb

Clerk of the Superior Court
*** Electronically Filed ***
5/12/2020 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    5/11/2020

                                            CLERK OF THE COURT
HONORABLE JENNIFER E. GREEN                      K. Scanlon
                                                   Deputy

IN THE MATTER OF:

**D.K.** KAHRAMAN                    KINDA  JOHNSON-HURD
F1149031
DOB: 9/27/2012
**K.K.** KAHRAMAN
F1149032
DOB: 9/27/2012

                                     JANNA LEE JOHNSON

                                     DEEAN  GILLESPIE STRUB

                                     SUZANNE M NICHOLLS

                                     CASA
                                     DCS SPECIALIST - MARICOPA EAST
                                     REGION


                            MINUTE ENTRY

        The court is in receipt of several motions filed in this case:

1.  Mother's Motion to Compel Accelerated Disclosure, filed April 24, 2020 and DCS's
    Response and Request to Strike, filed May 1, 2020

        Mother asked the court for DCS to disclose communications between DCS and any
service providers, and between DCS counsel and "any opposing party or that party's counsel,
where counsel for Mother was not included." (Motion at 1-2.)  Mother used most of the motion
to set forth an argument that DCS is biased in favor of Father over Mother, and that some of the
communications may support Mother's theory that DCS is biased against Mother.  DCS
responded that it has disclosed all communications between itself and service providers, and
reports as to services, consistent with Rule 44. (Response at 1.)  Mother's belief that DCS has

Docket Code ORDENTERED              Form XPJDBlankME                           Page 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031274

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    5/11/2020

mischaracterized Mother's participation in services (Motion at 8) does not mean that DCS has
violated its obligation to disclose reports and communications between DCS and
providers. Without further specific information setting forth deficiencies in disclosure, the court
finds that DCS has satisfied its disclosure obligation. Accordingly the court will deny the
Motion to Compel Accelerated Disclosure. The court will grant counsel for Mother leave to re-
urge this motion if more specific information is brought forward.

 IT IS ORDERED denying the Motion to Compel Accelerated Disclosure.

2. Mother's Emergency Motion to Compel Restoration of Services, filed April 23, 2020;
   Father's Response, filed April 30, 2020; DCS's Response, filed April 30, 2020

 Mother asked the court to compel DCS to restore services. (Motion at 1.) According to
DCS's Response, Mother's counseling referral has been extended after it expired. (Response at
2.) The court considers the Motion to Compel moot as to counseling. If there are other services
specifically requested to be restored, counsel for Mother should raise those issues with the court.

 IT IS ORDERED finding Mother's Emergency Motion to Compel Restoration of
Services to be moot.

3. Mother's Notice of Intent to Record all Interactions with DCS and Providers, filed April
   22, 2020; DCS's Response and Objection, filed April 28, 2020

 Mother alerted the court of her intent to record interactions with DCS and other
providers. (Motion at 1-2.) DCS indicated that Mother would be in violation of the policies of
the providers if she recorded her interactions with service providers. For example, JFCS was
assigned to conduct Mother's child-family team meetings (CFTs) and any person recording
those meetings violates HIPAA. DCS invited Mother to take detailed notes at the CFTs. DCS
also maintained that Mother would be in violation of the policies adopted by Buwalda
Psychological Services if she tried to record her interactions with her assigned psychologist, Dr.
Rodriguez. Similarly, Mother would be in violation of SWHD's policies if she attempted to
record her interactions with SWHD employees during therapeutic visitation. The court has no
authority to intervene in the policies adopted by any of these service providers.

 Accordingly,

 IT IS ORDERED taking no action on Mother's Notice of Intent to Record, other than to
note that DCS appropriately warned Mother that she may be in violation of service providers'
policies if she in fact recorded her interactions during services.

Docket Code ORDENTERED   Form XPJDBlankME     Page 2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031275

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                5/11/2020

4.  DCS's Motion to Permit Telephonic Appearance, filed May 1, 2020.

DCS asked for permission for one of its witnesses, Dr. Kelly, to appear telephonically for
the Rule 59 hearing on May 12, 2020.  DCS noted that Dr. Kelly is unavailable to appear in
person.  Since the filing of this motion, the court alerted parties that it would hold the Rule 59
hearing by videoconference via GoToMeeting due to the pandemic caused by COVID-19 and the
various Administrative Orders of the Maricopa County Superior Court and the Arizona Supreme
Court prohibiting in-person hearings in dependency cases.  The court will order Dr. Kelly to
appear by videoconference using GoToMeeting for the Rule 59 hearing, with the video turned
on.  This will allow the court to better assess his credibility, and allow for more robust cross-
examination by counsel for Mother and Father.

IT IS ORDERED granting the motion, in part, and denying the motion, in part.

IT IS FURTHER ORDERED that Dr. Kelly will be allowed to testify by videoconference
using GoToMeeting, with his video turned on, so the court and parties may better assess his
credibility.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031276





CLERK OF THE
SUPERIOR COURT
FILED
A. RODRIGUEZ. DEP

2020 MAY 12 PM 12: 37

## CASA COURT REPORT

**Court HearingDate:** 05/12/20
**CASA:** Susan Stark
**County:** Maricopa
**JD No:** JD532206
**#/Placements:** 2 each
**Contact Hours:** 422.00

| CHILD(REN)'S NAME | AGE |
|---|---|
| D.K. Kahraman | 7 |
| K.K. Kahraman | 7 |

## BRIEF HISTORY:

K.K. and D.K. Kahraman were taken into the temporary physical custody of the Arizona Department of Child Safety (DCS) on December 28, 2018. Allegations as to both parents, Mother Jessica Kahraman and Father Ahmet Kahraman, were an inability to parent due to abuse and/or neglect. It was determined that their strong belief regarding the children's diet and medical care interfered with the children's normal health and development.

The boys were initially placed in separate licensed foster homes because K.K. required a higher level of care. They are now placed together in the same Licensed DDD Foster Home.

I was appointed as CASA by Court Order dated May 28, 2019.

Information in this report is current as of May 5, 2020.

## ASSESSMENTS:

K.K. and D.K. are delightful 7 year old boys and, before restrictions due to the Pandemic, were excited for whatever activity we had planned for the day. They are doing very well being home schooled. They're healthy, generally happy and love to eat.

Since the last report, we went to see Santa. They were so excited to actually sit and actually talk to the big man and believe in all the magic, from the reindeer to the North Pole. They wondered if he could find them because they now lived in a foster home, but they were thrilled, when their parents brought them "his gifts." In January, K.K. jumped into my car one day, and announced, "Guess what Miss CASA! This is the longest I can remember not feeling sad!" He was elated, but didn't say happy, just not sad.

By February, at the Zoo, K.K. was sad again, saying he wished everything could be like it used to be, when they all lived together at home. He worries about things, like what the other children must have done that put them on Santa's naughty list and when he'll get his LEGOS back from the foster mom. Though he

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

has not said it, he is the type of child that would worry that it was his fault the family fell apart. He refers to "a black cloud" sometimes, that I think represents his feelings when he is sad, insecure, or depressed. As real and terrifying as it was, when he first described it last fall, usually he says it's outside now. And he's able to brush it off and move on to the next topic. ██D.K.██ is more 'cut and dry'. He'll say he was sleeping, or he never saw it, when ██K.K.██ goes on about the cloud, monsters in the closet, or under the bed. But ██D.K.██ always listens to ██K.K.██ supports him and never belittles him. He now sleeps in the same bed as his brother.

██K.K.██ told me he and ██D.K.██ were doing exercises to get strong, not because anyone told them to, but they do it on their own, because "they never know when they'll be strong." ██D.K.██ wishes he was an adult and had a purple car. ██K.K.██ drew himself in the driver's seat of a firetruck. The boys make plans for how they hope their world will be, where and what they'll be doing. ██K.K.██ wants to be a fireman and ██D.K.██ a policeman.

██K.K.██ told me his parents were living apart. I haven't heard them say divorce, but our visits are shorter and less frequent, so maybe I just haven't heard it. They seem to know about it because ██D.K.██ said that it made him sad because they could only live with one parent, but happy because when ██K.K.██ goes in the hospital, ██D.K.██ will be able to visit him. I said Kenan's doctor said his heart was all better and he might never have to be in the hospital again. ██D.K.██ didn't buy it, and persisted with, "Yeah, but when he does...."

The boys have a presumption of illness, after all that they've been put through, and they'll need support to process this as they grow older. ██D.K.██ went into great detail about how distressed he was when he couldn't see his brother.

The boys think they'll live with their father, because he lives closer to the foster mom. I think, it is not about the proximity as much as it is feeling safe. They've had that at the foster home, and are unsure what life would be like if they go back to their parents.

After a visit to the farmer's market, the boys talked about all the new food they've gotten to eat since being in foster care, including meatballs that weren't made of lamb. They said it was "boring" to eat lamb all the time. ██K.K.██ said that's what made him sick. Then ██D.K.██ said, "No ██K.K.██ It wasn't the lamb that made you sick. We just needed to be eating all the other foods too, like we do now." It was the first time I heard either boy put it together, that the cumulative toll of malnutrition was the cause of heart failure, and not just blame it on the lamb. And ██D.K.██ sounded resentful.

Once, the boys were trying to decide which acupuncture needles were the sharpest – red, green, or blue. I asked if they helped, and ██D.K.██ said, "No, because ██K.K.██ got heart failure anyway." He was angry about it and viewed it as a waste of time. They hate needles, and will avoid them as much as possible. But when ██D.K.██ gave ██K.K.██ a choice, ██K.K.██ said he'd rather have a lab test than get stuck by a saguaro cactus.

The boys eat everything with no problems. They take appropriate bites, stop when they are full, and enjoy talking during the meal. And sometimes, they're just plain silly.
The boys use restrooms independently, and only ask for help reaching the soap or towels. There is no drama. No whining. And they don't complain.

I know I am in a unique position in their lives, because they didn't know me when they were sick or malnourished. They don't associate me with that, so they can just be normal when they're with me. I don't fret over them. And they feel safe and comfortable sharing what's on their minds.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031316

**REASONABLE EFFORTS:**

The case plan goal is Family Reunification for the father. Severence and adoption for the mother. DCS has made Reasonable Efforts to achieve the goals.

**OPINIONS and/or CONCERNS:**

I believe the mother knew what she was doing when she restricted her children's diets, and understands the relationship between nutrition and disease, as evidenced by these facts:

Mrs. Kahraman is a licensed acupuncturist with a master's degree in Traditional Oriental Medicine, and a certified traditional Chinese nutritionist, according to her web page at: https://www.tempeacupunturist.wordpress.com.

It says that she enjoys, "helping people to safely and effectively maintain a healthy body weight. Add to the mix a personal training certification, studies in exercise physiology and a voracious appetite for studying Eastern and Western nutrition."

One of the pillars of Traditional Chinese Medicine is nutrition. Mrs. Kahraman's therapists say she is very smart. Her web page shows she had the educational and professional background to raise healthy, well nourished children. But she pathologized them, and failed to feed them the nutrition they needed.

History shows that the boys began to thrive, shortly after they were taken into DCS care. They were in wheelchairs when they started, and within 2 months, and a varied diet, they were running and jumping all over.

These boys are both stronger together, than they would be apart, and I think it is extremely important not to separate them. It disturbs me that the mother still reports "trusting" Becky Plotner (DCS notes 03-27-20, p.3). Ms. Plotner is an unlicensed "naturopath", and never met the children, but supported and advised Mrs. Kahraman on the infamous GAP diet, along with other medical advice. According to Mrs. Kahraman, Ms. Plotner said, "You can't rush it. Every kid goes at their own pace. If it takes a few years to get there, or a few years to get past stage one, then that is what we need to do." (DCS case notes 03-27-20, p. 3). At the time ▉D.K.▉ and ▉K.K.▉ were taken into care, in a 24 hour period, the boys would only eat; 4 cups of broth, 4 cups of lamb, tablespoons of carrots and beets, and water. They were only 6 years old.

At Dylan's intake on 04/14/14, Mrs. Kahraman reported to Dr. Cindy Schneider, at the Center for Autism Research and Education LLC. "▉D.K.▉ is often aggressive towards his parents and brother and has been known to kick and bite. Separation anxiety is also an issue. ▉D.K.▉ becomes very upset when mother leaves for work and is prone to extreme tantrums. If the parents let him cry at night, he begins to bite his hand. When frustrated, he hits himself lightly in the head." ▉D.K.▉ was 19 months old. Mother said he had recently transition to a low carbohydrate diet, and no potatoes, which he liked. Dr. Schneider began treating ▉D.K.▉ for multiple nutritional deficiencies. I wonder if his behavior was a reflection of his hunger. Dylans' records were redacted.

It bothers me Mrs. Kahraman said she put the boys on the GAP diet, and "the kids were calmer and more focused with less anger and crying spells." "▉K.K.▉ stopped skipping meals and finally loved all the food, he craved food." (DCS case notes- interview w Mrs. Kahraman 03-27-2020 p 3). Children cry and get upset when they're hungry. He was only 3 years old.

I am concerned she ignored medical advice of many doctors, such as Dr. Schneider's response to an email

AZ-KAHRAMAN031317

from Mrs. Kahraman's dated 06/25/14 said, "No, he can't survive on his current diet. He must eat other foods. Please continue to avoid gluten and caesin, but relax all other food restrictions, other than those that cause obvious reactions." ██ was only 21 months at this point.

Doctors are trained to accept that a parent provides a "close enough" picture of a child's symptoms. It takes a tremendous shift in attitude for doctors to acknowledge they have been misled. In an attempt to diagnose the boys leg weaknesses, neurologists suggested general anesthesia to run tests such as an MRI, and ECG. Fortunately, Mrs. Kahraman realized this risk, and chose to defer it. But, she suggested that, if "we just persisted with Dr. Jaffrie, there would have been more of a push towards the G.I. route." It sounds like she regrets that.

I don't know if she feels true remorse for the actual experiences the boys suffered at her hands, or if she has more regret that her actions were discovered. Even if ██ hadn't developed heart failure, the boys were suffering the malnutrition, and emotionally assumed a sick role, based upon mother's behavior. These boys are psychologically and physically vibrant since coming into care.

These are my opinions. I base them on my interactions with the boys, those involved with their case, and records obtained as I've disclosed below.

My role, and goal, is to represent, what I believe is in the best interests of these boys. That is what I base my recommendations on.

## RECOMMENDATIONS:

1. That ██ and ██ Kahraman remain wards of the Court, committed to the care, custody, and control of DCS.
2. That ██ and ██ remain in their current placement.
3. That services currently in place be continued.
4. That the boys start routine childhood vaccinations.
5. That the parents continue to participate in counseling and all case plan tasks.
6. That supervised visits continue with the mom and parent aide visits with the dad.
7. That the case plan goal of family reunification be affirmed for the dad.
8. That case plan goal be changed to severance and adoption for the mom.

