Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480-999-4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jessica Kahraman, *et al.*, <br><br> Plaintiffs <br><br> v. <br><br> The State of Arizona, *et al.*, <br><br> Defendants. | Case No.: CV-22-00375-PHX-SRB <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> (Hon. Susan R. Bolton) <br><br> ORAL ARGUMENT REQUESTED |

At the trial in this matter, the jury will be asked to consider questions about whether State Defendants' actions fell below the standard of care applicable to DCS ongoing case managers and supervisors, among other issues not litigated in the juvenile court dependency proceedings. State Defendants' Motion for Summary Judgment (Doc. 216) (the "motion") is more akin to a motion for reconsideration, essentially asking this Court to revisit rulings it made at the motion to dismiss stage. For instance, the overarching theme of the motion centers on three preclusions arguments this Court already rejected. State

Defendants offer no cogent reason why suddenly any of the preclusion arguments now apply. Nor do they identify with any specificity or precision the claims and issues they allege were decided by the state court or where in the record those rulings are found. In short, State Defendants' preclusion arguments fail on the merits for one simple reason— issues such as the standard of care were not litigated in the state court dependency proceedings and there are no final, binding, or sufficiently conclusive rulings from the juvenile court on the merits of the issues or claims here to support issue, claim, or *Rooker-Feldman* preclusion. Beyond the preclusion arguments, there is an abundance of evidence in the record to support Plaintiffs' claims. Consequently, State Defendants' Motion for Summary Judgment should be denied, and this matter should proceed to a jury trial.

## MEMORANDUM OF POINTS OF AUTHORITY

### I.    OVERVIEW

State Defendants moved this Court for summary judgment arguing: (1) issue preclusion, claim preclusion, and *Rooker-Feldman* bar Plaintiffs' § 1983 claim re: familial interference (Count 2); (2) issue preclusion, claim preclusion, and *Rooker-Feldman* bar Plaintiffs' tort claims: Count 8 (negligence/legal rights), Count 9 (negligence/reasonable efforts), Count 10 (negligence per se), and Count 11 (negligence per se – DCS directors); (3) lack of causation bars all claims; and, in addition to preclusion bars and a lack of causation, (4) failure to establish the elements of unwarranted interference with the family relationship (Count 2); (5) Plaintiffs' negligence claims (Counts 8, 9, 10, and 11) are overlapping, repetitive theories of negligence and negligence per se; (6) abuse of process claim (Count 12) fails as a matter of law; and (7) the intentional infliction of emotional distress claim (Count 13) fails because Plaintiffs cannot establish the three necessary elements. State Defendants' arguments, to the extent they are discernable, are unpersuasive, particularly since genuine disputes exist about material facts thus precluding summary judgment and because factual disputes and issues, such as causation, breach of the applicable standard of care, reasonableness of Bell's and Temple's actions must be determined by the jury, not the Court. State Defendants' motion should be denied.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## II.    **BACKGROUND**

This action arose out of State Defendants' removal and nearly two-year detention of twin brothers D.K. and K.K. from their parents, Jessica and Ahmet Kahraman. D.K. and K.K. suffered from chronic health issues and none of their healthcare providers, all of whom were mandatory reporters, ever raised concerns of neglect, abuse, or Munchausen Syndrome by Proxy[1] of either parent.  **CSOF ¶¶ 2, 5.**

Due to the boys' mobility issues in 2018, Jessica commenced care with Nicole McCants, DPT, at Advanced Neurologic Rehabilitation in Chandler, Arizona. **CSOF ¶ 20.** Dr. McCants noted that K.K. displayed similar symptoms as D.K., including progressive weakness in his lower extremities and requiring a wheelchair to ambulate. *Id.* On November 1, 2018, she advised Jessica to take K.K. to the Emergency Department ("ED") at Phoenix Children's Hospital to expedite a neurological evaluation.  *Id.* **at 5**.

K.K. and D.K. were seen at Phoenix Children's Medical Group for a Neurology consult with Dr. Daniel Crawford on November 18, 2018. **CSOF ¶ 5.** Dr. Crawford recorded K.K.'s general appearance as "well developed, well nourished, no apparent distress," with normal cardiovascular (i.e., no palpitations) and no chest pains. Dr. Crawford made referrals to genetics and rheumatology. K.K. was sent home with instructions to call the office or bring him to the ED if his symptoms worsened or new neurologic concerns arose. *Id.*

On December 18, 2018, his parents took K.K. to the ER at Banner Desert Medical Center ("Banner") due to lethargy, swelling in his hands and face, and a loss of appetite. Doc. 217 ¶ 1- Exhibit 1; **CSOF ¶ 1**.  Dr. Stewart examined K.K. and diagnosed acute right

---

[1] Munchausen Syndrome by Proxy ("Munchausen" or "MSBP") is an extremely rare DSM-5 mental health diagnosis by which its sufferers seek out unnecessary medical care for another to satisfy their own need for attention. Factitious Disorder Imposed on Another (FDIA): What It Is. In those rare cases where it is diagnosed, the perpetrator is usually a mother and the victim, her child. *Id.* Munchausen is also now more commonly known as "Fictitious Disorder Inflicted on Another" ("FDIA"), and as medical abuse. *Id.* The term "medical neglect" is a much broader term sometimes used to include MSBP/FDIA, although true MSBP/FDIA is premised on abuse, not neglect.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

heart failure, failure to thrive, anasarca, lower extremity weakness, pleural effusion, pulmonary hypertension, retarded development and malnutrition. *Id.* Dr. Stewart based his diagnosis on K.K.'s bloodwork, which showed the presence of ketones and slightly reduced glucose level. **Id. at 3**. Dr. Stewart admitted K.K. and assembled the Banner Suspected Child Abuse and Neglect ("SCAN") team who then called the Arizona Department of Child Safety ("DCS"). *See* **Doc. 217 ¶ 4-Exhibit 2 at 15; CSOF ¶ 4**. While K.K. was hospitalized, Dr. Miga attributed K.K.'s health decline to a possible metabolic disorder and chronic GI issues. **CSOF ¶ 12**. He recommended that K.K.'s diet be broadened and he assured the parents that Banner dietitians would assist them with broadening the diet. Unfortunately, Banner dietitians did not offer this support. **CSOF ¶ 8**.

Banner nurse practitioner and SCAN team member Maria Chico interviewed K.K.'s parents. She then put forth a malicious and false narrative that the parents were MSBP parents by manipulating the examining specialists' reports, including false claims that Jessica denied K.K. necessary treatments. **CSOF ¶ 11.** Tellingly, Ms. Chico's assessment did not align with that of Ashley Gershanov, MSW, who also interviewed Jessica with Ms. Chico on December 19, 2018. Ms. Gershanov reported that Jessica expressed her agreement and willingness to follow the medical team's recommendations**. Id.** Dr. Stewart opined that malnutrition was the most likely cause of K.K.'s medical condition. **CSOF ¶ 6, Exhibits E, L**. Dr. Stewart failed to speak with K.K.'s treating physicians or review those records, nor did they conduct any further testing to find the root cause of K.K. medical condition. *Id*.

Following Chico's hotline call, Sarah Kramer was assigned as the DCS Specialist to investigate the allegations. Kramer demanded that Jessica bring D.K. to Banner to undergo a medical evaluation/screening for malnutrition. **CSOF ¶ 16**. D.K was diagnosed was bilateral lower extremity weakness, but not malnutrition, and discharged home. *Id*.

