Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Jessica Kahraman, *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>State of Arizona, *et al.*,<br><br>  Defendants. | Case No.: 2:22-cv-00375-PHX-SRB<br><br>**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS IN SUPPORT OF RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Hon. Susan R. Bolton) |

Pursuant to LRCiv 56.1 and Rule 56 (b)(1)(2) of Fed.R.Civ., Plaintiffs' submit this controverting statement of facts in support of their Response in Opposition to Defendants' Motion for Summary Judgment.

**I.   RESPONSE TO DEFENDANT'S SEPARATE STATEMENT OF FACTS**

1. Disputed. Kenan ("KK") was medically cleared for discharge on 1/3/2019. DCS did not have a Placement for KK and left him at Banner for 3 additional days in violation of ARS §8-514. **See Exhibits A, B and C at 134:22-142:2.** KK was hospitalized due to exposure to toxic mold. **See Exhibit D**.

2. Disputed. The diagnosis of malnutrition is inaccurate or misleading. KK and DK were in regular contact with their treating physicians and had weekly therapies with AZ DDD workers – all mandated reporters. Not one ever made a hotline report to DCS. **See Exhibit C 133:1-134:21.**

3. Disputed in part. The diagnoses of malnutrition and failure to thrive are not based on sound medical practice. ***See* Exhibit E at 132:11-136:7;** *see also* **Exhibit L at 4-23, 30-43**.

4. Not Disputed.

5. Disputed. Exposure to toxic mold was the cause of KK's medical conditions. ***See* Exhibit D, E at 132:11-136:7, F and P**. The children's pediatrician, PCH physicians, and DDD workers knew the children were on the GAPS diet and never made a finding of malnutrition or made a hotline report. ***See* Exhibit C at 133:1-134:21; Exhibit F.** The children had been on the GAPS diet for over 2 years with no adverse side effects or concerns for malnutrition. ***See* Exhibit G at 4-9; Exhibits Y, Z.** When removed from the mold infested environments their symptoms improved. ***See* Exhibit P**.

6. Disputed. Dr. Stewart and Banner did not review or speak with KK's treating physicians or conduct further testing to find the root cause of KK's medical maladies. **Exhibit L at 4-23, 30-43**. Once Dr. Stewart found a diagnosis that *could* explain the symptoms, Banner and DCS stopped looking for other causes. **See Exhibit E 30:10-21; 117:17-119:22; 132:11-136:7 and L at 4-23, 30-43.**

7. Not Disputed.

8. Disputed in part. Dr. Stewart and Banner ignored the fact that Mother, maternal grandparents and Father communicated about feeding the KK more food and that he ate 2100-2500 calories a day. **See Exhibits G at 4-9,11 and H, and L at 4-23, 30-43, and Q at 5-6.** Dr. Miga told Mother that Banner nutritionists would help her broaden KK's diet, but they never did. ***See* Exhibit O ¶ 4.**

2

9. Disputed. The meaning of this paragraph is unclear. DK and KK's DDD workers witnessed the children's reactions to food. **Exhibit G at 14-15**. After 2 DDD witnesses informed DCS of this fact, Kramer refused to interview additional witnesses because their testimony did not fit their malnutrition narrative. **Exhibit C at 33: 14-41:1 and L at 4-23, 30-43, and Q at 5-6.**

10. Disputed in part. Kramer had a duty under ARS § 8-456 to conduct a complete and thorough investigation which would support *or refute the allegations of abuse or neglect*. Kramer admits she did not contact KK's treating physicians or other collateral contacts during her abbreviated investigation. *See* **Exhibit I, Exhibit C at 33:14-41:1, Exhibit Q at 5-6, 9.**

11. Disputed. As evident from the CSRA, Mother did not object to the hospital treating KK, nor with having DK examined by the hospital. *See* **Exhibit H.**

12. Disputed. KK had medical maladies due to living in a mold infested environment. Neither Dr. Stewart, Banner, nor Kramer thoroughly investigated this matter. *See* **Exhibit H; Exhibit C at 33:14-41:1; Exhibit L at 4-23, 30-43; Exhibit Q at 5-6, 9; Exhibit AH.**

13. Not Disputed.

14. Disputed in part. Kramer arranged for Banner security personnel and Mesa Police Officers to forcibly remove Mother and Father from the hospital while KK watched in horror. Kramer then prohibited their return. *See* **Exhibit O ¶ 6.**

15. Disputed in part. The accuracy of the information contained in the document is disputed. *See* **Exhibit L at 1-23, 30-43; Exhibit Q at 5-6, 9, 13-14.**

