# EXHIBIT C

[Page 3]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Jessica Kahraman, et al., )
                          )
          Plaintiffs,     )
                          )
vs.                       ) Case No.:
                          ) CV-22-00375-PHX-SRB
The State of Arizona,     )
et al.,                   )
                          )
          Defendants.     )
                          )

**DEPOSITION OF SARAH KRAMER**

Bellingham, Washington
September 13, 2024
10:05 a.m.

REPORTED BY:          CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR  Certified Reporters
AZ CR No. 50200        17505 N. 79th Avenue
              Suite 301-C
              Glendale, AZ 85308
(Certified Copy)       (480) 429-7573

---

I N D E X

EXAMINATION BY                        PAGE

Mr. Connelly................................  5
Mr. Crown....................................  187
Mr. Connelly................................  201

EXHIBITS          DESCRIPTION          PAGE
Exhibit 77  Statute re forensic interviewing  17
Exhibit 78  Comprehensive Child Safety and  44
            Risk Assessment

Exhibit 79  Bates AZ-KAHRAMAN001145 through  69
            001149, Application and
            Declaration for Ex Parte Removal
            of Children
Exhibit 80  Bates AZ-KAHRAMAN001152 through  81
            001153 Dylan's temporary
            custody notice
Exhibit 81  Bates AZ-KAHRAMAN001154 through  89
            001155 Kenan's temporary
            custody notice
Exhibit 82  Bates AZ-KAHRAMAN001144 through  99
            001145, Present Danger Plan for
            Dylan and Kenan
Exhibit 83  Bates KAHRAMAN-AZ009340 through  135
            009343, January 3, 2019, e-mail
            from Shannon Kirwin
Exhibit 84  Bates KAHRAMAN-AZ009344,         137
            January 4, 2019, e-mail from
            Sarah Kramer to Andrea McClimon

---

[Page 2]

DEPOSITION OF SARAH KRAMER
commenced at 10:05 a.m., on September 13, 2024,
Videoconference via Zoom, Bellingham, Washington,
before Kristy A. Ceton, RPR, CRR, Arizona Certified
Court Reporter No. 50200.

                    *  *  *

APPEARANCES:

    For the Plaintiffs:
      MILLS & WOODS LAW, PLLC
      By:  Thomas A. Connelly, Esq.
      5055 North 12th Street
      Suite 101
      Phoenix, Arizona 85014
    For the Defendants:
      BRUECKNER SPITLER SHELTS, PLC
      By:  Larry Crown, Esq.
      8355 East Hartford Drive
      Suite 200
      Scottsdale, Arizona 85255

---

[Page 4]

EXHIBIT          DESCRIPTION          PAGE
Exhibit 85  Bates KAHRAMAN-AZ009345 through  138
            009346, January 4th
            e-mail to from Sarah Kramer to
            Maricopa Placements

Exhibit 86  Bates KAHRAMAN-AZ009415,         139
            January 8th e-mail to Sarah
            Mendez

Exhibit 87  Bates KAHRAMAN-AZ009447          140
            January 8th e-mail from Sarah
            Kramer to Tori Papp

Exhibit 88  Bates KAHRAMAN-AZ006850 through  144
            006992, May 30, 2019 e-mail from
            Madison Bell to Mecca Temple and
            Tracy Reed
Exhibit 89  Bates AZ-KAHRAMAN001280 through  161
            001281 Kinship placement
            notification dated March 22nd,
            2019, to Dorothy Mann

[Page 13]

1    Q.    Okay.  That's what I asked.  So maybe the
2    internal training confused -- was where the confusion
3    is, because it's a close word to internship.
4         So you did the -- you did the DCS
5    training after you received your master's degree and
6    were hired in June, right?
7    A.    Correct.
8    Q.    Okay.  And going into the Department in
9    June, did you know that you were going to be an
10   investigator, or did you ask to be an investigator or
11   how did that come about?
12   A.    I cannot recall how the -- the details of
13   how it came about, but I was hired and placed in an
14   investigator position.
15   Q.    And when was the first time that you
16   investigated a case on your own?
17   A.    I can't recall the specific date or
18   timeframe in 2014.
19   Q.    The training you were in, did it last
20   throughout the summer?
21   A.    I cannot recall.
22   Q.    And then you worked at DCS, you had a
23   commitment for 18 months.  When did you leave the
24   Department?
25   A.    In June of 2021.

[Page 14]

1    Q.    And why did you leave the Department?
2    A.    Because I was moving out of state.
3    Q.    To Washington?
4    A.    Correct.
5    Q.    All right.  What did you do in
6    preparation for your deposition today?
7    A.    I met with Mr. Crown last week and I
8    reviewed the documents that I was provided.
9    Q.    How long did you meet with Mr. Crown?
10   A.    Approximately two hours.
11   Q.    How much time did you spend reviewing the
12   documents that Mr. Crown gave you?
13   A.    Approximately three to four hours.
14   Q.    Besides meeting with Mr. Crown and
15   reviewing documents, is there anything else you did
16   to prepare for today?
17   A.    No.
18   Q.    Did you talk with Madison Bell at all?
19   A.    No.
20   Q.    Have you talked to anybody from the
21   Department about the case --
22   A.    No.
23   Q.    -- to prepare for your deposition?
24   A.    No.
25   Q.    As far as the documents you reviewed, did

