# EXHIBIT E

# In the Matter of:

*Kahraman*

*vs*

**The State of Arizona**

*Video Recorded Deposition of Ryan Stewart, M.D.*

*February 26, 2024*



GRIFFIN GROUP INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

Page 30

1  to thrive.
2      THE REPORTER: It would get what?
3  A.  Failure to thrive diagnosis.
4  Q.  BY MR. CROWN: Malnutrition can cause failure
5  to thrive?
6  A.  Correct.
7  Q.  And malnutrition can cause acute right heart
8  failure?
9  A.  Correct.
10 Q.  Anasarca, explain what that is.
11 A.  Anasarca is just generalized edema, so swelling
12 of hands, feet and the face. It's called anasarca.
13 Q.  And when you say "generalized," meaning it's
14 bodywide, there's a swelling that is, you know,
15 throughout the body; correct?
16 A.  It's in multiple places, yes.
17 Q.  What does that indicate?
18 A.  So there are different reasons why patients can
19 have generalized edema. The two most common would be
20 heart failure or kidney failure, but you could also get
21 it from diffuse inflammation or infections.
22 Q.  And malnutrition can contribute to and cause
23 heart failure; correct?
24 A.  Correct.
25 Q.  So therefore, malnutrition can cause anasarca?

Page 31

1  A.  Correct.
2  Q.  Right ventricular dysfunction.
3  A.  Yes.
4  Q.  This is tied to the acute right heart failure?
5  A.  Yes.
6  Q.  Ketotic hypoglycemia, can you explain what that
7  is for the record?
8  A.  Yes. So when a patient goes into a starvation
9  state, they start to make ketones, kind of like a
10 diabetic, like, in DKA. So if you're not getting enough
11 nutrition, your body starts making ketones and breaking
12 down fats and muscles to find an alternate food source,
13 so you make ketones. And then the hypoglycemia meant
14 that his glucose at the time at presentation was below
15 normal.
16 Q.  If Kenan did not have this medical
17 intervention, was he starving to death?
18     MR. CONNELLY: Form and foundation.
19 A.  Yes, that -- that was a concern, yeah. More
20 general would be without medical intervention, he would
21 have had potential threat to life and limb.
22 Q.  BY MR. CROWN: And is that a fair description
23 based on what we've been discussing, that without
24 medical intervention, the malnutrition is such that he
25 was starving to death?

Page 32

1      MR. CONNELLY: Form and foundation.
2  A.  Well, by the evidence of the fact that the
3  patient needed to be admitted to the ICU and receive all
4  these interventions in order to stabilize them would
5  suggest that this was life -- potentially
6  life-threatening if not intervened.
7  Q.  BY MR. CROWN: Lower extremity weakness, can
8  you explain that a little bit more?
9  A.  Yeah, Mom reported patient was having trouble
10 walking, balance issues, weakness, yeah.
11 Q.  In fact, wasn't it reported that he stopped
12 walking two months before this hospital admission?
13 A.  Yes, that's what Mom reported.
14 Q.  And there was certainly no neurologic or
15 orthopedic explanation for that; correct?
16 A.  Not at the time when he came out of the ICU.
17 It was being investigated still.
18 Q.  Pleural effusion, can you explain what that is?
19 A.  That also would -- it's a similar thought
20 process around the anasarca or generalized edema where
21 you get fluid distributed outside of the blood vessels,
22 you can get fluid that distributes into the bases of the
23 lungs, so it's fluid that's outside of the lungs, but
24 still in the chest cavity.
25 Q.  Sure.

Page 33

1      In that -- in that pleural space area;
2  correct?
3  A.  Yes, yes.
4  Q.  That compromises breathing?
5  A.  It can, yes.
6  Q.  Pulmonary hypertension, what is that?
7  A.  That's when you have increased pressure in the
8  blood vessels in the lungs that the heart now has to try
9  to fight against.
10 Q.  Retarded development following protein-calorie.
11 Can you explain that?
12 A.  Yeah. So the last word is "malnutrition," so,
13 "Retarded development following protein-calorie
14 malnutrition." So his height and his weight were less
15 than what would be expected for his age and was being
16 attributed to protein-calorie malnutrition or just
17 malnutrition.
18 Q.  Then the last says, "Unspecified severe
19 protein-calorie malnutrition."
20     Can you explain that?
21 A.  So it's offering a diagnosis for the
22 malnutrition, so he has malnutrition, but it's not --
23 the unspecified says it's not giving a specific reason
24 why, so unspecified reason.
25 Q.  The reason eventually developed into the



