# EXHIBIT L

## DECLARATION OF ELI H. NEWBERGER, M.D.

I first consulted in this matter with Ms. Suzanne Nicholls of the Office of the Public Advocate on behalf of Father or private counsel DeeAn Gillespie Strub on behalf of Mother. I provided them my preliminary opinion that this is not a case of Munchausen Syndrome by Proxy ("MSBP"), sometimes referred to as Factitious Disorder or as Medical Child Abuse. Rather, my extensive review of the material provided me at that time revealed vulnerable parents who had fallen prey to less than adequate medical care providers and proponents of unscientific approaches to autism.

Subsequent to that consultation, here, the Department of Child Safety's ("DCS") intent to pursue severance of Mother's parental rights has been brought to my attention.

I once again reviewed the earlier and a large corpus of contemporary additional material. As previously, my preliminary review satisfied my ethical threshold for accepting to testify in contested custody or criminal matters: that if the side on which I was appointed to prevail, the greater interest of the protection and care of children would be served. It is my informed and professional opinion that Mother is safe to parent these children and that they should be returned to her exclusive care.

1.  I am a pediatrician with 50 years of experience in the diagnosis, treatment, and prevention of child abuse and neglect. I have contributed to clinical, research, and public discourse on child abuse and neglect, pediatrics, child development, and child welfare throughout my career. I have also published multiple articles and books on child abuse



EXHIBIT 15

BELL
8-6-24

KAHRAMAN 000091

==and related issues throughout my career.== I have attached my curriculum vitae to this affidavit as **Appendix A**.

2.     For three decades, I served as medical director of the child protection team at Boston Children's Hospital, during the course of which I personally diagnosed and treated over 300 cases of Munchausen Syndrome by Proxy (MSBP).  Additionally, I have consulted on over 50 cases of alleged MSBP and have presented over 100 lectures and workshops on MSBP to physicians, social workers, psychologists, prosecutors, and judges.

3.     ==I was qualified as a pediatric expert on MSBP in the Juvenile and Probate Courts of Massachusetts, as well as in Arizona, California, Florida, and New Hampshire. I also== testified in criminal trials in which MSBP was alleged in Massachusetts and Florida.

4.     In the course of my training at Boston Children's Hospital, I organized its first child protection team in September 1970. Subsequently, I devoted my medical career to service, research, and teaching, with a focus on the development of better methods to address child abuse and neglect in all their manifestations. I founded and directed the Family Development Clinic, the principal out-patient clinic for victims of abuse and neglect at Boston Children's Hospital, from November 1972 to December 1999. It was manifest at the time I began this work that child abuse was a major social and clinical problem.

5.     ==In my efforts to improve services to abused and neglected children, I have often taught current approaches to diagnosis, treatment, and prevention at conferences for physicians, nurses, social workers, lawyers, judges, child care workers, and mental==

2

health personnel. For example, on February 1, 1983, I gave a lecture at the Franklin N. Flaschner Judicial Institute First Annual Convocation for Experienced Justices on considerations for judges presiding in care and protection cases. I discussed children's attachments to parents and others, children's developmental stages, the impact of emotional unfitness of a parent and its long-term implications, and incest and sexual abuse of children. I have subsequently conducted trainings for judges in Massachusetts, California, Rhode Island, Maryland and the Philippines.

6.      My work in the formulation of policies to protect children from abuse began in the early 1970s, when child physical and sexual abuse were becoming salient clinical social problems. As always, my work in the public domain has been grounded in insights from clinical practice and research. This work includes consultations (to such governmental agencies as the U.S. Department of Health and Human Services, the Massachusetts Departments of Education, Mental Health, Mental Retardation, and Social Services, and the Board of Registration in Medicine, plus nonprofit organizations such as Big Brothers of Massachusetts Bay, the American Medical Association, the American Academy of Pediatrics, and public and independent schools in Massachusetts, Arizona, California, Colorado, Delaware, Maryland, New Hampshire, North Carolina and Wyoming).

7.      I have also served on committees and boards devoted to the elevation and standardization of practice in the professional and non-professional care of children. Notable among these are the Juvenile Justice Standards Project of the American Bar Association, on whose commission to develop a model child abuse reporting law I served

3

after President Richard Nixon signed the National Child Abuse Prevention and Treatment Act in 1972.

8.      During the course of my work in developing procedures for identification and treatment of abusive and neglectful parents, I also became aware of and concerned regarding the propensity of some within the medical profession to draw wrongful conclusions about abuse and neglect. My primary focus has always been and will remain the protection and treatment of abused and neglected children: I am not a "hired gun" for anyone, and I select carefully the cases in which I choose to testify.

9.      Many child welfare agencies, and DCS in particular in this case, have adopted policies and practices for their child welfare specialists that are not based upon accepted ethical treatment protocols (eg. that a client parent must acknowledge and confess to abuse or intentional neglect in order to not be considered a risk). Compelling parents to admit to a crime in order to avoid having their children taken into care appears to me to violate their civil rights.

10.     Under the Canons of Ethics of the AMA, medical doctors are expected to be scientists first, not advocates. Doctors are expected to collaborate with other doctors in seeking out the truth, and making valid diagnosis, not elevating their own opinions over those of specialists in medical fields in which they are not experts. Unlike lawyers, who are expected to be zealous advocates for their clients' objectives, doctors are required to work to understand and forge consensus about the treatment of a child in accord with his/her best developmental and clinical interests and needs.

4

11.     My opinion and recommendation has been informed by my decades of relevant

experience and by reviewing the documents below.

12.     I have reviewed the following documents:

a.   Cardon Labs pertaining to Dylan and Kenan Kahraman
b.   PCH Records pertaining to Dylan and Kenan Kahraman
c.   Angel Peds Records pertaining to Dylan and Kenan Kahraman
d.   Banner Records pertaining to Dylan and Kenan Kahraman
e.   Center for Autism Records pertaining to Dylan and Kenan Kahraman
f.   Dobson Pediatric Center Records pertaining to Dylan and Kenan Kahraman
g.   East Valley Children's Center Records pertaining to Dylan and Kenan Kahraman
h.   Jensen Family Medicine Records pertaining to Dylan and Kenan Kahraman
i.   UCP Records pertaining to Dylan Kahraman and Kenan Kahraman
j.   Dr. Oakley Report for Mother – Evaluation Date 4/16/19
k.   Letter to Dr. Mary Oakley dated 2/19/20
l.   Dr. Oakley Report for Father – Evaluation Date 2/19/20
m.   Dr. Oakley Report for Mother – Evaluation Date 2/20/20
n.   ANR Records of Nikki McCants pertaining to Dylan and Kenan Kahraman
o.   Email from Dr. Cindy Schneider
p.   6/7/19 Letter from Dr. Ron Peters
q.   Cardon Children's Center Calorie Count
r.   Food Logs and Door Dash Orders
s.   Spectra Cell Laboratory Report
t.   Case Plan and Child Safety Risk Assessment
u.   Case Notes
v.   Child's Disclosure
w.   Dependency Petition
x.   First Amended Dependency Petition
y.   Second Amended Dependency Petition
z.   Rule 59 Motion
aa.  Father's Objection to Mother's CPC
bb.  DCS's Objection to Mother's Rule 59 Motion
cc.  4/27/20 Progress Report to the Court
dd.  Emotions Journaling Exercise
ee.  DCS Disclosure Notes
ff.  12/2/19 Letter to Madison Bell from Dr. Michael Kelly
gg.  Mold Disclosure
hh.  Texts between Mother and Father
ii.  Letters from Dr. Jensen re: GAPS
jj.  Dr. Asma Jafri records
kk.  Photos of Rashes

5

KAHRAMAN 000095

ll. Notes from Jessica Kahraman to Maddie
mm. Arizona Attorney General Disclosure from April 29, 2020
nn. Becky Plotner records and review of website
oo. Photographs of children and family
pp. Summary of Record
qq. Buwalda Reports
rr. Southwest Human Development Reports
ss. Declarations of: Firishta Cubillo; Nicole McCants; Jerry Mann; Dorothy Mann; Rex Lambert; Shannon Southwick; Ronald Peters, MD.; and Laura Jochai

<u>Overview</u>.

13.     As stated above, in mid to late 2019, I was retained by and worked with counsel for both parents. They provided me all available medical records and DCS information, which I reviewed. After a thorough review, I verbally reported back to counsel for Father and a representative for Mother. I reported that I did not see a pattern of factitious disorder by either parent, rather, ==the key issue in my opinion was that the parents fell vulnerable to listening and following the inappropriate guidance of unscientific self-styled experts. My opinion has not changed in that regard.==

14.     Since that time, there have been various developments in this case. I have reviewed additional documentation, as well as interviewed Mother.

15.     Mother acknowledges that she was frequently overwhelmed by stress, including: marital discord, neglected self-care, lack of marital and personal boundaries, worry for her children's well-being, sleep deprivation and complex management of her children's in-home services and care, school, family, home and private acupuncture practice management.

6

16.     When DCS initially became involved in her children's lives, Mother was unaware that she and her family had been experiencing a sustained exposure to mold in their home.

17.     As well, Mother's anxiety and hypervigilance probably generalized from recent challenges to her health: (including Hashimoto's thyroiditis, melanoma, a surgical injury, prolonged menorrhagia, a kidney stone and a fractured foot).

18.     In December of 2018, Mother lacked the tools and support system she has now gained through proper medical care and intensive therapeutic discovery. Since that time, Mother has worked diligently to recover her own physical and emotional health and build a strong support network of pediatric care, therapy, hobbies, friends and family with whom she has taken this opportunity to more deeply reconnect.

19.     Mother expresses relief and delight that her boys are now tolerating an unrestricted diet, and she expressed that she wished she would have pushed the children harder through their food reactions to ensure they received more nutrients. Mother has resolved not to work with out-of-state providers in future, and understands she prioritized that advice over her own intuition and focused communication with the family's local pediatrician. Mother recognizes that conventional medicine has aided in her children's recovery. She is committed to sustaining trusting future relationships with the boys' current providers.

History:

20.     The records reveal neither boy had any prior hospitalizations or DCS involvement prior to December 2018. Apart from an autism diagnosis rendered at 22 months of age,

7

the boys' medical history for the first six years was unremarkable. The children were assessed by a standardized Autism Diagnosis Observational Schedule ("ADOS") administered by the Melmed Center in Phoenix, with regular care under Developmental Pediatrician Dr. Asma Jafri, MD. This assessment was conducted after parents expressed concern for Dylan's emotional outbreaks, traumatic diaper changes self-stimulating behaviors, and unusual vocalizations.

21.     Medical records from the children's medical doctors document consistent growth, and regularly note that the boys are well-developed and nourished. One example dated September 19, 2018 (just a few months before DCS involvement) in the children's pediatric record from the office of Asma Jafri, MD, (1, 2) her notes state both children are "well nourished, alert, active…with normal tone and motor development" and "routine evaluation child health evaluation without abnormal findings."

22.     I find no mention in any prior medical records that expresses concern for the children's development (apart from the autism diagnosis). Medical records do describe a long-standing challenges of food sensitivity by both children. These and other gastrointestinal disturbances are frequent concomitants of autism and are well documented in pediatric practice and literature. The children have not been formally tested for allergies or sensitivities.

23.     An ER visit for Kenan was noted on June 5, 2013 after Mother called the children's pediatrician to report that "the right side of his face and eye are very swollen. Mom says the eye is nearly swollen shut." Dr. Neil Aaron was consulted and advised Mother to take Kenan to the emergency room. Mother reported that after a long wait to be seen at Cardon

KAHRAMAN 000098

Children's Hospital, the allergic reaction had somewhat subsided and Kenan was treated with Benadryl. Mother was advised that in the future such reactions could be safely handled at home.

24.    Mother reported that the children were active in sports from the age of 18 months until the fall of 2018. Activities included enrollment in group soccer, tee-ball, tennis, tae kwon do and several multi-sport classes.

25.    Shortly after the boys began kindergarten on August 1, 2018, they each began experiencing balance disturbances, manifesting in trips and falls that, per Mother, were atypical. They both ultimately became unable to walk within a month of one another. Each child's experience of progressive weakness and pain closely resembled the others.

26.    The children's grandmother, Dorothy Mann, was watching Dylan when these mobility issues began. In her May 2, 2020 affidavit she wrote that "he had recently been walking fine as far as I knew. We had been sitting on the floor and playing, when he tried to stand up. He struggled to stand but finally achieved a sort of standing position but walked very feebly, rolling in on his feet and leaning his body awkwardly." She disclosed: "I considered that his legs had fallen asleep, but I saw that he walked a few steps, sat down again for a few minutes. He tried again to stand with the same results. He didn't seem to be in pain at all. I asked him if he was ok. He said he was. He made his way to the couch and sat leaning against the couch. Soon, he tried again to walk, with the same awkwardness. We continued to play and read. Soon he was simply scooting on his bottom to get from place to place. Even at bedtime an hour or so later, he managed no

KAHRAMAN 000099

more than a few clumsy steps. When his mom got home, the boys were still up. She was not aware of this current struggle."

27.     In her affidavit, Grandmother also noted a prior such incident that seemed similar with Kenan, which occurred when Kenan was about two years old, and had been taking an unlimited diet. Kenan was seen at Cardon Children's Hospital for this episode in April 2, 2016. Mother reports that on that date Kenan awoke complaining of foot and leg pain and did not want to stand or walk. His feet were red and swollen and he walked with a wide stance, as if he could not control his muscles. The parents gave it some time to improve on its own.

28.     Kenan's speech became impaired in the course, and he had trouble finding words. Parents took him to the ER. There, Cardon ER Dr. Shah described Kenan's walk as wide based and on his toes. He suggested viral arthritis as a possible cause. The parents followed up with his doctor, as instructed. Kenan continued to walk on his toes and complained of heel pain and tingling in his legs. Bloodwork revealed an elevated BUN/creatinine level, possibly indicating a deficit in kidney functioning, which persisted for about a month, despite Kenan being well-hydrated and eating an unlimited diet. The boys had not yet started the Gut and Psychology Syndrome ("GAPS") diet at this time, but Mother states that Kenan had been very picky about what he would eat. He seemed to have tummy aches, headaches, rashes and itchy eyes with many foods.

29.     This was the impetus for Mother's seeking nutritional support, and the reason the family started working with GAPS practitioner, Becky Plotner, in hopes of expanding their food tolerances. Mother now realizes she should not have worked with this

10

unscientific practitioner, and should have pursued more digestive support from the family pediatrician, Asma Jafri, MD.

30.    Maternal grandmother also noted her observation of Kenan's difficulties in walking in early October 2018. "Around the same time that Kenan had fallen at school, I was babysitting and had to come relieve Danielle. Kenan was seated on the couch and seemed upset. Danielle told me that he was not able to walk. My first thought is that he might be vying for attention since Dylan, by this time was not walking and even (if memory serves me correctly) was in a wheelchair. Knowing how very active Kenan was, I felt sure that he would forget and move without thinking. However, he needed to go to the bathroom, and whenever Danielle or I tried to help him, he would cry. Neither of us was successful in picking him up without his expression of much pain particularly when we would reach to lift his hips. We got the boys' wagon and managed to get him aboard and to the bathroom. All evening I tried to distract him to see if he might have relaxed and forgotten his discomfort. He never did. I am sure that his pain was real."

31.    I reviewed text messages between Applied Behavioral Analysis ("ABA") provider Danielle Schmidt and Mother that discuss Dylan's mobility challenges. In a September 12, 2018 text message, Ms. Schmidt wrote (about Dylan, per Mother), "Okay. I think it's going to be a good idea to use the wheelchair he is really unstable. He said that he is only staying in his chair at school and not sitting on the ground."

32.    Another text message from September 24, 2018 discussed the use of the leg brace recommended by orthopedist Eric Bowman, DO (Phoenix Children's Hospital). Ms. Schmidt wrote, "Had Dylan walk in the brace from his wheelchair a very short distance.

KAHRAMAN 000101

He is very unsure of it and was very emotional. I had to hold his hands. He doesn't like that he can't bend his knee and feels like he is going to fall."

33.    Both Grandmother's and Ms. Schmidt's observations corroborate Mother's report that the boys were both experiencing pain and difficulty in walking.

