# EXHIBIT O

## DECLARATION OF JESSICA MANN (FKA KAHRAMAN)

I, Jessica Mann, state and declare as follows:

1.     I am over the age of 18, a resident of Maricopa County, State of Arizona, and am competent to testify and to make this Declaration. I have personal knowledge of the matters stated in this Declaration and if called to testify, would do so as stated herein.

2.     I am the Mother and Ahmet Kahraman is the father of twin boys, K.K. and D.K., who were diagnosed with autism at age 22 months.

3.     While at Banner,  Dr. Miga completed his assessment and found that K.K. was experiencing issues with his heart. Dr. Miga attributed K.K.'s health decline to a possible metabolic disorder and chronic GI Issues.

4.     Dr. Miga recommended that K.K.'s diet be broadened and he assured us that Banner dietitians and we worked with them to introduce one new food every day.  We did have dietitians that came by and we followed (and exceeded) their instruction to introduce one new food every day. Kenan continued to react to these foods and reactions were reported and photographed, when possible. We were told by Dr. Miga that we would have outpatient care from a dietitian when we were sent home, in order to make sustainable changes and overcome food intolerances. This never happened due to removal.

5.     I fully cooperated with the Arizona Department of Child Safety ("DCS") during K.K.'s hospitalization and participated in a meeting with DCS and numerous hospital staff.  On December 28th, 2018, we created a care plan for K.K. and I believed we would move forward from there. I learned the next day that DCS had already applied to remove my children from my care but did not notify me of that on the 28th.

6.     On December 29, 2018, Ahmet and I were forcibly removed from K.K.'s hospital room by Banner security and Mesa Police officers at the request of DCS. This occurred in front of K.K. who was horrified and begged for us to stay.

7.      I was unable to see my children again until DCS provided supervised visitation in late February 2019.  DCS did offer for me to see my children after Kenan was discharged. However, because Ahmet and I  were working with advocates who told us not to agree to any of DCS' terms, they would not allow us to see the children until we agreed to all their terms and cooperate with SWHD contracts. We did so in late February and saw the boys in the last days of February.

8.      On April 18, 2019, Ahmet and I discovered that there were high levels of toxic black mold in our home; specifically in the children's bedroom and bathroom. We immediately began procedures to rid our home of the mold.

9.      Environmental medical specialist, Dr. Ronald Peters, and the boy's pediatrician, Dr. Scott Jensen, agreed there could be a connection between mold and the boys' adverse health symptoms.

10.     Ahmet and I both were tested for mycotoxin (i.e., mold toxicity) and we were both found to have significant levels of mycotoxins.

11.     Once we found out about the mold, we immediately moved out of our home, were treated for mold exposure, and our symptoms improved.

12.     We also learned from our doctors that the toxic mold could be an explanation for the reactions and sensitivities that K.K. and D.K. were experiencing with various foods and could also explain their muscle weakness, leg pain as well as Kenan's heart condition, hypothyroidism and both boys' small stature.

13.     We immediately notified DCS and asked that the children be tested for mold exposure because this exposure could explain, at least partially, the medical issues identified in December 2018.

14.     We asked the Juvenile Court to have the children examined by Dr. Melanie Alarcio, formerly at Phoenix Children's Hospital, a pediatric neurologist specializing in mold toxicity to determine if the children were victims of mold.

15.     Madison Bell, DCS case manager, refused to consider that mold could be an explanation and fought hard to prevent our children from being tested for mold exposure.

16.     Ms. Bell doubled down claiming to others that I had Munchausen Syndrome by Proxy aka Factitious Disorder Imposed Upon Another ("MSBP/FDIA") and that I intentionally harmed my children.

17.     Throughout this case, DCS case manager Bell made it almost impossible for me to complete DCS services so I could reunite with my children. Ms. Bell did the following:

- Twisting or misrepresenting my words to make it appear that I was not complying with services.
- Creating new treatment goals once I completed the previous goals.
- Insisted that I would put my children back on the GAPS diet despite my telling her verbally, in writing, numerous times and through providers that I would not use the GAPS diet in the future.
- Bell testified that I still trusted Ms. Plotner which was not true.
- Ignored my warnings about domestic violence perpetrated by Ahmet and Ahmet's increased consumption of alcohol.

18.     When Ms. Bell hired Dr. Kelly to do a medical records review, I offered to be interviewed by him if my attorney was present, which Dr. Kelly declined.  Dr. Kelly did not have a full family or social history on us, nor a complete set of pertinent medical records.

19.     During a meeting I had with Ms. Bell and the Assistant Attorney General assigned to the case in January 2020, I warned them both that Ahmet had begun drinking heavily and had become abusive.

20.     Due to Ahmet's drinking and abusive behaviors, I informed Ms. Bell and the Assistant Attorney General that I was going to divorce Ahmet and I was concerned how this would affect K.K. and D.K.

21.     Before I could file for dissolution of marriage, Ahmet discovered my plans and filed first. The only ones who knew about my plans were my attorney, Ms. Bell, her supervisor Mecca Temple, and the Assistant Attorney General.

