# EXHIBIT Q

DECLARATION OF TIMOTHY TURNER

I, Timothy Turner, declare as follows:

## I.      Expert Qualifications

I have been retained by DeeAn Gillespie-Strub, attorney for the Plaintiffs, to analyze the records related to the claims in the case known as Kahraman v. Arizona, et al., Case No. CV-22-00375-PHX-SRB.

I am an expert in the field of social work and specifically the appropriate standards for child protective services and best practices during investigations of alleged child abuse and neglect. I have a Bachelor of Science Degree in Criminal Justice and Social Work; as well as over 200 hours of specialized training in all aspects of child protective services. I retired in 2017 following a 20-year career as a social worker and social worker supervisor for at risk families. My abilities include advanced assessment skills and the practice of solutions-based efforts in which clients are encouraged to participate. I possess strong leadership skills within my area of expertise.

Since 2017, I have owned and operated Turner Consultant Services in which I have participated in 48 child abuse cases in eight different states, twenty in Arizona alone. My Curriculum Vitae is attached as Exhibit A.

## II.     Documents Reviewed

In giving the opinions set forth below I have reviewed declarations of the following witnesses:

**Dr. Eli H. Newberger**, pediatrician with 50 years of experience in the treatment of child abuse victims.

**Ann Schroeckenstein**, PSY.D., Licensed Psychologist since 2012 specializing in forensic work in child abuse and neglect cases.

**Mary Oakley, PSY.D.,** Licensed Psychologist who was brought into this case by DCS to complete a psychological profile of the mother, Jessica Kahraman.

**Alyssa Simpson**, RDN, CLT, dietary nutritionist, who examined Ms. Kahraman's practices when feeding her children and found no concerns.

**Dorothy Mann**, maternal grandmother to the twins.

**Laura Jochai**, Clinical Mental Health Specialist in Maricopa County since 2015, who was a therapist treating Ms. Kahraman in group therapy.

**Shannon Southwick**, Online Holistic Health and Fitness Coach for Ms. Kahraman, who performed at home habilitation and respite care for D.K. and K.K.

**Dr. Nicole MCCants**, Doctorate Level Physical Therapist, who worked with D.K. and K.K. during the latter part of 2018, hired to evaluate the effects of the GAPS diet on the boys.

**Firishta Gheyasi Cubillo**, Supervisor for the habilitation program at A Brighter Clinic, who oversaw the clinicians working with D.K. and K.K. from 2015 to 2018.

**Dr. Scott Jensen, M.D.**, treating physician of D.K. and K.K. who oversaw their GAPS diet and who was hired to evaluate whether black mold present in the Kahraman home, unknown to the parents, may have contributed to D.K.'s difficulty with walking.

**Ronald Peters, M.D.**, MPH, of the MindBody Medicine Center, who treated Jessica Kahraman for symptoms that were connected to her exposure to toxic black mold in her home.

**Michael B. Kelly, M.D.**, who was the only person to diagnose Ms. Kahraman with an undiagnosed mental health condition, based solely on a records review, and no in-person meeting between the mother and Dr. Kelly. This was one of the only

2

professionals that DCS paid any attention to while ignoring the opinions of all the other professionals on this list.  DCS paid him a lot of money for his opinion.

Additionally, I've reviewed for this declaration documents found online regarding the 4th Amendment to the Constitution; 42 U.S.C. §1983; A.R.S. §12-641; DCS Court Reports; CASA Court Reports; records related to Munchhausen Syndrome by Proxy (MSBP) otherwise known as Factitious Disorder; online research on medical symptoms connected to toxic black mold exposure as well as DCS Policies and Procedures.

## III.    Case Background

D.K.  and K.K. are twin boys born to Jessica and Ahmet Kahraman in 2012. They were diagnosed with autism in 2014 and in 2015, diagnosed with food sensitivities which their parents were properly treating medically.  They were working in conjunction with the Arizona Department of Developmental Disabilities (DDD) which provided services to the family and had representatives in the parent's home frequently.  In 2016, K.K. developed severe pain in his legs and had difficulty walking.  Both boys continued to suffer from a variety of other conditions as their health worsened.  They had never been the subject of a DCS complaint.

