# EXHIBIT R

Princess Lucas-Wilson, MSW, CPM
451 West Knight Lane
Tempe, Arizona 85284


February 23, 2024

GillespieShields
7319 N. 16th Street
Phoenix, AZ  85020


RE:    Kahraman v. The State of Arizona *et. Al.*

Dear Ms. Gillespie Strub,

I have reviewed records regarding Ms. Jessica Mann (previously Kahraman), Ke       and D
               (twin sons) and Ahmet Kahraman (Ms. Mann's ex-husband) to offer my professional
opinion regarding the following questions per your request:

1.  When DCS has an open dependency case, does the ongoing case manager have a responsibility to
keep her mind open to new information that may arise during the dependency case?


2.  A few months into this dependency, Mother first learned and promptly informed the ongoing case
manager that the townhome where the children resided since birth was contaminated with black mold,
and that a medical professional told her that living in the contaminated home had impacted her health.
The mold exposure report was dated 4/15/19. Should ongoing case manager Bell have cooperated with
the parents' request to have the children tested for mold exposure as part of her ongoing case
management responsibilities?


3.  In light of the mandate in A.R.S. § 8-456 for DCS to conduct a "prompt and thorough investigation"
and to "protect the legal and due process rights of children and families from the time of the initial
contact through case closure," and given Mother's disclosures regarding the boys' exposure to black
mold and her request for further investigation into whether exposure to black mold may have caused or
contributed to the boys' physical symptoms, was it case manager Bell's responsibility to ensure the boys
were tested for mold exposure? Did case manager Bell's resistance to the parents' request to have their
children tested for mold exposure violate the parents' and children's due process rights? If so, please
explain.


4.  When supervised visitation records documented that Mother was consistently feeding her children an
unrestricted diet as recommended, should DCS have then (i) increased the length and frequency of visits
between the boys and Mother; and (ii) lifted the food restrictions placed upon Mother?

5. After Dr. Oakley, Psy.D., completed her DCS-mandated psychological evaluation of Mother on 4/16/19 and did not make any findings of factitious disorder (FDIA), should case manager Bell have respected Dr. Oakley's determination and promptly provided the children unrestricted access with their Mother?

6. Mother filed for divorce from Father because his inability to effectively cope with the children's removal by DCS led to him having anger issues and committing domestic violence. Should DCS have been suspicious of Father's motives and dramatic change of position from one aligned with Mother to one in opposition to Mother?

7. Was there any factual basis noted in the records you reviewed that would justify case manager Bell's (i) animus towards Mother, or (ii) her disparate handling of Mother's visitation or custody of the boys in contract to those of Father?

8. Mother's actions during the dependency proceedings demonstrated her willingness to work with the professionals involved in the case. Concurrently, her children's health steadily improved after they were removed from the mold-contaminated environment. Given that Mother did not cause the mold and was unaware of its existence until after DCS removed the children from her care and considering Dr. Oakley's professional opinion that Mother did not have FDIA, was there a factual basis to continue to keep the children separated from their Mother?

9. Dr. Newberger submitted his comprehensive report on 5/7/20. Did case manager Bell have a responsibility under A.R.S. § 8-456 to consider Dr. Newberger's concerns as expressed in his report? As follows:

- Separation from a caregiver (i.e. Mother) is severely threatening for the child, irrespective of the quality of the child's experience with the parent.

- Father's perspective of the children's activities and health might be less informed than Mother's

- [Case manager Bell] appears to be rigidly stuck in a false narrative that Mother is dangerous, delusional and harmful to her children

- Father's counseling records reveal he has inappropriately taken to blaming Mother. Mother also reported being the victim of domestic violence, which can include emotional abuse. DCS's enabling of Father's dysfunction and need for control is domestic violence by proxy in seeking to use the courts to control and punish Mother.

- There is ample evidence in this record demonstrating Father's characterological preoccupation with control. Such an inordinate need for control is a major feature underlying domestic violence, both emotional and physical. DCS should be concerned for the dramatic shift in Father's perspective of Mother's care of the children, as well as its long-term implications for the character development of his sons were they to be transferred to his exclusive care.

