# EXHIBIT X

**Kahraman vs**
**The State of Arizona**                                      **Timothy Scott Turner**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Jessica Kahraman, an individual;      )
D.K., a minor, through his parent     )
and guardian Jessica Kahraman; and    )
K.K., a minor, through his parent     )
and guardian Jessica Kahraman,        )
                                      )
        Plaintiff,                    )
                                      )
        vs.                           ) Case No. 2:22-cv-00375-SRB
                                      )
The State of Arizona, a               )
governmental entity, et al.,          )
                                      )
        Defendants.                   )
_____)

VIDEOCONFERENCE DEPOSITION OF TIMOTHY SCOTT TURNER

Ukiah, California
January 23, 2025
12:29 p.m.

REPORTED BY:
TERESA A. WATSON, RMR
Certified Reporter
Certificate No. 50876

PREPARED FOR:
ASCII/Condensed

(Certified Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Kahraman vs
The State of Arizona                                          Timothy Scott Turner

2

1                              I N D E X

2     WITNESS:                                              PAGE:

3     TIMOTHY SCOTT TURNER

4          Examination by Mr. Crown                            4
           Examination by Mr. Connelly                       126
5

6                            E X H I B I T S

7     Deposition                                           PAGE:

8      1      Declaration of Timothy Turner, Curriculum Vitae    4
              and e-signature,
9             Bates TURNER_000539 - TURNER_000555 (17 pages)

10     2      Timothy Turner's File Materials,                   6
              Bates TURNER_000001 - TURNER_000538 (538 pages)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Kahraman vs                                                    Timothy Scott Turner
The State of Arizona

3

1          THE ZOOM VIDEOCONFERENCE DEPOSITION OF TIMOTHY SCOTT

2     TURNER was taken at 12:29 p.m., on Thursday, January 23, 2025,

3     with the witness appearing remotely from Ukiah, California,

4     before TERESA A. WATSON, Registered Merit Reporter, and a

5     Certified Reporter in and for the State of Arizona, County of

6     Maricopa, pursuant to the Rules of Civil Procedure.

7

8     COUNSEL APPEARING:

9     For the Plaintiff:

10         Mills & Woods Law PLLC
           Thomas A. Connelly, Esquire
11         tconnelly@millsandwoods.com
           5055 North 12th Street, Suite 101
12         Phoenix, Arizona  85014

13    For the Defendant:

14         BRUECKNER SPITLER & SHELTS PLC
           Larry J. Crown, Esquire
15         lcrown@tbl-law.com
           8355 East Hartford Drive, Suite 200
16         Scottsdale, Arizona  85255

17    Also Present:

18         Carrie Digby, Exhibit Technician

19

20

21

22

23

24

25



Kahraman vs
The State of Arizona                                    Timothy Scott Turner

47

1  elsewhere is what I review, is what's in the documentation.  If

2  it's not there or if the records aren't provided in discovery,

3  I'm not going to necessarily see all of those things.  I didn't

4  follow the court procedure word for word, hearing for hearing.

5  BY MR. CROWN:

6      Q.    And in reviewing the documents that you have been

7  provided, I did not see in there any of the court orders that

8  were issued in this dependency case involving D.K. and K.K.  Am

9  I correct on that, that you were not provided with any of the

10  court orders?

11     A.    I don't recall reading it.

12     Q.    And so my question to you is:  If there were court

13  orders issued after evidentiary hearings where witnesses

14  testified for the state and witnesses testified for the parents,

15  and the court reviewed reports prepared by both sides, would

16  those court orders be relevant to the type of opinions that

17  you've reached on standard of care?

18              MR. CONNELLY:  Form and foundation.

19              THE WITNESS:  Well, my opinions about standard of

20  care would apply to other issues besides the court rulings.  The

21  court rules how the court rules.  I can't overstep that, and I

22  wouldn't even try.  So if that's what they're -- the process

23  requires them to do, then that's it.

24  BY MR. CROWN:

25     Q.    You would agree that a basic tenet of the standard of



Kahraman vs                                                    Timothy Scott Turner
The State of Arizona

126

1   even saying that.  I'm saying documentation may or may not have

2   been withheld from the Court before they made those decisions.

3   That is my opinion.

4        Q.    Okay.  So it may or may not have been withheld.  That

5   sounds like speculation to me.  Are you speculating, sir?

