# EXHIBIT BG

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MARK BRNOVICH
Attorney General

JANNA L. JOHNSON
Assistant Attorney General
State Bar No. 030792
CFP/PSS
120 W. 1st Avenue, 2nd Floor
Mesa, Arizona 85210
Telephone: (602) 771-4000
PSSSef@azag.gov

Attorneys for the Department of Child Safety

CLERK OF THE
SUPERIOR COURT
FILED

C. Mohammed DEP

2020 AUG 20  AM 10: 55

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| In the Matter of: | No. JD532206 |
|---|---|
| D`      K<br>   d.o.b. - - - - - - - - -<br>K]        K,<br>   d.o.b.        ! | **DCS'S RESPONSE AND OBJECTION TO MOTHER'S MOTION FOR CHANGE OF PHYSICAL CUSTODY TO BOTH PARENTS** |
| Person(s) under 18 years of age. | (Honorable Jennifer E Green) |

The Department of Child Safety (DCS or the Department), by and through undersigned counsel, hereby requests that the Court deny Mother's Concurrent Motion for Change of Physical Custody to Both Parents.

Mother's statement that that she's done "significant work over the last three months since the May 12 hearing" actually echoes DCS's concerns that Mother previously failed to meaningfully engage in services, particularly Southwest Human Development therapeutic visitation, before the Rule 59 hearing. *See Attachment A – Progress Report to the Court dated August 4, 2020.* Father, on the other hand, progressed through therapeutic visitation, parent aide, and his counseling over the course of the last

eight months. As this Court has stated previously, "in many dependency cases, parents progress at different levels." *See Minute Entry – Order Entered by the Court, dated July 28, 2020, filed July 30, 2020.* In this case, Father has demonstrated an ability to appropriately and safely parent his children and make safe medical decisions regarding their care. Mother has only begun to do the hard work and has not demonstrated the same behavioral change. While Mother continues to report she is taking full accountability, Mother undermines her position by emailing Father's providers and stating Father has "unfounded fears." *See Attachment B – email from Mother to Dr. Elizabeth Capps-Conkle, dated July 28, 2020.*

Additionally, the children's therapist, Jennifer Young with JFCS, notes significant concerns regarding Mother's behaviors at CFTs that illustrate Mother has not yet made an internal behavioral change. *See Attachment C – email from Jennifer Young to Madison Bell, dated August 19, 2020.* Ms. Young has observed Mother at CFTs for the children for a prolonged period and noted she has "yet to observe mother accept any responsibility for her actions without minimizing the consequences of her choices, and blaming or deflecting consequences to another party." *Id.* As a result, Ms. Young is not prepared to recommend Mother begin the necessary family therapy between Mother and the children. *Id.*

Notably, there is no provider or professional even recommending unsupervised visitation for Mother and the children, a necessary recommendation in any transition to reunifying with the children. While Mother continuously touts completing treatment goals with Dr. Rodriguez, she does not acknowledge that the provider she switched to, Dr.

Celice Korsten, recommended Mother begin EMDR therapy. Additionally, she has not yet opined as to whether Mother can safely parent her children in an unsupervised setting.

Mother seemingly asserts her motion on two additional points, one being that the boys love her and are bonded to her. The Department does not doubt the children love Mother; and does not indicate otherwise. Likewise, both the Department and Father have advocated support for continued supervised visits with Mother should the Court grant the Department's request for change of physical custody to Father. However, there is a marked difference between a bond and an ability to appropriately and safely parent.

Mother also asserts that there is "substantial risk that if the children are returned solely to Father, [the children] will be subject to alienation from their Mother and emotional peril from their Father." *See Mother's Motion at Page 2, lines 1-4.* This statement is unfounded and inaccurate; at the TDM held on August 10, 2020, Father reiterated his support for Mother's presence in the children's lives. Additionally, it ignores entirely the underlying reasons why the children came into care in the first place.

Mother's motion continues on to *again* request a new visitation provider and a new case manager. The Department maintains its objections for reasons previously stated in various filings. These repeated requests reflect her pattern of seeking out providers who agree with her perspective on the case.

///

///

///

///

3

For the foregoing reasons, the Department respectfully requests this Court deny Mother's Concurrent Motion for Change of Physical Custody to Both Parents.

RESPECTFULLY SUBMITTED this 20 day of August, 2020.

MARK BRNOVICH
Attorney General

JANNA L. JOHNSON
Assistant Attorney General

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Attachment A

CT04400 (7/19)

# PROGRESS REPORT TO THE JUVENILE COURT

**Court Case Number**   JD532206       **Date of Report**   08/04/2020

**Case Name**      KAHRAMAN, JESSICA      **Case ID** 608484

**A.**  **Name and date of birth for each child subject to this court case number.**

    3874373 K/      I, D            DOB: (
    3874372 K/      I, K/           DOB: (

**B.**  **Child or children subject to this report if different from above.**

    N/A

**C.**  **Family composition.**

    Jessica Kahraman -  Mother
    Ahmet Kahraman - Father
    K     Ka       - Child
    D     Cal     - Child

**D.**  **If the family has or may have American Indian tribal affiliation, efforts to identify and contact the child's tribe and confirm the child's membership status or eligibility for membership.**

    N/A

**I.**    **REASON FOR DCS INVOLVEMENT**

      **A.**  **Description of the dangerous condition(s) currently occurring within the family that require Department involvement; including how the parent, guardian, or custodian's behaviors cause the child to be unsafe or at substantial risk of harm and, if applicable, why the child(ren) are removed from the parent, guardian or custodian's custody.**

          It is concerning that upon completion of the review of the children's medical records, "there are concerns that placing the children in the home of Ms. Kahraman places them at significant danger for additional harm". It is also concerning that Ms. Kahraman either is "intentionally attempting to evade detection or has lost touch with reality" due to what she reports to the doctors and her lack of follow up of medical needs, such as seizures.

          Since the release of Dr. Kelly's report, there have been opposite reactions from the parents. Ms. Kahraman denies that anything in the report in true and that if she had been allowed to meet with Dr. Kelly, the result would be different. Ms. Kahraman was offered many times, however she has declined. Ms. Kahraman reports she has no problem meeting with him, however her attorney has directed her not to. Ms. Kahraman's previous therapist Dr. Rodriguez reported that mother was not taking full accountability and reports that mother is very intelligent. Ms.

