# EXHIBIT BH

SUPERIOR COURT OF ARIZONA

MARICOPA COUNTY

IN THE MATTER OF

D   N      K ) Case No.

K      K

BEFORE THE HONORABLE JENNIFER E. GREEN

TELEPHONIC EVIDENTIARY HEARING

(Transcribed from Audio Recording)

September 15, 2020
10:30 a.m.

PREPARED BY:
Debra Riggs Torres, RPR
Certified Reporter
Certificate No. 50647

PREPARED FOR:
Ms. DeeAn Gillespie Strub

(Certified Copy)



Page 2

1              INDEX OF PROCEEDINGS
2
3  PROCEEDINGS                                    PAGE
4  September 15, 2020, proceedings commence........   5
5  Discussion re: Preliminary Matters..............   8
6  Testimony.......................................  19
7  Argument by Ms. Johnson.........................  47
8  Argument by Ms. Metelits........................  55
9  Argument by Ms. Johnson-Hurd....................  56
10 Argument by Ms. Gillespie Strub.................  59
11 Matter taken under advisement...................  72
12 September 15, 2020, proceedings concluded.......  72
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              A P P E A R A N C E S
2
3  For the Department of Child Safety:
4      Ms. Janna Lee Johnson
       Mr. Gregory Coordes
5
6  For the Children:
7      Ms. Kinda Johnson-Hurd, Guardian ad Litem
8
9  For the Mother Jessica Kahraman:
10     Ms. DeeAn Gillespie Strub
11
12 For the Father Ahmet Kahraman:
13     Ms. Rachel Metelits
14
15 Also Present:
16     Ms. Jessica Kahraman
       Mr. Ahmet Kahraman
17     Ms. Madison Bell, DSC specialist
       Ms. Emine Fougner, interpreter
18     Ms. Carol Cooper, CASA
       Ms. Susan Stark, CASA
19
20
21
22
23
24
25

Page 3

1              EXAMINATION INDEX
2
3  WITNESS                                        PAGE
4  ELI NEWBERGER, M.D.
5  Direct Examination by Ms. Gillespie Strub.......  19
6  Cross-Examination by Mr. Coordes................  24
7  Cross-Examination by Ms. Metelits...............  28
8  Redirect Examination by Ms. Gillespie Strub.....  29
9  ANN SCHROECKENSTEIN, Psy.D.
10 Direct Examination by Ms. Gillespie Strub.......  32
11 Cross-Examination by Ms. Johnson................  37
12 Redirect Examination by Ms. Gillespie Strub.....  38
13 CELISE KORSTEN, Psy.D.
14 Direct Examination by Ms. Gillespie Strub.......  40
15 Cross-Examination by Ms. Johnson................  42
16 Cross-Examination by Ms. Metelits...............  43
17 Cross-Examination by Ms. Johnson-Hurd...........  45
18 Redirect Examination by Ms. Gillespie Strub.....  46
19
20
21
22
23
24
25

Page 5

1              P R O C E E D I N G S
2
3          THE COURT:  All right.  Good morning,
4  everyone.  The Court calls JD 532206.  This is the matter
5  of Dylan and Kenan Kahraman.
6          Let's begin with appearances.  I see we have
7  Mr. Coordes and Ms. Johnson from the AG's office.  Good
8  morning.
9          MR. COORDES:  Good morning, Your Honor.
10         MS. JOHNSON:  Good morning, Your Honor.
11 Janna Johnson, assistant attorney general, for the
12 department.
13         THE COURT:  Thank you.
14         We have Madison Bell.  Good morning,
15 Ms. Bell.
16         MS. BELL:  Good morning.
17         THE COURT:  All right.  Ms. Strub, good
18 morning.  And I see we -- you have you and mother
19 together.  So good morning.
20         MS. GILLESPIE STRUB:  Good morning, Judge.
21         MS. KAHRAMAN:  Good morning.
22         THE COURT:  Great.
23         Ms. Metelits, representing Mr. Kahraman.  I
24 see we have both of you.  Is that right?
25         MS. METELITS:  That's correct, Your Honor.



