**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jessica Kahraman, et al., | No. CV-22-00375-PHX-SRB |
| Plaintiff, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Before the Court is Defendants State of Arizona, the Arizona Department of Child Safety ("DCS"), Madison Bell, and Mecca Temple's (collectively, "State Defendants") Motion for Summary Judgment ("Motion"). (Doc. 216, ("Mot.").) The Court will grant the Motion.

I.    **BACKGROUND**

    A.    **Factual Background**

This case arises out of the removal of twin brothers D.K. and K.K. ("Boys") from their parents, Jessica Kahraman ("Plaintiff")[1] and her former husband Ahmet Kahraman. (*See* Doc. 74, Second Am. Compl. ("SAC") ¶¶ 70–71.)

        **1.    Events Leading to Removal of Children**

Six-year-old K.K. was admitted at Banner Desert Medical Center (f.k.a. Cardon's Children's Hospital) ("Banner") on December 18, 2018. (Doc. 217, Statement of Facts in

---

[1] Ms. Kahraman is bringing suit on behalf of D.K. and K.K.. When discussing legal arguments made by the party, the Court will refer to Ms. Kahraman as "Plaintiff." When referencing specific facts regarding her conduct, the Court will refer to her as "Ms. Kahraman."

Supp't of Mot. ("SOF") ¶ 1; Doc. 240-2, Controverting Statement of Facts in Opp'n to Mot. ("CSOF") ¶ 1; *see also* Doc 217-1, Ex. 1 ("K.K.'s Medical Records") at 12.) The discharge diagnosis for K.K. was right ventricular dysfunction, pulmonary hypertension, anasarca, protein energy malnutrition, failure to thrive, and suspected child abuse. (SOF ¶ 3; CSOF ¶ 3; *see also* K.K.'s Medical Records at 12.) K.K. had potential threat to life and limb without medical intervention. (SOF ¶ 7; CSOF ¶ 7; *see also* Docs. 217-2, Ex. 2 & 232-5, Ex. E ("Dr. Stewart Dep.") at 31:19–32:6.[2])

The Suspected Child Abuse and Neglect Team ("SCAN Team") got involved for K.K.[3] (SOF ¶ 4; CSOF ¶ 4.) According to K.K.'s discharge summary and the deposition of Dr. Stewart, who attended to K.K. while he was hospitalized, "malnutrition was the most likely, most probable cause" of K.K.'s symptoms.[4] (SOF ¶ 6 (citing Dr. Stewart Dep. at 21:9–24); *see also* K.K.'s Medical Records at 13.) The discharge summary notes that prior to hospitalization and while in the hospital, K.K.'s parents offered him a restricted diet because of their belief that he suffered from "severe food allergy and intolerance." (K.K.'s Medical Records at 13.) While K.K. was hospitalized, Ms. Kahraman made a series of allegations regarding alternate causes for the Boys' physical condition, including that K.K.'s heart failure "[was] due to exposure to white board markers." (*Id.* at 52.)

Dr. Stewart informed SCAN Team members and DCS workers of his suspicion that Ms. Kahraman "misperceived" food allergies and insensitivities. (Dr. Stewart Dep. at 52:5–8; *see also* SOF ¶¶ 9–10; CSOF ¶¶ 9–10.) Dr. Stewart expressed concern that Ms. Kahraman was unwilling to allow the doctors to conduct a series of tests to determine the extent or existence of "any of these allergies or insensitivities." (Dr. Stewart Dep. at 52:5–

---

[2] The parties attach different excerpts from many of the same deposition transcripts. (*See, e.g.*, Docs. 217-2, Ex. 2 & 232-5, Ex. E.) When citing a deposition transcript for which there are multiple excerpts attached to the parties' respective Motions and statements of fact, the Court will list each excerpt's docket number, but will refer to the deposition transcript's own page and line numbers.

[3] The SCAN Team is a group of specialists that get involved when there is "suspected neglect or abuse." (Dr. Stewart Dep. at 15:20–16:2.) The Team is composed of an attending physician, along with nurse practitioners or physician assistants. (*Id.* at 16:5–7.)

[4] Plaintiff disputes malnutrition as the cause of the symptoms, instead asserting without evidentiary basis that exposure to toxic mold is the cause of the symptoms. Plaintiff repeatedly disputes facts on this basis. (CSOF ¶ 5; *see also e.g.*, CSOF ¶¶ 6, 12, 24, 33.)

8; *see also* SOF ¶¶ 9–10; CSOF ¶¶ 9–10.) Dr. Stewart recommended that it was not safe for K.K. to go home and that DCS assume control over decisions as to K.K.'s diet. (SOF ¶ 12; CSOF ¶ 12.) On or about December 23, 2018 twin brother D.K. underwent diagnostic testing and a medical evaluation, which revealed "significant malnutrition, electrolyte abnormalities, and an abnormal ECG likely related to nutritional deficits." (SOF ¶ 16 (citing Doc. 217-3, Ex. 201 ("Order for Ex-Parte Removal"); Doc. 217-3, Ex. 203 ("Jan. 8, 2019 Kramer Report")); CSOF ¶ 16.)

Healthcare providers at Banner contacted the child neglect hotline, to which Sarah Kramer responded as the initial DCS Investigating Case Worker. (SOF ¶ 14; CSOF ¶ 14.) Kramer prepared the Application and Declaration for Ex Parte Removal of Children Under Oath, and the juvenile court issued the Order for Ex Parte Removal of twin brothers K.K. and D.K. on December 28, 2018. (SOF ¶ 15; CSOF ¶ 15; *see* Order for Ex-Parte Removal; *see also* Doc. 217-2, Ex. 3, Doc. 232-3, Ex. C ("Kramer Dep.").)

### 2. Juvenile Court Proceedings

Dependency proceedings began with the court-ordered removal of D.K. and K.K. in December 2018 and ended with the juvenile court's dismissal of the dependency proceedings on November 9, 2020. (SOF ¶ 32; CSOF ¶ 32; *see* Doc. 217-3; Doc. 217-4; Doc. 217-5; Doc. 217-6; Doc. 217-7; Doc. 217-8; Doc. 217-9, Exs. 201–281.) Dependency proceedings involve several parties who are appointed by the juvenile court and protect the interests of the children: the court-appointed special advocate ("CASA"), the Foster Care Review Board, and a Guardian Ad Litem. The proceedings also include the DCS case managers, Assistant Attorneys General, the parents, the parents' attorneys, and the doctors at Banner. (SOF ¶ 31; CSOF ¶ 31.) The duties of DCS workers include preparing reports, testifying in court, following court orders, and working with Assistant Attorneys General, who are the legal representatives of the State of Arizona. (SOF ¶ 28; CSOF ¶ 28.) The Assistant Attorneys General file pleadings on behalf of the state, but the juvenile court controls the dependency proceedings and custody and placement of the children. (SOF ¶¶ 29–30; CSOF ¶¶ 29–30.) The juvenile court has a duty pursuant to A.R.S. § 8-846 to ensure

that DCS "makes reasonable efforts to provide services to the child and the child's parents." A.R.S. § 8-846(A); (*see* Mot. at 11.)

A "Team Decision Making" meeting was scheduled by DCS to review the safety and placement of the children on January 3, 2019, but Ms. Kahraman and Mr. Kahraman did not attend.[5] (SOF ¶ 18; CSOF ¶ 18; *see* Doc. 217-3, Ex. 204 ("Jan. 4, 2019 Juv. Ruling") at 34.) The parents initially refused to cooperate with DCS. (SOF ¶ 19; CSOF ¶ 19.)