## RESOURCES:
## Persons of Interest and/or Interviewed Since Last Report:

Children
Parents
Foster Mother
DCS case manager
FCRB
East Valley Children's Center
Angel Pediatrics
Cardon Children's hospital ██
Phoenix Children's Hospital
Dr Jody Carter's letter of opinion
East Valley Children's Center

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

Center for Autism
Dr. Mary Oakley

**Records Reviewed Since Last Report:**
Comprehensive Child Safety Evaluation dated 12-18-18
DCS court reports dated 01-08-19, 12-06-20, 04-27-20
Records from JCFS
Records from Southwest Human Development
Dr. Michael Kelly's review and recommendations
Banner records for D.K.
Banner records for K.K.
School records
DCS case notes
Dr. Rodriguez
Buwalda Psychological Services
SWHD
Laura Jochai
All documents filed with the Juvenile Court

**"THIS DOCUMENT IS DISCLOSED PURSUANT TO RULE 44(a)(3),RULES OF PROCEDURE OF THE JUVENILE COURT, AND IS OTHERWISE CONFIDENTIAL PURSUANT TO A.R.S. § 8 - 522(F), RULE 47(A), RULES OF PROCEDURE OF THE JUVENILE COURT, AND ACJA § 7 - 101(G).THIS DOCUMENT CANNOT BE DISCLOSED EXCEPT UPON ORDER OF THE COURT OR AS OTHERWISE PROVIDED BY LAW."**

**Respectfully submitted,**

**Susan Stark**
**Court Appointed Special Advocate**



# CASA COURT REPORT
## DISTRIBUTION FORM

| | | | |
|---|---|---|---|
| Kahraman | | 532206 | 5-12-2020 |
| CASE NAME | | JD# | HEARING DATE |
| Susan Stark | | | 5-5-2020 |
| CASA | | | DATE SUBMITTED |

| | | |
|---|---|---|
| 05-11-2020 | Hon. Jennifer Green | n/a |
| DISTRIBUTION DATE | HEARING OFFICER | EMAIL ADDRESS |
| 05-11-2020 | Shelby DeMassari | n/a |
| DISTRIBUTION DATE | JUDICIAL ASSISTANT | EMAIL ADDRESS |
| 05-11-2020 | Madison Bell | madison.bell@azdcs.gov |
| DISTRIBUTION DATE | DCS CASE MANAGER | EMAIL ADDRESS |
| 05-11-2020 | Kinda Johnson-Hurd | oladep@maricopa.gov |
| DISTRIBUTION DATE | CHILDREN'S GAL | EMAIL ADDRESS |
| 05-11-2020 | DeeAn Gillespie Strub | mailroom@gillaw.com |
| DISTRIBUTION DATE | MOTHER'S ATTORNEY | EMAIL ADDRESS |
| 05-11-2020 | Suzanne Nicholls | suzanne.nicholls@maricopa.gov |
| DISTRIBUTION DATE | FATHER'S ATTORNEY | EMAIL ADDRESS |
| 05-11-2020 | FCRB | rptfcrb@courts.az.gov |
| DISTRIBUTION DATE | | EMAIL ADDRESS |
| 05-11-2020 | AAG | psssef@azag.gov |
| DISTRIBUTION DATE | | EMAIL ADDRESS |
| 05-11-2020 | Court Clerk | Hand-delivered |
| DISTRIBUTION DATE | | |

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031320



Clerk of the Superior Court
*** Electronically Filed ***
5/15/2020 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    5/12/2020

                                                    CLERK OF THE COURT
HONORABLE JENNIFER E. GREEN                          D. Swan
                                                    Deputy

IN THE MATTER OF:

D.K. ▮▮▮▮ KAHRAMAN                          KINDA  JOHNSON-HURD
F1149031
DOB: 9/27/2012
K.K. ▮▮▮▮ KAHRAMAN
F1149032
DOB: 9/27/2012

                                            JANNA LEE JOHNSON

                                            DEEAN  GILLESPIE STRUB

                                            SUZANNE M NICHOLLS

                                            CASA
                                            DCS SPECIALIST - MARICOPA EAST
                                            REGION

                    EVIDENTIARY HEARING
                MATTER TAKEN UNDER ADVISEMENT

                    REPORT AND REVIEW HEARING


    Prior to the hearing commencing, Exhibits 1 through 30 are marked for identification.

    1:31 p.m.  This matter is digitally recorded in Courtroom 3.

    This is the time set for Evidentiary Hearing on Mother's Rule 59 Motion.

    This is the time set for Report and Review Hearing.


Docket Code EVIDIIRG                Form JDRNR                        Page 1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028142

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    5/12/2020

LET THE RECORD REFLECT that all appearances are being made telephonically via the Bridge Line and/or virtually via GTM.

Present:  Counsel for the Department, Assistant Attorney General, Janna Johnson and Gregory Coordes; DCS Child Safety Specialist, Madison Bell; guardian ad litem for the children, Kinda Johnson-Hurd; CASA, Susan Stark; counsel for Mother, DeeAn Gillespie Strub; Mother, Jessica Kahraman; counsel for Father, Rachel Metelits appearing for Suzanne Nicholls; Father, Ahmet Kahraman assisted by Court Interpreter; Court Interpreter, Ms. Fogner; and Conciliation Services, Amy Steemke observing.

All attendees of the hearing are admonished by the Court from disclosing any personally identifiable information mentioned in the proceedings and that doing so shall be deemed in contempt of court.

Discussion is held.

IT IS ORDERED denying Mother's Motion for Re-Allotment of Time and Reconsideration.

Further discussion is held.

The court finds Mother's Motions filed as Moot.

As to the Evidentiary Hearing,

Mother, Jessica Kahraman and DCS Child Safety Specialist, Madison Bell are sworn.

Further discussion is held.

The court releases Dr. Kelly.

Counsel for Mother makes avowals to the court.

Mother testifies.

Counsel for Mother offers Exhibit 19.

The witness is excused and remains in the courtroom.

Docket Code EVIDHRG                    Form JDRNR                            Page 2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028143

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                          5/12/2020

Madison Bell testifies.

Exhibits 1-3 are admitted into evidence without objection.

The Department moves to withdraw Exhibit 4 as a duplicate.

IT IS ORDERED granting the oral motion and withdrawing Exhibit 4.

Exhibit 9 is admitted into evidence without objection.

Madison Bell continues to testify.

Exhibit 8 admitted into evidence without objection.

Madison Bell continues to testify.

Exhibit 5 admitted into evidence without objection.

The parties stipulate to Exhibit 20 being admitted into evidence.

Madison Bell continues to testify.

Exhibits 6 and 7 admitted into evidence over the objection of counsel for Mother.

LET THE RECORD REFLECT that the Department will pause on Ms. Bell's testimony.

3:09 p.m.  The court takes a brief recess but FTR remains on.

3:13 p.m.  The hearing resumes.  Same parties are present with the addition of Dr. Kelly Rodriguez.

Dr. Kelly Rodriguez is sworn and testifies.

3:35 p.m.  The witness is excused, is released by the court and her telephonic appearance ends.

Madison Bell previously sworn resumes testifying.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028144

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              5/12/2020

The witness is excused and remains on GTM.

Discussion is held.

The court will take judicial notice of the Family Court matter.

Exhibits 10, 12, 14, 19, 29 and 30 are admitted into evidence without objection.

Exhibits 18 is admitted into evidence over the objection of the Department.

Exhibit 26 is admitted into evidence over the objection of the Department and counsel for Father.

LET THE RECORD REFLECT all exhibits not admitted into evidence will be released by the Clerk's Office to Ms. Gillespie-Strub.

Counsel for Mother requests to recall Mother for rebuttal testimony.

The Department objects.

IT IS ORDERED denying Mother being recalled for rebuttal testimony.

Closing arguments are present.

The court shall the Rule 59 Motion under advisement.

Counsel for Mother requests time to file a reply to the Motion for Injunctive Relief, and there being no objection,

IT IS ORDERED granting Mother's request to file a Reply.

As to the Report and Review Hearing,

The court has read and considered the DCS child safety specialist's report.

Discussion is held.

The Department moves for a change of case plan to Severance and Adoption.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028145

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    5/12/2020

Further discussion is held.

GAL and Mother object.  Father and CASA do not object.

The court will preserve ruling on the oral motion for change of case plan to Severance and Adoption after reviewing the exhibits.

Counsel for Mother requests a Contested Report and Review.

The court will set a Report and Review Hearing for 30 minutes.

The case plan remains Family Reunification.

Based on the matters presented,

THE COURT FINDS that the children continue to be dependent according to the statutes.

IT IS ORDERED that the above-named children remain wards of the Court in the legal care, custody and control of the Department of Child Safety.

IT IS ORDERED affirming current legal custody and placement orders.

THE COURT FINDS that there is a need for out-of-home care based upon the information presented, foster care being necessary to protect the children's welfare.

IT IS ORDERED reassigning this matter to the Foster Care Review Board to review this matter at least every six months as long as the children remain in out-of-home care to determine what efforts have been made by the Department of Child Safety to carry out the plan for permanent placement.

THE COURT FINDS that the Department of Child Safety has made reasonable efforts to finalize the permanency plan for the child(ren).

Counsel for the Department shall submit ASFA Findings, and over the objection of counsel for Mother,

IT IS ORDERED adopting same and signing the formal, written Order upon receipt.

Docket Code EVIDHRG                    Form JDRNR                              Page 5

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028146

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                5/12/2020

IT IS ORDERED setting this matter for Dependency – Contested Report & Review

   on  8/14/2020
   at   9:00 AM (30 minutes)
   before Honorable Jennifer E. Green
   at the Maricopa County Juvenile Court Center
   Southeast Facility, 1810 S. Lewis St., Mesa, AZ 85210

The DCS child safety specialist shall provide a report to the Court and the parties at least fifteen (15) days prior to the hearing which shall address:
1. The placement of the child;
2. The services being provided to the child and family;
3. The progress the parties have made in achieving the case plan goals; and
4. Whether the child continues to be dependent.

Any party seeking an evidentiary hearing on any issue shall file a motion requesting that the matter be set for a contested hearing. The motion shall identify the issues to be litigated, the names and addresses of all witnesses and the estimated time the parties will need to present evidence. The Court may reset the matter or proceed with the hearing as scheduled.

This Courtroom utilizes an electronic recording system for the Court's record. If a court reporter is needed, a written request must be filed with the Clerk of the Court and a copy provided to the assigned judicial officer at least 72 hours before the commencement of the proceeding.

To order a copy of the audio record on compact disc (CD), please call Juvenile Court Administration (Durango facility - 602-506-4533/Southeast facility - 602-506-2544). There will be a fee of $30 for each copy of the Superior Court proceedings. All copies will be provided using Court-supplied media.

   4:57 p.m. Court adjourns.

IT IS ORDERED, pursuant to Arizona Revised Statutes, that any and all schools, school districts and personnel thereof shall fully cooperate with juvenile probation officers, DCS child safety specialists, and attorneys or guardian ad litem or Court appointed special advocates representing a child in a dependency or delinquency action by allowing access by them to all educational records of the child, including but not limited to records pertaining to school, attendance, behavior, academic progress, and psychological evaluations, and shall discuss the

Docket Code EVIDHRG      Form JDRNR        Page 6

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028147

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              5/12/2020

contents and meaning thereof with them to assist them in the preparation, implementation, and completion of a rehabilitation and treatment plan for the child.

WARNING

As a parent, it is your responsibility to cooperate with all services offered, and work toward return of your children.  A failure to do so, within a reasonable period of time, may mean losing your children forever through termination of your rights and adoption.

| /s/ | HONORABLE JENNIFER E. GREEN |
| --- | --- |
|  | HONORABLE JENNIFER E. GREEN |

DATE

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN028148

OFFICE OF THE PUBLIC ADVOCATE
Rachel Metelits, State Bar No. 029049
106 E. Baseline Road
Mesa, AZ 85209
Phone: (602) 372-2815
Opa-DepMes@maricopa.gov
rachel.metelits@maricopa.gov
*Attorney for Father*



CLERK OF THE
SUPERIOR COURT
FILED

C. Mohammed DEP
2020 MAY 18 PM 4:10

EXHIBIT 259
BELL
8-23-24 H4b

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA
JUVENILE DIVISION**

In the Matter of:

D.K. ████ KAHRAMAN,
D.O.B. ████ 2012

K.K. ████ KAHRAMAN,
D.O.B. ████ 2012

Person(s) under 18 years of age.

CASE NO: JD532206

**FATHER'S OBJECTION TO
MOTHER'S MOTION FOR
INJUNCTIVE RELIEF**

(Honorable Jennifer E. Green)

Father, AHMET KAHRAMAN, respectfully objects to Mother's Motion for

Injunctive Relief ("Motion"), yet to be filed according to the docket, but emailed to

formerly assigned counsel on May 11, 2020.

## I.    Currently, DCS is making reasonable efforts to reunify the family.

Father believes that currently the Department of Child Safety is making reasonable

efforts to reunify the family, pursuant to A.R.S. § 8-829 and A.R.S. § 8-436(A). Father

objects to the relief being sought by Mother as it would be unduly burdensome to the

case. Father believes the case manager is well versed in the nuances of the case and

removal of her from the case would not be in the best interest of his children DLYAN

and K.K. ████ Ariz. R. Juv. P. 36.

1

AZ-KAHRAMAN031200

## II.    Injunctive relief is not appropriate for the issues raised by Mother.

Father does not believe that the requested injunctive relief is appropriate, pursuant to A.R.S. § 12-1801, because the case manager's conduct is not prejudicial, is not violating Mother's rights, and is not required based on the principles of equity.   If Mother does not believe a service being provided to her is appropriate, the remedy would be the appropriate service, not the removal to the Department of Child Safety's agent assigned to the case.

It appears that rather than complying with the procedural requirements for seeking injunctive relief outlined in A.R.S. § 12-1803, regarding the time and manner, Mother's counsel has filed this Motion in an effort to place Dr. Newberger's report before this Court, when its presentation at the recent Rule 59 hearing was precluded on May 11, 20202.

The caselaw Mother relies on does reinforce the notion that if "public officers act 'unlawfully,' … an injunction may issue to prevent unlawful conduct, when they exceed their authority or exercise discretionary authority in an unreasonable or arbitrary manner." *Boruch v. State ex rel. Halikowski*, 242 Ariz. 611, 399 P.3d 686 (Ct. App. 2017). However, such a remedy would require a showing of "unlawful conduct" or "unreasonable exercise of discretion." *Id.* A.R.S. A.R.S. § 12-1802(6). Such a showing has not been made, nor would be the reasonable conclusion of a case manager coordinating services as required, pursuant to A.R.S. § 8-454 and A.R.S. § 8-457.

///
///
///

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031201

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.    Conclusion

For the reasons stated above, Father objects to Mother's Motion as currently the Department of Child Safety is providing reasonable efforts to reunify the family, the requested relief would not be in the best interest of the children, and the request for injunctive relief was not properly made.

Respectfully submitted this 18th day of May, 2020.

SABRINA AYERS FISHER
OFFICE OF THE PUBLIC ADVOCATE

By _____
RACHEL METELITS
Deputy Public Advocate

3

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031202

1    ORIGINAL filed this 18th day of
2    May, 2020, and a COPY delivered to:

3    Honorable Jennifer E. Green
     Maricopa County Superior Court
4    1810 S Lewis St.
5    Mesa, AZ 85210

6    COPIES electronically delivered
7    this 18th day of May, 2020, to:

8    Kathleen Martoncik
     Janna Johnson
9    Gregory Coordes
     Assistant Attorneys General
10   PSSSEF@azag.gov; kathleen.martoncik@azag.gov; Janna.Johnson@azag.gov;
11   Gregory.coordes@azag.gov
     *Attorneys for DCS*
12
13   Kinda Johnson-Hurd
     JohnsonK010@mail.maricopa.gov
14   *Guardian ad litem for Children*

15   DeeAn Gillespie
16   DGillespie@gillaw.com; Mailroom@gillaw.com
     *Attorney for Mother*
17
     Madison Bell
18   madison.bell@azdcs.gov
     *DCS Case Manager*
19

20

21

22   By _____

23

24

25

26

27

28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

4

AZ-KAHRAMAN031203

1   OFFICE OF THE PUBLIC ADVOCATE
    Rachel Metelits, State Bar No. 029049
2   106 E. Baseline Road
3   Mesa, AZ 85209
    Phone: (602) 372-2815
4   Opa-DepMes@maricopa.gov
    rachel.metelits@maricopa.gov
5   *Attorney for Father*





6

7              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8                 IN AND FOR THE COUNTY OF MARICOPA

9                          JUVENILE DIVISION

10  In the Matter of:                    CASE NO: JD532206

11  D.K. ████████ KAHRAMAN,              **FATHER'S OBJECTION TO
    D.O.B. ████ 2012                      MOTHER'S MOTION TO
12  K.K. ████████ KAHRAMAN,              DISCLOSE REDACTED MINUTE
13  D.O.B. ████ 2012                      ENTRY IN CASE JS19309 TO
                                          THE PARTIES IN THIS CASE**
14
15  Person(s) under 18 years of age.     (Honorable Jennifer E. Green)

16          Father, AHMET KAHRAMAN, respectfully objects to Mother's Motion to
17
18  Disclose Redacted Minute Entry in case JS19309 to the parties in this case ("Motion"),
19  filed on May 21, 2020.

20

21  **I.    Disclosure of a ruling in another matter is not relevant to *this* proceeding.**
22
23          Disclosure of a ruling in another matter is not necessary nor is it relevant to this
24  proceeding. The ruling of a judicial officer on the purported conduct by an agency in
25  another case with different parents and facts is not relevant to this matter. This Court
26  is best suited to determine the appropriateness of reunification services in this case,
27  including providers. Denying Mother's request is not a violation of due process
28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031204

because Mother is able to raise the issues and facts in *this* case without relying on the facts and findings of another case wherein the parties were not the same.

## II. Disclosure of a ruling in another matter is at the Court's discretion, not that of another party, subject to Arizona Supreme Court Rule 123.

Disclosure of a ruling or minute entry from juvenile court would be subject to Arizona Supreme Court Rule 123(d)(1)(B) which requires a court order for dissemination. Mother's counsel did not request this process before inserting the ruling at issue in the underlying Motion. Arizona Supreme Court Rule 123 does refer to the cited to Arizona Rule of Juvenile Court 47, wherein a court order would be necessary for disclosure. Such disclosure, again, is by the Court and not by a party.