On December 28, 2018, without conducting the statutorily mandated thorough investigation, *see* A.R.S. § 8-456, Kramer filed an Application for Ex-Parte Removal of the children based solely on Dr. Stewart's "suspicion" of medical neglect and/or child

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

abuse. **Doc. 217, ¶ 15; Doc. 217-3; CSOF ¶ 15.** Based solely on Kramer's ex parte application, on December 28, 2018, the juvenile court issued an Order for Ex Parte Removal of D.K. and K.K. *Id.* Kramer also disingenuously averred, under penalty of perjury, that D.K. was "severely malnourished," a claim for which there was no medical support. *Id*.

On December 29, 2018, Kramer and her supervisor (Mendez) authorized Banner security and Mesa police officers to physically remove both parents from K.K.'s hospital room. K.K. watched in horror and cried for their return. **CSOF ¶ 14.** Banner staff further traumatized K.K. by telling him that his parents would return tomorrow knowing, however, that Kramer and Mendez prohibited their return. *Id***.**

On December 31, 2018, Kramer advised several DCS supervisors that Madison "Maddie" Bell, who had a history working MSBP/FDIA cases at the department, wanted the Kahraman case assignment and had already spoken with Mecca Temple, her supervisor, about the case. **CSOF ¶ 89.** Bell was assigned as the ongoing Case Manager on January 15, 2019, and began handling the case as a MSBP/FDIA case. **CSOF ¶ 90**.

Once Bell had the case, she restricted the parents from seeing their children but for two supervised hours per week. Since she was treating this case as MSBP/FDIA, Bell engaged Southwest Human Development ("SWHD"), the agency the Department regularly uses for MSBP/FDIA cases, to supervise those visits; she also ordered psychiatric medical reviews. **CSOF ¶ 90; Exhibit AC** (Bell Dep. Tr. Vol. 1) at 73:18-75:10.

On January 8, 2019, Kramer submitted a Report to the Juvenile Court for Preliminary Protective Hearing and/or Initial Dependency Hearing with the same facts alleged in the Application for Ex-Parte Removal. Doc. 217-3; Ex. 203 at 11; **CSOF ¶ 23**.

On January 9, 2019, a preliminary hearing occurred where the court ordered services be offered to the parents, including psychological evaluations and therapeutic visitations, and continued DCS' custody of the boys. Doc. 217-5, Ex. 216; **CSOF ¶ 25.** The court did not order that SWHD provide these services, nor did the court order DCS or SWHD to follow a MSBP/FDIA protocol. *Id*.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

On April 18, 2019, high levels of toxic black mold were discovered in the Kahraman home with a high concentration in the walls of D.K.'s and K.K.'s bedroom and bathroom. **CSOF ¶ 33**. The boys had been living in, sleeping in, and using those rooms since birth – nearly six years before K.K.'s hospitalization. **CSOF ¶ 12.** Independent lab testing and licensed mold inspectors identified strains of mold known to cause the very symptoms the boys had been experiencing. **CSOF ¶¶ 12, 44**. An environmental medical specialist, Dr. Ronald Peters, and the boy's pediatrician, Dr. Jensen, agreed there could be a connection between mold and the boys' symptoms. **CSOF ¶¶ 1, 5, 44**. Both parents tested positive for significant levels of mycotoxins. **CSOF ¶¶ 12, 44**. Once the parents moved out of that home, their mold-related symptoms improved. **CSOF ¶ 44**.

The parents sought to have the boys examined by Dr. Melanie Alarcio, a pediatric neurologist specializing in mold toxicity, to determine if the boys were also victims of mold toxicity. Doc 217 ¶ 41, Ex. 224; **CSOF ¶ 44**. Inexplicably, DCS objected to the boys being tested for mold toxicity with the obscure, weak justification that the boys should not suffer any additional needle pricks. **Doc. 217-6 227, CSOF ¶ 44**. On June 25, 2019, the court ordered DCS to engage a PCH doctor to review records and opine if testing for mold was warranted. Doc. 217 ¶ 42, Ex. 229, **CSOF ¶ 42**. Again inexplicably, Bell and/or DCS engaged a PCH doctor with no training in mold to conduct the records review. Doc. 217 ¶ 44, **CSOF ¶ 44**. The problem was that mold toxicity did not fit with Bell's MSBP/FDIA narrative. **CSOF ¶ 48.** Predictably, the doctor engaged by DCS, Dr. Jodi Carter, opined that testing the boys for mycotoxin was not warranted. Doc. 217 ¶ 44, **CSOF ¶ 44**.

Pursing their theory that Jessica was a MSBP/FDIA parent, Bell arranged for her psychological examination on April 16, 2019, by one of DCS' regular service providers, Dr. Mary Oakley, Psy.D., CMPC. **CSOF ¶¶ 93, 99**. In what was surely a grave disappoint to Bell, Dr. Oakley's report was positive regarding Jessica, and she did not diagnose Jessica with MSBP/FDIA or any other mental health disorders. **CSOF ¶ 99**. Bell and Temple ignored Dr. Oakley's positive report, as did SWHD; all refused to lift the MSBP/FDIA protocol they had imposed on Jessica. **CSOF ¶¶ 48, 90, 94**. Not to be deterred from their

false narrative, DCS, via Bell and Temple, spent $33,800 to commission a records review by Dr. Michael Kelly, an out-of-state provider engaged by Bell on several other MSBP/FDIA cases, hopeful that he would substantiate the MSBP/FDIA narrative. **CSOF ¶ 93, Ex. AC** (Bell Dep. Tr. Vol. 1 at 73:18-75:10).

Bell did not provide Dr. Kelly with a complete set of medical records for his review—she neglected to give him several records that tended to refute the allegations of neglect. **CSOF ¶ 46**. Dr. Kelly did not interview Jessica nor have a full family or social history for her. **CSOF ¶ 86**. However, Bell made sure Dr. Kelly had Dr. Oakley's report to poke holes in it. Not surprisingly, on December 2, 2019, Dr. Kelly issued a report where he takes issue with Dr. Oakley's report and supports the Department's narrative that Jessica is a danger to her boys. **CSOF ¶ 46**. However, Dr. Kelly did not make any DSM-5 diagnosis, including not MSBP/FDIA. CSOF ¶¶ 46, 56, 58.

In or around January 2020, DCS and Mother agreed to amend the dependency petition to proceed on allegations of neglect only, all abuse allegations were stricken. **CSOF ¶ 50**. On January 6, 2020, Mother pled "no contest" to the neglect allegations; thus, the juvenile court did not receive any sworn testimony. Doc. 217 ¶ 51, Ex. 247 at 2. Consistent with the no contest plea, the juvenile court found the boys dependent as to Mother for *neglect only* for failing to seek appropriate medical care and not taking "sufficient responsibility for her actions, specifically regarding the children's malnutrition." Doc. 217 ¶ 51, Ex. 247 at 3; **CSOF ¶ 50**.

With Dr. Kelly's report in hand, Bell sent it to Dr. Oakley and arranged for a second examination of Jessica, thus giving Dr. Oakley the opportunity to modify her earlier view and align herself with Bell's MSBP/FDIA narrative and Dr. Kelly's report. **CSOF ¶ 97**. Unfortunately for Bell, Dr. Oakley authored a second positive report and found that Jessica was of sound mind, did not require psychiatric evaluation, made no mental health diagnoses, and recommended that DCS relax the visitation and food handling restrictions imposed on Jessica. ***Id.*** Again, however, Bell, Temple, and SWHD ignored Dr. Oakley's positive report and refused to lift the restrictions on Jessica's visits at SWHD. **CSOF ¶¶**

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

7

**81, 96**. Shockingly, in April 2020, only two months after Dr. Oakley's second positive report, Bell and Temple went a step further and sought to change the case plan from reunification to severance of Jessica's parental rights. **CSOF ¶ 91**.