16. Disputed. DK was examined but not hospitalized. *See* **Exhibit Q at 5-6.**

17. Not disputed.

18. Not disputed.

19. Disputed in part. Parents sought the advice of an advocacy group and were advised not to attend the TDM or cooperate with DCS. *See* **Exhibit O ¶ 7.**

3

20. Disputed. KK and DK's DDD providers, Dr. McCants, and other treating physicians agreed that the children needed wheelchairs. *See* **Exhibits J, K, L at 11-23, 30-43; Exhibit Q at 6, 9, 13-14.**

21. Disputed in part. The court did not have all the information available when the order was issued due to Sarah Kramer's failure to comply with ARS § 8-456. **Exhibit C at 33:14-41:1; Exhibit Q at 6, 9, 13-14.**

22. Disputed in part. These boiler-plate findings and orders are made in almost every Dependency proceeding for Title IV-E funding purposes. *See* **Exhibit S**.

23. Disputed in part. Due to Kramer's violation of ARS § 8-456, the accuracy of the information in the report is disputed. **Exhibit C at 33:14-41:1; Exhibit L at 14, 30-43, 64; Exhibit Q at 5-9, 13-14.**

24. Disputed in part. Pursuant to DCS policy and procedure, a DCS Investigator must complete a thorough investigation. The children's condition improved when they were no longer exposed to toxic mold. **Exhibit C at 33:14-41:1; Exhibit L at 14, 30-43, 64; Exhibit Q at 5-9, 13-14.**

25. Disputed in part. *See* **Paragraph 22**.

26. Disputed. Kramer violated ARS §§ 8-415 and 8-456. *See* **Exhibit C at 32:20-41:24; Exhibit L at 14, 30-43, 64; Exhibit Q at 9, 13-14.**

27. Disputed. DCS case managers must continually reassess whether the children are in danger and update the CSRA when additional information arises. *See* **Exhibit L at 44- 64; Exhibit Q at 5-11, 13-14**.

28. Disputed in part. Bell did not perform all her duties with accuracy and honesty. *See* **Exhibit L at 44-64**.

29. Disputed in part. Madison Bell did not provide the AAG's with complete and accurate information. *See* **Exhibit L at 44-64**.

4

30. Disputed in part. The court makes its decisions with the information provided. It is disputed that Bell provided complete and accurate information to the court. *See* **Exhibit L at 44-64**.

31. Disputed in part. Not all of the "independent parties" have all the information available to protect the children's best interests. *See* **Exhibit L at 44-64.**

32. Not Disputed.

33. Disputed in part. The children improved because they were removed from exposure to toxic mold. *See* **Exhibit L; Exhibit Q at 5-11, 13-14; Exhibit R at 9-12.**

34. Not Disputed. Objection Relevance.

35. Not Disputed. Objection Relevance.

36. Not Disputed. Objection Relevance.

37. Not Disputed. Objection Relevance.

38. Not Disputed. Objection Relevance.

39. Not Disputed.

40. Not Disputed.

41. Not Disputed.

42. Not Disputed.

43. Not Disputed.

44. Disputed in part. Dr. Carter is not a mold specialist and did not have the requisite medical or scientific knowledge to make this recommendation. **Exhibit E at 132:11-136:7; Exhibit R at 9-12; Exhibit AI.**

45. Not Disputed.

46. Disputed in part. The accuracy of the information given to Dr. Kelly and the contents and recommendations in his report are disputed. **Exhibit L at 45, 56-64; Exhibit Q at 5-11, 13-14.**

47. Disputed in part. Neither CASA nor Bell informed parents or the court that CASA offered to take placement of KK and DK due to neglect by the foster placement. *See* **Exhibit N at AZ KAHRAMAN 000016-17.**

48. Disputed in part. As late as September 2020, Bell and Temple continued to assert this was an FDIA case and refused to reunify the children with Mother until she completed the ACCEPTS model, including satisfying their subjective opinions about whether Mother had taken "sufficient responsibility" for her actions. The ACCEPTS model is designed for therapeutic use for perpetrators of abuse formally diagnosed with DSM-5 FDIA. *See* **Exhibit Q at 5-11, 13-14; Exhibit T; Exhibit U; Exhibit AQ; Exhibit BC.**

49. Not Disputed.

50. Disputed in part. DCS removed allegations of medical abuse from the Dependency Petition. *See* **Defense Exhibits 246, 247.**

51. Not Disputed.

52. Disputed in part. *See* **Paragraph 22.**

53. Not Disputed.

54. Disputed in part. *See* **Paragraph 22**.

55. Not disputed.

56. Disputed in part. Dr. Newberger's report was highly critical of Dr. Stewart, Banner, and DCS, specifically Kramer and Bell. *See* **Exhibit L**. By objecting, DCS ensured the juvenile court did not receive all the evidence in support of the children's best interests.