[Page 15]

1    you review the notes and communications file?
2    A.    Please clarify what that file is.
3    Q.    It's a file produced by the Arizona
4    Department of Child Safety called "Notes and
5    Communications."  And it has notes, the phone calls,
6    interviews, e-mails.  It has notes of meetings with
7    parents, with children, child contacts.
8         Are you not familiar with that file?
9    A.    No.
10   Q.    Did you review the assessments and plans
11   file?
12   A.    No.
13   Q.    Do you know what that file is?
14   A.    I'm not aware of the contents of that
15   file.
16   Q.    Did you review the CSRA?
17   A.    No.
18   Q.    Did you review the comprehensive CSRA?
19   A.    No.
20   Q.    What did you review?
21   A.    The Court-authorized removal order and
22   affidavit.  The preliminary protective hearing court
23   report that I authored, and a minute entry from the
24   initial hearing.
25   Q.    Anything else?

[Page 16]

1    A.    No.
2    Q.    As part of your training, and I'm sure
3    maybe even as part of your coursework, you learned
4    about the statutes that apply to child welfare,
5    right?
6    A.    Yes.
7    Q.    Are you aware of any of them by number?
8    Like, if I said Arizona Revised Statute 8-456, do you
9    know what that is?
10   A.    No.
11   Q.    That's the statute that describes the
12   investigative function for DCS investigators, and
13   where it says that after receiving a DCS report from
14   the hotline, you, the investigator, shall do all the
15   following:  The No. 1 is, "Make a prompt and thorough
16   investigation."
17        You knew as an investigator you had a
18   statutory obligation to do a prompt and thorough
19   investigation, right?
20        MR. CROWN:  Objection to form.
21        THE WITNESS:  Yes.
22   Q.    BY MR. CONNELLY:  And the statute also
23   requires you to do an investigation of the facts that
24   would tend to support or refute the allegation that a
25   child is a victim of abuse or neglect.

[Page 17]

```
1            Do you understand that?
2        A.  Are you able to show me the statute so I
3   can reference what you're reading?
4            MR. CONNELLY:  I can do that.  Yes.
5        We'll mark it as Exhibit 77.
6   (Exhibit 77 was marked for identification.)
7        Q.  BY MR. CONNELLY:  Just take a minute
8   here.
9            Can you see my screen?
10       A.  Yes.  Are you able to zoom in on it at
11  all?  It's very small print.
12       Q.  Is that better?
13       A.  Yes.  Thank you.
14       Q.  Okay.  So you see here, "A.  The
15  Department shall train all investigators in forensic
16  interviewing and processes and protocols established
17  pursuant to" another section.
18           Did you have training on forensic
19  interviewing?
20       A.  Yes.
21       Q.  And that was part of the training that
22  you did in June and a couple of months afterwards,
23  after you started at the Department, right?
24       A.  No.  It's a separate training from the
25  Department-issued training.  I can't recall a
```

[Page 18]

```
1   specific timeframe that I took it, but it would have
2   been shortly after I was hired and completed the
3   Department training.
4        Q.  Okay.  You see paragraph D, "After
5   receiving a DCS report from the centralized intake
6   hotline pursuant to Section 8-455, an investigator
7   shall do all of the following."  And then there are
8   two main points under D.
9            Do you see that?
10       A.  Yes.
11       Q.  I'm talking about No. 1.
12           First, it starts out that you shall make
13  a prompt and thorough investigation, right?
14       A.  Yes.
15       Q.  And then the second sentence tells you
16  that you have to investigate not only those
17  conditions that tend to support, but also that tend
18  to refute the allegation that the child is a victim
19  of abuse or neglect.  Right?
20       A.  May I please have a minute to read that
21  sentence to myself?
22       Q.  Yes.  Absolutely.
23       A.  Thank you.  Okay.
24       Q.  So in December of 2018, when you were
25  investigating this case, you knew that you had an
```

[Page 19]

```
1   obligation under the law to do a prompt and thorough
2   investigation, which included information that would
3   tend to support or refute the allegation that the
4   child is a victim of abuse and neglect.  Right?
5        A.  Yes.
6        Q.  And were you also aware that you had a
7   duty to protect the due process rights of children
8   and families during the time that you were doing your
9   investigation?
10       A.  Yes.
11       Q.  Do you know what it means to protect the
12  due process rights of children and families?
13           MR. CROWN:  Objection to form and
14  foundation.
15       Q.  BY MR. CONNELLY:  What was your --
16           Oh, I'm sorry.  Did you want to continue
17  to read that?
18       A.  If we're going to continue referencing
19  any further information on the document, then yes.
20       Q.  I was asking you about your understanding
21  of the duty to protect the legal and due process
22  rights of children and families as an investigator.
23       A.  Yes.
24       Q.  Well, the question is, what is your
25  understanding?  What does that mean?
```