Page 114

1  Q.  There's no question pending, Doctor.
2      Now, on page 1085 is a discussion about
3  the diet that the kids were on down at the bottom there
4  where it talks about Dad reports that Kenan -- I'm
5  sorry.  That's not what I was looking for.
6      Right below that, regarding nutrition, Dad
7  reports about the New Zealand lamb and all that; right?
8  Do you see that?
9  A.  Uh-huh.
10     MR. CROWN:  What page are you on?
11     MR. CONNELLY:  1085.
12 Q.  BY MR. CONNELLY:  Is it your understanding or
13 do you know whether the parents were on the same diet,
14 eating the same foods that the children were eating?
15 A.  I'm not sure actually.
16 Q.  Did you ever ask Mother or Father that?
17 A.  I did not.
18 Q.  Okay.
19 A.  Not to my recollection.
20 Q.  Did either Mother or Father look
21 malnutrition -- malnourished to you?
22 A.  Not to my memory.
23 Q.  And you were able to -- you saw and spoke to
24 Mother a number of times; right?
25 A.  Yes.

Page 115

1  Q.  And did you see and speak with Father as well?
2  A.  Yes.
3  Q.  Okay.  And on this page right above the Other
4  on the Development, it says, "The child's development
5  was unremarkable.  Dad reports that Kenan achieved
6  normal developmental milestones at age-appropriate
7  intervals."  Do you see that?
8  A.  Yes.
9  Q.  And do you have any reason to dispute that?
10 A.  No.
11 Q.  In fact, you never obtained the records from
12 the children's primary-care physician to determine
13 whether or not the children had been meeting their
14 developmental milestones at age-appropriate intervals;
15 right?
16 A.  Not to my recollection, no.
17 Q.  Okay.  And that would be something that would
18 be kind of important to your diagnosis of failure to
19 thrive, wouldn't it?
20     MR. CROWN:  Objection to form and
21 foundation.
22 A.  It depends on -- like, failure to thrive can
23 start at any time.  So if you're talking about
24 developmental milestones, if he, you know, had normal
25 development through the first four years of life and met

Page 116

1  all of his milestones and then the malnutrition, failure
2  to thrive started at some point later than that, and at
3  that point, he completed the majority of his primary
4  neurological development, and then mainly at this point,
5  let's say in the last year before he came in, is more of
6  an issue of height and weight, then he could still meet
7  the -- he could -- both things could be true where he
8  met his milestones, but then now he's showing signs of
9  malnutrition and failure to thrive.
10 Q.  BY MR. CONNELLY:  Okay.  And do you agree with
11 me that if the parents had the child on this GAPS diet
12 or a special diet and the children are meeting their
13 milestones, that there wouldn't be any reason for the
14 parents to suspect that there was anything deficient in
15 the diet; right?
16     MR. CROWN:  Objection to form and
17 foundation.
18 A.  So as long as the diet was the same since -- I
19 mean, you'd have to look at when -- I mean -- you're
20 asking me to put myself in the position of the parents.
21 Just, like -- so if I saw them in clinic and they had
22 made no changes to the diet, let's say, over a longer
23 period of time and then the changes started to happen
24 later and there didn't seem like there was a time
25 condition, then, yeah, you wouldn't necessarily

Page 117

1  attribute it to the diet.
2      If the diet was becoming increasingly
3  restrictive and coincided with changes in height and
4  weight, then you would be suspicious.  And it's --
5  again, it's a long time ago, so it's hard to -- hard to
6  remember exactly what the time course was that Mom put
7  forth when speaking to her.
8  Q.  BY MR. CONNELLY:  And if the presence of the
9  mold infestation in the house was discovered after this
10 hospitalization, would it be reasonable for the children
11 to be tested and to consider whether the mold had been
12 an issue in Kenan's presenting problems in December of
13 2018?
14     MR. CROWN:  Objection --
15     MS. DEAN:  Form and foundation.
16     MR. CROWN:  -- form and foundation.
17 A.  That would be a better special -- question for,
18 like, a mycologist or someone who specializes in those
19 types of investigations, so I don't know specifically
20 which test that they would run or investigate.
21     The line of thinking is -- at the time
22 was, yeah -- so if Kenan in that situation wasn't
23 improving, then -- or -- you know, then -- with typical
24 interventions or the most -- like, when we start your
25 working diagnosis, you're starting to treat, and they