34.    Mother sought answers for her boys' impaired gait from the children's family physician, Dr. Scott Jensen, MD, pediatrician Dr. Jafri, MD, and orthopedists Dr. Eric Bowman and Dr. Ryan Miller (Banner Desert Medical Center). Per the records, while there was no indication of the cause of the children's leg pain and immobility, Mother diligently pursued blood work to assess micronutrient levels in Dylan, worried that his dietary limitation might be a contributing factor. Upon reviewing results, Scott Jensen, MD shared they were of little concern, prompting only an instruction to supplement with Vitamin K2. In Dr. Jensen's office notes by Timothy Lane, PA-C, Dylan is described as "well-nourished and well developed in no acute distress," although his gait is noted to be "ataxic".

35.    The parents also followed the orders from Dr. Bowman to complete lower body X-rays in both children. When Mother inquired of Dr. Bowman about the children's bone health, she was told it was normal and there were no signs of decalcification or malnutrition. Dr. Bowman's notes stated there were "no bony abnormalities". Dr. Bowman also noted of Dylan and Kenan, "general appearance normal, no apparent distress," although he did note that Kenan "refuses to stand or bear weight".

36.     After two sessions in September 2018 with sports medicine physical therapist Dr. Blake Scoresby, DPT, Dylan requested not to return to therapy. Dylan complained to his Mother that the exercises were painful, and Mother became concerned that Dylan's condition might be more than a sports injury due to his increasing complaints of leg tingling. Mother's texted Dr. Scoresby asking, "if we were to get [Dylan] back in soon to see what he can do in terms of non-weight bearing exercise, would you need clearance from his ortho or would a pediatrician be ok? This seems to have veered outside the ortho scope." Dr. Scoresby responded, "I honestly am not sure. This is uncharted territory for me. I would probably lean to orthodox [orthopedist] clearance but I am not sure." Subsequent evaluations at Advanced Neurologic Rehabilitation suggested a more concerning assessment of Dylan.

37.     Dr. Bowman at PCH referred Dylan for physical therapy with Dr. Nikki McCants, DPT, at Advanced Neurologic Rehabilitation. Dr. McCants' records during Dylan's initial evaluation on October 8, 2018 indicate:

"In summary, this patient presents with joint pain, occasional paresthesias, moderate weakness of the lower extremities with reduced ability to perform transfers, standing, gait and positions such as kneeling. This represents a significant decline in the patient's prior level of function. Additionally, of concern is a cluster of upper motor neuron signs such as hyper reflexia, spasticity of the plantar flexors and a weakly positive babinski sign on the left. Given the unknown origin of the patient's symptoms parents are encouraged to follow up with their physician and were recommended to seek consult with a neurologist as soon as possible (and not wait until February if able)." Mother

13

reported that due to the long wait for neurologists, this was the soonest appointment she had been able to obtain for Dylan.

38.     The parents brought both children for neurologic physical therapy with Dr. McCants 1-2 times weekly between September and December 2018. In her declaration dated May 4, 2020, Dr. McCants noted that both children experienced pain and progressive weakness in their lower extremities. As Kenan's pain and weakness progressively resembled Dylan's, she referred the children to Phoenix Children's Hospital for an expedited neurological evaluation. The following day, on November 2, 2018, the parents confirmed it.

39.     It is concerning and noteworthy DCS never contacted Dr. McCants, despite their obtaining records from her office that document objective and significant pain.

        Dr. McCants stated in her May 4, 2020 declaration, "DCS never consulted me regarding my experience with either Kenan or Dylan".

        Furthermore, DCS never disclosed the records from Dr. McCants, nor shared them with Dr. Kelly, who later opined "with reasonable medical certainty, that Ms. Kahraman's behavior toward her sons raises concerns for mental illness, and that regardless of the cause of Ms. Kahraman's behavior, she is currently incapable of providing safe and adequate care for her boys".

40.     Per Dr. McCants' referral, the parents presented to Phoenix Children's Hospital ER on November 2, 2018. It is noteworthy that even at this time, just six weeks before Kenan would be hospitalized at Cardon with serious health issues, there were no apparent signs of distress, aside from the children's pain and immobility. The children

14

were described as "playful" and having "normal muscle tone" as noted. Dylan's chart indicated, "on exam he is sitting in wheelchair but is well appearing".

41.     A neurology appointment was expedited for the children. At the November 2, 2018 appointment, blood work was conducted that showed normal levels of blood glucose (81 mg/dL for Dylan and 69 mg/dL for Kenan) and no expressed concern for malnutrition. (When Kenan's bloodwork was later taken at Cardon on December 18, 2018, it was slightly elevated. This may have been used by Dr. Ryan Stewart and his colleagues on the PCH Suspected Child Abuse and Neglect ("SCAN") team to adduce malnutrition arriving from parental neglect.)

42.     In November, the creatine kinase values were also normal for both children, which suggested an absence of muscle wasting. Kenan's evaluation showed no abnormalities in his cardiac or respiratory function.

43.     Significantly, both boys' blood sedimentation rate, a marker of inflammation in the body, was considerably elevated: 87 for Kenan and 108 for Dylan. Inflammation may result from viral or bacterial infections; toxic exposures; autoimmune or arthritic conditions; but it is generally not attributed to malnutrition. This inflammatory marker reduced considerably in both boys between the labs of November 2 and December 19-23, 2018. For Kenan, it was down to 2 mm/hr on December 19, 2018 and for Dylan it was reduced to 34 mm/hr on December 23, 2018. The children's last day of school was October 30, 2018, raising the question as to whether there were any contributing environmental factors at their school.

KAHRAMAN 000105

44.    DCS questioned Mother as to why parents refused Vitamin C blood levels and X-rays for the children at that time. Mother explained that both values had been obtained within the last 30 days for the children and that the X-rays were conducted by and were on file with PCH. This recommendation came after the family had been there for a few hours. After their blood was drawn, and a butterfly needle left in their veins attached to a syringe containing heparin (a heparin lock), they were very uncomfortable. Both children refused to urinate or eat with the heparin lock in place. The parents concurred further retention of the heparin lock would cause undue stress to the children, since the Vitamin C lab and x-ray information was already available and the children had been distressed for a prolonged period already.

45.    The children were referred by Phoenix Children's Hospital ("PCH") for assessment with Neurological Nurse Practitioner Daniel Crawford. On November 5, 2018, PNP Crawford described the children as "well developed, well nourished, in no apparent distress" and observed that their "muscle bulk is normal." Mother reported that PNP Crawford told her the children's presentations were peculiar, but that he did not suspect a nerve pathology, since the children's weakness was confined to only half the nerve pathway, which Mother reported he advised her was not how nerve pathology works. Dylan's records indicated that "his presenting symptoms and progression of symptoms is quite peculiar and does not localize to a specific neurologic etiology". PNP Crawford's records for Dylan indicate that he "attempted to assist patient to standing position from wheelchair with significant support. Patient flexed lower extremities at the knees to avoid putting weight on the legs. When feet placed on the ground, patient was

16

unable to stand with support and began to cry in pain. When asked to localized [sic] the pain, the patient points to his knees."

46.     PNP Crawford told Mother he'd like rheumatology to see them but felt Dylan could have a Magnetic Residence Imaging Study ("MRI") and Electromyelogram ("EMG") done in the interim, so as to not lose time during the long wait for rheumatology. Mother inquired whether the imaging was emergent and asked about the risk of waiting. Mother said PNP Crawford told her that Dylan might get weaker and take longer to recover strength, but that he did not see anything life-threatening. DCS now claims the parents refused this referral. This is not the case. The referral was accepted, the parents confirmed the date. Unfortunately, the children were taken into DCS care in the interim. DCS's intervention prevented the parents from keeping the appointment.

47.     A November 7, 2018 text message between Mother and Father documented their final decision on this, after having talked about it together. Mother wrote, "Thinking about everything with the neurologist, I feel like we should give it 30 days and see how they are a Healing [sic] at home before we make any risky decisions about sedation we may regret." Father responded, "ok." Mother again wrote to Father on November 15, 2018 asking, "I know you don't have much time but would feel better if we could talk quickly about our final decision for Dylan's procedure on Monday morning. I called the anesthesiologist and talked to Dr. Natasha through Becky today. Do you have a couple of minutes to call?"

17

48.     The parents decided that since Dylan was recovering and nearly walking again, they'd set Dylan's imaging appointment for the next available date: January 29, 2019 at 5:30 am, and would proceed if he had not fully recovered by then. Mother canceled the appointment due to Dylan's removal by DCS. According to Dr. McCants' declaration of May 4, 2020, "By December 2018, Dylan showed improvements in strength and mobility and an improved tolerance for weight-bearing with lessened pain or discomfort. Dylan's leg and knee pain substantially decreased, and he was able to crawl, tall kneel, quadruped, stand briefly and sidestep. With assistance, he could stand for about thirty seconds and take approximately 15 steps. He still displayed weakness in his joints and became fatigued when attempting to walk a short distance. His parents had scheduled ongoing therapy twice weekly, through the end of January."

49.     After the November 2, 2018 assessment at Phoenix Children's Hospital, Dr. McCants' records show the children continued to improve. But in late November and early December Mother reported that Kenan showed additional concerning symptoms. Although his pain and mobility slowly improved with physical therapy, Mother recalled that Kenan's food preferences and appetite began to change. Parents struggled to introduce new foods that Kenan might prefer, such as avocado, turkey and more vegetables. In early December, parents became concerned about facial puffiness, chest discomfort and irregular sleep patterns. Mother observed that these symptoms were not uncommon reactions to food, and the parents attributed them to food intolerances – particularly insofar as they were responsive to antihistamines administered by parents.

KAHRAMAN 000108

50.     In early December, Mother reported that Kenan had two or three brief episodes of nighttime waking with unusual body stiffness, crying and a vacant gaze. While she did not initially identify them as such, the children's GAPS consultant, Becky Plotner, suggested they may have been focal seizures. Mother reported that this practitioner told Mother the pattern was consistent with exposure to toxins, that it was a healing sign and that further medical attention was not required if the episodes did not persist. The episodes did not continue. Mother now realizes she should not have relied upon Ms. Plotner.

51.     In early December 2018, when Kenan's facial swelling and chest discomfort became more persistent, Mother took Kenan to Dr. Scott Jensen, MD's office for evaluation. After the examination demonstrated that the edema was not significant and no abnormal respiratory or cardiac symptoms were identified, the records indicate that Mother was told to return if Kenan did not improve in 2-3 weeks. It is possible Kenan's declining health should have been evident to providers and an ER referral made at that time.

52.     It is significant that a mere three weeks before Kenan was admitted to Cardon, multiple medical providers told the parents the children were not in medical danger. Mother reasonably relied upon medical providers who did not alert her that Kenan needed emergent medical attention. Nevertheless, Mother has accepted responsibility and has been open to DCS' concern. She has conceded she "should have realized Kenan was in emergent danger sooner."

KAHRAMAN 000109

53.    During the weeks preceding the December hospitalization, Mother reported Kenan had more good days than bad. The children continued to enjoy outings. She checked in with ABA providers caring for the children at home and was informed they were doing well.

54.    On the morning of December 18, 2018 Mother reports she and Father decided they should again take Kenan to the ER as in the preceding few days, Kenan had been lethargic, his appetite had diminished, and his face and hand swelling had become more pronounced. Mother's observation was that he looked as though he had lost some weight and the parents were concerned there may be something else going on. Kenan was admitted to the hospital with a diagnosis of pulmonary hypertension causing right atrium failure and undiagnosed severe hypothyroidism. The new diagnoses were concerning to the parents, as within the last six weeks they had taken him to PCH ER on November 2, neurology nurse on November 5, and medical doctor's office on December 5, 2018.

55.    I have reviewed various photos of the children taken during the months prior to DCS involvement. Photos as recent as November 2018 portray both boys as happy and appearing well-nourished, even though they were experiencing difficulty in walking. The photos do not evidence signs of emaciation or distress. The photos document the children at play on the swings, feeding ducks in a wagon, and feeding a giraffe at the zoo. The boys visited the zoo with their parents three days before Kenan was admitted to the hospital on December 18, 2018.

KAHRAMAN 000110

56.    After the boys began school on August 1, 2018, there is a documented decline in their ease of movement. There are reports of both boys tripping and falling at school, which Mother reports was atypical. Grandmother reports on August 30 she observed Dylan being unable to stand or walk during play.

57.    Mother reported that Kenan also began complaining of pain and "wobbly legs" during this time. She initially believed Kenan was simply vying for some extra attention because of his brother's circumstances. Mother also considered Kenan's complaining could be the result of being pushed down on the basketball courts at school by a peer.

58.    Given the children's physical condition and their mounting anxiety, the parents decided to homeschool them. After their withdrawal from school, the pediatric records document progressive improvement in both Kenan and Dylan's levels of pain and mobility, although Kenan had not yet been able to stand or walk. DCS' allegation that the boys were not improving does not align with and is not consistent with what is reported in their medical records.

59.    Significantly, at the time of Kenan's December 2018 hospitalization, the family was unaware of the chronic mold exposure in the home to which the entire family, including Kenan, had been subjected. From the time of his hospitalization until the present, Kenan has not been medically evaluated for mold exposure.

60.    Four months after DCS' involvement, the family became aware of high levels of penicillium/aspergillus and chaetomium within multiple areas of the walls surrounding the children's bathrooms and bedroom.

21

61.     I do not take issue with cardiologist Dr. Daniel Miga's assessment of Kenan's heart failure being attributed to malnutrition. I agree with Dr. Miga that children require a varied diet in order to ensure they receive all the necessary micronutrients.

62.     It is possible the boys' health issues were multifactorial and may have been exacerbated or set off by compounding environmental factors in the family home and at school. There is some indication that the timing of their leg pain issues was triggered when they started school, and that this condition improved somewhat when they were withdrawn. This is documented by the boys' improvement in sedimentation rate, pain levels and mobility.

63.     The mold exposure may have contributed to the signs of intolerances, inflammation, problems with their muscles, and food. Mother acknowledges her own anxiety over the children's well-being and that the parents' marital stress was certainly felt by both boys.

64.     The children's service providers, maternal grandmother, and both parents recognized the boys suffered reactions from food and chemicals. I have reviewed photos taken throughout the boys' lives that document their skin rashes and eczema.

65.     In a September 26, 2017 text message, ABA provider Danielle Schmidt discussed Dylan's abdominal pain after Mother reported she had provided both boys fruit to eat at school in celebration of their birthday. Mother wrote, "Now that my head is clearer, I don't think his pain had anything to do with his bladder – except that there was so much pressure in his abdomen from the gases that it was putting pressure on his bladder – like when someone is sitting on your stomach when you have to pee." Ms. Schmidt

22

responded, "Yeah, I don't think it was his bladder either. Not the way he was screaming in pain."

66.     Another text message from Ms. Schmidt (from Spring 2016, per Mother) stated that "she [the boys' therapist] didn't understand why the boys could not use the paints with the bunnies. Dylan told her they are not good for his body because they can make him feel yucky." Ms. Schmidt continued, "I am worried about the exposure thing for sure with her [the boys' therapist]. She doesn't understand how much some of these small things can and do have an impact on them."

Mother's Efforts to Address DCS Concerns.

67.     Mother has made extraordinary efforts to address DCS concerns, going further to find and integrate additional therapy and education. Above and beyond their requirements, Mother elected to participate in the following to improve her parenting capacity: Mastering Your Emotions, Mesa Public Schools Parent University, 6 hours; Parenting With Love & Logic (7+ year olds), Love & Logic Institute, 3 hours; Promoting Secure Attachment, Child Crisis Arizona, 2 hours; Child Development, Child Crisis Arizona, 2 hours; Parenting Through Adverse Childhood Experiences, Child Crisis AZ, 2 hours; Parenting the Love & Logic Way, Child Crisis Arizona, 12 hours; Positive Discipline and Guidance, Child Crisis Arizona, 2 hours; Raising Emotionally Intelligent Children, Child Crisis Arizona, 2 hours; Understanding Temperament, Child Crisis Arizona, 2 hours; Raging Rhinos, Child Crisis Arizona, 6 hours; Adverse Childhood Experiences, Child Crisis Arizona, 2 hours.

KAHRAMAN 000113

68.     Mother completed three nutrition courses, including a pediatric course on stages of development and feeding challenges, a childhood nutrition and cooking course taught by Maya Adam, MD., of Stanford University Medical School, and a Mesa Community College course on human nutrition (for nursing and registered dietitian majors) in which she received a grade of A. Thereafter, Mother twice met with local registered dietitian Alyssa Simpson to develop parameters for the children's diet (based on the My Plate guidelines used in hospitals). Mother then organized a week's worth of meal plans for the children, based on Ms. Simpson's recommendations. Mother was interested to hear Ms. Simpson tell her that she had seen many children and adults whose food tolerances had been impacted by mold exposure.