22.     Ms. Bell and DCS did not take my warnings about Ahmet seriously and to my knowledge did not investigate his drinking and domestic violence.

23.     Once Ahmet learned of my plans to divorce him, he told me I was no longer the children's mother and that he would ensure I would never have custody of them again.

24.     To further this goal, he completely changed his story with DCS and began blaming me for K.K.'s hospitalization and saying that I had intentionally harmed the children through the GAPS diet and that he played no role in this decisions.

25.     Once Ahmet turned against me, DCS and Ms. Bell quickly sought to reunify Ahmet with the children and ignored my warnings about his domestic violence and alcohol abuse.

26.     Ms. Bell agreed with Ahmet to sever my parental rights while telling me that she was working to reunify me with my children.

27.     At the January 6, 2020, hearing before the Juvenile Court, Attorney General Katie Martonick informed the Juvenile Court about the allegations of father excessively drinking. There were a handful of dates on which Ahmet was required to report for testing and he did so. I remember one of them was declined. DCS used solely this to refute his drinking problem.

28.     DCS refused to investigate or acknowledge Ahmet's threats or actions deeming him a safe parent.

29.     Ahmet repeatedly told me and others that he would never co-parent and he would not have to communicate with me about our children.

30.     Ms. Bell insisted I complete the ACCEPTS Model in therapeutic visitations at Southwest Human Development ("SWHD") before I could be reunited with my children.

31.     The ACCEPTS Model was created to treat perpetrators of child abuse who had a DSM-5 diagnosis of MSBP/FDIA.

32.     I have never been diagnosed with MSBP/FDIA or any other mental illness.

33.     Ms. Bell and SWHD were especially insistent that I complete step one of the ACCEPTS which was for me admitting that I intentionally abused or harmed my children.

34.     I never intentionally harmed my children; I would not lie and say that I did to placate Ms. Bell and SWHD.

35.     Ms. Bell ignored DCS providers who told her that I was a safe parent and that she should loosen the restrictions on my visits with my children by letting me progress to unsupervised visits and provide meals from home so I could show that I was not a danger to them.

36.     Ms. Bell refused, claiming that I would put them back on the GAPS diet which was not true.

37.     I had provided healthy, nutritious meals from Door Dash for more than a year and I had met with a nutritionist who helped me learn about proper meals planning and helped me create sample menus for the children's meals.  Ms. Bell ignored all this and refused to lift these restrictions.

38.     After DCS dismissed the Dependency in November 2020, our case went to the family court.

39.     As soon as the family court could get us a hearing in the early part of 2021 I received unsupervised parenting-time with my children including overnight visits.

40.     After the food restrictions were lifted, I continued to provide appropriate meals and the boys had no recurrence of their food sensitivities nor were they ever malnourished or in danger while in my care.

41.     In May 2021, Ahmet and I reached an Agreement for our divorce which included orders for our children. We agreed to joint legal decision-making of the children with equal parenting time.

42.     The Family Court judge ordered my attorney to draft the Decree and Parenting Plan and for Ahmet and his attorney to review and sign it.

43.     Instead, Ahmet refused to sign the Agreement, then took the Order from the Juvenile Court granting him temporary sole custody and sent it to the children's teachers and medical providers to cut me out off from being able to make educational or medical decisions or speak with their providers.

44.     In November 2021, the family court held a hearing and signed the Agreement according to the terms reached in May 2021.

45.     Ahmet's drinking continued and I requested that he be tested for drinking through the family court.

46.     In September 2022, Ahmet contacted my attorney and requested to voluntarily terminate his parental rights to K.K. and D.K.

47.     Ahmet voluntarily relinquished his parental rights and turned full custody over to me.

48.     Once he turned over the boys to me and upon returning their belongings, he urinated on the boys' clothes.

49.     Ahmet has had no contact with the boys since September 2022, including no birthday calls, cards, gifts, or visits and no holiday calls, cards, gifts, or visits. Nor has he attended any of their school or sports functions.

I declare under penalty of perjury that the foregoing is true and correct.  I further declare that my electronic signature affixed here is intended as my legal signature.



Jessica Mann

# Declaration of Jessica Mann.v4

Final Audit Report                                    2025-02-25

| | |
|---|---|
| Created: | 2025-02-25 |
| By: | Jenny Jansch (jjansch@gillaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA2hQhl2OoByuzwU2rxrUpo3aAoUU5gewb |

## "Declaration of Jessica Mann.v4" History

Document created by Jenny Jansch (jjansch@gillaw.com)
2025-02-25 - 11:41:51 PM GMT

Document emailed to Jessica Mann (jessicamannlac@protonmail.com) for signature
2025-02-25 - 11:41:56 PM GMT

Email viewed by Jessica Mann (jessicamannlac@protonmail.com)
2025-02-25 - 11:47:33 PM GMT

Document e-signed by Jessica Mann (jessicamannlac@protonmail.com)
Signature Date: 2025-02-25 - 11:52:10 PM GMT - Time Source: server

Agreement completed.
2025-02-25 - 11:52:10 PM GMT

Adobe Acrobat Sign