## IV.    Munchhausen's Syndrome by Proxy (MSBP)

DCS policies are specific in requiring a parent's prior history be considered before they decide to remove children from the home, which they did on December 28, 2018.  Dr. Ryan Stewart, M.D. diagnosed K.K. with malnutrition and failure to thrive.  He blamed both parents for mistreating their children due to Munchhausen's Syndrome by Proxy (MSBP) also known as Factitious Disorder, an extremely rare condition that most doctors will not see during their careers.  It is alleged but seldom substantiated as a cause of child abuse requiring DCS intervention.  This type of

neglect allegation virtually always involves the mother.  It is even rarer for a father to be diagnosed with MSBP which created a questionable belief by Banner Hospital and DCS that MSBP was the cause.

In fact, following a twenty-year career in CPS, I have only been involved in one MSBP child abuse complaint that required intervention.  In that case, hidden cameras were set up in the hospital room that caught the mother holding the baby's nose closed until the heart monitor went off and hospital staff responded with a Code Blue.  That was a substantiated case of MSBP by CPS when I was working in Texas. The case being doggedly pursued by DCS against the Kahramans involved nothing of the sort.  Apparently, Dr. Stewart determined the parents were afflicted with MSBP because of some blood work as well as a naïve definition of the disease of MSBP.  In fact, most of the medical professionals who provided declarations for this case were adamant that the parents, particularly Jessica Kahraman, showed no signs of MSBP based on the medical records reviewed.

Munchausen Syndrome by Proxy is defined as a psychological disorder in which a caregiver fakes or causes illness or injury in another person, usually a child under age six, to gain attention or sympathy.  True MSBP is a form of child abuse that requires immediate intervention from authorities and medical professionals. The caregiver may lie about the symptoms, tamper with tests, or harm the child directly. However, there must be a diagnosis of MSBP by a licensed professional first.

There is absolutely nothing about the Kahraman parents that meets the above definition. They were following medical advice and had no intent to harm the boys. The advice on the GAPS diet turned out to be ill advised but once again the parents were doing what they believed to be best based on good advice.  When they realized that advice may be harmful to their children, they changed course and began to follow the advice of more traditional doctors. Following questionable medical

4

advice is not MSBP. They had never been the subject of a DCS investigation and Jessica Kahraman was a licensed professional in the community.  The typical MSBP mother has low self-esteem and seeks attention or sympathy.  It is my opinion that DCS rushed in to accuse the parents of MSBP when it appeared from a records review that DCS did not understand the syndrome.  Even after toxic mold was discovered in the family home which could have contributed to the twins' medical issues, DCS refused to consider anything other than MSBP.  It fell below the standard of care for confirmation bias to take over the state's investigation.

## V.    Confirmation Bias

Confirmation bias is a cognitive bias that occurs when people process information in an illogical, biased manner.  Once people have developed an opinion about an issue, as happened in this case, they have difficulty processing information in a rational, unbiased manner.  Banner Hospital as well as DCS became fixated on an MSBP determination and caused confirmation bias in the nursing staff which led to confrontations between the parents and hospital staff.  MSBP is very rare and difficult to prove unless the children develop sudden acute symptoms while their parent is in the room and improve when they are not in the room.  This does not describe the situation in this case.  The boy's conditions only significantly improved after the children moved out of the home and were removed from the toxic mold environment.  This was environmental and not child neglect.

While K.K. was in the hospital, he was safe so there was no justification for an emergency removal.  There was no need for a TCN. On DCS's insistence, D.K. was examined by doctors at Banner who confirmed that he was not in any medical distress and did not need hospitalization. There would have been plenty of time to file a petition in which both sides could present their case to the judge before any authority to take the children from the home could be issued.

Additionally, DCS did not inform the judge that the boys were diagnosed with autism and were under the care of medical specialists who never saw any signs of abuse or neglect.