PLW_001183

- DCS should recognize that Father has taken advantage of Mother's disfavor with DCS to try to punish her by taking the children from her. His counseling records reveal that he now claims she should be jailed. Father's current position regarding Mother is consistent with previous accounts of Father's emotional reactiveness, immaturity and failure to prioritize the children's best interests. Father's pride and need for control is further demonstrated by his adamant refusal to consider co-parenting.

- [Father's] previously stated intention to kidnap the boys and take them to Turkey, and his engaging people he knows to "make people disappear" has become more threatening to [Mother] in light of his angry and harassing behavior.

- Father should also be provided a clear warning that if he were to violate custodial orders and remove the children from the state or the country, it could result in criminal consequences and the removal of parental privileges.

10. Is the fact that Father chose to abandon his children after the Family Court sought to hold him accountable for alcohol abuse and anger management issues consistent with Dr. Newberger's warnings to case manager Bell that DCS's management of this matter was enabling a man with domestic violence tendencies? Was it unreasonable for the case manager to disregard Dr. Newberger's warnings in favor of her own personal opinions?

11. Was it contrary to the children's best interests for case manager Bell to fast-track them to Father's sole custody given Dr. Newberger's warnings about Father's need for control, as well as his disrespect for Mother and his threats to take the children to Turkey?

12. Dr. Newberger warned case manager Bell about Father while Drs. Schroeckenstein and Oakley highlighted Mother's nurturing and protective parenting capacity. Is it indicative of bias that case worker Bell ignored the professional recommendations of these Ph.D.-level providers in favor of her own judgment to then restrict Mother's access to two supervised two-hour visits per week while fast-tracking the children's return to Father's sole legal custody?

13. Do the records you reviewed present any justification for case manager Bell's pursuit of severance of Mother's parental rights, especially given that the guardian ad litem did not concur with severance? Is case manager Bell's decision to change the case plan to severance of Mother's parental rights indicative of bias against Mother?

14. After Dr. Kelly rendered his opinion for DCS, case manager Bell arranged for Mother to return to Dr. Oakley for a follow-up evaluation. Dr. Oakley reviewed Dr. Kelly's report with Mother and again ruled out FDIA and further recommended loosening the visitation restrictions case manager Bell had placed upon Mother. Given that case manager Bell had access to Dr. Oakley's second report, as well as Dr. Schroeckenstein's positive reports of Mother's interactions with her sons, and Dr. Newberger's warnings about Father, was it unreasonable for case manager Bell to recommend that the dependency be

PLW_001184

dismissed with sole legal custody to Father while maintaining severe visitation restrictions on Mother? Did case manager Bell abuse her power and authority by disregarding multiple Ph.D.-level opinions if she disagreed with those opinions?

15. After the children were released from DCS custody, within months, Mother exercised equal parenting time and joint legal decision making with her sons with no evidence that they lacked nutrition or any other adequate parental care. Do those facts support Mother's position that she was not a danger to her children? Do those facts support the position that case manager Bell abused her authority in enabling a multi-year separation of the boys from their Mother?

16. Case manager Bell had access to the following exculpatory information about Mother:
- Dr. Oakley's evaluation ruling out a diagnosis of FDIA;
- Consistent reports of Mother providing her children an unrestricted diet;
- Consistent reports of Mother's nurturing parenting skills during visits;
- Both parents' request for mold exposure testing after providing DCS with a report of the black mold contamination in the home where the children were raised and resided immediately prior to removal.

Given that information, was case manager Bell justified in spending $30,000 for a separate opinion from Dr. Kelly to justify the continued separation of the children from their Mother? Is case manager Bell's persistence in seeking the opinion of Dr. Kelly an indication of confirmation bias on her part?

17. During the dependency, after Mother filed for divorce and Father reacted by becoming hostile toward Mother, should DCS have provided the family with family therapy services, particularly co-parenting skills classes and anger management classes for Father, to mitigate Father's control issues which Dr. Newberger warned about in his report?

Please note these questions are addressed in the summary section of this document.