6               MR. CONNELLY:  Form.

7               THE WITNESS:  I believe you're doing a lot of

8   speculating myself.

9   BY MR. CROWN:

10       Q.    Do you know what an AFSA finding is?  AFSA, all caps.

11       A.    I'm sorry.  Could you repeat that?

12       Q.    Do you know what an AFSA, A-F-S-A, finding is?

13       A.    I don't believe I do.  No.

14              MR. CROWN:  Thank you.  That's all the questions

15   I have, Tim.  Appreciate it.

16              THE WITNESS:  Thank you.

17

18                      EXAMINATION

19   BY MR. CONNELLY:

20       Q.    Okay.  I may have a few, so let me see.

21              First off, you were not asked to offer an opinion on

22   whether or not any of the court orders in the juvenile

23   proceedings were properly entered; is that right?

24       A.    That's right.

25       Q.    And you were not asked to second-guess the juvenile



1   court's orders in the engagement here to provide expert opinions

2   on the standard of care of the department; is that correct?

3        A.   Yes.

4        Q.   Now, you testified that you -- you testified two times

5   in federal court, once in Arizona and once in California, I

6   think?

7        A.   Sacramento, yes, federal court.

8        Q.   And those were -- were those civil rights cases like

9   this one?

10       A.   Yes.

11       Q.   And those cases each had underlying juvenile court

12  proceedings on which the federal cases were based; is that

13  correct?

14       A.   Yes.

15       Q.   And you said you testified in federal court in front

16  of a jury.  So those were jury trials; is that right?

17       A.   Yes.

18       Q.   And so those were cases where there have been trial

19  court proceedings in the juvenile court where court orders have

20  been issued, correct?

21       A.   Yes.

22       Q.   Okay.

23            MR. CROWN:  Objection to form and foundation.

24  BY MR. CONNELLY:

25       Q.   And in those cases, the juvenile courts had authorized



Kahraman vs
The State of Arizona                                    Timothy Scott Turner

128

1    the removal of children from their families; is that right?

2                    THE WITNESS:  Yes.

3                    MR. CROWN:  Objection to form and foundation.

4    BY MR. CONNELLY:

5       Q.    And the fact that there were court orders of juvenile

6    proceedings did not prevent civil rights lawsuits from

7    proceeding to a jury trial, did they?

8       A.    No.

9                    MR. CROWN:  Objection to form and foundation.

10                   THE WITNESS:  No.  No, they didn't.

11   BY MR. CONNELLY:

12      Q.    Okay.  No, they didn't.

13            Now, the standard of care for DCS workers involves

14   more than just complying with court orders.  Do you agree?

15      A.    Yes.

16      Q.    It involves complying with Arizona statutes in this

17   case.  Do you agree?

18      A.    Yes.

19      Q.    It involves complying with both Arizona court opinions

20   and federal court opinions involving the juvenile child

21   protection statutes, right?

22      A.    Yes.

23      Q.    It involves complying with federal court decisions

24   regarding the Constitutional rights of parents and families; is

25   that correct?



Kahraman vs
The State of Arizona                                    Timothy Scott Turner

129

1               MR. CROWN:  Objection to form and foundation.

2               **THE WITNESS:  Yes.  Okay.  Yes.**

3    BY MR. CONNELLY:

4         Q.   It involves complying with the 14th Amendment; is that

5    correct?

6               MR. CROWN:  Objection to form and foundation.

7               **THE WITNESS:  The answer's yes.**

8    BY MR. CONNELLY:

9         Q.   It involves complying with the department's own

10   policies and procedures; is that correct?

11              MR. CROWN:  Objection to form and foundation.

12              **THE WITNESS:  Yes.**

13   BY MR. CONNELLY:

14        Q.   It also is a standard of care for DCS caseworkers,

15   also involves ensuring that proper visitations occur; is that

16   right?

17        **A.   Yes.**

18        Q.   And it also concerns making well-reasoned and proper

19   decisions based on when a child should be returned to a parent;

20   is that right?

21        **A.   Yes.**

22        Q.   The standard of care also involves questions about

23   whether family placements were properly considered; is that

24   correct?

25        **A.   Yes.**



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Kahraman vs
The State of Arizona                                    Timothy Scott Turner

130

1    Q.    And those are the things that you were looking at in

2    relation to your engagement in this case; is that right?