Kahraman is struggling to release control over situations that are outside of her control. Ms. Kahraman attempts to direct what can and cannot occur in Mr. Kahraman's home. Ms. Kahraman recently emailed Mr. Kahraman's therapist and his attorney, where she is stating again that Mr. Kahraman's conclusions are based on inaccurate or incomplete information. It is concerning that Ms. Kahraman is reporting that the GAPS diet and her choice to put them on the diet is what caused the malnourishment and the heart failure but is reporting that Mr. Kahraman's conclusion are based on inaccurate information. There is conflicting information on whether or not Ms. Kahraman truly takes accountability for her actions and the consequences her actions had on her children. Ms. Kahraman is continuing to place blame on others for her actions and why she has not made progress in this case.

Mr. Kahraman has filed for divorce and the parents are now living separately.

Ms. Kahraman is continuing to disagree with Dr. Kelly's report and spends more time dissecting and trying to explain away the concerns that DCS and providers have by sending numerous emails detailing why what DCS and the providers say is inaccurate or taken out of context. Ms. Kahraman is not open to critical feedback or discussion, which is what Dr. Oakley reported would be necessary in order for a positive prognosis of being able to safely parent her children in the future. Ms. Kahraman continues to blame a variety of outside sources for the malnutrition and are struggling to let go of some control regarding the children's medical needs.  In May 2020, Ms. Kahraman informed Southwest Human Development that she was unwilling to discuss treatment plans goals except for coping skills and what is occurring directly in visitation on that day.

## II.    SAFETY PLANNING

### A.    If applicable, efforts to locate missing parent(s).

The whereabouts of Ms. and Mr. Kahraman are known at this time.

### B.    The current safety plan, including whether it is an in-home plan or out-of-home plan, the actions that are necessary to control the dangerous condition(s), when those actions are needed, the adults responsible for carrying out the actions, and any supportive resources to support the safety actions.

Dylan and Kenan Kahraman are residing in out of home care in a licensed DDD foster home.

### C.    Efforts to implement the least intrusive plan that is sufficient to control the dangerous conditions, including explanation of why the safety threats can or cannot be managed in the home; and for American Indian children, the active efforts to provide services designed to prevent the breakup of the Indian family and the outcome of these efforts.

The safety threats are unable to managed in Ms. Kahraman's home due to there being no appropriate responsible adult that can reside in the home.

**D.    If applicable, the conditions for return as described in the safety plan.**

Mrs. Kahraman recognizes and articulates that her behaviors are causing physical and emotional harm to Kenan and Dylan.

Mrs. Kahraman displays genuine remorse and has open and honest conversations regarding her behavior.

Mrs. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits.

Mrs. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mrs. Kahraman will allow the safety monitor to re-direct her.

Mrs. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so she, Mr. Kahraman, Dylan and Kenan, safety monitors and providers are safe.

Mr. Kahraman recognizes and articulates that Mrs. Kahraman's behaviors and Mr. Kahraman's lack of intervention are causing physical and emotional harm to Kenan and Dylan and displays and ability to protect his children - MET

Mr. Kahraman displays genuine remorse and has open and honest conversations regarding his behavior. - MET

Mr. Kahraman allows providers and responsible adults access to the home when asked, both scheduled and unannounced visits. - MET

Mr. Kahraman demonstrates a willingness to follow the safety plan and abide by the direction of the safety monitor and providers. Mr. Kahraman will allow the safety monitor to re-direct him. - MET

Mr. Kahraman has consistently demonstrated an ability to maintain a home environment that is calm and predictable so he, Mrs. Kahraman, Dylan and Kenan, safety monitors and providers are safe.  - MET

## III.    IDENTIFICATION, LOCATION, AND ENGAGEMENT OF EXTENDED FAMILY MEMBERS AND OTHER IMPORTANT CONNECTIONS (only applicable for children in out-of-home care)

**A.    Results of efforts to identify, locate, contact, and engage adult relatives of the child, including grandparents, great-grandparents, adult siblings, parents, step-parents who have custody of any siblings, aunts, uncles, first cousins, and persons who have a significant relationship with the child; and if known, information about each person's willingness to be a potential out-of-home caregiver for the child.**

Maternal grandparents were assessed as placement, however were denied due to not understanding the safety concerns and aligning themselves with the parents by refusing to provide food to Kenan when he was hungry.

Maternal great uncle has expressed an interest in being placement for the children on a long term basis if needed, however he resides in an retirement community and would have to purchase a new home in order to have the children placed in his care. If the children need permanent placement, the uncle is willing to purchase a new house.

**B.    Description of the child's important connections, including information**

**provided by the child, parents, and/or guardians; and efforts to maintain these connections.**

Maternal grandparents are allowed to attend 2 visits a month with the children in order to continue the relationship. Maternal great uncle has expressed a desire to see the children, however mother has denied him being able to attend visitation.

**C.    Description of contact between the child and the child's relatives, friends, former foster parents and any connections the child identifies; and if contact is restricted, the reasons why.**

Dylan and Kenan have supervised visitation with Ms. Kahraman and maternal grandparents at this time.

Dylan and Kenan have unsupervised visitation with Mr. Kahraman.

**D.    Efforts to maintain cultural connections, including opportunities for the child to build cultural awareness, identity, and involvement.**

Ms. and Mr. Kahraman can bring cultural activities and traditions to visit to share with the children. Paternal grandparents will video call into visitation from Turkey. Foster placement shares the same religious beliefs as Mr. Kahraman as is educating the children on the Islamic faith.

**IV.    CHILD FUNCTIONING, SERVICES, AND LIVING ARRANGEMENT**

**A.    The child's physical, developmental, and emotional functioning; including the child's medical, dental, behavioral health, and developmental needs and services.**

D     is 7 years old and is placed in the same foster home as his twin brother, Ke    K     n. D    enjoys spending time with his brother, K     and his foster brother. Dy    used to have a fear of dogs, however now is no longer afraid of placement's dog. D'    is open with JFCS for behavioral health services. D' engages in individual counseling as well as some sessions with his brother K The therapist is working with D     on speaking up for himself and emotional expression. D     has expressed that he controls his food now and not his parents.

Ke    is 7 years old and is placed in the same foster home as his twin brother, Dy    Ka    . Dy    enjoys spending time with his brother, Dy    and his foster brother. K     used to have a fear of dogs, however now is no longer afraid of placement's dog. D '    is open with JFCS for behavioral health services. Ke engages in individual counseling as well as some sessions with his brother Dy ' The therapist is working with K     on emotional expression and his anger. K expressed anger towards his father by scratching him out of photos. Ke    has expressed that he controls his food now and not his parents. K     heart failure has completely resolved itself since being on a proper diet. K     is being titrated off of the thyroid medication, as his lab work has come back as normal.