Page 18

those beautiful paintings behind you. So I'm glad we get to see your face and your background.
    All right. Dr. Schroeckenstein and Dr. Korsten, I'm going to ask that you leave the meeting.
    And then, Ms. Gillespie Strub, I'll let you text or a quick email to let them know when they know they need to pop back on. Because, like I said, we're going to go very quickly here. It's 10:43.
    So, Ms. -- Dr. Schroeckenstein and Dr. Korsten, go ahead and please exit.
    And, Ms. Gillespie Strub, as soon as they're gone, whenever you're ready and your clock will begin.
    MS. GILLESPIE STRUB: Thank you. And I did just make arrangements. We will email Dr. Schroeckenstein, and my client will text Dr. Korsten at the appropriate time.
    THE COURT: All right. It's 10:44. Go ahead.
    MS. GILLESPIE STRUB: Thank you.

    ELI NEWBERGER,
a witness herein, having been first duly sworn to speak the truth and nothing but the truth, was examined and testified as follows:

Page 19

DIRECT EXAMINATION
BY MS. GILLESPIE STRUB:
Q. Dr. Newberger, could you please give the Court a very brief history of your qualifications.
A. Sure. I founded and then served as the medical director for 30 years the Child Protection Team, Child Protection Research and Training program at Boston Children's Hospital and Harvard Medical School, beginning in September 1970.
    With regard to the issues in this case, I personally managed over 300 cases of what we used to call Munchausen syndrome by proxy, what's now called factitious disorder imposed by others in the Diagnostic and Statistical Manual of the American Psychiatric Association.
    Most of my consultations have been of children admitted to Boston Children's Hospital, where I closed my office at the end of 1999, subsequent to which I've served as an independent consultant.
    I'm agnostic with regard to whether I testify either on the plaintiff or on the defense side. But before accepting any testimony on behalf of any attorney's clients, I first assure myself by reviewing a sufficient corpus of data that were the side on which I were appointed to prevail, the greater interest of the

Page 20

protection and care of children will be served. In other words, I'm not a hired gun. And I explained this to attorney Suzanne Nicholls of the Office of Child -- of the State office of the -- of the child advocate, when she first made contact with me about this case back in 2019.
    At that time, she was representing Mr. Kahraman and --
    MS. JOHNSON: Objection as to hearsay regarding what Ms. Nicholls spoke to Mr. Newberger about.
    THE COURT: Ms. Gillespie Strub?
    MS. GILLESPIE STRUB: There's no attorney-client privilege in that. He's an expert.
    THE COURT: Well, that's the hearsay -- what is the hearsay exception?
    MS. GILLESPIE STRUB: Okay. Well, I guess we can -- we'll just move on, then. Okay?
    THE WITNESS: Sure.
    In any event, I was first consulted in this matter, by the office of the child advocate, and I reviewed, at that time, a large corpus of information and concluded, unequivocally, that this was not a case of Munchausen syndrome by proxy or factitious disorder imposed by other but was rather a situation where the parents were misled by unqualified professionals to restrict their children's diets in support of a therapy

Page 21

purported to be favorable to their diagnosed autism.
    This culminated in a severe nutritional deficiency, which was then evaluated and treated by the Phoenix Children's Hospital cardiologists, with a favorable outcome.
    I reviewed all of the evaluations that had been performed at that time by the department and all of the specialists' records at Phoenix Children's Hospital's various clinics, including, particularly, the physical therapy records by the PCH, Advanced Neurological Rehabilitation, Dr. Nikki McCants, who noted the improvement of the children after their nutritional disturbances were addressed, and I further reviewed the opinions of the department's experts, notably Dr. Kelly [phonetic], the psychiatrist in California, whom they relied on to make a diagnosis of factitious disorder by proxy.
    Dr. Kelly concluded that Ms. Kahraman's behavior to their sons raised questions for mental illness, and that regardless of the cause of Ms. Kahraman's behavior, she is currently incapable of providing safe and adequate care for her boys.
    Unfortunately, there was no interview of this woman that attached to making this diagnosis. And, furthermore, in my own assessment, I've interviewed the