The juvenile court order issued on January 4, 2019 made D.K. and K.K. temporary wards of the court. (SOF ¶ 20; CSOF ¶ 20.) The order found that returning the Boys to the home would be contrary to the children's welfare. (Jan. 4, 2019 Juv. Ruling at 33.) Medical providers assessed both K.K. and D.K. as being malnourished. (SOF ¶ 20; CSOF ¶ 20; *see* Jan. 4, 2019 Juv. Ruling at 33.) The court determined that there was no basis for the parents' belief that the Boys condition was due to food allergies and exposure to dry erase markers. (SOF ¶ 20; CSOF ¶ 20; *see* Jan. 4, 2019 Juv. Ruling at 33.) The January 4, 2019 order found that "reasonable efforts have been made to prevent removal of the children from the home." (Jan. 4, 2019 Juv. Ruling at 34.) The judge ordered the involvement of the CASA and the Foster Care Review Board, appointed a Guardian Ad Litem for K.K. and D.K., and appointed separate lawyers for Ms. Kahraman and Mr. Kahraman. (*Id.* at 35.)

Sarah Kramer, the initial DCS investigator, prepared and filed a comprehensive report to the juvenile court on January 8, 2019 pertaining to the removal of D.K. and K.K.. (SOF ¶ 23; CSOF ¶ 23; *see* Jan. 8, 2019 Kramer Report.) The report detailed the "severe and significant malnutrition" of K.K. and D.K. resulting from the restrictive diet imposed by Ms. Kahraman and Mr. Kahraman. (SOF ¶ 23; CSOF ¶ 23; *see* Jan. 8, 2019 Kramer Report.)

The preliminary protective hearing was held on January 9, 2019. (SOF ¶ 25; CSOF ¶ 25; *see* Doc. 217-3, Ex. 208, ("Jan. 9, 2019 Juv. Ruling").) The judge continued the children as temporary wards of the juvenile court, found that DCS has made reasonable

---

[5] A "Team Decision Making" meeting is an opportunity for DCS representatives and the parents to discuss underlying concerns and make a plan on how to move forward following removal of the children. (Kramer Dep. at 190:8–17.)

efforts to prevent the removal of the children from the home, and that continuation in the home would be contrary to the welfare of the children. (SOF ¶ 25; CSOF ¶ 25; *see* Jan. 9, 2019 Juv. Ruling at 168–69.) Madison Bell was assigned to the case as the ongoing DCS case manager. (SOF ¶¶ 27–28; CSOF ¶¶ 27–28.) In order to facilitate therapeutic visitation, the parents "were assigned to Southwest Human Development [(SWHD)]" in January 2019. (Doc. 217-6, Ex. 240 ("CASA Stark 12/16/19 Report") at 114.) Both CASA Susan Stark and CASA Carla White were involved during the juvenile court proceedings. (*Id.*)

### a.    Alleged Mold Exposure

Mr. Kahraman filed an emergency motion for the children to be tested for mold toxins on June 18, 2019. (SOF ¶ 41; CSOF ¶ 41; *see* Request for Mold Testing.) DCS objected to further testing because such testing was deemed unnecessary by medical providers overseeing the Boys' care. (Doc. 217-6, Ex. 227 ("DCS's Objection to Mold Testing") at 8–11.)

The juvenile court ordered an independent specialist from Phoenix Children's Hospital to review D.K. and K.K.'s medical records to determine whether testing for mold exposure would be appropriate on June 25, 2019. (SOF ¶ 42; CSOF ¶ 42; *see* Doc. 217-6, Ex. 229 ("Jun. 25, 2019 Juv. Ruling").) Dr. Jodi Carter, the independent specialist, determined that K.K. and D.K. did not need testing for mold-related illness on July 11, 2019. (SOF ¶ 44; CSOF ¶ 44; *see* Doc. 217-6, Ex. 234 (pertaining to K.K.), Ex. 235 (pertaining to D.K.).)

### b.    Adjudication Hearing

The adjudication hearing was held on January 6, 2020. (SOF ¶ 51; CSOF ¶ 51; *see* Doc. 217-7, Ex. 247 ("Jan. 6, 2020 Juv. Ruling").) At the hearing, Ms. Kahraman and Mr. Kahraman stipulated to the evidence and waived their right to trial. (SOF ¶ 51; CSOF ¶ 51; *see* Jan. 6, 2020 Juv. Ruling at 59.) The juvenile court found both parents were unable to parent due to neglect. (SOF ¶ 51; CSOF ¶ 51; *see* Jan. 6, 2020 Juv. Ruling at 59.) K.K. and D.K. were made wards of the court as dependent children, and the case plan was family reunification. (SOF ¶ 52; CSOF ¶ 52; *see* Jan. 6, 2020 Juv. Ruling at 60.)

Ahead of the hearing, both Bell, the ongoing DCS case manager assigned to the case, and CASA Susan Stark filed reports with the juvenile court. (SOF ¶ 47; CSOF ¶ 47; *see* Doc. 217-6, Ex. 240 ("Dec. 6, 2019 Bell Report"); CASA Stark 12/16/19 Report.)

### c.     Munchausen Syndrome by Proxy Allegations

Ms. Kahraman maintained that she was wrongly labeled and treated as a "Munchausen parent," despite never having been diagnosed with Munchausen Syndrome by Proxy ("MSP").[6] Over the course of the dependency proceedings, Ms. Kahraman was evaluated twice by Dr. Oakley, who was contracted by DCS. (CSOF ¶ 93.) Neither report diagnosed Ms. Kahraman with any psychiatric disorder.[7]

DCS also contracted with Dr. Kelly to conduct a records review specifically "for the medical neglect." (Docs. 232-29, Ex. AC & 217-2, Ex. 4 ("Bell Dep.") at 76:20–24.) Dr. Kelly is one of two doctors who is contracted by DCS to do records review in cases also assigned to therapeutic visitation through SWHD, which includes medical neglect cases and MSP cases. (*Id.* at 74:24–76:24.) Dr. Kelly's report did not diagnose Ms. Kahraman with MSP. (*See* Doc. 217-6, Ex. 239, ("Dr. Kelly Report"); *see* CSOF ¶ 90 (admitting that no psychologist ever diagnosed Ms. Kahraman with MSP).) Dr. Kelly concluded "that allowing [Ms. Kahraman] to care for her sons, [D.K. and K.K.], places them in significant danger for additional harm." (Dr. Kelly Report at 90.) Because Ms. Kahraman refused to meet with Dr. Kelly unless her lawyer could be present, his report was based only on a review of medical records. (SOF ¶ 87; CSOF ¶ 87; *see* Dr. Kelly Report at 92.)

Ms. Kahraman also solicited opinions from various medical providers and experts,

---

[6] MSP, also known as "Factitious Disorder Imposed on Another," is a disorder in which the person falsifies physical or psychological symptoms in another. Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).
[7] The first report did not diagnose Ms. Kahraman with any disorder but acknowledged the presence of "traits consistent with Obsessive-Compulsive Personality Disorder [("OCPD")]." (Doc. 232-27, Ex. AA, ("Apr. 16, 2019 Oakley Psych. Evaluation") at 3.) The second report by Dr. Oakley likewise stopped short of a diagnosis, repeating the conclusions of the first report with respect to the traits of OCPD. (Doc. 232-28, Ex. AB ("Feb. 20, 2020 Oakley Psych. Evaluation") at 2–5.) Dr. Oakley's second report added that Ms. Kahraman may have "History of Delusional Disorder (Possible)" that could have been present prior to her children being removed. (*Id.*)

including Dr. Eli Newberger, who is "considered 'the Father of child abuse detection.'" (CSOF ¶ 58.) Dr. Newberger opined that this was not a case of MSP. (Doc. 232- 12, Ex. L ("Dr. Newberger Report") at 7.)