## III. Disclosure of a ruling in another matter would likely include "DCS" information as defined by A.R.S. § 8-807, which requires further analysis before release.

Mother's counsel's request to disclose a redacted minute entry seems likely to include "DCS information" as defined by A.R.S. § 8-807(X). [1]  Mother's counsel received such information as a party to *that* matter, pursuant to A.R.S. § 8-807(C), but not the ability to disclose such information in *this* case. Release of any DCS information not specifically enumerated A.R.S. § 8-807, reverts to the balancing test in subsection K. *Hanson v. Rowe*, 18 Ariz. App. 131, 500 P.2d 916 (1972). In short, to release DCS information after an *in camera* review, the Court would need to make

---

[1] Based on a plain reading of Mother's Motion, DCS information, as defined by A.R.S. § 8-807(X) has already been released without a basis enumerated in the statute.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031205

a determination that "the rights of the parties seeking DCS information [in this matter] outweighs the rights of the parties who are entitled to confidentiality" in JS19309. A.R.S. § 8-807(K). Without such a finding, release of DCS information related to another case would be improper.

## IV.   Conclusion

For the reasons stated above, Father objects to Mother's Motion and request the Court deny Mother's Motion.

Respectfully submitted this 28th day of May, 2020.

SABRINA AYERS FISHER
OFFICE OF THE PUBLIC ADVOCATE

By_____

RACHEL METELITS
Deputy Public Advocate

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031206

ORIGINAL filed this 28th day of
May, 2020, and a COPY delivered to:

Honorable Jennifer E. Green
Maricopa County Superior Court
1810 S Lewis St.
Mesa, AZ 85210

COPIES electronically delivered
this 28th day of May, 2020, to:

Kathleen Martoncik
Janna Johnson
Gregory Coordes
Assistant Attorneys General
PSSSEF@azag.gov; kathleen.martoncik@azag.gov; Janna.Johnson@azag.gov;
Gregory.coordes@azag.gov
*Attorneys for DCS*

Kinda Johnson-Hurd
JohnsonK010@mail.maricopa.gov
*Guardian ad litem for Children*

DeeAn Gillespie
DGillespie@gillaw.com; Mailroom@gillaw.com
*Attorney for Mother*

Madison Bell
madison.bell@azdcs.gov
*DCS Case Manager*

By _____

**4**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031207

CLERK OF THE
SUPERIOR COURT
FILED
~~Savanna~~ DEP
2020 MAY 28 PH 4: 28

**GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**

7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
Email: mailroom@gillaw.com

EXHIBIT 2e1
BELL
8-23-24 HTD

**DeeAn Gillespie Strub #009987**
*Attorney for Respondent*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| In re: the matter of: | No. JD532206 |
|---|---|
| **D.K.** KAHRAMAN (d.o.b. 9/27/12), | **MOTHER'S JOINT REPLY REGARDING MOTHER'S MOTION FOR INJUNCTIVE RELIEF-MADISON BELL** |
| **K.K.** KAHRAMAN (d.o.b. 9/27/12), | *(Assigned to the Hon. Jennifer Green)* |
| Persons under 18 years of age. | |

On May 11, Mother filed a motion asking this Court to enjoin DCS from continuing to act in violation of statutory law, and in violation of the Federal and Arizona Constitution by continuing to have DCS Case worker Madison Bell assigned to this case. As the record amply demonstrates, Ms. Bell has failed and continues to fail to comply with the law, and is exercising the power entrusted to her as an agent of the state, in an arbitrary and unreasonable manner. As explained below, the arguments asserted by Father and DCS for this Court to allow the continued unlawful action by DCS fail. For the reasons stated in Mother's motion and below, Mother asks that this Court grant Mother's motion.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031615

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   This Court has the power, authority, and obligation, to grant injunctive relief to stop the unlawful actions of members of the executive.**

In its DCS response, DCS claims that this Court lacks the power to enjoin the state from committing unlawful acts because doing so would be a violation of the separation of powers. DCS's argument appears to be that because this Court does not have the power to replace a case worker when that worker is complying with the law, this Court also lacks the power to enjoin DCS to replace a case worker when that worker is not complying with the law. This argument is confusing, and wrong.

Mother's argument was clear and straightforward. DCS is legally required to make reasonable efforts to reunite Mother's family. DCS is not doing so. DCS is thus violating the law. Mother wants this Court to enjoin DCS from continuing to violate the law. Rather than respond to Mother's actual argument however, confusingly and without explanation, DCS instead responds to a fabricated argument of its own creation. DCS claims: "There is no constitutional guarantee to choice of case manager, nor is there a liberty interest in ensuring choice of case manager, thus the Court cannot encroach on the executive by ordering an employee removed from a case." (DCS Response at 5.) This argument makes absolutely no sense, nor does it in any rational way respond to Mother's motion. Mother's motion in no way argues, nor could it reasonably be mistaken to argue, that she is constitutionally entitled to a certain case manager or that she has a liberty interest in ensuring a choice of case manager. Mother did not make such a ridiculous argument. What Mother argues is that she is constitutionally guaranteed to the State's reasonable efforts to reunite her with her children and

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031616

that she has a liberty interest in the custody of her children. Indeed, "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). As the agency responsible for the care of Mother's children, DCS has the constitutional and statutory obligation to "make reasonable efforts to preserve the family." *Donald W.*, 247 Ariz. 9, 22 ¶ 46 (App. 2019). It is incredibly disingenuous for DCS to blatantly ignore the exact liberty interest at issue, and then claim that there is no liberty interest at issue. Ignoring the law "is not responsible litigation; a lawyer looks undignified with his head in the sand." *Bovee v. Broom*, 732 F.3d 743, 745 (7th Cir. 2013). "The belief that ostriches stick their heads in the sand to avoid seeing danger is a canard. Lawyers shouldn't do it either." *Id.*

Mother has a liberty interest in the custody of her children. DCS is failing to fulfill its statutory and constitutional obligations to protect that interest. It is behaving unlawfully. Under the well-established and binding law of this state, this Court absolutely has the authority to enjoin DCS from engaging in conduct that is unlawful. *Boruch v. State ex rel. Halikowski*, 242 Ariz. 611, 617, ¶ 18 (App. 2017). The United States Supreme Court "long ago recognized" that the availability of "injunctive relief" is "essential to prevent great, immediate, and irreparable loss of a person's constitutional rights." *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (citations omitted). This Court should reject DCS's invitation to disavow its authority to grant this "essential" relief.

The juvenile court has the independent authority and particular obligation to "oversee the dependency case, to consider the best interests of the child in every

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031617

decision, and to 'independently review the decisions and recommendations of [A]DES.'" *Alexander M. v. Abrams*, 235 Ariz. 104, 107, ¶ 15 (2014) (quoting *In re Maricopa Cnty. Juv. Action No. JD-6235*, 178 Ariz. 449, 452 (App. 1994)). It is not only appropriate, but authorized and required, that the Court reviews DCS decisions and actions, including the decisions and actions of DCS caseworkers. Part of this Court's obligation to review the decisions of DCS caseworkers includes its obligation to take action when, as here, those caseworkers are violating the law.

DCS's assertion that it has the authority to violate the law simply because it is a member of the executive branch, and that this Court is powerless to take any action to stop it, is disturbing. It is also wrong. "The principle that should guide the Court in deciding this question was stated long ago by Chief Justice Marshall: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Nixon v. Fitzgerald*, 457 U.S. 731, 783 (1982) (WHITE, J, dissenting) citing *Marbury v. Madison*, 1 Cranch 137, 163 (1803). "To the extent that the Court denies an otherwise appropriate remedy, it denies the victim the right to be made whole and, therefore, denies him "the protection of the laws." *Id.* Mother is entitled to the protection of the laws. DCS is violating the law. DCS's assertion that this Court is powerless to make Mother whole, and must stand-by while DCS violates her constitutional rights, fails. In this country, such an argument must always fail.

II. **There is nothing untoward about Mother submitting evidence in support of her motion with her motion.**

In their respective responses, both DCS and Father contend that it was somehow improper for Mother to attach Dr. Newberger's report, which provides

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031618

evidence supporting Mother's motion, to her motion. This assertion relies on the underlying assumption that this Court lacks the capability of considering Dr. Newberger's report only for the proper purpose of deciding Mother's motion, and not for the improper purpose of deciding Mother's Rule 59 motion, where this Court ruled the report was precluded. The assertion also relies on the proposition that Mother's litigation decisions about whether to attach evidence supporting her motion must be guided, and limited by, Father's and DCS's insult to this Court's capabilities. In fact, Mother is not so limited. Nor must she be. This argument is wholly without merit.

Courts, and juries for that matter, are often called upon to consider evidence only for a stated purpose, and required not to consider evidence for another purpose. Courts have this capability. Contrary to DCS and Father, Mother is confident that this Court possesses such a capability. Mother submitted Dr. Newberger's report in support of her motion based on her confidence in this Court's ability to consider the report only for its proper purpose. There was nothing nefarious about Mother's failure to share in DCS's and Father's unfounded lack of confidence in this Court's capabilities.

## III.  Mother's request for injunctive relief was procedurally proper.

In his response, Father contends that injunctive relief is inappropriate under A.R.S. § 12-1801. Father, however, fails to explain his contention. That statute grants judges of the superior court authority to grant injunctive relief when the party requesting it "is entitled to the relief demanded." A.R.S. § 12-1801(1). Rather than not supporting Mother's request, this statute supports Mother's entitlement to injunctive relief.

Additionally, Father contends that the request for injunctive relief does not

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031619

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

comply with A.R.S. § 12-1803. Again, Father fails to explain how Mother's request does not comply with this statute, and no lack of compliance is apparent. By its terms, A.R.S. § 12-1803 applies when a suit is filed for the purpose of obtaining an injunction, not when a request for injunction is filed during pending litigation. That is not the case here. As such, the statute does not apply.

IV.  **Ms. Bell is acting unlawfully**.

Ms. Bell is not making reasonable efforts to reunify Mother with her children. Thus, she is violating the law.

In its response, DCS claims that Mother is "not entitled to injunctive relief," not because Ms. Bell is complying with the law and not violating Mother's constitutional rights. Rather, DCS contends that Mother is not entitled to injunctive relief because Ms. Bell "has in-depth knowledge of the unique and complex issues present in the case" and claims that "enjoining her from the case causes unnecessary delay in finalizing a permanency plan for these children." (DCS Response at 7.) DCS thus contends that Mother is not entitled to not have her constitutional rights violated as long as the state actor violating her constitutional rights has knowledge of her case. DCS cites no law to support its contention that a certain amount of knowledge insulates a state actor, and grants them immunity for the violation constitutional rights, nor could it. Such a contention is wholly unsupportable. Equally unsupportable is DCS's contention that it is free to violate Mother's constitutional rights because not violating her rights would cause a delay in finalizing a permanency plan. There is no support for DCS's contention that its interest in finalizing a permanency plan must, or even should, take precedence over the state not violating constitutional rights. "As the Supreme Court made clear in *Santosky*, until a court finds grounds for

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031620

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

termination, parent and child "share a vital interest in preventing erroneous termination of their natural relationship." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286, (2005) citing *Santosky v. Kramer*, 455 U.S. 745, 760 (1982). The State's interest in rushing toward a permanency plan, at the expense of Mother's and her children's vital interest in their relationship, in no way justifies their continued violation of Mother's constitutional rights.

Conspicuously absent from DCS's response was an explanation of how the specific acts of Ms. Bell that clearly demonstrated how she is taking action to undermine reunification efforts, rather than making reasonable efforts to further the reunification of Mother with her children, were in actuality, not examples of such actions. DCS does not justify Ms. Bell's actions because no justification or explanation is possible. Ms. Bell is violating Mother's constitutional rights.

During the May 12, 2020 hearing, Ms. Bell's testimony provided further evidence of her failure to comply with the law and make reasonable efforts to reunite Mother and her children. Throughout the time DCS has had Mother's children, Ms. Bell has repeatedly manipulated the facts in this case to manufacture DCS's narrative against Mother. She has also demonstrated a disturbing propensity for minimizing or overlooking Mother's positive achievements or progress in this matter. Throughout this matter, Ms. Bell has amplified minor concerns, twisted unclear comments, and placed words in the mouths of providers.

As one example, earlier in this matter, Mother was very concerned when she discovered that the family residence contained elevated levels of toxic mold. Her consultations with different medical professionals left her with the understanding that this *might* have been a contributing factor to her children's issues, but that the

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031621

degree of to which this may have contributed was unknown and that her children's caloric consumption was the primary issue. Mother herself testified to that fact. (Exhibit R-A (5/12/20 *Hearing Transcript* at 12-13, 19.) Mother outright admitted that she did not know for sure as she was not a medical doctor. (*Id.* at 20.) Despite Mother's repeated statements, and all of the evidence to the contrary, Ms. Bell irrationally continues to claim that Mother is adamant that mold is a primary concern, if not the only issue. At the hearing, Ms. Bell testified:

> [Mother] is argumentative with me about it and she does bring up the fact that she does still believe that the mold and previous thyroid issues with Keenan are a major cause for all of these issues and she has not anything to do with it… I heard her speak a lot about how mold is a main issue and was a main issue.

(Exhibit R-A (5/12/20 *Hearing Transcript*) at 59-60).

When Mother's counsel confronted Ms. Bell with contradictory statements made by Dr. Rodriguez, each time Ms. Bell denied actually hearing those statements. When asked if she heard Dr. Rodriguez testify that Mother recognized her behaviors had caused harm to the boys, Ms. Bell answered, "I don't recall Dr. Rodriguez saying that but I know she did cut out a little bit for me so I can't say whether or not she did." (*Id.* at 65). When asked if she heard Dr. Rodriguez confirm that Mother displayed general remorse and is having an open and honest conversation about her behavior, Ms. Bell made a similar denial: "I did not. But once again she cut out a little bit for me so I can't say whether she did or did not say that." (*Id.* at 65).

Madison Bell's testimony contained a further litany of misrepresentations, which all were negative toward Mother:

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031622

- "[Mother] still hasn't taken accountability for her role and what effect she has caused on her children" (*Id.* at 38).

- "Mother does not believe that she was the reason that her children were malnourished that she can't get her as a therapy goal to make her take accountability for something that she doesn't believe happened… When I talked with Dr. Rodriguez she informed me that while she takes accountability, she can't really take accountability for her role in the malnutrition because she does not believe that had happened" (*Id.* at 39).

- AAG Johnson:    Does Ms. Rodriguez have an opinion as to whether or not Ms. Kahraman is able to safely parent on her own?

  Ms. Bell:    Yes she did provide an opinion.

  AAG Johnson:    And what was that opinion?

  Ms. Bell:    That at this point she is not able to safely parent independently. (*Id.* at 40).

The testimony of Dr. Kelly Rodriguez, however, directly contradicted these misrepresentations by Ms. Bell. Dr. Rodriguez confirmed that Mother had stated to her that she would never put her sons back on the GAPS diet or restrict their food again, (*id.* at 47), and that she admitted to relying too heavily on certain less-qualified providers, (*id.* at 49), and that her choices were at fault for the boys' malnutrition (*id.* at 53). Dr. Rodriguez further confirmed that she informed both Ms. Bell and the case manager at Southwest Human Development that Mother could appropriately parent her sons today if provided with a safety plan. (*Id.* at 47.) Dr. Rodriguez also confirmed that she believed Mother had accomplished all of the goals she had been given as of August 2018, prior to being given a new set of objectives by DCS. (*Id.* at 50.)

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031623

Ms. Bell further testified: "[Mother] trusts [GAPS diet expert] Becky Plotner, that she has full faith in Becky Plotner, and that she is very thankful for everything that Becky Plotner had done for her." (*Id.* at 59.) Not only does this testimony not make any logical sense, because no rational person in Mother's position would trust Ms. Plotner or tell Ms. Bell that they did so, it is also false. And Ms. Bell knew it was false when she made this statement during her testimony.

| | |
|---|---|
| Ms. Strub: | …There was a report that was brought to your Review Board that you told someone recently you continue to trust Becky Plotner, the out of state nutritionist that you relied upon prior to the boys' hospitalization. Did you ever say that? |
| Mother: | No. |
| Ms. Strub: | Do you know where that would have come from? |
| Mother: | No. Other than I mean I know that my husband and I are going through marital issues right now. So, he may have opined that but I hadn't spoken to... |

(*Id.* at 16)

| | |
|---|---|
| AAG Johnson: | And, isn't it true that in your discussion with Ms. Bell you told her that while you wouldn't trust out of state providers, you would trust Ms. Plotner. |
| Mother: | That is not true. I did not say that. |
| AAG Johnson: | It's Ms. Bell's note from that staffing indicates that you said that. Is it your testimony today that that's inaccurate? |
| Mother: | Yes. |
| AAG Johnson: | So, so far the records that don't advance your position |

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

10

AZ-KAHRAMAN031624

| | | |
|---|---|---|

in terms of hospital records are inaccurate. Ms. Bell's reporting of your meeting is inaccurate and reports from Dr. Miga are inaccurate. Is that correct so far?