Mother then hired Eli H. Newberger, M.D., a leading authority on child abuse and MSBP/FDIA, to conduct a comprehensive file review and interview with Jessica. **CSOF ¶¶ 56, 58, 61; Ex. L**; Ex. BH at 19:5-5. Dr. Newberger issued a report on May 7, 2020, which provided yet another positive evaluation of Jessica and a scathing evaluation of Dr. Kelly's report and Bell's handling of the case. **CSOF ¶¶ 58, 61; Ex. BH at 20:18-23:2.** Dr. Newberger was critical of Bell stating,

> I find it remarkable that caseworker Madison Bell changed the DCS case plan to severance in the course of the last three weeks. Defendant Bell did not consider the scope of information available. She appears to be rigidly stuck in a false narrative that Jessica is dangerous, delusional and harmful to her children.

**CSOF ¶¶ 56, 58, 61 Ex. L at 44 ¶ 118; CSOF ¶ 99**. Dr. Newberger recommended that the boys be immediately returned to Jessica.[2] **Exhibit L**. Bell and Temple, being consistent with their pattern to date, ignored Dr. Newberger's report, did not include any portion of it in their court reports, and failed to expand Jessica's visits or lift the prohibition on her providing home cooked meals. **CSOF ¶¶ 56, 97.** Nor did they return the boys to Jessica's care and custody. **CSOF ¶¶ 58, 61, 81.**

On August 28, 2020, Ann Shroeckenstein, Psy.D., of Phoenix Family & Forensic Services, LLC, issued her Expert Consultation Record Review Report, which was positive for Jessica. **CSOF ¶ 97.** Dr. Shroeckenstein did not identify any concerns regarding Jessica's ability to safely parent her children. *Id.* Once again, Bell and Temple ignored this

---

[2] Presciently, Dr. Newberger opined that father, Ahmet Kahraman, was a danger to the boys. **CSOF ¶ 91.** Ultimately, despite DCS aligning itself with father and recklessly returning the boys to his custody, father voluntarily relinquished his parental rights and turned full custody over to Jessica, urinating on the boys' clothes upon turning them over. **CSOF ¶ 102.** He has not seen, spoken with, or supported the boys in any way since then. *Id.*

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

report by not alerting the juvenile court to any aspect of it and by refusing to restore Jessica to full visitation and meal preparation rights. **CSOF ¶ 97.**

Sadly, due to the stress and strain of State Defendants' actions in this case, Jessica's and Ahmet's marriage began to fall apart and he became abusive towards Jessica. Due to Ahmet's abuse and harassment, on December 30, 2019, Jessica obtained a temporary Protective Order against him. **CSOF ¶ 91.** On January 3, 2020, after learning from Bell that Jessica intended to file for divorce, Ahmet did so first and used DCS' false narrative that Jessica was a MSBP/FDIA parent against her. ***Id.*** Bell and Temple knew that Ahmet was abusive – they had seen it themselves – but since Ahmet turned against Jessica and agreed to support DCS' narrative, Bell rewarded him by granting him unsupervised visits and ultimately returning custody of the boys to him. **CSOF ¶ 77.**

To increase Bell's chances of severing Jessica's parental rights, Bell and Temple withheld important information from the court, such as early SWHD reports, which indicated Jessica was meeting her visitation goals, Jessica's therapists' letters discharging her from therapy with successful completion of Bell's three sets of goals, and Drs. Newberger's and Schroeckenstein's positive reports. Bell even went as far as to testify that Jessica still trusted Ms. Plotner and would put the boys back on the GAPS diet even though she knew this statement was false. **CSOF ¶ 61**.

In February 2020, Mother filed a motion to have the boys returned to her custody. Doc. 217 ¶ 53, Exhibit 248. After full briefing, an evidentiary hearing was held on May 12, 2020. **CSOF ¶ 61**. Mother was not allowed to present her experts' reports or their testimony based on procedural objections by DCS. **CSOF ¶ 58**. On June 11, 2020, the court denied the motion. **CSOF ¶ 63**. Then, on August 7, 2020, DCS moved to return the boys to Father's custody. **CSOF ¶ 77**. A week later, on August 14, 2020, Mother responded in opposition to that motion and concurrently filed her own motion to return custody to both parents. **CSOF ¶ 78**. The competing motions were fully briefed by August 28, 2020, but due to the State's objection, only the State's motion was argued by avowals at a hearing on August 31, 2020. **CSOF ¶ 77**. The court granted the State's motion and returned the

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

boys to Father's custody,[3] but set Mother's motion for an evidentiary hearing on September 15, 2020. **CSOF ¶¶ 78, 99**. Drs. Newberger, Schroeckenstein, and Korsten all testified for Mother at that September 15 hearing, where they were all subjected to cross-examination by the State and other parties. *Id*. Importantly for purposes of State Defendants' motion here, the juvenile court took the evidence received at the September 15 hearing under advisement and did not rule on Mother's motion at that time. *Id*.

In November 2020, before the juvenile court could issue a ruling on Mother's change in physical custody motion, DCS moved to dismiss the dependency proceedings with sole custody to Father. **CSOF ¶¶ 77, 78, 99**. The juvenile court granted DCS' motion, dismissed the dependency while maintaining the strict supervised visits for Mother, sole physical and legal custody to Father, and turned the matter over to the family court. *Id*. Mother's pending August 14 motion for change in custody was not ruled on by the juvenile court because it was now moot. **CSOF ¶ 99**. Mother had also filed a motion to hold Bell in contempt for filing false reports with the court that was also left unresolved by the dependency dismissal and transfer of the matter to the family court. ***Id.***

## III.    STANDARD OF REVIEW

Rule 56, Fed.R.Civ.P., provides that a moving party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[T]the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor." *Puentes v. City of San Mateo*, No. C 11-02511 SI, 2011 WL 4005383, at *2 (N.D. Cal. Sept. 8, 2011), aff'd, 481 F. App'x 348 (9th Cir. 2012) (internal citations omitted). "Summary judgment will not lie if the dispute about a fact is 'genuine,' i.e., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 101

---

[3] In March 2020, Bell moved Father to unsupervised visits, including overnight visits in his home, and removed all food and meal preparation restrictions. **CSOF ¶ 91, Exhibit AL**. Mother's visits remained restricted to supervised visits only with full food restrictions still in place.

1   (1986). The trial court must inquire if "the evidence...is so one-sided that one party must

2   prevail as a matter of law" and "should not act other than with caution in granting summary

3   judgment." *Id.* at 242-43, 106 S.Ct. at 2507, 91 L.Ed 202.

4          The "[p]arty seeking summary judgment always bears the initial responsibility of

5   informing the district court of the basis for its motion and identifying those portions of the

6   pleadings, depositions, answers to interrogatories, and admission on file, together with

7   affidavits, if any, which it believes demonstrate the absence of a genuine issue of material

8   fact." *Celotex Corp. v. Catrette*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);

9   Fed. R. Civ. P. 56(a). Furthermore, the Ninth Circuit has held that "[i]n order to carry its

10  ultimate burden of persuasion on the motion, the moving party must persuade the court

11  there is no genuine issue of material fact.  If a moving party fails to carry its ultimate burden

12  of persuasion on the motion, the nonmoving party has no obligation to produce anything,

13  even if the nonmoving party would have the ultimate burden of persuasion at trial.  In such

14  a case, a nonmoving party may defeat the motion for summary judgment without producing

15  anything." *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, *Inc.*, 210 F.3d 1099, 1102-

16  03 (9th Cir. 2000) (internal citations omitted).

17  **IV.   ARGUMENT**

18         **A.   Law of the Case Applies Here to Defeat State Defendants' Three**
               **Preclusion Arguments**

19         State Defendants use five and a half pages of their motion asserting legal arguments

20  this Court previously rejected. *See* Mot. at 4:22-10:5 (preclusion arguments); *see also* (Doc.