57. Not Disputed.

58. Disputed in part. Pursuant to *Hays v. Gama*, 205 Ariz. 99 (Ariz. 2003) and *James A. v. Dep't of Child Safety*, 418 P.3d 1092 (Ariz. Ct. App. 2018), the best interests of the children are paramount and sanctioning a party by precluding evidence must be weighed against this interest. Dr. Newberger is considered the "Father of child abuse

detection"[1] and his opinion of KK's and DK's illness was contrary to that of DCS. ***See* Exhibits L; Exhibit BH at 19:5-23:2**.

59. Not Disputed.

60. Not Disputed.

61. Disputed in part that the court had the complete and accurate evidence available given DCS's failure to complete a thorough investigation, and DCS's failure to provide all the evidence to the court including, blocking Dr. Newberger from testifying.[2] ***See* Exhibit C at 33:14-41:1; Exhibit L; Exhibit M; Exhibit N; Exhibit Q at 5-11, 13-14; Exhibit R at 9-12.**

62. Disputed in part. ***See* Paragraph 22**.

63. Disputed in part**. *See* Paragraph 61.**

64. Disputed in part**. *See* Paragraph 61**

65. Disputed in part**. *See* Paragraph 61.**

66. Disputed in part**. *See* Paragraph 61**.

67. Disputed in part**. *See* Paragraph 61.**

68. Disputed in part**. *See* Paragraph 61**.

69. Disputed in part**. *See* Paragraph 61.**

70. Disputed in part**. *See* Paragraph 61.**

71. Disputed in part. ***See* Paragraph 61.**

72. Disputed in part**. *See* Paragraph 61**.

73. Not Disputed.

74. Disputed in part**. *See* Paragraph 61**.

75. Disputed in part**. *See* Paragraph 61**.

---

[1] Dr. Newberger was the preeminent witness on behalf of Maya Kowalski and her family in the well-known "Take Care of Maya" case documented on Netflix. The jury awarded $200 million against John Hopkins' Hospital.

[2] Plaintiff is not trying to "appeal" or have a "redo" of the hearing. Some of Plaintiffs' claims are based on the premise that DCS purposefully and knowingly did not provide the court with fully complete and accurate information.

7

76. Not Disputed.

77. Disputed in part. The court never made a ruling on the merits after hearing testimony from Dr. Schroeckenstein and Dr. Newberger. *See* **Exhibit BH at 72:11-15;** *see also* **Exhibit AV at 5**. Madison Bell and DCS dismissed the Dependency before the court could rule on the merits of the case. *See* **Exhibits AV, BF, BG, BH**.

78. Not Disputed, but the juvenile court never made a ruling on Mother's motion for change in physical custody before the dependency was dismissed on the State's motion. *See* **Exhibit BE; Exhibit BH;** *see also* **Exhibit AV at 5;** *see also* **Paragraph 99 below**.

79. Not Disputed.

80. Not Disputed.

81. Disputed. Bell violated Mother's and the children's due process rights throughout the case, withheld evidence from Mother and the court, and placed unreasonable restrictions on Mother's ability to make decisions for her children and to reunify with them. *See* **Exhibits L, M, N, Q at 5-11, 13-14, and R at 9-12.**

82. Not Disputed.

83. Disputed in part. Disputed that the information and recommendations therein were based on complete and accurate evidence. *See* **Exhibits L, R**.

84. Disputed in part. The court must have complete and accurate information which DCS and Bell prevented. *See* **Exhibits L, R**

85. Disputed in part. *See* **Paragraph 22**.

86. Disputed in part. Mother agreed to cooperate with Dr. Kelly on the condition that her attorney be present. Dr. Kelly refused to allow it. *See* **Exhibits L, O ¶ 18.**

87. Disputed. Temple and Bell still needed to close the case and file specific records with the Family court as ordered by the juvenile court. *See* **Exhibit AV**.

88. Disputed. Temple ratified, approved, and agreed with Bell's actions and decisions. These actions were contrary to the best interests of the children and violated state and federal law. *See* **Exhibits T, U**.