[Page 20]

```
1            MR. CROWN:  Objection to form and
2   foundation.
3            THE WITNESS:  That they have a right to
4   be treated -- be treated accordingly to the law and
5   policies.
6        Q.  BY MR. CONNELLY:  Are you also aware of
7   the requirements of A.R.S. 8-514?
8        A.  I'm not aware of that -- what that's
9   referencing.
10       Q.  All right.  Let me show you.  You see my
11  screen?
12       A.  Yes.
13       Q.  This is what's been formerly marked as
14  Exhibit 19.  This deals with -- it sets out
15  references in paragraph B for the placement of
16  children, right?
17       A.  May I please have a moment to read
18  through section B?
19       Q.  Please do.
20       A.  Okay.
21       Q.  So you agree with me that as a matter of
22  policy and law in the state of Arizona, the first
23  preference is not to remove a child from the home,
24  right?
25       A.  Correct.
```

**[Page 33]**

1  December.  And so one of the things you do early on,
2  according to your earlier testimony, then, is that you
3  contact the referral source.  And so do you recall
4  whether you contacted anybody over at Cardon's on the
5  20th?
6      A.  I cannot recall.
7      Q.  Do you recall when you first went to the
8  hospital?
9      A.  No, I don't recall a specific timing.
10     Q.  Even after you reviewed the documents,
11 you can't recall when you went to the hospital?
12     A.  I can't recall right now.  I would have
13 to reference my documents.
14     Q.  What do you recall about any other steps
15 you took in the course of this particular
16 investigation as far as gathering records yourself?
17 Do you recall what records you gathered?
18     A.  I gathered records from Banner Health and
19 Cardon Children's Hospital.
20         To clarify, are you talking about just
21 this very initial time or during the investigation
22 itself?
23     Q.  Well, let's start with during the
24 initial -- the initial days.
25     A.  I know that it was the Cardon Children

**[Page 34]**

1  Banner Health records initially because that's where
2  Kenan was currently hospitalized, and it had
3  information.
4      Q.  Okay.  Did you gather information from
5  anyplace else at that time?
6      A.  I can't recall specific timeframes on
7  when the other records were gathered.
8      Q.  Okay.
9      A.  If it was during the initial --
10     Q.  I'm sorry.  I didn't mean to interrupt.
11         What other records, then, did you gather
12 during your investigation, regardless of when?
13     A.  I know Phoenix Children's Hospital
14 records.  I can't recall specific places.  I know
15 that Ms. Kahraman gave me a list of different
16 providers or doctors or points of contact that the
17 children had been seen by or would have information.
18         So during my investigation, I did work on
19 attempting to either gather phone or physical records
20 from those.
21     Q.  Are there any other records you can
22 recall gathering before you made a decision on what
23 to do with the case?
24     A.  I cannot recall.
25     Q.  Okay.  Let me show you another exhibit.

**[Page 35]**

1  I'm going to show you what we previously marked as
2  Exhibit 18.
3          Do you recognize Exhibit 18?
4      A.  Yes.  Was this multiple pages?
5      Q.  Three pages.
6      A.  Yes.  I recall this document.
7      Q.  This is what you received from
8  Ms. Kahraman, right?
9      A.  Yes.
10     Q.  So let's start on the first page here.
11         Did you contact the Melmed Center,
12 Dr. Jessani?
13     A.  I cannot recall.
14     Q.  What about Dr. Jensen?
15     A.  I cannot recall.
16     Q.  PCH, Eric Bowman?
17     A.  I would have requested records from PCH.
18 I did not have direct contact with Dr. Bowman.
19     Q.  Okay.  So as part of your investigation,
20 you never spoke to Dr. Bowman; is that right?
21     A.  Correct.
22     Q.  And as far as No. 4, Dr. Crawford at PCH,
23 did you ever speak with him?
24     A.  No.
25     Q.  But you requested records from PCH,

**[Page 36]**

1  right?
2      A.  Yes.
3      Q.  Back up to No. 2.
4          You said you don't recall in relation to
5  Dr. Jensen.  Do you recall whether or not you ever
6  spoke with Dr. Jensen?
7      A.  I did not speak with him.
8      Q.  You don't recall whether you requested
9  records from him, and you know that you never spoke
10 with him, right?
11     A.  Correct.
12     Q.  And back up to No. 1.  It's the same
13 thing.
14         You don't recall whether you requested
15 records.  Did you ever speak with Dr. Jessani?
16     A.  No.
17     Q.  What about Dr. Jerald Underdahl and
18 Dr. Golub, in No. 6, at PCH.  Did you ever speak to
19 either one of them?
20     A.  No.
21     Q.  What about No. 7, did you request records
22 from Valley Medical Center?
23     A.  I cannot recall.
24     Q.  Did you ever speak with Dr. Christina
25 Kwasnica, K-w-a-s-n-i-c-a?



[Page 37]

1    A.   No.
2    Q.   What about Becky Plotner, did you request
3  records from Becky Plotner?
4    A.   I can't recall a specific method.  I do
5  recall attempting to contact her.  I can't recall a
6  specific route that that occurred.  It would be
7  documented in my investigative notes.
8    Q.   Do you recall ever speaking with Becky
9  Plotner?
10    A.   No.
11    Q.   What about No. 9, Lisa Madigan?  Did you
12  ever speak with Lisa Madigan?
13    A.   No.
14    Q.   What about ABC Family Dentistry, did you
15  get records from them?
16    A.   I cannot recall.  It would be documented
17  in my notes.
18    Q.   On page 2, did you -- did you request
19  records from Kevin Ross?
20    A.   I cannot recall.
21    Q.   Did you ever speak with Kevin Ross?
22    A.   No.
23    Q.   Did you request records from Ekama
24  Therapeutics?
25    A.   I cannot recall.