Page 118

1  fail to respond, then you start looking for the really
2  rare, weird things.
3     Q.    BY MR. CONNELLY: All right. Now, but if the
4  child is outside of the home --
5     A.    Uh-huh.
6     Q.    After he leaves this hospital here in January
7  of 2019, he doesn't go back home; right?
8     A.    Uh-huh.
9     Q.    He goes into foster care?
10    A.    Uh-huh.
11    Q.    You understand that; right?
12    A.    Yes, yes.
13    Q.    And then it's discovered that there's mold in
14  the home.
15    A.    Uh-huh.
16    Q.    Do you think that it would be a good idea --
17  DCS has custody of the children now; right?
18    A.    Uh-huh, uh-huh.
19    Q.    Do you understand that?
20    A.    Yes.
21    Q.    Okay. Would it be a good idea for DCS to then
22  come back either to PCH or to Banner or to some
23  mycologist to say, "Please test these children for mold
24  to see if they have toxins in their body and to tell us
25  whether or not the level of toxins might have caused

Page 119

1  some of these issues with Kenan"?
2           MS. DEAN: Form and foundation.
3           MR. CROWN: Objection to form and
4  foundation.
5     A.    So -- so in medicine, we're trained to think
6  along the lines of probability. So, like, is it
7  possible, yeah. You're talking about a one in a million
8  situation. Like, it's rare enough that, like, medical
9  schools and residencies, mold in houses isn't really
10  something that's stressed because it's so rare. Is it
11  possible, yes. Is it likely, no, it's not likely. But
12  again, better question, I mean, calling a mycologist and
13  asking them, I mean, sure, that's --
14    Q.    BY MR. CONNELLY: It makes sense?
15    A.    -- not a bad idea. Is that typical or
16  standard -- that would be more or less above and beyond
17  the typical, but, yeah, I don't have a problem with it.
18    Q.    If you're still looking for answers to issues
19  you haven't resolved, you should look at all
20  possibilities, shouldn't you?
21    A.    Yeah, I think that's -- that's a reasonable
22  statement.
23    Q.    There's been some discussion today about -- or
24  Mr. Crown had you looking at a bunch of statements about
25  Mom's conduct in relation to the nutrition being given

Page 120

1  at the hospital. He had you look at page 146 (sic), but
2  he didn't have you look at the statement in the
3  nutritional communications. Let me know when you're
4  there, page 1146. I'm sorry. I said 146, but I meant
5  1146.
6     A.    Yep, I'm there.
7     Q.    We've seen today that a lot of the notations
8  that were made about caloric intake and all were made by
9  Mother, right --
10    A.    Uh-huh.
11    Q.    -- while he was in the hospital?
12          Is that a "yes"?
13    A.    Yes.
14    Q.    And here in this paragraph at the very top,
15  there's a bunch leading up to this statement there. The
16  second to last sentence, Mom had made estimates of 1,118
17  calories, 56 grams of protein, 92 grams of fat in the
18  lamb meatballs and other things that he had been fed.
19  And then it says, "To verify data using USDA database
20  nutrition for -- excuse me, let me restart.
21          "To verify data using USDA database for
22  nutrition analysis, Mom's estimates appear to be
23  accurate." Did I read that correctly?
24    A.    Yes, uh-huh.
25    Q.    Okay. So do you know why -- you see a bunch of

Page 121

1  language that's stricken out below that section there?
2     A.    Yes.
3     Q.    Do you know why that's all stricken out?
4     A.    Usually means the author is saying it was
5  entered in error.
6     Q.    Okay. And -- but on December 22nd of 2018,
7  Tracey Chacon -- is she the nutritionist or he?
8     A.    I can't remember who Tracey was.
9           MS. DEAN: If you know.
10    A.    Looks like a nutritionist. I don't know.
11    Q.    BY MR. CONNELLY: Okay. But in any event, the
12  estimates that Mother had been making for the calories,
13  at least here, were accurate; right?
14    A.    Yes.
15    Q.    She wasn't making it up?
16    A.    Per Tracey's report, yes.
17    Q.    Okay. All right. Now, you said a couple of
18  times that as far as a discharge plan goes, that you
19  wanted to ensure -- your goal would be to ensure that
20  there was a safe discharge plan that would take into
21  consideration Kenan's needs and make sure he was getting
22  the caloric intake that you believe he needed in order
23  to put on weight and to stimulate growth and all; right?
24    A.    Correct.
25    Q.    Did you specifically tell DCS that the child