69.     One of DCS' goals for Mother was to address her self-esteem. Mother did not initially perceive this to be one of her weaknesses, but keeping an open mind, she sought out and attended a women's self-esteem support group to address potential roots of marital and personal challenges. Mother has come to value and enjoy this women's group, attending weekly for the last year, and currently by teleconference. The group was organized by therapist Laura Jochai, who subsequently invited Mother to become an individual therapy client.

70.     Therapist Jochai reported Mother was empathetic regarding the boys' emotional impact of their removal and remorseful that she had not been more aware and taken different steps to prevent their medical decline.

71.     Therapist Jochai also reported that "Jessica expressed a desire to build a closer relationship with her husband. She wanted to be able to discuss their individual wants,

24

needs, and feelings. She was willing to work on self-improvement to improve their relationship and was frustrated because he didn't seem interested."

72.     Mother's assigned DCS therapist, Dr. Rodriguez, indicated "Ms. Kahraman appears to be committed to making changes and demonstrate progress in order to reunify with her children" (Buwalda Progress Report, May 2019). In her recent interview on April 30, 2020 Dr. Rodriguez now says, "When I review my notes [Mother] has said to me that she does not want to go specifically back to the GAPS diet. She knows that that's not a thing that would be good for her children. And, she does not want to restrict their diet whatsoever. I think she may have mentioned consulting with or working with a dietician so they can get the proper nutrition. Actually, I believe she mentioned that somewhere." Additionally, she says that Mother now "has demonstrated growth and she has accepted responsibility." When asked if she believes Mother is committed to maintain those changes and to maintain the growth for the benefit of her sons, Dr. Rodriguez says, "I believe she has."

73.     Mother has consistently participated in visits with her sons twice weekly for the past 16 months. The children's grandparents Dottie and Jerry Mann, with whom the children have close relationships, have consistently attended twice monthly during this period.

74.     Visitation records from Southwest Human Development are devoid of concerns for parenting ability or mealtime conduct and replete with positive feedback. For instance, "Mr. and Mrs. Kahraman demonstrated age-appropriate parenting skills evidenced as setting consistent expectations, enforcing routine and structure during

25

visits. Both parents appear to be emotionally attuned to the children and can anticipate their food and play preferences. Both parents focused on spending positive quality time with the children by engaging in play throughout the visit" (August 17, 2019). Southwest Human Development Records note the following demonstrated qualities:

A.  A strong loving bond between Mother and her children.

     Numerous examples include:

1.  "Mrs. Kahraman gave the children a drawing she made. Dylan mentioned it was 'the best gift ever;'" (February 28, 2019)

2.  "Dylan told his mom that he loved her and hugged her. At the end of the visit, Dylan broke down crying and was not consolable," (March 4, 2019)

3.  "She said she heard them when they missed her the night before. The children asked how she heard them and she responded that she had superpowers," (March 7, 2019)

4.  "Kenan was affectionate with his mother during story time as evidenced by leaning against her body, and kissed her palms and face. He was very active and excited during the visit and hugged his mother repeatedly. When Kenan went to hug and kiss his mother, Dylan climbed into her lap for hugs as well" (March 4, 2019).

B.  Heightened attentiveness to the children's food preferences and hunger cues, as well as a relaxed approach to standard childhood foods and treats.

     Some examples are:

KAHRAMAN 000116

1. "Provided a meal the children enjoyed eating/provided praise in regards to trying new foods;" (February 28, 2019)

2. "Mrs. Kahraman has involved the children in what they will be eating for dinner and the children eat well and often ask for second portions;" (March 30, 2019)

3. "After eating, Dylan shared that he was still hungry. Mrs. Kahraman purchased on site, a small bag of chips for Dylan and Kenan;" (December 10, 2019)

4. "Kenan shared, 'I'm full.' Grandfather encouraged, 'Are you sure you are full?' Mrs. Kahraman prompted Kenan to 'listen to his body' and then praised him for doing so" (December 23, 2019).

C. Encouragement of independent thinking and skills, problem solving and positive reinforcement of effort:

1. "Kenan was responsive to the prompts and redirections to clean up his lunch when he was done. Dylan splashed water on the mirror in the bathroom but was responsive in helping clean it up;" (June 27, 2019)

2. "Mrs. Kahraman, I like the way you encourage the children to pick up after themselves etc. by asking what needs to be done. Great job encouraging the children to compete tasks as independently as possible;" (October 15, 2019)

3. "Mrs. Kahraman was observed to encourage Dylan to have a 'calm body' to do the activity as she cautioned there were some parts (pins) that could cause harm. Dylan appeared to respond as he was observed to use calm hands... both

KAHRAMAN 000117

parents assisted the children with carefully placing the pin into the balls and applying sequences [sequins] for decoration. Mrs. Kahraman continued to praise the boys for completing the tasks safely which Dylan stated, "I'm trying to be safe and I can do this" (December 17, 2019).

75.    Mother shared her "Dylan's Strong Legs for Christmas" chart that she used with both children to encourage efforts and positivity toward healing and walking, even before DCS became involved.

76.    This speaks to the inaccuracy of the DCS narrative that Mother reinforced a sick role with her children.

A.   Recognizing and verbalizing emotions. Some examples are:

1.   "At the end of the visit, Kenan did not want to give his father a hug and kiss goodbye. Mrs. Kahraman encouraged him to give his father a 'high five;' (February 28, 2019)

2.   "Mom – You really helped Kenan with his emotions during homework. Both attentive to their needs, empathetic and followed their lead;" (April 16, 2019)

3.   "During lunch, Kenan started sharing a story about Dylan being in timeout. Mrs. Kahraman & Mr. Kahraman took time to listen to their perception on what happened and then validated how they might have felt. Mrs. Kahraman went further to problem solve ways to express feelings when they are at foster placement;" (September 7, 2019)

KAHRAMAN 000118

4. "Mrs. Kahraman shared at dinner that no matter what choices Dylan or Kenan make and if they have to go to timeout, they are always loved, by them and foster placement. Mrs. Kahraman accented their good/bad choices are not who they are as people" (September 16, 2019).

B. Reinforcement of strength and wellness in both children.

Some examples are:

1. "Kenan and Dylan told their parents they can 'run and jump now.' Mrs. Kahraman hugged Dylan and said that makes her 'so happy;'" (February 28, 2019)

2. "Mrs. Kahraman told the children she is excited they are eating new foods and their bodies are doing so good;" (February 28, 2019)

3. "VS asked the parents how they felt about their first visit. Mom responded it was so good to see them and so good to see them eating new foods and in good health and walking again;" (February 28, 2019)

4. "Good job focusing on being healthy" (November 26, 2019).

77.    Southwest Human Development caseworker Carla White was interviewed on May 1, 2020. In that interview, Ms. White affirmed Mother had achieved all her therapy goals, and is now addressing coping strategies. This may be an unnecessary hurdle, as Mother's therapist Dr. Rodriguez was interviewed later the same day and clarified Mother presented with effective coping strategies. Mother's resiliency in the face of

29

prolonged separation from her children in the face of DCS' often unwarranted criticism is evidence of her application of those strategies and ability to effectively parent her boys.

78.     DCS described Mother as "rigid." This opinion may have originated from a narrow reading of Dr. Oakley's initial psychological evaluation of Mother. At that time, Mother was not yet aware she and her family had been exposed to mold and had no information to factor in how that exposure may have contributed to her children's health issues, including reliance on inappropriate advice from medical providers and non-medical providers. In Dr. Oakley's re-evaluation report of February 20, 2020, she recognized Mother has made significant progress in her awareness and parenting capacity.

79.     Input from Mother's providers and character references sharply contrast with her depiction by DCS as a rigid, controlling and manipulative person.

Factors that may have contributed to the boys' health decline.

80.     It is unknown to what extent the exposure to pervasive mold in the family home may have contributed to the children's health decline. Nevertheless, both parents reported improvement in their health since being domiciled apart from the mold.

81.     The mold was primarily found to be in the walls surrounding the boys' bedroom and bathroom. Mother often slept with the boys in their room due to Kenan's insomnia while Father slept upstairs. As a result, he was less significantly impacted, although his mycotoxin testing also revealed significant presence of mold exposure. Father reported

KAHRAMAN 000120

resolution of his environmental allergies after the family home was remediated and near resolution of his Hashimoto's thyroiditis shortly thereafter.

82.    Mother's testing revealed significantly higher levels of urinary and sinus cavity mycotoxins. Her stress and sleep deprivation may also have impacted her immune health. She has now achieved complete resolution of her Hashimoto's thyroiditis and neurological symptoms addressed with Environmental Medicine Specialist Ronald Peters, MD, MPH. These symptoms are referenced in his May 4, 2020 affidavit, to include "headaches, recurrent sore throat, tender axillary lymph nodes, hand tremors, finger and toe numbness and poor hand-eye coordination. Prior to this, she developed chronic fatigue, muscle weakness and stiffness, and disturbed sleep during the previous two years."

83.    Mother has come to realize how her sleep, energy, muscle strength/flexibility and mood may have been impacted by her exposure to mold. She perceives a significant improvement in her sense of well-being and movement.

84.    Once removed from the home, the boys' energy, sleep, mood and growth also improved. The quick resolution of their food sensitivities and acceleration of their mobility also improved once they were removed from the mold-infested environment. This improvement parallels Mother's own experience with the resolution of muscle weakness and stiffness in her body within days of moving to her parents' home. She reported her Hashimoto's thyroiditis has completely resolved, and Father's has improved dramatically. The family's exposure to toxic mold certainly should be considered when

31

evaluating the boys' medical circumstances, given their parents' swift physical improvement.

There are profound and predictable adverse developmental Impacts associated with removing children from their parents. Removal is indicated only in exigent circumstances.

85.     Many studies affirm the value of preserving the quality of the bond of attachment between children and their parents and refrain from interrupting it more than it is necessary to protect children from neglect or abuse. For example, in Rosalind D. Folman's paper, "'I Was Tooken:' How Children Experience Removal From Their Parents Preliminary to Placement in Foster Care" (Adoption Quarterly). "The paper focuses only on the 'crisis period' of the fostering process—i.e., 'the day the child is initially removed from his/her parents.' According to the paper, separation from a caregiver 'is severely threatening for the child, irrespective of the quality of the child's experience with the parent.' As a result, the day of placement 'constitutes a crisis for children because everything in their lives changes and the children are overwhelmed with feelings of abandonment, rejection, worthlessness, guilt, and helplessness.' The findings suggest that these feelings were intertwined with an overwhelming sense of loss."

86.     The studies of Professors Shirley Jenkins and David Fanshel at the Colombia School of Social Work document in extensive detail the developmental attrition associated with foster home placements of children with antecedent developmental risks.

87.     In this case, these boys have been separated from their parents for 17 months. This is a situation that could have (and I believe, should have) been appropriately addressed with their remaining with their family. The boys' stress has now been exacerbated

32

because they are only able to interact with their parents via teleconference. Mother and the children's grandparents have now been prevented from visiting with her children at all for the past two and a half weeks.

88.     It is evident from the records and reports of many collateral informants that the boys have a well-developed, strong and loving bond with their Mother. It is apparent they were happy at the time of their removal from their home. The healthy bond that was forged from early childhood has allowed them to adapt well, notwithstanding the extreme change and the trauma of separation. It is my understanding that the children continue to express a desire to return to their parents' care.

89.     From the materials I have reviewed, it is evident that Mother is mindful of her boys' psychological states.

90.     I have emphasized the long term value of this aspect of parental maturity in my book on boy's character development, "The Men They Will Become."

91.     Mother has a uniquely close bond with her boys that enables her to see reactions that others distant from the children may not observe. This bond also offers the boys security in communication.

92.     Information provided by others close to the children, including in-home care providers and the children's maternal grandmother, support Mother's claims of the children's food sensitivity over time and the leg pain and walking difficulties they experienced in the few months preceding DCS involvement. In the Child and Family Therapy notes of March 26, 2019 it is noted regarding Kenan, "Foster placement reported behavior changes when not feeling well and will not communicate verbally but will shut

KAHRAMAN 000123

down. Mother gave an example of how Kenan will express he does not feel well with her in the hospital but wouldn't communicate it to the nurses."

93.     Additionally, this sheds light on why Father's perspective of the children's activities and health might be less informed than Mother's and why Mother was tasked with most of the decisions for the children. Nevertheless, there is evidence that Mother regularly sought input from Father. I have seen nothing in the texts, interviews, or his therapy records to substantiate Father's objection to Mother's conduct with the boys.

94.     The mounting information available regarding these boys' medical and family history shows that DCS did not conduct a full investigation before concluding that Mother was being deceptive, manipulative or delusional. Dr. Stewart should first have consulted with Dr. Miga before concluding that the boys were victims of abuse and recommending that they be separated from their Mother's care. The nursing staff should have been informed of information DCS gleaned from speaking with the boys' long-term home providers. The lack of coordination and failure to disseminate accurate information compromised DCS' investigation to the detriment of these boys. This is more fully set forth in the procedural problems section below.

Procedural problems arising during Kenan's hospitalization arising after DCS involvement.

95.     Cardon Children's Hospital should have made every effort to support effective parental understanding and compliance with the children's needs. DCS' duty was to ensure the parents were provided with a written plan, including menus for Kenan. This did not occur.

KAHRAMAN 000124

96.    It is my understanding that Dr. Stewart acknowledged never speaking with Dr. Miga, Kenan's cardiac specialist. Dr. Stewart did not make himself aware that Mother was following food recommendations she had discussed with Dr. Miga. Dr. Miga instructed Mother to provide Kenan 1400-1600 kcal per day and to introduce new foods, as advised by the Registered Dietitian (whose instruction was one new food per day). Mother was compliant with Dr. Miga's instructions.

97.    Dr. Miga informed Mother that so long as Kenan was tolerating the food, he was supportive of the parents' bringing Kenan food from home, as well as their desire to avoid powdered formulas. Mother found and asked Dr. Miga to evaluate one particular powdered formula if the use of such became necessary. Dr. Miga's involvement with Kenan's care at Cardon became less evident once DCS came on the scene. No one informed Mother that the directives from Dr. Miga had changed. Mother was neither instructed to stop bringing food from home nor that she must only provide cafeteria food, nor was she told she must now allow Kenan to receive powdered formula. While Mother offered her input, she did not refuse any care she was informed was medically necessary for Kenan. Mother and Father were shocked DCS removed the children from their care on December 28, 2018.

98.    Mother also worked with registered dietitian Lindsay Manz at Cardon Hospital. On December 26, 2018, her notes indicated that "a new food should be offered daily". The food logs document in the hospital by both parents, as well as the text messages between them, document a caloric intake of 2,000 kcal per day (in addition to 500 kcal of TPN) that exceeds Dr. Miga's daily goal, and integrates several new foods per day, including:

35

lentils, green beans, sourdough bread, potatoes, whole eggs, turkey, butternut squash, baked apple, kale and broccoli, in addition to the children's regular requests for lamb meatballs, carrots and beets. The boys' own reports in the Child Safety Risk Assessment ("CSRA") indicate recent meals at Cardon (where Dylan visited Kenan) include references to eating broccoli and potatoes. Parents brought bottled water and broth and encouraged Kenan to drink freely. Text messages provide support for the variety of food introduced, and parents' attentiveness to Kenan's intake. Some examples include:

- One text message from Mother to Father at Cardon Children's Hospital on December 27, 2018 stated, "He's been saying he's hungry since you left. I've given him bread, carrots, beets, lamb, potatoes. He didn't drink much broth. I don't know what else to give him because I don't know what he's reacting to.

- Father responded, "Tell him tomorrow. Ask him to rest and sleep a little bit. He ate a lot of food today. He finished almost 2 lb. of lamb [happy face emoji]." Mother later states, "OK. Let him eat as much so [sic] whatever he wants then."

- Father replied, "ok."

- Mother stated, "More potatoes and more lentils. At least those will help his weight."

- In another text message from Mother to Father on December 26, 2018, Mother said, "We have to keep pushing the food all day. I'm going to try sourdough bread so that should help."