Dr. Stewart, who was relatively new to the medical profession as well as a new staff member at Banner Hospital, was the primary driving force in diagnosing MSBP in both parents and using this as an excuse for DCS to compel the removal of the children.   As stated before, none of the medical professionals who gave declarations for this case saw any symptoms of MSBP.  Dr. Newberger stated on page two of his report that he spent three decades as the medical director of the child protection team at Boston Children's Hospital.  He stated that his review of the children's medical records showed no concerns of anything other than the twins' autism diagnosis and no suspicions of failure to thrive or MSBP.    Ann Schroeckenstein Psy.D., on page 25 of her report, stated that the visitation notes she reviewed on Jessica Kahraman indicated that she established expectations and limits and being appropriately attentive to potential safety concerns for the boys.

During the mother's three years of forced exile from her children by DCS, she completed numerous parenting classes and cooperated fully with services.  There was never any concern regarding her behavior or parenting of her children and that the only barrier to reunification was her refusal to admit that she intentionally harmed her children.  DCS should have petitioned the court to restore her rights to the boys much sooner than they did in my opinion.

## VI.    Present Danger

There was no longer any present danger, if there ever was any at all.  After removal, Mr. Kahraman began excessively drinking. Mr. and Mrs. Kahraman eventually decided to divorce due to Mr. Kahraman committing domestic violence against his wife and drinking excessively.  He made a threat to remove the boys from

the country and take them to his native county of Turkey. Nevertheless, DCS rewarded the father with full custody for making adverse statements about his wife and accusing her of MSBP. These dubious adverse statements about Mrs. Kahraman confirmed DCS's theory of the case and allowed the Department to continue on a single-minded purpose. Mrs. Kahraman was not a danger to her children, yet she was being punished by DCS, once again, due to confirmation bias. This fell well below the standard of care and violated the mother's civil rights as DCS failed to even seek out a less intrusive option, as policy requires, before considering removal. DCS could have instituted a voluntary safety plan or at the least an In-Home Dependency. Either option would have protected the children while leaving the family intact. It was reckless on the part of DCS to encourage the father to fabricate details of his home life that were accusatory of the mother. DCS placed the boys in danger when they supported full custody for the father and no real plan for reunification with Mrs. Kahraman. DCS had no consideration of her rights and based the removal on something that Jessica Kahraman was never diagnosed with, MSBP. Yet, DCS moved to terminate the mother's parental rights based on their confirmation bias, but the Judge could apparently see through it.

## VII.   Malfeasance of DCS

Jessica Kahraman is an intelligent woman who loves her children. This is verified through an email communication dated March 31, 2020, between Jessica and the DCS Ongoing Case Manager, Maddie Bell. This email is part of this lawsuit and should be considered a partial list of misrepresentations by DCS during the nightmare they put Mrs. Kahraman through to reunify with her children. Among the mother's concerns were ways in which caseworker Bell took her words out of context and even brazenly documented statements that Jessica insists she never made. A review of the DCS case records will confirm these misrepresentations by

the caseworker into the official record if they were documented properly at the time. It is my opinion that DCS often fails to disclose actual case notes between the worker and the supervisor which would paint a clearer picture of what was going on at the time. However, some DCS caseworkers simply decide not to write it down even though DCS trains their caseworkers that if it isn't written down, it didn't happen.

However, DCS callously seized the boys prior to proving any neglect by Mrs. Kahraman and substantiated her in the DCS system for a belief with no verification. This fell below the standard of care in my opinion because DCS put the cart before the horse. They failed to establish probable cause to justify taking the children. They placed the boys in harm's way when they placed them with Mr. Kahraman. There was nothing stopping him from taking the children out of the country to his native Turkey. There was no safety plan instituted by DCS for the boys while they were with their father. Mr. Kahraman never participated in services and was never required to do so by DCS the same way they required Mrs. Kahraman to engage in services. My review of the DCS records disclosed during discovery revealed that the records speak very little about the father but extensively about the mother, particularly after the father turned against the mother to assist DCS is its case against her.