"On 12/20/2018, the SCAN team at the hospital was consulted for an evaluation. Several reasons for the evaluation were noted, including 'the child's current highly regimented diet does not provide sufficient caloric intake for normal growth/development and has contributed to his extremely poor nutritional status." There was also concern that mother reported seeing 'parasites' in Kenan's stool and did not seek follow up care for this. There was a 'recent evaluation at PCH neurology for the inability to walk that resulted in recommendations for MRI, NCV, EMG - which parents deferred due to fears of general anesthesia.' It was noted in the evaluation that 'the medical team is concerned that the child's health has been directly impacted by parent's belief system that values natural adult therapeutics in lieu of accepted pediatric standards of care. Unfortunately, this has likely resulted in the child's current critical cardiac status, overall poor nutritional state and de conditioning that has lead to an inability to ambulate.' Maria Chico reported that 'the child is at high risk for further/ongoing poor medical/nutritional status in his current environment.'"

PLW_001185

The children were taken into DCS custody in December 2018.   Reunification efforts were stared during this time.  However, due to case worker mis-management caused by the failure to adhere to best practices in child welfare, the children experienced unnecessary trauma and prolonged out-of-home placement.  According to the records reviewed, it is important to note despite the mis-management of the case (in my opinion), both boys are now healthy and thriving due to Mother's consistent efforts to provide a safe and nurturing environment.

**Educational, Training and Professional Experience**
MSW 1998, School of Social Work, Arizona State University
BSW 1975, School of Social Work, Arizona State University
Post Graduate Studies, School of Social Work, Arizona State University
Post Graduate Studies, Educational Psychology, Arizona State University

**Certifications**
Arizona State University Certification on Public Management
Arizona Community College Teaching Certification
Master Teaching Certification (Maricopa County Community College District)
Quality Matters Certification (Maricopa County Community College District)

**9/2016 – 11/2016:**  Contracted as an Expert Witness by the Arizona Attorney General's Office. Performed case review and prepared written materials in preparation for testimony

**Jan. 2015 to Dec. 2015**- Arizona Department of Child Safety/Arizona State University contracted Trainer for Bachelor and Masters level professionals and law enforcement officers with diverse educational backgrounds in Social Work, Psychology, Behavioral Health, Early Childhood Development, and Criminal Justice etc. I contracted to train Cultural Awareness, Family Dynamics, Introduction to Child Abuse and Neglect, Parent/Child Visitation, Introduction to Sexual Abuse, Case Planning and Family Centered Practice.

**2011 – 2014**:  Executive Director, FIBCO Family Services, Inc. (Non-Profit Community Based Social Services Agency) – Responsible for executive level management of various Programs and Budgets. Managed group homes for pregnant and parenting teens in Foster Care and group home for adults with developmental disabilities.    Other FIBCO programs included feeding/clothing programs for homeless and low- income individuals and families, support services for Refugee populations, job readiness, employment services, housing for individuals with disabilities and program development for a group home with pregnant/parenting teens and their infants/toddlers.  I was also responsible for management/ development of community partnerships/resources, and the hiring, supervision and evaluating of direct service professionals/clerical staff/volunteers

**2004 – 2010**:  Program and Policy Manager, Arizona Department of Economic Security, Division of Developmental Disabilities- Analyzed/drafted/revised public  policies and rules regarding: administration, eligibility, plan development, plan monitoring, services, assessment, early intervention programs, case closures, child welfare for children/youth with developmental disabilities, contracting and payment for services, third party liability, special programs, consumer's

     PLW_001186

rights and responsibilities, abuse and neglect, safety, confidentiality of records, grievances and appeals etc. for statewide use.  Solicited and managed policy reviews involving community leaders, department heads, advisory groups, internal committees and various stakeholders from diverse cultural and professional backgrounds.  Collaborated on strategies for "one stop" approaches to service delivery.  Responsible for program development, budget management for federal grants; credited by the Centers for Medicaid and Medicare Services for effective program development and collaboration with Northern Arizona University. Chaired Policy/Rule committees with executive level staff

**2001 – 2004**:  Area Program Manager, Arizona Department of Economic Security, Division of Developmental Disabilities-Hired, supervised and evaluated a culturally diverse staff. Managed operations for a foster care program serving 300+ families, infants, toddlers, preschoolers, children and youth.   Responsible for facilitating high level crisis management, effective service delivery, served as District lead on an interagency committee in order to make recommendations for program improvement for abused and neglected children/youth with behavioral health needs; credited with enhancing collaborative efforts between government agencies to improve service delivery.  Also responsible for 30+ employees, linked with diverse community and government service providers to improve program effectiveness; credited with linking technologies between the Division of Developmental Disabilities, Juvenile Court and Child Protective Services to streamline procedures. Provided technical assistance for child welfare practice statewide for diverse populations; responsible for budget management and credited with enhancing collaborative efforts between government agencies to improve service delivery.