3    A.    Yes.

4    Q.    You were never asked to opine on any of the court

5    orders that were issued in this case, right?

6    A.    Right.

7    Q.    Your standard of care opinions are based on your

8    review of the DCS records and the other records that you were

9    provided in relation to the juvenile case to determine whether

10   the defendants followed DCS policies and procedures and the

11   Constitution and state law and all those other things I just

12   took you through on the standard of care; is that right?

13   A.    That's right.

14   Q.    Now, the juvenile court did not adjudicate whether or

15   not the family's civil rights have been violated; is that right?

16   A.    That's right.

17   Q.    And have you ever seen a juvenile court adjudicate

18   whether or not a family's or a child's or a family's U.S.

19   Constitutional rights have been violated?

20   A.    Not in 20 years have I seen that.

21         MR. CROWN:   Objection to form and foundation.

22   BY MR. CONNELLY:

23   Q.    What was your answer?

24   A.    Not in 20 years have I seen that in juvenile court.

25   Q.    And in your eight or ten years, whatever it is, of



Kahraman vs
The State of Arizona

Timothy Scott Turner

131

1  doing expert work, how many cases have you been involved in that

2  are civil rights cases following a juvenile dependency case?

3      A.   Well, both the cases I testified in in federal court

4  started off as CPS removals, and I'd probably say maybe ten.

5      Q.   Ten out of the 56 cases that you've worked on in the

6  past eight to ten years were civil rights cases following a

7  juvenile case, right?

8      A.   Actually, I'll revise that.  I'll say more like

9  probably ten out of the 50-something I've done.

10      Q.   Okay.  Now, Arizona state law -- well, Arizona state

11  law includes a provision that allegations of abuse and neglect

12  are to be promptly and thoroughly investigated, right?

13      A.   Yes.

14      Q.   And state law requires that the investigation pursue

15  not only facts that tend to support the allegations, but also

16  those that tend to refute the allegations, correct?

17      A.   Correct.

18      Q.   Now, does the obligation to -- oh, and you would agree

19  with me that DCS investigators and caseworkers have an

20  obligation to present to the court facts that both support the

21  allegations and tend to refute the allegations; is that right?

22      A.   Yes.  They have a duty to do that.

23      Q.   And that duty exists even if the parents are

24  represented by their own attorneys; is that right?

25      A.   Yes.



Kahraman vs
The State of Arizona                                    Timothy Scott Turner

132

1      Q.   So would it be a violation of the standard of care and

2    the caseworker's duty to not inform the court of facts of which

3    they're aware that tend to refute the allegations of neglect,

4    even if the parents have their own attorney?

5      **A.   Yes.  That falls below the standard of care.**

6      Q.   Now, as you know, DCS resisted mold testing in this

7    case to determine whether or not that was a contributing factor

8    for the conditions resulting in K.K.'s hospitalization, right?

9      **A.   Yes.**

10              MR. CROWN:  Objection to form and foundation.

11              **THE WITNESS:  Okay.  The answer's yes.**

12    BY MR. CONNELLY:

13     Q.   And as we just discussed, DCS has a statutory duty to

14    fully investigate allegations of abuse or neglect, including

15    those things that tend to refute the allegations, right?

16     **A.   Right.**

17     Q.   And does that duty carry over to an ongoing case

18    manager like Madison Bell when facts arise after the initial

19    investigation that tend to refute the allegations of neglect?

20     **A.   Yes.  That duty starts at the beginning of the case,**

21    **and it goes all the way to the end of the case.  They have to**

22    **provide evidence and information that comes along, whether it**

23    **helps their case or hurts it.**

24     Q.   And so in this case -- and the whole goal -- or the

25    whole purpose of being -- of the department is to protect the



Kahraman vs                                                Timothy Scott Turner
The State of Arizona

133

1  best interests of children and families, right?

2      A.   Yes, to keep kids safe.  That's what it says in the

3  literature.

4      Q.   Keep kids safe.  And there's an obligation to return

5  children that are removed to a family as soon as possible,

6  right?

7      A.   Yes.

8      Q.   And so if information comes in to the department

9  following a removal that might shed light on the cause of the

10  conditions that caused the child to be removed in the first

11  place, the department has an obligation to investigate those

12  new facts, do they not?