**B.    The child's academic status and social development, including the child's needs and services, and efforts to ensure the child's educational stability.**

Dylan and Kenan just started the 2nd grade and there are no concerns noted. Due to COVID and their medical health history, the children are currently being homeschooled.

**C.   For youth age fourteen or older in out-of-home care, efforts and plans to assess and provide services to support the youth's preparation for adulthood.**

N/A

**D.   History of living arrangements (placements), including the length of time the child has been in out-of-home care (if applicable), and the type and dates of each living arrangement.**

D
12/28/2019-01/11/2019: DDD Licensed Foster Home
01/11/2019-Current: DDD Licensed Foster Home (with

Ke
12/28/2019-01/07/2019: Cardon's Children Medical Center
01/07/2019-Current: DDD Licensed Foster Home (with           )

**E.   Description of the child's current living arrangement, including the type; whether this living arrangement is consistent with the Department's placement preferences; and if the child is in out-of-home care and not living in the home of a grandparent, other relative, or person who has a significant relationship with the child, the reasons why such placement has not been identified or is contrary to the child's best interest.**

Dy   and K       reside in a licensed DDD foster home.

**F.   If the child is an Indian child, efforts to place the child according to ICWA placement preferences and active efforts to provide culturally appropriate services.**

N/A

**G.   If the child has a sibling in out-of-home care, efforts to place siblings together; and if not placed together, the specific reasons why this did not occur or reasons why this would be contrary to the child's or sibling's safety or well-being.**

Dylan and Kenan are placed together.

**H.   If placement with sibling(s) is not possible, efforts to facilitate frequent visitation or contact with siblings; and if frequent visitation or contact with siblings is not recommended, the reasons why this would be contrary to the child's or a sibling's safety or well-being.**

N/A

I.   **If out-of-state placement is appropriate and in the best interest of the child, the reasons why (include ICPC and/or out-of-state visitation status).**

N/A

J.   **Description of any assistance or services provided to the caregiver(s) to enhance their capacity to address the child's needs and provide appropriate care and supervision.**

D\` and K\_..... have CMDP insurance to provide for all medical, dental and vision needs. D  and K  ¡ foster placement is provided with standard and monthly allowances as well as daycare when needed.

K.   **Description of the Department's and out-of-home caregiver's efforts to implement reasonable and prudent parent standards to allow the child to participate in age and developmentally appropriate extracurricular, enrichment, cultural, and social activities.**

D\` and K  participate in age appropriate activities with their foster family, including family vacations. D\` and K\` are both engaged in karate.

## V.   PARENT FUNCTIONING AND CASE PLANNING

A.   **The behavioral changes necessary in order for the parent, guardian, or custodian to demonstrate enhanced caregiver protective capacity and eliminate the safety threats (as described in the case plan).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).

Ms. Kahraman  will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children.

Ms. Kahraman  will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers  in order to gain insight into her children's needs and how to respond appropriately. Ms. Kahraman  will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Mother will need to acknowledge the reasons why her children came into care and accept responsibility.

Mr. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).

Mr. Kahraman  will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman.

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to

respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility.

**B.    Each parent's, guardian's, or custodian's progress, or lack of progress, toward achieving necessary behavioral changes (including changes in caregiver protective capacities or family protective factors).**

Ms. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment).- Not Met

Ms. Kahraman  will need to gain insight into her own mental health condition and how this impacts her ability to safely parent her children. - Not Met

Ms. Kahraman  will understand the ages and stages of child development and parent according to what is developmentally appropriate. Mother will need to work with service providers in order to gain insight into her children's needs and how to respond appropriately. Mother will need to acknowledge the reasons why her children came into care and accept responsibility. - In Progress

Mr. Kahraman will need to report medical history and conditions accurately,(free from exaggeration or falsifying in order to prevent unnecessary medical treatment). - In Progress

Mr. Kahraman  will need to gain insight into mother's mental health condition and how this impacts her ability to safely parent her children. Mr. Kahraman will need to have a plan to protect his children form Ms. Kahraman. - Met

Mr. Kahraman will understand the ages and stages of child development and parent according to what is developmentally appropriate. Father will need to work with service providers in order to gain insight into his children's needs and how to respond appropriately. Mr. Kahraman will need to participate in psychological services to include but not limited to; psychological evaluation and follow recommendations made by service providers. Father will need to acknowledge the reasons why his children came into care and accept responsibility. - Met

**C.    Services and supports provided to assist in achievement of the behavioral changes identified in the case plan; and the participation in, and outcome of services and supports.**

Jessica Kahraman

Therapeutic Visitation

Beginning in May 2020, Ms. Kahraman reported that she is only willing to discuss what occurred in visitation at the direction of her attorney. Discussion towards therapeutic visitation goals was unable to happen, so no progress was made. This continued through June and most of July. On July 22nd, Ms. Kahraman reported that she is willing to work on her goals with Southwest Human Development. on

July 28th, Ms. Kahraman sent an email reporting that the lack of documentation provided by the Department is the reason for Ms. Kahraman not working on her goals in two months.

During visitation, Ms. Kahraman struggled with letting go of control. Ms. Kahraman directed what items were and were not allowed during visitation. The children wanted to show Ms. Kahraman their game on the computer, but Ms. Kahraman wanted no electronics during the visitation, as their focus was on the game, Ms. Kahraman felt it took away from bonding and quality time. Ms. Kahraman struggled with showing interest in activities that the boys wanted to share with her. Ms. Kahraman is working with Southwest Human Development on not focusing on food and how much they eat. Ms. Kahraman will tell the children to continuously monitor their food intake, instead of letting the boys listen to their bodies and determine if they are hungry or not.

Individual Counseling

In May 2020, Ms. Kahraman voluntarily chose to end services with Dr. Kelly Rodriguez. At the time of the closure, Dr. Rodriguez was working with Ms. Kahraman on making medical decisiosn based on fact and processing that the recommendations made from doctors came from information provided by Ms. Kahraman.

In June 2020, Ms. Kahraman started counseling with Dr. Celice Korsten through private pay. Based on the notes provided by Dr. Korsten, Ms. Kahraman is not making decisions based on fact. Ms. Kahraman reported to Dr. Korsten in June 2020, that Mr. Kahraman was doing unsupervised, even though this was not accurate information. It is concerning that Ms. Kahraman is continuing to report inaccurate information.

Ms. Kahraman was still focused on mold and the symptoms that were experienced during multiple sessions, while saying that she admitting to almost killing the children with her choices.