Page 22

1  children's mother on several occasions, and nothing in my
2  interviews disclosed any inappropriate medicalization,
3  distortion, or falsehoods with regard to the medical
4  record. She was totally honest with me, in my opinion,
5  and there were no diversions from the medical record.
6      My opinion in this matter is that this
7  mother is the effective psychological parent for these
8  boys, and that it would be damaging to them to change
9  their children's custody from her.
10     There are no grounds, in my opinion, for
11 making either the Munchausen diagnosis or the factitious
12 disorder imposed by other diagnosis.
13     And I have to say that, with regard to the
14 expert who has been retained by the department, Dr. Kelly,
15 he not only violated the criteria in the Diagnostic and
16 Statistical Manual of the American Psychological
17 Association -- I'm just showing it to you because I have
18 it in front of me -- and also the guidelines of the
19 American Professional Society on the Abuse of Children, or
20 APSAC, which has detailed guidelines for practitioners and
21 stipulate that the rigorous pediatric review is a
22 criterion for making this diagnosis.
23     In my opinion, this is a pediatric -- not a
24 psychiatric -- diagnosis, and Dr. Kelly not only violated
25 the DSM guidelines but the APSAC guidelines in forming his

Page 23

1  adventurous and inappropriate conclusion and
2  recommendation.
3      THE COURT: Ms. Gillespie Strub, you're on
4  mute.
5      MS. GILLESPIE STRUB: I have no further
6  questions for Dr. Newberger --
7      THE COURT: Okay.
8      MS. GILLESPIE STRUB: -- in the interest of
9  time.
10     THE COURT: Thank you.
11     Do you all want to pivot now to cross and
12 then keep time that way, or do you want to keep going?
13     Ms. Johnson, what's your preferred? If you
14 want to cross now and use your time, or do you want to
15 save your time and do it all together?
16     MS. JOHNSON: We can cross now. Mr. Coordes
17 will handle cross of Dr. Newberger.
18     THE COURT: Okay. It's 10:51.
19     Go ahead, Mr. Coordes.
20     MR. COORDES: Yes. And plaintiff had said
21 about 7 or 8 minutes for the direct. So I'll be short,
22 Your Honor.
23
24 ///
25 ///

Page 24

1       C R O S S - E X A M I N A T I O N
2  BY MR. COORDES:
3      Q.  So, Dr. Newberger, can you hear me?
4      A.  I can.
5      Q.  Okay. Great.
6      So you testified that Dr. Kelly made a diagnosis
7  of factitious disorder imposed on others in his report.
8  Is that your testimony?
9      A.  Yes.
10     Q.  Okay. So if the report doesn't say that, you
11 would -- do you believe that that would be accurate?
12     A.  Yes. I mean, the clear burden of his report was
13 that this was child abuse and that the mother couldn't be
14 treated, you know, in a sufficient way to protect these
15 boys.
16     Q.  Okay. And then that -- also that Dr. Kelly
17 didn't do an interview of mother. Is that correct?
18     A.  That was my understanding.
19     Q.  And that was because mother did not make herself
20 available; is that correct?
21     A.  I don't know that.
22     Q.  Okay. So would that concern you, if she didn't
23 make herself available for that?
24     A.  I'm sorry. What was the question?
25     Q.  I'll move on.

Page 25

1      So if -- you testified that it's your opinion
2  that these parents were misled into giving an
3  overrestricted diet to the children; is that correct?
4      A.  Yes.
5      Q.  And --
6      A.  They fell -- they fell in the hands of
7  unqualified practitioners who theorized inappropriately
8  and wrongly about dietary interventions. That caused the
9  symptoms that led to the cardiac problem that was treated
10 successfully at Phoenix Children's Hospital.
11     Q.  And these children were completely dependent on
12 their parents for their diet; correct?
13     A.  Yes.
14     Q.  And so it was ultimately the parents who chose to
15 give the child -- the children restrictive diets; is that
16 correct?
17     A.  Yes. They were wrongly advised, and they
18 followed inappropriate advice.
19     Q.  And it's your opinion -- are you aware of the
20 actual -- the actual diet that they were given?
21     A.  Yes.
22     Q.  And it was very restricted; is that correct?
23     A.  Yes.
24     Q.  And it was -- do you need to be a doctor to
25 recognize that that was a very restrictive diet?