### d.    Rule 59 Motions & Evidentiary Hearings

During the dependency, Ms. Kahraman and Mr. Kahraman began divorce proceedings. (Resp. at 9.) The parents' ability to safely parent their children was then evaluated individually beginning in early 2020. (*See e.g.*, Doc. 217-7, Ex. 252 (Apr. 27, 2020 Bell Report").) Ms. Kahraman contested the restrictions imposed upon her by filing two motions for change in physical custody pursuant to Rule 59 of the Juvenile Rules of Procedure. (SOF ¶¶ 53, 78; CSOF ¶¶ 53, 78.) DCS also filed one Rule 59 motion to change physical custody of the Boys to Mr. Kahraman. (SOF ¶ 77; CSOF ¶ 77; *see* Doc. 217-9, Ex. 275, ("Aug. 31, 2020 Juv. Ruling") at 31–32 (ordering that the Boys be placed in custody of Mr. Kahraman).) To succeed on a Rule 59 Motion, the moving party has the burden of proving that "return of the children would [not] create a substantial risk of harm to the child[ren]'s physical, mental or emotional health or safety." Ariz. R. P. Juv. Ct. 59(A); (Doc. 217-8, Ex. 263, ("Jun. 11, 2020 Juv. Ruling") at 64.)

Ms. Kahraman filed her first Rule 59 Motion on February 19, 2020 to which DCS and Mr. Kahraman objected. (SOF ¶ 53; CSOF ¶ 53.) Ahead of the Rule 59 hearing, Plaintiff commissioned Dr. Newberger's report. (Resp. at 8; *see* Reply at 7–8) In response to a motion filed on behalf of DCS, the juvenile court judge excluded Dr. Newberger's report and his testimony. (*See* Doc. 217-8, Ex. 255 ("May 11, 2020 Juv. Ruling").) Dr. Newberger's report and testimony were excluded from the Rule 59 hearing due to Plaintiff attorneys' "extraordinarily late disclosure" of the report and "unprofessional" conduct in failing to respond to requests from DCS's counsel to interview the expert ahead of the hearing. (May 11, 2020 Juv. Ruling at 18–19.)

After the juvenile court granted DCS's motion, Ms. Kahraman filed a motion for injunctive relief to remove Bell as the DCS caseworker, alleging that Bell "exercised her authority in an arbitrary and unreasonable manner contrary to law." (SOF ¶ 57; CSOF ¶

57; *see* Doc. 217-8, Ex. 254 ("Ms. Kahraman's Motion to Remove Bell").) The motion attached Dr. Newberger's report, which was critical of "whether [Bell was] appropriately assessing [Ms. Kahraman]'s ability to parent." (Doc. 217-8, Ex. 264 ("Jul. 9, 2020 Juv. Ruling") at 76; *see* Ms. Kahraman's Motion to Remove Bell.). The juvenile court denied Ms. Kahraman's motion, ruling that DCS made reasonable efforts to provide reunification services to Ms. Kahraman and that Bell's efforts were "not unlawful or unreasonable, nor were her efforts performed in an arbitrary manner." (SOF ¶¶ 74–75; CSOF ¶¶ 74–75; Jul. 9, 2020 Juv. Ruling at 76.)

The first of three Rule 59 evidentiary hearings was held on May 12, 2020, wherein Ms. Kahraman, Bell, and Dr. Rodriguez testified. (SOF ¶ 61; CSOF ¶ 61; *see* Doc. 217-8, Ex. 258 ("May 12, 2020 Juv. Ruling").) The court also reviewed evidence in the form of written reports filed by Dr. Kelly and CASA White. (*See* Jun. 11, 2020 Juv. Ruling 68–70.) At the hearing, DCS moved for a change of case plan from family reunification to severance and adoption. (SOF ¶ 61; CSOF ¶ 61; *see* May 12, 2020 Juv. Ruling at 34.)

Following the May 12, 2020 Rule 59 hearing, the judge issued an "Under Advisement Ruling" that reviewed and summarized the evidence presented. (Jun. 11, 2020 Juv. Ruling.) The judge denied both Ms. Kahraman's Rule 59 motion and DCS's request to change the case plan to termination and adoption. (SOF ¶¶ 63, 73; CSOF ¶¶ 63, 73; *see* Jun. 11, 2020 Juv. Ruling at 72.) The judge "[found] Dr. Kelly's opinions to be credible." (Jun. 11, 2020 Juv. Ruling at 69.) The ruling quoted Dr. Kelly's report, which stated that allowing Ms. Kahraman to care for the Boys "places them in significant danger for additional harm." (Jun. 11, 2020 Juv. Ruling at 68 (quoting Dr. Kelly Report at 90).) The court explicitly found that "during [Ms. Kahraman]'s testimony . . . there were signs that the children may still face a 'substantial risk of harm' if returned to [Ms. Kahraman]'s care." (Jun. 11, 2020 Juv. Ruling at 70; *see* Reply at 2.) The court expressed "concern" that Ms. Kahraman continued to "discuss the impact of mold and [K.K.]'s thyroid condition on his poor physical condition" and "[found] that [Ms. Kahraman]'s willingness to chase down theories about things like mold, bacteria, and dry erase markers serves as a detriment

1   to her ability to make sound decisions." (Jun. 11, 2020 Juv. Ruling at 67–68; *see* SOF ¶
2   68; CSOF ¶ 68.)

3        The Rule 59 evidentiary hearing for DCS's Rule 59 motion was held on August 31,
4   2020. (SOF ¶ 77; CSOF ¶ 77; *see* Aug. 31, 2020 Juv. Ruling at 31–32.) The court granted
5   the motion to change physical custody to Mr. Kahraman. (SOF ¶ 77; CSOF ¶ 77; *see* Aug.
6   31, 2020 Juv. Ruling at 32.) Ms. Kahraman then filed a second Rule 59 motion seeking to
7   change physical custody of the Boys to herself. (*See* Doc. 217-9, Ex. 276 ("Sep. 15, 2020
8   Juv. Ruling").)

9        Ms. Kahraman's second Rule 59 evidentiary hearing was held on September 15,
10   2020. (SOF ¶ 78; CSOF ¶ 78; *see* Sep. 15, 2020 Juv. Ruling.) The juvenile court took the
11   matter under advisement. (SFO ¶ 78; CSOF ¶ 78; *see* Sep. 15, 2020 Juv. Ruling at 36.)

12        **3.**      **Dismissal of the Juvenile Court Proceedings**

13        At a Report and Review Hearing on November 9, 2020, the juvenile court dismissed
14   the dependency action. (SOF ¶ 80; CSOF ¶ 80; *see* Doc. 217-9, Ex. 281 ("Nov. 9, 2020
15   Juv. Dismissal").) The order released D.K. and K.K. from the wardship of the court, and
16   relieved DCS of further responsibility for the children. (SOF ¶ 80; CSOF ¶ 80; *see* Nov. 9,
17   2020 Juv. Dismissal at 102.) The dismissal order rendered all outstanding motions moot,
18   including Ms. Kahraman's second Rule 59 motion. (Nov. 9, 2020 Juv. Dismissal at at 105;
19   *see* SOF ¶ 80; CSOF ¶ 80.) The court also entered temporary orders in the pending family
20   court action. (Nov. 9, 2020 Juv. Dismissal at 102–03.) The judge continued Mr.
21   Kahraman's custody of the Boys and gave him sole legal decision making authority. (*Id.*
22   at 103.) The court ordered that Ms. Kahraman's visits with the Boys continue to be
23   supervised. (*Id.* at 103–04.)