Mother:    I have not seen inaccurate reports from Dr. Miga but I did provide clarification immediately after my conversation with Ms. Bell. I also corrected her.

(*Id.* at 20.)

After the case plan staffing telephone—during which Ms. Bell claims that Mother stated that she continues to trust Ms. Plotner—Mother immediately sent Ms. Bell an email to memorialize the conversation. (Exhibit R-B (Mother's Case Plan Email.) Mother made clear to Ms. Bell that she would never put her children back on the GAPS diet. Mother also sent a document to Ms. Bell in which she specifically discussed how she had put too much trust in Ms. Plotner, and that she would never again trust or work with an out-of-state practitioner like Ms. Plotner. (Exhibit R-C (Mother's Notes of Case Plan Staffing.) Even if it were at all possible that Ms. Bell could have somehow misunderstood Mother's expression of distrust of Ms. Plotner to have actually been an expression of trust—despite Mother's repeated statements to Dr. Rodriguez and Dr. Oakley that Mother would not ever again trust Ms. Plotner, or any nutritionist that advised the GAPS diet, of which Ms. Bell was well aware—after receiving Mother's email and letter, no rational person could have concluded that Mother had actually made such a statement. Ms. Bell's testimony that Mother stated that she trusted Ms. Plotner was completely false.

Given the circumstances under which Mother's children came into care, Ms. Bell's intentionally false and misleading testimony that Mother continues to place any trust in Ms. Plotner or any intention to return her children to the GAPS

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031625

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

diet is highly prejudicial and unquestionably undermined Mother's efforts to reunite with her children. As a matter of law, efforts to reunify a family are not reasonable "when they undermine the parent." *Donald W.*, 247 Ariz. at 23, ¶ 49. Ms. Bell is failing in her obligation to make reasonable efforts to reunify this family.

Additionally, during the hearing, Dr. Rodriguez's offered her expert opinion that Mother should begin family therapy with her children and this Court ordered:

> …I will say I do believe that we need to explore when it's appropriate for Mother and the kids to engage in family therapy. So, Ms. Johnson if the time is not now I would like to see an email from Ms. Bell to all parties within a week about when is the appropriate time?

(Exhibit R-A (5/12/20 *Hearing Transcript*) at 82.)

Ms. Bell, however, ignored this Court's instruction and failed to send any such email. On May 20, 2020, Mother specifically requested that Ms. Bell arrange for her to start family therapy with her children. (Exhibit R-D (Email re Family therapy).) Yet, as of this filing, Ms. Bell has yet to arrange for Mother to start such therapy. "The State does not…make a "concerted effort to preserve" the parent-child relationship when it neglects to offer the very services that its consulting expert recommends." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶37 (App. 1999). In failing to arrange the family therapy recommended by DCS's own consulting expert, and in ignoring this Court's order, Ms. Bell is failing in her obligation to make reasonable efforts to preserve Mother's relationship with her children.

12

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031626

Furthermore, six months ago, Dr. Rodriguez also recommended that Mother be discharged from therapy because she had met all of the goals required by Ms. Bell. Rather than follow Dr. Rodriguez's recommendation however, Ms. Bell instead unilaterally decided to move the finish line, and provided new goals that Mother was required to meet. Mother has now met those "second set" of goals. (Exhibit R-E (Rodriguez letter of 5/27/20.) Failing to follow Dr. Rodriguez's expert conclusion that Mother had completed therapy, is yet another example of Ms. Bell failing in her obligation to make reasonable efforts to preserve Mother's relationship with her children.

"The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense." *Santosky v. Kramer*, 455 U.S. 745, 763, 102 S. Ct. 1388, 1400, 71 L. Ed. 2d 599 (1982). Furthermore, "because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination." *Id*. Given the awesome and overwhelming power the state has in dependency cases, it is absolutely essential that the state not abuse its power. When the state abuses its power in dependency cases, it is not lost money or property that results; it is the destruction of a family. Ms. Bell is abusing her power. She is violating the law and Mother's constitutional rights. This Court should enjoin her from remaining on this case and continuing to do so.

**V.    Conclusion.**

"In this great country of ours, as it should be, under a Constitution which was ordained to make all men equal under the law, no man is above the law whether he be the President of the United States," *Winsor v. Hunt*, 29 Ariz. 504, 511 (1926), or the Arizona Department of Child Safety. "There is no royal prerogative or official position in this country which exempts one from yielding

13

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031627

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

obeisance to the law." *Id.* DCS is violating the law. It is violating the constitutional rights of Mother. This Court should reject DCS's invitation to abandon over 200 years of legal precedent and determine that DCS is free to continuing to violate the law simply due to its position in the executive branch. DCS should reject DCS's invitation to conclude that as a member of the judicial branch, this Court is powerless to stop its continued violations of the law. This Court has the authority, and the obligation, to hold DCS accountable to the law. Because DCS is violating Mother's constitutional rights, this Court should enjoin it from continuing to do so, and require that it immediately remove Ms. Bell as the case worker in this matter.

Respectfully submitted this 28 day of May, 2020.

GILLESPIE, SHIELDS, GOLDFARB
& TAYLOR

DeeAn Gillespie Strub
*Attorney for Jessica Kahraman*

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

14

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031628

ORIGINAL filed this  day of May, 2020.

COPIES emailed this same date to:

Honorable Jennifer E. Green
*Maricopa County Superior Court*

Gregory Coordes
Janna Johnson
Kathleen Martoncik
*Assistant Attorneys General*
Katheen.martoncik@azag.gov
gregory.coordes@azag.gov
janna.johnson@azag.gov

Kinda Johnson-Hurd
*Guardian ad litem for Children*
johnsonK010@mail.maricopa.gov

Suzanne Nicholls
*Attorney for Father*
suzanne.nicholls@maricopa.gov

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

15

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031629





1  OFFICE OF THE PUBLIC ADVOCATE
2  Rachel Metelits, State Bar No. 029049
   106 E. Baseline Road
3  Mesa, AZ 85209
   Phone: (602) 372-2815
4  Opa-DepMes@maricopa.gov
   rachel.metelits@maricopa.gov
5  *Attorney for Father*
6

7          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
8              IN AND FOR THE COUNTY OF MARICOPA
9                        JUVENILE DIVISION
10

In the Matter of:                    CASE NO: JD532206

11  D.K.          KAHRAMAN,           **FATHER'S OBJECTION TO**
    D.O.B.    2012                    **MOTHER'S MOTION FOR**
12  K.K.          KAHRAMAN,           **INJUNCTIVE RELIEF AND**
    D.O.B.    2012                    **MOTION FOR SANCTIONS**
13
14                                    (Honorable Jennifer E. Green)
15  Person(s) under 18 years of age.
16
17      Father, AHMET KAHRAMAN, respectfully objects to Mother's Motion for
18  Injunctive Relief and Motion for Sanctions ("Motion"), filed on June 2, 2020. Father
19  objects.
20      Father's understanding of why Mother did not participate in a Child and Family
21  Team meeting (CFT) was that she insisted on recording the behavioral health meeting.
22  Mother file a notice regarding her intent to record interactions with DCS and Providers
23  on April 22, 2020. In the Court's Minute Entry dated May 11, 2020 the Court noted that
24  Mother may be in violation of service providers' policies if she recorded. Father is
25  unaware of how compliance with service providers in this matter constitutes an unlawful
26  prohibition as argued Mother. Father is unclear what precipitated the cancellation of
27
28

1

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER                          AZ-KAHRAMAN031208

parenting time for Mother. However, to view the parenting time at issue as retaliation requires additional information that was not posted.

Father takes no position regarding Mother recording her parenting time. He has complied with therapeutic visitation at Southwest Human Development, and hopes Mother can successfully complete this service, as well. Again, the disclosure of information regarding another matter with different parties does not appear to be relevant to this matter, and potentially a violation of Arizona Supreme Court Rule and A.R.S. § 8-807.

For the reasons stated above, Father objects to Mother's Motion for Injunctive Relief and Motion for Sanctions.

Respectfully submitted this 8th day of June, 2020.

SABRINA AYERS FISHER
OFFICE OF THE PUBLIC ADVOCATE

By _____
RACHEL METELITS
Deputy Public Advocate

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031209

1    ORIGINAL filed this 8th day of
2    June, 2020, and a COPY delivered to:

3    Honorable Jennifer E. Green
     Maricopa County Superior Court
4    1810 S Lewis St.
5    Mesa, AZ 85210

6    COPIES electronically delivered
7    this 8th day of June, 2020, to:

8    Kathleen Martoncik
     Janna Johnson
9    Gregory Coordes
10   Assistant Attorneys General
     PSSSEF@azag.gov; kathleen.martoncik@azag.gov; Janna.Johnson@azag.gov;
11   Gregory.coordes@azag.gov
12   *Attorneys for DCS*

13   Kinda Johnson-Hurd
     JohnsonK010@mail.maricopa.gov
14   *Guardian ad litem for Children*

15   DeeAn Gillespie
16   DGillespie@gillaw.com; Mailroom@gillaw.com
     *Attorney for Mother*
17
     Madison Bell
18   madison.bell@azdcs.gov
19   *DCS Case Manager*

20

21

22   By _____

23

24

25

26

27

28

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031210



JD532206

Clerk of the Superior Court
*** Electronically Filed ***
6/18/2020 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

6/11/2020

CLERK OF THE COURT
P. Bryant
Deputy

HONORABLE JENNIFER E. GREEN

IN THE MATTER OF:

D.K.   KAHRAMAN
F1149031
DOB: 9/27/2012

K.K.   KAHRAMAN
F1149032
DOB: 9/27/2012

KINDA  JOHNSON-HURD

JANNA LEE JOHNSON

DEEAN  GILLESPIE STRUB

RACHEL  METELITS

CASA
DCS SPECIALIST - MARICOPA WEST
REGION

UNDER ADVISEMENT RULING
ORDER ENTERED BY THE COURT

On May 12, 2020, the court held an evidentiary hearing on Mother's Motion for Change in Physical Custody, filed February 19, 2020; DCS's Objection, filed February 26, 2020; Father's Objection to Mother's Motion for Change of Physical Custody, filed February 27, 2020; Mother's Offer of Proof in Support of Request for Evidentiary Hearing, filed February 28, 2020; and Mother's Reply Regarding Mother's Motion for a Change in Physical Custody, filed March 25, 2020.  Counsel for Mother waived the Rule 59(B) requirement to hold a hearing within 30 days so she could file a reply.

Docket Code ORDENTERED                Form XPJDBlankME                                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                    6/11/2020


Rule 59 requires the court to hold a hearing to determine "whether return of the children would create a substantial risk of harm to the child's physical, mental or emotional health or safety." Ariz. R.P. Juv. Ct. 59(A). As it is Mother's motion, Mother bears the burden of proof. *Dep't. of Child Safety v. Juan P.*, 245 Ariz. 265, 266, 427 P.3d 785, 786 (App. 2018)(holding "as the moving party, and the one seeking to have [the child] returned to his care, Father bears the burden of establishing that [the child's] return would not create a substantial risk of harm to his physical, mental or emotional health or safety").

The court finds the history of this case is important to understand the context of some of the evidence presented at the hearing. The child K.K. was admitted to Cardon's Children's Medical Center on December 18, 2018 "following a two-month history of inability to walk, [a] three-week history of chest pain, facial swelling, periodic abdominal pain, and two weeks of increasing lethargy." (Exh. 9 at 2.) The doctors diagnosed K.K. with pulmonary hypertension, acute right heart failure, failure to thrive, anasarca, right ventricular dysfunction, ketotic hypoglycemia, lower extremity weakness, pleural effusion, retarded development following protein-calorie malnutrition, unspecified severe protein calorie malnutrition. (*Id.*) K.K. was admitted to the PICU. (*Id.*) Doctors learned that for two years, the parents put the children on a highly restrictive diet, the "Gut and Psychology Syndrome" diet, known as GAPS. (*Id.*) Following the GAPS diet, the children ate New Zealand lamb, broth, carrots, and beets. (*Id.*) In a single day, the children were eating "about four cups broth, four cups meat, ¼ cup carrots and ¼ cup beets," and a quarter to half of an egg yolk "off and on." (*Id.* at 3.) The children's daily caloric intake was 500 calories, and doctors asserted it should be 1,500 calories per day. (*Id.*) Mother reported that they consulted with a GAPS expert in Georgia who had never seen the children in person. (*Id.* at 2-3.)

On December 20, 2018, doctors opined that "[Kenan's] current highly regimented diet does not provide sufficient caloric intake for normal growth/development and has contributed to his extremely poor nutritional status." (*Id.*) There were also concerns that both children could not walk and needed wheelchairs. (*Id.*; Exh. 20 at 331-333.) The parents objected to doctor-recommended medical procedures because of their fear of anesthesia. (Exh. 9 at 2-3.) The court finds credible the medical team's opinion that "the child's health has been directly impacted by parent's [SIC] belief system that values natural adult therapeutics in lieu of accepted pediatric standards of care. Unfortunately, this has likely resulted in the child's current critical cardiac status, overall poor nutritional state and deconditioning that has led to an inability to ambulate. Maria Chico reported that the child is at high risk for further/ongoing poor medical nutritional status in his current environment." (*Id.*)


Docket Code ORDERTERED            Form XPJDBlankME                        Page 2

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031278

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                6/11/2020

On December 26, 2018, Dr. Steward stated that Mother stated K.K. was "overly hungry and she can't provide enough food to keep [him] full, despite the fact that his belly his distended." (*Id.* at 3.) Mother blamed Kenan's pulmonary hypertension on his exposure to white board markers. (*Id.*) At the time, Mother "refused to relinquish any control of the patient's food options, and refuses supplemental formulas due to "corn syrup, maltose, and GMO's being present in them." (*Id.*) Dr. Steward suspected "medical neglect or medical child abuse." (*Id.*) DCS obtained a warrant and removed the children on December 28, 2018. (*Id.*)

DCS investigated the case. DCS discovered that Mother and Father were consulting with an out-of-state naturopath, Becky Plotner, who urged Mother to put the children on the GAPS diet. Ms. Plotner never met the boys in person. Mother and Father had the boys on the diet for two to three years. Also, parents were not working with hospital staff to expand the boys' diets. DCS's concerns at the outset of the case expanded beyond Mother and Father providing the boys with such a restrictive diet that it led to K.K. having heart failure. DCS found documentation that K.K. had some seizures when he was with Mother, and Mother did not seek medical treatment for the seizures. Further, when Mother consulted Ms. Plotner about this issue, Ms. Plotner recommended Mother not seek medical care. This demonstrated that Mother was relying on Ms. Plotner for more than just dietary advice.

During the DCS investigation, the boys were diagnosed with autism. (Exh. 3 at 16.)

As the case has progressed, in October 2019, the DCS Case Manager set forth goals for Mother, including "[Mother] will demonstrate insight into the medical issues her children do/do not have based upon documented medical evidence"; "[Mother] will explore how the over medicalization/malnutrition has impacted the lives of her children"; and "[Mother will explore guidelines for medical providers treating her own family members." (Exh. 8 at 6.) The court wholeheartedly agrees with these goals as appropriate for Mother to demonstrate she realizes the serious danger she put the children in by both adhering to the GAPS diet and not seeking medical treatment for her children when they needed it. Given this backdrop, in this court's mind, minimally adequate parenting from Mother would include a) her acknowledgement of how dangerous these decisions were to her children's physical and emotional health, and b) demonstrated behavior changes to show she can safely care for her children.