21  145 at 8:24, n.13) (order rejecting preclusion arguments made in State Defendants' motion

22  to dismiss); (Doc. 92 at 13:21-15:15) (State MTD making preclusion arguments). State

23  Defendants clumsily argue that they are entitled to summary judgment on all remaining

24  claims here because the issues and claims here were all determined by the juvenile court

25  and this action is nothing more than a de facto appeal of juvenile court rulings and

26  judgments, invoking issue preclusion, claim preclusion and *Rooker-Feldman* as their legal

27  support. Mot. at 4:22-10:5. However, as noted, this Court already rejected those arguments.

28

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

(Doc. 145 at 8:24, n.13). The motion does not specifically identify any evidence received in discovery here that changes that result.

Under the "law of the case" doctrine, a court is "generally precluded from reconsidering an issue that has already been decided by the same court." *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (citing *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993), *cert. denied*, 508 U.S. 951, 113 S.Ct. 2443 124 L.Ed.2d 661 (1993). A court has discretion to depart from "the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result." *Alexander*, 106 F.3d at 876. In the Ninth Circuit, the "principle applies to interlocutory decisions of the same or higher tribunals." *Ridgeway v. Mont. High Sch. Ass'n*, 858 F.2d 579, 587 (9th Cir. 1988). Thus, issues that a district court "determines during pretrial motions become the law of the case." *U.S. v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004). The doctrine is intended to aid "the efficient operation of court affairs" and "maintain consistency during the course of a single lawsuit." *Smith*, 389 F.3d at 948 (internal citations omitted).

Previously, in its motion to dismiss the SAC (Doc. 92), State Defendants argued, as they seem to do now, that "Plaintiffs' claims, if successful, would be contrary to state court rulings." (Doc. 92 at 13:22.) As they seem to do now, State Defendants previously argued that the juvenile court affirmed the boys' removal from mother's custody, that "the [juvenile] court retained jurisdiction and made decisions throughout the case until the dependency was dismissed on November 9, 2020[,]" and that the juvenile court made "related decisions on reasonable efforts," among other things. (Doc. 92 at 14:5-16.) Because of all that, State Defendants argued then as they seem to do now, that "[t]his lawsuit is an improper collateral attack on the state court judgments, so all state and federal claims against [them] require dismissal with prejudice[,]" and that "[t]he *Rooker-Feldman* doctrine is also applicable." *Id*. at 14:26-15:16. This Court made short work of those legal arguments, ruling that:

> State Defendants contend that Plaintiffs' lawsuit is an "impermissible attack" on the juvenile court judgments, or alternatively, that the *Rooker-Feldman* doctrine applies. Plaintiffs are not challenging judgments of or alleging a legal error by the juvenile court but are instead seeking relief from [State] Defendants' allegedly unlawful conduct during their investigation in relation to the dependency proceedings.

(Doc. 145, n.13.) In the present motion, State Defendants do not contend that this Court's prior ruling was clearly erroneous, that there has been an intervening change in the law, that there exists now any substantially different evidence than there was then, that other changed circumstances exist, or that a manifest injustice would result from recognizing and applying the Court's prior rejection of these preclusion arguments. Accordingly, the motion should be denied as to the preclusion arguments on the application of the law of the case doctrine. Nonetheless, genuine issues of material fact exist about what issues or claims here were litigated in the dependency case that were finally decided adversely to Plaintiffs.

## B.    Even in the Absence of the Court's Prior Rejection of the Preclusion Doctrines, None of Those Three Doctrines Bar Plaintiffs' Claims

Even if law of the case does not apply here, issue, claim, and *Rooker-Feldman* preclusion still do not apply here to preclude any of Plaintiffs' claims. At a macro level, what State Defendants fail to understand is that Count 2 – Plaintiffs' claim that Bell and Temple violated their constitutional and statutory rights to familial association by continuing to detain the boys for nearly two years following their initial removal – and the other claims are focused on Bell's and Temple's conduct as the ongoing case manager and supervisor, respectively, not on any adverse rulings by the juvenile court.

All three preclusion doctrines require a judgment on the merits in the dependency that Plaintiffs are purportedly seeking to relitigate here. *See Elia v. Pifer*, 194 Ariz. 74, 81 ¶ 33 (App. 1998) (holding that a final judgment in the issue preclusion context is "any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.") (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 13 (1982)); *Lawrence T. v. Dep't of Child Safety*, 246 Ariz. 260, 261-62 ¶ 8 (App. 2019) ("A final judgment on the merits for the purpose of claim preclusion is one that is not 'tentative,

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

provisional, or contingent and represents the completion of all steps in the adjudication of the claim by the court.'"); *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004) ("*Rooker-Feldman* thus applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court and seeks as her remedy relief from the state court judgment."); *see also Wright v. S. Ariz. Children's Advocacy Ctr.*, No. CV-21-00257-TUC-JGZ, *8 (D. Ariz. Sep. 30, 2022) (holding that *Rooker-Feldman* does not bar district court jurisdiction over claims that DCS violated the plaintiffs' constitutional rights in a dependency proceeding).

Although State Defendants repeatedly protest that Plaintiffs are seeking to overturn juvenile court judgments, the motion fails to identify exactly which of the myriad juvenile court judgments are under attack and were "sufficiently firm" or not "tentative, provisional, or contingent and represents the completion of all steps in the adjudication of the claim by the court." For example, as discussed below, the June 11, 2020, ruling denying a return of custody to Mother was reopened two months later and then never finally ruled upon. Doc. 217 ¶ 78; **CSOF ¶¶ 78, 99**. Indeed, none of the juvenile court judgments were final, appealable orders, nor are any being challenged here. *See Rita J. v. Ariz. Dept. of Economic Security*, 196 Ariz. 512, 513-15 ¶¶ 5-9 (App. 2000) (in a case on all fours procedurally to this one, the appellate court dismissed an appeal from a permanency order as non-appealable holding that orders following permanency hearings and other interim orders, such as those concerning custody, services, placement, or reasonable efforts by the department, are not final decisions because the juvenile court continues to make determinations regarding those issues throughout the duration of the proceedings); *see also* A.R.S. § 8-862 (setting out findings the juvenile court must continually make after a permanency hearing that determine the further direction of a dependency case). The preclusion analysis can and should end here; however, some nuances in each type of preclusion are discussed next.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

### 1.   <u>Issue preclusion does not apply here</u>

State Defendants do not set forth the elements for issue preclusion.[4] Nor do they clearly identify for the Court exactly which issues in this case are precluded by which final juvenile court judgments.[5] These failures are reason enough to deny the Motion.

In Count 2, Plaintiffs allege that Bell and Temple violated Plaintiffs' constitutional rights by, among other things, ignoring exculpatory evidence, experts' opinions, and other things in failing to reunite this family for nearly two years. *See* SAC ¶¶ 93, 104, 114-15, 118, 122 (disregarding reports from Dr. Oakley, Dr. Newberger, Ann Shroeckenstein, and Dr. Korsten); **CSOF ¶¶ 56, 58, 61, 81**. Instead of listening to experts retained and paid by the Department, such as Dr. Oakley ($1,800) and Dr. Rodriguez ($7,525), Bell and Temple spent $33,800 on an out-of-state (purported) medical abuse expert, Dr. Kelly, in an insidious attempt to prove mother was a Munchausen parent and thus unfit to parent. **SAC ¶ 94; CSOF ¶¶ 46, 93**. Plaintiffs also allege that Bell and Temple interfered with mother's progress toward unsupervised visits, her right to prepare meals for the boys, and reunite the family, and that they misrepresented or omitted material information to the juvenile court when seeking to permanently terminate mother's parental rights. SAC ¶¶ 137-41; **CSOF ¶¶ 81, 90-92, 96, 97**. The motion does not present evidence of who, where, when, how, or whether any, all, or some of those issues were litigated in the juvenile court to satisfy the five elements of issue preclusion and their burden on summary judgment.