## II. ADDITIONAL FACTS THAT ESTABLISH A GENUINE ISSUE OF MATERIAL FACT

89. Madison Bell specifically asked to be assigned to this case as it was a FDIA case. **See Exhibit W**.

90. Bell and Temple refused to believe any other narrative even when evidence pointed to other causes for the boys' medical symptoms and no psychologist ever diagnosed Mother with MBP/FDIA. **See Exhibit P; Exhibits AA, AB[3], AC, AM, AP, AT.**

91. Bell often misconstrued or twisted the words of Mother and other providers including Mother's counselor, Dr. Rodriguez. **See Exhibits O ¶ 17, AJ, AK**. At times Bell outright lied.[4] **See Exhibit AL**. Bell and Temple ignored Mother's and Dr. Newberger's warnings about Father's alcohol consumption and domestic violence. **See Exhibit O ¶¶ 20, 22; Exhibit L at 44-51.**

92. Bell insisted that Mother was manipulative and was lying to doctors and DCS providers and that only she, Bell, could see the truth. **See Exhibit AU**.

93. Dr. Kelly was DCS's hired gun for FDIA/medical abuse cases. **See Exhibits AD, AC at 73:18-75:10**. He was an out-of-state provider with a lucrative contract to help DCS and the State diagnose and prosecute parents. **See Exhibit AE**. He was paid $33,800 for his report on Mother alone. In comparison, DCS paid Dr. Oakley $1,800 for 2 psychological evaluations and Dr. Rodriguez $7,525 for more than one year of therapy with Mother. **See Exhibit AF; Exhibit AR; Exhibit AS**.

94. At $103,500 received from DCS, SWHD was the highest paid provider by for almost two years of therapeutic visitation services to the family. **See Exhibit AG**.

95. Mother worked with DCS's assigned therapist, Dr. Rodriguez, and met her treatment goals in August 2019; then Bell changed those goals in September 2019

---

[3] Dr. Oakley is a DCS contracted provider and was given documents and questions to answer straight from DCS.

[4] On 3/17/2020 – Bell agreed with Father to sever Mother's parental rights, yet she told Jessica and SWHD on 3/31/2020 that they were working towards family reunification.

9

preventing the children from returning home. **See Exhibits AN, AO, and AT.** DCS paid Dr. Rodriguez $7,525 total for providing a year of counseling to Mother. **See Exhibit AS**.

96.  Later, Bell and SWHD implemented a third set of goals based on the ACCEPTS model which was specifically created and designed for parents diagnosed with FDIA. *See* **Exhibits AP, AQ**.

97.  Bell, Temple and SWHD ignored their own providers who stated that Mother should be allowed to bring food during her visits with the children and did not have FDIA. *See* **Exhibits AA, AB, BD.**

98.  On January 6. 2020, AAG Martncik avowed to the court that Bell would arrange for Father to undergo alcohol testing to ensure the children were safe returning to his care. Bell never arranged for the testing. *See* **Exhibit BJ at 34:3-16**.

99.  After the Dependency was dismissed, jurisdiction transferred to the Family court. *See* **Exhibit AV**. The juvenile court ordered DCS to provide the family court several documents including DCS's last report to the court and Mother's objection to that report. ***See id***. The juvenile court did not make any rulings from the September 15, 2020, evidentiary hearing on Mother's change of custody motion where Drs. Schroeckenstein and Newberger testified, or on Mother's motion to find Bell in contempt, finding "all outstanding Motions are moot…." *Id.* **at 5.**

100.  On January 7, 2021 (less than two months after the Dependency dismissal) the Family court ordered that Mother have unsupervised parenting time, including overnights with the children. *See* **Exhibits O ¶ 39, AW**

101.  In open court on May 25, 2021, Mother and Father entered into a binding Rule 69 Agreement dissolving the parents' marriage and granting joint legal decision-making with Mother having final decision-making in case the parties' disagreed. The parties had equal parenting time. *See* **Exhibit AX**. Almost immediately Father refused to follow or sign the Agreement forcing Mother to lodge the Decree and file an Order to Show Cause. *See* **Exhibit AY**. The court signed the Decree on November 9, 2011. ***See* Exhibit AZ**; *see* **Exhibit O ¶ 44**.

102.  Less than a year later, on his own initiative, Father abandoned his children and voluntarily terminated his parental rights. *See* **Exhibit BA; Exhibit O ¶¶ 45-47**. When he relinquished the children's belongings to Mother, she found that he had urinated on them and threw them into a trash bad. Father's last known whereabouts was his native country of Turkey; he has not had any contact with the boys since September 2022. *See* **Exhibit O ¶¶ 48-49**.

103.  Plaintiffs' expert on standard of care for DCS case managers and supervisors has opined in writing and at deposition that Bell's and Temple's conduct in the Kaharman case fell below the applicable standard of care. **Exhibit Q; Exhibit X**. He also testified that he was not asked to opine on any juvenile court orders, and he had not done so in his report. **Exhibit Q; Exhibit X**.

RESPECTFULLY SUBMITTED this 25th day of February 2025.