[Page 38]

1    Q.   Did you ever request records from
2  Dr. Jafri or Ronald Jones Pediatrics?
3    A.   I cannot recall.
4    Q.   Did you ever speak with Dr. Jafri?
5    A.   No.
6    Q.   Did you ever speak with Ruth Tan-Lim?
7    A.   No.
8    Q.   Did you ever request records from that
9  office?
10    A.   I cannot recall.
11    Q.   Did you ever request records from East
12  Side Family Medical in Mesa?
13    A.   I cannot recall.
14    Q.   Did you ever speak with Dr. Neil Aaron?
15    A.   No.
16    Q.   Did you ever speak with Cindy Schneider?
17    A.   No.
18    Q.   Did you ever request records from her?
19    A.   I cannot recall.
20    Q.   Did you ever request records from
21  Dr. Davidson's office?
22    A.   I cannot recall.
23    Q.   Did you ever speak with Dr. Davidson?
24    A.   No.
25    Q.   Did you seek records from Dr. Bowman's

[Page 39]

1  office?
2    A.   I cannot recall.
3    Q.   Did you ever speak with Dr. Bowman?
4    A.   No.
5    Q.   Did you request records from Dr. Bryan
6  Siegel?
7    A.   I cannot recall.
8    Q.   Did you ever speak with Dr. Siegel?
9    A.   No.
10    Q.   Did you ever speak with Ronald Hansen at
11  PCH?
12    A.   No.
13    Q.   Did you ever request records from A
14  Brighter Avenue?
15    A.   I cannot recall.
16    Q.   Did you talk to anybody at that agency?
17    A.   I recall completing a collateral contact
18  with someone through DDD or that worked with them
19  through that capacity, but I can't recall
20  specifically what agency that person was with or who
21  it was.
22    Q.   And is that Danielle Schmidt that you're
23  talking about?
24    A.   I cannot recall the name.
25    Q.   What about records from Advanced Autism

[Page 40]

1  Center.  Did you ever request records from there?
2    A.   I cannot recall.
3    Q.   Did you ever speak with Valerie Smith?
4    A.   No.
5    Q.   And so you don't recall about Danielle
6  Schmidt, whether you talked to her or not, right?
7    A.   Correct.  I cannot recall specifics.
8    Q.   What about Brittany von Borstel, did you
9  ever speak with her?
10    A.   I cannot recall.
11    Q.   Did you ever speak with Ellen Jones of
12  Sunrise Therapy?
13    A.   I cannot recall.
14    Q.   Did you ever request records from there?
15    A.   I cannot recall.
16    Q.   Did you ever request records from Clausen
17  Pediatric Therapy?
18    A.   I cannot recall.
19    Q.   Did you ever request records from the
20  EAIO Enterprises?
21    A.   I cannot recall.
22    Q.   Did you ever request records from --
23         Oh, we already talked about A Brighter
24  Avenue.
25         What about Neurological Music Therapy

[Page 41]

1  Services of Arizona?
2      A.  I cannot recall.
3      Q.  And for all of these that you say you do
4  not recall, if you had contacted these persons or
5  entities, it would be reflected in your investigation
6  notes, right?
7      A.  Yes.
8      Q.  And if we don't see any such contacts in
9  your investigation notes, then we can assume that you
10  never contacted those persons, right?
11      MR. CROWN:  Objection to form and
12  foundation.
13      THE WITNESS:  I mean, we can't assume,
14  but if I did something, it was specifically
15  documented.
16      Q.  BY MR. CONNELLY:  Right.  Because that's
17  part of what they teach you in your training, is
18  you've got to document everything you do.  Everybody
19  you talk to, right?
20      A.  Yes.
21      Q.  They teach you that if you don't document
22  it, it's as if it never happened, right?
23      MR. CROWN:  Objection to form and
24  foundation.
25      THE WITNESS:  That's a phrase I heard,

[Page 42]

1  yes.
2      MR. CONNELLY:  All right.  We've been
3  going for a little bit over an hour.  Let's just take
4  a five-minute break.
5      (A break was taken at 11:06 a.m.)
6      Q.  BY MR. CONNELLY:  I'm going to show you
7  what has been previously marked as Exhibit 20.  This
8  is what has been produced to us as the assessments
9  and plans file.  And we go to page 12 of 64.
10      The first time we see a note in here
11  that's authored by you begins on page 12 of 64.  It
12  says "Investigation Sequence 1."  Do you know what
13  that means?
14      A.  No.
15      Q.  I see you as assigned December 20th,
16  completed January 29th of 2019.  And that spans the
17  time that you were assigned to the case, right?
18      A.  Yes.
19      Q.  And then I got this briefly, scan down
20  here, just to show you this first note, you see that
21  you're the author of it on January 17th, 2019, right?
22      A.  Yes.
23      Q.  So this, to me, it's about -- let me see.
24  It goes on through page 36.  So it's about 24 pages.
25  And if we -- you said earlier, you didn't know what

[Page 43]