Page 130

1 for cardiovascular; right?
2  A.  Yes.
3  Q.  -- it says, "Continue sildenafil, 20
4 milligrams" -- what does PO mean?
5  A.  By mouth.  Stands for per oral.
6  Q.  Okay.  Three times a day.
7      Sildenafil is the active ingredient in
8 Viagra; right?
9  A.  Correct.
10  Q.  So what was it prescribed here to do?
11  A.  Cause pulmonary vasodilation, so decrease the
12 pressure in the pulmonary vasculature.  So --
13  Q.  And in layman's terms, what's it doing?
14  A.  Lowering the blood pressure in the lungs.
15  Q.  Okay.  And is that -- is that a regular use of
16 sildenafil or is that an off-label use?
17  A.  Well, my -- so it's regular in that we do it
18 routinely in patients with pulmonary hypertension.  It
19 may be an off-label use because -- you'd have to ask
20 Dr. Miga if that's off label or if there is a specific
21 indication, but most -- or a large number of drugs that
22 we use in children are actually off label because they
23 don't specifically do the studies in the children.  They
24 do them in adults.
25  Q.  Okay.  Let's look at the next page, 1000.

Page 131

1 Maybe it's not the next page, but page 1000.  There are
2 some allergies that are identified on the right -- in
3 the right column.  Do you see that?
4  A.  Yes.
5  Q.  Are those allergies that were identified and
6 confirmed at the hospital or were those reported by
7 Mother?
8  A.  I'd have to -- so when you look in the system,
9 it will actually say who reports, but most often it's
10 usually just reported by parent, family member.
11  Q.  But looking at this record, you can't tell
12 whether these are what were reported by Mother or what
13 were identified and confirmed by the hospital?
14  A.  Correct.
15  Q.  As far as -- on page 1001, there's a paragraph
16 that had carried over from the previous page.  Mr. Crown
17 had asked you some questions about the last part of this
18 carryover paragraph.  One thing that's noted in here is
19 that patient's appetite has increased and Mom is wanting
20 to stop the medication that's identified there.  That's
21 the thyroid hormone; right?
22  A.  Correct.
23  Q.  Hormone, I mean.
24     That's one of the effects of that drug is
25 it increases the patient's appetite; right?

Page 132

1  A.  It can, yes.
2  Q.  And can it increase the patient's appetite to
3 the point where the -- that the patient might want to
4 overeat?
5  A.  So theoretically, yeah, if you're taking super
6 physiologic -- if you're overdosing on it basically,
7 yeah, it would give you an abnormally high metabolism,
8 so that was Mom's concern, and that's why I called
9 endocrinology, and they did not think that that would be
10 likely at the dose he was on.
11  Q.  Okay.  I'm going to just mark a couple of
12 exhibits real quick.  Let me just ask you this question,
13 maybe I won't even mark this, but do you -- are you
14 familiar at all with the mold variety of Aspergillus?
15 That's A-S-P-E-R-G-I-L-L-U-S.
16  A.  Uh-huh, Aspergillus, yes.
17  Q.  Okay.  What do you know about Aspergillus?
18      MR. CROWN:  Objection to form and
19 foundation.
20  A.  So Aspergillus can cause -- I have seen it in
21 some patients, usually patients with leukemia or on
22 chemotherapy.  Most commonly, it can cause pneumonia, so
23 fungal pneumonias.  You can also get fungal infections
24 in other organs, like in the liver from it.  But
25 primarily, it's an infection of immunocompromised

Page 133

1 patients.
2  Q.  BY MR. CONNELLY:  Okay.  And there was nothing
3 that you did at the hospital to determine whether or not
4 that fungus was present in Kenan; right?
5  A.  I did not specifically send any Aspergillus
6 testing or fungal testing, no.
7  Q.  Do you know a doctor by the name of Scott
8 Jensen?
9  A.  No, not to my recollection.
10  Q.  Okay.  So you're not aware that he's the
11 children's primary-care physician; right?
12  A.  No.
13      MR. CONNELLY:  Okay.  I'm going to go
14 ahead and mark Exhibit 2.
15      (Exhibit No. 2 was marked.)
16      (Discussion off the record.)
17  Q.  BY MR. CONNELLY:  Go ahead and take a minute to
18 read that, Doctor.  It's a short paragraph.
19      MS. JUDD:  Can you provide the Bates label
20 for Exhibit 2.
21      MR. CONNELLY:  You know what, I'm sorry,
22 it doesn't have a Bates label.  Let me see.  I did get
23 an email this morning.  Let me see if there's a Bates
24 label on that one.  Yeah, TURNER_000321.
25      MS. JUDD:  Thank you.