- Mother indicated habilitation provider Danielle Schmidt was home with Dylan and assisting with food preparation while Kenan was hospitalized. She stated that

36

Danielle came to visit Kenan in the hospital on a few occasions. In a December 28, 2019 text message with Danielle, Mother wrote, "They said that since he has not gained weight this week, I must not be giving him the food I say I am and I am being noncompliant."

- Ms. Schmidt replied, "This is all so ridiculous. I am so sorry. You have been feeding Kenan. He has been eating. I don't understand how they think you have been noncompliant."

99.    Ms. Manz' notes from December 26, 2018 indicate, "Mom reports not notifying staff of these reactions [joint pains in back and knees, screaming in pain during the night from abdominal pain, up for 4 hours last night with a rash on his back from a food reaction]." In contradiction of Ms. Manz' note, a previous note from December 26, 2018 by Sara Isbell, RN related that "around 1850 mom came out to let RN know that pt had rash on shoulders, increased breathing rate, congestion, stuffy nose and felt warm. Asked RN to check temperature and stated 'it was from all the new introduction of letting him eat whatever per the nutritionist.'

100.    Mother indicated that after a senior pediatrician whom she had not previously met, came in to examine Kenan, he noted Kenan's distended abdomen and advised her to continue with food introduction, reassuring her that pushing through food reactions would be necessary. Mother stated she continued to do so.

101.    Mother reported that once additional parameters were advised in the meeting on the evening of December 28, 2018, she agreed to any and all interventions, including palliative and necessary medications, cafeteria food, endoscopy under sedation, and even

37

offered for Kenan to undergo physical therapy alone, believing it would improve his compliance and effort. Despite her full agreement, the children were removed from her care immediately thereafter. Dr. Stewart indicated two days prior he had advised DCS to take the steps necessary to remove the parents' decision-making authority. I believe Dr. Stewart's newly licensed status may have contributed to his uninformed and inappropriate recommendation.

102.   It is evident Mother would have complied with a written plan of care for Kenan that included menus, had they been provided. This is supported by Mother's immediate provision of a wide variety of foods for the children over the past year during visitation, which she personally ordered based upon the children's input, which she regularly sought.

103.   Shannon Southwick, the boys' ABA provider from 2015-2016 concurred stating, "Based on my experience working with Jessica and her family, it is my belief that she would never do anything to intentionally harm her children, and certainly would not harm them to seek attention for herself. If she had ever been provided a plan with specific requirements for her to follow in order for her children to remain in her care, I know she would have followed it to the letter. That is her nature. No one from DCS ever contacted me to ask about the children."

104.   The first time Mother reported receiving a sample menu plan at Cardon was on December 28, 2018, two days after Dr. Stewart had advised the removal of the children from Mother, and the day of the aforementioned morning meeting. This menu plan comprised just over 1400 kcal per day. A hospital note by Laura Veleta, RD dated

KAHRAMAN 000128

December 28, 2018 stated, "RDN met with mom after meeting to go over recommended 1 day sample menu created based on foods pt is able to order from CCMC kitchen. Menu was created to provide 67 kcal/kg of Kenan's IBW… should be noted mom is providing eggs to child which patient tolerates… copies left with Mom, RN and Diet Tech. The RDN informed mom this was just a guideline for everyone involved to follow including variety and balance of healthy foods Kenan may tolerate. Mom verbalized understanding. Mom stated Dad was going to bring lamb, butternut squash spirals, and other vegetables he purchased at Whole Foods today." In this same note, Ms. Veleta writes, "Pt has continued to lose weight, approximately 41 g/day x 10 days from admit, and 30g in the last hour. May be partially attributed to fluid losses given pt initial edema."

105.    DCS never provided Mother an opportunity to implement this recommended nutrition plan. The children were abruptly removed from her care just hours later.

106.    In the same December 28, 2018 note, Ms. Veleta summarized her conversation with Mother. Mother reported this was the first time she felt like she was receiving supportive guidance regarding Kenan's food intake. Ms. Veleta noted, "Dad stated he provided ~ 10 teaspoons of green beans, baked apples and avocado yesterday in addition to Kenan's normal diet of lamb meatballs, broth and bone marrow. Dad states Kenan broke out in a rash on left shoulder yesterday. Information was not documented or reported to RN last 24 hours." She then indicated, "Mom reports she has provided Kenan with a variety of foods such as hard boiled eggs, broccoli, baked apples, and green beans in the last few days. Also states she believes Kenan is consuming close to 2500 kcal/day, to which Dad chimed in pt ate 1.5 lbs of lamb yesterday." RDN stated recent calorie counts indicating pt

KAHRAMAN 000129

was eating closer to 1200 kcals/day and that Kenan had also continued to lose weight rather than gain. RDN also encouraged pt to have greater variety of foods including balanced amounts of fruits, vegetables, grains and fluids. RDN suggested reducing amount of protein/fat based foods d/t lab values, and supplementing with greater variety of other nutritious foods. Mom stated she was hesitant in starting nutrition support to which RDN agreed with, stating nutrition team also were in agreeance to provide Kenan with real foods and allowing him to eat without restrictions… RDN discussed addition of vitamin and mineral supplements given micronutrient deficiencies as indicated by lab values and nutrition focused physical exam findings upon assessment. Mom stated she was hesitant that Kenan would not tolerate supplements stating she had tried multiple ones prior and he did not absorb them. Mom ultimately agreeable to start multivitamin and minerals." Mother reported the above information was accurately recorded.

107.    On December 26, 2018, when Mother was questioned by an investigative DCS caseworker, she provided Ms. Kramer with a three-page list of medical and personal references who could shed light on her care, treatment and loving bond with the boys. After receiving positive reports from the first two contacts they called, DCS did not contact any of the other people for whom Mother had provided telephone numbers, including the children's medical providers. ABA provider Danielle Schmidt, who was contacted, reported that she had worked in the family home for over two years, for approximately 40 hours per week. In their interview, DCS states, "Danielle does not have concerns regarding the boys' development. Every couple of weeks Jessica will introduce

40

new foods. DCSS discussed reactions to food. Danielle reported that Kenan has had some rashes and behavior changes, such as being grump. It happens about an hour later. He will also get red under his eyelids. Danielle has seen the reactions herself. The children are usually satisfied with this meal but if they are still hungry, she can give them a little bit more. She has never been told not to feed the children. She stated it is rare that they ask for more food."

DCS also called Kimberly Armstrong, the children's DDD support coordinator for the past year, who had also been in the family home regularly. She reported having no concerns about the children's development, care or well-being.

108.    Declarations by the children's providers and extended family make it clear the boys had sufficient food and were energetic, happy, and active. Multiple providers expressed their respect for the parents and their dedicated care of their boys.

109.    Firishta Gheyasi Cubillo, the masters-level professional who formerly served as supervisor for the children's ABA (Applied Behavioral Analysis) program, was in the family's home 1-2 times monthly from 2015-2018. She indicated that "I never saw the children display excessive hunger. Rather, they had a great deal of energy. They were very talkative, social, healthy children. They loved to play a variety of games... I had no concerns regarding their parents. Their mother, Jessica, was the more involved of the two. She always displayed a very high level of concern for her children's welfare. They were very affectionate with her especially."

110.    Shannon Southwick, in-home ABA provider for the children from 2015-2016 reported, "I was aware that the children were on a restricted diet due to their various food sensitivities and reactions. Even though the children were on a restricted diet, Dylan and Kenan always appeared healthy and well-nourished. I was personally responsible for feeding them their breakfast and snacks during the day."

111.    Jennifer Rodriguez, MT-BC, the children's music therapy teacher from 2016-2017 shared, "I had no doubts that Jessica wanted the very best for her children and was actively involved in their safety, growth and nurturing... During my time with this family, I observed nothing indicative of any kind of neglect or mistreatment and had no such concerns. Based on my impressions, I would have a very difficult time believing any such allegation to be true. Genuine love and concern was apparent in the way Kenan and Dylan interacted with their mom, and vice versa. I believe Jessica would do anything in her power to give her sons anything they needed to live happy, healthy, and successful lives."

112.    ABA provider Brittney von Borstel texted Mother on July 12, 2018, "It was so amazing to get to make those memories with the boys. Their happy faces and excited energetic nature is just so pure and wonderful. This was such a great treat!"

113.    ABA provider Danielle Schmidt texted Mother on May 26, 2017, "Lol, you are a great mom and your boys adore you." Another text from Danielle dated March 6, 2018, stated (in response to Mother's hope that they can continue to work together), "I hope so too! I really love your boys and your family!"

KAHRAMAN 000132

114.    The children's chiropractor, Dr. Kevin Ross, DC, wrote on December 31, 2018, "In the numerous interactions over the last year I have found [Mother] nothing but consistently loving and caring for her boys. She has always been most concerned for their wellbeing and always open for advice and suggestions that I provided."

115.    With the exception of Kenan's December hospitalization, the boys' medical records consistently described both boys as well-developed and well-nourished without concern for their growth or development. Consistent growth and weight gain was documented over the course of their lives.

Mother's acceptance of her responsibility for her boys' health.

116.    Mother's updated psychological evaluation of February 20, 2020, and the recent interviews with SWHD staff Carla White and therapist Dr. Kelly Rodriguez, all document that Mother has taken responsibility for the choices she made that led to her boys' health decline.

117.    Mother's private therapist Laura Jochai observed, "Despite Jessica's concerns regarding her husband, I never observed her to blame him or anyone else for her difficult circumstances in being separated from her children." She further stated, "it took Jessica some considerable time to come to acknowledge the extent of Ahmet's issues and their impact on her life. Initially, she would defend his conduct as circumstantial to put him in a better light." Ms. Jochai also shared that Mother "expressed remorse at the thought that her actions could have contributed to her children being brought into care. She felt a wrenching guilt and grief about the children being separated from her and Ahmet. I observed that Jessica accepted responsibility for her actions and the role she may have

43

played. She also behaved in a very restrained manner despite having a great deal of concern about how she has been treated, both by Ahmet and DCS."

118.    I find it remarkable that caseworker Madison Bell changed the DCS case plan to severance in the course of the last three weeks. Ms. Bell did not consider the scope of information available. She appears to be rigidly stuck in a false narrative that Mother is dangerous, delusional and harmful to her children.

119.    Notwithstanding abundant evidence of Mother's compliance with DCS' requirements, has unhesitatingly provided her boys with a variety of food, participated in all recommended services, proactively educated herself on a higher level with nutritional education, Ms. Bell appears unable to see her as a competent, safe parent who manifests a loving and close bond with her boys.

120.    As well, Ms. Bell has failed to acknowledge Mother has been extraordinarily open to change and enhance her parenting capacity. Carla White of Southwest Human Development ("SWHD"), who is in charge of supervising Mother's access with her sons has unequivocally stated it is not in the boys' best interest to be severed from their Mother. DCS should certainly have considered this opinion prior to asking the court to change the case plan to severance. It appears the more Mother stands up for herself and demands accuracy, the greater the DCS' retaliatory conduct against her becomes.

DCS' inappropriate handling of the marital dynamics.

121.    There is no evidence that Mother blames Father for the children being taken into custody or for the children's medical issues. However, Father's counseling

KAHRAMAN 000134

records reveal he has now inappropriately taken to blaming Mother. Mother also reported being the victim of domestic violence, which can include emotional abuse. DCS' enabling of Father's dysfunction and need for control is domestic violence by proxy in seeking to use the courts to control and punish Mother.

122.  I have decades of experience working with people in domestic violence circumstances and have developed programs and protocols to help families impacted by DV. There is ample evidence in this record demonstrating Father's characterological preoccupation with control. Such an inordinate need for control is a major feature underlying domestic violence, both emotional and physical. DCS should be concerned for the dramatic shift in Father's perspective of Mother's care of the children, as well as its long-term implications for the character development of his sons were they to be transferred to his exclusive care.

123.  Father texted Mother on December 4, directly after receiving word of Kelly's assessment. He asked her to call him immediately. When they spoke, Father expressed to Mother that Dr. Kelly's report was ridiculous and that his factual basis was in error, as much of what Dr. Kelly expressed as facts were contrary to what Father had personally experienced.

124.  In early January 2020, Father's position regarding Dr. Kelly's report dramatically changed. This could only have been because Mother had determined that separation and divorce was in her and the boys' best interest.

KAHRAMAN 000135

125.     The Order of Protection Mother obtained against Father was based on his inordinate and threatening demands for physical intimacy. The texts between Father and Mother demonstrate an underpinning control dynamic. For almost a year after the children were taken, Mother urged Father to make use of the time for self-improvement. In her November 16, 2019 letter asking for legal separation she stated, "You drink to deal with the pain of losing the boys and haven't tried to use this time to find healthy coping tools, to work on problems in our marriage, or to lean on me in ways other than physically... When you don't want to do any of the things I've been asking for, but still ask (or even push me) to cater to your needs with sex, I feel used and unheard. I've begun to feel my role is to take care of the boys and you, without expectation of my needs being met."

126.     Father's initial response to Mother's request for a separation was self-referential. He texted Mother, "Askim, I love you forever! I'm nothing without you. Come back to our family." Shortly thereafter, around November 23, Father stated in a text, "You're pushing so hard not to be together! If my dad died it would not hurt this much! You don't know or see how I feel, how much I love you and am trying to save our marriage."

127.     Father texted Mother on November 24, 2019, "I'm so lost in a big hole and I don't want to do anything stupid." He then shared notes with Mother in a screen shot from December 3, 2019: "I will not get upset to you," "I will continue to the

KAHRAMAN 000136

therapies and will discuss Alcohol Anonymous with you first before I start," "I will quit drinking and smoking," and "I will not try to attract you, force you to come back or want me in." Mother was concerned for her and her family's safety; she worried that if he stopped drinking he would hurt someone.

128.  When Father realized Mother was firm in her decision to permanently separate, Father told her she was "no longer the children's mother." Mother asked to meet Father in a neutral location to discuss working toward the children's return in a cooperative manner. Father refused to meet Mother in a neutral location and wrote, "I will get the boys back not you! Remember there is no we!"

129.  Although Father received Dr. Kelly's report on December 4, 2019, he did not rush to be the first to file for divorce until after his threatening actions, Mother's subsequent Order of Protection, and Mother's report of her concerns regarding Father's behavior and intent to divorce were provided to DCS and the AAG. Nevertheless, Father claimed his decision was based on Dr. Kelly's report.

130.  Upon her filing for divorce, Father's account of Mother's character and parenting decisions shifted dramatically One example reported in Father's early therapy notes of April 2, 2019 stated, "He wanted the hospital to use alternative medicines that contain less chemicals," and "He stated he believes the children are still reactive to certain foods and he can tell this by the children having rashes on

47

their faces. He was asked if the children are able to walk now. He said they can walk, but he feels it is not completely normal."

131. At present Father endorses DCS' narrative that Mother's conduct made the children sick and that their food reactions were not real. Another statement in Father's early pre-divorce therapy noted, "they recently discovered mold in their home and believe this may have caused the children's symptoms. They are working to have the mold removed."

132. Father's recent psychological evaluation stated, "There was evidence of under-reporting in that he presented himself in an extremely positive light by denying minor faults and shortcomings. This level of self-virtuous self-presentation is very uncommon even in individuals with a background stressing traditional values. The resulting profile is likely invalid and not a good representation of Mr. Kahraman's functioning, problems or symptoms." The validity of Father's psychological evaluation was compromised because DCS failed to notify Mother that Father was scheduled to undergo a psychological evaluation, and thereby denied her any opportunity to present the evaluator, Dr. Oakley, with evidence of Father's threatening and controlling behavior. Mother could have provided Dr. Oakley with information regarding a call to DCS within days of the children being taken. The call was made by her uncle, who reported a threat by Father to take his family to Turkey (had DCS made her aware of this

KAHRAMAN 000138

fact). Mother could also have provided four corroborating witness statements detailing Father's stated plans of kidnapping the boys and fleeing to Turkey, photos of Grandmother's car that had been keyed, screenshots of Mother's email account resets being sent to Father's email and phone number, an affidavit by Laura Jochai regarding cyber-hacking she attributed to Father, two police reports and an order of protection filed by Mother, as well as numerous threatening text messages from Father to Mother that had been shared with DCS. DCS should have provided this data to Dr. Oakley for her consideration in evaluating Father. 127.

Through the records I reviewed, it was evident that DCS demonstrated a **retrospective confirmation bias** in its selection of records and opinions. This, in my opinion, affected its objectivity, distorted the focus of its case management, and redounded adversely to Mother's petitions and efforts to regain the care and custody of her children.