From the age of two, D.K. and K.K., once their autism and food sensitivities were diagnosed, were in frequent contact with various medical professionals with their mother's support. All those medical professionals are mandated reporters. They are required to contact DCS to report any suspected child abuse or neglect they encounter while providing services to a child or family. None of these medical professionals ever saw anything that made them suspect MSBP or any other mental health condition in Jessica Kahraman that exposed the boys to abuse or neglect. Thus, there were no previous calls to DCS on this family when they arrived at Banner Hospital and went under the care of Dr. Stewart. Some of the professionals working

8

with the children were employed and trained by the Arizona Department of Developmental Disabilities (DDD) and they were the most appropriate people to evaluate the boys' medical conditions and report anything that concerned them as possible abuse or neglect during the four years they worked with the boys. They never did.

Sarah Kramer, from DCS, was provided with a long list of these medical professionals and doctors by Mrs. Kahraman including many listed in the beginning of this report. Ms. Kramer, apparently with her supervisor's approval, only contacted two of the professionals on the list. When it became apparent to Ms. Kramer that these calls were in support of Mrs. Kahraman and against the DCS theory of MSBP, she simply stopped contacting the rest of the professionals on the list. This fell below the standard of care since, according to DCS policies and procedures and Arizona law, one of the caseworker's duties was to evaluate any evidence available regarding the claim of abuse or neglect, including exculpatory information that refutes the claim or tends to support the parent.

Ms. Bell and DCS apparently had blinders on when it came to Jessica Kahraman having MSBP which was, once again, never diagnosed and never proven by DCS. In fact, DCS deliberately failed to inform the court that the boys were autistic and had been working with DDD for four years. I concur with the belief that this was judicial deception by omission. The court was never aware of all the relevant facts due to DCS purposely not providing the information. Sarah Kramer violated her statutory duty to protect the rights of the mother and children while she was working with the family. This is a due process issue.


## VIII. Toxic Mold

The Center for Disease Control reports that toxic mold may cause many serious health issues. For some people, mold can cause a stuffy nose, sore throat,

coughing and wheezing, burning eyes, or skin rash.  People with asthma or who are allergic to mold may have more severe reactions.  Immune-compromised people, such as the twins, and people with chronic lung disease may get infections in their lungs from mold.

On April 19, 2019, toxic mold was discovered in the Kahraman home.  It was especially prevalent in the bathroom and bedroom where the boys slept.  The parents were both found to have heavy mold exposure when Mrs. Kahraman sought medical care for her health-related issues; those issues were eliminated once she was removed from the mold.  Many of the conditions from which the boys were suffering could have been caused by their continued exposure to toxic mold since their birth.  Nevertheless, DCS failed to even consider this possible cause because it didn't fit their theory that Jessica suffered from MSBP.

Banner Hospital failed to establish that either parent suffered from MSBP and it was never proven by DCS from a child welfare prospective.  Nevertheless, DCS substantiated Mrs. Kahraman for MSBP related neglect without ever providing proof and forced her to comply with the MSBP protocol without ever receiving a diagnosis.  DCS failed in their statutory duty to thoroughly investigate the allegations of abuse when they dismissed the mold theory without any mold testing.  Furthermore, Dr. Gray states in his report that the twins' labs show their proteins were within normal limits and did not suffer from malnutrition, but from Mycotoxicosis due to mold exposure.  As wards of the State, DCS was under a duty to ensure the twins received adequate health care. Refusing to have them tested for mold when the Department learned of their exposure was negligent and fell below the standard of care.

One of the medical professionals that DCS failed to contact was Dr. Scott Jensen, M.D., the primary care physician for the twins.  He submitted a letter early in the case in which he discussed that the presence of black mold could be related

to, and explain, some of the boy's symptoms.  He recommended that the boys be seen by a specialist in mold exposure.  DCS refused to ever follow up on this recommendation and actively fought against having the boys tested for mold exposure.  Instead, DCS accused the parents of failing to take responsibility for their actions that led to neglect of the children.  This was a ludicrous assumption by Maddie Bell which was another attempt to manipulate the official record by making unproven assertions in her court documentation. DCS deliberately misled the court by doubling down on their MSBP theory to the exclusion of all other plausible theories.