**1996 – 2001**:  Training Officer, Arizona Department of Economic Security, Administration for Children Youth and Families.   Responsible for professional level staff training and development for staff with diverse cultural backgrounds. Delivered training to social work/child welfare professionals, attorneys and Administrative Law Judges in the following areas: identifying child abuse/neglect, sex abuse, parental substance abuse, effective leadership/management strategies and cultural competency. Also responsible for curriculum development.

 **1991 – 1996**:  Supervisor, Arizona Department of Economic Security, Administration of Children Youth and Families, Young Adult Program- Hired, supervised and evaluated diverse staff. Assessed assigned and resolved cases of abuse/neglect for youth at risk from diverse cultural backgrounds who were also adjudicated delinquent/dependent wards of the juvenile court and in some cases parenting teens.  Also responsible for program development and grant management.
.

**1987 – 1991:**  Supervisor, Arizona Department of Economic Security, Division Developmental Disabilities. Hired, supervised and evaluated a diverse staff.  Assessed, assigned and resolved cases for youth, young adults and seniors from diverse backgrounds with developmental disabilities who lived in community settings, group homes, state and private facilities.  Responsible for 15+ employees.  Monitored programs and, credited with enhancing behavioral health services for persons with developmental disabilities.

**1985 – 1987:**  Program and Project Specialist for adoption programs, Arizona Department of Economic Security- Administered/managed contracts for adoption programs for children and youth from diverse cultural backgrounds.  Responsible for budget related to state grants.  Responsible for policy and rule development.  Served as guest/lecturer at the community college and university level.  Also served as agency representative for the Intertribal Council and worked with local tribes to facilitate an Intergovernmental Agreement.

**Other Professional Experience**:  Case Management foster care and adoption services, Adoption Home Certification, Family & Marriage Counseling, Instructor for Parenting Classes, In-Home Therapy Provider, Therapist for Child Sex Abuse Perpetrators, Substance Abuse Counselor

**Community Organizations:**       Served on the Children's Action Alliances Child Welfare and Youth Transition Committees.  Served on the Citizens Review Panel for the Department of Child Safety/ Arizona State University and a community-based Foster/Adoption/Kinship committee. Officer and Executive Board member of a national Civil Rights Organization

## Instructional Expertise

**2022 – Present:**  Adjunct Faculty, Mesa Community College, Counseling Department.  Teach First Year Experience courses designed for student success and retention based on positive psychology.

**2017 – 2020:**  Full time Instructor, School of Social Work Department, Arizona State University. During this time, I taught SWG 510 Foundation Practice I, SWG 501 Micro Human Behavior in the Social Environment, 502 Macro Human Behavior in the social Environment, SWG 614 Advanced Generalist Practice IV, (Master Instructor), SWG 516 Social Work Skills Seminar, SWG 623 Program Evaluation (Master Instructor), SWU 411 Social Work Practice III, SWU 488 Advocacy Strategies, SWU 306 Ethics in Social Services and, SWU 340 Macro Human Behavior in the Social Environment. These courses explore multidimensional approaches and social work practice at the undergraduate and master's level).  I have also served as an Academic Associate for SWG 585 Macro Practice, SWG 632 Policy and serve as Field Liaison.

**2016 – 2017:**  Faculty Associate, School of Social Work Department, Arizona State University. (Taught graduate level SWG 501 & SWG 502 Social Work Courses-Human Behavior in the Social Environment; these courses examine multidimensional approaches to social work practice, SWG 514 & SWG 515 Bridge Seminar I & II; these courses explore professional social work practice at the master's level.

**2015 – 2016:**  Adjunct Faculty, Behavioral Sciences/Social Sciences Department, Paradise Valley Community College (Taught Sociology/Social Work/Criminal Justice courses: Introduction to Sociology, Racial & Ethnic Minorities, and Victimology & Crisis Management Courses).