13      A.   They do.

14      Q.   And so if Madison Bell received information after the

15  children were removed in April of 2019 that the home that they

16  grew up in and were born in was -- had extensive mold

17  infestation the entire six years of their lives before they were

18  removed, she had an obligation to investigate whether or not

19  that mold had any effect on K.K.'s ability to process food he

20  was fed.  Do you agree?

21      A.   Yes.  She had an absolute obligation, because she was

22  the one that proposed it.

23      Q.   Proposed what?  Oh, she was the one that opposed it.

24      A.   Opposed it.

25      Q.   So in your professional opinion, based on your 20



Kahraman vs
The State of Arizona

Timothy Scott Turner

134

1    years as a child protection professional, and maybe even your

2    eight, ten years as an expert in child protection, why would

3    Madison Bell at DCS resist having the boys tested for mold

4    exposure to see if they had mold toxins in their body?

5                    MR. CROWN:  Objection, form and foundation.

6                    THE WITNESS:  Well, based on my 20 years in the

7    profession, my belief was that it didn't fit -- the mold theory

8    did not fit into their theory of this factitious disorder or,

9    you know, that the mother had deliberately committed some sort

10   of neglect, because the family lived in that house for years,

11   didn't know it was infested with mold.  So the worker definitely

12   had an obligation to investigate it.

13   BY MR. CONNELLY:

14       Q.   So is it your opinion that it was -- it was -- it fell

15   below the standard of care for DCS to oppose having the boys

16   tested for mold toxicity?

17                    MR. CROWN:  Objection to form and foundation.

18                    THE WITNESS:  It fell below the standard of care

19   because it was a viable alternative theory to how these children

20   became ill, and it should have been investigated properly and

21   provided to the Court.

22   BY MR. CONNELLY:

23       Q.   You were asked about Dr. Newberger a little bit, and

24   Dr. Newberger authored his report on May 7th --

25       A.   Uh-huh.

Kahraman vs
The State of Arizona

Timothy Scott Turner

135

1    Q.   -- of 2020.  And Dr. Newberger is a recognized

2    specialist in child abuse and neglect and in Munchausen's.  And

3    you've seen his report, right?

4    **A.   Yes.**

5    Q.   And you've also seen progress reports that Madison

6    Bell submitted to the juvenile court, right?

7    **A.   Yes.**

8    Q.   And you agree with me that Dr. Newberger's report

9    refutes the department's narrative in this case that the mother

10   was a Munchausen's parent, and that the GAPS diet was solely

11   responsible for why K.K. ended up in the hospital, right?

12                MR. CROWN:  Objection to form and foundation.

13                **THE WITNESS:  Right.**

14   BY MR. CONNELLY:

15   Q.   And so is that information from Dr. Newberger

16   information that refutes the allegation of neglect by the

17   mother?

18                MR. CROWN:  Objection to form and foundation.

19                **THE WITNESS:  Yes, it does.**

20   BY MR. CONNELLY:

21   Q.   And your answer was yes?

22   **A.   It does.  And I was...**

23   Q.   And --

24   **A.   Go ahead.**

25   Q.   And so then did Madison Bell, independent of whether

Kahraman vs
The State of Arizona
                                                    Timothy Scott Turner

136

1   or not the parents had lawyers of their own, or the mother had a

2   lawyer of her own, did Madison Bell have an independent duty to

3   inform the Court in one of her progress reports about what

4   Dr. Newberger was saying in his report?

5              MR. CROWN:  Objection to form and foundation.

6              THE WITNESS:  Yes.  That can be used -- that can

7   be considered exculpatory evidence.

8   BY MR. CONNELLY:

9       Q.   And a case manager, an ongoing case manager has an

10  obligation under the law, under statute, to inform the court of

11  exculpatory information, right?

12      A.   Right.

13      Q.   All right.  Just a couple of other things.

14           You were asked about how many malnutrition cases

15  you've had.  You said you've had five of them.  Are all cases of

16  alleged malnutrition necessarily cases of neglect?

17      A.   No.

18      Q.   As far as you know, are there ways that children might

19  become malnourished without there necessarily being neglect by

20  the parent?

21      A.   Yes.  There could be medical causes.  There could be,

22  you know, different things that had happened that really were

23  not allegations of child neglect.  Kids get sick.