Psychological Evaluation

Ms. Kahraman completed an updated evaluation on 02/20/2020. Dr. Oakley made the following observations:

Ms. Kahraman was referred for a psychological re-evaluation by DCS. During her previous evaluation, Ms. Kahraman did not endorse any significant mental health symptoms. Her scores on testing measures were invalid and questionably valid, based on Ms. Kahraman presenting herself in a favorable light and denying problems. It was noted that the full extent of her difficulties was likely not completely clear. Ms. Kahraman was not given any formal diagnoses; she was noted to have traits consistent with Obsessive-Compulsive Personality Disorder based on her being meticulous, rigid, and inflexible. It was further noted that she may have reinforced a sick role in her children, but there was not enough information to suggest that she was doing it intentionally or intentionally harming the children or feigning medical symptoms in the children. It was also noted that

Ms. Kahraman continued to deny any accountability for the children's medical issues. A report from Dr. Kelly suggests that Ms. Kahraman required follow up to determine if she is "psychotic and/or has other mental health conditions." It suggested that she may have been deceitful, been trying to cover up abuse, may have "lost touch with reality," was having irrational beliefs about the children, or may be delusional. He further stated, "it is my opinion, with reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley." He cited the invalid and questionably valid test results, limited record review, and Ms. Kahraman's "strange statements about the cause of the children's health difficulties." Dr. Kelly requested a follow-up evaluation and provided recommendations for Ms. Kahraman's treatment.

During the current evaluation, Ms. Kahraman described that, in hindsight, she can see that she was extremely stressed prior to the children being removed from her care. She explained that Father was not particularly involved with raising the children, that she was tending to Father's needs, that she was isolated from her support system, she was not getting enough sleep because the children were keeping her up, and that she was working on top of caring for the children and home. She described that she was told that her children were particularly sick, and that she became consumed with finding ways to help them, including conducting a lot of independent research, serving in a consulting capacity with the children's multiple medical providers, not following her instincts, and becoming overly reliant on certain medical provider's information. Ms. Kahraman admitted that she was driven by fear and that she became particularly rigid and inflexible. She admitted that her rigidity and hyper focus on the children's diet contributed to their malnutrition and medical issues.

Ms. Kahraman described that at the time of the current evaluation, she was feeling pretty good. She endorsed ongoing fear about the future of her case and frustration that her children have not been returned to her care but that she has not been given more direction about what she needs to do. Yet, she was able to recognize that the case has given her time to be introspective and to make some positive changes in her life. She seemed more relaxed and at ease than she did during the previous evaluation. Ms. Kahraman described that she is much healthier and more grounded than she was in the past.

Ms. Kahraman's previous test results indicate that her IQ is estimated to be in the above average range and that her word reading score was high enough for independent administration of the remaining psychological evaluations. She denied any experiences that time that would be likely to result in a change of scores; as such, the testing was not repeated. On the MMPI, Ms. Kahraman's response style suggested that she answered in a consistent manner and that she did not seem to over or under-endorse symptoms; her resulting profile is probably a fairly reliable clinical picture. Ms. Kahraman did not obtain any clinical elevations and her scores were not indicative of any significant mental health symptoms or diagnoses. She endorsed a sense of well-being. Ms. Kahraman's test results have been fairly consistent with her presentation during her two clinical interviews; during the first assessment, her results were guarded and she minimized issues, which was consistent with her closed off body language and minimization of fault. During the second evaluation, her scores were deemed to be more valid and she was observed to be more open, to take accountability for her role in the child's health issues, and to be more relaxed and well adjusted.

Ms. Kahraman seems to be making progress and has recognized how her rigidity and inflexibility have had a negative impact on her children. She appears to have gained some insight into how her actions, and inaction, contributed to her children's health problems. She admitted that the children's diet was responsible for their malnutrition. She acknowledged that she should have taken Kenan to the doctor sooner, that she had too many different medical providers who were not in communication, and that she was experiencing a significant amount of stress at the time. Ms. Kahraman described that she became too dependent on the diet and her provider's advice regarding the diet because it was the first time she had been given hope about the children's future.

As such, it appears as though Ms. Kahraman was experiencing significant anxiety at the time the children were removed from the home and taken into care. She described feeling desperate to try to help her children, to the point that she was singularly focused on their diet and the opinions of a provider who apparently said she could help them, to the extent that she made poor decisions and did not follow her instincts. When considering this and additional medical information, it is possible that Ms. Kahraman was experiencing delusions (fixed beliefs that are not amenable to change in light of conflicting evidence) related to her son's health. This option appears more likely a possibility than the idea that she intentionally harmed the children. It appears, however, that at this time, Ms. Kahraman has been able to be more accepting of the medical evidence that contradicts her previous beliefs. Furthermore, Ms. Kahraman has not demonstrated any other signs of psychosis. Her history of anxiety may have been responsible for some of the medical concerns she previously endorse about herself. Medical follow-up is advised if she continues to experience significant physiological symptoms.

Ms. Kahraman continued to speak of heath factors that she believes may have contributed to the children's health difficulties and was overly elaborative. It is possible that she is holding on to some of her previous beliefs, yet, she is able to see that she made mistakes and to described what she needs to do differently in the future. While various parties have expressed concern that Ms. Kahraman will return to a strict diet for the boys if they are placed in her care, she described that she will feed them a mostly healthy, balanced diet with occasional snacks and treats, which is appropriate. She also described that she is no longer hyper focused on all natural medical care and household products. She stated that she now recognizes the value of more traditional medical care that saved Kenan. She added that she can be more accepting of medical provider's opinions, rather than feeling as though she has to be a collaborator.

Overall, Ms. Kahraman meets criteria for the following diagnoses:

Traits of Obsessive-Compulsive Personality Disorder

History of Anxiety Disorder

History of Delusional Disorder (Possible)

Ms. Kahraman was still noted to have traits consistent with Obsessive Compulsive Personality Disorder. She described, and her test results and her test results and presentation support, that she has been making progress in recognizing the traits and not letting them consume her beliefs and actions. Ms. Kahraman endorsed a history of significant anxiety, occurring prior to when the children were removed from her care. It is also noted that she may have been experiencing a Delusional Disorder at that time, though she appears to be more accepting of medical

evidence and her role in the children's health problems at this time.

Ms. Kahraman, and others, have described that the children are healthy. Though, they have been diagnosed with Autism Spectrum Disorder, which is not a curable condition. Ms. Kahraman has demonstrated that she is capable of seeking services for the children and getting them the support they need. She needs to demonstrate that she is capable of not getting hyper focused or stressed if an issue does arise. Mother has a pattern of becoming hyper focused on the health of the children and then adhering to rigid guidelines. She admitted to these patterns; she described that she has gained insight into her attitudes and behaviors, and that she has been much less rigid as of late. Ms. Kahraman further expressed that she was desperate for answers and support previously, in part due to high anxiety and lack of support. She was able to recognize that her anxiety was recognized and likely wore off on the children. Ms. Kahraman described that she has made positive changes for herself, which she believes will have a positive impact on her children, if they are returned to her care.