Page 50

1    It's my understanding as well that in April,
2 when she chose to try to record the visit, she did not
3 have visitation because she did not want to participate in
4 visitation unless she recorded the visitation.
5    So we've had several stops and starts in
6 that service since April that has -- that have caused
7 delays in her ability to work on that program with
8 Southwest Human Development.
9    THE COURT: Okay. Are you saying -- what's
10 the name of the model again? Can you spell it for me?
11    MS. JOHNSON: ACCEPTS. It's spelled
12 A-C-C-E-P-T-S. And you'll see it in the Southwest Human
13 Development monthly reports that have been marked and
14 admitted as DCS exhibits. And I can get you the number.
15 It is specifically to work through accepting
16 responsibility for your role in your child's neglect or
17 abuse.
18    And I know that mother's attorney has an
19 issue with the word "abuse." However, this Court is aware
20 that that's an umbrella term in this case, and we're
21 talking about medical neglect and abuse as a whole in this
22 case.
23    THE COURT: Okay. So is she working on
24 ACCEPTS or is she not working on ACCEPTS?
25    MS. JOHNSON: Now she is working on it

Page 51

1 again. In July she agreed to work on it again with
2 Southwest Human Development. We have not received --
3    THE COURT: Go ahead.
4    MS. JOHNSON: We have not received July or
5 August's monthly reports from Southwest Human Development.
6 Ms. Bell has been following up with Southwest Human
7 Development to get those. But we have not received them
8 yet, so we don't know exactly where she's at. But they
9 do -- they do feedback sessions and notes that have been
10 disclosed on an ongoing basis.
11    THE COURT: Well, it's already the middle of
12 September. I mean, shouldn't we have June and July's
13 reports?
14    MS. JOHNSON: We have June. We don't have
15 July and September. They emailed Ms. Bell at the end of
16 August, I believe -- and she can correct me -- saying that
17 they were going to be a little late with the July report.
18 They have not sent it as of yet. And now we are to the
19 point where we should be getting August's report.
20    Ms. Bell has followed up on both from
21 Southwest Human Development. But, ultimately, Your Honor,
22 it's the department's position, and I don't want to say
23 this lightly, but the visitation reports are a minor --
24 are a minor factor in why the department doesn't believe
25 mother should have physical custody at this time.

Page 52

1    We still have a huge question as to how she
2 is going to interact and handle medical providers who do
3 not agree with her. Frankly, any time she does not agree
4 with the professional opinion provided by providers
5 throughout this case, she asked for their removal from the
6 case. And that's indicative -- the department believes
7 that's indicative of how she will behave in the future.
8    The department would ask this Court to look
9 at the email from Jennifer Young dated August 19th. She
10 is the child's therapist. And she acknowledges that she
11 is the child's therapist and has not met mother in person.
12 However, she has dealt with mother through several CFTs
13 over the phone and actually posits that it's very
14 concerning that still mother displays attention-seeking
15 behaviors. She evades direct questions and instead
16 expounds on all the things she's done for the boys. She
17 takes discussion away from the boys (indiscernible)
18 services and wants to focus on justifying her behaviors
19 and what she's done since this case has opened.
20    That is the child's therapist who is trying
21 to work with mother, and mother is continually trying to
22 control and manipulate the discussion.
23    The department has no doubt that mother is
24 bonded to these children. Has no doubt that mother does
25 well in visitation. In fact, I think the Court has heard

Page 53

1 the department say this on numerous occasions, that there
2 is no doubt that mother interacts well with her children
3 during these supervised visitations. The -- her parenting
4 ability on a day-to-day basis has never been in question.
5 It's always been how is she going to react when these
6 children have medical issues coming up and how is she
7 going to behave with these medical professionals. And
8 still, to this day, we do not have confidence or evidence
9 that she can behave appropriately and take guidance and
10 feedback from professionals without attempting to control
11 the narrative.
12    THE COURT: In one of my orders we talked
13 about a medical gatekeeper. Does the department think
14 that's a realistic way of moving forward in this case?
15    MS. JOHNSON: Your Honor, we did have that
16 court-ordered meeting, and it's the department's position,
17 and we are -- this is a very unique issue and a unique
18 procedural posture that we're in. The children are
19 already returned to father. The department believes,
20 based on father's eight months of demonstrated consistency
21 and stability with the professional providers, that father
22 can be that medical gatekeeper and that medical
23 decision-maker in this case.
24    The department -- it's the department's
25 position that that's father's role in this case.