24        The dismissal order made several pertinent findings regarding Ms. Kahraman and
25   Mr. Kahraman's ability to parent the children. (Nov. 9, 2020 Juv. Dismissal at 103–04.)
26   With respect to Mr. Kahraman, the court found that he "successfully remediated the
27   identified issues and there no longer exists any legal or factual basis for the children to
28   remain wards of the court." (*Id.* at 103.) With respect to Ms. Kahraman, the court identified

several "concerns," specifically "whether she completed her treatment goals" that required her to take "responsibility" for what happened to the Boys; "whether she is ready for unsupervised parenting time"; and, "whether she is prepared to make medical decisions for the children based on facts and science." (*Id.*) The court concluded that while Ms. Kahraman has made progress towards her treatment goals, Ms. Kahraman "had not remedied all of her outstanding issues." (*Id.*)

After the dependency was dismissed, jurisdiction over the Boys transferred to the family court. (*Id.* at 102.)

### B.    Procedural Background

Plaintiff filed the original Complaint on November 16, 2021 in Maricopa County Superior Court, alleging, *inter alia*, that Defendants unlawfully interfered with the familial relationship. (*See* Doc. 1-3, Ex. A, Compl.) Defendants removed the action to this Court on March 10, 2022 and Plaintiff filed an Amended Complaint. (Doc. 1, Not. of Removal; Doc. 17, First Am. Compl.) Plaintiff filed a Second Amended Complaint ("SAC") on October 12, 2022. (*See* SAC.) Thereafter, the Court issued Final Judgments dismissing Defendants Southwest Human Development, Gwyneth Kelly, and Drue Kaplan-Siekman. (*See* Doc. 207 (dismissing with prejudice all claims against Defendants Gwyneth Kelly and Southwest Human Development); Doc. 212 (dismissing with prejudice all claims against Defendant Kaplan-Siekman).) The Court also dismissed Defendants Sarah Mendez, Sarah Kramer, Michael Kelly, Ryan Stewart, Maria Chico, and Banner from the lawsuit. (Doc. 145, 4/26/23 Order; *see also* Doc. 172, 9/21/23 Order.)

On April 23, 2023, the Court dismissed all claims brought by Ms. Kahraman in an individual capacity, leaving only the claims brought on behalf of D.K. and K.K.. (*See* 4/26/23 Order.) Pertinent to the remaining State Defendants, on April 26, 2023 the Court dismissed claims regarding unlawful seizure (Count 1), judicial deception (Count 3), conspiracy to commit judicial deception (Count 4),[8] due process violations (Count 5),

---

[8] With respect to the remaining State Defendants, the Court did not expressly dismiss Count 4, alleging conspiracy to commit judicial deception. (*See* 4/26/23 Order at 16.) However, since the Court dismissed Count 3 regarding judicial deception, there is no basis to allege conspiracy. "Conspiracy is not itself a constitutional tort under § 1983. . . . [T]here must

1  violation of the right to make medical decisions (Count 6), and due process violations

2  related to medical treatments (Count 7). (*See* Doc. 145, 4/26/23 Order.)

3  The Court denied State Defendants' motion to dismiss the remaining federal claim

4  of interference with familial association by the alleged unlawful detention (Count 2), and

5  the remaining state law claims of gross negligence (Counts 8 and 9), negligence per se

6  (Count 10), DCS Directors' negligence per se (Count 11), abuse of process (Count 12), and

7  intentional infliction of emotional distress (Count 13) as to D.K. and K.K.'s claims against

8  Defendants Bell and Temple. (4/26/23 Order at 16.)

9  State Defendants filed the Motion for Summary Judgment on December 16, 2024.

10  (Mot.) Plaintiff responded on February 26, 2025, and State Defendants replied on March

11  13, 2025. (Doc. 229, Resp.; Doc. 236, Reply.) The Court heard oral argument on April 3,

12  2025. (Doc. 242, Min. Entry.)

13  **II.    LEGAL STANDARDS & ANALYSIS**

14  Under Federal Rule of Civil Procedure ("Rule") 56, summary judgment is properly

15  granted when: (1) there is no genuine dispute as to any material fact; and (2) after viewing

16  the evidence most favorably to the non-moving party, the movant is clearly entitled to

17  prevail as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986);

18  *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). A fact is

19  "material" when, under the governing substantive law, it could affect the outcome of the

20  case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of

21  material fact exists if "the evidence is such that a reasonable jury could return a verdict for

22  the nonmoving party." *Id.* In considering a motion for summary judgment, the court must

23  regard as true the non-moving party's evidence if it is supported by affidavits or other

24  evidentiary material. *Eisenberg*, 815 F.2d at 1289; *see also Celotex*, 477 U.S. at 324.

25  However, the non-moving party may not merely rest on its pleadings; it must produce some

26  
27  always be an underlying constitutional violation. Conspiracy may, however, enlarge the
pool of responsible defendants by demonstrating their causal connections to the violation."

28  (4/26/23 Order at 8 n.12 (quoting *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir.
2012) (internal citations omitted); citing *Fidler v. Arizona*, No. CV-22-00300-PHX-DWL,
2022 WL 16649520, at *15 (D. Ariz. Nov. 2, 2022)).)

1    significant probative evidence tending to contradict the moving party's allegations, thereby

2    creating a material question of fact. *Anderson*, 477 U.S. at 256–57; *First Nat'l Bank of*

3    *Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

4         State Defendants argue they are entitled to summary judgment because 1) Plaintiff's

5    constitutional familial association claim fails as a matter of law; 2) Plaintiff's negligence

6    claims fail because Plaintiff cannot establish causation; 3) Plaintiff's abuse of process

7    claim fails as a matter of law; and 4) Plaintiff's intentional infliction of emotional distress

8    claim likewise fails as a matter of law.[9] (*See* Mot.)

9         **A.    Familial Association**

10        State Defendants argue that Plaintiff's constitutional familial association claim fails

11   because Bell and Temple's alleged interference with the familial relationship was not

12   unwarranted. (Mot. at 12.) To state a § 1983 claim, a plaintiff must assert "(1) that a right

13   secured by the Constitution or laws of the United States was violated, and (2) that the

14   alleged violation was committed by a person acting under the color of State law." *Long v.*

15   *Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Plaintiff asserts that Bell and

16   Temple, acting under the color of State law, violated Plaintiff's right to be free from

17   unlawful seizures under the Fourth Amendment. (SAC ¶¶ 171–180.)

18        As stated in the Court's April 26, 2023 Order, though pled as a Fourth Amendment

19   claim, the Court assesses the Boys' claim that they were unlawfully removed from their

20   parents' custody "under the Fourteenth Amendment standard for interference with the right

21   to family association." *Hardwick v. Cnty. of Orange*, 980 F.3d 733, 741 (9th Cir. 2020)

22   (quoting *Wallis v. Spencer*, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000)); (*see* SAC ¶¶ 171–

23   80.) "Despite the different constitutional source of the right, . . . 'the same legal standard

24   applies in evaluating Fourth and Fourteenth Amendment claims for the removal of [Ms.

25   Kahraman's] children.'" *Hardwick*, 980 F.3d at 741 (quoting *Keates v. Koile*, 883 F.3d

26   1228, 1235 (9th Cir. 2018)).

27        To prove a familial association claim, a plaintiff must show that the defendant's

28   _____

[9] The Court does not reach the merits of State Defendants' arguments regarding issue
preclusion, claim preclusion, or the *Rooker-Feldman* doctrine. (*See* Mot. at 4–10.)