In November 2019, the court finds evidence that demonstrated Mother was both on track to reunify and that suggested Mother still did not fully comprehend the seriousness that her own actions played in her children's somewhat shocking physical condition when they were brought to Cardon's in December 2018. For instance, in November 2019, Mother acknowledged and was overjoyed that the boys' health had improved, and that they were running and participating in recreational sports. (Exh. 8 at 41.) Mother saw improvement in the boys' "sensory activity,

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031279

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    6/11/2020

energy levels, growth, and moods." (*Id.*)  She "has willingly fed them with an unlimited menu since beginning visitation, without concern." (*Id.*)  Finally, she provided the boys with play activities that included dry erase markers, paints, and play dough. (*Id.*)  The court finds all of this evidence encouraging and promising.  On other hand, as part of the same lengthy DCS Progress Report, Mother "believes the boys had complicated health presentations that occurred due to the overlapping of chronic, toxic levels of mold, as defined by the EPA, in their home; severe undiagnosed thyroid impairment in K.K. and less than optimal thyroid levels in D.K. extreme food and chemical sensitivities (which is not the same as food allergies) that challenged variety in their diet; stress, viral and chemical exposure." (*Id.* at 42.)  The court finds as of November 2019, there was compelling evidence to show that Mother *both* understood the error of her ways in putting the children on a restrictive diet, *and* that she was not prepared to parent the children safely because she was blaming the children's poor and dangerous health on mold, Kenan's thyroid condition, food sensitivities, stress, and chemical exposure.

A February 2020 Southwest Human Development case note set forth the parents' progress. (Exh. 9 at 168.)  In that case note, "visits were overall positive" with Mother and Father, but "[n]either parent has fully acknowledged their role in the abusive behaviors that took place." (*Id.* at 170-71.)  As of at least February 2020, Mother and Father are separated and plan to obtain a divorce. (*Id.* at 170.)  The court finds this relevant because the children's therapists are working with Mother and Father to help the children through this significant transition. (*Id.* at 170-71.)  Mother and Father have been having separate visits. (*Id.* at 171.)

A March 31, 2020 Southwest Human Development case note signed by two Visit Supervisors and Ms. White opined that Mother provided "more insight as to the role she played in the children coming into DCS care." (*Id.* at 187.)  Also, the supervisors and Ms. White assert that "[Mother's] overall perspective is that she was completely misdirected and misguided by doctors and now has full trust in Dr. Miga and his recommendations.  [Mother] is observed to extensively detail the events that have lead up to the boys' decline in health and hospitalization; however, she is unable to identify specific acquired coping skills that can be implemented to avoid any past behaviors from occurring.  Thus, continued evaluation is still needed to identify [Mother's] healthy coping skills and if she is capable of making appropriate medical decisions in the future." (Exh. 9 at 187-188.)  Based on the case notes from February and March 2020, the court finds (as it did in November 2019) that there was compelling evidence to show that Mother *both* understood the error of her ways *and* that she was not prepared to parent the children safely due to not accepting responsibility for her role in their poor physical condition.

The court has reviewed all the evidence, including the exhibits.  The court will highlight additional testimony and evidence it found compelling:

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031280

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                6/11/2020

### 1. Dr. Oakley

Dr. Oakley conducted a psychological evaluation and re-evaluation of Mother in April 2019 and February 2020. (Exh. 30.) In the April 2019 report, Dr. Oakley opined that Mother's prognosis to be a minimally adequate parent "is dependent upon her openness for accepting feedback and implementing positive change . . . she still fails to acknowledge her role in her children's health problems, despite evidence indicating that her children have been able to tolerate new foods, to be physically active, and to be fine even when exposed to white board markers." (Exh. 30 at Report dated 4/16/19 at 20.) In her February 2020 report, Dr. Oakley asserted that "Mother's prognosis appears to be improved since her last psychological evaluation. It continues to be dependent on her willingness to be open to gaining insight regarding her role in her children's health issues, and her ability to make the necessary changes as a result." (*Id.* at Report dated 2/20/20 at 23.) Dr. Oakley further suggested that especially given the children's autism diagnosis, "[some] sort of mediation or family services would be beneficial if the children are to be returned to both homes." (*Id.* at 24.)

### 2. Dr. Rodriguez

Mother's psychologist Dr. Rodriguez testified that the children could be returned to Mother with a Safety Plan in place, and a "medical gatekeeper." (Exh. 8 at 19; Exh. 5 at 5.) Dr. Rodriguez asserted that Mother would not put the children back on the GAPS diet again. (*Id.* at 24, 137.) She believed that the DCS Case Manager's opinion that Mother would consider GAPS is a misrepresentation of Mother's actual view. Dr. Rodriguez maintained that Mother understood that Kenan's condition was life threatening and that medical intervention saved Kenan's life. (*Id.* at 137.)

Although Dr. Rodriguez "worked on honesty" with Mother, Mother never shared with her own psychologist that she was having trouble in her marriage. The court finds this peculiar and evidence that even during moments of clarity and realization, Mother withheld significant matters from Dr. Rodriguez —that she and Father were divorcing, and that Mother was consulting another therapist. Dr. Rodriguez was unaware that Mother was involved in a new romantic relationship. The court finds credible Dr. Rodriguez's assessment that Mother has taken responsibility for her decisions that contributed to her children's extraordinary physical condition when they were admitted to Cardon's in December 2018, but she does not believe she harmed her children. The court also remains concerned that as recently as April 2020, Mother was still discussing the impact of mold and Kenan's thyroid condition on his poor physical condition. Finally, the court finds credible the notion from Dr. Rodriguez that Mother "would not be in the position today if she had not been going down rabbit holes." (Exh. 5 at 2.) The court finds that

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031281

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    6/11/2020

Mother's willingness to chase down theories about things like mold, bacteria, and dry erase markers serves as a detriment to her ability to make sound decisions. (Exh. 5 at 1.)

The court found enlightening the conversations between Dr. Rodriguez, Carla White, and the DCS Case Manager Madison Bell. (Exh. 5 at 1-8.) All three seemed to agree that prior to reunification, Mother needed to demonstrate her ability to make medical decisions based in fact. (*Id.* at 3, 5.) All three agreed that Mother needed a "medical gatekeeper" (outside of her parents) to ensure her medical decisions for the children were based in fact. (*Id.* at 5.) Further, Dr. Rodriguez expressed concern about Mother parenting without a medical gatekeeper in place. (*Id.* at 5.) The court finds credible Dr. Rodriguez's take on Mother's acceptance of responsibility in this matter –that Mother "has taken responsibility for her decision-making, but she will not say that she has intentionally starved or harmed her children." (*Id.*) Carla White suggested that as for the medical gatekeeper, that Mother "should have to go through a clinic team or to have a treatment done or diet change prior to the implementation." (*Id.*) Finally, Dr. Rodriguez opined that the Safety Plan should include Mother identifying "the additional support she has outside of family," and for them to know "her decision-making process, and having a written plan before making [decisions], looking at the facts, [and discussing] with an objective person."

3.   Dr. Kelly

DCS hired Dr. Michael Kelly to conduct a records review in this case. (Exh. 6 and 7.) He reviewed 25 sources of information as part of his report, dated December 2, 2019. (Exh. 6 at 2-3.) DCS asked Dr. Kelly to review the records and opine on specific questions, including "does Mother suffer from a mental illness or disorder according to the DSM," "what is the prognosis that Mother will be able to demonstrate minimally adequate parenting skills in the foreseeable future," "is the child in the care of this parent in risk in any way," "are there mental health services that could be provided to improve [Mother's] condition," "what kind of supervision is needed for contact or visitation?" (Exh. 6 at 1.)

Based on his records review, Dr. Kelly opined as follows:

1.   "It is my opinion, with reasonable medical certainty, that allowing [Mother] to care for her sons, ▆▆▆ and ▆▆▆ places them in significant danger for additional harm."

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031282

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                              6/11/2020

2. "It is also my opinion that additional recommendations must be followed to determine if [Mother] is psychotic and/or has other mental health conditions that are preventing her from parenting the boys safely."

3. "It is my opinion that [Mother] needs mental health treatment services, like those described in the opinion section of this report, in order to make enough progress toward the goal of reunification with ██████ and ██████  (*Id.* at 2.)

The court finds Dr. Kelly's opinions to be credible. Dr. Kelly found that Mother's poor judgment went beyond her decision to administer the boys a severely restrictive diet. His review of an email Mother sent to Kenan's chiropractor, Dr. Ross, dated December 4, 2018 indicated that ██████ had a "focal seizure (first ever) upon waking and pooped and vomited parasites. Seemed better afterward, but awoke with facial edema." (Exh. 6 at 8.) Mother went on in another email to share with Dr. Ross that ██████ had another seizure the following day and hit his head on the counter, "though I think he's ok. Complained of head pain (left occipital) for a couple of days afterward . . . ██████ had] tummy pain again [that] night, two longer focal seizures back to back and passed parasites and vomited a liver fluke." (*Id.* at 8-9.) Dr. Kelly found that "[Mother's] decision to defer taking ██████ to the hospital despite allegedly observing him have five seizures, vomit up liver flukes, and pass parasites in his stool defies common sense." (*Id.* at 9.) The court agrees.

4. DCS Case Manager and SWHD Senior Program Manager

At the May 12, 2020 evidentiary hearing, the DCS Case Manager still harbored concerns that if the children were returned to Mother, that she would put them back on the GAPS diet based on comments Mother made to Ms. Bell on March 27, 2020. Ms. Bell testified that Mother said that although she did not trust the out-of-state doctors, she still trusted Ms. Plotner. Mother denies making this statement. The court reviewed Mother's email to DCS Case Manager Madison Bell dated March 31, 2020. (Exh. 8 at 143.) The court finds that Mother wrote that "I would never put the boys on GAPS diet, or any other diet, as I respect the information I received from Dr. Miga that it contributed to Kenan's hospitalization." (*Id.* at 144.) Mother also noted "I understand the severity of Kenan's condition at Cardon. It was frightening." (*Id.*) The court finds that the evidence is unclear about whether Mother understands and appreciates her role in putting the children on the GAPS diet. Ms. Bell believes that Mother has not accepted responsibility, whereas Dr. Rodriguez thinks Mother has. The court agrees with Dr. Rodriguez's assessment of this disagreement –that Mother "has taken responsibility for her decision-making,

Docket Code ORDENTERED          Form XPJDBlankME                    Page 7

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031283

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                          6/11/2020

but she will not say that she has intentionally starved or harmed her children," because Mother does not believe she did those things. (Exh. 5 at 5.)

Ms. White opined that Mother did not meet her treatment goal and is not able to parent her children safely. One of Ms. White's chief concerns was a statement by Mother in March 2020 that although she would not rely on out-of-state providers, she would still trust Ms. Plotner. On a positive note, however, Ms. White opined that in 2019, Mother had met her treatment goals related to overcoming issues she had with food and feeding her children. Mother has used "DoorDash" to order the children food, and has no hesitation to offer the children a wide variety of food, including hamburgers and french fries, vegetables, pizza, shrimp, and salad. The children now enjoy and tolerate a wide variety of foods. (Exh. 19.)

The court finds that while Mother's food-ordering is appropriate, it does not demonstrate that when grocery shopping and cooking every day in her home for the children that she will make appropriate choices. The court further finds that Mother's commendable actions in ordering her children a wide variety of foods by way of DoorDash are undercut by her mentioning the impact of mold and Kenan's thyroid condition on the children's health, as recently as March 2020.

5.   Mother's testimony

Mother has meaningfully engaged in services provided to her by DCS, including therapeutic visitation, therapy, two psychological evaluations, and she submitted her medical records for a records review. Mother testified that she understands through therapy and nutrition classes what caused the children to come into DCS's care. She explained that to resolve the children's food sensitivities, she put them on a diet that she should not have. Mother agreed that the diet was too restrictive and caused their dangerous health conditions.

Mother now lives in an apartment and she has room for the children. Mother took three classes to be educated about proper nutrition. Mother disagreed with the testimony and evidence that she still trusts Ms. Plotner; Mother relayed that she trusts Dr. Jafri and Dr. Miga, who helped K.K.

During her testimony, however, there were signs that the children may still face a "substantial risk of harm" if returned to Mother's care. Mother indicated that she did not believe that the food she and Father were giving K.K. in the hospital was insufficient; this contradicts the hospital staff who overheard Mother, Mother and Maternal Grandmother deny food to K.K. when he stated he was hungry. (Exh. 1 at 3.) Kenan's bedside Registered Nurse noted that Kenan's food and water intake despite his complaints of being hungry. (*Id.* at 2.) The court

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031284

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                          6/11/2020

finds that the evidence showed the parents were not working with hospital staff to expand the children's diet. Mother later admitted that her restrictive diet put the children in care, but also that mold may have been a factor. Again, the court finds perplexing that Mother is still blaming mold for their condition. Finally, DCS elicited testimony from Mother that although there are no other adults who live with her, Mother's new romantic interest who lives out-of-state (and who has not yet been to her home) has not been evaluated by DCS. The court finds that Mother should have identified this person and have him or her vetted by DCS to see whether that person passes a background check to be eligible to be around the children.

The court has considered all the testimony and evidence in this matter. The court finds on one hand, Mother asserted that she has made a behavior change and takes responsibility for her actions. The court also finds credible Ms. Bell's position that Mother has only taken partial responsibility for her actions; Mother's references on March 27, 2020 to being thankful for everything Ms. Plotner did for the boys and mentioning mold as a factor recently as March or April 2020 undercut her acceptance of responsibility.

Putting those issues aside, although not the focus of the evidentiary hearing, the court finds the parents' ability to manage the children's autism diagnosis is a critical factor in whether the children should be returned to either parent. If the children are going to be returned to Mother, as urged by this motion, Mother must demonstrate she is able to effectively manage their autism. Further, if visits were allowed in both Mother's and Father's homes, the parents must work together to create a plan to ensure there were similar routines and rules in both homes. (Exh. 3 at 16.) Without identifying specifically how a parent of an autistic child would manage the child's autism, the court finds the autistic child would be at risk in that parent's care.

The court is also concerned about whether Mother has the ability to recognize when her children are in medical distress and need medical attention. Even though Mother's failure to take K.K. to the hospital when he had seizures occurred in 2018, the court finds little evidence to demonstrate she now has the common sense to seek medical attention when appropriate. In this respect, the court finds credible Dr. Kelly's assessment that Mother's inactions in failing to take K.K. to the hospital in 2018 defied common sense. The court agrees with Dr. Rodriguez, Carla White, and Madison Bell that a "medical gatekeeper" must be in place prior to returning the children to Mother's care.

The court has weighed the evidence, and finds that Mother has not met her burden in this case. There was credible evidence presented on both sides of this issue. Mother has not shown that return of the children would not create a substantial risk of harm to the children's physical, mental, or emotional health or safety. While it is abundantly clear that Mother loves her children, the court finds there is a substantial risk of harm to children's physical, mental, and

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031285

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                  6/11/2020

emotional health because Mother has not shown she can seek appropriate medical attention for the children or that she would act in the children's mental and emotional best interests. Very recently, she did not attend a CFT meeting because she was prohibited from recording the meeting. This shows she is still putting her own wants ahead of her children.

      IT IS ORDERED DENYING the Motion for Change in Physical Custody.

      The court has considered DCS's request for a change in the case plan to termination and adoption. The court agrees with the position of the Guardian ad Litem that Mother and Father have clearly made some progress, and the children need additional therapeutic visitation with Mother and Father. The court understands DCS's position that Mother's inaction and action in this case put the children in grave danger; she insisted on putting the children a diet that malnourished them so severely that ▉▉▉ suffered pulmonary hypertension and both of her children needed wheelchairs to walk. But the question for the court now is, have Mother and Father made behavior changes? Have they recognized their actions almost caused ▉▉▉ to die? Can they demonstrate they are able to make better decisions and exercise sound judgment with regards to the children's physical, mental, and emotional well-being? Are they able to show they can be "minimally adequate" parents to these autistic children who have experienced significant trauma?

      The court finds that Mother has engaged in reunification services, and has taken partial responsibility for her role in what happened. It is the court's hope that Mother stops equivocating about her role in what caused DCS to remove her children and "going down medical rabbit holes" to the detriment of her children. The court hopes Mother is able to demonstrate she can be flexible, that she can work with a "medical gatekeeper" and follow her or his instructions, that she can co-parent with Father, that she can make decisions based in fact, that she can identify a supportive network of objective friends whom she can consult outside of her family, that she can successfully navigate what it means to parent autistic children, and that she can create a healthy, stable home for her children.

      IT IS FURTHER ORDERED denying DCS's request to change the case plan to termination and adoption.

      The court orders DCS to facilitate a meeting among all parties and counsel in this matter within 30 days of receipt of this order to discuss the following:

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031286

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                      6/11/2020

1. Whether Mother and/or Father are capable of caring for the children given their autism diagnosis, and if not, what services could be put into place to address this issue;

2. Whether Mother and/or Father are capable of seeking appropriate medical attention for the boys when they need it, and if not, what services could be put into place to address this issue;

3. Whether a "medical gatekeeper" could be identified and if so, how would that be implemented; how would Mother and Father would be required to consult that person prior to making any significant medical decisions or dietary changes for the boys; and

4. Whether Mother and Father are capable of co-parenting with each other, and establishing similar rules and routines in their homes to show they can act in their children's best interests, and if not, what services could be put into place to address these issues.