Simply stated, issue preclusion does not apply here because there was never a ruling by the juvenile court on the appropriateness of services (particularly, whether it was appropriate to hold mother to a Munchausen protocol when she never received a DSM-5 diagnosis, *see* **CSOF ¶¶ 77, 87**), or visitation and custody issues sufficiently firm to be

---

[4] In Arizona,[4] "[c]ollateral estoppel, or issue preclusion, binds a party to a decision on an issue litigated in a previous lawsuit if the following factors are satisfied:  (1) the issue was actually litigated in the previous proceeding, (2) the parties had a full and fair opportunity and motive to litigate the issue, (3) a valid and final decision on the merits was entered, (4) resolution of the issue was essential to the decision, and (5) there is common identity of the parties." *Campbell v. SZL Properties, Ltd*., 62 P.3d 966, 968 (App. 2003).

[5] Neither this Court nor Plaintiffs are obligated to find admissible evidentiary support for State Defendants' contentions.

accorded conclusive effect. *Rita J.*, 196 Ariz. at 513-15 ¶¶ 5-9 (discussed *supra* § IV.B at 14:20-26). For example, even assuming all the wrongs Plaintiffs complain of in Count 2 were actually litigated in the juvenile court, which they were not, issue preclusion still does not apply because the juvenile court's June 11, 2020, ruling on Mother's Rule 59 motion was not a "valid and final decision on the merits" of the question of the boys' custody since it was later reopened in August 2020 but then never ruled on, **CSOF ¶¶ 53, 61, 73, 77, 78, 99**. *Rita J.*, 196 Ariz. at 513-15 ¶¶ 5-9. Nor did Mother have "a full and fair opportunity" to present her case at that hearing since the court did not consider Dr. Newberger's report. **CSOF ¶¶ 56, 63**. Although the court did deny Mother's Rule 59 motion at that time, CSOF ¶ 63, which is the ruling State Defendants rely on for their summary judgment argument, *see* Mot. at 6:4-12, that ruling was not a final ruling on the issue of custody (the issue was later reopened by that court), and Mother did not have the opportunity to present the testimony of her experts at that hearing, **CSOF ¶ 56**. The dependency proceeding remained pending after that ruling. *See* A.R.S. § 8-862. In August 2020, the State filed a motion to change custody to father thus reopening the custody issue. **CSOF ¶ 77**. Mother opposed that motion and filed her own motion to change custody to both parents. **CSOF ¶¶ 78, 99**. The juvenile court conducted an evidentiary hearing on Mother's custody motion on September 15, 2020, at which it received the testimony of Dr. Newberger, Dr. Korsten, and Dr. Shroeckenstein, but rather than ruling on the motion, the court took it under advisement. **CSOF ¶¶ 78, 99**. Then, on November 9, 2020, Bell and DCS moved to dismiss the dependency proceedings before the juvenile court issued a ruling on Mother's custody motion. **CSOF ¶¶ 78, 80, 99**. Consequently, the issue of visitation and reunification vis-à-vis Mother was not fully and finally resolved on June 11, 2020, or at any time before dismissal, nor the subject of a valid and final decision on the merits.[6]

---

[6] At that same hearing on November 9, 2020, the juvenile court dismissed all pending motions as moot, necessarily including mother's custody motion and a motion to find Bell in contempt and transferred the case to the family court. **CSOF ¶ 99**. Less than two months later, mother had unsupervised visits and shared legal custody. **CSOF ¶ 100.** Soon after that, father voluntarily relinquished his parental rights and mother was granted full legal and physical custody of the boys, which she has maintained since then. **CSOF ¶¶ 101, 102.**

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

In sum, summary judgment based on issue preclusion should be denied.

## 2.    Claim preclusion does not apply to this case

As noted directly above, there was not a final judgment on the merits in the dependency case—it was dismissed while Mother's custody motion was pending—and no judgments whatsoever on the merits of the issues pertinent here. Thus, claim preclusion does not apply.[7] *Lawrence T*, 246 Ariz. at 263 ¶ 11 (citations omitted); *see aslo* A.R.S. §§ 8-845(B) (setting forth the criteria for reviewing dependent status); 8-862(B), (C); *see also J'America B.*, 282 Ill.Dec. 317, 806 N.E.2d at 301; *In re A.S.*, 12 Kan.App.2d 594, 752 P.2d 705, 711 (1988) (holding that claim preclusion did not apply because "[t]he case and the issue of unfitness remained open for future review"). Nor does application of the "same evidence" test help State Defendants. Under the "same evidence" approach,

> [f]or an action to be barred [by claim preclusion], it must be based on the same cause of action asserted in the prior proceeding. Arizona has applied a rather restrictive test to resolve this question: If no additional evidence is needed to prevail in the second action than that needed in the first, the then the second action is barred.

*Phoenix Newspapers*, 934 F.2d at 804. "Two causes of action which arise out of the same transaction or occurrence are not the same for purposes of res judicata if proof of different or additional facts will be required to establish them." *E.C. Garcia Co., Inc. v. Ariz. Dep't of Revenue*, 178 Ariz. 510, 520 (App. 1983). "The 'same evidence' test is quite liberal, and permits a plaintiff to avoid preclusion 'merely by posturing the same claim as a new legal theory,' even if both theories rely on the same underlying occurrence." *Power Rd.-Williams Field LLC v. Gilbert*, 14 F.Supp.3d 1304, 1309 (D. Ariz. 2014) (citation omitted).

Here, the evidence needed to prove the allegations in Count 2 includes evidence of the standard of care applicable to ongoing case workers and whether that standard was met,

Father has not seen, spoken with, or otherwise communicated with the boys September 2022. **CSOF ¶ 102.**

[7] For claim preclusion to apply under Arizona law, there must be "(1) an identity of claims in the suit in which a judgment was entered and the current litigation, (2) a final judgment on the merits in the previous litigation, and (3) identity or privity between parties in the two suits." *Lawrence T. v. Dep't of Child Safety*, 246 Ariz. 260, 261-62 ¶ 8 (App. 2019).

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

which was not necessary, or presented, in the dependency matter to determine the visitation and custody issues there. Claim preclusion simply does not apply.

### 3.    **The *Rooker-Feldman* doctrine is not applicable**

As noted above, this Court already determined *Rooker-Feldman* does not apply to Count 2. (Doc. 145 at 8-9 n.13); *see also supra* § IV.A. That should end the inquiry; nonetheless, the *Rooker-Feldman* doctrine does not apply in any event.

The Ninth Circuit adheres to the following general formulation of the doctrine:

> If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, *Rooker-Feldman* bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.

*Noel v. Hall*, 341 F.3d 1148, 1164 (9th Cir. 2003). "*Rooker-Feldman* thus applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court and seeks as her remedy relief from the state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004) (emphasis in original); *see also Wright v. S. Ariz. Children's Advocacy Ctr.*, No. CV-21-00257-TUC-JGZ, *8 (D. Ariz. Sep. 30, 2022) (holding that *Rooker-Feldman* does not bar district court jurisdiction over claims that DCS violated the plaintiffs' constitutional rights in a dependency proceeding). "In assessing whether the *Rooker-Feldman* doctrine applies, the fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment." *Normandeau v. City of Phoenix*, 516 F.Supp.2d 1054, 1063 (D. Ariz. 2005) (quoting *Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996)).