**MILLS + WOODS LAW PLLC**

By  */s/ Thomas A. Connelly*
    Thomas A. Connelly
    Robert T. Mills
    Sean A. Woods
    5055 North 12th Street, Suite 101
    Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
    DeeAn Gillespie Strub
    Jenny D. Jansch
    7319 North 16th Street
    Phoenix, AZ 85020

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2025, I electronically transmitted the foregoing document to be filed electronically with the Clerk's Office through the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the court's CM/ECF system.

/s/ Thomas A. Connelly

## TABLE OF EXHIBITS
### PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS

| Exhibit | Description |
|---------|-------------|
| A | Emails re: Placement for KK |
| B | INTENTIONALLY OMITTED |
| C | Deposition Transcript of Sarah Kramer |
| D | Letter from Dr. Jensen re: Mold Testing |
| E | Deposition Transcript of Dr. Stewart |
| F | Medical Records – Dr. Jensen |
| G | DCS CSRA – **UNDER SEAL** |
| H | Text Messages between parents re: food for KK |
| I | INTENTIONALLY OMITTED |
| J | Text Message with DDD worker Schmidt re: Wheelchairs and Reactions |
| K | Declaration of Dr. McCants |
| L | Expert Report of Dr. Newberger |
| M | Emails between CASA and DCS re Placement Issues |
| N | DCS Case Build – **UNDER SEAL** |
| O | Declaration of Jessica Kahraman |
| P | Expert Report of Dr. Gray |
| Q | Expert Report of Timothy Turner |
| R | Expert Report of Princess Lucas-Wilson |
| S | DCS Training – IV-E Funding – **UNDER SEAL** |
| T | Email from Bell re: This is a FDIA Case |
| U | DCS Email re: Mother is "looney" |
| V | Medical Records – DK |
| W | Email re: Madison Bell Asking to Work Case |
| X | Deposition Transcript of Timothy Turner |
| Y | Growth Chart – KK |
| Z | Growth Chart – DK |
| AA | Dr. Oakley's Psychological Evaluation of Mother – 1st Report |
| AB | Dr. Oakley's Psychological Evaluation of Mother – 2nd Report |
| AC | Deposition Transcript of Madison Bell |
| AD | DCS Email re Hire Dr. Kelly for FDIA Cases |
| AE | DCS Email re Dr. Kelly Hired for this Case |
| AF | State Funds paid to Dr. Kelly – **UNDER SEAL** |
| AG | State funds paid to Dr. Kelly – **UNDER SEAL** |
| AH | Mold Report for Family Home |
| AI | Letter from Mother's Doctor re: Mold Exposure |
| AJ | Mother's Email to Bell re: Misrepresenting her words |

| AK | Dr. Korsten Notes re: Bell Misrepresenting Dr. Rodriguez's words |
| AL | DCS Case Notes and Communications – **UNDER SEAL** |
| AM | Email from DCS re: This is a Factitious Case |
| AN | Dr. Rodriguez's Notes re: Bell Changing Treating Goals |
| AO | Bell Changing Treatment Goals Again |
| AP | Email from Southwest Human Development re: ACCEPTS Model |
| AQ | Chart: ACCPETS Model for FDIA Treatment |
| AR | State Funds Made to Dr. Oakley/Stride Psychology – **UNDER SEAL** |
| AS | State Funds paid to Dr. Rodriguez/Buwalda Psychological Services – **UNDER SEAL** |
| AT | Email from Bell re: Third Set of Goals Including ACCEPTS Model |
| AU | Email from Bell Accusing Mother of Lying to Doctors |
| AV | Juvenile Court Order Dismissing Dependency |
| AW | Family Court Order for Unsupervised Parenting Time |
| AX | Minute Entry re: Binding Rule 69 Agreement for Joint Legal Decision-Making and Equal Parenting Time |
| AY | Notice of Loding Decree for Dissolution of Marriage |
| AZ | Minute Entry re: Court Signed Decree |
| BA | Father's Voluntary Termination of Parental Rights to KK and DK |
| BB | Email from Mother to Bell re: Bringing Homemade Food to Visis |
| BC | Email from Father to Bell re: Immigration Help and FDIA Case |
| BD | Expert Report of Dr. Schroeckenstein |
| BE | Mother's Motion for Change of Physical Custody to Both Parents |
| BF | DCS's Motion for Change of Physical Custody to Father |
| BG | DCS's Response to Mother's Motion for Change of Physical Custody |
| BH | 9/15/2020 Evidentiary Hearing Transcript |
| BI | INTENTIONALLY OMITTED |
| BJ | 1/6/2020 Hearing Transcript |