1  the assessments and plans file was.  So have you not
2  seen the information organized in this manner before?
3      A.  Right.  I have not seen it organized like
4  this before.
5      Q.  Okay.  So when you're doing your
6  investigation -- investigation and you're entering
7  information into the child's system, where are you
8  putting the information that you're gathering?
9      A.  In case notes and in the CSRA, which is
10  this document that I've authored in this -- these
11  pages that you stated.
12      Q.  Right.
13      So inside the assessments and plan, we've
14  got the CSRA, the child safety and risk assessments.
15  Right?
16      A.  Yes.
17      Q.  And this is -- this goes on for, like I
18  said, 24 pages.  This is what you then used to create
19  both the -- you take information from there and use
20  it to create your application for Court-authorized
21  removal, right?  Some of the information?
22      A.  Yes.  Some of the information.
23      Q.  And then some of the information is also
24  used in the preliminary report to the Court, right?
25      A.  Yes.

[Page 44]

1      Q.  Okay.  And so there is another file that
2  got produced in the case called the Comprehensive
3  Child Safety and Risk Assessment.  And you're not
4  familiar with -- you said earlier, you're not
5  familiar with the comprehensive CSRA, right?
6      A.  I believe so.  I'm trying to remember the
7  certain terminology.  I believe the comprehensive
8  CSRA is what is an ongoing worker's.  Like, once -- I
9  would need to be shown the document so I could
10  formally refresh my memory if I'm aware of the
11  document.
12      MR. CONNELLY:  Yeah.  I'm going to show
13  it to you.  So I'm going to show you -- it's not in
14  this.  So I'm going to show you what we're going to
15  mark as Exhibit 78.
16      (Exhibit 78 was marked for identification.)
17      Q.  BY MR. CONNELLY:  This is the
18  comprehensive child safety and risk assessment.  Are
19  you familiar with, seeing it now, or have you seen it
20  before?
21      A.  When I reference the CSRA, this is the
22  document that I'm referencing is the comprehensive
23  child safety and risk assessment.
24      Q.  And the same information that's in here
25  is what we find in the assessments and plans, Exhibit

[Page 45]

1  20, that I was just showing you. The same sections
2  with the same information that you input. Obviously,
3  you didn't input the line item stuff.
4      But is that your understanding of how the
5  information works and is stored and populated in
6  different areas of child? Do you have any knowledge
7  about that at all?
8      A. Yes, I have knowledge that my -- as an
9  investigator, the places where my information is
10  stored is in this document that you're showing and in
11  case notes.
12      Q. And also in assessments and plans?
13      A. This -- So what you're showing, that is
14  generated from the comprehensive CSRA that you were
15  just showing. It's just pulling it into a bigger
16  file.
17      Q. Okay. So, right.
18      And it's the same information. It
19  doesn't get edited from the comprehensive CSRA? As
20  it's populating the assessments and plans, it doesn't
21  get edited; it stays the same, right?
22      A. Correct.
23      Q. Okay. And so this will show us the steps
24  you took and who you talked to, how you made your
25  safety threat assessment and how you made your

[Page 46]

1  placement decision and all those things, right?
2      A. Yes. The assessment of the -- and the
3  investigation is in this document.
4      Q. And so if we go to collateral sources, we
5  can see everybody that you've talked to and
6  investigated. We can see what collateral contacts
7  you've talked to during your investigation, right?
8      A. Yes. Collateral contacts can also be
9  documented in case notes, though.
10      Q. Okay. We'll get to that. That's another
11  file. That's the notes and communications file.
12      But collateral contacts, these would be
13  the people that you talked to other than -- other
14  than parents and the children. This would be anyone
15  else you talked to during the investigation, right?
16      A. Yes.
17      Q. So, for instance, on December 20th at
18  5:17, we see that you spoke to a social worker at the
19  hospital named Kami. And then there's a -- you --
20  you populated this with your notes about that
21  conversation, right?
22      A. Correct.
23      Q. And when you -- when you put things in
24  quotes, are those exact words that somebody said or
25  wrote somewhere?

[Page 47]

1      A. Yes. In my documentation style, when I
2  put quotes, it's either directly taken from a
3  document word for word, or directly taken word for
4  word from a verbal conversation.
5      Q. If you're having a verbal conversation
6  with someone, are you taking notes contemporaneously
7  with that conversation?
8      A. Can you please define what you -- what
9  that word is?
10      Q. Are you taking notes as you're having
11  your conversation with somebody?
12      A. Yes. My notes are occurring while I'm
13  speaking with them.
14      Q. And how are you taking notes while you're
15  speaking with somebody?
16      A. Are you asking specifics to these
17  collateral contacts for this specific case or in
18  general?
19      Q. Well, just in general. When you're
20  talking to somebody, how do you -- how are you taking
21  notes? What's the method of note-taking you use
22  while you're speaking with them?
23      A. There's different methods. It depends on
24  my current situation. I will either be typing
25  them -- notes on the computer while I'm speaking on

[Page 48]