Page 134

1   Q.   BY MR. CONNELLY:  Let me know when you've read
2  through it, Doctor.
3   A.   I've read it.
4   Q.   So Dr. Jensen says that the issue about the
5  exposure to black mold could explain muscle weakness and
6  lethargy.  Do you have any reason to dispute what
7  Dr. Jensen said?
8        MR. CROWN:  Objection to form.
9        MS. DEAN:  Form and foundation.  Just for
10 the record, this is dated 6-3-2019.
11       MR. CONNELLY:  Yes.
12  A.  No, I do not.
13  Q.   BY MR. CONNELLY:  Okay.  And he suggests, as
14 you have, that a physician specializing in mold should
15 be consulted.  You agree with that if there was a
16 concern that long exposure to black mold might have been
17 part of the problem here?
18       MR. CROWN:  Objection to form and
19 foundation.
20       MS. DEAN:  Form.
21  A.  So I'm always an advocate for patient --
22 parents seeking second opinions, third opinions, so I
23 would not oppose that.
24  Q.   BY MR. CONNELLY:  Then Dr. Jensen says, "There
25 are mold detoxification enzyme issues that individuals

Page 135

1  can have that explain susceptibility to mold-related
2  illness."
3        Do you agree or disagree with that?
4        MR. CROWN:  Objection, form, foundation.
5        MS. DEAN:  Form, foundation.
6   A.  I have no reason to disagree with his
7  recommendation.
8   Q.   BY MR. CONNELLY:  Then he says, "If the issues
9  they are having resolve outside the home, it would
10 provide reasonable suspicion as well for a plausible
11 explanation for their illness."
12       When he's saying "they" and "their," he's
13 talking about Kenan and Dylan.  Do you take any issue
14 with that last sentence?
15       MS. DEAN:  Form.  So he's here as a fact
16 witness to comment on his own care, but this is --
17       MR. CONNELLY:  Yeah.
18       MS. DEAN:  -- things -- this is going on a
19 year later.
20       MR. CONNELLY:  I'm asking him if he agrees
21 or disagrees from a medical perspective with this
22 statement.
23       MR. CROWN:  I join in form and foundation.
24       MR. CONNELLY:  Okay.
25  A.  I don't -- I don't -- again, so this is an area

Page 136

1  of expertise that is not mine, so if somebody has some
2  medical knowledge or experience or recommendation, I
3  don't have any reason to oppose this.
4        MR. CONNELLY:  All right.  And I'll just
5  note for the record that June of 2019 is six months
6  later, not a year later, later from Dr. Stewart's
7  involvement.
8   Q.   BY MR. CONNELLY:  And then the only other thing
9  I'm going to do here today, Doctor, is just show you
10 Exhibit 3 and what we'll mark as Exhibit 3.  I don't
11 have -- this is not anything that's been produced
12 previously.
13       MS. DEAN:  Do you have an extra one, Tom?
14       MR. CONNELLY:  Oh, sorry.
15       MS. DEAN:  Thank you.
16       MR. CONNELLY:  But it is the doctor's
17 LinkedIn.  If you want to look on LinkedIn for him, and
18 all I want to do -- go ahead and give him the exhibit.
19       MR. CROWN:  You're saying this has not
20 been produced?
21       MR. CONNELLY:  It has not been produced.
22       MR. CROWN:  So this is the first time
23 we're seeing it?
24       MR. CONNELLY:  First time we're seeing it.
25  Q.   BY MR. CONNELLY:  And my question is -- I think

Page 137

1  my only question is, Doctor, is this your LinkedIn
2  account?
3   A.  Yeah, it appears to be me, yes.
4   Q.   And as far as the experience that's identified
5  here, outside of not having your employment at Banner on
6  here, is the rest of the experience noted correct?
7   A.  Everything else on here is correct.
8   Q.   And it says here in your research experience
9  that you spent two years in microbiology lab studying
10 Yersinia pestis from 2009 to 2011 and that you are a
11 teaching assistant for microbiology and pathophysiology.
12 Is that right?
13  A.  Yes.
14  Q.   And what is the Yersinia pestis?
15  A.  It's the bacteria the causes the bubonic
16 plague.
17  Q.   Okay.  But you're not a microbiologist; right?
18  A.  No.
19  Q.   Okay.
20       MS. DEAN:  Is that right?
21  A.  Yeah, that's correct.
22       MR. CONNELLY:  I don't have anything else.
23       MR. CROWN:  I have a few follow-up
24 questions.
25       MR. CONNELLY:  Thank you, Doctor.