133.    DCS should recognize that Father has taken advantage of Mother's disfavor with DCS to try to punish her by taking the children from her. His counseling records reveal that he now claims she should be jailed. Father's current position regarding Mother is consistent with previous accounts of Father's emotional reactiveness, immaturity and failure to prioritize the children's best interests. Father's pride and need for control is further demonstrated by his adamant refusal to consider co-parenting.

KAHRAMAN 000139

134.   Mother reports her efforts to discuss her ongoing concerns with Father made it more evident that his patriarchal mentality was inconsistent with her desire for all family members to feel equally valued and supported.

135.   Father's controlling and aggressive tone and unmitigated demand for sex is set forth in his text messages. Father's controlling and threatening behavior warranted Mother's filing for and obtaining a Protective Order on December 30, 2019.

136.   It is inexcusable for DCS to shame Mother and accuse her of lying and manipulation, especially when she openly shared her concerns regarding Father's conduct. Mother made herself vulnerable when she met with Assistant Attorney Generals Kathleen Martoncik, Janna Johnson, and Gregory Coordes, as well as caseworker Madison Bell in the presence of her own attorneys to candidly report the abuse she had been experiencing with Father. Mother was empowered to come forward and ask for help through her counseling.

137.   The "counseling" of Jessica Kahraman by Dr. Kelly Rodgriguez under the supervision of DCS Case Manager Madison Bell, placed her and her sons at risk by not responding appropriately to disclosures of domestic violence, her client's expressed fear of him, his drinking every night, his attack on her mother's car (outside the home where she was staying) immediately subsequent to her filing a police report on his hacking into her email, and his threat to kidnap their sons to

==Turkey, and making a veiled threat to arrange to have her killed by people in Turkey who "can make people disappear."==

In her note on her psychotherapy sessions with Ms. Kahraman on January 8, 2020, 1/15/20 and 1/22/20, labeled Progress Report on Arizona DCS form CS)-1139A (9-15), Kelly Rodriguez, Psy. D, CSOTP, violated the standard of care for psychologist's and social worker's interviewing women who disclose threats and actions of abuse.

Her notes on the January 8, 2020, session include the following (emphases added) "Ms. Kahraman said her husband has been verbally abusive, and he is a high functioning drinker. She said she has been staying with her parents since August of 2019. *She said on 11/15/2019 her husband wanted to have sex with her, and she had to push him off, and this had happened also a week prior.* She said she indicated to him he needed to change, and he mostly made superficial changes, such as going to the gym.

*"She said he hacked into her Gmail account, and also did 2 weeks ago, which was why she had not returned an email to therapist. Therapist asked about the Order of Protection, therapist learned about in the 2 weeks prior of not seeing Ms. Kahraman due to holidays.*

*"Ms. Kahraman stated it was filed on 12/30/2019, and she said her husband wanted to go to Turkey in the beginning of the case, and he was saying he wanted*

51

*to go and kidnap the children and go to Turkey, which was the reason she obtained the Order of Protection.*

*"She said is now afraid of her husband, he is not stable and has been drinking every night. She stated after the OOP was served, she said her mother's car was keyed on 1/05/2020.*

*"Ms. Kahraman said she filed a police report with regard to her husband hacking into her email, and the night prior she had to park the car outside, and the other side of the car was keyed, and they needed to put cameras out.*

"Ms. Kahraman said she has been trying to work things out, and told her husband she wanted a divorce after the case.

"She said her husband agrees with Dr. Kelly's report, and he filed for divorce on Friday, and he is retaliating. Therapist asked if she wanted to talk to Dr. Kelly to explain herself . . . She stated her husband is against her due to she no longer wants to be in the marriage, and if she is not willing to stand next to him, he wants a divorce. She said he is putting his emotions in front of their boys. Therapist attempted to ask her reasons for not bringing up these concerns in previous sessions, and Ms. Kahraman did not answer."

Her notes on the January 15, 2020, session include the following:

*"Therapist explored with Ms. Kahraman what she believed was her part in the breakdown of the relationship, and she said she took on all the responsibility,*

52

which was realized in her support group, her husband was going to cause problems in getting her sons back, and her husband has issues with abandonment and he told her not to leave."

Her notes on the January 22, 2020, session include the following:

"Today therapist and Ms. Kahraman processed her relationship with her husband and part of Dr. Kelly's report. She indicated she was concerned about her husband, and therapist asked if she thought he was going to harm her.

"She said he has never physically harmed her before, and she stated *he told her he has people in Turkey that can make people disappear, and her husband will do whatever is necessary for him to keep their boys.*

"She said he wants to hurt her by keeping the boys. . .Therapist and Ms. Kahraman subsequently started to go through the Dr. Kelly report in more detail starting on page 4. . ."

Since the 1970's, when domestic violence became a salient social problem, an abundant body of clinical knowledge and research has demonstrated that the time of greatest risk to women in abusive relationships is when they signal their intention to leave their partners. Ms. Kahraman's divorce letter and filing of the Order of Protection appear to have precipitated her husband's defacing her mother's car parked outside the home where she was temporarily living with her parents. His previously stated intention to kidnap their sons and take them to

53

Turkey, and his engaging people he knows to "make people disappear" has become more threatening to her in light of his angry and harassing behavior.

As well, a large corpus of guidance has emerged for therapists working with abused women on avoiding any lines of questioning that appear to blame them for their partner's abuse, and a specific obligation to empower them to protect themselves and their children by developing safety plans in the setting of therapy of sessions, or making referrals to battered women's service programs and/or collaborating with criminal justice agencies.

The cascade of worrisome disclosures in the January 8, 2020, session was ignored by Dr. Rodriguez, who, rather than to follow these leads and help her client to strategize about keeping her sons and herself safe, challenged her for not bringing up these concerns in earlier sessions.

In the January 15, 2020, her practice again fell below the standard of care, by not only not supporting her client but by attempting to blame her again, this time by "exploring her part in the breakdown of the relationship."

In the January 22, 2020, session, the therapist again ignored the ethical requirement to pursue, address, and empower her anxious client to protect herself and her children from violent threats against her, and harming her by separating her sons from her.

KAHRAMAN 000144

Under color of protecting children, based on these therapy records, DCS appears to have done the opposite, **endangering both these boys and their mother. Dr. Rodriguez, and the supervising DCS case manager, Madison Bell, ignored the red flags and colluded in Ms. Kahraman's disempowerment and vulnerability to assault.**

138.    Mother candidly reported the difficulties she was experiencing with Father to her therapist in 2019.

139.    Mother's therapist, Laura Jochai, also described her own concerning experience with Mr. Kahraman, discussing his "volatile, obsessive behavior and his inability to manage his emotions appropriately. Shortly after Jessica informed him of her desire to divorce him, he posted a hypercritical review about me on Yelp, accusing me of 'brainwashing people.' I believe he tried to hack my website, given concurrent cyberattacks I experienced. I've immediately changed all my passwords and requested backup authorization for my system."

140.    Maternal grandmother reported that Father "showed affection to the boys, especially as he was leaving for work. However, he readily angered and became frustrated with them. He would raise his voice and leave the room. He would often bring Kenan to tears, and Dylan would say that he didn't want to be with his dad. I was raised by an abusive father. Though Ahmet was never as severe as my father, I could see the symptoms."

KAHRAMAN 000145

141.    Habilitation provider Shannon Southwick also shared that as far back as 2016, "I observed Ahmet displaying hostile behaviors towards Jessica. The other providers and I would occasionally hear him arguing with Jessica. He would raise his voice and she would ask him to lower it. This occurred more frequently towards the end of my time working with the family. I grew increasingly uncomfortable around Ahmet and this discomfort was a contributing factor as to why I stopped working with the family."

The forensic unreliability of Michael Kelly, M.D.'s report.

142.    Mother readily participated in the initial evaluation by her DCS service provider, Dr. Mary Oakley, Psy.D.

143.    When Dr. Oakley's evaluation of Mother did not support DCS' narrative, they brought in Dr. Michael Kelly.

144.    Dr. Michael Kelly is an out-of-state provider regularly used by DCS to substantiate assertions of factitious disorder. He completed his report without any interaction with Mother and without receiving a complete medical and social history. When DCS requested Mother meet with Dr. Kelly, Mother's counsel, knowing of Dr. Kelly's reputation, indicated Mother would only meet with Dr. Kelly with counsel present. This offer was declined.

145.    Dr. Kelly's ill-conceived opinion is superseded by Mother's immediate willingness to address the DCS's concern by providing her boys with a wide

56

variety of food, her consistent participation in DCS directed services, as well as her initiative to go above and beyond in improving her understanding of nutrition and parenting. It appears DCS has gone to great lengths to justify and strengthen their decision to remove these children from their Mother's care.

146.    DCS' continued reliance on Dr. Kelly's uninformed assumptions about Mother, especially in light of the fact that they have received two positive evaluations from Dr. Oakley, further demonstrate their punitive attitude toward Mother.

Among the deficiencies that make Dr. Kelly's report unreliable are:

a.  DCS did not provide him with records from the boys' primary care pediatrician, Dr. Asma Jafri. Dr. Jafri's records show Mother's adhering to her expectations in delivering should pediatric care.

Mother provided Dr. Jafri's contact information to investigative caseworker, Sarah Kramer, in her initial interview. This knowledgeable physician, important doctor, among others, was never contacted before DCS made the decision to take the boys into care;

b.  DCS also failed to provide Dr. Kelly with the boys' therapy records from Dr. Nikki McCants, DPT, a neurological physical therapist that provided physical therapy for the boys twice weekly for 3-4 months. Had Dr. Kelly been provided these records, he might not have ignored that Dr. McCants convincingly

KAHRAMAN 000147

documented the boys' pain and physical limitations. (DCS failed to consult with Dr. McCants regarding the boys' pain and the inability to walk that they developed in the latter months of 2018.)

c. DCS only presented Dr. Kelly with the records of Dr. Blake Scoresby, a sports medicine specialist. Dr. Scoresby only saw Dylan twice. He never examined Kenan. Dr. Scoresby acknowledged to Mother that the nature and complexity of Dylan's symptoms were outside the nature and scope of his practice.

d. Dr. Kelly's diagnostic conclusions appear to me to be paradigmatic examples of retrospective cherry-picking and adventurous speculation that bleed through with bias against Mother. To invent a diagnosis of delusional psycopathy on the basis of data absent from consultant psychologist's Dr. Oakley's report is beneath the standard of care of forensic practice. It invents a major mental disturbance from the whole cloth. I have never seen or heard of such a practice by a licensed psychiatrist.

e. Dr. Kelly referenced a 181-page grid that summarized all interactions with Mother and the medical care provided to the children throughout their six years of life. The grid appears to be based on the records he was provided. It is significant that out of 181 pages and 6 years of medical care, Dr. Kelly could only reference a few instances as a basis to buttress his assertion that Mother must be

58

either manipulative or delusional. Dr. Kelly's conclusions derive from selective cherry-picking and retrospective bias, and they are neither logical nor reasonable.

      f.    In 1.1.4.1 of his report, Dr. Kelly drew conclusions about Mother's allegedly controlling Kenan's 2018 food intake by relying on an email from 5 years previous wherein Mother reported to Dr. Cindy Schneider that Kenan was self-restricting food. Viewed in full context of the 2015 email, it is evident that Mother was concerned that Kenan's was self-restricting his food intake. When the email is reviewed in its entirety, the forensic reliability of Dr. Kelly's claim is further diminished, and his downside bias against Mother is evident.

      g.    In 1.1.3 of Dr. Kelly's report, he referenced five-year-old laboratory study to conclude Mother is currently delusional because the testing in 2015 did not reveal parasites. He ignored the fact that the out-of-state practitioner Becky Plotner (with whom Mother consulted throughout 2018) informed Mother after viewing photographs of the boys' fecal matter that they were discharging parasites, which, in her view, was a "healthy sign." Mother now recognizes she should not have relied on Becky Plotner's opinion. At that time, Mother gave credence to Ms. Plotner's opinion because of her claimed expertise in parasitology. This was no delusion (i.e. firm, fixed belief) on Mother's part. It was another example of unscientific interpretation from a bogus practitioner. But Dr. Kelly again propounds it in the most damning manner.

KAHRAMAN 000149

h. In the example 1.1.4.2 of Dr. Kelly's report, Mother did *not* tell Dr. Schneider in 2015 that she wanted to restrict vegetables. Mother was simply asking Dr. Schneider if they needed to be temporarily restricted due to watery stools. Mother indicated she never wanted to limit vegetables and made continued efforts while on GAPS to introduce new ones every two weeks: broccoli, rutabaga, kale, asparagus, cauliflower, carrots, beets, and bok choy were in rotation. Mother's efforts to introduce new vegetables is supported by the interview of Danielle Schmidt, the children's 2.5-year in-home care provider, who informed DCS that she introduced new foods every two weeks.

i. In regard to 1.1.4.3 of Kelly's report: it was impossible for hospital staff and Dr. Kelly to determine the boys' food intake while they were residing in their family's home. Had she been asked to, Mother would have provided home food journals for the children. Per Mother's account, the children consumed approximately 500 kcal per meal, not per day, for a total of over 2500 kcal per day. The children could not have been active or consistently described by physicians as well-developed and well-nourished if they had only been fed 500kcal per day. This statement is another forensically unreliable conclusion.

j. In 1.3.2 of Dr. Kelly's report, he concluded, "The above note is evidence that Ms. Kahraman did not seek emergency medical attention for Kenan despite his allegedly having multiple seizures within the previous month." Dr. Kelly failed

KAHRAMAN 000150

to recognize that Mother took Kenan to Dr. Scott Jensen, MD's office within days after the possible seizures occurred. He also failed to recognize that the parents had just taken Kenan to the PCH ER one month prior, when doctors did not express any emergent concern for Kenan's well-being.

k.  1.5.1 of Dr. Kelly's report: Mother never asked to stop any medications, nor refused any medications nor did she refuse any medications or medical care that was advised. One dose of levothyroxine was put on hold in Georgia Androutsopoulou's notes, because Mother asked to speak with Dr. Miga before the medication was administered. Dr. Androutsopoulou's notes indicate Mother consented to levothyroxine once Dr. Miga answered her question. Mother was very concerned about Kenan's TSH of 11 and knew he desperately needed the medication. Dr. Kelly cannot responsibly rely on a broad generalization that Mother is refusing treatment, and he provides no specifics that indicate Mother refused any necessary medication or treatment. It is more than a stretch for Dr. Kelly to conclude that Mother's request for a momentary pause of Kenan receiving his levothyroxine until she consulted with Dr. Miga somehow amounted to a pattern of withholding necessary medication. Rather, Dr. Kelly appears to propound the DCS preconceptions and bias against Mother. This is a profound lapse of professional objectivity.

KAHRAMAN 000151

147.    DCS inappropriately removed the children from their parents' care without providing a specific written in-home safety plan and giving the parents an opportunity to demonstrate their ability and willingness to abide by it. Much of the information contained herein would have been available to DCS had they conducted a thorough evaluation of the boys' needs and conditions, the parents' efforts and conduct, which would have included Dr. Miga, the children's pediatrician and in-home service providers.

148.    DCS does not dispute that Mother embraced the fact that the children are now tolerating a wide variety of foods, nor that she has continued to provide them a varied diet for well over a year. Mother candidly acknowledged the boys were not receiving the macronutrients needed for healthy development. She deeply regrets taking the advice of GAPS practitioner, Becky Plotner.

149.    Text messages and food logs evidence that while in the hospital the parents fed Kenan: lamb, turkey, broth, carrots, beets, green beans, potatoes, lentils, baked apple, butternut squash, sourdough bread, and broccoli. Mother acknowledges that the parents gave small quantities of a number of different foods over many small meals to minimize anticipated food reactions and to be able to assess which foods Kenan was tolerating best. She was seeking a sustainable plan after Kenan's discharge from the hospital.

KAHRAMAN 000152

150.    Mother never restricted water. The parents brought bottled water and broth and encouraged Kenan to drink freely. Hospital staff never required Kenan to drink water provided by the hospital and did not.

151.    The parents made the decision to take Kenan to Cardon Children's Hospital two weeks later on December 18, 2018, when he became lethargic and it was evident his physical condition was caused by more than food reactions.

152.    Mother addressed these concerns with Becky Plotner and naively relied on her advice that Kenan's symptoms were signs of healing. Mother regrets her lapse in judgment and has now expressed the understanding that she will immediately address any seizure-like activity with the children's pediatrician or emergency department.