## IX.    DCS Expert Witnesses

Mary Oakley, Psy.D., CMPC, of Stride Psychology, conducted psychological evaluations of both parents. She did not diagnose either parent with MSBP. She also evaluated the parents' current mental health functioning and their ability to parent and provided professional recommendations.  DCS provided her with their own documentation, and she interviewed and evaluated Mrs. Kahraman. DCS apparently chose to ignore her recommendations even though she was their witness.

On December 2, 2019, DCS compounded their unethical actions by paying a reported $30,000 of taxpayer money to secure the opinion of Dr. Michael B. Kelly M.D., an out-of-state, so-called specialist in diagnosing mental illness in parents.  He was hired to discredit Jessica Kahraman and accuse her of MSBP.  It was another expensive attempt by DCS to manipulate the facts of the case and point blame towards the mother.  This report is part of this lawsuit and should be reviewed in full.  The conclusion of Dr. Kelly's report stated that Mrs. Kahraman was suffering from an undiagnosed mental health condition and the only way to prove this was for Mrs. Kahraman to give DCS full access to all her medical records.  This did not happen and never should have been suggested because DCS used this as another

11

excuse to claim that mother was not cooperating with the Department. In fact, this was a violation of the mother's civil rights to keep her medical information private under HIPPA.

While DCS was desperately searching for anything to support their MSBP determination, they had the audacity to claim that placing the children back with their mother would be placing them in danger. The irony was that DCS put them in danger when they supported full custody for the father. Mr. Kahraman was already accused of domestic violence against Jessica as well as excessive alcohol abuse and had stated he wanted to remove the children from the United States to his native country of Turkey. DCS argued that full custody by the father eliminated the concern of present danger by the mother. However, the opposite was true. There was no present danger concern with mother and granting full custody to father contributed to present danger when the children were given to the father with no input from the mother. DCS apparently made no efforts to supervise the children while they were with their father.

This, as well as many of the issues in this case is a result of coercion. The DCS records disclosed so far indicate that the Department routinely violated Mrs. Kahraman's constitutional right to be from government interference to raise her children. The precedent federal case is Wallis v. Simpson, 202 F.3d at 1141-1142.

## X.    Conclusion

In conclusion, it is my opinion that DCS and their representative, Maddie Bell, fell well below the standard of care in child welfare by failing to consider exculpatory evidence, such as the professional opinions of several medical professionals and social workers and instead insisting on maintaining a weak, unprovable allegation of MSBP, a rare condition that is often alleged but seldom proven. For DCS, it appeared to be a convenient excuse for the unexplained

12

symptoms afflicting D.K. and K.K. even though the theory of toxic mold affecting the boys appeared the more plausible explanation. Rather than correct course and ensure the children's best interests were served, DCS refused to reconsider their theory that mother medically neglected her children due to MSBP. DCS's actions are especially egregious because DCS had no credible evidence to prove mother suffered from MSBP but continued to push that narrative and even sought to fabricate evidence to support that baseless theory.

Not only does the evidence demonstrate that DCS refused to consider any other explanation but their own, and lied about it to the court, it also demonstrates a callous disregard for the civil rights of Mrs. Kahraman and the children. In response to Mr. Kahraman changing his statements to implicate his wife of MSBP symptoms in the family home, the Department literally placed D.K. and K.K. in danger by consenting to their full custody being delivered to him. He had already publicly threatened to take the children out of the country and had already committed acts of domestic violence. Tellingly, Mr. Kahraman later entered into a voluntary custody agreement with Jessica Kahraman giving her full custody of the boys and voluntarily severed his own parental rights.