**2010 – 2015:**  Adjunct Faculty, Counseling Department, Mesa Community College (Taught -Introduction to Multiculturalism, CPD 150 Strategies for College Success, Service Learning and Career Exploration Courses)

**2010 (Fall Semester):** Faculty Associate, School of Social Work, Arizona State University (Taught Masters Level Course-Social Work Policy)

**Summary of Records Reviewed**

1. Second Amended Complaint (pages 1 to 56)

2. Declaration of Eli Newberger, MD (pages 1-85)

3. Report from Ann Schroeckenstein, Psy.D (pages 1-25)

4. Psychological Reevaluation from Dr. Mary Oakley (pages 1-44)

5. Psychological Evaluation of Mother dated April 16, 2019 (pages 1-21)

6. Declaration of Alyssa Simpson (pages 1-3)

7. Declaration of Alyssa Simpson (pages 1-4)

8. Declaration of Dorothy (Dottie) Mann (pages 1-2)

9. Declaration of Laura Jochal (pages 1-5)

10. Declaration of Shannon Southwick (pages 1-4)

11. Declaration of Dr. Nicole McCants (pages 1-4)

12. Declaration of Firjshta Gheyasi Cubbillo (pages 1-2)

13. Progress Report to the Juvenile Court dated 1.30.20 (pages 1-14)

14. Mothers Objection (pages 1-39)

15. Letter from Dr. Scott Jensen, MD (1 page)

16. AZ Case Plan and CSRA (pages 1-39)

17. CASA Court Report (pages 1-5)

18. Case History (pages 1-7)

## Summary

Competent best practice in child welfare cases facilitate safety, well-being and permanency as the core goals.  In my opinion the following 10 factors did not facilitate the safety, well-being

PLW_001189

and permanency as mandated by best practices in child welfare regarding the Kahraman case, these factors are as follows:

1. Subjective Case Planning
2. An Incomplete Initial Assessment
3. Mis-management of Maternal Parental Visits
4. Failure to Update the Case Plan
5. Failure to Re-assess the Marital Relationship
6. Disregard for Professional Findings/Recommendations
7. Lack of Evidence to Pursue Severance
8. Unnecessary Prolonged Separation
9. Failure to Test the Children for Mold
10. Failure to Offer Father Services Related to His Detrimental Behavior

## Subjective Case Planning

In my professional opinion, it is evident the case manager did not consider all of the information available regarding Mother's ability to safely parent the children as the case evolved.  It is common for circumstances to change throughout a case once problems are identified and services are provided.  In order to facilitate a plan that is in the best interest of the children, it is imperative to continually consider new information as it develops.  Further considering all evaluations and assessments, especially those that may not fit with initial reason for the dependency case helps to make objective decisions based on the facts of the case and can potentially minimize inaccurate case plan decisions based on personal bias. (Question 1)

## Incomplete Initial Assessment & Violation of Due Process

Another area of concern is what appears to be an incomplete initial case management assessment regarding the children's physical symptoms.  Efforts to use the information related to three mold inspections for the home did not occur.  It seems this was a significant mis-step as such a verification could have either prevented or decreased the amount of time the children spent in out-of-home-placements.  In my view based on my experience as a child welfare professional, this inaction prolonged the separation of the children from their parents and denied due process as all available information was not taken into consideration to accurately assess safety risk. (Questions 2 &3)

## Mis-Management of Parental Visits

Once the records regarding the mother's visits indicated there were no documented safety risks and the children were fed a typical unrestricted diet by observation, the limitations on the mother's visits should have been canceled in order to begin a successful transition of the children back into the home.   It is also important to note consistent visitation with parents can potentially mitigate the impact of trauma children experience as a result of separations caused by out-of-placements. (Question 4)

**Failure to Update the Case Plan**

On 4/16/19 Dr. Oakley, Psy.D completed a psychological evaluation on Mother.  At this time, Dr. Oakley did not find any evidence of factitious (FDIA) disorder.  To allow the children to remain in out-of-home placement without considering (1) documented evidence indicating the absence of factitious disorder, and (2) the positive parenting behavior reportedly displayed by Mother, warranted a change in the case plan, by first eliminating the restrictive visitation schedule in support of a reunification plan.  This change in case planning could have expedited returning the children home.  In my view this particular failure by the case manager to consider additional facts exacerbated trauma for the children and also prolonged the out of home placements. (Question 5 & 7)