24      Q.   And there were -- you testified a little bit about

25  Sarah Kramer, and Mr. Crown asked you all kinds of questions



**Griffin Group International**
888.529.9990 | 602.264.2230

Kahraman vs
The State of Arizona

Timothy Scott Turner

137

1    that go to the initial investigation and the removal, and you're

2    aware, are you not, that the mother provided Sarah Kramer with

3    three pages of names of people, medical professionals and

4    characters witnesses and DDD providers that she could have

5    contact during her investigation?

6        A.    Yes.  Many of them are on this list of people,

7    professionals I have at the beginning of my report.

8        Q.    And many of those people, particularly the DDD

9    providers, were in the home on a regular basis prior to the

10   removal, right?

11       A.    Yes.  I believe for two or three years.

12       Q.    And those people are mandated reporters, right?

13       A.    Absolutely.

14       Q.    And they never made a report to the DCS hotline that

15   the children were being abused or neglected, right?

16       A.    No.  The family never had a previous report prior to

17   all this.

18       Q.    And, in fact, the declarations provided by those DDD

19   people that you identify in your report state that they,

20   themselves, observed the children experience reactions to food,

21   negative reactions to foods, right?

22       A.    Yes.

23       Q.    And so did the department in -- first of all, in

24   seeking the court-authorized removal, have an obligation to

25   inform the Court in an ex parte basis -- the applications for



Kahraman vs                                                    Timothy Scott Turner
The State of Arizona

138

1    removal are ex parte, right?

2         A.    Yes.

3         Q.    Meaning the parents aren't aware of it, and they don't

4    have any opportunity to provide any contrary information to the

5    court, right?

6         A.    Right.

7         Q.    But do the -- do the DCS professionals, nonetheless,

8    have an obligations to inform the court at that point about

9    exculpatory information when they're seeking a court-authorized

10   removal?

11        A.    Absolutely.  They're supposed to provide the court

12   with thorough information to the best of their knowledge, all of

13   it.

14        Q.    And if there were still a claim for unlawful removal,

15   wouldn't it have been below the standard of care for Sarah

16   Kramer not to contact all the other people on that list after

17   she had contacted two who were -- who were supportive of the

18   parents?

19        A.    Yes.  She should have --

20              MR. CROWN:  Objection to form and foundation.

21              THE WITNESS:  She should have exercised due

22   diligence.  That's part of her job.

23   BY MR. CONNELLY:

24        Q.    Now, you were asked earlier about what medical

25   professionals recommended the GAPS diet.  Do you recall that?

139

1    A.    Yes.

2    Q.    And do you recall seeing in any of the information you

3    reviewed that Dr. Jensen, the child's -- the children's

4    pediatrician for several years before they were removed,

5    recommended the GAPS diet to the parents?

6    **A.    Yes.  It's in my report under this list when I talk**

7    **about Dr. Scott Jensen.  That -- that's documented in my report**

8    **on page 2.**

9    Q.    And then the ill-advised information about the GAPS

10   diet, you used "ill-advised" because K.K. ended up in the

11   hospital and taken away from his family.  So is that why you

12   used "ill-advised"?

13   **A.    Yes.**

14   Q.    And then you recall it was not Dr. Jensen, but it was

15   Becky Plotner, a woman in Georgia, a naturopathic doctor, who

16   oversaw the implementation of the GAPS diet?

17             MR. CROWN:  Objection to form and foundation.

18             **THE WITNESS:  Yes.  I saw that.**

19   BY MR. CONNELLY:

20   Q.    Now, from your research on mold, could mold have

21   impacted the boys' ability to process nutrients in the food they

22   were fed?

23             MR. CROWN:  Objection to form and foundation.

24             **THE WITNESS:  Yes.  It can have significant**

25   **impacts on their diet, on -- and that could be associated with**

140

1  **what they're breathing and how that substance is affecting their**

2  **body.  So yes.**

3          MR. CROWN:  Move to strike.  No foundation.

4  Witness is not competent to provide medical opinions.

5  BY MR. CONNELLY:

6      Q.   Now, you were asked about the part in your report

7  where you talk about a present danger.  That was on page 6.

8      **A.   Uh-huh.**

9      Q.   You say the first sentence of that section, "There was

10 no longer any present danger, if there was ever any at all."