Ms. Kahraman's prognosis appears to be improved since her last psychological evaluation. It continues to be dependent on her willingness to be open to gaining insight regarding her role in her children's health issues, and her ability to make the necessary changes as a result. Ms. Kahraman still spoke at length about the children's medical issues, and suggested that there may have been some underlying issues that contributed to their issues. Yet, she acknowledged that malnutrition from their diet was mostly responsible.

Ms. Kahraman has demonstrated that she is invested in having the children returned to her care. Records have suggested that she has done well at visits and that she has likely demonstrated as much as possible given the current limitations of her interactions with the children. Mother explained that she is willing to make changes. The next steps may include her having more flexibility in her interactions with the children, particularly as it relates to food and her focus on their physical health. Eventually, if they are going to be returned to her care, Ms. Kahraman will need to demonstrate that she can choose appropriate meals for the children. It would be best to do this in a step-wise fashion. Mother also needs to continue to accept that the children are strong and healthy, and to not reinforce symptoms or ailments in the children. Ms. Kahraman would benefit from continuing with her mental health treatment. She described that she has made significant personal progress. She would benefit, however, from additional insight to help her understand her role in this case. She also could benefit from support to remind her to stick with the changes she has made and not resume her previous patterns of rigidity and inflexibility, especially if she is getting more time or freedoms with the children.
Some sort of mediation or family services would be beneficial if the children are to be returned to both homes. They family needs a parenting plan so that the children have similar routines and rules while in the two different homes; this is particularly important given the children's Autism diagnosis. Mother expressed interest in co-parenting with Father, though was somewhat worried about how he would interact with her. Father expressed disinterest in co-parenting.

It appears that Ms. Kahraman has been given the services that she needs to be successful; she has also participated in additional services on her own accord. Loosening the restrictions related to her interactions with the children will help her better demonstrate if she is able to make ongoing, measurable changes. This will need to occur if the children are to be returned to Ms. Kahraman's care.

Records Review Evaluation with Dr. Michael Kelly

Dr. Kelly completed his evaluation on 12/02/2019. Dr. Kelly noted the following:

It is my opinion, with reasonable medical certainty, that allowing Ms. Jessica Kahraman to care for her sons, Dylan and Kenan, places them in significant danger for additional harm.
It is also my opinion that additional recommendations must be followed to determine if Ms. Kahraman is psychotic and/or has other mental health conditions that are preventing her from parenting the boys safely.
It is my opinion that Ms. Kahraman needs mental health treatment services, like those described in the opinion section of this report, in order to make enough progress toward the goal of reunification with Dylan and Kenan.

I cannot opine on whether Ms. Kahraman meets Diagnostic Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) criteria for a mental disorder because she deferred meeting with me, and I was not granted access to her entire medical record. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman's behavior toward her sons raises concerns for mental illness, and that regardless of the cause of Ms. Kahraman's behavior, she is currently incapable of providing safe and adequate care to her boys. (Please see pages 4-13 of the evaluation attached for his evidence that supports his opinion) Dr. Kelly reports in the 10 pages that Ms. Kahraman's concerns about food and chemical sensitivities are unwarranted. Dr. Kelly states "It is unclear whether Ms. Kahraman's statements related to Kenan's chemical sensitivities reflect attempts to evade detection of abuse or serves as evidence that she has lost touch with reality." and "Ms. Kahraman was aware that restricting her boys' nutritional intake for extended periods of time would cause harm." Dr. Kelly noted "Ms. Kahraman's decision to defer taking Kenan to the hospital despite allegedly observing him have seizures, vomit up liver flukes, and pass parasites in his stool defies common sense."

It is my opinion, with reasonable medical certainty, that Ms. Kahraman is currently unable to demonstrate minimally adequate parenting skills. Ms. Kahraman will require continued mental health treatment and appropriate supervision to determine if she can demonstrate minimally adequate parenting skills in the foreseeable future. Please see the examples of Ms. Kahraman's behavior in this report and the Jessica Kahraman Date of Birth: 08/29/1972 accompanying chronological summary of records for evidence supporting my opinion.

It is my opinion, with reasonable medical certainty, that Kenan and Dylan are at risk for serious harm if returned to Ms. Kahraman's care. Evidence supporting my opinion includes, but is not limited to, Ms. Kahraman's belief that the boys' health

problems are due to sensitivities to environmental chemicals and mold rather than inadequate nutrition, her unsubstantiated claims that Kenan has been infested with parasites, and her reports of chronic food intolerances that were shown to be false once the children were removed from her home.

I carefully considered whether Ms. Kahraman's current treatment program was optimal based on the findings and recommendations from Dr. Mary Oakley's psychological evaluation dated 04/16/2019. However, it is my opinion, with reasonable medical certainty, that Ms. Kahraman may be suffering from undiagnosed mental illness that was not apparent during her meeting with Dr. Oakley. It is also my opinion that Ms. Kahraman may benefit from additional mental health services as she progresses toward reunification with her sons.

It is my opinion that the standard protocol for therapeutic supervised visitation used by DCS must be followed in order to ensure Dylan and Kenan's safety. Dylan and Kenan's parents should not be allowed to supply food during visits. Ms. Kahraman's continued denial of the cause of Kenan's health problems and her role in precipitating them and records indicating that she may have misrepresented Kenan's calorie count in the hospital, of her role in precipitating the boys removal from her care, medical records indicating that she may have misrepresented Kenan's calorie count during his hospital stay necessitate that the parents not be allowed to supply food during visits.

Father, Ahmet Kahraman

Individual Counseling

In April 2020 Mr. Kahraman worked in therapy on processing his emotions regarding the Dr. Kelly report and mother's psychological evaluation. Mr. Kahraman was working on making a plan to keep his children safe in regards to Ms. Kahraman.

In May 2020, Mr. Kahraman continued to work on safety planning for his children and how that would look in the future. Mr. Kahraman continued to process the children's medical history and what they have experienced, including internal hydrotherapy.

In June 2020, Mr. Kahraman's therapy decreased to biweekly. Mr. Kahraman expressed concerned whether or not Ms. Kahraman was following through on her reported willingness to coparent due to the fact that Ms. Kahraman would rather have the children placed with her parents instead of father.