Page 70

1      Has any treatment provider recommended that
2  yet?
3      MS. GILLESPIE STRUB:  Dr. Oakley.
4      THE COURT:  Okay.  Ms. Johnson, go ahead.
5      MS. JOHNSON:  Thank you, Your Honor.
6      No professional who have seen mother with
7  the children have recommended that.  Ms. Bell indicates
8  they were going to reassess the food restrictions at their
9  next staffing since mother started talking about the
10 ACCEPTS model again.
11     So that is on the table to discuss that
12 restriction and how that -- what that looks like moving
13 forward.
14     THE COURT:  Okay.  I think it's important
15 that I understand how far mother is on the ACCEPTS model
16 and how long she took a break from it.
17     Ms. Johnson, where in the exhibits would I
18 find that?
19     MS. JOHNSON:  Yes, Your Honor.  It is in the
20 visit notes from Southwest Human Development.  I
21 apologize.  I'm trying to pull up the exhibit worksheet.
22     THE COURT:  That's okay.  I've got 41.
23     MS. JOHNSON:  Yeah.  So I think they're
24 actually mislabeled on the worksheet.  It should be
25 Exhibit 38, Exhibit 40, and Exhibit 41.

Page 71

1      THE COURT:  38, 40, and 41.
2      MS. JOHNSON:  And 49, Your Honor.
3      You'll see that there's a summary at the end
4  where they talk about each letter of the acronym
5  separately in the --
6      THE COURT:  Thank you.
7      Ms. Gillespie Strub, did you have something?
8      MS. GILLESPIE STRUB:  Yes.  In Exhibit 28,
9  Dr. Schroeckenstein also draws from the Southwest records
10 and addresses the ACCEPTS model in Exhibit 28, starting on
11 Bates number 267.
12     THE COURT:  Thank you.
13     Okay.  So very briefly, is she 50 percent
14 through ACCEPTS?  Is she 25 percent through?  How far is
15 she?
16     MS. GILLESPIE STRUB:  It's our position
17 she's a hundred percent through, Judge.
18     THE COURT:  Ms. Bell, are you able to
19 quantify it?  It's my understanding that they work on the
20 entire model each time and how each factor may play into
21 different visits.
22     MS. BELL:  Correct.  So a lot of the aspects
23 of the steps overlap with each other.  So sometimes they
24 hit on multiple different parts of it.  I can't give you
25 how far she is right now because I believe it was the end

Page 72

1  of May or end of April she reported that she was not
2  willing to discuss the ACCEPTS model, and she stated in
3  July that she was starting to accept -- to discuss it
4  again.  And without the August report, I can't say how
5  much progress she's made since she agreed to restart
6  working through the ACCEPTS model again.
7      MS. GILLESPIE STRUB:  It was a three out of
8  nine met.  That's in the record.
9      THE COURT:  Okay.  Thank you, everyone, for
10 all of your thoughts.  I appreciate your presentation in
11 the Kahraman matter.  I'm talking it under advisement.
12     Actually, I'll take it under advisement on
13 the 28th, when I get those records, because I'll need time
14 to review them and all the records.
15     Thank you.  This matter is adjourned.
16     MS. METELITS:  Thank you.
17     (September 15, 2020, proceedings concluded)

Page 73

1  STATE OF ARIZONA     )
                        ) ss.
2  COUNTY OF MARICOPA   )
3
4       BE IT KNOWN that the foregoing audio/video
   recording was transcribed by me; that the 73 pages are a
5  full, true, and accurate record of the audio recording,
   all done to the best of my skill and ability.
6
        I CERTIFY that I am in no way related to any of
7  the parties hereto, nor am I in any way interested in the
   outcome hereof.
8
9       [ ]  Review and signature was requested.
        [ ]  Review and signature was waived.
10      [X]  Review and signature not required.
11
        I CERTIFY that I have complied with the ethical
12 obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
   J(1)(g)(1) and (2).
13      Dated at Phoenix, Arizona, this 21st day of
   February, 2025.
14
15
16
                    /S/ Debra Riggs Torres
17                  DEBRA RIGGS TORRES, RPR
                    Certified Reporter
18                  Arizona CR No. 50647
19
                *    *    *    *    *
20
21      I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
   complied with the ethical obligations set forth in ACJA
22 7-206 (J)(1)(g)(1) through (6).
23
                    /S/ Griffin Group International
24                  GRIFFIN GROUP INTERNATIONAL
                    Registered Reporting Firm
25                  Arizona RRF No. R1005