1    interference with the familial relationship was unwarranted. *Crowe v. Cnty. of San Diego*,

2    608 F.3d 406, 441 n.23 (9th Cir. 2010) (citing *Lee v. City of Los Angeles*, 250 F.3d 668,

3    685–86 (9th Cir. 2001)); *but see Demaree v. Krause*, No. CV-11-00046-PHX-ROS, 2012

4    WL 12548144, at *6 (D. Ariz. Sept. 10, 2012) (evaluating whether the defendant's removal

5    of the child was so egregious that it "shock[ed] the conscience"). "Unwarranted

6    interference includes governmental actions that are vexatious and unnecessary, harassing,

7    unfounded or unreasonable, and arbitrary, discriminatory, or demonstrably irrelevant."

8    *Daurio v. Arizona Dep't of Child Safety*, No. CV-18-03299-PHX-GMS, 2020 WL

9    6940812, at *5 (D. Ariz. Nov. 25, 2020) (citation omitted).

10       Plaintiff argues that Bell and Temple's actions were "unwarranted" because they

11   "intentionally presented misleading information and/or withheld information from the

12   juvenile court in an effort to present [Ms. Kahraman] as an [MSP], mentally ill, and unfit

13   parent." (SAC ¶ 174; *see* Resp. at 21–24.)

14                     **1.    Treating Ms. Kahraman as a Munchausen Parent**

15       Plaintiff does not offer a sufficient factual or evidentiary basis for the assertion that

16   Bell and Temple are "responsible" for "[MSP] restrictions placed on [Ms. Kahraman]."

17   (Resp. at 21.) In support of their assertion that Defendants adhered to a false narrative of

18   MSP, Plaintiff presents two email threads between DCS employees wherein Temple, Bell's

19   supervisor, refers to the "factitious case." (*See* CSOF ¶ 48.) The first email thread from

20   Bell to another DCS employee and cc'd to Temple, on August 3, 2020, concerned whether

21   homeschooling was an appropriate option due to COVID. (Doc. 232-20, Ex. T ("Aug. 3,

22   2020 Email") at 2–3.) Temple responded, "[t]his is also a factitious case. Primarily due to

23   [Ms. Kahraman] but [Mr. Kahraman] has made good progress." (*Id.*) The second email

24   thread was between Bell, Temple, and another DCS program manager, wherein Bell

25   inquired about whether DCS could provide an immigration letter for Mr. Kahraman's

26   mother requested by Mr. Kahraman after he gained custody of the Boys. (Doc. 232-55, Ex.

27   BC ("Sep. 1, 2020 Email") at 2–5.) Temple responded stating "[t]his is the factitious case

28   and highly contested." (*Id.* at 2.) There is no evidence that Bell ever referred to the case as

a "factitious" one.[10] Moreover, there is no evidence that Bell or Temple pursued the narrative that Ms. Kahraman was a Munchausen parent before the juvenile court or with any examiners. The Court is unpersuaded that two uses of the term "factitious case" by Temple are sufficient to support Ms. Kahraman's claim that she was falsely portrayed as a Munchausen parent or create a dispute of material fact with respect to whether Ms. Kahraman was treated as a Munchausen parent.[11]

Plaintiff has not identified any court order or sworn testimony from Bell or Temple describing the case as a "factitious" one or stating that Ms. Kahraman is a Munchausen parent and such a narrative was never presented to the court. (*See* Resp.; *see also* CSOF ¶ 90.) Plaintiff acknowledges that no doctor ever diagnosed Ms. Kahraman as MSP. (CSOF ¶ 90.) Early on in the case, DCS filed a responsive pleading with the juvenile court explicitly refuting Plaintiff's notion that the case was being treated as a MSP case. (SOF ¶ 48 (citing Doc. 217-6, Ex. 242, ("Dec. 12, 2019 DCS Resp.") at 135–36); CSOF ¶ 48 (disputing on the basis of the ACCEPTS model[12]).) In her sworn deposition, Bell explicitly denied the allegation that she had a "preconceived notion about [Ms. Kahraman]" being a "Munchausen parent." (Bell Dep. at 224:13–18.)

Plaintiff points to the use of the ACCEPTS model by SWHD as evidence that the case was being treated as if Ms. Kahraman was diagnosed with MSP. (Resp. at 21–22.) Plaintiff does not present any evidence to support the allegation that Bell and Temple

---

[10] *See* CSOF ¶ 48 (citing Doc. 232-21, Ex. U (email thread between Bell, Temple, and a DCS secretary wherein the DCS secretary inquired about the nature of the case and Bell responded "[Ms. Kahraman] is convinced that her kids were allergic to all foods and had chemical sensitivities. She is convinced that her children lost the ability to walk because of the smell of whiteboard markers." The email thread never mentioned MSP or that Ms. Kahraman was diagnosed with any sort of disorder.).)

[11] There is no evidence in the record that any State Defendant ever used the term "Munchausen parent," "Munchausen syndrome," or "Factitious Disorder," etc. Temple twice used the term "factitious case." The word "factitious," as defined in the Merriam-Webster dictionary means "produced by humans rather than by natural forces," which accurately describes the cause of the life-threatening medical condition of the Boys in December 2018. Merriam-Webster's Collegiate Dictionary 448 (Frederick C. Mish et al. eds., 11th ed. 2003).

[12] The ACCEPTS Model was utilized by SWHD to "identify goals to be achieved as part of the therapeutic visitation process" for separated families working towards reunification. (Doc. 236, Ex. A, ("White Dep.") at 79:11–19.) The ACCEPTS model is used in all cases referred to the special cases unit of SWHD, including medical neglect cases. (*Id.* 79:13–19, 133:12–20, 194:13–25.)

"instructed SWHD to implement the [MSP] ACCEPTS protocol." (*Id.* at 22.) Plaintiffs may not merely rest on their pleadings; there must some significant probative information that creates a material question of fact. *Anderson*, 477 U.S. at 256–57. The evidence before the Court is that SWHD uses the ACCEPTS model for all cases referred to the special cases unit. *See supra* note 6; (*see* White Dep. at 78:24–79:25, 133:16–20, 194:13–25 (clarifying that the use of the ACCEPTS model was within the exclusive province of SWHD).)

Plaintiff next argues that Dr. Kelly was a "favored provider" that Bell used for the purpose of supporting the inaccurate MSP narrative. (Resp. at 22; *see* CSOF ¶ 93.) Bell testified that although Dr. Kelly is one of two doctors contracted by DCS to do record review in MSP cases he does not work exclusively on such cases. (*See* Bell Dep. at 74:24–76:24.) Bell further stated that Dr. Kelly was specifically hired "to do the records review [in Plaintiff's case] for the medical neglect." (*See* Bell Dep. at 76:20–24.) Plaintiff also points to the high cost of Dr. Kelly's services as evidence to support the accusation that he was hired to "substantiate the [MSP] false narrative." (Resp. at 22.) The cost of Dr. Kelly's services is not probative evidence that he was hired for the purpose of labeling Ms. Kahraman as a MSP. *Anderson*, 477 U.S. at 256–57. Dr. Kelly's report never mentioned MSP or diagnosed Ms. Kahraman with the disorder. (*See* Dr. Kelly's Report.) The juvenile court found Dr. Kelly's expert report and opinions to be credible. (Jun. 11, 2020 Juv. Ruling at 69.) Plaintiff fails to present any evidence that Dr. Kelly was hired by Bell and Temple to support an alleged narrative that Ms. Kahraman was a Munchausen parent.