IT IS FURTHER ORDERED that within 30 days of receipt of this order that DCS facilitate a meeting with parties and counsel in this matter, and any interested treatment providers including Carla White, Dr. Rodriguez, and Madison Bell, to discuss the above-listed items.

File:
    Exhibit Worksheet

6/17/2020          / s /   HONORABLE JENNIFER E. GREEN
DATE                       HONORABLE JENNIFER E. GREEN

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031287

Clerk of the Superior Court
*** Electronically Filed ***
7/10/2020 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY



JD532206                                                      7/9/2020

CLERK OF THE COURT
P. Bryant
Deputy

HONORABLE JENNIFER E. GREEN

IN THE MATTER OF:

DYLAN KEMAL KAHRAMAN                    KINDA  JOHNSON-HURD
    F1149031
    DOB: 9/27/2012
KENAN TROY KAHRAMAN
    F1149032
    DOB: 9/27/2012

                                         JANNA LEE JOHNSON

                                         DEEAN  GILLESPIE STRUB

                                         RACHEL  METELITS

                                         CASA
                                         DCS SPECIALIST - MARICOPA EAST
                                         REGION


                              RULING


    The court has considered Mother's Motion for Injunctive Relief, filed May 11, 2020; DCS's Response and Objection to Mother's Motion for Injunctive Relief, filed May 19, 2020; Father's Objection to Mother's Motion for Injunctive Relief, filed May 19, 2020; and Mother's Joint Reply Regarding Mother's Motion for Injunctive Relief-Madison Bell, filed May 28, 2020.

    Mother asked the court to remove assigned DCS caseworker from this dependency case, claiming she acted unlawfully by exceeding her authority or acting in an unreasonable or arbitrary manner. (Motion at 9.) DCS and Father objected, asserting the caseworker has acted lawfully in her position of making reasonable efforts to provide appropriate reunification services to Mother. DCS cited A.R.S. §12-1802(C) for the proposition that an injunction shall *not* be granted "[t]o prevent the exercise of a public or private office in a lawful manner . . .."

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                          7/9/2020

Arizona courts have held that DCS has "a constitutional obligation to attempt to unite" children with their parents. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 22, 444 P.3d 258, 271 (App. 2019)(citations omitted). DCS must provide a "reasonable effort to preserve the family," which "requires DCS 'to undertake measures with a reasonable prospect of success.'" *Id.* This means DCS must act with diligence to provide services to parents. *Id.*

In *Jones v. Santa Cruz County*, 72 Ariz. 374, 378 (1951), the Arizona Supreme Court held that "[i]t is of course well-settled law that an injunction will not issue to restrain a lawful act." In turning to whether the assigned case worker acted unlawfully in this case, the court examined the record:

A. On January 4, 2019, Commissioner Shellie Smith found DCS made reasonable efforts to prevent removal of the children from the home. (Docket 8 at 4.) DCS held a Team Decision-Making meeting and the parents did not attend. (*Id.*) The court found in the same order that DCS tried to place the children with relatives, but no identified family members were willing or able to do so. (*Id.*);

B. On January 6, 2020, this court found the children dependent as to Mother and Father, and found that "the services are necessary and reasonable." (Minute Entry dated January 6, 2020 at 4.);

C. On February 20, 2020 (filed March 2, 2020), this court found DCS made reasonable efforts to finalize the permanency plan. (Order, filed March 2, 2020.); and

D. On June 17, 2020 (filed June 18, 2020), the court issued a lengthy order containing findings from an Evidentiary Hearing held on May 12, 2020 wherein the court detailed Mother's engagement in services provided to her by DCS. (Minute Entry, filed June 18, 2020.) Specifically, the court found Mother engaged in reunification services provided to her by DCS: "therapeutic visitation, therapy, two psychological evaluations, and she submitted her medical records for a records review." (*Id.* at 8, 10.)

The court was unable to find in the record any evidence that the court found that the DCS had not provided Mother with a meaningful opportunity to reunify. The record as set forth above contradicts Mother's allegations set forth in her Motion that the DCS caseworker did not provide Mother with a meaningful opportunity to reunify with her children. Mother made specific references to statements and misstatements the DCS caseworker made in support of its position. (Motion at 10-13.) Mother also cited a report by Dr. Newberger that was deemed inadmissible at the Rule 59 Evidentiary Hearing. (*Id.* at 10.) The court finds that statements by the DCS caseworker that reflect negative opinions of Mother's ability to parent in this case have not affected DCS's charge to provide appropriate services to Mother. The court also finds that

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD532206                                                    7/9/2020

Dr. Newberger's statements that reflect his belief about whether the DCS caseworker is appropriately assessing Mother's ability to parent have no relation to whether the DCS caseworker is lawfully offering appropriate services to Mother.  Mother has the services she needs to reunify, and the court ordered DCS to undertake additional efforts to facilitate reunification.  (Minute Entry, filed June 18, 2020 at 11.)  The court finds that the DCS caseworker's statements and Dr. Newberger's report are not compelling, however, in light of the court's findings, on four occasions, that DCS provided reasonable efforts to provide reunification services to the parents.

As for DCS's argument that the court lacks authority to remove a DCS caseworker, that this court has the responsibility to ensure DCS is complying with the law by making diligent efforts to provide reunification services to parents, however, Mother cited no authority allowing the court to remove a DCS caseworker.

For all the reasons above,

THE COURT FINDS that DCS made reasonable and diligent efforts to provide reunification services to Mother.

THE COURT FURTHER FINDS that the DCS caseworker's efforts in providing reunification services were not unlawful or unreasonable, nor were her efforts performed in an arbitrary manner.

IT IS ORDERED denying Mother's request for injunctive relief.

7/9/2020            / s /    HONORABLE JENNIFER E. GREEN
DATE                         HONORABLE JENNIFER E. GREEN

CT04400 (7/19)

# PROGRESS REPORT TO THE JUVENILE COURT

**Court Case Number**    JD532206              **Date of Report**    08/04/2020

**Case Name**         KAHRAMAN, JESSICA              **Case ID** 608484

**A. Name and date of birth for each child subject to this court case number.**

3874373 KAHRAMAN, DYLAN              DOB: 09/27/2012
3874372 KAHRAMAN, KENAN              DOB: 09/27/2012

**B. Child or children subject to this report if different from above.**

N/A

**C. Family composition.**

Jessica Kahraman -  Mother
Ahmet Kahraman - Father
Kenan Kahraman - Child
Dylan Kahraman - Child



**D. If the family has or may have American Indian tribal affiliation, efforts to identify and contact the child's tribe and confirm the child's membership status or eligibility for membership.**

N/A

## I.  REASON FOR DCS INVOLVEMENT

**A. Description of the dangerous condition(s) currently occurring within the family that require Department involvement; including how the parent, guardian, or custodian's behaviors cause the child to be unsafe or at substantial risk of harm and, if applicable, why the child(ren) are removed from the parent, guardian or custodian's custody.**

It is concerning that upon completion of the review of the children's medical records, "there are concerns that placing the children in the home of Ms. Kahraman places them at significant danger for additional harm". It is also concerning that Ms. Kahraman either is "intentionally attempting to evade detection or has lost touch with reality" due to what she reports to the doctors and her lack of follow up of medical needs, such as seizures.

Since the release of Dr. Kelly's report, there have been opposite reactions from the parents. Ms. Kahraman denies that anything in the report in true and that if she had been allowed to meet with Dr. Kelly, the result would be different. Ms. Kahraman was offered many times, however she has declined. Ms. Kahraman reports she has no problem meeting with him, however her attorney has directed her not to. Ms. Kahraman's previous therapist Dr. Rodriguez reported that mother was not taking full accountability and reports that mother is very intelligent. Ms.

Kahraman is struggling to release control over situations that are outside of her control. Ms. Kahraman attempts to direct what can and cannot occur in Mr. Kahraman's home. Ms. Kahraman recently emailed Mr. Kahraman's therapist and his attorney, where she is stating again that Mr. Kahraman's conclusions are based on inaccurate or incomplete information. It is concerning that Ms. Kahraman is reporting that the GAPS diet and her choice to put them on the diet is what caused the malnourishment and the heart failure but is reporting that Mr. Kahraman's conclusion are based on inaccurate information. There is conflicting information on whether or not Ms. Kahraman truly takes accountability for her actions and the consequences her actions had on her children. Ms. Kahraman is continuing to place blame on others for her actions and why she has not made progress in this case.

Mr. Kahraman has filed for divorce and the parents are now living separately.

Ms. Kahraman is continuing to disagree with Dr. Kelly's report and spends more time dissecting and trying to explain away the concerns that DCS and providers have by sending numerous emails detailing why what DCS and the providers say is inaccurate or taken out of context. Ms. Kahraman is not open to critical feedback or discussion, which is what Dr. Oakley reported would be necessary in order for a positive prognosis of being able to safely parent her children in the future. Ms. Kahraman continues to blame a variety of outside sources for the malnutrition and are struggling to let go of some control regarding the children's medical needs.  In May 2020, Ms. Kahraman informed Southwest Human Development that she was unwilling to discuss treatment plans goals except for coping skills and what is occurring directly in visitation on that day.

II.    **SAFETY PLANNING**

A.    **If applicable, efforts to locate missing parent(s).**

The whereabouts of Ms. and Mr. Kahraman are known at this time.

B.    **The current safety plan, including whether it is an in-home plan or out-of-home plan, the actions that are necessary to control the dangerous condition(s), when those actions are needed, the adults responsible for carrying out the actions, and any supportive resources to support the safety actions.**

Dylan and Kenan Kahraman are residing in out of home care in a licensed DDD foster home.

C.    **Efforts to implement the least intrusive plan that is sufficient to control the dangerous conditions, including explanation of why the safety threats can or cannot be managed in the home; and for American Indian children, the active efforts to provide services designed to prevent the breakup of the Indian family and the outcome of these efforts.**

The safety threats are unable to managed in Ms. Kahraman's home due to there being no appropriate responsible adult that can reside in the home.

**D.    If applicable, the conditions for return as described in the safety plan.**

Mrs. Kahraman recognizes and articulates that her behaviors are causing physical and emotional harm to Kenan and Dylan.
Mrs. Kahraman displays genuine remorse and has open and honest conversations regarding her behavior.
Mrs. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits.
Mrs. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mrs. Kahraman will allow the safety monitor to re-direct her.
Mrs. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so she, Mr. Kahraman, Dylan and Kenan, safety monitors and providers are safe.

Mr. Kahraman recognizes and articulates that Mrs. Kahraman's behaviors and Mr. Kahraman's lack of intervention are causing physical and emotional harm to Kenan and Dylan and displays and ability to protect his children – MET
Mr. Kahraman displays genuine remorse and has open and honest conversations regarding his behavior. - MET
Mr. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits. - MET
Mr. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mr. Kahraman will allow the safety monitor to re-direct him. - MET
Mr. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so he, Mrs. Kahraman, Dylan and Kenan, safety monitors and providers are safe.  - MET

## III.    IDENTIFICATION, LOCATION, AND ENGAGEMENT OF EXTENDED FAMILY MEMBERS AND OTHER IMPORTANT CONNECTIONS (only applicable for children in out-of-home care)

**A.    Results of efforts to identify, locate, contact, and engage adult relatives of the child, including grandparents, great-grandparents, adult siblings, parents, step-parents who have custody of any siblings, aunts, uncles, first cousins, and persons who have a significant relationship with the child; and if known, information about each person's willingness to be a potential out-of-home caregiver for the child.**

Maternal grandparents were assessed as placement, however were denied due to not understanding the safety concerns and aligning themselves with the parents by refusing to provide food to Kenan when he was hungry.

Maternal great uncle has expressed an interest in being placement for the children on a long term basis if needed, however he resides in an retirement community and would have to purchase a new home in order to have the children placed in his care. If the children need permanent placement, the uncle is willing to purchase a new house.

**B.    Description of the child's important connections, including information**

provided by the child, parents, and/or guardians; and efforts to maintain these connections.

Maternal grandparents are allowed to attend 2 visits a month with the children in order to continue the relationship. Maternal great uncle has expressed a desire to see the children, however mother has denied him being able to attend visitation.

**C. Description of contact between the child and the child's relatives, friends, former foster parents and any connections the child identifies; and if contact is restricted, the reasons why.**

Dylan and Kenan have supervised visitation with Ms. Kahraman and maternal grandparents at this time.

Dylan and Kenan have unsupervised visitation with Mr. Kahraman.

**D. Efforts to maintain cultural connections, including opportunities for the child to build cultural awareness, identity, and involvement.**

Ms. and Mr. Kahraman can bring cultural activities and traditions to visit to share with the children. Paternal grandparents will video call into visitation from Turkey. Foster placement shares the same religious beliefs as Mr. Kahraman as is educating the children on the Islamic faith.

## IV.  CHILD FUNCTIONING, SERVICES, AND LIVING ARRANGEMENT

**A. The child's physical, developmental, and emotional functioning; including the child's medical, dental, behavioral health, and developmental needs and services.**

Dylan is 7 years old and is placed in the same foster home as his twin brother, Kenan Kahraman. Dylan enjoys spending time with his brother, Kenan and his foster brother. Dylan used to have a fear of dogs, however now is no longer afraid of placement's dog. Dylan is open with JFCS for behavioral health services. Dylan engages in individual counseling as well as some sessions with his brother Kenan. The therapist is working with Dylan on speaking up for himself and emotional expression. Dylan has expressed that he controls his food now and not his parents.

Kenan is 7 years old and is placed in the same foster home as his twin brother, Dylan Kahraman. Dylan enjoys spending time with his brother, Dylan and his foster brother. Kenan used to have a fear of dogs, however now is no longer afraid of placement's dog. Dylan is open with JFCS for behavioral health services. Kenan engages in individual counseling as well as some sessions with his brother Dylan. The therapist is working with Kenan on emotional expression and his anger. Kenan expressed anger towards his father by scratching him out of photos. Kenan has expressed that he controls his food now and not his parents. Kenan's heart failure has completely resolved itself since being on a proper diet. Kenan is being titrated off of the thyroid medication, as his lab work has come back as normal.

**B. The child's academic status and social development, including the child's needs and services, and efforts to ensure the child's educational stability.**

Dylan and Kenan just started the 2nd grade and there are no concerns noted. Due to COVID and their medical health history, the children are currently being homeschooled.

C. **For youth age fourteen or older in out-of-home care, efforts and plans to assess and provide services to support the youth's preparation for adulthood.**

N/A

D. **History of living arrangements (placements), including the length of time the child has been in out-of-home care (if applicable), and the type and dates of each living arrangement.**

Dylan
12/28/2019-01/11/2019: DDD Licensed Foster Home
01/11/2019-Current: DDD Licensed Foster Home (with Kenan)

Kenan
12/28/2019-01/07/2019: Cardon's Children Medical Center
01/07/2019-Current: DDD Licensed Foster Home (with Dylan)

E. **Description of the child's current living arrangement, including the type; whether this living arrangement is consistent with the Department's placement preferences; and if the child is in out-of-home care and not living in the home of a grandparent, other relative, or person who has a significant relationship with the child, the reasons why such placement has not been identified or is contrary to the child's best interest.**

Dylan and Kenan reside in a licensed DDD foster home.

F. **If the child is an Indian child, efforts to place the child according to ICWA placement preferences and active efforts to provide culturally appropriate services.**

N/A

G. **If the child has a sibling in out-of-home care, efforts to place siblings together; and if not placed together, the specific reasons why this did not occur or reasons why this would be contrary to the child's or sibling's safety or well-being.**

Dylan and Kenan are placed together.

H. **If placement with sibling(s) is not possible, efforts to facilitate frequent visitation or contact with siblings; and if frequent visitation or contact with siblings is not recommended, the reasons why this would be contrary to the child's or a sibling's safety or well-being.**

N/A

I.    **If out-of-state placement is appropriate and in the best interest of the child, the reasons why (include ICPC and/or out-of-state visitation status).**

N/A

J.    **Description of any assistance or services provided to the caregiver(s) to enhance their capacity to address the child's needs and provide appropriate care and supervision.**

Dylan and Kenan have CMDP insurance to provide for all medical, dental and vision needs. Dylan and Kenan's foster placement is provided with standard and monthly allowances as well as daycare when needed.

K.    **Description of the Department's and out-of-home caregiver's efforts to implement reasonable and prudent parent standards to allow the child to participate in age and developmentally appropriate extracurricular, enrichment, cultural, and social activities.**

Dylan and Kenan participate in age appropriate activities with their foster family, including family vacations. Dylan and Kenan are both engaged in karate.