Rather than show how this action is a forbidden de facto appeal of a juvenile court judgment, State Defendants incorrectly jump to the "inextricably intertwined" analysis.[8]

---

[8] The *Rooker-Feldman* inquiry can be conducted in two steps: (1) does the federal action contain a forbidden de facto appeal of a state court decision; if so, (2) does the federal action contain issues that are "inextricably intertwined" with the state court judicial decision from which the forbidden de facto appeal is brought. *Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013) (citing *Noel*, 341 F.3d at 1158); *Bianchi v. Rylaarsdam*, 334

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

"[T]he 'inextricably intertwined' language 'is not a test to determine whether a claim is a de facto appeal, but is rather a second and distinct step in the *Rooker-Feldman* analysis. Should the action not contain a forbidden de facto appeal, the *Rooker-Feldman* inquiry ends." *Id*.; *see also Nat'l Ass'n for the Advancement of Multijurisdiction Practice v. Berch*, 973 F.Supp.2d 1082, 1095 (D. Ariz. 2013) ("The Ninth Circuit has explained that 'inextricably intertwined' simply means a plaintiff cannot assert legal error of a state court judgment in a district court." (citing *Kougasian*, 359 F.3d at 1142-43)). Nonetheless, "inextricably intertwined" is where State Defendants begin.

Count 2 is not inextricably intertwined with any juvenile court rulings. *First*, the motion simply makes broad, conclusory statements that Count 2 is inextricably intertwined with juvenile court rulings without providing any analysis of the issues in each action to demonstrate that to be true (which they would never be able to do, regardless). This deficiency stymies an educated, meaningful analysis and response. *Second*, "[u]nder the 'inextricably intertwined' test, *Rooker-Feldman* bars claims 'if the relief requested in the federal action would effectively reverse the state court decision or void its ruling." *Stuart v. City of Scottsdale*, No. CV-21-01917-PHX-DJH (D. Ariz. Nov. 7, 2024); *see also Benavidez v. County of San Diego*, 993 F.3d 1134, 1143 (9th Cir. 2021) (finding that *Rooker-Feldman* did not preclude plaintiffs' claims that social workers violated their constitutional rights during juvenile court dependency proceedings); *Reiman v. Cnty of San Bernandino*, No: 20-cv-00362-CBM-SP, 2022 WL 16985680 * 7 (C.D. California) aff'd on other grounds *Reiman v. Vasquez*, 96 F.4th 1085 (9th Cir. 2024). State Defendants do not argue that the relief requested here would reverse or void any juvenile court rulings, let alone present a convincing argument that such would be so. And it would not be so because the relief sought here are money damages and injunctive relief aimed at improving the policies and procedures at the Department, not return of custody of the boys to Mother, for

_____

F.3d 895, 898 (9th Cir. 2003). Even if a plaintiff seeks relief from a state court judgment, a suit constitutes a "forbidden de facto appeal only if the plaintiff *also* alleges a legal error by the state court." *Id*. (emphasis in original); *see also Kougasian*, 359 F.3d at 1140.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

instance. *See* SAC at 54-56 (Prayer for Relief). Consequently, Count 2 is not inextricably intertwined with any juvenile court rulings; thus, *Rooker-Feldman* does not apply.[9]

In summary, Plaintiffs are not seeking a de facto appeal from a final state court judgment. There is no unfavorable state court judgment, no appeal, and no issue of preclusion before this Court. There were interim decisions made by the juvenile court, and after almost two years the juvenile court dismissed the case at the request of DCS. That was the end. No appealable judgments, no appeals, and no unfavorable judgments by the juvenile court, the Arizona Court of Appeals, or the Arizona Supreme Court. This case arises due to State Defendants' wrongful actions recounted herein, withholding crucial information, and misleading representations or omissions that resulted in prolonged detention of the boys and the violation of Plaintiffs' constitutional rights. Plaintiffs allege out-of-court constitutional violations, not any erroneous final state court judgment as the basis of their claims. Therefore, *Rooker-Feldman* does not apply and State Defendants are not entitled to summary judgment on the basis of that doctrine.

### C. Causation is a Question of Fact for the Jury and Nonetheless is Present Here

State Defendants claim that Bell and Temple, even though they were the ongoing case manager and supervisor with responsibility for visitation and custody decisions, did not cause the ongoing separation of D.K. and K.K. from their mother, (Mot. at 10:7-10), that they were independently ordered by the juvenile court to be involved (*id.* at 11:7-8), and that it is obvious that Bell and Temple did not cause an unconstitutional continuation

---

[9] *Rooker-Feldman* also does not apply in cases involving "extrinsic fraud." *Reiman,* 2022 WL 16985680 * 8 citing *Wood v McEwen*, 644 F.2d 797, 801 (9th Cir. 1981). "'Extrinsic fraud' is 'conduct which prevents a party from presenting his claim in court.'" *Id*. Here, Bell and Temple not only failed to inform the juvenile court about Dr. Newberger's and Dr. Schroeckenstein's reports in their regular reports to the court, but they quickly moved to return the boys to father's custody and dismiss the dependency after receiving those consequential reports and hearing those doctors' sworn testimony, and before the juvenile court could rule on Mother's August 14, 2020, motion to return custody of the boys to her. **Doc. 217 ¶¶ 77-78**; **CSOF ¶¶ 77-78, 99**. It is arguable that these actions amounted to an extrinsic fraud on the juvenile court.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

of the boys' physical custody (*id.* at 12:1-2) to support their argument of no causation. This argument is frivolous, without merit, and, dare we say, sanctionable.

State Defendants' actions and negligence are the cause of the injuries complained of here. The question of causation is one of fact for the jury. *Robertson v. Sixpence Inns of America, Inc.*, 163 Ariz. 539, 546 (1990).  "Plaintiff need only present probable facts from which causal relationship may be inferred." *Id.* (citations omitted).  "Only when plaintiff's evidence does not establish a causal connection, leaving causation to the jury's speculation, or where reasonable persons could differ on the inference derived from the evidence, may the court properly [decide]." *Id*. There is ample evidence here demonstrating causation and from which reasonable jurors can find for Plaintiffs.

***First***, Bell and Temple were responsible for the ongoing unwarranted detention of D.K. and K.K. due to the unnecessary MSBP/FDIA restrictions placed on Jessica. ***Second***, Bell, who had a history working MSBP/FDIA cases, pursued the Kahraman case assignment. **CSOF ¶ 89**. Furthermore, Bell and Temple were involved as a normal and natural consequence of DCS' involvement and staffing procedures at DCS – they were not singled out and ordered to appear as the ongoing case workers by the juvenile court. Once they were assigned this case at DCS, they immediately began handling it as one of MSBP/FDIA, including invoking stiff restrictions on visits and food handling, and measuring Mother's visitation progress using the MSBP/FDIA ACCEPTS model – a protocol designed for the treatment of perpetrators of abuse (not neglect) who have been professionally diagnosed with the DSM-5 disorder, which was not the case here. Those restrictions were not organically ordered by the court; nor was the utilization of the ACCEPTS model in the absence of a DSM-5 diagnosis. Indeed, the juvenile court did not even realize Mother was being held to the ACCEPTS model until the November 9, 2020, hearing on Mother's motion for return of custody. **Exhibit BH** at 50:9-10, 23-24. ***Third***, although the juvenile court ordered therapeutic services be provided and psychological evaluations be conducted, the court never ordered that an inapplicable MSBP/FDIA protocol be implemented. It was Bell's and Temple's decision to engage SWHD to oversee