1  the phone or writing down on a piece of paper.
2      Q. I mean, when you write notes down on a
3  piece of paper, do you keep those pieces of paper?
4      A. No.
5      Q. You throw them away?
6      A. They're shredded in a confidential
7  shredder once they are entered into the system.
8      Q. Do you have any paper documents that you
9  maintain in relation to this file?
10      A. No.
11      Q. Okay. So in the collateral contacts, we
12  should see -- when we went through the list of people
13  on Exhibit 18, if you talked to them, we should see
14  them here in this section of the CSRA or of this
15  assessment and plans, right?
16      A. Can you please repeat your question?
17      Q. Yeah.
18      Do you recall we just went through
19  Exhibit 18, and I was asking you whether you spoke to
20  the people identified on that exhibit?
21      A. Yes.
22      Q. And if you spoke to any of those persons,
23  that conversation would be reflected in this section
24  of this report, right?
25      A. It typically is, but it could also be

[Page 133]

1    Q. Do you recall that PCH saw Kenan in
2  November of 2018, shortly before he was hospitalized,
3  right?
4    A. I can't recall the specific details in
5  the records.
6    Q. And the records indicate that PCH knew
7  about the diet, and they didn't identify that the
8  child was malnourished, and they didn't make a
9  hotline call about the child being malnourished,
10  right?
11    A. I can't speak as to information that's in
12  those documents.
13    Q. Why is that?
14    A. I cannot recall the information.
15    Q. All right. And you do recall that when
16  you investigated the family's background, that there
17  was no prior history, right?
18    A. Yes.
19    Q. There was no history of prior hotline
20  calls regarding the family, right?
21    A. For me to provide an answer, I would need
22  to confirm on the CSRA, the top section -- the top
23  sections where it reviews the history. Either the
24  CSRA or the court report, whichever one you have
25  available.

[Page 134]

1    Q. Oh, I'm not showing it to you. I'm
2  sorry. Let me show it to you.
3    Here's the court report. Family does not
4  have prior history with DCS, right?
5    A. Correct. The family does not have prior
6  history of calls reported to DCS.
7    Q. Right.
8    So a month earlier, the child was seen at
9  PCH. They were told about his diet. They didn't
10  observe him as being malnourished; otherwise, they
11  would have made a hotline call, right?
12    A. I can't speak as to what observations or
13  determinations they made at that appointment, but
14  there was no hotline call about concerns about what
15  you stated.
16    Q. Right.
17    No hotline calls in November from PCH
18  about malnourishment or anything else. And, if you
19  recall, if you looked at the medical records, you'll
20  note that they describe him as being well-nourished
21  and well-developed. All right. Well, let's move on.
22    Do you recall if Kenan was ready to be
23  discharged from the hospital on January 3rd of 2019?
24    A. I can't recall the specific date.
25    Q. Do you recall that he was ready for

[Page 135]

1  discharge, and it was four or five days later before
2  you were able to find a placement for him, and so he
3  stayed in the hospital for those extra days?
4    A. I can't fully recall the details of that
5  time -- of that sequence.
6    MR. CONNELLY: All right. You're going
7  to make me mark some more documents, then. I think
8  we ended up with 82. So now we're up to 83.
9    (Exhibit 83 was marked for identification.)
10    Q. BY MR. CONNELLY: Okay. Well, I was
11  going to show you this. I don't see you copied on
12  this particular e-mail. You are on another e-mail in
13  this string. You see here we're on January 3rd,
14  2019, right?
15    A. Yes.
16    Q. And it says here on January 3rd, that now
17  his DDD sibling is well enough to be discharged from
18  the hospital and they're hoping to place the siblings
19  together, which is why they reached out to you
20  requesting to know the capacity, population increase.
21    Do you see that?
22    A. Yes.
23    Q. So does this refresh your recollection
24  that Kenan was ready to be discharged on January 3rd?
25    A. Around that time. I can't say. This

[Page 136]

1  does not say specifically he was ready to be
2  discharged on the 3rd. But around the 3rd, yes.
3    Q. It says down here, "Furthermore, this is
4  time sensitive. The child's being discharged from
5  the hospital today and needs to be placed."
6    Do you see that?
7    A. Yes. I would like to be able to read
8  this full e-mail that you're referencing.
9    Q. Please start with where you are copied so
10  you can get the flavor of that e-mail.
11    MR. CROWN: Tom, this is Exhibit 83?
12    MR. CONNELLY: 83. Yeah. 83, I think.
13  Is that right, 83? Is it 83 or 82?
14    THE COURT REPORTER: It's 83.
15    Q. BY MR. CONNELLY: Okay. So let's see.
16  Here you are, Sarah Kramer, on January 2nd, 2019. So
17  go ahead and read this one.
18    A. Yes.
19    Q. And then the next one, here you go.
20  You're copied on this one as well.
21    A. Okay.
22    Q. All right. And I don't know whether
23  you're copied on this one or not.
24    A. Okay.
25    Q. And then we get to the one we were just

[Page 137]

1  looking at on the 3rd.
2      A.  Which I am not copied on or cc'd.
3      Q.  Right.  You're not copied on or cc'd.
4  But you knew the child was ready to be discharged,
5  right?
6      A.  Yes.  I am taking a minute to read this
7  e-mail.  Okay.
8      MR. CONNELLY:  All right.  So then we'll
9  look at Exhibit 84.
10      (Exhibit 84 was marked for identification.)
11      Q.  BY MR. CONNELLY:  On January 4th, Andrea
12  McClimon says to you -- and this is a social worker
13  at the hospital.  It says, "Kenan is definitely clear
14  to discharge.  Is there an opportunity to provide a
15  rescue home for him on the off chance that the twins'
16  placement isn't ready by this afternoon?
17      "The medical staff doesn't like to keep
18  kids in the hospital longer than they have to be
19  because Kenan is around other kiddos who may be
20  contagious, and we wouldn't want him to end up with
21  another illness."
22      Do you see that?
23      A.  Yes.
24      Q.  So he's sitting in the hospital ready to
25  be discharged on the 3rd, right?