Page 146

1 hypoglycemia, lower extremity weakness, pleural
2 effusion, pulmonary hypertension, retarded development,
3 suspected child abuse. All of those diagnoses are
4 consistent with severe malnutrition; correct?
5     MR. CONNELLY: Form and foundation.
6 **A. Correct.**
7 Q. BY MR. CROWN: And that's why malnutrition was
8 the probable and leading diagnosis to explain Kenan's
9 severe compromised health condition on admission and
10 through his hospital course; correct?
11     MR. CONNELLY: Form and foundation.
12 **A. Correct.**
13 Q. BY MR. CROWN: By you and by the medical team
14 at Banner Children's Hospital; correct?
15     MR. CONNELLY: Form and foundation.
16 **A. Correct.**
17     MR. CROWN: Thank you. No further
18 questions.
19     MS. JUDD: I have nothing further.
20     MR. CONNELLY: I don't need to -- I don't
21 think I need to re-ask questions I've already asked.
22 I'll just ask one question, though, Doctor.
23     (Next page, please.)
24
25

Page 147

1     FURTHER EXAMINATION
2 BY MR. CONNELLY:
3 Q. You were never asked to consider under what
4 conditions the child could be returned home to the
5 mother if there were interventions that were put in
6 place to track his feeding and weight gain; correct?
7 **A. No, I was never asked.**
8     MR. CONNELLY: Okay. Thank you. I don't
9 have any other questions.
10     MS. DEAN: We will read and sign.
11     THE VIDEOGRAPHER: We are off the record.
12 The time is 1:59 p.m. This concludes the deposition of
13 Dr. Ryan Stewart.
14     (1:59 p.m.)
15
16
17
18     _____
        RYAN STEWART, M.D.
19
20
21
22
23
24
25

Page 148

1     CERTIFICATE OF CERTIFIED REPORTER
2
    BE IT KNOWN that the foregoing proceedings were
3 taken before me; that the witness before testifying was
  duly sworn by me to testify to the whole truth; that the
4 foregoing pages are a full, true and accurate record of
  the proceedings, all done to the best of my skill and
5 ability; that the proceedings were taken down by me in
  shorthand and thereafter reduced to print under my
6 direction.
7
    I CERTIFY that I am in no way related to any of
8 the parties hereto nor am I in any way interested in
  the outcome hereof.
9
    [X] Review and signature was requested; any
10 changes made by the witness will be attached to the
   original transcript.
11     [] Review and signature was waived/not
   required.
12
    I CERTIFY that I have complied with the ethical
13 obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
   J(1)(g)(1) and (2). Dated at Phoenix, Arizona, this 11th
14 of March, 2024.
15
        /s/ Jennifer Hanssen
16      _____
        Jennifer Hanssen, RPR
        Certified Reporter
17      Arizona CR No. 50165
18      *    *    *    *    *
19     I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
   complied with the ethical obligations set forth in ACJA
20 7-206 (J)(1)(g)(1) through (6).
21
        /s/ Pamela A. Griffin
22      _____
        GRIFFIN GROUP INTERNATIONAL
23      Registered Reporting Firm
        Arizona RRF No. R1005
24
25

Page 149

1 GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY
2 3200 East Camelback Road Suite 177 Phoenix, Arizona 85018
3 Kahraman vs The State of Arizona-Video Recorded Deposition of Ryan-Stewart, M.D.-February 26, 2024
4 Errata & Signature due no later than April 19, 2024.
5
7 PAGE  LINE  CORRECTIONS/CHANGES        REASON
8 ___  ___  _____  _____
9 ___  ___  _____  _____
10 ___  ___  _____  _____
11 ___  ___  _____  _____
12 ___  ___  _____  _____
13 ___  ___  _____  _____
14 ___  ___  _____  _____
15 ___  ___  _____  _____
16 ___  ___  _____  _____
17 ___  ___  _____  _____
18 ___  ___  _____  _____
19 ___  ___  _____  _____
20 ___  ___  _____  _____
21 ___  ___  _____  _____
22 ___  ___  _____  _____
23 ___  ___  _____  _____
24 _____    _____
25 SIGNATURE OF WITNESS    DATE