153.    Medical staff at Cardon presumed Kenan did not have adequate food intake because he was not gaining weight. The contributing factors to Kenan's lack of weight gain may include starting levothyroxine, losing water weight from edema, and poor nutrient absorption due to severe hypothyroidism. (Kenan later tested positive for TPO antibody consistent with his parents' Hashimoto's thyroiditis.)

154.    Mother indicates she would have provided cafeteria food to be given to Kenan if it was an instruction she received the medical professionals. Mother had two conversations with specialist Dr. Daniel Miga, MD, who told Mother twice that food from home was fine to minimize variables, as long as Kenan was eating

KAHRAMAN 000153

it and was meeting caloric goals. Mother believed he was. Dr. Miga never spoke with Dr. Stewart. Neither Dr. Stewart nor anyone else instructed the parents to provide Kenan with cafeteria food.

155.    In 1.4.3 of Dr. Kelly's report, the medical staff only weighed one small meatball and made calculations and assumptions based on that one meatball. Mother indicated the parents based caloric intake on the total raw meat they had purchased, which was weighed. The medical staff did not count all the foods Kenan consumed because they did not observe Kenan eating them. Mother explained that medical staff were often unavailable as it was the week of Christmas. The staff simply asked parents to self-report and they did.

156.    During the meeting with both parents on December 28, 2018, they both agreed to ALL recommended interventions, including cafeteria food, Tylenol, endoscopy, sedation, PT without parents, and anything else the hospital deemed necessary. Despite the parents' agreement to follow the directives of the hospital staff, the boys were immediately taken into custody. DCS investigator Sarah Kramer justified DCS taking the children by claiming that Mother would not uphold the agreement due to "history of agreeing to something, then not following through." No factual basis was given for Ms. Kramer's assertion.

KAHRAMAN 000154

Recommendations.

157.    That the children be immediately be returned to the care of their Mother, that appropriate co-parenting counseling be provided to help bridge the tension between parents, that further evaluation of Father be done, which evaluation should include input from Mother and collateral information from those who have expressed concerns about Father's anger. Father should also be provided a clear warning that if he were to violate custodial orders and remove the children from the state or the country, it could result in criminal consequences and the removal of parental privileges.

Date: May 7, 2020

Eli H. Newberger, M.D.

65

KAHRAMAN 000155

# APPENDIX "A"

## Curriculum Vitae

| | |
|---|---|
| **Date Prepared:** | **November 5, 2019** |
| **Name:** | **ELI H. NEWBERGER** |
| **Office Address:** | **132 Lime Kiln Road** |
| | **Lenox, MA 01240** |
| **Home Address:** | **132 Lime Kiln Road** |
| | **Lenox, MA 01240** |
| **Work Phone:** | **413-637-9131** |
| **Work Email:** | **newberge@massmed.org** |
| **Place of Birth:** | New York, N.Y. |

## Education

| | | | |
|---|---|---|---|
| 1962 | B.A. | Theory of Music (Scholar of the House) | Yale College |
| 1966 | M.D. | Medicine | Yale Medical School |
| 1972 | M.S. | Epidemiology | Harvard School of Public Health |

### Postdoctoral Training

| | | | |
|---|---|---|---|
| 1966-1967 | Intern | Internal Medicine | Yale-New Haven Hospital |
| 1969-1972 | Resident | Pediatrics | Boston Children's Hospital |

### Faculty Academic Appointments

| | | | |
|---|---|---|---|
| 1972-1976 | Instructor | Pediatrics | Harvard Medical School |
| 1976-2006 | Lecturer | Maternal and Child Health | Harvard School of Public Health |
| 1976-2016 | Assistant Professor | Pediatrics | Harvard Medical School |

### Appointments at Hospitals/Affiliated Institutions

| | | | |
|---|---|---|---|
| 1971-1974 | Assistant in Medicine | Medicine | Boston Children's Hospital |
| 1974-1980 | Associate in Medicine | Medicine | Boston Children's Hospital |

1

| 1980-2007 | Senior Associate | Medicine | Boston Children's Hospital |
|---|---|---|---|
| 1971-2000 | Medical Director | Child Protection Program | Boston Children's Hospital |
| 1972-2000 | Director | Family Development Program | Boston Children's Hospital |
| 1979-2000 | Director | Clinical Research Training Program on Family Violence | Boston Children's Hospital |
| 1972-2000 | Attending Physician | Medicine | Boston Children's Hospital |
| 2008-2019 | Adjunct in Medicine | Medicine | Boston Children's Hospital |

**Other Professional Positions**

| 1967-1969 | Peace Corps Physician | | Burkina Faso (Upper Volta) West Africa |
|---|---|---|---|

**Major Administrative Leadership Positions**

**Local**

| 1977-1997 | President | Massachusetts Committee for Children and Youth |
|---|---|---|
| 1970-1973 | Chairman | Subcommittee on Services, Governor's Committee on Child Abuse |
| 1979-1982 | Chairman | Subcommittee on Families in Crisis, Governor's Advisory Committee on Children and Families |

**National and International**

| 1991-1992 | President | American Orthopsychiatic Association |
|---|---|---|
| 1982-1988 | Executive Council | International Society for the Prevention of Child Abuse and Neglect |

**Committee Service**

**Local**

| 1971-1979 | Board of Directors | Parents and Children's Services, Boston |
|---|---|---|
| 1975-1980 | Board of Directors | Brookline Mental Health Association |
| 1983-1986 | Board of Overseers | Massachusetts Cultural Education Collaborative |
| 1992-2003 | Board of Overseers | Planned Parenthood League of Massachusetts |
| 1994-2009 | Board of Overseers | New England Conservatory of Music |
| 2001-2010 | Board of Trustees | Berklee College of Music |
| 2005- | Visiting Committee | Art of Asia, Oceania, and Africa, Museum of Fine Arts, Boston |
| 2008-2016 | Advisory Committee | Funders' Learning Collaborative on Youth Violence (State Street Bank and City of Boston) |
| 2012-2016 | Board of Directors | Planned Parenthood League of Massachusetts |

2

**Regional**

| | | |
|---|---|---|
| 1977-1980 | Advisory Committee on Protective Services | Massachusetts Department of Public Welfare |
| 1978-1980 | Pediatric Task Force | Massachusetts Department of Public Health |
| 1992-1993 | Blue Ribbon Commission on Foster Care and the Department of Social Services | Office of Governor William Weld, MA |
| 1988-1992 | Child Fatality Review Board | City of New York, N.Y. |
| 1993-2003 | Committee on Violence | Massachusetts Medical Society |
| 2009- | Co-Chair, Advisory Committee | Kids 4 Harmony (El Sistema Program) Berkshire Children and Families |

**National and International**

| | | |
|---|---|---|
| 1972-1980 | National Board of Advisors | Parents Anonymous |
| 1973 | Maternal and Child Health Field Survey Team, Diffa Department, Niger, West Africa | Africare, Washington, D.C. |
| 1974-1975 | Advisory Committee, Model Child Abuse Reporting Law Project | American Bar Association |
| 1976-1980 | Task Force on Child Abuse | American Academy of Pediatrics |
| 1977-1978 | Multidonor Project Appraisal Mission, Lake Chad Basin Commission, Central Africa | United Nations Development Program |
| 1978-1982 | Committee on Social Policy | Society for Research on Child Development |
| 1979 | Medical Research Appraisal Project, Dakar, Senegal, West Africa | National Academy of Sciences |
| 1980-1982 | Public Member, Interagency Advisory Board, National Center on Child Abuse and Neglect | U.S. Department of Health and Human Services |
| 1980 | Primary Health Care Planning Mission, Uganda, East Africa | Africare, Washington, D.C. |
| 1980-1988 | Advisory Council | Defense for Children, Geneva |
| 1981-1984 | Board of Directors | National Committee to Prevent Child Abuse |
| 1982-1985 | Council on Scientific Affairs Committee on Child Abuse | American Medical Association |
| 1986 | Child Survival Planning Mission, Institute of Child Health, Lagos, Nigeria, West Africa | The Population Council |
| 1987-1991 | Committee on Ethical Conduct in Child Development Research | Society for Research in Child Development |
| 1987-1989 | Child Protection Standards Committee | Child Welfare League of America |
| 1989-1992 | Vice Chair, Council on Scientific Affairs Committee on Family Violence | American Medical Association |
| 1989-1994 | National Advisory Committee | National Data Archive on Child Abuse and |

3

| | | |
|---|---|---|
| | | Neglect, Cornell University |
| 1995-1998 | Committee on the Assessment of Family Violence Interventions | National Research Council |
| 1993-1998 | Public Member, Board of Trustees | Council on Accreditation of Services to Children and Families |
| 2007- | Advisory Board | Leadership Council on Child Abuse |

## Professional Societies

| | | |
|---|---|---|
| 1974- | American Academy of Pediatrics | Fellow |
| 1975- | American Orthopsychiatric Association | Fellow |
| 1976-1995 | Society for Epidemiological Research | Member |
| 1980-1987 | Society for Pediatric Research | Member |
| 1981-1995 | American College of Epidemiology | Member |
| 1981- | Massachusetts Medical Society | Member |
| 1987-2009 | American Pediatric Society | Member |

## Grant Review Activities

| | | |
|---|---|---|
| 1986-1995 | Noonan Memorial Fund, The Medical Foundation | Committee on Health Delivery, Grantee Selection Committee |
| 1990-1994 | Centers for Disease Control | Injury Research Grant Review Committee |
| 1974-1992 | National Center on Child Abuse and Neglect, U.S Dept. of D.H.H.S. | Consultant, Research and Program Review Panels |
| 1978-2000 | National Institute of Child Health and Human Development | Consultant and occasional grant review special committee member |
| 1980-2000 | National Institute of Mental Health | Consultant and occasional grant review special committee member |
| 1994-2000 | U.S. Department of Justice Bureau of Juvenile Justice and Delinquency Prevention | Consultant and occasional grant review special committee member |

## Editorial Activities

1971 –

Ad Hoc Reviewer for the New England Journal of Medicine, Journal of the American Medical Association, Pediatrics, Journal of Pediatrics, Archives of Pediatrics and Adolescent Medicine, Journal of the American Academy of Child Psychiatry, American Journal of Public Health, Journal of Public Health Policy, Child Development, Monographs of the Society for Research in Child Development, Child Abuse and Neglect, Harvard University Press, Stanford University Press, University of California Press

### Other Editorial Roles

| | | |
|---|---|---|
| 1963-1966 | Yale Journal of Biology and Medicine | Editorial Board |
| 1977-1985 | Child Abuse and Neglect | Editorial Board |
| 1977-1978 | Monographs of the Society for Research in Child Development | Board of Consulting Editors |
| 1984-1990 | Victimology | Editorial Board |
| 1985-1998 | Journal of Interpersonal Violence | Editorial Board |

4

| 1985-2000 | Violence and Victims | Editorial Board |
| 1985-1989 | American Journal of Orthopsychiatry | Editorial Board |
| 1990-1999 | Family Violence Update | Board of Governors |
| 1990-1993 | Journal of Child Sexual Abuse | Editorial Board |
| 1992-1999 | Crisis Intervention and Time-Limited Treatment | Editorial Board |

## Honors and Prizes

| 1965 | Alpha Omega Alpha medical honorary society |
| 1969-1972 | Fellow, Career Development Program in Global Community Health, U.S. Public Health Service |
| 1976 | Annual Award for improvement of the welfare of children, Massachusetts Society for the Prevention of Cruelty to Children |
| 1985 | Helenka Adamowska Pantaleoni Award for the outstanding contribution to the betterment and welfare of children, Greater Boston Committee for UNICEF |
| 1985 | Commissioner's Award, for Outstanding Leadership and Service in the Prevention of Child Abuse and Neglect, Office of Human Development Services, U.S. Department of Health and Human Services |
| 1988 | Humanitarian Award, Massachusetts Psychological Association |
| 1992 | Award for Excellence for outstanding research in the infant-parent field, Boston Institute for the Development of Infants and Parents |
| 1998 | Gift of Safety Lifetime Achievement Award for Violence Prevention, The LiveSafe Foundation (Impact Model Mugging) |
| 1999 | Richard L. Allard, DMD, Award for outstanding achievement in promoting the message of mandatory reporting of abuse and neglect within the dental community, Massachusetts Dental Association |
| 2000 | Martha May Eliot Award, Massachusetts Committee for Children |
| 2004 | Award for "tireless efforts to open the door for a better life for so many children," Brockton Family and Community Resources |
| 2012 | Family Services of Greater Boston Family Legacy Award (with Dr. Carolyn M. Newberger) for service and research innovations to strengthen Boston families, presented by Mayor Thomas M. Menino |

## Report of Funded Projects

### Funding Information

Past

1971-1974    P.I., Safe Streets Committee, Office of the Mayor, Boston, MA, direct costs approximately $150,000.00.
This award funded the appointments of a full-time lawyer, a part-time psychiatrist, and a part-time clinical case coordinator to work with the Children's Hospital Boston Child Protection Program

1972-1978    P.I., Study of Social Illness in Children, Office of Child Development, U.S. Department of D.H.H.S., direct costs approximately $2,000,000.00
This award funded two epidemiological studies of the interrelationships among child abuse and neglect, failure to thrive, accidents and poisonings in preschool children, focusing on risk factors originating in child developmental attributes, parental conflicts, social isolation, and stresses originating from environmental crises, as well as a family advocacy program.

1979-1997    P.I., Interdisciplinary Clinical Research Training on Family Violence, National Research Service Award, National Institute of Mental Health, direct costs approximately $2,500,000.00.
This award had as its overall goal bridging the gaps between research and practice in the family violence field. One- or two-year fellowships were given to post-doctoral fellows in the following research and clinical fields: Pediatrics, Research and Clinical Psychology, Psychiatry, Sociology, Epidemiology, Anthropology, Nursing, and Social Work. Clinicians and researchers worked side-by-side in research on family violence, teaching of clinicians and others, and clinical consultations and care. Fellows, faculty, and clinicians and researchers attended a weekly family violence seminar from the Boston community. A monograph on the project was published by N.I.M.H.

1982-1985    Co-P.I. (With Co-P.I., Carolyn M. Newberger, Ed.D), Childhelp USA, Impact of Child Physical Abuse. Direct costs, approximately $600,000.
This award funded the study, planning, and exploratory study of the psychological affects of physical maltreatment in boys and girls, and the maturity of parental consciousness in their parents.

1986-2000    P.I., Project AWAKE program grants. Funders: The Hyams Trust and the Massachusetts Office of Victim Assistance, direct costs approximately $1,500,000.
These awards funded the first hospital-based domestic violence advocacy program. Conceived by post-doctoral fellow Martha Straus, Ph.D. who worked with the clinical faculty of the above-noted research training program, the program began with a single domestic violence advocate in the outpatient clinic of the Family Development Program.

1985-1991    Co-P.I, Victim Recovery Study. (P.I., Carolyn M. Newberger, Ed.D.) Funders: National Center on Child Abuse and Neglect, D.H.H.S, National Institute of Justice, U.S. Department of Justice, and W.T. Grant Foundation, direct costs approximately $1,500,000. These awards funded a longitudinal study of the impacts of child sexual abuse, and its disclosure, on children and mothers in the year subsequent to disclosure.

1989-1990    P.I., Pregnant Woman Abuse and Adverse Birth Outcome. Funder: Deborah Monroe Noonan Memorial Fund, The Medical Foundation, direct costs approximately $35,000. This award funded a descriptive epidemiological study of intimate partner violence during pregnancy and the risks of fetal injury and low birth weight.

1992-1994    Co-P.I. (with Edward DeVos, Ed.D., of the Education Development Center, Newton, MA), Health Care and Family Violence Field Project. Funders: Robert Wood Johnson Foundation. Approximate direct costs: $2,000,000. This award funded a national study of the impact of family violence on health professionals and hospitals in five communities.