In my twenty years as a CPS investigator and eight years as an expert witness in DCS/CPS lawsuits, I have never seen such egregious failures of the standard of care and violations of parents' constitutional rights by a governmental child protection agency like DCS. It is my opinion that in the Kahraman case, DCS and its employees and agents severely overstepped their authority and manipulated the court to manufacture the result they wanted. They lied in their paperwork and repeatedly violated the rights of the mother and children in their court documentation. DCS teaches their case managers to document, document, document. If it wasn't written down at the time, it never happened is their training

philosophy.  Here DCS used that same policy to create false documentation to try to prove that MSBP happened, when, in fact, it never did.

All my opinions were reached and are made within a reasonable degree of certainty and probability within the field of children's social services.  Should further discovery provide additional information the right is reserved to amend this report.

Respectfully submitted,

Timothy Turner (Aug 23, 2023 06:46 PDT)                    8-22-2023
_____
Timothy Turner, CPS Consultant

Date:  August 22, 2023

14

Exhibit 1

**660 Tahoe Ct • Ukiah, CA 95482 • (760) 524-8187 • timturn9@outlook.com**

# *Timothy Scott Turner*

## QUALIFICATIONS:

My educational qualifications include a Bachelor of Science Degree in Criminology with a minor in Social Work; as well as over 200 hours of specialized training in all aspects of child protective services. I worked for 20 years as a senior social worker and social work supervisor for at risk families. My abilities include advanced assessment skills and the practice of solutions-based efforts in addition to strong leadership skills.

I have now retired from the field as my consultant business has expanded. For the past 9 years, I have also served as a legal consultant and expert witness in legal matters related to the proper standard of care required by CPS procedures, training, and personnel.

## EXPERIENCE AS A CHILD WELFARE CONSULTANT & EXPERT WITNESS:

After serving as a professional consultant/Expert Witness in the field of child welfare for the past decade, I have participated in 48 lawsuits since 2011. I've completed assignments, written reports and provided deposition testimony for cases filed in Federal Court in Arizona, California, Nevada, North Carolina, Washington; State Courts in New York and Wisconsin, as well as state lawsuits in the California counties of Contra Costa, Placer, San Bernardino, Sonoma, and Santa Clara. A list of cases I've participated in will be provided upon request.

## EXPERIENCE IN CHILD PROTECTIVE SERVICES:

Three years with Mendocino County Health and Human Services Department, Ukiah, CA. ER Investigations Supervisor/ Social Worker V.

Two years with Fairfax County Department of Family Services, CPS Division, Fairfax, VA. CPS Specialist III.

Three years with Mendocino County Health and Human Services Department, Ukiah, CA. Social Worker III.

Three years with San Bernardino County Department of Children and Families, Victorville, CA. Social Services Practitioner.

Two years with the Clark County Children and Families Division, Las Vegas, NV. Specialized Investigations, Sex Abuse Investigator.

Three years with Arizona Department of Economic Security, CPS Division, Prescott Valley & Kingman, AZ. Investigative Specialist III.

Two years with New Mexico Children, Youth and Families Dept. CPS Division, Farmington, NM. CPS Senior Investigator.

15

Five years with Texas Department of Protective and Regulatory Services, San Angelo (1988-90) & Austin, TX (1993-96).  CPS Specialist II and III.

# 230822 - Kahraman Declaration

Final Audit Report                                         2023-08-23

| | |
|---|---|
| Created: | 2023-08-23 |
| By: | Jenny Jansch (jjansch@gillaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAwd7EyRwGDHdm3Knd7t9gSikgMcbCWQho |

## "230822 - Kahraman Declaration" History

📄 Document created by Jenny Jansch (jjansch@gillaw.com)
2023-08-23 - 2:31:08 AM GMT

📧 Document emailed to Timothy Turner (timturn9@outlook.com) for signature
2023-08-23 - 2:32:38 AM GMT

📄 Email viewed by Timothy Turner (timturn9@outlook.com)
2023-08-23 - 1:39:37 PM GMT

✒️ Document e-signed by Timothy Turner (timturn9@outlook.com)
Signature Date: 2023-08-23 - 1:46:18 PM GMT - Time Source: server

✅ Agreement completed.
2023-08-23 - 1:46:18 PM GMT

**Adobe Acrobat Sign**