**Failure to Re-Assess Marital Relationship**

The Father's documented behavioral changes (anger issues, increased alcohol use, domestic violence, etc.) should have been considered in case planning. Each of these behavioral changes has the potential to not only negatively affect the marital relationship, thereby putting Mother at risk, but to also create an unsafe environment for the children which could lead to jeopardizing safety and permanency.  In my social work practice in child welfare, I witnessed the potential harm of taking one parents side.  Mitigating and resolving challenges families face in the DCS systems requires the case manager to view the family as a unit in order to pursue the most beneficial plan for the children, therefore it is a mistake to align with one parent. (Question 6)

**Loss of Objectivity Related to Mother**

It appears from the records I reviewed the case manager had an antagonistic approach to case planning involving Mother.  Despite the documented efforts by Mother to continually work on the concerns shared with her about the children's care, the case manager continued to restrict Mother's visitation without solid evidence to do so.  In contrast to what seems to have been the case manager's amicable approach to case planning involving the father despite findings shared by Dr. Newberger.  These obvious differences in approach delayed reunification as a case plan in my view which was not in the best interest of the children. (Questions 8 & 11)

**Disregarding Professional Findings/Recommendations**

Dr. Newberger's report of 5.7.20 raises serious concerns about Father's behavior and stated intentions.  Of particular concern, as documented in the counseling records, is Father blaming

Mother. In my opinion and professional experience, this type of attitude fragments families further. The Father not taking responsibility for the family issues and the health of the children could potentially aggravate problems, thus placing the children in peril. Also of concern is Mother reporting she is a victim of domestic violence and emotional abuse by Father.  It is imperative to take information from credentialed professionals into account when planning for the safety and well-being of children. Also, Father's threats to kidnap the children, and his assertion that he can contact people in Turkey who can "make people disappear," obviously could have resulted in grave consequences. However, it seems this information was ignored by the case manager.

Further, a second evaluation by Dr. Oakely recommending increased visitations, and Dr. Schroeckenstein's observations about the mother positively interacting with her sons, seems to have been ignored by the case manager. In my opinion, disregarding these findings does not adhere to best practices in child welfare and is not in the children's best interest.  Finally, the father should have not been considered for placement due to these concerns until such concerns were addressed by the case manager and resolved.  Additional services such as family therapy, anger management, and possibly a substance use assessment should have been offered to the father prior to considering him for sole custody to ensure the family's safety. (Question 9, 10, 12 & 17)

**Unfounded Pursuit to Severe Mother's Parental Rights**
In my professional experiences as a case manager, supervisor, manager in all aspects of child welfare, including all adoption proceedings/services along with severing parental rights, etc., I have seen the potential damage to children by cutting them off legally from family and their community.  I have also seen children left in legal limbo due to parents' rights being severed, and the affected children not being adopted or disrupting from their adoptive home.

It is important to note I have worked with a number of Fost/Adopt disruption cases which are extremely traumatic for children.  I have witnessed some case managers moving to pursue adoption by Foster Parents prematurely, sometimes due to animus for one parent or to expedite case dismissals and closures.  This set of events does irreputable psychological and emotional damage to children. Therefore, serious consideration is required when deciding to severe parental rights.

I did not see any supporting documentation from the credentialled professionals in the records I reviewed to merit severing the mother's parental rights.  One can only conclude in such circumstances moving from a case plan to reunite the family to severance may have more to do with a particular case manager's desire to terminate their relationship with the parent due to animus as opposed to a case plan that serves the best interest of the children.  (Question 13)

**Unnecessary Prolonged Separation**

The fact the children were well nourished after being placed with Mother, coupled with no signs of maltreatment, demonstrates Mother's ability to care for her children.  Again, a case management approach without ongoing efforts to review and consider progress made as documented by multiple credentialed professionals, can lead to bias, impede family reunification, and unnecessarily prolong separation from family and community.