11         Now, DCS, once they remove a child, they have an

12 obligation to make a de facto present danger determination every

13 six months in relation to whether the children should be

14 returned home or not, right?

15     **A.   Right.  It should be part of the re-unification plan.**

16     Q.   So every six months, the department has an obligation

17 to look at what are the factors that -- if any, that prevent

18 this child from returning to the home, right?

19     **A.   Right.**

20     Q.   And so you agree with me that that analysis that they

21 have to go through each of those every six months is akin to a

22 present danger analysis?

23     **A.   Yes.  That's part of it.**

24     Q.   Okay.  And so when you say there was no longer any

25 present danger analysis, would it be fair for us to interpret

141

1 that as meaning there was no present danger at any of the six

2 months where the department was reviewing whether or not the

3 children should be returned home?

4     **A.   Yes.  They were not in present danger while they were**

5 **in the custody of the department.  I mean, they could not have**

6 **been.  I -- my opinion was they weren't to begin with.**

7     Q.  Right.  Your opinion is there was no reason to remove

8 the children in the first place, right?

9     **A.   Right.**

10     Q.  Is it your opinion that there was no analysis or

11 consideration given to whether or not an in-home safety plan

12 would have been successfully implemented?

13     **A.   Nothing I read in the documentation.  I didn't see**

14 **where they did anything other than move to a court-ordered**

15 **removal.**

16     Q.  In your 20 years of experience as a child protection

17 specialist, wouldn't it have been appropriate -- and when I say

18 "appropriate," I mean wouldn't it have been an adequate way to

19 protect the safety of these boys to leave them in the home with

20 the parents, with a safety plan that required the parents to

21 provide a weekly or a monthly menu, a meal plan to the

22 department, provided the department with copies of grocery

23 receipts showing the kind of food that they were buying and

24 feeding the boys?

25                 MR. CROWN:  Objection.  Lack of disclosure, and



142

1  form and foundation.

2              THE WITNESS:  Okay.  You ask me again.  I'm

3  sorry.

4  BY MR. CONNELLY:

5      Q.   Based on your experience, your 20 years' experience as

6  a child protection specialist, and particularly, the

7  investigator making removal determinations, wouldn't it have

8  been appropriate in this case to have left the children -- left

9  the boys in the home under a safety plan that included things

10 such as unannounced visits by the department, the requirement

11 that the parents provide meal plans and grocery receipts showing

12 the food that they were feeding to the boys?

13             MR. CROWN:  Again, objection.  Failure to

14 disclose in violation of Rule 26.1.  Lack of foundation, and

15 form.

16             THE WITNESS:  Okay.  If I can answer, yes.  I

17 mean, they -- removing children from the home by policy, by best

18 practice in child welfare is the most restrictive option.  It

19 should only be used as a last resort, meaning that DCS workers

20 and supervisors could have used a safety plan.  They could have

21 put a safety monitor, another person that they approved of to

22 live in the home and monitor what the mom's feeding the

23 children, but also, what you were saying about all the receipts

24 and coming up -- the department would have done a case plan

25 where they would have asked for certain requirements as far as

Kahraman vs                                                    Timothy Scott Turner
The State of Arizona

143

1    food.  If Mom is complying with those requirements and providing

2    receipts, then you have no need to put kids in foster care for

3    three years.

4        Q.   And from what you -- the records you saw, the DCS

5    records you saw, an in-home safety plan was never given any

6    consideration.

7             MR. CROWN:  Objection to form and foundation.

8    BY MR. CONNELLY:

9        Q.   Is that right?

10       A.   Not that I saw.  It should have been documented if it

11   was.

12       Q.   And in your view, based on your experience, would that

13   have been a more appropriate response, more appropriate than

14   removing the children and placing them in a non-relative foster

15   setting?

16            MR. CROWN:  Objection to form and foundation.

17            THE WITNESS:  Yes.  Yes.  Anything short of the

18   last thing you said should have been considered first.

19   BY MR. CONNELLY:

20       Q.   Should the department have given consideration to the

21   medical records from the boys prior to the time that K.K. was

22   admitted to Banner in December of 2018?