In July 2020, Ms. Kahraman was successfully closed from therapy with all goals being met.

Psychological Evaluation

Mr. Kahraman completed a psychological evaluation with an interpreter present on 2/19/2020. Dr. Oakley noted the following:

Mr. Kahraman was referred for a psychological evaluation by DCS. He denied current or past symptoms consistent with a mental health diagnosis. He further denied a history of participating in mental health treatment prior to DCS involvement. He described his mood is generally positive and happy; he added that he has been feeling more hopeful as of late because his only significant stressor is the DCS case and he believes he is making progress. Mr. Kahraman reported that he has been participating in individual counseling for the duration of the DCS case to discuss how to protect the children, including healthy eating habits. He further noted that, more recently, he has been seeing a second therapist related to his divorce; this therapist helps him understand the divorce processes and to process the relationship. Mr. Kahraman described his counseling experiences as positive; he believes that he has been making progress and gaining insight. Mother has made allegations that Ms. Kahraman has a drinking problem. He denied the claim, though admitted that he consumed alcohol more frequently once the children were removed from his care; he denied a history of alcohol abuse. He does have a history of one DUI charge. Yet, Mr. Kahraman has apparently been doing UA screenings which do not indicate that he has been drinking. Testing results indicate that Mr. Kahraman's cognitive abilities are estimated to be in the average range of functioning. There is no indication that he has any cognitive abilities which would interfere with his ability to parent. Mr. Kahraman's MMPI questions were read to him by the interpreter. His responses yielded an invalid profile due to underreporting problems that most people admit to. It is possible that this response style was due to the translation of questions. Furthermore, Ms. Kahraman described that the Turkish language is much more direct and to the point, which also may have contributed. Either way, there were no test results available. Mother has described that Mr. Kahraman is angry and has been vindictive since they separated. She further described that he has low tolerance for the children. Mr. Kahraman denied these claims. There were no reports or observations from the current evaluation or records to support Mother's claims. Yet, there is no valid testing to be utilized for the evaluation to provide further insight. Because Mr. Kahraman denied experiencing any mental health symptoms, and there was no indication from records or testing to suggest otherwise, he was not given any mental health diagnoses, aside from Tobacco Use Disorder. His diagnoses were noted to be deferred; more information could change the conclusions.
Overall, Mr. Kahraman meets criteria for the following diagnoses:
305.1 – Tobacco Use Disorder Diagnosis Deferred

Mr. Kahraman admitted that he was not persistent enough when he had concerns about the children's health and eating habits. He explained that he expressed his concerns to Mother, but that she did not respond to his concerns and continued to take charge and control the situation. Mr. Kahraman further admitted that because Mother has a medical background and he is not familiar with medical terminology, that he deferred medical decisions to Mother. He expressed anger at Mother because he believes that she is responsible for the children's health issues. He acknowledged that he did not protect the children and stated that, now that he has more insight, he is willing to do whatever it takes to protect the children. He described that he does not want the children to be around Mother and that he does

Progress Report to Juvenile Court

not intend to coparent.

Mr. Kahraman reported that he smokes cigarettes. He noted that he intends to quit. He needs to ensure that he does not smoke around the children so that he does not expose them to the harmful effects of second hand smoke. No other diagnosis were given at this time. Mother has described that Father is angry and short-tempered. Mr. Kahraman admitted that he is angry with Mother for hurting the children. He denied that he is generally angry or short with the children.

Mr. Kahraman acknowledged that he has previously deferred all medical decisions to Mother. If the children are to be returned to his care, he will need to take over the medical decision making. The boys have diagnoses of Autism Spectrum Disorder, which is not a curable condition. It is likely that they will need additional services in the future. Mother has described that Father was not particularly involved with the children and that he had a short-temper with them. Mr. Kahraman denied these claims and stated that he has been an active part of the children's lives and that he enjoys his time with the children. There were no records to suggest that Father was inappropriate with the children. Mr. Kahraman stated that he intends to parent the children independently. This will be an adjustment to his lifestyle if it occurs. He described that he has support. Otherwise, he may be required to coparent. It is unclear how well he will coparent and if he will be able to put the children's needs above his own emotions.

Mr. Kahraman's prognosis is fair. He has apparently gained insight regarding the case. Furthermore, he has taken accountability for his actions and described that he is willing to protect the children. There is some concern how well he will be able to coparent, if it comes down to that.

Mr. Kahraman has been transitioning to more privileges with the children. It is advised that this trend continue, as long as things continue to go well. He should be included in any medical appointments so that he can get in the habit of being an active participant.
Furthermore, Mr. Kahraman would benefit from continuing with individual counseling services to help him cope with the adjustment of having the children more time and on his own. Treatment should address coping skills to utilize if he becomes overwhelmed. He should also be encouraged to address his anger with Mother in treatment, and any resulting behaviors. Treatment should address different types of relationship violence. If the children are going to be returned to both homes, some sort of mediation or family services would be beneficial. They family needs a parenting plan so that the children have similar routines and rules while in the two different homes; this is particularly important given the children's Autism diagnoses. Mother expressed interest in coparenting with Father. Mr. Kahraman expressed disinterest in coparenting.

Parent Aide

Mr. Kahraman completed his intake for parent aide services on 02/18/2020. Mr. Kahraman completed one skill session for February 2020, which focuses on proper nutrition and meal planning. In February and March 2020, father has attended all

Progress Report to Juvenile Court

visitation and skill sessions. The parent aide reports that father is open and engaging in the skill sessions. Mr. Kahraman is flexible with his children and allows for them to lead the visit and provide ideas on things they would like to do.

In April 2020, Mr. Kahraman attended all visitation and skill session. The midpoint was completed in April and Mr. Kahraman fully enhanced 4 out of 9 protective capacities. The parent aide reported he had made progress in the remaining 5 capacities, but they were still working on them. He fully enhanced the following capacities:

Controls Impulse
Sets aside own needs for child
Recognizes Threats
Understands Protective Role

In May and June 2020, Mr. Kahraman attended all visitation and skill sessions. Mr. Kahraman fully engaged in all skill sessions and was open to feedback and communication with the parent aide. By the end of June 2020, Mr. Kahraman had fully enhanced the remaining 5 capacities. The following 5 capacities were enhanced:

Takes Action
Is Self-Aware
Recognizes Childs Needs
Plans and Articulates plans for protection
Meets own emotional needs

In July 2020, the parent aide and Mr. Kahraman continued to review all capacities until successful closure on 7/30/2020.