## 2. Defendants Did Not Withhold Information or Fail to Investigate

Plaintiff asserts that Bell and Temple's actions were unwarranted because they withheld exculpatory information from the juvenile court and failed to investigate the other potential causes of the Boys' medical issues. (Resp. at 21–24.) First, Plaintiff asserts that Bell and Temple "fail[ed] to provide" Dr. Newberger's report to the juvenile court. (*Id.* at 22–23.) But it was the juvenile court judge who excluded the report. (*See* May 11, 2020 Juv. Ruling at 17–20.) The reasons for excluding Dr. Newberger's report and testimony from the Rule 59 hearing included Plaintiff's attorneys' "extraordinarily late disclosure"

of the report and "unprofessional" conduct in failing to respond to requests from DCS's counsel to interview the expert ahead of the hearing. (*Id.* at 18–19.) Viewing evidence in the light most favorable to the Plaintiff, there is no evidence to support the allegation that the report was excluded by Bell and Temple to withhold information from the court.[13] (*See* CSOF ¶ 61.)

Second, Plaintiff asserts that Bell and Temple are responsible for the failure to investigate the merits of the parents' mold exposure theory as the "root cause" of the Boys' physical condition. (Resp. at 4, 6.) The juvenile court, in response to parents' motions to require additional testing, ordered an independent specialist to review the Boys' medical records and determine if testing for mold toxicity was necessary. (*See* Mr. Kahraman's Request for Mold Testing; Jun. 25, 2019 Juv. Ruling at 18–19.) DCS objected to the request to subject the children to additional testing, providing statements from multiple doctors and medical professionals responsible for the Boys' care who agreed that testing for mold was unnecessary. (Jun. 25, 2019 Juv. Ruling at 17.) The juvenile court judge weighed these opinions against the conflicting opinions of Mr. Kahraman's experts, who advocated for various types of blood and genetic testing. (*Id.* at 16–18.) The juvenile court did not defer to the objections of DCS. (*Id.* at 17–18.) To the contrary, the judge accepted the suggestion of the Boys' Guardian Ad Litem to appoint an independent specialist to review their medical records and determine whether mold testing was appropriate. (*Id.* at 18.) The independent specialist, Dr. Jodi Carter, concluded that mold testing was unnecessary as to both children, and further noted that since being taken into foster care in January 2019, both children "continue[d] to thrive on a regular diet without restriction." (Ex. 234 (pertaining to K.K.) at 56–59; *see* Ex. 235 (pertaining to D.K.) at 61–64.)

The juvenile court independently ruled to exclude Dr. Newberger's report and

---

[13] Likewise, Plaintiff accuses Bell and Temple of "ignoring" the positive reports of Dr. Oakley and Dr. Shroeckenstein in favor of emphasizing the negative report of Dr. Kelly. (Resp. at 22–23.) All of these reports were submitted to and reviewed by the juvenile court judge, who was responsible for making decisions regarding the dependency of the children. (*See e.g.* Jun. 11, 2020 Juv. Ruling (weighing the expert opinions and testimony of Dr. Oakley, Dr. Rodriguez, Dr. Kelly, Bell, Temple, White, and Ms. Kahraman).) Plaintiff does not present any evidence to show that Bell or Temple withheld information from the juvenile court. (*See* Resp. at 22–23.)

appointed an independent specialist who determined that testing for mold exposure was unnecessary. There is no evidence that Bell and Temple withheld exculpatory information from the juvenile court or failed to investigate other potential causes of the Boys' medical issues.

The Court finds that Bell and Temple are not liable for interference with the familial relationship. The juvenile court made all decisions regarding removal and continued dependency. There is no evidence that Bell and Temple's actions were unwarranted. *Anderson*, 477 U.S. at 248.

### B.    Negligence

State Defendants argue that Plaintiff's negligence and negligence per se claims fail as a matter of law because Plaintiff does not present evidence of causation, an essential element of Plaintiff's negligence claims. (Mot. at 10–13.)

Plaintiff asserts overlapping negligence and negligence per se claims as they relate to 1) the duty to protect the legal and due process rights of children and families (Counts 8 and 10), and 2) the duty to make reasonable efforts to preserve the family relationship (Counts 9 and 10). (Resp. at 20–23, 24–26; *see* SAC ¶¶ 220–260.) Plaintiff seems to assert that as a result of Bell's and Temple's negligence, State Defendants are liable for the harm caused by the initial and ongoing removal of the Boys from Ms. Kahraman's care. (Resp. 20–23.)

Because causation is dispositive for both types of negligence claims, the Court will focus the analysis on causation. Under Arizona law, the elements of causation in a negligence tort claim require proving both "but-for" causation and "legal" or "proximate" causation. *Ontiveros v. Borak*, 667 P.2d 200, 205 (Ariz. 1983). A plaintiff must produce evidence sufficient to demonstrate that the injury would not have occurred "but for" the defendant's negligent conduct. *Id.* "Proximate cause" is defined as "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Alsadi v. Intel Corporation*, 519 F. Supp. 3d 611, 628 (2021) (citation omitted).

Arizona courts have emphasized that "negligence is not actionable in the abstract." *Sabina v. Yavapai Cnty. Flood Control Dist.*, 993 P.2d 1130, 1135 (Ariz. Ct. App. 1999). A defendant's acts are the proximate cause of a plaintiff's injury only if they are a substantial factor in bringing about the harm. *Barrett v. Harris*, 86 P.3d 954, 961 (Ariz. Ct. App. 2004). "The mere possibility of causation is not enough." *Grafiti-Valenzuela v. City of Phoenix*, 167 P.3d 711, 717 (Ariz. Ct. App. 2007); *see also Badia v. City of Casa Grande*, 988 P.2d 134, 142 (Ariz. Ct. App. 1999) ("Sheer speculation is insufficient to establish the necessary element of proximate cause or to defeat summary judgment.") Although causation is generally a factual matter decided by the jury, summary judgment is appropriate if no reasonable juror could conclude that the damages were proximately caused by a defendant's conduct. *Gipson v. Kasey*, 150 P.3d 228, 230 & n.1 (Ariz. 2007) (en banc).

### 1.    Initial Removal

Neither Bell nor Temple was involved in the initial removal. (*See* Mot. at 10–11; Resp. at 4–5.) Plaintiff concedes that Kramer prepared the Application and Declaration for Ex Parte Removal as the DCS caseworker who responded to the child neglect hotline call made by Banner medical staff. (SOF ¶¶ 14–15, 23–26; CSOF ¶¶ 14–15, 23–26.) Plaintiff further concedes that the judge reviewed the declaration of Kramer and granted the application for ex-parte removal. (SOF ¶ 15; CSOF ¶ 15.) Since Bell and Temple did not participate in the initial removal, no reasonable juror could conclude that there is a casual connection between Bell and Temple's alleged negligence and the initial removal. *See Gipson*, 150 P.3d at 230 & n.1.

### 2.    Ongoing Dependency

State Defendants argue that Plaintiff cannot establish causation because the ongoing dependency of the Boys was controlled by the juvenile court, not Bell and Temple. (Reply at 10.) Plaintiff argues that there is a causal connection between the harm from ongoing separation and Bell and Temple's alleged negligence because 1) Bell and Temple treated Ms. Kahraman as a Munchausen parent; 2) Bell and Temple withheld information or

otherwise attempted to mislead the juvenile court; and 3) Bell and Temple rewarded Mr. Kahraman with custody for adhering to their alleged narrative regarding Ms. Kahraman being a Munchausen parent. (Resp. at 20–23.)