V.    **PARENT FUNCTIONING AND CASE PLANNING**

A.    **The behavioral changes necessary in order for the parent, guardian, or custodian to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as described in the case plan).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).

Ms. Kahraman will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children.

Ms. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers in order to gain insight into her children's needs and how to respond appropriately. Ms. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Mother will need to acknowledge the reasons why her children came into care and accept responsibility.

Mr. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).

Mr. Kahraman will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman.

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to

respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility.

**B.    Each parent's, guardian's, or custodian's progress, or lack of progress, toward achieving necessary behavioral changes (including changes in caregiver protective capacities or family protective factors).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).- Not Met

Ms. Kahraman  will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children. - Not Met

Ms. Kahraman  will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers in order to gain insight into her children's needs and how to respond appropriately. Mother will need to acknowledge the reasons why her children came into care and accept responsibility. - In Progress

Mr. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment). - In Progress

Mr. Kahraman  will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman. - Met

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility. - Met

**C.    Services and supports provided to assist in achievement of the behavioral changes identified in the case plan; and the participation in, and outcome of services and supports.**

Jessica Kahraman

Therapeutic Visitation

Beginning in May 2020, Ms. Kahraman reported that she is only willing to discuss what occurred in visitation at the direction of her attorney. Discussion towards therapeutic visitation goals was unable to happen, so no progress was made. This continued through June and most of July. On July 22nd, Ms. Kahraman reported that she is willing to work on her goals with Southwest Human Development. on

July 28th, Ms. Kahraman sent an email reporting that the lack of documentation provided by the Department is the reason for Ms. Kahraman not working on her goals in two months.

During visitation, Ms. Kahraman struggled with letting go of control. Ms. Kahraman directed what items were and were not allowed during visitation. The children wanted to show Ms. Kahraman their game on the computer, but Ms. Kahraman wanted no electronics during the visitation, as their focus was on the game, Ms. Kahraman felt it took away from bonding and quality time. Ms. Kahraman struggled with showing interest in activities that the boys wanted to share with her. Ms. Kahraman is working with Southwest Human Development on not focusing on food and how much they eat. Ms. Kahraman will tell the children to continuously monitor their food intake, instead of letting the boys listen to their bodies and determine if they are hungry or not.

Individual Counseling

In May 2020, Ms. Kahraman voluntarily chose to end services with Dr. Kelly Rodriguez. At the time of the closure, Dr. Rodriguez was working with Ms. Kahraman on making medical decisiosn based on fact and processing that the recommendations made from doctors came from information provided by Ms. Kahraman.

In June 2020, Ms. Kahraman started counseling with Dr. Celice Korsten through private pay. Based on the notes provided by Dr. Korsten, Ms. Kahraman is not making decisions based on fact. Ms. Kahraman reported to Dr. Korsten in June 2020, that Mr. Kahraman was doing unsupervised, even though this was not accurate information. It is concerning that Ms. Kahraman is continuing to report inaccurate information.

Ms. Kahraman was still focused on mold and the symptoms that were experienced during multiple sessions, while saying that she admitting to almost killing the children with her choices.

Psychological Evaluation

Ms. Kahraman completed an updated evaluation on 02/20/2020. Dr. Oakley made the following observations:

Ms. Kahraman was referred for a psychological re-evaluation by DCS. During her previous evaluation, Ms. Kahraman did not endorse any significant mental health symptoms. Her scores on testing measures were invalid and questionably valid, based on Ms. Kahraman presenting herself in a favorable light and denying problems. It was noted that the full extent of her difficulties was likely not completely clear. Ms. Kahraman was not given any formal diagnoses; she was noted to have traits consistent with Obsessive-Compulsive Personality Disorder based on her being meticulous, rigid, and inflexible. It was further noted that she may have reinforced a sick role in her children, but there was not enough information to suggest that she was doing it intentionally or intentionally harming the children or feigning medical symptoms in the children. It was also noted that

Ms. Kahraman continued to deny any accountability for the children's medical issues. A report from Dr. Kelly suggests that Ms. Kahraman required follow up to determine if she is "psychotic and/or has other mental health conditions." It suggested that she may have been deceitful, been trying to cover up abuse, may have "lost touch with reality," was having irrational beliefs about the children, or may be delusional. He further stated, "it is my opinion, with reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley." He cited the invalid and questionably valid test results, limited record review, and Ms. Kahraman's "strange statements about the cause of the children's health difficulties." Dr. Kelly requested a follow-up evaluation and provided recommendations for Ms. Kahraman's treatment.

During the current evaluation, Ms. Kahraman described that, in hindsight, she can see that she was extremely stressed prior to the children being removed from her care. She explained that Father was not particularly involved with raising the children, that she was tending to Father's needs, that she was isolated from her support system, she was not getting enough sleep because the children were keeping her up, and that she was working on top of caring for the children and home. She described that she was told that her children were particularly sick, and that she became consumed with finding ways to help them, including conducting a lot of independent research, serving in a consulting capacity with the children's multiple medical providers, not following her instincts, and becoming overly reliant on certain medical provider's information. Ms. Kahraman admitted that she was driven by fear and that she became particularly rigid and inflexible. She admitted that her rigidity and hyper focus on the children's diet contributed to their malnutrition and medical issues.

Ms. Kahraman described that at the time of the current evaluation, she was feeling pretty good. She endorsed ongoing fear about the future of her case and frustration that her children have not been returned to her care but that she has not been given more direction about what she needs to do. Yet, she was able to recognize that the case has given her time to be introspective and to make some positive changes in her life. She seemed more relaxed and at ease than she did during the previous evaluation. Ms. Kahraman described that she is much healthier and more grounded than she was in the past.

Ms. Kahraman's previous test results indicate that her IQ is estimated to be in the above average range and that her word reading score was high enough for independent administration of the remaining psychological evaluations. She denied any experiences that time that would be likely to result in a change of scores; as such, the testing was not repeated. On the MMPI, Ms. Kahraman's response style suggested that she answered in a consistent manner and that she did not seem to over or under-endorse symptoms; her resulting profile is probably a fairly reliable clinical picture. Ms. Kahraman did not obtain any clinical elevations and her scores were not indicative of any significant mental health symptoms or diagnoses. She endorsed a sense of well-being. Ms. Kahraman's test results have been fairly consistent with her presentation during her two clinical interviews; during the first assessment, her results were guarded and she minimized issues, which was consistent with her closed off body language and minimization of fault. During the second evaluation, her scores were deemed to be more valid and she was observed to be more open, to take accountability for her role in the child's health issues, and to be more relaxed and well adjusted.

Ms. Kahraman seems to be making progress and has recognized how her rigidity and inflexibility have had a negative impact on her children. She appears to have gained some insight into how her actions, and inaction, contributed to her children's health problems. She admitted that the children's diet was responsible for their malnutrition. She acknowledged that she should have taken Kenan to the doctor sooner, that she had too many different medical providers who were not in communication, and that she was experiencing a significant amount of stress at the time. Ms. Kahraman described that she became too dependent on the diet and her provider's advice regarding the diet because it was the first time she had been given hope about the children's future.

As such, it appears as though Ms. Kahraman was experiencing significant anxiety at the time the children were removed from the home and taken into care. She described feeling desperate to try to help her children, to the point that she was singularly focused on their diet and the opinions of a provider who apparently said she could help them, to the extent that she made poor decisions and did not follow her instincts. When considering this and additional medical information, it is possible that Ms. Kahraman was experiencing delusions (fixed beliefs that are not amenable to change in light of conflicting evidence) related to her son's health. This option appears more likely a possibility than the idea that she intentionally harmed the children. It appears, however, that at this time, Ms. Kahraman has been able to be more accepting of the medical evidence that contradicts her previous beliefs. Furthermore, Ms. Kahraman has not demonstrated any other signs of psychosis. Her history of anxiety may have been responsible for some of the medical concerns she previously endorse about herself. Medical follow-up is advised if she continues to experience significant physiological symptoms.

Ms. Kahraman continued to speak of heath factors that she believes may have contributed to the children's health difficulties and was overly elaborative. It is possible that she is holding on to some of her previous beliefs, yet, she is able to see that she made mistakes and to described what she needs to do differently in the future. While various parties have expressed concern that Ms. Kahraman will return to a strict diet for the boys if they are placed in her care, she described that she will feed them a mostly healthy, balanced diet with occasional snacks and treats, which is appropriate. She also described that she is no longer hyper focused on all natural medical care and household products. She stated that she now recognizes the value of more traditional medical care that saved Kenan. She added that she can be more accepting of medical provider's opinions, rather than feeling as though she has to be a collaborator.

Overall, Ms. Kahraman meets criteria for the following diagnoses:
Traits of Obsessive-Compulsive Personality Disorder
History of Anxiety Disorder
History of Delusional Disorder (Possible)

Ms. Kahraman was still noted to have traits consistent with Obsessive Compulsive Personality Disorder. She described, and her test results and her test results and presentation support, that she has been making progress in recognizing the traits and not letting them consume her beliefs and actions. Ms. Kahraman endorsed a history of significant anxiety, occurring prior to when the children were removed from her care. It is also noted that she may have been experiencing a Delusional Disorder at that time, though she appears to be more accepting of medical

evidence and her role in the children's health problems at this time.

Ms. Kahraman, and others, have described that the children are healthy. Though, they have been diagnosed with Autism Spectrum Disorder, which is not a curable condition. Ms. Kahraman has demonstrated that she is capable of seeking services for the children and getting them the support they need. She needs to demonstrate that she is capable of not getting hyper focused or stressed if an issue does arise. Mother has a pattern of becoming hyper focused on the health of the children and then adhering to rigid guidelines. She admitted to these patterns; she described that she has gained insight into her attitudes and behaviors, and that she has been much less rigid as of late. Ms. Kahraman further expressed that she was desperate for answers and support previously, in part due to high anxiety and lack of support. She was able to recognize that her anxiety was recognized and likely wore off on the children. Ms. Kahraman described that she has made positive changes for herself, which she believes will have a positive impact on her children, if they are returned to her care.

Ms. Kahraman's prognosis appears to be improved since her last psychological evaluation. It continues to be dependent on her willingness to be open to gaining insight regarding her role in her children's health issues, and her ability to make the necessary changes as a result. Ms. Kahraman still spoke at length about the children's medical issues, and suggested that there may have been some underlying issues that contributed to their issues. Yet, she acknowledged that malnutrition from their diet was mostly responsible.

Ms. Kahraman has demonstrated that she is invested in having the children returned to her care. Records have suggested that she has done well at visits and that she has likely demonstrated as much as possible given the current limitations of her interactions with the children. Mother explained that she is willing to make changes. The next steps may include her having more flexibility in her interactions with the children, particularly as it relates to food and her focus on their physical health. Eventually, if they are going to be returned to her care, Ms. Kahraman will need to demonstrate that she can choose appropriate meals for the children. It would be best to do this in a step-wise fashion. Mother also needs to continue to accept that the children are strong and healthy, and to not reinforce symptoms or ailments in the children. Ms. Kahraman would benefit from continuing with her mental health treatment. She described that she has made significant personal progress. She would benefit, however, from additional insight to help her understand her role in this case. She also could benefit from support to remind her to stick with the changes she has made and not resume her previous patterns of rigidity and inflexibility, especially if she is getting more time or freedoms with the children.

Some sort of mediation or family services would be beneficial if the children are to be returned to both homes. They family needs a parenting plan so that the children have similar routines and rules while in the two different homes; this is particularly important given the children's Autism diagnosis. Mother expressed interest in co-parenting with Father, though was somewhat worried about how he would interact with her. Father expressed disinterest in co-parenting.

It appears that Ms. Kahraman has been given the services that she needs to be successful; she has also participated in additional services on her own accord. Loosening the restrictions related to her interactions with the children will help her better demonstrate if she is able to make ongoing, measurable changes. This will need to occur if the children are to be returned to Ms. Kahraman's care.


Records Review Evaluation with Dr. Michael Kelly

Dr. Kelly completed his evaluation on 12/02/2019. Dr. Kelly noted the following:

It is my opinion, with reasonable medical certainty, that allowing Ms. Jessica Kahraman to care for her sons, Dylan and Kenan, places them in significant danger for additional harm.
It is also my opinion that additional recommendations must be followed to determine if Ms. Kahraman is psychotic and/or has other mental health conditions that are preventing her from parenting the boys safely.
It is my opinion that Ms. Kahraman needs mental health treatment services, like those described in the opinion section of this report, in order to make enough progress toward the goal of reunification with Dylan and Kenan.

I cannot opine on whether Ms. Kahraman meets Diagnostic Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) criteria for a mental disorder because she deferred meeting with me, and I was not granted access to her entire medical record. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman's behavior toward her sons raises concerns for mental illness, and that regardless of the cause of Ms. Kahraman's behavior, she is currently incapable of providing safe and adequate care to her boys. (Please see pages 4-13 of the evaluation attached for his evidence that supports his opinion) Dr. Kelly reports in the 10 pages that Ms. Kahraman's concerns about food and chemical sensitivities are unwarranted. Dr. Kelly states "It is unclear whether Ms. Kahraman's statements related to Kenan's chemical sensitivities reflect attempts to evade detection of abuse or serves as evidence that she has lost touch with reality." and "Ms. Kahraman was aware that restricting her boys' nutritional intake for extended periods of time would cause harm." Dr. Kelly noted "Ms. Kahraman's decision to defer taking Kenan to the hospital despite allegedly observing him have seizures, vomit up liver flukes, and pass parasites in his stool defies common sense."

It is my opinion, with reasonable medical certainty, that Ms. Kahraman is currently unable to demonstrate minimally adequate parenting skills. Ms. Kahraman will require continued mental health treatment and appropriate supervision to determine if she can demonstrate minimally adequate parenting skills in the foreseeable future. Please see the examples of Ms. Kahraman's behavior in this report and the Jessica Kahraman Date of Birth: 08/29/1972 accompanying chronological summary of records for evidence supporting my opinion.

It is my opinion, with reasonable medical certainty, that Kenan and Dylan are at risk for serious harm if returned to Ms. Kahraman's care. Evidence supporting my opinion includes, but is not limited to, Ms. Kahraman's belief that the boys' health

problems are due to sensitivities to environmental chemicals and mold rather than inadequate nutrition, her unsubstantiated claims that Kenan has been infested with parasites, and her reports of chronic food intolerances that were shown to be false once the children were removed from her home.

I carefully considered whether Ms. Kahraman's current treatment program was optimal based on the findings and recommendations from Dr. Mary Oakley's psychological evaluation dated 04/16/2019. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley. It is also my opinion that Ms. Kahraman may benefit from additional mental health services as she progresses toward reunification with her sons.

It is my opinion that the standard protocol for therapeutic supervised visitation used by DCS must be followed in order to ensure Dylan and Kenan's safety. Dylan and Kenan's parents should not be allowed to supply food during visits. Ms. Kahraman's continued denial of the cause of Kenan's health problems and her role in precipitating them and records indicating that she may have misrepresented Kenan's calorie count in the hospital, of her role in precipitating the boys removal from her care, medical records indicating that she may have misrepresented Kenan's calorie count during his hospital stay necessitate that the parents not be allowed to supply food during visits.

Father, Ahmet Kahraman

Individual Counseling

In April 2020 Mr. Kahraman worked in therapy on processing his emotions regarding the Dr. Kelly report and mother's psychological evaluation. Mr. Kahraman was working on making a plan to keep his children safe in regards to Ms. Kahraman.

In May 2020, Mr. Kahraman continued to work on safety planning for his children and how that would look in the future. Mr. Kahraman continued to process the children's medical history and what they have experienced, including internal hydrotherapy.

In June 2020, Mr. Kahraman's therapy decreased to biweekly. Mr. Kahraman expressed concerned whether or not Ms. Kahraman was following through on her reported willingness to coparent due to the fact that Ms. Kahraman would rather have the children placed with her parents instead of father.

In July 2020, Ms. Kahraman was successfully closed from therapy with all goals being met.