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

therapeutic visits and instructed SWHD to implement the MSBP/FDIA ACCEPTS protocol. At the very least, there is a genuine issue about this material fact. **Fourth**, State Defendants arranged for Jessica's psychological examinations by one of DCS' regular service providers, Dr. Oakley. But when Oakley's reports were positive towards Jessica and did not diagnose her with MSBP/FDIA or any other mental health disorders, Bell and Temple ignored those reports and failed to lift the inappropriate ACCEPTS protocol and instead used it to hamstring Mother's progress. **Fifth**, not to be deterred from their false narrative, State Defendants spent $33,800 to commission a records review by Dr. Kelly, a favored provider Bell used on several other MSBP/FDIA cases with the hope that he would substantiate the MSBP/FDIA false narrative. Bell did not provide Dr. Kelly with a complete set of medical records for his review, thus skewing and biasing his work. Predictably, although he did not offer a DSM-5 diagnosis, Dr. Kelly's report supported Bell's narrative that Jessica was a danger to her boys. **Sixth**, with Dr. Kelly's report in hand, Bell and Temple sent it to Dr. Oakley and arranged for a second examination of Jessica, thus giving Dr. Oakley the opportunity to modify her earlier view and align herself with their MSBP/FDIA narrative and Dr. Kelly's report. Their plan failed as Dr. Oakley's second report was positive of Jessica and found that she was of sound mind, did not require psychiatric evaluation, made no mental health diagnoses, and recommended that DCS relax its visitation and food handling restrictions. **Seventh**, Bell and Temple again ignored Dr. Oakley's positive report and refused to lift the restrictions on Jessica's visits at SWHD. **Eighth**, only two months after Dr. Oakley's second positive report, Bell and Temple then moved to change the case plan from reunification to severance of Jessica' parental rights even though the evidence did not support it; the juvenile court rejected that change. **Ninth**, with Bell and Temple ignoring the strong evidence against MSBP/FDIA and their desire to sever Jessica's rights then declared, Mother hired Dr. Newberger, who issued a report providing another positive evaluation of Jessica and a scathing evaluation of Dr. Kelly's report and Bell's handling of the case. Dr. Newberger recommended that the boys be immediately returned to Jessica. Bell and Temple, being consistent with their pattern to

22

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

date, ignored Dr. Newberger's report, failed to provide this information to the juvenile court, and failed to expand Jessica's visitations or lift the prohibition on her providing home cooked meals during visits. And, of course, they did not return the boys to Jessica's care and custody. ***Tenth***, Dr. Shroeckenstein issued a positive report based on her review of the records and did not identify any concerns regarding Jessica's ability to safely parent her children. Naturally, Bell and Temple ignored this report, failed to provide this information to the juvenile court and refused to restore Jessica to full visitation and meal preparation rights, thus causing the continuing detention of the boys away from Mother. ***Eleventh***, with the overwhelming evidence against Bell's and Temple's MSBP/FDIA narrative, they were able to convince Father, who had not completed his recommended goals, to align with their false narrative that Jessica was a Munchausen parent and a danger to the boys. Once Father aligned with Bell and Temple, they rewarded him and lifted his visitation and food restrictions, then moved to dismiss the dependency with the boys being returned to Father but with Jessica's visitation still severely restricted to twice weekly supervised visits. If not overwhelming evidence of causation, these facts at least present genuine issues of material fact regarding causation that precludes entry of summary judgment for State Defendants.

**D.**    **Evidence Exists to Establish the Elements of Count 2**

State Defendants repackage their preclusion arguments to next assert that the evidence discovered in this case present no genuine issues of material fact about whether their failure to reunify this family for nearly two years was unconstitutional (Count 2). *See* Mot. at 12:5-22.[10] Besides the numerous juvenile court orders relied on earlier in the motion, State Defendants incredulously argue that because Bell and Temple each testified

---

[10] Although not stated the way it is put forth here, that must be what State Defendants are trying to say in § VI of their motion. Notably, State Defendants do not present substantive or procedural due process arguments as to Count 2. They are precluded from doing so in their reply brief. *Awsum v. Comm'r of Soc. Sec. Admin.*, No. CV-21-01770-PHX-MTL, *5 (D. Ariz. Mar. 17, 2023). It is also noted that this Court already determined that qualified immunity does not apply to Bell and Temple because Plaintiffs allege violation of constitutional rights that were clearly established at the time of the wrongful conduct, which rulings are law of the case. (Doc. 145 at 10 n.15).

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

that their actions were reasonable, that settles the matter in their favor. *Id*. at 15-16. Simply put, that is ridiculous. Whether the actions Bell and Temple took, or failed to take, pertinent to their failure to be forthcoming of exculpatory information in court reports and their prolonged detention of the boys were reasonable is a quintessential question of fact for the jury. The jurors, as the proverbial reasonable persons, must decide those questions. Beyond that, as discussed extensively above, there are myriad genuine disputes about whether Bell's and Temple's conduct was reasonable and meet the standard of care for case workers. For instance, in addition to all the evidence about the impropriety of applying MSBP/FDIA/ACCEPTS protocols to Mother in the absence of a DSM-5 diagnosis, Plaintiffs' DCS standard of care expert, Tim Turner, testified that many of the actions by Bell and Temple to not inform the court of exculpatory information and prevent the family's prompt reunification fell below the applicable standard of care. **CSOF ¶ 103.** It seems axiomatic that falling below the standard of care in doing your job is per force unreasonable. Similarly, whether Bell's and Temple's conduct was "vexatious and unnecessary, harassing, unfounded, or unreasonable, and arbitrary, discriminatory, or demonstrably irrelevant" is another question quintessentially for the jury. *See, e.g., Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (familial association is a fundamental liberty interest that officials may be held responsible for interfering with) (citing *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982)); *see also* 42 U.S.C. § 671(a)(15) and A.R.S. § 8-846 (requiring prompt reunification when children are removed from their family). At the very least, the record discussed herein presents many genuine issue of material facts.

E.    **Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Negligence Claims**

In Section VII of their motion, State Defendants (ironically) argue that Plaintiffs' Counts 8-11 present overlapping, repetitive theories of negligence and negligence *per se* so they fail as a matter of law again because of: (i) issue, claim, and *Rooker-Feldman* preclusion, (ii) no causation, and (iii) because Bell testified multiple times in juvenile court. Mot. at 12:23-13:17. Being generous in the reading of their argument, State Defendants seem to be struggling to argue that Plaintiffs cannot meet their burden of proof to establish

both a breach of the applicable standard of care for ongoing case managers and causation, two essential elements of negligence claims. However, they overlook, among other things, the fact that their failure to follow the applicable law is a breach of the standard of care.

Again, most of questions pertinent to the negligence claims are questions of fact for the jury, and not properly disposed of on summary judgment. Furthermore, contrary to State Defendants' proclamation that "the material evidence shows that Bell and Temple acted reasonably, [and] complied with the applicable standard of care", genuine issues of material fact exist on both those questions. As noted earlier, Plaintiffs' DCS standard of care expert, Mr. Turner, has opined in writing and sworn testimony that numerous aspects of State Defendants' conduct here fell below the applicable standard of care, thus putting those questions squarely at issue. **CSOF ¶ 103**.