[Page 138]

1      A.  Yes.
2      Q.  And then you tell her, that's the option
3  I'm planning.  "That's the option I was planning on
4  if we can't secure the home for them together today,
5  either him going to our placement center or
6  identifying a temporary placement."
7      "Him" being Kenan, right?
8      A.  Yes.
9      MR. CONNELLY:  What I'll mark as Exhibit
10  85.
11      (Exhibit 85 was marked for identification.)
12      Q.  BY MR. CONNELLY:  It starts down here at
13  the bottom, still on January 4th.  You're talking to
14  Maricopa Placements, whoever that is.  And you say,
15  "The child has medically cleared for discharge as of
16  yesterday."
17      Talking about Kenan, right?
18      A.  Yes.  And "yesterday" is the 3rd.
19      Q.  "Yesterday" is the 3rd.
20      And --
21      A.  Can you please scroll back down so I can
22  read that complete e-mail?  Thank you.
23      Okay.  Thank you.
24      Q.  And then Maricopa Placements, Amy Fox
25  says to you she'll follow up with DDD.  "Please do

[Page 139]

1  not pick him up until we have a placement."  Right?
2      A.  Yes.
3      Q.  So, in other words, keep him in the
4  hospital until we find a place for him, right?
5      A.  Yes.
6      Q.  And then you send a letter, an e-mail
7  back to her, sending her some records, I guess.
8      Do you remember when it was that you
9  finally found a place for him?
10      A.  No.
11      MR. CONNELLY:  This is going to be
12  Exhibit 86.
13      (Exhibit 86 was marked for identification.)
14      Q.  BY MR. CONNELLY:  You send an e-mail on
15  January 8th, five days after he was ready for
16  discharge, to Sarah Mendez telling her, "I finally
17  got placement for Kenan at 5 p.m."  Right?
18      A.  Yes.  I am looking -- Yeah.  The time of
19  that is weird on that e-mail.  That's why I'm just
20  trying to reference if it's --  Do we have anywhere
21  else that says it's the 8th that he was placed, like
22  any other notes?
23      Q.  I don't -- I don't know.
24      A.  Okay.
25      Q.  But you see, this is an e-mail apparently

[Page 140]

1  sent from you at 1:30 in the morning on the 8th,
2  where you say, "I finally got placement for Kenan at
3  5 p.m."  I'm assuming at 5 p.m. on the 7th you found
4  a placement for him?  "It's in Anthem and they can't
5  pick him up, so I'm at the hospital to discharge him
6  and then drive him to placement."
7      A.  Okay.
8      Q.  Do you see that?
9      A.  Yes.
10      Q.  And you recognize that, "I was working
11  late tonight and so someone knows where I'm at
12  tonight."  Right?
13      A.  Yes.
14      Q.  And so he was in the hospital during
15  those five days that you were trying to find some
16  place for him, right?
17      A.  Yes.
18      MR. CONNELLY:  And if you want to see
19  something else, I'll show you Exhibit 87.
20      (Exhibit 87 was marked for identification.)
21      Q.  BY MR. CONNELLY:  Where later in the day,
22  on the 8th, shortly after noon you say, "Kenan was
23  discharged last night, but he is placed in Anthem."
24      A.  Okay.  Thank you for showing that so I
25  was able to confirm the timeline.

[Page 141]

1    Q.  So he wasn't even placed in a placement
2  with his brother when you finally got a placement for
3  him, right?
4    A.  Correct.
5    Q.  Him being in the hospital from
6  January 3rd until January -- until early morning
7  hours of January 8th had nothing to do with any
8  medical need to be in the hospital that much longer,
9  right?
10    A.  I just want to clarify.  You said the
11  early morning hours of the 8th.  He was placed on the
12  evening of the 7th, based on this e-mail.
13      But, yes, he was in the hospital those
14  days pending a placement being identified.
15    Q.  He didn't leave the hospital until at
16  least the early morning hours of the 8th, right?  You
17  were at the hospital on January 8th at 1:30 to pick
18  him up, right?
19    A.  That does not seem consistent with my
20  memory, but I acknowledge that that's what the e-mail
21  says.
22    Q.  And so the fact that he was in the
23  hospital from January 3rd until the early morning
24  hours of January 8th was because the Department had
25  no place to put him, not because he needed to be in

[Page 142]