6

# Report of Local Teaching and Training

## Teaching of Students in Courses

| | | |
|---|---|---|
| 1971-1975 | Department of Epidemiology, Harvard School of Public Health | Section Leader, Epidemiology survey course |
| 1970- | Harvard Medical School | Courses and electives on violence: lecturer, preceptor, and clinical supervisor |
| 1976-2008 | Department of Maternal and Child Health and Department of Society, Human Development, and Health, Harvard School of Public Health | Co-leader of course on Social Services for Mothers and Children, occasional lectures and colloquia on violence, the American family, and male character development |

## Formal Teaching of Residents, Clinical Fellows and Research Fellows (post-docs)

| | | |
|---|---|---|
| 1972-2000 | Children's Hospital Boston | Attending physician in the inpatient and outpatient departments, supervisor of medical students' and pediatric residents' child abuse electives, and supervision of post-doctoral fellows in the Research Training Program on Family Violence |

## Clinical Supervisory and Training Responsibilities

| | | |
|---|---|---|
| 1971-2000 | Children's Hospital Boston | Medical Director, Child Protection Program, responsible for updating the knowledge of the junior and senior staffs of the hospital, through presentations at subspecialty Grand Rounds, individual case conferences, and clinical consultations. |
| 1972-2000 | Chief, Family Development Clinic | Supervision of a multidisciplinary staff of physicians, psychologists, nurses, and social workers, as well as clinical research trainees, medical students, pediatricians, psychiatrists, psychologists, nurses, and social workers in training rotations. |

## Formal Teaching of Peers (e.g., CME and other continuing education courses)

7

| 1980-1993 | Department of Continuing Medical Education, Harvard Medical School | Director, annual 3-day conferences on Abuse and Victimization in Life-Span Perspective |
|---|---|---|

# Report of Regional, National and International Invited Teaching and Presentations

## Invited Presentations and Courses

### Regional

| | |
|---|---|
| 3/28/2006 | Keynote Address, "Raising Boys," Fathers and Families Network, Worcester, MA |
| 3/31/2006 | Workshop, "Boys' Attachments and Character," Adoption Rhode Island, Lincoln, RI |
| 10/18/2006 | Psychology Colloquium, "The Core of Character in Boys: Implications for Parental Care, Clinical Practice, and Research, Northeastern University, Boston, MA |
| 11/14/2006 | Parent and Teacher Lecture, "Building Character in Boys and Girls," The Rivers School, Weston, MA |
| 3/15 - 3/16/2007 | Annual Retreat Co-Leader (with Tina Packer, Artistic Director, Shakespeare and Company, "The Discipline of Improvisation," Massachusetts CEO Roundtable, Babson College, Wellesley, MA |
| 11/6/2007 | Parent and Teacher Conference, "The Core of Character in Boys and Girls," Advent School, Boston, MA |
| 1/29/2008 | Lecture and Workshop, "The Different Worlds of Girls and Boys," United Way of Massachusetts Bay and Merrimac Valley "Inspire 4 Life Summit on Youth, Boston, MA |
| 3/28/2008 | Keynote Address, "The Nature, Nurture, and Control of Violence in Males," Conference, Middlesex Partnerships for Youth, Newton, MA |
| 1/21 and 22/2010 | Annual Retreat Co-Leader (with Tina Packer, Artistic Director, Shakespeare and Company), "Embodied Imagination," Massachusetts CEO Roundtable, Babson College, Wellesley, MA |
| 1/29/2010 | Keynote Address, "Bullying," Boston Association for the Education Of Young Children Conference, Arlington, MA |
| 5/20/2010 | Lecture and Workshop: "Trauma, Music, and the Brain: Palliative and Integrating Rhythms," Trauma Center Conference, World Trade Center, Boston, MA |
| 6/11/2010 | Keynote Address, "Inspiring Prevention in the Berkshires," Conference on Children at Risk, Berkshire Children and Families, Inc., Pittsfield, MA |
| 1/22/2011 | Keynote address, "The Family Anatomy of Bullying," Annual Conference, Montessori Schools of Massachusetts, Cambridge, MA |
| 3/31/2011 | Preconference course, "Music Trauma and the Brain." American Music Therapy Association, Brewster, MA |
| 3/16/2011 | Lecture, "Men's Character and Behavior," Cummings Family Foundation Conference, "Our Broken Family Court System," Phoenix, AZ |
| 4/4/12 | Keynote Address, "Child Abuse Prevention: Does Gender Matter?" Geminus, Inc. Conference, Merrillville, IN |

8

**National**

| | |
|---|---|
| 10/27/2005 | Address, "Strengthening the Characters of Boys: What We Know and Can Do," White House Conference on Helping America's Children, Washington, D.C. |
| 2/23/2006 | Keynote Address: "The Core of Character in Boys and Girls: Understanding and Countering Aggression," Wisconsin School Counselor Association, Stevens Point, WI |
| 3/22/2006 | Evening Public Lecture, "Families and Boys: The Challenge of Strengthening Them, College of Arts and Letters, Old Dominion University, Norfolk, VA |
| 3/23/2006 | Pediatric Grand Rounds, "Violence and Males," Grand Rounds, Children's Hospital of the King's Daughters, Norfolk, VA |
| 9/25/2006 | Keynote Address, "The Changing American Family," Governor's Summit on Juvenile Justice, Reno, NV |
| 10/19/2006 | Public Lecture, "Character Building in Boys and Girls," Milburn Parent Education Committee, Milburn, NJ |
| 12/95/2006 | Parents' and Community Lecture "Character," Robert M. Beren Academy, Houston, TX |
| 1/7/2008 | Keynote Address, "Strengthening Character in Boys and Girls," Arizona Association of Independent Schools, Phoenix, AZ |
| 4/24/2008 | Pediatric Grand Rounds, "Child Abuse and Boys' Character Development," Pittsburgh Children's Hospital, Pittsburgh, PA |
| 4/24/2008 | Keynote Address, "Prevention of Child Abuse, "Third Annual Child Advocacy Center Conference on Hope and Healing, Pittsburgh, PA |
| 9/18/2008 | Keynote Speaker, "Foundations of Healthy Child Development, and Risks and Impacts of Traumatic Experience," U.S. Department of Justice National Children's Bench Book Symposium on Improving Judicial Responses to Child Sexual Abuse, University of Maryland, College Park, MD |
| 10/9/2008 | Keynote Address, "The Transformation of the American Family: Implications for Psychological Risk," Annual Conference, Highlands Community Services Center for Behavioral Health, Bristol, VA |
| 11/8/2008 | Lecture, "Building Character in Boys," For the Love of Kids Parenting Conference, Cincinnati, OH |
| 3/16/2011 | Lecture, "Men's Character and Behavior," Cummings Family Foundation Conference, "Our Broken Family Court System," Phoenix, AZ Keynote Address, "Child Abuse |
| 4/4/2012 | Prevention: Does Gender Matter?" Geminus, Inc. Conference, Merrillville, IN |

**International**

| | |
|---|---|
| 1/12/2006 | Lecture, "Child Abuse and Child Development," Asian-U.S. Partnership in Early Child Development and Primary Care, Honolulu, HI |
| 6/25/2006 | Keynote Address, "The Men They Will Become," International Boys School Coalition Annual Conference, Johannesburg, South Africa |

9

## Report of Clinical Activities

### Current Licensure and Certification

| | |
|---|---|
| Current Licensure | Commonwealth of Massachusetts, Board of Registration in Medicine, License #33613 |
| Board Certification | American Board of Pediatrics, 1973 |

## Report of Education of Patients and Service to the Community

### Activities

| | |
|---|---|
| 1992-1998 | Standing Committee on Continuing Medical Education, Harvard Medical School |
| 2003-2007 | Collection Development Subcommittee, Joint Library Committee, Countway Medical Library, Harvard Medical School |
| 1990- | Consultant, Our Bodies and Our Selves Project, Somerville, MA |
| 1995-2000 | Consultant, Transition House, Cambridge, MA |
| 1994- | Student Mentor, New England Conservatory of Music, Boston, MA |
| 2006- | Conductor and Pianist, Cupcake Philharmonic Orchestra (Performances of Tubby the Tuba and related works for children at schools in Acton, Boston, Brookline, Cambridge, Milton, and Pembroke, MA, as well as at Tanglewood, Lenox, MA) |
| 2007-2011 | Student Mentor, Berklee College of Music, Boston, MA |
| 2009-2011 | Consultant, El System Fellowship Program, New England Conservatory of Music, Boston, MA |

## Report of Scholarship

### Peer reviewed publications in print or other media

1. Newberger EH, Hagenbuch JJ, Ebeling NB, Colligan EP, Sheehan JS, McVeigh SH. Reducing the

10

literal

and human cost of child abuse: impact of a new hospital management system. Pediatrics 1973; 51:840-848.

2.    Newberger EH, Newberger CM, Richmond JB. Child health in America: toward a rational public policy. Milbank Memorial Fund Quart/Health and Society. 1976; 54:249-298; reprinted in: McKinley JD, ed. Issues in health care policy. Cambridge: MIT Press, 1981; 97-146.

3.    Newberger EH, Reed RB, Daniel JH, Hyde JN, Kotelchuck M. Pediatric social illness: toward an etiologic classification. Pediatrics. 1977; 60: 178-185; reprinted in Cook JV, Bowles RG, eds. Child abuse: commission and omission. Toronto: Butterworths, 1980; 351-362.

4.    Bourne R, Newberger EH. 'Family autonomy' or 'coercive intervention'?: ambiguity and conflict in the proposed standards for child abuse and neglect. Boston Univ Law Rev 1977; 670-706.

5.    Morse AN, Hyde JN, Newberger EH, Reed RB. Environmental correlates of pediatric social illness: preventive implications of an advocacy approach. Am J Public Health 1977; 67:612-615.

6.    Daniel JH, Newberger EH, Kotelchuck M, Reed RB. Child abuse screening: implications of the limited predictive power of child abuse discriminants in a controlled family study of pediatric social illness. Child Abuse Neglect 1978; 2:247-259.

7.    Newberger EH, Bourne R. The medicalization and legalization of child abuse. Am J Orthopsychiatry 1978; 48:593-607; reprinted in Eekelaar JM, Katz SN, eds. Family violence. Toronto: Butterworths, 1978: 301-317; in Familien dynamic (Zurich), 1979; in Cook JV, Bowles RT, eds. Child abuse: commission and ommission. Toronto: Butterworths; 1979: 377-393; in Garland R, ed. Readings in child abuse. Guilford (Conn): Special Learning Corporation, 1979: 183-190; and in Skolnick JH, Skolnick A, eds. Family in transition. 3rd ed. Boston: Little, Brown, 1980: 411-426.

8.    Rosenfeld AA, Newberger EH, Compassion vs. control: conceptual and practical pitfalls in the broadened definition of child abuse. JAMA 1977; 237: 2086-2088; reprinted in Chess S, Thomas A, eds. Annual progress in child psychiatry and child development, 1978. New York: Brunner/Mazel, 1979; and in Am J Forensic Psychiatry, 1:71-81, 1979.

9.    Taylor L, Newberger EH. Child abuse in the international year of the child. N Engl J Med 1979; 301:1205-1212; reprinted in Gelles RJ, Cornell CP, eds. International Perspectives on Family Violence. Lexington: D.C. Heath, 1983.

10.   Bourne R, Newberger EH. Interdisciplinary group process in the hospital management of child abuse. Child Abuse Neglect 1980; 4:137-144.

11.   Kotelchuck M, Newberger EH. Failure to thrive: a controlled study of familial characteristics. J Amer Acad Child Psych 1983; 22:322-328.

12.   Newberger EH, Newberger CM, Hampton RL. Child abuse: the current theory base and future research needs. J Amer Acad Child Psych 1983; 22:262-268.

11

13. Daniel JH, Hampton RL, Newberger EH. Child abuse and accidents in black families: a controlled, comparative study. Am J Orthopsychiatry 1983; 53:645-653; reprinted in Hampton RL, ed. Violence in the black family. Lexington: D.C. Heath, 1987, 55-65.

14. Hampton RL, Daniel JH, Newberger EH. Pediatric social illness and black families. West J Black Studies 1984; 7:190-197.

15. Hampton RL, Newberger EH. Child abuse incidence and reporting by hospitals: significance of severity, class, and race. Am J Public Health 1985; 75:56-60; reprinted in Hotaling GT, Finkelhor D, Kirkpatrick JT, Straus M, eds. Coping with Family Violence. Newbury Park: Sage, 1988, 212-221.

16. Bithoney WG, Snyder JC, Michalek J, Newberger EH. Childhood ingestions as symptoms of family distress. Am J Dis Child 1985; 139:456-459.

17. Katz MH, Hampton RL, Newberger EH, Bowles RT, Snyder JC. Returning children home: clinical decision-making in cases of child abuse and neglect. AM J Orthopsychiatry 1986; 56:253-262.

18. Snyder JC, Newberger EH. Consensus and differences among hospital professionals in evaluating child maltreatment. Violence and Victims 1986; 1:125-139.

19. Newberger EH, Hampton R, White KM, Marx T. Child abuse and pediatric social illness: an epidemiological analysis and ecological reformulation. Am J Orthopsychiatry 1986: 56:589-601.

20. Bithoney WG, Newberger EH. Child and family attributes of failure to thrive. J Devel Behav Peds 1987; 8:32-36.

21. Dubowitz H, Hampton RL, Bithoney WG, Newberger EH. Inflicted and non-inflicted injuries: differences in child and familial characteristics. Am J Orthopsychiatry 1987; 57:525-535.

22. Woolf A, Taylor L, Melnicoe L, Andolsek K, Dubowitz H, DeVos E, Newberger EH. What residents know about child abuse: implications of a survey of knowledge and attitudes. Am J Dis Child 1988; 142:668-672.

23. McKibben L, Devos E, Newberger EH. Victimization of mothers of abused children: a controlled study. Pediatrics 1989; 84:531-535.

24. Dubowitz H, Zuckerman DM, Bithoney WG, Newberger EH. Child abuse and failure to thrive: individual, familial, and environmental characteristics. Violence and Victims 1989: 4:191-201.

25. Newberger EH, Barkan SE, Lieberman ES, McCormick MC, Yllo K, Gary LT, Schechter S. Abuse of pregnant women and adverse birth outcome: current knowledge and implications for practice. JAMA 1992; 267:2370-2372

26. Newberger CM, Gremy I, Waternaux CM, Newberger EH. Mothers of sexually abused children: trauma and repair in longitudinal perspective. Am J Orthopsychiatry 1993; 63:92-102

KAHRAMAN 000168

27.   Cohen C, DeVos E, Newberger E.  Barriers to Physician Identification and Treatment of Family Violence:  Lessons from Five Communities.  Acad Med 1997; 72: 19-25.

28.   Newberger EH.  Treating this heavy midlife of men.  Am J Orthopsychiatry, 70: 278-280, 2001

## Non-peer reviewed scientific or medical publications/materials in print or other media

1.   Newberger EH.  Book review of Violence against children (Gil DG).  Pediatrics 1971;  48:668-670.

2.   Newberger EH, Hagenbuch JJ.  Book review of Helping the battered child and his family (Kempe CH, Helfer RD, eds.).  Pediatrics 1973;  6:894.

3.   Newberger EH.  Book review of The maltreated child (Fontana V).  Pediatrics 1973;  52:159

4.   Newberger EH, Mulford RM, Hass G.  Child abuse in Massachusetts, Massachusetts Physician 1973;  32:31-38

5.   Newberger EH.  The myth of the battered child syndrome.  Current Medical Dialog.  1973; 40:327-330; reprinted in : Chess S, Thomas A, eds.  Annual progress in child psychiatry and child development, 1974.  New York:  Brunner, Mazel, 1975;  569-573.

6.   Newberger EH, Howard RB.  A conceptual approach to the child with exceptional nutritional requirements.  Clin Pediatric 1973;  12:456-467

7.   Newberger EH.  Child abuse and neglect.  In: Graef JW, Cone TE, eds.  Manual of pediatric therapeutics.  Boston:  Little, Brown, 1974, 56-58; 2nd Ed., 1980, 57-59.

8.   Newberger EH, Hyde JN.  Child abuse:  principles and implications of current pediatric practice.  Ped Clin N Amer 1975; 22:695-715; reprinted in: Gil D, ed.  Child abuse and violence.  New York:  AMS Press, 1976:309-339.

9.   Newberger EH, Daniel JH:  Knowledge and epidemiology of child abuse:  a critical review of concepts.  Pediatr Ann 1976; 5:140-145.

10.  Newberger EH.  A physician's perspective on the interdisciplinary management of child abuse.  In:  Ebeling NB, Hill DA, eds.  Child abuse:  intervention and treatment.  Littleton:  Publishing Sciences Group, 1975, 61-67; reprinted in Psychiatr Opin 1976; 13:13-18.