Additionally, a stagnated approach to permanency planning can also result in irresponsible use of state funds to shop for professionals to confirm the case managers views, as opposed to seriously considering the findings and recommendations of the professionals with divergent conclusions. Considering all recommendations can help safeguard against confirmation bias.

Further, it is obvious that the pursuit of additional unwarranted evaluations and assessment can potentially prolong time in foster care for children. In my professional opinion and experience, the longer the separation, the more detrimental it is to children and their families.  I observed the lasting effects of this type of trauma as a manager of a foster care program for youth/young adults aging out of foster care. (Question 16)

These opinions are based on my over forty-four years of experience as a social work practitioner, instructor for parenting classes, in-home family therapist, supervisor, trainer, educator, manager and executive director in the field of child welfare, developmental disabilities and community practice.

Sincerely,
*Princess Lucas-Wilson*
Princess Lucas-Wilson, MSW, CPM
Experienced Social Work Practitioner
Educator

PLW_001193

July 8, 2024

Re: Kahraman matter

To whom it may concern,

It is my understanding that some clarification regarding my records review in the Kahraman matter has been requested. My services were obtained to serve as a rebuttal to the records review performed by Dr. Christopher Thompson and Karin Kline at the behest of the defendants' counsel in concert. As stated in my report, I have over forty-four years of experience as a social work practitioner, instructor for parenting classes, in-home family therapist, supervisor, trainer, educator, manager and executive director in the field of child welfare, developmental disabilities and community practice.

The documents I received to review were as follows:

1. Plaintiff's Second Amended Complaint
2. Declaration of Dr. Eli Newberger
3. Report of Dr. Ann Schroeckenstein
4. Psychological Evaluation by Dr. Mary Oakley
5. Psychological Reevaluation by Dr. Mary Oakley
6. 1st Declaration of Alyssa Simpson
7. 2nd Declaration of Alyssa Simpson
8. Supporting Declarations Packet
9. Declaration of Dorothy Mann
10. Declaration of Laura Jochai
11. Declaration of Shannon Southwick
12. Declaration of Dr. Nicole McCants
13. Declaration of Firishta Gheyasi Cubillo
14. Progress Report to Court – 10/20/20
15. Mother's Objection
16. Letter from Dr. Scott Jensen
17. Letter from Dr. Ronald Peters
18. DCS Case Plan and CSRA
19. Report to Court – 1/18/19
20. Addendum Report to Court – 1/25/19
21. Report to Court – 12/6/19
22. Progress Report to Court – 4/27/20

23. Progress Report to Court – 8/4/20
24. Progress Report to Court – 10/30/20
25. CASA Report – 12/12/19
26. CASA Report – 5/12/20
27. CASA Report – 8/12/20
28. CASA Report – 11/10/20
29. Report of Dr. Michael Kelly
30. Kahraman Family Photos
31. Additional Kahraman Family Photos
32. Photo of Mother and Children
33. News Article re: Dr. Eli Newberger
34. Declaration of Tim Turner
35. Declaration of Bruce Wescogame
36. Declaration of Dr. Michael Gray
37. Case History Timeline
38. Motion for Parenting Time
39. Order for Unsupervised Parenting Time
40. Consent Decree
41. Expedited Motion for Temporary Orders
42. Motion to Modify Child Custody
43. Order Terminating Father's Rights
44. Report of Dr. Christopher Thompson
45. Drue Kaplan-Siekman Expert Disclosure Statement
46. State Defendants' Expert Witness Disclosures
47. Drue Kaplan-Siekman 1st Supplemental Expert Disclosure Statement
48. State Defendants' 1st Supplemental Expert Witness Disclosures
49. Drue Kaplan-Siekman 2nd Supplemental Expert Disclosure Statement
50. State Defendants' 2nd Supplemental Expert Witness Disclosures
51. Southwest Human Development's 4th Supplemental Disclosure Statement
52. Report of Karin Kline
53. Report of Dr. Frank LoVecchio
54. Rebuttal Report of Karin Kline
55. Rebuttal Report of Dr. Frank LoVecchio
56. Rebuttal Report of Dr. Christopher Thompson

I would be happy to answer any further inquiries with regard to my records review. The conclusions from my initial report remain unchanged.

Respectfully,

*Princess Lucas-Wilson*

Princess Lucas-Wilson, MSW CPM