23            MR. CROWN:  Objection to form and foundation.

24   And lack of disclosure.

25            THE WITNESS:  DCS should have had access to



144

1   **medical records for these kids before that happened.**

2   BY MR. CONNELLY:

3       Q.   And if they -- if they -- before they obtained the

4   medical records from people like Dr. Jensen and Dr. Jahari

5   (phonetic), who were the boys' pediatricians --

6       **A.   Uh-huh.**

7       Q.   -- and those records showed that prior to the time

8   K.K. was admitted to Banner that the boys were within the growth

9   charts and gaining weight, consistently gaining weight, should

10  that have been something that should have gone into their

11  analysis of whether or not there was reason to remove the

12  children, or should that have gone into their present danger

13  analysis when determining whether or not to send the children

14  back home?

15      **A.   I think it should have been in both, as a matter of**

16  **fact.  You know, to have the children -- you know, have you --**

17  **have all the proper information means a comprehensive record,**

18  **medical record on the kids was produced and collected, then DCS**

19  **should have documented that and filed reports appropriately.**

20      Q.   Now, in this case, as you noted, Mother was never

21  diagnosed as a Munchausen parent, correct?

22      **A.   Right.**

23      Q.   And is it your opinion that it fell below the standard

24  of care for DCS to require mother to be evaluated using the

25  Accepts (phonetic) model in therapy or in -- not therapy, but in

Kahraman vs                                          Timothy Scott Turner
The State of Arizona

145

1   the supervised visitations to determine -- to use as a basis to

2   determine whether or not -- what kind of visits she should have

3   and whether or not the boys should be returned home?

4              MR. CROWN:  Objection to form and foundation.

5              **THE WITNESS:  No.  That was not the proper use of**

6   **the Accepts protocol.  It's -- Accepts is supposed to gain**

7   **complete control over the family, and to keep them in a**

8   **Munchausen's protocol is a very strict protocol, because we**

9   **don't have a lot of real cases of Munchausen's.  And so it's a**

10  **therapy model.  It's supposed to be used with a parent in**

11  **therapy, not in visitation.**

12  BY MR. CONNELLY:

13      Q.   And it --

14      **A.   So it was wholly inappropriate in a visitation**

15  **setting.**

16      Q.   And it's also to be used only in those cases where the

17  parent has been diagnosed with Munchausen or factitious

18  disorder; is that right?

19      **A.   Yes.**

20             MR. CROWN:  Objection to form and foundation.

21  BY MR. CONNELLY:

22      Q.   Now, do you agree with the statements that courts do

23  not micromanage how DCS goes about discharging its duties in

24  child neglect cases?

25             MR. CROWN:  Objection to form and foundation.

146

1          **THE WITNESS:  I agree with that statement.**

2    BY MR. CONNELLY:

3          Q.    And you were asked all kinds of questions about court

4    orders in the hearings.  The preliminary protective hearing is

5    not an evidentiary hearing, is it?

6          **A.    No.**

7          Q.    And status hearings that occur during a course of a

8    dependency are not evidentiary hearings, are they?

9                MR. CROWN:  Objection to foundation.

10               **THE WITNESS:  They are not.**

11   BY MR. CONNELLY:

12         Q.    Is it your experience as a -- your 20 years'

13   experience as a court -- or a child protection specialist that

14   juvenile courts give undue deference to the department

15   representatives in abuse and neglect cases?

16               MR. CROWN:  Objection to form and foundation.

17               **THE WITNESS:  Yes, based on my experiences.**

18   **That's why I think I said to an answer earlier that it**

19   **doesn't -- even the court-authorized removals don't happen that**

20   **often.  So DCS basically is given -- and CPS in general is given**

21   **a lot of leeway by the juvenile courts.  They -- the court is**

22   **more inclined, unless it's something egregious, to believe**

23   **whatever DCS tells them.  So DCS is going to tell them what**

24   **makes their case.**

25               MR. CROWN:  As I said, objection to form and



147

1  foundation.  Move to strike this entire line of questioning.

2  BY MR. CONNELLY:

3      Q.  Do you know how often judges rotate onto and off of

4  the juvenile court dockets?

5      **A.  On a fairly regular basis, because the juvenile --**

6  **judges, I believe, are -- want to move up.**

7      Q.  So --

8              MR. CROWN:  Objection, form and foundation.  Move

9  to strike.

10  BY MR. CONNELLY:

11     Q.  In this -- let's use the totem pole analogy.  In

12  the -- where do juvenile courts fall on the totem pole of

13  judicial assignments?