## VI.    PARENTING TIME (VISITATION)

### A.    The plan for parenting time (visitation) for each parent and child; including the frequency, length, location, level of supervision, why a less restrictive level of supervision is not sufficient to ensure child safety, and the plan for progressive parenting time.

Ms. Kahraman currently has 4 hours of therapeutic visitation through Southwest Human Development. These visits occur at the SWHD visitation center.

Mr. Kahraman currently has unsupervised overnight visitation with the children.

### B.    Attendance at, and results of, parenting time (visitation) between each child and parent, guardian, or custodian since the last report to the court.

Mr. Kahraman has consistently attended all visitation.

Ms. Kahraman was consistently attending visitation, however on 4/22/2020, mother informed all parties that she intended to record the visitation and feedback

Progress Report to Juvenile Court

sessions. This is a violation of Southwest Human Development policy, so visitation did not occur until 5/11/2020 as Ms. Kahraman was awaiting a ruling from the court on recording visitation. Since visitation resumed, Ms. Kahraman has been consistent with visitation.

## VII.  PERMANENCY GOAL AND CONCURRENT PLANNING

### A.  Permanency goal and target date (attach case plan).

Family Reunification with a target date of 09/27/2020.

### B.  Concurrent goal and target date, including a description of activities initiated to implement the concurrent plan, if applicable.

N/A

### C.  Recommended permanency goal and target date, if different than the current permanency goal.

N/A

### D.  Reason for recommended change in permanency goal, if applicable.

N/A

## VIII.  DCS SPECIALIST'S CONCLUSIONS

It is this case manager's conclusion that Mr. Kahraman has demonstrated the ability to safely parent Dylan and Kenan Kahraman and is able to meet all of their needs. Mr. Kahraman is aware and is able to articulate the current safety concerns with Ms. Kahraman parenting the children. Mr. Kahraman is able to meet the children's educational, medical, and behavioral health needs.

Ms. Kahraman is a significant safety concern to her children with the choices she makes on their behalf in regards to their health and well-being. Ms. Kahraman is encouraged to continue to work with Southwest Human Development and her therapist Dr. Celice Korsten to make progress towards being able to safely and appropriately parent her children.

It is respectfully recommended that Dylan and Kenan Kahraman be placed in the physical custody of their father, Ahmet Kahraman.

## IX.  RECOMMENDATIONS

### A.  Agency

**It is respectfully recommended that** Dylan and Kenan Kahraman **remain a ward(s) of the court, committed to the care, custody and control of the Arizona Department of Child Safety.**

**It is further respectfully recommended that** Ahmet Kahraman **with appropriate medical,**

social, and educational authorizations.

If the child is in out-of-state placement, it is further respectfully recommended that the court find that the out-of-state placement continues to be appropriate and in the best interest of the child.

B.    **Financial**

It is respectfully recommended that beginning (date) _____ , the parents listed below be assessed the following amounts on a monthly basis per child as the contribution towards the cost of foster care:

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

C.    **Reasonable Efforts Findings**

It is respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to eliminate the need for continued out-of-home placement and to make it possible for the child to safely return home.

It is further respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to place the child in a timely manner in accordance with the permanency plan and to finalize the permanent placement of the child.

It is further respectfully recommended that the court approve the permanent case plan.

**Respectfully submitted:**

**Name/Title**    Madison Bell DCS Specialist
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**    480-656-9306
**Date:**   08/04/2020

**Approved by:**

Page 19    Progress Report to Juvenile Court

*Taylor Ferguson for Mecca Temple*

**Name/Title** Mecca Temple DCS Program Supervisor
**ARIZONA DEPARTMENT OF CHILD SAFETY**
**Telephone Number:**    480-656-9427
**Date:**    08/04/2020

**Case Name:** KAHRAMAN, JESSICA   **Case ID:** 608484

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Attachment B

**Schlotfeld, Kelsey**

| | |
|---|---|
| **From:** | Johnson, Janna |
| **Sent:** | Wednesday, August 19, 2020 8:32 PM |
| **To:** | Johnson, Janna |
| **Subject:** | FW: Communications |

**From:** Jessica Mann
**Sent:** Tuesday, July 28, 2020 12:19 PM
**To:** Rachel.Metelits@Maricopa.Gov; ecappsconkle@buwaldapsychologicalservices.com
**Cc:** Bell, Madison M ; Celice Korsten
**Subject:** Communications

**CAUTION:** This email originated from outside of DCS. Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon ladies,

I am grateful to read of Ahmet's work with the parent aide. I feel more comfortable knowing he is learning parenting skills, and that a transition team will be in place. I have discussed with Dr. Korsten that this allows me to more comfortably avoid further concern for or discussion of Ahmet's parenting choices. I have witnessed firsthand how inflammatory accusations can be to the relationship, if not properly supported as healthy two-way communication in therapy. I have been urging him to partake in couple's counseling since 2015, to no avail.

In reviewing Ahmet's therapy and parent aide records, I now understand that many of his conclusions relating to matters outside this case seem to be based on incomplete or inaccurate information, the source of which is questionable. "I found out that..." does not mean it's based in fact. I understand he does not want to go to therapy. That being said, I think it would be healing for both of us, and therefore the boys, if we could talk about the actual truths rather than his worst case scenario presumptions. He's angry about things that have not happened. Yes, this may be hard but adults can do hard things and he's been sitting on unfounded fears for 7 months. It only seems beneficial to do this before the boys are in our homes full-time. They need us to demonstrate respectful and healthy communication.

I appreciate your consideration.

Jessica Kahraman

Sent with ProtonMail Secure Email.

NOTICE: This e-mail (and any attachments) may contain PRIVILEGED OR CONFIDENTIAL information and is intended only for the use of the specific individual(s) to whom it is addressed. It may contain information that is privileged and confidential under state and federal law. This information may be used or disclosed only in accordance with law, and you may be subject to penalties under law for improper use or further disclosure of the information in this e-mail and its attachments. If you have received this e-mail in error, please immediately notify the person named above by reply e-mail, and then delete the original e-mail. Thank you.