First, Plaintiff argues that Bell and Temple's negligence caused the "ongoing unwarranted detention of [the Boys] due to the unnecessary [MSP] restrictions placed on [Ms. Kahraman]." (*Id.* at 21.) The dependency case was based on neglect, not allegations of Ms. Kahraman being a Munchausen parent.[14] (Reply at 10; *see e.g.*, Jan. 6, 2020 Juv. Ruling at 59 (finding the allegation of neglect to be true by a preponderance of the evidence); Jun. 11, 2020 Juv. Ruling at 65 (describing "suspected medical neglect" and never mentioning MSP).) Since there is no evidence that Bell and Temple treated Ms. Kahraman as a Munchausen parent and the juvenile court never considered her a Munchausen parent, Plaintiff cannot establish causation with respect to the continued dependency of the Boys being attributed to Bell and Temple's alleged negligence in treating Ms. Kahraman as a Munchausen parent.

Second, Plaintiff argues that Bell and Temple prevented the juvenile court from having complete and accurate evidence. (*See* Resp. at 21–22.) As discussed above, State Defendants are not responsible for the report of Dr. Newberger not being considered or failing to investigate mold as an alternative cause of the Boys' symptoms; those decisions were made by the juvenile court. (*See* SOF ¶¶ 42, 58; CSOF ¶¶ 42, 58.) Moreover, the assumption that the juvenile court would have ended the dependency if Dr. Newberger's report had been considered at the Rule 59 hearing or mold testing had been conducted is based on "sheer speculation" and insufficient to establish a causal connection between Bell and Temple's alleged negligence and the continued dependency of the Boys. *Badia*, 988 P.2d at 142.

Third, Plaintiff asserts that Bell and Temple's negligence caused the ongoing

---

[14] Plaintiff again cites to the use of the ACCEPTS model as evidence that Bell and Temple negligently treated Ms. Kahraman as a Munchausen parent. (Resp. at 21.) As discussed above, since Plaintiff failed to present evidence that Bell and Temple had any role role in SWHD utilizing the ACCEPTS model, Plaintiff fails to establish causation in this respect. *Badia*, 988 P.2d at 142.

dependency of the Boys because Bell and Temple convinced Mr. Kahraman to align with the narrative that Ms. Kahraman was a danger to the boys, and then purportedly rewarded him by "lift[ing] his visitation and food restrictions." (Resp. at 23.) There is no evidence to support this assertion. The juvenile court's denial of Ms. Kahraman's first Rule 59 motion is dispositive evidence that Bell and Temple did not cause the ongoing dependency of the Boys. (*See* Jun. 11, 2020 Juv. Ruling.) To succeed on a Rule 59 Motion, the moving party has the burden of proving that "return of the children would [not] create a substantial risk of harm to the child[ren]'s physical, mental or emotional health or safety." Ariz. R. P. Juv. Ct. 59(A); (Jun. 11, 2020 Juv. Ruling at 64.) Prior to ruling on Ms. Kahraman's motion, the juvenile court heard testimony or reviewed reports from Dr. Oakley, Dr. Rodriguez, Dr. Kelly, Bell, White, and Ms. Kahraman herself. (Jun. 11, 2020 Juv. Ruling at 70.) The juvenile court had full access to and reviewed the purportedly "positive" reports of Ms. Kahraman that Bell and Temple allegedly ignored or otherwise withheld.[15]

The juvenile court ruled that "during [Ms. Kahraman]'s testimony . . . there were signs that the children may still face a 'substantial risk of harm' if returned to [Ms. Kahraman]'s care." (Jun. 11, 2020 Juv. Ruling at 70; *see* Reply at 2.) The juvenile court ruled that Ms. Kahraman "[did] not meet her burden" to warrant a change in physical custody. (Jun. 11, 2020 Juv. Ruling at 71.) In light of the juvenile court's finding that Ms. Kahraman failed to meet her burden of proof, Bell and Temple could not be the cause of the Boys' ongoing separation from Ms. Kahraman. *Anderson*, 477 U.S. at 248. As State

---

[15] Plaintiffs misconstrue Dr. Oakley's psychiatric reports by presenting them as unequivocally "positive" of Ms. Kahraman. (Resp. at 22–23.) Dr. Oakley's first report emphasized that Ms. Kahraman continued to "deny medical neglect." (Apr. 16, 2019 Oakley Psych. Evaluation at 3–4.) Continued treatment was necessary for Ms. Kahraman "to resume parenting without exposing her children to risk." (*Id.* at 4.) Whereas Dr. Oakley's reports stopped short of diagnosing Ms. Kahraman, her first and second reports explicitly noted that Ms. Kahraman "[had] traits consistent with Obsessive-Compulsive Personality Disorder." (*Id.* at 3; *see* Feb. 20, 2020 Oakley Psych. Evaluation at 3.) Dr. Oakley's second report added that "[Ms. Kahraman] meets the criteria" for the diagnoses of "History of Delusional Disorder (Possible)," elaborating that at the time the children were removed, Ms. Kahraman "may have been experiencing a Delusional Disorder." (Ex. AB at 3.) Dr. Oakley recommended that "next steps *may* include [Ms. Kahraman] having more flexibility in her interactions with the children, particularly as it relates to food and her focus on their physical health" while maintaining that "[Ms. Kahraman] would benefit from additional insight to help understand her role in this case." (*Id.* at 5 (emphasis added).)

Defendants point out, "[t]he attorneys for both sides submitted pleadings and litigated motions and hearings before the Juvenile Court." (Reply at 10.) Ultimately, "[i]t was the Juvenile Court Judges who made all the rulings regarding wardship and physical custody." (*Id.*)

### 3.    Dismissal of the Dependency

Plaintiff further asserts that Bell and Temple's negligence caused the dependency to be dismissed and custody awarded to Mr. Kahraman, while Ms. Kahraman's visitation remained restricted. (Resp. at 23.) Plaintiff cannot establish causation because the decision to dismiss the case and award Mr. Kahraman custody of the Boys was made independently by the juvenile court. (*See* Nov. 9, 2020 Juv. Dismissal.)

The juvenile court concluded that there was no longer "any legal or factual basis for the children to remain wards of the court," because Mr. Kahraman sufficiently met his treatment goals. (Nov. 9, 2020 Juv. Dismissal at 103.) Although the juvenile court recognized that Ms. Kahraman had made progress, the court concluded that Ms. Kahraman had not completed her treatment goals. (*Id.*) The court expressed concern as to "whether [Ms. Kahraman] is ready for unsupervised parenting time" and noted that "no provider who has supervised her during parenting time has opined that she is ready for unsupervised parenting time." (*Id.*) After weighing the evidence and reviewing the record in this case, the juvenile court determined that Mr. Kahraman "successfully remediated the identified issues." (Nov. 9, 2020 Juv. Dismissal at 103.) Plaintiff alleges without basis that Ms. Kahraman "completed all her treatment goals," and that Bell and Temple "moved to dismiss the dependency" to prevent the court from ruling on Ms. Kahraman's third Rule 59 Motion and an additional motion to hold Bell in contempt. (Resp. at 27.) Plaintiff's allegations regarding causation with respect to the dismissal are without basis or otherwise premised on "sheer speculation," insufficient to establish proximate cause. *Badia*, 988 P.2d at 142. The juvenile court ordered that Ms. Kahraman continue with supervised visits. (*See* Nov. 9, 2020 Juv. Dismissal at 104.) The juvenile court, not Bell and Temple, "made all the rulings regarding wardship and physical custody." (Reply at 10; *see* SOF ¶ 30; CSOF

¶ 30.)

Because the juvenile court made all decisions regarding removal, continued dependency, and dismissal with supervised visitation for Ms. Kahraman, Plaintiff fails to establish that Defendants Bell and Temple caused the dismissal of the dependency. The Court grants the Motion as to Plaintiff's negligence and negligence per se claims.[16] *See Gipson*, 150 P.3d at 230 & n.1.