Psychological Evaluation

Mr. Kahraman completed a psychological evaluation with an interpreter present on 2/19/2020. Dr. Oakley noted the following:

Mr. Kahraman was referred for a psychological evaluation by DCS. He denied current or past symptoms consistent with a mental health diagnosis. He further denied a history of participating in mental health treatment prior to DCS involvement. He described his mood is generally positive and happy; he added that he has been feeling more hopeful as of late because his only significant stressor is the DCS case and he believes he is making progress. Mr. Kahraman reported that he has been participating in individual counseling for the duration of the DCS case to discuss how to protect the children, including healthy eating habits. He further noted that, more recently, he has been seeing a second therapist related to his divorce; this therapist helps him understand the divorce processes and to process the relationship. Mr. Kahraman described his counseling experiences as positive; he believes that he has been making progress and gaining insight. Mother has made allegations that Ms. Kahraman has a drinking problem. He denied the claim, though admitted that he consumed alcohol more frequently once the children were removed from his care; he denied a history of alcohol abuse. He does have a history of one DUI charge. Yet, Mr. Kahraman has apparently been doing UA screenings which do not indicate that he has been drinking. Testing results indicate that Mr. Kahraman's cognitive abilities are estimated to be in the average range of functioning. There is no indication that he has any cognitive abilities which would interfere with his ability to parent. Mr. Kahraman's MMPI questions were read to him by the interpreter. His responses yielded an invalid profile due to underreporting problems that most people admit to. It is possible that this response style was due to the translation of questions. Furthermore, Ms. Kahraman described that the Turkish language is much more direct and to the point, which also may have contributed. Either way, there were no test results available. Mother has described that Mr. Kahraman is angry and has been vindictive since they separated. She further described that he has low tolerance for the children. Mr. Kahraman denied these claims. There were no reports or observations from the current evaluation or records to support Mother's claims. Yet, there is no valid testing to be utilized for the evaluation to provide further insight. Because Mr. Kahraman denied experiencing any mental health symptoms, and there was no indication from records or testing to suggest otherwise, he was not given any mental health diagnoses, aside from Tobacco Use Disorder. His diagnoses were noted to be deferred; more information could change the conclusions.
Overall, Mr. Kahraman meets criteria for the following diagnoses:
305.1 – Tobacco Use Disorder Diagnosis Deferred

Mr. Kahraman admitted that he was not persistent enough when he had concerns about the children's health and eating habits. He explained that he expressed his concerns to Mother, but that she did not respond to his concerns and continued to take charge and control the situation. Mr. Kahraman further admitted that because Mother has a medical background and he is not familiar with medical terminology, that he deferred medical decisions to Mother. He expressed anger at Mother because he believes that she is responsible for the children's health issues. He acknowledged that he did not protect the children and stated that, now that he has more insight, he is willing to do whatever it takes to protect the children. He described that he does not want the children to be around Mother and that he does

not intend to coparent.

Mr. Kahraman reported that he smokes cigarettes. He noted that he intends to quit. He needs to ensure that he does not smoke around the children so that he does not expose them to the harmful effects of second hand smoke. No other diagnosis were given at this time. Mother has described that Father is angry and short-tempered. Mr. Kahraman admitted that he is angry with Mother for hurting the children. He denied that he is generally angry or short with the children.

Mr. Kahraman acknowledged that he has previously deferred all medical decisions to Mother. If the children are to be returned to his care, he will need to take over the medical decision making. The boys have diagnoses of Autism Spectrum Disorder, which is not a curable condition. It is likely that they will need additional services in the future. Mother has described that Father was not particularly involved with the children and that he had a short-temper with them. Mr. Kahraman denied these claims and stated that he has been an active part of the children's lives and that he enjoys his time with the children. There were no records to suggest that Father was inappropriate with the children. Mr. Kahraman stated that he intends to parent the children independently. This will be an adjustment to his lifestyle if it occurs. He described that he has support. Otherwise, he may be required to coparent. It is unclear how well he will coparent and if he will be able to put the children's needs above his own emotions.

Mr. Kahraman's prognosis is fair. He has apparently gained insight regarding the case. Furthermore, he has taken accountability for his actions and described that he is willing to protect the children. There is some concern how well he will be able to coparent, if it comes down to that.

Mr. Kahraman has been transitioning to more privileges with the children. It is advised that this trend continue, as long as things continue to go well. He should be included in any medical appointments so that he can get in the habit of being an active participant.
Furthermore, Mr. Kahraman would benefit from continuing with individual counseling services to help him cope with the adjustment of having the children more time and on his own. Treatment should address coping skills to utilize if he becomes overwhelmed. He should also be encouraged to address his anger with Mother in treatment, and any resulting behaviors. Treatment should address different types of relationship violence. If the children are going to be returned to both homes, some sort of mediation or family services would be beneficial. They family needs a parenting plan so that the children have similar routines and rules while in the two different homes; this is particularly important given the children's Autism diagnoses. Mother expressed interest in coparenting with Father. Mr. Kahraman expressed disinterest in coparenting.

Parent Aide

Mr. Kahraman completed his intake for parent aide services on 02/18/2020. Mr. Kahraman completed one skill session for February 2020, which focuses on proper nutrition and meal planning. In February and March 2020, father has attended all

visitation and skill sessions. The parent aide reports that father is open and engaging in the skill sessions. Mr. Kahraman is flexible with his children and allows for them to lead the visit and provide ideas on things they would like to do.

In April 2020, Mr. Kahraman attended all visitation and skill session. The midpoint was completed in April and Mr. Kahraman fully enhanced 4 out of 9 protective capacities. The parent aide reported he had made progress in the remaining 5 capacities, but they were still working on them. He fully enhanced the following capacities:

Controls Impulse
Sets aside own needs for child
Recognizes Threats
Understands Protective Role

In May and June 2020, Mr. Kahraman attended all visitation and skill sessions. Mr. Kahraman fully engaged in all skill sessions and was open to feedback and communication with the parent aide. By the end of June 2020, Mr. Kahraman had fully enhanced the remaining 5 capacities. The following 5 capacities were enhanced:

Takes Action
Is Self-Aware
Recognizes Childs Needs
Plans and Articulates plans for protection
Meets own emotional needs

In July 2020, the parent aide and Mr. Kahraman continued to review all capacities until successful closure on 7/30/2020.

## VI.   PARENTING TIME (VISITATION)

### A.   The plan for parenting time (visitation) for each parent and child; including the frequency, length, location, level of supervision, why a less restrictive level of supervision is not sufficient to ensure child safety, and the plan for progressive parenting time.

Ms. Kahraman currently has 4 hours of therapeutic visitation through Southwest Human Development. These visits occur at the SWHD visitation center.

Mr. Kahraman currently has unsupervised overnight visitation with the children.

### B.   Attendance at, and results of, parenting time (visitation) between each child and parent, guardian, or custodian since the last report to the court.

Mr. Kahraman has consistently attended all visitation.

Ms. Kahraman was consistently attending visitation, however on 4/22/2020, mother informed all parties that she intended to record the visitation and feedback

sessions. This is a violation of Southwest Human Development policy, so visitation did not occur until 5/11/2020 as Ms. Kahraman was awaiting a ruling from the court on recording visitation. Since visitation resumed, Ms. Kahraman has been consistent with visitation.

## VII.  PERMANENCY GOAL AND CONCURRENT PLANNING

### A.  Permanency goal and target date (attach case plan).

Family Reunification with a target date of 09/27/2020.

### B.  Concurrent goal and target date, including a description of activities initiated to implement the concurrent plan, if applicable.

N/A

### C.  Recommended permanency goal and target date, if different than the current permanency goal.

N/A

### D.  Reason for recommended change in permanency goal, if applicable.

N/A

## VIII.  DCS SPECIALIST'S CONCLUSIONS

It is this case manager's conclusion that Mr. Kahraman has demonstrated the ability to safely parent Dylan and Kenan Kahraman and is able to meet all of their needs. Mr. Kahraman is aware and is able to articulate the current safety concerns with Ms. Kahraman parenting the children. Mr. Kahraman is able to meet the children's educational, medical, and behavioral health needs.

Ms. Kahraman is a significant safety concern to her children with the choices she makes on their behalf in regards to their health and well-being. Ms. Kahraman is encouraged to continue to work with Southwest Human Development and her therapist Dr. Celice Korsten to make progress towards being able to safely and appropriately parent her children.

It is respectfully recommended that Dylan and Kenan Kahraman be placed in the physical custody of their father, Ahmet Kahraman.

## IX.  RECOMMENDATIONS

### A.  Agency

**It is respectfully recommended that** Dylan and Kenan Kahraman **remain a ward(s) of the court, committed to the care, custody and control of the Arizona Department of Child Safety.**

**It is further recommended that** Dylan and Kenan Kahraman **be placed in the physical custody of** Ahmet Kahraman **with appropriate medical,**

Progress Report to Juvenile Court

social, and educational authorizations.

If the child is in out-of-state placement, it is further respectfully recommended that the court find that the out-of-state placement continues to be appropriate and in the best interest of the child.

**B.    Financial**

It is respectfully recommended that beginning (date) _____ , the parents listed below be assessed the following amounts on a monthly basis per child as the contribution towards the cost of foster care:

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

**C.    Reasonable Efforts Findings**

It is respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to eliminate the need for continued out-of-home placement and to make it possible for the child to safely return home.

It is further respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to place the child in a timely manner in accordance with the permanency plan and to finalize the permanent placement of the child.

It is further respectfully recommended that the court approve the permanent case plan.

Respectfully submitted:

**Name/Title**    Madison Bell DCS Specialist
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**    480-656-9306
**Date:**    08/04/2020

**Approved by:**

Page    Progress Report to Juvenile Court
19

DCS Supervisor    Taylor Ferguson
for
**Name/Title**    Mecca Temple DCS Program Supervisor Mecca Temple
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**    480-656-9427
**Date:**    08/04/2020

**Case Name:** KAHRAMAN, JESSICA    **Case ID:** 608484



**CASA**
FOR CHILDREN
MARICOPA COUNTY

CLERK OF THE
SUPERIOR COURT
FILED
C. CAMACHO, DEP

2020 AUG 12 PM 12: 16

## CASA COURT REPORT

**Court Hearing Date:** 08/14/20
**CASA:** Susan Stark
**County:** Maricopa
**JD No:** JD532206
**#/Placements:** 2 each
**Contact Hours:** 508.50



| CHILD(REN)'S NAME | AGE |
|---|---|
| Dylan Kahraman | 7 |
| K.K. Kahraman | 7 |

## BRIEF HISTORY:

K.K. and D.K. Kahraman were taken into the temporary physical custody of the Arizona Department of Child Safety (DCS) on December 28, 2018. The allegation as to both parents, Mother Jessica Kahraman A.K.A. Jessica Mann and Father Ahmet Kahraman, was Medical Neglect.

K.K. and D.K. were initially placed in separate licensed foster homes, because K.K. required a higher level of care. They are now placed together in the same licensed DDD foster home.

CASA Susan Stark was appointed by Court Order dated May 28, 2019.
Co-CASA Carol Cooper was appointed by Court Order dated July 27, 2020.

Information in this report is current as of August 11, 2020.

## ASSESSMENTS:

K.K. and D.K. Kahraman, Children
At the last CFT, the foster mother relayed how well the boys are coping during the extended stay-at-home orders. I can only assume this is so, having been permitted to have only two virtual visits in 16 weeks.

On the visits we did have, I observed that both boys are as delightful as ever. K.K. has more difficulty following directions and gets frustrated when he is unable to keep up with D.K. but he is artistically creative and frequently develops his own version of a project. When doing small crafts, D.K. finds it easy to follow directions, complete the project, and put materials away. Overall, they seem to be doing well.

The foster mother is working with Mr. Kahraman on virtual education for the boys and has stated a willingness to continue even if they are moved from her home.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031321

Jessica Kahraman A.K.A. Jessica Mann, Mother, and Ahmed Kahraman, Father, Parents
The parents filed for divorce in January 2020. Visits with their children are being held separately.

In June 2020, supervised visits between Ms. Kahraman and the boys returned to in-person visits.

Ms. Kahraman has been participating in individual therapy with a private therapist, after releasing the therapist assigned by DCS in May. In an email to the DCS case manager, the new therapist noted that, since June, "mother states that she recognizes it was the GAP diet that caused the boys problems, not dry erase markers, mold or anyone else."

Ms. Kahraman has asked for family therapy and therapeutic visits with the boys. The boys' individual therapist would like to wait until they can meet in person, after restrictions due to COVID-19 are lifted.

Mr. Kahraman has been determined to have successfully completed six months of parenting skills and is able to apply them appropriately.

The boys have been having overnight visits, and pictures submitted to the court show nutritious eating choices. According to the AZ Baptist Children's Service's records, conversation around meals appears relaxed. Mr. Kahraman has demonstrated the ability to care for the children, listen and set appropriate boundaries.

A Motion for Change in Physical Custody of the boys to Mr. Kahraman was filed on August 7, 2020.

## REASONABLE EFFORTS:
The case plan goal is Family Reunification. DCS has made Reasonable Efforts to achieve this goal.

## OPINIONS and/or CONCERNS:
It is this CASA's opinion that Ms. Kahraman continues to lack insight into how her actions and behaviors, not just the diet, led to the deterioration of the boy's health, causing unnecessary physical and emotional suffering. Disturbing reports of "internal hydrotherapy" a month before Kenan's admission for heart failure, and mother's report that K.K. had a colonic the day before admission, are reflected in the records. D.K. told this CASA that the (acupuncture) needles his mother used to treat both he and K.K. were,"a waste of time, because K.K. got heart failure anyway."

Ms. Kahraman's children have been in foster care for 20 months, yet in May, she decided not to discuss the case at SWHD, beyond the immediate visit. She would not discuss the broader case. It is unclear how much participation is occurring at this time.

This CASA is concerned that family therapy, not just visitation, between Ms. Kahraman and the boys may become more painful than necessary, if Ms. Kahraman does not seek professional advise about their issues beforehand.

Mr. Kahraman has successfully completed the assigned case plan tasks. The children seem to be creating their own "new normal" relationship with him. D.K. has started calling him "Dad." K.K. shared a page

from his journal with his father, told him he was scared, and they talked about it.

In this CASA's opinion, these boys are ready for a permanent home with their father so they can continue to grow, develop, and achieve the milestones of a normal childhood.

## RECOMMENDATIONS:

1.That ███ and ███ Kahraman remain wards of the Court, committed to the care, custody, and control of DCS.
2. That the Motion for Change in Physical Custody of both boys to their Father Ahmed Kahraman be granted with the appropriate medical, social, and educational authorizations.
3. That services currently in place be continued.
4. That the case plan goal remain Family Reunification.

## RESOURCES:

**Persons of Interest and/or Interviewed Since Last Report:**
Children
Foster Mother
Child Family Team members

**Records Reviewed Since Last Report:**
Documents filed with the Juvenile Court
AZ Baptist Children's Services reports
Buwalda Psychology Services, AK, May 2020
SWHD notes, April 2019 to June 2020
Cardon Children's Medical Center progress notes for ███

"THIS DOCUMENT IS DISCLOSED PURSUANT TO RULE 44(a)(3),RULES OF PROCEDURE OF THE JUVENILE COURT, AND IS OTHERWISE CONFIDENTIAL PURSUANT TO A.R.S. § 8 - 522(F), RULE 47(A), RULES OF PROCEDURE OF THE JUVENILE COURT, AND ACJA § 7 - 101(G).THIS DOCUMENT CANNOT BE DISCLOSED EXCEPT UPON ORDER OF THE COURT OR AS OTHERWISE PROVIDED BY LAW."

Respectfully submitted,

**Susan Stark**
**Court Appointed Special Advocate**

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



# CASA COURT REPORT
## DISTRIBUTION FORM

Kahraman
CASE NAME

532206
JD#

8-14-2020
HEARING
DATE

Susan Stark
CASA

8-11-2020
DATE
SUBMITTED

| DISTRIBUTION DATE | | EMAIL ADDRESS | |
|---|---|---|---|
| 8-11-2020 | Hon. Jennifer Green | n/a | |
| | HEARING OFFICER | EMAIL ADDRESS | |
| 8-11-2020 | Shelby DeMassari | n/a | |
| | JUDICIAL ASSISTANT | EMAIL ADDRESS | |
| 8-11-2020 | Madison Bell | madison.bell@azdcs.gov | |
| | DCS CASE MANAGER | EMAIL ADDRESS | |
| 8-11-2020 | Kinda Johnson-Hurd | oladep@maricopa.gov | |
| | CHILDREN'S GAL | EMAIL ADDRESS | |
| 8-11-2020 | DeeAn Gillespie Strub | mailroom@gillaw.com | |
| | MOTHER'S ATTORNEY | EMAIL ADDRESS | |
| 8-11-2020 | Rachel Metelits | rachelk.metelits@maricopa.gov | |
| | FATHER'S ATTORNEY | EMAIL ADDRESS | |
| 8-11-2020 | FCRB | rptfcrb@courts.az.gov | |
| | | EMAIL ADDRESS | |
| 8-11-2020 | AAG | psssef@azag.gov | |
| | | EMAIL ADDRESS | |
| 8-11-2020 | Court Clerk | Hand-delivered | |
| DISTRIBUTION DATE | | | |

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

AZ-KAHRAMAN031324