Specifically, as to negligence per se, the standard of care can be "established by a legislative enactment or adopted by the court from legislative enactment." *St. George v. Plimpton*, 241 Ariz. 163, 166 (App. 2016) (citing *Tellez v. Saban,* 188, Ariz. 165, 169 (App. 1996)). "A person who violates a legislative enactment that establishes the standard of care or that has been adopted by a court as the relevant standard of care is negligent per se and the violation is conclusive of negligence." *Id*. Arizona enacted § 8-456 providing in relevant part that DCS and its agents have the "duty to protect the legal and due process rights of children and families from the time of the initial contact *through case closure*." A.R.S. § 8-456 (emphasis added). Furthermore, investigators and case workers must be "prompt and thorough" and "must evaluate … any condition… that would tend to support or refute the allegation that the child is a victim of abuse. . ." A.R.S. § 8-456(C)(1); *see also* 42 U.S.C. § 671 (a)(15) (child welfare agencies must use "reasonable efforts" to preserve the family); A.R.S. § 8-846 (same). Section § 8-802 (D)(1) was enacted to establish a standard for care for child safety workers to protect children and families from harm arising from a violation of their legal rights. "All child safety workers shall be trained and demonstrate competency in [their] duty to protect the legal rights of children and families from the time of the initial contact through treatment." A.R.S. § 8-802(D)(1). Here,

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Bell and Temple did not protect the legal rights of children and families in violation of their statutory duties when they (i) failed to follow the law; (ii) failed to properly investigate the allegations of neglect in light of new evidence regarding significant mold infestation so they could continue to detain the boys in DCS' custody; (iii) failed to consider significant information in their possession that refuted the allegations of neglect, including reports from expert psychologists and Jessica's treating therapists; (iv) limited Jessica's visits with her sons; (v) made representations to the court that were false and/or demonstrated a reckless disregard for the truth; and (vi) violated Plaintiffs' constitutional rights. Such conduct is direct violation of A.R.S. § 8-456(C)(1) and is negligence per se under Arizona law. *George*, 241 Ariz. at 166, 384 P.3d at 1246.

Issues of gross negligence are fact questions for a jury. *Walls v. Ariz. Dep't of Public Safety*, 170 Ariz. 591, 595 (App. 1991). "A court may withdraw the issue of gross negligence from the jury only when **_no_** evidence is introduced that would lead a reasonable person to find gross negligence." *Id*. (emphasis added). "A party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Noriega v. Town of Miami*, 243 Ariz. 320 (App. 2017). As assiduously shown throughout this response, at the very least there are genuine issues of material fact as to the negligence claims and sufficient evidence exists to present these claims to the jury.

**F.    Plaintiffs' Abuse of Process Claim Does Not Fail**

State Defendants incorrectly assert that Plaintiffs' Count 12 for abuse of process fails as a matter of law. Mot. at 13:19-15:12. Yet again, relying on issue, claim, and *Rooker -Feldman* preclusion and causation as dispositive. Mot. at 13:19-21. As stated above, the preclusion and causation arguments are not winners for them, but also, Bell and Temple willfully used the juvenile dependency proceedings for their own ulterior purpose, *i.e.*, to label Jessica as a Munchausen parent and sever her parental rights.

The elements for abuse of process are "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Crackel v. Allstate Ins. Co.*, 208 Ariz. 252, 257 (App. 2004) (*citing Nienstedt v. Wetzel*, 133 Ariz. 348, 353 (App. 1982)). The latter element is met by "showing that the process has been used primarily to accomplish a purpose for which the process was not designed." *Neinstedt*, 133 Ariz. at 353. In the context of this tort, Arizona interprets "process" as encompassing "the entire range of the procedures incident to the litigation process." *Id.* "It is immaterial that the process may have been properly obtained or issues as a normal incident of the litigation involved. It is the subsequent misuse which constitutes the misconduct for which liability is imposed." *Id.*

As shown above, the evidence is clear that State Defendants abused the process when they misled the juvenile court, used its Orders to continue their false narrative that Jessica has MSBP/FDIA by personally selecting providers that they use specifically for MSBP/FDIA cases, misleading the juvenile court in their reports that Jessica had not met her goals by not informing the court that they were holding her to the ACCEPTS model, ignored exculpatory information, ignored all the positive reports from professionals to continue their false narrative, never giving Jessica the opportunity to demonstrate her parental fitness with unsupervised visits and meal preparation, then moving to sever Jessica's parental rights even though she completed all her treatment goals, all the while dragging out the juvenile dependency longer than necessary by their actions. Finally, with the evidence stacked against Bell and Temple, and after they were able to get Father to join their false narrative against Mother, they moved to dismiss the dependency before the court ruled on Mother's motion to change physical custody to her and to hold Bell in contempt. The juvenile court, without ruling on the evidence received at the September 9, 2020, hearing, dismissed the dependency petition at Bell's request but also with her desired stipulation that Mother continue to only have restricted supervised visits. It is clear that Bell and Temple used the legal process for an ulterior purpose of attempting to sever

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Jessica's parental rights instead of reunifying her with her boys as was the court-approved case plan for nearly two years.

### G.   Plaintiffs Can Prove Intentional Infliction of Emotional Distress (IIED)

State Defendants' final argument is that "the strong record established by the Statement of Facts and supporting exhibits show Plaintiffs' claims failed to establish the three elements necessary in intentional infliction of emotional distress claims." Mot. at 16:21-23. However, there is strong evidence and a strong record that establishes that Plaintiffs can prove IIED and they suffered emotional distress by State Defendants' actions.

"A plaintiff suing for [IIED] must prove the defendant[s] caused severe emotional distress by extreme and outrageous conduct committed with the intent to cause emotional distress or with reckless disregard of the near-[c]ertainty that such distress would result." *Watkins v Arpaio*, 239 Ariz. 168, 170-71 ¶ 8 (App. 2016) (citing *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987)). Arizona defines extreme and outrageous as going "beyond all possible bounds of decency, as to be regarded as atrocious, and utterly intolerable in a civilized community." *Ford*, 153 Ariz. at 43 (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. D (1965)); *Mintz v. Bell Atlantic Sys. Leasing Int'l, Inc.*, 183 Ariz. 550 (App. 1995). Only when reasonable minds could differ in determining whether State Defendants' conduct is sufficiently extreme or outrageous does the issue go to the jury. *Mintz*, 183 Ariz. 550.

There is a genuine issue of fact and sufficient evidence to present to the jury about whether State Defendants' conduct was intentional and/or recklessly disregarded the near-certainty that their actions would cause emotional distress, to wit: actions taken to label Jessica as MSBP/FDIA so they could continue to detain the boys long enough to severe Mother's parental rights; continue with their false narrative that Jessica is MSBP/FDIA to warrant only limited access to the boys; ignore crucial information from professionals that Jessica is not MSBP/FDIA; waste state funds on an out-of-state a doctor willing to support their false narrative of MSBP/FDIA; move to dismiss the dependency and then turn the

children over to their father even though they knew he was aggressive, threatening, and had not met his treatment goals; then move to terminate mother's parental rights. It is up to a jury to decide if State Defendants' conduct was extreme and outrageous.

## V.    CONCLUSION

None of Plaintiffs' claims are barred by any preclusion argument. Therefore, summary judgment can be granted only if there "is no genuine dispute as to any material fact [pertinent to all the claims] and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P.56. As demonstrated above, this matter is replete with genuine disputes on many material facts.  State Defendants' motion must be denied.

WHEREFORE, Plaintiffs request this court deny State Defendants' Motion for Summary Judgment in its entirety and set this matter for trial to a jury.

**RESPECTFULLY SUBMITTED** this 25th day of February 2025.

**MILLS + WOODS LAW PLLC**

By ___/s/ Thomas A. Connelly___
    Thomas A. Connelly
    Robert T. Mills
    Sean A. Woods
    5055 North 12th Street, Suite 101
    Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**

    DeeAn Gillespie Strub
    Jenny D. Jansch
    7319 North 16th Street
    Phoenix, AZ 85020
    *Attorneys for Plaintiffs*

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2025, I electronically transmitted the foregoing document to be filed electronically with the Clerk's Office through the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system.

_/s/ Thomas A. Connelly_

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556