1  the hospital for any medical reasons, right?
2    A.  Correct.
3    Q.  All right.  Now, we see that you placed
4  him in some foster placement in Anthem.  And we've
5  talked about -- a little bit about why you didn't
6  place him at home with the parents.  We know from
7  what we looked at earlier that Arizona's policy and
8  law has a decided preference for grandparents as a
9  placement if the parents can't be the first
10  placement.
11    A.  Correct.
12    Q.  And so what did you do to consider the
13  maternal grandparents as placement?
14    A.  I recall having a phone conversation, but
15  I cannot recall the specific details of that
16  conversation with them.  There was also the concern
17  about the grandparent being present in the hospital
18  and denying Kenan food when he said he was hungry.
19    Q.  Let's talk about that.
20      Did you --  Let me first show you what
21  we'll mark.
22      Do you recall --
23      First of all, do you recall in February
24  of 2019, there being questions about why the child
25  wasn't -- why the children weren't placed with the

[Page 143]

1  maternal grandmother that got you back involved?
2    A.  No.
3    Q.  All right.  Let me show you what was
4  previously marked as Exhibit 22.  So this is an
5  e-mail -- I'm sorry.  I said February.  I meant May
6  was when they got you back involved with this
7  question.
8      Do you recall this e-mail?
9    A.  I don't recall this e-mail, but I
10  acknowledge that I read it right now and I'm cc'd on
11  it or put on the e-mail.
12    Q.  Right.
13      And so this, what you see here on this
14  e-mail, those two sentences are a rephrasing of a
15  record that I'll show you.  All right.  Let me -- let
16  me see how we should best do this.  I want to -- let
17  me see.  There are a couple of prior exhibits.  All
18  right.
19      So we're looking at Exhibit 22.  And
20  you've seen these two sentences here.  This says,
21  May 29th that Madison is e-mailing Tracy Reed and you
22  with these two sentences that she's written.
23      And then we've got an e-mail on May 30th
24  at 11:16 a.m. from Madison Bell to you where she
25  says, "Where is the documentation from Cardon's that

[Page 144]

1  Grandmother refused to give Kenan food?"
2      And you say, "I just e-mailed you the one
3  note that I remember it being in."
4      Do you see that?
5    A.  Yes.
6    Q.  Okay.  And then, there's another e-mail.
7  That's from Madison Bell to Mecca Temple.
8      MR. CONNELLY:  So this will be Exhibit
9  88.
10      (Exhibit 88 was marked for identification.)
11    Q.  BY MR. CONNELLY:  It's going to be
12  Exhibit 88.
13      So at this -- at this time in May of
14  2019, there are mostly e-mails between Madison Bell,
15  Mecca Temple, and Tracy Reed about this issue.  And
16  then Madison Bell says to Mecca Temple, page 34, this
17  is her saying that what we just looked at from you,
18  where you said, "I just e-mailed you the one note
19  that I remember it being in."
20      Madison Bell says to Mecca Temple, page
21  34.  And you see attached this record.  We can't see
22  it in your e-mail.  There's no attachment that we
23  see.  But when we go to --  Okay.  Now, you see that
24  this -- this whole file that I've shown you is 143
25  pages long, right?

[Page 205]

1  health conditions to improve following their removal
2  from that home, wouldn't you?
3        MR. CROWN:  Objection.  Form and
4  foundation.
5        THE WITNESS:  I can't speak as to that,
6  as mold was not a consideration or involved during my
7  time on the case.
8        Q.  BY MR. CONNELLY:  And you can't speak
9  from general knowledge or commonsense?
10       A.  I am not trained in mold or surrounding
11  information of that to make a determination.  It's
12  not my expertise.
13       MR. CONNELLY:  All right.  Thank you.  I
14  don't have any other questions.
15       Larry?
16       MR. CROWN:  No more questions.  We
17  will -- we'll reserve signature.
18       THE COURT REPORTER:  Same orders as last
19  time?
20       MR. CROWN:  Yes.
21  (The proceedings concluded at 5:25 p.m.)
22
23       _____
       SARAH KRAMER
24
25

[Page 206]

1   STATE OF ARIZONA        )
                             ) ss.
2   COUNTY OF MARICOPA       )

3

4       BE IT KNOWN that the foregoing
    proceedings were taken by me, KRISTY A. CETON, a
5   Certified Reporter, in and for the County of
    Maricopa, State of Arizona; that the witness before
6   testifying was duly sworn to testify to the whole
    truth; that the questions propounded to the witness
7   and the answers of the witness thereto were taken
    down by me in shorthand and thereafter reduced to
8   typewriting under my direction; that the witness
    requested reading and signing said deposition; that
9   the foregoing pages are a true and correct transcript
    of all proceedings had, all done to the best of my
10  skill and ability.
        I FURTHER CERTIFY that I am in no way
11  related to any of the parties hereto, nor am I in any
    way interested in the outcome hereof.
12      I FURTHER CERTIFY that I have complied
    with the ethical obligations set forth in ACJA
13  7-206(J)(1)(g)(1) and (2).

14

    Kristy A. Ceton                 50200_____
15  Certified Reporter              CR Number
16
    _Kristy A. Ceton_____
17  Certified Reporter Signature       Date  09/30/2024

18

        I CERTIFY that this Registered Reporting
19  Firm has complied with the ethical obligations set
    forth in ACJA 7-206(J)(1)(g)(1) and (2).

20

21  Carrie Reporting, LLC             R1064
    Registered Reporting Firm         RRF No.
22
    _Traci Loftis_____
23

    Registered Reporting Firm       Date  09/30/2024
24  Signature

25