11.  Newberger EH, McAnulty EH.  Family intervention in the pediatric clinic:  a necessary approach to the vulnerable child.  Clin Pediatr (Philal) 1976; 15:1155--1161.

12.  Newberger CM, Newberger EH, Harper GP.  The social ecology of malnutrition in childhood.  In:

13

KAHRAMAN 000169

Llyod-Still J, ed. Malnutrition and intellectual development. Lancaster, England: Medical and Technical Press, 1976 and Littleton: Publishing Sciences Group, 1976; 160-186.

13. Cupoli JM, Newberger EH. Optimism or pessimism for the victim of child abuse? Pediatrics 1977; 59:311-313.

14. Newberger EH. Child abuse and neglect: toward a firmer foundation for practice and policy. Am J Orthopsychiatry 1977; 47:374-376; reprinted in Cook JV, Bowles RT, eds. Butterworths, 1979; 363-365.

15. Newberger EH, Rosenfield AA, Hyde JN, Holter JC: Child abuse and child neglect. In: Hoekelman RA, Blauman S, Brunell PA, Friedman SB, Seidel HM, eds. Principles of pediatrics: health care of the young. New York: McGraw-Hill, 1978, 614-622, reprinted in Friedman SB, Hoekelman RA, eds. Behavioral pediatrics: psycho-social aspects of child health care. New York: McGraw-Hill, 1980; 329-338.

16. Hyde JH, Morese AN, Newberger EH, Reed RB. Family advocacy: implications for treatment and policy. In: Maybanks S, Bryce M, eds. Home-based services for children and families: policy, practice, and research. Springfield: C.C. Thomas, 1979; 177-185.

17. Kessler DB, Newberger EH. At risk: the developing infant. Children Today 1981; 10:10-14.

18. Bittner S, Newberger EH. Pediatric understanding of child abuse and neglect. Ped in Rev 1981; 2:197-207.

19. Newberger CM, Newberger EH. The etiology of child abuse. In: Ellerstein NS, ed. Child abuse and neglect: a medical reference. New York: Wiley, 1981; 11-20.

20. Bittner S, Newberger EH. Child abuse: current issues of etiology, diagnosis and treatment. In: Henning J, ed. The rights of children: legal and psychological perspectives. Springfield: C.C. Thomas, 1981; 64-98.

21. Newberger CM, Newberger EH. Prevention of child abuse: theory, myth, practice. J Prev Psych 1982; 1:443-451.

22. Snyder JC, Bowles RT, Newberger EH. Improving research and practice on family violence: potential of a hospital-based training program. Urban Soc Change Rev 1982; 15:3-8.

23. Bithoney W, Newberger EH, Bittner S. Child abuse and neglect. In: Gellis SS, Kagan BM, eds. Current pediatric therapy. 10th ed. Philadelphia: Saunders, 1982; 736-739.

24. Newberger EH, Newberger CM, St Louis M. Child health: whose responsibility? In: Haskins, R, ed. Maternal and child health policy in an age of fiscal austerity. Norwood: Ablex, 1983; 68-94.

25. Newberger EH. When the injury is a symptom: parental risk and child abuse. In: Hoekelman RA, ed. Minimizing high-risk parenting. Media (Pa.): Harwal, 1983; 165-174.

14

26.   White KM, Newberger EH. Parenting and its problems. In: Levine MD, Carey WB, Crocker AC, Gross RT, eds. Developmental-behavioral pediatrics. Philadelphia: Saunders, 1983; 209-224.

27.   Snyder JC, Hampton R, Newberger EH. Family dysfunction: violence, neglect, and sexual misuse. In: Levine MD, Carey WB, Crocker AC, Gross RT, eds. Developmental-behavioral pediatrics. Philadelphia: Saunders, 1983; 256-275.

28.   Newberger EH, Newberger CM. Problems and prospects of a new profession: review of Handbook for the practice of pediatric psychology (Tuma JM, ed.) Merrill-Palmer Quart, 1983; 29:No.4, 483-484.

29.   Newberger EH. The helping hand strikes again: unintended consequences of child abuse reporting. J Clin Child Psych 1984; 12:307-311.

30.   Bowles RT, Newberger EH, White KM. Violence experienced by children: issues of etiology for different manifestations. Human Affairs, 1985; 8:1-17.

31.   Dubowitz H, Newberger EH. Sequelae of reporting child abuse. J Amer Acad of Ped Dentistry 1986; 8:88-92.

32.   Newberger CM, Newberger EH. When the pediatrician is a pedophile. In: Burgess NW, ed. Sexual exploitation by health professionals. New York: Praeger, 1986; 99-106; reprinted in: Maney A, Wells S, eds. Professional responsibilities in protecting children. New York; Praeger, 1988; 65-72.

33.   Newberger EH. Prosecution: A problematic response to child abuse. J Interpersonal Violence 1987; 2:112-117.

34.   Newberger EH, Hyde JN, Holter JC, Rosenfeld R. Child abuse and child neglect. In: Hoekelman RA, Blatman S, Friedman SB, Nelson NM, Seidel HM, eds. Primary pediatric care. St. Louis: C.V. Mosby Company, 1987; 629-638.

35.   Newberger EH. Introduction: Social Policy. In: Prentky RA, Quinsey VL, eds. Human sexual aggression. New York. Annals NY Acad Sci. v. 528, 1988; pp.359-360.

36.   Dubowitz H, Newberger CM, Melnicoe LH, Newberger EH. The changing American family. Ped Clin N Amer 1988; 35:1291-1311.

37.   Newberger EH. Book Review of child maltreatment and paternal deprivation (Biller HB, Solomon SS). Child Abuse Neglect 1988; 12:601.

38.   Dubowitz H, Newberger EH. Pediatrics and child abuse. In: Cicchetti D, Carlson B, eds. Child maltreatment. New York: Cambridge University Press, 1989, 76-94.

39.   Newberger EH. Book review of sexual exploitation of children (Ennew J). Contemp Psychol,

KAHRAMAN 000171

1989; 34:190-191.

40.    Newberger EH. Pediatric interview assessment of child abuse: challenges and opportunities. Ped clin N Amer 1990; 37:943-954.

41.    Newberger EH. Family transition, stress, and support: impacts on children. Curr Opin Ped 1990, 2:856-862.

42.    Segal RM, Newberger EH. Child abuse. In: Poss R, ed. Orthopedic knowledge update III. Park Ridge: American Academy of Orthopedic Surgeons, 1990; 67-73.

43.    Newberger EH. Child abuse. In: Rosenberg ML, Fenely MA, eds. Violence: a public health approach. New York: Oxford University Press 1991; 49-78.

44.    Newberger EH. Book review of assessing pediatric practice: a critical study (Duff RS). N Engl Med 1991; 325: 1258.

45.    Newberger EH. Intervention in child abuse. In: Schetky DH, Benedek EP, eds. Clinical handbook of child psychiatry and the law. Baltimore: Williams and Wilkins, 1992; 145-161.

46.    Newberger EH, Lieberman ES, McCormick MC, Yllo K, Gary LT, Schechter S. Physical and sexual abuse of women and adverse birth outcome. In: Fuchs F, Stubblefield PG, Fuchs AR, eds. Preterm birth: causes, prevention, and treatment, second edition. New York: McGraw-Hill 1993; 189-195.

47.    Newberger EH, Newberger CM. Treating children who witness violence. In: Schwartz DF, ed. Children and violence. Columbus: Ross Laboratories, 1992, 118-123.

48.    Newberger EH. Child physical abuse. Prim Care 1994.

49.    Vandeven AM, Newberger EH. Child abuse. Annu Rev Pub Hlth 1994, 15: 367-79.

50.    Newberger EH. The medicine of the tuba. In: Curnen MGM, Spiro H, St. James D, eds. Doctors Afield. New Haven: Yale University Press, 1999; 67-74

51.    Newberger EH. Forward to: Senay E. From boys to men: A woman's guide to the health of husbands, partners, sons, brothers and fathers. New York: Charles Scribner's Sons, 2004.

52.    Newberger EH. Strengthening the Characters of Boys: What We Know and Can Do. In: Proceedings, White House Conference on Helping America's Youth. Washington, D.C. The White House, October 27, 2005.

KAHRAMAN 000172

**Professional educational materials or reports, in print or other media**

1.  Newberger EH, ed.  Child advocacy and pediatrics.  Report of the eighth Ross roundtable on common pediatric problems in collaboration with the Ambulatory Pediatric Association.  Columbus:  Ross Laboratories, 1978.

2.  Bourne R, Newberger EH, eds. Critical perspectives on child abuse. Lexington:  D.C. Heath, 1979

3.  Terry J, McEvers N, Newberger EH.  Health in the development of Senegal:  options for research.  Washington:  Family Health Care, 1979.

4.  Newberger EH, ed.  Child abuse.  Boston:  Little, Brown, 1982.

5.  Newberger EH, Bourne R, eds.  Unhappy families:  clinical and research perspectives on family violence.  Littleton:  Publishing Sciences Group, 1985.

6.  Newberger CM, Melnicoe LH, Newberger EH.  The American family in crisis:  implications for children.  Chicago:  Yearbook Medical Publishers.  Current Problems in Pediatrics 1986;  16:669-739.

7.  White KM, Snyder JC, Bourne R, Newberger EH.  Treating child abuse and family violence in hospitals:  a program for training and services, Lexington:  D.C. Heath, 1989.

8.  Newberger E.  The men they will become: The nature and nurture of male character.  Cambridge, MA:  Perseus Books, 1999.  Reprinted as Bringing up a boy. London, UK: Bloomsbury, 2001

17

9.    Newberger EH. Why Get the HPV Vaccine? Boston Parents Paper, December 27, 2012
http://bostonparentspaper.com/article/why-get-the-hpv-vaccine.html

## Other Writings

1.    Newberger EH. The transition from ragtime to improvised piano style. J Jazz Studies 1976; 3:3-18.

2.    Newberger EH. Archetypes and antecedents of piano blues and boogie-woogie style. J Jazz Studies 1976; 4:84-109.

3.    Newberger EH. The development of New Orleans and stride piano style. J Jazz Studies 1977; 4:43-71.

4.    Newberger EH. Refinement of melody and accompaniment in the evolution of swing piano style. In: Morgenstern D, Nanry C, Cayer DA, eds. Annual Review of jazz studies I. New Brunswick: Transaction Books, 1982, 85-109.

5.    Newberger, EH. Reviews of performances of classical music and of dance. Boston Musical Intelligencer, 2010.

6.    Newberger, EH. Reviews of performances of classical music and of dance. The Berkshire Edge, 2014- https://theberkshireedge.com/author/eandcnewberger/

## Narrative Report

After an internship in internal medicine, I spent two years in West Africa as a Peace Corps Physician. In this period, my interests developed in pediatrics and in epidemiological approaches to understanding family and social concomitants of adult and child health. I began in 1969 a three-year course of study in which I completed a residency in pediatrics and a master's degree in epidemiology. During this training, I became deeply involved in efforts to address the problem of child abuse, and I organized in 1970 the Children's Hospital's first child abuse consultation unit. Also in this period, I conceived the notion of an interdisciplinary research and clinical unit on family violence and in 1972 organized, with support from the federal Office of Child Development, the Family Development Study.

This project housed an epidemiological study of pediatric social illness (child abuse, childhood injuries, failure to thrive, and childhood ingestions), a child abuse consultation team, a clinic (Family Development Clinic) in the Hospital's outpatient department, and a family advocacy program. Staffed by an interdisciplinary group of researchers and clinicians, it provided the setting from which to develop a number of research efforts and an institutional context in which could be explored and evaluated promising new clinical approaches in the family violence field.

These include the AWAKE (Advocacy for Women and Children in Emergencies) Program that began in 1986. The first battered women's advocacy project at a hospital in the U.S., AWAKE was conceived by a group of fellows and clinicians working in Family Development Clinic who had begun systematically to

18

ask mothers of children referred for child abuse, child sexual abuse, and parental bonding assessments by family and juvenile courts, social welfare agencies, and medical and mental health personnel, about their current personal experiences with victimization. Under my guidance and with the consultation of local and national experts on programs for battered women, an intervention project was conceived that constructed a link with the battered women's service community.

My research has pushed the family violence field forward in many theoretical and practical areas, drawing attention in the 1970's to the confining nature of the prevailing psychopathological conceptions on the etiology of child abuse and to the greater utility of an investigative and clinical perspective focusing on family and social stresses; conducting the first systematic evaluation of interdisciplinary practice on child abuse; proposing and demonstrating in my research and clinical work the value of the so-called "ecological" approach to understanding child abuse and related problems of parents and children; identifying and documenting the connection between child abuse and woman abuse and stimulating the design of the above-noted AWAKE Program; examining the effectiveness of family violence interventions and the impacts of family violence on the health care system; and applying a life-span developmental analysis to the impacts of family violence.

In recent years, since closing my office at Children's Hospital in 2000, I have focused my attention on the character development of boys, on the therapeutic uses of music in allaying the impacts of traumatic experience in children and adults, on the prevention of institutional abuses of children, and on justice for children in the court system. My book, The Men They Will Become: The Nature and Nurture of Male Character, has been favorably received by parents, educators, pediatricians, mental health professionals, and judges, and has provoked a number of productive consultations in schools, universities, and judicial proceedings involving children.

Music (performance, analysis, and criticism) has always been a source of deep satisfaction, and I remain curious about its therapeutic possibilities, even as I continue to perform professionally with various classical and jazz ensembles.

http://www.bostonglobe.com/lifestyle/2015/12/28/tuba-hand-acclaimed-physician-eli-newberger-delights-his-first-passion/Bw3NRBiZpquTRTH3wtGXlK/story.html

In the child abuse and family violence field, I sustain my long interest in the ethical standards of congregate care of children by serving occasionally as an expert consultant in cases of alleged abuse in educational, religious, and medical institutional settings. I also consult on the validity of allegations of child abuse and domestic violence in the setting of divorce, custody, and visitation conflicts in family, probate, and criminal court proceedings in cases where my expertise will serve the larger goal of elevating the protection and care of children.

19

KAHRAMAN 000175

**BUWALDA PSYCHOLOGICAL SERVICES, PLLC**
**Clinical, Neuropsych, and Forensic Specialties**
**1405 E. Guadalupe Rd. Tempe, AZ 85283**
**Telephone: (480)921-3314  Fax: 480-967-0174**

Ms. Kahraman will identify at least 3 ways in which, medical neglect impacts children, and at least 3 methods to resolve.

Ms. Kahraman will identify at least 3 methods for self-esteem improvement, at least 3 new ways of being assertive, 3 possible maladaptive personality traits, and at least 3 new social skills.

Ms. Kahraman will identify at least 3 methods, which facilitate bonding/attachment between herself and her children.

Ms. Kahraman will identify at least 3 methods of coping in a healthy manner, in dealing with the removal of her children.

Ms. Kahraman will identify and make reasonable efforts to make the behavioral changes needed to achieve reunification.

**BUWALDA PSYCHOLOGICAL SERVICES, PLLC**
*Clinical, Neuropsychology, and Forensic Specialties*
1405 E. Guadalupe Rd., Tempe, AZ 85283
Telephone: (480) 921-3314  Fax: (480) 967-0174
Email: krodriguez@buwaldapsychologicalservices.com

May 27, 2020

Jessica Kahraman
PID# 3874374

Dear Jessica:

This letter is to inform you and the Department of Child Safety (DCS), the discontinuation of services/individual counseling at the request of you and your attorney. As documented in court, you met your second set of goals set forth by the Department, and today the last items requested to be discussed will be addressed and noted in your progress notes. Your case at this office will be closed out, and a copy of this letter will be provided to your DCS case manager.

If you are interested in continuing services with our office, please feel free to contact our office at 480-921-3314 and schedule an appointment. Should you experience a crisis or non-medical emergency, please contact local crisis lines in your area.

**Department of Child Safety:**
1-888-767-2445
**Maricopa County**
**Suicide Crisis Hotlines:**
1-800-631-1314
602-222-9444
**Empact Crisis:** 480-784-1500
**Adult Protective Services:**
602-255-0996
**Southern Arizona Crisis Line-** Cochise, Graham, Greenlee, La Paz, Pima, Pinal, Santa Cruz and Yuma Counties Crisis Line- (866) 495-6735
**National Suicide Prevention Lifeline:**
1-800-273-TALK (8255)

**In the case of a medical emergency, dial 911.**

Kelly Rodriguez, Psy.D., CSOTP
Licensed Psychologist