14             MR. CROWN:  Objection to form and foundation.

15             **THE WITNESS:  Towards the bottom.  They're more**

16  **family court related, so...**

17  BY MR. CONNELLY:

18     Q.  And in general, judges don't sit on those benches for

19  more than two years; is that right?

20     **A.  That's right.**

21     Q.  And that may be one of the reasons that they give

22  undue deference to the department.  Do you agree?

23             MR. CROWN:  Objection, form and foundation.

24             **THE WITNESS:  I think it's one reason.  Yes.**

25  ...

148

1  BY MR. CONNELLY:

2      Q.    Now, you were asked about reasonable efforts findings.

3  The court makes reasonable effort findings at status hearings

4  without receiving any sworn evidence or testimony; is that

5  right?

6                MR. CROWN:  Objection to form and foundation.

7                **THE WITNESS:  In a large part, yes.**

8  BY MR. CONNELLY:

9      Q.    And would you agree with me that the court has to make

10 reasonable effort -- that the department made reasonable efforts

11 in order for the department to receive state and federal funds?

12                MR. CROWN:  Objection to form and foundation.

13                **THE WITNESS:  I do believe that they are tied**

14 **together, yes.**

15 BY MR. CONNELLY:

16     Q.    And do you agree with me that the finding that the

17 department made reasonable efforts is more of a check-the-box

18 finding than it is a litigation issue?

19                MR. CROWN:  Objection to form and foundation.

20                **THE WITNESS:  Yes.  It's a checkbox kind of**

21 **thing.**

22 BY MR. CONNELLY:

23     Q.    And if the court didn't make the findings that the

24 department made reasonable efforts to return the children home

25 or to not remove them in the first place, the department might

149

1   not receive a significant portion, in this case, of a billion

2   dollar budget that it has; is that right?

3                MR. CROWN:  Objection to form and foundation.

4                **THE WITNESS:  My belief is that, yes.**

5   BY MR. CONNELLY:

6       Q.   I may have asked this question in a different way

7   earlier, but I'm going to ask it again just in case I didn't,

8   but as an investigator, if you contacted collateral witnesses

9   during an investigation to provide information that supported

10  the parents and did not support removal, was there a duty to

11  include that information in the ex parte application for

12  removal?

13      **A.   Yes.**

14      Q.   And if you're an ongoing caseworker and you come into

15  possession of information that supports the parents, does not

16  support the continued removal, do you have a duty to inform the

17  court about that information?

18      **A.   Yes.  That goes to -- that goes to -- trying to say --**

19  **the future.  It goes to re-unification efforts.  Sorry.**

20      Q.   And that duty exists in the department's

21  representatives, irregardless of whether or not the parents have

22  lawyers themselves; is that right?

23      **A.   Yes.  They have an obligation to the government, not**

24  **to the attorney.**

25      Q.   They have an obligation to the court and to the people

150

1  of the State of Arizona, right?

**2       A.   Yeah.  Yes.  That's what I meant.  Yeah.**

3       Q.   You said that there were some instances in which you,

4  in your 20 years, including the time you were in Arizona, served

5  as -- served in the ongoing role, ongoing case manager role,

6  right?  Correct?

**7       A.   Correct.**

8       Q.   And in the role as an ongoing case manager, if a

9  therapist that the department has provided to provide services

10  to a parent says that the parent has met the treatment goals, is

11  that something that the caseworkers should be overriding?

12            MR. CROWN:  Objection to form and foundation.

**13            THE WITNESS:  No.  It's part of the exculpatory**

**14  information.  I mean, especially when they hired the expert, and**

**15  now they don't want to listen to their own expert.  So, you**

**16  know, that is below the standard of care.**

17            MR. CONNELLY:  All right.  I don't think I have

18  any other questions.

19            MR. CROWN:  We don't have any questions further.

20            Tim, do you want to read and sign your

21  transcript?

**22            THE WITNESS:  Sure.  Yeah.**

23            MR. CROWN:  Okay.  So show signature reserved,

24  and we're done.

25            (Deposition concluded at 5:14 p.m.)



**Kahraman vs**
**The State of Arizona**                                              **Timothy Scott Turner**

151

1

2

3        _____

4              Timothy Scott Turner

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