**Attachment C**

**Bell, Madison M**

| | |
|---|---|
| **From:** | Jennifer Young <Jennifer.Young@jfcsaz.org> |
| **Sent:** | Wednesday, August 19, 2020 1:08 PM |
| **To:** | Bell, Madison M |
| **Cc:** | Jennifer Young |
| **Subject:** | [***] Family Therapy with Kahraman siblings |

CAUTION: This email originated from outside of DCS. Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Hello Madison,

First, as I explained during our phone conversation JFCS prohibits its therapists from making recommendations regarding placement or visitation time with parents as this falls outside the scope of general mental health services.  What I can do is speak directly about my concerns regarding starting family therapy at this time with the boys and mother. I have been the primary therapist for both boys since services opened with JFCS. While I have not interacted with mother on an individual basis, I have been able to observe her behavior during telephonic CFT meetings as well as making observations of the content of the emails she sends out to the team. In both cases mother has and continues to Demonstrate attention seeking behaviors via attempts to dominate the CFT group discussions with with her own lengthy commentary. Mother continues evade direct questions with, often irrelevant or very loosely related statements that are more an exposition of her innocence, an exhaustive list of what she believes she has done for the boys health, or  lengthy monologues of her perception of the progress she thinks she has made in her therapy.  To my knowledge, mother has yet to acknowledge how her choices put her children's health at great risk without minimizing, deflecting and or blaming another party. For example, on many different occasions in the past mother has stated she was merely following the nutritional advice of a doctor or recommended website and had no idea that these nutritional choices were having or could have an adverse impact on the health of her children. I have also yet to observe mother accept any responsibility for her actions without minimizing the consequences of her choices, and blaming or deflecting consequences to another party. Mother continues to attempt to dominate the discussion during CFT meetings by professing her innocence, her progress, and the many ways she is concerned for the boys health.

While I am not a psychiatrist, I am an associate licensed counselor and all of these symptoms are consistent with diagnostic criteria set forth in the DSM five for factitious disorder. As I understand it, mother has evaded the necessary assessments to assign this diagnosis. That, in and of itself, is incredibly concerning. Further mother has recently switched her therapist to a new one. Mother would verbally indicate her agreement for me to collaborate with her previous therapist and yet barrier after barrier was encountered and I was never able to actually consult with her therapist. Now mother has a new Therapist that likely is not familiar with the entire case history.  All of these behaviors are incredibly concerning and indicate that mother is not, at this time, ready in her own therapy to begin family therapy with the children.

In summary, I am not in agreement with starting family therapy between the boys and mother at this time. While I clearly cannot dictate courses of therapy for mother, I can set forth my minimum requirements before I will revisit starting family therapy with mother.  Of course, if mother or the team does not agree with my recommendations/ requirements; then mother and the team are free to pursue a different therapist for family therapy. If the team is wanting me to provide family therapy between mother and the boys then the following requirements are representative of industry wide best practices both clinically and ethically.
1) Mother will complete any required assessments with a licensed psychiatrist to rule out/assess for factitious disorder by proxy.
2) Mother completes a minimum of 12 consecutive individual therapy sessions on either a weekly or bi-weekly frequency with a single therapist. For example, it would not be acceptable for mother to complete 4 individual therapy

sessions with one therapist, changes to a new therapist and completes 8 with that therapist. All 12 must be done by the same individual therapist with mother.

2) After mother successfully completes the minimum eight consecutive individual therapy sessions with her therapist, then I and mothers new therapist are able consult with each other and mutually agree that mother is ready to begin family therapy with the boys.

3) Mother verbalizes accountability and responsibility for how harmful her choices for the boys have been in the past without blaming third-parties such as father, other doctors, or websites.

4) Mother is able to demonstrate the ability to refrain from attention seeking behaviors in CFT meetings and emails to the team. In functional terms the team should see mother spend more time listening to team discussions and recommendations then she does justifying and/or rationalizing her own position/ view point. Mother will be able to quickly and concisely answer questions without Minimizing, blame or deflection.

Conversely, father's verbal engagement during CFT meetings has and remains appropriate. He has verbalized ownership and responsibility of his part in the children's health history and appears to be actively willing to improve his own parenting styles. Father spends very little time blaming or deflecting and instead seems ready to move forward As evidenced by my direct observations of father's verbal engagement during CFT meetings as well as emails father has sent to the team.  For this reason, I am comfortable with, and feel it is appropriate, to start family therapy with father and the boys.

Kind Regards,
Jenna Young

*Kind Regards,*
*Jenna Young L.A.C.; MA*





**Jennifer "Jenna" Young MA; LAC**
*Child Therapist*
Direct Phone, (623)687-2857
Phone: (623) 486 - 8202, ext. 15857
Jennifer.young@jfcsaz.org.
https://www.jfcsaz.org

5701 West Talavi Blvd. Suite 180
Glendale, AZ 85306
Direct Phone, (623)687-2857
Phone: (623) 486 - 8202, ext. 15857
Jennifer.young@jfcsaz.org.
**Office Hours:**
Tuesday, Wednesday 11am-7pm
Thursday 10-6pm
Friday 9-5pm
Saturday 8-4pm

*"For a seed to achieve its greatest expression, it must come completely undone. The shell cracks, its insides come out & everything changes. To someone who does not understand growth, it would look like complete destruction."*
*– Cynthia Occelli*

*************************************CONFIDENTIAL**************************************
********
This electronic mail message contains information that is or may be LEGALLY PRIVILEGED,
CONFIDENTIAL, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and
is intended only for the use of the Addressee(s) named herein. If you are not the
intended recipient, an addressee, or the person responsible for delivering this to an
addressee, you are hereby notified that reading, using, copying, or distributing any part
of this message is strictly prohibited. If you have received this electronic mail message
in error, please contact us immediately and take the steps necessary to delete the
message completely from your computer system. Thank you.
*************************************CONFIDENTIAL**************************************
********

1     ORIGINAL of the foregoing filed
      this 20th day of August, 2020, to:

2

3     Clerk of the Court
      Maricopa County Superior Court

4     Juvenile Court Southeast Facility
      1810 South Lewis Street

5     Mesa, AZ 85210

6
      Copy of the foregoing hand-delivered

7     this 20th day of August, 2020, to:

8
      Honorable Cassie Woo

9     Maricopa County Superior Court
      Juvenile Court Southeast Facility

10    1810 South Lewis Street

11    Mesa, AZ 85210

12    Copies of the foregoing electronically mailed this
      20th day of August, 2020, to:

13

14    Kinda Johnson-Hurd, Esq.
      Kinda.Johnson-Hurd@Maricopa.Gov

15    Guardian Ad Litem for the Children

16
      DeeAn Gillespie Strub, Esq.

17    DGillespie@gillaw.com
      Attorney for Mother

18

19    Rachel Metelits, Esq.
      rachel.metelits@maricopa.gov

20    OPASEFDisclosure@maricopa.gov
      Attorney for Father

21

22    Madison Bell
      madison.bell@azdcs.gov

23    Case Manager

24
      Susan Stark

25    Susan.Stark@maricopacasa.org
      Court Appointed Special Advocate

26

27

28    jlj/JD532206/HDM#8908943

5