## C.    Abuse of Process

Plaintiff asserts that Bell and Temple "willfully used the juvenile dependency proceedings for their own ulterior purpose, *i.e.*, to label [Ms. Kahraman] a Munchausen parent and sever her parental rights." (Resp. at 26.)

An abuse of process claim requires two elements: "1) a willful act in the use of judicial process; 2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Nienstedt v. Wetzel*, 651 P.2d 876, 881 (App. 1982). A party can demonstrate "ulterior purpose" by "showing that the process has been used primarily to accomplish a purpose for which the process was not designed." *Id.*; *see also Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 889 (Ariz. Ct. App. 2004) (explaining that to demonstrate an "improper" motive, "a claimant must establish that the defendant used a court process in a fashion inconsistent with legitimate litigation goals"). Arizona interprets "process" as encompassing "the entire range of procedures incident to the litigation process." *Nienstedt*, 651 P.2d at 880. A plaintiff must "present more than mere speculation to support the assertion that the defendant has used court processes with an improper intent." *Crackel*, 92 P.3d at 889.

State Defendants argue that Plaintiff's abuse of process claim fails as a matter of law. (Mot. at 13–15.) In terms of identifying a specific court process, Plaintiff asserts that Bell and Temple "misled the juvenile court [and] used its Orders to continue the false

---

[16] Count 11 is a negligence per se claim pled only against Defendants McKay and Faust, both of whom are DCS Directors. (SAC ¶¶ 256–60.) Plaintiff does not present any evidence that McKay and Faust "failed to formulate policies, plans, or programs to ensure DCS employees" complied with statutory requirements, beyond the bare allegations in the SAC. (*See* CSOF; Resp.) The Court grants State Defendants' Motion as to Count 11 because the same arguments regarding lack of causation apply to the claim against Faust and McKay.

1    narrative that [Ms. Kahraman] has [MSP]." (Resp. at 27.) Further, Plaintiff asserts that Bell

2    and Temple "moved to dismiss the dependency" intentionally to prevent the court from

3    ruling on Ms. Kahraman's pending motion to change physical custody, as well as a motion

4    to "hold Bell in contempt." (Resp. at 27.)

5        Plaintiff does not present any evidence that court orders refer to Ms. Kahraman as a

6    "Munchausen parent," or considered that Ms. Kahraman was a Munchausen parent. (*See*

7    CSOF.) In terms of "misleading" the Court, Plaintiff claims that Bell and Temple held Ms.

8    Kahraman to the "ACCEPTS model" and chose providers that are "specifically for [MSP]

9    cases." (Resp. at 27.) As discussed above, SWHD made the decision to use the ACCEPTS

10   model, and there is no evidence that SWHD was used for supervised visitation because Ms.

11   Kahraman was considered a Munchausen parent. Plaintiff also presents no evidence that

12   Dr. Kelly was a "hired gun for [MSP]/medical abuse cases." (CSOF ¶ 93.)

13       Lastly, Plaintiff seems to assert that the juvenile court "dismissed the dependency

14   petition at Bell's request" to prevent the court from ruling on Ms. Kahraman's pending

15   motion to change custody of the children to both parents, and her pending motion to hold

16   Bell in contempt. (Resp. at 27–28.) There is no evidence that the dependency case was

17   dismissed "at Bell's request." (Resp. at 27.) The evidence is that the case was dismissed

18   based on the juvenile court's determination that there was no longer "any legal or factual

19   basis for the children to remain wards of the court," because Mr. Kahraman had sufficiently

20   met his treatment goals. (Nov. 9, 2020 Juv. Dismissal at 103.).

21       The Court grants the Motion regarding the abuse of process claim because Plaintiff

22   presents no evidence that Bell and Temple abused the judicial process.

23                **D.    Intentional Infliction of Emotional Distress**

24       State Defendants argue that Plaintiff fails to state a claim for intentional infliction

25   of emotional distress ("IIED"). (Mot. at 15–16.) To prove their IIED claim, Plaintiff must

26   show that (1) Bell and Temple engaged in "extreme and outrageous conduct," (2) with the

27   intent to cause emotional distress (or with reckless disregard for the "near certainty" that

28   the conduct will cause emotional distress), and (3) such conduct did in fact cause the Boys

to suffer severe emotional distress. *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 905 P.2d 559, 562–63 (Ariz. Ct. App. 1995). The first element resolves Defendants' motion.

Summary judgment is improper where "reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous." *Id.* at 563. Nevertheless, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980). The burden of proof for IIED is "extremely high" in Arizona. *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 747 (9th Cir. 2004). Plaintiff may only recover if a defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *See id.* (quoting *Cluff v. Farmers Ins. Exch.*, 460 P.2d 666, 668 (Ariz. Ct. App. 1969), *overruled on other grounds*, *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 784 (Ariz. 1989)). It was not.

Plaintiff appears to argue that Bell and Temple's "extreme and outrageous conduct" consisted of 1) adhering to the "false narrative that [Ms. Kahraman] was [MSP]" to limit Ms. Kahraman's interaction with the boys; 2) "mov[ing] to dismiss the dependency" and award full custody to Mr. Kahraman despite him allegedly not meeting his treatment goals; and 3) attempting to sever Ms. Kahraman's parental rights. (Resp. 28–29.)

The Court has already determined that there is no evidence to support Plaintiff's repeated assertion that Bell and Temple adhered to a "false narrative that [Ms. Kahraman] was [MSP]." Ms. Kahraman's interaction with the Boys was limited because of continuing concern regarding Ms. Kahraman's ability to safely parent the children. (*See e.g.*, Doc. 217-9, Ex. 280 ("Nov. 2, 2020 CASA Report") at 98–99.) In terms of Bell and Temple "mov[ing] to dismiss the dependency," the Court has already determined that the dismissal was based on the juvenile court's determination that there was no longer "any legal or factual basis for the children to remain wards of the court," because Mr. Kahraman sufficiently met his treatment goals. (Nov. 9, 2020 Juv. Dismissal at 103.) Finaly, DCS's

recommendation that the case plan of family reunification be affirmed for Mr. Kahraman, and the case plan changed to severance for Ms. Kahraman, was premised on Bell's conclusion that Ms. Kahraman "is unable or unwilling to take full responsibility for her role in the declined health of her children," and further that Ms. Kahraman "is a significant safety concern to her children with the choices she makes on their behalf in regards to their health and well-being."[17] (Doc. 217-7, Ex. 252 ("Apr. 27, 2020 Bell Report") at 133–34.) The Court finds that making recommendations based on extensive notes from Ms. Kahraman and Mr. Kahraman's service providers is not extreme and outrageous conduct. (*See* Apr. 27, 2020 Bell Report.)

## III.    CONCLUSION

The Court grants State Defendants' Motion as to Counts 2, 8, 9, 10, 11, 12 and 13 because there is no genuine dispute of material fact and State Defendants are entitled to judgment as a matter of law.

**IT IS ORDERED** granting State Defendants' Motion for Summary Judgment (Doc. 216).

**IT IS FURTHER ORDERED** directing the Clerk to enter Judgment in favor of the State Defendants.

Dated this 26th day of June, 2025.

Susan R. Bolton
United States District Judge

---

[17] Bell's report summarizes or excerpts service provider notes for both parents detailing therapeutic visitation, individual counseling, and independent psychiatric evaluations by Dr. Oakley, along with Dr. Kelly's evaluation of Ms. Kahraman's available records. (*See* Apr. 27, 2020 Bell Report at 118–132.) As stated above, the juvenile court found Dr. Kelly's report "credible" and acknowledged his conclusion that allowing Ms. Kahraman to care for her sons "places them in significant danger for additional harm." (Nov. 9, 2020 Juv. Dismissal at 103.)